# IN THE UNITED STATES COURT OF APPEALS

## FOR THE THIRD CIRCUIT

CASE NO. 23-1480

**GARTOR KIKI BROWN,**

**APPELLANT**

V.

## MR. MAXWELL, MR. PLOCINIK, MR. FOCHTMAN, MR. JOHNSTON

**APPELLEES**

**APPELLANT'S BRIEF**,

**Appeal from March 3rd, 2023 Order Entering Judgment Against All Defendants In The United States District Court Middle District of Pennsylvania,**

**Civil Docket 2: 16-cv-3887**

**Gartor Brown**

**Krome Detention center**

Defendants Maxwell, Plocinik, Fochtman, Johnston were and are correctional officers with the Department Of Corrections at all times during my claims. Defendants are trained to recognize the challenges that and consequent effect thereof that attaches to labels. Thus, what the wise do in the beginning, not so wise do at the end.

Here, defendants have called on exceptional lawyers to mellifluously explain their actions or lack thereof. Precisely put, had defendants requested, on the wise, assistance prior to their actions, they would have simply stated, you cannot and should not force an inmate label as a "snitch, a faggot, with feminine characteristics," and a history of victimization, in a corner cell, a cell furthest from the bubble in the RHU, with a inmate that exhibited dangerous and predatorial behavior arising from unfulfilled sexual desires, needs, needs that was not being met as a lifer.

The logistics of the case may keep so up at night. How can an investigation be so egregious? Put another way , the merit of the case could carve a river of tears through a blistering desert.

Had defendants called on the wise prior to their actions, the wise would have simply stated, why did you refuse to Move Thee from cell 108 after a plethora of requests through a cry for help?

With that score, from February 3rd through 8th, you was aware of evidence that Appellant Brown was incarcerated under conditions posing a substantial risk of serious harm. ovule with fear and grief," it was evident that things were taking the turn for the worst; that dark times were near; so much so that one can smell "fear" just standing beside Thee's cell, emotions "tugging at the strings of her heart;" beating upon the door of her soul, and crying out. Unknown to Brown, Thee she would pay for her crimes in the worst way; the irony was Brown felt a keen sense of uncertainty somewhat dexterous to a lady coming home to a "Burglarize house" not knowing what is missing. Things of sentimental value gone; a galvanic feeling, like running in the dark; only to become on a field of landmines. To get out alive; Brown, Thee had to "discover the genius which slept within her brain."

You witnessed an assault on February 3rd at uncuffing Allen and laughed, "fuck him up, Thee's a rat, faggot, kiddie toucher."

At the time you was aware that Allen had (77) misconducts, most of whom was violent, four of which was sexual related. Due to your actions, the assaults continued on February 4th, as Allen wrapped his hands with socks forcing Thee to cover up with her arms.

On February 5th, forcing Thee back into the very same cell after showers, attacked in the middle of the night, Thee hitting her head on the bed fixture, congeal blood from her head. February 6th, forcing Thee to cuff up and face the wall as inmate Allen was let out for recreation; encountering Thee injuries firsthand on February 7th.

Likewise, likewise, even switching her jumpers, linens, boxers, t-shirts, but refusing to move her. Acknowledging that she requested to see medical, scared, vulnerable, but this day, this day she did not see medical. What if pictures were token on this day, that time during those dark hours? What would they look like?

This led to sexual assaults. Your actions led to Brown being harmed. This doesn't merit negligence; nor is Thee "Malehouse." Let's set the record straight at the door. This is not a case of cell manipulation. This is a case, a case that will keep you up at night.

What the wise do in the beginning, others do at the end. Precisely put, had defendants requested assistance from the wise, assuming they lack the ability to rectify their actions or lack thereof, they would have simply stated, asking us to explain your actions, if you proceed with such actions; would be like asking us to write a review of a book we've never reed. Put another way, it would be as rewarding as struggling in quicksand.

The aftermath, oh, the aftermath. The acknowledgment that Thee had cooperated with the law, the banging on cell walls for days so as the aphorism goes "tempest in a teapot." Banging would not stop. "Faggot, rat, how does your asshole feel;" the sex noises by prison guards every time they encountered my cell.

As troubling as it may sound, the ramifications from the initiation of this lawsuit, what would cause one to spike a person's food? And Blusing, Blusing is a custom so common at SCI Huntingdon, it has a nickname. In this case Thee will show that in defendant's world, not being harmed is a privilege, not a right. The principle of the Eighth Amendment will reject that. In Brown's case, this privilege was maliciously token from her.

As to the caveat, let's remove the layer between defendants decision or lack thereof and put it into perspective. How can one, the very same one in charge of care, custody, and control, be so cruel?

Now we are in the Courts, the Federal Court Of Appeals; a Court that has a history of unbuttoning complex disputes, but also, yard to simplify all affairs. This is Brown v. Maxwell.



# JURISDICTION'S STATEMENT

The court of appeals (other than United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a district review may be had in the Supreme Court. The Jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292© and (d) and 1295 of this title [28 USCS 1292 © and (d) and 1295] 1291]



# TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................................................1,2,3,4,5,6

JURISDICTION'S STATEMENT...................................................................................................................1

STATEMENT OF ISSUES PRESENTED..................................................................................................1,2,3

STATEMENT OF THE CASE...............................................................................................................1,2,3,4,5,6

STATEMENT OF STANDARD REVIEW.......................................................................................................1

SUMMARY OF THE ARGUMENT............................................................................................................1,2

ARGUMENT.............................................................................................................................................2

I.     The District Court Erred by Denying Plaintiff's Motion For Spoliation Of Electronically Stored Information, & Plaintiff's Motion For Sanction Under Rule 37(e)..........................................3,4,5

II.     Brown Raised The Issue That The District Court Error In Denial Of Her State Tort Claims Of Negligence, And Intentional Infliction Of Emotional Distress At The Summary Judgment Stage. Claiming That THE Doctrine Of Sovereign Immunity Bars State Employees Against Brown's Claims...........................................................................................................................................5,6,7,8

III.    *Brown raised the issue that her (Phase 1, Package 7, Exhibit 28), statement of Mr. Saul Ortiz signed and dated, accompany medical pass dated 11/1/17 was not admissible under Rule 401, 402, General Admissibility of Relevant Evidence or 803. Exception to Rule against Hearsay, present sence impression. The Trial court erred by refusing to admit a statement from Mr. Saul Ortiz, accompany medical pass dated 11/1/17; either as Substantive evidence or impeachment purposes; this amounted to error of Constitutional dimension to whom was precisely critical, that her actions of refusing cellie's was out of fear, and subsequent measures. This deprived Brown of a powerful means not limited to damaging Mr. Plocinik credibility; that Brown willfully moved into a cell with Mr. Allen, a known sexual predator*..........................................................................................................................9,10,11,12

IV.    Brown also raised the issue that her (Phase 1,Package 11, Exhibit 44), a sign statement from Shae Delgrosso was not admissible Under Rule 401, 402, General Admissibility of Relevant Evidence, Rule 608, 613(b), 801, 803, exception to Rule against Hearsay, present sence impression. The Trial court error by refusing to admit a statement from Shae Deldrosso, either as Substantive evidence or impeachment purposes; this amounted to error of Constitutional dimension to whom deprived Brown of a powerful means of damaging Defendants credibility.......................................................................................................12,13,14,15,16



V.    Brown raised the issue that her unmarked grievance (Phase 1, Package 10, Exhibit 36, & 37) dating 1/16/18 was rejected, as to the date...........................................................................17,18

VI.    *Brown raised the issue that her (Exhibit 172) was admissible under Rule 402, General Admissibility of Relevant Evidence, 607, May Impeach a Witness, 608, A Witness's Character for Truthfulness. To attack Mr. Maxwell's credibility & for impeachment proposes, "that Brown was never a "Z-Code during her stay at SCI Huntingdon;" contrary to the principle of the Grievance response...........................................................................................................19,20,21*

VII.    *Brown raised issue pursuant to witness Mr. Gilbert availability, apparently Mr. Gilbert was due to testify, defendant predicated that Mr. Gilbert had some medical issues; without admitting any documents supporting alleged derivative. Mr. Gilbert's testimony pursuant to Mr. Allen's misconduct D080673, defendant's (Exhibit 46) could had been impactful under Rule 402, General Admissibility of Relevant Evidence 404, 405, 607, and 608. Mr. Gilbert testimony would had been critical, consistent with Mr. Allen's history of propensity for violence...........................................................................................................................21,22,2 3.*

VIII.    Brown raised the issue, production of document (Doc 85, 86, 91, 104, 105, 108, at 2, 109, 178, 179, and 181) concerning policies relating to classification and housing inmates. P.R.A.T. policy; the unsworn Declaration of Mr. Jason Stauffer and or security concerns under DC-ADM-003 did not outweigh the significance, and critical relevant information, not limited to identifying sexual predators; and criteria that staff shall carefully review when considering Z-code, characteristics of sexually aggressive inmates. Brown also challenges the District Courts in limine order (Doc. 183). The District Court accompanied with an error by denying Brown access to Mr. Allen's IRC & Cumulative Adjustment Records, and not limited to policy concerning the operation of "CCTV," monitoring and recording. (Doc. 108)...........................................................23,24,25,26,27,28,29,30,31,32

IX.    Brown raised the issue that defendants withheld "key" discovery during discovery to whom violated Rule 26 of Fed. R. civ. P. Brown's "medical records in its entirety," Brown's "Cumulative Adjustment Record in its entirety," Brown's "misconduct history." The Trial Judge error by overruling Brown's objection as to the non discloser of specific records at the discovery stage. The evidentiary ruling resulted in the allowance of medical records entered to support Ms. Trice testimony, (Defendants exhibit's 14, pages 13, 78, 82, 83, 84,) were admitted and used as substantive evidence, and impeachment purposes favoring the defense; the records were also admitted with instructions that defendants provide when the documents were provided at the discovery stage. (Doc.85,86, Exhibit A, C),(Doc.74,76,92, 96, 97, 108) (Defendants exhibit, 49 misconduct D031777, exhibit, 50 misconduct D031797 exhibit, 51 misconduct D031184) was admitted used as substantive evidence, and impeachment purposes favoring the defense; it was perceived  precisely that Brown engaged in targeting Mr. Plocinik after the initiation on (exhibit 49). (Defendants exhibit 57) Brown's ICAR was also admitted and used as substantive evidence during Ms.Richard's testimony...........................................................................................33,34.35.36,37



X.      The Trial Court error when Mr. Johnston testimony was found credible, when Brown admitted a previous statement from Mr. Johnston that was inconsistent with his trial testimony.................................................................................................................38,39

XI.     Brown preserved the right to raise issue pursuant to questioning defendant Mr. Fochtman as to inconsistency or lack thereof, pursuant to Mr. Johnston & Mr.Heaster statements pursuant to Fed. R. Evid.  613(b), 608(a), 608(b)......................................................................40,41,42

XII.    Court error by not finding Defendants Mr. Plocinik, Mr. Maxwell Mr. Johnston, Mr. Fochtman liable under the Eighth Amendment cruel and Unusual Punishment at Trial For Failure To Protect, and Depriving Brown Medical Treatment....................................42,43,44,45,46,47,48,49,50,51,52,53,54,55,56,57,58,59,60,61

XIII.   Brown contest that her Proposed Amended Complaint (Doc. 22) did not violate Federal Rules of Civil Procedure 8, General Rules of Pleading, and Rule 20, Permissive Joiner of Parties.................................................................................................................61,62

XIV.    Mr. Keith Lambing, a witness Brown presented was not allowed to testify on objection to hearsay. Mr. Lambing's testimony was critical sense Mr. Allen made a spontaneous statement to a close acquaintance pursuant to "Fucking Brown." as an essential component the trial Court errored when they sustained defendants objection as to hearsay. Brown consist that Lambing's testimony is admissible under Rule 608, 801,803, 804(b), 701 ...................................................................................................................63,64,65,66,67

XV.     Brown challenges the District Court's grant of Summary Judgment in favor of Defendants Maxwell & Plocinik, pursuant to Brown's Eighth Amendment Medical Treatment Claims. (Doc. 137)........................................................................................................67,68,69,70

XVI .   Brown Sought Information Upon How She Was Assigned a Risk Level Score, Pursuant To The PREA. Risk. Assessment. Tool. Without Participating In The P.R.A.T. Questionnaires. Thus Sought To Inquire On What The Administration Of The P.R.A.T. Questionnaire's Used For, And The Referral Process For The Reassessment For The Risk Of Victimization. P.R.A.T. Is The PREA Risk Assessment Tool, And When The P.R.A.T Is Conducted Inmates Are Required To Participate, Pursuant To The P.R.A.T. Questions. The District Court Erred When They Credited Mr. Maxwell testimony, That He Did Not Know, Nor Had Anything To Do With The PRAT Questionnaires.  Precisely; That He Was Not Aware That Brown Did Not Participate In The PRAT Questionnaires. This Amounted To Error Of Constitutional Dimension To Whom Was Critical To Brown's Case.............................................................................70,71,72

XVII.   Brown also raised the issue that her (Phase 3,Package 20, Exhibits 135, 136, 137), a sign statement from inmate Hector Vargas was not admissible Under Rule 401, 402, General Admissibility of Relevant Evidence, Rule 608, 613(b), 801, 803, exception to Rule against Hearsay, present sense impression. The Trial court erred by refusing to admit a statement from inmate Vargas, either as Substantive evidence or impeachment purposes; this amounted to error of Constitutional dimension to whom deprived Brown of a powerful means of damaging Defendants credibility........73,74,75

## XVIII.  Brown's Trial Exhibit List;

Brown presented her Trial exhibits In a (3) three phase system particularly as to the series of related events. Phase (1) one, distinguishes the series of events prior to being withheld with Mr. Allen in the Restriction Housing Unit. Subsequently phase (2) two, are the series of related events while Brown was withheld with Mr. Allen in 108 cell. Phase (3) three, are the series of related events after Brown was withheld with the Lifer and or consequence. Thus Package (1-12) all consist of exhibits; see Exhibits (1-49), these exhibits are consider to acknowledge Phase (1) one. Packages (13-16) consist of Exhibits (50-100); these exhibits are consider to acknowledge Phase (2) two.  And Phase (3) three exhibits consist of Packages (17-21); exhibits (101-172).

Package (1) one exhibits are; Exhibits (1-11)

Package (2) exhibit is; exhibit (12)

Package (3) exhibit is; exhibit (13)

Package (4) exhibits are; exhibits (14-19)

Package (5) exhibits are; exhibit (20)

Package (6) exhibits are; exhibits (21-25)

Package (7) exhibits are; exhibits (26-28)

Package (8) exhibits are; exhibits (29)

Package (9) exhibits are; exhibits (30-34)

Package (10) exhibits are; exhibits (35-42)

Package (11) exhibits are; exhibits (43-48)

Package (12) exhibits are; exhibits (Mr. Allen's Misconduct history, misconducts # D031781, # B159510, # B661661, # C009726, # D080673; and DC- ADM 008 Policy)

Phase (3)

**Package (13) exhibits are; exhibits (50-81)**

**Package (14) exhibits are; exhibits (82-93)**

**Package (15) exhibits are; exhibits (94-95)**

**Package (16) exhibits are; exhibits (96-100)**

Photos (5)

**Package (17) exhibits are; exhibits (101)**

**Package (18) exhibits are; exhibits (102-1125)**

**Package (19) exhibits are; exhibits (126-129)**

**Package (20) exhibits are; exhibits (130-162)**

**Package (21) exhibits are; exhibits (162-172)**

## STATUTES

**28 U.S.C. 1291**...................................................................................**1**

**42 U.S.C. 1983**...........................................................................**1-62**

42 Pa. C.S.A. 8522(b) (10)......................................................................................6,7,8

Fed.R.Civ.P. 37(e)..................................................................................................3,4,5

Fed.R.Evid.401.............................................................................9,10,11,12,13,14,15,16,73

Fed.R.Evid.402................................................9,10,11,12,13,14,15,16,19,20,21,22,23,73

Fed.R.Evid.404.............................................................................................21,22,23

Fed.R.Evid. 405............................................................................................21,22,23

Fed.R.Evid.602.....................................................................................................75

Fed.R.Evid. 607.........................................................................................19,20,21,22,23

Fed.R.Evid..608............................................................12,13,14,15,16,1920,21,40,41,74

Fed.R.Evid.613...........................................................................12,13,14,15,16,40,41

Fed.R.Evid.701.....................................................................................................67

Fed.R.Evid.801.........................................................................................12,13,14,15,16,66

Fed.R.Evid.803...................................................9,10,11,12,13,14,15,16,65,66,67,75

Fed.R.Evid.804.....................................................................................................66

Fed.R.Civ.P. 26................................................................................32,33,34,35,36,37

Fed. R. Civ.P 8..............................................................................................61,62,63

Fed. R.Civ.P.20............................................................................................61,62,63

Fed. R. Evid. 901..............................................................................................17,18

Eighth Amendment......................................42,43,44,45,46,47,48,49,50,51,52,53,54,55,56,57,58,59,60,61

# The United States Court Of Appeals

## For The Third Circuit

|                           |   |          |
|---------------------------|---|----------|
|                           | : |          |
| **Gartor Kiki Brown**     | : |          |
| **v.**                    | : | **23-1480** |
| **Maxwell, et al.**       | : |          |
|                           | : |          |
|                           | : |          |
|                           | : |          |

## Appellant's Formal Brief

### Statement of the issues presented

1.      The District Court erred when they denied Plaintiff's Motion For Spoliation Of Electronically Stored Information, & Plaintiff's Motion For Sanction under Rule 37(e) (Doc 83,84,85,86,87,90, 91,100 ).

2.      Brown raised the issue that the District Court erred in Denial of her State Tort Claims of Negligence, and Intentional Infliction of Emotional Distress at the Summary Judgment stage. It was proclaimed that the Doctrine of Sovereign immunity bars state employees against Brown's claims. (137).

3.      Brown raised the issue that her (Phase 1, Package 7, Exhibit, 28), statement of Mr. Saul Ortiz signed and dated, accompany medical pass dated 11/1/17 was not admissible under Rule 401, 402, General Admissibility of Relevant Evidence or 803. Exception to Rule against Hearsay, present sence impression. The Trial court erred by refusing to admit a statement from Mr. Saul Ortiz, accompany medical pass dated 11/1/17; either as Substantive evidence or impeachment purposes; this amounted to error of Constitutional dimension to whom was precisely critical, that her actions of refusing cellie's was out of fear, and subsequent measures. This deprived Brown of a powerful means of damaging Mr. Plocinik credibility; that Brown willfully moved into a cell with Mr. Allen, a known sexual predator.

4.      Brown also raised the issue that her (Phase 1, Package 11, Exhibit , 44), a sign statement from Shae Delgrosso was not admissible Under Rule 401, 402, General Admissibility of Relevant Evidence, Rule 608, 613(b), 801, 803, exception to Rule against Hearsay, present sence impression. The Trial court errored by refusing to admit a statement from Shae Deldrosso, either as Substantive evidence or impeachment purposes; this amounted to error of Constitutional dimension to whom deprived Brown of a powerful means of damaging Defendants credibility.

5.      Brown raised the issue that her unmarked grievance (Phase 1, Package 10, Exhibit, 36, & 37) dating 1/16/18 was rejected, as to the date, also Fed. R. Evid. 901.

6.      Brown raised the issue that her (Exhibit 172) was admissible under Rule 402, General Admissibility of Relevant Evidence, may impeach a witness, 607, 608, A Witness's Character for Truthfulness. To attack Mr. Maxwell's credibility & for impeachment proposes, "that Brown was never a "Z-Code during her stay at SCI Huntingdon;" contrary to the principle of the Grievance response.

7.      Brown raised issue pursuant to witness Mr. Gilbert availability, apparently Mr. Gilbert was due to testify, defendant predicated  that Mr. Gilbert had some medical issues; without admitting any documents supporting alleged derivative. Mr. Gilbert's testimony pursuant to Mr. Allen's misconduct D080673, defendant's (Exhibit 46) could had been impactful under Rule 402, General Admissibility of Relevant Evidence 404, 405, 607, and 608. Mr. Gilbert testimony would have been critical, consistent with Mr. Allen's history of propensity for violence.

8.      Brown raised the issue, production of document (Doc 85, 86, 91, 104, 105,108, at 2, 178, 179, and 181) concerning policies relating to classification and housing inmates. P.R.A.T. policy; the unsworn Declaration of Mr. Jason Stauffer and or security concerns under DC-ADM-003 did not outweigh the significance, and critical relevant information, not limited to identifying sexual predators; and criteria that staff shall carefully review when considering Z-code, characteristics of sexually aggressive inmates. Brown also challenges the District Courts in limine order (Doc. 183). The District Court accompanied with an error by denying Brown access to Mr. Allen's IRC, & Cumulative Adjustment Records, and not limited to policy concerning the operation of "CCTV," monitoring and recording. (Doc 108).

9.      Brown raised the issue that defendants withheld "key" discovery during discovery to whom violated Rule 26 if Fed. R. civ. P. Brown's "medical records in its entirety," Brown's "Cumulative Adjustment Record in its entirety," Brown's "misconduct history." The Trial Judge error by overruling Brown's objection as to the non discloser of specific records at the discovery stage. The evidentiary ruling resulted in the allowance of medical records entered to support Ms. Trice testimony, (Defendants exhibit's 14, pages 13, 78, 82, 83, 84,) were admitted and used as substantive evidence, and impeachment purposes favoring the defense; the records were also admitted with instructions that defendants provide when the documents were provided at the discovery stage. (Doc. 86, Exhibit A, C), (74, 76, 92, 96, 97, 108), (Defendants exhibit, 49 misconduct D031777, exhibit, 50 misconduct D031797, exhibit, 51 misconduct D031184) was admitted used as substantive evidence, and impeachment purposes favoring the defense; it was perceived  precisely that Brown engaged in targeting Mr. Plocinik after the initiation on (exhibit 49). (Defendants exhibit 57) Brown's ICAR was also admitted and used as substantive evidence during Ms.Richard's testimony.



10. The Trial Court erred when Mr. Johnston testimony was found credible, when Brown admitted a previous statement from Mr. Johnston that was inconsistent with his trial testimony.

11.    Brown preserved the right to raise issue pursuant to questioning defendant Mr. Fochtman as to inconsistency or lack thereof, in connection to Mr. Johnston & Mr.Heaster statements pursuant to Fed. R. Evid. 613(b), 608(a), 608(b).

12. Court erred when they Granted Judgment in favor of Defendants Mr. Plocinik, Mr. Maxwell Mr. Johnston, Mr. Fochtman under the Eighth Amendment cruel and Unusual Punishment at Trial For Failure To Protect, and Depriving Brown Medical Treatment.

13.    Brown contest that her Proposed Amended Complaint (Doc. 22) did not violate Federal Rules of Civil Procedure 8, General Rules of Pleading, and Rule 20, Permissive Joinder of Parties.

14. Mr. Keith Lambing, a witness Brown presented was not allowed to testify on objection to hearsay. Mr. Lambing's testimony was critical sense Mr. Allen made a spontaneous statement to a close acquaintance pursuant to "Fucking Brown." as an essential component the trial Court erred when they sustained defendants objection as to hearsay. Brown consist that Lambing's testimony is admissible under Rule 608, 801,803, 804(b), 701.

15.    Brown challenges the District Court's grant of Summary Judgment in favor of Defendants Maxwell & Plocinik, pursuant to Brown's Eighth Amendment Medical Treatment Claims. (Doc. 137).

16.    Brown Sought Information Upon How She Was Assigned a Risk Level Score, Pursuant To The PREA. Risk. Assessment. Tool. Without Participating In The P.R.A.T. Questionnaires. Thus Sought To Inquire On What The Administration Of The P.R.A.T. Questionnaire's Used For; And The Referral Process For The Reassessment For The Risk Of Victimization. P.R.A.T. Is The PREA Risk Assessment Tool, And When The P.R.A.T Is Conducted Inmates Are Required To Participate, Pursuant To The P.R.A.T. Questions. The District Court Erred When They Credited Mr. Maxwell testimony, That He Did Not Know, Nor Had Anything To Do With The PRAT Questionnaires. Precisely; That He Was Not Aware That Brown Did Not Participate In The PRAT Questionnaires. This Amounted To Error Of Constitutional Dimension To Whom Was Critical To Brown's Case.

17. Brown also raised the issue that her (Phase 3,Package 20, Exhibits 135, 136, 137), a sign statement from inmate Hector Vargas was not admissible Under Rule 401, 402, General Admissibility of Relevant Evidence, Rule 608, 613(b), 801, 803, exception to Rule against Hearsay, present sense impression. The Trial court erred by refusing to admit a statement from inmate Vargas, either as Substantive evidence or impeachment purposes; this amounted to error of Constitutional dimension to whom deprived Brown of a powerful means of damaging Defendants credibility.

# The United States Court Of Appeals

## For The Third Circuit

|                     |   |          |
|---------------------|---|----------|
|                     | : |          |
| Gartor Kiki Brown   | : |          |
| v.                  | : | 23-1480  |
| Maxwell, et al.     | : |          |
|                     | : |          |
|                     | : |          |
|                     | : |          |

## Appellant's Formal Brief

## Statement of the case

The facts of the case gleaned from February 3, 2018 through February 8, 2018, Brown to whom was forced in a cell with a Violent Lifer, who exhibited" predatory behavior" arousing from sexual desires needs, needs that were not being meat as a lifer; also with knowledge that Mr. Allen known that Brown had cooperated with several state police pursuant to another sexual assault. The inmate established that he hated "rats & faggots." This case acknowledges defendants ignorance of physical and "sexual" abuse of a "Transgender" prisoner at the hands of another prisoner.

It was also established that defendants Mr. Johnston, and Mr. Fochtman deprived Brown of medical treatment, preventing Brown from encountering medical staff. It is therefore transcended that defendants Mr. Plocinik and Mr. Maxwell also delay treatment in connection to Brown's claims. Brown points to the record, well documented "underline circumstances." It was promulgated that Brown posted "feminine characteristics," "wear eyeliner', 'women underwear,' long hair,' swatch hips,' only 120 pounds;" ambled with both safety and mental health cancers. Consequently, at the time Brown was

withheld with Mr. Allen, Mr. Heaster noted that Brown was eating "feces" from a cup; consequently, it was also noted that Brown was listed under housing concerns.

Stigmatized as a "rat, and faggot," Brown initiated a request of staff to her counselor on February 2nd, 2018 that she was told by Mr. Plocinik that she would be moving in with Mr. Allen. Consequently, this simultaneously triggered an encounter with prison "leaderships," one of whom was defendant Mr. Maxwell. Brown explicitly predicated to Mr. Maxwell and other 'leadership" members like Unit Manager Kendrick that both Mr. Allen and Mr. Jackson were extorting her while she was briefly on a population pod with both individuals; after an Officer Kovak retaliated against her by passing mail receiving, pursuant to the Camp Hill sexual assault. Mr. Jackson at the time was Brown's cellmate, and Mr. Kovak retaliated because Brown had disputed with him at the unit's front desk, furthering an initiation of a PREA call and complaint. Prior to being housed with Mr. Jackson Brown had refused a cell partner due to fear of victimization, still recovering from the Camp Hill sexual assault; Brown sought mental health and medical help to no prevail.

Upon Brown returning to the R.H.U. due to misconduct for alleged to have threatened a staff, Brown was put into a camera cell around January 21, [st 2018.] Around this time Brown was "Flag" with housing concerns, also stigmatized as a "rat, and a faggot" by many inmates. Mr. Heaster noticed that Brown was eating feces from a cup. Brown had refused a cellmate at least once while in the R.H.U. camera cell. Defendant Plocinik had transferred Brown from Unit G- pod-A cell 116, to Unit G- pod-D cell 214 on February 2nd, 2018. The cell was saturated with "O.C." gas, this trigged Brown's Ashuma, forcing Brown to request to be move.

Defendant Plocinik was made aware of the humane conditions, Mr. Plocinik left and came back, predicating to Brown that she would be moving with Mr. Allen. Brown told Mr. Plocinik directly of the issues with Mr. Allen and Mr. Jackson. Simultaneously Brown was called to speak with "leadership," at this time Brown's sexual assault claims from Camp Hill was so promulgated at SCI Huntingdon, that when she was pulled out the cell, inmates would make comments, "o that's the faggot that got his ass took at Camp Hill."

Although the encounter with "leadership" was brief on Febuary 2nd, Brown did amplified to defendant Maxwell and others that Mr. Plocinik predicated to her that she would be moving in a cell with Mr. Allen. After Brown transcended the information and the mail passing, and PREA complaint against Mr. Kovach that was previously investigated by Mr. Maxwell, Brown stated that she was targeted by Mr. Jackson and Mr. Allen also due to her feminine characteristics. Mr. Maxwell assured Brown that force would be use if Brown is told to move with Mr. Allen and refuse.

Mr. Plocinik removed Brown from Unit G- pod-D cell 214 on Feburay 3rd, 2018 to cell 108 on Unit-G-pod-A. Brown utilized the time to communicate to Mr. Plocinik and another staff member her fear, safety concerns, and Mr. Allen's propensity for violence; only for Mr. Plocinik to amplify that Brown would be spray. Brown transcended that while on G-A- pod she would look in the direction of 109-cell to whom housed a witness Mr. Seah Delgrosso as she expressed she did not feel safe going into cell 108; " you do not have to go in there, they can't force you." Delgrosso.



Mr. Allen would also transcend his dislike of Brown, uncooperative, angry, as he conferred with Mr. Plocinick and other guards that came rushed out from the RHU bubble; as to why he did not want a known "rat," and "faggot," in his cell. Imminently Brown was forced into the cell, as the cuffs came off, Defendant Plocinik witness Mr. Allen hit Brown multiple times; "have fun with him, he's a kiddie toucher." Consequent to defendants actions, or ramification thereof, in present, cell 108 would become "hell" on earth.

Brown encountered all of the defendants while in the cell farrest from the bubble. What was also apparent was that Mr. Allen had a plethora of supporters, so much so they would echo their thoughts through the cell doors. "All body joooons,' rap your hands too.""Get that faggot out your cell." Mr. Allen would take Brown's Mattress directing Brown to seat in the corner.

On February 4th, Mr. Allen continued to show his propensity for violence, punching Brown after rapping his hands with socks, and hitting Brown in abdominal area. Doing the initiation of dinner trays, Brown communicated to Mr. Plocinik, and Mr. Fochtman, Mr. Allen's actions, this lead to Mr. Allen simultaneously taking Browns food tray with no empathy. While picking up mail Mr. Plocinik returned to 108-cell, Brown passed a note and a request of staff seeking help to Mr. Plocinik. Brown also requested to see medical but was ignored.

On February 5th, 2018 Brown was forced in handcuffs and directed to face the wall in transition of Mr. Allen cuffing to go to recreation; during this time Mr. Allen premised on the theory of direct insults and threats directing staff to remove Brown before he returns to the cell. Mr. Law, and Mr. Harris also ran showers, even cuffing Brown and letting her out the cell; Brown transcended to Mr. Harris that she was being harm and wanted out 108-cell. Mr. Harris directed Brown to shut up.

Upon returning to the cell Mr. Allen would refuse to enter the cell, entirely asserting derogatory threats, saturated with the believe that Brown was a rat and a faggot. During the same day, Mr. Chilcote returned to 108-cell with representation that he had clearance to move Allen, "But Brown must stay in this cell." "We can't have you refusing to lock in; they will Fuck you up and spray you." However Mr. Allen would evidently refuse, and clarified that he wants Brown out. Mr. Chilocote even directed that a friend of Allen was waiting for him on a different pod.

Brown also communicated to Mr. Chilote that she had attempted to refuse to return to 108-cell as instructed by Mr. Allen after shower, only to encounter threats of use of force by Mr. Law, and Mr. Harris. "Get him the fuck out my cell or he will be sucking my dick soon!," Mr. Allen would assault Brown. Brown would also encounter Mr. Maxwell, Brown expressed that she was being assaulted; consequently Brown mentioned that after an assault the previous day, she was directed to sit in the corner of the cell, to whom she was asked repeated questions some of which were pursuant to the Camp Hill sexual assault. Simultaneously Mr. Allen asserted what he intended to do to Brown.

Brown also encountered Mr. Johnston through the cell door, upon Brown telling him that she was being harm by Mr. Allen, she was ignored. During the middle of the night, Brown hit her head after Mr. Allen pulled her out of bed, causing her to bleed. Brown to whom was over powered putting Brown into a "choke hole," as he attempted to engage into sexual acts with Brown. Mr. Allen

could not get around taking Brown's jumper off, as Brown resisted. Due to the attempted "rape," Brown sustained multiple injuries not limited to rips pain, back pain, groin tightness, head contusion and pain. On February 6, 2018, during the morning hours, Brown encountered multiple staffs explicitly expressing that inmate Allen attempted to rape her. It appeared to Brown that the Officers were being directed to ignore Brown, some of whom had present indolence in body language. Brown was directed to cuff up and face the cell wall, as Mr. Allen was accompanied to recreation.

Brown encountered Mr. Maxwell and Mr. Plocink at different times on Feburary 6th, Brown predicated safety concerns to both defendants, even articulating the rape attempt, as Mr. Allen compressing Brown to tell the defendants. Mr. Maxwell witness Allen hit Brown demanding Mr. Maxwell to remove Brown, in repercussion, Brown would not eat, and or an imminent "rape" assaults threats, Mr. Maxwell did not same face, as he parted ways.

Entered into February 7th during the same procedure, Brown directed her concerns to multiple officials, "we are only following orders, and we cannot move you." Brown encountered the Unit Manager through the door, during a previous encounter with Mr. Kendrick; he predicted that there was no open cell, to his account, "if you go to shower refuse to lock in." Mr. Allen made ambiguous threats as to "kill, and rape," Brown; consequently Mr. Kendrick would walk away. During rounds Brown also encountered Mr. Johnston, stating that she was aware of open cells, pleading to be move. "I 'am sick of this shit!" Brown was attacked.

Mr. Allen tackled Brown with intent to harm, forcing Brown to surrender; overpowering Brown on the floor, consequently ripping through Brown's jumpsuit. Brown simultaneously started to yell "get off of me, yall help, help," Brown also remember Mr. Plocinik approaching the cell. Mr. Allen's propensity of violence lead to part of a sheet being force into her mouth, it was also apparent that Mr. Allen had wrapped his hands with socks. "Shut the fuck up, I did this before, I did this before!" Mr. Allen forcedly "thrust" into Brown's anal after forcing her jumper off; as Brown was on her back with legs somewhat over her shoulders.

After the inevitable assault Brown was left with bleeding from the "anal,""nose," mouth, knee. Mr. Johnston was the first person to return to 108 cell, Mr. Johnston commented that it looked like an animal was "slay," at the time Brown injuries were obvious as she started to ask to see medical. Mr. Plocinik and Mr. Fochtman both joked about Brown Conceiving, "it's a boy; "no" it's a girl." Mr. Fochtman asked, "Which one of yall am 'I going to Wright up for fighting?" Mr. Allen replied, "There was no fight; I did what I told yall I was going to do." Brown transcended that she was "rape," and requested to be move. "We do not make 'courtesy' moves; this is Huntingdon, not the Hilton!"

Mr. Johonston return to 108-cell, "they want you to give me everything that has bleed on it," it was apparent that Mr. Johnston was ordered to exchange Brown's clothing, and or linens. Brown handed over her linen, boxers, jumper, socks, t-shirt. Consequently Brown requested to see medical again and again, however Brown was not provided the opportunity. A second rape assault was initiated by Mr. Allen, to whom Brown's jumper was forced off. Insofar while Brown was at the cell door frighten, she was dragged by the cell toilet, at one point Brown's head was forced into the toilet; this was

repercussion to whom transcended due to defendants refusal to move Brown. On the morning of February 8th, 2018, it was very apparent that very inmate on G-Unit A-pod was aware that Brown was sexual assault, from banging on the wall to yelling through the doors, "get young bouy out of there." "You got your ass took, both of yall some faggots." Staffs also appeared to have had direct knowledge; the scintilla of evidence was supported by officials denying Mr. Allen of recreation. This amplified Mr. Allen's actions, to whom resorted to threatening and banging on the cell door. Furthermore officials who attempt to deprive both Brown and Mr. Allen of their showers; this lead to a plethora of inmates banging doors, and exchanging words with the officers, this forced officials to take an action they were hesitant to act upon.

Brown and Mr. Allen was let out 108-cell for showers, Mr. Allen was direct with his words, "if you return to my cell this time I will "KILL" you!" Brown refused, "I can't go back in there,""Cuff up or we will fucking kill you!""I'm not going back to that cell,' I'm not going back n that cell." There was nothing mendacious about Brown's words, as the threats continued, Brown ignored them; Brown was repetitive with her words. As God on Brown's side this day, this day Brown was moved to Unit-G D-pod, cell-105.

The series of occurrence that lead to the move was so promulgated, that the banging on Brown's wall would not stop; night through day. "Kill yourself faggot,"" you fucking rat." "You got rape!" "How does your asshole feel?" Consequently Brown was deprived of some of her food trays, showers, paper, pen and other necessity until February 13th, 2018. Brown initiated a sick call.

# +STATEMENT OF STANDARD REVIEW

Before success comes in any person life, he is sure to meet with much temporary defeat, and perhaps, some failure. Derived from; (The Prosperity Bible Pg 16); inasmuch failures are tools to be utilize to path success. Following a bench trial, appellate courts review a district court's findings of fact for clear error and exercise plenary review over its conclusions of law. Jobe v. Argent Mortg. Co., LLC, 373 Fed. Appx. 260.

The Federal Rules of Civil Procedure provide, in pertinent part: Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of any other party. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1). Bistrian v. Levi, 448 F. 5upp. 3d 454.

The appellate court exercises plenary review over a grant of summary judgment and applies the same legal standard used by the district court. In doing so, we evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Pacitti v. Macy's, 193 F .3d 772 (3d Cir. 1999). The appellate court reviews orders not specified in the notice of appeal where: (1) there is a connection between the specified and unspecified order, (2) the intention to appeal the unspecified order is apparent, and (3) the opposing party is not prejudiced and has a full opportunity to brief the issues.

The Court can disregard legal conclusions and recitals of the elements of a cause of action supported by mere conlusory statements. Santiago v. Warminster Twp., 629 F .3d 121, 128 (3d Cir. 2010).

# SUMMARY OF THE ARGUMENT

There are no secrets in prison; Brown's safety concerns were well promulgated. Defendants were aware; however they did not response appropriately and they had the authority to rectify the serious issues. Defendants had both objective and subjective knowledge; actual knowledge also unparallax circumstantial evidence would also indicate that defendants had been exposed to contents concerning the risk to Brown's safety; also from the very fact that it was obvious. Thus when you see the world from a computer virus, it's easy to justify the cruelest behavior. Derived from; (The Four Agreement. at. Pg. 41).

Brown a transgender not menstruated, somewhat larghetto, encountered Mr. Maxwell on February 2nd, 2018, a day prior to moving with Mr. Allen. Brown predicated to Mr. Maxwell," Allen and Jackson extorting and targeting Brown, Kovack passed mail pursuant to the Camp Hill's abuse to Mr.

Jackson, to whom at the time was cellmates with Brown. Forced with knowledge intent in a corner cell with no "stress button," furthest from the bubble in the, "restricted housing unit," with a lifer that, an inferior lifer with "dark iris" that exhibited dangerous and predatoral behavior arousing from sexual desires. Desires that were not being meat as a lifer. The mind is a creature of habit; it thrives upon the dominating thoughts fed it. Mr. Allen may had carried with him certain traits or character, had the fire that had not been subdued by time & circumstances; Brown," Brown was his source for stimulation." At the time Mr. Allen had "(77) misconduct, (4) of whom were sexual related. What was also apparent was Mr. Allen was known for his propensity of violence, and sexually aggressive behavior.

Mr. Allen had direct knowledge that Brown had cooperated with several state police pursuant to sexual assault claims, and it was also promulgated that Mr. Allen hated "rats and faggots." This case acknowledges defendants Mr. Mexwell, Mr. Plocinik, Mr. Fochtman, and Mr. Johnston's ignorance of physical and sexual abuse of Brown by another prisoner Mr. Allen, and consequent deprivation of medical treatment. It was well documented that Brown a transgender inmate had underline circumstances; it was transcending that Brown post "feminine characteristics, ambled with safety and mental health concerns. Just days prior to Brown being withheld with Mr. Allen, Mr. Heaster noted Brown was eating feces out of a cup; it was also noted that Brown was listed under housing concerns, stigmatized as a rat and a faggot.

Brown put in a request of staff directed to her counselor on February 2nd, 2018 articulating that Mr. Plocinik told her that she would be moving with Mr. Allen. A witness Shae Delgrosso keyed in on February 3rd, "you don't have to go in there,' they cannot force you!" Mr. Plocink witnessed and provoked first assault per cuffs came off. Brown informed defendants Mr. Plocinik, Maxwell, Johnston, and Fochtman amplifying assaults and attempted sexual assault prior to February 7th, 2018. Brown directly handed Mr. Plocinik a request of staff requesting help on February 4th, 2018.

Defendants refused to remove Brown from Mr. Allen after acknowledging her injuries first hand on February 7th, 2018 from a sexual assault." "Which one of yall I' am I writing up for fighting?" "We do not make 'courtesy' moves; this is Huntingdon, not the Hilton!" Mr. Johnston came back and exchanged Brown's clothing and linens to whom had blood stains. Brown was victimized for a second time due to defendant's deliberate indifference.



ARGUMENT

1.    The District Court Erred by Denying Plaintiff's Motion for
Spoliation Of Electronically Stored Information, & Plaintiff's Motion for
Sanctions (Fed. R. Civ. P. Rule 37(e), 26, 30, 33, 34, 37, 38, 39, 40).



While housed at SCI Huntingdon in the ("RHU"), in February of 2018, Brown was a victim of assaults and sexual assaults. Brown was forced in a corner cell with no stress button furthest from the bubble in the, restricted housing unit, with a lifer that, a lifer that exhibited dangerous and predatorial behavior arousing from sexual desires. Desires that were not being meat as a lifer. Brown encountered all defendants through the cell door at different times, predicating safety concerns from February 3rd, through 8th.

Brown handed Mr. Plocinik a request of staff requesting help. Mr. Allen was afforded recreations on February 5th, 6, 7th, but not on the 8th. Brown encountered Mr. plocinik, Mr. Fochtman, and Mr. Johnston on February 7th, after being sexually victimized, Brown injuries were obvious, so much so that Mr. Johnston was send to exchange Brown's clothing and linens due to "blood stains."

SCI Huntingdon has a vast network of surveillance cameras that capture most everything that takes place within the facility. (Tr. Tra. P. 18-19, P.421-422). G-Unit is the restricted housing unit, ("RHU") with four Quads. G-A-Quad housed Brown and Mr. Allen in cell 108. It was established that G-A-Quad had surveillance cameras, at high ankles capturing everything outside inmate's cells. Although 108 cell was the furthest cell from the bubble; camera ankles would capture most of everything that took place outside the cell.

The cameras are so effective that they are routinely used as investigative tools to distinguish the facts pursuant to polemic issues. The authentic network is known as the ("CCTV"). (Tr. Tra. P. 421). During discovery, Brown made multiple attempts to obtain video monitoring (CCTV") footage from February 3rd, through 8th, 2018. (Doc. 85) It was alarming and somewhat troubling that during the investigation of Brown's claims of victimization, there wasn't any ("CCTV") footage retrieved to utilize and or collected as evidence per custom; and or policy. What also raised suspicion was the fact that Brown requested that defendants preserve all ("CCTV") footage from February 2nd, through February 13th, the filing date of her administrative grievance.

Thus the District Court erred when they denied Brown's Motion for spoliation of electronically stored information. When the District Court finds that spoliation has occurred, it has the authority to fashion an appropriate sanction to remedy the damage to other parties. The District Court abused its discretion, citing no legal authority with respect to Brown's Motion for sanction and accompany Brief (Doc 83, 84), see (Doc 90), Honorable Judge Jones amplified that "no such video exists," with no caution identifying way an institution with a CCTV network did not preserve important footage; citing (Doc 84, p. 11) to whom was a page from the investigation lead by Defendant Maxwell. Defendant Maxwell related that no video surveillance of the alleged assault or rape was available. (Tr. Tra. P. 460).

Honorable Judge Jones ignored Brown's arguments that the videos at hand involves information in relation to "plaintiff's" case, as consistent if obtained, the footage can lead to other discovery; and that Brown submitted a properly filed grievance seeking preservation to whom defendants rejected as not legible; when clearly Brown's grievance was understood. (Doc. 84, p. 3). Contrary to (Doc. 84, p. 5,,) ( Doc. 84, p. 3) the Facility manager acknowledged Brown grievance was readable; however that Brown did not present any complaint or issues. The District court also failed to distinguish that in other investigations within the ("RHU"), officials did not hesitate to utilize the CCTV to help gather evidence. See (Doc. 84, p. 9) officials alleged that the CCTV in the ("RHU") revealed that there was no interaction with an officer and Mr. Strong.



Also see Brown's (package 12, Misconduct D080673), also Defendants (Exhibit 46, Misconduct D080673); officials acknowledged that CCTV footage reviewed that "it was apparent that inmate Allen entered the detail closet with intent, demonstrated by his physical actions of looking around." The misconduct alleged that Mr. Allen assaulted inmate Figueroa in a detail closet, and or fighting. Again the exhibit shows two distinguish facts; (1) that SCI Huntingdon investigators routinely used the CCTV cameras as investigative tools to distinguish the facts pursuant to polemic issues. (2) Consistent with Brown claims (Tr. Tra. P. 330), CCTV footage are utilized even if the direct merit of an alleged act that caused the initiated investigation was not present on camera.

In Brown's Motion to compel (Doc. 85) Brown transcended that the video recording sought would be direct evidence to help set apart the facts. For example, Brown told investigators that she was forced into the cell, by Mr. Plocink and other officers that discharged from the bubble. (Tr. Tra. P. 171). Consequently on February 7th, Brown amplified that it was defendant Johnston that had exchanged her clothing and linens that had blood on them including boxers; contrary to Mr. Fochtman's claims; and was simultaneously deprived of medical treatment. Brown was also consistent in that at the time of her claims; there wasn't any T.V. on the unit; so it was mendacious of Mr. Fochtman to insert that Brown had asked to move with Mr. Allen to see the T.V.

To the extent that relevant video is not functional and will not play, the court "cannot compel the production of things that do not exist. Nor can the court compel the creation of evidence by the parties who attest that they do not possess the material sought by an adversary in litigation." See Amfosakyi v. Frito Lay, No. 1:11-cv-651, 2011 U.S. Dist. LEXIS 132646, 2011 WL 5593133, at *3 (M.D. Pa. Nov. 17, 2011).

The Third Circuit relied on both the Federal Rules of Civil Procedure and the inherent authority of the court in imposing sanctions for spoliation of any kind of evidence. In 2015, however, Federal Rule of Civil Procedure 37 was amended to provide a uniform standard governing spoliation sanctions for the loss of electronically stored information.

The Supreme Court promulgated amended Rule 37(e) in recognition of "the serious problems resulting from the continued exponential growth in the volume of [electronically stored] information." Where the amended rule applies, it provides the exclusive remedy for spoliation of tangible items and other non-electronic information; however, the analysis established in the Third Circuit's spoliation precedent still governs motions based on spoliation of non-electronic information. See Bistrian v. Levi, 448 F. Supp. 3d 454. Also see In re Schaefer Salt Recovery, Inc., 542 F .3d 90, 97 n. 3 (3d Cir. 2008).

Spoliation occurs where ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored.""The advisory committee's notes to the 2015 amendment further explain the elements of spoliation. First, the spoliating party was under a duty to preserve when the loss occurred. (Tr. Tra. P. 423). Second, the lost ESI was within the scope of the duty to preserve. (Tr. Tra. P. 421). Third "the information was lost because the party failed to take reasonable steps to preserve" it. (Tr. Tra. P. 425). Fourth, because ESI "often exists in multiple locations," spoliation occurs only where the information is truly lost and not recoverable elsewhere. See Sosa v. Carnival Corp., 2018 U.S. Dist. LEXIS 204933, 2018 WL 6336178, at * 11 (S.D. Fla. Dec. 4, 2018).

Chief Justice Reports noted that the amendments "Shall take effect on December 1, 2015, and shall govern in all proceedings in civil cases thereafter. At trial Brown established that defendants had a duty to preserve. ("Mr. Hawn") testified that ("CCTV") video monitoring is use as tools to monitor inmates and staffs.(Tr. Tra. P. 421). ("Mr. Hawn") testified that ("CCTV") monitoring technologies did exist in the ("RHU") at the time of Brown's claims, and that the camera monitoring surveillance has the ability to record. (Tr. Tra. P. 421-422). .(" Mr. Hawn") acknowledged that he had been assigned as a

("CCTV") officer, to whom saddled him to an area or various areas that over sees all the units' cameras. (T. P. 422). Also see Brown's (package 23, Shift Roster), Defendants (Exhibits 25, 28, 31, 34, 40).

("Mr. Hawn") explained how the ("CCTV") retention preservation works; in simple terms, the digital system monitors, records, and preserve in a simultaneous fashion. (T. P. 432). ("Mr. Hawn") also acknowledged that if an inmate was looking to retrieve surveillance footage to present as evidence in an ongoing investigation; it would be possible by filing an administrative grievance seeking preservation. (T P. 424). ("Mr. Hawn") also testified that there should have not been an issue with preservation with respect to the time Brown initiated her grievance. See Brown's (Package 16, Exhibit 96, grievance # 721491). (T. P. 424-425). Lastly ("Mr. Hawn") testified that around the time of Brown's claims, he did not remember any odd defects within the digital system that would prevent preservation.

Defendants argued that the video never exits, (DOC. 87) contradicts ("Mr. Hawn"), an experience Correctional officer testimony. Although defendants policy DC-ADM 06.03.01 section 42-operation of close circuit television ("CCTV") monitoring and recording may be relevant and consistent with ("Mr. Hawn's") knowledge; Brown would not be concern with weather the defendants acted in strict accordance with policy, but rather the alleged violation of her federal and state tort rights occurred. See Huertas v. Beard, No. 101-, 2012 U.S. Dist. LEXIS 105631, 2012 WL 3096430, at *3 (W.D. Pa. July 30, 2012). Brown claims spanning a relatively short period, a visual aid of the series of events will create a division that is consistent with Browns claims. Thus if defendants spoliation of relevant ("ESI") material was calculated to deprive Brown of proofing her case; than a sanction is necessary. Furthermore, defendants must articulate a argument greater than "the video never exits."(T. P. 425).

It's apparent that defendants acted with the intent to deprive; defendants failed to communicate if the footage ever exists. Even if all elements are met, a plaintiff can show that a party's failure to preserve evidence rises to the level of sanctionable spoliation only where the absences of that evidence is predicated on bad faith, such as where a party purposely loses or destroys relevant evidence. If direct evidence of bad faith is unavailable, the moving party may use circumstantial evidence to establish bad faith in which requires (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case (2) the spoliating party engaged in an affirmative act causing the evidence to be lost, (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; (4) the affirmative act causing the loss cannot be credibly explained as not moving bad faith by the reason proffered by the spoliator.

In Easley v. Tritt, 2020 U. S. Dist. LEXIS 28776; the Middle District denied Platinff's motion for sanction' the plaintiff requested 185 video recordings, The videos pose a difficulty for a few reasons-first, they are recorded via the prison's proprietary software and can only be played back with a copy of the prison's proprietary software. Additionally videos must be functional and then converted into a standard file format that can be played on any computer. In Brown's case, Brown only sought videos from February 3rd, through February 8th, 2018.

1

II.    Brown Instead The Lower Had The District Court

Should In Model    Of The State Tort Claims Of Negligence

---

[1] In Union there is strength; Derived from The Prosperity Bible, Pg 106.

*[illegible handwritten text]*

The Defendants argued that the doctrine of sovereign immunity bars Browns claims against state employees and the District Court agreed. Due to the District Court error, Brown's claims of Negligence and Intentional Infliction of Emotional Distress were dismiss at the Summary Judgment stage. Brown respectfully reject the District Court's disposition, and depicts that the Department of Corrections is an agency of the Commonwealth and the defendants, as employees of an agency of the Commonwealth, are not entitled to the protection afforded by sovereign immunity. . See McGrath v. Johnson, 67 F. 2d 499, 511 (E.D. Pa. 1999)

As set forth in Brown's complaint, the acts for which the defendants are being sued were not conducted within the scope of their duties as employees of the Department of Corrections. Brown Claims that defendants Mr. Fochtman, Mr. Plocinik, Mr. Maxwell, and Mr. Johnston failed to protect her from sexual abuse. It is understood that the state and its employees has waive its sovereign immunity for claims involving negligent and IIED. (Doc. 137, p. 29) order contradicts the principles under 42 pa. C.S. 8522(b).

Honorable Judge, Jones cited the authority under 8522(b) but did not transcend that the subject matter "specific statutory exceptions" to whom he stated nine exceptions, however 8522(b) extends to ten (10) statutory exceptions. Thus section 8522(b) of title 42 also relates to claims of "sexual abuse." 42 Pa. C.S.A. 8522(b) (10). See Cunning v. W. Chester Univ., 2021 U.S. Dist. LEXIS 35874. (10) Sexual abuse. - Conduct which constitutes an offense enumerated under section 5551(7) (relating to no limitation application) if the injuries of the plaintiff were caused by actions or omissions of the commonwealth party which constitute negligence. Thus Brown argues that, "because 42 pa. C.S. 5551(7) enumerates' both sexual assault and rape,' 8522(b) (10)'s sovereign immunity exception applies to her negligence claims.

Commonwealth parties acting within the scope of their employment generally are immune from suit except when immunity is explicitly waived. Pennsylvania's General Assembly has carved out certain limited exceptions from its grant of sovereign immunity to commonwealth actor. See Brown v. Waxford, 2022 U.S. Dist. LEXIS 125171, 2022 WL 2759064, at *9 (M.D. Pa. July 14, 2"tt022). It was identified that defendant Mr. Plocinik was not acting within the scope of his employment when he allegedly contaminated Brown's food with a piece of metal the very next day upon knowledge of Brown initiation of this lawsuit, against Mr. Plocilik's desires.

Thus section 8522(b) of Title 42 of the Pennsylvania Consolidated Statues provides ten narrow categories where the state has waived its sovereign immunity for claims involving negligent conduct, consequently this state statutory immunity applies to both negligent and intentional tort committed by commonwealth actors. 8522. Exception to Sovereign immunity

(a) Liability imposed. – The General Assembly, pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, does hereby waive, in the instances set forth in subsection (b) only and only to the extent set forth in this subchapter and within the limits set forth in section 8528 (relating to limitations on damages), sovereign immunity as a bar to an action against Commonwealth parties, for damages arising out of a negligent act where the damages would be recoverable under the common law or a statute creating a cause of action if the injury were cause by a person not having available the defense of sovereign immunity.

(b) Acts which may impose liability.- The following acts by a Commonwealth party result in the imposition of liability on the Commonwealth and the defense of sovereign immunity shall not be raised to claims for damages caused by:

(1) Vehicle Liability.- The operation of any motor vehicle in the possession or control of a Commonwealth party. As used in this paragraph, "motor vehicle" means any vehicle which is self-propelled and any attachment thereto, including vehicles operated by rail, through water or in the air.

(2) Medical-Professional Liability.- Acts of health care employees of Commonwealth agency medical facilities or institutions or by a Commonwealth party who is a doctor, dentist, nurse or related health care personnel.

(3) Care, Custody or Control of Personal Property.- The care, custody or control of personal property in the possession or control of Commonwealth agency, except that the sovereign immunity of the Commonwealth is retained as a bar to actions on claims arising out of Commonwealth agency activities involving the use of nuclear and other radioactive equipment, devices and materials.

(4) Commonwealth Real Estate, Highways and Sidewalks.- A dangerous condition of Commonwealth agency real estate and sidewalks, including Commonwealth-owned real property, leaseholds in the possession of a Commonwealth agency and Commonwealth-owned real property leased by a Commonwealth agency to private persons, and highways under the jurisdiction of a Commonwealth agency, except conditions described in paragraph

(5) Potholes and Other Dangerous Conditions.- A dangerous condition of highways under the jurisdiction of a Commonwealth agency created by potholes or sinkholes or other similar condition created by natural elements, except that the claimant to recover must establish that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred and that the Commonwealth agency had actual written notice of the dangerous condition of the highway a sufficient time prior to the event to have taken measures to protect against the dangerous condition. Property damages shall not be recoverable under this paragraph.

(6) Care, Custody or Control of Animals. - The care, custody or control of animals in the possession or control of a Commonwealth party, including but not limited to police dogs and horses and animals incarcerated in Commonwealth agency laboratories. Damages shall not be recoverable under this paragraph on account of any injury caused by wild animals, including but not limited to bears and deer, except as otherwise provided by statute.



(7) Liquor Store Sales.- The sale of liquor at Pennsylvania liquor stores by employees of the Pennsylvania Liquor Control Board created by and operating under the act of April 12, 1951 (P.L 90, No. 21), known as the "Liquor Code," if such sale is made to any minor, or to any person visibly intoxicated, or to any insane person, or to any person known as habitual drunkard, or of known intemperate habit.

(8) National Guard Activities.- Acts of a member of the Pennsylvania military forces.

(9) Toxoids and Vaccines.- The administration, manufacture and use of a toxoid or vaccine not manufactured in this Commonwealth under the following conditions.

(i) The toxoid or vaccine is manufactured in, and available only from, an agency of another state.

(ii) The agency of the other state will not make the toxoid or vaccine available to private persons or corporations, but will only permit its sale to another state or state agency.

(iii) The agency of the other state will make the toxoid or vaccine available to the Commonwealth only if the Commonwealth agrees to indemnify, defend and save harmless that agency from any and all claims and losses which may arise against it from the administration, manufacture or use of the toxoid or vaccine.

(iv) A determination has been made by the appropriate Commonwealth agency, approves by the Governor and published in the Pennsylvania Bulletin, that the toxoid or vaccine is necessary to safeguard and protect the health of the citizens or animals of this Commonwealth.

(v) The toxoid or vaccine is distributed by a Commonwealth agency to qualified persons only if the person agrees to indemnify, defend and save harmless the Commonwealth from any and all claims and losses which may arise against the Commonwealth from the manufacture, distribution, administration or use of the toxoid or vaccine.

(10) Sexual Abuse.- Conduct which constitutes an offense enumerated under section 5551 (7) (relating to no limitation applicable) if the injuries to the plaintiff were caused by action or omissions of the Commonwealth party which constitute negligence.

An appeal of a nonfinal order will lie if (1) the order from which the appellant appeals conclusively determines the disputed question; (2) the order resolves an important issue that is completely separate from the merits of the dispute; and (3) the order is effectively unreviewable on appeal from the judgment See Pearson v. Miller, 211 F .3d 57..

It should be noted that Brown did not appeal the District Court's (Doc 137) order pursuant to the dismissal of her state tort claims at the time of the dismissal since it is of practice; to whom the Appellant Court had dismissed other appeals not limited to this case for lack of appellate jurisdiction. (Doc. 64). The (Doc 137) order was not a "final order [that] ended the litigation on the merits and leaves nothing for the court to do but execute the judgment." See Republic Natural Gas Co. v. Oklahoma, 334 U.S. 62, 68 (1948). Also see (Doc 64), this case was briefly in the appellants' court.

*[illegible] statement of Mr. Saul Ortiz signed and dated, accompany medical pass dated 11/1/17 was not admissible [illegible] admissibility of [illegible] exception to Rule [illegible] Brown [illegible] in. The trial court err[illegible] by refusing to admit a statement from Mr. Saul Ortiz, accompany medical pass dated 11/1/17; either as Substantive evidence or impeachment purposes; this amounted to error of Constitutional dimension to whom was precisely critical, that her actions of refusing cellie's was out of fear, and subsequent measures. This deprived Brown of a powerful means not limited to damaging Mr. Plocinik credibility; that Brown willfully moved into a cell with Mr. Allen, a known sexual predator.*

---

Rule 401, Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action. [Therefore] "it follows that evidence is irrelevant only when it has no tendency to prove the fact." See Frank v. County of Hudson, 924 F. Supp. 620, 626 (D. N. J. 1996). Rule 402 of the Federal Rules of Evidence, in turn, provides that all "relevant evidence will be admissible unless the rules of evidence provide to the contrary." United States v. Sriyuth, 98 F. 3d 739, 745 (3d Cir. 1996).

Brown presents that Mr. Ortiz's statement is relevant, for reasons not limited to impeaching, and credibility purposes. The statement coordinates with Brown's testimony that she had been consistently victimized in the months leading to February 7th, 2018 to whom was of consequence to refusing cell partners. (Tr. Tra. P. 148).

Brown predicated at her deposition see (Package 8, Exhibit 29, Deposition Transcripts at; p. 19), that months prior to the events in this case, she was transfer back to SCI Camp Hill. As

relevant, Brown was back at SCI Camp Hill due to her claims of victimization by inmate Strona while in the ("RHU") in October of 2018. Upon Brown returning at SCI Camp Hill, she was placed into a cell with an inmate Willson on ("P-Block") see (Package 3, Exhibit 13) cell 1018; the only other housing alternative presented to Brown was the ("RHU"). A frustrated, and aggravated lifer to whom emphasis was on targeting Brown's feminine characteristics articulated that Brown must go somewhere else.

On November 1st, 3018, Brown was directed by Mr. Willson to pack her belongings and get out the cell she shared with Mr. Willson. Brown walked to the pod-bubble directing her concerns to a Sgt. Leteux. The officer walked to Mr. Willson at the time stationed in 1018 cell. Consequently Sgt. Leteux predicated to Willson, "the only way he's leaveing this cell is in a body bag." Due to the derivative of Sgt. Leteux's actions; Brown was assaulted by Mr. Willson. (T. P. 147). Inmate Ortiz had approached Brown upon departing from the shower. Mr. Ortiz witnessed Blood on Brown's clothing, face, and nose. See (Package 7, Exhibit 28). Prior to Mr. Ortiz shower, He witness the encounter with Sgt. Leteux and Mr. Wilson; and the derivative of Sgt. Leteus statement was the only way Brown is departing from Wilson's cell is in a body bag. Brown was sent to medical. See (Exhibit 28) medical pass dated ("11-1-18"). Brown expressed that she was send to medical blood dripping from her nose to the floor, but only to be send back to P-Block by a LT. Frances.

Rule 803(1) provides Present Sense Impression. A statement describing or explaining an event or condition made while or immediately after the declarant perceive it. " This exception has three requirements: '(1) the declarant must have personally perceived the event described; (2) the declaration must bean explanation or description of the event rather than a narration; and (3) and declaration and the event described must be contemporaneous."" AAMCO Transmissions, Inc. v. Baker, 591 F. Supp. 2d 788, 795 (E.D. Pa. 2008). (Citing United States v. Mitchell, 145 F. 3d 572, 576 (3d Cir. 1998)). Although there is no bright-line rule as to how in time to an event a statement must be made to render the statement admissible under Rule 803(1), "the fundamental premise behind this hearsay exception 'is that substantial contemporaneity of event and statement minimizes unreliability due to the [the declarant's] defective recollection or conscious fabrication."" United States v. Green, 556 F .3d 151, 155 (3d Cir. 2009).

Brown articulates that prior to February 7th, 2018, there were warning signs; precisely put Brown realized that she could die in prison. *Cautionary and afraid*, Brown engaged in taking "sequent remedial measures. For example Brown had a grievance pending, predicating that defendant Maxwell had forced her to sign a "double celling sheet." (Package 4, Exhibit 14-19). Also see (Package 9, Exhibit 34) Brown had written a request slip directed to the psyche department, expressing her fears and symptoms. Upon returning back to SCI Huntingdon, Brown refused a celly on December 1st, 1017. See (Package 9, Exhibit 30). While housed in the ("RHU") Brown initiated grievances directed to psyche, see (Package 9, Exhibit 32, 34).

On 12/16/18. Brown received another misconduct for refusing a celly. On December 27th, 2017, Brown was released into population to a ("A-A") pod at cell 108; upon arrival Brown noticed an empty cell with multiple bunks. Simultaneously upon leaving the cell briefly and

returning, Brown encountered Mr. Jackson; he too had return from the ("RHU"). Brown reflected her obstacles and treatment while housed with Mr. Jackson; an acquaintance of Mr. Allen, see (Package 10, Exhibit 36, 37).

Mr. Saul Ortiz statement is precisely relevant as much it coordinates with Brown's testimony; for example Brown give meaniful testimony that she was afraid to take a celly due to her previous experience of victimization. (Tr. Tra. P 153, 168).Mr. Ortiz's statement is a bright-line " footprint in the sand," an essential component is also the medical pass accompanying the statement to whom presents Brown and Mr. Ortiz credibility that Brown had sustained a nose bleed deriving from the assault consistent with Mr. Ortiz's present sense impression; to whom would fall under the hearsay exception.

Excited Utterance Rule 803(2). A statement relating to a starting event or condition, made while the declarant was under the stress of excitement that it caused. The United States Court Of Appeals for the Eleventh Circuit looks at the totality of the circumstances in other to determine whether a hearsay statement was an excited utterance. See Carrizosa v. Chiquita Brands Int'l, Inc., 47 F. 4th 1278.

Rule 803(2) permits the introduction of statements "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." The "basis for the 'excited utterance' exception... is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation.' Idaho v. Wright, 497 U. S. 805, 820, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990). While the declarant must still be under the stress or excitement that the startling event caused, the excited utterance need not be made contemporaneously to the startling event. See United States v. Belfast, 611 F .3d 783, 817-18 (11th Cir. 2010). (holding that the district court did not abuse its discretion in admitting, as excited utterances, states made by a person four to five hours after he was tortured.

Brown lay the foundation for admissibility by establishing the timing and circumstances, Mr. Ortiz wrote his declaration in which he admitted seeing a bloody nose; he witnessed a prison guard refusing to remove Brown. As the proponent of Mr. Ortiz's statement, the information was enough to be admissible under Rule 803. Precisely, the defense principle was that Brown appeared potentially dangerous, and manipulative for secondary gain Z-code; contrary to Mr. Ortiz's statement (Exhibit 28), that Brown had just been victimized, through ramifications; Brown should have every reason to take cautionary measures. To whom lead to Brown refusing cellys.

Rule 803(5) provides, Recorded Recollection. A record that:

(A) Is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;

(B) Was made or adopted by the witness when the matter was fresh in the witness's memory; and

(C) Accurately reflects the witness's knowledge. To satisfy the requirements of Rule 803(5), the party offering the evidence must show that (1) the witness now has insufficient recollection to enable him to testify fully and accurately; and (2) the statement was made or adopted at a time

when the subject matter was fresh in the witness's memory. Zenith Radio Corp. v. Matsushita Elec. Ind. Co., 505 F. Supp. 1190, 1228-1229 n.48 (Del. 1980).

IV.   Brown also raised the issue that her (Phase 1, Package 3), Exhibit 13), and instances declaration a Shae Delgrosso was not admissible under rule 803, 401. General Admissibility of Relevant Evidence, Rule 803, 803(b), and 807, error that the Rule against Hearsay, present sense impression. The Trial court erred by refusing to admit a statement from Shae Delgrosso, either as Substantive evidence or impeachment purposes; this amounted to error of Constitutional dimension in whom deprived Brown of a powerful means of damaging Defendants credibility.

Brown's cell history establishes that she was housed on G-A-Quad in 108 cell from February 3rd, through 8th, 2018. See (Phase 1, Package 3, Exhibit 13) Witness's Shae Delgrosso signed credible declaration precisely identifies similarities in defendants' actions that coordinates' with Brown's testimony. See (Package 11, Exhibit 44). The Security Level 5 Housing Unit "Exercise, Shower, Shave Sign (Phase 2, Package 13, Exhibits 75, 75, 77) establishes that Mr. Delgrosso was housed on G-A-Quad in 109 cell during the period of Brown's Claims. Prior to trial, Brown was unable to locate Mr. Delgrosso to testify in person; subjecting him to cross – examination as feasible by the defense.

At trial Brown was not afforded the opportunity to admit (Exhibit 44) for different reasons. First defendants objected to the exhibit as hearsay; (Tr. Tra. P. 233,183), as Brown subsequently argued not limited to "exception rule to hearsay," however Honorable Judge Carlson cited on the record that the exhibit would not be admitted due to a defect; that the record was not dated. (Tr. Tra. P. 493,494). It was retrospective that defendants hearsay objection may had been circumvented by the Judge; to whom the Judge allowed excludtion of the statement precisely due to lack of date;(Tr. Tra. P. 234), an approach defendants did not laid a foundation for nor raise. Mr. Delgrosso testimony was relevant to offer in evidence for not limited reasons; to prove the truth of the matter asserted in the statement, impeachment purposes, and or substantive evidence for damaging defendants credibility, and "use for purpose other than proving the truth of what was asserted" inter alia, as extrinsic evidence. (Tr. Tra. P. 169). Thus Brown raised the issue on appeal.

Under Rule 401, evidence is relevant if it tends to make a fact of consequence to the action more or less probable. Fed. R. Evid. 401. Under Rule 402, only relevant evidence is potentially admissible; irrelevant evidence, in contrast, is always inadmissible. Fed. R. Eiv. 402. See United States v. Sriyuth, 739, 745 (3d Cir. 1996). (citations omitted). While these principles favoring inclusion of evidence

are subject to some reasonable limitations, even those limitations are cast in terms that clearly favor admission of relevant evidence over preclusion of proof in federal proceedings. Rule 613(b) theory provides: Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. United States v. Buffalo, 358 F .3d 519.

Rule 608(a), allows a party to attack the credibility of a witness through reputation and opinion evidence of his character for truthfulness. See United States v. Garza, 448 F .3d 294, 297 (5ᵗʰ Cir. 2006). For specific instances of an alleged bad act to be admissible under 608(b), "first, the alleged bad act must have a basis in fact and second, the incidents inquired about must be relevant to the character traits at issue in the trial. That does not mean that the basis in fact must be proved as a fact before a good faith inquire can be made. "United States v. Skelton, 514 F. 3d 433, 443-44 (5ᵗʰ Cir. 2008). Rule 801 defines hearsay as a statement by a declarant who does not testify at trial which is offered in evidence to prove the truth of the matter asserted in the statement. Fed. R. 801©.²

On February 3ʳᵈ, 2018, Mr. Delgrosso witnessed "Co/1 Plocinik returned Brown back to G- unit A-Pod." It was to Mr. Delrosso's knowledge that Mr. Allen was a sexual predator. (Tr. Tra. P. 169). Coherent in expressing her refusal to be withheld in 108 cell with Mr. Allen; Brown to whom made direct eye contact with Mr. Delgrosso. Consequently Mr. Delgrosso witnessed Allen call Brown derogatory names and threats of harm, not limited to "faggot." Furthermore Mr. Allen had allegedly amplified his dislike and desires to not have a cell partner.

The first paragraph of Mr. Delgrossos' declaration identified a defendant, and explicitly coordinates' with the records to whom perceived as relevant. For example Brown had crystallized persistence that she was forced in 108 cell. (Package 10, Exhibit 39) exists a misconduct Brown received for refusing a cellie, dated 1/25/18 just days prior to the events. (package 10, Exhibit 35) Mr. Allen's cell history establish that he was housed on ("A-A") from 06/28/2017 through 1/20/18. Brown's cell history identify that Brown was released into population to a ("A-A") pod at cell 108. (Package 3, Exhibit 13). Mr. Jackson and Mr. Allen would target Brown after a mail pursuant to the Camp Hill sexual assault was passed to Mr. Jackson. (Package 10, Exhibit 36, 37).

Also transcending was Brown's request of staff written on 2/2/18 directed to her counselor predicating concerns. (Package 11, Exhibit 44). As an essential component Mr. Allen had amplified to his counselor that he was seeking a ("Z-Code") Mr. Allen's Cumulative Adjustment Record (Package 11, Exhibit48), dated 2/2/18 a day prior to Brown moving in; the existence of the record indicates that Mr. Allen did not want a cell partner around the time of the sexual assault.

On February 3ʳᵈ, 2018, Witness Delgrosso took notice of "fighting nose," and defendant Plocinik laughing.(Tr. Tra. P. 171). During the series of occurrence that's presented in Brown's complaint from February 3ʳᵈ, 2018 through February 8ᵗʰ, 2018, Mr. Delgrosso witnessed all four defendants conspiring,

---

² Please note that there are two different Exhibits 44, in Package 11. One is the declaration from Mr. Shae Delgrosso; the second is a request slip dated 2/4/18. The request of staff was admitted with no objections.

in contour, refusing to separate Brown from Mr. Allen. Although the declaration lacks additional dates, and details specifying when each defendant made contact with Brown; it is jaded with information that supports transcending imminent danger that was created or ignored by the defendants. See (Package 8, Exhibit 29 at. P. 50-51, "Brown's Deposition Transcripts").

At trial Brown testified that officials had forced her back into 108 cell with Mr. Allen after shower on February 5th, 2018. Mr. Delgrosso statement also corroborate s' with Browns' testimony. Mr. Delgrosso continued that Mr. Allen was unvague, and eager to get Brown out the cell, to whom lead to alerting defendants that he was going to" funk Brown." On February 7th, 2018, Mr. Delgrosso heard "get offff, stop," simultaneously Mr. Johnston and Plocinik ignored the action; consequently resulted in Mr. Fochtman calling Brown a rat, (Tr. Tra. P. 186,187,188) and Mr. Johnston exchanging Brown's bloody boxers and clothing. See (Package 16, Exhibit 98, Grievance # 98), (Defendants Exhibit 21).

Mr. Delgrosso's declaration is relevant and critical to Brown's case, and coordinates with the principle that defendants were deliberate indifference to Brown's safety. All defendants would had been impeachable had the statement been admissible; to whom deprived Brown of a powerful means of damaging defendants credibility. Delgrosso's declaration is admissible under rule 401, and 402 from the very fact that he witness must of what occurred from a cell over, ("109 cell"). (Package 13, Exhibit 51). Mr. Delgrosso's statement is not confusing nor misleading, to whom the trial court may exclude. United States v. Parker, 2022 U. S. Dist. LEXIS 182553.

Brown presents under rule 608, statement was admissible for the purposes of attacking the witness's character for truthfulness on cross-examination. See United States v. McGee, 408 F .3d 966, 981-83 (7th Cir. 2005); United States v. Wilson, 985 F .2d 348, 351-52 (7th Cir. 1983). For example Rule 608(b) states, in relevant part: Specific instances of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness. Although Rule 608(b) bars extrinsic evidence of specific instances of conduct bearing on a witness' character for truthfulness, the extrinsic evidence may still be admissible for another reason, such as impeachment for bias, contradict, or prior inconsistent statement. United States v. Abel, 469 U. S. 45, 105 S. Ct. 465, 83 L. Ed. 2d 450 (1984).

Brown arguer's at the very least, Mr. Delgrosso's statement was admissible under Rule 613 as extrinsic evidence. For example, Mr. Johnston made a statement prior to trial that "Brown had requested medical treatment for a nose bleed," (Package 17, Exhibit, 101), however at trial Mr. Johnston predicated that "Brown had refused medical treatment. (Tr. Tra. P. 54). " During cross- examination, counsel is permitted to show discrepancy between two statements, one at trial and one previously, by extrinsic evidence if necessary, not to demonstrate which of the two is true but to show that the two do not jibe, thus calling into question the declarant's credibility. See United States v. Diaz-Colon, 2022 U. S. Dist. LEXIS 238982.

The Third Circuit has held that in the discretion of the court, specific instances of the conduct of a witness, "if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness... concerning his character for truthfulness or untruthfulness," for purpose of attacking the witness's credibility. United States v. Leake, 642 F .2d 715, 718 (4th Cir. 1981). Mr. Delgrosso's statement is evidence that is properly the subject of cross-examination under Rule 608(b) bearing on the witness's character for untruthfulness; Mr. Delgrossos' stated that "it was widely known that inmate Allen was a sexual predator that pick fights." The record indicates Mr. Allen had "(77) misconduct, (4) of whom were sexual related. Brown had refused to go in the cell, but was forced by defendant Plocinik. After the attack, Mr. Fochtman refused to remove Brown, furthermore to Mr. Delgrosso's account, Fochtman had allegedly called Brown a" rat," with Mr. Johnston simultaneously exchanging Brown's blood stained boxers and linens. (T. P. 54). Apparently the statement reflects instances of the defendant's conducts to whom Mr. Delgrosso's declaration would support the witness's characters for untruthfulness, thus is admissible on cross-examination "if they are probative of truthfulness or untruthfulness." In re Peanut Farmers Antitrust Litig., 2021 U. S. Dist. LEXIS 63971.

Under Federal Rule of Evidence 801©, "Hearsay' is any statement that a declarant makes outside of court and that is offered to prove the truth of the matter asserted in the statement. Statements offered for non-hearsay purposes are not hearsay." Mr. Delgrosso's statement implied that Brown was subject to verbal threats on February 3rd, 2018, by Mr. Allen. "Don't put that faggot in here!" With Brown stating "I don't want to go in there." Mr. Delgrosso established that he heard fighting, to whom he identified Mr. Plocinik and other officers laughing. Mr. Delgrosso also structured that he heard Mr. Fochtman predicated to him, "fucking that rat" inasmuch talking about Brown on February 7th, 2018, prior to simultaneous "get offff, stop!"

Under Rule 801 courts did not error when admitting statements not alleged to be factual statement, or truth of which was in question, rather threats were verbal acts to whom is excluded from hearsay. See Tompkins v. Cyr, 202 F .3d 770, 46 Fed. R. Serv. 3d ( Callaghan) 319, 53 Fed. R. Eiv. Serv. (CBC) 1424, 2000 U. S. App. LESIX 1027 (5th Cir. 2000). Here in Brown's case the Declarant identified himself and signed a statement to whom he heard "threats" on different days, clearly it could also be used to place defendant's statements in" context;" and not for the truth. See United States v. Detelich, 351 Fed. Appx. 616, 2009 U. S. App. LEXIs 24313 (3d Cir. 2009). Incriminating response are not hearsay. See Quartararo V. Hanslmaier, 186 F .3d 91, 1999 U. S. App. LEXIS 16784 (2d Cir. 1999).

Statement is not hearsay when it's offer not to prove the truth of the matter. What is also essential is that Mr. Delgrosso's statement could also be offer inter alia as identifying the defendants and for reasons of locations, not limited to the location of the defendants at a specific time and date. Federal Rule of Evidence 803(1) renders admissible as a present-sense impression "[a] statement describing or explaining an event of condition made while the declarant was perceiving the event or condition, or immediately thereafter." A hearsay statement may be admitted under this exception if it explains or describes an event personally witnessed by the declarant, and if the declaration is made

essentially contemporaneous to witnessing the event. United States v. Mitchell, 145 F .3d S72, 576 (3d Cir. 1998)

The fundamental premise behind present-sense impression exception are statements made virtually contemporaneously with the event being perceived. See United States v. Green, 556 F .3d 151. In Brown's case it appears that the Judge was skeptical as to the contemporaneity and or time of Mr. Delgrosso's statement. At trial Brown was never given the chance to explain that Mr. Delgrosso wrote his statement immediately after he perceived it.

Fed. Evid. 803(2) does not require that, in order to be admissible, the statement be contemporaneous with the starling event, but rather only with the excitement caused by the event. A party seeking to introduce a statement by an unidentified declarant under Fed. R. Eivd. 803(2) carries a burden heavier than where the declarant is identified to demonstrate the statement's circumstantial trustworthiness, however, such statements are admissible if they otherwise meet the criteria of Fed. R. Evid. 803(2), utterance is admissible as an exception of hearsay rule as long as it is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The applicability of the exception is unaffected by the availability or unavailability of the declarant as a witness. See United States v. Joy, 192 F .3d 761, 766 (7th Cir. 1999), cert. denied, 530 U. S. 1250, 120 S. Ct. 2704, 147 L. Ed. 2d 974 (2000). The Third Circuit has expanded the requirements of admissibility to include: (i) a starling occasion; (ii) a statement relating to the circumstances of the startling occasion; (iii) a declarant who appears to have had opportunity to observe personally the events; and (iv) a statement made before there has been time to reflect and fabricate. See. United States v. Mitchell, 145 F .3d 572, 576 (3d Cir. 1998); Miller v. Keating, 754 F .2d 507 (3d Cir. 1985).

If carefully applied the four analysis as set forth in Mitchell and Miller, Mr. Delgrosso's declaration should be admissible. First Mr. Delgrosso observed a defendant forced Brown into a cell with a known sexual predator;" Mr. Delgrosso established that he heard fighting, to whom he identified Mr. Piocinik and other officers laughing. Mr. Delgrosso also structured that he heard Mr. Fochtman predicated to him, "fucking that rat" inasmuch talking about Brown on February 7th, 2018, prior to simultaneous "get offff, stop!" To whom lead to the simultaneous exchange of Brown's blood stained boxers, jumper, clothing...First, this would qualify as starling. Second, Mr. Delgrosso's statement constituted as a statement relating to a startling event. Third, the declarant's statement that he had personally seen defendants actions, and conspiring; coupled with the subsequent events that lead to the sexual assault that Mr. Delgrosso had the opportunity to observe personally; established that the declarants had the opportunity to observe the startling event at issue Fourth, the delarant appeared to be very "excited" and "nervous" and "sad."

At Trial Brown offered into evidence her ("exhibits 36, and 37") an unmarked grievance Brown had initiated on a filing date of January 16th, 2018. (Tr. Tra. P. 236). Brown claims she filed the grievance while housed with Mr. Jackson on ("A-A"). (Tr. Tra. P. 161,162). Retrospectively Brown was released into population to a ("A-A") pod at cell 108; upon arrival Brown noticed an empty cell with multiple bunks. See (Package 3, Exhibit 13). Simultaneously upon leaving the cell briefly and returning, Brown encountered Mr. Jackson; he too had returned from the ("RHU"). Brown reflected her obstacles and treatment while housed with Mr. Jackson; an acquaintance of Mr. Allen, see (Phase 1,Package 10, Exhibit 36, 37), also see (Phase 1, Package 10, Exhibit 35)

The grievance requested a separation against Mr. Jackson and Mr. Allen during the derivative of sexual harassment, threats, and extortion. Brown was assaulted by Mr. Jackson a day prior to the grievance date; January 15th, 2018. (T. P. 161). Consequently Brown was ordered to stay in the cell by Mr. Jackson. However upon Mr. Jackson leaving for school; Brown exited the cell and approached Sgt. Aurano and c/o kovach relating explicitly that he was assaulted by Jackson. At the time an assault was obvious, as Brown was bleeding. It was asserted by Sgt. Aurano that Brown was a "walking lawsuit," consequently Brown was never send to medical.

Prior to the assault by Mr. Jackson, Brown was fitted with polemic circumstances to whom derived from Mr. Kovach calling Brown a faggot while she was at the front desk. Brown simultaneously initiated a PREA report by the utilization of the phone on January 7th, 2018; with a follow up correspondence directed to the department of corrections. See (Phase 1, Package 9, Exhibit, 32). Thus ambled with information pursuant to a previous victimization, c/o Kovach put into motion a retaliatory plan. (Phase 1, Package 8, Exhibit 29, at P. 24, 25, 26) C/o kovach passed Mr. Jackson incoming mail pursuant to the Camp Hill sexual assault.

Brown initiated her grievance dated ("1/16/18"). Brown did not receive a response from the facility grievance coordinator. Around the consequent period Brown returned to the ("RHU"). Brown simultaneously articulated a correspondence response directed to the facility manager and secretary office of inmate grievance & appeal; than derived (Exhibit 37). At trial the grievance was admitted; as principle only to represent a date of February 16th, 2018.(Tr. Tra. P. 160,236). To intricate things, Honorable Judge Carlson illustrated that the grievance could not had been written prior to Brown's sexual assault claims.

[3]To the contrary Brown contest that she initiated the grievance at or near the time of each event. Precisely as an essential component, the grievance ("date") is critical to Browns case; inter alia substantive evidence interrelating to Brown's credibility, inasmuch that Mr. Allen known who she was. It also represent a special aspect of relevancy as to what defendants known as principle of Mr. Allen, & Jackson targeting Brown; not limited to her feminine characteristics. The grievance date is also relevant as to Brown claimed that both Mr. Jackson and Mr. Allen known that Brown had previously been victimized; as Brown reported, c/o Kovach had put into motion a retaliatory plan. C/o kovach passed Mr. Jackson incoming mail pursuant to the Camp Hill sexual assault. Mr. Jackson being; an acquaintance of Mr. Allen told him.

What is also relevant is Mr. Maxwell's roll as investigating all this; likewise Brown had met with Mr. Maxwell prior to January 21st, 2018 in connection with Brown's PREA's claims against c/o Kovach and Brown's ill treatment by Mr. Jackson and Allen. (Tr. Tra. P. 162). Honorable Judge Carlson comparison of the admitted grievance appeared to opinion that the date of the grievance was not authenticate; to whom triggered Fed. R. Evid. Rule 901 (a) merely requires that proponent of documentary evidence make showing sufficient to permit reasonable juror to find that evidence is what it purports to be. United States v. Blackwell, 694 F .2d 1325, 224 U. S> App. D. C. 350, 12 Fed. R. Evid. Serv. (CBC) 60, 1982 U. S. App. LEXIS 23421 (D. C. Cir. 1982).

Court is required under Rule 901(a) to make a preliminary determination of whether there is sufficient or prima facie evidence, directed or circumstantial, to support finding that matter in question is what its proponent claims. United States v. Gerhart, 538 F .2d 807, 1 Fed. R. Evid. Serv. (CBC) 286, 1976 U.S. App. LEXIS 7754 (8th Cir. 1976). Requirement for authentication under Rule 901 (a) is in category of relevancy dependent upon fulfillment of condition of fact and is governed by procedures set forth Rule 104(b). In re James E. Long Constr. Co., 557 F .2d 1039, 1 Fed. R. Evid. Serv. (CBC) 997, 1977 U. S. App. LEXIS 13452 (4th Cir. 1977). Requirement of showing authenticity is governed by general approach to issues of conditional relevancy set forth in Rule 104(b) whereby order of proof is committed to discretion of trial judge. United States v. Black, 767 F .2d 1334, 19 Fed. R. Evid. Serv. (CBC) 128, 1985 U. S. App. LEXIS 21711 (9th Cir.).

Brown's evidence was admitted with no authenticity objections with respect to her documents (Exhibits 36, & 37) nor challenged genuine samples of Brown's handwriting under Fed. R. Evid. 901 (a), (b)(7), (b)(9). Brown agues' that there exists substantial evidence to support finding that her document date is authentic. Brown also identifies extrinsic evidence her (Exhibit 32), response to her (PREA

---

[3] Please note that there are two different (Exhibits 32) the first of the two is a grievance # (710649); a grievance directed to Ms. Butterbaugh dated (12/8/17). Brown sight's the second (Exhibit 32) above to whom was a response to her (PREA correspondence) directed to the Department of Corrections around January 11th, 2018; pursuant to "sexual, harassment, and retaliation." An authentic copy of the correspondence was never part of the briefing record. Also it was an error by Brown when she agreed with Honorable Judge Carlson that the unmarked grievance was dated February 16, 2018; see Trial transcribes at page 160.

correspondence) directed to the Department of Corrections around January 11th, 2018; pursuant to "sexual, harassment, and retaliation.

> [illegible handwritten text spanning several lines, largely unreadable]
> [illegible handwritten text]
> [illegible handwritten text]
> [illegible handwritten text]
> Maxwell's credibility & for impeachment purposes.
> "that Brown was never a "Z-Code during her stay at SCI
> Huntingdon" contrary to the principle of the Grievance
> response.

At trial Brown was prohibited from offering her (Exhibit 172), See (Phase 3, Package 21, Exhibit 172). Defendants sought objection to the exhibits under "Rule 401, and or 402, "General Admissibility of Relevant Evidence. Defendants reasoning that the grievance was filed over a year after Brown's claim of rape. The grievance is dated July 18th, 2019. The trial Judge articulated in an evidentiary ruling that exclusion of the grievance was necessary due to lack of relevance. See (Trial Transcripts). Defendants also contest during their objection to Brown's exhibit list prior to trial that the grievance was incomplete.

Under Rule 401, evidence is relevant if it tends to make a fact of consequence to the action more or less probable. Fed. R. Evid. 401. Under Rule 402, only relevant evidence is potentially admissible; irrelevant evidence, in contrast, is always inadmissible. Fed. R. Eiv. 402. See United States v. Sriyuth, 739, 745 (3d Cir. 1996). (citations omitted). While these principles favoring inclusion of evidence are subject to some reasonable limitations, even those limitations are cast in terms that clearly favor admission of relevant evidence over preclusion of proof in federal proceedings.

First Brown articulated a grievance dated July 18, 20119. The context of the grievance raised serious concerns. Brown established that from July 9th, 2019 through July 16th, 2019, Mr. Allen was placed directly above her, in cell 209 on G-D-Quad. Consequently both Brown and Mr. Allen shared cell walls and cell vent. The environment soon turn antagonistic as Mr. Allen and his gang members started to bang on Brown's wall day turning into night; followed by threats with serious bodily harm. Brown also claimed during this time discovery documents from the "Attorney General Office" in connection with this litigation was passed to Mr. Allen. Brown transcended that multiple defendants like Mr. Maxwell and Mr. Plocinik known of these evens but did nothing.

As a result of Brown's grievance; See (Phase 3, Package 21, Exhibit 172), Brown was interviewed by Mr. Maxwell; consequently Mr. Maxwell concluded that Brown was a ("Z-Code") discharging her

issues presented. The ("Remanded Initial Review Response"), also reflects the statement that Brown was a "Z-Code," inmate. See (Exhibit 172).

According to Fed. R. Evid. 607, the credibility of a witness may be attacked by any party, including the party calling the witness. United States v. Sesere, 413 Fed. Appx. 653, 2011 U. S. App. LEXIS 2448 (4th Cir. 2011). Fed. R. Evid. 607. Indeed, Rule 607 authorizes impeachment by contradiction, and Fed. R. Evid. 403 govers its application. Impeachment by contradiction is a means of policing the defendant's obligations to speak the truth in response to proper questions. Gilmore, 553 F .3d at 271 (citing United States v. Greenidge, 495 F .3d 85. 99 (3d Cir. 2007)).

In United States v. Sebetich, 776 F .2d 412 (3d Cir. 1985), the Third Circuit positioned that a witness may not be called for the purposes of circumventing the hearsay rule by means of Rule 607. Id. At 429. A party can attack a witness's credibility using otherwise inadmissible evidence, but cannot pretend that inadmissible hearsay evidence is being used to impeach a witness so that the jury will hear it's substance.

During Mr. Maxwell's testimony at trial, the defendant admitted that Brown did not meet the criteria nor was she an ideal candidate for a ("Z-Code") (Tr. Tra. P. 322). The defense projected on presenting their case that Brown appeared {"potentially dangerous, and manipulative for secondary gain Z-code"}. A ("Z-Code") is a housing statuses given to individuals who are consider sexual predators, or victims. In simple terms, the ("Z-Code") allow prison officials to assign an inmate a single cell. Thus it was Mr. Maxwell's position that Brown was never a ("Z-Code"). (Tr. Tra. P. 285). Mr. Maxwell also predicted that he did not know that Brown was ever assigned a ("Z-Code") while at SCI Huntingdon.

With that score Brown, offered her (Phase 3, Package 21, Exhibit 172), for impeachment purposes. Consequently the defense objected, and their objection was sustained as to relevance. (Tr. Tra. P. 288-289). Brown contest that in view of questioning Mr. Maxwell pursuant to if Brown was a ('Z-Code"), her (Exhibit 172), fell within the language of Rule 607 & 608, permitting the introduction of such evidence to support or damage a witness' credibility when his character for truthfulness or untruthfulness has been under attack. See, United States v. Dring, 930 F .2d 687, 692 (9th Cir. 1991). Fed. R. Evid. 608 allows opinion or reputation evidence of a witness's truthful character to be admitted "only after" the witness's character for truthfulness has been attacked. Fed. R. Evid. 608(a)(2). Brown argues' that the use of prior inconsistent statements during cross-examination would raise to the level of an attack on Mr. Maxwell's character for truthfulness. See, e.g.., Renda v. King, 347 F .3d 550, 554 (3d Cir. 2003)

Interruption of plaintiff line of inquiry on redirect attempting to establish these facts by Honorable Judge Carlson was also found to be prejudice; to whom inter alia undermined the issue at hand; how did Brown become a ("Z-Code"), and why would Mr. Maxwell lie during his testimony that he known nothing about Brown being a ("Z-Code"). (T. P. 285). The government had used documents and testimony that Brown was seeking a Z- Code to prove its case. Brown was prohibited from attacking Maxwell credibility by inquiring into when was it, or how did she become a ("Z-Code").As principle the trial court was prejudice and erroneously rejected Brown's (Exhibit 172).

Rule 608 provides: (a) the credibility of a witness may be ... supported by evidence in the form of opinion or reputation, but subject to these limitations... (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise. (b) Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility... may not be proved by extrinsic evidence.

Under Rule 608(a), whether a witness's credibility has been attacked depends on the nature of the opponent's impeaching evidence.

VII.        On an raised issue pursuant to witness Mr. Gilbert availability, apparently Mr. Gilbert was due to testify, defendant predicated that Mr. Gilbert had some medical issues; without admitting any documents supporting alleged derivative. Mr. Gilbert's testimony pursuant to Mr. Allen's misconduct D080673, defendant's (Exhibit 46) could had been impactful under Rule 402, General Admissibility of Relevant Evidence 404, 405, 807, and 608. Mr. Gilbert testimony would had been critical, consistent with Mr. Allen's history of propensity for violence.

Brown was required to pay a witness feed of $ 40. 00, pursuant to each witness on her witness list. Brown put defendants on notice that she intended to call Mr. Gilbert as a witness at trial. Precisely what did Mr. Gilbert know about the last misconduct Mr. Allen acquired; See Brown's (Phase 1, Package, 12, Misconduct D-080673), (Defendants, Exhibit 46) two weeks leading to Brown's claims. Mr. Gilbert testimony was sought by Brown as an essential component; not limited to "shine light on Mr. Allen's propensity for violence," also concerning his character for truthfulness or untruthfulness; and prison experience just days prior to sexually assaulting Brown. A lifer that, a lifer that exhibited dangerous and predatorial behavior arousing from sexual desires. Desires that were not being meat as a lifer. At the time Mr. Allen had "(77) misconduct, (4) of whom were sexual related. Mr. Maxwell known about Mr. Allen's predatoral behavior; Mr. Maxwell admitted in his testimony that Mr. Allen was a known pervert.

$$\sum \boxed{4} <$$

(Tr. Tra. P. 376).Mr. Gilbert testimony was also relevant from the view that Mr. Allen had engaged in an act of violence intricated with deceptive behavior to likewise satisfied his agenda.

Consequently on the day Mr. Gilbert was due to testified; defendants conveyed to the Court that Mr. Gilbert was sick, surgery. (Tr. Tra. P. 326,322,327,391,458). As principle the trial Court was prejudice at failing to inquire about the witness illness. The court also erred by not requiring additional clarity and or defense to elicite or produce any documents to substantiate their rationale, that Mr. Gilbert was ill. As it is Brown's position that it was the defense burden to show explicitly why the witness was not available. As Brown concedes, inter alia Mr. Gilbert had an interest or motive not to give favorable testimony anticipated; to help prevail Brown's claims against defendants. United States v. Torres, 845 F .2d 1169 (2d Cir. 1988). It could be looked at that Mr. Gilbert's abrupt illness was no more than a strategy to keep him out of court; with knowledge that Mr. Gilbert testimony would be critical as principle to Brown's case.

On January 20th, 2018 C/o J. Gilbert initiated misconduct, precisely "charges Class (1, # 16) Fighting, and a Class (1, # 40) Presence in an unauthorized area. Assigned to ("A-A"), a population pod; inmate Allen and another inmate Mr. Figueroa was found in the detail closet together. When Mr. Gilbert allowed Mr. Allen to come out; it was noted that Mr. Figueroa had a "large cut" on his head, and blood on his shirt. ("CC T.V.") reviewed that it was apparent that inmate Allen entered the detail closet with intent, demonstrated by his physical actions in looking around to ensure staff would not see him enter the detail closet. Subsequently Mr. Allen started at the "block phone" where he pretended as though he was using the phone. The misconduct alleged that Mr. Allen cornered Mr. Figueroa in the closet where Mr. Figueroa was performing his job duties.

As a result of the targeted trap, Mr. Figueroa sustained a cut on his head. Mr. Allen's shirt was "stained," and "saturated with blood." Consequently Mr. Allen plead guilty at his hearing; in retrospect predicating that he & Mr. Figueroa were only horse playing. However Mr. Allen's deceptive strategy conflicted with the ("CCTV") video monitoring. The ("CCTV") reviewed his deceptive behavior outside the closet prior to entering. The preponderance of evidence supported that Mr. Figueroa may had been hit in his head with a lock; causing a laceration to whom "stained" Mr. Allen's shirt and chin with congeal blood, even assuming otherwise; If Weighed on ethical grounds at the round-table, the misconduct raises hairs on necks.

First Mr. Allen uses his prison experience to maneuver his way In a detail closet undetected; Mr. Allen also created deception, synonymous upon acting as though he had to use the phone. Mr. Allen looked around then slipped into the closet simultaneously invading Mr. Figueroa's work space. The ("CCTV") was also "key," detecting Mr. Allen's physical actions. Although only Mr. Allen and Mr. Figueroa knows' what happened in the closet; one can conclude that MR. Figueroa was assaulted by a lock, saturating Allen's T-Shirt with blood stains.

The missing witness inference is based on the simple proposition that if a party who has evidence which bears on the issues fail to present it, it must be presumed that such evidence would be detrimental to

his cause. According a fact fact finder could infer that the missing witness's testimony would have been adverse, or, at the least, not helpful to the party who declined to produce the witness.

When a potential witness is available to only one of the parties to trial, and it appears this witness has special information material to the issue, and this person's testimony would not merely be cumulative then if such party does not produce the testimony of this witness, the jury may draw interference that it would have been unfavorable. See Commonwealth v. Peifer, No. 197 WDA 2001, slip op. at 5, quoting Commonwealth v. Boyle, 1999 PA Super 142, 733 A .2d 633, 638 (Pa. Super. 1999). United States v. Torres, 845 F .2d 1169 (2d Cir. 1988). The Second Circuit Court of Appeals held that a trial court could exercise its discretion to give a missing witness charge when "a party has it peculiarly within his power to produce witness whose testimony would elucidate the transaction," yet fails call those witnesses.

In this case, the government failed to secure the witness Mr. Gilbert at trial; somehow the witness fell sick on the same day he was due to testified. (t. P 391). Due to the circumstances the witness relationship more fundamentally in connection to the misconduct that send Mr. Allen to the ("RHU"), just days leading into the sexual assault on Brown. At the time Mr. Gilbert was and is an employee of the Department of Corrections; and had been subpoenaed to testify at the trial to whom would make him available to the defendants. It was in the power of the court to (1) compel Mr. Gilbert's testimony or (2), stayed the testimony for another day. Mr. Gilbert testimony was relevant; not limited to "shine light on Mr. Allen's propensity for violence," also concerning his character for truthfulness or untruthfulness; and prison experience.

VIII. Brown raised the issue, production of document (Doc 85, 86, 91, 104, 105, 108, at 2, 109, 178, 179, and 181) concerning policies relating to classification and housing inmates, P.R.A.T. policy, the unsworn Declaration of Mr. Jason Stouffer and or security concerns under DC-ADM-003 did not outweigh the significance and critical relevant information, not limited to identifying sexual predators; and criteria that staff shall careful review when considering Z-code, characteristics of inherently aggressive inmates. Brown also challenges the District Courts in limine order (t. ref. 1051). The district ___ in ___ imparted with an order by

*[illegible faded text, approximately four lines]*

---

The general framework for determining the scope of allowable discovery for cases in federal courts is provided by Fed. R. Civ. P. 26, which provides that parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. Feb. R. Civ. P. 26(b)(1). As an initial matter, therefore, all relevant material is discoverable unless an applicable evidentiary privilege is asserted. The presumption that such matter is discoverable, however, is defeasible. Rule 26(c) grants federal judges the discretion to issue protective orders that impose restrictions on the extent and manner of discovery where necessary to protect a party or from annoyance, embarrassment, oppression, or undue burden or expense.

Fed. R. Civ. P. 26 allows for two approaches to seeking the protection of sensitive-but relevant-information. A party seeking to protect the confidentiality of such information may argue that the information is protected by an evidentiary privilege. Any material covered by a properly asserted privilege would necessarily be protected from discovery, pursuant to Rule. 26(b)(1). Where such a privilege is not available, a party may petition the court for a protective order that limits discovery in accordance with Rule26(c). The court, in its discretion, is authorized by this subsection to fashion a set of limitations that allows as much relevant material to be discovery as possible, while preventing unnecessary intrusion into the legitimate interests-including privacy and other confidentiality interests-that might be harmed by the release of the material sought.

Brown requested department policy 11.2.1 reception and classification, including, but not limited to, the Prison Rape Assessment Tool, or ( PRAT, The caveat is precisely the documents were sought as interrelated to classifications of all inmates; and in compliant with PREA. Brown's initial request derived through her "Production of Documents" directed to Defendants. (Doc. 86, Exhibit A, C). Brown articulated her first "Motion to Compel Discovery" with accompany Brief (Doc. 85, 86, P. 1 ),(Doc. 104, 105) Brown claimed she was forced in a corner cell furthest from the bubble in the, "restricted housing unit," with a lifer that, a lifer that exhibited dangerous and predatoral behavior arousing from sexual desires. Desires that were not being meat as a lifer. At the time Mr. Allen had "(77) misconduct, (4) of whom were sexual related, inter alia a program (code Y), subsequently Brown to whom at "housing concerns" listed in the unit management system had (8) misconducts none of whom were sexually related or violent; most of her misconducts were for refusing a cellie out of fear.

The (PRAT) policy was welcome from the very fact that this is a classification case. The procedure that was utilized to compel Brown with Mr. Allen is relevant to Brown's case; as is the caveat that was Brown's experience while in the cell with the lifer. Assuming the policy reveals'

the "screening process" and "double celling" procedures, how custody level are assigned; and how does the policy relates' to the (008) policy for any indication of a history of sexual victization, or sexual predator behavior, and facts regarding, characteristics of an inmate who may be targeted as a "victim or pray."

Conversely how inmates identified by the power to be as "sexual predators" are assigned a Z-Code; which is a designation that requires single-cell status. Brown bolsters the policy relevance pursuant to if the (PRAT) target their screening system for Z-Code, at sexual predators, or victims, or both? Also interrelated is, dose the policy establishes certain criteria considering a inmate for Z-Code? In accordance with the (PRAT), who reviews the inmate, and reviews their available records to determine an appropriate housing assignment; and how are inmates involve in this matter per preference and accommodations? Brown also sought the policy to consider if it exhibits for officials double celling conditions, and reporting issues with double celling; not limited to potential imbalance of power between cellmates and or how to detect such issues per training.

If scrutinized, Brown's motion to compel (Doc. 85, 86, P. 1), (Doc. 104, 105), may not had specified how the (PRAT) policy is relevant to her claims against the government; leaving the District Court no option but to denied the motion. See (Doc. 108). Inasmuch, the responses sought must comport with the traditional notions of relevancy and must not impose an undue burden on the responding party. See Hicks v. Arthur, 159 F. R. A. 468, 470 (E. D. Pa. 1995). Consequently defendants brief in opposition to plaintiff motion to compel (Doc. 91 p. 6), defendants objected for different reasons as to why Brown should not be allowed the (PRAT) policy.

"Plaintiff has violated Rule 5.4©, as he has not provided a copy of the Defendants' various objections." Defendants also objected for security and safety concerns that would be associated with releasing to inmates; pursuant to manipulating placements or classifications. (Doc. 91 p. 6).Defendants (Doc 109, p. 1-4) Unsworn Declaration of Mr. Jason Stauffer, is associated with similar concerns.  First Brown addresses her lack of ability to specify how the (PRAT) policy is relevant to her claims against defendants. Brown argues' she is a pro se litigator, if her complaint and discovery requests are liberally construed; such "action opens the way for the upward climb, removing many obstacles from her path." Derived from "The Prosperity Bible" Pg. 58.

Second: the District Court did not rule on relevance; for example the June 4th, 2020 order (Doc. 108, p. 2) acknowledged Mr. Stauffer's declaration as it relates to "preserving the confidentiality of the communications concerning the policies relating to classification and housing inmates." Consequently the District Court cited; U. S. v. O' Neill, 619 F .2d 222, 226 (3d Cir. 1980). But it appears O' Neill may favor Brown scene in U. S. v. O' Neill, 619 F .d 222, 226 (3d Cir. 1980), the Appellant Court vacated the District Court's order; the court found that the manner in which appellees asserted the claim of privilege was unsatisfactory. Furthermore the District Court had a open door to recover; as Brown presented the issue after her release from

the (DOC) see (Doc. 178, 179). As ." Defendants previously objected for security and safety reasons. (Doc. 91 p. 6). Brown's release should had moot any security and or safety concerns.

Assuming Brown's argument is still on relevance; as to what is the component linking the set policy relevant to Brown's claims . Brown claimed she was forced in a corner cell furthest from the bubble in the, "restricted housing unit," with a lifer that, a lifer that exhibited dangerous and predatoral behavior arousing from sexual desires. Furthermore, there is a substantial risk of sexual assault when inmates with certain characteristics are housed together. Second: can Brown point to any case in the Third Circuit to whom a inmate claimed sexual assault via cellmate, and a subsequent revealance of the (PRAT) supported on the merit? See Coleman v. Wetzel, 2019 U. S. Dist. LEXIS 120719.

Brown urge' that the District Court error at the very least, failing to provide Brown access to part of the (PRAT) policy they believe is relevant. The Court also error in "preserving confidential privilege" at the very outstretch of Mr. Stauffer's concerns of manipulation of the tool to cause inappropriate housing, (Doc. 109, p. 1-4). Brown at the time was already "sticky tag a P. C." inmate by the (DOC). *Ms. Butterbaugh agreed that the P.R.A.T. is the PREA Risk Assessment Tool, and when the P.R.A.T is conducted inmates are required to participate pursuant to the P.R.A.T. questions for reasons of (Tr. Tri. P. 432), substantive evidence, also relevant is that the (PRAT), policy may lead to other discovery of admissible evidence, like does the policy establish that Mr. Allen or Brown required a Z-Code at the time; or review information pursuant to the DC-46 vote sheet; additionally not limited to the roll the IRC members played;* for example it would be relevant to know who all participated in the DC-46 voting, and if it played any roll into Browns cell assignment. "There is a 'special danger' in permitting state governments to define the scope of their own privilege when the misconduct of their agents is alleged." ACLU v. Finch, 638 F .2d 1336, 1344 (5th Cir. 1981); see also Longenbach, 750 F. Supp. At 180-81 ("Nor does it make sense to allow the state, under whose color of authority officers have allegedly violated rights, to limit unilaterally the availability of evidence."). Federal Rule of Civil Procedure 34 instructs that parties are only bound to produce documents already in existence or in their "possession, custody, or control." See generally Harris, 271 F. R. D. at 371.

The District Court also error when they denied Brown's Motion to compel with respect to Mr. Allen's (IRC) Initial Reception Committee, and ( ICAR) Cumulative Adjustment Records as irrelevant. During the District Court order dated June 4, 2020; the court concluded that Mr. Allen IRC documents were irrelevant. (Doc. 108, p. 2(a), 3(b))(Doc. 104, 105). Brown requested document of the Initial Reception Committee (IRC) as it relates to at least six months leading to Browns' victimization hand over. Brown also requested that Mr. Allen's ICAR records be made available.

First Brown arguer's that the documents were relevant as the records leading to other discovery of admissible evidence. The (IRC) team could consist of management staff, PRC staff, unit manager, and counselors, medical and psychotic staff. The entire (IRC) handles cell assignments, review's characteristics, furthermore evaluate behavior, and inmates risk for victimization, not limited to treatment. The team also addresses inmate's misconducts and grievances, or may have access to such. The (IRC) team creates and encounters inmates for different reasons. Some of these encounters are

documented via the inmate's (ICAR), medical and psychiatric notes, grievances and misconducts reports and or responses.

With that score, Brown argues that all documents consistent with Mr. Allen's encounters with members of the (IRC) team is relevant at least within that six month period; inasmuch the documents may also lead to other discovery of admissible evidence. For example Brown's (Phase 1, package 11, Exhibit 48) a single page of Mr. Allen's Cumulative Adjustment Record reveals that on February 2nd, 2018, just a day of being with held with the inmate; Mr. Allen had a encounter with a counselor Yost demanding a Z-Code; consequently the counselor replied that " there was no reason for a Z-Code." Brown initial discovery request, upon defendant's response under their (DEF) system, a page labeled (DEF000101) was presented "redacted" preventing viewing of any content. Furthermore, (Doc. 108, p. 2, 3(a)(i)) establishes that the District Court ordered removed from the documents Brown sought (DEF000101-114), base on "confidentiality, or security concerns during an in camera submission." For better understanding Brown should note that Defendants produce an unredacted copy after the briefing stage of the case as a sagacious strategy to utilize documents Brown did not have access to at the discovery stage; and or preventing Brown from meaningful discovery.

Had Mr. Allen's Cumulative Adjustment Record been produce at the discovery stage, it would had open advancement to consequence meaningful discovery; for example did the inmate put on paper via a grievance, or DC-135 directed to any (IRC) members requesting a Z-Code or rejecting cellies? Or did he raise these issues with psychiatric officials; likewise did the inmate make vague threats to harm cellmates? What was the circumstances surrounding the production of his" initial Z-Code?' In a letter Dated May 15, 2018, (Doc. 109), Defendants established the (IRC) refers to an "evaluation that is conducted when inmates is transferred to a new facility." Concluding that Mr. Allen was transferred in 2009 to SCI Huntingdon, Brown argues that that may be of ramification. However it is important to acknowledge that (IRC) are not limited to an evaluation conducted upon arrival to a facility; nor are documents limited; adding to inmate grievances, misconducts, request of staffs, criminal history, inmate's (ICAR), medical and psychiatric notes; Brown's substantial rights to these documents some of relevance and critical, outweighs security concerns under DC-ADM-003.

For the sick of arguendo, defendants objected to Brown's request for these records in their opposition to plaintiff's motion to compel discovery, (Doc. 91, p. 4,5), see DC-ADM-003 "release of information policy; also see defendants initial response to Brown's production of document let's call it an (extension of Doc. 91, p. 4-6). Pursuant to DC-ADM 003, Release of Information, inmates are not permitted access to the records of their fellow inmates. The policy states in relevant part, "[a]n inmate is prohibited from receiving inmate information pertaining to another inmate other than him/herself." Section IV(A)(5)."When there are federal law claims in a case also presenting state law claims, the federal rule favoring admissibility, rather than any state law privilege, is the controlling rule." Wm T. Thompson Co. v. General Nutrition Corp., 671 F .2d 100, 104 (3d Cir. 1982). Accordingly material relevant to both federal and state claims, Rule 501 directs the appellant court to apply federal privilege law.

Federal privilege law, as conceived by Rule 501, is determined by "the principles of common law as they may be interpreted by the courts of the United States in the light of reason and experience."



However in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law. Thus, Federal Courts are to apply federal law of privilege to all elements of claims except those as to which state law supplies the rule of decision.

In Brown's initial production request, as a result defendants produced a plethora of redacted documents; one of whom under their "(DEF) system" labeled (DEF0000101). (Doc. 108, p. 2, 3(a)(i)) establishes that the District Court ordered removed from the documents Brown sought (DEF000101-114), base on "confidentiality, or security concerns during an in camera submission. For better understanding Brown should note that Defendants produce an unredacted copy after the briefing stage of the case as a sagacious strategy to utilize documents contents Brown did not have access to at the discovery stage. Currently labeled (Phase 1, package 11, Exhibit 48) a single page of Mr. Allen's Cumulative Adjustment Record. Brown concede that Mr. Allen's ( ICAR) Cumulative Adjustment Records in its entirety is also relevant as it lay the foundation as to how at the very lease the (IRC) team conceived him as it relates to assaultive or sexually predatory behavior; and it appears reasonably calculated to lead to the discovery of other admissible evidence. Relevance can be "construed broadly," see ppenheimer Funds, v. Sanders, 437 U. S. 340, 351, 98 S. Ct, 2380, 57 L. Ed. 2d 253 (1978); also see Paluch v. Dawson, 2008 U. S. Dist. LEXIS 60908.

Defendants argument that Brown had violated Rule 5.4© is moot; as the District Court did not acknowledge that argument, nor did defendants object to (Doc. 108).

While normally an objection to the admission of evidence must be raised at trial to be preserved, this court will sometimes permit evidentiary question to be preserved by a motion in limine, see American House Assurance Co. v. Sunshine Supermarket, 753 F .2d 321 (3d Cir. 1985). A determination that the objections were preserved by a motion in limine requires an evaluation of the extent of the briefing on the motion in limine, and the definitiveness of the district court's ruling on the motion. Brown initiated a motion to renew Motion in Limine with accompany brief. (Doc. 178, 179), also see Brown's initial Motion and accompany brief. (Doc 149, 151-154). The court concluded Brown's first issue sought as moot pursuant to the a diagram. See (Doc. 183). Brown second issue sought was the allege video tape to whom the court acknowledged had been ruled as no such video exist. (Doc. 100, at 1) the request was denied without prejudice. Assuming that issue is set aside, as it is already being raised on appeal.

"<u>In addition,</u> Brown requests that the court preclude the defendants from referring to his own criminal and disciplinary history at trial. In the alternative, Brown requests greater access to information concerning the criminal and disciplinary history of his alleged inmate assailant, Kaheim Allen. Further, Brown requests disclosure of the Department of Corrections Inmate

Reception and Classification Policy." (Doc. 183).

Brown initiated multiple Motion in limine to exclude certain records, with her Pretrial Memorandum. These records were filed on May 25, 2021. (Doc.148), (Doc 149, 151-154). Brown's Motions were denied without prejudice; upon plaintiff's right to refile if unsuccessful insecuring counsel.(Doc. 155). Brown initiated a motion to renew Motion in Limine with accompany brief. (Doc. 178, 179). Thus Brown introduces the record as a hold not limited to (Doc. 178, 179).

First Brown addresses her Motion in Limine to exclude her criminal records. Brown was convicted with "Aggravated Harassment and Burglary" in 2016. Brown requested that the records be excluded at trial, citing Walker v. Horn, 385 F .3d 321, 332-35 (3d Cir. 2004)(noting exclusion of convictions for assault; firearms violations and terroristic threats on the grounds that their prejudicial effect was greater than their probative value.. However due to a non jury trial; the issue that was Brown's criminal convictions as a principle were not utilize for impeachment or credibility reasons by the defense.

After trial in this matter, in a memorandum dated March 3, 2023, the court entered judgment in favor of the remaining individual defendants. The court erred when they considered word by word, "Brown's criminal history "marked by violence." "In Allen's case, he was serving a life sentence for murder." "Moreover, like Brown, Allen had amassed a significant disciplinary history.""While Brown noted that this disciplinary history included instances of sexual misconduct, it appears that these disciplinary citations involved alleged sexual harassment of female prison staff." Thus the footnote quotation confirms that the District Court considered Brown's criminal conviction to justified or point out similarity as to why Brown was withheld with Mr. Allen. Pursuant to Rule 26 Fed. R. civ. P. defense must produce in discovery what they intent to offer at trial. Fed. R. Civ. P. 26(b)(1). Bistrian v. Levi, 448 F. 5upp. 3d 454.

At Brown's Motion in limine to exclude criminal conviction; the court did not rule on her initial motion on the merit. (Doc. 155). Upon Brown's motion to renew Motion in Limine with accompany brief. (Doc. 178, 179), the court deferred to rule in excluding Brown's convictions; only to consider Brown's record to justify or point out similarity as to why defendants withheld Brown with Mr. Allen. Brown argues that admission of her criminal record was more prejudicial than probative and must be excluded under Rule 403 of the Federal Rules of Evidence. See J. H. Cruz, 2022 U. S. Dist. Lexis 233664. Plaintiff Motion in Limine sought to exclude evidence of Defendant's Cruz's acquittal.

Second: Brown intended to exclude the conclusion of the PREA investigation. Brown conveys' that one of the defendant Mr. Maxwell conducted a PREA investigation. Brown transcended that the conclusion of the report is not "trustworthy," and that "self- interest" function in retrospect may had been the derivative that was the conclusion. (Exhibit 1of 3, & 1 of 4),(Summary Judgment Exhibits). See Klein v. vanek, 86 F .Supp .2d 812, 820 (N. D. 111 . 2000)(Police investigator's conclusion that plaintiff was not credible held not admissible as a public record because of lack of trustworthiness. Defendant Mr. Maxwell and others had self-interest to conspire & bolster an inadequate inconsistence investigation, possible bias, because not only were they involved, but conveys' disciplinary actions, criminal prosecution, and law suit; Brown many legal boxes also made it obvious.

The vitality of Mr. Maxwell's investigation were statements from the (10) (DOC) employees, but Brown can point to numerous inconsistencies with staff statements. First Mr. Maxwell claims that Brown referred to Mr. Allen as Adam (Summary Judgment Exhibit 72), when other records exist around the

time, to whom Brown identified Mr. Allen as "Allen." Mr. Kendrick statement, "Kendrick made numerous rounds, Brown had told him he wanted a single cell; because of mental and physical issues' Brown told him he tend to eat and play with his feces which bothers his celly, I told Brown if he refuse he will receive a misconduct."

But if a misconduct relief's Brown of a cellie; consequently Brown was synonymous with refusing cellies around that time, one must conclude in a common sense manner that on February 5th, 2018 Brown first encounter with Mr. Kendrick while in cell 108; Brown would had happily taken a misconduct. It appears unlogical that Brown would wait until February 8th, 2018 to receive the very same misconduct if her goal was to be in the cell by herself. What make sense is defendants' compelled Brown to live with Allen despite underline circumstances; for example, Sgt Heaster witnessing Brown's mental issues days prior; Brown had requested to be moved to various officers (Exhibit 71). Defendants gived Brown a misconduct on February 8th, 2018 because it was determined that force would not be used to force Brown back into cell 108.

Mr. Johnston's statement is saturated with inconsistency. "Brown did ask me to be move but we already had cell moves done." "Another thing I remember about Brown, he had a bloody nose, ask to see medical, wanted different sheets and wanted another jumpsuit.""Medical was doing rounds at that time, so I informed them also."(Exhibit 77). Mr. Fochtman statement "I never saw the nose bleed but he did report to a trainee he had a nose bleed." It should be noted that, Mr. Fochtman proclaimed that he exchanged Brown linens and jumpsuit. It should also be noted that Mr. Fochtman was the only official that claimed Brown and Allen asked to move to see the T.V., but did not make apparent if this request was made around the time of the alleged nose bleed. Also see (Tr. Tra. P. 469). (Exhibit 69). Mr. Chilcote statement "Brown did not ask me to move to a different cell, but Brown told me he was moving because the unit manager saw him eating feces and told him he was moving so he was under the impression he had a z-code ."

The investigator claim that Brown did not provide a statement, contrary to Mr. Orndorf statement, (Summary Judgment, Exhibit S ), and Brown concedes that she was interviewed by a trooper Lear with the State Police, but it was very brief. No inmate witnesses or summaries of interviews of other inmates as eye witnesses were never presented to whom may conflict defendants statements, (Tr. Tra. P. 457,458); (Phase 1, Package 11, Exhibit , 44), a sign statement from Shae Delgrosso s; consequently SCI Huntingdon has a vast network of surveillance cameras that capture most everything that takes place within the facility, however no ("CCTV") footage exists. (Tr. Tra. P. 460). Inmate Allen's (ICAR) was never consider. One may speculate what if the investigation was conducted by Brown?[4] In Lewis v. velez, 149 F. R. D. 474 (S. D. N. Y. 1993), the court held that incident reports generated by correction officers were not admissible under Rule 803(6) because they lack reliability.

Brown also dispute that her (Summary Judgment Exhibits 99, 100) should be excluded. Fed. R. Evid. 803(4) governs admissibility of medical records. A hearsay exception for a statement made for medical diagnosis or treatment, which is defined as follows: A statement that {A} is made for- and is reasonable pertinent to medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause. Nurse trice statement on the night of 2/13/18 that "Brown had refused treatment, Brown refused because she wants to be seen by a doctor, and refused photos, Brown did not have any apparent injuries; and nurse Emigh; "Nursing Assessment, no injuries observed by this nurse, pictures taken of inmate as inmate allowed. Brown contest that the statement are hearsay and not inadmissible under the hearsay exception of F.R.E.

Brown's original Summary Judgment (Exhibits 1-102) is numbered differently from Brown's Trial Exhibit list.

30

803(4), because defendants failed to establish that Brown made the statements; as Brown claims she never refused treatment or photos, nor did Brown refused due to lack of doctor.

With that score, defendants also failed to establish that the statements were made for purposes of medical diagnosis or treatment and fall within the exception of F.R.E. 803(4), and or purposes of impeachment under F.R.E. 613(b). See Kennedy v. Norfolk Southern Ry., 2008 U. S. Dist. LEXIS 29154 (W. D. Pa. April 8, 2008) statement with unknown sources in a medical record are not automatically admissible as part of business record. Also for impeachment purposes, it is axiomatic that a plaintiff cannot be impeached by a purported statement she did not make.

Thus Nurse trice statement on the night of 2/13/18 that "Brown had refused treatment" may be admissible; to the contrary a statement as to fault may not be admissible such as, "Brown refused because she wants to be seen by a doctor, and refused photos, Brown did not have any apparent injuries." Brown claims that Nurse Trice had a motive to set forth facts in the light most favorable to her co-workers. (Summary Judgment Exhibit 100) Statement made by nurse Emigh; "Nursing Assessment, no injuries observed by this nurse, pictures taken of inmate as inmate allowed" should be excluded. While a medical record generally constitutes hearsay, it may be admissible if it meets the requirements

FRE 803(6) provides ; A record of an act, event, condition, opinion, or diagnosis is admissible hearsay if (A) the record was made around the time, (B) the record was kept in the course of a regularly conducted activity of a business, (C) making the record was a regular practice, (D) all these conditions are shown by the testimony of the custodian, (E) the opponent does not show that the source of the information indicate a lack of trustworthiness. The prinpal precondition to admission as business records pursuant to Fed. R. Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable. United States v. Consolidated Edison Co., 580 F .2d 1122, 1131 n. 18 (2d Cir. 1978), and even though the foundation for their receipt is laid by a witness who is not an employee of the entity that owns and prepared them.

While authority on the trustworthiness of medical opinion is scarce, courts have found medical opinions to be untrustworthy under Rule 803(6) when the information in the opinion came from the patient, rather than the doctor, when the source of the information is unknown. See 2 MccoRMICK on EVID. 293 (7th ed.) ("Where indication of lack of trustworthiness are shown, which may result from a lack of expert qualifications or from a lack of factual support, exclusion is warranted."). Pursuant to Rule 803(8)© requires that the district court to determine if the "source or other circumstances indicate lack of trustworthiness." Because a trustworthiness evaluation might involve calling the author of the fact-finding or his staff members to permit parties to impeach their work, the need for judicial confidentiality makes judicial finding unsuitable for this scrutiny. The non-exhaustive factors indicating trustworthiness include: (1) the timeliness of the investigation; (2) the investigator's skill and experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation.

Nurse Trice encounter with Brown on February 13th, was brief, as an essential component Brown agreed to leave the cell, and was taken to a ("RHU") cage doors down from Mr. Allen's cell. Ms. Trice also acknowledged having a digital camera at hand, but opted not to record Brown's alleged refusal contrary to practice. Brown dispute that she refused any treatment; inasmuch no tool were utilize to evaluate Brown.

The Court error when they denied Brown access concerning the operation of "CCTV," monitoring and recording policy. The court did not give Brown access to (Facility Security Procedures Manual 6. 3. 1 policy), section 42-operation of (CCTV) monitoring and recording (Doc. 85, 91, 108). Although this is a confidential policy and procedures manual governing certain aspects of the DOC's

institutional operation; the documents are relevant because it pertain to DOC's policies and procedures for video recording and monitoring.

SCI Huntingdon has a vast network of surveillance cameras that capture most everything that takes place within the facility. G-Unit is the restricted housing unit, ("RHU") with four Quads. G-A-Quad housed Brown and Mr. Allen in cell 108 . It was established that G-A-Quad had surveillance cameras, at high ankles capturing everything outside inmate's cells.(Tr. Tra. P. 347).

Brown argues that under Federal Rule of Civil Procedure 26(b)(1) defines the permissible scope of discovery; that parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claims, and proportional to the need of the case. See Thuy v. Gilmore, 2019 U. S. Dist. LEXIS 220300. During discovery, Brown made multiple attempts to obtain video monitoring (CCTV") footage from February 3rd, through 8th, 2018. (Doc. 85) It was alarming and somewhat troubling that during the investigation of Brown's claims of victimization, there wasn't any ("CCTV") footage retrieved to utilize and or collect as evidence. What also raised suspicion was the fact that Brown requested that defendants preserve all ("CCTV") footage from February 2nd, through February 13th, the filing date an administrative grievance. Brown transcend that the materials would likely contain information relevant to how *retention preservation works*.

IX.    Brown raised the issue that defendants withheld "key" discovery during discovery to whom violated Rule 26 of Fed. R. civ. P. Brown's "medical records in its entirety," Brown's "Cumulative Adjustment Record in its entirety," Brown's "misconduct history." The Trial Judge erred by overruling Brown's objection as to the non disclosor of specific records at the discovery stage. The evidentiary ruling resulted in the allowance of medical records entered to support Ms. Trice testimony.

(Defendants exhibits 14, pages 13, 78, 82, 83, 84,) were admitted and used as substantive evidence, and impeachment purposes Knowing the defense; the records were also submitted with instructions that Defendant put at his advantage documents were provided

> *... exhibit ...*
> *... §2. ... ... (Defendants exhibit 47*
> *this product ... and this information was NOT*
> *... at trial, but substantial need for*
> *... substantive evidence and to any and all information used for*
> *proving the defense of how a perceived product that*
> *Brown engaged in completing Mr. Plaintiff after the*
> *Initiation of (exhibit 49). (Defendants exhibit 57)*
> *Brown's ICAR was also admitted and used as*
> *substantive evidence during Ms.Richard's testimony*

Under Federal Rule of Civil Procedure 26, a party must disclose certain information within discovery, including "the name... of each individual likely to have discoverable information' and copies "of all documents... that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses." Fed. R. Civ P. 26(a)(1)(A). Further, the party must supplement or correct its disclosure responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). The failure to timely disclose discoverable information results in "the party is not [being] allowed to use that information or witness to supply evidence on a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). See Lopez v. Mulligan, 2018 U. S. Dist. LEXIS 1285.

Rule 26(a) and 37(c) makes clear, that failure to disclose or supplement **records/medical/misconduct/ICAR records bars** a party from using such information. Without adequate notice of such information, Brown was substantially prejudiced under Federal Rule of Evidence 403 when such information was admitted at trial.

District courts provide magistrate judges with particularly broad discretion in resolving discovery disputes. See Farmers & Merchs. Nat'l Bank v. San Clemente Fin. Group Sec., Inc., 174 F. R. D. 572, 585 (D.N.J. 1997). When a magistrate judge's decision involves a discretionary [discovery] matter..., "courts in this district have determined that the clearly erroneous standard implicitly becomes an abuse of discretion standard." Saldi v. Paul Revere Life Ins. Co., 224 F. R. D. 169, 174 (E. D. Pa. 2004) (citing Scott paper Co. v. United States, 943 F. Supp. 501, 502 (E. D. Pa. 1996)). Under that standard, a magistrate judge's discovery ruling "is entitled to great deference and is reversible only for abuse of discretion." Kresefsky v. Panasonic Communs. & Sys. Co., 169 F.R.D. 54, 64 (D. N. J. 1996); see also Hasbrouck V. BankAmerica Hous. Servs, 190 F.R.D. 42, 44-45 (N.D.N.Y. 1966) (holding that discovery ruling are reviewed under abuse of discretion standard rather than de novo standard)

Brown raised the issue that defendants withheld "key" discovery during discovery to whom violated Rule 26 of Fed. R. civ. P. Brown's "medical records in its entirety." **Specifically (Defendants exhibit's 14, pages 13, 78, 82, 83, 84,)** Brown's objection to defense exhibits during nurse Trice testimony was overrule by Honorable Carlson. (Tr. Tra. P. 116,124,487). The records were also admitted with instructions that defendants provide when the documents were provided at the discovery stage(T. P. 124). Nurse Trice also proffered testimony relevant to the cited exhibits; for example nurse Trice testified that she had an encounter with Brown on February 13th, 2018. "Brown had refused treatment', Brown refused because she wants to be seen by a doctor', and refused photos, 'Brown did not have any apparent injuries. 'Furthermore "Brown stated he was ok because he was in a single cell." (Tr. Tra. P. 109,110,111).

The defense admitted (Exhibit 14, page 84), specifically nurse Tice depiction to (Exhibit 14, Pg. 84), (T. P. 117). Was that "Brown claim he was being abuse by his cellmate; had inmate remove from his cell and taken to the psyche office." "I spoke with him regarding a sick call slip." "He claimed he was abused, punched and strangled." "No burses or marks around neck were noted or evidence of the alleged allegations, no acute distress noted." "Inmate refused to be taken to medical to be assess by me and stated he is only be seen by the doctor." "Inmate refused to have photo taken and that he was find being housed alone and did not want a cell mate." (T. P. 111). Consequently, the defense admitted (Exhibit 14, pg. 13, 78, 82, 83) nurse Tice testimony was critical sense it was predicated of relevance and credibility not limited to outlay about Brown's allege refusal of an HIV antibody test on February 15th, 2018; and consequence alleged refusal of treatment on February 14th, an encounter with nurse Emigh, an alleged encounter with nurse Gessel on February 14th pursuant to "needs to sick call," (Exhibit 14. Pg.82). Witness Tice also proffered testimony as to Brown refusing care on February 23rd, 2018.

Appellant's initial Production of Document request put defendants on notice that she sought medical records, documents, electronically stored information, and tangible things that the disclosing party has in its possession. Brown's request was consistent with Rule 26(a). See Brown's initial request derived through her "Production of Documents" directed to Defendants. (Doc. 86, Exhibit A, C).Defendants through a (DEF) system send Brown requested discovery documents, most of whom redacted, but none of the documents enclosed resembled any documents form (Defendants Exhibit, 14).For a visual understanding as to what was send by defendants through a (DEF) system relating to medical records, look to (Brown's Summary Judgment Exhibit 74-86, 99, 100). Brown's summary Judgment is (Doc. 92-95,) Brown's Summary Judgment Exhibits are (Doc. 96, 97). Although multiple discovery motions were articulated after Brown initiated her Summary Judgment (Doc.100, 104,105, 108, 109), as a substantial question, Brown establishes that defendants did not disclose their trial

5

---

[5] It does not appear that Brown sought to Compel specific medical records, nonetheless it was the defense responsibility to disclose their (Exhibit 14, P. 13, 78, 82, 83, 84); see (Doc. 85, 86).

Exhibit, (Defendants Exhibit, 14).

For example defendants send Brown documents through smart communication by way of their (DEF) system. See (Extension of Doc. 91), (Defendants Responses to Plaintiff's Request for Production of Documents) they verified disclosing (PSP) report as (DEF000139-DEF000147). Also see Brown's unmark exhibit, (Plaintiff's Supplemental Request for Production of Documents), the document is relevant as it relates' to citations of a plethora of documents that appeared to be redacted. Not limited to DEF000014,15, 85-88,103,105,106,110,119,123,45,53,58-72,74. In an order dated June 4th, 2020 (Doc. 108) Honorable Jones directed defendants to remove from their (DEF System, 8-138) "pages identified as DEF000045,51-53,57-72,101-114,121-123 for either confidentiality and/or security concerns;' pages identified as DEF000020,50,54-56,74,85-92,119 and 120 redacted to the extent they contain confidential, security, or irrelevant information." It was also ordered that" pages identified as DEF0008-19,21-44,46-49,73,75-84,93-100,115-118, &124-138 be deliver," upon scrutiny for sensitive information. (DEFoooo74, 103,105,106,110,118,119,124,) appears to relate to mental health or medical documents.

As an essential component, Defendants did not disclose Brown's medical record at or around the time of the June 4th, 2020 court order (Doc.108), see (Defendants Exhibit, 14, P. 13, 78, 82, 83, 84). Consequently parties were ordered to file a pretrial memorandum by May 21st, 2021. (Doc. 140). Upon Brown's filings, the Motions were set aside due to Brown's Motion for Appointment of Counsel. (Doc 143, 144). Fed. R. Civ. P. 26(a) requires litigants to make certain disclosures. The disclosure mandates in Fed. R. Civ. P. 26 are given teeth by the threat of sanctions in Fed. R. Civ. P. 37. Rule 37(c)(1) provides that when a party fails to comply with the disclosure requirements in **Rule 26(a), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial,** unless the failure was substantially justified or is harmless. The advisory committee notes describe this as a self-executing sanction for failure to make a disclosure required by Rule 26(a), without need for a motion for sanction. Rule 37(c) advisory committee's note. Rule 37 (c)(1) further provides: In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, cause by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions. Rule 37(c)(1). See Vanderberg v. Petco Animal Supplies Stores, Inc., 906 F .3d 698.

At Trial defendants did not address their discovery deficiencies, yet upon being confronted by Brown, they argued that medical records were made available for viewing, and that it was Brown's responsibility to press the viewing of the records and or request via DC135; consequently upon instructions that defendants provide when the documents were provided at the discovery stage, the Court erred by overruling Brown's objection; without a substantial justification for defense failure to disclose, subsequently admitting the records, (T. P. 124), circumventing their own requirement. (Defendants Exhibit, 14).Rule 26(b)(1) entitles a party to "discovery regarding any nonprivileged matter that is relevant to any party claim or defense. A party is also required to supplement information disclosed pursuant to a discovery request "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect and if the additional or corrective information had not otherwise been made known to the other parties." See Bistrian v. Levi, 2022 U.S. Dist. LEXIS 53882.

Defendants did not seek Sovereign Immunity; however the doctrine of Sovereign Immunity does not shield state officials from sanctions for failure to fulfill its discovery obligations.

Defendants also violated its discovery obligations under the Federal Rules of Civil Procedure Rule 26(a) when they **failed to disclose Misconduct D031184, (Defendants Exhibit, 51), and misconduct D031797 (Defendants Exhibit 50), not limited to (Defendants Exhibit 49).** Brown in her initial request for Production of Document, requested all electronically stored information, any designated tangible things. (Doc. 85, 86, exhibit, A). Brown also requested documents to whom was non privilege. Although the docket is jaded with documents, it does not appear that any documents served prior to discovery closing resample's any of the cited misconducts; although Brown concede that (Defendants Exhibit 49 D031777) may be part of the investigative record; assuming it was disclosed during discovery; Brown contest that (Defendants Exhibits, 50, 51) did not fall within those boundaries. Assuming **the close of discovery derived from the June 4th, 2020. (Doc. 108).**

It appears that defendants disclosed most of their exhibits for the first time on June 27th, 2022, "some (753 Days)" after the close of discovery. See (Doc. 180). Brown's objection to defense exhibits was overruled at trial at the climax of Mr. Plocinik's testimony. (Tr. Tra. P. 250, 489,490). Brown raised the issue that defendants withheld "key" discovery during discovery to whom violated Rule 26 of Fed. R. civ. P. For example had defendants disclosed Misconduct D031184, (Defendants Exhibit, 51), and misconduct D031797 (Defendants Exhibit 50); simply put it may had lead to more discovery; not limited to interrogatories. Likewise For better understanding Brown should note that Defendants produced an unredacted copy of their initial discovery documents served, see (DEF System, 8-138) after the briefing stage of this case as a sagacious strategy to utilize "documents/ content" Brown did not have access to at the discovery stage. However to the contrary; Misconduct D031184, (Defendants Exhibit, 51), and misconduct D031797 (Defendants Exhibit 50) were introduced with a web of documents that were not available during the long standing discovery window. See (Doc. 180).

What is probative and relevant is that Mr. Plocinik testified that he was a victim of targeting, to whom was the ramifications of Misconduct D031184, (Defendants Exhibit, 51);(Tr. Tra. P. 264), sense the misconduct was pursuant to a radio found in Brown's belongings that belonged to another inmate. Mr. Plocinik cited a "conspiracy theory" that was saturated with a retaliatory scheme that interrelated a series of complaints and PREA claims Brown filed against him. (Tr. Tra. P. 265,266). Likewise, as an essential component Mr. Plocinik also articulated testimony that as part of a never ending retaliatory scheme, precisely he had ordered Brown to take a cellmate on February 13th, 2018; upon Brown's refusal as principle, derived misconduct D031797 (Defendants Exhibit 50); consequently As a retaliatory move, Brown initiated a sick call claiming victimization. See (Defendants Exhibit, 50); (Tr. Tri. 262,263). Also critical is that on cross-examination of Brown, the defense strategy derived from admitting multiple misconducts that they believe had interrelated Brown to indulge in targeting Mr. Plocinik; the documents were also utilized for impeachment purposes. See, Misconduct D031184, (Defendants Exhibit, 51), and misconduct D031797 (Defendants Exhibit 50).

To better illustrate as to what defendants disclosed to Brown during discovery pursuant to misconducts, Brown point's to (Defendants DEF System), (DEF000055, DEF000056). The two page

documents are consistent with (8) eight misconducts reaching from (Misconduct B209550, dated 9/29/17) to (Misconduct D031777, dated 2/8/18). Consequently Brown dispute that pursuant to Rule 26(a), and 37(c), only the misconducts disclosed at discovery would be admissible at trial. Brown also argues that the court errored when they considered Brown's misconduct history in its entirety; word by word, "Moreover, like Brown, Allen had amassed a significant disciplinary history.""While Brown noted that this disciplinary history included instances of sexual misconduct, it appears that these disciplinary citations involved alleged sexual harassment of female prison staff."

After trial in this matter, in a memorandum dated March 3, 2023, the court entered judgment in favor of the remaining individual defendants. Thus the footnote quotation cited above confirms that the District Court considered Brown's misconduct history in its entirety to justified or point out similarity as to why Brown was withheld with Mr. Allen. See (Defendants Exhibit 47) Brown's misconduct history in its entirety; Brown had accumulated (38 misconducts) by October 4th, 2021. Also see (Defendants Exhibits 58-75), but the footnote quotation undermines the fact that when Brown was withheld with Mr. Allen Allen had amassed (77) misconducts to Brown's (7).Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim of defense and proportional to the needs of the case." See Osagie v. Borough of State Coll., 586 F. Supp. 3d 314. To be subject to discovery information need not be admissible, so long as it "appears reasonably calculated to lead to the discovery of admissible evidence." Feb. R. Civ. P. 26(b)(1).

Defendants also violated its discovery obligations under the Federal Rules of Civil Procedure Rule 26(a) when they failed to disclose Brown's ICAR in its entirety at the discovery stage. See (Defendants Exhibit 57). To better illustrate as to what defendants disclosed to Brown during discovery pursuant to Brown's ICAR records; look to defendants (DEF system); (DEF000085-88). Likewise For better understanding Brown should note that Defendants produce an unredacted copy of their initial discovery documents served, see (DEF System, 8-138) after the briefing stage of this case as a sagacious strategy to utilize "documents/ content" Brown did not have access to at the discovery stage. Also see Brown's (Phase 2, Package 13, Exhibit 79, 80). Brown in her initial request for Production of Document, requested all electronically stored information, any designated tangible things. (Doc. 85, 86, exhibit, A, C). Brown also requested documents to whom was non privilege.

It appears that defendants disclosed most of their exhibits for the first time on June 27th, 2022, "some (753 Days)" after the close of discovery. This prevented Brown from seeking other discovery upon viewing her ICAR in it's entirety. See (Doc. 180). Brown's objection to (Defense Exhibit, 57) was overruled at trial by Honorable Carlson. As to the logistical content of defendants Ms.Richard's testimony would not be admissible to show the truth of the content in Brown's ICAR; pursuant to any date not consistent with what was made available to Brown at the discovery stage. See (Tr. Tra. P. 444, 489), from 12/5/17 through 2/16/18. Brown also objects to the ICAR record in its entirety; limited to what was made available to Brown during discovery. (DEF000085-88), also see Brown's (Phase 2, Package 13, Exhibit 79, 80) also see Brown's Motion for Summary judgment (Doc119-122), (Exhibits O, P, Q, R). It appears Honorable Carlson did not consider Brown's ICAR its entirety, (T. P. 489) sense Brown raised the issue as it pertains to Rule 26. So Brown's direct argument would be moot. (T. P. 489).

*[handwritten/faded text illegible]*

After trial in this matter, in a memorandum dated March 3, 2023, the court entered judgment in favor of the remaining individual defendants. The court error when they found and or admitted defendant Johnston testimony as credible. Brown points to inconsistency in defendant Johnston's testimony at trial to whom was ignored.

(March 3rd, 2023 Memorandum) "Brown testified that she had blood all over her linens and jumpsuit, and she requested new linens and a new jumpsuit from Johnston.' For his part, Officer Johnston testified that he was a CO Trainee (Tr. Tra. P. 28,38) working in the RHU on February 7, (Tr. Tra. p. 21). During direct examination, Mr. Johnston did not recall his actions or lack thereof, (Tr. Tra. P. 41), however on cross his member was repaired. Also see (Tr. Ex. 115-119)." "Johnston stated that he was making his rounds as the "punch man" in the unit when he was "flagged down by Brown; claiming that she had a bloody nose." (Tr. Tra. P. 69). Johnston contends that both Brown and Allen were in the cell at that time, that nothing looked out of order and there were no signs of a fight, and that Brown never told him Allen assaulted her. (Tr. Tra. 70)." "Rather, Johnston testified that he asked Brown if she needed medical attention, and Brown told him that she did not (Tr. Tra. P. 45, 46), and she requested new linens and a new jumpsuit (Tr. Tra. P. 46, 70)."

Under Fed. R. Evid. 608(b), "a court may at its discretion permit questioning about specific instances of conduct on cross-examination, but only if the conduct is probative of the witness's character for truthfulness or untruthfulness." United States v. Williams, 464 F. 3d 443, 448 (3d Cir. 2006), If the conduct is probative of the witness's character for truthfulness, a party may inquire of that conduct on cross-examination, but may not offer extrinsic evidence of the conduct.

Brown called defendant Johnston as a witness; however upon direct examination the defendant expressed that he did not know nor remember much; (Tr. Tra. P. 41) much like his interrogatory responses. See (Doc. 98, Brown's Summary Judgment Exhibits, Exhibits 30-34),(Tr. Tra. P. 11-55). Consequently the court "slyly" ignored Mr. Johnston's conflicting testimony upon being question by Brown (Tr. Tra. P. 45,46,47). Consequently upon being questioned by the defense, the scope of Mr. Johnston's responses supported no limits as to his memory. (Tr. Tra. P. 59-79)."As the twig is bent, so shall the tree grow." Derived from (The Prosperity Bible, Pg. 89). On redirect, Brown's efforts to impeach Mr. Johnston's character for truthfulness were supported by questions about his account of the series of occurrence that lead to Brown's bloody nose on February 7th, 2018, and what role he played if any, to see Brown to medical(Tr. Tra. P. 81,82,83,85). Once a party becomes a witness, his credibility may be attacked. Fed. R. Evid. 607. See Andrade v. Walgreens-OptionCare, Inc., 784 F . Supp. 2d 533.



Precisely Brown urges that she had encountered Mr. Johnston multiple times while withheld with Mr. Allen From February 3rd, through February 8th, 2018, as Brown's account, she repeatedly asked to be move due to threats and assaults. Brown points to (Phase 1, Package 8, Exhibit 29, Dep. Tr., at P. 53, 57, 60, 66); multiple defendants not limited to Mr. Johnston deprived Brown medical attention on February 7th, 2018 as a result of sexual assault by her cellmate; Brown believe just her bleeding alone is classified as an medical emergency, to whom Johnston acknowledged. (Tr. Tra. P. 67). Furthermore Mr. Johnston had return to 108 cell multiple times, essentially at one point predicating; " Easter and those guys want you to hand over anything that has blood on it." (Dep. Tr., at P. 66). Mr. Johnston exchanged Brown's clothing not limited to jumper, t-shirt, boxers, socks, linens, only to ignore her injuries. (Tr. Tra. P. 54,55 175,176,177,188,189).

With Brown's knack for unbuttoning a complex subject; on direct & redirect-examination; Mr. Johnston now admitted that he did remember encounters with Brown and that Brown was celled with Allen in February of 2018. (T. P. 68). Precisely as to the caveat, Johnston was in "uncharted water" throughout his entire testimony. Mr. Johnston projected that Brown had flagged him down (T. P. 69), while he was punch man on February 7th, 2018." Brown had a nose bleed." Consequently he remembered Brown "on the top bunk, came down to talk with nose clogged,(70), Brown showed where he was bleeding by shoulder drips of blood. (71)." "I asked if he wanted to see medical, he refused.(70).""I recall his sheets showed a little bit of blood, I do not recall Allen wearing a jumper." "I reported to Heaster and Fochtman, Brown did not tell me he needed medical care, I did not fail to tell medical; Brown did not ask me to move."

Brown impeached Mr. Johnston by attacking his credibility and character for truthfulness or untruthfulness by admitting multiple statements; to underline different dimension of inconsistency in contrast with previous statements made, and the big hole in his testimony. See (DEF000013, 42), also see (Defendants Exhibits, 7, 8, 9). "Be greedy when others are fearful." Derived from (The Making Of An American Capitalist, Pg. 150). Mr. Johnston admitted that in February of 2018 in principle he was obliged to cooperate with a PREA investigation conducted my defendant Maxwell, subsequently he also admitted writing and being interviewed in statements. (DEF000013, 42), (Tr. Tra. 44,45,76,77). During Mr. Johnston interview on February 20th, 2018, he was asked if he had witnessed Allen attack Brown he stated "no." Mr. Johnston was asked if Brown ever asked to be move while being withheld with Mr. Allen; contrary to his trial testimony,(Tr. Tra. 79-85), he admitted that **"Brown had asked" him to be move, "but isn't a Z-code." "Another thing I remember about Brown is the one day he had a bloody nose, asked to see medical, wanted different sheets and wanted another jumpsuit." "Brown told me from time to time he gets a bloody nose." "I let the Sgt. Know about it and medical was actually doing rounds at that time so I informed them also."**

As relevant the district court prejudice Brown by ignoring the impeachment of witness Johnston, damaging the defendant credibility to whom the defendant had switched stories in mid testimony. As substantive evidence, Brown contest that the investigation involved and or offered insight into what Officer Johnston remembered just two weeks removed from Brown's claims. Consequently although Mr. Johnston sagaciously deferred as it pertain to answering any of Brown's interrogatories; at trial; on direct, he mendaciously denied remembering anything; only to come vouching on cross-examination

: 

that he did remember Brown, **But that Brown never asked him to be move nor did Brown seek medical treatment.** Accordingly Brown sought to attack defendant's testimony by impeaching him with statements he made as to the caveat that was; Brown consistently asked to be moved, and consequently sought medical care upon being sexually assaulted and treated like a "domestic slave." Thus "what the wise do in the beginning, fools do in the end." Derived from, (The Essays Of Warren Buffett, Lessons For Corporate America Fourth Edition).

> XII.    Brown preserved the right to raise issue pursuant
> to questioning defendant Mr. Fochtman as to
> inconsistency or lack thereof, in connection to Mr.
> Johnston & Mr. Heaster statements pursuant to Fed. R.
> Evid. 613(b), 608(a), 608(b).

Rule 613(b) controls, which provides by negative implication that extrinsic evidence is admissible to support the admission of a witness' prior inconsistent statement, provided the witness is afforded an opportunity to admit or deny the statement and the opposing party is afforded an opportunity to also interrogate. Fed. R. Evid. 613(b).

Rule 608(a) provides that the credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but that such evidence is limited to character for truthfulness or untruthfulness. United States v. Thomson, 2011 U.S. Dist. LEXIS 67950.

Federal Rule of Evidence 608(b) provides that: specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified. States v. Leake, 642 F .2d 715, 718 (4ᵗʰ Cir. 1981)

Thus, Rule 608(b) distinguishes between the admissibility of extrinsic evidence of specific instances of a witness's conduct and the permissibility of inquiring into such instances on cross-examination. While courts have discretion to permit inquiry into instances of conduct on cross-examination, they are categorically barred from admitting extrinsic evidence of such instances. As a result, if a witness denies having engaged in alleged untruthful conduct on cross-examination, "the examiner must take (or is bound) the witness's answer." Jack B. Weinstein & Margaret A. Berger,

Weinstein's Federal Evidence 608.22[1] (2d ed. 1997); see United States v. Crowley, 318 F. 3d 401 417-418 (2d Cir. 2003)(" The voir dire examination established that the witness would deny making false accusations or lying... Since the defense would be precluded by Rule608(b) from attempting to refute the witness's testimony by offering extrinsic evidence concerning the incidents in question, the only evidence before the jury on the subject would have been the witness's denial of falsehood.")

 Brown argument derived unequivocally by way of Mr. Fochtman's verbal testimony; in principle Brown may present extrinsic evidence through testimony or previous statements from other witnesses that is relevant to the circumstances surrounding Brown's claims to compare it to contradictory trial testimony, limited to character for truthfulness or untruthfulness. Brown to whom should had been permitted to direct-examine Mr. Fochtman about other witness statements interrelating to Mr. Fochtman's testimony and the circumstances surrounding Brown's claims. The District Court error in limiting Brown on direct (Tr. Tra. 66-69), for multiple reasons, distinction; Brown may be permitted to present extrinsic evidence through a witness statement for impeachment reasons. See United States v. Thomson, 2011 U.S. Dist. LEXIS 67950. Rule 613(b) applies when two statements, one made at trial and one made previously, are irreconcilably at odds. In such an event, the cross-examiner is permitted to show the discrepancy by extrinsic evidence if necessary not to demonstrate which of the two is true but, rather, to show that the two do not jibe (thus calling the declarant's credibility into question). In short, comparison and contradiction are the hallmarks of Rule 613(b).

At trail Mr. Fochtman admitted during testimony that he was responsible for cell assignments in the ("RHU") in February of 2018. (Tr. Tra. P. 479). Mr. Fochtman transcending that although he had made the cell assignment for Brown to be withheld with Mr. Allen; subsequently he did not work the day Brown and Mr. Allen was celled together; on February 3rd, 2018. In demonstrating a nexus between Brown's deplorable mental state, and cell placement, Brown attempted to inquire as to what if any did Mr. Fochtman know about Brown's mental state or "exhibiting strange behavior" prior to the cell assignment; inter alia Heaster acknowledgement that "Brown had requested to various officers to be remove from the cell always from Mr. Allen."(Tr. Tra. P. 476), See (Phase 3, Package 17, Exhibits 101), (DEF000010, 42). Honorable Judge Carlson conveyed that that would not be appropriate to use another witness statement. (468), to whom deprived Brown from highlighting inconsistencies in statements and Mr. Fochtman's testimony; since it was the defendant believe that "Brown and Allen asked me to be move together to a different cell so that they can see the T.V.""I did not see Brown's nose bleed; furthermore I exchanged Brown's jumpsuit and linens." in principle it was Mr. Fochtman's rationale that he went to 108 cell to investigate on February 7th, 2018. Mr. Fochtman testified that upon inspecting Brown and Allen's hands it did not appeared that the parties engaged in a physical altercation; inter alia "Brown had refused medical treatment;' (T. P. 468).

In principle, as an essential component to underline different dimension of inconsistency in contrast with previous statements made by other defendants and witnesses, and for impeachment purposes; Brown subsequently attempted to admit extrinsic evidence through witness statements;(Tr. Tra. P.469), precisely statements from defendant Mr. Johnston, See (Phase 3, Package 17, Exhibits 101), (DEF000013,26).Furthermore it did not become apparent that defendants Objected. The Court also deprived Brown's of presenting for example; did you know, or consider Brown's mental state prior to

assigning her in a cell? (Phase 2, Package 13, Exhibit 51).( Ex. 101, DEF11). In principle; if Brown asked multiple staff to be move none of whom articulated T.V. watching; how so Brown only sought to request a T.V. move through you; to the contrary Mr. Johnston acknowledged that he could not move "not a Z-code"?(EX. 101, DEF13, 26). Defendant Johnston acknowledged that Brown sought "medical attention" around the same time you established a point of encounter with Brown; why would Brown refuse treatment if offered through you? (EX. 101, DEF13).

In contrast, Rule 608(b) addresses situations in which a witness's prior activity, whether exemplified by conduct or by a statement, in and of itself casts significant doubt upon her veracity. Thus Rule 608(b) applies to, and bars the introduction of extrinsic evidence of specific instances of a witness's misconduct if offered to impugn her credibility. So viewed, Rule 608(b) applies to a statement, as long as the statement in and of itself stands as an independent means of impeachment without any need to compare it to contradictory trial testimony. United States v. Winchbach, 197 F .3d 548, 558 (1st Cir. 1999). Brown should note that during Ms. Trice testimony, Honorable Carlson allowed her to inquire into Mr. Johnston previous statement; (Tr. Tri. P. 91,92).

XII.    Court erred when they granted Judgment in Favor of Mr. Plocinik, Mr. Maxwell Mr. Johnston, Mr. Fochtman under the Eighth Amendment cruel and Unusual Punishment at Trial For Failure To Protect, and Depriving Brown Medical Treatment.

---

Bluesing is a policy so common; at SCI Huntingdon it has a nickname. Initially intended to prevent inmates from playing the mental health roll; or just out right retaliation. It's when officials put inmates in freezing cells, turn cell water off; ambled with lack of basic necessity for life inter alia no bed, sheets, blanket, clothing, hygiene supplies Sometimes cells are so clod it creates ice like particles on the wall. . See Brown v. Waxford, 2022 U.S. Dist. LEXIS 125171, 2022 WL 2759064, at *9 (M.D. Pa. July 14, 2022). It was identified that defendant Mr. Plocinik was not acting within the scope of his employment when he allegedly contaminated Brown's food with a piece of metal the very next day upon knowledge of Brown initiation of this lawsuit, against Mr. Plocilik's desires. Why would one take interest in so far as to spike once food? See (Phase 3,Package 20, Ex. 134-160)

A.    Defendants consist that Brown labeled a "lunatic," "ridiculed,""-in-the pass for abusing the courts system." Brown claims are nothing more than "higher level of thoughts," "so infinite intelligence throw itself on the side of the person who still fights on; after the battle has been lost, with the whole world on the opposing side."" Brown claims 'Staggers one's imagination," and that "throughout Brown's incarceration, he had a history of refusing cellmates and making attempts to obtain a cell without a cellmate,' a single cell, otherwise known within the DOC as "Z Code;" "so much so that Brown engaged in fabricating claims against Allen." "Brown slick as they come, "farsighted,""ingenious,"" daring;" he is a thinker,' has imagination-detects the

vulnerable spot in any man and can plan cold-bloodedly to hit it." Derived from, (Reminiscences Of A Stock Operator; at P. 152).

On February 3rd, 2018, while celled in Restricted Housing Unit ("RHU"), Brown was moved into a cell with Allen and remained in the cell with him until February 8th, 2018. There were no known reasons why the two should not be together. While Brown was celled with Allen, both inmates were permitted to leave the cell separately for reasons including, but not limited to, visiting the showers, yard, law library, and visits with staff.

During the time they were celled together, Brown and Allen made requests to be moved to a cell closer to the television that was available in the common area. Staff declined to move them. On February 7th, 2018, Brown reported suffering a nose bleed to staff, stated there was some blood on his clothing, and requested and was provided new clothing and linens. He had no other complaints at the time. On February 8th, 2018, Brown went to the shower and refused to return to his cell with Allen. He was send to another cell to whom was a single cell. On February 13th, 2018, Brown was order to take a cellie to whom he refused. That evening, LPN Trice received a sick call slip to medical containing an allegation of ongoing physical assault by his previous cellmate between Feb. 3rd, 2018 through February 7th, 2018, culminating in sexual assault on February 7th, 2018.

Brown was evaluated the same night; it was determined that there was no evidence of injuries. Brown refused to take pictures. On February 14th, 2018 Brown agreed to take picture as allowed, but refuse treatment. It should be noted that no injuries were observe either, also the pictures does not show any injures. When the investigation concluded, it was concluded that no staff had received a report of abuse or assault by Brown.

**B.**     **He among you who is without sin, let him cast the first stone.** To the contrary, Brown a transgender inmate serving a sentence at 2 to 4 years on an Aggravated Harassment conviction for throwing feces on a staff member while at Chester Counter jail in connection of her initial conviction for Burglary, inter alia receiving stolen property, theft by unlawful taking.(Phase. 1, Package. 2,Exhibit. 12). Brown was admitted to the ("DOC"), on July 26th, 2017. While at SCI Greatiford Brown had multiple cellmates. Brown was transferred to SCI Camp Hill on August 4th, 2017, for classification reasons and had seven different cellmates; one of whom sexually assault Brown while in the ("RHU"). When Brown arrived at SCI Huntingdon, Mr. Maxwell was playing different rolls, on October 23, 2017, injecting himself as a member of the IRC. At the time Mr. Maxwell was the prison's investigator. (Tr. Tra. P. 290). Upon arrival at SCI Huntingdon; Mr. Maxwell intercepted Brown's claims of sexual assault while at SCI Camp Hill. Subsequently Mr. Maxwell "coerce" Brown in to signing a Double Celling agreement although Brown was reluctant; (T.P.143,145) furthermore a subsequent meeting was had with Brown, Maxwell and other leadership; to whom Brown was forced to write a statement that she felt save to enter prison population. (Phase 1, Package 4, Exhibit 14-19).   Maxwell had called Brown a "rat," "whistle blower," upon Brown returning from a Camp Hill transfer in November of 2018; Maxwell claimed he use to work at camp hill; to whom was verified at trial;(T.P.293) and that Brown sexual assault claims had his friends under heat.(T.P.149), (Phase 1, Package 26, Exhibit 21-23), (PH. 7, P. 7, Ex.26-28).



Brown initiated a request of staff directed to Ms. Cousins the facility psychologist pursuant to logistical circumstances, not limited to housing concerns and psychiatric issues. (PH 1. Package 9, Ex, 34). Upon returning from Camp Hill, Brown was housed On B-A-Quad from November 13th,2017 through December 1st, 2017 to specified every cell on this quad has one bunk single cell. (PH. 1, Package, 3 Ex. 13) Brown encountered Ms. Butterbaugh pursuant to ("Appellant's wellness") months leading to Brown's claims 11/15/18 and 11/17/18. ( Ex. O, Summary Judgment Exhibits). Ms. Butterbaugh claimed that Brown appeared "anxious, tearful, shaking, low voice," and this effect, Brown did not appear potentially dangerous, and manipulative for secondary gain Z-code. (T.P.430). On December 1st, 2017, Brown was directed to pack up, that she would be moving to A-A- Quad. Brown requested to know what cell and who she is moving in with. "You will move when you are told to move." Brown had a "panic attack" subsequently predicating to the officer that she was suicidal and homicidal. Brown's mental crisis was interpreted as a threat. (Tr. Tra. P. 152,153).

Brown also refused to go cell with a person she did not know out of fear and as "sequent remedial measures, Brown was also denied P.C." Brown received her first misconduct for refusing a cellmate in the ("DOC"). (PH. 1, Package. 9, Ex.30). Subsequently, Brown returned to the ("RHU"), interrelating a second misconduct for refusing a cellmate. (Ex. 30, Misconduct # C084585). Consequently Brown started to raise concerns that she fear to return to population during brief encounters with her counselor. While still in the ("RHU"), Brown initiated multiple grievances directed to mental health in connection with depression anxiety, and fear being around people. (Ex. 32), also see (Ex. 34). Around this time Brown was subsequently deprived protective custody again. Mr. Jackson just doors down from Brown in the ("RHU") intercepted one of Brown's request for P.C. while talking to counselor Banks, consequently commenting that Brown was scare. (Tr. Tra. P. 157,158).

As relevant Brown was on retaliation monitoring pursuant to DC ADM 008 policy (citing Camp Hill). (Ex. 25). Brown was release to A-A- Quad around December 27th, 2017 . Upon arrival Brown notice multiple bunks within the cell; subsequently Brown briefly left the cell only to return with her. Mr. Dale Jackson reside in the lower bunk, it appeared that Mr. Jackson was also release from the ("RHU").(Phase. 1, Package. 8, Exhibit 29, at p. 24, 25), (Dep. Tr.). Although Brown raised some concerns with her new housing arrangement, returning to the desk requesting P.C., she was ignored. Mr. Jackson engaged in concerning inquires as to if Brown was gay with uningenuous approach. (Dep. Tr. at. P. 24). On January 7th, 2018 Brown encountered Mr. Maxwell pursuant to Brown's initiation of a PREA complaint via PREA hotline due to derogatory comments made by a c/o 1, Khovak, calling Brown a faggot while Appellant was at the front desk on 1/6/18. Brown predicated that c/o Khovak had simultaneously passed inmate Jackson correspondence grievance response pursuant to the Camp Hill sexual assault; to whom also related to Brown cooperating with state police. Brown also related that prior to Khovak's action Mr. Jackson constantly harassed her; for example Brown would utilize color pencils to apply "eye liner," Brown would also sit to "urinate." Subsequently Brown concluded that Mr. Jackson also went through her legal boxes while she was out the cell. (Tr. Tra. P. 161,162).

Brown next encounter with Mr. Maxwell consist that Mr. Jackson had confided in a friend name Allen; and the two had engaged in harassing and extorting Brown; for example both inmates forced Brown to call family for money (Dep. Tr. At. P. 26) Jackson putting a shank to Brown. (PH. 1,

Package. 10, Ex. 35). Mr. Maxwell's response was that Brown should stop wearing eyeliner. Brown was stigmatized as a "rat, and a faggot It was now promulgated that Brown worked with state police in connection to a rape case; and posted "feminine characteristics," "wear eyeliner', 'women underwear,' long hair,' swatch hips,' at the time only 120 pounds and particularly vulnerable. in principle; Brown believe that her consistent voicing logistical concerns was of consequent or one of such reason a new counselor was plugged in. This also allowed unethical decisions to be undermined. For example Brown was assigned a risk level score, pursuant to the PREA. Risk. Assessment. Tool. without participating in the P.R.A.T. questineers; section 2 of the DC-ADM 008 policy requires inmates to participate in the P.R.A.T. questioners. (Brown's ICAR p. 28, Defendants Ex. 57). All encounters with the retaliation monitoring stopped. Tr. Tra. P. 299.300,432).

Brown was assaulted by Mr. Jackson on January 15th, 2018 during an argument, prior to Jackson going to school. Brown was told to stay in the cell by Jackson and Allen; however due to constant bleeding, Brown came out requesting to see medical only to be send back into the cell by Sgt. Aurano, and C/o Khovak. Than derived an unmark grievance that was never responded to at the institution level, although Brown dropped the grievance in the grievance box (T.P.161,162). (PH. PK. 10. Ex. 36, 37). Subsequently Brown return to the ("RHU"). (PH. PK. 10. Ex. 38). On January 25, 2018 Brown received misconduct for refusing a cellmate. (PH. 1, PK. 10, Ex. 39). Brown was put into a camera cell around January 21, [st 2018.] At this time Brown was "Flag" with housing concerns, also stigmatized as a "rat, and a faggot" by many inmates. Mr. Heaster noticed that Brown was eating feces from a cup. (T. P. 400). Brown had refused a cellmate at least once while in the R.H.U. camera cell. Defendant Plocinik had transferred Brown from Unit G- pod-A cell 116, to Unit G- pod-D cell 214 on February 2nd, 2018. The cell was saturated with "O.C." gas, this trigged Brown's Asthoma, forcing Brown to request to be move. (Ex. 13). (tr. Tra. 165,166).

Defendant Plocinik was put on notice as to the humane conditions, Mr. Plocinik returned, transcending to Brown that she will be moving with Mr. Allen. Brown conveyed to Mr. Plocinik the issues with Mr. Allen and Mr. Jackson. Subsequently Brown was called to speak with "leadership," at this time Brown's sexual assault claims from Camp Hill was well promulgated at SCI Huntingdon, so much so that when she was pulled out the cell, unknown inmates made comments, "o that's the faggot that got his ass took at Camp Hill." (Dep. Tr. P. 28, 29). (T.P.166). Although the encounter with "leadership" was brief on February 2nd , 2018 it was also critical, to note, the meeting on this date was not disputed by Mr. Maxwell at trial. Brown amplified to defendant Maxwell not limited to Mr. Kendrick that Mr. Plocinik conveyed that she would be moving in a cell with Mr. Allen. Subsequently Brown also transcended the information and the mail passing, and PREA complaint against Mr. Kovach that was previously investigated by Mr. Maxwell, Brown stated that the officer's actions were interrelated to targeting by Mr. Jackson and Mr. Allen that followed; also due to her feminine characteristics. Mr. Maxwell assured Brown that force would be use if Brown is told to move with Mr. Allen and refuses. (Dep. Tr. P. 29). (Tr. Tra. P. 167,168,321).

Upon returning to her cell, Brown initiated a request of staff directed to her counselor. (PH. 1, Package. 11, Ex. 43). Brown to whom conceded she feared for her safety in connection with moving with Mr. Allen. **"ovule with fear and grief," it was evident that things were taking the turn for the worst;**

that dark times were near; so much so that one can smell "fear" just standing beside Brown's cell, emotions "tugging at the strings of her heart;" beating upon the door of her soul, and crying out. Unknown to Brown, Brown she would pay for her crimes in the worst way; the irony was Brown felt a keen sense of uncertainty somewhat dexterous to a lady coming home to a "Burglarize house" not knowing what is missing. Things of sentimental value gone; a galvanic feeling, like running in the dark; only to become on a field of landmines. To get out alive; Brown, Brown had to "discover the genius which slept within her brain." Derived from The Prosperity Bible Pg. 28. In retrospect the cell 108 would became "Slavonic," in way Brown made assiduous requests to be move, all of whom turn their backs.

Mr. Plocinik removed Brown from Unit G-D-quad-D cell 214 on February 3rd, 2018 to cell 108 on Unit-G-A-quad. (Ex. 13). Brown utilized the time to communicate explicitly to Mr. Plocinik and another staff member her fear, safety concerns; only to amplify that Brown would be spray. Brown transcended that while on G-A-quad she would look in the direction of 109-cell to whom housed a witness Mr. Seah Delgrosso as she expressed she did not feel safe going into cell 108; " you do not have to go in there, they can't force you.(Tr. Tra. P. 168,169)." Delgrosso! Delgrosso to whom will later become a key witness. (PH. 1, Package. 11, Ex. 44). (Ex. 13).

Mr. Allen would also diametrically transcend his dislike of Brown, faggots, and rats, also uncooperative, angry, as he conferred with Mr. Plocinick and other guards that came rushing out from the("RHU") bubble; as to why he did not want a known "rat," and "faggot," in his cell. Imminently Brown was forced into the cell, as the cuffs came off, Defendant Plocinik witness Mr. Allen hit Brown multiple times; apparently Allen was the first to uncuff; "have fun with him, he's a kiddie toucher.(T.P.171)." Consequent to defendants actions, or ramification thereof, in present, cell 108 would become "heli" on earth. (PH. 1, Package. 11, Ex. 44). Forced in a corner cell with no stress button, furthest from the bubble in the, ("restricted housing unit,)" with a lifer that, a lifer that exhibited dangerous and predatoral behavior arousing from sexual desires. Desires that were not being meat as a lifer, many feared, synonymous with a diamondback. The mind is a creature of habit, it thrives upon the dominating thoughts fed it. Mr. Allen may had carried with him certain traits or character, had the fire that had not been subdued by time & circumstances; Brown was his source for stimulation. At the time Mr. Allen had "(77) misconduct, (4) of whom were sexual related. (PH. 1, Package. 12, Misconduct C009726), (Ex. 51),(PH. 1, Package. 11, Ex. 43, 48), (Dep. Tr. P. 33). At the time, Mr. Allen was angry that the department had took always his Z-Code; and was seeking to get it back; even if to the mercy of Brown. (Ex. 48).

Brown encountered not limited to all defendants while in 108-cell at different times. What was also apparent was that Mr. Allen had a plethora of friends and or gang mates, so much so they would echo their thoughts through the cell doors. "All body joooons,' rap your hands too.""Get that faggot out your cell." Mr. Allen would take Brown's Mattress directing Brown to sit in the corner of the cell. On February 4th, Mr. Allen continued to show his propensity for violence, punching Brown after rapping his hands with socks, and hitting Brown in abdominal area. Doing the initiation of dinner trays, Brown communicated to Mr. Plocinik, and Mr. Fochtman, Mr. Allen's actions, this lead to Mr. Allen

<sup>67</sup>subsequently taking Browns food tray with no empathy.(T.P.154). While picking up mail Mr. Plocinik returned to 108-cell, Brown passed a dossier note within request of staff crystallizing help to Mr. Plocinik.(Tr. Tra. P. 268-270). Brown also requested to see medical but was ignored. ( Phase. 1, Package. 11, Exhibit, 44), a request of staff.

On February 5th, 2018 Brown was forced in handcuffs and directed to face the wall in transition to assist Mr. Allen cuffing and compliance for recreation; Mr. Allen was must consistent rec participant, during this time Mr. Allen premised on the theory of direct insults and threats directing staff to remove Brown before he returns to the cell.(T. P.188),( Phase 2, Package. 13, Exhibit. 75). Mr. Law, and Mr. Harris also ran showers, even cuffing Brown and letting her out the cell; Brown transcended to Mr. Harris that she was being harm and wanted out 108-cell. Mr. Harris directed Brown to shut up. Upon returning to the cell, Mr. Allen would refuse to enter the cell, entirely asserting derogatory threats, saturated with the believe that Brown was a rat and a faggot. (Ex. 44). Brown had also encountered Mr. Partsson; a psyche staff, Brown proclaimed that she was suicidal requesting to be move; Brown also made it apparent that Mr. Allen did not want her in the cell, to whom derived threats and assault. " You are still breathing." (Dep. Tr. P. 37). Mr. Partson did not believe Brown was suicidal, although could be looked at as speculative, Precisely, Partsons believe that Brown was playing the mental health roll to be remove from a situation Brown herself must had gotten herself into.

During the same day, Mr. Chilcote returned to 108-cell with representation that he had clearance to move Allen, "But Brown must stay in this cell." "We can't have you refusing to lock in; they will Fuck you up and spray you." However Mr. Allen would evidently refuse, and clarified epiculy that he wants Brown out. Mr. Chilocote even directed that a friend of Allen was waiting for him on a different pod. Brown also communicated to Mr. Chilote that she had attempted to refuse to return to 108-cell as instructed by Mr. Allen after shower, only to encounter threats of use of force by Mr. Law, and Mr. Harris. "Get him the fuck out my cell or he will be sucking my dick soon!," Mr. Allen would assault Brown. Brown would also encounter Mr. Maxwell, Brown expressed that she was being assaulted; consequently Brown mentioned that after an assault the previous day, she was directed to sit in the corner of the cell, subsequently Brown was asked repeated questions some of which were pursuant to the Camp Hill sexual assault. (Tr. Tri. P 190). Simultaneously Mr. Allen asserted what he intended to do to Brown. (Dep. Tr. At. P. 38). (Ex. 44).

Brown also encountered Mr. Johnston through the cell door, upon Brown predicating to him that she was being harm by Mr. Allen, she was ignored; Johnston looked at Brown as if he did not have the authority to rectify Brown's safety concerns; he also equivocated vaguely stated that they had did moves already. (Tr. Tra. P. 177). During the middle of the night, Brown hit her head after Mr. Allen pulled her out of bed, causing her to bleed. Brown to whom was over powered putting Brown into a "choke hole," as he attempted to engage into sexual acts with Brown. (Dep. Tr. At. P. 46, 47, 48). Mr. Allen could not get around taking Brown's jumper off her, as Brown resisted. Due to the attempted

---

<sup>6</sup> With regards to Mr. Allen's misconducts, Appellant direct the Court to her (Phase 1, Package 12), these misconducts are also enclosed as to Defendants exhibits 12, 42-46.
7

"rape," Brown sustained multiple injuries not limited to ribs pain, back pain, groin tightness, head contusion, shoulder, and neurological pain.(T.P.188). On February 6, 2018, during the morning hours, Brown encountered multiple staffs explicitly expressing that inmate Allen attempted to rape her. (Ex. 44). It appeared to Brown that the Officers were being directed to ignore Brown, some of whom had present indolence in body language. Brown was directed to cuff up and face the cell wall, as Mr. Allen was accompanied to recreation. (Ex. 76). Mr. Allen was also reminded that he was given an opportunity to move on the previous day but refused.

Brown encountered Mr. Maxwell and Mr. Plocink at different times on February 6th, Brown predicated safety concerns to both defendants, even articulating the rape attempt the night before, as Mr. Allen compressing Brown to tell the defendants. (T.P.174). Mr. Maxwell witness Allen hit Brown demanding Mr. Maxwell to remove Brown, in repercussion, Brown would not eat, and or an imminent "rape" assaults threats, Mr. Maxwell did not same face, as he parted ways. ( Dep. Tr. at. P. 52). Entered into February 7th, during the same procedure, Brown directed her concerns to multiple officials, "we are only following orders, and we cannot move you." Brown encountered the Unit Manager through the door, during a previous encounter with Mr. Kendrick on February 5th; he predicted that there was no open cell, to his account, "if you go to shower refuse to lock in." (Ex. 44). Mr. Allen made ambiguous threats as to "kill, and rape," Brown; consequently Mr. Kendrick would walk away. During rounds Brown also encountered Mr. Johnston, stating that she was aware of open cells, pleading to be move. "I 'am sick of this shit!" Brown was attacked. (Tr. Tra. P. 177)

Mr. Allen tackled Brown with intent to harm, forcing Brown to surrender; overpowering Appellant on the floor, consequently ripping through Brown's jumpsuit. Brown simultaneously started to yell "get off of me, yall help, help." (Ex. 44).(Dep. Tr. At. P 57, 58). Brown also remember Mr. Plocinik approaching the cell. Mr. Allen's propensity of violence lead to part of a sheet being force into her mouth, it was also apparent that Mr. Allen had wrapped his hands with socks. "Shut the fuck up, I did this before, I did this before!" Mr. Allen forcedly "thrust" into Brown's anal after forcing her jumper off; as Brown was on her back with legs somewhat over her shoulders. After the inevitable assault Brown was left with bleeding from the "anal,""nose," mouth, knee. Mr. Johnston was the first person to return to 108 cell, Mr. Johnston commented that it looked like an animal was "slay," at the time Brown injuries were obvious as she started to ask to see medical.(Tr. Tri. P. 175,176,187,188). Mr. Plocinik and Mr. Fochtman both joked about Brown conceiving upon returning to the cell, "it's a boy; "no" it's a girl." Mr. Fochtman asked, "Which one of yall am 'I going to Wright up for fighting?" Mr. Allen replied, "There was no fight; I did what I told yall I was going to do." (Dep. Tr. At. P. 51, 52). Brown transcended that she was "rape," and requested to be move. "We do not make 'courtesy' moves; this is Huntingdon, not the Hilton!"

Mr. Johnston return to 108-cell, "they want you to give me everything that has bleed on it," it was apparent that Mr. Johnston was ordered to exchange Brown's clothing, and or linens, Brown's jumper now missing buttons, discharged on the floor somewhere. Brown handed over her linen, boxers, jumper, socks, t-shirt. Consequently Brown requested to see medical again and again, however Brown was not provided the opportunity. (Tr. Tra. P. 46,70), (Dep. Tr. At. P. 66), (Phase 3, Package 17, Exhibit 101. at. DEF000013, 42). A second rape assault was initiated by Mr. Allen, to whom Brown's jumper was

forced off. Insofar while Brown was at the cell door frighten, she was dragged by the cell toilet, at one point Brown's head was forced into the toilet; this was repercussion to whom transcended due to defendants refusal to move Brown. (T.P.187). On the morning of February 8th, 2018, it was very apparent that every inmate on G-Unit A-pod was aware that Brown was sexual assault, from banging on the wall to yelling through the doors, "get young bull out of there." "You got your ass took,' both of yall some faggots." Staffs also appeared to have had direct knowledge; the scintilla of evidence was supported by officials denying Mr. Allen of recreation. This amplified Mr. Allen's actions, to whom resorted to threatening and banging on the cell door. Furthermore officials who attempt to deprive both Brown and Mr. Allen of their showers; this lead to a plethora of inmates banging doors, and exchanging words with the officers, this forced officials to take an action they were hesitant to act upon.

Brown and Mr. Allen was let out 108-cell for showers, Mr. Allen was direct with his words, "if you return to my cell this time I will "KILL" you!" Brown refused, "I can't go back in there,""Cuff up or we will fucking spray you!""I'm not going back to that cell,' I'm not going back in that cell." There was nothing mendacious about Brown's words, as the threats continued, Brown ignored them; Brown was repetitive with her words. As God on Brown's side this day, this day Brown was moved to Unit-G D-pod, cell-105. (Ex. 13), (Phase. 3, Package. 16, Ex. 98).(Ph. 3, Package. 13, Ex. 81))The series of occurrence that lead to the move was so promulgated, that the banging on Brown's wall would not stop; night through day. "Kill yourself faggot,"" you fucking rat." "You got rape!" "How does your asshole feel?"(Ex.127). Consequently Brown was deprived of some of her food trays, showers, paper, pen and other necessity until February 13th, 2018. Brown initiated a sick call. (PH. 3, Package. 14, Ex. 82). Brown encountered Mr. Orndorf through the cell door on February 13th,2018 around 11:25 pm. Brown was given a pen and paper to wright a statement. See,(Summary Judgment, Exhibit S ). It does not appear that that statement ever appeared on the record.

Nurse Trice approached Brown's cell, with a frown upon gesture, confirming that Brown was to be path out to medical. Contrary to whom Brown was escorted to a cage in the ("RHU") doors down from Mr. Allen's cell. (Tr. Tra. P. 89,134). Ms. Trice approached the cage; " I remember you was the one that was rape at Camp Hill; apparently the Doctor is not here at this time."It was also transcended that (48) hours had passed, in principle Brown was never asked to take pictures and refuse; what was apparent was that the language of Brown's statement discontinued any aid, nor were any tools utilized to evaluate Brown contrary to her (Summary Judgment Exhibit 99).[8]

On February 14th, 2018 Brown was directed out to cell, told the doctor has called for you; only to be corner to a cage, Brown encountered Nurse Eighm. "I was told to take pictures. Nurse Eighm indulged to vague and ambiguous comments; "I hate when you homosexuals cry rape when you willingly participate in sexual acts, only to make my job harder." The caveat in effect is also the aftermath to Brown's claime. Look to (Phase. 3 of Browns Exhibits). For example (PH. 3, Package 19, Exhibit 126-129).

C.

---

[8]It should be noted that the Security Level 5 Housing Unit, Exercise, 5hower, Shave Sign-Up sheet for February 8th, 2018 was never part of the discovery record; it would reflect that officials deprived Allen of recreation on this day.

**Brown challenges the District Court's grant of judgment in favor of Defendants Maxwell, Plocinik, Fochtman, and Johnston on her Failure-to-Protect & Medical Treatment Claims.**

Brown claims that defendants violated her Eighth Amendment rights by failing to protect her from assaults by inmate Allen. Brown at trial proved that defendants Mr. Maxwell, Mr. Plocinik, Mr. Fochtman, and Mr. Johnston violated her Eighth Amendment to the United States Constitution by way of deliberate indifference to a substantial risk of serious harm. Specifically, Brown claims that Mr. Maxwell, Mr. Plocinik, Johnston, and Fochtman failed to protect her from physical and sexual assaults at the hands of her cellmate.

To establish her Eighth Amendment violation for failure to protect from assaults, Brown must prove the following by a preponderance of the evidence; **First** there was a substantial risk of serious harm inasmuch, a substantial risk that she would be attacked by another inmate. **Second**, Mr. Maxwell, Plocinik, Fochtman, Johnston, were deliberately indifferent to that risk. **Third** Brown would had suffered less harm if defendants had not been deliberately indifferent. A prison official may be held liable under the Eighth Amendment for acting with "deliberate indifference" to inmate health or safety only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. Whitley V. Albers, 475 U. S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986).

The Eighth Amendment requires prison officials to protect prisoners from violence at the hands of other prisoners. Farmer v. Brennan, 11 U. S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). "It is not however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the prisoner safety." Farmer, 511 U. S. at 834. To prevail on a failure to protect claim, the prisoner must show: (1) " that he is incarcerated under conditions posing a substantial risk of serious harm", and (2) that " the official knows of and disregards an excessive risk to inmate health or safety." Id. At 834-38.

With respect to the second element, the court must determine whether the official acted with a sufficiently culpable state of mind because " only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." See Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012). Deliberate indifference requires that the official "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U. S. at 834-38. It is not an objective test for deliberate indifference; rather, the court must look to what the prison official actually knew, rather than what a reasonable official in his position should have known. Id. Also see Coleman v. Wetzel, 2019 U. S. Dist. LEXIS 172587 (M. D. Pa., July 18, 2019).

In Farmer, supra, the Supreme Court stated: [I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past,' and the circumstances suggest that the defendant-officials being sued had been exposed to information concerning the risk and thus 'must have

known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

At trial Brown proved and produced sufficient evidence to support the inference that defendants "knowingly and unreasonably disregarded an objectively intolerable risk of harm.' See Beers-Capitol v. Whetzel, 256 F .3d 120, 132 (3d Cir. 2001). Brown's circumstances were obvious; Brown was stigmatized as a "rat, and a faggot It was promulgated that Brown worked with state police in connection to a rape case; (T. P. 146,147) and posted "feminine characteristics," "wear eyeliner', 'women underwear,' long hair,' swatch hips,' at the time only 120 pounds and particularly vulnerable. Forced in a corner cell with no stress button furthest from the bubble in the, ("restricted housing unit,)" with a lifer that, a lifer that exhibited dangerous and predatory behavior arousing from sexual desires. Desires that were not being meat as a lifer. Mr. Allen may had carried with him certain traits or character, had the fire that had not been subdued by time & circumstances; Brown was his source for stimulation.. At the time Mr. Allen had "(77) misconduct, (4) of whom were sexual related. (PH. 1, Package. 12, Misconduct C009726), (Ex. 51),(PH. 1, Package. 11, Ex. 43, 48), (Dep. Tr. P. 33). At the time, Mr. Allen was angry that the department had taken always his Z-Code; and was seeking to get it back; even if to the mercy of Brown. (Ex. 48). As to the caveat as is to protect Brown, the record is "jaded" with concrete evidence some of whom may stagger one's imagination.

First; Brown identified each defendants in accompany rolls they played. Even removing the fabric of Brown's unmark grievance (PH. PK. 10. Ex. 36, 37) & previous encounters with Mr. Maxwell pursuant to Brown's initiation of a PREA complaint via comments made by a c/o 1, Khovak, and c/o Khovak simultaneously passing inmate Jackson correspondence grievance response in connection with the Camp Hill sexual assault; and consciously dismissing the fact that Allen's cell history collaborates with Brown depiction that She and Allen were house on the same population non Z-Code- quad from December 27th, through January 20th, 2018, (PH. 1, Package 9, Ex. 35), (Ex. 13); or the fact that she was assigned a risk level score, pursuant to the PREA. Risk. Assessment. Tool. without participating in the P.R.A.T. questineers; section 2 of the DC-ADM 008 policy requires inmates to participate in the P.R.A.T. questioners, (DEF000088) ; insofar that Brown was labeled a ("housing concern and Allen was not listed as housing concerns"); what is not disputed is that Brown meat with Mr. Maxwell on February 2nd,2018! (Tr. Tra. P. 321).

Consequently what is probative and relevant is Mr. Maxwell depiction that Brown did not transcend any safety concerns nor was Brown in distress, as Brown negated otherwise. Brown points to ((Ex. 43) request of staff directed to her counselor Ms. Richards on February 2nd, 2018 ".Lt .Maxwell and Plocinik told me I have to cell up with Allen, the same person that was extorting me in population; I told Maxwell that they know that I was sexually assaulted at Camp Hill." as to the caveat, Mr. Maxwell also proffered testimony relevant during rounds in the ("RHU"), while Brown was withheld with Mr. Allen, ideally consistent with Brown Claims that she encountered Maxwell multiple times; and that Allen was seeking a Z-code, a day prior to Brown being withheld. Mr. Maxwell known that there was substantial risk that she would be attacked by Allen; not limited to the risk geotropically obvious; and that Brown was a homosexual listed under "housing concerns told Maxwell on Feb 5th , 6th she was being assaulted; consequently Brown mentioned that after an assault the previous day, she was directed to sit

in the corner of the cell, subsequently Brown was asked repeated questions some of which were pursuant to the Camp Hill sexual assault. (Tr. Tri. P 190),(Tr. Tra. P. 456,457). Subsequently Mr. Allen engaged in compressing Brown to tell the defendant. Mr. Maxwell witness Allen hit Brown demanding Mr. Maxwell to remove Brown, in repercussion, Brown would not eat, and or an imminent "rape" assaults threats, Mr. Maxwell did not same face, as he parted ways. ( Dep. Tr. at. P. 52).

Put into prospective, at the time Brown was withheld with Mr. Allen, Brown had occurred (7) misconduct; as an essential component in contrast, Mr. Allen's misconducts history to whom collaborates' with Allen the "lifer thirst for violence,' prison experience,' and predatoral behavior." Mr. Allen had "(77) misconduct, (4) of whom were sexual related.(PH. 1, Package. 12, Misconduct C009726), (PH. 1, Package. 11, Ex. 43, 48).Maxwell himself acknowledged that Allen was a "pervert." (Tr. Tra. P. 375,376). Mr. Allen had exposed his "penis" to a female guard through the cell door; Subsequently Allen plead guilty at the hearing to, "Sexual Harassment,' and Indecent Exposure," as relevant, Mr. Allen appealed the misconduct denying his actions; subsequently upon appealing (PRC)'s decision to the facility superintendant, he confirmed his actions "seeking leniency" within the "notion of a modification and time cut." To distinguish one of many issues alarming as it relates to the misconduct is that, that Mr. Allen exhibited predatoral behavior arousing from sexual desires; Desires needs that were not being meat as a lifer. Also see Brown's (package 12, Misconduct D080673), Defendants (Exhibit 46, Misconduct D080673); Mr. Allen's must resent misconduct leading to Brown's victimization; officials acknowledged that CCTV footage reviewed that "it was apparent that inmate Allen entered the detail closet with intent, demonstrated by his physical actions of looking around." The misconduct alleged that Mr. Allen assaulted inmate Figueroa in a detail closet, and or fighting. Again the exhibit shows two distinguish facts; (1) Mr. Allen's ability for deception, to whom indicates' prison experience, (2) Mr. Allen's thirst for violence. Blood stains tarnishing clothing.

Mr. Plocinik did not so dispute that he put Brown a greenhorn, into 108 cell; however what is relevant is Mr. Plocinik's depiction that Brown did not predicate any concerns, as Brown negated otherwise.(Tr. Tra. P. 228,229,257). For example Brown claim's an inmate Shae Delgrosso witnessed Mr. Plocinick and other officers forcing her into 108 cell "have fun with him, he's a kiddie toucher." (Tr. Tra. P. 171), (Ex. 44). Defendants points to the (G- Control station),(PIPE system), to whom per custom a punch man must observe each cell while doing rounds in the ("RHU") at least once every 30 minutes. (DEF000075-83),(Tr. Tra. P. 239,336). In contrast Brown urge that the source is flaw; as an essential component, the fact that the G-Control station exist does not confirm nor establish that defendants did not engage in unconstitutional activity; amble with the fact that Brown established that they created substantial risk of serious harm by forcing her in a corner cell with no stress button, furthest from the bubble in the, ("restricted housing unit,)" with a lifer that, a lifer that exhibited dangerous and predatoral behavior arousing from sexual desires. Furthermore Suspicion exists where the "must adequate tool" that tracks all movements outside the cells was destroyed. ("CCTV"). (Tr. Tra. P. 171, 460).

In Farmer deliberate indifference was identified as equivalent to reckless disregard " and describes a state of mind more blameworthy than negligence, but is something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. Thus Brown

points to evidence showing that she was incarcerated under conditions posing substantial risk of serious harm. Brown also utilized a request slip to whom Brown wrote on February 4ᵗʰ, 2018 seeking help (Brown exhibit 44),(Tr. Tra. P. 268-270), insofar Mr. Plocinik did not contest that he picked up. Upon receiving the request of staff, defendant were deliberate indifference to that substantial risk to Brown's health & safety by failing to act on the obvious, inter alia remove Brown and investigate Brown's serious claims. see Coleman v. Wetzel, 2019 U. S. Dist. LEXIS 172587 (M. D. Pa., July 18, 2019).

Brown also encountered Mr. Johnston through the cell door on February 5ᵗʰ,2018, upon Brown telling him that she was being harm by Mr. Allen, she was ignored; he also vaguely stated that they had did moves already. (DEF13). Brown testified that the night of February 5ᵗʰ, Mr. Allen pulled her out of bed, causing her to bleed. Brown to whom was over powered putting Brown into a "choke hole," as he attempted to engage into sexual acts with Brown.(Tr. Tra. P. 188), (Dep. Tr. at. P. 46, 47, 48). Mr. Johonston testified that he encountered Brown on Feburary 7ᵗʰ, 2018; only to Brown flagging him down about nose bleed. (Tr. Tra. P. 69). Although he disputed exchanging Brown's clothing, and or linens, or Brown ever transcending sexual assault, and requesting medical; (Tr. Tra. 70), Brown testified that she handed over her linen, boxers, jumper, socks, t-shirt to Johnston per order,(188); in principle; Mr. Heaster remembered Brown asked multiple staff to be move none of whom complied. (Tr. Tra. P. 476), See (Phase 3, Package 17, Exhibits 101), (DEF000010, 42)

Thus the first element of deliberate indifference sets out an objective inquiry; that the official "knowingly & unreasonably disregarded an objectively intolerable risk of harm. The second element of deliberate indifference; is a subjective standard; "the prison officials-defendants must actually have known or been aware of the excessive risk, to satisfy these elements, Brown points to the record. Brown points to a previous statement articulated by Johnston. Mr. Johnston acknowledged that he could not move Brown, " Brown not a Z-code, that at least on one occasion Brown asked him to move."(EX. 101, DEF13, 26). Defendant Johnston acknowledged that Brown sought "medical attention" around the same time he established a point of encounter with Brown. The District Court refused to acknowledge Brown's impeachment of the defendant.

Defendant Fochtman testified that he was responsible for assigning Brown with Mr. Allen, (Tr. Tra. P. 479); however he known nothing, because Brown did not articulate any claims of sexual assault. To the contrary her (Phase 1, Package 11, Exhibit , 44), a sign statement from Shae Delgrosso acknowledges Mr. Fochtman as one of many officials present; consistent with Brown's move requests ample with serious threats from Allen as to what he intent to do to Brown. Thus Brown to whom testified that she communicated to Mr. Plocinik, and Mr. Fochtman on February 4ᵗʰ, 2018 (T.P.186),Mr. Allen's actions, this lead to Mr. Allen ⁹¹⁰simultaneously taking Browns food tray with no empathy. Mr.

Plocinik and Mr. Fochtman both joked about Brown Conceiving upon returning to cell 108 on Feburary 7th, 2018, "it's a boy; "no" it's a girl." (Tr. Tra. P. 187).

Mr. Fochtman asked, "Which one of yall am 'I going to Wright up for fighting?" Mr. Allen replied, "There was no fight; I did what I told yall I was going to do." (Dep. Tr. At. P. 51, 52). Brown transcended that she was "rape," and requested to be move. **We do not make 'courtesy' moves; this is Huntingdon, not the Hilton!**"Mr. Fochtman disputed that Brown only had a nose bleed that in did not see; and that Brown and Allen asked to move together to see T.V. but would not specified when the request derived. (Tr. Tra. P. 468), (Ph. 3, Package. 17, Ex. 101DEF000011, 28, Ex. 122). In principle; if Brown asked multiple staff to be move none of whom articulated T.V. watching; how so Brown only sought to request a T.V. move through you; to the contrary Mr. Johnston acknowledged that he could not move Brown, "not a Z-code"?(EX. 101, DEF13, 26). Defendant Johnston acknowledged that Brown sought "medical attention" around the same time Fochtman established a point of encounter with Brown; why would Brown refuse treatment if offered through you; but subsequently request to see medical upon a point of encounter with Mr. Johnston? (EX. 101, DEF13) The District Court refused to acknowledge Brown's impeachment of the defendant.

**D. Defendants Were Personally Involved In Depriving Brown Of Her Eighth Amendment Rights.**

To establish personal liability against a defendant in a 1983 action, that defendant must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondent superior. Rizzo v. Goode, 423 U.S. 362, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976). Accordingly, individual liability can be imposed under 1983 only if the state actor played an "affirmative part" in the alleged misconduct. Personal involvement by a defendant can be shown by alleging either personal direction or actual knowledge and acquiescence in a subordinate's action. Rode, 845 F .2d at 1207.

Defendants Maxwell, Fochtman, Plocinik, and Johnston were personally involved in failing to protect Brown. Brown conveyed to Mr. Maxwell that she would be moving in a cell with Mr. Allen. Subsequently Brown also transcended the information and the mail passing, and PREA complaint against Mr. Kovach that was previously investigated by Mr. Maxwell, Brown stated that the officer's actions were interrelated to targeting by Mr. Jackson and Mr. Allen that followed.(T.P.167,168). Mr. Plocinik removed Brown from Unit G-D-quad-D cell 214 on February 3rd, 2018 to cell 108 on Unit-G-A-quad. (Ex. 13). Brown utilized the time to communicate to Mr. Plocinik and another staff member her fear, safety concerns; only to amplify that Brown would be spray. Allen was the first to uncuff; "have fun with him, he's a kiddie toucher."(171).

Doing the initiation of dinner trays, Brown communicated to Mr. Plocinik, and Mr. Fochtman, Mr. Allen's actions, this lead to Mr. Allen [1112]simultaneously taking Browns food tray with no empathy. While picking up mail Mr. Plocinik returned to 108-cell, Brown passed a note and a request of staff seeking help to Mr. Plocinik. (T.P.268-270). Brown also encountered Mr. Johnston through the cell door, upon Brown telling him that she was being harm by Mr. Allen, she was ignored; Johnston looked at Brown as if he did not lacked the authority to rectify Brown's safety concerns; he also vaguely stated

12

that they had did moves already. Subsequently into the night of February 5th, Mr. Allen pulled her out of bed, causing her to bleed. Brown to whom was over powered putting Brown into a "choke hole," as he attempted to engage into sexual acts with Brown. .(Tr. Tra. P. 188), (Dep. Tr. At. P. 46, 47, 48).

Brown encountered Mr. Maxwell and Mr. Plocink (175) at different times on Feburary 6th, Brown predicated safety concerns to both defendants, even articulating the rape attempt the night before, as Mr. Allen compressing Brown to tell the defendants. Mr. Maxwell witness Allen hit Brown demanding Mr. Maxwell to remove Brown. (Tr. Tri. P 190). Mr. Johnston was the first person to return to 108 cell on February 7th , Mr. Johnston commented that it looked like an animal was "slay," at the time Brown injuries were obvious as she started to ask to see medical. (T.P.87). Mr. Plocinik and Mr. Fochtman both joked about Brown conceiving upon returning to the cell, "it's a boy; "no" it's a girl." Mr. Fochtman asked, "Which one of yall am 'I going to Wright up for fighting?" Mr. Allen replied, "There was no fight; I did what I told yall I was going to do." (Dep. Tr. At. P. 51, 52). Brown transcended that she was "rape," and requested to be move. **"We do not make 'courtesy' moves; this is Huntingdon, not the Hilton!"**

Brown carry out her burden proven that individual defendants violated her Eighth Amendment Rights to whom they were personally involved; cited above in facts stated that prison officials defendants had ample knowledge of impending assaults and sexual assaults creating a triable issue of fact..

### E. Brown challenges the District Court's grant of judgment in favor of Defendants Fochtman, and Johnston Pursuant to Deprivation Of Medical Treatment Claims.

The District Court concluded that "the only physical evidence of any injury was the nosebleed that Brown suffered on February 7th, 2018.' However, this injury, standing alone, is insufficient to establish Brown's Eighth Amendment claim for several reasons." "At the outset, it is well settled that in the absence of some expert witness testimony to the contrary, the seriousness of a nosebleed as a medical condition would not be apparent to a layperson like the defendants. "McFadden v. Dalmasi, No. CV 17-5787,2019 U.S. Dist. LEXIS 202405, 2019 WL 6218220, at*8 (E.D. Pa. Nov. 21, 2019), aff'd, 837 F. App'x 135 (3d Cir. 2020). (citing Williams v. Guard Bryant Fields, 535 F. App'x 205, 212 (3d Cir. 2013)).

"Moreover the evidence indicates that both Brown and Allen denied that the nosebleed was the result of any physical confrontation between these prisoners, and for her part, Brown declined medical care at this time. Moreover, even when Brown belatedly reported this alleged assault one week later, she initially declined any medical examination by prison staff.""Finally, once Brown consented to an examination on February 14th, 2018, that examination revealed no apparent injuries.' Therefore, Brown simply has not carried her burden of proof regarding this first essential element of her Eighth Amendment claims, that she actually suffered significant physical injuries at the hands of a fellow prisoner."

The contour of McFadden's case; he sustained a broken nose in a fight. Nurse Sogo acknowledged that McFadden was seen and treated the day of the injury and the following days while McFadden was in the SHU. Nurse Sogo cleaned his abrasions with iodine, and determined that no

treatment was necessary at that time. Within five days of McFadden injure, Dr. Dalmasi reviewed nurse Sogo's encounter note, order x-ray for his nose, reviewed the radiologist's findings, and requested an appointment for McFadden to see an ENT specialist. McFadden was diagnosed with non-allergic rhinitis, a chronic condition and was prescribed Flonase to dealleviate his symptoms. The District Court properly recognized that McFadden did not necessarily require expert evidence to challenge Dalmasi's decision but required at least some extrinsic evidence- which McFadden did not proffer-to challenge the adequacy of Dalmasi's care in that regard. In Boring 833F. 2d at 473, the Court affirmed the decision and determined that when the lay jury did not have the basis on which to determine whether the injuries complained of were serious, it was incumbent on the plaintiff to provide expert testimony to guide the jury.

The McFadden case is distinct from that of Brown's case; for example, Mr. McFadden had seen a medical official the same day extricating from a fight. Nurse Sogo. Brown was not afforded the opportunity to see medical staff on February 4th, 5th, 6th, and 7th, (89)On February 4th, Mr. Allen continued to show his propensity for violence, punching Brown after rapping his hands with socks, and hitting Brown in abdominal area. Doing the initiation of dinner trays, Brown communicated to Mr. Plocinik, and Mr. Fochtman. (EX. 44), (T.P.186,187),. On February 5th, Johnston looked at Brown as if he did not have the authority to rectify Brown's safety concerns; he also equivocated vaguely stated that they had did moves already. (Ex. 44). See (DEF000013, 42). Mr. Johnston was the first person to return to 108 cell on February 7th, Mr. Johnston commented that it looked like an animal was "slay," (87), at the time Brown injuries were obvious as she started to ask to see medical. Mr. Fochtman asked, "Which one of yall am 'I going to Wright up for fighting?" Mr. Allen replied, "There was no fight; I did what I told yall I was going to do." (Dep. Tr. At. P. 51, 52). Brown transcended that she was "rape.

At Trial Mr. Johnston admitted that in February of 2018 in principle he was obliged to cooperate with a PREA investigation conducted my defendant Maxwell, (Tr. Tra. 44,45,76,77),subsequently he also admitted writing and being interviewed in statements. (DEF000013, 42). During Mr. Johnston interview on February 20th, 2018, he was asked if he had witnessed Allen attack Brown he stated "no." Mr. Johnston was asked if Brown ever asked to be move while being withheld with Mr. Allen; contrary to his trial testimony,(Tr. Tra. 79-85),he admitted that **"Brown had asked" him to be move, "but isn't a Z-code." "Another thing I remember about Brown is the one day he had a bloody nose, asked to see medical, wanted different sheets and wanted another jumpsuit." "Brown told me from time to time he gets a bloody nose." "I let the Sgt. Know about it and medical was actually doing rounds at that time so I informed them also."**

Although Mr. Johnston's "sleazy" testimony contradicted his previous statement;(79-85), "Brown did not ask me to see medical," inter alia, at trial Mr. Johnston also confirmed that he had no training in the medical field. Retrospectively even assuming that prior to February 7th, Brown had not aggregated any medical issues to whom was serious; at trial, Brown established that on February 7th, 2018, something was wrong upon multiple encounters requesting to see medical, to whom her requests were repressed. (91,92,80,81). Furthermore Mr. Johnston had return to 108 cell multiple times, essentially at one point predicating; " Easter and those guys want you to hand over anything that has blood on it." (Dep. Tr., at



P. 66). Mr. Johnston exchanged Brown's clothing not limited to jumper, t-shirt, boxers, socks, linens, only to ignore her injuries. (Ex. 44), (Tr. Tra. P. 54,55 175,176,177,188,189).

At trial, Mr. Fochtman vaguely expressed that Mr. Heaster told him that Brown had a "nose bleed" on February 7th, 2018. In principle it was Mr. Fochtman's rationale that he went to 108 cell to investigate on February 7th, 2018. Mr. Fochtman testified that upon inspecting Brown and Allen's hands it did not appeared that the parties engaged in a physical altercation; (T. P. 468) inter alia "Brown had refused medical treatment. Contrary to Mr. Fochtman's testimony, defendant Johnston acknowledged that Brown sought "medical attention" around the same time Fochtman established a point of encounter with Brown; why would Brown refuse treatment if offered through you? (EX. 101, DEF13).

Deliberate indifference by prison officials may be evidenced by intentional refusal to provide care known to be medically necessary, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, or denial of reasonable requests for treatment resulting in suffering or risk of injury. Prior to February 13th, 2018 Brown establishes she had multiple encounters with Mr. Fochtman and Mr. Johnston requesting medical care, but was outright deprived. At the time the defendants did not have a reason to believe that Brown was under medical care sense it was through their efforts to whom Brown could see medical; as correctional staff who are not medical experts, may rely on medical officials for ongoing treatment. *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).(Ex.44).

When a prisoner alleges deliberate indifference of his or her serious medical needs, a district court may properly require expert medical opinions when, as layman, a jury would not be in a position whether any of the condition described by the plaintiff's could be classified as serous. Expert testimony is not necessarily in some cases. Pearson, 850 F .3d at 535-36, 539.

Prison official violate the Eighth Amendment when they act deliberately indifferent to a prisoner's serious medical needs. To prove this claim, a plaintiff must show that: (1) the defendant were deliberately indifferent to his medical needs and (2) those needs were objectely serious. James v. Varano, 2023 U. S. App. LEXIS 960. A person medical professional acts with deliberate indifference towards an inmate's medical needs when he or she knows of and recklessly disregards excessive risk to the inmate's health. The deliberate indifference prong also requires showing that a defendant subjectively appreciated the risk of harm without proper care but ignored the risk or delayed providing care for a nonmedical reason. Expert testimony may be helpful to examine the adequacy of care, but expert are not required when the facts permit a layperson to judge whether the care was clearly substandard. See James v. Varano, 2023 U. S. App. LEXIS 960.

In Varano, 2023 U. S. App. LEXIS 960, James stated he was unable to stand he told offers he was having an asthma attack, James contuiend to wheeze, gasp for air, cough, thus he informed the officers that he needed his asthma inhaler and medical care. James was placed in a holding cell, and stripped searched; a medical nurse visually examined James from the outside of the cage. The nurse discussed admitting him to the infirmary but there were no room. James collapsed on the floor in a cell ; james was scheduled for a chronic care clinic and psychiatric. Medical official order lab testing; later that day James was escorted to the shower "he nearly collapsed. James alleged he again requested medical

attention but never received it. James contends that he spent "four days" laying on the cell floor, during that time he was continuously deprived access to medical care, refusing to notify medical; and was denied sick-call forms. James was later treated at a hospital for "acute exacerbation of asthma."

Like James, Brown was continuously deprived access to medical care, officers refusing to notify medical; and was denied sick-call forms while in a ('RHU") cell with no stress button. Brown was initially deprived of medical treatment on February 3rd,2018 upon Defendant witnessing Allen assaulting Brown.(Tr. Tra. P. 169-171),( Dep. Tr. at. Pg. 33). ( Phase 1, Package 11, Ex. 44). Brown communicated to Mr. Plocinik, and Mr. Fochtman, Mr. Allen's actions, on February 4th, 2018 also requesting to see medical. (Brown exhibit 44),(Tr. Tra. P. 268-270)[1314]Brown testified that the night of February 5th, Mr. Allen pulled her out of bed, causing her to bleed. Brown to whom was over powered putting Brown into a "choke hole," as he attempted to engage into sexual acts with Brown. (Dep. Tr. at. P. 46, 47, 48). Mr. Johonston testified that he encountered Brown on February 7th, 2018; only to Brown flagging him down about nose bleed. (T.P.70,71,72,87)

Mr. Allen forcedly "thrust" into Brown's anal after forcing her jumper off; as Brown was on her back with legs somewhat over her shoulders. Mr. Johnston return to 108-cell, "they want you to give me everything that has bleed on it," it was apparent that Mr. Johnston was ordered to exchange Brown's clothing, and or linens, Brown's jumper now missing buttons, discharged on the floor somewhere. Brown handed over her linen, boxers, jumper, socks, t-shirt. Consequently Brown requested to see medical again and again, however Brown was not provided the opportunity. (Dep. Tr. At. P. 66), (Phase 3, Package 17, Exhibit 101. at. DEF000013, 42). A second rape assault was initiated by Mr. Allen, to whom Brown's jumper was forced off. (87).

Trice testified that she had an encounter with Brown on February 13th, 2018. "Brown had refused treatment', Brown refused because she wants to be seen by a doctor', and refused photos, 'Brown did not have any apparent injuries. 'Furthermore "Brown stated he was ok because he was in a single cell.( Summary Judgment Exhibit, 99 ). . (Tr. Tra. P. 109-112). The defense admitted (Exhibit 14, page 84), specifically nurse Tice depiction to (Exhibit 14, Pg. 84) was that "Brown claim he was being abuse by his cellmate; had inmate remove from his cell and taken to the psyche office." "I spoke with him regarding a sick call slip." "He claimed he was abused, punched and strangled." "No burses or marks around neck were noted or evidence of the alleged allegations, no acute distress noted." "Inmate refused to be taken to medical to be assessed by me and stated he is only be seen by the doctor."

Brown's allege refusal of an HIV antibody test on February 15th, 2018; and consequence alleged refusal of treatment on February 14th, an encounter with nurse Emigh, an alleged encounter with nurse Gessel on February 14th pursuant to "needs to sick call," (Exhibit 14. Pg.82). Witness Tice also proffered



testimony as to Brown refusing care on February 23rd, 2018. (Summary Judgment Exhibit 100) Statement made by nurse Emigh; "Nursing Assessment, no injuries observed by this nurse, pictures taken of inmate as inmate allowed."

### F. Serious Medical Need

The medical record created after February, may not be relevant as it if open door relating to defendants deprived or delayed treatment from February 3rd, through 7th. Thus in order to state a claim that the medical care provided by the defendants or medical staff, a prisoner must plead that his needs were serious and that prison officials were deliberately indifferent to those needs. Inmates of Allegheny County Jail v. Pierce, 612 F .2d 754, 762 (3d Cir, 1979). A medical need is serious if it is " one that has been diagnosed by a physician as requiring treatment or not that is so obvious that a lay person would easily recognize the necessity for a doctor's attention. "Woloszyn v. County of Lawrence, 396 F .3d 314, 320 (3d Cir. 2005).

With regard to the first component, " because society does not expect that prisoner will have unqualified access to health care, deliberate indifferent to medical needs amounts to an violation only if those needs are serious. " Hudson v. McMillian, 112 S. Ct. 995, 1000 (U. S. 1992) also see Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F .2d 326, 347 (3d Cir. 1987). A medical need is also serious if it can be reasonably said to cause "wanton and unnecessary infliction of pain'," or result in permanent disability or loss.

Brown did not receive immediate attention after she sustained multiple injuries from February 3rd, through 7th, 2018. Not limited to rips pain, back pain, groin tightness, head contusion, neurological pain, bleeding from the "anal,""nose," mouth, knee. (Dep. Tr. At. P. 66), (Phase 3, Package 17, Exhibit 101. at. DEF000013, 42). ( Phase 1, Package 11, Ex. 44). Defendants refused to take prompt actions through multiple encounters. At no time was Brown provided pain medication. Brown was subsequently deprived of sick-calls, until February 13th, 2018.(95), (Brown Summary Judgment Ex. 74). Upon Brown encountering Ms. Trice, no tools were utilize to diagnose any of Brown's symptoms It is well settled that pictures are not a form of treatment. It cannot be confirmed that Brown nose wasn't broken just by a brief visual scan.( Summary Judgment Exhibit, 99 ). Subsequently it could not be concluded that Brown's head injury were not serious if never examined; even assuming Brown was looked at, Brown cannot be deprive treatment due to lack of burses to "a dark pigment skin." Furthermore, Brown had established that Allen had a plethora of friends and or gang mates, so much so they would echo their thoughts through the cell doors. "All body joooons,' rap your hands too." On February 4th, Mr. Allen continued to show his propensity for violence, punching Brown after rapping his hands with socks, and hitting Brown in abdominal area. (T.P.186,187), ( Summary Judgment Exhibit, 100).

Inasmuch Ms. Trice encounter with Brown on February 13th, (95,109), was brief, the witness testified that Brown had refused treatment and pictures. (Def. Ex. 14, pg. 84). "Why would Brown draw attention to non existence injuries, just to refuse treatment;" knowing that this will be documented by medical staffs?" (Tr. Tra. P. 135).The fact that Brown left her cell, compelled with writing a statement is akin to the fact that Brown was cooperative. It is widely analogous to Brown cooperating on February

that a substantial risk of serious harm exists, and he must also draw the inference." Id. Thus Brown had meat her burden that both Mr. Fochtman and Mr. Johnston known of Brown serious medical condition in subsequently depriving Brown for medical treatment.

[illegible text]

Court must construed complaint liberally in light of prisoner's pro se status. Brown's complaint articulated was distinctively detail and consistent as Brown made it apparent that she was only bringing claims forth relating to the same transaction, occurrence, or series of occurrence in connection with her sexual assault clams against defendants at SCI Huntingdon in their individual and official capacity. See (Amended Complaint. at. P 1, at. P. 5 of 13). Brown was precise as to each defendant actions or lack thereof pursuant to her serious claims. Brown brought forth claims of Cruel And Unusual Punishment Under the Eighth Amendment, Due Process Under The Fourteenth Amendment, Retaliation Under The First Amendment, State Tort Claims of Negligence, and Intentional Infliction of Emotional Distress, Municipal Claims of Inadequate Medical Treatment; an Inadequate Housing practices For LGBTQ people. (at. P. 11, 12).

Although Brown challenged the DC-ADM 803 Mailing Policy, it was brief and vague, and not to be analyzed as so distinct. (at. P. 12). Previously Brown's initial complaint was filed on August 1st, 2018, accompany with her Order To Show Cause, & Preliminary Injunction. (Doc. 1, 3). On August 28th, 2018, Brown's Motion for leave to proceed IFP (7), was Granted, all other document were Denied Without Prejudice. (Doc.10). Brown was order to file an Amended Complaint. The District Court predicated that Brown Complaint violated Federal Rules of Civil Procedure 8 and 20. "The claim contained therein concern a number of unrelated separate transactions or occurrence or series of transactions or occurrences against various defendants and do not involve an issue of law or fact common to all defendants."

Brown was Granted an extension of time of time to file her Amended Complaint. (Doc. 14, 16).Brown filed her (12) page Amended Complaint; also acknowledged as Document Filed. (Doc.22). On November 1st, 2018, the District Court rejected Brown's Amended Complaint as erroneous; the disposition depicted that Brown had failed to comply with Court's Orders (Docs. 10 and 16). Thus subsequently Brown was ordered to file a proposed Amended Complaint. (Doc. 24), inter alia the District Court transcended that Brown had violated Federal Rules of Civil Procedure 8 and 20. The District Court erred inasmuch concluding that Brown Amended Complaint violated Federal Rules of Civil Procedure 8 and 20.

14th, leaving her cell, went to a cage in the ("RHU"); where nurse Emigh's directed that her sole obligations were to only take pictures. ( Def. Ex. 14, Pg. 83). The record is also evident that Brown wrote multiple sick-calls after February 13th, seeking treatment, consistent with ongoing pain. (Brown Summary Judgment Ex. 75, 76), as Brown depicts that prior to February 13th, she was deprived sick calls. Brown concede that a point of encounter was had through the cell door; while the provider deliberately spoke loudly knowing that Brown was being harassed and threaten by other inmates sense her claims were promulgated, as Brown refused to talk about her anal bleeding through the door asking to be seen outside the cell; to whom Brown request was rejected, subsequently the provider departed. ( Def. Ex. 14, Pg. 82). Also see (Def. Ex. 14, Pg. 78).

A similar encounter through her cell door with Nurse King was had; upon writing multiple sick calls. (S. J. Ex. 75, 76). Also see Browns (P. 3, Package 19, Ex. 126,127, 128). Nursing official skilled with institutional operations, known that Brown was subject to imamates threats, banging on walls in their presents, sense Brown clams were so promulgated; due to such knowledge, they initiated point of encounters through the cell doors devoted in speaking loudly, seeking sensitive information, refusing to take Brown out in private. To the contrary documents also exist pursuant to Brown elements to remembering in connection with her victimization prior to the encounter with Nurse King (Phase 3, Package 15, Ex. 94) also (Defendants Ex. 49), also (Ex. 98), (Defendants Ex. 21). Also at the alleged point of encounter with Nurse King on February 23, 2018, Brown had pending grievance against Ms. King and the medical department. See (PH 2, Package 6, Ex 24), Ms. King had refused to treat Brown in connection with the Camp Hill sexual assault. Brown had also written another grievance challenging an anal exam conducted by P.A. Gomes around November 17th, 2017. (Ph. 1, Package 9, Ex. 31), in connection with her previous abuse claims. Although Brown later meat with King outside her cell; it was mostly vague talks with other leadership present; and it did not lead to medical treatment.

## G. Deliberate Indifference

Brown claims that defendants Mr. Johnston, and Mr. Fochtman were deliberate indifference to her serious medical needs; when they deprived Brown of medical treatment from February 4th, through February 8th, 2018. A prison official does not act with deliberate indifference unless the official knows of and disregards an excessive risk to inmate health and safety, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm. Farmer v. Brennan, 511 U. S. 825, 837 (1994).

It is well settled that when an inmate is provided with medical care and the dispute is over the adequacy of that care, an Eighth Amendment claim does not exist. See Nottingham v. Peoria, 709 F. Supp. 542, 547 ( M. D. Pa. 1988). Mere disagreement over treatment does not violate the Eighth Amendment. Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F .2d 326 (3d Cir. 1987). Medical negligence alone cannot result in an Eighth Amendment violation, nor can disagreements over The professional judgment of a health care provider. Estelle v. Gamble, 429 U. S. at 105-06. (medical malpractice is insufficient basis upon which to establish an Eighth Amendment violation);

15

Brown handed Mr. Plocinik a request of staff requesting help. Mr. Allen was afforded recreations on February 5th, 6, 7th, but not on the 8th. Brown as to the caveat, encountered Mr. Plocinik, Mr. Fochtman, and Mr. Johnston on February 7th, after being sexually victimized, Brown injuries were obvious, so much so that Mr. Johnston was send to exchange Brown's clothing and linens due to "blood stains." (Tr. Tra. P. 186-190). Mr. Allen galvaniclly admitted that he had sexually assaulted Brown. Brown she sustained multiple injuries from February 3rd, through 7th, 2018. Not limited to rips pain, back pain, groin tightness, head contusion, neurological pain, bleeding from the "anal,""nose," mouth, knee. (Dep. Tr. At. P. 66), (Phase 3, Package 17, Exhibit 101. at. DEF000013, 42). ( Phase 1, Package 11, Ex. 44). During this time defendants deprived Brown sick calls and to relate to medical officials that Brown needed medical care; as Brown could not do that herself; in a corner cell with no stress button, furthest from the bubble in the, ("restricted housing unit)." (Ex. 51).

Due to the location of the cell in the corner, it was a common practice that nurses would not walk back to the corner cells unless inmates within such cells are on consistent medication. Due to the logistics nurses routinely ignored inmates yelling through the cell doors. (Ex. 44). At Trial Mr. Johnston testified that the practice to whom medical officials are contacted for medical emergency was consistent with walking to the bubble alerting bubble officers to call medical. (T.P.67). During Mr. Johnston interview on February 20th, 2018, he was asked if he had witnessed Allen attack Brown he stated "no." Mr. Johnston was asked if Brown ever asked to be move while being withheld with Mr. Allen;(T.P.69-77). contrary to his trial testimony, he admitted that **"Brown had asked" him to be move, "but isn't a Z-code." "Another thing I remember about Brown is the one day he had a bloody nose, asked to see medical, wanted different sheets and wanted another jumpsuit." "Brown told me from time to time he gets a bloody nose." "I let the Sgt. Know about it and medical was actually doing rounds at that time so I informed them also."** (DEF000013, 42). Mr. Johnston statement is akin to the fact that he known Brown had requested to see medical; even assuming that Johnston believed that Brown gets nose bleeds from time to time.

The Eighth Amendment claim must allege facts from which it can reasonably be inferred that the defendant acted with deliberate indifference to his serious medical needs. Id. At 104; see Groman v. Township of Manalapan, 47 F .3d 628, 637 (3d Cir. 1995)(" Failure to provide medical care to a person in custody can rise to the level of a constitutional violation. Only if that failure rises to the level of deliberate indifference to that person's serious medical needs.") This is a two part inquiry," a plaintiff must make (1) a subjective showing that 'the defendants were deliberate indifferent to [his or her] medical needs' and (2) an objective showing that 'those needs were serious." Pearson v. Prison Health Serv., 850 F .3d 526, 534 (3d Cir. 2017) (quoting Rouse v. Plantier, 182 F .3d 192, 197 (3d Cir. 1999). To act with deliberate indifference, the prison official must have known of the substantial risk of serious harm and must have disregarded that risk by failing to take reasonable measures to abate it. Farmer, 511 U. S. at 837. "[t]he official must both be aware of facts from which the inference could be drawn

---

$^{15}$ It should be noted that Brown had objected to Defendants Exhibits 14 in its entirety, not limited to Pg, 13, 78, & 82, sense she did not have access to the documents during and after discovery.

Fed. R. Civ. P. 8(d) Pleading to be concise and direct; 8(d)(1) Each allegation must be simple, concise, and direct. 8(e) construing pleadings, pleading must be construed so as to do justice. Requirement of complaint may be stated , in different words, as being statement of facts showing (1) Jurisdiction of court; (2) ownership of right by plaintiff; (3) violation of that right by defendants; (4) injury resulting to plaintiff by such violation; and (5) Justification for equitable relief where that is sought. Patten v. Dennis, 134 F .2d 137, 1943 U.S. App .LEXIS 3500 (9th cir. 1943). Thus stating a claim for purposes of Fed. R. Civ. P. 8 requires complaint with enough factual matter (taken as true) to suggest required elements; this does not impose probability requirement at pleading stage, but instead simply calls for enough facts to raise reasonable expectation that discovery will reveal evidence of necessary elements. Phillips v. County Of Allegheny, S15 F .3d 224, 2008 U. S. App. LEXIS 2513 (3d cir. 2008). Although inmate's complaint was terse and disjointed, especially with respect to " who did what to whom, when, where, and why," court construed complaint liberally in light of prisoner's pro se status and determined that it gave sufficient notice to prison medical personnel pursuant to Fed. R. Civ. P. 8(a). Carter v. Newland, 441 F. Supp. 2d 208, 2006 U. S. Dist. LEXIS 47275 (D. Mass. 2006).

It appears that Brown's Amended Complaint would satisfied the elements of Fed. R. Civ. P. 8 & 20. Brown's Amended Complaint was concise, direct; and consistent with enough factual matter, also related as arising out of the same transaction, occurrence, or series of such. See Carter v. Newland, 441 F. Supp. 2d 208, 2006 U. S. Dist. LEXIS 47275 (D. Mass. 2006).Subsequently Brown also showed ownership of her claims, ample with how each defendant violated her constitutional rights. (Doc. 22).

Rule 20 Permissive Joinder of Parties; 20(a) the assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transaction or occurrence (B) any question of law or fact common to all plaintiffs will arise in the action. Purpose of Rule 20 is to promote trial convenience and expedite final determination of disputes, thereby preventing multiple lawsuits. Mosley v. General Motors Corp., 497 F .2d 1330, 7 Empl. Prac. Dec. (CCH) 9408, 8 Fair Empl. Prac. Cas. (BNA) 92, 18 Fed. R. Serv. 2d (Callaghan) 1142, 1974 U.S. App. LEXIS 8388 (8th Cir. 1974). In assessing joinder under Rule 20, court operates in area of considerable discretion, and considerations involved are essentially those of fairness; thus, in determining propriety of joinder, trial court must analyze complaint to determine what has been alleged and what claims are made. Kuechle v. Bishop, 64 F.R.D. 179 19 Fed. R. Serv. 2d (Callaghan) 802, Fed. Sec. L. Rep. (CCH) 94776, 1974 U.S. Dist. Brown convoy's that her Amended Complaint is akin to cureing the defect that was precisely identified by the District Court pursuant to (Docs. 10 & 16). For example in (Doc. 10), the District Court directed Brown to file an amended complaint that to be direct, concise, Brown was strictly cautioned that the inclusion of separate, unrelated will be considered failure to comply. (Doc. 10 at. P. 3), similar as to (Doc. 16). In receipt to whom, Brown acknowledged depiction of wishes at the Judge; Brown drafted an amended complaint that targeted only defendants at a single institution SCI Huntingdon.

[illegible faded text block]

Hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule.

Brown claims she was transferred by the DOC to SCI Greene from SCI Forest in March of 2021. While in the Restricted Housing Unit ('RHU") at SCI Greene, Brown was directed to go to recreation, whom the order came from Mr. Keith, retrospectively Brown did not know the inmate at the time. Consequently Brown followed the order at the direction of thee, Brown came out the next morning and was placed into a restricted cage. Mr. Keith Lambing transcended that he was a close acquaintance of Haime aka Allen, and subsequently engaged by inquires inter alia, if and how Brown known Allen? As an essential component Brown was directed to watch her back that Mr. Allen was housed at SCI Greene; currently in the ("RHU"), and coming out for recreation shortly. Subsequently Mr. Allen was brought out to a distant cage. "You bitch ass nigga,' I fucked you and you told." "Your faggot ass told." I fucked you at Huntingdon,' you remember 108 cell, you rat." "Shit his faggot ass down Keith." Mr. Lambing was ordered to "shit Brown down," in reprisal to Brown's actions at SCI Huntingdon; transcended by Mr. Lambing.

"Haime my man, but I in wit the faggot shit just to belittle a nigga, the shit you did to Brown give me chills; you stressing me out dog." "Mr. Lambing communicated with Mr. Allen, "Yo Haime I can't do it,' yet Brown's a rat, but that's some faggot shit you did." "Just watch your back, you don't have to worry about me, but everybody knows." During this time, Brown and Mr. Lambing were housed on the same ("RHU") block. Brown was housed on this block with Mr. Limbing from November through February of 2021. Pestering and threats of serious bodily harm followed by multiple inmates one of whom claimed he was housed at SCI Huntingdon during the time of Brown's claims.

In principle, Mr. Allen made a spontaneous statement to a close acquaintance once he received word that Brown was on the property of SCI Greene. Furthermore the Declarant's testimony would also corroborate' with a previous statement made by Mr. Castillo, (Ex. 127, 128). "Inmate harasses Garter all the time, the inmate tell him he got rape and he tell the police.""Some guy in the yard name Sam told me the guy name Allen on A-pod rape Garter in cell 108." also see (Ex. 44). At trial defendants objected to Mr. Keith to whom Brown presented as a witness.(Tr. Tra. P. 312-317). Defendants claimed that Mr. Keith's testimony was hearsay; (T.P.314,315) subsequently their objection was sustained by the

Honorable Carlson. The trial court erred to whom was prejudice to Brown since Mr. Keith Lambing's testimony was relevant, for either substantive evidence or for impeachment purposes. At the very lease Mr. Lambing's responses to Mr. Allen while in the recreation cage would be admissible since such statements are not offered to prove truth of the matter asserted but to show that words were spoken. See Embree v. National Starch & Chemical Corp., 10 Fed. R. Evid. Serv. (CBC) 704 (9th Cir. Apr. 16, 1982).

In action by physician and his wife against anti-abortion protestors, district court did not abuse its discretion in admitting threatening letters and telephone calls which plaintiffs received since they were not alleged to be factual statements, truth of which was in question, rather threats were verbal acts. Tompkins v. Cyr, F .3d 770, 46 Fed. R. serv. 3d (Callaghan) 319, 53 Fed. R. Evid. Serv. (CBC) 1424, 2000 U. S. App. LEXIS 1027 (5th Cir. 2000). A witness's testimony that another woman asked her if she knew anyone who could kill someone for her was admissible evidence of verbal act; it was fact that declaration was made, and not truth of declaration, which was relevant. United States v. Childs, 539 F .3d 552, 2008 FED App. LEXIS 18616 (6th Cir. 2008).

Fed. R. Evid. 803(3) provides an exception for evidence of state of mind. The state of mind exception to the hearsay rule allows the admission of extrajudicial statements to show the state of mind of the declarant at that time if that is the issue in the case. It also allows such statements to show a future intent of the declarant to perform an act if the occurrence of that act is at issue. United States v. Brown, 160 U. S. App. D. C. 190, 490 F .2d 758 (1970).

In Wallace v. Price, 2002 U. S. Dist. LEXIS 19973 petitioner Mr. Wallace claimed his conviction for first degree murder should be vacated because the trial court refused to admit, either as substantive evidence or for impeachment purposes, Henry Brown's statement that he, and not Wallace, shot a teenage clerk. At its core, Wallance's claim turns on the admissibility of one phrase: "[i} shot the girl." A few days after the murders, Henry Brown allegedly said these words to his then girlfriend, Anita Johnson. Johnson, in turn, give a written statement to the police in which Brown's damaging words were duly recorded. At trial the Commonwealth introduced the testimony of Anita, to whom she offered important testimony about the activities of Brown and wallance both before and after the crime. In this fashion the petitioner's first degree murder conviction was vacated.

In Chambers, the supreme Court held that "some exculpatory statements contained a 'persuasive assurance of trustworthiness,' because (1) the confession was spontaneously made to two close acquaintances shortly after the murder occurred; (2) each statement was corroborated at trial by other independent evidence; (3) the confession was self incriminating and unquestionably against penal interest; and (4) the declarant was available for cross-examination." Chambers, 410 U. S. at 300-301, as summarized by Cunningham, 941 F .2d at 539. Although the Chambers factors are instructive, they are "not exhaustive or absolute," and a defendant is not required to meet all four factors before a hearsay statement will be admitted. Cunningham, 941 F .2d at 540.

Other Courts have considered similar factors, including: the relationship between the declarant and the exculpatory party; whether the statement was voluntary; whether there is any evidence that the statement was made to "curry favor" with authorities; whether the declarant's statements are

contradictory; and whether other evidence corroborated the statement. See, e.g., Moses, 148 F .3d at 280; Boyce, 849 F .2d at 836-37; United states v. US Infrastructure, Inc., 576 F .3d 1195, 1208 (11th Cir. 2009) The district court has substantial discretion in determing what constitutes a spontaneous declaration. The general objective of the judicially doctrine known as the hearsay rule is the exclusion of out-of-court statements made by persons who are not present at trial since, under such circumstances, the credibility of the statements cannot be tested on cross examination. Gov't of V.i. V. Dyches, S07 F .2d 106.

Brown presents under rule 608, statement was admissible for the purposes of attacking the witness's character for truthfulness on cross-examination. See United States v. McGee, 408 F .3d 966, 981-83 (7th Cir. 2005); United States v. Wilson, 985 F .2d 348, 351-52 (7th Cir. 1983). Apparently the statement reflects instances of Mr. Allen's conducts to whom Mr. Lambing's testimony would support the witness's characters for untruthfulness, thus is admissible on cross-examination "if they are probative of truthfulness or untruthfulness." In re Peanut Farmers Antitrust Litig., 2021 U. S. Dist. LEXIS 63971.

Brown arguer's at the very least, Mr. Allen's statement was admissible under Rule 613 as extrinsic evidence. For example, The Third Circuit has held that in the discretion of the court, specific instances of the conduct of a witness, "if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness... concerning his character for truthfulness or untruthfulness," for purpose of attacking the witness's credibility. United States v. Leake, 642 F .2d 715, 718 (4th Cir. 1981).

Under Federal Rule of Evidence 801©, "Hearsay' is any statement that a declarant makes outside of court and that is offered to prove the truth of the matter asserted in the statement. Statements offered for non-hearsay purposes are not hearsay. Under Rule 801 courts did not error when admitting statements not alleged to be factual statement, or truth of which was in question, rather threats were verbal acts to whom is excluded from hearsay. See Tompkins v. Cyr, 202 F .3d 770, 46 Fed. R. Serv. 3d ( Callaghan) 319, 53 Fed. R. Eiv. Serv. (CBC) 1424, 2000 U. S. App. LESIX 1027 (S[th] Cir. 2000). Here in Brown's case, she encountered Mr. Allen to whom thee admitted to abusing Brown; followed by threats to whom Mr. Lambing witnessed and was willing to testified. Clearly it could also be used to place Mr. Allen's statements in" context;" and not for the truth. See United States v. Detelich, 351 Fed. Appx. 616, 2009 U. S. App. LEXIs 24313 (3d Cir. 2009).

Fed. R. Evid. 804 defines various situations where hearsay testimony comes in even though the declarant is unavailable. Among these are dying declarations, former testimony, and declarations against interest. Miller V. Keating, 754 F .2d 507.A hearsay statement made by an unavailable declarant can be admitted pursuant to Rule 804(b)(3) if, at the time of its making, "it so far tended to subject the declarant to civil or criminal liability. Since there is no dispute over Mr. Lambing's unavailability, the only question under Rule 804(b)(3) is whether the admitted statements were sufficiently against Mr. Lambing's interest so as to be deemed reliable." Williamson v. United States, 512 U. S. 594, 603-604, 129 L. Ed. 2d 476, 114 S. Ct. 2431 (1994).

$$\sum \boxed{86} \lessgtr$$

Rule 803(1) provides an exception to the hearsay rule for a "present sense impression." Three requirement must be met: (1) the declarant must have personally perceived the event, (2) the declaration must be an explanation or description of the event rather than a narration; and (3) the declaration and the event described must be contemporaneous. See United States v. Mitchell, 145 F. 3d 572, 576 (3d Cir. 1998). Likewise, under Fed. R. Evid. 803(2), which are: (1) a startling occasion, (2) a statement relating to the circumstances of the starting occasion, (3) a declarant who appears to have had opportunity to observe personally the events, and (4) a statement made before there has been time to reflect and fabricate. Here Brown claims that Mr. Lambing would have personal knowledge as it obtain to Allen's statement. A witness may not testify about a subject without personal knowledge. Fed. R. Evid.602.

This rule applies with equal force to hearsay statements. To be admissible, the declarant of an excited utterance must personally observe the starting event. In retrospect Mr. Lambing's comment as to responding to thee after Allen statement "I fucked you," was "the shit you did to Brown give me chills; you stressing me out dog." Clearly Mr. Lambing appeared to be startled to say the lease, to whom excited utterance may authorize admission. 6 J. Wigmore, Evidence 1750-51 (J. Chadbourn rev. 1976). See Fed. R. Evid. 803 advisory committee note; S Saltzburg & K. Redden, Federal Rules of Evidence Manual 574-75 (3d ed. 1982). J. Weinstein, Evidence para. 803(2)[01] (1984). See United States v. Brown, 254 F. 3d 454, 460 (3d Cir. 2001) ('Fed. R. Evid. 803(2) does not require that, in order to be admissible, the statement be contemporanceous with the starling event, but rather only with the excitement caused by the event.").

Federal Rule of Evidence 701 govers the opinion testimony of a lay witness. Alay witness may testify as to his or her opinions if the opinion is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determing a fact in issue; and (c) not base on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Rule 701 permits a lay witness to offer an opinion on the basis of facts that the witness has perceived, provided that the opinion is well founded on personal knowledge and subject to cross-examination, Teen-Ed, Inc. v. Kimball Intern, inc., 620 F .2d 399, 403 (3d Cir. 1980); Hirst v. Invernness Hotel Corp., 544 F .3d 221, 225, 50 V.I. 1122 (3d Cir. 2008). Mr. Lambing's testimony would convey "firsthand knowledge of the facts predicated, secondly the testimony would helpful to the trier of fact in issue namely whether Allen rape Brown, and admitted it.

Mr. Brown challenges the District Court's grant of Summary Judgment in favor of Defendants Maxwell & Wocinik, pursuant to **Brown's** Eighth **Amendment** Medical Treatment Claims (Gr. ???)

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001)

(citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)); accord Fed. R. Civ. P. 56 (c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

[P]rison officials violate the Eighth Amendment's proscription of cruel and unusual punishment when they exhibit 'deliberate indifference to serious medical needs of prisoners.'" Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991) (quoting Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)); see also Herman v. Cty. of York, 482 F. Supp. 2d 554, 564 (M.D. Pa. 2007) (quoting Estelle, 429 U.S. at 105-06). "An overdose is undoubtedly a serious medical condition." Wichterman v. City of Philadelphia, Civil Action No. 16-5796, 2019 U.S. Dist. LEXIS 119136, 2019 WL 3216609, at *6 (E.D. Pa. July 17, 2019).To be liable on a deliberate indifference claim, a defendant prison official must both "know[ ] of and disregard[ ] an excessive risk to inmate health or safety."The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware.

However, subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk. Finally, a defendant can rebut a prima facie demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring.Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (quoting and citing Farmer v. Brennan, 511 U.S. 825, 837-38, 842, 844, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)) (citations omitted) (alterations in original). The needless suffering of pain when relief is readily available gives rise to a cause of action against those whose deliberate indifference caused the inmate's unnecessary pain. Westlake v. Lucas, 537 F.2d 857 (6th Cir. 1976).

Honorable Judge Jones reasoned that "the record is devoid of any evidence that either Plocinik or Maxwell denied Brown medical treatment." Thus the defendants were entitled to an entry of Summary Judgment. (Doc. 137; at. Pg.27). To the contrary the records is evident that at the time Brown was withheld with Mr. Allen defendants knew Brown was being assaulted, resulting in pain and injuries. Brown she sustained multiple injuries from February 3rd, through 7th, 2018. Not limited to rips pain, back pain, groin tightness, head contusion, neurological pain, bleeding from the "anal,""nose," mouth, knee. (Dep. Tr. At. P. 66), (Phase 3, Package 17, Exhibit 101. at. DEF000013, 42). ( Phase 1, Package 11, Ex. 44). Brown claim's an inmate Shae Delgrosso witnessed Mr. Plocinick and other officers forcing her into 108 cell "have fun with him, he's a kiddie toucher.". (Ex. 44). The Court must determine "whether the prisoner was actually deprived of adequate medical care" and "whether the inadequacy in medical care is sufficiently serious." Salahuddin, 467 F.3d at 279, 280. Several factors are relevant to the seriousness of the medical condition: whether a reasonable doctor or patient would comment on the condition;

whether the prisoner's daily activities are affected by the condition; and, whether the condition causes chronic and substantial pain. *Id.* at 280.

Brown was forced into the cell, on February 3rd,2018; as the cuffs came off, Defendant Plocinik witness Mr. Allen hit Brown multiple times apparently, Allen was the first to uncuff; "have fun with him, he's a kiddie toucher." During this time defendants deprived Brown sick calls. While picking up mail Mr. Plocinik returned to 108-cell, Brown passed a note within request of staff crystallizing help to Mr. Plocinik. .(Tr. Tra. P. 268-270). Brown also requested to see medical but was ignored. ( Phase. 1, Package. 11, Exhibit, 44)." Furthermore, Brown had established that Allen had a plethora of friends and or gang mates, so much so they would echo their thoughts through the cell doors. "All body joooons,' rap your hands too." On February 4th, Mr. Allen continued to show his propensity for violence, punching Brown after rapping his hands with socks, and hitting Brown in abdominal area. ( Summary Judgment Exhibit, 100). In the middle of the night on February 5th,2018, Brown hit her head after Mr. Allen pulled her out of bed, causing her to bleed. (Dep. Tr. At. P. 46, 47, 48). Brown to whom was over powered putting Brown into a "choke hole," as he attempted to engage into sexual acts with Brown. (Dep. Tr. At. P. 46, 47, 48). Mr. Allen could not get around taking Brown's jumper off her .. Due to the attempted "rape," Brown sustained multiple injuries .(T.P.188).

Brown encountered Mr. Maxwell and Mr. Plocink at different times on February 6th, Brown predicated concerns to both defendants, even articulating the rape attempt the night before, as Mr. Allen compressing Brown to tell the defendants. (T.P.174). Mr. Maxwell witness Allen hit Brown demanding Mr. Maxwell to remove Brown, in repercussion, Brown would not eat, and or an imminent "rape" assaults threats, Mr. Maxwell did not same face, as he parted ways. ( Dep. Tr.  at. P. 52), ( Dep. Tr.  at. P. 52). (Ex. 44). Under the objective prong, the prisoner must show an actual deprivation of medical care that was "sufficiently serious." *Salahuddin,* 467 F.3d at 280. Determining whether a deprivation reaches this threshold involves two inquiries "tailored to the specific circumstances of each case." *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir. 2003).  Brown established that on February 7th, 2018, something was wrong upon multiple encounters requesting to see medical, to whom her requests were repressed; one of whom was defendant Plocinik. .(Tr. Tri. P. 175,176,187,188).

If the prisoner complains of a delay or interruption in treatment, the seriousness inquiry "focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Id.*

Brown was not afforded the opportunity to see medical staff on February 4th, 5th, 6th, and 7th, On February 4th. (Ex.44). Brown also remembers Mr. Plocinik approaching the cell. Mr. Plocinik and Mr. Fochtman both joked about Brown conceiving upon returning to the cell, "it's a boy; "no" it's a girl." Mr. Fochtman asked, "Which one of yall am 'I going to Wright up for fighting?" Mr. Allen replied, "There was no fight; I did what I told yall I was going to do." (Dep. Tr. At. P. 51, 52). Mr. Johnston was send to exchange Brown's clothing and linens due to "blood stains." Mr. Allen galvaniclly admitted that he had sexually assaulted Brown. Brown's clothing, and or linens were exchanged; handing over her linen, boxers, jumper, socks, t-shirt. Consequently Brown requested to see medical again and again, however

Brown was not provided the opportunity. (Dep. Tr. At. P. 66), (Phase 3, Package 17, Exhibit 101. at. DEF000013, 42). Brown was deprived sick calls by defendant Plocinik; as they refused to relate to medical officials that Brown needed medical care; as Brown could not do that herself; in a corner cell, a cell that Nurses did not come to unless you were on their medication list.

Under the subjective prong of the *Estelle* test, a prison official must exhibit deliberate indifference to the prisoner's health or safety to violate the prisoner's constitutional rights. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (citing *Wilson*, 501 U.S. at 302-03). Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm; it is the equivalent of acting recklessly. *Id.* at 826. Neither "negligen[ce] in diagnosing or treating a medical condition," *Estelle*, 429 U.S. at 106, nor the inmate's "mere disagreement over the proper treatment," *Chance*, 143 F.3d at 703, give rise to an Eighth Amendment claim. *See also Nails v. Laplante*, 596 F. Supp. 2d 475, 480 (D. Conn. 2009) ("Inmates do not have a constitutional right to the treatment of their choice."). To demonstrate the requisite culpability, "proof of awareness of a substantial risk of the harm suffices." *Salahuddin*, 467 F.3d at 280. As with other questions of fact, this showing may be made using direct evidence, circumstantial evidence, or "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

The Supreme Court has noted that "the Eighth Amendment's prohibition on cruel and unusual punishments encompasses the deliberate failure to treat 'a prisoner's. How can one deprive thee from medical encounters for nearly a week; only to subject thee to multiple sexual assaults. How can one deprive thee of sick calls, while in a cell, a cell furthest from the unit bubble; Not limited to rips pain, back pain, groin tightness, head contusion, neurological pain, bleeding from the "anal,""nose," mouth, knee. Defendants deprivation was sufficiently serious. *See Salahuddin*, 467 F.3d at 279-80 (noting that a "serious medical condition" is only one factor in determining whether the deprivation of care was sufficiently serious). As to the contour Brown transcends that Plocinik and Maxwell completely denied access to treatment and or sick calls; consistent with multiple encounters from February 3rd through 8th. The record clearly shows that Defendants did ignore Thee. (Ex.44).

*XVI. Brown sought information upon how she was assigned a Risk Level Score, Pursuant To The PREA, Risk Assessment Tool. Without Participating In The P.R.A.T. Questionnaires. Brown thus sought To inquire As What The Administration Of The P.R.A.T. Questionnaire's Used For; And The Referral Process For The Reassessment For The Risk Of Victimization; S.A.V.I. Is The PREA Risk Assessment Tool. And When The P.R.A.T. Is Conducted Inmates Are Required To Participate, Pursuant To The S.A.V.I. Questions; The Diné Asks In art Many when They Credited Mr. Plocinik testimony; That He Blunts Knows Nor How Ago thy They Go With*

*[illegible handwritten text]*

Brown a transgender inmate serving a sentence at 2 to 4 years on an Aggravated Harassment conviction admitted to the ("DOC"), on July 26th, 2017. Brown was transferred to SCI Camp Hill on August 4th, 2017, for classification reasons and had seven different cellmates; one of whom sexually assault Brown while in the ("RHU"). When Brown arrived at SCI Huntingdon, Mr. Maxwell was playing different rolls, on October 23, 2017, injecting himself as a member of the IRC. At the time Mr. Maxwell was the prison's PREA investigator. (Tr. Tra. P. 290), Mr. Maxwell intercepted Brown's claims of sexual assault while at SCI Camp Hill. Mr. Maxwell "coerce" Brown in to signing a Double Celling agreement although Brown was reluctant; (T.P.143,145). Subsequent meeting was had with Brown, Maxwell and other leadership; to whom Brown was forced to write a statement that she felt save to enter prison population. (Phase 1, Package 4, Exhibit 14-19). Maxwell had called Brown a "rat," "whistle blower," upon Brown returning from a Camp Hill transfer in November of 2018; Maxwell claimed he use to work at camp hill; and that Brown sexual assault claims had his friends under heat.(T.P.149), (Phase 1, Package 26, Exhibit 21-23), (PH. 7, P. 7, Ex.26-28).

As to the caveat, in demonstrating a nexus between her Claims and Maxwell's actions; thus are the elements, Mr. Maxwell had a motive to make adverse decisions when it came to Brown's housing. First Maxwell frown upon Brown's participation as it consisted with the Camp Hill sexual assault investigation; calling Brown a "rat," "whistle blower," Secondly Brown had initiated a grievance around the same time condemning Maxwell's action; "coerce" Brown in to signing a Double Celling agreement although Brown was reluctant; (T.P.143,145), forced to write a statement that she felt save to enter prison population. (Phase 1, Package 4, Exhibit 14-19). Brown initial grievance was dated 10/25/17; the initial response was dated 11/13/17; Brown's appeal dated around the same time her PRAT was completed in IRC. With that score, at trial Mr. Maxwell admitted working at Camp Hill from 200-2011.(T.P.293).

Retrospectively Brown believed that Mr. Maxwell was playing different rolls, for example strategically injecting himself as a member of the IRC, as a retaliatory and or reprisal; move that would able him to control the voting of Z-code (DC-46, vote sheet), around this time Brown was targeted, she was assigned a custody level four, program code H(Tr. Tra. P. 302), precisely as an essential component of procedural fairness; the PRAT was completed in IRC without participation as it pertained to the **P.R.A.T. questionnaires. This was posted in Brown's ICAR by a Michelle Mingle, dated 11/13/17;** at the **time she was not Brown's counselor.**

At trial Brown articulated substantial questions to whom Maxwell did not dispute. Mr. Maxwell admitted that the P.R.A.T. would had been conducted in ("IRC").(T.T.P.301). Mr. Maxwell conveyed that he routinely fill in the roll of ("IRC"), although he was still in the capacity as the PREA investigator not limited to interviewing Brown upon arrival to SCI Huntingdon. (T.T.P.290). Furthermore he admitted that as a member of the ("Initial Reception Committee"), you receive annual PREA training. Precisely



relevant, Mr. Maxwell acknowledged in principle what the P.R.A.T. was and that members of the ("IRC") are responsible for administering the P.R.A.T. (T.P.296,299).With that score Maxwell confirmed that in applying the PRAT tools, it was required for an inmate to specifically answer certain questionnaires not limited to own perception, **vulnerability, gender identity,** and **prior acts of abuse. Ms. Butterbaugh established that the P.R.A.T. is the PREA Risk Assessment Tool, and when the P.R.A.T is conducted inmates are required to participate pursuant to the P.R.A.T. questions (Tr. Tri. P. 432).**

Mr. Maxwell did not dispute that the information received through the administration, of the PRAT, are used to inform housing, bed space, work, education, and program assessment with the goal of keeping separate those inmates at high risk for being sexually victimized from those at high risk of being sexually abused.(T.T.P.299,300). As an essential component, in light of the four defendants, Mr. Maxwell playing the leadership roll had the ability and experience to identify that the lack of procedures **that were in terms not utilized would be critical when it came to housing Brown, so much so that officials not within the leadership roll could justified housing Brown with any inmate; to whom set the tone for this case. The Trial Court error when they credited Maxwell's testimony that he did not know at the time that Brown had yet to participate in the PRAT Questionnaires.**

At Trial Mr. Maxwell testified that he did not know that Brown did not participate in the PRAT questionnaires. (Tr. Tra. P. 299), to whom was credited, in despite of transcending testimony that around this time, Maxwell had access to both Brown's and Mr. Allen's cumulative adjustment record and misconduct history. (Tr. Tra. P. 323). As to the caveat, Mr. Maxwell did not denied that on February 2nd, 2018 Brown meat with him predicating serious concerns as to why she should not be withheld with Allen.(Tr. Tra. P. 320,321). Maxwell response, "I would have to look at my notes; I'M not sure."(T.T.P.321). Thus the Court should had approached Mr. Maxwell's testimony with caution since the record is jaded with transcending documents to the contrary. Brown established that prior and after the PRAT was completed, multiple encounters with the defendant were had pursuant to safety and PREA allegations; and two of the encounters were disputed via grievance by Brown around the PRAT completion. (Phase 1, Package 4, Exhibit 14-19). At this time Maxwell was fully aware of the challenges to whom encountered Brown; it is underscored that the motive and nexus between her Claims and Maxwell's actions are so obvious that the court could conclude Maxwell's acknowledgement that Brown was deprived of participation of the PRAT; not limited to involvement while playing the roll of the IRC.

At trial Ms. Richard's testified that as it pertained to the PREA risk assessment tools, it is policy that inmate's participat as to the questionnaires; and that anytime she ever did the PRAT with the inmate "they were present." (Tr. Tra. P. 447,448). However contrary to Mr. Maxwell's testimony; Ms Richards disputed that as a counselor she would only be responsible for initiating the "retaliation monitoring and not the PRAT; contrary to Maxwell's predicating that it's the counselor oriented and social worker."(Tr. Tra. P 301). It appears that any member of the ("IRC") can initiate the PRAT not limited to psychology. (Tr. Tra. P. 448). Precisely I can't be disputed that Maxwell had access to the records in consequence knew that Brown did not participate in the PRAT questionnaires.



*[illegible] exhibit [illegible] 136, 137), [illegible] statement [illegible] Vargas were not admissible Under Rule 401, [illegible] admissibility of [illegible] evidence, Rule 402 [illegible], 403, [illegible] trial [illegible] in rejecting [illegible] statement from inmate Vargas, either as Substantive evidence or impeachment purposes; this amounted to error of Constitutional dimension to whom deprived Brown of a powerful means of damaging Defendants credibility.*

---

Brown presented her Trial exhibits In a (3) three phase system particularly as to the series of related events. Phase (1) one, distinguishes the series of events prior to being withheld with Mr. Allen in the Restriction Housing Unit. Subsequently phase (2) two, are the series of related events while Brown was withheld with Mr. Allen in 108 cell. Phase (3) three, are the series of related events after Brown was withheld with the Lifer and or consequence. **Bluesing is a policy so common; at SCI Huntingdon it has a nickname. Initially intended to prevent inmates from playing the mental health roll; or just out right retaliation. It's when officials put inmates in freezing cells, turn cell water off; ambled with lack of basic necessity for life inter alia no bed, sheets, blanket, clothing, hygiene supplies Sometimes cells are so clod it creates ice like particles on the wall.** . See Brown v. Waxford, 2022 U.S. Dist. LEXIS 125171, 2022 WL 2759064, at *9 (M.D. Pa. July 14, 2022). It was identified that defendant Mr. Plocinik was not acting within the scope of his employment when he allegedly contaminated Brown's food with a piece of metal the very next day upon knowledge of Brown initiation of this lawsuit. See (Phase 3,Package 20, Ex. 134-160).

At Trial Brown attempted to enter in to evidence (Phase 3, Package 20, Exhibit 136,137); defendants objected as to hearsay since Mr. Vargas was not present as a declarant. (Tr. Tra. P. 231). However Brown transcended that she could enter the exhibit as present sense impression and excited utterance; consequently Brown presented that she did not intent to enter the exhibit for the truth but rather to show intent, motive, and impeachment purposes. With underscoring Honorable Carlson cited (Ex. 137), in evaluating concluded that Mr. Hector Vargas statement appears to related to an incident in August of 2018 is "temporally and topically distant from the matters presented at trial," thus simultaneously sustaining defendants objection..(Tr. Tra. P. 232). Brown contest that the trial court evaluated the wrong exhibit, none the less, the trial court erred. The trial court also erred in concluding that Brown should not enter the exhibits for reasons not limited to show intent, motive, impeachment purposes, or present sense impression and excited utterance.

Under Rule 401, evidence is relevant if it tends to make a fact of consequence to the action more or less probable. Fed. R. Evid. 401. Under Rule 402, only relevant evidence is potentially admissible; irrelevant evidence, in contrast, is always inadmissible. Fed. R. Eiv. 402. See In re Japanese Elec. Prods. Antitrust Litig., 723 F .2d 238, United States v. Long, 574 F. 2d 761, 767 (3d Cir). Rule 613(b)

theory provides: Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. United States v. Buffalo, 358 F .3d 519. Rule 608(a), allows a party to attack the credibility of a witness through reputation and opinion evidence of his character for truthfulness. See United States v. Garza, 448 F .3d 294, 297 (5th Cir. 2006). For specific instances of an alleged bad act to be admissible under 608(b),.

To underscore it's apparent that Honorable Carlson rejected the exhibits under hearsay, this derived from defendant's objection as to hearsay; Mr. Vargas was not present as a declarant. (Tr. Tra. P. 231). Although the Judge concluded that the statements were not admissible since "Mr. Hector Vargas statement appears to related to an incident in August of 2018 is "temporally and topically distant from the matters presented at trial;" the record is evident that Honorable Carlson sustained defendants objection..(Tr. Tra. P. 232). Thus the fact that the Judge believed that the statement was "distant" would not be relevant in evaluating court error to sustaining defendant's objection as to hearsay.

The fundamental premise behind present-sense impression exception are statements made virtually contemporaneously with the event being perceived. See United States v. Green, 556 F .3d 151.Fed. Evid. 803(2) does not require that, in order to be admissible, the statement be contemporaneous with the starling event, but rather only with the excitement caused by the event.

Witness Vargas witnessed an encounter with Mr. Plocinik and Brown at Brown's cell door while he was housed next to Brown in the ("RHU") on G-A-Quad at 215 cell as Brown in 216 cell. Apparently this encounter occurred just days from Brown being removed from the "Bluesing cell." . Bluesing is a policy so common; at SCI Huntingdon it has a nickname. Initially intended to prevent inmates from playing the mental health roll; or just out right retaliation. See Brown v. Waxford, 2022 U.S. Dist. LEXIS 125171, 2022 WL 2759064, at *9 (M.D. Pa. July 14, 2022). It was identified that defendant Mr. Plocinik was not acting within the scope of his employment when he allegedly contaminated Brown's food with a piece of metal the very next day upon knowledge of Brown initiation of this lawsuit. See (Phase 3,Package 20, Ex. 134-160).

Mr. Vargas heard Mr. Plocinik predicate to Brown on August 2nd, 2018; " it you don't stop crying about that little ass metal I put in your food I'm going to stick my dick so far up your ass, they are going to need a fucking screw driver to get it out.""You put in Lawsuits you get screw." Plocinik also told Brown that he's going to come in there and rape him; if he tells. (Phase 3, Package 20, Exhibit 136). Consequently on July 31st, 2018 while in the ("RHU"), the same day Brown left the Bluesing cell; Mr. Vargas witness multiple inmates yelling through their cell doors " Yea nigga Blood life, we gonna murder you if you go to population; you got Fucked nigga and you told." "His asshole hurts from getting fuck; you ratted on my manz ,'He Em!"

Brown claims if true these statements are troublesome as Brown face many hardship consistent with what Mr. Vargas witnessed to whom is nothing short of evil. As it derive, not only are the statement relevant but they also present's "present-sense impression exception." Why would one take interest in so far as to spike once food? First the relevance is that another Lawsuit exist; to whom

evoked Mr. Plocinik's actions upon knowledge of Brown initiation of **this lawsuit**. See (Phase 3,Package 20, Ex. 134-160). Brown's claims are wildly vast in concrete fashion pointing to Defendant's Plocinik's misconducts to whom lead to putting her into the Bluseing cell and turning her cell water off for five days; as underscored the Judge in the Waxford case cited that defendants did not have the authority to put prisoner on the restrictions Brown was subject to while in the Bluesing cell, contrary to defendants absorbing that Brown was in a dry cell. See Brown v. Waxford, 2022 U.S. Dist. LEXIS 125171, 2022 WL 2759064, at *9 (M.D. Pa. July 14, 2022). Thus particularly, it comes full circle that Mr. Vargas **heard Mr. Plocinik predicate to Brown on August 2nd, 2018; " it you don't stop crying about that little ass metal I put in your food I'm going to stick my dick so far up your ass, they are going to need a fucking screw driver to get it out.""You put in Lawsuits you get screw."** Plocinik also told Brown that he's going to come **in there and rape him; if he tells.** (Phase 3, Package 20, Exhibit 136). The statement standing alone solidified's a subjective showing in transitory measures in whom Plocinik sought to carry out his reprisals interconnected to acknowledgement that Brown send out her litigating claims as it pertain to this case.

Secondly prior to the event with Mr. Plocinik, on July 31st, 2018 while in the ("RHU"), the same day Brown left the Bluesing cell; Mr. Vargas witness multiple inmates yelling through their cell doors " Yea nigga Blood life, we gonna murder you if you go to population; you got Fucked nigga and you told." "His asshole hurts from getting fuck; you ratted on my manz ,'He Em!" With that score even if the statements cannot be enter for the truth of the matter; Plocilik's and other inmate's comments was startling to the declarant. Mr. Vargas contacted Brown through the vent as Brown consequently solicited a written statement; thus although the declarant wrote the statement after the occurrence, Brown reminded the declarant that he must sign and date the statement to whom the statement was dated the same day Brown retrieved and not the day it was written. Thus the statement was made before the declarant had time to reflect and fabricate.

Fed. R. Evid. 803(3) provides an exception for evidence of state of mind. The state of mind exception to the hearsay rule allows the admission of extrajudicial statements to show the state of mind of the declarant at that time if that is the issue in the case. It also allows such statements to show a future intent of the declarant to perform an act if the occurrence of that act is at issue. United States v. Brown, 160 U. S. App. D. C. 190, 490 F .2d 758 (1970). Likewise, under Fed. R. Evid. 803(2), which are: (1) a startling occasion, (2) a statement relating to the circumstances of the starting occasion, (3) a declarant who appears to have had opportunity to observe personally the events, and (4) a statement made before there has been time to reflect and fabricate. Here Brown claims that Mr. Lambing would have personal knowledge as it obtain to Allen's statement. A witness may not testify about a subject without personal knowledge. Fed. R. Evid.602.

# TABLE OF AUTHORITIES

## CASES                                                                          PAGES

AAMCO Transmissions, Inc. v. Baker,
591 F. Supp. 2d 788, 795 (E.D. Pa. 2008)..............................................................................................10

ACLU v. Finch, 638 F .2d 1336, 1344 (5th Cir. 1981)....................................................................................26

Allegheny County Jail v. Pierce, 612 F .2d 754, 762 (3d Cir, 1979)................................................................58

American House Assurance Co. v. Sunshine Supermarket,
753 F .2d 321 (3d Cir. 1985)....................................................................................................................28

Amfosakyi v. Frito Lay, No. 1:11-cv-651,
2011 U.S. Dist. LEXIS 132646, 2011 WL 5593133, at *3 (M.D. Pa. Nov. 17, 2011)........................................4

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)....................68

Andrade v. Walgreens-OptionCare, Inc., 784 F . Supp. 2d 533......................................................................38

Boyce, 849 F .2d at 836-37.....................................................................................................................66

Beers-Capitol v. Whetzel, 256 F .3d 120, 132 (3d Cir. 2001)....................................................................50,68

Bistrian v. Levi, 448 F. Supp. 2d 454.........................................................................................................1,4

Bistrian v. Levi, 2022 U.S. Dist. LEXIS 53882............................................................................................35

Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012)......................................................................................50

Brown v. Waxford,

2022 U.S. Dist. LEXIS 125171, 2022 WL 2759064, at *9 (M.D. Pa. July 14, 2"tt022)............6,42,73,74,75

Camival Corp., 2018 U.S. Dist. LEXIS 204933, 2018 WL 6336178, at * 11 (S.D. Fla. Dec. 4, 2018)..............4

Carter v. Newiand, 441 F. Supp. 2d 208, 2006 U. S. Dist. LEXIS 47275 (D. Mass. 2006)............................62

Carrizosa v. Chiquita Brands Int'l, Inc., 47 F. 4th 1278...............................................................................11

Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)................................68

Chambers, 410 U. S. at 300-301, as summarized by Cunningham, 941 F .2d at 539....................................65

Chance, 143 F.3d at 703.........................................................................................................................70



Cunning v. W. Chester Univ., 2021 U.S. Dist. LEXIS 35874...................................................................6

*Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991).....................................................67

Coleman v. Wetzel, 2019 U. S. Dist. LEXIS 120719.......................................................................26

Coleman v. Wetzel, 2019 U. S. Dist. LEXIS 172587 (M. D. Pa., July 18, 2019)............................................50,52

Commonwealth v. Boyle, 1999 PA Super 142, 733 A .2d 633, 638 (Pa. Super. 1999)....................................23

Commonwealth v. Peifer, No. 197 WDA 2001, slip op. at 5,...........................................................23

Easley v. Tritt, 2020 U. S. Dist. LEXIS 28776;.............................................................................5

Embree v. National Starch & Chemical Corp., 10 Fed. R. Evid. Serv. (CBC) 704 (9th Cir. Apr. 16, 1982).....6S

*Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)....................................56,60,68,70

**Farmer v. Brennan, 11 U. S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)..................50,60,61,68,69,70**

Farmers & Merchs. Nat'l Bank v. San Clemente Fin. Group Sec., Inc.,

174 F. R. D. 572, 585 (D.N.J. 1997).......................................................................................33

Frank v. County of Hudson, 924 F. Supp. 620, 626 (D. N. J. 1996).....................................................9

Funds, v. Sanders, 437 U. S. 340, 351, 98 S. Ct, 2380, 57 L. Ed. 2d 253 (1978).............................................28

Gilmore, 553 F .3d at 271....................................................................................................20

Gov't of V.i. V. Dyches, 507 F .2d 106.....................................................................................66

Groman v. Township of Manalapan, 47 F .3d 628, 637 (3d Cir. 1995)..............................................61

Harris, 271 F. R. D. at 371...................................................................................................26

Hasbrouck V. BankAmerica Hous. Servs, 190 F.R.D. 42, 44-45 (N.D.N.Y. 1966)...........................................33

*Herman v. Cty. of York*, 482 F. Supp. 2d 554, 564 (M.D. Pa. 2007) (quoting *Estelle*, 429 U.S. at 105-06)..68

Hirst v. Inverness Hotel Corp., 544 F .3d 221, 225, 50 V.I. 1122 (3d Cir. 2008).........................................67

Huertas v. Beard,

No. 101-, 2012 U.S. Dist. LEXIS 105631, 2012 WL 3096430, at *3 (W.D. Pa. July 30, 2012)........................5

Idaho v. Wright, 497 U. S. 805, 820, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990)..............................................11

Inmates of Allegheny County Jail v. Pierce, 612 F .2d 754, 762 (3d Cir, 1979).............................................58

Inmates v. Lanzaro, 834 F .2d 326, 347 (3d Cir. 1987)............................................................................58

In re James E. Long Constr. Co.,

557 F .2d 1039, 1 Fed. R. Evid. Serv. (CBC) 997, 1977 U. S. App. LEXIS 13452 (4th Cir. 1977)...................18

In re Peanut Farmers Antitrust Litig., 2021 U. S. Dist. LEXIS 63971.............................................................15,66

In re Schaefer Salt Recovery, Inc., S42 F .3d 90, 97 n. 3 (3d Cir. 2008)..............................................................4

In Varano, 2023 U. S. App. LEXIS 960,..............................................................................................................57

Jack B. Weinstein & Margaret A. Berger,

Weinstein's Federal Evidence 608.22[1] (2d ed. 1997)....................................................................................40

James v. Varano, 2023 U. S. App. LEXIS 960.....................................................................................................57

J. H. Cruz, 2022 U. S. Dist. Lexis 233664...........................................................................................................29

Kennedy v. Norfolk Southern Ry.,

2008 U. S. Dist. LEXIS 29154 (W. D. Pa. April 8, 2008).....................................................................................31

Klein v. vanek, 86 F .Supp .2d 812, 820 (N. D. 111 . 2000)................................................................................29

Kresefsky v. Panasonic Communs. & Sys. Co., 169 F.R.D. S4, 64 (D. N. J. 1996)............................................33

Kuechle v. Bishop, 64 F.R.D. 179 19 Fed. R. Serv. 2d...................................................................................63

Longenbach, 750 F. Supp. At 180-81................................................................................................................26

Lopez v. Mulligan, 2018 U. S. Dist. LEXIS 1285................................................................................................33

Lewis v. velez, 149 F. R. D. 474 (S. D. N. Y. 1993)............................................................................................30

Manual 574-75 (3d ed. 1982)............................................................................................................................67

McFadden v. Dalmasi, No.
CV 17-5787,2019 U.S. Dist. LEXIS 202405, 2019 WL 6218220, at*8 (E.D. Pa. Nov. 21, 2019)...................55

2 MccoRMICK on EVID. 293 (7th ed.).................................................................................................................31

McGrath v. Johnson, 67 F. 2d 499, 511 (E.D. Pa. 1999)....................................................................................6

Miller v. Keating, 754 F .2d 507 (3d Cir. 1985).............................................................................................16,66

Monmouth County Correctional Inst. Inmates v. Lanzaro,

834 F .2d 326 (3d Cir. 1987)...........................................................................................................................60

Mosley v. General Motors Corp.,

  497 F .2d 1330, 7 Empl. Prac. Dec. (CCH) 9408, 8 Fair Empl. Prac. Cas. (BNA) 92, 18 Fed. R. Serv. 2d
  (Callaghan) 1142, 1974 U.S. App. LEXIS 8388 (8th Cir. 1974)................................................................62

Moses, 148 F .3d at 280..................................................................................................................................66

Nails v. Laplante, 596 F. Supp. 2d 475, 480 (D. Conn. 2009)............................................................70

Pacitti v. Macy's, 193 F .3d 772 (3d Cir. 1999)...............................................................................................1

Paluch v. Dawson, 2008 U. S. Dist. LEXIS 60908...................................................................................28

Patten v. Dennis, 134 F .2d 137, 1943 U.S. App .LEXIS 3500 (9th cir. 1943).....................................62

Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001).......................................67

Pearson v. Prison Health Serv.,
  850 F .3d 526, 534 (3d Cir. 2017...................................................................................................61

Phillips v. County Of Allegheny, 515 F .3d 224, 2008 U. S. App. LEXIS 2513 (3d cir. 2008).........................62

ppenheimer Funds, v. Sanders, 437 U. S. 340, 351, 98 S. Ct, 2380, 57 L. Ed. 2d 253 (1978)......................28

Quartararo V. Hanslmaier, 186 F .3d 91, 1999 U. S. App. LEXIS 16784 (2d Cir. 1999)...................................15.

Renda v. King, 347 F .3d 550, 554 (3d Cir. 2003)..............................................................................20

Republic Natural Gas Co. v. Oklahoma, 334 U.S. 62, 68 (1948). Also see (Doc 64).........................................8

Rizzo v. Goode, 423 U.S. 362, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976)..............................................53
Santiago v. Warminster Twp., 629 F .3d 121, 128 (3d Cir. 2010)........................................................1

Salahuddin, 467 F.3d at 279, 280........................................................................................68,69,70

5aldi v. Paul Revere Life Ins. Co., 224 F. R. D. 169, 174 (E. D. Pa. 2004).........................................33

5cott paper Co. v. United States, 943 F. Supp. 501, 502 (E. D. Pa. 1996))........................................33

Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003)........................................................................68

Sosa v. Camival Corp.,

  2018 U.S. Dist. LEXIS 204933, 2018 WL 6336178, at * 11 (S.D. Fla. Dec. 4, 2018)...........................4

Teen-Ed, Inc. v. Kimball Intern, inc., 620 F .2d 399, 403 (3d Cir. 1980)............................................67

Tompkins v. Cyr,

202 F .3d 770, 46 Fed. R. Serv. 3d ( Callaghan) 319, 53 Fed. R. Eiv. Serv. (CBC) 1424, 2000 U. S. App. LESIX 1027 (5th Cir. 2000)..............................................................................................................................................15,65,66

Thuy v. Gilmore, 2019 U. S. Dist. LEXIS 220300...............................................................................................................32

United States v. Abel, 469 U. S. 45, 105 S. Ct. 465, 83 L. Ed. 2d 450 (1984)...................................................14

United States v. Belfast, 611 F .3d 783, 817-18 (11th Cir. 2010)...........................................................................11

United States v. Black,
767 F .2d 1334, 19 Fed. R. Evid. Serv. (CBC) 128, 1985 U. S. App. LEXIS 21711 (9th Cir.)...............................18

States v. Blackwell,

694 F .2d 1325, 224 U. S> App. D. C. 350, 12 Fed. R. Evid. Serv. (CBC) 60, 1982 U. S. App. LEXIS 23421 (D. C. Cir. 1982).................................................................................................................................................................18

United States v. Brown, 160 U. S. App. D. C. 190, 490 F .2d 758 (1970).............................................65,67,75

United States v. Buffalo, 358 F .3d 519....................................................................................................................13

United States v. Childs, 539 F .3d 552, 2008 FED App. LEXIS 18616 (6th Cir. 2008)........................................65

United States v. Crowley, 318 F. 3d 401 417-418 (2d Cir. 2003).....................................................................40

United States v. Detelich, 351 Fed. Appx. 616, 2009 U. S. App. LEXIs 24313 (3d Cir. 2009)...................15,66

United States v. Diaz-Colon, 2022 U. S. Dist. LEXIS 238982...............................................................................15

United States v. Dring, 930 F .2d 687, 692 (9th Cir. 1991)..................................................................................20

United States v. Garza, 448 F .3d 294, 297 (5th Cir. 2006)...........................................................................13,74

United States v. Gerhart,

538 F .2d 807, 1 Fed. R. Evid. Serv. (CBC) 286, 1976 U.S. App. LEXIS 7754 (8th Cir. 1976).........................18

United States v. Green, 556 F .3d 151, 155 (3d Cir. 2009)...........................................................................10,16

United States v. Greenidge, 495 F .3d 85. 99 (3d Cir. 2007))..............................................................................20

United States v. Joy,

192 F .3d 761, 766 (7th Cir. 1999), cert. denied, 530 U. S. 1250, 120 S. Ct. 2704, 147 L. Ed. 2d 974 (2000)...................................................................................................................................................................16

Miller V. Keating, 754 F .2d 507...............................................................................................................................66



United States v. Leake, 642 F .2d 715, 718 (4th Cir. 1981)...........................................................15,66

United States v. Long, 574 F. 2d 761, 767 (3d Cir).........................................................................73

United States v. McGee, 408 F .3d 966, 981-83 (7th Cir. 2005)....................................................14,66

United States v. Mitchell, 145 F .3d 572, 576 (3d Cir. 1998)...................................................10,16,67

United States v. Parker, 2022 U. S. Dist. LEXIS 182553.................................................................14

U. S. v. O' Neill, 619 F .2d 222, 226 (3d Cir. 1980)..........................................................................25

United States v. Sebetich, 776 F .2d 412 (3d Cir. 1985),................................................................20

United States v. Skelton, 514 F. 3d 433, 443-44 (5th Cir. 2008).....................................................13

United States v. Sesere, 413 Fed. Appx. 653, 2011 U. S. App. LEXIS 2448 (4th Cir. 2011)...........................20

United States v. Sriyuth, 98 F. 3d 739, 745 (3d Cir. 1996).........................................................9,13,19

United states v. US Infrastructure, Inc., 576 F .3d 1195, 1208 (11th Cir. 2009)................................................66

United States v. Williams, 464 F. 3d 443, 448 (3d Cir. 2006),..........................................................38

United States v. Wilson, 985 F .2d 348, 351-52 (7th Cir. 1983).....................................................14,66

United States v. Thomson, 2011 U.S. Dist. LEXIS 67950...............................................................41

United States v. Torres, 845 F .2d 1169 (2d Cir. 1988)...................................................................22

Walker v. Horn, 385 F .3d 321, 332-35 (3d Cir. 2004)....................................................................29

Wallace v. Price, 2002 U. S. Dist. LEXIS 19973.............................................................................65

Westlake v. Lucas, 537 F.2d 857 (6th Cir. 1976). .........................................................................68

Whitley V. Albers, 475 U. S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)............................................50

Wichterman v. City of Philadelphia, Civil Action No. 16-5796, 2019 U.S. Dist. LEXIS 119136, 2019 WL 3216609, at *6 (E.D. Pa. July 17, 2019)..........................................................................................68

Williams v. Guard Bryant Fields, 535 F. App'x 205, 212 (3d Cir. 2013)).........................................................55

Williamson v. United States, 512 U. S. 594, 603-604, 129 L. Ed. 2d 476, 114 S. Ct. 2431 (1994)................66

Wilson, 501 U.S. at 302-03)..........................................................................................................70

Woloszyn v. County of Lawrence, 396 F .3d 314, 320 (3d Cir. 2005).................................................58

Zenith Radio Corp. v. Matsushita Elec. Ind. Co., 505 F. Supp. 1190, 1228-1229 n.48 (Del. 1980)..............12

# Certificate Of Service

I Gartor Kiki Brown, hereby certifies that on November 7, 2023, I served the within Brief of

Appellee Cover Page, (3) page, Table of Authorities (7) pages, Table of Contents (5) pages, Jurisdictional Statement (1) page, Statement Of Issues Presented (3) pages, Statement Of The Case (5) pages, Appellant's Motion For Leave To Exceed Page Limitation (1) PAGE, Appellant's Brief To Motion To Exceed Page Limitation (1) page,  Appellee's Brief, (75) pages, Appellant's Exhibits over (172) pages,  Via United States  first- class certified mail to The United States Court Of Appeals  for the Third Circuit; original and (10) copies of each page, also (1) copy directed to Appellees address.

United States Court Of Appeals

601 Market Street Philadelphia PA

19106

Date: November 7th, 2023

Krome Detention Center

18201 SW, 12th st.

Miami, Fl. 33194



**UNITED STATES POSTAL SERVICE ®**

FROM:

USPS TRACKING #

9114 9014 9645 1005 4535 71

Label 400 Jan. 2013
7690-16-000-7946

US POSTAGE
$022.80°
11/13/2023
0386 001183D653

PS00011132700
RU: 12 x 11 /0 x 8.5
OD: 12.25 x 12 x 6
ODCUFT: 0.510

TO: US court of Appeals
21400 U.S courthouse
601 Market St
Philadelphia, PA 19106

**E FLAT RATE BOX**
STIC AND INTERNATIONAL USE

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

USPS.COM/PICKUP