1          IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

   GARTOR KIKI BROWN,                :
3                                    :  Civil Action No. 3:18-CV-1527
                      Plaintiff      :
4           vs.                      :
                                     :  (Magistrate Judge Carlson)
5   LT. MAXWELL, et al.,             :
                                     :
6                     Defendants     :

7
              TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
8                            DAY 1
                     PAGES 1 THROUGH 180
9
           BEFORE THE HONORABLE MARTIN C. CARLSON
10            UNITED STATES MAGISTRATE JUDGE
              JANUARY 10, 2023; 10:21 A.M.
11               HARRISBURG, PENNSYLVANIA

12
   FOR THE PLAINTIFF:
13
      Gartor Kiki Brown, Pro Se
14    Moshannon Valley Processing Center
      555 GEO Drive
15    Philipsburg, PA 16866

16  FOR THE DEFENDANTS:

17    Lindsey A. Bedell, Assistant Counsel
      Kimberly A. Adams, Assistant Counsel
18    Office of General Counsel
      Pennsylvania Department of Corrections
19    1920 Technology Parkway
      Mechanicsburg, PA  17050
20

21
                       Lori A. Buggy
22          Federal Certified Realtime Reporter
         Sylvia H. Rambo United States Courthouse
23               1501 North Sixth Street
                 Harrisburg, PA  17102
24                    717-215-1270
                lori_buggy@pamd.uscourts.gov
25  Proceedings recorded by mechanical stenography; transcript
          produced by computer-aided transcription.

1                          I N D E X

2

3                    PLAINTIFF WITNESSES

4    CURTIS JOHNSTON                                 PAGE

5    Direct Examination by Brown                      12
     Cross-Examination by Ms. Adams                   59
6    Redirect Examination by Brown                    79

7    ANATA TRICE                                     PAGE

8    Direct Examination by Brown                      86
     Cross-Examination by Ms. Adams                   94
9    Redirect Examination by Brown                   125

10   GARTOR KIKI BROWN                               PAGE

11   Direct Testimony by Brown                       142

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          *THE COURT:* Please be seated. Good morning. Welcome

2   here to federal court this morning. This is the time and place

3   set for the commencement of the nonjury trial in the case of

4   Gartor Brown v. Lieutenant Maxwell and others.

5          I want to express my appreciation to the Immigration

6   and Naturalization authorities for arranging the appearance of

7   Brown here today. Good morning, Brown. How are you doing?

8          *BROWN:* Excellent, good. Could be better. How are

9   you?

10         *THE COURT:* I'm doing well. Thank you for asking.

11  And, Ms. Bedell, Ms. Adams, how are you all doing?

12         *MS. BEDELL:* We're doing well. Thank you.

13         *THE COURT:* Very well. I am, of course, from our

14  prior discussions, thoroughly familiar with the factual

15  background of this case, and so what I would propose that we

16  do, subject to any preliminaries that folks would like to

17  raise, is simply get into the presentation of evidence by Brown

18  in this matter.

19         And I will note for you, Brown, that I appreciate you

20  being here today. I appreciate authorities making arrangements

21  for you to join us. I will note for you that here at the

22  federal courthouse, the U.S. Marshals Service has procedures

23  and protocols that ensure the safety and security of everyone

24  in the building and that we are all obliged to follow those

25  procedures and protocols. So that I go through a form of

1  screening every day when I come here, and everyone who comes to

2  the building must go through the form of screening that the

3  marshals require.

4         So I appreciate the fact that -- I understand you have

5  cooperated with the marshals service today in that screening

6  process and would note for you, as we move forward, that will

7  be necessary for all participants in this case.  Okay?

8         *BROWN:*  Yes, sir.

9         *THE COURT:*  Are you then ready to call your first

10  witness, sir?

11         *BROWN:*  Yes, Your Honor.  I believe I left my glasses

12  downstairs.

13         *THE COURT:*  Well, that will present a small challenge,

14  won't it?  I believe someone is going to try to see if we can

15  get your glasses for you.

16         *BROWN:*  Yeah, and two --

17         *THE COURT:*  Yes.

18         *BROWN:*  -- I would like to contest the shackles under

19  the grounds of civil detention.

20         *THE COURT:*  And I appreciate your concern about

21  shackles.  Once again, as I will note for everyone, issues of

22  security are matters that are determined both by the marshals

23  service and, in a case such as this where you've appeared

24  pursuant to a writ, because you are in the administrative

25  custody of immigration authorities, that those authorities also

1   will make determinations regarding the appropriate level of
2   security for you.

3           If the marshals service or immigration service believe
4   that shackles are appropriate as a security measure in your
5   case, I'm not going to overrule them.  I will let you know that
6   the fact that you may be wearing shackles will play no role
7   whatsoever in my determination of the facts of this case.  So I
8   understand your concern.  I've noted your objection on the
9   record, but I'll be overruling that.

10          Now, it appeared that some eyeglass search was
11  ongoing.  How's that going?

12          *IMMIGRATION OFFICER:*  Your Honor, they're checking
13  back by the cellblock right now, and if they're there, they're
14  going to be brought down.

15          *THE COURT:*  Very well.  Recognizing that those
16  glasses, if they are there, will be en route, are you prepared
17  to proceed, Brown?

18          *BROWN:*  Yes, yes, yes, Your Honor.

19          *THE COURT:*  Very well.  You may call your first
20  witness.

21          *BROWN:*  Okay.  Is it possible to initiate an opening
22  statement, or would that not be --

23          *THE COURT:*  It's not necessary.  I'm familiar from our
24  prior conversations regarding your position, but if you wish to
25  make a brief opening, I'll be pleased to hear it for a few

1    moments.  Go ahead.

2              *BROWN:*  Okay.  Do I remain sitting?

3              *THE COURT:*  Yes, you're fine right where you are.

4    Just pull that microphone up so everyone can hear you.  And

5    there are your glasses.

6              *BROWN:*  Hello.

7              *THE COURT:*  Yes, you may proceed.

8              *BROWN:*  Okay.  The eye of the storm has arrived.

9              *THE COURT:*  Yes, and what I should note for you is

10   that an opening statement would be a brief description of what

11   you expect the evidence to show.  The eye of the storm arriving

12   is more something that would be appropriate in a closing

13   argument.  So if you could just focus for me on what you expect

14   your witnesses and evidence to show, that would be very

15   helpful.

16             *BROWN:*  Defendants Fochtman, Plocinik, Maxwell,

17   Johnston were and are correctional officers with the Department

18   of Corrections at all times during my claims.  Defendants are

19   trained to recognize the challenges that and consequent effect

20   thereof that attaches to labels.  Thus, what the wise do in the

21   beginning, not so wise do at the end.

22             Here today, defendants have called on exceptional

23   lawyers to mellifluously explain their actions or lack thereof.

24   Precisely put, had defendants requested, on the wise,

25   assistance prior to their actions, they would have simply

1    stated, you cannot and should not force an inmate label as a
2    snitch, a faggot, with feminine characteristics and a history
3    of victimization, in a corner cell, a cell furthest from the
4    bubble in the RHU, with an inmate that exhibited dangerous and
5    predatorial behavior arising from unfulfilled sexual desires,
6    needs, needs that was not being met as a lifer.

7            This is a case that will keep you up at night.  How
8    can an investigation be so egregious?  Put another way, this is
9    a case that will carve a river of tears through a blistering
10   desert.

11           Had defendants called on assistance from the wise
12   prior to their actions, the wise would have simply stated, why
13   did you refuse to move Brown from cell 108 after a plethora of
14   requests through a cry for help?

15           From February 3rd through 8th, you was aware of
16   evidence that Brown was incarcerated under conditions posing a
17   substantial risk of serious harm.  You witnessed an assault on
18   February 3rd after Allen was uncuffed and laughed, fuck him up,
19   he's a rat, a faggot, and a kiddie toucher.

20           At that time you was aware that Allen had 77
21   misconducts, most of whom was violent, four of which was sexual
22   related.  Due to your actions, the assaults continued on
23   February 4th, as Allen wrapped his hands with socks forcing
24   Brown to cover with her arms.

25           On February 5th, forcing Brown back into the very same

1  cell after showers, attacked in the middle of the night, Brown
2  hitting her head on the bed fixture, congeal blood from her
3  head.  February 6th, forcing Brown to cuff up and face the wall
4  as Inmate Allen was let out for recreation.  Encountering Brown
5  injuries firsthand on February 7th.

6      Likewise, likewise, even switching her jumpers,
7  linens, boxers, t-shirts, but refusing to move her.
8  Acknowledging that she requested to see medical, scared,
9  vulnerable, but this day, this day she did not see medical.
10 What if pictures was tooken on this day, that time during those
11 dark hours?  What would they look like?

12      This led to sexual assaults.  Your actions led to
13 Brown being harmed.  This is not a case of negligence.  Brown
14 is not king male house.  Let's set the record straight at the
15 door.  This is not a case of cell manipulation.  This is a
16 case, a case that will keep you up at night.

17      What the wise do in the beginning, others do at the
18 end.  Precisely put, had defendants requested assistance from
19 the wise, assuming --

20      *THE COURT:*  And forgive me, you're using a term there,
21 and I want to make sure I understand it.  Requested assistance
22 from the "waz"?

23      *BROWN:*  Better, like, of knowledge, assuming that they
24 requested assistance from somebody that was knowledgeable.

25      *THE COURT:*  Oh, from the wise.

1          *BROWN:* From the wise.

2          *THE COURT:* Very well. I did not know if you were

3   referring to some specific person or unit within the

4   institution.

5          *BROWN:* No, no, Your Honor.

6          *THE COURT:* You're just suggesting that they should

7   have sought out information from those more informed. I'm

8   sorry, I've interrupted your opening. Did you have anything

9   further you wanted to share with me?

10          *BROWN:* Yes, it's about a paragraph left.

11          *THE COURT:* That's quite all right. Please proceed.

12          *BROWN:* Precisely put, had defendants requested

13   assistance from the wise, assuming they lacked the ability to

14   rectify their actions or lack thereof, they would have simply

15   stated, asking us to explain your actions, if you proceed with

16   these actions, would be like asking us to write a review on a

17   book we've never read. Put another way, it would be as

18   rewarding as struggling in quicksand.

19          The aftermath, oh, the aftermath. The acknowledgment

20   that Brown had cooperated with the law, the banging on the

21   walls for days. Banging would not stop. It sounded like a

22   tempest in a teapot. Faggot, rat, how does your asshole feel,

23   the sex noises by prison guards every time they encountered my

24   cell.

25          As troubling as it may sound, the ramifications from

1  the initiation of this lawsuit, what would cause one to spike a

2  person's food? And blusing, blusing is a policy so common at

3  SCI Huntingdon, it has a nickname.

4        In this case, Brown will show that in defendants'

5  world, not being harmed is a privilege, not a right. The

6  principle of the Eighth Amendment will reject that. In Brown

7  case, this privilege was maliciously tooken from her.

8        Let's remove the layer between defendants' decision or

9  lack thereof and put it into perspective. How can one, the

10  very ones in charge of care, custody, and control, be so cruel?

11        Now we are in the courts, the federal courts at that,

12  with a history of unbuttoning complex disputes, but also, Your

13  Honor, to simplify all affairs. This is Brown v. Maxwell.

14        *THE COURT:* Very well. Thank you. Thank you, Brown.

15  Again, I am familiar with the defendants' position. Does the

16  defense wish to make any sort of brief opening statement, or

17  shall we just proceed with testimony?

18        *MS. BEDELL:* We will refrain, Your Honor.

19        *THE COURT:* Very well. Brown, you may call your first

20  witness.

21        *BROWN:* Yes, and I would like to call Defendant

22  Mr. Johnston.

23        *THE COURT:* Very well. Mr. Johnston, would you come

24  on forward.

25        *COURTROOM DEPUTY:* Please raise your right hand.

1    *CURTIS JOHNSTON, called as a witness, having been duly*

2    *sworn or affirmed, testified as follows:*

3          *COURTROOM DEPUTY:* Please be seated. Please state

4    your full name for the record, and please spell your last name.

5          *THE WITNESS:* Curtis Johnston, J-o-h-n-s-t-o-n.

6          *THE COURT:* Thank you, Mr. Johnston. You may pose

7    your questions, Mr. Brown.

8          *BROWN:* Yeah. So simultaneously, we'll attempt to

9    enter multiple exhibits, so can you please predicate how that

10   process will work?

11         *THE COURT:* Well, if you've got exhibits, you should

12   identify them. Are there copies available for the witness?

13         *BROWN:* I believe the exhibits I have are

14   self-explanatory, but I could definitely hand it to the witness

15   to --

16         *THE COURT:* Yeah, the witness will need to be able to

17   see an exhibit if you want to refer to it.

18         *BROWN:* Yeah.

19         *THE COURT:* Why don't you begin by posing some

20   questions, and if you've got an exhibit that you want to show

21   the witness, we'll take that up as we get to it. So why don't

22   you begin by posing a question or two to Correctional Officer

23   Johnston.

24         *BROWN:* Okay.

25                          DIRECT EXAMINATION

Exam. - Johnston

1    BY BROWN:

2    Q.   Can you please state your duties as a correctional officer?

3    A.   My duties of -- my duties as a correctional officer is

4    care, custody, and control of the facility where I work at.

5    Q.   Now, to your knowledge, are those duties more specific?

6    A.   In what way?

7    Q.   Well, would you need certain training?  What are the bare

8    as to what your duties would project?

9    A.   Are you talking about the training?

10   Q.   Yeah.  Before we get to that, I just wanted a more specific

11   assertion as to your job duties as far as -- it could be very

12   brief, but I would like more on the record as to your duties

13   just based on your knowledge.

14   A.   It's going to have to be based off of what part of the jail

15   we're talking about.

16   Q.   We could use the RHU as an example.

17   A.   The residential housing unit is a -- about -- it's a

18   24-hour jail within the jail, I like to call it, if you want to

19   use my words.  Everybody is housed in cells.  Really the only

20   time you are out of the cell is by handcuffs or restraints, we

21   would like to call them.

22        You are partnered with someone else to escort you or

23   inmate-wise to wherever they are allowed to go to.  So it could

24   be a yard, it could also be for legal library, a visit, a Zoom

25   visit, that is, seeing psych, psychology, or even the unit

Exam. - Johnston

1  manager.

2  Q.  Okay.  Thank you.  Thank you so much.  When did you start

3  working at SCI Huntingdon, if you remember the year and the

4  month?

5  A.  March of 2015.

6  Q.  Okay.

7  A.  Correction, can I say 2017, please?  It was six years.

8  I'll be at my six-year mark in March this year.

9  Q.  Okay.

10  A.  I'm bad with math.

11         *THE COURT:*  That's quite all right.  I appreciate you

12  clarifying that for us.

13  BY BROWN:

14  Q.  And, Mr. Johnston, I want to know a little bit about you.

15  Are you religious?

16         *BROWN:*  And they're quite fine to object.

17         *MS. ADAMS:*  Your Honor, I'm going to object to the

18  relevance of this.

19         *THE COURT:*  Yeah, what is the relevance of

20  Correctional Officer Johnston's religious views?

21         *BROWN:*  I just want to know more about the defendant

22  as far as, I mean, your religion could tell --

23         *THE COURT:*  And I can appreciate a natural human

24  curiosity regarding these matters, but I think what we need to

25  do is focus on the Eighth Amendment claims --

Exam. - Johnston

1          *BROWN:*  Okay.  Absolutely, Your Honor.

2          *THE COURT:*  -- arising out of February, so I'm going

3     to sustain that objection.

4          *BROWN:*  Absolutely, Your Honor, and that's fair.

5     BY BROWN:

6     Q.   Mr. Johnston, are you familiar with the term rat?

7     A.   In what sense?

8     Q.   Just are you familiar with the term, just rat, if you hear

9     the word rat?

10    A.   An animal.

11    Q.   Would you know what that means?

12    A.   An animal.

13    Q.   Okay.  I was just asking for a yes or a no, sir.  So you

14    are familiar with the term rat?

15    A.   Yes.

16    Q.   Okay.  Thank you.  Are you familiar with the term snitch?

17    A.   Yes.

18    Q.   Okay.  So, now, in the prison environment, what does those

19    terms mean?  So if you hear an individual direct this word to

20    another person, like, what does that mean in the prison

21    setting, to your knowledge?

22    A.   Telling on someone else.

23    Q.   Okay, okay.  What about the term faggot, are you familiar

24    with that term?

25    A.   Yes, sir -- yes, ma'am.

Exam. - Johnston

1    Q.   In the prison environment, what does that term implies, if

2    I'm -- allegedly if I'm saying faggot, if it's directed to

3    another individual, what in the prison environment, what you --

4    in your opinion?

5         THE COURT:   Well, let me ask this for the parties.

6    Can I take judicial notice of the fact that within a prison

7    setting, that term is a derogatory term for someone who may be

8    homosexual?   Is that where you're going, Brown?

9         BROWN:   Yeah.

10        THE COURT:   Is there any objection to me taking

11   judicial notice of that fact, that that term is a derogatory

12   term used to identify a person who may exhibit homosexual

13   tendencies?

14        MS. ADAMS:   No, Your Honor.

15        THE COURT:   Very well.   So I've taken judicial notice

16   of that fact, and you may move on to your next question.

17        BROWN:   Yes.   Smart man.

18        THE COURT:   I'm doing the best I can.

19        BROWN:   Right.

20   BY BROWN:

21   Q.   So judicial notice is already on the record, so the term

22   faggot is a derogatory term pertaining to an individual who was

23   perceived as a homosexual.   Can we agree?

24        THE COURT:   Yeah, we just did.

25        BROWN:   Okay.

Exam. - Johnston

1        *THE COURT:* I just took judicial notice of that fact.

2        *BROWN:* Okay.

3        *THE COURT:* So why don't you pose your next question

4    to --

5    BY BROWN:

6    Q.   So what about lifer? What does that -- what does that term

     mean? Are you familiar with that term, first?

8    A.   It means their sentence is life.

9    Q.   Okay. Thank you very much, Mr. Johnston. In your opinion,

10   what are some unique challenges in the prison environment kind

11   of a person face with any of decided label -- if any of those

12   decided labels are attached?

13            So we could -- you could first start, I could remind

14   you the first term was, I believe, a snitch or a rat. So what

15   are some challenges an individual stigmatized or an individual

16   labeled as a snitch or a rat, what kind of challenges would --

17   possibly would an individual like that be subject to in the

18   prison environment?

19            *MS. ADAMS:* Your Honor, I'm going to object to this

20   question for relevance, and also he's asking Mr. Johnston's

21   personal opinion. I think that's kind of outside the scope of

22   what we're doing.

23            *THE COURT:* I understand. Brown, what I'm -- I'm

24   going to sustain the objection to the question as it was posed.

25   It strikes me you're trying to ask a more specific question.

Exam. - Johnston

1        *BROWN:*  Yes.

2            *THE COURT:*  Mr. Johnston, in your experience, do

3    individuals who are -- inmates who are identified as snitches,

4    rats, or faggots encounter problems at the prison?  Is that

5    what you're going for?

6            *BROWN:*  Absolutely, Your Honor.

7            *THE COURT:*  So, in your experience, do individuals who

8    have been labeled as snitches, rats, or faggots encounter

9    problems in prison?

10           *THE WITNESS:*  I think any inmate that goes into a

11   facility can experience any type of problem in there dealing

12   with a mass majority of --

13           *BROWN:*  Objection, Your Honor.

14           *THE COURT:*  What's the nature of your objection to his

15   answer to my question?

16           *BROWN:*  Well, he's not directly answering --

17           *THE COURT:*  I think you can do a followup question.

18           *BROWN:*  All right.

19           *THE COURT:*  I think I've gotten his answer.  If you

20   want to follow up, please do, but I think we should try to move

21   to the events that caused --

22   BY BROWN:

23   Q.  So you're acknowledging that plausible individuals labeled

24   as snitches, rats, faggots, do face a challenge in a prison

25   environment, distinguished from the fact that you're already an

18

Exam. - Johnston

1   incarcerated inmate? Am I correct?

2   A.   I'm saying any inmate can have challenges, it doesn't

3   matter who is being called what, any inmate can when they step

4   in the door.

5   Q.   Okay.  So retrospectively speaking, do inmates with those

6   labels stigmatized have more of a challenge in the prison

7   environment?

8   A.   I cannot really say.  I don't know.

9   Q.   Okay.  That's fair.  I can't force you to what you may not

10  know.  Are you familiar with the term stigmatize?

11  A.   No.

12  Q.   Okay.  Are you familiar with GA unit at SCI Huntingdon?

13  A.   Yes.

14  Q.   All right.  Now, what is GA unit?  If we're getting the

15  courts more acquainted with GA unit, what exactly is it?

16  A.   It's the gulf alpha unit, which is G unit, alpha pod, which

17  is the one, one side of the actual hole unit.  That's why it's

18  called GA, gulf alpha, gulf unit, alpha pod.

19  Q.   So it's the hole?  G unit is the hole?

20  A.   The RHU.

21  Q.   The RHU.

22  A.   One of four.

    Q.   Okay.  Thank you, sir.  Now, are there cameras on the

    block, like video monitoring on G unit?

25  A.   There is numerous cameras.  There's also cameras in cells,

Exam. - Johnston

1   as well.

2   Q.   Interesting.  Do you remember where the cameras are

3   located?

4   A.   No.

5   Q.   Do they record?

6   A.   That I know of, yes.

7   Q.   What about cell 108?  Do you remember where cell 108 is

8   located on GA?

9   A.   Yes.

10        BROWN:  Okay.  I'd like to enter my first exhibits on

11   the Federal Rules of Civil Procedure 402, relevance.  I mean

12   20 -- yeah, yeah, 402 and 204, adjudicated facts.

13        THE COURT:  What is the exhibit?

14        BROWN:  It's just a diagram of where cell 108 is

15   located.

16        THE COURT:  Yes.  Has it been marked as an exhibit?

17        BROWN:  Yes.

18        THE COURT:  Okay.  And when it got marked as an

19   exhibit, what number was put on it?

20        BROWN:  I believe it's --

21        THE COURT:  Does the defense have a copy of this

22   exhibit?

23        MS. BEDELL:  We are looking, Your Honor.

24        THE COURT:  Yeah, and I don't mean to burden you all,

25   but --

Exam. - Johnston

1          *MS. ADAMS:* Your Honor, it's Exhibit 56 in the binder
2     that's up there.
3          *THE COURT:* Very good. I'm told that it is Exhibit 56
4     in the binder before you. Thank you.
5          *MS. ADAMS:* And, Your Honor, it's Defendants' Exhibit
6     56.
7          *THE COURT:* Let's make sure -- you just make sure that
8     Brown has a copy of that and see if that is the exhibit he is
9     endeavoring to refer to. Brown, I have a diagram of the unit
10    that looks like this. Is this the exhibit you're referring to?
11         *BROWN:* Yes, I believe so.
12         *THE COURT:* Okay.
13         *BROWN:* But I can't be too sure if it's what they
14    have.
15         *THE COURT:* Well, it is what is in front of the
16    witness, and you were squinting some there. I may ask defense
17    counsel to share a copy of that exhibit with you so that you
18    can see it. But if that is our exhibit, is there any objection
19    to its admission?
20         *MS. ADAMS:* I have no objection.
21         *THE COURT:* It's in your book, so I'm thinking you
22    probably think it's, like, real, so we're going to admit
₣23   Exhibit 56 without objection. Mr. Brown, you may proceed with
24    questioning regarding where cell 108 is located on this
25    diagram.

Exam. - Johnston

1          *BROWN:*  Yeah, I really -- I'm having a hard time

2    locating that specific exhibit --

3          *THE COURT:*  Here's what we'll do.

4          *BROWN:*  -- for some reason.

5          *THE COURT:*  Mr. Neary, can you loan Brown my Exhibit

6    56?

7          *BROWN:*  Thank you.

8          *THE COURT:*  You bet.  Go ahead there.  The exhibit has

9    been admitted.  It's in front of Mr. Johnston.  You were asking

10   where cell 108 is located.  Where is it located?

11         *THE WITNESS:*  In the corner of the unit.

12   BY BROWN:

13   Q.   Okay.  Thank you, Mr. Johnston.  Would you consider this

14   the furthest cell from the bubble on the lower level?

15   A.   Yes.

16   Q.   Okay.  Yes or no, on February 7th, 2018, were you working

17   in the RHU on G unit at SCI Huntingdon?

18   A.   Yes.

19   Q.   Okay.  Did Brown ask you to see medical at any time on this

20   day?

21   A.   I do not recall.

22   Q.   Interesting.  So you remember that you was working on this

23   day, but however -- I just want to understand and process the

24   information.  So you recall -- you recall that you was working

25   on this day, I believe it's over four years ago, but you don't

Exam. - Johnston

1    remember if --

2    A.  Five years.

3    Q.  My math, I'm so -- I'm horrible at math.  You recall that

4    you was working on this day, but you do not recall if Brown

5    ever asked you to see medical?

6    A.  No.

7    Q.  Okay.

8    A.  The only reason why I recall --

9    Q.  No, that's fine.

10   *THE COURT:*  You can just wait for the next question.

11   *THE WITNESS:*  Thank you, sir.

12   BY BROWN:

13   Q.  Yeah, that's fine.  That's okay.  So obviously you're aware

14   that you're a defendant in this serious matter.  My question

15   is, do you remember responding to Brown interrogatories in this

16   case?

17   A.  No.

18   Q.  Oh, you don't remember?

19   A.  *(Shakes head.)*

20   Q.  Okay.  I bring this up because you did not seem to remember

21   anything at the time the interrogatories were submitted, but

22   you remember that you worked on February 7th, 2018?

23   A.  I do remember, yes.

24   *BROWN:*  Okay.  So now may I enter Exhibits 115 through

25   119, Package 17, under Federal Rules of Evidence Rule 402 as



Exam. - Johnston

1   relevance?  This is, I believe, Mr. Johnston interrogatories
2   response.
3           THE COURT:  And you believe these to be which exhibit?
4           BROWN:  They're plaintiff's exhibits, so I have it
5   listed as Exhibits 115 through 119.
6           MS. ADAMS:  I'm going to object to these as hearsay.
7           THE COURT:  Because I haven't seen them yet, I'm not
8   quite sure whether they are.
9           BROWN:  This, this -- well, there is statements.
10          MS. ADAMS:  Your Honor, I do have a copy of what
11   he's --
12          THE COURT:  Is this Exhibit 115?
13          MS. ADAMS:  It's Plaintiff's Exhibit 115.
14          THE COURT:  Yes, yes, yes, yes, which appears to be
15   responses to the plaintiff's interrogatories and requests for
16   production of documents as to this defendant.
17          MS. ADAMS:  Yes.
18          THE COURT:  So it wouldn't be inadmissible hearsay as
19   to this defendant, it would be a statement by a party, so I'm
20   going to overrule your objection.  You want Mr. Johnston to
21   examine this exhibit in some way, Brown?
22          BROWN:  Yeah, yeah, this is relevance, and I will
23   predicate why in a second.
24          THE COURT:  I'm going to show him --
25          BROWN:  Okay.

Exam. - Johnston

1          *THE COURT:* -- what I have from Brown's exhibits as
2     Exhibit 115, which purports to be responses to interrogatories
3     and requests for production of documents that you would have
4     provided in this litigation. So he's got Plaintiff's Exhibit
5     115 in front of him.

6          *THE WITNESS:* Just the first page, sir?

7          *THE COURT:* I don't know. I'm waiting to find out
8     from Brown. So did you have a question for him?

9          *BROWN:* Yeah, just please one second.

10         *THE COURT:* Sure.

11         *BROWN:* And is this entered under what, Rule 613 or
12    402, just to be --

13         *THE COURT:* It's his answers to the interrogatories.
14    They would be admissible under the rules. Why don't you pose a
15    question to him regarding them.

16         *BROWN:* Okay, yeah.

17    BY BROWN:

18    Q. So -- all right. So my first question to you is, did you
19    deliberately not respond to Brown interrogatories to prevent
20    Brown from adequately preparing for this case?

21         *MS. ADAMS:* Your Honor, I'm going to object.

22         *THE COURT:* That really is more in the nature of
23    argument than a question. I'm going to sustain that objection.
24    If you want to point out matters relating to what --

25         *BROWN:* Okay.

Exam. - Johnston

1      THE COURT:   -- Mr. Johnston put down on those

2   responses, you should feel free to do so.

3              BROWN:   All right.

4   BY BROWN:

5   Q.   So did you physically put Brown into cell 108?  Do you

6   remember?  Did you physically put Brown into cell 108 on GA?

7   A.   I do not recall that.

8   Q.   Okay.  You didn't, but let's go to Interrogatory Number 10.

9              THE COURT:   They're serially numbered --

10             THE WITNESS:   Oh, okay.

11             THE COURT:   -- and you can just flip through the pages

12   and find it.

13             BROWN:   And this will be under Rule 404?

14             THE COURT:   I don't know because I've given up my only

15   copy of it to the witness.

16             BROWN:   All right.

17             THE COURT:   So why don't you just ask a question.

18             BROWN:   All right.

19   BY BROWN:

20   Q.   So have you been under investigation for any wrongdoing by

21   in-house administration or outside pertaining to any kind of

22   injuries, ignoring inmates or inmates' sexual assaults or use

23   of force deaths, search?  Also, are you currently a defendant

24   in any other pending litigations?

25             MS. ADAMS:   Your Honor, I'm going to ask that the

Exam. - Johnston

1  question be broken up.

2          *BROWN:* Yeah, yeah.

3          *MS. ADAMS:* That he asked two questions.

4          *THE COURT:* Yeah, it was a compound question. And is

5  this a question on the interrogatory?

6          *MS. ADAMS:* Yes, it is.

7          *BROWN:* Yes.

8          *MS. ADAMS:* And, Your Honor, the defense, we did

9  object to that as inadmissible character evidence.

10          *THE COURT:* Okay.

11          *BROWN:* Well, this is not to show intent.

12          *THE COURT:* You're questioning him about an answer to

13  an interrogatory that I gather is objected to, so there's no

14  answer.

15          *BROWN:* Okay.

16          *THE COURT:* So using the interrogatory won't advance

17  the ball. In order -- if you're going to ask about specific

18  instances of conduct, then you should just ask about specific

19  instances of conduct, and then I'll hear --

20          *BROWN:* Have you --

21          *THE COURT:* Excuse me. And then I'll hear from the

22  defense. So why don't you just recast your question.

23          *BROWN:* Yeah, sure.

24          *THE COURT:* Okay.

25  BY BROWN:



Exam. - Johnston

1   Q.   Put another way, have you been under investigation for
2   anything in the past, let's say from 2017 through the filing of
3   this litigation, which would have been 2018?
4           *MS. ADAMS:* I just want to clarify, we're asking the
5   specific timeframe of this incident if he was under any
6   disciplinary investigation?
7           *THE COURT:* Yeah, I'm not quite sure what the question
8   is.   It seemed to be cast broadly in terms of any sort of
9   investigation in a 2017-2018 timeframe.   That's what I
10  understood the question to be.   Is there an objection to that
11  question as it is framed?
12          *MS. ADAMS:* No --
13          *THE COURT:* Very well.
14          *MS. ADAMS:* -- Your Honor.
15          *THE WITNESS:* So from 20 -- like, during this
16  investigation?
17          *THE COURT:* I understand the question to be, were you
18  under investigation for any institutional misconduct on your
19  part in 2017 and 2018, to your knowledge?
20          *THE WITNESS:* No, not to my knowledge.
21  BY BROWN:
22  Q.   Okay, okay.   So to -- just retrospectively speaking, you
23  don't remember much about the timeframe, but you do remember
24  that you wasn't under any type of investigation, assuming you
25  are correct, during this time?

Exam. - Johnston

1    A.    I was a -- at the time of this allegation I was a
2    corrections officer trainee.
3    Q.    Okay.  We'll get to that.  I understand.  I just wanted a
4    yes or no.  You're having a hard time remembering anything
5    around this time span, but you do remember that you wasn't
6    under investigation for anything around this time?
7    A.    I do.
8              THE COURT:   That's what he said.
9              BROWN:   Okay.  Thank you, thank you.
10   BY BROWN:
11   Q.    So prior to February 7, 2018, were you aware of any
12   underlying circumstances as to why Brown should have been
13   removed from cell 108?
14   A.    I do not know.
15             BROWN:   Okay.  I would like to enter my next exhibit,
16   which it's Plaintiff's Exhibit 14 through 19, Package 4, under
17   Federal Rules of Evidence 402.
18             THE COURT:   Do you have a copy of that exhibit before
19   you?  I'm asking the defense, do you have a copy of the
20   exhibit?
21             MS. ADAMS:   I'm sorry, Your Honor.
22             THE COURT:   No, that's quite all right.  Brown has
23   indicated that he wishes to introduce Exhibits 14 through 19.
24   They're not in that binder.
25             THE WITNESS:   I'm sorry.

Exam. - Johnston

1    *THE COURT:* That's okay, Mr. Johnston.  I appreciate
2    your diligent search.  I don't think you'll find them there.
3    They appear to be documents relating to some grievances and
4    matters at SCI Huntingdon, all of which appear to predate this
5    incident.  Do you have a copy of these items in front of you?
6         *MS. ADAMS:* I do, Your Honor.
7         *THE COURT:* Okay.  Mr. Brown, you're moving these into
8    evidence.  What is the relevance, particularly in terms of the
9    testimony of Mr. Johnston?
10        *BROWN:* They are relevant as to my previous
11   predication when I asked if Mr. Johnston was aware of any
12   underlying circumstances as to why Brown should have been
13   removed from cell 108.
14        *THE COURT:* I understand.  These are matters in the
15   nature of grievances or concerns that Plaintiff Brown has
16   brought up, it appears, at other times.  Is there any objection
17   to the admission of these exhibits?
18        *MS. ADAMS:* I don't know how CO Johnston will be able
19   to testify to these.
20        *THE COURT:* I'm not sure that he can.
021       *MS. ADAMS:* So I guess that would be my objection,
22   that there's no foundation that he's --
23        *THE COURT:* I understand.  Let's assume, for purposes
24   of this proceeding, that -- and, Brown, please correct me if
25   I'm wrong -- that what Brown is endeavoring to do is show that

Exam. - Johnston

1 | on prior occasions, Brown had provided complaints to prison
2 | officials, not Mr. Johnston, I don't think, from the paperwork
3 | in front of me, but prior complaints to prison officials about
4 | double celling and risks to his safety. Is that why you're
5 | endeavoring to offer these items, Brown?

6 | *BROWN:* Yeah, partially, in part.

7 | *THE COURT:* So recognizing that that appears to be
8 | what Brown is endeavoring to do, is to note that at prior
9 | times, he had made complaints, is there any objection to the
10 | admission of these exhibits?

11 | *MS. ADAMS:* I wouldn't have an objection to 15, 16,
12 | 17, 18, and 19. I don't believe Exhibit 14 is actually part of
13 | that grievance document, Exhibit 14 that looks like his -- the
14 | double cell policy.

15 | *BROWN:* Yeah, and I object under 402 relevance.

16 | *THE COURT:* Okay. And the double celling policy that
17 | you signed, Brown, you believe it is relevant for what reason?

18 | *BROWN:* Well, partially, I was forced to sign this
19 | document. Secondly, it appears to be the center of this case,
20 | at least from defendants' perspective, first and foremost.

21 | *THE COURT:* Well, then what I'm going to do is this,
22 | I'll find out what the pivotal item in the defense case is from
23 | the defense in the fullness of time. They have not objected to
24 | Exhibits 15, 16, 17, 18, and 19, which are some prior
25 | grievances of yours, and if they're not objected to, they will

Exam. - Johnston

1  be admitted.

2          *BROWN:* And the grievances are pertaining to --

3          *THE COURT:* Yeah, I've already said they'll be

4  admitted.

5          *BROWN:* Oh, thank you.

6          *THE COURT:* Okay? Now, what did you want to do with

7  these with respect to this witness? And you can have a seat if

8  you want, ma'am.

9          *MS. ADAMS:* Thank you.

10         *THE COURT:* No, I appreciated your insight and

11  information regarding these exhibits.

12         *BROWN:* Yeah, I will like him to please --

13         *THE COURT:* Take a look at them, see if he knows

14  anything about these items?

15         *BROWN:* Yeah, if he may read Exhibit 14 so for better

16  clarity and understanding.

17         *THE COURT:* I didn't admit 14.

18         *BROWN:* Oh, okay.

19         *THE COURT:* Are you familiar with the institution's

20  double celling policy, Mr. Johnston?

21         *THE WITNESS:* Yes, sir.

22         *THE COURT:* Okay. So he's familiar with the policy,

23  and he's going to take a look at those exhibits, and now why

24  don't you ask him a question.

25         *BROWN:* Okay. Can you create an offer of proof,

```
                         Exam. - Johnston

 1  because the --
 2            THE COURT:  No, I've ruled, and I've ruled in your
 3  favor.  Why don't you ask him a question --
 4            BROWN:  Oh, yeah, yeah, yeah, yeah.
 5            THE COURT:  -- regarding the exhibits.
 6            BROWN:  Thank you.
 7            THE COURT:  Yeah, you bet.
 8  BY BROWN:
 9  Q.  Mr. Johnston, can you read Exhibit 15, or would you like me
10  to read it?
11            THE COURT:  Neither of those things is necessary.  The
12  exhibit has been admitted into evidence, and I can read it at
13  my leisure.
14            BROWN:  Okay, okay, okay.
15            THE COURT:  Okay?
16            BROWN:  All right.  So the exhibits are pertaining to
17  basically Brown being forced to sign a double celling upon
18  arrival at SCI Huntingdon.  I would like to enter Package 6.
19            THE COURT:  Wait, wait.  You've got a witness here on
20  the stand.  Are you going to ask him any questions about these
21  items?
22            BROWN:  Oh, yeah.  So --
23            THE COURT:  Well, then why don't we ask him questions
24  about these items.
25            Mr. Brown, I realize that this is somewhat new to you,
```

Exam. - Johnston

1   but you have a witness.  He's under oath.  Ask him questions
2   about the matters pertinent to your claim and use exhibits
3   pertinent to the witness.  That's what you need to do.
4          Now, do you have any questions for Mr. Johnston
5   regarding these exhibits which are grievances that predated --
6          BROWN:  No, it was specifically just to show him that
7   I had filed a grievance pertaining to this issue.
8          THE COURT:  Mr. Johnston, were you aware of the
9   existence of any of these grievances?
10          THE WITNESS:  Due to the fact my name is not on it,
11   sir, I do not.
12          THE COURT:  Okay.  Very well.
13          BROWN:  Okay.
14          THE COURT:  But I'm going to admit them anyway for
15   whatever value they may have.  Why don't you pose any other
16   questions you have to Mr. Johnston.
17   BY BROWN:
18   Q.  During this time, were you aware of Brown's misconduct
19   history at any time?
20   A.  No.
21   Q.  Okay.  Were you aware that Brown had filed a grievance
22   pertaining to an unrelated sexual assault?
23   A.  No.
24          BROWN:  If I may, may I enter Package 6, Exhibits 21
25   through 24?

Exam. - Johnston

1              *THE COURT:* I don't know.

2              *BROWN:* Under --

3              *THE COURT:* Package 6 appears to be some other

4    grievance, grievances that Brown has submitted.  This witness

5    has said he never -- that he was unaware of them.

6              *BROWN:* Okay.

7              *THE COURT:* If at some point in time you'd like me to

8    consider them as evidence in this case, we can take that up

9    separately, and I can find out if there's an objection to those

10   documents coming in.

11             *BROWN:* Oh, yeah, yeah, absolutely.

12             *THE COURT:* But why don't you just ask your questions

13   of this witness.

14   BY BROWN:

15   Q.  During this time, were you aware that Brown had filed a

16   grievance directed to mental health, Ms. Cousins and

17   Mr. Richards, pertaining to her concerns with safety and mental

18   health issues and pertaining to a previous sexual assault

19   claim?

20   A.  No.

21             *BROWN:* Okay.  I'd like the courts to consider Exhibit

22   34 from Package 9.

23             *MS. ADAMS:* Your Honor, I'm going to object.  He

24   testified he was not familiar with this.

25             *THE COURT:* Yeah, I think what we need to do, Brown,

Exam. - Johnston

1   is this:   I understand that you've got certain exhibits,

2   records of the Department of Corrections that relate to

3   grievances.   You've asked this witness if he knew anything

4   about them.   He says he didn't.

5           When we break at the noon hour, perhaps you and

±96   opposing counsel can discuss whether we can stipulate to the

A 7   authenticity of some of these records subject to understanding

8   that Mr. Brown will have to find out if any one of the named

9   defendants knew anything about the records.

10          So you've asked him, and he said he doesn't know

11  anything about that.   Do you have another question for him?

12          *BROWN:*   Yeah.

13          *THE COURT:*   Okay.

14  BY BROWN:

15  Q.   Were you aware that around January 25th, that Brown had

16  refused a celly and received a misconduct?

17  A.   No.

18  Q.   Were you aware that on February 2nd, 2018, that Brown had

19  wrote a request slip to her counselor pertaining to

20  acknowledgment that she would be moved with Inmate Allen?

21  A.   No.

22          *BROWN:*   Okay.   Your Honor, I'm a little muddled.   How

23  do I go about attempting to enter some of these exhibits on the

24  record?

25          *THE COURT:*   Well, and that was something that I had

Exam. - Johnston

1   mentioned a moment ago. My suggestion is this, that at the

2   noon hour, when we break for lunch, that you and counsel

3   briefly discuss whether counsel are prepared to stipulate that

4   Brown made these various grievances at these various times.

5           You did agree to the admission of Exhibits 15 through

6   19, which seemed to be one of these packages, and whether the

7   defendant -- defense counsel can stipulate to the authenticity

8   of these exhibits while reserving the right to point out that

9   none of the individual defendants were aware of this

10  information and I suppose also reserving the right to challenge

11  the veracity of the claims made by Brown.

12          So that's what I'm going to ask that you all do, is

13  talk about whether you can stipulate to the admissibility of

14  these items, and then I can simply consider them as exhibits

15  subject to whatever limits of relevance they may have.

16          So that's going to be a conversation I'd like you to

17  take up with counsel. At this point the witness has told us he

18  didn't know any of this stuff.

19          *BROWN:* Okay. So after stipulations, you will

20  decide --

21          *THE COURT:* If the parties can stipulate to the

22  admissibility of these items as authentic records, then I'll

23  give them the weight that they are entitled to, recognizing,

24  Brown, that as part of your Eighth Amendment claim, you have to

25  show that the individual defendants were aware, actually aware

Exam. - Johnston

1    of a substantial risk of harm to you.

2              So there has to be a -- for these items to be

3    probative, it will likely be necessary for you to, at some

4    time, establish that someone knew this, that someone among the

5    four defendants was aware of these concerns.  This witness

6    hasn't been able to provide you with that testimony, but we

7    shall see what the future holds.

8              *BROWN:*  Okay.

9              *THE COURT:*  Do you have other questions for this

10   witness?

11             *BROWN:*  Yeah.

12             *THE COURT:*  Okay.  Then let's proceed with those

13   questions.

14   BY BROWN:

15   Q.  So you wasn't aware that Brown had wrote a request slip to

16   her counselor pertaining to a fear about moving in with Inmate

17   Allen?

18   A.  No.

19   Q.  Okay.  Were you aware that in the grievance dated

20   January 16th, Brown had filed a grievance pertaining to being

21   extorted on a different unit by Inmate Allen and Inmate

22   Jackson?

23   A.  No.

24   Q.  Mr. Johnston, are you familiar with the term training, as

25   you mentioned earlier that you were in training?  So we're

Exam. - Johnston

1   back -- full circle back to that term.  Are you familiar with
2   the term?
3   A.   The term training?
4   Q.   Yes.
5   A.   Yes.
6   Q.   In the prison environment, what does that mean?  Can you
7   please clarify what that means?
8   A.   We're subject to X amount of weeks to a training facility,
9   learn DOC policy and the security of our facility.
10  Q.   So you were newly employed?
11  A.   Excuse me?
12  Q.   You was newly employed?
13  A.   Yes.
14  Q.   Okay.
15  A.   Like anyone else.
16  Q.   Okay.  So as you admitted earlier, that you were in
17  training.  Is that correct?
18  A.   The training for the job was already done by then.
19  Q.   Yes.
20  A.   I was actually on Phase 4 of my training, which actually,
21  if you look at the date, I was almost done with that training.
22  Q.   Okay.  And thanks for the specific information.  So may we
23  conclude that you were considered a trainee?
24  A.   Yes, we established that.
25  Q.   Okay.  While at SCI Huntingdon, have you ever felt targeted

Exam. - Johnston

1  or discriminated against due to the color of your skin?

2          *MS. ADAMS:*  Your Honor, I'm going to object to

3  relevance.

4          *THE COURT:*  What is the relevance of this question to

5  the Eighth Amendment issue pertaining to what happened to you

6  in February of 2018?

7          *BROWN:*  Because there's kind of a code of silence

8  where certain individuals was put on certain posts pertaining

9  to the fact that they acknowledge they're less experienced or

10  pertaining to the fact of the color of their skin.

11          *MS. ADAMS:*  Your Honor, I'm going to object.  None of

12  that has been established.

13          *THE COURT:*  I'm going to sustain that objection.

14          *MS. ADAMS:*  Okay.

15          *THE COURT:*  Mr. Brown, why don't you pose your next

16  question regarding the matters that allegedly took place in

17  February of 2018.  Do you have any other questions for this

18  witness?

19          *BROWN:*  Yeah.  And this might be objected to, but --

20          *THE COURT:*  I don't know.  We'll find out.

21  BY BROWN:

22  Q.  Did you ever witness a written custom to whom individuals

23  in training or even individuals of color like yourself are

24  deliberately put on certain posts?

25          *MS. ADAMS:*  Your Honor, I'm going to object to that

Exam. - Johnston

1   question.

2           THE COURT:   And the basis for the objection?

3           MS. ADAMS:   Again, it's not relevant to the matter at

4   hand.

5           THE COURT:   Yeah, I think the nature of the claim that

6   you have brought, Brown, which we are trying here today is a

7   claim that specific correctional staff violated the Eighth

8   Amendment by failing to protect you --

9           BROWN:   All right.

10          THE COURT:   -- from harm that they knew of.   So issues

11  of -- questions of race in terms of duty assignments of

12  correctional staff I think are beyond the scope of this

13  lawsuit, and I'm going to sustain that objection.   Do you have

14  any other final questions of this witness defendant?

15  BY BROWN:

16  Q.   At any time in February of 2018 did you ever feel like you

17  lacked the power to rectify an issue encountered while on your

18  job duty?

19  A.   No.

20  Q.   Then can you explain why you did not rectify the fact that

21  on February 7th, you encountered Brown with an alleged bloody

22  nose, Brown demanded to see medical through you, you responded

23  that you told the RHU sergeant, Heaster, and our new medical

24  official, but Brown did not see medical on this day?   And I

25  could repeat the question if you want me to.

Exam. - Johnston

1    A.    Can you repeat the question, please?

2    Q.    Yeah.   I had asked if in February, if you felt like you

3    lacked the ability to rectify certain -- any type of encounters

4    or issues that you encountered, and you stated, no, at no time

5    did you lack that ability.

6          So I followed up by predicating it, why didn't you

7    rectify -- the fact that you encountered Brown with a bloody

8    nose, allegedly, and she asked to see medical, you stated that

9    you told Sergeant Heaster and you told a new medical official,

10   but on this day Brown never saw medical.   Was that a

11   rectifiable issue?

12   A.    I honestly do not recall.

13   Q.    Okay.  So you conceded that the bleeding was obvious to the

14   point that there were blood on the sheets and jumpers,

15   jumpsuits?

16               MS. ADAMS:   Your Honor, I'm going to object to the way

17   that question was phrased.

18               THE COURT:   The witness has said he didn't recall.

19               BROWN:   Yeah, I'm --

20               THE COURT:   So I'm going to sustain that objection.

21   Is there a basis for you posing these questions to the witness?

22               BROWN:   Yeah, I was getting to my conclusion.

23               THE COURT:   Okay.

24   BY BROWN:

25   Q.    So prior to the bloody encounter with Brown on

Exam. - Johnston

1    February 7th, had Brown ever complained to you as having

2    nasal -- sinus, nasal congestion?

3    A.    I do not recall that.

4    Q.    What about bleeding from blowing?

5    A.    No.

6    Q.    Are you aware of any medical records or filed grievances

7    where Brown was ordering nasal spray or complaining of nasal

8    congestion?

9    A.    I am a corrections officer, not medical, so no.

10    Q.    Okay, so you're not aware of any filed grievances.  Okay.

11            *BROWN:* May I enter Package 17, Exhibit 101?  This is

12    pertaining to Federal Rule of Civil Procedure -- this is a

13    statement from Mr. Johnston.

14            *MS. ADAMS:* Your Honor, I'm sorry, what number did he

15    say?

16            *THE COURT:* I believe that you said 101.  Is that

17    correct?

18            *BROWN:* Yeah, Package 17, Exhibit 101, DEF000042 and

19    DEF000013.  And this is on the relevance and witness prior

20    statement under oath, 613.

21            *THE COURT:* Well, I found 42, which appears to be --

22    do you have that in front of you?

23            *MS. ADAMS:* Your Honor, I'm not sure -- he said

24    Exhibit 101.

25            *THE COURT:* Exhibit 101.  It is in part of what Brown

Exam. - Johnston

1   has designated is Packet 17.

2            *MS. ADAMS:* The Exhibit 101 I have is a statement

3   by --

4            *THE COURT:* It goes beyond that. There are a series

5   of pages.

6            *MS. ADAMS:* Oh, I'm sorry, Your Honor.

7            *THE COURT:* That's quite all right, that's quite all

8   right.

9            *MS. ADAMS:* Okay. I see where we're at now.

10           *THE COURT:* And he had referenced something that bears

11  the Bates Stamp Number DEF000042, which appears to be a

12  handwritten document. Do you want -- is there any objection to

13  this handwritten document?

14           *MS. ADAMS:* No, Your Honor.

15           *THE COURT:* Very well. Then the one page of the

16  exhibit would be admitted, and I'll provide it to the witness,

17  Brown. Okay?

18           *BROWN:* Yeah, yeah. Thank you.

19           *THE COURT:* You bet.

20           *BROWN:* Is that the 32?

21           *THE COURT:* It is 42.

22  BY BROWN:

23  Q.  Okay. Can you please read your previous statement,

24  Mr. Johnston? Or I could read it.

25           *THE COURT:* Give him a chance to read it for a second,

Exam. - Johnston

1   and then you can pose any questions you want to him.  Have you
2   read that?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Very good.  Go ahead, Brown, you may pose
5   your question.

6          BROWN:  As relevance --

7          THE COURT:  Why don't you just pose a question to the
8   witness.  He's read the statement.  What questions would you
9   like to ask him about this statement?

10         BROWN:  It's also, Your Honor, Exhibit 101.  It's
11  another statement from --

12         THE COURT:  You're looking at --

13         BROWN:  Thirteen at the end.

14         THE COURT:  Thirteen?

15         BROWN:  Yes.

16  BY BROWN:

17  Q.  Can you please look at that, Mr. Johnston?

18         THE COURT:  Wait a second.  Page 13, do you see that?

19         MS. ADAMS:  Yes, Your Honor.

20         THE COURT:  Very well.  I'm going to show it to the
21  witness, but you can let me know if you have any objection to
22  him --

23         MS. ADAMS:  Your Honor, I don't actually have a Page
24  13.

25         THE COURT:  It is DEF000013.

Exam. - Johnston

1          MS. ADAMS:  I do have it, Your Honor.

2          THE COURT:  Okay.  There you go.  I'm going to show it

3     to the witness so he can read it, the bottom half of the page

4     there.

5          THE WITNESS:  Oh, all right.

6          THE COURT:  Did you have a chance to read that

7     paragraph there, Mr. Johnston?

8          THE WITNESS:  Yeah.

9          THE COURT:  Before you do anything, any objection to

10    the admission of that, or would you like to have Brown further

11    question the witness regarding this?

12         MS. ADAMS:  No objection, Your Honor.

13         THE COURT:  Very well.  Go ahead, Mr. Brown, you may

14    pose questions regarding these statements.

15    BY BROWN:

16    Q.  So now do you remember on this date that you encountered

17    Brown with a bloody nose?

18    A.  As of reading, yes, I do remember.

19    Q.  Do you remember Brown requesting medical attention?

20    A.  I stated that I asked if you needed medical attention, and

21    I wrote, no, you did not need medical attention because you

22    said you did not need medical attention.

23    Q.  Okay.

24         THE WITNESS:  Your Honor, thank you, sir.

25         THE COURT:  Thank you.  Any other questions of this

Exam. - Johnston

1   witness?

2   BY BROWN:

3   Q.   Do you remember exchanging Brown's linens and jumpers?

4   A.   I recall asking if there were any more linens or jumpers at

5   that time.  Due to the fact we were on second shift, we had to

6   go get them from laundry because there were none at the time.

7   Q.   So you don't remember at all on this day exchanging any

8   linens, jumpers, t-shirts, anything pertaining to the blood.

9   Am I correct?

10   A.   No.

11   Q.   And we have established that on this day, you did not see

12   to it that Brown received medical attention.  Am I correct?

13   A.   I stated that you told me you did not need medical

14   attention from a nosebleed.

15   Q.   Okay.  So Brown did not see medical on that day.  Am I

16   correct?

17   A.   That I know of, correct.

18   Q.   Would you admit that you told medical that Brown had a

19   bloody nose?

20   A.   Admit?

21   Q.   Did you tell medical, any medical staff, that Brown -- did

22   you tell anybody, including the medical staff, that Brown had a

23   bloody nose?

24   A.   I was doing my round then.

25   Q.   At any time did you tell medical, medical staff, that Brown

```
                         Exam. - Johnston

 1   had a bloody nose?

 2   A.  No.

 3            BROWN:  Okay.  So I'd like to admit Package 16,

 4   Exhibit 96.

 5   BY BROWN:

 7   Q.  Mr. Johnston, you admitted earlier that there was video

     monitoring on GA?

 8   A.  There's videos everywhere.

 9   Q.  Okay.

10   A.  There's cameras everywhere in the facility, from outside

11   the whole way in, even in our lounge.

12   Q.  Wow.

13            BROWN:  I would like to enter exhibit -- Package 16,

14   Exhibit 93.

15            THE COURT:  Well, a couple of things.  First, Exhibit

16   93 isn't in your Package 16.  Your Package 16 begins with

17   Exhibit 96.

18            BROWN:  Yeah, I'm sorry.  That's --

19            THE COURT:  That's okay.  I'm just trying to figure

20   out what you want me to do.

21            BROWN:  That's why you're a lot smarter than me.

22            THE COURT:  I'm kind of confused today, but what would

23   you like me to do?

24            BROWN:  Yeah, yeah, it's 96.

25            THE COURT:  Ninety-six, which is -- appears to be a
```

Exam. - Johnston

1   grievance that Mr. Brown had written relating to this incident.

2   Is that what it is, Mr. Brown?

3        *BROWN:*  Yeah.  Can you please have Mr. Johnston take a

4   look at it?

5        *THE COURT:*  Well, first I want to find out if there's

6   any objection to it.

O 7       *MS. ADAMS:*  Your Honor, I am, again, going to object

8   to this.  I believe that Mr. Johnston testified that he's not

9   aware of any grievances, misconducts.

10       *THE COURT:*  Yeah, this is actually the incident that

11  is at question here, so I'm going to allow the witness to take

12  a look at the exhibit, 96, and we'll reserve on whether it will

13  be admitted for a moment here until we find out where Mr. Brown

14  is going.

15       Go ahead, Mr. Brown, the witness has got the exhibit

16  in front of him.  Pose a question, please, sir.

17  BY BROWN:

18  Q.  Did you admit earlier that there are video monitoring on GA

19  and there are a plethora of cameras everywhere on this unit?

20       *THE COURT:*  I don't know that he used the term

21  plethora, but he's already testified that there were cameras on

22  the unit, so why don't you pose another question to him.

23  BY BROWN:

24  Q.  Would you happen to have any preservation as to any video

25  saved on this matter?

Exam. - Johnston

1    A.    I wouldn't know that.

2    Q.    Okay.

3              THE COURT:    And I will note that the exhibit that

4    Brown is referring to does contain a handwritten notation from

5    him asking for the preservation of recordings, but the witness

6    has said he didn't know anything about that.

7              Go ahead, Brown, what else have you got for us with

8    respect to this witness?

9              BROWN:    I'd like to enter Package 16, Exhibit 98.

10             THE COURT:    Yes, this is -- Brown, what we need to do

11   with respect to exhibits is, they have to be exhibits that

12   relate to the testimony of the witness.

13             I understand that you may wish to have me consider

14   matters in -- perhaps in these grievances, and that's what I've

15   already told you.    In terms of Department of Corrections

16   records, you and counsel should discuss whether you can

17   stipulate to the authenticity and admissibility of any of these

18   exhibits.    But is there anything in that exhibit that you think

19   this witness knows about?

20             BROWN:    Yeah, it's a filed grievance basically --

21             THE COURT:    It's an appeal of a grievance.

22             BROWN:    Yeah, it's a whole grievance from the initial

23   to the appeal process, yes.

24             THE COURT:    Right, right.    But you have this witness

25   on the stand to ask him about things he knows, things he has

Exam. - Johnston

1   seen, things he has done. Are you saying that he played a role
2   in processing this grievance?

3        *BROWN:* No, no, no, no, I'm not. It was just certain
4   things that was omitted, I mean that was omitted in the
5   grievance pertaining to this --

6        *THE COURT:* That would be a separate issue --
7        *BROWN:* Oh, okay.

8        *THE COURT:* -- beyond what this witness can testify
9   to. Please, if you could, focus on the witness before you and
10  ask him questions relating to your claim. And if you don't
11  have any other questions, then you can turn the witness over to
12  the defense for cross-examination.

13  BY BROWN:

14  Q. Were you aware that Mr. Allen exhibited violent and
15  predatorial behavior arising from unfulfilled sexual desires,
16  needs that were not being met as a lifer in the previous months
17  prior to being withheld with Brown?

18  A. No.

19       *BROWN:* Package 12, Misconduct 009726.

20       *MS. ADAMS:* Is there an exhibit number with that?

21       *BROWN:* Yeah, so Package 12, but the misconducts are
22  just numbered as misconducts.

23       *THE COURT:* Actually not. What you gave me when you
24  gave me Package 12 was that it was Exhibits 42 through 46, and
25  they were misconducts of Inmate Allen. You've already asked

Exam. - Johnston

1   this witness if he knew of any misconducts of Inmate Allen.

2              Were you aware of any misconducts that had been --

3   that Inmate Allen had been cited for?

4              THE WITNESS:  No, sir.

5              THE COURT:  So I understand you may want me to

6   consider the fact that there·were prior misconducts.  This

7   witness can't help you there.  He says he doesn't know that.

8              BROWN:  Okay.

9   BY BROWN:

10  Q.  So for the record, at any time when Mr. Allen and Brown was

11  withheld together, do you believe any of the inmates met any

12  criteria that staff should have considered to review

13  considering a Z code?

14  A.  No.

15  Q.  Again, as relevance, are you familiar with the reception

16  and classification policy under 11.21?

17  A.  No.

18             BROWN:  I would like the reception and classification

19  policy to be considered.

20             THE COURT:  And that will be an issue that, as I have

21  said a couple of times this morning, you need to take up with

22  counsel at the noon break.

23  BY BROWN:

24  Q.  Are you familiar with the PRAT, the prison assessment tool

25  policy pertaining to classification?

Exam. - Johnston

1   A.   Not that much, but yes.

2   Q.   Oh, you are.  So in the Coleman case law, this information

3   was made public.  Are you familiar with the characteristics of

4   a sexually aggressive prisoner?

5   A.   No.

6   Q.   All right.  So, first, what part of the PRAT policy are you

7   familiar with, if you don't mind me asking?

8   A.   Nothing in terms of knowing any inmates or anything in the

9   lines of anything you're asking me.

10  Q.   Okay.  Thank you for clearing that out, but I'm still

11  curious to see what part of the policy you know.

12  A.   I know PRAT, just the word PRAT.  I don't know anything

13  else about that.

14  Q.   Oh, it's a familiar word?

15  A.   Yeah.

16  Q.   Okay.  But you don't know anything pertaining to that

17  policy?

18  A.   No.

19  Q.   Okay.  So were you aware that within the PRAT policy, at

20  least what was made public through the case law Coleman, that a

21  sexually aggressive prisoner was between the age of 27 through

22  45?

23              MS. ADAMS:  Your Honor, I'm going to object.  I

24  don't --

25              THE COURT:  Brown, he's already told you he doesn't

Exam. - Johnston

1   know what the content of that policy is, so asking him about

2   the content of the policy does not advance the ball here.   I'm

3   going to sustain that objection.   Do you have any other

4   questions for this witness?

5   BY BROWN:

6   Q.   Were you aware of why Brown was incarcerated pertaining to

7   his -- anything with his sentencing or nature of crime?

8   A.   No.

9   Q.   Were you aware of why Inmate Allen was incarcerated

10  pertaining to his sentencing or any nature of his crimes?

11  A.   No.

12  Q.   At any time when Brown was withheld with Mr. Allen, do you

13  believe that Mr. Allen fit the description of a sexually

14  aggressive prisoner consistent -- well, you say you don't know

15  anything about the PRAT.

16       So do you believe that Mr. Allen fit the description

17  of a sexually aggressive inmate?

18  A.   No.

19  Q.   Were you aware that Mr. Allen has 77 misconducts, most of

20  whom was violent, four of which was sexually related at the

21  time he was withheld with Brown?

22  A.   No.

23  Q.   Do you believe there was any imbalance of power between

24  Brown and Mr. Allen?

25  A.   No.

Exam. - Johnston

Q.   Prior to February 7, 2018, did Brown ask you to be moved
from 108 cell at any time?

A.   Not that I recall.

Q.   So you encounter Brown on this day, according to you.
Brown is in the cell furthest from the bubble.  You're at the
cell door.  Brown, allegedly by Brown, requested to be moved.
Allegedly by Brown, Brown was a bloody mess, even assuming a
bloody nose, so much so that staff, assuming it was you by
Brown, it's predicating, that you initiated to exchange his
jumpers, sheets, boxers, t-shirts, et cetera, and that you did
not rectify or see to the fact that Brown saw medical.  Did
Brown request medical attention from you any other time around
this time?

A.   My job was to ask you if you needed medical, and you told
me no because it was a bloody nose.

Q.   So you told Sergeant Heaster?

A.   Heaster.

Q.   Heaster.  Excuse me, my French.  You told Sergeant Heaster
that Brown had a bloody nose and medical was around and you
told medical, too?

A.   I did not talk to medical.

Q.   Okay.  At any time did you refuse Brown medical attention?

A.   No, hence the question.

Q.   Do you know why Officer Fochtman said Brown refused medical
attention?

Exam. - Johnston

1   A.   I do not recall that.

2   Q.   Is it fair to understand that when Brown requested to move,

3   that you consider whether she was a Z code or not?

4   A.   As a COT, we do not make moves pertaining to any block,

5   unit, any inmate, period.

6   Q.   So at any time did you know that Brown wasn't a Z code?

7   A.   I did not know.

8   Q.   Do you know what a Z code is?

9   A.   You are -- pertaining to a single cell.

10  Q.   Okay.  So is it also fair to say that you did not consider

11  the imbalance of power between Brown and Allen?

12  A.   I was a trainee, and, again, no.

13           *BROWN:*  Thank you very much for your precious time.

14           *THE WITNESS:*  Thank you.

15           *BROWN:*  Yes.

16           *THE COURT:*  It is the noon hour.  Will there be

17  cross-examination?

18           *MS. ADAMS:*  There is, Your Honor, and I am going to

19  ask permission to go outside the scope of direct.

20           *THE COURT:*  In terms of the efficiency of proceedings

21  here as a nonjury proceeding, I'll permit that, but let me

22  suggest this, if I might.  We are at the noon hour, and I want

23  to give everyone a chance to take a brief pause to refresh and

24  to reflect.  It's been two hours.

25           We're going to break for an hour, and we'll resume at

Exam. - Johnston

1   1 o'clock.  You shouldn't discuss your testimony with anyone or

2   let anyone discuss it with you during the noon hour.  We will

3   reconvene at 1 o'clock here in the courtroom.

4        We'll begin taking testimony shortly after that,

5   because I want the parties to have a chance to discuss whether

6   you can stipulate to the authenticity of a number of these

7   exhibits, recognizing that Mr. Brown will ultimately bear the

8   burden of proving that individuals were subjectively aware of a

9   risk to his safety.  Okay?  I'm sorry, go ahead.

10       *MS. BEDELL:*  One brief matter.  We'll be prepared to

11  stipulate to exhibits.  Pursuant to your order, the four

12  corrections officers who are named defendants are appearing

13  here, and we also, pursuant to your order, brought Ms. Anata

14  Trice, who was a nurse during these events.

15       *THE COURT:*  Sure.

16       *MS. BEDELL:*  We wanted to suggest that -- the court

17  may suggest that she be called as the next witness so that she

18  need not appear in person again, if possible.

19       *THE COURT:*  Mr. Brown, I think that's a fair request,

20  that your next witness be Ms. Trice.

21       *BROWN:*  Yeah, and with due respect to her precious

22  time.

23       *THE COURT:*  Okay.  So what we will do is, we'll break

24  for the noon hour.  The parties can reach stipulations, if they

25  can, on authenticity of exhibits.

Exam. - Johnston

1        We'll resume with the cross-examination of

2   Mr. Johnston shortly after 1:00, then we will hear from the

3   witness Ms. Trice.  Thank you for joining us here today.  And

4   then we will hear testimony from any other witnesses that we

5   can fit in today.  I would contemplate, for those who will be

6   traveling with Mr. Brown, that we would wrap up testimony at

7   around 4:30.

8        And, Brown, I need to notify you that I understand

9   that someone that you had once hoped to have as a witness, an

10  individual named Butterbaugh, no longer works for the

11  Department of Corrections.  So if you wanted Butterbaugh as a

12  witness, you would have to have us issue a subpoena, you'd have

13  to serve that subpoena and pay the witness fee to Butterbaugh.

14  Do you understand that?

15       *BROWN:*  Yeah.  Am I correct that the witness fee was

16  already paid for Ms. Butterbaugh?

17       *THE COURT:*  No, not that I know of.  I just learned

18  recently that Ms. Butterbaugh is no longer employed by the

19  Department of Corrections, so I certainly haven't paid the

20  witness fee and --

21       *BROWN:*  Ms. Bedell?

22       *MS. BEDELL:*  She was not included with the, I believe,

23  four people, four or five who Mr. Brown had paid for.

24       *THE COURT:*  Okay.  So you would need to make those

25  arrangements, too, and you can do that when we reconvene at 1

Case: 23-1480   Document: 34   Page: 58   Date Filed: 11/17/2023

Exam. - Johnston

1  o'clock. But you'd still need to serve Butterbaugh because
2  Butterbaugh is no longer in the employ of the Department of
3  Corrections. Okay?

4         *BROWN:* Yeah, yeah. Now, as far as the logistics of
5  her employment, would that be relevant pertaining to what time
6  era that she had negated from her duties?

7         *THE COURT:* If you were going to call -- one, she
8  isn't a defendant. Two, she's no longer employed by the
9  Department of Corrections. So if you were going to call
10  Butterbaugh as a witness, you would have to make arrangements
11  to serve a subpoena upon her.

12         *BROWN:* Okay.

13         *THE COURT:* Okay? We'll stand in recess. Thank you.
14         *(Luncheon recess taken.)*

15         *THE COURT:* Please be seated. We're prepared to
16  resume the afternoon session in Gartor Kiki Brown's trial. I
17  will note, just in terms of trying to keep pace of the
18  exhibits, that I believe that the following exhibits have been
19  admitted into evidence:

20         Defendant Exhibit 56, which is a diagram of the GA
21  unit; Plaintiff's Exhibits 15, 16, 17, 18, and 19, which were
22  various grievance matters; then Pages 13 and 42 of Plaintiff's
23  Exhibit 101, which were reports of statements made by
24  Mr. Johnston; and then Plaintiff's Exhibit 115. And I know the
25  parties were going to discuss and can provide to me, at their

Exam. - Johnston

1  convenience, a list of exhibits that are otherwise stipulated

2  to in terms of authenticity and admissibility.

3         But having covered those matters, why don't we proceed

4  with the cross-examination of Mr. Johnston.  And I understand

5  that for purposes of efficiency in this nonjury proceeding, you

6  should feel free to combine both your cross-examination and any

7  direct that you would have presented in the defense case.

8         *MS. ADAMS:*  Thank you, Your Honor.

9         *THE COURT:*  Thank you.

10                       CROSS-EXAMINATION

11  BY MS. ADAMS:

12  Q.  Good afternoon, Officer Johnston.  Just for clarification

13  purposes, you were hired by the Department of Corrections in

14  March of 2017?

15  A.  Yes.

16  Q.  And employed at SCI Huntingdon?

17  A.  Yes.

18  Q.  And questions were asked about you being a training

19  officer, and during February, 2018, you were a training

20  officer?

21  A.  That's correct.

22  Q.  Did you complete your period of training?

23  A.  Yes.

24  Q.  After you complete your period of training, are you on

25  probation or anything else before you become a full-fledged

Exam. - Johnston

1  corrections officer?

2  A.  Yes, for six months after.

3  Q.  After your training period?

4  A.  Yes, ma'am.

5  Q.  And did you complete that period?

6  A.  Yes.

7  Q.  Now, we've been talking about the G unit and the RHU, and

8  the RHU is the restrictive housing unit?

9  A.  Yes.

10  Q.  Is that also the G unit?

11  A.  Yes.

12  Q.  So they can be used interchangeably?

13  A.  Yes.

14  Q.  And do you still have Exhibit 56 up there?  Do you have it?

15  A.  Yeah, yeah.

16  Q.  And that is a map of the G unit or the RHU?

17  A.  Both, G unit and RHU, yes.

18  Q.  Okay.  And we had been talking about GA, as in the letter

19  A.  What does that A stand for, or what does A signify?

20  A.  It signifies one part of the unit.  So there's alpha,

21  there's bravo, there's Charlie, and there's Delta.  So if

22  they're in that one specific area, that is technically A.

23  Q.  And the cell we are talking about is 108?

24  A.  Yes.

25  Q.  And I believe you pointed out that that is in the corner of

Exam. - Johnston

1   G unit, pod quad A?

2   A.   Yes.

3   Q.   And in the center of G unit or the RHU, what is that in the

4   center?

5   A.   The control room.

6   Q.   And what's in the control room, or who is in the control

7   room?

8   A.   The sergeant, lieutenant, and the one man.

9   Q.   Okay.   And the one man is the corrections officer?

10  A.   Yes.

11  Q.   The fact that cell 1008 being in G unit, A quad, is in the

12  corner, is that cell any less secure than any of the other

13  cells in quads A, B, C, or D?

14  A.   They're all the same.

15  Q.   Okay.

16  A.   Except for a couple have video, actual video cameras.

17  Q.   Video cameras into the cells?

18  A.   Yes.

19  Q.   Okay.   And you said there are cameras on the block?

20  A.   Yeah.

21  Q.   Do these cameras, except for the specific ones that look

22  into certain cells, do any of these cameras actually look into

23  these cells?

24  A.   No.

25  Q.   And we're here for the time period -- we're done with that

Exam. - Johnston

1  exhibit.  You don't need to hold it up.  We're here for the

2  time period of February 3rd, 2018, to February 17th, 2018.  Do

3  you recall what shift you would have been working during that

4  time?

5  A.  Mostly pertaining to second shift.

6  Q.  Is that, like, what time?  Like 6:00 to 8:00, 2:00 to

7  10:00?

8  A.  2:00 to 10:00, 2:00 p.m. to 10:00 p.m.

9  Q.  And on these specific dates, do you recall what unit you

10  would have been assigned to?

11  A.  As a trainee, I can literally be anywhere.

12  Q.  On these specific dates, do you recall if you -- what unit

13  you were in?

14  A.  Mostly the RHU that I can say.

15  Q.  And prior to the dates that we're talking about, this

16  February 3rd, 2018, to February 7th, 2018, did you have any

17  interactions with Inmate Brown?

18  A.  No, not that I recall of.

19  Q.  Prior to these dates, were you ever told that Inmate Brown

20  was a homosexual or any of the other terms he used earlier?

21  A.  No.

22  Q.  Were you ever told that Inmate Brown did not want to have a

23  cellmate?

24  A.  No.

25  Q.  So you were asked questions about the PRAT.  In February of

Exam. - Johnston

1   2018, you said you were a training officer.  Did you have any

2   job duties that would result in you classifying inmates?

3   A.   No.

4   Q.   Did you have any job duties that would allow you to assign

5   cells or inmates that go into cells?

6   A.   No.

7   Q.   So in 2018, when you were this training officer, none of

8   your duties required you to be familiar with the PRAT?

9   A.   That's correct.

10   Q.   Now, you stated you were working the 2:00 to 10:00 shift

11   while in the RHU.  Do you recall any specific duties that you

12   were assigned to those days?

13   A.   Not really.  I mean, other than just the punch man.

14   Q.   Okay.  What is a punch man?

15   A.   Pretty much you do rounds.  You == pretty much it's like

16   circling around every cell in each unit.

17   Q.   Okay.  So when you're saying you're circling around every

18   cell in each unit, are you talking about those specific quads?

19   A.   Yes.

20   Q.   So the punch man is going around to all these quads, A, B,

21   C, and D, and going past all the cells?

22   A.   Um-hum.

23   Q.   Is there anything a punch man must do while going around

24   these cells?

25   A.   You have to check in to make sure the inmate is actually --

64

1   inmate or inmates are alive and well, there's no concerns

2   whatsoever, no, like, meaning fires or any type of state of

3   emergencies.  You also have to use a punch tool to -- they call

4   it a Zak tool to punch -- not a Zak tool, but, I mean, a punch

5   gun which you go in, there's three on each level, one and two.

6   Other than that, I mean --

7   Q.  So if I can expand a little bit more.  So you have like a

8   punch tool?

9   A.  Yes.

10  Q.  You said that there's three on every level.  Are you

11  checking in this punch tool?

12  A.  No, I'm not checking in, I'm just actually punching an area

13  where that it equips into the tool itself and it makes a

14  beeping noise when it is registered.

15  Q.  So is there -- to your recollection or to your knowledge,

16  when you're making these punches, are there any recordings of

17  this?

18  A.  That I know of there is, but I don't know anything about

19  that.

20  Q.  Okay.  How often are you required to go around these quads,

21  these cells, and use the punch tool?

22  A.  Every half hour.

23  Q.  So when you say every half hour, is that per quad, per --

24  A.  Every half -- well, it's every half hour throughout the

25  quad, I have to make my rounds throughout all three.  The

Exam. - Johnston

1   fourth one is every 20 minutes.

2   Q.  And is quad A part of every half hour?

3   A.  Yes.

4   Q.  So it's fair to say that in a 60-minute period, you are on

5   quad A at least two times in an hour and going past cell 1008?

6   A.  Yeah.

7   Q.  So you said when you're conducting your rounds, you're

8   conducting checks of cells, and you said that you check every

9   cell?

10  A.  Yes.

11  Q.  Does this include empty cells?

12  A.  Yes.

13  Q.  Can you explain, when you're at the cell, like, how these

14  cells are set up?  Like, what are you looking at when you're

15  looking in a cell door?

16  A.  First of all, you're looking through a window and a door.

17  So you're looking into a window.  One side will have a

18  toilet-sink, and then on the far same end would be a desk and a

19  chair equipped to the wall, and then across from the desk and

20  the chair would be a bunk or a single bed.

21  Q.  And you said there is a window in the door?

22  A.  Yes, in the far end.

23  Q.  Is there a window in the cell door, as well?

24  A.  Yes.

25  Q.  So you're actually able to look through this window and see

Exam. - Johnston

1    the whole cell?

2    A.   Yes.

3    Q.   Do inmates ever cover this window in the cell door?

4    A.   Yes.

5    Q.   As you're making your rounds, do the inmates have to remove

6    the coverings?

7    A.   Yes.

8    Q.   What is the lighting situation in the cells?  Is it 24-hour

9    illumination, is it like neon lights?

10   A.   They have a light that they can turn on themselves, but

11   there is a light still functioning all 24 hours of the day.

12   Q.   So there's never a period of time within these cells in the

13   RHU where they are completely dark?

14   A.   No.

15   Q.   So when you're making these rounds, the cell is

16   illuminated?

17   A.   Yes.

18   Q.   Now, when you're checking the cells doing rounds, what are

19   you looking for?

20   A.   In the cell itself?

21   Q.   Yeah.

22   A.   First off, I'm going to make sure that the inmate is okay,

23   any emergencies like fires, anything broken, implements of

24   escape, pretty much anything that has to pertain to that inmate

25   for the care, custody, and control of the facility.

Exam. - Johnston

1   Q.  So when you're saying to make sure they're okay in the

2   care, custody, are you just looking at their safety?

3   A.  Yes.

4   Q.  And what were you -- what are you required to do if you

5   find a safety issue in a cell?

6   A.  We are supposed to report it.  If there is a safety issue,

7   we are supposed to remain at the door to make sure that nothing

8   further does come to that inmate or anything in those lines.  I

9   also wait for backup, as well, and further notice.

10  Q.  So when you say you report it, you have a radio that you're

11  able to --

12  A.  Yes, ma'am.

13  Q.  Okay.  And what -- when you're looking for the safety of

14  the inmates, do you look for medical issues, as well?

15  A.  If it does actually come up, yes.

16  Q.  Would you look for medical emergencies?

17  A.  Yes.

18  Q.  Like, what would be a medical emergency, something that you

19  would notice on this?

20  A.  An inmate saying, you know, he fell off his bed, anything

21  that has to do with him bleeding, anything that has to do with

22  the -- if he falls out, that's a big one in our jail.

23  Q.  What does falling out mean?

24  A.  Unconscious.

25  Q.  Okay.

Exam. - Johnston

1    A.   We have to make sure that they are breathing and alive.   So

2    if they do fall out, then we are supposed to make -- we're

3    supposed to report that right away.

4    Q.   And, again, would you report that through your radio?

5    A.   My radio.

6    Q.   Now, you established there's a window on each cell door.

7    Are you able to hear through these doors, or are they

8    soundproof?

9    A.   You can hear through them.

10   Q.   And whenever you make these rounds going past the cells, do

11   inmates ever talk to you or make requests?

12   A.   Yes.

13   Q.   So anytime an inmate would talk to you through a door,

14   you're able to hear them?

15   A.   Yes.

16   Q.   Do you ever pass along requests?

17   A.   If need be.

18   Q.   So prior to this time period of February 3rd to

19   February 7th, were you aware that Brown and Mr. Allen had been

20   celled together?

21   A.   By passing through, yes.

22   Q.   Were you aware what cell they were in together?

23   A.   I don't really pay attention to whose cell is who.

24   Q.   So on these dates, we've established Brown was housed in

25   the RHU and he was housed in cell 1008.

Exam. - Johnston

1    A.   Yes.

2    Q.   So you would have been passing past this cell at least two

3    times an hour?

4    A.   At least.

5    Q.   During any of your rounds -- I'm going to go specifically

6    to February 7th now.

7    A.   Okay.

8    Q.   On any of these rounds, did you ever come across any issues

9    in cell 1008?

10   A.   Specifically that day?

11   Q.   Yes.

12   A.   I was coming through, and I actually got flagged down.   I

13   got stopped by -- I'm not really sure which inmate it was, but

14   one of the inmates stopped me to tell me that Inmate Brown had

15   a nosebleed.

16   Q.   Do you recall, did you talk to Inmate Brown about this

17   nosebleed?

18   A.   Yes.

19   Q.   Was there anything significant about it?

20   A.   It just looked like a typical nosebleed.

21   Q.   Were you told by Brown that he had been assaulted which

22   caused the nosebleed?

23   A.   I was told nothing like that.

24   Q.   Were you ever told that Brown had been sexually assaulted

25   by Inmate Allen?

Exam. - Johnston

1    A.   No.

Q.   When you come to the cell 1008 and you're told about the

3    bloody nose, do you recall where Brown was sitting within the

4    cell?

A.   On the top bunk.

6    Q.   Did he talk to you from the top bunk?

7    A.   Yes.

Q.   Did he ever come down and speak to you, like standing by

9    the window?

10   A.   After a minute or so.   The block gets a little loud

11   sometimes, so he actually came down.

12   Q.   So as you're observing this and you're talking to Brown

13   about the bloody nose, did it appear to be actively bleeding or

14   was it stopping?

15   A.   He kind of clogged it up, so to speak, put some -- probably

16   toilet paper in his nose to stop the bleeding.

17   Q.   Did you ask Brown if he needed a nurse or medical to look

18   at his bloody nose?

19   A.   I asked him, yes.

20   Q.   Do you recall what he said?

21   A.   He just -- he told me that it was just a nosebleed.

22   Q.   So he refused your offer of medical help?

23   A.   Yes.  But he did request, though, for linens and a new

24   jumper and everything because he did have some -- a little bit

25   of blood on his jumper and his linens.

Exam. - Johnston

1   Q.   Okay.  Did you report this bloody nose to anybody?

2   A.   Yes.

3   Q.   Who did you report that to?

4   A.   Officer Fochtman, I think that's how it went, to the

5   control room, Heaster.

6   Q.   So you reported it to another corrections officer?

7   A.   Yeah.

8   Q.   And I believe you said that there was an exchange of linens

9   and a jumpsuit?

10  A.   Yeah.

11  Q.   Did Brown show you where blood was on his clothing?

12  A.   Yes.  That's how I knew, actually, where it was.

13  Q.   Do you recall where the blood was at?

14  A.   Not really.  I just know that it was somewhere above --

15  like, in his shoulder area, like around here.  Other than

16  that --

17  Q.   Did the jumpsuit appear to be saturated with blood, or was

18  it more consistent with a bloody nose?

19  A.   Like I said, the bloody nose.  It looked like a bloody

20  nose.

21  Q.   And you said it was kind of up in the shoulder area?

22  A.   Yeah, it wasn't -- it, like, kind of dripped.

23  Q.   Did you observe blood anywhere else on the jumpsuit, say,

24  like, around the waist, at the cuffs, anywhere?

25  A.   No.

Exam. - Johnston

1    Q.   And the amount of blood that was on the jumpsuit, was that

2    consistent with Brown telling you he had a bloody nose?

3    A.   From -- yeah, from my standing on 31.  So, yeah, I would

4    say so, yes.

5    Q.   Did Brown request a new jumpsuit?

6    A.   He asked, yes.

7    Q.   And were you able to provide a new jumpsuit right away?

8    A.   Not right away, but as soon as we got one available for him

9    in his size, we gave him one.

10   Q.   Did you allow him to keep two jumpsuits in the cell or do

11   you exchange them?

12   A.   I don't recall of exchanging it at all, to be honest.

13   Q.   So you don't know if you were there when the jumpsuit was

14   exchanged?

15   A.   No.

16   Q.   Do you recall if any of the linens had blood on it?

17   A.   Just a little bit, nothing profuse.

18   Q.   Do you recall, was it the pillow, a sheet?  Do you recall

19   which specific linens?

20   A.   I just -- I know it was mostly the sheet.  Just other than

21   that, like, I really wasn't -- like, he started showing me all

22   types of little droplets of blood.  So other than that, I could

23   say the sheet maybe, and that was it.

24   Q.   Do you recall, did he bring the sheet to the window or did

25   he, like, show you it while he was sitting on his bed?

Exam. - Johnston

1    A.   It started with his -- on his bed, and that's when I told
2    him to come to the door so I could see it more to make sure
3    that there was actually blood on the linen.
4    Q.   So would you say there was a significant amount of blood on
5    the linens?
6    A.   No, it wasn't a lot.
7    Q.   Would the amount of blood you saw on the linens, would that
8    be consistent with a bloody nose?
9    A.   Yes, I would say.
10   Q.   So while you're at the cell door talking to Brown about the
11   bloody nose, did you have an opportunity to see inside of the
12   cell?
13   A.   Yes.
14   Q.   Do you recall what the condition of the cell was?
15   A.   It looked just like another normal RHU cell, everything in
16   its rightful place.   Didn't look like any type of -- you know,
17   it didn't look dirty or anything, like, nothing out of place,
18   period.
19   Q.   So it didn't look like there had been a recent struggle?
20   A.   No.
21   Q.   While you were at the cell door, was Mr. Allen in the cell,
22   as well?
23   A.   Yes.
24   Q.   Do you recall if Mr. Allen was wearing his jumpsuit?
25   A.   I can't really recall that.

Exam. - Johnston

1    Q.   Do you recall if Mr. Allen's clothing had any blood on it?

2    A.   There was nothing there that I know of.

3    Q.   Do you recall if he had any bruises or contusions or cuts

4    on his hands?

5    A.   No.

6    Q.   Now, you said you don't recall if you were there when the

7    linens and jumpsuit were exchanged. Did you have an

8    opportunity to observe the linens and jumpsuits before they

9    were sent to laundry?

10   A.   Not really to an extent, just the fact that it was put in a

11   bag, I was told, and given to laundry.

12   Q.   So as you're doing these rounds, if an inmate tells a CO,

13   including yourself, that he's been sexually assaulted, what

14   must you do?

15   A.   For one, I'm staying at the cell. You're not supposed to

16   leave after something like that is being said. I'm reporting

17   it to my control room to let them know what's going on. And

18   then a lieutenant would show up. And then on further than

19   that, that's not my show after that.

20   Q.   If a sexual assault is reported and the victim and the

21   perpetrator are in the same cell, is there any different

22   protocols or anything else different you have to do?

23   A.   We would handcuff both. One would go back to the end of

24   the cell, and the other would come to the other -- to the door,

25   as well, to be handcuffed. One would be taken out, and then

Exam. - Johnston

1      the second would also be taken out because that technically is

2      now a crime scene.

3    Q.    What about if an inmate tells a CO, including yourself,

4      that he's been physically assaulted, what, if anything, must

5      you do?

6    A.    The same thing, exactly the same thing.

7    Q.    On February 7th, 2018, when you were at Brown and

8      Mr. Allen's cell, were you told by Brown that he had been

9      sexually assaulted by Inmate Allen?

10   A.    No.

11   Q.    Did Brown provide you with any type of information that

12     would have led you to believe that he had been sexually

13     assaulted by Inmate Allen?

14   A.    No.

15   Q.    Were you told by Brown that he had been physically

16     assaulted by Inmate Allen?

17   A.    No.

18   Q.    Did Brown provide you with any type of information that

19     would have led you to believe that he was physically assaulted

20     by Inmate Allen?

21   A.    No.

22   Q.    When were you made aware that Brown had made a PREA

23     complaint against Allen?

24   A.    When I got called up to the lieutenant's office.

25   Q.    Do you recall who the PREA lieutenant was?

Exam. - Johnston

1   A.  Lieutenant Maxwell.  Well, Captain Maxwell now, yes.

2   Q.  And did you cooperate in the investigation with Captain

3   Maxwell?

4   A.  Yes.

5   Q.  Previously admitted was Plaintiff's Exhibit 101, Page

    Number DEF00042.  I don't know if that's still in front of you.

7         THE COURT:  It will be in just a minute.

8         MS. ADAMS:  Okay.

9         THE WITNESS:  Thank you, sir.

10  BY MS. ADAMS:

11  Q.  Do you know what this document is?

12  A.  Yeah, it's my written statement.

13  Q.  What's the date of this document?

14  A.  February 20th of 2018.

15  Q.  And when you say it's your written statement, what's the

16  title at the top?

17  A.  Staff written statement of sexual abuse, slash, harassment.

18  Q.  And you wrote this statement on February 20th, 2018?

19  A.  Yes, ma'am.

20  Q.  Is it fair to say this is when you first became aware of

21  the PREA allegation?

22  A.  Yes.

23  Q.  And looking at this document, is this a copy of your

24  statement?

25  A.  Yes.

Exam. - Johnston

1   Q.   And previously did you have a chance to review the document
2   when you were testifying earlier?
3   A.   Yes.
4   Q.   Does this statement accurately reflect your recollection of
5   events that occurred on February 7th, 2018?
6   A.   Yes.
7   Q.   Do you recall if there was a Pennsylvania State Police
8   investigation into this matter?
9   A.   I have no idea.
10  Q.   If there was a PSP investigation, would you have
11  cooperated?
12  A.   Yes.
13  Q.   At any time on February 7th, 2018, did Brown tell you that
14  he needed medical care?
15  A.   No.
16  Q.   At any time on February 7th, 2018, did you deny Brown
17  medical care that he had requested?
18  A.   No.
19  Q.   At any time on February 7th, 2018, did you fail to report a
20  request for medical care by Brown to the appropriate medical
21  staff?
22  A.   No.
23  Q.   At any time on February 7th, 2018, did Brown indicate that
24  he had been sexually assaulted by Mr. Allen?
25  A.   No.

Exam. - Johnston

TPYL

Q. At any time on February 7th, 2018, did Brown indicate that
2   he had been physically assaulted by Mr. Allen?
3   A.  No.
4   Q.  At any time on February 7th, 2018, did you discuss with
5   other COs not to provide Brown medical care?
6   A.  No.
7   Q.  Are you aware of any reports prior to this date of
8   February 7th, 2018, that Brown had been harmed by another
9   inmate?
10  A.  No.
11  Q.  Did you have any further interactions with Brown after
12  February 7th, 2018?
13  A.  Not that I recall.
14  Q.  Did you want to punish Brown by refusing him medical care?
15  A.  No.
16  Q.  Did you want to punish Brown by putting him in a cell with
17  someone who could cause him harm?
18  A.  No.
19  Q.  Did you ever have any reason to want harm to be caused to
20  Brown?
21  A.  No.
22  Q.  And did you ever have any reason to harm Brown?
23  A.  No.
24          MS. ADAMS:  Your Honor, may I have the court's
25  indulgence for a moment?

Exam. - Johnston

1    THE COURT:  Certainly.

2    MS. ADAMS:  Your Honor, I do not have any further

3  questions.

4    THE COURT:  Very well.  If I can just retrieve that

5  exhibit.

6    THE WITNESS:  Yes, you may.

7    THE COURT:  Any brief redirect, Mr. Brown?

8    BROWN:  Yeah.

9    REDIRECT EXAMINATION

10  BY BROWN:

11  Q.  Mr. Johnston, you just admitted on February 7th, 2018, that

12  Brown did not request medical attention?

13  A.  That's what I said.

14  Q.  Okay.  You just admitted that you did not feel the need to

15  tell medical officials that Brown needed medical attention?

16    MS. ADAMS:  Your Honor, I'm going to object.  That's

17  not what he testified to.

18    THE COURT:  I'm going to overrule that.  I'm going to

19  let him explore this very briefly.  Go ahead, Brown, you may

20  proceed.

21  BY BROWN:

22  Q.  Did you admit that you did not encounter any medical

23  officials pertaining to Brown request of medical attention?

24  A.  I asked you if you needed medical attention, and you

25  refused it.

Exam. - Johnston

Q. So at no time did you tell any medical official that Brown
2   needed medical attention?

A. You told me it was a nosebleed.

Q. Okay. You do not remember exchanging Brown jumpers, and
5   you do not remember who exchanged Brown jumpers. Am I correct?

6   A. Yes.

7   Q. But you do remember hearing that it was never preserved,
8   but, however, it went to laundry. Am I correct?

9   A. That's where all soiled -- excuse me, soiled laundry goes
10  to.

11  Q. Now, you stated that Brown initially was on her bed during
12  the encounter, but you did not know who first attempted to stop
13  you during your punches. Am I correct?

14  A. Yes.

15  Q. But you stated during investigating the matter, Brown did
16  come down and talk to you. Am I correct?

17  A. Yes.

18  Q. You also stated that during this time, you noticed Brown
19  had a nosebleed. Am I correct?

20  A. Yes, that's what you told me.

21  Q. But you stated, however, it did not seem so serious, nor
22  was the bleeding a lot. Am I correct?

23  A. Yeah.

24  Q. Are you a medical official, Mr. Johnston? Do you have any
25  type of medical training?

1   A.   Actually, I've been a junior fire captain, as well as a

2   firefighter volunteering for HRFR since I was 14 years old,

3   sir.

4   Q.   Okay.  And being that, how would you be introduced to

5   certain medical abilities?

6   A.   I think I can tell the difference between a bloody nose and

7   someone withstanding some type of major injury.

8   Q.   Do you have any certifications?

9   A.   Not that I'm aware of, no.

10   Q.   So you don't have any documents here today showing that you

11   have any experience in the medical department?

12   A.   Nope.

13   Q.   Okay.  So in your statement, 101, it reads that one day

14   Brown did ask me to move, but we already had made cell move,

15   and he wanted a single cell, but he wasn't a Z code.  Is that

16   your statement?

17   A.   I don't recall that type of statement.

18   Q.   I remember earlier in my examination I asked you if you

19   refused to move me simply because I wasn't a Z code, and you

20   responded that --

21   A.   I was a COT, and I do not make the moves.

22   Q.   But you did acknowledge what a Z code was.  Am I correct?

23   A.   That's one of the things we have to learn, what they are.

24   Q.   Okay.  So --

25   A.   In training.

Exam. - Johnston

Q.   So can you admit that Brown did ask you to move even if it
2   was, in your mind, isolated?
3   A.   I was -- I was not told or asked to move you anywhere,
4   ma'am.
5   Q.   So you don't remember Brown ever asking you to move?
6   A.   No.
7   Q.   And you don't remember any acknowledgment that Brown was
8   distinguished as double celling -- assuming you knew he was
9   double celling from the very fact that Allen was in the cell
10   with her, but you didn't have any record, recognition that
11   Brown was a Z code.  Am I correct?
12   A.   If you were a Z code, you would be in a single cell.
13   Q.   Okay.  So you also stated, another thing I remember about
14   Brown is the one day he had a bloody nose, asked to see
15   medical.  Did you make that statement?
16   A.   I said that I asked you if you needed medical from the
17   bloody nose that you had.  That was stated from you.
18   Q.   Okay.
19   A.   And you refused medical attention.
20   Q.   Okay.  So did you ever make the statement that Brown had
21   requested, through you, to see medical?
22   A.   Not that I recall of, no.
23   Q.   Okay.  Did Brown ever ask you directly for a new set of
24   jumpers?
25   A.   Yes.  You asked for a set of jumpers and a set of new

Exam. - Johnston

1   linens because you had blood on them, and that's when you came

2   down off your bunk to show me the blood on your -- on your old

3   linens and your old jumper.

4   Q.  Can you describe the pattern of the blood?

5   A.  I do not -- I can't just trace out a pattern of blood.

6   Q.  You just said it was dripping blood.  There was none on the

7   pillowcase?

8   A.  Like a nosebleed.

9   Q.  Yes, but you was very descriptive when you were talking to

10   Ms. Bedell.  Can you be descriptive pertaining to this issue?

11   Do you remember exactly --

12   A.  Droplets of blood coming from the nose going to a jumper

13   and a set of linens on the bed.

14   Q.  So you noticed an active nosebleed?

15   A.  Like I said.

16   Q.  Did you go back to the unit bubble -- first of all, are you

17   trained to use your radio in a situation where you encounter

18   any type of medical emergency?

19   A.  Yes.

20   Q.  So did you use your radio during this encounter, this

21   bloody mess with Brown?

22   A.  No.

23   Q.  Okay.  So did you go back to the unit bubble to inquire

24   with anybody pertaining to this mysterious nosebleed?

25   A.  Yes, to get a jumper and linens.

84

Exam. - Johnston

1  Q.  During your time at the bubble, did you encounter anybody?

2  A.  I think Officer Fochtman and Sergeant Heaster.

3  Q.  Okay.  So you encounter Officer Fochtman -- and please

4  forgive me if I'm pronouncing that wrong -- and Sergeant

5  Heaster.  Am I correct, Heaster?

6  A.  Heaster.

7  Q.  And you're now concerned and worried, I'm assuming, hey,

8  Brown is a bloody mess or Brown has drips of blood, Brown has a

9  nosebleed.  So did you inform Sergeant Heaster that Brown had a

10  nosebleed?

11  A.  Yes, that was where the blood came from.

12  Q.  Okay.

13  A.  As you said.

14  Q.  And was medical doing rounds at the time?

15  A.  I do not recall that.  My job was to look into cells at

16  that time.

17  Q.  So at no time did you inform medical that Brown had a

18  nosebleed?

19  A.  After requesting you -- asking you if you need medical

20  attention for your nosebleed.

21  Q.  So you did --

22  A.  Ask you, yes.

23  Q.  But at no time did you encounter medical telling them Brown

24  had a nosebleed?

25  A.  After you refused, yes.

Exam. - Johnston

Q.  I'm a little more -- please help me.  I'm real tired, had a
2   long day.  But are you predicating that you encountered a
3   medical official on February 7th pertaining to Brown nosebleed?
4   A.  I said I was encountering you.  I was talking to you, I was
5   not talking to anyone else.  I asked if you needed medical
6   attention for your nosebleed.  You refused medical attention,
7   so I was going to get your jumper and your linens, hence the
8   reason why I got up to leave to find out where the jumpers and
9   the linens were.
10  Q.  I understand, I understand.  So assuming that I refused
11  medical attention, at any time did you encounter medical staff
12  pertaining to Brown nosebleed?
13  A.  No, I do not recall.
14  Q.  Okay.  So is there a reason why your statement states that
15  you did let Sergeant Heaster know and about the medical was
16  actually doing rounds at the time, so I informed them, also?
17  Is there a reason why your statement is so contradictive to
18  what you're saying now?
19  A.  What I said was, I informed the people that needed to be
20  informed.  I didn't say anything to medical because that wasn't
21  my job at the time.  My job was to treat with you your linens
22  and your jumper and make sure there was no other blood anywhere
23  else in the cell, because if so, then we would actually have to
24  remove you guys from the cell.
25  Q.  So Brown stayed in that cell after the encounter with the

1  blood.  Am I correct?

2  A.  I would not know that.

3          *BROWN:*  Okay.  Thank you.  No further questions.

4          *THE COURT:*  Very well.  You may step down.

5          *THE WITNESS:*  Thank you, sir.

6          *THE COURT:*  I understood, Brown, that your next

7  witness would be Ms. Trice.

8          *BROWN:*  Yes.

9          *THE COURT:*  Very well.  And thank you, Ms. Trice, for

10  being here with us today.

11          *BROWN:*  Thank you.  Your time is so precious.

12          *COURTROOM DEPUTY:*  Good afternoon.  Please raise your

13  right hand.

14      *ANATA TRICE, called as a witness, having been duly sworn or*

15  *affirmed, testified as follows:*

16          *COURTROOM DEPUTY:*  Thank you.  Please be seated.

17  Please state your full name for the record, and please spell

18  your last name.

19          *THE WITNESS:*  Anata Trice, T-r-i-c-e.

20          *THE COURT:*  Are you ready to proceed there, Brown?

21          *BROWN:*  Yeah.

22          *THE COURT:*  Okay.

23                        DIRECT EXAMINATION

24  BY BROWN:

25  Q.  And, Ms. Trice, hope you're having a nice day.  I'm sorry

Exam. - Trice

1    for having you here in this matter, understanding that you're

2    not a defendant.  I just had a couple quick questions, with due

3    respect to your precious time.  Is that plausible?

4    A.   Yes.

5    Q.   Okay.  Ms. Trice, a healthcare professional, what does that

6    mean?

7            THE COURT:  Maybe if we could just be a little more

8    focused.  What were your duties in February of 2018?  What did

9    you do?

10           THE WITNESS:  I'm an LPN.

11           THE COURT:  And that's a Licensed --

12           THE WITNESS:  Licensed Practical Nurse.

13           THE COURT:  -- Practical Nurse.  What are the duties

14   of an LPN?

15           THE WITNESS:  The duties range -- vary depending on

16   what job, anywhere you work, but it's all the same.  I'm a

17   medical professional.  I maintain life.  I do wounds, I do

18   treatments, I do medications, I do rounds, I do assessments, I

19   do paperwork.

20           THE COURT:  We all do.  I'm sorry, Mr. Brown, I

21   focused that a little bit more.  She's an LPN, and she does

22   kind of first-level patient care and necessary paperwork.  You

23   may proceed, sir.

24   BY BROWN:

25   Q.   Ms. Trice, are you aware of the Prison Medical Service

Exam. - Trice

1    Program?

2    A.  Yes.

3    Q.  Oh, wow, okay.  So under this -- the healthcare

4    professional, it's any physician, physician assistant, nurse,

5    dentist, and other licensed professional in the healthcare

6    under the law of Commonwealth.  Am I correct?

7    A.  What was your question?

8    Q.  I was just predicating what a healthcare professional was

9    pertaining to the Prison Medical Service Program.

10   A.  The same as pertaining to anywhere outside the world.

11   Medical is medical inside or outside.

12   Q.  Okay, Mamma.  Thank you.  Now, medical service, it reads:

13   Diagnostics, evaluation, treatment, or preservation of the

14   health of the human body, including its organs, et cetera, et

15   cetera.

16            BROWN:  So that would be Exhibit 14, 88 through 92.

17            THE COURT:  This is, again, some -- it's not going to

18   be in that book, ma'am.  You can stop searching there.

19            THE WITNESS:  Okay.

20            THE COURT:  It's a separate set of exhibits.  This is,

21   again, a corrections policy statement, and the parties can let

22   me know if this is something whose authenticity you would

23   stipulate to, but, Mr. Brown, why don't you focus your

24   questions towards Ms. Trice.

25            BROWN:  Yes, Mamma.

Exam. - Trice

1    Q.   Okay.  Now, are you familiar with the word custom, a

2    custom?  If I say a custom, are you familiar with that word?

3    A.   Yes.

4    Q.   Can you please state what that means to you briefly?

5            MS. ADAMS:  Your Honor, I'm going to object.

6            THE COURT:  Let's do this, Mr. Brown, let's try to be

7    more focused on what it is that you're driving at as opposed to

8    having LPN Trice define custom in general.

9    BY BROWN:

10   Q.   So in February of 2018, were you aware of any custom where

11   security or nonmedical officials made medical decisions at SCI

12   Huntingdon?  Were you aware of any such customs?

13   A.   What decisions are you pertaining to?

14   Q.   It's just on the broad spectrum if you was aware of

15   nonmedical officials in any matter customarily making medical

16   decisions, yes or no?

17   A.   If it's not medical, we don't make any decision.  That's

18   all security.  Again, I'm medical.

19   Q.   So you wasn't aware of any such custom by nonmedical

20   officials making medical decisions?

21   A.   Not to my knowledge.

22   Q.   Okay.  Thank you.  Now, do you know -- what's the process

23   of an inmate requesting medical treatment while in RHU?  Can

24   you walk me through the process?

25   A.   If you need seen by medical, you fill out a sick call

Exam. - Trice

1          *THE COURT:* LPN Trice.

2     BY BROWN:

3     Q.   Do you remember anything pertaining to your encounter with

4     Brown on February 13th around 2255?

5     A.   Yes.

6     Q.   10:55.  Hold up.  Would you predicate that the encounter

7     derived from a sick call submitted by Brown?

8     A.   Yes.

          *BROWN:* Exhibit 82, sick call.

10          *THE COURT:* Any objection to Exhibit 82, sick call?

11          *MS. ADAMS:* The sick call slip, no, Your Honor.

12          *THE COURT:* Very well.  The slip, the sick call slip,

13    will be admitted.  Here's a copy of it.  Go ahead, Mr. Brown,

14    ask your next question.

15    BY BROWN:

16    Q.   Now, the sick call briefly states basically certain bleed

17    symptoms and the occurrence of a sexual assault.  So is that --

18    the sick call is admitted.  So Brown was housed on GD, the

19    restrictive housing unit.  Are you familiar with the daily

20    operations of the restrictive housing unit on G unit?

21    A.   For the most part.

22    Q.   Okay.  For example, are inmates able to walk out their

23    cell, help theirselves to sick calls or pen or grievances, or

24    would that be your request?

25    A.   I'm medical.  That's all security.

Exam. - Trice

1    slip --

2    Q.  Okay.

3    A.  -- and you're seen on sick call the next day.

4    Q.  Okay.  So I already had on the record Exhibit 101, Package

5    17, a statement from Officer Johnston and DEF13.  And CO

6    Johnston stated that he told medical officials of a bloody nose

7    on February 17th -- I mean 7th, 2018, after which Brown's

8    sheets and jumpers were exchanged.

9         Were you -- on this date, were you aware of any

10   information pertaining to any type of medical being

11   reciprocated to the medical department, information being

12   reciprocated pertaining to any medical emergency in the RHU

13   pertaining to Brown?

14   A.  Well, I worked night shift at this time, in February, so I

15   would have came in at 2130, and it was not given and reported

16   that anyone had said anything to you about a nosebleed or any

17   kind of medical emergencies that you were seen in the RHU that

18   day.

19   Q.  So nothing was ever reported that day.  Am I correct?

20   A.  It was not reported to me.  Like, again, I did not come in

21   until 2130.

22   Q.  Okay.  Okay, Mamma.  Thank you.  Pertaining to Defendant

23   Johnston written statement, can you explain why Brown did not

24   see medical on this day if medical were doing rounds and

25   Mr. Johnston told medical officials of Brown obvious injuries?

Exam. - Trice

1   A.  Well, if you stated to Officer Johnston, as he said, that

2   you did not need medical attention, they would have said --

3   maybe said something to the medical personnel that was down

4   there that day.

5   Q.  Yeah.

6   A.  I cannot speak for any of them.  I was not there.

7   Q.  Yeah.

8   A.  So, I mean, I can't say whether or not he did or whether or

9   not medical seen you.  I have no clue.

10  Q.  So assuming this was the case, you basically don't have a

11  disposition as to why Brown did not see medical?

12  A.  Correct.

13  Q.  Do you have any record today that medical was made aware of

14  Brown injuries on February 7th and any treatment thereof?

15  A.  Not to my knowledge.

16  Q.  Thank you, Mamma.  Pertaining to Defendant Johnston

17  statement, can we conclude that Brown was denied medical

18  treatment on February 7th?

19  A.  I cannot confirm that.  I was not there to witness you

20  denying or accepting it.

21  Q.  I have the statement right here.  I let sergeant know about

22  it, and medical was actually doing rounds at that time, so I

23  informed them, also.  It's on record that Mr. Johnston

24  acknowledged this statement.

25  A.  Is it on record that that statement was made to me or my

Exam. - Trice

1    name was in that statement that he reported it to me?

2            THE COURT:  No, it's not.

3            THE WITNESS:  No, it's not.

4            THE COURT:  I've got it in front of me, and, no, it's

5    not.  The exhibits, Exhibit 101, Page 13 and 42, are in

6    evidence, and I think what you need to do is ask this witness

7    about things she knows, things she saw, things she did.

8    BY BROWN:

9    Q.  Are there any stress buttons in the RHU cell, to your

10   knowledge?

11   A.  For inmates?

12   Q.  Yeah, in the RHU, on G, on GA during this time.  It's

13   unbeknownst to me after this fact, after I was transferred to

14   PC.

15   A.  Again, that's security.  I have no clue what's in your

16   cells.

17   Q.  Okay.  So you have no knowledge of any stress buttons in

18   the RHU cells.  Am I correct?

19           THE COURT:  I think that is what she has said.  You'd

20   have to ask security, and I think we've got some folks who work

21   in that unit that you'll be able to speak to in the future.

22   BY BROWN:

23   Q.  Prior to February 7th and after February 7th, 2018, have

24   you ever had any encounters with Brown for any reason?  And

25   that's just a yes or a no.

Exam. - Trice

1   A.   Yes.

2   Q.   Okay.  Had Brown ever complained to you of having sinus,

3   nasal congestion at any time?

4   A.   Not that I'm aware of.

5   Q.   How about bleeding when blowing, blowing?

6   A.   Not that I'm aware.

7   Q.   Are you aware of any medical records on file via request

8   sick call, grievance, that Brown was ordering nasal spray at

9   any time?

10  A.   Without looking at your medical chart, I cannot answer that

11  question.

12  Q.   Okay.  There is not.  There's not on any -- on record.

13        *BROWN:*  Yeah, that would be it for my direct.

14        *THE COURT:*  Very well.  Is there any combined

15  cross-examination and defense direct for this witness?

16        *MS. ADAMS:*  There is, Your Honor.

17        *THE COURT:*  Very well.

18                       CROSS-EXAMINATION

19  BY MS. ADAMS:

20  Q.   Ms. Trice, you stated you're an LPN.  Are you currently

21  licensed by the State Board of Nursing in that position?

22  A.   Yes.

23  Q.   And Ms. Brown asked you about the sick call slip.  Is that

24  one way in which inmates can request to be treated by medical

25  staff, is using a sick call slip?

Exam. - Trice

1    A.   Yes.

2    Q.   And the same way on the RHU, an inmate can use a sick call

3    slip?

4    A.   Yes.

5    Q.   Do you know how inmates submit sick call slips?

6    A.   They ask the officers for a sick call slip, they fill it

7    out, and the inmates either leave them on their door and wait

8    for a nurse to come around to do meds to give them the sick

9    call slip or they're placed in a secure box that only medical

10   has a key to that medical can then retain the sick call slips.

11   Q.   When you said they're put on the block, is it like a box,

12   something that it goes in?

13   A.   Yes, there is a box on each housing unit in the RHU that

14   the sick call slips will be placed in --

15   Q.   And --

16   A.   -- for us to pick up.

17   Q.   And, I'm sorry, and only medical has the key to those

18   boxes?

19   A.   Yes.

20   Q.   And I believe you said that the sick call slips are

21   typically picked up every day?

22   A.   Yes.

23   Q.   Now, you're part of SCI Huntingdon's medical staff?

24   A.   Yes.

25   Q.   Is there someone assigned or does someone on the medical

Exam. - Trice

1   staff review sick call slips every day?

2   A.   When sick call slips are picked up and we put them in the

3   computer for the -- to make the call-out, generate the call-out

4   for the medical providers to do their rounds the next day, all

5   staff is responsible for picking them up, and there's no set

6   person who inputs them in the computer.  But we look at them,

7   scan them to make sure there's no emergencies or anything,

8   like, on the sick call slip that needs seen right away versus

9   being -- waiting to be seen the next day.

10  Q.   But it's fair to say there's at least somebody on the

11  medical staff who's reviewing --

12  A.   Yes, all medical staff, all nurses, either LPN, RN, yes.

13  Q.   And they're being reviewed at least every day?

14  A.   Yes.

15  Q.   And have you been the person who's reviewed medical slips

16  at any given day?

17  A.   Yes.

18  Q.   So I'm assuming there's a voluminous amount of sick call

19  slips at times?

20  A.   Yes.

21  Q.   So when you're reviewing them and putting them into the

22  computer, and I believe you said looking for medical

23  emergencies, is there any order of priority?  Like, how do you

24  handle the sick call slips when you're going through them?

25  A.   So you triage them.  Like, depending on what they put on

Exam. - Trice

1  their sick call slips, you triage them.  Like, if someone says
2  that they have been having chest pains, we would have seen them
3  that night.  We wouldn't wait until the next day.  We would
4  assess them that night to make sure they're okay or whatever is
5  going on there.

6        Any kind of PREA claims, that's seen right away.  It's
7  not waited until the next day.  Anything that's life-sustaining
8  situations or issues that is a concern, it's a triage, that we
9  would triage instead of waiting for them to be seen the next
10 day.

11 Q.  So it's fair to say that when you're doing this triage,

12 you're kind of putting them in place, like in --

13 A.  Priorities.

14 Q.  -- importance of order?

15 A.  Yes.

16 Q.  And I believe you said, like, chest pain, so you're looking

17 for emergencies or urgent matters?

18 A.  Yes.

19 Q.  After sick call slips are submitted, when are inmates

20 typically seen by a doctor or a physician assistant or another

21 medical staff member?

22 A.  Well, if they're just a -- if it's an emergency situation,

23 they're seen right away.  And if there's no medical providers

24 there, then we use the on-call system to whoever the provider

25 is.

Exam. - Trice

1     If it's something that can be wait to be seen, sick
2   call slips are usually seen the next day unless it's a weekend
3   or a holiday.  And then we do have urgent care on weekends,
4   even if it's something that's urgent but not urgent to be seen
5   right away, they can be placed on the weekends or holidays, it
6   would be for urgent care.
7   Q.  And this triage of the sick call slips, is this procedure
8   any different for sick call slips you receive from inmates in
9   the RHU?
10  A.  No.
11  Q.  To your recollection, in the time you've been at SCI
12  Huntingdon, do you ever recall if an inmate had to wait at
13  least a week after submitting a sick call slip?
14  A.  No.
15  Q.  Besides using sick call slips, are there other ways an
16  inmate can request to see medical?
17  A.  They can go to the officers and talk to them and say, you
18  know, whatever the urgent is.  The officers then normally call
19  down to medical to let us know what's going on, whether or not
20  they come down.  It's called a pink pass system, something
21  from -- kind of like on the streets for emergency rooms, urgent
22  care.  So they can be seen that way, too.
23  Q.  Okay.  So when an inmate is seen by medical, whether in the
24  infirmary, on the blocks, another room unit, is there a -- does
25  the staff who sees the inmate make a record of this visit in

Exam. - Trice

1  any way?

2  A.  Yes, we have a charting system, which is Sapphire.  We use

3  that to do all our charting notes, our notes.

4  Q.  Are there any, like, progress notes, anything that are

5  made?

6  A.  Yes, in that charting system, yes, the electronic system.

7  Q.  Is there a specific department form number that goes with

8  that?

9  A.  So they come down, we do a DC-457, which is an incident

10  report, and then depending on what their complaints are, we

11  have medical nets, which is kind of a guideline background on

12  what we are assessing for.

13  Q.  Okay.  So is it the individual who sees the inmate that

14  completes the DC-457?

15  A.  Yes.

16  Q.  And does this person, whether it's -- let me back up.

17  Sapphire is an electronic system, and prior to Sapphire, how

18  were records kept?

19  A.  Paper, paper chart.

20  Q.  So with Sapphire, if a medical staff member is doing this

21  DC-457, do they electronically sign their name to it?

22  A.  Yes, you have a login.  Like, it's your signature.  Like,

23  every medical personnel that has access to Sapphire has their

24  own medical login.  If you're charting, it will stamp your

25  signature that you charted.

Exam. - Trice

1  Q.  So if you're seeing a specific inmate, you log in with your

2  name --

3  A.  Yes.

4  Q.  -- username, whatever, and whatever form, whether it's this

5  DC-457 or another form, if you fill it out, your name will

6  electronically be --

7  A.  Yes.

8  Q.  -- put onto this form?

9  A.  Yes.

10 Q.  Are you familiar with the inmates' medical records?

11 A.  Just what I have been involved in, that's it.

12 Q.  But you're familiar that -- I guess I should back up.  Does

13 SCI Huntingdon keep medical records of their inmates?

14 A.  In the electronic system, I can get in to look at his chart

15 if I need to.

16 Q.  And do you know what's kept in the chart typically for an

17 inmate, not Brown specifically, but for an inmate?

18 A.  In the medical chart in Sapphire?

19 Q.  Yes.

20 A.  It has everything, regular medical notes, doctors' notes,

21 progress notes, med orders.  There's some psych consults in

22 there.  Anyone -- like, any charting on their medical health or

23 mental health issues or whatever is in that chart.

24 Q.  So an inmate's medical file, is it kept in any particular

25 order?

Exam. - Trice

1   A.   Yes.

2   Q.   Why do you do the subjective part of it?  Or why do you

3   write down what the inmate is telling you is wrong?

4   A.   Because that's -- I mean, it's their body, they're telling

5   us what's wrong or how they're feeling, I guess.

6   Q.   Okay.  And do these medical notes and records -- I believe

7   you said they're kept chronologically.  Do they have all the

8   dates and times when an inmate is seen by medical staff?

9   A.   Yes.

10  Q.   And through Sapphire, is that automatically logged?

11  A.   Yes.

12  Q.   What staff, what medical staff has access to an inmate's

13  medical records?

14  A.   Everyone in medical, medical, has a medical license or --

15  has access to their medical file.

16  Q.   So you would have -- as a registered LPN, you'd have access

17  to -- or a licensed LPN, you'd have access to an inmate's

18  medical file?

19  A.   Yes.

20  Q.   And do you know, is an inmate's medical record kept for the

21  entirety of their incarceration?

22  A.   I believe they're kept -- even after they're incarcerated,

23  we keep them for so many years.

24  Q.   Okay.  But the record itself, like, it covers the time

25  period from when --

101

Exam. - Trice

1  A.  Order of date.

2  Q.  So it would be in chronological order?

3  A.  Yes.

4  Q.  When an inmate is seen by medical staff, does -- are the

5  inmate's symptoms, concerns checked into?

6  A.  Yes.

7  Q.  How do they typically chart those, if you know?

8  A.  Well, we do an assessment, and then we put their subjective

9  assessments of what they're saying their complaints, whatever,

10  are.  And we do our objectives of what we find, what we see,

11  and we do the -- you know, like the vitals and stuff.  And then

12  we refer it, if it needs referred, to higher-up doctors or PAs

13  or whatever for any orders or anything.

14  Q.  So do you follow the SOAP format?

15  A.  Yes, we have a SOAP format.

16  Q.  And for the record, can you do what SOAP stands for?

17  A.  So SOAP is subjective, that is what the patient is claiming

18  are their symptoms; objective is what you see; A is assessment,

19  is our assessment of what's going on; and then P is the plan.

20  Q.  And is it typically when an inmate is seen by medical staff

21  that the SOAP -- I guess the SOAP form or the SOAP is followed?

22  A.  Yes, all of our charts are in SOAP format.

23  Q.  Okay.  Format, that's the word I was looking for.  Thank

24  you.  And that includes any inmate complaints and symptoms that

25  they tell you?

Exam. - Trice

1    A.    From the time they entered the DOC, well, Department of

2    Corrections system, yes.

3    Q.    Okay.  And then I believe you said you have access to

4    inmate's medical records, and so you would have access to

5    Brown's medical records?

6    A.    Yes.

7    Q.    Are you familiar with Brown's medical records?

8    A.    Just what -- you know, that day I had to see him, that's

9    all.

10   Q.    Are you familiar with the department's PREA policy?

11   A.    Yes.

12   Q.    Can you -- first of all, what does PREA stand for?

13   A.    It is -- PREA is the Prison Rape Elimination Act.

14           THE COURT:  Prison Rape Elimination Act.

15   BY MS. ADAMS:

16   Q.    Okay.  So a little while ago we talked about these sick

17   call slips.  What are you trained to do if you receive a type

18   of PREA complaint on these sick call slips?

19   A.    Well, whenever -- so when a complaint like that comes on a

20   sick call slip, in my instance, like I said, I work night

21   shift, so when I got there at 2130, I got it, and I immediately

22   called up to the captain because, like, you have to take action

23   on it.  So once I got it, I called the captain, and we went

24   down and talked to Inmate Brown and assessed him, in which he

25   refused all care.

Exam. - Trice

1    Q.  Okay.  I want to step back just a little bit.  Outside of
2    Inmate Brown, if you would receive a sick call slip from any
3    inmate with a PREA complaint, what do you, as a medical staff
4    person, have to do?
5    A.  Well, typically you would contact a PREA coordinator to let
6    them know the complaint.  Well, your supervisor first, and then
7    the PREA coordinator, and then it goes down from there on --
8    like, they're either brought down or we get them assessed.
9    Q.  Is there ever a time when an inmate may go to a hospital
10   after receiving a PREA complaint?
11   A.  Yes.
12   Q.  In what time period would that occur?
13   A.  So if a PREA complaint comes in, within 72 hours, I believe
14   so, they -- we would like them to be taken out to be seen from
15   -outside providers, to be examined.  Yeah, I think it's 72
16   hours.  I'm not sure.
17   Q.  Now, is this -- the PREA complaint procedures or what
18   happens when one comes in through a sick call slip, is this the
19   same process for an inmate whether in the RHU or general
20   population block or a mental health unit?
21   A.  Yes, it's the same.
22   Q.  As it relates to nurses medical staff, is there anything
23   specifically with the PREA policy that you must do?
24   A.  We have to -- well, when -- usually a PREA case, they come
25   down, they're assessed.  We go through a series of questions

Exam. - Trice

1    and papers to try to get all the information and everything

2    that we can about, you know, the PREA, whatever.  We do the

3    assessments.

4         And then they're offered to go to an outside -- like,

5    we refer them to an outside hospital for a further examination

6    for the PREA complaint of sexual assault.  And then it's -- we

7    turn it over -- after we do our medical part, like, medical

8    assessment, whatever, we turn it over to the PREA coordinator

9    and security.

10   Q.   If there's a doctor at the facility when a complaint comes

11   in, is the inmate seen by the doctor?

12   A.   Yes.

13   Q.   And if there's no doctor at the facility at the time, how

14   is the doctor contacted?

15   A.   We call the doctor to let them know what's going on and get

16   verbal orders via telephone to send them out to the outside

17   facility.

18   Q.   So you said an inmate would be evaluated by medical staff.

19   Where would this occur?  Would this occur in the cell or --

20   A.   In medical.

21   Q.   In medical.  If an inmate is in the RHU and there's a PREA

22   complaint and they're being evaluated, are they brought down to

23   medical or sometimes are they seen in other places?

24   A.   Well, we have a medical room in the restrictive housing

25   unit, but most of the time they are brought down to the main

Exam. - Trice

1    medical.

2    Q.   Are pictures taken of an inmate?

3    A.   Yes.

4    Q.   Is any record made of this?

5    A.   Yes.  Pictures are part of the DC-457, as well as the PREA

6    packet.

7    Q.   And what's the PREA packet?

8    A.   It's just -- I'm not -- I do not know what the number is

9    for the PREA packet, but it's just pretty much we have a binder

10   that tells us what we need to do for PREA cases and PREA

11   policy, I guess.

12   Q.   So you fill out a specific form to go with --

13   A.   Yes, there's a PREA -- yeah.

14   Q.   And what information is recorded?

15   A.   Everything that the inmate is saying, what we observe, what

16   we find in our assessment, our plan, plan of action.

17   Q.   And, again, the medical staff fills out the forms?

18   A.   Yes.

19   Q.   And the staff, you note what the inmate would be telling

20   you?

21   A.   Yes.

22   Q.   Do you try to -- when you're making a report, do you try to

23   keep it in the order the inmate told you or do you like, like,

24   change around the order of how stuff happened?  Like, how are

25   you trained to report incidents?

1    A.   I try to go in how it happens.  But, I mean, you're not
2    trained really in any certain area, aspect, when it comes to
3    writing reports.
4    Q.   And any of these forms you fill out with regards to PREA
5    allegations, does that become part of the inmate's medical
6    record?
7    A.   Yes.
8    Q.   Now, I believe we established you were working
9    February 13th, 2018.  I believe you said you were working the
10   night shift?
11   A.   Yes.
12   Q.   And you came -- what's the hours for the night shift?
13   A.   2200 to 0630.
14   Q.   And you said you got in there at 2130 or 9:30?
15   A.   It was, like, 2130, somewhere around there.
16   Q.   And on this date, did you -- do you recall if you reviewed
17   sick call slips?
18   A.   Yes, whenever I came into medical, his -- Inmate Brown's
19   sick call slip was there.  And I read it, and then I
20   immediately called the captain because it was after-hours.
21   Q.   So when you got there on February 13th, 2018, you said you
22   saw a sick call slip from Inmate Brown, and it was admitted as
23   Plaintiff's Exhibit 28.  The binder in front of you, if you
24   could turn to Exhibit 7, Page 47.
25               *BROWN:*  What is this?

Exam. - Trice

MS. ADAMS: It's just the sick call slip from the
2  defendants' exhibits.

3          THE WITNESS:  Okay.

4  BY MS. ADAMS:

Q.  That's a copy of the sick call slip that was in Exhibit 82,
6  which you saw when Brown was asking you questions.  Correct?

A.  Yes.
8  Q.  And this is his sick call slip?

A.  Yes.
10  Q.  What's the date of this slip?

11  A.  February 13th of 2018.

12  Q.  When you -- and this is the date you would have -- when you

13  came into shift, the same date, the date on the sick call slip,

14  February 23rd, is the same date as the date you were reviewing

15  it?

16  A.  Yes.

17  Q.  What, if anything, significant stuck out to you about this

18  sick call slip?

19  A.  The fact that he put in here that he was assaulted from

20  February 3rd to February 7th.

21  Q.  And when you saw this, did you consider a PREA complaint or

22  a PREA allegation?

23  A.  Yes.

24  Q.  So what did you do -- I know you testified a little bit

25  ago, but if we can go over it again.  When you saw this sick

Exam. - Trice

1    call slip, what --

2    A.   I called up to control and talked to the captain.

3    Q.   Captain Maxwell?

4    A.   No, I'm not sure who the captain was that night, but I

5    called up there and talked to them.  And then Lieutenant

6    Orndorf and I went down and talked to Mr. Brown.

7    Q.   So when you said you went down, you went to the RHU?

8    A.   Yes.

9    Q.   And did you talk to Brown in his cell or somewhere else?

10   A.   No, we pulled him out of his cell to a private, secure

11   cell, which was a psych office that was not being utilized at

12   that time, and spoke with him in there.

13   Q.   And you said it was yourself and another lieutenant?

14   A.   Yes.

15   Q.   Was there anybody else present at this time?

16   A.   Not in the room.  There were officers outside the door,

17   which I do not recall who they were, the ones that brought him

18   over from his cell.

19   Q.   Was Inmate Brown secured?

20   A.   Yes.

21   Q.   How was he secured?

22   A.   He was -- so in the psych room, they have, like, little

23   wire, I guess, cells inside their office so the inmates are

24   able to sit in there and talk privately with the psych, so he

25   was inside that.

Exam. - Trice

1  Q.  Was he handcuffed?

2  A.  I do not recall if he was.  I don't -- he was handcuffed

3  when he was brought over, but I think once he was inside the

4  secure cell, the handcuffs were removed.

5  Q.  Okay.  Do you recall his appearance or his demeanor?

6  A.  He was -- his appearance was good, and his demeanor was

7  calm.

8  Q.  Did you observe any physical injuries?

9  A.  No injuries were noted.

10  Q.  Did you see any signs of a struggle?

11  A.  No.

12  Q.  Did you see any signs of an actively bloody or broken nose?

13  A.  No.

14  Q.  Did you see any signs of a healing broken nose?

15  A.  No.

16  Q.  Did you see any signs of bruising?

17  A.  No.

18  Q.  What do you recall Brown told you about this incident?

19  A.  Brown, he just said that he was abused by Inmate Allen.  He

20  would not go into details and tell me.  The only thing he would

21  report to me is that he was punched.

22       I had to step out of the psych room for him to tell

23  the lieutenant that Brown (sic) had sexually assaulted him.  We

24  offered him to go up to be examined, offered to send him out to

25  be examined, and he refused all care.  He refused pictures, and



Exam. - Trice

1    he denied any injuries or anything with me.

2    Q.    So just to clarify, he was offered medical attention?

3    A.    Yes.

4    Q.    Did you offer him medical attention?

5    A.    Yes.

6    Q.    And he refused your medical attention?

7    A.    Yes.

8    Q.    And you said you offered to take him out.  You offered to

9    take him to a hospital or to the medical unit?

10   A.    Yes.  We offered to take him up to the medical unit to be

11   further assessed up there and offered to have him sent out to

12   be seen with an outside provider.

13   Q.    And you're saying he refused all those offers?

14   A.    He refused it.

15   Q.    And he refused to take pictures?

16   A.    Yes.

17   Q.    Did he say why he was refusing medical attention?

18   A.    He was okay.  His statement was that he was fine, he was in

19   his cell by himself now, that he was okay.

20   Q.    And he specifically said he was in a cell by himself, that

21   he was okay?

22   A.    Yes.

23   Q.    Was the doctor called?

24   A.    The doctor was -- the doctor was not called that night.

25   Q.    Okay.

Exam. - Trice

1   A.   But he was notified that he was seen by medical providers

2   the next morning.  Or, no, I don't know.  I'm pretty sure I

3   called the doctor.  I know I would have.

4   Q.   Okay.  Did he say he was refusing to take the pictures for

5   the same reason, he was fine?

6   A.   Yes, he didn't -- he was fine, he was in his cell by

7   himself now, he didn't want medical treatment, he didn't want

8   to go up to be assessed, he didn't want sent out, and there

9   were no injuries.

10  Q.   Is this unusual when an inmate refuses all medical

11  attention, all pictures, anything like this?

12  A.   Not for someone who's claiming sexual assault.

13  Q.   So him refusing everything was unusual?

14  A.   Yes.

15  Q.   Did you ask if he was having suicidal thoughts?

16  A.   Yes.

17  Q.   Did he indicate if he was or was not?

18  A.   He was not.

19  Q.   Did he indicate if he was afraid of being harmed?

20  A.   Not at this point because he was in a cell by himself.

21  Q.   So this statement of he was in a cell by himself, he's

22  okay, did this stick out to you in any way?  Was it unusual?

23  A.   Yes.  So to me it stuck out as that he was trying to get

24  the Z code status, which is single cell status, because with

25  the allegations in the complaint, he did not want to have the

Exam. - Trice

1  assessment done, he didn't want treatment, he refused to take

2  pictures, he was not compliant at all with the process and the

3  procedures of these allegations, so --

4  Q.  And you said an inmate rarely denies to be seen by medical

5  staff after making PREA allegations?

6  A.  Correct.

7  Q.  What impressions did you have of your interaction with

8  Brown on this date?

9  A.  Well, my impression of -- I wasn't sure what to think of

10  it, seeing how the sick call was put in a week later than the

11  allegations that he's claiming had happened.  And it was -- no

12  one had any knowledge of any of these complaints that he was

13  saying that happened from December -- February 3rd to

14  February 7th.

15       So I was not sure what to take from it, what he was

16  gaming for, I guess, trying to get, until, like, at the end of

17  our talk whenever he said about he was in a single cell by

18  himself now.  So my impression -- I take all my -- when I'm

19  seeing someone, I take all their complaints serious and do the

20  assessment.

21  Q.  Now, you indicated that when an inmate is seen for a PREA

22  allegation, that medical staffs, medical staff completes

23  reports.  Would reports have been done for Inmate Brown?

24  A.  Yes.

25  Q.  So in front of you -- we're still on Exhibit 7.  If you

Exam. - Trice

1  could turn to Page 73.  Do you recognize what this document is?

2  A.   Yes, it's my DC-457.

3  Q.   So what is the DC-457?

4  A.   It is a medical incident report.

5  Q.   And you said this is your form.  How do you know this is

6  your form?

7  A.   It's my handwriting, my signature, my stamp.

8          BROWN:  Excuse me, excuse me, what exhibit would that

9  be under?

10         THE COURT:  I understand it to be Defense Exhibit 7,

11  Page 73.  Does Mr. Brown have a binder of these exhibits, as

12  well?

13         MS. BEDELL:  We had provided one to him, Your Honor.

14         THE COURT:  Do you have the binder with you today,

15  Mr. Brown?

16         BROWN:  No.  I do have all the exhibits.  However,

17  they're numbered differently from -- due to the current

18  events -- to the later current events.

19         THE COURT:  Mr. Neary, can you do me a favor and

20  deliver this spare copy of the exhibit book?  But I'm going to

21  need it back at the end of the day, Mr. Brown.  Don't you and

22  your colleagues there be taking it back to Moshannon because

23  I'll be looking for it.

24         BROWN:  All right.  Thank you.

25         THE COURT:  Thank you, Mr. Neary.

Exam. - Trice

1   *COURTROOM DEPUTY:* You're welcome.

2   *THE COURT:* And that was Exhibit 7 and Page 73, I

3 think. I'm also thinking, Mr. Brown, that it may also be your

4 Exhibit 83.

5   *BROWN:* Okay.

6   *THE COURT:* But that's just me guessing.

7   *BROWN:* You're a smart man.

8   *THE COURT:* Well, why don't you just work off of the

9 exhibit there that we got to you so that we can keep moving

10 along.

11 BY MS. ADAMS:

12 Q. So, Ms. Trice, you said this is the form you filled out.

13 What's the date of this form?

14 A. February 13th, 2018.

15 Q. And that's the date you saw Brown?

16 A. Yes.

17 Q. And is this a form that would be kept as part of Brown's

18 medical file?

19 A. Yes.

20   *THE COURT:* We're looking at the same document.

21   *THE WITNESS:* Yep.

22   *THE COURT:* Very well. Go ahead.

23 BY MS. ADAMS:

24 Q. You previously stated as part of the medical staff you have

25 access to Brown's medical file and that his medical file is

Exam. - Trice

1    kept by the Department of Corrections at SCI Huntingdon.

2    A.   Yes.

3    Q.   So if we can turn to Tab 14 --

4         BROWN:   Is this part of my medical records?

5         MS. ADAMS:   Yes.

6         BROWN:   I would object pertaining to my medical

7    records.

8         THE COURT:   And the nature of that objection?

9         BROWN:   Under the grounds that I was never provided

10   this during discovery upon request, multiple requests.

11        MS. ADAMS:   Your Honor, we did provide all the

12   documents, I believe back in June or July that we provided all

13   documents that we were going to be using at trial, and this

14   would have been included in it.  So he's had these since --

15   almost seven, eight months at this point.

16        BROWN:   I object.  I was never provided my medical

17   records upon several --

18        THE COURT:   Take a look at Exhibit 14.  It's being

19   represented to me that that exhibit was provided to you.

20        BROWN:   During discovery?

21        THE COURT:   I'm being told that it was provided at

22   least at the time of this past summer when exhibits were being

23   exchanged.

24        BROWN:   Okay.  So after discovery, after -- before

25   trial.

Exam. - Trice

1          THE COURT:  Yes.  And so I understand your objection,

2     but I'm going to overrule it and allow testimony regarding

3     these exhibits.

4          MS. ADAMS:  Thank you.

5     BY MS. ADAMS:

6     Q.  Can you briefly flip through Exhibit 14?  You don't need to

7     read every page.  Do you know what this Exhibit 17 is -- I'm

8     sorry, 14 is?

9     A.  It seems like all -- like, what would have encountered in

10    his medical from a certain time to a certain time.

11    Q.  When you say -- you're talking about Brown?

12    A.  Yes, correct.

13    Q.  So this would be Brown's medical file?

14    A.  Yes.

15    Q.  How are you able to identify this as Brown's medical file?

16    A.  It has his name.  It's stamped with his name and number and

17    his date of birth and his location of housing at that time.

18    Q.  So when you say number, you're referring to the inmate

19    number?

20    A.  Inmate number, yes.

21    Q.  And an inmate number is a unique number to each --

22    A.  To each inmate to identify them, yes.

23    Q.  So can we turn to Page 84 of Exhibit 14?

24    A.  Okay.

25    Q.  Can you tell me what this form is?

Exam. - Trice

1    A.    This is my DC-472, which is my progress note, narrative.

2    Q.    And what date was this form completed?

3    A.    February 13, 2018.

4    Q.    And I believe you said it's your form?

5    A.    Yes.

6    Q.    How do you know it's your form?

7    A.    Because it's my name stamped on it.

8    Q.    And this, again, would have been through the Sapphire

9    system?  You would have logged in, and it automatically would

10   have put your name?

11   A.    Yes.

12   Q.    When was this form created?  Or when was this form

13   completed?

14   A.    February 14th, 2018, at zero -- or 12:48 a.m.

15   Q.    And the date of the incident on this form is February 13th,

16   2018, at 2332?

17   A.    Yes.

18   Q.    So you would have completed this form after meeting with

19   Brown?

20   A.    After, yes.

21   Q.    How did you fill this form out?

22   A.    Whenever I got done with Brown and everything, when I come

23   back and I do my findings.

24   Q.    Can you take a moment and read the narrative to yourself?

25   A.    Okay.

Exam. - Trice

1    Q.  Does this report accurately portray the interaction you had
2    with Brown on February 13th, 2018?
3    A.  Yes.
4    Q.  You can flip forward to Page 83. What is this form?
5    A.  This form is a DC-472B. This is the SOAP progress note.
6    Q.  And do you know who filled this form out?
7    A.  The RN that I was working with that night.
8    Q.  And what's the date of the actual note itself?
9    A.  February 14th, 2018, at 10:45 a.m.
10   Q.  And you said it was with the nurse you were working with,
11   and at the bottom it says, Emig, RN?
12   A.  Yeah. Amy, yes.
13   Q.  Amy, oh, I'm sorry. So she would have been the individual,
14   the nurse who would have --
15   A.  Yeah, she was the charge nurse that night.
16   Q.  And her filling out this form, this form automatically
17   became part of Brown's medical record?
18   A.  Correct.
19   Q.  Could you read to yourself the SOAP portion of this form?
20   A.  Okay.
21   Q.  Did she note anything in the objective portion about
22   Brown's demeanor?
23   A.  That he was smirking and smiling.
24   Q.  Did she write any concerns about that demeanor?
25   A.  She stated that she told him that it was not a laughing

Exam. - Trice

1  matter.

2  Q.  And when she's saying that this is not a laughing matter,

3  does this progress note -- this is about the sexual assault

4  that occurred on 2/7/18?

5  A.  Yes.

6  Q.  We're staying with Exhibit 14.  If you could turn to Page

7  78.  Can you tell the court what this form is?

8  A.  This is a DC-472.  This is the provider's progress note.

9  Q.  And at the bottom it says, King, PA?

10  A.  That would have been the nurse practitioner -- or the

11  physical -- I'm sorry, physician assistant, Mrs. King.

12  Q.  And what's the date of this note?

13  A.  Two -- February 23rd, 2018.

14  Q.  Would this have been a followup to the original PREA

15  complaint?

16  A.  Yes.

17  Q.  Can you take a moment to read through the subjective and

18  objective and the assessment and the plan?

19  A.  Okay.

20  Q.  Was he offered any type of medical treatment that he

21  refused?

22  A.  Yes, he was offered another examination.  He was offered

23  the rectal examination, which he refused.  He was -- yes, he

24  refused --

25  Q.  Did he believe he had rectal bleeding at this date?

Exam. - Trice

1    A.   No.   Patient did not believe -- no, he -- no, no complaints

2    of rectal bleeding.

3    Q.   Still on the same exhibit, can you turn back to Page 82?

4    A.   Okay.

5    Q.   And what is this progress note?

6    A.   This is a DC-472 narrative note made by Physician Assistant

7    Gessel.

8    Q.   And the date of this one?

9    A.   February 14th, 2018.

10   Q.   And this would have been done as a result of the PREA

11   investigation or the PREA complaint?

12   A.   Yes.

13   Q.   In reading the narrative, did Brown provide any further

14   information?

15   A.   He didn't provide any difference than what he had already

16   reported before.

17   Q.   And are you aware, was an investigation done into Brown's

18   PREA complaint?

19   A.   Yes.

20   Q.   Do you recall, were you interviewed as part of the PREA

21   investigation?

22   A.   Yes.

23   Q.   And as part of the investigation, you would have filled out

24   any forms required of you?

25   A.   Yes.

Exam. - Trice

1    Q.   If we could turn to Exhibit 7, Page 49. Can you tell me

2    what this form is?

3    A.   This is my DC-121.

4    Q.   And this is the form you would have filled out as part of

5    the PREA investigation?

6    A.   Well, this would have been -- I would have filled this out

7    as part of the incident.   It's secure -- we do a 121, report

8    for security.

9    Q.   Okay.   So this was actually completed at the time of the --

10   A.   Of seeing him, yes.

11   Q.   So the date on this, February 13th, 2018, that's the date

12   he --

13   A.   Yes.

14   Q.   And you said this is your form.   How do you know this is

15   your form?

16   A.   This is my signature.

17   Q.   Okay.   And does this form accurately reflect your

18   interactions with Brown on February 13th and what you did when

19   you found the sick call slip?

20   A.   Yes.

21   Q.   And do you recall, were you asked to provide a written

22   statement as far as the PREA investigation?

23   A.   When I was called up to the PREA lieutenant.

24   Q.   We're still on Exhibit 7.   If you could flip forward to

25   Page 40. Can you tell me what this document is?

Exam. - Trice

1   A.   This would have been my statement that I wrote for the

2   PREA, for the investigation itself.

3   Q.   And what's the date of this?

4   A.   February 20th, 2018.

5   Q.   And, again, it's your signature at the bottom?

6   A.   Yes.

7   Q.   So that's how you're able to identify it?

8   A.   Yes.

9   Q.   Can you read through this to yourself?

10  A.   Okay.

11  Q.   Does that written statement reflect what you put in on that

12  date when you were interviewed?

13  A.   Yes.

14  Q.   And all these documents reviewed, the DC-121 we just did,

15  this -- your statement, the other forms, does all that

16  accurately reflect your recollections of the allegations

17  involving Mr. Brown?

18  A.   Yes.

19  Q.   And is that how the incident was reported to you by Brown

20  on February 13th?

21  A.   Yes.

22           MS. ADAMS:   Your Honor, may I have the court's

23  indulgence?

24           THE COURT:   Certainly.

25           MS. ADAMS:   Your Honor, I have no further questions

Exam. – Trice

1   for Ms. Trice.  I would ask for the admission of Exhibit 14 and

2   then Exhibit 7, Page 40, and I believe it was -- sorry.

3          *THE COURT:*  I'm going to admit Exhibit 7 with respect

4   to the pages that have been specifically referenced.  I show

5   Pages 73, 49, and 40.  And with respect to Exhibit 14, I'll

6   admit it with respect to the pages specifically referenced, 82,

7   83, 84, 78.

8          *BROWN:*  Excuse me, Your Honor.

9          *THE COURT:*  Yes.

10         *BROWN:*  May I enter an offer of proof?

11         *THE COURT:*  Certainly if you wish to lodge a further

12   objection, you may, yes.

13         *BROWN:*  Yeah, because the discovery rule insists that

14   under Rule 26, that I must be provided with everything --

15         *THE COURT:*  And that is a fair point, and here's what

16   I'm going to do.  I'm going to provisionally admit those

17   exhibits, but I'm going to direct defense counsel to establish

18   for us at our next proceeding when these materials were

19   provided to Mr. Brown or when he was given the option in

20   discovery of making his own copies of his medical records.

21   Okay?

22         *MS. ADAMS:*  Yes, Your Honor.

23         *THE COURT:*  So, Mr. Brown, I understand your point,

24   and I'm going to require them to point out to us when it was

25   that you were provided access to this information.  Okay?

Exam. - Trice

1    *BROWN:* Yeah, thank you.

2    *THE COURT:* You're certainly welcome. Anything

3    further then in terms of the cross and defense direct of this

4    witness?

5    *MS. ADAMS:* I do not have anything.

6    *THE COURT:* Very well. Any brief redirect, Mr. Brown?

7    *BROWN:* Yeah.

8    *THE COURT:* Okay.

9                    REDIRECT EXAMINATION

10   BY BROWN:

11   Q.  Ms. Trice, sorry, hope I don't keep you long.  Prior to

12   February 13th, were you aware of any grievances pertaining to

13   medical treatment Brown was filing back and forth with the

14   medical department?

15   A.  I don't handle grievances.  Any grievances that come

16   through the medical department go out to security, so no.

17   Q.  Were you aware that around November 15th of 2017 that Brown

18   was subject to a rectal examination by a PA Gomes?

19   A.  I would not know that without looking at your medical

20   records to see if there's any note of it.

21   Q.  Do you know who a PA Gomes is?

22   A.  Yes.

23   Q.  Okay.  Now, were you aware that Brown had disputed on how

24   the examination was conducted in the open, in front of other

25   inmates --

Exam. - Trice

1   A.   I would not know --

2   Q.   -- causing pain?

3   A.   -- that information because that -- obviously it sounds

4   like it would have been a security, an investigation, which if

5   I had no part in it, I would not know any information about it.

6   Q.   Okay.  Also, were you aware that Brown had a pending

7   grievance against PA King?

8   A.   I would not know anything about any grievances that you had

9   against anyone.

10  Q.   Were you aware around that time PA King had evaluated Brown

11  pertaining to a previous sexual assault and discovered some

12  type of abdominal pain?

13  A.   Again, I would not know anything about your grievances.

14  Q.   Now, so is it fair to say that at the time of these claims

15  the medical department knew who Brown was, at February 13,

16  2018?

17  A.   I think it's fair to say that everyone knew who Inmate

18  Brown was.

19  Q.   Okay.  I'll take that lightly.  So you encounter Brown at

20  night on February 18th.  Am I correct?

21  A.   February 13th.

22  Q.   Thirteenth.  Am I correct?

23  A.   Correct.

24  Q.   Exhibit 14 -- I mean Package 14, Exhibit 84, which would be

25  a statement from Orndorf, I believe that was the lieutenant

Exam. - Trice

1  identified that came down with you.

2  A.  Um-hum.

3  Q.  Was he a lieutenant or a captain?

4  A.  Lieutenant.  He's a CO3, so lieutenant.  I don't know,

5  captain, lieutenant.

6  Q.  Could you please read that to yourself quietly?

7  A.  What, his statement?

8      THE COURT:  She doesn't have it in front of her --

9      BROWN:  Oh.

10      THE COURT:  -- if you're referring to some exhibit of

11  yours.

12      BROWN:  Okay.  So --

13      THE COURT:  Are you referring to an exhibit of yours

14  or an exhibit in the defense binder?

15      BROWN:  Yeah, yeah, yeah, I'm referring to exhibits of

16  mine.

17      THE COURT:  Okay.  And the exhibit of yours that you

18  are referring to is your Exhibit 84?

19      BROWN:  Yeah, Package 14.

20      THE COURT:  Which purports to be some sort of a form

21  completed by Mr. Orndorf.  Do you have that in front of you?

22      THE WITNESS:  I have mine.  I found it in my book.

23      THE COURT:  In your book, where is it located?

24      THE WITNESS:  Page 48.  Tab 7, Page 48.

25      THE COURT:  Okay.  So Exhibit 7, Page 48, appears to

Exam. - Trice

1    be identical, Mr. Brown, to your Exhibit 84, and you both have

2    the document in front of you.  Do you have some questions you

3    want to ask?

4            MS. ADAMS:  Your Honor, I'm actually going to object

5    to him questioning her about this.  I don't believe there's

6    been a foundation laid that she would know what this document

7    is, as it wasn't written by her, so she really can't testify to

8    anything that was written in there.

9            THE COURT:  Well, I don't know what he's going to ask

10   yet.

11           MS. ADAMS:  Okay.

12           THE COURT:  Yeah, I think he asked her to read it.

13           MS. ADAMS:  Okay.

14           THE COURT:  You had her read a bunch of things and

15   then attest that they accurately reflected stuff that happened.

16   So go ahead, take a quick read there, ma'am, and then we'll

17   wait and see what the next question is.

18   BY BROWN:

19   Q.  So --

20           THE COURT:  Wait until she gets a chance to read.

21           BROWN:  Sorry.

22           THE COURT:  That's okay.  And just let us know when

23   you're done reading that paragraph.

24           THE WITNESS:  Okay.

25           THE COURT:  Thank you.

```
                          Exam. - Trice

 1              THE WITNESS:  Go ahead.
 2    BY BROWN:
 3    Q.  Yeah.  So Mr. Orndorf --
 4              THE COURT:  Well, you've got to wait until she's
 5    finished reading the paragraph.
 6              THE WITNESS:  I told him it's good.
 7              THE COURT:  Okay.  Very good.  You may proceed.
 8              BROWN:  All right.
 9    BY BROWN:
10    Q.  So Mr. Orndorf does admit that he did come down with you to
11    the RHU in this statement and --
12              MS. ADAMS:  Again, I'm sorry, I'm going to renew my
13    objection.
14              THE COURT:  Yeah, is there any dispute at all on God's
15    green earth that you and Orndorf went down there?
16              THE WITNESS:  No, not at all.
17              THE COURT:  Okay.  So I'm going to overrule the
18    objection to that question because everyone agrees that Orndorf
19    went with LPN Trice.  Do you have another -- stay on the ready,
20    and we'll see what the next question brings.  Go ahead.
21    BY BROWN:
22    Q.  Now, is it -- do you have any acknowledgment if Brown was
23    ever asked to write a statement during this encounter with you,
24    Orndorf?
25    A.  That would have been security.  I was there for medical.
```

Exam. - Trice

1  So your statement would have came from the security after I was
2  done.
3  Q.  So Brown is claiming that he wrote a statement with you
4  present.  Is that accurate?  Would you know of any statements
5  that Brown wrote?
6  A.  That is not accurate.  Brown did not write a statement
7  while I was present.
8  Q.  Okay.  So you're not aware of Brown writing any such
9  statements?
10  A.  No.  Did Brown make statements, is that what you're
11  referring to --
12  Q.  No, we're talking written, because making a statement
13  through documents that they created is different from writing a
14  statement that was --
15          THE COURT:  She says that she doesn't know.
16          BROWN:  Okay.
17          THE COURT:  Isn't that what you said?
18          THE WITNESS:  Um-hum.
19          BROWN:  Yeah.
20          THE COURT:  Okay.  I just wanted to make sure I had
21  that right.
22  BY BROWN:
23  Q.  So you encounter Brown, and at the time we acknowledged
24  that Brown already had a pending medical grievance since --
25  and, like you say, everybody knew who Brown was.

Exam. - Trice

1    Can we stipulate that medical had already refused to
2    see plaintiff on an earlier date, on the 7th?  Is that
3    something you're willing to stipulate to?
4    A.  I cannot state anything as to that.  It would not have been
5    me.  Like, I can't say if medical refused you.
6    Q.  Okay.  I'm sorry, I was just going off a statement.  I'm
7    sorry.
8        Now, Brown states that she never refused any kind of
9    medical treatment on the 13th, but I'm a little eerie on the
10   7th.  So if Johnston did tell medical if Brown was complaining
11   about any medical emergency, do you believe that medical
12   avoided Brown due to the very fact that they wouldn't be
13   incompetent to preserve Brown bloody jumper and underwear?
14   A.  Absolutely not, rather --
15   Q.  What about conducting to stick me?
16   A.  If medical was notified of anything, whether it was a
17   little mosquito bite to you falling and cracking your head, we
18   follow through, we come and see you, paperwork is done.
19   Medical would not have denied you.
20   Q.  So Brown was never denied treatment on the 7th to avoid
21   none of these things, to your knowledge?
22   A.  No.
23   Q.  To the best of your knowledge?
24   A.  To the best of my knowledge, you were not denied any
25   medical treatment.

Exam. - Trice

1   Q.   Okay.  And like you implied, that the written statement

2   would be via security, so you don't have any written statement

3   pertaining to Brown today here with you.  Am I correct?

4   A.   Are you asking if I have a written statement from you?

5   Q.   Well, yeah, there's a dispute.  I'm saying that you was

6   aware of the written statement.  You're saying you wasn't.  So

7   I'm just asking, I'm just following up as to you having any

8   record.

9   A.   I'm medical.  I would not have been a part of your

10  investigation and your statement writing.  And if you look at

11  your exhibit that you pointed out, your statement was --

12  Q.   Now, do SCI Huntingdon have an infirmary?

13  A.   Excuse me?

14  Q.   Do SCI Huntingdon have a place where they take --

15  A.   We do have an infirmary.  It's up at SCI Smithfield.

16  Q.   Oh, oh, okay.  So SCI Huntingdon does not have an

17  infirmary?

18  A.   We have a medical infirmary.  We do not have a housing

19  infirmary to where you would keep if you was needed for

20  infirmary intensive care, no.

21  Q.   And where is the medical infirmary located?

22  A.   In the medical complex behind quad B, B, bravo housing

23  unit.

24  Q.   Okay, Mamma.  And now on February --

25              THE COURT:  Wait a minute, wait a minute, Mr. Brown --

Exam. - Trice

1    excuse me, Brown, you will refer to the witness by her name.

2            THE WITNESS:  Thank you.

3            THE COURT:  You referred to her as Mamma, and that is

4    not permitted.  Brown, we are -- I am attempting to make sure

5    that everyone properly addresses you.

6            BROWN:  Okay.

7            THE COURT:  And you will properly address every

8    witness.  Am I clear?

9            BROWN:  Yes.

10           THE COURT:  Don't use a slang expression.  You refer

11   to the witness by her name and her title.  Am I clear?

12           BROWN:  Yes, Your Honor.

13           THE COURT:  Very well.  I apologize, I didn't mean to

14   interrupt the flow of your redirect, but do you have any last

15   questions for LPN Trice?

16   BY BROWN:

17   Q.  On February 13th, was Brown tooken to the medical

18   department?

19   A.  I offered it; you refused it.

20   Q.  Okay.  So can you -- where was Brown tooken?

21   A.  We seen you in the psych office right there in the

22   restricted housing unit off of bravo quad, in the psych office

23   department right there, where I offered you to be taken to

24   medical and be assessed by the RN and to be seen by the outside

25   doctor and which you refused all medical care and denied any

Exam. - Trice

1  injuries and you were fine because you were housed by yourself.

Q.  Now, did you have a camera with you?

3  A.  Yes, I had a camera.

Q.  Was it digital?

5  A.  Yes.

Q.  Now, did that camera record?

A.  It does not record, it just takes pictures, as we do per

8  policy and which you refused.

Q.  So the digital camera only took pictures, but it doesn't

10  record.  Am I correct?

A.  I take the camera to take pictures.  I don't take the

12  camera to do a video of my assessment with you.

13  Q.  Okay.  Because you underlined that a sexual assault is a

14  very serious thing at SCI Huntingdon.  Am I correct?

15  A.  Sexual assault is serious whether it's anywhere, not just

16  at SCI Huntingdon.  Sexual assault is a very serious crime.

17  Q.  You find it alarming that an inmate would refuse treatment

18  after claiming sexual assault.  Am I correct?

19  A.  I've never had an inmate in my career at the DOC since 2012

20  put in allegations of sexual assault and then deny treatment

21  besides you.

22  Q.  Yes, Ms. Trice, was there a reason you didn't press record

23  on your digital camera to certify --

24  A.  It does not have --

25      MS. ADAMS:  Your Honor, I'm going to object.  This is

Exam. - Trice

1  hear from Brown, and then I'll decide if you answer.

2        *MS. ADAMS:*  Your Honor, I'm going to object to his

3  current question as being speculation as to why she --

4        *THE COURT:*  It does, indeed, seem speculative to me.

5  It seems, Ms. -- it seems, Brown, that you are asking this

6  witness to speculate on a number of matters, some of which

7  would relate to your state of mind.  Do you have any response

8  to that?

9        *BROWN:*  No, it's just to show intent, so it's --

10        *THE COURT:*  Yeah, but it really kind of goes to what

11  your intent or state of mind was, and this witness, competent

12  as she is as an LPN, is not competent to testify to that, so

13  I'm going to sustain that objection.

14        *MS. ADAMS:*  Your Honor, at this point I'm also going

15  to object to this line of questioning.  She has answered

16  numerous times that she offered medical, she offered to take

17  him down to the medical unit, he refused.

18        *THE COURT:*  I think it is appropriate for Brown to

19  move on to any other topic that he might have as he wraps up

20  his redirect.  Any other questions, Brown?

21        *BROWN:*  Yeah, just a sec.

22        *THE COURT:*  Sure.

23  BY BROWN:

24  Q.  So was any tool used to detect any alleged symptoms by

25  Brown around this time?

Exam. - Trice

1   asked and answered.

2          *THE COURT:* I'm going to sustain that objection.   Why

3   don't you move on to a new area there, Brown.

4          *BROWN:* All right.

5   BY BROWN:

6   Q.   So, now, what treatment was offered to Brown at 10:55 p.m.

7   in the psych room on G unit just 20 yards from the assaulter?

8   A.   The services that I offered you was to be taken to medical

9   to be fully assessed and do a fully complete packet of the

10  PREA, and you refused all medical care.

11  Q.   Did you consider the distance between Brown and the

12  assaulter?

13  A.   Again, why I offered to take you to medical to where there

14  was more distance between you and the assaulter and which the

15  assaulter had no clue that you was even pulled out of your

16  cell, and you refused all care.

17  Q.   Okay.   Put another way, why would Brown request medical

18  treatment via sick call but only to refuse knowing that

19  documents would be created by medical that Brown had refused?

20  Do you know why that would occur?

21          *MS. ADAMS:* Your Honor --

22          *THE COURT:* Excuse me, counsel is on her feet, which I

23  think means she is going to lodge an objection.

24          *MS. ADAMS:* Your Honor --

25          *THE COURT:* I'll hear the objection, and then I'll

Exam. - Trice

1        *MS. ADAMS:* Your Honor, I --

2        *THE COURT:* I think we've pretty well gone over what

3    transpired in terms of LPN Trice's encounters and offers of

4    treatment to you, so I'm going to sustain that objection

5    because I think this area has been pretty thoroughly asked and

6    answered. Do you have anything else for this witness?

7        *BROWN:* Yeah, because, well --

8        *THE COURT:* Well, ask your question then.

9        *BROWN:* Yes. Oh, you said ask the question?

10        *THE COURT:* Yeah, I've asked if you have any other

11    questions for this witness.

12    BY BROWN:

13    Q. So as you've admitted that pictures wasn't tooken that

14    night, but you do admit that pictures was tooken the next day.

15    Am I correct?

16    A. Correct, you refused to take pictures for me and Lieutenant

17    Orndorf, but you did take pictures for Ms. Amy the next

18    morning.

19    Q. And you reflected that you did not notice any injuries of

20    bloody nose, bruising, et cetera?

21    A. There were no injuries noted on you, around your neck, your

22    claims of strangulation. There were no indications of any

23    broken nose, any bloody nose, or anything, for the bloody nose

24    was seven days prior to. No, there were no injuries noted, and

25    you denied all injuries whenever I was speaking to you.

Exam. - Trice

₮91 | Q. Do you recall calling a doctor?

√₮2 | A. I called a doctor that evening, and you were seen the next
3 | day.

√₮₮4 | Q. Do you know why you just stated that you did not remember
5 | if you called a doctor or not?

6 | A. I do not -- I said I would have called a doctor because I
7 | always call the doctor.

8 | Q. Well, it's in the record, but let's pass that. So pictures
9 | was tooken on the 14th, and did you have access to those
10 | pictures?

11 | A. If I go to your file, I can look at them, but I did not
12 | take the pictures, so therefore I did not see the pictures.

13 | Q. Would you consider -- would you -- is pictures a form of
14 | treatment?

₮915 | A. Pictures is a form of policy and treatment, yes. Any
16 | injuries to any inmates or staff we always take pictures of the
17 | incidents. It is part of the evidence packet and the discovery
18 | packet.

19 | Q. Okay. So Brown has acknowledged on previous occasion that
20 | she did not refuse medical attention pertaining to multiple
21 | instances around the time period of her claims. Am I correct?

22 | A. You refused care and all medical on the night of
23 | February 13th of 2018 whenever I came down to assess you. What
24 | you did after that, the next day, with the other nurses and
25 | other providers is in your medical file. You complied, but you

Exam. - Trice

1   did not comply that night, so I'm not sure what it is that

2   you're asking for.

3   Q.  There's no reason for these medical records to create any

4   type of mendacious trail?

5           MS. ADAMS:  Your Honor, I'm --

6           THE COURT:  Yes, I'm going to sustain an objection to

7   that as argumentative.

8           MS. ADAMS:  Thank you.

9           THE COURT:  Brown, you may pose any last questions you

10  have of this witness before she is excused.

11  BY BROWN:

12  Q.  So to your memory, Brown was never assessed on

13  February 7th?

14  A.  I was not present February 7th to say whether or not you

15  were or were not.

16  Q.  And in your opinion, Brown would have refused treatment --

17          MS. ADAMS:  Your Honor --

18  BY BROWN:

19  Q.  -- on February 13th?

20  A.  And my --

21          MS. ADAMS:  Your Honor --

22          THE COURT:  Excuse me, there's an -- this really has

23  been asked and answered a couple of times now.

24          MS. ADAMS:  Thank you.

25          THE COURT:  So I'm going to sustain the objection.

1       *BROWN:*  That's it.

2       *THE COURT:*  Okay.  Then may LPN Trice be excused?

3       *MS. ADAMS:*  Your Honor, I was going to ask if she

4   could be excused.  Thank you.

5       *THE COURT:*  LPN Trice, thank you for your time here

6   today.  You are excused with the thanks of the court.

7       *THE WITNESS:*  Thank you.

8       *BROWN:*  Yeah, thank you so much.

9       *THE COURT:*  I'm going to -- we'll take a five-minute

10  recess, and then, Brown, you may call your next witness.

11      *(Recess taken.)*

12      *THE COURT:*  Mr. Brown, you may call your next witness.

13      *BROWN:*  I would like to call Plocinik, but if I may, I

14  could go before him.  It's really up to the court.

15      *THE COURT:*  No, it's really up to you.  This is your

16  case.  I'm just sitting here presiding.  So you may call your

17  next witness.

18      *BROWN:*  Okay.

19      *THE COURT:*  And we're going to go for about an hour

20  and 20 minutes.  I had promised the road crew that we'd get --

21  wrap up at 4:30, so that's when we'll be wrapping up.  So your

22  next witness, Brown, is?

23      *BROWN:*  It would be me.

24      *THE COURT:*  Oh, very well.  Then you may come on up

25  and take the stand.  You'll be sworn in by Mr. Neary, and then

1   you may provide your direct testimony in a short,
2   straightforward narrative, you don't have to ask yourself
3   questions, and then you'll be subject to cross-examination.   So
4   come on up, Brown.

5          *BROWN:*  When I come up, can I enter evidence?

6          *THE COURT:*  Sure, you can.  That would be what you
7   would be doing as a witness.  But, again, if you have exhibits,
8   you should feel free to reference them, sir.

9          *BROWN:*  Okay.

10         *COURTROOM DEPUTY:*  Please raise your right hand.

11      *GARTOR KIKI BROWN, called as a witness, having been duly*
12   *sworn or affirmed, testified as follows:*

13         *COURTROOM DEPUTY:*  Thank you.

14         *THE COURT:*  Very well.  Then please, in your own
15   words, with respect to the allegations in the complaint, what
16   is the information you believe I need to know to reach a fair
17   outcome in this case, sir?

18         *BROWN:*  First and foremost, I have a paper to whom is
19   periodic pertaining to the exhibits I would like to enter, but
20   I can't cite it, so I'm asking how that would work.

21         *THE COURT:*  I'm sorry, what are you trying to tell me,
22   sir?

23         *BROWN:*  During the testimony, I had planned to enter
24   certain exhibits or try to enter certain exhibits.

25         *THE COURT:*  Yes, and I told you you could do so.

1        *BROWN:*  Okay.  So am I allowed to grab the paper?

2        *THE COURT:*  Yes.

3        *BROWN:*  Thank you.

4        *THE COURT:*  And why don't you do this, once you get

5    back there with your paper, why don't you just testify from

6    that table, if that's okay with everyone.

7             So you don't have to come schlepping back and forth

8    and have other people schlep with you.  You go on back there,

9    you're sworn in, you've got your paper, and then you can begin

10   telling me what I need to know.

11            Is that agreeable to the defense to allow Brown to

12   testify from the table?

13       *MS. BEDELL:*  Yes.

14       *THE COURT:*  Thank you.  So, sir, you have my

15   attention, what would you like to share with me?

16                        DIRECT TESTIMONY

17       *BROWN:*  I'm Gartor Brown.  I had encountered

18   Mr. Maxwell at SCI Huntingdon at the door, and I predicated to

19   him I was from Camp Hill.  And --

20       *THE COURT:*  When was this, sir?

21       *BROWN:*  This was around October 23rd of 2017.

22       *THE COURT:*  Okay.  Go ahead, I'm sorry, you were

23   saying?  So you saw him at Huntingdon around the 23rd.  You

24   were talking about your experience at Camp Hill.  Please

25   proceed.

Direct - Brown

1    *BROWN:* And I was specific, and I had told him that I
2    was sexually assaulted in the cell, and he decided to ask some
3    questions, to whom I told him I was gay. I did not tell him I
4    was a transsexual.

5         I had concerns with basically searches by other
6    females and it drawing attention, more attention to me.  Told
7    him I was gay and I possessed feminine characteristics.  And he
8    asked -- gave them examples like, well, I sit when I pee, I
9    swish my hips, I'm very supple.

10        And during this time, I encountered Nurse Hain, and I
11   noticed she wasn't really documenting what I was saying as far
12   as my symptoms.  At this time I was forced to sign a double
13   bunky.  I perceive it as a policy.  When I say in the paper I
14   rejected Mr. Maxwell offer and --

15        *THE COURT:* What offer?

16        *BROWN:* To sign the paper --

17        *THE COURT:* Oh, okay.  Very good.  I understand.

18        *BROWN:* -- pertaining to a double bunky.  And I was
19   forced to sign this paper.  And this would be -- I would like
20   to enter this exhibit.  And I believe it was already entered,
21   so I'll just cite it, Package 4.

22        *THE COURT:* Yeah, it was not already entered.  You're
23   referring to an Exhibit 14.

24        *BROWN:* Yeah.

25        *THE COURT:* Which is a statement of double bunking

Direct - Brown

1   policy dated October 23, 2017, that you're testifying you
2   signed under duress.  Is there any objection to the admission
3   of this exhibit?

4           *MS. BEDELL:* No, Your Honor.

5           *THE COURT:* Very well.  It will be admitted.  Go
6   ahead, Mr. Brown.

7           *BROWN:* So I was tooken to the RHU, and I had an
8   evaluation with PA King.  And she insisted to feel around my
9   ribs, and I predicated to her that I had -- I was feeling
10  neurological pain from my back, through my lower back, my hip,
11  my groin, I was experiencing numbness on the left side of my
12  head, and just a lot going on with me.

13          And I noticed Ms. King would only feel around my
14  abdominal area.  And I believe she stated, well, if they're
15  bruised, it will heal on its own, and your injuries did not
16  occur here.  This was concerning to me because now it was a
17  clear reality of prison.

18          I filed a grievance.  I'd like to enter this Exhibit,
19  Package 6, Exhibit 24.

20          *THE COURT:* Which is a December, 2017 grievance
21  relating to Ms. King.  What's the defense position?

22          *MS. BEDELL:* No objection, Your Honor.

23          *THE COURT:* Very well.  It will be admitted without
24  objection.

25          *BROWN:* I'm having a hard time finding it.  But in the

Direct - Brown

1   grievance, it was just a brief complaint about my treatment and
2   lack thereof and my concerns.  I followed up with a meeting
3   with security.  There I was intimidated.

4           THE COURT:  When was this meeting with security?
5           BROWN:  It was around October 25th, 2017.
6           THE COURT:  Very well.  And who was it that you met
7   with?

8           BROWN:  Maxwell, House, Eberling -- sorry if I
9   pronounce that wrong -- and I believe one other staff.  And in
10  there they're basically saying, well, we want you to write this
11  statement and saying you're safe in population.

12          And that raised an air of concern.  Like, I don't want
13  to have to sign anything.  I don't know who is in population.
14  So it wouldn't be honest of me to admit that I don't have any
15  enemies in population.  I mean, I did come from a county jail,
16  and I am aware that I was subject to multiple assaults.  I
17  don't know where these people are.

18          And their voice got masculine, well, you're going to
19  write this statement, the RHU is going to be your home.  You
20  have no other options.  So I wrote the statement that I'm okay
21  with population.

22          I follow up with a grievance pertaining to the matter.
23  Package 5, Exhibit -- no, excuse me.  Yes, it's Package 4,
24  Exhibit 15 through 19.

25          THE COURT:  Yes, they're already in evidence.

Direct - Brown

1        *BROWN:*  So that I contested and made them aware that I

2   was just forced to sign and write a statement that I did not

3   feel comfortable writing.

4            I was placed on, I believe, AA -- no, BA, which I

5   would like to stipulate that it's the only single cell unit at

6   SCI Huntingdon, so all the cells are single cells.  And I was

7   put in a single cell at the time.  So this is from October 25th

8   through October 30th, 2017.

9            I felt scared, just the prison environment, mental

10  issues, inmates come too close to me, brush against me, feel

11  scared.  I requested PC.  It was never offered to me.  I

12  believe I wrote a request to mental health, I heard your name

13  is Cousins, I just arrived, this is what's going on with me,

14  I'm scared, can you help?

15           I was called to go back to Camp Hill pertaining to an

16  investigation, I believe it was the 31st of October.  And I was

17  at Camp Hill from the 31st of October through, I believe,

18  November 13th, and then I met with state police pertaining to

19  my sexual assault claims from Camp Hill.  And --

20           *MS. BEDELL:*  Your Honor, respectfully, I'm going to

21  object to this testimony as irrelevant.  I'm not seeing a

22  connection between what he alleges happened at Camp Hill and

23  the corrections officers here.

24           *THE COURT:*  Yes.  And, Mr. Brown, the connection

25  between the officers named in this complaint and the matters at

Direct - Brown

1    Camp Hill is what?

2          *BROWN:*  That I was subject to another assault at SCI

3    Camp Hill.  And when I arrived at Huntingdon, I made Maxwell

4    aware during our encounter and I had a medical past that was

5    written at Camp Hill to go to medical and I had a statement

6    from an inmate that witnessed a bloody nose.  And I told

7    Maxwell this upon return to SCI Huntingdon, so I do believe it

8    may be relevant under 402.

9          *THE COURT:*  I'm going to permit that brief

10   narrative --

11         *BROWN:*  Thanks.

12         *THE COURT:*  -- and ask Brown to continue to move

13   forward towards the events that are subject to this civil

14   complaint, the events of February of 2018.

15         *BROWN:*  And pertaining to the medical past and the

16   inmate statement that's under Package 7, Exhibit 28, so this

17   would show the medical past to whom the assault occurred.  And

18   that's at the bottom.  It's a little area to read.

19         *THE COURT:*  These are allegations relating to an

20   incident at Camp Hill?

21         *BROWN:*  Yes, but I believe it was -- the derivative of

22   this led to Mr. Maxwell acknowledgment after I came to -- back

23   to Huntingdon.

24         *THE COURT:*  I think you can testify to whatever

25   conversation you had with Mr. Maxwell when you returned to



Direct - Brown

1   Huntingdon.  Let me ask the defense, is there an objection to

2   these exhibits relating to some incident in Camp Hill?

3         MS. BEDELL:  Yes, Your Honor.  I believe Plaintiff's

4   Exhibit 28 was offered, and we do object to that.  No

5   foundation has been laid.  It appears to be a witness statement

6   by another inmate named Saul Ortiz.

7         THE COURT:  Yeah, I'm going to sustain the objection

8   to those exhibits, but I understand you may wish to testify

9   regarding any communication you had with Lieutenant Maxwell

10  concerning risks to your safety or vulnerabilities that you

11  perceived.

12        BROWN:  Yes.  Can I please offer proof pertaining to

13  these exhibits?

14        THE COURT:  Certainly.  What further offer of proof

15  beyond what you've done did you wish to share with me?

16        BROWN:  Well, I had it listed as relevance under Rule

17  402 and 803, exception for hearsay, present sense impression.

18        THE COURT:  I understand, but the issue before me is

19  not -- does not directly relate to any alleged assault that

20  happened at Camp Hill.

21        And for that reason, I'm not admitting these exhibits,

22  although, as I said a moment ago, if you wish to testify to any

23  discussions you had with correctional staff at Huntingdon

24  relating to what you regarded as your susceptibility --

25        BROWN:  Yes.

Direct - Brown

1   alarming because this was pertaining to a cavity search sexual

2   assault that I alleged at another facility.  And he proceeded

3   to ask me some questions about the Savadogo case, and I felt

Ẽ4  compelled to answer them.  Package 8, Exhibit 29, is --

5           THE COURT:  It is your deposition.

6           BROWN:  Yes.

7           THE COURT:  And that would not be separately

8   admissible by you in the trial of this case, although you can

9   certainly testify now to any of the matters that you think were

10  pertinent that you covered in that deposition.

11          BROWN:  Oh, yeah, so I find it as relevance and I

12  would attempt to enter the deposition.

13          THE COURT:  Yes, and I'm not going to permit the

14  deposition to come into evidence because the rules against

15  hearsay would not permit you to introduce your own prior

16  statement, but you may testify regarding any matters that you

17  discussed in this deposition that you believe are pertinent to

18  your claims in this lawsuit.

19          BROWN:  Okay.  So --

20          THE COURT:  So you had returned from Huntingdon, you

21  had this conversation that you've described with Lieutenant

22  Maxwell.  What else would you like to share with me that

23  relates to the claims you have made concerning these defendants

24  and their conduct in February of 2018?

25          BROWN:  So I believe I wrote a medical sick call

1    *THE COURT:* -- to assault, then you can do that. And
2    I'm asking you to do that now.

3    *BROWN:* Yes. And I'm respectfully offering the proof
4    pertaining to these exhibits.

5    *THE COURT:* Yes, and I've overruled -- I've sustained
6    the objection. I'm not admitting those exhibits. But you may
7    proceed with your testimony.

8    *BROWN:* Okay. So I came back to SCI Huntingdon, I
9    believe November 13th, 2017, and I encountered Mr. Maxwell,
10   Ms. Mandy Sipple, I believe another official. And Maxwell
11   stated that I had a lot of people at Camp Hill under a lot of
12   heat and that he used to work at SCI Camp Hill. So I'm asking
13   myself, well, what do I have to do with this? And he called me
14   a whistleblower, and this was very concerning.

15   So here I am in front of an official, a security
16   official that's supposed to help me through this process. And
17   he basically stated, well, just because you was allegedly
18   sexually assaulted, that doesn't recommend that we give you a Z
19   code, it has no bearing in this, we don't have to get you a
20   single cell at no time. And I don't even believe I brought up
21   single cell.

22   And what was also concerning during this meeting with
23   Mr. Maxwell was that he predicated some questions about another
24   unrelated case, which would be the Savadogo case, that had no
25   bearing with our encounter whatsoever. And this was very

Direct - Brown

1   pertaining to pending injuries, and I encountered medical

2   pertaining to my symptoms.  And during the encounter --

3           THE COURT:  When is this?

4           BROWN:  This was November 17th or 16th of 2017.

5           THE COURT:  Okay.  And the injuries you're talking

6   about are -- relate to what?

7           BROWN:  They were injuries sustained pertaining to the

8   Camp Hill sexual assault.  And this is relevant because a

9   rectum, a rectum exam was conducted by PA Gomes.  And during

10  the exam, I didn't refuse medical treatment, but I was kind of

11  eerie about him conducting the rectum exam for the very purpose

12  that it would cause pain and that it was in an open area.

13          Fairness to medical that there was a little -- little

14  departments, but within the departments, you could clearly see

15  other inmates were waiting to get treatment.

16          MS. BEDELL:  Your Honor, respectfully, again, I'm

17  going to object to this testimony.  I'm not seeing a

18  connection.

19          THE COURT:  This seems kind of far afield, Brown.  How

20  does it relate to your claims against the defendants in this

21  case that concern matters in February of 2018?

22          BROWN:  I believe this is -- I have a relevant under

23  402 and --

24          THE COURT:  Yeah, I'm less interested in what rule

25  number.  I'm more interested in how you think factually this

Direct - Brown

1  relates to the allegations you've made against these four

2  defendants.

3       BROWN:  Because now there a record created that I was

4  seeking treatment and that a cavity search was conducted,

5  although I aired some concerns in the open.  And I believe the

6  records are highly relevant in this case just from one

7  standpoint where it was another sexual assault and that it

8  appears to be a dispute that the sexual assault that occurred

9  at SCI Huntingdon, that I totally refused treatments.

10      So I believe there is a connection under relevance

11 that I sought treatment from a sexual assault alleged within

12 the same timeframe from the medical officials at SCI

13 Huntingdon.

14      THE COURT:  Ms. Bedell, with that offer of proof, what

15 is your objection?  Is it still a relevance objection?

16      MS. BEDELL:  I still don't see the relevance, Your

17 Honor.

18      THE COURT:  I'm not going to admit these documents.

19 You've testified, Mr. Brown, that in November, November 17,

20 that you sought and received medical care relating to a prior

21 incident at another prison.  That testimony is in the record.

22 Why don't you move forward with your narrative, sir.

23      BROWN:  So now housed, I was housed in a single pod

24 unit on BA, and I believe around December 1st I was called to

25 move to AA, and I raised some concerns.

153

Direct - Brown

1    I started having a panic attack. Well, where am I
2  moving? Who am I moving with? Is this person safe to move
3  with? I was told, pack your shit, you're moving. It created a
4  very sudden feeling in my stomach. I started sweating
5  profusely. I requested PC. And then --

6    THE COURT: And when you say PC, I assume you're
7  talking protective custody?

8    BROWN: Protective custody.

9    THE COURT: I just wanted to make sure that I
10  understood that term. Go ahead.

11    BROWN: Yeah. So now I'm down -- requesting PC again
12  and trying to inquire where is AA, who -- it was acknowledged
13  that it's with somebody. Well, who is this person? Just pack
14  your shit, that's where you're moving, you're moving where we
15  tell you to move.

16    Well, I'm having a panic attack. Can I see psych?
17  No, you can't see psych. I'm suicidal. I'm having shakes.
18  I'm having feelings in my stomach. I'm having sweats. Well,
19  if you're suicidal, then I guess the RHU is where you're going.
20  Are you saying you're refusing a cellmate? No, I'm saying that
21  I'm suicidal.

22    I did state that I was homicidal, too, at that time,
23  and I was written up for threatening an inmate. And I'd like
24  to enter the misconduct, which is Package 9, Exhibit 30, I
25  believe.

Direct - Brown

1       *THE COURT:* Any objection to Exhibit 30, Package 9,

2 which appears to be a disciplinary package relating to an

3 allegation of threatening another person and refusing to obey

4 an order?

5       *MS. BEDELL:* No objection, Your Honor.

6       *THE COURT:* Very well. It will be admitted without

7 objection.

8       *BROWN:* Okay. So now I'm in the RHU at this time.

9       *THE COURT:* And what time is this again, just so that

10 I've got a timeframe?

11       *BROWN:* This was around December 1st, 2017.

12       *THE COURT:* Very good.

13       *BROWN:* And I'm in the RHU, I'm getting -- I'm scared.

14 I'm asking to see psych. I'm just reaching for help anywhere I

15 could get help. And I'm trying to talk to prison officials. I

16 believe I wrote multiple stuff to psych, one to whom is Exhibit

17 34 in Package 9, and I request relevance.

18       *THE COURT:* Let's wait and see if there's an objection

19 to Exhibit 34.

20       *MS. BEDELL:* Your Honor, I have Exhibit 34 as looking

21 like a grievance packet. Is that accurate? I want to make

22 sure I have the right one.

23       *THE COURT:* I think part of my challenge is there

24 appear to be two completely unrelated documents, both of which

25 are marked Exhibit 34.

Direct - Brown

1       *BROWN:* Yeah.

2       *THE COURT:* One of them is --

3       *BROWN:* It's a request, I believe.

4       *THE COURT:* Excuse me, Mr. Brown -- Brown, excuse me,

5    sir, let me take a cut at this, and then you can weigh in. One

6    of them appears to be a document that is dated December 17,

7    2017.

8       *BROWN:* I believe that's the correct --

9       *THE COURT:* And then there is a grievance package

10   beyond that from October of 2017.

11      *MS. BEDELL:* Your Honor, I have no objection to the

12   grievance that's dated December 17th.

13      *THE COURT:* Very well. Then without objection, that

14   exhibit will be admitted. You may continue, Brown.

15      *BROWN:* So in my concern with psych, I'm basically

16   saying -- if I may read certain parts.

17      *THE COURT:* It's in evidence, and I can read it. If

18   you can just articulate for me what your concerns were, that

19   would be great.

20      *BROWN:* So I'm directing it to Cousins and Goss and

21   basically predicating that I seen security and that I seen Eric

22   Parsons and Ms. Butterbaugh, and I told them of symptoms of

23   feeling down, gray, sweats, heart rate going up every time an

24   inmate brush against me, shaking to the point that officers was

25   calling me shake and bake.

Direct - Brown

1        I was scared, and I had issues breathing and just

2   emotional, psychiatric issues that I had going on with me.  And

3   I felt that it was very important to document and report these

4   things to the proper -- through the proper form to officials to

5   get some help.

6        THE COURT:  Very well.  Again, in terms of your

7   narrative, moving forward, what else should I -- do I need to

8   know that relates to your claims against these four defendants?

9        BROWN:  Exhibit 33 under the same package.

10       MS. BEDELL:  Your Honor, we have no objection to

11  Number 33.

E12       THE COURT:  Very well, Exhibit 33, which appears to be

13  a grievance package --

14       BROWN:  Yeah.

15       THE COURT:  -- dated December 13, 2017, will be

16  admitted without objection.

17       BROWN:  In here, basically observing my pain from

18  shoulder to left-hand side and to that I had already

19  encountered medical and X-rays was tooken and it was had that

20  something with scoliosis and mild pain.

21       I received a response from Ms. Price, and she stated

22  herniated disc, scoliosis, right hip, right groin, ankle, X-ray

23  results two weeks prior, muscle tissues, and other ongoing

24  injuries.

25       So she stated that I met with Dr. Gildea and that I

Direct - Brown

1   requested an MRI and that an MRI was not provided, but the

2   X-rays was provided and which acknowledged acute or mild pain,

3   scoliosis.

4        And a followup again was acknowledged and that I

5   somehow refused the visit, and physical therapy was

6   acknowledged around 12/27.

7        THE COURT:  And Mr. -- excuse me, pardon me, I

8   apologize, Brown, how does this relate to your allegations that

9   the defendants in this case failed to --

10        BROWN:  Well, this --

11        THE COURT:  No, you let me finish my question, and

12   then I'll look forward to receiving your answer.

13        How does this relate to the allegations in your

14   complaint that between February 3rd and February 7 of 2018,

15   these defendants were deliberately indifferent to a threat to

16   your safety caused by assaults by Inmate Brown -- Inmate Allen?

17   How do they relate to each other?

18        BROWN:  I believe my psych request and medical

19   requests were a direct paper trail as to the circumstances and

20   my well-being and what was going on around me, to whom was the

21   derivative that was -- led to February 8th just weeks down the

22   line.

23        THE COURT:  Well, and I suppose what I would encourage

24   you to do, sir, is move to those events --

25        BROWN:  Okay.

Direct - Brown

1      THE COURT:  -- and provide me with testimony regarding

2   what you believe the named defendants in this case have done

3   that violated your rights under the Eighth Amendment.

4      BROWN:  So, again, I believe I had refused to go to

5   population and received a writeup around this time.

6      THE COURT:  You're talking about another disciplinary

7   citation or writeup in December?

8      BROWN:  Yes, yes.

9      THE COURT:  Okay.

10      BROWN:  And I believe I entered back into population

11   around December 27th of 2017.

12      THE COURT:  Okay.

13      BROWN:  And during, while -- during my stay in the

14   RHU, I was moved to GD, from GA to GD, and I noticed, while

15   talking to Counselor Banks, basically inquiring about PC, that

16   another inmate started to yell, well, oh, man, he's a bitch,

17   he's scared to go to population.

18           And this led to me coming out the hole on the 27th.

19   Then I was carried over to AA, which is a double celling pod

20   where there are two bunks in every cell.  So it was different

21   from BA where I was originally at.

22           And when I walked in the cell, it was only me, but I

23   did notice two bunks.  And I believe I put my stuff down.  I

24   have a lot of legal work.  I believe I wanted to take a bath, a

25   shower, and when I came back, an inmate was in the cell.  And

Direct - Brown

1   against -- again, this raised some concern.  Who are you?  I'm
2   Money.  This inmate was later identified as Dale Jackson.
3        I recognized that this inmate was next-door to me on
4   GD, and he was the inmate that had predicated that I was soft
5   and I was scared to go to population.  And this was concerning
6   that this inmate was now in the cell with me and I haven't -- I
7   wasn't told that I was receiving a celly at this time.  So this
8   is highly relevant because I didn't know I was getting a celly
9   at this time.

10       THE COURT:  And how does that relate to the four
11  defendants that you have brought these allegations against who
12  I gather --

13       BROWN:  It's --

14       THE COURT:  Excuse me, who I gather were employed in
15  the RHU in February?

16       BROWN:  Yes, this inmate was best friends with Inmate
17  Allen, to whom was housed on AA at the time with us.

18       THE COURT:  Okay.

19       BROWN:  Would you find that relevant?

20       THE COURT:  You know what, one of the great things
21  about the job I have is, I ask the questions, but people don't
22  question me.

23       BROWN:  I'm so sorry.

24       THE COURT:  That's quite all right.  No, no, it was
25  worth a try, but that's just not the way that things operate

Direct - Brown

1   here.  So I appreciate your testimony there.  Why don't you

2   move forward, if you would, please, in terms of your narrative.

3        *BROWN:*  So I would like to enter Exhibit 36 and 37 as

4   to Package 10.  This is a grievance that involves Inmate Allen.

5   And in the grievance, I stated that I was being extorted by

6   Inmate Allen and Inmate Dale Jackson and that the derivative

7   led to an assault by Jackson, which led to a nosebleed.

8        *THE COURT:*  You're referring to Exhibit 36?

9        *BROWN:*  Yes.

10       *THE COURT:*  Which --

11       *BROWN:*  In Package 10.

12       *THE COURT:*  Yes, which, as I read it, is a grievance

13  that is dated February 16, 2018.

14       *BROWN:*  Yes.

15       *MS. BEDELL:*  We have no objection, Your Honor.

16       *THE COURT:*  Then it will be admitted without

17  objection.

18       *BROWN:*  And I thank you.  I seriously thought you guys

19  was going to object to this.  So this is concerning because

20  this was an unmarked grievance as in it wasn't processed

21  through the grievance channels, so there's no acknowledgment

22  that this grievance was ever received by SCI Huntingdon.

23       I did put this in the grievance box.  And when I

24  didn't receive a response, I tried appealing, and I ended up

25  appealing to Central Office, like, hey, I put in a grievance

Direct - Brown

1    about an assault that occurred on AA where I was extorted by

2    Inmate Allen and Inmate Jackson, and this grievance was never

3    responded to.  So Exhibit 37 was a response.  Basically I'd

4    like to enter Exhibit 37.

5              *THE COURT:*  Any objection?

6              *MS. BEDELL:*  No objection, Your Honor.

7              *THE COURT:*  Very well.  It will be admitted.

8              *BROWN:*  This was from Central Office.  Basically we

9    have no receipt of an appeal in this office, and your attempt

10   to appeal this grievance has not been given a grievance number.

11   Unfortunately, this office cannot process grievances --

12   basically they're contesting that they're now aware of the

13   grievance, but there was no processing of the grievance at SCI

14   Huntingdon.

15             And I believe the grievance is relevant because in the

16   grievance I clearly state that Inmate Allen and Dale Jackson,

17   who's currently -- Dale Jackson is currently my celly, and that

18   I was a victim of sexual assault and that a CO Kovach slipped

19   him a grievance response from the Camp Hill sexual assault,

20   after which I was extorted and threatened by both Jackson and

21   Allen, and I was forced to call a family member to put money on

22   Jackson books.

23             And on January 15th, 2018, before Jackson went to

24   school, I sustained an assault by Jackson, and that these

25   inmates was aware that I was basically sexually assaulted at



Direct - Brown

Camp Hill through going through my legal boxes and from the

fact that the officer passed a returning grievance to the

inmate.  That is why I felt that the grievance was very

important.  And I stated that I met with Mr. Maxwell, which at

the time was an LT.

So I received a misconduct around July.  And first I'd

like to enter the inmate housing, Mr. Allen's cell history as

relevant.  And that's under 402.  And is it Package -- I

believe it's Package 13.  Am I permitted to enter this exhibit,

Your Honor?

THE COURT:  I'm endeavoring to locate the exhibit.

You had said Package 13?

BROWN:  Yes.  It might be 11.

MS. BEDELL:  Your Honor, in case it's helpful to the

court, I believe Defendants' Exhibit 55 is the cell history for

Mr. Allen.

THE COURT:  Why don't you take a look there at the

defendant exhibit book that is in front of you, Mr. Brown --

excuse me, Brown.  Brown, excuse me, take a look and see if

Defendant Exhibit 55 is what you're driving at.

BROWN:  Yeah, that would be my cell history, which is

also relevant.

THE COURT:  Yes, and I gathered you were looking for

Mr. Allen's cell history.

BROWN:  Yeah.  It's right there, too.

Direct - Brown

1           *THE COURT:* Okay.

2           *BROWN:* So it would be --

3           *THE COURT:* Any objection to your own Defendant

4    Exhibit 55?

5           *MS. BEDELL:* No, Your Honor.

6           *THE COURT:* Very well.

7           *BROWN:* So the cell history is concerning because --

8    first I will point to my cell history.  It points out that

9    around this time, right before the sexual assault when I was

10   housed on AA, cell 108 in general population from 12/27 to

11   1/22, that I was the only inmate in that cell.  And I find it

12   relevant because it's contradicting my grievance, one, and,

13   two, it was double bunks within that cell.

14          And then we go to Mr. Allen's cell history, and it

15   shows that in 2017 -- from June 28th, 2017, through July 22nd,

16   2018 -- I mean through January 20th, 2018, Mr. Allen was housed

17   on AA, and he appeared to have a celly.  So I received this

18   misconduct for refusing to obey an order.

19          *THE COURT:* Which misconduct is this, and when is

20   this?

21          *BROWN:* This would be Package 10, Exhibit 38,

22   Misconduct D081229.

23          *THE COURT:* When is the misconduct?

24          *BROWN:* On January 22nd, 2018.

25          *MS. BEDELL:* Your Honor, I had missed the exhibit

Direct - Brown

1    number.  Could Brown repeat it?

2         BROWN:  Exhibit 10 -- I mean Package 10, Exhibit 38.

3    It ends in 29.

4         THE COURT:  Which appears to be a January 22, 2018

5    writeup for refusing to obey an order and threatening an

6    employee.

7         BROWN:  Yes.  So this is relevant because this got me

8    to the RHU.

9         MS. BEDELL:  No objection, Your Honor.

10        THE COURT:  Very well.  Then Exhibit 38 will be

11   admitted without objection.

12        BROWN:  And for basically threatening the staff.  I

13   mean, first refusing to obey an order to return to my cell.  I

14   was asking for my legal mail.  I was a little disgruntled.  I

15   had concerns with them passing my mail to my cellmate at the

16   time.  And I didn't refuse to go to my cell.  I was written up.

17   But also relevant is the alleged threat that I allegedly stated

18   that I got something coming for you.

19        I was sent to the RHU, and as relevant, I believe LT

20   Younker was present and one of the escorting officers to the

21   RHU at the time.  I was put in a camera cell.  Again, I was

22   scared, and Exhibit 39 will be a misconduct, I believe, in the

23   same package.

24        MS. BEDELL:  We have no objection, Your Honor.

25        THE COURT:  Very well.  That's the misconduct dated

Direct - Brown

1    January 25th, 2018.  The charge was refusing to obey an order.
2    That's admitted without objection.

3         So, Brown, it sounds like we're now into late January,
4    turning to February of 2018.  You are in the RHU.  With respect
5    to failures to protect you in the RHU during that first week of
6    February and the alleged involvement of any of these defendants
7    in that failure to protect, what testimony do you wish to
8    offer?

9         *BROWN:*  So I encounter CO Plocinik at the cell door
10   and --

11        *THE COURT:*  When is this?

12        *BROWN:*  In January, late January of 20 --

13        *THE COURT:*  Okay.

14        *BROWN:*  -- 18.

15        *THE COURT:*  So you encounter Plocinik.  Go ahead.

16        *BROWN:*  And I exhibited odd behavior where I was
17   playing with feces.  It was alleged that I was eating feces
18   from a cup.

19        Plocinik was the transferring officer on February 2nd
20   from GA through GD to cell 214, after I had refused a celly
21   previously.  And I point to my cell history to whom it would
22   show the transfer from -- to cell 214 on February 2nd of 2018.

23        And I was transferred to a cell 214 by Officer
24   Plocinik.  I believe Officer Plocinik was working that day, and
25   he was doing escorts, too.  I noticed the cell was filled with



Direct - Brown

1   mace, and I have chronic asthma.  So immediately it was an
2   issue.

3          And you could see blood stains on the wall.  It
4   appeared there was some type of altercation in the cell before
5   I was moved into the cell.  I don't know if it was deliberate.
6   I'm asking to be removed from the cell, what's going on, like,
7   it's thrown mace all over in the cell.  I was ignored.

8          Plocinik came back and stated that you will be moving
9   with Inmate Allen, and right away I objected, I don't know if
10  you're aware, but Allen and those guys were extorting me in
11  population.  Like, I'm scared of that guy.  I believe I tried
12  to put a separation on that guy.  I don't feel comfortable
13  moving in with Allen, can you please move me somewhere else?
14  That is where you will be moving.

15         He leaves.  He comes back, Maxwell would like to see
16  you.  I cuff up.  I came out the cell.  And this is highly
17  relevant because when I came out the cell, I could contest an
18  inmate saying, damn, that shorty, that young bull, that guy's
19  ass tooken at Camp Hill.  There he is right there, he's going
20  to see Maxwell.

21         So it's two distinguished concerns, one that it was
22  promulgated that Maxwell was some type of PREA investigation,
23  so it was frowned upon by other inmates by going to see a PREA
24  investigator, and, two, that it was promulgated that I was
25  sexually assaulted at SCI Camp Hill.

Direct - Brown

1    like you're trying to attract men, so why are you crying rape?

2            So she's alluding to the fact that I'm wearing eye

3    liner and I dress a certain way and I carry myself a certain

4    way.  And it was basically confirmed that if I didn't move,

5    force would be used.  And the meeting was ended, and I was

6    returned back to cell 214.  And this is relevant because

7    this --

8            *THE COURT:*  You don't have to explain to me why it's

9    relevant.

10           *BROWN:*  I'm sorry.

11           *THE COURT:*  Please just continue with your factual

12   narrative of matters relating to these defendants.

13           *BROWN:*  So on the 3rd, I was encountered by

14   Mr. Plocinik, and he's saying, you ready to move, it's time to

15   move.  And this was the 2:00 to 10:00 shift, and I believe it

16   was around 2:00 something, don't quote me.  I said, no, I'm not

17   ready, I don't want to go.  You're moving, or I'm spraying your

18   ass.  You're going to be moved, or I'm going to spray you.

19           And I'm like, well, I'm not ready to move.  I do want

20   to move out this cell because I've been complaining about the

21   mace and the spray situation.  He's like, cuff up now, you're

22   moving.  Don't quote me, but I believe another officer was with

23   Mr. Plocinik, and I believe it was Clark.

24           I was cuffed, I was tooken to GA, back to the same

25   unit that I had just been moved to, so I was only on GD for

Direct - Brown

1    I go with Plocinik to see Maxwell, and in the meeting,
2    I believe it was Unit Manager Kendrick, Mr. Maxwell,
3    Ms. Sipple, I believe Mr. Eberling was present, and a couple
4    other officials.

5    And immediately the situation was brought up, you're
6    aware that you're getting a celly, you have raised some
7    concerns, why are you concerned to -- with taking a celly?
8    Well, I'm not concerned with taking a celly, but it was
9    specifically stated that it would be Inmate Allen, and Allen
10   and those guys were extorting me in population.

11   And not only that, I requested separation from Inmate
12   Allen, and I have met with you pertaining to the PREA
13   initiation that I made while in population.  After CO Kovach
14   called me a faggot, I used the telephone and I dialed the PREA
15   hotline and I met with you pertaining to that issue.

16   And in there, I stated that both I was housed with
17   Inmate Jackson and my concerns with my feminine characteristics
18   and him pressing on me due to me sitting when I pee, due to me
19   wearing eye liner, which inmates can order a colored pencil on
20   commissary and break it down and shade their eyebrows, and you
21   did nothing.

22   So he said, look, you have no control over your moves,
23   we don't care what your deal with Allen is, you're going to be
24   moved when we ask you to move.  You can't have your cake and
25   eat it, too, and I believe it's looking like -- it looks to us

Direct - Brown

1    maybe a night.  And I'm in the hallway, I'm in the common area

2    outside of one of A cell.  And if I may enter Exhibit 51, which

3    is my Exhibit 51, the diagram of unit GA.

4            THE COURT:  Yes, I already have that in evidence as

5    Exhibit 56.

6            BROWN:  So I'm looking, and there's a dispute as to me

7    getting into the cell.  And I'm saying, I don't want to go in

8    that cell.  And I'm looking directly at cell 109, and I'm

9    like -- like, you could see it in my eyes, like, damn, like,

10   this dude is really scary, I don't want to go in that cell.

11           And right when Inmate Allen seen us, he's like, that

12   faggot, don't put that faggot in here, I'm not taking any

13   faggot, he's a rat, I know him from population, I'm not taking

14   him, don't put him in here.  And I'm pleading, like, please,

15   like, please don't put me in here, I don't want to go in that

16   cell.  Like, I know Allen, and I know what he's about.  And I'm

17   looking directly at cell 109.

18           And I remember him saying something along the lines,

19   like, well, you don't have to go in there, or they can't force

20   you in the cell, you don't have to go in there.  Like, Allen's

21   a known predator.  Like, it's known that ---

22           THE COURT:  Excuse me, who is saying this?  Who is

23   saying this?

24           BROWN:  Oh, Shea Delgrosso.  He was in the cell next

25   to me, which would be 109.  Shea Delgrosso, D-e-l --

Direct - Brown

1      *THE COURT:* This is some other inmate who is engaging

2    in this commentary?

3      *BROWN:* Yes.

4      *THE COURT:* Okay. It's helpful if you identify who it

5    is that you're talking about and particularly helpful if you

6    can identify what actions, if any, any of these defendants

7    took. So you're at the threshold of cell 1008. Go ahead.

8      *BROWN:* Yeah, so I'm standing outside the cell, and

9    I'm outright refusing to go in the cell. Like, I'm not going

10   in the cell. And I'm cuffed, and I believe there was some

11   property with me. I don't know where my glasses were. I was

12   either wearing them or they were in my property. You're going

13   in the cell.

14     *THE COURT:* Excuse me, again, now you're saying

15   someone is saying something, but you're not telling me who.

16   Who is saying, you're going in the cell?

17     *BROWN:* Mr. Plocinik is saying this --

18     *THE COURT:* Thank you, thank you. I need -- you have

19   sued these people, and you have had a lawsuit pending against

20   them for four years. You need to identify here today now what

21   they did, and you need to identify it by name. Go ahead.

22   Please continue with your narrative.

23     *BROWN:* Mr. Plocinik is saying, ~~you're going~~ in that

24   cell. And the officer with him, I believe it was Clark, is

25   saying, you're going in the cell. And then that's when

1  officers started to come from the unit bubble and other places
2  from the unit.

3       And one officer I could identify would be a
4  non-defendant, which is Mr. Younker, Younker, and I believe he
5  was an LT.  And he came and he held me, you're going in the
6  freaking cell.  When we tell you to go in a cell, you're going
7  to go in a cell.  Allen, freaking cuff up, you're getting a
8  celly.  No, I'm not getting no F-ing celly.  You're coming in
9  the cell -- he's coming in the cell, cuff up now.

10      Allen cuffed up.  I was praying to God that he didn't
11 cuff up.  Allen cuffed up, and after he cuffed up, the door was
12 simultaneously opened, and I was forced into the cell.  After I
13 was forced into the cell, the cell was slammed, and Allen was
14 directed that he would be the first one to get uncuffed.  Allen
15 came, Mr. Plocinik uncuffed Allen, and Allen was uncuffed.

16      I came.  As I was getting uncuffed, I remember one of
17 my hands was uncuffed, and Mr. Plocinik like, fuck him up, you
18 know Brown is a kiddie toucher and a rat and he's also a
19 faggot.

20      So right away Allen started hitting me.  And when he
21 hit me, I believe he hit me in the mouth area.  And then I
22 started to cover up, so I had one hand, and now I could hear
23 laughing.  And he started hitting me in the mid area.  And now
24 I'm uncuffed, and I do this trying to push him away.  And it
25 was just a series of punches, but mostly I'm blocking, and it

Direct - Brown

1  was in the mid area.

2          So I was assaulted right there in front of
3  Mr. Plocinik at that time, at that moment, on that date, and he
4  laughed.  And after he laughed, they walked off not caring of
5  my well-being.  And I knew now I was in hell and I had to find
6  a way to get out the cell.

7          So the inmate first told me to sit in the corner.  He
8  immediately took my mattress.  So I'm begging, like, like,
9  please, I did nothing wrong.  Like, I didn't ask to come in
10  this cell with you.  Please, please understand why I'm crying.
11  They put me here.  I didn't ask to come in this cell with you.
12  I don't control that.

13          Well, when they come, you better make every effort to
14  move out the cell.  This is my cell.  I don't want you in here,
15  faggot.  He started calling me all type of derogatory names.
16  And I kept repeating to myself, please, like, I didn't ask to
17  come in this cell, but you're in it, just, please, I'll try my
18  best to get out this cell.  I understand you don't like me.
19  I'll try my best, but please.

20          He kept my mattress.  I'm asking for my mattress back.
21  He won't give it.  So I was in the far right corner for a brief
22  period of time.  I was told to sit in the corner.  And I
23  believe CO Plocinik served in the trays, and my tray was given
24  to Inmate Allen.  So, again, I asked for my tray, and the
25  inmate refused to give my tray.  This was the first day, which

Direct - Brown

1  was February 3rd.

2       *THE COURT:* You've described for me what you allege

3  happened between you and Correctional Officer Plocinik on the

4  3rd.  Between the 3rd and the 7th, is there any other matters

5  relating to that correctional officer that you wish to bring to

6  my attention?

7       *BROWN:* Yes.

8       *THE COURT:* Okay.  As to Corrections Officer Plocinik,

9  what other involvement does he have in these matters?

10      *BROWN:* So before, can I request to admit --

11      *THE COURT:* No, I want to find out from you what other

12 involvement Correctional Officer Plocinik had in these matters.

13 So why don't you just answer my question.  What other

14 involvement did Correctional Officer Plocinik have?

15      *BROWN:* I believe I encountered Mr. Plocinik on the

16 4th pertaining to dinner and pertaining to a request slip that

17 I sent out to law library.

18      On the request slip I stated, help, please, I'm trying

19 to get out this cell.  I believe he took the request slip, and

20 I believe he delivered dinner trays on the 4th.  And I believe

21 on the 5th another encounter was had with Officer Plocinik,

22 which was now a Monday, and I was ignored.

23      *THE COURT:* What was the encounter?  What did you tell

24 Plocinik?

25      *BROWN:* Well, he's assaulting me, he doesn't want me

Direct - Brown

1    in his cell.  Every time I ask him to do something, he's
2    denying me access.  I have to ask him to drink.  Can you please
3    remove me?  That was, I believe, an encounter with the officer
4    on the 5th.

5         THE COURT:  Very well.  Anything else as to Plocinik?
6         BROWN:  So on the 6th, which was now a Tuesday, I
7    believe I encountered Plocinik during dinner trays, and I
8    believe my dinner tray was given to Inmate Allen.  And Plocinik
9    was aware that I was attacked by Allen in the middle of the
10   night, that Allen had attempted to sexually assault me --

11        THE COURT:  Wait, wait, wait.  You say he was aware.
12   How is he aware of that?  You said you spoke to Plocinik on the
13   5th.  Now you're speaking to him on the 6th, and you're saying
14   that sometime in the middle of the night you had been
15   assaulted.  How would Plocinik know that?

16        BROWN:  From the very fact that I stated to him and
17   other prison officials around him that Allen had attacked me on
18   the night of the 5th.

19        THE COURT:  When did you tell Plocinik that, if at
20   all?

21        BROWN:  It was a brief encounter on the 6th at the
22   cell door.

23        THE COURT:  Okay.  So I had understood you a moment
24   ago to be telling me that Officer Plocinik, on the 6th, had
25   ignored your prior complaints.  You're now telling me that you

Direct - Brown

1   raised this issue with Plocinik on the 6th.  Is that correct?

2       · BROWN:  Yes.

3       THE COURT:  As to Officer Plocinik, what else are you

4   alleging that pertains to these allegations?

5       BROWN:  On the 7th, Mr. Plocinik was aware that -- he

6   came to my cell and that I had requested to be moved.  And when

7   I was attacked, Johnston was at my cell.  And after I was

8   attacked and I was on the floor, I seen CO Plocinik walk up to

9   the cell and then quickly turn around from the cell and walked

10  off away from the cell during me being attacked on the 7th.

11      THE COURT:  And I've heard some testimony from Officer

12  Johnston about the 7th.  Are you saying that on the 7th, all

13  that you see Plocinik do is come up to the cell and turn away?

14  Is that what he did on the 7th?

15      BROWN:  Yeah, this was at the initiation of the

16  attack.

17      THE COURT:  Yes.  Anything else as to Mr. Plocinik?

18      BROWN:  Yes.  After the assault and officers started

19  coming to the door periodically, I believe Plocinik did come to

20  the door briefly and acknowledge me in the cell with Allen and

21  acknowledged that I had asked to be moved and acknowledged --

22      THE COURT:  You say acknowledged that you asked to be

23  moved.  What did he say?

24      BROWN:  Well, I heard stuff was going on in the cell.

25      THE COURT:  No, what did Officer Plocinik say?

Direct - Brown

1      *BROWN:*  Yes, I heard stuff was going on in the cell

2   and that you're requesting an exchange of jumpers.  I'm like,

3   yes, I'm requesting an exchange of jumpers.  I've talked to

4   Johnston, I've talked to Fochtman.  And Chilcote had came to

5   the door, and I believe I talked to Chilcote, and they all are

6   aware of the issues, I'm bleeding, can I please get some help,

7   and he walked away.

8      *THE COURT:*  As to Correctional Officer Plocinik, is

9   there anything else that you allege that he did that

10   constituted a violation of your Eighth Amendment rights during

11   this time period?

12      *BROWN:*  At that time, no.

13      *THE COURT:*  Okay.  Then we have a few minutes before

14   4:30.  Let me ask you about -- and you'll forgive me, is it

15   Officer Fochtman?  Am I pronouncing that name correctly?

16      *OFFICER FOCHTMAN:*  No, Fochtman, Your Honor.

17      *THE COURT:*  Fochtman?

18      *OFFICER FOCHTMAN:*  Yeah.  It doesn't make any sense

19   phonetically.

20      *THE COURT:*  It does not make much sense phonetically,

21   but if it's Fochtman, it is, so be it.

22      As to Officer Fochtman, what is it that you allege he

23   did that was a -- that involved a failure to protect you?

24      *BROWN:*  So starting directly on the 7th, he was an

25   investigation officer --

Direct - Brown

1    *THE COURT:* Did he have any involvement before the
2    7th?

3    *BROWN:* Yes.

4    *THE COURT:* Well, then let's start -- we're talking
5    about events between the 3rd and the 7th. Starting at the 3rd,
6    tell me what Officer Fochtman did that you believe involved a
7    violation of your rights.

8    *BROWN:* So I believe he served my dinner tray with CO
9    Plocinik on the 4th and the 5th and that he was aware that
10   Plocinik gave my dinner tray to Inmate Allen.

11   *THE COURT:* Okay.

12   *BROWN:* And he was aware that Allen made threats to
13   keep assaulting me if they did not remove me from his cell.

14   *THE COURT:* And he was aware of that because he was
15   present when Plocinik had these encounters with you?

16   *BROWN:* Yes.

17   *THE COURT:* Did you have any conversation with him at
18   all?

19   *BROWN:* Yeah. So I believe the 5th I had a brief
20   conversation with him, please move me, I've told Johnston I
21   fear for my safety.

22   *THE COURT:* Wait a minute. Johnston, as I understood,
23   only encountered you on the 7th.

24   *BROWN:* No, Johnston encountered me on the 5th, too.
25   I believe it's in my declaration.

1    *THE COURT:*  Okay.  You didn't question Johnston about
2    some encounter on the 5th, did you?

3        *BROWN:*  I don't --

4        *THE COURT:*  I was here this morning.  You didn't.
5    This may be an appropriate time -- we're not going to get to
6    your cross-examination, Ms. Bedell.  This may be an appropriate
7    time, recognizing the travel that will be -- that is involved
8    for Mr. Brown and for -- for Brown, excuse me, sir -- excuse me
9    ma'am, and the ICE officials, this may be an appropriate time
10    for us to take a break.

11        What I'm going to do is, I will issue a writ for your
12    appearance to continue this trial at 1:00 p.m. on January 18,
13    which was the next date we had set aside.  I have some
14    commitments in the morning that won't permit us to start in the
15    morning, but we'll start at 1:00, and we'll go until about
16    4:30.

17        And at that time, Brown, I want to have you focus your
18    account on the remaining correctional officers and what they
19    did that you allege violated your Eighth Amendment rights, and
20    then we'll have cross-examination of you by defense counsel,
21    and then you may proceed with your other witnesses in this
22    case.

23        Is there anything further I can be doing here today on
24    behalf of Brown?  Ma'am, is there anything I can do on your
25    behalf at this point?  I'm asking you.

1      *BROWN:* Yeah, there was some confusion as to what

2 facts was -- I mean what exhibits was stipulated to, and I

3 believe defendant agreed to stipulate to their exhibits. And

4 Ms. Bedell handed me a page of the specific exhibits that was

5 agreed to stipulate to. Was that copy given to the courts or

6 did the court know of this?

7      *MS. BEDELL:* Your Honor, on the break, I had given

8 some exhibit numbers to Brown, and if you'd like, I'm happy to

9 put them on the record now.

10      *THE COURT:* Certainly.

11      *MS. BEDELL:* The -- it may be easier to give a shorter

12 list of the exhibits that we do maintain objections to.

13      *THE COURT:* Well, how about if we do this, how about

14 if when we gather on the 18th, you all can provide Mr. Neary,

15 who is the hardest working man in this courtroom and has been

16 endeavoring to keep track of these exhibits, with a list of the

17 exhibits that the parties agreed may be admitted.

18      *MS. BEDELL:* Certainly, Your Honor.

19      *THE COURT:* Okay. Thank you. I appreciate that. Was

20 there anything else, Brown, that we can do on your behalf at

21 this time?

22      *BROWN:* Yeah. And can I also create a list of offer

23 of proofs pertaining to the exhibits that were rejected?

24      *THE COURT:* You certainly may. You could bring that

25 with you on the 18th by way of any further objections you wish

1    to note to those exhibits I have not admitted.  Okay?

2             *BROWN:*  Yes.

3             *THE COURT:*  Is there anything then further, Brown,

4    that I can do on your behalf?

5             *BROWN:*  No, Your Honor.

6             *THE COURT:*  Very well.  We will see you on the 18th at

7    1:00 p.m.  On behalf of the defendants, is there anything

8    further I can be doing here today?

9             *MS. BEDELL:*  No.  Thank you, Your Honor.

10            *THE COURT:*  Very well.  Ms. Trice, you are neither a

11   defendant, nor any more needed as a witness.  We appreciate

12   your patience here today, and we will stand in recess and

13   reconvene on the 18th at 1:00 p.m.

14            *COURTROOM DEPUTY:*  Court is in recess.

15       *(Whereupon, the proceedings were adjourned at 4:29 p.m.)*

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Lori A. Buggy, Federal Certified Realtime Reporter, in and for the United States District Court for the Middle District of Pennsylvania, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript to the best of my ability of the stenographically reported proceedings held in the above-captioned matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated in Harrisburg, Pennsylvania, this 25th day of September, 2023.

**/s/ Lori A. Buggy**
Lori A. Buggy
Federal Certified Realtime Reporter

1     IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2

3 GARTOR KIKI BROWN,     :
               : Civil Action No. 3:18-CV-1527
       Plaintiff  :

4     vs.       :
               : (Magistrate Judge Carlson)

5 LT. MAXWELL, et al.,    :
               :

6       Defendants :

7

     TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
8          DAY 2
       PAGES 181 THROUGH 309

9

    BEFORE THE HONORABLE MARTIN C. CARLSON
10    UNITED STATES MAGISTRATE JUDGE
     JANUARY 18, 2023; 1:02 P.M.
11     HARRISBURG, PENNSYLVANIA

12

13 FOR THE PLAINTIFF:

14   Gartor Kiki Brown, Pro Se
   Moshannon Valley Processing Center
   555 GEO Drive
15   Philipsburg, PA 16866

16 FOR THE DEFENDANTS:

17   Lindsey A. Bedell, Assistant Counsel
   Kimberly A. Adams, Assistant Counsel
18   Office of General Counsel
   Pennsylvania Department of Corrections
19   1920 Technology Parkway
   Mechanicsburg, PA  17050

20

21

       Lori A. Buggy
22   Federal Certified Realtime Reporter
   Sylvia H. Rambo United States Courthouse
23     1501 North Sixth Street
     Harrisburg, PA  17102
24     717-215-1270
    lori_buggy@pamd.uscourts.gov
25 Proceedings recorded by mechanical stenography; transcript
   produced by computer-aided transcription.

1                         I N D E X

2

3                    PLAINTIFF WITNESSES

4   GARTOR KIKI BROWN                              PAGE

5   Continued Direct Testimony by Brown           185
    Cross-Examination by Ms. Bedell               196
6
    DUANE PLOCINIK                                 PAGE
7
    Direct Examination by Brown                    214
8   Cross-Examination by Ms. Adams                 237
    Redirect Examination by Brown                  268
9
    MICHAEL MAXWELL                                PAGE
10
    Direct Examination by Brown                    285
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    *THE COURT:* Please be seated. This is the
2    continuation of the nonjury trial in Brown v. Maxwell. Again,
3    I appreciate the assistance of Immigration and Customs
4    Enforcement officials in enabling the plaintiff, Brown, to join
5    us here today. How are you doing today, Brown?

6    *BROWN:* Good. Could be better.

7    *THE COURT:* You know what, I start every day kind of
8    that way, good, but I could be better. Well, hopefully by the
9    end of the day, we'll all be a bit better.

10   I do, as we get ready to proceed with the testimony, I
11   do have a document in front of me, a handwritten document that
12   purports to explain what exhibits have been stipulated to. It
13   is not completely transparent to me. Perhaps someone could
14   provide me a code for how I am to interpret this document.

15   *MS. BEDELL:* Your Honor, the exhibits of Brown's that
16   we are not willing to stipulate to at this point are written
17   under, No stipulations, so Exhibits 5 and 6, Exhibit 28,
18   Exhibit 44, 56 to 70, 88 to 92, 134 to '37, 157 to '58, and 161
19   to 162. There was some minor discrepancy with the other
20   exhibits. I'll note there were two exhibits numbered 44.

21   So barring that and any other unforeseen things that
22   were missed during my review, those listed exhibits should be
23   the only ones that we are unable to stipulate to as authentic.

24   *THE COURT:* Very well. So the two sticky notes that
25   have a list -- I see, the sticky note that says "okay"

1    represents those that you have stipulated to.

2           *MS. BEDELL:*  Correct, Your Honor.

3           *THE COURT:*  The sticky note that says "not okay" is a

4    duplicate of the list of no stips?

5           *MS. BEDELL:*  Correct.

6           *THE COURT:*  Well, then I have underestimated my

7    ability to figure out what this document means.  I do, in fact,

8    understand this document.

9           Brown, when we last were together and when we broke,

10   you were -- my recollection is you were just finishing your

11   direct examination and were going to be subject to

12   cross-examination by counsel for the defendant.

13          As you are wrapping up your direct examination, are

14   there any final matters relating to the individual defendants

15   and the conduct at issue during the first week of February that

16   you wish to share with me?

17          *BROWN:*  Yeah, sure.

18          *THE COURT:*  Well, then, Mr. Neary, please administer

19   the oath and then you may finish your direct and we'll proceed

20   with the cross-examination.

21          *COURTROOM DEPUTY:*  If you would please raise your

22   right hand.

23       *GARTOR KIKI BROWN, called as a witness, having been duly*

24    *sworn or affirmed, testified as follows:*

25          *COURTROOM DEPUTY:*  Thank you.  And let me just pull

1    that microphone a little closer to you so we can all hear.

2            *THE COURT:* And so, Brown, what are the -- what is the

3    concluding direct testimony relating specifically to the

4    allegations in the complaint and these defendants that you wish

5    to share with me before cross-examination commences?  Go ahead.

6                    DIRECT TESTIMONY *(cont'd.)*

7            *BROWN:* First and foremost, I want to establish that I

8    encountered every defendant sometime around from the 2nd

9    through the 7th of February.  And obviously the encounter with

10   Mr. Maxwell around the 2nd was prior to moving into 108 cell.

11   And the encounter with Mr. Plocinik, obviously he was the one

12   that moved me into 108 cell.  And I was forced into the cell,

13   did not want to go.  I encountered Mr. Johnston while in the

14   cell, and I specifically told him --

15           *THE COURT:* When was this?

16           *BROWN:* The 5th and I believe a brief encounter on the

17   6th.  And I definitely encountered him on the 7th --

18           *THE COURT:* Okay.

19           *BROWN:* -- multiple times.  And I encountered

20   Mr. Fochtman --

21           *THE COURT:* And is that Fochtman?  Is that the

22   pronunciation, sir?

23           *OFFICER FOCHTMAN:* Your Honor, it's pronounced

24   F-o-o-f, Foof.

25           *THE COURT:* Fochtman.



Direct - Brown

1    *OFFICER FOCHTMAN:* Yes, Your Honor.

2    *THE COURT:* Very well. Thank you, sir. I'm sorry, go

3    ahead.

4    *BROWN:* I encountered Mr. Fochtman I believe around

5    the 4th, around dinner trays. And I encountered --

6    *THE COURT:* Okay. You encountered him on the 4th.

7    Very briefly, the nature of that encounter?

8    *BROWN:* Yeah.

9    *THE COURT:* I'm asking you, what was the nature of

10   that encounter?

11   *BROWN:* Predicated --

12   *THE COURT:* No, just tell me what was the nature of

13   the encounter. What happened?

14   *BROWN:* It was during dinner trays and I wanted to

15   move because Allen was assaulting me and I was scared.

16   *THE COURT:* Go ahead. I'm sorry, I had interrupted

17   you. Any other specific matters that you wanted to make sure

18   that I was aware of in terms of your direct testimony? Go

19   ahead.

20   *BROWN:* And then on the 6th, I briefly encountered

21   them again making them aware. And on the 7th, after the

22   assault, I definitely encountered them, and I will remember

23   this for the rest of my life: We don't make courtesy move,

24   this is Huntingdon, not the Hilton.

25   And this was when he came back and he stated, which

P87

1  one of you guys am I going to write up?  Because Johnston, I
2  believe, was the first one I encountered after the sexual
3  assault, and he made a comment like it looked like somebody got
4  slayed in here.

5  And then I also encountered Plocinik, and Mr. Plocinik
6  and Fochtman, at one point it was conceiving, they was joking
7  as to me conceiving, like, it's a boy, no, it's a girl.  And I
8  specifically asked for medical attention.  I specifically asked
9  for my clothing to be exchanged.  This was on the 7th.

10  And I remember Johnston coming back and saying the
11  sergeant want me to exchange everything that has blood on it.
12  It is to my vivid memory that it was Mr. Johnston that
13  exchanged all my clothing, not Mr. Fochtman.  It was
14  Mr. Johnston.  And then they left me in the cell and refused to
15  address the dire issue.

16  And later on in the night, Allen dragged me by the
17  toilet, and I was sexually assaulted again.  And my head was
18  briefly in the toilet.  So my hand was behind my back, and my
19  head was briefly in the toilet, too.

20  And another important fact, I remember around the 4th
21  Mr. Allen, he has a lot of friends on the unit, so he kept
22  communicating with them like, I'm trying to get this faggot out
23  my cell.  They're like, yeah, they're gonna move him, just keep
24  hitting him, just keep hitting him, make sure you wrap your
25  hands, hit him in body jewels.  It's a slang.  So they're

Direct - Brown

1    directing him to, like, hit me in the body and keep hitting me,

2    that they was gonna move me, et cetera.

3           Another thing about the 7th, Johnston did exchange my

4    underwear and t-shirts, and there was blood.  And another thing

5    about the 5th, I was attacked in the middle of the night, and I

6    did hit my head on the bed fixture.  And he pulled me down, and

7    he kept slamming me.  Like, every time I tried to get up, he

8    would slam me back down, and he tried ripping through my

9    jumper.  I kept telling him to stop, but he wouldn't stop.

10          So at one point I just stayed on the ground and

11   covered up.  I just stayed on the ground, just covered myself,

12   protect myself, and he stopped.  And on the 6th, immediately

13   that morning I started telling them, like, everything, like,

14   immediately, like, in the morning.

15          And I remember during -- starting on the 5th, they was

16   running rec, and they forced me to cuff up and stay on the back

17   of the wall and face the wall as Allen went out for rec.  So

18   they did not let me go to rec or ask if I even wanted to go to

19   rec.  And Allen is known for going to rec.  So they would tell

20   me to stand in the back of the cell cuffed.  If I moved, they

21   would spray me.

            And then they was trying to get us for shower on the

23   5th, this is the first shift, and --

24          THE COURT:  These events you're talking about, which

25   of the four defendants you've named are involved in these

```
                        Direct - Brown

 1   events?  You need to identify --
 2            BROWN:  Yeah.
 3            THE COURT:  -- the people you've sued and what their
 4   involvement is.  So --
 5            BROWN:  Yeah.  So like I explained, on the 3rd,
 6   Plocinik --
 7            THE COURT:  No, no, no.  We're not going back over the
 8   3rd.  We've already gone over the 3rd several times.  You were
 9   talking about some events that happened on the 5th.  You
10   weren't identifying who at all was involved in those events.
11   I'm asking you as to the things you were describing on the 5th,
12   who was involved?  Any of these defendants?
13            BROWN:  Yes.
14            THE COURT:  Well, you need to identify them.
15            BROWN:  Yes.
16            THE COURT:  This is what we've been going over.
17            BROWN:  I did encounter Mr. Johnston briefly on the
18   5th.  I asked him to remove -- I was scared, I was being
19   assaulted by Inmate Allen.
20            THE COURT:  Right, and you've already covered that
21   with me.  You were talking about some matters relating to rec
22   or something.  Is there anything else that you want to share
23   with me beyond what you've shared?
24            And you've testified at great length regarding these
25   incidents.  Is there anything further you want to share with me
```



1    regarding the events that are the subject of your complaint
2    that relate to the defendants in the courtroom?
3         *BROWN:* Yes. Lastly, I remember Allen, like, asking
4    me questions about the Camp Hill sexual assault, and I remember
5    when I encountered Mr. Maxwell on the 5th, I specifically told
6    him that I was being forced in the corner. And Allen kept
7    asking me about the previous sexual assault and telling me how
8    do you let another man rape you, you wanted to be raped. And
9    I'm asking to enter some exhibits.

10        *THE COURT:* Well, and I'll be pleased to hear you on
11   exhibits, but I want to make sure, does that conclude your
12   direct testimony?

13        *BROWN:* Well, as far as specific involvement of the
14   defendants, yes.

15        *THE COURT:* Okay. And so there are some exhibits that
16   you want us to consider, and what exhibits are they?

17        *BROWN:* Yes. Now, I was a little muddled as to the
18   okay exhibits because I see exhibit -- actually, I do not see
19   exhibit -- I do see Exhibit 44. Now, this second 44 to
20   which -- which one of those exhibits are you guys identifying
21   as okay?

22        *MS. BEDELL:* Your Honor, there were two, and I'll take
23   a look at them now, but the second of the two was okay.

24        *THE COURT:* Let me suggest this, we'll be taking a
25   break around 3 o'clock, and you can sort out and identify for

1   us which of those exhibits is stipulated to.  Did you have

2   other exhibits that you wanted to have me consider?

3           *BROWN:*  Yeah.  So the first exhibit would be Exhibit

4   44.

5           *THE COURT:*  Yes, and that's the one that I just said a

6   moment ago you all need to -- because there are two of them, at

7   the 3 o'clock break, you can identify for me which it is.

8   Okay?  Anything else?

9           *BROWN:*  Yes.  So the second exhibit would be under

10  public records, and it would be pertaining to Coleman 6 -- I

11  mean case law as to describing --

12          *THE COURT:*  Excuse me, what exhibit is it?

13          *BROWN:*  It's Page 10.  It describes --

14          *THE COURT:*  Page 10 of what?

15          *BROWN:*  It's the Coleman v. Wetzel case law.

16          *THE COURT:*  Oh, you're just giving me a cite to a

17  case.  Well, I'll collect legal authority from you at the close

18  of the testimony.  It would be my anticipation that to the

19  extent anyone wants to provide me with legal authority, once

20  we've completed the testimony, they can provide it to me.  Was

21  there anything else?

22          *BROWN:*  Yes, an actual exhibit in this Page 10

23  pertaining to sexual aggressive --

24          *THE COURT:*  And I'll be pleased to take judicial

25  notice of the law, and I can get a cite, we can get a citation

1   from you in the future.

2           BROWN:  Okay.

3           THE COURT:  Is there anything else?

4           BROWN:  Yes.  Exhibit 56, I believe that's the prison

5   roster and the shift commander roster.

6           THE COURT:  That exhibit appears not to have been

7   stipulated to.

8           BROWN:  And this exhibit is, I believe, 401 and 402 as

9   relevance.  It shows all the defendants working on the unit

10  from the 3rd through the 7th.

11          THE COURT:  The thing that I have in front of me as

12  Exhibit 56 does not show any such thing.

13          BROWN:  Then --

14          THE COURT:  No, excuse me, it doesn't show that.  The

15  exhibit I have in front of me is a list of staff as of

16  December 7, 2018, so it doesn't show what you're saying.

17          BROWN:  Oh.  Well, it's Defendants' Exhibit 28.

18          THE COURT:  Okay.  So now you want me to look at

19  Defendants' Exhibit 28 and not your Exhibit 56?

20          BROWN:  Yes.

21          THE COURT:  Is there any objection to Defendants'

22  Exhibit 28, whatever that might be?

23          MS. BEDELL:  No objection.

24          THE COURT:  Okay.  Well, then it will be admitted as

25  Defendants' Exhibit 28.  Any other exhibits you want me to

1    consider?

2           *BROWN:*  Yeah, it's -- yeah, it starts from 25 through

3    41, and it's basically --

4           *THE COURT:*  What are you referring to now?

5           *BROWN:*  The shift commander roster pertaining to who

6    was working where.

7           *THE COURT:*  You're referring to Exhibit 28?

8           *BROWN:*  Yeah, so 28 would just be one shift,

9    essentially.

10          *THE COURT:*  Yes, but now you're referring to something

11   that's multiple pages, and Exhibit 28 is a single page.

12          *BROWN:*  Yes, I believe one or two pages, yes.

13          *THE COURT:*  Yeah, it's two pages, front and back.

14          *BROWN:*  Yeah, pertaining to one shift.

15          *THE COURT:*  Okay.

16          *BROWN:*  So it would be 24 through 41.

17          *THE COURT:*  What are you referring to now?

18          *BROWN:*  Well, I was just identifying --

19          *THE COURT:*  These are other shift reports that the

20   defendants --

21          *BROWN:*  Yeah, yeah, from, like, the 2:00 to

22   10:00 shift.

23          *THE COURT:*  Okay.  Is there any objection to

24   consideration of the Defense Exhibits 24 through 41?

25          *MS. BEDELL:*  No objection, Your Honor.

```
 1              THE COURT:  They will all be admitted.  Anything else,
 2     Mr. Brown, before Ms. Bedell and Ms. Adams have a chance to
 3     engage in cross?
 4              BROWN:  Yeah, exhibit -- Package 16, Exhibit 96.
 5              THE COURT:  That has been stipulated to, if I read
 6     your carefully constructed handwritten list correctly.
 7              MS. BEDELL:  Yes, Your Honor.
 8              THE COURT:  Very well.  So Exhibit 96, Plaintiff's
 9     Exhibit 96, will be admitted.
10              BROWN:  Ninety-seven.
11              THE COURT:  And that is also on the stipulated list.
12     Anything else?
13              BROWN:  And 98.
14              THE COURT:  Also on the stipulated list.  Anything
15     else?
16              BROWN:  Ninety-nine.
17              THE COURT:  Okay.  And let me guess, the next one
18     would be a hundred?
19              BROWN:  Actually, no.
20              THE COURT:  Okay.  Well, there you go.  Now you're
21     tripping me up.  That's okay.  Ninety-nine is also on the
22     stipulated list and will be admitted without objection.  What
23     else do you have?
24              BROWN:  Exhibit 126 through 129.
25              THE COURT:  Those also appear to be on the stipulated
```

1    list.

2         *BROWN:*   Exhibit 130 to '33.

3         *THE COURT:*   Those are also on the stipulated list.

4         *BROWN:*   Exhibit 166.

5         *THE COURT:*   That also appears to be stipulated to.

6         *BROWN:*   Exhibit 164.

7         *THE COURT:*   And that is also stipulated to.

8         *BROWN:*   And Exhibit 167.

9         *THE COURT:*   That also appears to be stipulated to, if

10   I'm reading the sticky note correctly.

11        *BROWN:*   And lastly, Exhibit 43.

12        *THE COURT:*   That also appears to be on the stipulated

13   list.

14        *BROWN:*   Exhibit 48.

15        *THE COURT:*   That's also on the stipulated list.

16        *BROWN:*   And as you stated, we should communicate

17   pertaining to 44.

18        *THE COURT:*   Yes, you guys will take that up at around

19   3 o'clock when I'd anticipate an afternoon break.  Okay?

20        *BROWN:*   Okay.  Yeah, I believe that's it for now.

21        *THE COURT:*   Very well.  Then you may anticipate,

22   perhaps, having a number of questions posed to you by defense

23   counsel.  You may proceed with cross-examination.

24        *MS. BEDELL:*   Thank you, Your Honor.

25                        CROSS-EXAMINATION

Exam. - Brown

1   BY MS. BEDELL:

2   Q.  Brown, you submitted your sick call slip on February 13th,

3   2018.  Correct?

4   A.  Yes.

5   Q.  And on February 13th, you were in a cell by yourself.  Is

6   that correct?

7   A.  Yes.

8   Q.  You were issued a misconduct that day for refusing a

9   cellmate, weren't you?

10  A.  Yes.

11  Q.  And then you wrote out your sick call slip later that day?

12  A.  No.

13  Q.  You did not write out a sick call slip on February 13th?

14  A.  I wrote the sick call the same day, but, however, it had

15  nothing to do with the fact that I was issued a misconduct.

16          *THE COURT:*  She's asking what the chronology was.  So

17  you got -- what happened first, did you get the misconduct and

18  then the sick call slip?

19          *BROWN:*  I believe I wrote the sick call slip first.

20  BY MS. BEDELL:

21  Q.  All right.  Mr. Brown -- Ms. Brown, excuse me, I will show

22  you what has been marked as Defendants' Exhibit 50.  This is

23  Page 8 of Defendants' Exhibit 50.

24          Do you see the incident date -- or the incident time,

25  24-hour base, at the top of this misconduct report?  Do you

Exam. - Brown

1  agree with me that the incident time, 24-hour base, is noted as
2  1625?
3  A.  Yes.
4  Q.  And on the 24-hour time base, that would be 4:25.  Is that
5  correct?
6  A.  Yes.
7  Q.  Now I will show you your sick call slip.  So I will show
8  you what has been marked as Defendants' Exhibit 7.
9  A.  What was the previous one?
10 Q.  Defendants' Exhibit 50, the eighth page.  And this one is
11 Defendants' Exhibit 7, Page 124, defendants', DEF124.  Is this
12 the sick call slip that you wrote that day?
13 A.  Yes.
14 Q.  Do you agree with me that the time noted on here is noted
15 as 6:30?
16 A.  Yes.
17 Q.  Do you agree with me that this sick call slip alleges you
18 had a lot of injuries and you were bleeding from the anus and
19 had a broken nose?
20 A.  Yes.
21 Q.  When medical staff came to see you right away that evening,
22 you refused to provide any details to them, didn't you?
23 A.  That's not correct.
24 Q.  And you told Nurse Trice that you were okay because you
25 were in a cell to yourself at that point, didn't you?

Exam. - Brown

1    A.    That's not correct.

2    Q.    You refused to let them take pictures that first night,

3    didn't you?

4    A.    That's not correct.

5    Q.    You didn't want photographic evidence showing you weren't

6    really injured, did you?

7    A.    That's not correct.

8    Q.    Let's talk about Officer Plocinik.  Plocinik was the one

9    who issued you a misconduct on the 13th for refusing a

10   cellmate.  Is that correct?

11   A.    I believe so, but I'm not sure what time it was issued.

12   Q.    But you would agree it was Officer Plocinik?

13   A.    I believe so.

14   Q.    You targeted Officer Plocinik and retaliated against him

15   for giving you that misconduct, didn't you?

16   A.    I did not.

17   Q.    You filed multiple grievances against him, didn't you?

18   A.    I did.

19   Q.    Two months later, in April of 2018, you wrote a grievance

20   saying Officer Plocinik made derogatory comments to you while

21   handing out dinner trays and he threatened you.  Is that

22   correct?

23   A.    I definitely did.

24   Q.    And then later, in September of 2018, you again wrote a

25   letter claiming Officer Plocinik made verbal threats and

Exam. - Brown

1    threatened to rape you.  Is that correct?

2    A.   Are you implying pertaining to the statement another inmate

3    wrote?  But that would be correct.

4    Q.   Your allegations against Officer Plocinik were investigated

5    and determined to be unfounded, weren't they?

6    A.   Which, which claim?

7    Q.   All of them, Brown.

8    A.   I'm not aware as to the statement that the other inmate

9    wrote pertaining to, I believe, early August.

10   Q.   I'm only referring to your allegations.  Your allegations

11   against Officer Plocinik were all investigated and determined

12   by Department of Corrections staff --

13   A.   There we go, yes, determined by Department of Corrections,

14   yes.

15   Q.   After your allegations were determined to be unfounded, you

16   continued to target Officer Plocinik, didn't you?

17   A.   I didn't.

18   Q.   But you sued him in this lawsuit.  Is that correct?

19   A.   Because he violated my constitutional rights.

20   Q.   And you sued him in another lawsuit.  Is that correct?

21   A.   Yes.

22   Q.   You continue to target him today, don't you?

23   A.   No, I have nothing against anybody.  I pray for everybody.

24   Q.   But he's here in this courtroom with us today, isn't he?

25   A.   I believe so, yes.

```
                        Exam. - Brown

 1   Q.  Brown, you made up being attacked by your cellmate, didn't
 2   you?
 3   A.  I did not.
 4   Q.  You thought it would help you get a cell to yourself,
 5   didn't you?
 6   A.  I did not.
 7   Q.  But you do admit that you wanted a cell to yourself?
 8   A.  Yes.
 9   Q.  Thank you.  Did you request a cell to yourself multiple
10   times?
11   A.  Yes.
12   Q.  You told staff that you wanted a single cell?
13   A.  Yes.
14   Q.  And that was because you didn't want a cellmate.  Is that
15   correct?
16   A.  No, that was because of fear and to prevent constant
17   assaults on me.
18   Q.  So you wanted a single cell, you wanted a cell to yourself?
19   A.  I just wanted to be safe.
20   Q.  So you wanted a single cell to yourself.  Is that correct?
21   A.  I just wanted to be safe.
22   Q.  Yes or no, Brown, did you want a single cell to yourself?
23   A.  I just wanted to be safe.  I wanted PC.
24          THE COURT:  Did you want a single cell?
25          BROWN:  Honestly --
```

Exam. - Brown

1          *THE COURT:*  I understand you told me why you wanted
2      it, but did you want --
3          *BROWN:*  It didn't matter to me as long as it was a
4      safe environment and I knew the person I was with was safe and
5      it's -- for example, when I was transferred to PC, I had a
6      celly.
7          *THE COURT:*  Okay.  I'm sorry, Ms. Bedell, I had
8      interrupted the flow of your cross.
9          *MS. BEDELL:*  Not a problem, Your Honor.
10     BY MS. BEDELL:
11     Q.  Brown, before being celled with Allen, staff tried to cell
12     you with other inmates in the past.  Is that correct?
13     A.  Yes.
14     Q.  And you were given direct orders to take cellmates.  Is
15     that correct?
16     A.  Yes.
17     Q.  And you refused direct orders to take cellmates?
18     A.  Yes, I refused multiple times because I was scared.
19     Q.  And you were written up for refusing cellmates prior to
20     being celled with Allen.  Is that correct?
21     A.  Yes.
22     Q.  You were written up multiple times for refusing cellmates.
23     Is that correct?
24     A.  Yes.
25     Q.  And getting written up resulted in you being sent to the

Exam. - Brown

1   restricted housing unit and serving disciplinary time.  Is that

2   correct?

3   A.   Yes.

4   Q.   You wanted to avoid more disciplinary time, didn't you?

5   A.   No.

6   Q.   You wanted more disciplinary time?

7   A.   Can you please rephrase that question?

8   Q.   You wanted to avoid being sent to the restricted housing

9   unit and serving more disciplinary custody time.  Is that

10  correct?

11  A.   Oh, specifically disciplinary time, yes, but I didn't want

12  to live in population, either, because of my fear.

13  Q.   So to clarify, you did want to avoid serving disciplinary

14  custody?

15  A.   Yes.

16  Q.   And you thought making up that your last cellmate attacked

17  you might get you a Z code, didn't you?

18  A.   No.

19  Q.   But if you had a Z code, you'd be given a cell to yourself.

20  Is that right?

21  A.   I believe so.

22  Q.   Let's talk about being celled with Allen.  You were in a

23  cell with Allen between February 3rd and February 8th.  Is that

24  right?

25  A.   Yes.

Exam. - Brown

1  Q.  And Allen isn't here to testify about what happened during
2  those days, is he?
3  A.  No, I don't see him.
4  Q.  You say you were abused by Allen between February 3rd and
5  February 7th.  Is that correct?
6  A.  Yes.
7  Q.  So three, four, five, six, seven, that was five days.  Is
8  that correct?
9  A.  Yes.
10 Q.  You say he raped you on the 7th.  Is that correct?
11 A.  Yes.
12 Q.  And then you were moved out of the cell the next day on the
13 8th.  Is that correct?
14 A.  Yes.
15 Q.  You were moved into a cell by yourself?
16 A.  Yes.
17 Q.  And you saw your counselor, Ms. Richards, the next day on
18 the 9th?
19 A.  I believe so.
20 Q.  And you complained to her about getting a misconduct
21 charge.  Is that correct?
22 A.  I believe I complained to her about multiple things.
23 Q.  So you don't dispute that you --
24 A.  I don't dispute that.
25 Q.  Do you dispute that you complained to her about needing to

Exam. - Brown

1    have a cellmate?

2    A.    That I wanted a cellmate or that I didn't want a cellmate?

3    Q.    Did you complain to her about staff telling you that you

4    needed to take a cellmate?

5    A.    My direct complaint was the abuse and sexual assault and my

6    treatment in the RHU.

7    Q.    Did you complain to her about needing to have a cellmate?

8    A.    I complained to her about abuse and my treatment in the

9    RHU.

10   Q.    So you did not mention that you did not want to take a

11   cellmate to her?

12   A.    I'm not sure if that came up.  If it did, then, yes, I

13   probably mentioned it.

14   Q.    You asked her about your family, didn't you?

15   A.    I believe I did.

16   Q.    You didn't really tell her that you were raped, did you?

17   A.    I told everyone.

18   Q.    That's because you weren't really raped, were you?

19   A.    I was sexually assaulted.

20   Q.    You knew there was a hotline available for you to report

21   abuse.  Is that correct?

22   A.    We don't have access to the phone at RHU.

23   Q.    But you had called that hotline before to express your

24   concerns.  Is that correct?

25   A.    Absolutely, in population.

Exam. - Brown

1  Q.  When you moved into the cell with Inmate Allen, you've said

2  Allen was telling staff to get you out of the cell.  Is that

3  correct?

4  A.  Yes, he told a lot of staffs.

5  Q.  You claim he told them multiple times to move you out of

6  the cell.  Is that correct?

7  A.  Yes, and he was loud about it and direct.

8  Q.  Every time a corrections officer came to the door, he would

9  tell them to get you out.  Is that correct?

10  A.  Either I would tell them or he would tell them --

11  Q.  And all the staff ignored him?

12  A.  -- but not exactly every time.

13  Q.  And staff --

14  A.  But -- yeah, go ahead.

15  Q.  Staff ignored him.  Is that correct?

16  A.  Yes, we was ignored.

17  Q.  And when you weren't moved out of the cell, Allen started

18  beating you.  Is that correct?

19  A.  He started hitting me from the door, from when I was forced

20  in the cell, immediately.

21  Q.  And he continued beating you over the course of those few

22  days.  Is that correct?

23  A.  Absolutely.

24  Q.  He beat you on your mid-section?

25  A.  Yes.

Exam. - Brown

1    Q.  You covered your face with your arms then?

2    A.  Yes, but he still hit me in the face multiple times, like

3    my mouth.

4    Q.  So then he beat you on your arms, too.  Is that correct?

5    A.  Yes.

6    Q.  And then Allen attacked you in the middle of the night.  Is

7    that correct?

8    A.  Yes.

9    Q.  And he repeatedly slammed you into the ground?

10   A.  Yes, he repeatedly slammed me.

11   Q.  You reported you hit your head on the bed.  Is that

12   correct?

13   A.  Yes, the left side of my head.

14   Q.  And you were bleeding from the left side of your head.  Is

15   that correct?

16   A.  Congeal blood.

17   Q.  You've reported you suffered injuries to your knee, your

18   back?

19   A.  My groin, my hip flexor.

20   Q.  Your shoulder and your ribs and your head.  Is that

21   correct?

22   A.  Yes.

23   Q.  You said you had bruising on your ribs.  Is that correct?

24   A.  I believe I stated I suffered injuries to my back, my

25   groin, my hip flexor, the left side of my head, my knee.

Exam. - Brown

1    Specifically, I don't know if I stated I had bruising on my

2    ribs, but I was hurting, yes.

3    Q.  Do you dispute that you have reported that you had bruising

4    on your ribs?

5    A.  No.

6    Q.  You reported you had bruising on your nose, your head, and

7    your knee, as well.  Correct?

8    A.  I reported nose pain, yes.

9    Q.  And you reported you had bruising on your anus.  Is that

10   correct?

11   A.  I reported anus bleeding and anus pain, yes.

12   Q.  You said you were bleeding not only from your anus, but

13   from your mouth, nose --

14   A.  From my nose.

15   Q.  -- knee, and your head?

16   A.  Yeah, I believe I had a -- some type of scratch on my knee,

17   yes, but I don't believe I stated I was bleeding from my knee.

18   If I did, I believe it was a scratch.

19   Q.  You said there was blood all over the cell.  Is that

20   correct?

21   A.  It was a lot of blood in the cell, yes.

22   Q.  All over?

23   A.  There was blood in the cell, yes.

24   Q.  All over the cell?

25   A.  No, I stated there was blood in the cell.  However, I did

```
                        Exam. - Brown
```

1  state that Mr. Johnston made a comment that it looked like

2  somebody got slayed in here.

3  Q.  Do you dispute that you said there was blood all over in

4  the cell?

5  A.  No.

6  Q.  You have scars from this incident.  Is that correct?

7  A.  Yes.

8  Q.  You have scars on both your knees and on the left side of

9  your head.  Is that correct?

10  A.  Yes, as far as the left side of my head.

11  Q.  So you don't have a scar on both your knees?

12  A.  Currently?  No.

13  Q.  You claim you reported these attacks to staff, didn't you?

14  A.  Yes.

15  Q.  You reported to Sergeant Heaster that you were abused?

16  A.  Heaster never came to my cell.  He stopped at 107 cell on

17  the 7th.  He did not directly come to my cell, but I did

18  communicate to him through the door.  But Heaster was never

19  directly in front of my cell when I was in 108 cell.

20  Q.  But you made a report to him that you were being abused?

21  A.  I stated it through the door, yes.

22  Q.  You reported issues to Officer Chilcote.  Is that correct?

23  A.  Yes.  And that's a key, that's another important fact.  He

24  was the only officer that attempted to move Allen.  Brown must

25  stay in the back, Brown must stay in the cell, they don't want

```
                        Exam. - Brown

 1    Brown to move from the back.
 2    Q.  Later Officer Chilcote was one of the officers who
 3    responded after you were raped.  Is that correct?
 4    A.  Yes.
 5    Q.  You told another corrections officers, Officer Long, you
 6    feared for your safety and that you were repeatedly assaulted
 7    in your cell.  Is that correct?
 8    A.  I remember a chokehold.
 9    Q.  Are you disputing that you told Officer Long that you
10    feared for your safety?
11    A.  No, I'm not disputing that.
12    Q.  You told Officer Harris that you feared for your safety, as
13    well?
14    A.  Yes.
15    Q.  And in response, both of those officers, Officers Long and
16    Harris, both told you they'd mace you and use force if you
17    didn't go back to the cell where Allen was.  Is that correct?
18    A.  Yes, after showers on the 5th.
19    Q.  You told another person, Parsons, you feared for your
20    safety in the cell.  Is that correct?
21    A.  Absolutely.  And I told him I was even suicidal.
22    Q.  You directed your concerns to another person, Garlik, on
23    February 7th.  Is that correct?
24    A.  Absolutely.  I told him I wasn't going back in that cell.
25    Q.  And you directed your concerns to Poorman on February 7th.
```

Exam. - Brown

1   Is that correct?

2   A.  Absolutely, in the morning I told him.

3   Q.  And you reported the attacks to a sergeant on third shift.

4   Is that correct?

5   A.  Yes, but I don't know who the sergeant is.

6   Q.  Understood.  You reported issues to the unit manager,

7   Kendrick.  Is that correct?

8   A.  Absolutely.  And he said, the next time you get out the

9   cell, just don't lock in.

10  Q.  You talked to the unit manager, Kendrick, multiple times,

11  didn't you?

12  A.  Yes, I believe on the 5th and on the 7th.

13  Q.  And you've said not only did you talk to him, but Allen

14  assaulted you in front of Kendrick?

15  A.  Absolutely, and he walked away.

16  Q.  You saw a psychiatrist named Portsman, didn't you?

17  A.  Portsman?

18  Q.  Did you see a psychiatrist during this period?

19  A.  I remember Parsons.

20  Q.  And none of those people helped you.  Is that correct?

21  A.  No.

22  Q.  The Department of Corrections has a PREA policy.  Do you

23  agree with that?

24  A.  Yes.

25  Q.  And the PREA policy is a no tolerance policy, all reports

Exam. - Brown

1   have to be reported and investigated?

2   A.   Yes.

3   Q.   But despite that, you are claiming that all of those people

4   ignored you?

5   A.   I'm claiming nothing was done, yes.

6   Q.   And none of those people, Heaster, Chilcote, Long, Harris,

7   Parsons, Garlik, Poorman, Kendrick, are here at trial, are

8   they?

9   A.   No, but an interesting fact is they were a defendant in my

10  initial complaint.

11  Q.   You claimed medical staff came by, too, during this period,

12  didn't you?

13  A.   I believe so, yes.

14  Q.   And even medical staff ignored you?

15  A.   I believe so, yes.

16  Q.   Eventually, though, you were able to submit a sick call

17  slip to request medical treatment.  Is that correct?

18  A.   Yes.

19  Q.   And after you submitted that sick call slip, you were seen

20  by Nurse Trice that evening.  Is that correct?

21  A.   Yes.

22  Q.   And you claim she refused to treat you.  Is that correct?

23  A.   Yes.

24  Q.   And Nurse Trice testified.  Is that correct?

25  A.   Yes.

Q.   And she testified that you were the one who refused
treatment, didn't she?

A.   Yes.

Q.   You were seen --

A.   Well, I didn't refuse treatment, nor did I refuse pictures.

Q.   Thank you.  You were seen that night by Nurse Trice?

A.   Yes.

Q.   And then you were seen the next day by Nurse Emig.  Is that
correct?

A.   Yes.

Q.   You claim she accused you of being a willing participant
with Inmate Allen.  Is that correct?

A.   Yes.  I don't know why a homosexual would cry rape.

Q.   And you claim she refused to treat you, too.  Is that
correct?

A.   Yes.  She took pictures.

       MS. BEDELL:  No further questions, Your Honor.

       THE COURT:  Very well.  Thank you.  Mr. Brown, was
there -- beyond what was covered in cross, was there any
further information you wanted to provide on the matters
covered by cross?

       BROWN:  No.  It would all be argumentative, and I
believe there's a --

       THE COURT:  Very well.

       BROWN:  -- time and place for that.

1      THE COURT:   Then -- and you're right, there will be a
2    time and place for further argument on what the evidence shows.
3    Then you may call your next witness, Brown.
4         BROWN:   Now, Ms. Bedell briefly stated that a certain
5    witness was willing to participate today.
6         THE COURT:   We've got a batch of potential witnesses
7    here.   I think that we've got -- the defendants are present,
8    but you may call your next witness.
9         BROWN:   Is Ms. Butterbaugh available?
10        MS. BEDELL:   Ms. Butterbaugh is available on the
11   23rd and the 26th, Your Honor.
12        THE COURT:   Very well.  And I will note, for the
13   benefit of those who have been assisting in this trial, that we
14   will be issuing writs for the 23rd and the 26th.
15        Ms. Butterbaugh will be available to us next week,
16   Brown.   You may call your next witness from those who are
17   available here today.
18        BROWN:   Okay.  I believe it's Mr. Plocinik.
19        THE COURT:   Very well.  Mr. Plocinik, come on forward.
20        DUANE PLOCINIK, called as a witness, having been duly sworn
21   or affirmed, testified as follows:
22        COURTROOM DEPUTY:   Thank you.  Please be seated.
23   Please state your full name for the record, and please spell
24   your last name.
25        THE WITNESS:   Duane Michael Plocinik.  Plocinik,

1    P-l-o-c-i-n-i-k.

2         *THE COURT:*  Very well.  Mr. Brown, you may proceed.

3                        DIRECT EXAMINATION

4    BY BROWN:

5    Q.  Yeah, Mr. Plocinik, how you doing today?

6    A.  Not too bad.  How are you doing?

7    Q.  Good.  Could be better.  Can you please state your duties

8    as a correctional officer during the time of 2018?

9    A.  Duties as a correctional officer would be to provide care,

10   custody, and control over the inmates housed at the facility.

11   Q.  Thank you.  Do you remember if you were working RHU 2:00 to

12   10:00 shift in February of 2018?

13   A.  I would have been assigned the RHU, yes.  I worked RHU from

14   2016 to 2019, I believe.  Both shifts when I did overtime, as

15   well.

16   Q.  Okay.  How long had you been employed at Huntingdon?

17   A.  I started December 30 of '14, I believe.  My math is a

18   little bad.  I don't know how many years that is, nine or ten.

19   Q.  That's all right.  Did you receive any training prior to

20   working at Huntingdon or on-the-job training?

21   A.  As far as what?

22   Q.  Just as far as running your duties, PREA, like, any kind of

23   training.

24   A.  Correctional officers go to the academy in Elizabethtown.

25   Once they're hired, they'll complete a portion of walk-around.

Exam. - Plocinik

1  After they're hired, then they'll go to the academy.  I believe

2  it was a month when I went.  I think the timeframe for the

3  academy has been stretched out a little bit now.  But prior to

4  working at Huntingdon, no, no training as far as correctional

5  facilities go.

6  Q.  Okay.  We'll get to PREA here in a little bit.  But do you

7  remember anything about the writeup issue, July 26th, 2018?

8  A.  I don't remember specifically about any writeup issued.  I

9  know that I have issued several misconducts for various

10  charges.

11  Q.  Okay.  Do the DOC limit inmates' access to water?

12  A.  No.

13  Q.  Okay.

14  A.  Let me rephrase that, if you're placed on water

15  restriction, which requires a DC-709 property restriction, an

16  example would be flooding your cell, there would be a 121

17  written, which is an extraordinary occurrence report.

18       That would be submitted to control, and control would

19  inform us if we are going to shut your water off, at which

20  time, if we do, you are offered water at a minimum of every two

21  hours.  You must stop the officer doing rounds if you're

22  requesting water more often than that.  Other than that, there

23  is no limit to the water.  You have running water in your cell.

24  Q.  So put another way, are you aware of any policy that states

25  that you could walk up to a cell and turn the water off?

Exam. - Plocinik

1  A.   The 709 property restriction form, yes, you can, but,
2  again, that requires a report written to control and approval
3  from the shift commander prior to doing so.
4  Q.   Okay.  And -- okay.  So when you are an escort officer in
5  the RHU, what are your duties?
6          I'm asking you this because my claims are pertaining
7  to 2/3/18 to whom I claim that you had moved me from 214 cell
8  to 108 cell.  The shift commander report sheet states that you
9  was the escorting officer that day.  Can you tell me a little
10  bit about that?
11  A.   Escorting officers, what I believe you're referring to is
12  just any job title down there, however, will cover the
13  responsibilities of escorting.  For example, like, going to
14  yard or shower, that would be an assigned crew.

15          They would approach your cell if you were partaking
16  in, say, going to yard.  They'll run a yard sheet around.
17  You're to be standing at your door with your light on if you
18  wish to receive that opportunity.  They will mark down that you
19  are going to yard or you're not going to yard, whatever your
20  response is.

21          Once they come around, if you are partaking in
22  whatever opportunity is being presented at that time, you would
23  be restrained behind the back utilizing handcuffs.  If you have
24  a cellmate that is or is not partaking in the same exercise,
25  they would also be restrained behind the back for officer

Exam. - Plocinik

1  safety.

2         The door would be opened.  The inmates that are

3  partaking would be escorted out of the cell by a minimum of two

4  staff members, escorted to whatever they're participating in.

5  In this example, we're using yard.  You would be escorted to

6  yard.  You would be secured in your -- the pen out in the yard.

7  I don't remember the exact term for that.  It's a secured yard.

8  You're fenced in, and the door is secured, and then your

9  handcuffs would be removed.

10  Q.  With all due respect, I understand.

11  A.  Okay.  The same process for other escorts around the block.

12  Like moving, you would be secured behind the back, and you

13  would be escorted to, if we're going to another cell, to that

14  cell.  If there's an inmate inside of that cell and you're

15  being double-celled, that inmate must be restrained with his

16  hands behind his back prior to the cell door being opened.

17  Q.  Okay.  Was you aware as to Allen was at the time -- who

18  Mr. Allen was at the time?

19  A.  I had had a couple of run-ins with Inmate Allen.  Nothing

20  sticks out other than his name.

21  Q.  Okay.  Thank you.  Did you know that he was a lifer?

22  A.  Not until it was addressed for this trial, no.

23  Q.  Okay.  Did you know he was seeking a Z code?

24  A.  No.

25  Q.  Okay.  Did you know Brown was knew for refusing cellies and

```
                          Exam. - Plocinik

 1   going to population out of fear?
 2   A.  No.
 3   Q.  Okay.  Can you explain how Brown ended up in a cell in the
 4   RHU furthest from the RHU bubble and with a history of refusing
 5   to go to population and refusing cellmates?  How did Brown end
 6   up --
 7   A.  I could answer as far as the cell, but refusing to go to
 8   population, I had no knowledge of that.
 9   Q.  We can just stick to the cell.
10   A.  Ending up in a cell that is less than preferable, if that's
11   the only cell that's available, then that is where you're
12   assigned.
13   Q.  Okay.  So I'm asking if -- can you properly explain how
14   Brown willingly ended up in 108 cell?
15   A.  That would have been the only cell left available.
16         BROWN:  Okay.  And I'd like to enter Exhibit 43 and 48
17   of Package 11.
18         THE COURT:  They had previously been admitted.
19         BROWN:  Okay.
20         MS. ADAMS:  Your Honor, I'm sorry, did he say 33 and
21   38?
22         THE COURT:  I think he said 43 and 48.  That was my
23   understanding.
24         BROWN:  So Your Honor is correct.
25         THE COURT:  Is that correct, Mr. Brown?  Is that
```

Exam. - Plocinik

1   correct, Brown?

2        *BROWN:*  Yes, yes.  Your Honor is correct, it's been

3   admitted.

4   BY BROWN:

5   Q.  Are you familiar with the term a rat or a snitch?

6   A.  Yes.

7   Q.  Okay.  In the prison environment, what does that mean if

8   we're talking strictly prison?

9   A.  In the prison environment, a rat would be a label for a

10  snitch or an informant of some sort.

11  Q.  Okay.  In the prison environment, what does the term faggot

12  mean, just in the prison environment?

13  A.  That would be another term for a homosexual.

14  Q.  What about a joint, he a joint?

15  A.  That I don't know.

16  Q.  Stiginatiz, are you familiar with that word?

17  S-t-i-g-i-n-a-t-i-z.

18  A.  No, this would be the first time I'm hearing that.

19  Q.  Okay.  What about the term lifer?

20  A.  Yes.

21  Q.  What would be considered a lifer?

22  A.  An inmate that is doing life.

23  Q.  Okay.  What about the term sex offender?

24  A.  An inmate that was a sex offender, committed a sex offense.

25  Q.  What about kiddie toucher?

Exam. - Plocinik

A.   An inmate that would have been a child molester.

Q.   In your opinion, what are some unique challenges in the
prison environment that people face with any of those labels
attached to?

A.   I'm sure they have a difficult time.

Q.   Difficult as in -- can you be more specific?  Like, what
type of challenge, specific challenges?

A.   Other than it being a little bit more difficult, I have no
idea.

Q.   Okay.

A.   It's difficult for anybody that is stored in a prison away
from their family and away from their loved ones.

Q.   Okay.  Before February 3rd, were you aware of any -- at any
time were you aware of any underlying circumstances as to why
Brown should not have been withheld with Inmate Allen?

A.   No.

Q.   Okay.  And you didn't know who Inmate Allen was at the
time.  Right?

A.   I had heard his name, but as far as personally, no.

        BROWN:  I'd like to enter Package 10, Exhibit 36 and
37.  I believe that was already stipulated.

        MS. ADAMS:  That's correct.

        THE COURT:  Sure.

BY BROWN:

Q.   So were you aware that Brown had filed a grievance

Exam. - Plocinik

1  pertaining to extortion and other type of harassment prior to
2  being housed with Inmate Allen?
3  A.  No.
4          BROWN:  I'd like to enter Exhibit 15 through 19.
5  They're 402.
6          THE COURT:  Yes, these have already been admitted, by
7  my count, so why don't you just ask your next question.
8          BROWN:  Okay.
9  BY BROWN:
10  Q.  So on February 7, was you aware that Mr. Allen exhibited
11  dangerous predatorial behavior arising from unfulfilled sexual
12  desire needs that were not being met as a lifer in the
13  preceding months before Brown claims?
14  A.  No.
15  Q.  Do you want me to repeat that, or did you understand what
16  I --
17          THE COURT:  He said no.
18          THE WITNESS:  No.
19          BROWN:  Okay.
20          THE COURT:  He said no, so --
21          BROWN:  Do you believe --
22          THE WITNESS:  I believe I understood the question.
23          THE COURT:  Excuse me.  If you answer a question, the
24  assumption is you understood it and felt you could answer it.
25  Is that correct?

Exam. - Plocinik

1    *THE WITNESS:* Yes, sir.

2    *THE COURT:* Very well. So you don't have to ask him

3    if he understood it. If he answers it, then he understood it.

4    BY BROWN:

5    Q. Do you believe there was any underlying circumstances as to

6    why Brown should not have been withheld with Mr. Allen at the

7    time?

8    A. No.

9    *BROWN:* Okay. I'd like to enter Exhibit 45 through

10   48, Package 11.

11   BY BROWN:

12   Q. Are you familiar with the PRAT?

13   *THE COURT:* Are you just entering these, or are you

14   going to use them in any way with these witnesses?

15   *BROWN:* Yeah. Well, my thing is, I didn't know if I

16   even had the time to explain since they were already onboard.

17   *THE COURT:* Those exhibits were stipulated to, so

18   they'll be deemed admitted, 45 through 48.

19   *BROWN:* Do I have the time to explain?

20   *THE COURT:* You have the time to ask questions of the

21   witness. This is the time for posing questions to the witness,

22   so please feel free to pose your questions.

23   *BROWN:* Yeah, but I'm just confused as to when I enter

24   the exhibit, you asked if I -- if I'm going to explain --

25   *THE COURT:* No, that's not what I asked. I asked if

Exam. - Plocinik

1    you were going to ask any questions --
2              BROWN:  Oh.
3              THE COURT:  -- of the witness regarding the exhibit.
4              BROWN:  Okay.
5              THE COURT:  No, I don't need some sort of rolling
6    commentary from you on the exhibits.  They have been admitted.
7              BROWN:  Okay.
8              THE COURT:  Pose your questions to your witness.
9    BY BROWN:
10   Q.  Are you familiar with the PRAT, prison risk assessment
11   tool, policy pertaining to classification?
12   A.  No.
13   Q.  Are you familiar with the characteristics of a sexually
14   aggressive prisoner?
15   A.  Some obvious ones, but as far as all of them, no.
16   Q.  Okay.  So what are you familiar with?
17   A.  Inmates that state that they're sexually aggressive or
18   inmates that have been caught being sexually aggressive, such
19   as rape, voluntarily conducting sexual behaviors or sexual
20   favors for another inmate.  That would be about it.
21   Q.  Okay.  So the characteristics as to a sexual aggressive
22   prisoner is usually between the age of 27 through 45.
23             MS. ADAMS:  Your Honor, I'm going to object.
24             THE COURT:  And the nature of the objection?
25             MS. ADAMS:  He's testifying.

Exam. - Plocinik

1              *THE COURT:* Right. He's already told you he doesn't
2    know what these characteristics are.

3              *BROWN:* Yeah.

4              *THE COURT:* So you can't read these items. He's told
5    you he doesn't know what they are. You would need to pose your
6    next question. And perhaps you could pose some questions
7    relating to the events between February 3rd and February 8th of
8    2018.

9              *BROWN:* All right.

10   BY BROWN:

11   Q.  Did you know at the time, did you know at the time that
12   Allen had 77 misconducts, most of whom was violent for -- which
13   was sexual?

14   A.  No.

15             *BROWN:* Okay. I'd like to enter Package 12,
16   Misconducts B159510, C009726 --

17             *THE COURT:* Well, wait a minute. For one thing,
18   exhibits aren't entered by packages. They're entered as
19   exhibits. What exhibits are you referring to?

20             *BROWN:* So in -- my exhibits is in -- within Package
21   12, but they are misconducts.

22             *THE COURT:* Yes, and what is the exhibit number of the
23   exhibit that you're referring to?

24             *BROWN:* B15 --

25             *THE COURT:* That's not an exhibit number. Your

Exam. - Plocinik

1     Package 12 --

2              *BROWN:*  Yeah.

3              *THE COURT:*  -- purports to be Exhibits 42, 45, 44, 43,

4     12, and 46.

5              *BROWN:*  Yes.  And within the package, I just have the

6     misconducts.

7              *THE COURT:*  Yeah, I need -- for the purposes of a

8     record, as we've been discussing throughout these proceedings,

9     you will need to identify an exhibit if you want to refer to

10    it, and you'll need to identify it by the exhibit number.  Am I

11    clear, Brown?

12             *BROWN:*  Yes.

13             *THE COURT:*  Very well.

14             *BROWN:*  So we'll turn to defendants' exhibit list,

15    Exhibit 43, Exhibit 46.  And apparently Allen misconduct that

16    ends in 26 doesn't have an exhibit number, nor is it on

17    defendants' exhibit list.  But this is an important exhibit, as

18    it was granted to me via camera review during discovery.

19             *THE COURT:*  Well, you've referred to Defense Exhibits

20    43 and 46.  Is there any objection to the admission of those

21    exhibits that appear to be misconducts relating to Raheem

22    Allen?

23             *MS. ADAMS:*  No, Your Honor.

24             *THE COURT:*  Very well.  So those will be admitted.

25    Did you have a question for the witness?

Exam. - Plocinik

1     *BROWN:* Yeah. So my issue is with Misconduct C009726.

2   I believe defendants have a record of that.

3     *MS. ADAMS:* Your Honor --

4     *THE COURT:* I don't know what you're referring to.

5   Maybe Ms. Adams can help us.

6     *BROWN:* The sexual assault --

7     *THE COURT:* Excuse me, I'm asking Ms. Adams if she can

8   help us. Do you know what that is?

9     *MS. ADAMS:* I'm sorry, I did not hear which number he

10  said.

11    *BROWN:* The sexual harassment misconduct Allen

12  acquired prior --

13    *MS. ADAMS:* I'm sorry, I missed the number of the

14  misconduct report.

15    *BROWN:* It's C009726.

16    *THE COURT:* While they're looking, if you have a

17  question for the witness, why don't you pose your question.

18  Yes, I'm sorry.

19    *MS. ADAMS:* Your Honor, I believe all the misconducts

20  begin with the letter D or B. So I don't know --

21    *THE COURT:* Okay.

22    *BROWN:* It's 1/30/17, the date issued by Officer

23  Nellie.

24    *THE COURT:* Yeah, what we're going to do now is, we've

25  got two exhibits that have been identified. If you have

Exam. - Plocinik

1   questions for the witness regarding these exhibits, please feel

2   free to pose them.  And then when we break at 3:00, you all can

3   engage in kind of a merry chase to determine what this other

4   exhibit might be.

5           *BROWN:*  Okay.

6           *THE COURT:*  So go ahead, pose your question.

7   BY BROWN:

8   Q.  What is a program code Y?  Do you believe -- what is a --

9   are you familiar with a program code Y?

10  A.  No.

11  Q.  Okay.  Do you believe Allen was in search for a Z code at

12  the time?

13  A.  I don't know, no.

14          *BROWN:*  Okay.  Enter Exhibit 48 under Package 11.

15          *THE COURT:*  And that has already been stipulated to,

16  but are you going to ask the witness any questions regarding

17  these exhibits?

18  BY BROWN:

19  Q.  While Brown was housed at Huntingdon --

20          *THE COURT:*  Answer my question first.  Are you going

21  to ask the witness questions about these exhibits?

22          *BROWN:*  Yeah, I've been trying to, but --

23          *THE COURT:*  You have not.  You move exhibits in, and

24  then you move on to some other topic without asking the witness

25  a single question regarding the exhibits.  You're now at

Exam. - Plocinik

1   Exhibit 48.  It's been stipulated to its admissibility.  Do you

2   have a question regarding the exhibit that you want to ask this

3   witness?

4            *BROWN:*  Yeah.

5            *THE COURT:*  Then ask the question.

6   BY BROWN:

7   Q.  Are you aware that just before Allen was housed with Brown

8   on 2/2/18 that he requested a Z code from his counselor?

9            *MS. ADAMS:*  Your Honor, at this point --

10           *THE WITNESS:*  No.

11           *MS. ADAMS:*  -- this has been asked and answered

12  numerous times about if he knew Allen wanted a Z code.

13           *THE COURT:*  You have asked that question a number of

14  times.  The witness has said he was unaware of it.

15           *BROWN:*  Okay.

16  BY BROWN:

17  Q.  So at any time did you encounter Brown while she was in 108

18  cell?

19  A.  I'm sure I encountered you several times in 108, as I was

20  assigned on that unit.

21  Q.  Did you physically remove Brown from 214 cell to 108 cell

22  on February --

23  A.  I don't know.  I did several moves while I was down there.

24  I don't know if you were one of the ones that I moved or not.

25  Q.  Did you witness Allen hit Brown when Brown was moved into

Exam. - Plocinik

1    the cell?

2    A.   No.

3    Q.   At any time did you state to Allen that Brown was a kiddie

4    toucher and a faggot and a rat and fuck him up?

5    A.   No.

6    Q.   And prior to Brown moving within the cell, did you tell

7    Brown he would be moving with Inmate Allen?

8    A.   If I would have moved you, then yes.  Other than that, I

9    don't -- again, I don't know if I moved you.  If I did, then

10   yes, I would have informed you who your next cellmate would be.

11   Q.   Okay.  And you said earlier that usually you guys assign

12   cells as to the next cell up.  Right?

13   A.   I've never been in the position where I assigned the cells,

14   that is, to my understanding, that if that cell is available,

15   if you are a double-able inmate and we are getting another

16   inmate down and we need you to move, then you would be asked to

17   move, too, as well, yes.

18   Q.   Okay.  On February 5th, did you encounter Brown at any time

19   during the day?

20   A.   With that being the housing unit that I was working on, I'm

21   positive that I would have encountered him at least several

22   times during the day.

23   Q.   Do you usually do trays at dinnertime?  Were you doing

24   trays at dinnertime around this time?

25   A.   Every day that I was assigned down there, yes.

Exam. - Plocinik

1    Q.  So at any time did you give Brown food to Inmate Allen?

2    A.  I would not be able to tell you.  I don't -- I don't

3    believe so.

4    Q.  At any time did you witness Inmate Allen assault Brown?

5    A.  No.

6    Q.  At any time did Brown ask you to be removed from 108 cell?

7    A.  No.

8    Q.  Will you admit that 108 cell is the cell furthest from the

9    bubble, from the RHU bubble?

10   A.  On that quad, yes.

11   Q.  Will you admit that there are multiple cameras on the

12   housing unit on GA?

13   A.  Yes.

14   Q.  Do those cameras work?

15   A.  As far as I know.

16   Q.  Were they preserved?

17   A.  I do not know.

18   Q.  Would you happen to have any footage of Brown from

19   February 2nd through February 8th or 7th?

20   A.  I'm not permitted to retain any footage for anything that's

21   for institutional use.  They would not give it to me, no.

22   Q.  Okay.  But if Brown had requested retention, is that the

23   proper course?

24   A.  That falls outside of my job duties.  I would not know.

25   Q.  Okay.  So at no time did you witness Inmate Allen assault

```
                        Exam. - Plocinik

 1    Brown?

 2    A.  No.

 3              BROWN:  Okay.  Now, is it okay if I go back and

 4    explain the exhibits that --

 5              THE COURT:  You can pose questions to the witness.

 6              BROWN:  Yeah.  So, like, the exhibits, I didn't really

 7    explain it because I wasn't sure if I would have the time to

 8    explain the exhibits.

 9              THE COURT:  You've got exhibits that have been

10    admitted, and as I've indicated, you may pose questions to the

11    witness regarding those exhibits, if you want to direct his

12    attention to any of those defense exhibits that you moved into

13    evidence.

14              BROWN:  Okay.  I'd like to enter Exhibit 136 -- no,

15    135.  It's a statement from Vargas.

16              THE COURT:  That has been objected to.  And so if you

17    all would do me the favor of explaining what the exhibit is,

18    then I can try to address the objection as I work through the

19    various packages.

20              MS. ADAMS:  Your Honor, this, I believe, is an inmate

21    statement, so it would be hearsay.

22              BROWN:  I believe I could enter that under 803 --

23              THE COURT:  You're talking about something called 137

24    or 136?

25              BROWN:  Yeah, present sense impression and excited
```

Exam. - Plocinik

1   uterus.

2          THE COURT:  An excited uterus?  Utterance, right?

3          BROWN:  Utterance.

4          THE COURT:  Yeah, those are two different things.

5   Yeah, okay, I'm with you now.  That's all right, that's all

6   right.  That was a phrase that was new to me.



7          So I'm looking at 137, and I guess my more fundamental

8   question and concern is that it appears to be describing

9   something that happened in August of 2018.

10          MS. ADAMS:  That's correct, Your Honor, so it wouldn't

11   be an excited utterance.

12          THE COURT:  It might have been an excited utterance by

13   the person in August of 2018, but this case involves things

14   that happened in February of 2018.

15          BROWN:  Yes.  And this is not entered for the truth

16   but for motive and intention and basically -- yeah, so I'm not

17   entering the statement as to the truth of the statement.

18          THE COURT:  Well, then why is it being admitted -- I

19   understand that you might wish to present this, but it does

20   appear to be a statement of a -- of someone who is not present

21   as a declarant, Hector Vargas.  It appears to relate to an

22   incident in August of 2018 and provides Mr. Vargas' account of

23   that incident.  And that incident is temporally and topically

24   distant from the matters we're discussing here.

25          So I'm going to sustain that objection to Exhibit 137,

233

Exam. - Plocinik

1  but I'll note your objection, and the exhibit will be part of

2  the record in these proceedings.

3       BROWN:  Okay.  What about the statement from Shea

4  Delgrosso?

5       THE COURT:  Yeah, I don't know what that statement is.

6  Do you have an exhibit number?

7       BROWN:  Yeah, Exhibit 44.

8       MS. ADAMS:  Your Honor, I believe we're not

9  stipulating to that.  Again, it's a statement of a witness who

10 is not here.

11      BROWN:  Yeah, Package 11.  And at the time --

12      THE COURT:  Okay.  So I have the Exhibit 44 in front

13 of me.  It appears to be a handwritten statement by someone

14 named Shea Delgrosso.

15      BROWN:  Yeah.  At the time he was housed in nine cell.

16      THE COURT:  I understand.  The objection is hearsay.

17 The witness is not here, not available to be cross-examined.

18 What is your response to that?

19      BROWN:  I proceed to enter it under 803, sense

20 impression and excited utterance and under --

21      THE COURT:  When was the statement --

22      BROWN:  At the same time --

23      THE COURT:  When was the statement written by

24 Delgrosso?

25      BROWN:  Basically around the same time of the events.



Exam. - Plocinik

THE COURT: How do we know this? There's nothing on
it that self-authenticates it in that way. You see, for it to
be an excited utterance or a present sense impression, it has
to be contemporaneous with the event that is being described,
and I don't see how I can make that determination based on this
document.

BROWN: I believe I could show that -- at the very
least that the inmate was housed next to me at the time.

THE COURT: I understand that it's your view that he
was housed near you at the time. But in order for the
statement to come in, under the rules, it would have had to
have been written at the time that the inmate was under the
impression or the sense of some striking or exciting event, and
there's nothing on the document that indicates that's the case.

BROWN: Yeah. So as far as date, the statement is not
dated, but it does have specific dates --

THE COURT: I understand, but my problem is the
statement is not dated. So what would be a factual predicate
to me admitting the statement under the rules as an excited
utterance or present sense impression is information that is
unavailable to me.

BROWN: So -- okay. So the statements -- can you tell
me under what grounds it is not admittable?

THE COURT: What I've told you is that I don't believe
that you've laid a foundation for the admission of this as

Exam. - Plocinik

1    either an excited utterance or a present sense impression
2    because I do not know when the statement was prepared.  And
3    otherwise, I believe the statement would be hearsay and
4    inadmissible.

5         *BROWN:*  Okay.  Now, can I predicate my attempts to get
6    Mr. Delgrosso here to testify but to no prevail?

7         *THE COURT:*  We are long past the time of identifying
8    witnesses, and you've got a witness on the stand.  So why don't
9    you pose questions to that witness, and then if you want to
10   discuss who the additional witnesses will be, I'd be delighted
11   to hear from the parties who they would be.  But you've got a
12   witness on the stand, and I think you ought to pose some
13   questions to him.

14        *BROWN:*  So back to Package 10, Exhibit 36 and 37.

15        *THE COURT:*  It appeared that they were stipulated to
16   and may be admitted.

17        *BROWN:*  Yes.

18   BY BROWN:

19   Q.   I just, I just want to ask Mr. Plocinik, Mr. Plocinik, are
20   you aware that I attempted separation from this Inmate Allen?

21   A.   No.

22   Q.   Do you know who Inmate Jackson is?

23   A.   I know a few Inmate Jacksons.

24   Q.   Okay.  So during the time Inmate Jackson was my cellmate
25   and right before being housed with Inmate Allen, the exhibit

Exam. - Plocinik

1    states that I attempted a separation from Allen due to his

2    actions of harassments and extortion.  Were you aware of any of

3    this?

4    A.  No.

5        THE COURT:  And I would note, Brown, just so that the

6    record is clear, that Exhibit 36, which is what you were

7    referencing, is dated February 16, 2018.  It is dated more than

8    a week after the events in your complaint.

9        BROWN:  No, so it's actually a one, not a two.  So it

10   would be 1/16/18.

11       THE COURT:  The exhibit will reflect what the number

12   is.  I read it as a two.

13       BROWN:  That would be, respectfully, an error.

14       THE COURT:  And I think that it is -- you should feel

15   free to note any error that I make so that you'll have a chance

16   to have another court review that, but that's what I see the

17   exhibit as revealing, so you should pose your next question.

18       BROWN:  Yeah, my questions is done with Mr. Plocinik.

19       THE COURT:  Yeah, pose a question.

20       BROWN:  Yeah, I'm done.

21       THE COURT:  You're done?

22       BROWN:  Yeah.

23       THE COURT:  Very well.  Any cross or combined defense

24   direct?

25       MS. ADAMS:  Yes, Your Honor.

```
                              Exam. - Plocinik

1               THE COURT:  Very well.
2                          CROSS-EXAMINATION
3     BY MS. ADAMS:
4     Q.  Good afternoon, Officer Plocinik.
5     A.  Good afternoon.
6     Q.  So the record is clear, when we're talking about you
7     being -- working at SCI Huntingdon, that's a state correctional
8     institution?
9     A.  I'm sorry, could you speak up?  I'm having a difficult time
10    hearing you.
11    Q.  Sorry.
12              THE COURT:  She's asking if SCI Huntingdon is a state
13    correctional institution.
14              THE WITNESS:  Yes.
15    BY MS. ADAMS:
16    Q.  And under the purview of the Department of Corrections?
17    A.  Yes.
18    Q.  And is this the only institution that you've worked at
19    during your career with the Department of Corrections?
20    A.  Yes.
21    Q.  And I believe that you testified that you spent most of
22    your career in the RHU?
23    A.  That's correct.
24    Q.  And during this time when you were working in the RHU, were
25    you considered a full-time corrections officer?
```

Exam. - Plocinik

1  A.  Yes.

2  Q.  You were asked if you had any previous training.  Do you

3  have any military experience?

4  A.  Yes.

5  Q.  What is that?

6  A.  United States Marine Corps military police.

7  Q.  So you had some security training with that?

8  A.  Yes.

9  Q.  Did you ever work any other type of security?

10 A.  Unarmed security, two different companies, CES Security out

11 of Baltimore, Maryland, and Allied Barton I believe is the name

12 of the other security company out of Baltimore.

13 Q.  And this was all before your time with the Department of

14 Corrections?

15 A.  Yes.

16 Q.  And I believe you testified that your duties with the

17 Department of Corrections is the care, custody, and control of

18 inmates?

19 A.  Yes.

20 Q.  So you did have experience with that type of work, not

21 necessarily with inmates but with security work?

22 A.  Security work, yes.  The care and the custody part, not so

23 much.

24 Q.  Okay.  During your time with the RHU at SCI Huntingdon,

25 were you assigned a specific job every shift or would your job

Exam. - Plocinik

1   duties change every day?

2   A.   The job duties changed every day for the most part.

3   Q.   What were some of the specific duties that you would have

4   to do while on the RHU?

5   A.   Some of the specific duties, we'll start with you have what

6   we refer to as the punch guy.   That is the officer that's

7   assigned, he's given a PIPE system.   It's a magnetic wand.

8   Then they have little magnetic beepers on the wall that just

9   register that you went by that station.

10       While you're conducting your rounds, you're to look

11  into every single cell, ensure that inmates are alive, inmates

12  that are supposed to be there are there.   If there is inmates

13  that are not in their cell and you're unaware of that, you

14  would address that with the bubble to make sure that they are

15  not missing.   They actually either have a call-out through

16  another department or they're -- there's a reason that they're

17  not in their cell.

18       You're going to note any type of emergency situations,

19  flooding, fires, smoke, electrical malfunctions, if a door,

20  electric -- the electric malfunctions and the door pops open or

21  if lights go out in an area.   You would report all of that to

22  the bubble.

23       The next one up, you have an officer that is assigned

24  to the work detail in the RHU.   Those are Level 5 inmates.

25  Those are the only inmates that are Level 5, and they're not

Exam. - Plocinik

1   restrained while they are out working. They're pushing the
2   broom around, mopping the floors. When cells are emptied,
3   those inmates go in and they clean the cells. In the event of
4   a flood, we've pulled them out and then had them squeegee water
5   towards a central drain in the unit. That's your basic duties
6   with the -- when you have the workers.

7         You'll have an officer that's assigned trays. They
8   will go up to the dining hall, they will observe the inmates
9   making the trays. And then once all the trays are made,
10  they'll escort the inmate workers from the dining hall back to
11  the back of D block, which once you leave D block, you will
12  exit the jail, you'll go into the RHU. It's a separate
13  building.

14        The dining hall workers do not go down to G block.
15  They will take that, they will secure it behind the housing
16  unit so that the trays are on camera while they're not being
17  attended. You'll escort those kitchen workers back up to the
18  kitchen, and then you'll bring the trays the rest of the way
19  down to the block.

20        You have the one man and the two man. The one man is
21  responsible for the housing unit. He'll assign the jobs for
22  the day. He's responsible for the block change. The two man
23  is responsible for the mail, getting the mail set up and
24  labeled so that that can be handed out during -- usually during
25  one of the rounds.

Exam. - Plocinik

1      You'll have a property crew.  Those staff members,
2   they'll -- when inmates come down to the RHU, their property
3   will be brought down.  It will be placed on an uninventoried
4   shelf.  That is the responsibility -- once it gets to the RHU,
5   the property crew will place it onto the uninventoried shelf,
6   log it on an uninventoried log.  They will go down the list of
7   inmates as they come down, they'll do it in order, remove the
8   property from the uninventoried shelf to lay out on a table.

9      That inmate will then be secured.  He will have his
10   hands cuffed in front, and he'll have a leather belt put on him
11   to secure his hands to his waist.  That way he is able to
12   utilize his hands to go through his property.  If he has
13   property that's in there that he's claiming is not his and he
14   doesn't know how it got packed with his stuff, he'll be
15   permitted to put that off to the side.

16      If the inmate is over on property and opts to destroy
17   the property at his own request, then he will be permitted to
18   throw that property in the trash.  These officers oversee all
19   of that activity.

20   Q.   Okay.

21   A.   I believe that's all of them.  I may have missed one.

22   Q.   Okay.  You specifically mentioned the one man, the person

23   who assigns cells.  In your time in the RHU, were you ever

24   assigned as a one man?

25   A.   For about ten minutes, one shift.

Exam. - Plocinik

1  Q.   Did that shift happen to be the time between February 2nd,
2  2018, to February 7th, 2018?
3  A.   No.
4  Q.   And you were asked earlier about the PRAT.  Not being the
5  one man or not assigning inmates cells, would you have to be
6  familiar with the PRAT as part of your job duties?
7  A.   No.
8  Q.   Outside of being the one man, which you said you did for
9  about ten minutes, as just a general corrections officer on the
10 RHU, would you have the authority to move inmates to different
11 cells or to give them a single cell?
12 A.   No.
13 Q.   Were you the individual who assigned Brown to cell with
14 Inmate Allen on February 3rd, 2018?
15 A.   No.
16 Q.   Do you have the authority to assign inmates single cells?
17 A.   No.
18 Q.   If an inmate would be adamant, I want a single cell, and
19 bugs you and bugs you about it, would you still be able --
20 would you be able to give him a single cell?
21 A.   No.
22 Q.   Are you allowed to issue a Z code?
23 A.   No.
24 Q.   And if an inmate would request of you a single cell, what
25 would you do?

Exam. - Plocinik

1    A.   I would inform the inmate that he would need to, he or she

2    would need to submit a request slip to their unit manager

3    requesting information on how to go about obtaining a Z code.

4    Q.   I believe there was testimony last week that a Z code is

5    for a single cell.

6    A.   As far as I know.  I don't know what else comes into hand

7    with a Z code, but that's -- as far as I know, that's single

8    cell status.

9    Q.   And the time period we're talking about here, February 3rd,

10   2018, to February 7th, 2018, do you recall if you were working

11   during that time period?

12   A.   I do not dispute that I was working.  I don't know and I

13   wouldn't know without looking at a shift roster.

14   Q.   So if there are questions about it, you wouldn't have a

15   reason to --

16   A.   No.

17   Q.   And typically what shift would you work?

18   A.   Typically the 2:00 to 10:00 shift, although in 2018, I

19   pulled a significant amount of overtime.  I would have also

20   been assigned to the 6:00 to 2:00 shift for a large portion of

21   the year.

22   Q.   And during this time in the RHU and specific time period,

23   February 3rd, 2018, to February 7th, 2018, you testified you

24   were not aware who Brown was prior to Brown being moved to the

25   RHU?

Exam. - Plocinik

A.   That's correct.

Q.   Is it fair to say that you did not have any interactions
with Brown outside of the RHU?

A.   None that were notable.

Q.   So to get to the RHU, an inmate would normally come from a
different block.  Correct?

A.   Correct.

Q.   Can you explain the process of how an inmate is transferred
from general population to the RHU?

A.   Well, there's a couple of different ways that they'll end
up down there.  We'll start with an inmate receiving a
misconduct that does not involve a use of force.  The majority
of the time the inmate is locked in his or her cell or they'll
be placed on center.

     The RHU crew will be notified that they are getting an
inmate.  I believe they're also notified whether or not it's
going to be prehearing confinement or administrative custody.
There will be two officers, a commissioned officer, and then a
third officer that's assigned a hand-held camera that will go
to either the inmate's cell, if that's where he's at, or if
he's sitting on center waiting for us to get there.

     We'll go up there.  The inmate will be informed that
he is going to the RHU.  He'll be given an order to turn around
and place his hands behind his back.  We will secure his hands
behind his back.  He will then be submitted to a clothes

Exam. - Plocinik

1   search, a pat search.  I don't know if we had our body scanner
2   that year or not.  Now that's one of the things we'll take them
3   through, the body scanner, as well.

4        Then they are escorted to the Level 5 housing unit
5   secure search area.  Once in the secure search area, the door
6   will be secured.  The hand restraints will be removed.  The
7   lieutenant will go through -- I don't remember what the name of
8   the packet is.  It's a suicide risk indicator, a gang
9   affiliation sheet, and a meal preference sheet.  And that --
10  once they're there, then that begins the process of getting
11  into the RHU.

12       In the event of a use of force, a physical altercation
13  in the yard, a fight of some sort or a staff assault, the
14  inmates will be -- well, will be restrained, their hands will
15  be restrained behind their back during the incident utilizing
16  the minimal amount of force necessary to gain compliance with
17  rules there.

18       If there is a need for immediate medical
19  attention, i.e., significant bleeding, it appears that a bone
20  has been broken, something of that nature, they will be
21  escorted immediately to the medical department.  Otherwise,
22  medical will come down and see them in the secure search area
23  and ask them if they have any injuries, and any injuries will
24  be noted.

25  Q.  Okay.  So it's fair to say that an inmate, whether from the

Exam. - Plocinik

1   general population, the yard, or somewhere else, is not walking
2   himself or herself into the RHU?
3   A.   No.
4   Q.   And I believe you testified there are two officers and at
5   least one commissioned officer when escorting to the RHU?
6   A.   Correct.  And policy reads that a camera, a camera operator
7   will be there as soon as possible, that's for in the event of a
8   use of force.  The camera will already be there if it is not
9   involving the use of force.
10  Q.   Okay.  You were in the courtroom last week when Brown began
11  his -- her testimony.  Correct?
12  A.   Yes.
13  Q.   And Brown testified that you were one of the officers who
14  escorted Brown from general population to the RHU on
15  February 2nd, 2018, and that you placed Brown in cell 2014,
16  which was filled with mace and blood.  Did you place Brown
17  in --
18           BROWN:   Objection, objection.
19           THE COURT:   And the nature of the objection?
20           BROWN:   I never testified that he transferred me from
21  population.  It was already established that I was already in
22  the RHU when he transferred me.
23           MS. ADAMS:   I'll strike that portion.
24           THE COURT:   Very well.  Why don't you just rephrase
25  the question.  I gather you were asking whether this witness

Exam. - Plocinik

1    had transported Brown to a particular cell in the RHU.

2    BY MS. ADAMS:

3    Q.    So Brown testified that you placed Brown in cell 2014,

4    which was filled with mace and blood.  At any point did you

5    place Brown in a cell that was dirty to that extent?

16   A.    I don't remember whether or not I placed Brown into a cell,

7    but I would not place any inmate in a cell that is covered in

8    OC or blood.  I keep hearing you guys refer to it as mace.

9    There's a difference.  It is OC, oleoresin capsicum.  It is not

10   mace.  Nevertheless, no, that would not have happened.

11   Q.    So inmates don't get placed in dirty cells?

12   A.    No.

13   Q.    And just for clarification, as you just said, the COs at

14   the Department of Corrections use OC?

15   A.    Correct.

16   Q.    So just in general, when an inmate is transferred from

17   general population or somewhere else to the RHU, are there

18   restrictions on what items an inmate may bring into the RHU?

19   A.    Yes.

20   Q.    And does this apply to every inmate the same?

21   A.    Yes.

22   Q.    What property would an inmate be allowed to bring into the

23   RHU with them?

24   A.    Well, first of all, inmates are only permitted a -- one

25   record center size box of cell content in their cell while

Exam. - Plocinik

1    they're housed in the RHU. They're given a basic issue, which
2    clothing will come out of their personal property once it
3    arrives down there.  If they do not have any, they will be
4    issued temps.

5            That property will consist of three t-shirts, three
6    boxers, three socks, two towels, two wash clothes, one soap
7    dish without the soap, without their personal soap.  They'll be
8    issued state -- they'll be issued new state-issued soap, one
9    Flex pen.  In the basic issue, there will be two request slips,
10   two sick calls, two cash slips, a roll of toilet paper, a comb,
11   a toothbrush, two toothpastes, two shampoos, their blanket,
12   their coat, which will not be kept in their cell, that will be
13   stored on a coat rack outside, state-issued boots, which will
14   also be stored on a coat rack outside of the cell.

15           Once they receive -- once their property is
16   inventoried, they are permitted to take in one record center
17   size box of paperwork only.  That will be searched for
18   contraband by the officers assigned to property that day.
19   Q.  So in regards to the specific record size box and their
20   papers and property, if an inmate wants to bring more property
21   than that box, what must he or she do?
22   A.  They would submit a request slip to the superintendent
23   requesting additional property while they're being housed in
24   the RHU.  On that request slip, they would state whatever
25   reason they felt necessary, whether it was legal work or if

Exam. - Plocinik

1   they just wanted more property.  That would be approved or

2   denied.  I don't know what his guidelines for approving

3   additional property are, but those would be the steps to obtain

4   it.

5   Q.  And it's fair to say that you're not that person who can

6   approve or disapprove extra property?

7   A.  That's correct.

8   Q.  And I believe you testified a little bit earlier about some

9   of the duties going to, like, the property room.  Is this where

10  their property is inventoried when they're coming into the RHU?

11  A.  Yes.

12  Q.  And who is present when an inmate's property is being

13  inventoried before going into their assigned cell in RHU?

14  A.  At a minimum, it would be the two officers inventorying

15  their property.

16  Q.  And I believe you said that when Brown would come into the

17  RHU, Brown's property would have been set to the same

18  restrictions for everybody in the RHU?

19  A.  Correct.

20  Q.  And you are assigned to inventory property for inmates in

21  the RHU?

22  A.  I have been, yes.

23  Q.  I'm going to ask you -- well, we're going to show you

24  Exhibit 51, Defense Exhibit 51.

25       THE COURT:  Before you display that, Brown, do you

Exam. - Plocinik

1   have Exhibit 51 before you?  I'm waiting to find out if Brown

2   knows what Exhibit 51 is --

3           *BROWN:*  No, I don't know what it --

4           *THE COURT:*  -- so I can find out if there's an

5   objection.

6           *BROWN:*  I don't know what it is.

7           *THE COURT:*  Can someone show Brown Exhibit 51?  Thank

8   you, Ms. Bedell.  Any objection to this exhibit, Brown?

9           *BROWN:*  Yeah, 403.  I don't know what the relevance

10  are.

11          *THE COURT:*  What is the relevance of this exhibit?

12          *MS. ADAMS:*  Your Honor, this is a misconduct issued by

13  Officer Plocinik to Inmate Brown on 1/22/18 regarding the

14  inventory of his property while being admitted into the RHU.

15          *THE COURT:*  Sure, that is what it is, so it's relevant

16  to the issues in this case.

17          *MS. ADAMS:*  Inmate Brown was questioned as to about

18  targeting inmate -- I'm sorry, CO Plocinik.  I'm just

19  establishing that CO Plocinik has issued a number of

20  misconducts to Inmate Brown which would lead to the targeting

21  of CO Plocinik, and this was one of the misconducts.

22          *THE COURT:*  Okay.  I understand.  The

23  cross-examination of Brown -- Brown was questioned regarding

24  whether he has any motive to target Correctional Officer

25  Plocinik for litigation or for grievances, and if I understand

Exam. - Plocinik

1   it, you wanted to present this exhibit as evidence that Brown
2   may have had a motive because he had been the subject of a
3   misconduct about a week before the incidents in this complaint.
4   Is that --
5              *MS. ADAMS:*  That's correct.
6              *THE COURT:*  Very well.  With that offer of proof, I
7   will admit Exhibit 51, and it may be displayed.
8   BY MS. ADAMS:
9   Q.  Are you able to see the --
10             *COURTROOM DEPUTY:*  Give it one second.  There's a
11  little bit of a lag in the system.
12             *THE COURT:*  It will come.
13             *THE WITNESS:*  It's on the screen.
14  BY MS. ADAMS:
15  Q.  Are you able to read it?
16  A.  Yes, ma'am.
17  Q.  Can you please tell me what this misconduct number is?
18  A.  Misconduct Number Delta 031184.
19  Q.  And what is the date of this misconduct?
20  A.  1/22/18.
21  Q.  And to whom was the misconduct issued?
22  A.  Inmate Brown.
23  Q.  And who issued the misconduct?
24  A.  I did.
25  Q.  And how are you sure that you were the CO who issued the

Exam. - Plocinik

1   misconduct?

2   A.   That is my handwriting and my signature.

3   Q.   And where did this misconduct take place?

4   A.   RHU property room.

5   Q.   What are the misconduct charges or other actions?

6   A.   Misconduct Charge Number 36, possession of contraband,

7   specified property of another, and Misconduct Number 44,

8   loaning or borrowing.

9   Q.   And what is your version of events that happened?

10  A.   You want me to read it out loud?

11          THE COURT:   It's been admitted, and it speaks for

12  itself.   We're not really litigating this misconduct.   I had

13  understood you were admitting it for the limited purpose of

14  showing some adversarial contact between Brown and Correctional

15  Officer Plocinik as it relates to your allegations that Brown

16  may have had a motive to falsify.   So I think it's admitted.   I

17  don't know that we need to get further into the substance of

18  it.

19          MS. ADAMS:   Okay.

20  BY MS. ADAMS:

21  Q.   Are you aware of Brown receiving any type of disciplinary

22  action as a result of this misconduct?

23  A.   I don't know.

24  Q.   Would you be responsible for giving a misconduct -- any

25  disciplinary time for this misconduct?

Exam. - Plocinik

1    A.   No.

2    Q.   You've been asked a number of times about Brown's safety.

3    While Brown was in the RHU, did Brown ever express to you any

4    safety concerns Brown had?

5    A.   Not to my knowledge.

6    Q.   There had been earlier testimony that Brown was a

7    homosexual.  Were you aware that Brown was a homosexual?

8    A.   No.

9    Q.   You testified that you were not aware Brown wanted a

10   cellmate prior to him being placed in 1008.  When were you

11   aware that Brown wanted a single cell?

12   A.   I don't know.  I don't remember.

13   Q.   You were asked about Inmate Allen's misconducts.  As a CO,

14   are you told about every misconduct every inmate receives?

15   A.   No.

16   Q.   Is it unusual that you would not be aware of all the

17   misconducts Allen had?

18   A.   It would not be unusual, no.

19   Q.   Are you mainly only aware of the misconducts that you

20   issue?

21   A.   Yes.

22   Q.   On the date that you escorted Brown to cell 1008, is that

23   the first time you were aware Brown and Allen would be celling

24   together?

25   A.   If, in fact, I did, I have no reason to dispute.  I

Exam. - Plocinik

1    don't -- I don't know whether I did or not.  No, I would not --

2    I didn't know of any -- I'm sorry, brain fart.  What was the

3    question there?

4    Q.  The day you were escorting Brown to cell 1008, is that the

5    first time you would have been aware Brown and Allen would be

6    celling together?

7    A.  That would have been, yes.

8    Q.  You were asked if you forcibly removed Brown from cell 2014

9    on the date to go to cell 1008.  Did you forcibly remove Brown

10   from cell 2014?

11   A.  No.

12   Q.  You were asked questions about the location of cell 1008,

13   and I believe you said it was the farthest away from the center

14   of the RHU?

15   A.  On Level 1, yes.

16   Q.  And Brown used the phrase of being a less desirable cell,

17   that cell 1008 is a less desirable cell.

18              BROWN:  Objection.

19              THE COURT:  Yes, and the nature of the objection?

20              BROWN:  I never stated it was less desirable.  I

21   stated that it was the farthest cell from the bubble.

22              THE COURT:  Why don't you just rephrase your question.

23              MS. ADAMS:  Okay.

24   BY MS. ADAMS:

25   Q.  Are there certain cells within the RHU that are considered

Exam. - Plocinik

1   less desirable than other cells?

2   A.   Yes.

3   Q.   What reason would make a cell less desirable?

4   A.   Once they placed TVs on the quads, there's only a handful

5   of cells that you can see, you get a direct view of the

6   television.  And during that timeframe, we had just put TVs on

7   the quads, and everybody wanted a good TV cell.  Unfortunately,

8   we weren't able to give everybody a good view of the

9   television.

10  Q.   Would an inmate be able to see the TV well from cell 0018?

11  A.   No.

12  Q.   Last week Brown testified, I believe it was CO Clark was

13  with you when you escorted Brown from cell 2014 to 1008.  Do

14  you recall if that who is -- who was with you when you escorted

15  Brown?

16  A.   I don't remember moving Brown.  Again, I have no reason to

17  dispute.  If I did, I did, but I don't remember moving him.

18  Q.   If you were one of the officers who moved him from cell

19  2014 to 1008, would there have been another officer with you?

20  A.   Yes.

21  Q.   And is having two corrections officers doing an escort from

22  one cell to another normal procedure?

23  A.   Minimum of two officers for an inmate, yes.

24  Q.   I know you just said that you don't recall being the person

25  who moved Brown to cell 1008.

Exam. - Plocinik

1    A.    Correct.

2    Q.    You would not recall if Brown said Brown was uncomfortable

3    celling with Inmate Allen?

4    A.    If Brown would have claimed any reason that he did not want

5    to go into that cell, he would not have been put in that cell.

6    If he would have appeared to be in any type of duress, he would

7    not have been put in that cell.  If the inmate in the cell made

8    any threats towards Brown or the officers, for that fact,

9    that -- Brown never would have been put into that cell.

10         At that point he would have been either taken back to

11   the cell he came out of, unless for some reason that cell had

12   already been filled, in which case he would have been moved

13   over to either the secure search area or the showers because we

14   are able to lock those until another cell would have been

15   found.

16   Q.    Last week Brown testified that upon approaching cell 1008,

17   that you had to force Brown into the cell.  Did that ever

18   happen?

19   A.    That would never have happened.

20   Q.    Is that because of what you just testified to?

21   A.    Yes, ma'am.

22   Q.    Brown also testified that on the same date, that a number

23   of COs, including the lieutenant from the bubble, had to come

24   assist you in forcing Brown into the cell.  Did that occur?

25   A.    No.

Exam. - Plocinik

791   Q.   And if Brown -- I'm sorry, you just testified to that, too.

2   Did you ever threaten to use OC spray on Brown to force Brown

3   into cell 1008?

4   A.   No.

5   Q.   Did you ever threaten to use force on Brown to force Brown

6   into cell 1008?

7   A.   No.

8   Q.   When at cell 1008, did Allen ever say not to put that rat,

9   in reference to Brown, in the cell with him?

10   A.   No.

911   Q.   Do you recall if Brown was ever pleading with you not to be

12   placed in a cell with Allen?

13   A.   No.

914   Q.   Brown testified that after you placed him in cell 1008, you

15   took the handcuffs off Allen first, and then as you were taking

16   the handcuffs off Brown, Allen assaulted Brown, and you

17   laughed.

18   A.   No.

19   Q.   Did that ever occur?

20   A.   No.

21   Q.   Did you ever stand by and watch Allen physically assault

22   Brown?

23   A.   No.

24   Q.   If you saw an inmate assaulting another inmate, what would

25   you have done?

Exam. - Plocinik

1   A.   Immediately notified the control room via 247 radio --
2   that's our personal radio that we carry with us -- that there
3   was a cell fight and the location.  If it would have occurred
4   in alpha 108, the radio transmission would have been, Plocinik
5   to G control, we have a cell fight in alpha 108.
6           After making the radio transmission, both inmates
7   would be given a direct order to stop fighting and cuff up.  We
8   would use the term cuff up for them to submit to being
9   restrained behind their back.
10          If they refused to cuff up or if even just one refused
11  to allow the other to cuff up, at the time that the
12  commissioned officer arrived at the cell, they would have been
13  given a second order to cuff up, and if that was still refused,
14  then it would have resulted in a use of force.
15  Q.   Did that ever occur on February 3rd, 2018?
16  A.   No.
17  Q.   Last week Brown testified that after Brown was placed in
18  the cell with Allen, that Allen took Brown's mattress.  Were
19  you aware of this occurring?
20  A.   No.
21  Q.   Brown testified that you would given Brown's meals to
22  Allen.  What time on the 2:00 to 4:00 -- on the 2:00 to
23  10:00 shift are meals served?
24  A.   Immediately after count, in between 4:00 and 4:30, 1600 to
25  1630.

Exam. - Plocinik

1   Q.   And I believe you had mentioned that some of the duties in
2   the RHU would be to deliver the meals to the inmates?
3   A.   Correct.
4   Q.   Do you recall if you ever would have delivered meals to
5   Inmate Brown or Allen during this timeframe?
6   A.   The possibility exists, yes.
7   Q.   Did you ever give Brown's meals to Inmate Allen?
8   A.   No.
9   Q.   Do you recall if Brown or Allen had any special diets or
10  dietary restrictions that would result in either of them
11  receiving a special meal?
12  A.   I do remember Allen had a special diet, yes.
13  Q.   So did Brown have the same special diet?
14  A.   No.
15  Q.   Did you ever deprive Brown of receiving meals during your
16  shifts?
17  A.   No.
18  Q.   During the time in question, February of 2018, to your
19  recollection, was it possible for every inmate in the RHU to
20  have a single cell?
21  A.   No.
22  Q.   No, you don't recall, or, no, it wasn't possible?
23  A.   No, it wasn't possible.
24  Q.   Is this due to the number of inmates on the RHU at the
25  time?

Exam. - Plocinik

1   A.   Yes.

2   Q.   Can an inmate refuse to take a cellmate?

3   A.   They can refuse.  It will result in a misconduct.

4   Q.   Under what circumstances would you issue a misconduct to an

5   inmate for failing to take a cellmate?

6   A.   If an inmate was classified as a double-able inmate,

7   meaning there was no reason he could not have a cellmate, on

8   the block change, he's being moved in with a cellmate, if the

9   inmate refused verbally or got to the cell and said the other

10   inmate refused him, then that inmate would receive a misconduct

11   for refusing.

12   Q.   Have you issued misconducts to inmates for failing to take

13   a cellmate?

14   A.   Several.

15   Q.   Have you issued misconducts to multiple inmates?

16   A.   Yes.

17   Q.   I'm going to have you look at Exhibit 50, Page 8.  And this

18   is a misconduct from February 13th, 2018.

19        THE COURT:  Brown, have you had a chance to see this

20   exhibit?

21        BROWN:  No, I'm not aware of the exhibit.

22        THE COURT:  Before it's displayed and admitted, let's

23   see if Brown has any objection to the exhibit.  Recognizing

24   that we're at about 3 o'clock, how much longer did you

25   anticipate your direct being?

Exam. - Plocinik

1        *MS. ADAMS:*   Maybe 10 to 15 minutes.

2        *THE COURT:*   Then perhaps what we could do is take a

3    brief recess, a moment to pause, refresh, reflect, and this

4    would also provide everyone a chance to make sure that Brown is

5    aware of the exhibits that you're going to be referring to so

6    that they could be admitted without objection, unless there is

7    an objection, in which case I'll address the objection.  We'll

8    take a recess, and we'll reconvene in five minutes.

9        *(Recess taken.)*

10       *THE COURT:*   I'll just note for everyone, as was the

11   practice at the first session of the court, recognizing, Brown,

12   that you and your escorts have some distance to travel, I would

13   anticipate concluding testimony at around 4:30 to try to give

14   everyone the opportunity to get back as quickly as they could.

15   We will then reconvene, of course, next week on the 23rd, and I

16   believe the 26th.  Please, you may proceed.

17       *MS. ADAMS:*   Thank you.  Officer Plocinik, do you have

18   a copy of Exhibit 50, Page 8, up there?  And we did provide a

19   copy of that to Brown.

20       *THE COURT:*   And did you want to -- was there any

21   objection to the exhibit, Brown?  Any objection?

22                 *BROWN:*   Yeah, under relevance.

23       *THE COURT:*   Okay.  And what is the relevance of the

24   exhibit, Ms. Adams?

25                 *MS. ADAMS:*   Your Honor, this was a misconduct issued

Exam. - Plocinik

1  by Officer Plocinik to Brown on March 13th, 2018.  This is the

2  same date that Brown submitted the sick call slip.  He was

3  questioned about the timing of the misconduct he received from

4  Plocinik to the timing of --

5           THE COURT:  Fair enough.  I'm going to admit the

6  exhibit, and you may display it.  And, Officer Plocinik, you'll

7  have a chance to take a look at it.  Go ahead, you may proceed.

8           MS. ADAMS:  Thank you.

9  BY MS. ADAMS:

10  Q.  And, Officer Plocinik, you can see the misconduct on the

11  screen?

12  A.  Yes, ma'am.

13  Q.  And the date of this misconduct?

14  A.  The date?  2/13/2018.

15  Q.  And what time was this misconduct issued?

16  A.  1625.

17  Q.  And did you issue this misconduct?

18  A.  Yes.

19  Q.  For what reason?

20  A.  Refusing to obey an order.

21  Q.  And what was that specific order?

22  A.  Giving Inmate Brown a direct order to take a cellmate.

23  Q.  Did he accept the cellmate?

24  A.  No, he refused the order.

25  Q.  So that's what the misconduct is for, for refusing to take

Exam. - Plocinik

1   a cellmate?

2   A.   Yes.

3   Q.   So on this exhibit, you noted that Brown stated, You ain't

4   putting anyone in my cell.  Would this indicate he currently

5   had a single cell?

6   A.   That would indicate that he was in the cell alone, yes.

7   Q.   That he did not have a cellmate?

8   A.   Correct.

9   Q.   Are you aware if Brown received any type of disciplinary

10  action as a result of this misconduct?

11  A.   No.

12  Q.   And would you have been responsible for giving any type of

13  discipline or penalty for issuing this misconduct?

14  A.   No.

15  Q.   After issuing this misconduct, did you feel Brown began

16  targeting you?

17  A.   It would have been at some point after this, yes.

18  Q.   Are you aware Brown made a PREA allegation against Inmate

19  Allen by submitting a sick call slip on February 3rd, 2018?

20  A.   I don't remember if he did or not.

21  Q.   Were you eventually made aware that Brown filed this

22  PREA allegation?

23  A.   I would have -- if I would have been accused of being

24  involved, yes, then, yes, I would have been made aware of.

25  Q.   I'm going to have you look at Exhibit 7, Page 34.

264

Exam. - Plocinik

1    *MS. ADAMS:*  And we did provide a copy of that to
2    Brown, as well.
3         *THE COURT:*  Very well.  Is there any objection, Brown?
4    Any objection, Brown?
5         *BROWN:*  No.
6         *THE COURT:*  Very well.  Then it may be admitted and
7    displayed.
8    BY MS. ADAMS:
9    Q.  As part of the PREA investigation were you asked to make a
10   statement?
11   A.  I would have been, yes.
12        *THE COURT:*  Exhibit 7, Page 34.  There you go.
13   BY MS. ADAMS:
14   Q.  Is this a copy of your statement?
15   A.  Yes.
16   Q.  Is what you wrote in the statement, does this reflect your
17   recollections of the allegations Brown made?
18   A.  Yes.
19   Q.  Did you also cooperate with the PSP investigation into
20   these PREA allegations?
21   A.  Yes.
22   Q.  So you had said sometime after February 3rd, it began to
23   feel like Brown was targeting you.  Did this include this PREA
24   allegation?
25   A.  Yes.

Exam. - Plocinik

1   A.   The amount of inmates that I've escorted throughout that

2   time, I -- it's possible.  I would have no reason to dispute

3   it.  I don't remember escorting him specifically.

4   Q.   Would you have ever told other inmates in the RHU that

5   Brown had filed a PREA complaint from an incident in Camp Hill?

6   A.   No.

7   Q.   Did you ever tell Inmate Allen that Brown had filed a PREA

8   complaint from an alleged incident in Camp Hill?

9   A.   No.

10  Q.   And during this escort, Brown never told you that he

11  wanted -- that Brown wanted separated from Inmate Allen?

12  A.   No.

13  Q.   Did you ever make derogatory statements to Brown regarding

14  any of the PREA complaints he had filed?

15  A.   No.

16  Q.   Last week Brown testified that on one of your shifts, you

17  observed Brown eating feces, his own feces from a cup.  Do you

18  recall this happening?

19  A.   I don't remember it happening.

20  Q.   If you had observed Inmate Brown eating Brown's own feces,

21  is that a reportable event?

22  A.   That would have been reported, yes.

23  Q.   Do you recall if you ever made such a report?

24  A.   For Brown, no.  I have made reports for several inmates.

25  If he would have been, then it definitely would have been

Exam. - Plocinik

1   Q.   Are you aware that Brown filed a PREA complaint

2   specifically against you on April 13th, 2018?

3   A.   I kind of lost track of how many times he had filed PREA

4   and grievances on me.  So any specific one, no.  I was aware

5   that he had filed several.

6   Q.   So you are aware that he had filed several PREA complaints

7   against you?

8   A.   Yes.

9   Q.   Just not the specific dates.  When were you ever made aware

10   of these allegations?

11   A.   During the investigations.

12   Q.   And would you have cooperated fully with all the

13   investigations?

14   A.   Yes.

15   Q.   Were you involved in determining any of the outcomes of the

16   allegations?

17   A.   No.

18   Q.   Were you ever made aware of the outcome of the

19   investigations?

20   A.   I don't think so.  I doubt it.

21   Q.   So last week Brown testified that at one point you were

22   escorting Brown to a meeting with Captain Maxwell regarding a

23   PREA complaint outside of this one and outside of other ones

24   against you.  I believe it was from one regarding Camp Hill.

25   Do you recall if you escorted Brown to Captain Maxwell at all?

Exam. - Plocinik

1    reported.

2    Q.   At any time during your shifts February 3rd, 4th, 5th, 6th,

3    or 7th did Brown ever indicate to you Brown was afraid of

4    Allen?

5    A.   No.

6    Q.   On these same dates, did Brown ever tell you Inmate Allen

7    was assaulting Brown?

8    A.   Inmate Allen what?

9    Q.   That Inmate Allen was assaulting Inmate Brown.

10   A.   No.

11   Q.   On any of these dates, did Brown provide you with any staff

12   request slips asking for help indicating that Brown was being

13   assaulted by Inmate Allen?

14   A.   No.

15   Q.   At any time during your shifts on these same dates did

16   Brown ask you for help in any manner?

17   A.   No.

18   Q.   On these shifts, on these same dates, did you ever see

19   Allen assault Brown and walk away from the incident?

20   A.   No.

21   Q.   On the same dates and the same shifts, did Brown ever

22   indicate to you that Brown did not want to cell with Inmate

23   Allen?

24   A.   No.

25   Q.   At any time during these shifts on these dates did you

Exam. - Plocinik

1 refuse Brown help, whether medical help or help from a CO or
2 yourself?
3 A.  No.
4 Q.  Did you have any reason to wish harm upon Brown?
5 A.  No.
6 *MS. ADAMS:* Your Honor, I do not have any further
7 questions.
8 *THE COURT:* Very well.  Brown, may the witness be
9 excused?
10 *BROWN:* I have some rebuttal.
11 *THE COURT:* Very well, then ask your questions.
12 REDIRECT EXAMINATION
13 BY BROWN:
14 Q.  Mr. Plocinik, you reported that sometimes as part of your
15 job duties, you sometimes pick up mail?
16 A.  Correct.
17 Q.  Around what time do you usually pick up those mail?
18 A.  End of the evening, usually in between 8:00 and 8:30.  It
19 would be Sunday night through Thursday night, I believe.
20 Q.  Do you recall around February 3rd through 7th ever picking
21 up mail at the end of your shift?
22 A.  I would have no reason to dispute picking up mail.  Do I
23 recall it?  No.  It would have been a nightly thing.
24 Q.  So you wouldn't dispute it?
25 A.  Not picking up mail.  No, I wouldn't dispute picking up

Exam. - Plocinik

1 mail.

2 Q.   Would you dispute --

3        *BROWN:*   I'd like to enter, it's already stipulated,

4 but Exhibit 44 dated 2/4/18.  Brown stated that she put --

5        *THE COURT:*   Well, wait.  The exhibit has been

6 stipulated to in terms of its admissibility.  Now, do you

7 want -- do you have some question that you wish to pose to the

8 witness?

9        *BROWN:*   Yes, Your Honor.

10        *THE COURT:*   Okay.  Well, then please feel free to pose

11 your question.

12        *MS. ADAMS:*   Your Honor, I'm sorry, for clarification,

13 is this Plaintiff's Exhibit 44?

14        *BROWN:*   Yes.

15        *THE COURT:*   So you have a question you want to pose to

16 the witness?

17        *BROWN:*   Yes.

18        *THE COURT:*   Then pose your question.

19 BY BROWN:

20 Q.   In the exhibit dated 2/4/18, around the same time Brown

21 requested law library but also wrote some fear and some

22 concerns pertaining to basically getting out the cell and have

23 Inmate Allen assaulting him.  And Brown wrote this on this

24 request slip, and this request was returned per D --

25        *THE COURT:*   Well, let me make sure -- this is one of

Vil 270

```
                        Exam. - Plocinik

 1  the two Exhibit 44s.

 2            MS. ADAMS:  Yes, that's correct.

 3            BROWN:  Yes, Your Honor.

 4            THE COURT:  You've referred to it.  Is there -- and

 5  you had stipulated to one of the two.

 6            MS. ADAMS:  And I believe this is the one that we

 7  stipulated to.

 8            THE COURT:  Okay.  Well, very well, I'm going to let

 9  the witness see the exhibit.  Go ahead, Brown, you may pose

10  your question.

11  BY BROWN:

    Q.  And you admitted earlier that you do not dispute ever

13  picking up mail?

14  A.  Correct.

15  Q.  Now, so it wouldn't have been far-fetched that Brown had

16  slipped this through the cell door, would it?

17  A.  It wouldn't be far-fetched, no.

18  Q.  Okay.  So on this, Brown stating that she was scared and

19  being assaulted.  You had knew about this request?

20  A.  Not necessarily.

21  Q.  So you just pick up the mail, and I'm assuming you drop it

22  in the proper box?

23  A.  Correct.

24            BROWN:  Okay.  Plaintiff Exhibit 74, 76, and 77.  I

25  believe it's in Package 13, exercise, shower, shave sign-up
```

```
                         Exam. - Plocinik

 1    sheet.
 2            THE COURT:  Okay.  Again, the exhibits are what?
 3            BROWN:  74, 7 -- 77, 76.  Package 13.
 4            THE COURT:  I do not appear to have those here.  Go
 5    ahead, the exhibits are -- what are the exhibits and what is
 6    the relevance?
 7            BROWN:  The exercise, shower, and shave sheet.  And
 8    they're basically identified via inmate numbers as to who was
 9    in what cell at the time and --
10            THE COURT:  I'm sorry, here we go.  You were saying
11    74 --
12            BROWN:  76 and 77.
13            THE COURT:  74, 76, and 77.  Okay.  Is there any
14    objection to these exhibits?
15            MS. ADAMS:  No, Your Honor.
16            THE COURT:  Very well.  Then Exhibits 74 through 77
17    will be admitted without objection.
18    BY BROWN:
19    Q.  Mr. Plocinik, with these -- can you see this exhibit?
20    A.  No, I cannot.  Yes, I can.
21    Q.  At the time you stated that Brown was obviously in 108 cell
22    is not a dispute, but were you aware that inmates was in 107
23    cell?
24    A.  I can see on the sheet that they are.
25    Q.  Okay.  What about 109 cell?
```

Exam. - Plocinik

1  A.  Yes, I can see on the sheet that there's inmates in that
2  cell.
3  Q.  So you would agree the other inmate name that's not on the
4  paper is LR6121?
5  A.  I have no reason to dispute that.  Yeah, that's what's on
6  the paper.
7  Q.  Okay.  Would you happen to know who that inmate was?
8  A.  Not off the top of my head, no.
9          BROWN:  Okay.  Now, I'd like to enter part of the 008
10 pertaining to the PREA DC-ADM 008 Prison Rape Elimination Act
11 procedurally.
12         THE COURT:  What is the exhibit?
13         BROWN:  It's pertaining to employee --
14         THE COURT:  Yes, what is the exhibit number?  I'm
15 sorry, Brown, when I ask what the exhibit is, I'm trying to
16 find out what the exhibit number is so I can find the exhibit.
17         BROWN:  It's Package 12, 12F.
18         THE COURT:  But what is the exhibit number because --
19         BROWN:  12F.
20         THE COURT:  Yes, as I mentioned to you earlier today,
21 a package is not an exhibit.  So I'm trying to find out what
22 the number is of the exhibit that you are referring to.
23         BROWN:  Yes, it's 12F.  That's what I have it labeled
24 as, but --
25         THE COURT:  Well, the Package 12 references an Exhibit

Exam. - Plocinik

1    12.  Is that what you're talking about?

2          *MS. ADAMS:*  Your Honor, we do -- the defense does have

3    the PREA policy as Defense Exhibit 13, if that's easier.

4          *THE COURT:*  I don't know.  Are you trying to refer to

5    the PREA policy?

6          *BROWN:*  Yeah, but not the whole policy, just

7    specific --

8          *THE COURT:*  Well, why don't we take a look at whatever

9    this Defense Exhibit 13 is.  And if you believe that there is

10   a --

11         *THE WITNESS:*  Here, sir.

12         *THE COURT:*  Thank you.

13         *THE WITNESS:*  Thank you.

14         *THE COURT:*  If there is a portion of it that you would

15   like to refer to, let's refer the witness to that portion.  So

16   what would you like to refer the witness to in this policy?

17   Because I'm prepared to acknowledge it as a policy.  Go ahead.

18         *BROWN:*  Yeah, Section 2 of the policy pertaining to

19   employee training, basic training.

20         *MS. ADAMS:*  I'm going to -- can I ask Brown to

21   indicate the page numbers on the -- ----

22         *THE COURT:*  That would be helpful to all of us.

23         *BROWN:*  Two through fourteen.

24         *THE COURT:*  Page 2 through 14?  The page numbering

25   doesn't go that way.

Exam. - Plocinik

1       *MS. ADAMS:* Your Honor, on the bottom, it's actually 2

2   dash 14.

3       *THE COURT:* That's different than 2 through 14, but

4   I'll be happy to try to do that. Two dash fourteen, and I'll

5   provide that to the witness.

6       *THE WITNESS:* Thank you, sir.

7   BY BROWN:

8   Q.   Now, Mr. Plocinik, are you aware of the DC-ADM 008 policy?

9   A.   Portions of it, yes.

10  Q.   Are you aware of the employee training, the basic training?

11  A.   I mean, I have it sitting right here in front of me.

12  Q.   Okay.   At any time did you undergo any basic training

13  pertaining to this -- to policy?

14  A.   Yearly we have several computer-based trainings pertaining

15  to the PREA policy, yes, as well as classroom training.

16  Q.   Okay.   So you underwent -- you annually go through training

17  pertaining to the basic PREA training then?

18  A.   Yes.

19  Q.   Okay.   And can you please elaborate as to what the

20  training consists of and what did you learn from the training,

21  what the --

22      *MS. ADAMS:* Your Honor, I'm going to object at this

23  point.   I believe Officer Plocinik testified that he doesn't do

24  any of the investigations into the PREA.

25      *THE COURT:* No, but he's being asked about training,

Exam. - Plocinik

1    and he said he has undergone training.  I'm going to permit a

2    few questions in this regard.  You may proceed.  Go ahead.

3              THE WITNESS:  I'm sorry.

4              THE COURT:  No, that's okay.  Go ahead and --

5              THE WITNESS:  A large portion -- I understand the

6    question is what training we go through and what I remember as

7    far as it?

8    BY BROWN:

9    Q.   Yeah, the employee training.

10   A.   Reporting procedures.  We carry a card around.  It actually

11   has a -- we call it a dummy card.

12             If an inmate were to come to me and say, hey, I've

13   been raped or I've been sexually assaulted or anything or he's

14   calling me derogatory names, you faggot, homosexual, something

15   of that nature, I would pull the card immediately out of my

16   pocket, and I would say, okay, the first step that I need to do

17   is remove the inmate from that situation.

18             The second step is to notify the chain of command.  If

19   you are currently housed in a cell by yourself, personally, I

20   would ask you if you are comfortable remaining in your cell

21   until I can get a commissioned officer available.

22             After that, depending on how long it's been since the

23   assault, whether there was penetration or anything of that

24   nature, they would take you to medical.  I've done this one

25   time, so I'm not a hundred percent on all of it.  I know that

Exam. - Plocinik

1    all of your clothing would be removed and bagged for evidence.

2    Medical would take pictures, you would be asked several

3    questions, you would be issued clothing.

4            Timeframes would determine whether or not you were

5    taken to an outside hospital.  The majority of the training is

6    what to do if somebody reports, and it's all based on that

7    little dummy card that they give you that makes it pretty

8    dummy -- I don't have it with me, so as far as going verbatim,

9    no, I couldn't go verbatim.

10   Q.  So it fills certain responsibility incompetent of as far as

11   your action pertaining to --

12   A.  Yes.

13   Q.  -- if you encounter a PREA issue?

14   A.  Correct.

15   Q.  And you undergo this training annually?

16   A.  Yes.

17   Q.  Okay.  Mr. Plocinik, I remember you -- you stated that you

18   was a part of a PREA investigation --

19   A.  Yes.

20   Q.  -- pertaining to this matter?

21   A.  Yes.

22   Q.  You stated you was never let to know the outcome of the

23   matter?

24   A.  Not to my knowledge.

25   Q.  Okay.  So when you was called during this investigation, do

277

Exam. - Plocinik

1    you remember what you was asked?

2    A.   No.  It happened so long ago, I would have to -- I would

3    have to read any statements that I have.  But, no, I don't

4    remember the questioning.

5    Q.   Do you remember writing any statements?

6    A.   I had the statement in front of me, yes.

7         THE COURT:  Yeah, the statement was admitted into

8    evidence.  It's Defense Exhibit 7, Page 34.  It just got

9    admitted.

10   BY BROWN:

11   Q.   Do you remember escorting Brown to see a PREA -- to see

12   Maxwell at any time?

13   A.   I don't remember.  I'm not disputing whether or not I did,

14   I just don't -- I've escorted a lot of inmates to the PREA

15   lieutenant.  You may have been one of them.  I don't know.

16   Q.   Do you also remember escorting Inmate Allen?

17   A.   Again, I've escorted a lot of inmates.  As far as a

18   specific one, no, I don't remember.

19   Q.   Okay.  Now, we had a quick misunderstanding pertaining to

20   the misconduct.  I had asked earlier if you was aware of Inmate

21   Allen exhibiting sexual behavior prior to being housed with

22   Brown, and we concluded that Defendants' Exhibit 12 was the

23   specific misconduct that I would like to enter.

24        THE COURT:  Is there any objection to the admission of

25   Defendant Exhibit 12?

Exam. - Plocinik

1    MS. ADAMS:  No, Your Honor.

2    THE COURT:  Very well.  Defendant Exhibit 12 will be

3  admitted without objection.

4  BY BROWN:

5  Q.  Is it unusual for a lifer to indulge in exposing his or

6  herself to correctional officer staffs?

7    MS. ADAMS:  Your Honor, I'm going to object to

8  speculation and relevance.

9    THE COURT:  I think this is kind of speculative.  I'm

10  going to ask you to try to frame a more direct question.  I'm

11  going to sustain that objection.

12  BY BROWN:

13  Q.  Was you aware that Inmate Allen exposed himself to a female

14  correctional officer?

15  A.  No.

16  Q.  You did admit that you was aware that Inmate Allen was a

17  lifer, though.  Right?

18  A.  Yes.

19  Q.  Okay.  Were you aware that prior to being housed with

20  Brown, Inmate Allen was basically alleged or found guilty for

21  beating another inmate up in a locked closet?

22    MS. ADAMS:  Your Honor, I'm going to object at this

23  point.  We've --

24    THE COURT:  And I think we need some context in terms

25  of what you're talking about, when it occurred.

Exam. - Plocinik

1          *BROWN:* Yes.

2          *THE WITNESS:* Do you need this back, sir?

3          *THE COURT:* No, you can hold on to that because, who

4     knows, there may be a reference to something in there. So,

5     Brown --

6          *BROWN:* Yes.

7          *THE COURT:* -- a question for the witness?

8          *BROWN:* Yes.

9     BY BROWN:

10    Q.   On 1/20/18, about 10, 15 days before Brown was housed with

11    Inmate Allen, was you aware that Inmate Allen exhibited violent

12    behavior?

13         *MS. ADAMS:* Your Honor, I'm going to renew my

14    objection.   Brown previously asked CO Plocinik specifically if

15    he was aware of any misconducts of Allen and --

16         *BROWN:* I was more direct.   I'm trying to get to --

17         *THE COURT:* Well, are you talking about a specific

18    misconduct?

19         *BROWN:* Yeah, right before.

20         *THE COURT:* What exhibit is it?

21         *BROWN:* It's Defendants' Exhibit 46, Defendants'

22    Exhibit 46.

23         *THE COURT:* Could you turn to Defendant Exhibit 46,

24    Mr. Plocinik.

25         *THE WITNESS:* I'm trying not to mess up the box here.

Exam. - Plocinik

1   I think I got it.  This is Exhibit 45.  Is it a misconduct for
2   Allen?
3           *BROWN:*  Yeah, Incident 73.
4           *THE WITNESS:*  I think this is it.  Is this correct?
5           *THE COURT:*  I have no idea because I don't know what
6   Brown is referring to.  Looking at that exhibit --
7           *THE WITNESS:*  I have a misconduct appeal.  Is that
8   what that is?
9           *BROWN:*  No, it's a direct -- it's part of the record.
10  There's a direct misconduct with it.
11          *MS. ADAMS:*  Your Honor, I believe he's referencing
12  Page 008 specifically.
13          *THE COURT:*  008 of that exhibit?  And are you familiar
14  at all, were you aware at all of this misconduct involving
15  Inmate Allen?
16          *THE WITNESS:*  No.
17          *THE COURT:*  Okay.  There you go.
18  BY BROWN:
19  Q.  Now, the interesting part in the misconduct --
20          *THE COURT:*  He says he's unaware of it, though.
21          *BROWN:*  Yeah, I understand, but it's pertaining to
22  basically what was used to determine Allen actions.
23          *THE COURT:*  But this witness has testified he was
24  unaware of this misconduct, so you can't ask him further
25  questions about it.  The misconduct is admitted into evidence,

Exam. - Plocinik

1  and I'll be able to take a look at it and draw whatever

2  inferences I think are warranted based on the arguments of the

3  parties.  Why don't you ask your next question.  Do you have

4  any other questions, or is this witness --

5         *BROWN:*  Yeah, Mr. Plocinik stated that he's aware of

6  the CCTV channel within the institution.  And my point was in

7  this misconduct, the CCTV was used to determine certain actions

8  and inactions, and it was utilized, so I just wanted to ask

9  Mr. Plocinik --

10        *THE COURT:*  But he says he doesn't know anything about

11  this, so you're going to have to move on.

12        *BROWN:*  Okay.

13  BY BROWN:

14  Q.  Mr. Plocinik, you stated that you usually do the trays

15  while in the RHU.  Am I correct?

16  A.  All of the officers do.  Yes, I do hand out trays in the

17  RHU.

18  Q.  And you believe Brown started to target you after you

19  articulated a misconduct pertaining to her refusing a celly

20  around the 13th of February.  Am I correct?

21  A.  Correct.

22  Q.  Okay.  So do you remember anything around April of 2018

23  where you approached Brown cell pertaining to serving a tray in

24  reference to something about Inmate Allen?

25        *MS. ADAMS:*  Your Honor, I'm going to object.  We're

Exam. - Plocinik

1   dealing specifically with the dates of --

2           THE COURT:  I'm going to permit a question or two

3   because you did open the door --

4           MS. ADAMS:  Okay.

5           THE COURT:  -- by referring to these items.  But we're

6   limiting it to a question or two.  It's time to wrap this up,

7   Mr. Brown.

8           BROWN:  All right.  So I'd like to enter Exhibit 126

9   through 129, Grievance Number 7310 --

10          THE COURT:  Yes, and those have not been objected to,

11  so they will be admitted, and why don't you pose your question.

12  BY BROWN:

13  Q.  So, Mr. Plocinik, do you have this record in front of you?

14          THE COURT:  He does not because there weren't copies

15  made.  So I will endeavor to find these exhibits.  You said

16  126, 127, 128, and 129?

17          BROWN:  Yes, and -- yes, yes, Your Honor.

18          THE COURT:  Here they are.

19          THE WITNESS:  Thank you, sir.

20          THE COURT:  You're welcome.

21  BY BROWN:

22  Q.  Do this -- some type of reminder by reading this?

23  A.  A reminder of what?

24  Q.  As to encountering Brown on that day.

25  A.  No.

Exam. - Plocinik

Q.   So you don't remember encountering Brown on this day, on --

A.   I don't really remember encountering you on any specific

days.   I remember going up to security a dozen times or so to

be interviewed and -- over investigations for a variety of

instances.   I don't remember any specific ones, no.

Q.   Okay.   So at any time around this time when you was called

for an investigation, was it brought to your attention that

you -- Brown had alleged that you approached her cell and

stated, that homosexual have little dick and that Brown should

stick her thumb up her ass and pretend that it's Allen's dick?

A.   If that was a complaint on a grievance and it was addressed

towards myself, then any investigation, yes, I would have been

asked.   Do I remember specifically?   No, I do not.

Q.   But you remember an investigation --

A.   I remember several investigations.

Q.   Okay.   Now, this leads to Exhibit 127.   Do you remember an

inmate statement being brought to your attention?

        MS. ADAMS:   Your Honor, I believe --

        THE COURT:   Well, he's already told us that he doesn't

recall.

        BROWN:   Okay.

        THE COURT:   So that's what we've got, so let's move

on.

        BROWN:   All right.   I'd just like to make sure the

statement is admitted and that -- yeah, that's it.

1           *THE COURT:* Although I think that -- well, I will --
2   because there had been a stipulation to the admissibility of
3   those items, we'll let them in for whatever relevance they may
4   have. Okay. Then you are done in your examination of Officer
5   Plocinik?
6           *BROWN:* Yes.
7           *THE COURT:* Very well. You may step down.
8           *THE WITNESS:* Thank you, sir.
9           *THE COURT:* You may call your next witness.
10          *THE WITNESS:* Here's your books here.
11          *THE COURT:* Thank you.
12          *BROWN:* Your Honor, is it possible to use the
13  bathroom?
14          *THE COURT:* That's what the break was for.
15          *BROWN:* Yeah, I was basically trying to figure --
16          *THE COURT:* We are going to have another half an hour,
17  40 minutes of testimony. Are you going to be --
18          *BROWN:* I'll hold it.
19          *THE COURT:* Are you going to be able to proceed for
20  another half an hour, 40 minutes?
21          *BROWN:* Yeah, I'll try to hold it.
22          *THE COURT:* I don't want you to try, you must succeed.
23  Okay?
24          *BROWN:* All right.
25          *THE COURT:* Call your next witness.

```
 1              BROWN:  Mr. Maxwell.

 2              THE COURT:  Very well.  Lieutenant Maxwell.

 3              COURTROOM DEPUTY:  Good afternoon.  Please raise your

 4    right hand.

 5         MICHAEL MAXWELL, called as a witness, having been duly

 6    sworn or affirmed, testified as follows:

 7              COURTROOM DEPUTY:  Thank you.  Please be seated.

 8    Please state your full name for the record, and please spell

 9    your last name.

10              THE WITNESS:  Michael Todd Maxwell, M-a-x-w-e-l-l.

11              THE COURT:  You may proceed.

12                        DIRECT EXAMINATION

13    BY BROWN:

14    Q.  Mr. Maxwell, was Brown ever given a Z code while housed at

15    SCI Huntingdon at any time?

16    A.  No.

17    Q.  Okay.  While Brown was housed at SCI Huntingdon, did she

18    ever raise any concerns to you pertaining to safety?  And can

19    you be specific as to what you may have remembered, if it was

20    one occasion or multiple times?

21    A.  What do you mean?

22    Q.  Well, I was housed at SCI Huntingdon -- well, let me give

23    you a timeline.  Anytime from October through -- 2017 through,

24    let's say, March, 2018.

25    A.  Not that I'm aware of.
```

Exam. - Maxwell

1  Q. So it states that you worked as a PREA investigator for

2  three years.

3          BROWN: This is Exhibit 120 -- Exhibit 112, Number 16.

4          THE COURT: Are you offering Exhibit 112?

5          BROWN: Yes, yes, please.

6          THE COURT: It appeared that that was on the list of

7  exhibits that were stipulated to.  Is that correct?

8          BROWN: Yes.

9          THE COURT: And this appears to be one page from an

10 answer to interrogatories.  Is that correct?

11         BROWN: Yes.

12         THE COURT: Very well.  Here you go.

13         THE WITNESS: Thank you.

14         THE COURT: Have you read that exhibit there, sir?

15         THE WITNESS: Yes.

16         THE COURT: Okay.  Go ahead, ask your question, Brown.

17 Your question, sir.

18         BROWN: Yeah, I'm still trying to locate -- oh, so

19 Number 16.

20 BY BROWN:

21 Q. How long were you an investigator and are you still an

22 investigator with the PREA program at SCI Huntingdon?

23 A. I was the investigator for approximately three years, and,

24 no, I am not.

25 Q. Okay.  You stated that you conducted a PREA investigation

Exam. - Maxwell

1  to whom both Brown and Mr. Allen was interviewed by you and

2  state police pertaining to Brown sexual harassment claim.  Am I

3  correct?

4  A.  If you're referring to the incident between February 3rd

5  and February 7th --

6  Q.  Yes.

7  A.  -- then, yes, I completed that investigation.

8  Q.  Okay.

9  A.  Along with Pennsylvania State Police.

10 Q.  Okay.  Was there ever a separation created so -- was there

11 ever a separation created before -- after the fact, after the

12 investigation between Inmate Allen and Inmate Brown?

13 A.  Not that I'm aware of.

14 Q.  Okay.  So staff was free to do this.

15          BROWN:  Would you enter exhibit -- enter Exhibit 12

16 through 14 at deposition, Brown deposition.  So it would be

17 Exhibit 29, Page 12 through 14.

18          THE COURT:  You're referring to your own deposition?

19          BROWN:  Yes.

20          THE COURT:  And you want the witness to look at Pages

21 12 through 14 of that exhibit?

22          BROWN:  Yes.

23          THE COURT:  Okay.  Do you have a question for the

24 witness?

25          BROWN:  Yes, just a sec.

Exam. - Maxwell

1   *THE COURT:*  Then please pose your question.  Your
2   question, sir.
3   BY BROWN:
4   Q.  Was you aware that Brown was placed -- Inmate Allen was
5   placed next to Brown where the inmate started to threaten Brown
6   with serious bodily harm and bang on his wall and motivate
7   other inmates telling Brown that he was a rat due to the fact
8   that he cooperated with the investigation pertaining to the
9   sexual assault?
10  A.  No.  I did not work in the RHU.  I worked in the security
11  office.
12  Q.  Oh, all right.  So you wasn't aware of this.  So this would
13  lead me to Exhibit 172.  I have some questions for you.
14          *THE COURT:*  And it appears that 172 was also on your
15  list of unobjected-to exhibits.  Is that correct?
16          *MS. BEDELL:*  Yes, Your Honor.
17          *THE COURT:*  The Exhibit 172 I have in front of me is
18  some sort of a grievance dated January 9, 2019, 11 months after
19  the matters that are at issue in this case.
20          *BROWN:*  Oh, yeah.  My first question --
21          *THE COURT:*  Yeah, what I'd like -- yeah, but what is
22  the relevance of this exhibit?
23          *BROWN:*  The relevance was pertaining to my first
24  question when I asked Mr. Maxwell if Brown was ever given a Z
25  code or if Brown was ever a Z code at SCI Huntingdon, and he

Exam. - Maxwell

1   stated no.  So I believe, first, this is relevant to the very
2   fact that this grievance contradict that, and this is a case
3   about a Z code.  Apparently they're saying I was trying to
4   obtain a Z code.  So it would be --

5       THE COURT:  The grievance is written a year after the
6   events we're talking about.

7       BROWN:  It would be a remand to respond where
8   basically they admitted that you're a Z code.  And I'm
9   complaining about Inmate Allen threatening me due to the fact
10  that he was placed next to me, and they're admitting that I'm a
11  Z code.  So, technically, I wasn't in the cell with Allen.

12      THE COURT:  I'm going to not admit this exhibit.  I'm
13  not sure from my own reading of it that it relates to the
14  events that are at issue here.  And it does -- the institution
15  response indicates that you were not a Z code, that a Z code
16  was not warranted in your case.  So why don't you pose your
17  next question.

18      BROWN:  I object to that because right here it says,
19  you are a Z code --

20      THE COURT:  I've already indicated that this document
21  that postdates these events by a year is, in my estimation, not
22  relevant to these matters.  It's been stipulated to, so it will
23  be part of the record of these proceedings, and to the extent
24  that there has been a prejudicial error in my judgment in this
25  regard, you've preserved that error.  Pose your next question,

1   please.

2   BY BROWN:

Q.   Would you admit that Brown arrived at SCI Huntingdon and

4   you was one of the first encounters?

A.   I would agree to that.

Q.   And would you admit at this time that you were still in the

7   capacity as the PREA investigator?

A.   Yes.

Q.   What about a member of the IRC team?

A.   I was filling in on IRC that day.

11   Q.   Okay.  So you would routinely make replacements?

A.   If the regular lieutenant was off, I would fill in, yes.

13   Q.   Okay.  So you was -- would you dispute that you was a

14   member of the IRC team?

A.   I already said I was there that day.

16   Q.   Okay.  What is the responsibility of the IRC members?

17   That's initial reception committee.

18   A.   We would have -- we would just interview individuals, see

19   if they're safe to go to population, see if there's any

20   security concerns, any security threat groups.  You were seen

21   by medical, psychology, and you'd be sent to general

22   population.  Or if you were a Level 5 inmate, you'd be

23   transported to the RHU.

24   Q.   Okay.  So it's pertaining to screening and evaluation of

25   inmates?

Exam. - Maxwell

1    A.  Yes.

2    Q.  So as a member of the IRC, did you receive any special

3    training?  And let's first start specifically with just basic

4    training, basic annual PREA training.

5    A.  Annual PREA training?

6    Q.  Yes.

7    A.  All officers go through the annual CBT.

8          BROWN:  Okay.  I'd like to admit Exhibit 12F under the

9    008.

10          THE COURT:  We're going back to the PREA policy again?

11          BROWN:  Yeah.

12          THE COURT:  Okay, which is also Defense Exhibit 13,

13    which was what we used as a reference point before.  Is there

14    somewhere in that policy that you'd like to direct the witness?

15          BROWN:  Yes.

16          THE COURT:  Well, then please direct the witness

17    there.  It will be Exhibit 13.  So what would you like the

18    witness to look at, Brown?

19          BROWN:  Yes, I'm trying to find the paper.

20    BY BROWN:

21    Q.  So in the meantime, while I'm looking, can we concede that

22    at this time you had specialized training pertaining to 28 CFR

23    115.34(a)?

24    A.  What are you talking about?

25    Q.  This is the special PREA training.

Exam. - Maxwell

1        *THE COURT:*  You've referred to something that's in the

2    Code of Federal Regulations.   That CFR site would be federal

3    regulations.

4        *BROWN:*  Here it is.

5        *THE COURT:*  Why don't you just ask him some direct

6    questions regarding the extent of his PREA training at the time

7    that he encountered you in October of 2017.

8        *BROWN:*  Yeah.

9    BY BROWN:

10   Q.   So what is the extent of the employee PREA training, like,

11   by the PCM, initiated by the PCM?

12   A.   It's the computer-based training that we talked about with

13   Officer Plocinik.   It's an annual training, reporting

14   requirements.

15   Q.   It has a zero tolerance policy.   Like, what are you

16   learning from the training annually, and is it updated

17   annually?

18   A.   They do policy updates, which a lot of the stuff is still

19   the same, and reporting requirements, it's still the same.

20   Q.   Okay.   So it could be anything from retaliation

21   monitoring --

22   A.   The normal officer doesn't do that.   The PCM -- or the

23   CCPM --

24   Q.   Yes.

25   A.   -- and the PREA AO are in charge of that.   The regular

Exam. - Maxwell

1   officer on the floor doesn't -- isn't in charge of retaliation

2   monitoring or anything like that.

3   Q.   Yeah, I understand.

4   A.   The corrections counselor is the one that sees you and does

5   the retaliation monitoring stuff.

6   Q.   Yeah.

7   A.   As you are well aware of.

8   Q.   I understand that.  And to be more specific, can you

9   indulge more as to distinguishing the updates pertaining to the

10   PREA training?  Like, is it the same training every year, or

11   what would be different from the updates in the training?

12   Like, how would that occur?

13   A.   If there's any policy changes, that would be included in

14   the yearly updates in the new policy -- or the new PREA CBT.

15   And the PREA CBT is uploaded by the PREA compliance manager

16   from Central Office.

17   Q.   Okay.  Did you ever work at Camp Hill at one point prior to

18   working at SCI Huntingdon?

19   A.   Yes.

20   Q.   If I may ask, how long?  And were you in a supervisor role

21   down there?

22   A.   No, I was not.  I was there from 2001 to 2010 -- or,

23   actually, May of 2011.

24        THE COURT:  So six to seven years before the events

25   we're talking about here?

Exam. - Maxwell

1          *THE WITNESS:  (Nods head.)*

2          *THE COURT:* Very well.  Mr. Brown, can we turn to the

3     events that frame your complaint and your allegations as to

4     Maxwell?

5          *BROWN:* Yeah.

6          *THE COURT:* Okay, let's do that then.

7          *BROWN:* I think certain issues are relevant, like, for

8     example, the training.

9          *THE COURT:* Yeah, but I want you to ask some questions

10    that are relevant then, please, sir.

11    BY BROWN:

12    Q.  At any time did you force Brown to sign a double bunking

13    sheet?

14    A.  No, I did not.

15    Q.  Or policy?

16    A.  The double celling agreement?

17    Q.  Yes.

18    A.  Policy.  No, you were not forced to sign anything.

19    Q.  Okay.  But is this a regular practice that you bring this

20    to new inmates' attention?

21    A.  It is part of the IRC, yes.  It's the double celling

22    policy.

23    Q.  Would you admit that you brought this to Brown's attention?

24    A.  It is brought to every inmate in the intake area in IRC,

25    yes.

Exam. - Maxwell

1   Q.   But would you admit that you brought it to my attention?

2   A.   It was brought to every inmate that comes into the facility

3   and goes through IRC.

4   Q.   Okay.

5   A.   If you came through IRC, which you had said you did, then,

6   yes, it was brought to your attention.

7            *BROWN:*  Okay.  So this would be my answering of

8   Exhibit 14 through 19.

9            *THE COURT:*  Yes, they've already been entered.

10  They've been entered, they're in evidence.

11  BY BROWN:

12  Q.   Are you familiar with the DC-46 vote sheet?

13  A.   I'm not involved in the vote sheet.

14  Q.   Who's involved in the vote sheet?  Is it --

15           *THE COURT:*  Mr. Brown, forgive me, I don't mean to

16  interrupt you, and you're doing a fine job with the very

17  challenging task of being your own attorney, but what does a

18  DC-46 vote sheet have to do with the allegations that this

19  defendant violated your Eighth Amendment rights by knowingly

20  exposing you to harm by a fellow prisoner between February 6

21  and February 7 of 2018?

22           *BROWN:*  I was getting to the policy.  Apparently, as a

23  supervisor role and as a member of the IRC, there is a usual

24  practice that they're aware of the PRAT policy and certain

25  procedures, so I was kind of getting to that.

Exam. - Maxwell

1        *THE COURT:*  No, you're just asking about some sort of

2    vote sheet.

3              *BROWN:*  Yeah, that involves --

4              *THE COURT:*  Excuse me for one second.

5              *BROWN:*  Yeah.

6              *THE COURT:*  I appreciate that.  I thought I heard the

7    witness say that he wasn't involved in that.

8              *BROWN:*  Yeah, I'll continue.

9              *THE COURT:*  Well, then let's do that.

10   BY BROWN:

11   Q.  At any time prior to 11/13/17 were you aware of what the

12   PRAT is, P-R-A-T?

13   A.  Prison rape assessment tool.

14   Q.  Okay.  And who is responsible for administering the PRAT?

15   A.  The counselors and/or the social worker.  At that time we

16   didn't have a social worker, the counselors completed the PRAT.

17   Q.  Sometimes would an IRC member be involved in this matter?

18   A.  The counselor, yes.

19   Q.  Okay.  And the PRAT questionnaires, what are we looking at?

20   Are you familiar with the PRAT questionnaires?

21              *MS. BEDELL:*  Your Honor, I'm going to object to these

22   questions.  He testified that the PRAT would be handled by a

23   counselor, and he's not a counselor.  I don't see the

24   relevance.

25              *BROWN:*  That's not necessarily true.

*THE COURT:* Did you handle the PRAT questionnaires?

*THE WITNESS:* No, I did not.

*THE COURT:* There you go.

*BROWN:* My question was, are you aware of the PRAT questionnaires, not if you handled it.

*THE COURT:* What does that have to do with your allegation that this defendant --

*BROWN:* Because he stated --

*THE COURT:* Excuse me. Wait until I finish my question. Okay? Do you understand?

*BROWN:* Yes.

*THE COURT:* Very well. What does that have to do with the allegation that this defendant knowingly exposed you to an unreasonable risk of harm at the hands of another inmate between February 3rd and February 7th of 2018?

*BROWN:* Well, I do have an objective task to fill pertaining to deliberate indifference, and I am getting to that by basically acknowledging what the defendant knew about the PRAT and what he knew about the various PREA policy in his roles, his specific roles within the institution. I'm trying to establish --

*THE COURT:* Fine, why don't you pose a question or two. But I think it would be important for you, because you have to prove subjective knowledge of a risk of harm by this defendant to prevail on your claim, that he knew of an

Exam. - Maxwell

1  unreasonable risk of harm and did not act upon it.  You need to

2  get to that point.  Do you understand?

3          *BROWN:* Yes, Your Honor.

4          *THE COURT:* Okay.  Then pose a couple of questions,

5  and then why don't we get to that crucial issue in this

6  litigation.

7          *BROWN:* Okay.

8  BY BROWN:

9  Q.  Now, at any time is it required for an inmate to

10 specifically answer certain questionnaires not limited to own

11 perception, vulnerability, gender identity, or prior acts of

12 abuse?

13 A.  I'm not sure what he's --

14         *BROWN:* This is where I was getting at.

15         *THE COURT:* And the witness doesn't understand your

16 question.  Please rephrase.

17         *BROWN:* Yes, sir.

18 BY BROWN:

19 Q.  At any time is it required for an inmate to answer or

20 participate in specific questions pertaining to -- not limited

21 to own perception of vulnerability, gender identity, and prior

22 acts of abuse?

23 A.  Sir, are you referring to the PRAT questions?

24 Q.  Yes, I'm referring to that, and I'm referring to basically

25 evaluating an inmate pertaining to being a member of the IRC.



1   A.   I don't complete the PRAT questions, nor do I see the

2   questionnaire.

3   Q.   Okay.  But you are aware of the questionnaires.  Am I

4   correct?

5   A.   The PRAT, I am aware that a PRAT is conducted or completed

6   on every intake.  And anytime an inmate moves in or out of the

7   facility, it's completed within 72 hours of them returning to

8   the facility.  Whether it's a hospital trip, overnight stay at

9   another facility, whatever, it's completed upon any movement.

10   Other than that, I don't know anything about the questionnaire.

11   That's not part of my job duties.

12   Q.   Are you aware as to why Brown was never a participant

13   pertaining to these questionnaires pertaining to perception,

14   vulnerability, gender identity, and prior acts of abuse?

15   Because this, by itself --

16        THE COURT:  No, you've asked a question.  Were you

17   aware --

18        THE WITNESS:  No.

19        THE COURT:  Okay.  He says he wasn't aware of any of

20   that.

21        BROWN:  Okay.

22   BY BROWN:

23   Q.   The information received through the administration, the

24   administration of the PRAT, used to inform housing, bed space,

25   work, education, and program assessment with the goal of

Exam. - Maxwell

1   keeping separate those inmates at high risk for being sexually

2   victimized from those at high risk of being sexually abused?

3   A.   So you're talking about high risk victimization and high

4   risk abuse?

5   Q.   Yes.   And if you need, I could repeat the question.

6   A.   That is why the PRAT is completed, to figure out if you're

7   a high risk victim, high risk abuser, or none of the above, or

8   you're in the middle.

9        BROWN:   Okay.   I just want to stipulate that you

10   understood that --

11        THE COURT:   He's answered the question.

12        BROWN:   Okay.

13        THE COURT:   Perhaps it would be appropriate to ask

14   another one.

15   BY BROWN:

16   Q.   Will you agree that an inmate assigned a high risk derived

17   from the administration of the PRAT tool -- so in order for an

18   inmate to be assessed a high risk, it would have to derive from

19   the PRAT tool.   Am I correct?

20   A.   That's what the PRAT does.   That's what the PRAT tool is.

21   Q.   Okay.   Would you agree that the PRAT is basically the key

22   to adequately screen the inmate to help conclude risk level?

23   A.   That's what the PRAT assessment tool is utilized for.

24   Q.   What do you know about reassessment pertaining to basically

25   screening?

Exam. - Maxwell

1   A.  I'm not -- that's not my job.  I am security.  That is more

2   counselor oriented and social worker.  I have nothing in on

3   that.

4   Q.  Okay.  So this states that an inmate must be reassessed

5   within 20 to 30 days upon arrival at a different institution,

6   and I only ask you that because you stated that you routinely

7   do evaluation pertaining to the IRC.

8   A.  No, I didn't say that.

9           THE COURT:  I think that actually misstates the

10  witness's testimony.  I think he said he was serving on the ICR

11  on the day -- at the time you came in.

12          BROWN:  Okay.

13          THE COURT:  Okay?  That was my understanding of your

14  testimony.  Have I mischaracterized it?

15          THE WITNESS:  No.

16          THE COURT:  Very well.  I just wanted to make sure.

17  BY BROWN:

18  Q.  All right.  So since you was involved in the screening of

19  Brown upon arriving at SCI Huntingdon, can you explain why an

20  inmate involved in a sexual assault claim was never a

21  participant in the PRAT pertaining to own perception,

22  vulnerability, gender identity, and prior acts of abuse?

23  A.  PRAT would have been completed in IRC.

24  Q.  So Brown is saying that she was never a participant, and

25  Brown is saying that the policy requires that she is a

Exam. - Maxwell

1   participant --

2           *THE COURT:* And forgive me, at this point, Brown --
3   and I recognize you've got a couple of roles in this
4   litigation. You're a party, you've testified previously, and
5   you're acting as your own counsel.

6           You seem to be testifying regarding whether you went
7   through the PRAT process. That seems to be what you're doing.
8   And this wouldn't be the time for you to testify whether you
9   filled out a PRAT questionnaire, this would be the time to pose
10  questions to Mr. Maxwell.

11  BY BROWN:

12  Q.  Were you aware that Brown level was CL4H? And what would
13  be considered a CL4H, as a layman that doesn't really know much
14  about --

15  A.  That's your custody level, four, program code H.

16  Q.  Okay. Can you explain what the CL stands for?

17  A.  I just said custody level.

18  Q.  Custody level.

19          *THE COURT:* I was thinking that's the custody level
20  part, right.

21          *BROWN:* Okay.

22  BY BROWN:

23  Q.  So what are we looking at with the cumulative adjustment
24  record?

25  A.  Your ICAR.

Exam. - Maxwell

1    Q.   Okay.

2         THE COURT:   You'll forgive me, you're looking at his

3    ICAR?

4         THE WITNESS:   Inmate cumulative adjustment record.

5         THE COURT:   Okay.   And --

6         THE WITNESS:   That's completed by the counselors, unit

7    managers, psychs.

8         THE COURT:   Okay.   And in terms of the allegations as

9    to Mr. Maxwell, Ms. Brown -- or Brown, excuse me, where are we

10   going here?

11        BROWN:   Yeah, so I'd like to enter my first exhibit,

12   which is Exhibit 13.   This is the inquiry cell history.

13        THE COURT:   And that has been stipulated to, so it

14   would be admitted.   Do you have a question for this witness?

15        BROWN:   Yes.

16   BY BROWN:

17   Q.   So while looking at this, it is obviously promulgated

18   within the litigation that Brown was under request for a single

19   cell so as much that -- leading to cell 108.   But that was why

20   Brown was refusing cellies.

21        THE COURT:   Well, you're going to need to pose a

22   question, Brown.   I'm sorry, I don't mean to interrupt you, but

23   you're just engaging in a narrative.   If you've got a question

24   about the exhibit for the witness, please pose it.

25   BY BROWN:

Exam. - Maxwell

1  Q.  By looking at this, around -- anytime around the time prior
2  to February 3rd, 2018, do you see at any time was Brown in a
3  cell, was Brown double-celled at any time, does this reflect?
4  A.  The cell history doesn't reflect if he had a cellmate.
5      BROWN:  I will object to that.  For example --
6      THE COURT:  Well, he's posed an answer to your
7  question.  You can't object to the answer to your own question.
8  But if you believe that he needs to focus his attention
9  somewhere else on that exhibit, focus his attention.
10  BY BROWN:
11  Q.  Yes, please focus your attention, per Your Honor, on the
12  second entry, 7/26/17 through 8/9/17 on EB cell 1044.  That's
13  at the top.
14  A.  I see it.
15  Q.  What does the bed number states?
16  A.  In each cell, there's two bunks.  Top bunk is bed two,
17  bottom bunk is bed one.  So you were assigned to bed two.  But
18  that doesn't say if you had a cellmate, that just says what bed
19  you were assigned to.
20  Q.  But that stipulates that there's two bunks in a cell?
21  A.  Yeah, I mean, it says bed two or bed one, but that doesn't
22  mean that there was another inmate in the cell with you.
23  Q.  Okay, okay.  Very fine, very fine.  We will switch to
24  Inmate Allen cell history.
25      THE COURT:  Which is what?

Exam. - Maxwell

1        *BROWN:*  Exhibit --

2        *MS. BEDELL:*  Plaintiff's Exhibit 35, Your Honor.

3        *THE COURT:*  Thank you.  And is there any objection to

4   that exhibit?

5        *MS. BEDELL:*  No, Your Honor.

6        *THE COURT:*  There you go.  Without objection then, it

7   would be admitted.  Pose your question, Brown.

8        *BROWN:*  Yes.  And I deeply apologize, the cell history

9   is so long.  But --

10       *THE COURT:*  Why don't you pick something pertinent to

11  the lawsuit.

12       *BROWN:*  Yes, yes, I have derived.

13  BY BROWN:

14  Q.   Can you please go to January 30th, 2018, GA?

15  A.   What is that date again?

16       *THE COURT:*  January 30th, 2018.

17       *THE WITNESS:*  So the cell history runs from

18  November 10th, 2018 -- or, I'm sorry, November 13th, 2018, to

19  January 4th of 2019.

20       *THE COURT:*  So the exhibit doesn't cover the time

21  period you're talking about, Brown.

22       *BROWN:*  Yeah, January 30, 2018, is right here on the

23  exhibit.

24       *THE COURT:*  The witness -- I don't have the exhibit in

25  front of me because it's in the witness's hand.  He's reporting

1    that it runs from November of 2018 into 2019.

2            BROWN:  Yeah, would the defense attorney stipulate
3    that the exhibit runs --

4            THE COURT:  He's told me something else.  Yes, Ms.
5    Bedell.

6            MS. BEDELL:  Your Honor, I'm not sure what the goal of
7    this line of --

8            THE COURT:  I have no idea what the goal of this line
9    of testimony --

10           MS. BEDELL:  If the point is to prove Inmate Brown and
11   Allen were in the cell at the same time, that's something we
12   can stipulate to.

13           THE COURT:  Is that what you're trying to prove?

14           BROWN:  No, that's --

15           THE COURT:  What are you trying to prove?

16           BROWN:  Basically Mr. Maxwell stated that on 7/26/17,
17   that the two -- that Brown may have been the only person in the
18   cell, but it just meant that it was two beds within a cell.

19           THE COURT:  Yes, I think what the witness testified to
20   with respect to Exhibit 13 was that he could not ascertain from
21   that exhibit whether you had a cellmate.  So that's the
22   testimony as to that exhibit.

23           And we are now at 4:30, which is the time that I had
24   promised the good men and women who have assisted you in
25   joining us here today that we would wrap up for the day.  So

1  we're going to take a break at this juncture in the testimony.

2        *BROWN:* Okay.

3        *THE COURT:* And we will resume again on the 23rd. And

4  what I'd encourage you to do between now and then, Brown, is in

5  terms of your questioning of this witness and any subsequent

6  witnesses, identify the exhibits you want to use with them and

7  then concisely move to those exhibits as you are questioning

8  the witnesses.

9        It is also essential, Brown, that you focus on

10  establishing that -- I'll take that for you -- establishing

11  that the individuals you have sued were subjectively aware of

12  an unreasonable risk of harm to your safety as a result of you

13  being celled with Inmate Allen, and that knowing that, that

14  they failed to act to protect you.

15        That is the nature of the claim that survives in this

16  case, and so that is what you need to be proving. And we'll

17  endeavor to pick that proof up on the 23rd, at which point in

18  time we'll be issuing a writ for the appearance of Brown at

19  10:00 a.m., again, trying to allow a little time for you for

20  that commute.

21        ...Before we adjourn for the day, Brown, is there

22  anything further on behalf of the plaintiff?

23        *BROWN:* Yeah.

24        *THE COURT:* What is it?

25        *BROWN:* I remember starting the first day of live

1  testimony I had made reference to offers of proofs.

2         *THE COURT:* Yes.

3         *BROWN:* And I don't think we had time to get to that

4  today, partially my fault, but how would I want to go about

5  that?

6         *THE COURT:* You can raise any offers of proof, any

7  issues that you wish at 10:00 a.m. on the 23rd.

8         *BROWN:* Yeah, thank you.

9         *THE COURT:* Okay? Anything else? Was there anything

10 else, Brown?

11        *BROWN:* No.

12        *THE COURT:* Okay. And what I'll just note for the

13 record of these proceedings is that we are frequently referring

14 to the plaintiff by his last name, by Brown, and I just wanted

15 to note for purposes of the record, because it would not

16 otherwise be entirely clear, that this is a matter we had

17 discussed with Brown prior to trial, and that Brown's preferred

18 manner of address was to be addressed by his last -- by her

19 last name, Brown, and that is why we are using this manner of

20 address.

21        I thought it was important for the record in this

22 proceeding to make it clear that the use of Brown as a manner

23 of address for the plaintiff is being done at her request and

24 as her preferred manner of address. Is that correct, Brown?

25        *BROWN:* Yes, Your Honor.

1           *THE COURT:* Very well.  Is there anything for the

2 defense?

3           *MS. BEDELL:* Briefly, Your Honor, I wanted to put the

4 court on notice that two witnesses who will be appearing by

5 Zoom are only available on the 23rd.  So I wanted to suggest

6 that two witnesses, Gilbert and Skillings, be called to testify

7 on the 23rd.

8           *THE COURT:* Brown, we're being told that those

9 witnesses, Gilbert and Skillings, are only available on the

10 23rd.

11           *BROWN:* Yeah, I don't object to it.

12           *THE COURT:* Well, that's good, because you'll need to

13 complete your examination of both of them on the 23rd.

14           *BROWN:* Yes, Your Honor.

15           *THE COURT:* Okay.  Was there anything else that you

16 wanted to bring to our attention?

17           *MS. BEDELL:* No.  Thank you, Your Honor.

18           *THE COURT:* Very well.  Then we will stand in recess,

19 and we'll see you all on the morning of the 23rd.  Thank you.

20           *COURTROOM DEPUTY:* Court is in recess.

21       *(Whereupon, the proceedings were adjourned at 4:34 p.m.)*

22

23

24

25

1            CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4         I, Lori A. Buggy, Federal Certified Realtime Reporter, in

5    and for the United States District Court for the Middle

6    District of Pennsylvania, do hereby certify that pursuant to

7    Section 753, Title 28, United States Code, that the foregoing

8    is a true and correct transcript to the best of my ability of

9    the stenographically reported proceedings held in the

10   above-captioned matter and that the transcript page format is

11   in conformance with the regulations of the Judicial Conference

12   of the United States.

13        Dated in Harrisburg, Pennsylvania, this 26th day of

14   September, 2023.

15

16                          **/s/ Lori A. Buggy**
                            Lori A. Buggy
17                          Federal Certified Realtime Reporter

18

19

20

21

22

23

24

25

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

GARTOR KIKI BROWN,                    :
3                                      :   Civil Action No. 3:18-CV-1527
                        Plaintiff      :
4            vs.                       :
                                       :   (Magistrate Judge Carlson)
5    LT. MAXWELL, et al.,              :
                                       :
6                       Defendants     :

7
         TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
8                         DAY 3
                 PAGES 310 THROUGH 501
9
         BEFORE THE HONORABLE MARTIN C. CARLSON
10             UNITED STATES MAGISTRATE JUDGE
               JANUARY 23, 2023; 10:12 A.M.
11               HARRISBURG, PENNSYLVANIA

12

FOR THE PLAINTIFF:
13
         Gartor Kiki Brown, Pro Se
14       Moshannon Valley Processing Center
         555 GEO Drive
15       Philipsburg, PA 16866

16   FOR THE DEFENDANTS:

17       Lindsey A. Bedell, Assistant Counsel
         Kimberly A. Adams, Assistant Counsel
18       Office of General Counsel
         Pennsylvania Department of Corrections
19       1920 Technology Parkway
         Mechanicsburg, PA  17050
20

21                   Lori A. Buggy
              Federal Certified Realtime Reporter
22        Sylvia H. Rambo United States Courthouse
                  1501 North Sixth Street
23                Harrisburg, PA  17102
                     717-215-1270
24            lori_buggy@pamd.uscourts.gov
     Proceedings recorded by mechanical stenography; transcript
25          produced by computer-aided transcription.

1    I N D E X

2

3                      PLAINTIFF WITNESSES

4    KEITH LAMBING                                    PAGE

5    Direct Examination by Brown                       313

6    MICHAEL MAXWELL                                  PAGE

7    Continued Direct Examination by Brown            318
     Cross-Examination by Ms. Bedell                  334
8    Redirect Examination by Brown                    456

9    ERIC HEASTER                                     PAGE

10   Direct Examination by Brown                      393
     Cross-Examination by Ms. Adams                   409
11
     JAY SKILLINGS                                    PAGE
12
     Direct Examination by Brown                      415
13
     CLINTON HAWN                                     PAGE
14
     Direct Examination by Brown                      420
15
     KIRSTEN BUTTERBAUGH                              PAGE
16
     Direct Examination by Brown                      427
17   Cross-Examination by Ms. Bedell                  434

18   MARILYN RICHARDS                                 PAGE

19   Direct Examination by Brown                      440
     Cross-Examination by Ms. Bedell                  451
20
     MICHAEL FOCHTMAN, JR.                            PAGE
21
     Direct Examination by Brown                      462
22   Cross-Examination by Ms. Bedell                  479

23

24

25

1   *THE COURT:*  Please be seated.  Good morning.  This is

2   a continuation of proceedings in the nonjury trial of Brown v.

3   Maxwell.

4        At the risk of disrupting the orderly presentation of

5   the evidence, I understand that we have got a Zoom witness who

6   is prepared to testify, and so I'm prepared to take the

7   testimony of that witness.  Are you prepared to proceed, Brown?

8        *BROWN:*  Yeah.

9        *THE COURT:*  Very well.  And the defense is ready, as

10  well?

11       *MS. ADAMS:*  Yes, Your Honor.

12       *THE COURT:*  Very well.  Mr. Neary, you may administer

13  the oath.

14       *COURTROOM DEPUTY:*  Sir, if you would please raise your

15  right hand.

16     *KEITH LAMBING, called as a witness, having been duly sworn*

17  *or affirmed, testified via Zoom as follows:*

18       *COURTROOM DEPUTY:*  Thank you.  If you would just

19  please state your full name for the record and please spell

20  your last name.

21       *THE WITNESS:*  Keith Jordan Lambing, L-a-m-b-i-n-g.

22       *THE COURT:*  You may proceed, Brown.  And I would

23  encourage you to make sure that your direct exam is concise and

24  direct to the point.

25       *BROWN:*  Okay.

<div align="center">DIRECT EXAMINATION</div>

BY BROWN:

Q.  Mr. Lambing, this is Brown.  How you doing?

A.  I'm doing all right.

Q.  Okay.  Real fast, I had a couple questions for you.  Do you

remember me?

A.  I believe, if you're the right person, you were below me in

the RHU on I block here at Greene.

Q.  Yes, yes, yes, sir.  Do you remember what time?

A.  Yes, I --

Q.  What year?  What time, around what time -- do you remember

what year or around what time?

A.  No, I can't.  Recently, maybe a year, a year ago or so.

Q.  Okay.

A.  A little bit more than that.

Q.  Okay.  So we was housed together at SCI Greene in the RHU.

Correct?

A.  Yes.

Q.  All right.  Now, while at Greene, do you remember an

individual in two cell?

        MS. ADAMS:  Your Honor, I'm going to object.

        THE WITNESS:  Um --

        THE COURT:  Excuse me, Mr. Lambing, just one moment.

        THE WITNESS:  I'm gonna need a little bit more.

        THE COURT:  Excuse me, there's an objection.  Go

Exam. - Lambing

1   ahead.

12          MS. ADAMS:   The incident we're here for is Huntingdon

3   in 2018, not Greene from a year to a year and a half ago.

4           THE COURT:   I understand.  They do seem distantly

5   related.  I'm going to give -- I'm going to give Brown a chance

6   and a question or two to try to show me how these two disparate

7   events at different prisons at different times could possibly

8   be related to one another.  Brown.

9   BY BROWN:

10  Q.  Was an individual from SCI Huntingdon over there with us?

11  A.  I believe so.

12  Q.  Do you remember what cell he was in?

13  A.  No.

14  Q.  Excuse me?

15          THE COURT:   He said no.

16          THE WITNESS:   No.

17  BY BROWN:

18  Q.  All right.  Now, there were some communication directed at

19  me at one point.  Now, do you remember what the individual was

20  saying to me around this time?

21          MS. ADAMS:   Your Honor, I'm going to object.  We have

22  not, one, identified the individual, and, two, that would be

23  hearsay.  And, again, I'm going to renew my other objection.

24          THE COURT:   I understand.  Brown, we haven't

25  identified who the declarant is, and in the absence of some

Exam. - Lambing

1  further showing, it seems that this would be hearsay. What is

2  your response to that objection?

3      *BROWN:* I'm willing to identify the individual.

4      *THE COURT:* Yeah, but the witness hasn't. But let's

5  assume we identify the individual. Is it one of the

6  defendants?

7      *BROWN:* No, it's not a defendant in this case.

8      *THE COURT:* Okay. Well, then how does the hearsay

9  declaration that's made several years after the event come in?

10      *BROWN:* Well, he occurred to be a witness and had

11  basically said some stuff pertaining to the sexual assault.

12      *THE COURT:* Yes, but this is a statement by a

13  third-party declarant who is not here with us and it's made

14  years after the event, so it would not fall within the excited

15  utterance exception that you had cited to us last week.  So

16  what's the basis for its admission?

17      *BROWN:* From the very fact that the individual was

18  present and he vividly remembers what occurred, and he said --

19  specifically told individuals what was said.

20      *THE COURT:* Okay.  I understand your offer of proof,

21  but I don't think it overcomes the hearsay objection.

22      So while you have made an excellent record of your

23  offer of proof for appellate court review purposes, I'm going

24  to sustain the hearsay objection. Do you have other questions

25  for this witness?

1      *BROWN:*  It wouldn't be in the boundary of -- if you're
2   saying -- classifying it as hearsay, I believe all my questions
3   would --

4      *THE COURT:*  And sometimes this is the nature of
5   sustaining a hearsay objection.  Sometimes it means that you
6   are just out of luck in terms of eliciting testimony from this
7   witness regarding what someone else may have said a year and a
8   half ago about an incident that took place about five years
9   ago.  Sometimes that's just the way rules work.  So if you
10  don't have anything beyond trying to elicit hearsay from this
11  witness --

12     *BROWN:*  Now, would it be appropriate to contest to see
13  what Inmate Allen has specifically told him?

14     *THE COURT:*  And you've now suggested by way of proffer
15  that the person is Inmate Allen.  The difficulty remains that
16  what Mr. Lambing is saying about what Mr. Allen might have said
17  about something that occurred some years ago still seems to
18  fall within the hearsay rule, unless there is some exception
19  you could cite to me.

20     *BROWN:*  Yeah, I believe this may be offered, also
21  offered pertaining to character, motive.

22     *THE COURT:*  Yeah, but the character and motive of
23  Allen aren't at issue here.  What's at issue is the character,
24  the motive, the actions and inactions of the defendants.

25     *BROWN:*  Yeah, okay, okay.  Yeah, that would just be

1   offered then.

2           THE COURT:   Okay.

3           BROWN:   Mr. Jordan, thanks for your time.

4           THE COURT:   Thank you, sir.   Was there any

5   cross-examination in light of that evidentiary ruling?

6           MS. ADAMS:   No, Your Honor.

7           THE COURT:   I assumed there would not be.   Thank you.

8   Were there other witnesses that we wanted to make sure we heard

9   from via Zoom?

10          MS. ADAMS:   This was the only witness from SCI Greene.

11          THE COURT:   Okay.

12          MS. ADAMS:   So we're done with SCI Greene for right

13  now.   I know there are some from Huntingdon.

14          THE COURT:   Very well.   And I appreciate the

15  assistance of the folks at SCI Greene in that regard.   We can

16  terminate the Zoom connection at SCI Greene with the thanks of

17  the court.   And would you like to resume with the direct then

18  of Defendant Maxwell?

19          BROWN:   Yeah, absolutely.

20          THE COURT:   Okay.   Well, that would seem an

21  appropriate thing to do.   Mr. Maxwell.

22          BROWN:   Yeah.   Thank you, Jordan.

23          THE WITNESS:   No problem.   I wish I could be of more

24  help.

25          BROWN:   Yeah.



1          *THE COURT:* We appreciate your assistance, sir.   Thank
2    you.
3          *COURTROOM DEPUTY:* Sir, if you could please raise your
4    right hand.
5       *MICHAEL MAXWELL, called as a witness, having been duly*
6    *sworn or affirmed, testified as follows:*
7          *COURTROOM DEPUTY:* Thank you.  Please be seated.
8          *THE COURT:* And what I would encourage you to do,
9    Brown, is get down to the meat of the issue, which is whether
10   Defendant Maxwell was deliberately indifferent to your safety
11   by ignoring a known threat to your security.  So you may
12   proceed with your direct.
13          *BROWN:* Yes, absolutely, Your Honor.
14                DIRECT EXAMINATION   *(cont'd.)*
15   BY BROWN:
16   Q.  Mr. Maxwell, Brown was admitted to the DOC on January 26th,
17   2017.  Am I correct?
18          *THE COURT:* You'll forgive me, Brown.  I think we're
19   going backwards instead of forwards.
20          *BROWN:* Yeah, it should take like two, two or three
21   statements or questions, and then it should be right there --
22          *THE COURT:* Very well.
23          *BROWN:* -- to where we need.
24          *THE WITNESS:* I don't know.  I didn't come in contact
25   with you until October of '17.

Exam. - Maxwell

1    BY BROWN:

2    Q.  Brown first writeup for refusing a celly was 12/1/17.  Am I

3    correct?

4    A.  If that's what the records show.

5              BROWN:  Okay.  I believe it's already stipulated.  It

6    would be Exhibit 30.

7              THE COURT:  And I believe that is among -- you won't

8    find it in that book.  It is in Mr. Brown's various packages.

9    Are you just noting that fact?  Did you want the witness to see

10   the exhibit?

11             BROWN:  Yeah, yeah, I'll just put it on the record.

12             THE COURT:  Very well.  And without objection, you had

13   stipulated to that.

14             MS. BEDELL:  Certainly, Your Honor.

15             THE COURT:  Okay.  Ask your next question.

16   BY BROWN:

17   Q.  Is it correct that Brown took cellies between July 26th,

18   2017, and October 8th, 2017?

19   A.  I can't dispute that.  I don't know.

20   Q.  Okay.  So would you -- would it be correct that Brown first

21   refusal of a cellmate on 12/1/17 was nothing more than a

22   measure tooken that would have made an earlier injury or harm

23   less likely to occur?

24   A.  I don't know.

25   Q.  Okay.  At this time Brown made this promulgated and was

Exam. - Maxwell

1  also seeking mental health treatment.  Am I correct?

2  A.  I am not a psychologist, so I do not know if you were

3  seeking mental health treatment.

4      *BROWN:*  Exhibit 34 is stipulated.  I'd like to enter

5  that.

6      *THE COURT:*  It is among the stipulated exhibits.  Do

7  you want it shown to the witness?

8      *BROWN:*  Yeah, I actually want to show the defendant.

9      *THE COURT:*  Very good.  Well, let's see what we can

10 do.  I have presented what has been identified and admitted as

11 Plaintiff's Exhibit 34 to the witness.  Go ahead, Brown, you

12 may ask your next question.

13      *BROWN:*  Okay.  Assuming you read that briefly, I'd

14 then like to admit -- it was already stipulated, Exhibit 32.

15      *THE COURT:*  Are we showing this to the witness, as

16 well?

17      *BROWN:*  No, we don't have to.

18      *THE COURT:*  Okay.

19      *BROWN:*  It's stipulated.

20      *THE COURT:*  Okay.

21      *BROWN:*  That should be enough.

22      *THE COURT:*  Very well.

23 BY BROWN:

24 Q.  Brown met with you on February 2nd, 2018, predicating

25 serious concern that Plocinik had told her that she would be

Exam. - Maxwell

1   moving in with Allen and that Allen was extorting and sexual

2   harassing her in population, didn't she?

3   A.   I would have to look at my notes.  I'm not sure.

4   Q.   Okay.  At that time you was aware of Brown feminine

5   characteristic, wasn't you?

6   A.   No, I was not.

7            BROWN:  I'd like to enter Exhibit 43, a request slip,

8   that we could show to the witness, please.

9            THE COURT:  Did you say 43?

10           BROWN:  Yeah.  It's a request slip.

11           THE COURT:  No, it isn't.  Well, I see there are

12   several 43s.

13           BROWN:  Yes, two.

14           THE COURT:  Okay.  Just a practice pointer in the

15   future, Brown, is that each document should have a separate

16   number because if you give me multiple 43s, it's like there

17   being two popes, one in Rome and one in Avignon, and I don't

18   know which one to pick.

19           So we're talking about 43, which is an inmate request

20   to staff member.  Is that what you're referring to?

21           BROWN:  Yes, yes, Your Honor.

22           THE COURT:  Very well.  Any objection?

23           MS. BEDELL:  Not to that page, Your Honor.

24           THE COURT:  Very well.  Then I will show it to the

25   witness.

Exam. - Maxwell

1  BY BROWN:

2  Q.  Is it correct that in there Brown also directed concerns to

3  Counselor, at the time, Richards pertaining to some concerns of

4  safety with --

5  A.  Well, this was not directed towards me, so I would not have

6  seen this.

7  Q.  Okay.  At this time you was a supervisor that had received

8  training regarding the characteristics of likely victims and

9  predators and imbalance of power and sexual aggressive

10  behavior.  Am I correct?

11  A.  Yes, and you were housed appropriately.

12  Q.  Put her in a corner cell furthest from the bubble, this was

13  an agreement all along, wasn't it?

14  A.  Say what?

15  Q.  Put her in a corner cell furthest from the bubble, this was

16  an agreement all along, wasn't it?

17  A.  I don't assign cells, nor did I make suggestions of where

18  inmates are housed in the RHU.

19  Q.  You encountered Brown at the corner cell door on 2/5/18,

20  and Brown cried to be moved, didn't she?

21  A.  I was never -- I didn't go to the cell.  I didn't meet you

22  at the cell door.

23  Q.  You encountered Brown again on 2/6/18.  During this time,

24  Brown told you that Allen was assaulting her and threatening

25  her with serious harm.  Allen hit Brown while you were standing

Exam. - Maxwell

1    at the door, didn't he?

A.    I was not at the cell door.

Q.    You understood that danger would be upon Brown if you let

4    her in that cell, didn't you?

5    A.    No, I did not.

6    Q.    In February of 2018, you had access to records that a

7    regular CO 1 did not have access to, didn't you?

8    A.    As a commissioned officer, I have access to multiple

9    records that regular COs didn't have access to.

10    Q.    So you will agree with that then?

11    A.    Yeah, it's common knowledge.

12    Q.    Thank you.  You had access to Brown and Allen cumulative

13    adjustment file, didn't you?

14    A.    Yes.

15    Q.    You had access to both Brown and Allen misconduct history,

16    didn't you?

17    A.    Yes.

18    Q.    You was also experienced enough to cover your tracks and

19    make decisions behind the scene, wasn't you?

20    A.    No.

21    Q.    One of your roles was a PREA investigator, wasn't it?

22    A.    Yeah.  I was a security lieutenant assigned to --

23    Q.    You conducted a PREA --

24            THE COURT:  Excuse me.  Wait until he finishes his

25    answer.



Exam. - Maxwell

1    *BROWN:*  Yeah.

2    *THE COURT:*  That's all right.  You're on a roll, but

3    you've got to wait until he finishes his answer.

4    *BROWN:*  All right.

5    *THE WITNESS:*  I was a security lieutenant assigned to

6    conduct sexual assault, sexual harassment investigations.

7    BY BROWN:

8    Q.  So you would agree that one of your roles was a PREA

9    lieutenant?

10   A.  Yes.

11   Q.  Okay.  You conducted a PREA investigation to Brown claims.

12   Right?  Didn't you?

13   A.  Which claim?

14   Q.  Pertaining to why we're here.

15   A.  Yes, and along with PSP.

16   Q.  Thank you.  Allen's cumulative adjustment record was not

17   part of the investigation record because you was aware that at

18   the time Allen was seeking a Z code, didn't you?  Weren't you?

19   A.  Allen's -- ICAR was not pertinent to the investigation.

20   Q.  But was Brown ICAR part of the record pertaining to the

21   investigation?

22   A.  Yes.

23   *BROWN:*  Okay.  I would like to enter Exhibit 48.

24   *THE COURT:*  And is this something to be shown to the

25   witness?



Exam. - Maxwell

1    BROWN:  Yes.

2         MS. BEDELL:  Your Honor, there are at least two

3    Exhibit 48s.

4         BROWN:  It's a page of Allen's cumulative adjustment

5    record, to be specific.

6         THE COURT:  And here's what I might do, since the

7    defense seems to be able to locate what this item is, if you

8    would be good enough to present a copy to the witness, I'd

9    appreciate it, as I find my --

10        MS. BEDELL:  Sure, Your Honor.  Or I have it on the

11   computer.  I should be able to put it on the screen.

12        THE COURT:  That would be fine, as well.

13        MS. BEDELL:  Your Honor, we'll take a paper binder up.

14        THE COURT:  Very well.  Thank you so much.  I

15   appreciate your assistance in that regard.  The witness has the

16   exhibit before him, Brown.  You may ask your next question.

17   BY BROWN:

18   Q.  Now, Mr. Maxwell, specifically pertaining to this exhibit,

19   on 2/2/18, just a day prior to the housing of Brown and Allen,

20   Allen requested a transfer, a Z code, and he acknowledged that

21   he was previously a Z code, didn't he?

22   A.  This is what he says, but he was never a Z code.

23   Q.  But he acknowledged asking for a Z code, didn't he?

24   A.  Multiple inmates ask for a Z code.

25   Q.  Well, would you dispute that Mr. Allen acknowledged asking

Exam. - Maxwell

1    for a Z code?

2    A.  No.

3    Q.  Okay.  Thank you.  You was aware that Allen had 77

4    misconduct, most of whom was violent, four of whom was sexual

5    related, and that Allen exhibited dangerous and predatorial

6    behavior arising from unfulfilled sexual desire needs, needs

7    that were not being met as a lifer in the preceding months

8    leading up to Brown being held with Allen, wasn't you?

9    A.  He had a lengthy misconduct history.  However, you guys

10   were housed appropriately through the PRAT system.  His sexual

11   misconducts were towards female staff members, not towards

12   other inmates.

13   Q.  Okay.  Thank you.  So would you dispute that you wasn't

14   aware of Inmate Allen 77 misconduct and predatorial behavior?

15   A.  He had misconducts, yes.  His predatorial behaviors, no.

16   Q.  Okay.  And you would dispute that Allen did not exhibit

17   dangerous or predatorial behavior arising out of unfulfilled

18   needs?

19   A.  I don't know what his sexual arousement was.

20   Q.  Needs that was not being met as a lifer in the preceding

21   months leading up to Brown being harmed?

22   A.  Once again, you guys were housed appropriately through the

23   PRAT system.  His sexual misconducts were towards female staff

24   members for indecent exposure, not towards another inmate.

25   Q.  So you would acknowledge that that is predatorial behavior?

```
                      Exam. - Maxwell
```

A.   No.

Q.   Okay.  Would you acknowledge that Allen displayed violent

behavior prior to being housed with Brown?

A.   He was in fights with other inmates, but, once again, you

were housed appropriately.

Q.   From Brown year or year and a half while housed at SCI

Huntingdon, are you aware of any writeup where Brown was

accused of physically assaulting somebody else?

A.   He received multiple misconducts for fighting, but that has

nothing to do with him being housed with you.

Q.   Okay, okay.  That's enough, Mr. Maxwell.  Thank you for

answering that question.

        BROWN:  We will turn to Defendants' Exhibit 12, and

this was the one that I had failed to number, but it would be

Misconduct 09726.

        THE COURT:  I think the last time that we trotted down

this road, the defense was good enough to identify it, perhaps,

as a defense exhibit, maybe 13 or something like that.

        BROWN:  No, 12.

        THE COURT:  No, no, the last time we did this, we

couldn't find your exhibit because it wasn't numbered, but I

thought the defense was able to identify it as a defense

exhibit.

        MS. BEDELL:  Correct, Your Honor.

        THE COURT:  And what was the number of that defense

Exam. - Maxwell

1    exhibit?

2          *MS. BEDELL:*  I believe Brown pointed to the correct

3    one.  It should be Exhibit 12.

4          *THE COURT:*  Okay.  Okay, he's got it in front of him.

5    Ask your question, Brown.

6    BY BROWN:

7    Q.  So would you dispute that Allen exposed himself to a female

8    guard?

9          *THE COURT:*  That's been asked and answered.  He said

10    it happened.

11          *BROWN:*  Okay.  I would then like to enter, I believe

12    Defendants' Exhibit 46, Incident 73.  It's also a misconduct.

13          *THE COURT:*  Now, the Defendant Exhibit 46 I have in

14    front of me is a page from the Z code manual.  So why don't you

15    move on to your next exhibit, because that one is misidentified

16    in the exhibits I have.  So please move on.

17          *BROWN:*  Okay.  Yeah, the -- I would like to enter

18    Misconduct 080673.

19          *THE COURT:*  I don't know what that is.  Is it a marked

20    exhibit?

21          *BROWN:*  Yes, it's under the exhibit list right here

22    as --

23          *THE COURT:*  Whose exhibit list?

24          *BROWN:*  Defendants'.

25          *THE COURT:*  Okay.  Then why don't we identify it by an

Exam. - Maxwell

1   exhibit number, because that's the way we do things in court.

2          *BROWN:*  Yes, but when I stated 46, you stated that you

3   had something else --

4          *THE COURT:*  Yeah, I'm looking at your exhibits.

5          *BROWN:*  Oh, no, I said defendants' --

6          *THE COURT:*  No, no, no, wait.  Wait a minute, wait a

7   minute.  If you want me to understand your claim, it is very

8   important that you speak precisely.  If you are using a

9   plaintiff's exhibit, call it a plaintiff's exhibit.  If you are

10   using a defense exhibit, call it a defense exhibit.

11          You have me like a pig looking for truffles in the

12   pile of exhibits you have provided to me.  And so when I look

13   for Plaintiff's Exhibit 46, it isn't what you said.  Now, are

14   you referring to Defense Exhibit 46, yes or no?

15          *BROWN:*  Yes.

16          *THE COURT:*  Very well.  Would the defense be -- would

17   you turn to Defense Exhibit 46.  Is there any objection?

18          *MS. BEDELL:*  No, Your Honor.

19          *THE COURT:*  Very well.  And you may ask your question,

20   Brown.

21   BY BROWN:

22   Q.   Now, pertaining to this exhibit, it states in January of

23   2018, that Allen was involved in a physical altercation where

24   he snuck in a locked -- in a closet, and upon returning out the

25   closet, there was blood on both him and another inmate.  Am I

Exam. - Maxwell

1   correct?

2   A.   Which page are you looking at?

3   Q.   I'm looking at the first page of the misconduct.

4   A.   So you're looking at the misconduct?

5   Q.   Yes, detail closet.

6   A.   Okay.  It was noted he had a large cut on his head and

7   bleed -- blood on his shirt.  Okay.

8   Q.   Okay.  So -- and during this time, Allen and another inmate

9   was escorted to medical.  Am I correct?

10  A.   I only see that Inmate Figuero was escorted to medical.  It

11  doesn't say anything about Inmate Allen.

12  Q.   Okay.  But am I correct that CCTV was used, utilized in

13  this misconduct to determine Allen's actions or lack thereof?

14  A.   CCTV footage was reviewed to see if he entered the closet.

15  Q.   Okay.  Thank you.  Can you explain why, from February 3rd

16  through February 8, 2018, it state that Mr. Allen was the only

17  one housed in 108 cell on GA during the time of Brown's claims?

18  A.   What are you asking?

19  Q.   Can you please explain why, at the time from February 3rd

20  through 8th, Allen's cell history states that he was the only

21  one housed in 108 cell?

22  A.   The cell history does not show cellmates.  It just shows

23  that he was housed in that cell.  If you would go to your cell

24  history, it would show that you were housed in that cell.  It

25  doesn't say who the cellmate was or if there was another inmate

Exam. - Maxwell

1  housed in the cell.

2  Q.  Would you dispute that my cell history stated that two

3  inmates was housed in that cell at the time, but Allen's cell

4  history stated that he was the only one housed in that cell at

5  the time contradicting the --

6  A.  The cell history does not determine -- show if there was

7  one or two inmates in the cell.

8  Q.  Okay.  I'd like to enter --

9  A.  If you're referring to one or two, that is the bed

10 assignment.  That doesn't say how many inmates are in the cell.

11 Q.  So how is the bed assignment different from my cell history

12 and his cell history if it's the same cell?

13         THE COURT:  I would guess perhaps he was in one and

14 you were in two.  That's just me --

15         THE WITNESS:  That is correct, sir.

16         THE COURT:  Very well.  Then we have the answer.  Is

17 there something further, Brown, that you'd like to pursue with

18 this witness?

19 BY BROWN:

20 Q.  Mr. Maxwell, are there cameras located on GA at the time

21 when Brown claims?

22 A.  There's cameras located in all the units.

23 Q.  Was you aware of CCTV and preservation policy that exists

24 in February of 2018?

25 A.  CCTV footage would be preserved if requested by a staff

Exam. - Maxwell

1  member, yes.

2  Q.  Was any footage of the incident preserved and used as a

3  fact finder during the investigation process?

4  A.  There was no video footage pulled for this incident because

5  it occurred in the cell.  There was no cameras in the cell,

6  that way it wouldn't -- there was no video footage available.

7  Q.  The fact that Brown claims she was forced into 108 cell on

8  2/3/18 and had key encounters with defendants around this time,

9  wouldn't that be relevant to the record of preservation?

10  A.  I don't know if video was reviewed for that because it

11  wasn't included with the packet for your sexual assault

12  allegation.

13  Q.  Thank you, Mr. Maxwell.

14        *BROWN:*  I would like to enter package -- Exhibit 96,

15  please, Plaintiff Exhibit 96.

16        *THE COURT:*  This appears to be among the stipulated

17  exhibits.

18        *BROWN:*  Yes.

19        *THE COURT:*  Is this an exhibit that you wish to show

20  to the witness?

21        *BROWN:*  Yes, please.

22        *THE COURT:*  Any objection?

23        *MS. BEDELL:*  No objection, Your Honor.

24        *THE COURT:*  Very well.  You won't find it over there.

25  I'm ferreting it out over here.

Exam. - Maxwell

1       *THE WITNESS:* Is it a grievance?

2       *THE COURT:* Here is what -- yes, I'm going to show you

3   what Brown has identified for me as Exhibit 96. Go ahead,

4   Brown.

5   BY BROWN:

6   Q. Is this a grievance requesting preservation of the

7   recording from 2/2/18 through the grievance date?

8   A. Yeah, and your grievance was denied --

9       *BROWN:* Thank you, Mr. Maxwell. That's all.

10      *THE WITNESS:* Your grievance was denied --

11      *THE COURT:* Well, he gets a chance to answer the

12  question.

13      *BROWN:* Okay, yeah.

14      *THE COURT:* Yeah, go ahead. So that is a grievance

15  that reflects some request, and you were saying?

16      *THE WITNESS:* Your grievance was denied because you

17  did not put in here what your clear issue was.

18      *BROWN:* Okay.

19      *THE WITNESS:* And it doesn't permit you to submit a

20  rejected grievance.

21      *BROWN:* Okay. Thank you, Mr. Maxwell.

22      *THE COURT:* Thank you.

23      *BROWN:* That will be it for now.

24      *THE COURT:* Okay. Any brief redirect -- any brief

25  direct -- cross or defendants' direct?

Exam. - Maxwell

1          *MS. BEDELL:*  Yes, Your Honor.

2                    CROSS-EXAMINATION

3    BY MS. BEDELL:

4    Q.  Captain, your current position is as the shift captain.

5    Correct?

6    A.  Yes.

7    Q.  What do you do as the shift captain?

8    A.  I oversee the 2:00 to 10:00 shift, make sure the rosters

9    are filled, the shift complement for that day is completed.

10   Q.  As the shift captain, do you have access to shift rosters?

11   A.  Yes.

12   Q.  Do you have access to inmate records?

13   A.  Just the one like ICAR entries, that kind of stuff, but

14   not -- well, yeah, I do.

15   Q.  Do you have access to inmates' misconduct records?

16   A.  Just on the computer, yes.

17   Q.  What was your position in February of 2018?

18   A.  I was a security, slash, PREA lieutenant.

19   Q.  And that is part of the security office.  Correct?

20   A.  Yes.

21   Q.  How many PREA investigators were there at SCI Huntingdon in

22   2018?

23   A.  Just myself.

24   Q.  What were your usual work hours?

25   A.  8:00 to 4:00.

Exam. - Maxwell

1   Q.   And how many PREA investigations did you normally conduct

2   in a year?

3   A.   One hundred, if not more.

4   Q.   Did you investigate complaints from prisoners all over the

5   prison?

6   A.   Yes.

7   Q.   As the PREA lieutenant, were you -- did you travel through

8   the restricted housing unit?

9   A.   Sometimes, yes.

10   Q.   But you weren't assigned to the restricted housing unit.

11   Is that correct?

12   A.   Correct.

13   Q.   So you weren't working daily conducting rounds, escorting

14   inmates, and that sort of thing in the restricted housing unit?

15   A.   No.

16   Q.   Did you have any involvement in assigning inmates to cells

17   in the restricted housing unit?

18   A.   No.

19   Q.   As the PREA lieutenant, did your duties include escorting

20   inmates at any time between cells in the RHU?

21   A.   No.

22   Q.   If you received a request from an inmate in the restricted

23   housing unit to be moved, what would you do with the request?

24   A.   I would refer it to the unit manager in the RHU.

25   Q.   So as the PREA lieutenant, what steps would you take when

Exam. - Maxwell

1  you received a PREA complaint?

2  A.  I would look at the complaint.  I would talk to the alleged

3  victim to get a timeframe of what I was dealing with, whether

4  it was sexual assault, sexual harassment.  Say it was a sexual

5  assault, the timeframe that it happened, the when, where, how,

6  to see if it was within the 96 hours to be taken out to an

7  outside hospital.

8       If not, of course, you'd separate the alleged victim

9  and the alleged abuser.  If it was in a cell, you would double

10  lock the cell so that no one could get in there, depending if

11  it was a sexual assault.

12       If it was a sexual assault, I also contacted

13  Pennsylvania State Police, and one of their crime investigators

14  also came over to the facility, and we would talk to the

15  alleged abuser together, alleged victim, and any witnesses.

16       I would pull video if it was pertinent, cell

17  histories, the PIPE -- the Guard 1 report, anything else that I

18  could think of that would help prove or disprove the

19  allegation.

20  Q.  Did you compile a report summarizing your findings?

21  A.  Yes.

22  Q.  In your role as an investigator, are you impartial?

23  A.  Yes.

24  Q.  Did you keep an open mind?

25  A.  Yes.

Exam. - Maxwell

1    Q.    Did you ever receive false PREA allegations?

2    A.    All the time.

3    Q.    Did you still take them seriously?

4    A.    Yes.

5    Q.    Did you take all witnesses seriously whether they were

6    staff or inmates?

7    A.    Yes.

8    Q.    We've heard testimony that the restricted housing unit is a

9    housing unit with extra security measures and inmates are

10   placed there for either disciplinary custody or administrative

11   custody status.  Can you briefly describe what those two terms

12   mean?

13   A.    Okay.  Disciplinary custody means they were found guilty of

14   a rules infraction, they received a misconduct, they were seen

15   by the hearing examiner, and sentenced to DC time.

16           Administrative custody is, they're housed there for

17   any broad reasons, investigation, they're sent down there for a

18   transfer, for security reasons for temporary -- or transfers

19   for separations, whether it be on staff, inmates that were

20   involved in either debt or fights, gang related, that kind of

21   stuff.

22   Q.    So one purpose of administrative custody is like protective

23   custody.  Would that be fair to say?

24   A.    Yes.

25   Q.    Do some inmates in the restricted housing unit have

Exam. - Maxwell

1  cellmates?

2  A.  Yes.

3  Q.  Have inmates ever tried to avoid living with cellmates?

4  A.  Yes.

5  Q.  And we heard a lot of discussion about a Z code.  A Z code

6  is an inmate who is designated to have a single cell.  Is that

7  correct?

8  A.  Correct.

9  Q.  Now, are inmates ever aware of reasons why other inmates

10  are given Z code status?

11  A.  No, unless they -- the other inmate tells that inmate.

12  Q.  So are inmates ever generally aware of what could prompt

13  someone obtaining a Z code?

14  A.  No.

15  Q.  But inmates do share the reason for the status?

16  A.  Yes.

17  Q.  In the restricted housing unit, so an inmate with a Z code

18  would be in a cell by himself.  Are there additional

19  limitations on who an inmate can be celled with in the

20  restricted housing unit?

21  A.  If they were involved in an altercation, they would not be

22  celled together.  If their gang affiliation -- if there's a hit

23  out on them, they wouldn't be celled with anyone.

24  Q.  So if they had a separation, they wouldn't be celled

25  together?

Exam. - Maxwell

1  A.  Yeah, correct.

2  Q.  Can inmates who are on AC status be celled with inmates who

3  are DC status?

4  A.  No.

5  Q.  Why is that?

6  A.  AC -- only AC status inmates can be housed with AC status

7  inmates.  DC status inmates are housed with DC status inmates.

8  So there's multiple different -- I'm drawing a blank on what

9  the term is, but if they get on AC status or for a misconduct,

10  they're considered on prehearing confinement until they have

11  their hearing.

12       Prehearing confinement inmates can be housed with

13  another prehearing confinement inmate, but if one of them has

14  their hearing and the other one doesn't, then you have to --

15  the officers have to move the inmate that was found guilty of

16  their charge, so now they're not the same status anymore.

17       So if they're the same status, they can be housed

18  together, but if they're not, then they can't be.

19  Q.  What about inmates who are listed as housing concerns, are

20  they limited in who they can be celled with?

21  A.  Yes.

22  Q.  In what way?

23  A.  If it's a housing concern, whether it would be a potential

24  victim or a potential abuser, victims can be housed with other

25  victims.  Abusers can be housed with other abusers.  If they're

Exam. - Maxwell

1  not designated as either, an abuser can be housed with that

2  inmate and a victim can be housed with that inmate.

3  Q.  Who decides what inmates are identified as a housing

4  concern?

5  A.  That would be the PRAT, which is conducted by a counselor,

6  a unit manager, psych staff, and/or a social worker.

7  Q.  And you were not involved in doing the PRAT questionnaire.

8  Is that correct?

9  A.  Correct.

10  Q.  We have heard Brown say she told people she was a

11  homosexual.  Are homosexual inmates automatically listed as a

12  housing concern?

13  A.  No.

14  Q.  Why not?

15  A.  It depends on their PRAT scores.  There's -- throughout the

16  facility, there's multiple homosexuals that coexist with other

17  inmates.  Just because they're a homosexual doesn't mean they

18  can't have a cellmate.

19  Q.  Are homosexual inmates given a Z code status automatically?

20  A.  No.

21  Q.  Why not?

22  A.  They have to be -- what's the word?  They have to get

23  the -- be approved for a Z code.  They have to go through this

24  process if they're -- if they meet the criteria for a Z code,

25  then they are.  But I haven't -- there's very -- like I said,

Exam. - Maxwell

1   there's multiple homosexuals throughout the facility that
2   coexist with other inmates.
3   Q.  We've established inmates serving disciplinary time in the
4   restricted housing unit spend a lot of time in their cells.
5   Let's talk about when they can leave their cells.  So what do
6   inmates in the restricted housing unit come out of their cells
7   for?
8   A.  Okay.  They come out of their cells for yard, which is one
9   hour a day Monday through Friday.  They come out of their cell
10   for showers.  They come out of their cell for the law library,
11   out-of-cell contact with psychology and/or medical.  And they
12   come out if -- they just come down, they get their property
13   done for legal exchanges.  Anything like that, they're taken
14   out to the property room to do their property and/or get legal
15   exchange.
16   Q.  What about haircuts?
17   A.  Haircuts, as well.
18   Q.  How often do inmates in the restricted housing unit get to
19   shower?
20   A.  Three times a week.
21   Q.  And how often -- you said Monday through Friday.  How often
22   do they get to go to the yard?
23   A.  Monday through Friday, one hour a day.
24   Q.  On what shift does that occur?
25   A.  Yard is typically done on daylight.

Exam. - Maxwell

Q. So that would be the 6:00 to 2:00 shift?

A. 6:00 to 2:00 shift, yes.

Q. How often can inmates visit the law library?

A. They can sign up -- they send a request slip to the 2:00 to 10:00 RHU sergeant. That sergeant comes up with a schedule, and they can get it three times a week.

Q. Do you know how often inmates meet with psychology or mental health staff?

A. They can request to meet with psychology staff, but there is a psychology staff assigned to the RHU, and they do daily rounds.

Q. If there are two inmates in a cell together in the restricted housing unit, are they ever separated from each other?

A. Yes.

Q. When would they be separated from each other?

A. If one wants the shower, one doesn't; if one wants to go to yard, the other one doesn't; if one goes to the law library, the other one doesn't. Haircuts, if one wants a haircut and the other one doesn't, there's that time that they're separated. And, of course, psychology or medical out-of-cell contact, they wouldn't be together.

Q. Are there records kept of shower, yard, law library access, and that sort of thing for inmates in the restricted housing unit?

1   A.   Yes.   The showers and yard are on the daily activity sheet.

2   The law library wouldn't be on that.   It would be marked in

3   their ICAR or their 17X.

4   Q.   How do inmates in the restricted housing unit see medical

5   staff?

6   A.   They could submit a request slip, they could tell an

7   officer, or they could talk to the nurse when they're coming

8   around during med line.

9   Q.   So if they have an urgent issue, they could be seen right

10   away?

11   A.   Correct.

12   Q.   Can an inmate report a medical concern to a corrections

13   officer?

14   A.   Yes.

15   Q.   What would that corrections officer do?

16   A.   He would immediately report it to the control booth in the

17   RHU.   They would contact medical, and they would contact main

18   control, as well, to let them know if there was an urgent

19   medical need, if medical was going to the RHU.   That way we

20   would know and control what was going on.

21   Q.   And the corrections officers carry radios, so that's how

22   they would contact the bubble.   Is that correct?

23   A.   Yes, or they would just walk up, depending on what the

24   medical issue was.   Sometimes they would stand directly in

25   front of the cell until additional staff arrived, or they

Exam. - Maxwell

1   would -- if it wasn't urgent, they would go to the control

2   bubble themselves and talk to the sergeant or lieutenant that

3   was in there, and then they would make the phone call from

4   there.

5   Q.   And for nonurgent concerns, an inmate can submit sick call.

6   Where do sick call slips go?

7   A.   They go in a secure box on the unit that only medical has

8   the key to.  Or, or, I'm sorry, and the nurse that does med

9   line would pick them up if they were on their cell door, if an

10  inmate handed them directly to them.

11  Q.   How often are those picked up?

12  A.   Daily.

13  Q.   And how often do medical staff come through the restricted

14  housing unit in a day?

15  A.   The PA does daily rounds.  A nurse does med lines,

16  depending on how many -- if there's insulin-dependent inmates

17  down there.  So there's at least twice.  And med line in the

18  morning, noon, and evening.  So at least a minimum of three

19  times a day.

20  Q.   If an inmate had a medical concern while there was medical

21  staff on the unit, could they pull the inmate out to be seen in

22  the medical room while the medical staff was there?

23  A.   Yes.

24  Q.   We've covered that inmates are escorted by officers when

25  they leave their cells in the restricted housing unit.  Inmates

Exam. - Maxwell

1  are stripped-searched, too, before leaving their cells.  Is
2  that correct?
3  A.  Correct.
4  Q.  What's the purpose of doing that?
5  A.  Security.
6  Q.  In what way?  How does that keep the prison secure?
7  A.  Inmates in the RHU, they can have feces -- they call them
8  Molotov cocktails -- stuff be thrown on staff or other inmates.
9  So they're strip-searched before they are removed from the
10  cell, and again they are strip-searched when they return to
11  their cell.
12      So they're strip-searched.  Once the strip-search is
13  conducted, they're given their clothes back.  Their clothing is
14  searched.  They're dressed.  They're restrained behind their
15  back.  And then their cellmate would be strip-searched, as
16  well, if they were coming out of the cell.
17      If not, then he would be restrained and placed -- told
18  to go to the back of the cell while the door is open, remove
19  the inmate, secure the door, remove the restraints from the
20  inmate that's still in the cell, and then take the other inmate
21  to where they're going.
22  Q.  And that requires at least two staff people to escort an
23  inmate.  Is that correct?
24  A.  Yes, yes.  It's always two on one or three on two.
25  Q.  Is there anything different that happens when moving an

Exam. - Maxwell

1   inmate and his property to another cell?

2   A.   It would be the same thing as moving an inmate from out of

3   the cell, other than this time the property for the inmate is

4   removed, as well.

5   Q.   During what shift are inmates typically moved to new cells

6   in the restricted housing unit?

7   A.   On second shift, 2:00 to 10:00, unless there is a

8   maintenance issue, then they could be moved on any shift.

9   Q.   Or if there's an urgent concern.  Correct?

10  A.   Yeah, correct.  If there's a cell fight, they could be

11  moved then, as well.

12  Q.   Officer Johnston had testified about rounds in the

13  restricted housing unit and how the officers mark their rounds

14  on separate punch stations.  Do reports -- are the reports of

15  these punch stations reviewed to make sure all rounds were

16  conducted?

17  A.   Yes.

18  Q.   What happens if a punch is missed for a round?

19  A.   If the officer knows they missed the punch, it's notated in

20  the logbook, and a 121 is also written that the punch was

21  missed.  Depending on if there's -- say there's a use of force

22  in the RHU, a punch may get messed due to all the staff being

23  involved in it.  But they typically try to leave the punch man

24  out of everything that they can continue their rounds.

25  Q.   Are staff subject to possible discipline if a round is

347

Exam. - Maxwell

1   missed?

2   A.   Yes.

3   Q.   So conducting rounds is very important.  Is that fair to

4   say?

5   A.   Yes.

6   Q.   There has been mention of cameras in the restricted housing

7   unit, and we heard that cameras are everywhere.  Can you

8   elaborate on that?  Are they really everywhere on the

9   restricted housing unit?

10  A.   They are in every -- all the quads, meaning the RHU is

11  divided into four different segments, A, B, C, and D.  They are

12  pointed in multiple directions in the unit.  Some cells have

13  cameras in them, but not all cells do have cameras in them.

14  Q.   Are inmates in the restricted housing unit able to verbally

15  report concerns about things that might not be visible on

16  camera?

17  A.   Yes.

18  Q.   Let's talk about the staff who come through the restricted

19  housing unit who an inmate may see or be able to talk to.  We

20  established medical staff come through every day, and inmates

21  can report concerns to them.  Let's talk about the corrections

22  staff.  How many shifts are there in a day for the corrections

23  officers?

24  A.   Three shifts.

25  Q.   And are there different groups of officers to cover shifts

Exam. - Maxwell

1   every day?

2   A.   Yes.

3   Q.   How many groups are there?

4   A.   You mean -- are you talking letter groups or different --

5   or officers assigned to each shift?

6   Q.   Yes.  We said there are three shifts in a day.

7   A.   Right.

8   Q.   So then how many groups of officers cover --

9   A.   So there would be three different, three different sets of

10  officers on -- so there would be a set of officers on daylight,

11  a set of officers on 2:00 to 10:00, and a set of officers on

12  10:00 to 6:00.  And then they all have -- there are relief

13  officers, as well, because we have off day groups A through G,

14  so if they're off, then there's officers that fill in to fill

15  the complement for the shifts.

16  Q.   So there are groups of officers that are named after

17  letters A through G that cover all the shifts that need to be

18  covered?

19  A.   Correct, that would be assigned to those off day groups,

20  yes.

21  Q.   And does the superintendent's assistant come through the

22  restricted housing unit on a daily basis?

23  A.   Yes.

24  Q.   For what purpose?

25  A.   To pick up grievances.

349

Exam. - Maxwell

1   Q.   And are grievance -- how are grievances stored?

2   A.   They are in a locked box, as well, which only she has the

3   key to.

4   Q.   Can an inmate talk to the superintendent's assistant and

5   report a concern as she's traveling through?

6   A.   Yes.

7   Q.   What about the --

8           BROWN:  Objection, objection.

9           THE COURT:  I'm sorry, the nature of the objection,

10  Brown?

11          BROWN:  That's more speculative.  He wouldn't know for

12  a fact that she would stop or this is consistent or

13  inconsistent as pertaining to her stopping and talking to

14  different inmates.

15          MS. BEDELL:  I'll rephrase, Your Honor.

16          THE COURT:  Very well.

17  BY MS. BEDELL:

18  Q.   Captain, given your knowledge and experience with inmates

19  and staff in the restricted housing unit, is there -- would an

20  inmate be able to speak to a superintendent's assistant as she

21  traveled through the restricted housing unit?

22  A.   Yes.  Prior to being promoted, I did spend multiple years

23  in the RHU as the RHU lieutenant, and I have seen the

24  superintendent's assistant stop at cells if the inmate

25  requested to speak to her.

(350)

Exam. - Maxwell

1      *BROWN:* Again, objection.

2      *THE COURT:* I'm going to overrule that objection,

3   although I think your first objection was well taken.  I think

4   an adequate foundation was laid.

5      *BROWN:* All right.

6   BY MS. BEDELL:

7   Q.  Captain, what about mental health staff?  There's one

8   person who is available on the unit.  Is there anyone else who

9   travels through the restricted housing unit from the mental

10  health staff team?

11  A.  There is a psych staff that is assigned there, and like I

12  said, medical staff travel through the RHU, as well.

13  Q.  And what about the shift commander?

14  A.  The shift commander does daily rounds or his designee.

15  Q.  What about counselors?

16  A.  Their assigned counselor is to see them, the inmates in the

17  RHU, I believe weekly.

18  Q.  So at some periodic interval?

19  A.  Yes.

20  Q.  What about the chaplain?

21  A.  The chaplain does daily or weekly rounds, as well.

22  Q.  I think we heard the term PRC.  What is PRC?

23  A.  The program review committee.

24  Q.  And does the program review committee come through the

25  restricted housing unit?

```
                        Exam. - Maxwell

 1   A.   Weekly.

 2             BROWN:  I would like to object again.

 3             THE COURT:  And the nature of the objection?

 4             BROWN:  Again, I believe this is more of an opinion

 5   than a fact.

 6             THE COURT:  I'll allow you to, if you can, to develop

 7   a factual basis for the testimony.

 8   BY MS. BEDELL:

 9   Q.   Captain, given your knowledge and experience with the

10   restricted housing unit, have you seen the executive team come

11   through the restricted housing unit?

12   A.   Yes.

13   Q.   And would that include deputies, a major, and a CCPM?

14   A.   Yes, they do PRC weekly.

15             THE COURT:  A CCPM?

16             THE WITNESS:  Classifications --

17             THE COURT:  See, you don't even know what it is.

18             THE WITNESS:  It's corrections classification program

19   manager.

20             THE COURT:  Very well.  Thank you, thank you.

21   BY MS. BEDELL:

22   Q.   All this staff we just talked about, what are they required

23   to do if an inmate reported to them that she was sexually

24   assaulted?

25   A.   They are required to report it.
```

Exam. - Maxwell

1    Q.   And who would they report it to?

2    A.   The shift commander and the security office.

3    Q.   Are there potential repercussions for staff for failing to

4    report PREA allegations?

5    A.   Yes.

6    Q.   What are those potential repercussions?

7    A.   Up to discipline because it's -- the DOC has a zero

8    tolerance for sexual abuse, sexual harassment, and they are

9    required to report it.

10   Q.   Is it fair to say that all reports of sexual assault or

11   abuse by inmates are taken seriously?

12   A.   Yes.

13   Q.   In 2018, if an inmate did not want to verbally tell staff

14   about a sexual assault, were there ways an inmate could report

15   that in writing?

16   A.   Yes.

17   Q.   And we talked about grievances.  Could an inmate file a

18   written grievance?

19   A.   Yes.  It would be denied due to being on the PREA category.

20   Q.   But an inmate could use a grievance to notify staff that he

21   was being assaulted?

22   A.   Yes, and it would be sent to the security office for

23   investigation.

24   Q.   And can inmates in the restricted housing unit still file

25   grievances?

Exam. - Maxwell

1    A.   Yes.

2    Q.   And we had heard there was a hotline inmates could call to

3    report abuse, and Brown testified that hotline was not

4    available to inmates in the restricted housing unit.  Was that

5    accurate?

6    A.   No, it is available.

7              BROWN:  Again, objection that --

8              THE COURT:  I understand.  You want to make sure that

9    there is a basis based upon this witness's personal knowledge?

10             BROWN:  Yes, and not just an opinion or taken as a

11   fact.

12             THE COURT:  I'll ask you to lay a foundation for that.

13   BY MS. BEDELL:

14   Q.   Captain, you had testified that you worked as a lieutenant

15   in the restricted housing unit.  Correct?

16   A.   Correct.

17   Q.   So during your time that you have spent in the restricted

18   housing unit, based on that knowledge that you have, can you

19   tell me how the abuse hotline worked?

20   A.   We have phones that are -- portable phones that are taken

21   to the cell.  The officer dials the number for the abuse

22   hotline, which there's a placard on the phones for the abuse

23   hotline.  The number is dialed.  The phone receiver is handed

24   into the inmate.  He turns the phone, and the officer walks

25   away.  There is also a DC-121 completed that the inmate

354

Exam. - Maxwell

1    requested and utilized the abuse hotline phone.

2    Q.   And the DC-121 would be completed by the staff who handed

3    the inmate the phone?

4    A.   Correct.

5    Q.   You had talked about contacting the state police for some

6    of these investigations.  When does that happen?

7    A.   As soon as I get -- as soon as I would get the

8    investigation, I would get some preliminary information just to

9    see what I was dealing with, and then I would contact the state

10    police.

11    Q.   What types of claims would you -- would prompt you to

12    contact the state police?

13    A.   All sexual abuse claims.

14    Q.   So after -- in your practice as the PREA lieutenant, after

15    pulling relevant documentation and contacting the police, if

16    necessary, what would you do next?

17    A.   Then I would start getting a list of potential witnesses,

18    whether it would be for the alleged victim and/or alleged

19    abuser.

20    Q.   And was it your practice to interview a victim early on?

21    A.   Yes.

22    Q.   And how did you determine which staff to interview?

23    A.   It depended on what the allegation was, if the victim

24    identified staff, depending on if I would pull video and see

25    who -- what staff members were in the area, logbooks.

Exam. - Maxwell

1   Q.   And when in your practice did you typically interview the
2   abuser?
3   A.   The -- I'm sorry, the abuser was interviewed last.  And if
4   it was a sexual abuse allegation, the abuser would be
5   interviewed -- I wouldn't talk to the abuser at all until state
6   police was present.
7   Q.   And why was that?
8   A.   For potential charges.
9   Q.   Would the state police read the abuser's rights to the
10  abuser --
11  A.   Yes.
12  Q.   -- if that was the case?
13  A.   Yes.
14  Q.   Can you go back and reinterview witnesses a second time if
15  you deem it necessary?
16  A.   Yes.
17  Q.   What are the possible outcomes of your investigation?
18  A.   It would be substantiated, which means it was proven that
19  the incident happened, unsubstantiated would be that there
20  wasn't enough evidence to say it happened or it didn't happen,
21  and unfounded, which it was proven that the incident did not
22  happen.
23  Q.   Did you prepare a written report of your findings?
24  A.   Yes.
25  Q.   Would your report be delayed in any way if the state police

Exam. - Maxwell

1  were involved?

2  A.  Sometimes, yes.

3  Q.  Why would that happen?

4  A.  It would be delayed for them to complete their

5  investigation.  Their incident report was also an attachment on

6  my report, so I needed their report to go along with my report

7  before I submitted it to Central Office.

8  Q.  Is your final report reviewed by other staff?

9  A.  Yes.

10 Q.  In what way?

11 A.  It is reviewed by all the administrative staff in my

12 facility.  It's reviewed -- I finish -- my report would be -- I

13 would finish it, then it would go to the CCPM because they are

14 in charge of the PREA end, so they're the PREA compliance

15 manager.  They would review the report and sign off on it.

16        Then the security captain would get it.  He would

17 review it and sign off on it.  The major would review it, sign

18 off on it.  The deputy for facilities management would review

19 it and sign off on it.  The superintendent would then review

20 it, sign off on it, and forward it to Central Office.

21 Q.  What was the purpose of having all those people review and

22 sign off on the report?

23 A.  Checks and balances to make sure everything was covered.

24 Q.  And then when the report is forwarded to Central Office,

25 then what happens?

Exam. - Maxwell

1   A.   They would review all of the documentation that was

2   provided, all the attachments, any evidence that was completed.

3   Then they would determine whether they agreed with my findings

4   or change the result.

5   Q.   Would they send you a closing -- or a memorandum back?

6   A.   Yeah, they would send a closing memo stating that they

7   reviewed the investigation and they concurred with the

8   findings, they found that the investigation was satisfactorily

9   completed.

10  Q.   And who at Central Office was doing this review?

11  A.   There would be a staff member in BII that completed the

12  investigation -- or the review.

13  Q.   So after you received a memorandum back from Central

14  Office, would you notify anyone of the final result?

15  A.   The inmate would get a closing -- or they would get the

16  results of the investigation.

17  Q.   Would anything be done to protect a victim while an

18  investigation was being conducted?

19  A.   They would be -- it depends on what was -- if they were

20  already single-celled.  If they were in population, they would

21  be in population, they would put them in single cells.  The

22  alleged abuser, if it was a sexual assault, they would be

23  placed in the RHU pending the outcome of the investigation.

24  More times than not, the abuser would actually be transferred

25  to protect the victim.

```
                          Exam. - Maxwell

 1   Q.   Would victims be examined by medical staff?

 2   A.   Yes.

 3   Q.   In what way?

 4   A.   For a sexual assault, they would have vitals taken.   There

 5   would be no photos that would be taken at the hospital if it

 6   was within the 96 hours.  They just did a bare workup at the

 7   facility so that they could send information to the hospital,

 8   as well.

 9   Q.   So even if an inmate isn't sent out to a hospital within

10   that 96-hour period, they're still seen by internal medical

11   staff to the prison.  Is that correct?

12   A.   Correct.

13   Q.   Is it ever possible for inmates who were found to have been

14   sexually assaulted to be transferred to another institution?

15   A.   Yeah, we did -- yes.

16   Q.   Is it ever possible for inmates who were found to have been

17   sexually assaulted to obtain a single cell?

18   A.   Sometimes, yes.

19   Q.   You've testified that sometimes you receive false PREA

20   reports.  Do inmates ever make just false reports to staff?

21   A.   Yes.

22   Q.   Are there repercussions for inmates who make false reports

23   to staff?

24   A.   Yes.  Once the investigation is complete and it's returned

25   from BII, they would receive a misconduct for lying to an
```

```
                          Exam. - Maxwell

 1   employee.

 2   Q.   Is lying a serious offense?

 3   A.   Yes.

 4   Q.   Why is lying a serious offense?

 5   A.   If they want to -- they set a pattern, they want to lie, if

 6   they want to file multiple PREA allegations and they're found

 7   unfounded, then when something does, it's like crying wolf one

 8   too many times.

 9   Q.   Does that use up staff resources?

10   A.   Yes.

11   Q.   I'll direct your attention to Brown.  Brown had asked you

12   about having a Z code, and you said you didn't know he -- she

13   ever had a Z code.  Then she showed a grievance that seemed to

14   indicate that she received one after the events that are at

15   issue in this case.  Did you have any involvement with giving

16   her that Z code?

17   A.   No.

18   Q.   Were you aware that she had received that Z code after the

19   events in this case?

20   A.   No.

21   Q.   We know you talked to Brown when she first arrived at

22   SCI --

23            BROWN:  Excuse me, objection, please.  I don't see how

24   this is relevant due to the fact that the witness had already

25   established that Brown was never a Z code and --
```

Exam. - Maxwell

$\tau^q 1$         *THE COURT:* I think it is -- if I understand

2 | correctly, it's in response to some of your direct testimony

3 | setting a proper chronology of events relating to subsequent

4 | requests for a Z code. Is that where you were going?

$\sqrt{L}5$         *MS. BEDELL:* Exactly, Your Honor. Thank you.

6 |         *THE COURT:* With that understanding, I'm going to

7 | overrule the objection. You may proceed.

8 | BY MS. BEDELL:

9         Q.   And we know you talked to Brown when she first arrived at

10 | SCI Huntingdon, and she showed you what was Plaintiff's Exhibit

11 | 14, that double celling agreement. We can find it if you need

12 | to see it, but do you recall that document?

13 | A.   Yes.

14         Q.   Was that document forcing Brown to admit she would feel

15 | safe in general population?

16 | A.   No, the double celling agreement policy, we have every

17 | inmate -- what they're signing for whenever they receive that

18 | in IRC is that they received a copy of the double celling

19 | agreement. We have all inmates that come through IRC, they get

20 | that double celling agreement. It's explained to them that we

21 | double-cell everybody that we can, that can be double-celled.

22 |         Then it says about your cellmate's property, that they

23 | should be respectful for your property, as you should be for

24 | theirs. It also states in there that there -- if there's

25 | contraband in the cell and they don't report it immediately to

Exam. - Maxwell

1  a staff member, that if it's found in there, that it's
2  considered their contraband and they could be written up for
3  it.

4        And then there's a paragraph in there, as well, that
5  describes how to obtain a single cell if they feel that they
6  are eligible for that.  Then we have -- we give the inmate a
7  copy, along with the PREA pamphlet, suicide prevention
8  pamphlet, and a copy of the supplemental handbook for SCI
9  Huntingdon.

10       They all have receipts that we have the inmate sign
11  stating that they received those packets.  They're not stating
12  they agree with the packets, they are receiving -- they are
13  just signing those forms saying -- the receipt stating that
14  they received them.

15  Q.  Brown testified that when she arrived at SCI Huntingdon
16  from SCI Camp Hill, she reported to you she had suffered an
17  assault at Camp Hill.  Can you tell us what happens then?
18  A.  I would take the information from the alleged victim, in
19  this case Brown.  I would type up a memorandum of interview,
20  and I would forward that information to SCI Camp Hill's PREA
21  lieutenant for investigation.

22  Q.  So after you forwarded the allegation, did you have any
23  further involvement with that investigation?

24  A.  No.

25  Q.  Do you know what the outcome was of that investigation?



Exam. - Maxwell

1      *BROWN:*  Objection.

2      *THE WITNESS:*  No.

3      *BROWN:*  How would this be relevant pertaining to my

4  sexual assault?

5      *THE COURT:*  And he's already said that he doesn't know

6  the outcome.  I'm going to sustain that objection, and we'll

7  give no weight to the fact that the witness knew nothing about

8  that outcome.

9  BY MS. BEDELL:

10  Q.  When you met with Brown, did she ever report to you

11  anything about being extorted by Allen and his friends?

12  A.  No.

13  Q.  Brown used various exhibits where she complained about

14  being extorted by Allen prior to being celled with him.  Do you

15  remember seeing those?

16  A.  Go ahead.

17  Q.  Did you see any documents that were dated as being written

18  prior to when Brown claimed she was assaulted by Cellmate

19  Allen?

20  A.  No.

21  Q.  Brown testified that you brought up another case she had

22  filed against staff from another institution even though she

23  had never told you or anyone else about it.  Do you recall

24  that?

25  A.  Yes.

Exam. - Maxwell

Q. Can you tell us what happened during that meeting?

A. I was contacted by another facility to gather information for an allegation that Brown submitted prior to being transferred out. I was asked specific -- I was told to ask specific questions for their investigation.

Brown refused to answer questions towards that, basically stating that it's a litigating matter, he don't -- she didn't feel comfortable talking about it, and that if they had any information to share, that would help her out.

Q. Did Brown provide a witness statement during that meeting?

A. No, he refused.

Q. Did Brown have any further involvement -- or did you have any further involvement with that investigation for Brown?

A. No. Once I forwarded the information to the officer that requested the information, I was -- I didn't do anything else with it.

Q. Are you aware of any other investigations where Brown alleged she was a victim?

A. Just the ones that was reported to me.

Q. And are you able to say how many were reported to you?

A. Not off the top of my head. I know there's quite a few.

Q. Is there anything that stood out to you from those other investigations?

A. The ones that I completed?

Q. Yes.

Exam. - Maxwell

A.   During the interview process, Brown was, like, standoffish,
wouldn't participate in questioning, wouldn't -- it was almost
like it wasn't really a true victim.

        *BROWN:*  Again, I would like to object.

        *THE COURT:*  I'm going to sustain the objection that
called for some speculation there.  So if you can just move on
to your next question.

BY MS. BEDELL:

Q.   Let's talk about the PREA report that's at issue in this
case.  We know you completed the investigation.  How were you
notified that Brown made a report of sexual abuse?

A.   That was -- I had received an email stating when I come in,
I'd have an envelope that had the 121 from the lieutenant the
night before, and there were some medical reports, as well.

Q.   What happened when you came in for your shift on
February 14th?

A.   I received that packet.  And then I waited -- my AO came
in, we started reviewing it.  I contacted PSP, let them know
what I had.  And it wasn't -- it was later that day a trooper
actually showed up to the facility and we started doing some
interviews.

Q.   Was Brown in a cell to herself at this point?

A.   Yes.

Q.   Was she assessed by medical staff the prior night?

A.   Yes.

Exam. - Maxwell

1    Q.  Were photos taken at some point?

2    A.  They were taken, I believe, the morning of.  When I came in

3    to work, I believe that's when they were taken because I

4    believe that she refused the night before.  And I believe she

5    actually refused medical assessment that night, as well.

6         BROWN:  Excuse me, again, speculating.  He wasn't

7    there.

8         THE COURT:  I understand.  I'll make any conclusions

9    regarding medical from the medical witnesses themselves, so

10   I'll sustain that.

11        MS. BEDELL:  Sure, Your Honor, we'll move on.

12   BY MS. BEDELL:

13   Q.  Captain, I'll direct your attention to Defendants' Exhibit

14   7, which should be in a binder up there.  Let me know if you

15   have it.

16   A.  Okay.

17   Q.  What is this document?

18   A.  This is my investigative summary.

19   Q.  And who is the complainant?

20   A.  Brown.

21   Q.  And who is the subject?

22   A.  Allen.

23   Q.  And what is the date that this report was finished and

24   submitted?

25   A.  March 14th of 2018.

Exam. - Maxwell

1    Q.   I will direct your attention, on the lower right-hand

2    corner of the page, there are what we refer to as Bates

3    numbers.   Turn to Page DEF00094.

4    A.   Okay.

5    Q.   And what is this document?

6    A.   That is the initial response allegation victim checklist.

7    Q.   When was this report prepared?

8    A.   February 13th, 2018, at 2245.

9    Q.   And who prepared this?

10   A.   Lieutenant Orndorf.

11   Q.   I'll have you turn to the next page, Page 95, and then I'll

12   ask you, what is this document?

13   A.   It's the second page -- or Page 3 of the initial response

14   for the victim.

15   Q.   And does this document reflect that Brown was transported

16   to a hospital?

17   A.   He was not.

18   Q.   She was not?

19   A.   No.

20   Q.   And why was she not transported to a hospital?

21   A.   It was outside of the 96-hour reporting frame for evidence

22   collection.

23   Q.   Is this page signed by you?

24   A.   Yes.

25   Q.   What is Section F on this page for?

Exam. - Maxwell

1   A.   It determines temporary housing for the victim.  It's for
2   the shift commander.  But there was no need for any temporary
3   housing due to Brown being single-celled at that time.
4   Q.   And what is the date of this document for your signature?
5   A.   February 14th, 2018.
6   Q.   Can you make out the time?
7   A.   Zero eight -- or zero nine.
8   Q.   Did you sign this as the shift commander?
9   A.   Being the PREA lieutenant, I had -- I can sign this if the
10  shift commander did not fill it out the night before, but
11  Lieutenant Orndorf did complete the checklist.  I just finished
12  filling it out and signing it.
13  Q.   And you testified you had notified the state police and
14  they responded and a trooper came out.  Can you tell me what
15  happens when the trooper came to the prison?
16  A.   He would come up -- I would get him at the front gate,
17  escort him up to my office.  He would get some background
18  information.  I would give him stuff that he would request
19  there in the office.  And then we would go -- we always did
20  interviews, it's called Rear D.  We would take the inmate to a
21  secure area where we could interview them privately.

22          So Brown would have been interviewed by the trooper
23  first, information -- the AO who -- she would type the --
24  everything out for us.  And then the victim -- alleged abuser,
25  in this case Allen, would have been interviewed, as well.

Exam. - Maxwell

1  Because of PSP being involved, Allen would have been read his

2  rights just in case there would have been further charges

3  coming.

4  Q.  So what happened during your meeting with Brown?

5  A.  Can I refer to --

6  Q.  I'll direct your attention to Page DEF0009.  You can take a

7  moment and review that page, and let me know when you're ready

8  for questions.

9  A.  Okay, go ahead.

10  Q.  Can you describe what happened during your meeting with the

11  trooper and Brown?

12  A.  Okay.  He -- or Brown started out -- he alleged that it was

13  on the 3rd when he was taken out of the camera cell, which I

14  believe he was housed in a camera cell in the RHU when he first

15  went down -- or Allen -- or Brown, sorry, first went down.

16       Brown alleged that the assault started right away when

17  Plocinik put him in the cell.  He spoke to Mr. Parsons, Unit

18  Manager Lieutenant Kendricks, the sergeant, and other COs.

19  Then he was asked to describe the alleged assaults, and then

20  Brown refused to submit a written statement.

21  Q.  Was Brown able to describe any details of the abuse?

22       BROWN:  Prior to the witness answering, excuse me, I

23  would like to object that Brown had ever refused to write a

24  statement.

25       THE COURT:  The witness has testified to that.  You

```
                          Exam. - Maxwell
```

1   may disagree with that, but I don't know that that's grounds

2   for objecting to the testimony. I'm going to overrule that

3   objection.

4   BY MS. BEDELL:

5   Q. Captain, did Brown provide any details of the abuse during

6   this meeting?

7   A. He -- or, I'm sorry, Brown stated Allen attempted to pull

8   the jumpsuit down, they were fighting. Brown stated that she

9   got tired, didn't want to fight off Allen, and that Brown (sic)

10  then put his dick in my butt and raped me. And then Brown was

11  asked why he waited so long to report the allegations, and

12  Brown stated because the same COs were on the block who kept

13  ignoring me.

14  Q. Was the fact that Brown refused to give you a written

15  statement here significant to you in any way?

16  A. Yes.

17  Q. In what way?

18  A. Normally the alleged victim wants to provide as much

19  information as they can to the investigator to help prove the

20  allegations.

21  Q. I'll direct your attention to Page DEF00098.

22  A. Okay.

23  Q. What is this?

24  A. That is an informed consent disclosure for psych.

25  Q. Do you see a date on this document?

Exam. - Maxwell

1    A.    That would be February 15th, 2018.

2    Q.    And is there a time?

3    A.    No.

4    Q.    So that would be about a day and a half after Brown

5    reported the assault in a sick call slip?

6    A.    Correct.

7    Q.    I'll direct your attention then to Page DEF00096, so two

8    pages prior.

9    A.    Ninety-six?

10   Q.    Ninety-six.

11   A.    Okay.

12   Q.    What is this page?

13   A.    That is the alleged abuser initial response checklist.

14   Q.    And what is the date on this document?

15   A.    February 14th, 2018.

16   Q.    Can you walk me through what happened on this page?

17   A.    Okay.  The alleged abuser would have been seen by medical,

18   as well.  Certain facts would have been obtained through

19   medical personnel.  A DC-457 would have been completed.  There

20   was no evidence collected due to the timeframe.  It was outside

21   the 96 hours.  And then temporary housing for the alleged

22   abuser, which at this point he was also in a single cell, as

23   well.

24   Q.    Who completed this form?

25   A.    I did.

Exam. - Maxwell

Q.   Do you see your signature on the next page, on DEF00097?

A.   Yes.

Q.   And I'll direct your attention to Page 46, DEF00046.

A.   Okay.

Q.   What is this page?

A.   This is Inmate Allen's written statement.

Q.   What is the date on this document?

A.   February 14th, 2018.

Q.   So Allen did provide a written statement?

A.   Yes.

Q.   Did he deny that any abuse had occurred?

A.   Yes.

Q.   I'll direct you to the prior page, Page 45.

A.   Okay.

Q.   What is this page?

A.   That is the inmate query summary sheet for Inmate Allen.

Q.   Does this provide a general summary of Inmate Allen?

A.   Yes.  It just gives his marital status, address, his offense, his sentence structure.

Q.   Why did you pull this document?

A.   It was standard for all investigations.

Q.   Does this document reflect that Inmate Allen was listed as a housing concern in February of 2018?

A.   No.

Q.   How do you know that?

372

Exam. - Maxwell

A.   There would be a housing concern banner at the top,
2   basically right under where it's the RRRI, in that area, on the
3   left hand underneath his name and that.

4        BROWN:  Excuse me.  Objection again.  It appears that
5   the defendant is speculating as there should have been or there
6   should be --

7        THE COURT:  I understood the defendant -- I understood
8   the witness to be testifying from his own knowledge of these
9   forms that if there had been a housing concern, it would have
10   been reflected there.  So I'm going to overrule that objection.
11   BY MS. BEDELL:

12   Q.   Since Allen is not listed as a housing concern, does that
13   mean he could be celled with anyone?

14   A.   Correct.

15   Q.   Does that mean he could be celled with someone even if that
16   other person is listed as a housing concern?

17   A.   Correct.

18   Q.   So I'll direct you to Page 20, DEF00020.

19   A.   Okay.

20   Q.   What is this page?

21   A.   It is Inmate Brown's inmate query summary.

22   Q.   Does this page reflect that Brown was listed as a housing
23   concern in February of 2018?

24   A.   Yes.

25   Q.   Do you know why Brown was listed as a housing concern?

Exam. - Maxwell

1    A.    It does not state why Inmate Brown was a housing concern.

2    It just says it was a housing concern.

3    Q.    And Allen was not listed as a housing concern, so Brown's

4    status here didn't prevent the two of them from being celled

5    together.  Correct?

6    A.    Correct.

7    Q.    I'll direct your attention a few pages prior to Pages 16

8    and 17.

9    A.    Okay.

10    Q.    Can you describe what these pages are showing?

11    A.    Sixteen is the conclusion, the recommendations, charges,

12    meaning the local charges, and the attachments to the

13    investigative report.

14    Q.    What do the attachments show?

15    A.    What the attachments -- the attachments included in the

16    investigative report?

17    Q.    Are the attachments all the relevant documentation that you

18    pulled throughout your investigation?

19    A.    Yes.

20    Q.    Did you interview -- looking at these attachments, are you

21    able to say, did you interview all staff from all the shifts

22    that you determined to be relevant to Brown's allegation?

23    A.    Yes.  And most of the -- a lot of the officers that were

24    interviewed were also identified by Inmate Brown.

25    Q.    So these are the staff Brown claims she made reports to?

Exam. - Maxwell

1    A.    Correct.

2    Q.    Can you summarize generally your findings from your

3    interviews with these staff?

4    A.    That nothing of a sexual assault was ever reported to them.

5    Q.    Was anything reported about a bloody nose?

6    A.    Just with Officer Johnston and Sergeant Heaster and I

7    believe Fochtman, without going back through and completely

8    reading everything.

9    Q.    In your investigation, did you determine that staff were

10   credible?

11   A.    Yes.

12   Q.    And it looks here like Inmates Allen and Brown were

13   interviewed.  Why were no other inmates interviewed here?

14   A.    Due to the location of the cell, there would have been no

15   inmates being able to see into the cell.

16   Q.    Did you review the cell histories for Inmates Brown and

17   Allen?

18   A.    Yes.

19   Q.    Why did you do that?

20   A.    Basically just showing that they were housed together

21   during the alleged allegation.

22   Q.    Did you review the misconduct histories for the two

23   inmates?

24   A.    Yes.

25   Q.    Why did you do that?

Exam. - Maxwell

1    A.    It was protocol.  I always included the misconduct history
2    for that and to show that Brown, his -- or her cell misconduct
3    history and then also Allen's misconduct history.
4    Q.    When you looked at Brown's misconduct history, was there
5    anything that stood out to you?
6    A.    Brown's, he just -- or she just had a bunch of misconducts
7    that were refusing to obey an order, basically refusing an
8    order to go to a -- to cell up with another inmate.
9    Q.    So Brown had misconducts for refusing a cellmate?
10    A.    Yes.
11    Q.    What were you looking for when you were looking at Allen's
12    misconduct history, anything in particular?
13    A.    See if there was any sexual in nature, if he had any type
14    of pattern that he was sexually violent to help prove Brown's
15    allegation or disprove Brown's allegation.
16    Q.    Now, I'm going to direct your attention -- Brown had
17    pointed to Defendants' Exhibit 12.  Can you flip to that one?
18    This was a misconduct that was issued to Inmate Allen.
19    A.    Okay.
20    Q.    Number 12.  Can you say what the nature of this charge was?
21    A.    Sexual harassment, indecent exposure.
22    Q.    And you had pointed out that this was focused on a female
23    staff person and not an inmate.  Why was that significant to
24    you?
25    A.    Allen had a -- he exposed himself to the female staff.

Exam. - Maxwell

Q. Does that make a difference?

A. Towards staff he wasn't sexually violent, he was more like a pervert towards female staff.

Q. So was there anything here that indicates to you that he could be a predator?

A. No.

Q. So would that misconduct there suggest in any way to you that Allen might later sexually assault a cellmate?

A. No.

Q. Brown has pointed to Inmate Allen as having a history of violence and fighting. Is it fair to say that all inmates serving disciplinary time in the restricted housing unit have committed a rules infraction of some way?

A. Yes.

Q. Despite that, is it true that many inmates are celled with cellmates in the restricted housing unit without issue?

A. Yes.

Q. And even if an inmate --

          BROWN:  Excuse me, again, please, objection pertaining to that.  Can you please rephrase that question because --

          THE COURT:  I'm going to just sustain that objection. I understand your point.

          BROWN:  Thank you.

          THE COURT:  But perhaps you can just move on to another topic area.

Exam. - Maxwell

1        *MS. BEDELL:* Certainly, Your Honor.

2        *THE COURT:* Thank you.

3    BY MS. BEDELL:

4    Q.   Captain, when you looked at -- I want to go back to Brown's

5    misconduct history.  I want to direct your attention to Exhibit

6    48.   This is Defense Exhibit 48.

7    A.   Okay.

8    Q.   Is this a misconduct report?

9    A.   Yes.

10   Q.   And who was it issued to?

11   A.   Brown.

12   Q.   And what is the date on this misconduct report?

13   A.   One -- January 25th, 2018.

14        *BROWN:* I'd like to object to this misconduct and

15   specifically on Rule 26.  It's my understanding that none of

16   Brown misconduct was made available at the discovery stage

17   pertaining to this matter, and defendants are now using --

18        *THE COURT:* So the objection is that Brown had made a

19   proper discovery request and had not received this.

20        *MS. BEDELL:* Your Honor, we responded to all discovery

21   requests that were given to us by Brown.

22        And on that matter, Brown previously had made an issue

23   for the court of not receiving his medical documents until we

24   were preparing for trial.  I went back and reviewed the

25   discovery request, and we had prepared his medical records to

Exam. - Maxwell

1   send to him. They were redacted. You know, we redact birth
2   dates, that sort of thing.

3        And they -- documents were produced to his institution
4   for him to review, and we know that he was able to review
5   documents because he later filed a motion to compel to Judge
6   Jones, which was fully briefed, including an in camera review
7   of various documents.

8        So if Brown was unable for some reason to review his
9   medical documents at that time, we weren't made aware. And it
10  wasn't an issue that was briefed in the motion to compel at the
11  time.

12        BROWN: And, excuse me, this is now pertaining to the
13  misconducts, my misconduct. Were these misconducts delivered
14  during discovery, and can you guys show that it was, assuming
15  at a different point, if it's not too much to ask?

16        THE COURT: Brown, did you request your prior
17  misconducts?

18        BROWN: Yes, I believe I requested all documents
19  pertaining to any matter that would be used within the court
20  circumference.

21        THE COURT: In the court's circumference. Did you
22  request your prior disciplinary --

23        BROWN: I believe, I believe I asked for such material
24  or related materials, yes.

25        THE COURT: I'm going to permit some inquiry here,

Exam. - Maxwell

1  this being a nonjury proceeding, but it will be subject to the

2  defense establishing that -- it would be subject, sir -- I'm

3  sorry, Brown, it would be subject to you establishing that you

4  made a proper request that had not been responded to.  So you

5  may proceed.

6        MS. BEDELL:  Thank you, Your Honor.

7  BY MS. BEDELL:

8  Q.  Captain, what is the nature of this misconduct?

9  A.  Refusing to obey an order, that he was -- Brown was ordered

10  to take a cellmate, at which time Brown refused by stating he's

11  not -- or I'm not taking any cellies.

12  Q.  Thank you.  I will direct your attention to the next

13  exhibit, Defendants' Exhibit 49.  I'll have you turn -- the

14  pages have a number on the lower right-hand corner again.

15  A.  Okay.

16  Q.  I will direct your attention to Page 8.  What is this page

17  showing?

18  A.  That is another misconduct for refusing to obey an order.

19  Q.  Is this a misconduct that was issued to Brown?

20  A.  Correct.

21  Q.  And what is the date on this misconduct?

22  A.  February 8th of 2018.

23  Q.  From this document, are you able to see what happened to

24  Brown after this misconduct was issued?

25  A.  It looks like Brown was in the shower, and Brown was

Exam. – Maxwell

1   refusing to take a celly and said he was -- or Brown stated

2   that she was not going back into 1008 on A quad.

3   Q.   Do you remember February 8th, 2018, as being the date that

4   Brown was moved into her own cell?

5   A.   I believe so.  Without -- without looking at the cell

6   history, I have no reason to dispute it, but yes.

7   Q.   So would that have been in conjunction with this misconduct

8   being issued?

9   A.   Correct.

10   Q.   I will direct your attention back to Defendants' Exhibit 7,

11   and then I'll ask you to turn to Page 75, DEF0075.

12   A.   Okay.

13   Q.   What is this showing?

14   A.   This is the Guard 1 report for the punch station on GA

15   1008.

16   Q.   Where was this punch station?

17   A.   It was right beside GA 1008 cell, cell door on the wall.

18   Q.   And is that the cell where Brown was celled with Inmate

19   Allen?

20   A.   Yes.

21   Q.   When you pulled these records, did you determine whether

22   any rounds were missed during this time period?

23   A.   There were no rounds missed.  All the rounds were recorded.

24   Q.   And I will direct your attention to Page 89, DEF0089.

25   A.   Okay.

Exam. - Maxwell

1   Q.   What is this page showing?

2   A.   This is the Security Level 5 housing unit exercise, shower,

3   shave sign-up sheet.

4   Q.   Why did you review these?

5   A.   I wanted to see if at any time Allen and/or Brown were in

6   the cell by themselves, if one or both refused rec or went to

7   rec, went to the showers.

8   Q.   So when you reviewed these during your investigation, what

9   did you determine?

10  A.   That there were multiple days where Allen had went to yard

11  and/or showers that Brown did not, and that if there was

12  something going on in the cell, that Inmate Brown had ample

13  opportunity to not let Brown -- or Allen back in the cell or

14  report it confidentially to another officer.

15  Q.   And I'd like you to turn to Page 90, DEF0090.  Brown had

16  testified she was denied yard on February 5th.  Do these

17  records reflect that?

18  A.   Brown refused exercise on that date.

19  Q.   And what shift would yard have been done on?

20  A.   6:00 to 2:00 shift.

21  Q.   Did you have an opportunity to review the shift rosters for

22  this day, February 5th?

23  A.   They would have been part of the packet.

24  Q.   Do you know whether any of the four defendants in this

25  civil action were working on the 6:00 to 2:00 shift that day,

Exam. - Maxwell

1  February 5th?

2  A.  The only way any of them would have been working, it would

3  have been working overtime, but I don't believe any of them

4  were.

5  Q.  Did you review any video during your investigation?

6  A.  No, because there was no video due to the incident taking

7  place in the cell.

8  Q.  So no video was preserved, either.  Correct?

9  A.  Correct.

10 Q.  But you were able to confirm staff did all the necessary

11 rounds.  Is that right?

12 A.  Correct.

13 Q.  Did you check any medical records for Brown during this

14 time period?

15 A.  The ones that pertain to this investigation.

16 Q.  What was the purpose of you pulling those specific medical

17 records?

18 A.  To show whether Brown had or did not have any injuries.

19 Q.  Did you review photos that were taken by the medical staff?

20 A.  Yes.

21 Q.  I'll direct your --

22       BROWN:  Again, objection, and pertaining to both

23 relevance and pertaining to, even if it's relevance, that the

24 defendant just stated that pertaining to Brown having any

25 injuries, I don't believe pictures -- especially he's not an

Exam. - Maxwell

1  expert, neither -- would determine if Brown had injuries or not
2  under those grounds.
3       THE COURT:  I'm going to overrule that objection
4  noting that the witness is, I think, simply testifying to the
5  collection of any photographs that medical may have taken on or
6  about the 14th of February, and the pictures will show what
7  they show or what they don't show.
8  BY MS. BEDELL:
9  Q.  Captain, you are not medical staff.  Correct?
10 A.  Correct.
11 Q.  You don't have a medical license?
12 A.  No.
13 Q.  You're not making medical conclusions here.  Is that
14 correct?
15 A.  No.
16 Q.  But you are testifying to your observations.  Is that
17 correct?
18 A.  Correct.
19 Q.  I'll direct your attention to Defendants' Exhibit 11.
20 A.  Okay.
21 Q.  What are these?
22 A.  They are photos of Inmate Brown.
23 Q.  Were these the photos that you reviewed during your
24 investigation?
25 A.  Yes.

Exam. - Maxwell

1   Q.   Was there anything notable to you when you looked at these
2   photos?
3   A.   I didn't see any noticeable injuries to Inmate Brown other
4   than like a scratch on his knee.  But nothing that would show
5   that he was in a physical assault.
6   Q.   Given your experience working in prisons, have you seen the
7   aftermath of inmates who were involved in fights?
8   A.   Yes.
9   Q.   Are there photos in here of Inmate Allen, as well?
10  A.   Yes.
11  Q.   Given what you see here of the photos of Inmate Brown and
12  Allen, do either of them appear to have just been involved in a
13  fight?
14  A.   No.
15             BROWN:  Again, objection.  That's more of an opinion.
16             THE COURT:  I'm going to sustain that objection.  I've
17  got the photos in front of me as Exhibit 11.  They depict what
18  they depict, and I'll make whatever findings I think are
19  appropriate based on that evidence.
20  BY MS. BEDELL:
21  Q.   Captain, did you review Brown's ICAR notes, his inmate
22  cumulative adjustment records?
23  A.   Part of the investigative packet, yes.
24  Q.   I will direct your attention back to Exhibit 7, Defendants'
25  Exhibit 7, and have you turn to Page 85.

Exam. - Maxwell

1    A.   Okay.

2    Q.   What was your purpose for looking at these records?

3    A.   I was trying to link the allegation to an attempt to gain a

4    single cell.

5    Q.   Did these records help you do that?

6    A.   Yes.

7    Q.   Did you reach any conclusions based on that?

8    A.   Based on all the evidence that was collected, that's how I

9    came to my conclusion.

10   Q.   What was reflected in Brown's inmate cumulative adjustment

11   records?

12   A.   That Brown had multiple -- that there were multiple entries

13   in here by various staff, counselors, psych, that there was an

14   attempt to gain a single cell --

15   Q.   Did you --

16   A.   -- or a Z code.  Sorry.

17   Q.   When you finished your investigation, did you provide all

18   the information that you had gathered to the state police?

19   A.   Yes.

20   Q.   Did the state police do their own investigation?

21   A.   Yes.

22   Q.   Were you finished with your investigation prior to the

23   state police being finished with theirs?

24   A.   Pretty close, yeah.

25   Q.   And you were provided a copy of the state police report.

Exam. - Maxwell

1   Is that correct?

2   A.   Correct.

3   Q.   Did you use the state police report in any way?

4   A.   It is an attachment with the investigative packet.

5   Q.   It's noted as an attachment.  Correct?

6   A.   Yes.

7   Q.   And is this state police report retained by the Department

8   of Corrections?

9   A.   Yes, it is kept with the investigative summary that I

10  completed.

11  Q.   So it's standard procedure to keep it?

12  A.   Yes.

13  Q.   And you said a copy is maintained with the investigative

14  report?

15  A.   Yes.

16  Q.   I'll direct your attention to Exhibit 8.

17  A.   Okay.

18  Q.   What is this document?

19  A.   It is the state police investigative report.

20  Q.   What was the final result of the state police's report?

21  A.   Trooper Lear determined, after all the interviews were

22  conducted with the victim, abuser, and all witnesses, and

23  looking at all the other information provided, that they

24  believed, at the conclusion of all interviews and reading ICARs

25  for Inmate Brown, that Trooper Lear did not believe a crime was

Exam. - Maxwell

1  committed and did not believe Inmate Brown to be credible in

2  his initial interview.  Inmate Brown did not present as a

3  legitimate victim, and there was -- he did not believe any type

4  of assault or rape occurred.

5  Q.  So when your investigation was complete, did you make a

6  summary of your own impressions?

7  A.  Yes.

8  Q.  What were your impressions?

9  A.  I came to the conclusion that the allegations made by

10 Inmate Brown were unfounded due to his -- or her unwillingness

11 to, what's the word, participate, give -- fully cooperate with

12 the investigative process.

13       There was no -- that Inmate Brown alleged that she had

14 a broken nose.  There was -- and it was noted by LPN Trice that

15 there were no bruises, marks, or evidence supporting the

16 allegation, that Inmate Brown stated at this point he didn't --

17 just didn't want any cellmates.  There's multiple entries noted

18 in the ICARs that Brown was attempting to request or manipulate

19 staff into giving him a Z code.

20       Inmate Allen denied all the allegations, and that this

21 allegation could be construed as another attempt for

22 manipulative or self-gain, and PSP concluded that any type of

23 assault or rape did not occur.  Inmate Brown was not credible

24 or presented as a legitimate victim.

25 Q.  Did you make a recommendation?

Exam. - Maxwell

1  A.  I closed it at my level.

2  Q.  And then was this report reviewed by the other staff --

3  A.  Yes.

4  Q.  -- going up the chain?  And did Central Office concur with

5  your findings?

6  A.  Yes.

7  Q.  I'll direct your attention then to Exhibit 9.

8       THE COURT:  Let me ask you, if I might, Ms. Bedell, I

9  don't want to interrupt the flow of your cross and defense

10  direct, but we are at the noon hour.  How much longer were you

11  anticipating --

12       MS. BEDELL:  I think just a few minutes, but we're

13  fine to pause here if you would like, Your Honor.

14       THE COURT:  I think I'd like to try to come to

15  closure, if I can.  So please take this as Shakespeare's advice

16  about the soul of wit.

17       MS. BEDELL:  Certainly, Your Honor.

18       THE COURT:  Thank you.

19  BY MS. BEDELL:

20  Q.  Exhibit 9, can you turn to the Defendants' Exhibit 9?

21  A.  I'm there.

22  Q.  What is this document?

23  A.  That is the notification to the inmate for a PREA

24  investigation.

25  Q.  I will direct your attention then to Defendants' Exhibit

Exam. - Maxwell

1    89.

2    A.  Okay.

3    Q.  Were there any repercussions to Brown from this

4    investigation?

5    A.  Brown received a misconduct for lying to an employee from

6    the outcome of this investigation.

7    Q.  And is Exhibit 89 that misconduct?

8    A.  Yes.

9    Q.  Do you have it in front of you?

10   A.  Yes.

11   Q.  What is the date on that misconduct?

12   A.  April 26th of 2018.

13   Q.  And after this investigation concluded, did Brown make

14   false allegations against any of the other defendants?

15   A.  Yes.

16   Q.  Do you recall who?

17   A.  Officer Plocinik.

18   Q.  Did you have any involvement with that investigation?

19   A.  Yes.

20   Q.  What was the result of that investigation?

21   A.  It was unfounded.

22   Q.  And I'll direct your attention to Defendants' Exhibit 88.

23   A.  Okay.

24   Q.  What is this document showing?

25   A.  That Brown received another misconduct on December 11th,

 1   2018, for lying to an employee for an unfounded investigation.

 2          *BROWN:*  Is this 88?

 3          *MS. BEDELL:*  Correct.

 4   BY MS. BEDELL:

 5   Q.  Captain, would that have been the other investigation that

 6   pertained to Officer Plocinik?

 7   A.  Yeah, yes.

 8   Q.  Captain, throughout all of your interactions with Brown,

 9   did you ever delay reporting abuse of Brown to any authorities?

10   A.  No.

11   Q.  Did you ever delay or prevent Brown from obtaining medical

12   care?

13   A.  No.

14   Q.  At any time did you ever have any reason to want to harm

15   Brown?

16   A.  No.

17          *MS. BEDELL:*  Nothing further, Your Honor.

18          *THE COURT:*  Very well.  We will break at this

19   juncture, Brown, and then we will resume the testimony at

20   1:10 in the afternoon.  Thank you.  We'll stand in recess.

21      *(Luncheon recess taken.)*

22          *THE COURT:*  Please be seated.  We continue with the

23   nonjury trial in Brown v. Maxwell.  A quick question regarding

24   the schedule and an observation.  It's still my intent to wrap

25   up testimony today, for today's session, at 4:30, just for

1    those of you who are escorting Brown back and forth. Th    ou
2    again for your help. I had understood there were some
3    witnesses who had to testify today.

4        *MS. BEDELL:* Yes, Your Honor. A quick update, one
5    person had a medical emergency, had to have surgery and is not
6    available to testify.

7        *THE COURT:* I can imagine.

8        *MS. BEDELL:* And that was Gilbert.

9        *THE COURT:* Okay.

10        *MS. BEDELL:* He had only been available today, but now
11    he's not available at all. I'm not -- if Brown would like to
12    make an offer of proof, maybe there's something we can
13    stipulate to.

14        *THE COURT:* Right.

15        *MS. BEDELL:* And then Officer Skillings is only
16    available today. He will be there shortly. And Heaster is
17    available in the room. He's ready to testify. And there was
18    one more person. And Officer Hawn is on call. He's ready to
19    testify, as well.

20        *THE COURT:* Very well. Recognizing, Brown, that some
21    of these people are only available today and that it sounds as
22    if Gilbert is not because of a medical emergency, you would
23    have the opportunity to do brief redirect of Defendant Maxwell,
24    but I want to make sure that your witnesses are heard,
25    especially those with limited availability. Do you want to go

1   directly to those witnesses?

2       *BROWN:*  Whatever the court desires.

3       *THE COURT:*  For better or for worse, Defendant Maxwell
4   is with us for the long haul here, so it might be more prudent
5   to call those witnesses who are otherwise unavailable and try
6   to conclude their testimony.  As to Gilbert, what were you
7   looking for from Mr. Gilbert?

8       *BROWN:*  It was basically pertaining to the misconduct
9   that brought Inmate Allen to the RHU.  I just had some
10  questions pertaining to that.  I believe that was Gilbert's
11  testimony pertaining to that misconduct, what was witnessed by
12  him, because it was a little disturbing.

13      *THE COURT:*  The misconduct itself is in evidence, if I
14  recall.

15      *BROWN:*  Yes.

16      *THE COURT:*  So I'm not sure what beyond that you would
17  be able to elicit from Gilbert.  But we've got that misconduct
18  in evidence, and Gilbert now, because of surgery, is
19  unavailable.  Then do you want to call your remote staff
20  witnesses at this time, Brown?

21      *BROWN:*  Yeah, sure.

22      *THE COURT:*  Okay.

23      *BROWN:*  What would be the order?

24      *THE COURT:*  That's what I'm trying to find out.  Those
25  are the questions I'm asking.

1          *MS. BEDELL:* Lieutenant Heaster is in the room right
2   now.
3          *THE COURT:* You have Heaster there right now.
4          *BROWN:* Yeah, okay. We'll call Heaster right now.
5          *THE COURT:* Very well. Then why don't we proceed in
6   that fashion.
7          *COURTROOM DEPUTY:* Good afternoon, sir. If I could
8   ask you to please raise your right hand.
9      *ERIC HEASTER, called as a witness, having been duly sworn*
10  *or affirmed, testified via Zoom as follows:*
11         *COURTROOM DEPUTY:* Thank you. And, sir, if I could
12  ask you to please state your full name for the record and
13  please spell your last name.
14         *THE WITNESS:* Eric Mitchell Heaster. My last name is
15  spelled H-e-a-s-t-e-r.
16         *THE COURT:* You may proceed, Brown.
17         *BROWN:* Okay.
18                       DIRECT EXAMINATION
19  BY BROWN:
20  Q. Good afternoon, Mr. Heaster. On February -- in February of
21  2018, did you know who Brown -- you was aware who Brown and
22  Allen was, wasn't you?
23  A. Yes.
24  Q. As you're already aware, you're not a defendant in this
25  case. The shift commander report states that you was the

Exam. - Heaster

1   sergeant in the RHU on G unit from -- on the 2:00 to 10:00

2   shift on the 5th, 6th, and 7th.  Is that correct?

3   A.   That's correct.

4   Q.   How long have you been employed at SCI Huntingdon?

5   A.   Over 15 years.

6   Q.   During this time, did you have any reason to believe that

7   Brown was at high risk for victimization or assault?

8   A.   (Inaudible.)

9   Q.   You want me to rephrase that?

10  A.   I said no.

11       THE COURT:   We didn't hear you, but thank you.   He

12  says no.

13  BY BROWN:

14  Q.   As a RHU sergeant, did you have access to Mr. Allen

15  misconduct history?

16  A.   Yes.

17  Q.   And when Brown was housed with Mr. Allen, did you know that

18  77 misconduct exist for most of whom was violent and four of

19  whom was sexual -- let me rephrase that -- some of what was

20  violent and four of which was sexual related?

21  A.   I didn't -- I didn't know what his misconduct history was

22  without looking at it, so --

23  Q.   When Johnston ran to the bubble and stated Brown is

24  bleeding, did you know prior to being withheld that Allen and

25  Brown was on the same population unit?

Exam. - Heaster

1    A.   I didn't realize you two had lived on the same population
2    unit, no.
3    Q.   Okay.  Did you know Allen had exposed Brown as to working
4    with state police pertaining to another sexual assault?
5    A.   I would not be privy to that information because I didn't
6    work in the security office.
7    Q.   Prior to the unfortunate encounter with Mr. Johnston on
8    February 7th, 2018, did you know that Brown was seeking mental
9    health treatment?
10   A.   No.
11   Q.   Would you have had any reasons to believe that Brown was
12   mentally unfit to be with -- housed with Inmate Allen?
13   A.   No.
14   Q.   Can you -- do you have a reason as to why Brown was housed
15   in the cell furthest from the RHU bubble?
16            MS. ADAMS:  Your Honor, I'm going to object to
17   speculation.
18            THE WITNESS:  There's inmates housed in those cells
19   all the --
20            THE COURT:  Excuse me.
21            THE WITNESS:  The RHU --
22            THE COURT:  Excuse me, Lieutenant, there's been an
23   objection lodged.  The nature of the objection?
24            MS. ADAMS:  That's speculation.
25            THE COURT:  If you can, without speculating, can you

Exam. - Heaster

1   answer that question?

2           THE WITNESS:  It was probably an empty cell that we

3   were able to double inmates up in because the RHU was

4   particularly full at that period of time.

5   BY BROWN:

6   Q.  Okay.  Looking at Brown's cell history, Brown was in 214

7   cell just a day before moving with Inmate Allen on GD.  Was

8   there a reason Allen wasn't tooken to Brown cell and that Brown

9   was brought to the 108 cell, the corner cell furthest from the

10  bubble?

11  A.  I wasn't at work the day that you were moved, so I'm

12  unclear as to why they moved you where they did.

13  Q.  During that time, were there video monitors on GA?  Were

14  there cameras located on GA?

15  A.  There's cameras on every quad in the RHU.

16  Q.  And can you see what's going on as pertaining to the video

17  surveillance from the bubble?  Are there monitors within the

18  bubble to display -- to basically see what's going on in the

19  units?

20  A.  What are you asking, specifically?

21  Q.  Can you sit in the unit and view an officer during rounds

22  or view certain activities going on on the unit, like jumper

23  exchange and other stuff along those natures, via a monitor in

24  the bubble?

25  A.  You watch out through -- sorry.  Most of those you watch

397

Exam. - Heaster

out through the windows.  There are certain cameras that you

can view, and there are certain cameras that you can't view

while in the bubble in the RHU.

Q.  So there are monitors in the bubble that you could watch

from?  Would you dispute that?

A.  Certain cameras, no.

Q.  Are you familiar with Mobley v. Barnacle?

     MS. ADAMS:  Your Honor, I'm going to --

     THE COURT:  Yeah, I'm going to sustain an objection to

questions about whether he's familiar with particular case

citations.

     BROWN:  Okay.  I'm sorry.

     THE COURT:  If you have case citations for me, I'll

get them after we've taken the testimony.

     BROWN:  Okay.

     THE COURT:  So I'll sustain that objection.

BY BROWN:

Q.  Are you familiar with DC-ADM 631, Section 42, operation of

a CCTV monitor and recording?

A.  Yes.

Q.  So you was called to participate in a PREA investigation on

February 15th, 2018?

A.  Yes.

Q.  You was interviewed by Captain Maxwell?

A.  Yes.

V 398

Exam. - Heaster

1  Q.  Do you remember writing a statement?

2  A.  I do.

3  Q.  In your interview statement, did you predicate some

4  concerns about Brown mental health in that statement?

5  A.  I don't see anything in the statement that would predicate

6  mental health concerns.

7      *BROWN:*  I'd like to enter Exhibit 101 as part of

8  Brown's, plaintiff's exhibits.  I believe it ends in 10, so

9  DF00 --

10     *THE COURT:*  Is this the same handwritten statement

11 that shows up as Defendants' Exhibit 7, DF -- DEF26?

12     *BROWN:*  That would be different, but it's similarly

13 situated.

14     *THE COURT:*  Okay.  So this is some other statement?

15     *MS. ADAMS:*  I'm sorry, did he say Plaintiff's Exhibit

16 101?

17     *THE COURT:*  That's what I understood him to be saying.

18     *BROWN:*  Yes, it's another statement, but it was by the

19 same defendant -- I mean non-defendant, yes.  But 10 and 26 are

20 different.

21     *MS. ADAMS:*  Your Honor, okay, there's -- I see two

22 Exhibits 101.  But assuming he's talking about Sergeant

23 Heaster's statement specifically.  The bottom says, DEF00026.

24     *BROWN:*  Zero one ten -- one zero.

25     *THE COURT:*  Once again, yes, we do have two Exhibits

Exam. - Heaster

1  101, one of which seems to be typewritten reports, another a

2  handwritten statement.  What are you referring to, Brown?

3         *BROWN:*  Yes, I'm referring to both, actually.

4         *MS. ADAMS:*  Your Honor, I believe Brown has all the

5  PREA investigation marked as Exhibit 101, and I believe he's

6  specifically talking about DEF00010, which was the summary of

7  Sergeant Heaster's interview.

8         *THE COURT:*  Okay.  Does the witness -- is there an

9  objection to that exhibit?

10         *MS. ADAMS:*  No, Your Honor.

11         *THE COURT:*  Does the witness have it before him?  If

12  Brown is going to be asking a question about it, that might

13  come up.

14         *UNIDENTIFIED ZOOM SPEAKER:*  Just ask what exhibit is

15  it.  What exhibit is it?

16         *MS. ADAMS:*  If it would be easier, it's also in

17  Defense Exhibit 7, Page DEF --

18         *UNIDENTIFIED ZOOM SPEAKER:*  Okay, we have seven.

19         *MS. ADAMS:*  -- 00010.

20         *UNIDENTIFIED ZOOM SPEAKER:*  There's seven.

21  BY BROWN:

22  Q.  So first, with due respect to your precious time, can you

23  please take a look at the DEF000010, a typewritten --

24         *UNIDENTIFIED ZOOM SPEAKER:*  000010?

25         *BROWN:*  Yes, ma'am.

V, 400

Exam. - Heaster

1      *UNIDENTIFIED ZOOM SPEAKER:*  Okay.

2           *THE WITNESS:*  I see what you're talking about.

3   BY BROWN:

4   Q.   Sometimes it's been so long, and, again, I apologize.

5   Again, I'll try to rephrase my question.

6           Do you remember the interview and you writing a

7   statement, interview statement, did you predicate some concerns

8   about Brown's mental health?

9   A.   In my interview statement, I did not, but apparently at

10  some point during the interview I had discussed that you had

11  been eating feces out of a cup.

12  Q.   Mr. Heaster, that sounds very concerning.  When did you

13  discover this?  Was it around the time of Brown being withheld

14  with Mr. Allen?

15  A.   I think it was probably prior to you being celled with him.

16  I don't recollect.

17  Q.   And I understand you're not a mental health expert, so I

18  hate to do this, but due to your experience as a Correctional

19  Officer 2, what steps were tooken to address the situation or

20  rectify what you allegedly witnessed pertaining to Brown mental

21  instability?

22  A.   You're right, I'm not a mental health expert, but in my

23  time in the RHU, I've witnessed multiple different inmates

24  playing in their own excrement and they didn't have mental

25  health issues.

Exam. - Heaster

Q. And, again, you stated that you're not a mental health
expert. Am I correct?

3   A. That's correct.

4        THE COURT: That's correct. Why don't we pose our
5   next question.

6        BROWN: Okay.

7   BY BROWN:

Q. Was you aware that Brown had refused multiple times to take
9   cellmates around this time due to fear?

10   A. I was aware that you had refused to take multiple
11   cellmates. I was not aware that you did it out of fear.

Q. Okay. Now, I would like you to look at the actual written
13   statement under DEF000026.

14   A. Is this my written statement you're talking about?

15   Q. Yes.

16   A. Yes.

17   Q. And did you predicate that various COs around this time of
18   February came to you predicating different concerns as to Brown
19   not wanting to be withheld with Inmate Allen?

20   A. It says that -- my written statement says that you stated
21   they violated policy by placing him in a cell with another
22   inmate after you had received a misconduct for refusing to
23   double cell on an earlier date.

24   Q. Did I tell, did I tell you this directly, or was this told
25   to you by somebody else?

Exam. - Heaster

1   A.   I believe it was told to me by somebody else, but I can't
2   recall.

3   Q.   Would you also dispute that Brown had requested to move to
4   different cells by various officers from 2/3/18 through 2/3 --
5   2/7/18?

6   A.   I can only speak for 2/5, 2/6, and 2/7 because I was not
7   there on 2/3 or 2/4 or the dates after that in which you state.

8   Q.   But you wouldn't dispute that Brown had made concerns to
9   various officers from the dates you was working, assuming that
10  he did not want to be -- or she did not want to be in a cell
11  with Inmate Allen?  Would you dispute that?

12  A.   I would dispute that you didn't want a cell with anybody,
13  that you thought we had violated your rights by giving you a
14  celly, period.

15  Q.   Okay.  So now you also stated that Brown had an opportunity
16  to go to showers and willingly returned back to the cell.
17  Would you dispute that?

18  A.   I wouldn't dispute it.

19  Q.   What shift did you run during this time?  Am I aware that
20  you ran the 2:00 to 10:00 shift or 2:00 to 8:00 shift?

21  A.   I was the 2:00 to 10:00 sergeant.

22  Q.   When are showers ran in the RHU around that time?  Do you
23  remember when showers were ran?

24  A.   It's the wintertime, so they more than likely were done on
25  daylight.

Exam. - Heaster

1   Q.   So 6:00 to 2:00?

2   A.   Correct.

3   Q.   So would you dispute that you wasn't present during any

4   kind of shower encounter around that time with Brown?

5   A.   I wouldn't dispute that.

6   Q.   Okay.   Now, on this day, who came to you about the bloody

7   nose on the 7th?

8   A.   Officer Johnston.

9   Q.   So do you remember what part of the day that was?

10  A.   I'm not exactly sure, but I want to say it was like 8:30,

11  9 o'clock at night.

12  Q.   Before this, was you watching the officer via the monitors

13  in the bubble?  Like, was there anything unusual going on

14  around that time that would alert you to watch the officers via

15  the monitor?

16  A.   No.

17  Q.   So Johnston ran to you, Brown has a bloody nose.   What

18  happened next?

19  A.   I sent Officer Fochtman over to find out what was going on.

20  Q.   Okay.   Prior to this, had Officer Fochtman raised any

21  concern as to Brown complaining to him?

22  A.   I don't recollect.

23  Q.   You don't remember?

24  A.   No.

25  Q.   So you sent Officer Fochtman.   How long was he gone for, do

Exam. - Heaster

1   you remember?

2   A.   An exact amount of time?  I can't give you an exact amount

3   of time.  I think it was a couple minutes.

4   Q.   He came back.  What did he report?

5   A.   He told me that you stated to him that you often got

6   nosebleeds and that you wanted a new jumpsuit and new sheets,

7   and he had no indication that a fight had occurred.

8   Q.   Now, he specifically stated that I want a new jumper and

9   new sheets.  Right?

10  A.   Correct.

11  Q.   Now, if I would have never asked for the new jumper and new

12  sheets, would you have took it upon your duty to order Fochtman

13  to give me new jumpers and new sheets regardless?

14  A.   If you requested them, I see no issue with you getting them

15  if they were covered in blood.

16  Q.   Okay.  So are you aware as to who returned to exchange the

17  sheets and the jumper?

18  A.   I didn't know who returned the sheets and the jumper.  I

19  was informed that you had received them.

20  Q.   So it could have been anybody within their job capacity?

21  A.   Yes.

22  Q.   So on this day at any time did Brown -- this is a corner

23  cell with Inmate Allen.  Did this raise any enigma, any

24  concerns as to Brown is subject to bleeding and now sheets and

25  jumpers were exchanged?  Did you call medical outside of what

Exam. - Heaster

1  allegedly Fochtman had told you?

2  A.  Medical, you didn't request medical.  You said you ofte..

3  got nosebleeds and that you just wanted sheets and a jumper.  I

4  did not see any point in calling medical for a routine

5  nosebleed, which is what was reported to me.

6  Q.  Has Brown ever reported to you or requested any type of

7  issues for his nose outside of the event of February 7th, for

8  example, like, blood when blowing or nasal, sinus, nasal

9  congestion?

10  A.  I don't remember any specific request to me, but the nurse

11  makes regular rounds, and you could have requested it through

12  them.

13  Q.  Okay.  So speaking of the nurse, what was Mr. Johnston

14  involvement after the fact that Fochtman had returned and

15  allegedly investigate the matter and stated to you that I

16  usually have routine nosebleeds?

17         What -- now, what was Johns -- what was Mr. Johnston

18  role?  Did he continue the punches?  Did you inquire with

19  Mr. Johnston at any time?

20         MS. ADAMS:  Your Honor, I'm going to object --

21         THE WITNESS:  He reported to me --

22         THE COURT:  One moment.  There's an objection being

23  lodged.

24         MS. ADAMS:  It appears that this is a question that

25  should have been addressed to CO Johnston about what he did

Exam. - Heaster

1 afterwards.

2 *BROWN:* It's not.

3 *THE COURT:* I'm going to permit the question and
4 answer, but it does seem to me, Brown, that you're rapidly
5 exhausting the extent of this witness's knowledge. So go
6 ahead, pose your question and find out what the answer is.

7 *BROWN:* To that derivative, I would like to enter
8 Exhibit 101, DEF000013 and DEF000042.

9 *MS. ADAMS:* Your Honor, these are CO Johnston's
10 statement and then the summary of CO Johnston's interview. I'm
11 going to object that these were questions posed to CO Johnston.

12 *THE COURT:* These have already been admitted. To the
13 extent you're trying to demonstrate some inconsistency in
14 accounts, this is already in evidence.

15 *BROWN:* Yeah, yeah.

16 *THE COURT:* Okay? So why don't we move on to
17 something else.

18 *BROWN:* Yeah, I would like to ask him some questions
19 about what was stated specifically to Johnston encounter and
20 Johnston --

21 *THE COURT:* Well, then ask him some questions, but
22 let's get on with it, please.

23 *BROWN:* All right.

24 BY BROWN:

25 Q. So Mr. Johnston, Mr. Johnston stated that he did tell you

Exam. - Heaster

that I requested medical attention and that medical was
actually doing rounds and that he informed medical on this day.
Would you dispute that?

A.   Are you talking about Officer Johnston's written statement?

Q.   I'm talking about the one at Incident 13 first.

        *MS. ADAMS:*  Your Honor, I'm going to object.  There's
been no foundation that Lieutenant Heaster would even know what
another CO said during the investigation of this report.

        *BROWN:*  He's saying I refused medical attention.

        *THE COURT:*  No, no, no, the point is a different one,
Brown.  The point is a question regarding whether this witness
knows what another person said.  I understand the point you are
endeavoring to make regarding alleged inconsistencies in folks'
statements.  You've made that point.  I think it would be time
to move on.

        *BROWN:*  Okay.

BY BROWN:

Q.   Mr. Heaster, did you undergo -- do you annually undergo
PREA training?

A.   Yes.

Q.   And can you predicate just briefly as to what the training
is about?

A.   It's about the Prison Rape Elimination Act.

Q.   Yes, yes, PREA, yes.

        *THE COURT:*  I think he's answered your question.

Exam. - Heaster

1          *THE WITNESS:*  Yes.

2          *THE COURT:*  Why don't you try another one.

3     BY BROWN:

4     Q.   Are you familiar with the PRAT?

5     A.   Yes.

6     Q.   What is the PRAT?

7     A.   It's a form that's filled out by psychologists, sociology

8     staff, for an initial reception committee anytime there's a

9     transfer between jails, anytime I get a new inmate, anytime

10    that there's an allegation of sexual abuse.

11    Q.   Okay.  Are you familiar with the imbalance of power between

12    inmates?

13         *MS. ADAMS:*  Your Honor, I'm going to object to

14    relevance.

15         *THE COURT:*  Well, I'm going to sustain that objection.

16    That's simply cast too broadly and too globally.  If you've got

17    a specific question for the witness, you should pose it, Brown.

18    BY BROWN:

19    Q.   Are you familiar with characteristics of a sexual

20    aggressive inmate?

21         *MS. ADAMS:*  Your Honor, I'm going to raise the same

22    objection.

23         *THE COURT:*  I'm going to permit this question and

24    answer, but, Brown, we've been -- we've trotted over this

25    ground numerous times, and this would be the time to develop

Exam. - Heaster

1   evidence relating to your claims against these defendants. And

2   this testimony, while I'm going to permit this question and

3   answer, it isn't providing me any information regarding your

4   claims against these defendants. So pose your question.

5           *THE WITNESS:* Would you repeat the question?

6           *THE COURT:* Yes.

7   BY BROWN:

8   Q.  Are you familiar with the characteristics of a sexual

9   aggressive inmate?

10  A.  They're not always evident, is what I'll say. I mean, you

11  could have a sexually aggressive inmate that is 135 pounds, or

12  you could have a sexually aggressive inmate that was

13  300 pounds. It's not always evident.

14          *BROWN:* Okay. Thank you.

15          *THE COURT:* Did that conclude your --

16          *BROWN:* Yeah.

17          *THE COURT:* Very well. Is there any brief

18  cross-examination?

19          *MS. ADAMS:* There is, Your Honor.

20                      CROSS-EXAMINATION

21  BY MS. ADAMS:

22  Q.  Lieutenant Heaster, you testified that you were the shift

23  commander for the RHU in February of 2018. However, you were

24  not on shift when Brown was assigned cell 1008?

25  A.  That's correct, I wasn't there.

Exam. - Heaster

1   Q.   As shift commander, do you have the authority to overrule
2   cellmates -- inmates being celled together?
3   A.   I wasn't the shift manager, I was the RHU sergeant.
4   Q.   Okay, I'm sorry, the RHU sergeant.  As the RHU sergeant,
5   would you have been able to overrule inmates being celled
6   together?
7   A.   Usually the number one man in the RHU comes up with cell
8   assignments by walking around and talking to the inmates to see
9   if it will work out.  And, yes, if I saw a cell move that I
10   didn't want to take place, I could overrule it as a sergeant.
11   Q.   During this time, February, 2018, did you see any reason
12   why Inmates Brown and Allen could not be celled together?
13   A.   No.
14   Q.   You were asked a question about being aware of Inmate
15   Allen's misconducts, and you testified that you're able to look
16   up an inmate's misconducts.  Do you look up every inmate's
17   misconducts and read every misconduct an inmate has received?
18   A.   No, that would prevent me from getting much of anything
19   done.
20   Q.   Are you aware if inmates in the RHU prefer to have a single
21   cell or be a Z code?
22   A.   You either have a permanency that's always assigned to you,
23   but you can have a temporary Z code assigned to you if the need
24   exists.
25   Q.   Do you recall if Brown wanted a single cell or a Z code

Exam. - Heaster

1    during his time in the RHU?

2    A.  Yes, he did.

3    Q.  Can you explain a little bit, like, how you knew this?

4    A.  Because he'd constantly refuse his cellies and didn't want

5    to live with anybody.

6    Q.  And you were questioned about the date of February 7th with

7    the bloody nose, and you said you sent CO Fochtman to look into

8    the situation after CO Johnston reported it to you.  Was there

9    anything unusual that was told to you that would make you think

10    this is more than a routine bloody nose?

11    A.  No.

12    Q.  Did you have any reason to doubt what Officer Fochtman or

13    Officer Johnston told you?

14    A.  No.

15    Q.  And you did cooperate with the PREA investigation.

16    Correct?

17    A.  Correct.

18    Q.  And I believe you had in front of you -- it's Defense

19    Exhibit 7, Page 26, your statement, and you were questioned

20    about this.  Does this statement reflect what you recall of the

21    incident when you were interviewed?

22    A.  Yes, it does.

23    Q.  At any time on February 7th were you -- was it reported to

24    you that Inmate Brown had been assaulted by Inmate Allen,

25    whether physically or sexually?

Exam. - Heaster

1    A.   No.

2    Q.   Did Brown ever directly report to you that he had been

3    assaulted?

4    A.   No.

5    Q.   You were questioned about when showers were happening.

6    Coming into the 2:00 to 10:00 shift, if there was an issue with

7    an inmate refusing to go back to his cell after showers, yards,

8    haircut, anything like that, would you have been informed of

9    this information?

10   A.   Yes, I would have, and we also keep records of showers that

11   are performed.

12   Q.   On the dates in question, were you ever informed about

13   Brown refusing to go back to his cell after a shower or yard or

14   anything to that effect?

15   A.   No.

16   Q.   You were asked about monitoring the cameras inside the

17   bubble.  Are you able to see the various quads of the RHU

18   through the window?

19   A.   Yes.

20   Q.   And just to clarify, the bubble has windows that you can

21   see out of, it's not a solid, windowless room?

22   A.   Correct, it's got lots of windows.

23   Q.   And so you would not necessarily need to be monitoring

24   the -- or watching the monitors inside the bubble the whole

25   time because you can see what's going on outside in the quads?

A.   Correct.

          *MS. ADAMS:*  Your Honor, I have nothing further.

          *THE COURT:*  Very well.  Anything further, Brown --

          *BROWN:*  No.

          *THE COURT:*  -- or is this witness excused?

          *BROWN:*  He's excused.

          *THE COURT:*  Very well.  In terms of calling our next

witness, how would we like to proceed?

          *MS. BEDELL:*  Your Honor, I believe Officer Skillings

should be close by or Officer Hawn should be available.

          *THE COURT:*  You had wanted those as witnesses,

Brown --

          *BROWN:*  Yes.

          *THE COURT:*  -- those people?

          *BROWN:*  Yes, Your Honor.

          *THE COURT:*  Then why don't we take up either Skillings

or Hawn.  And thank you for your assistance there at

Huntingdon.  I appreciate it.

          Do we know how long a delay there would be between

witnesses at this juncture?

          *UNIDENTIFIED ZOOM SPEAKER:*  He'll be here in a minute.

          *THE COURT:*  Okay.  Well --

          *UNIDENTIFIED ZOOM SPEAKER:*  Maybe two minutes.  He's

on his way out.

          *THE COURT:*  Okay.  Thank you.

1          *UNIDENTIFIED ZOOM SPEAKER:* You're welcome.

2          *MS. BEDELL:* Your Honor, may I ask Brown if she would

3    be willing to identify who the next witness will be, and then

4    we can make sure to have them on standby?

5          *THE COURT:* That would be great, yes.

6          *BROWN:* Yes, to the witness convenience, if it's --

7    Hawn wants to go because he's present first, I'm willing to

8    cooperate. If Skillings want to go because he's present first,

9    I'm willing to cooperate.

10         *MS. BEDELL:* Okay.

11         *THE COURT:* So it sounds like whoever shows up next is

12   next, and then the person who didn't show up next is after

13   that.

14         *MS. BEDELL:* And then after that, we would need to go

15   to a different institution, Your Honor. And would you be able

16   to inquire if Brown would desire Butterbaugh or Ms. Richards to

17   testify?

18         *THE COURT:* Why don't I do this, why don't I just take

19   a -- instead of you asking me to ask him, I'm going to take a

20   two-minute recess, and then you can cut me out as the

21   middleman. How does that sound?

22         *MS. BEDELL:* That sounds great.

23         *THE COURT:* Excellent. That's what we'll do then.

24   Mr. Neary, let me know when there's a witness.

25         *COURTROOM DEPUTY:* I will.

1           *THE COURT:*  We'll just have a recess for a few
2    minutes.
3           *COURTROOM DEPUTY:*  Court is in recess.
4        *(Recess taken.)*
5           *THE COURT:*  And our next witness is?
6           *BROWN:*  Officer Skillings.
7           *THE COURT:*  Very well.
8           *BROWN:*  I'm expecting an objection.
9           *THE COURT:*  Excellent.  Well, we'll wait until that
10   happens, but why don't I have Mr. Neary administer the oath to
11   Officer Skillings.
12          *COURTROOM DEPUTY:*  Sir, if you would please raise your
13   right hand.
14       *JAY SKILLINGS, called as a witness, having been duly sworn*
15   *or affirmed, testified via Zoom as follows:*
16          *COURTROOM DEPUTY:*  Thank you.  If you would please
17   state your full name for the record and please spell your last
18   name.
19          *THE WITNESS:*  My name is Jay Skillings.  Last name
20   S-k-i-l-l-i-n-g-s.
21          *THE COURT:*  You may proceed, Brown.
22                         DIRECT EXAMINATION
23   BY BROWN:
24   Q.  Good morning, Mr. Skillings.  This is pertaining to a PREA
25   report from SCI Huntingdon that was substantiated in part and

Exam. - Skillings

1   unsubstantiated in part.  And we had Mr. Maxwell in here

2   earlier, and it was concluded by him that Brown had made

3   multiple PREA complaints and that -- I believe this is relevant

4   due --

5              THE COURT:  You need to ask the witness a question.

6              BROWN:  Yeah.

7              THE COURT:  I don't know what you're referring to, so

8   perhaps if you can just pose a question.

9   BY BROWN:

10  Q.   Did an inmate threaten Brown with serious bodily harm

11  pertaining to a sexual assault claim she had brought forth

12  within the institution previously, before this encounter with

13  the inmate?

14  A.   I don't recall any such thing.

15  Q.   Yeah, okay.  I would love to refresh your memory.

16             BROWN:  May I enter Exhibit 168 under relevance?

17             THE COURT:  And Exhibit 168 would be what?

18             BROWN:  It was substantiated in part, unsubstantiated,

19  pertaining to an inmate alleged to have been friends with

20  Inmate Allen threatening Brown with serious bodily harm

21  pertaining to cooperating with a sexual assault investigation

22  on a previous occasion.  And this was one, I believe one of the

23  only substantiated PREA reports.

24             THE COURT:  You said Exhibit 168?

25             BROWN:  Yeah.

Exam. - Skillings

1      THE COURT:  The Exhibit 168 I have is some sort of a
2   grievance.
3      MS. ADAMS:  Your Honor, if I may, there are two
E   Plaintiff's Exhibits 168.  I believe the one --
5      THE COURT:  Not anymore, not anymore.  We're not doing
6   this anymore.  I'm not -- guessing the number of an exhibit is
7   not a multiple choice game.  This has happened multiple times
8   now, Brown, where you give me an exhibit number but there's a
9   whole array of things that are marked with that number.
10      BROWN:  You are correct.
11      THE COURT:  Yes, and that is not a way to make an
12   orderly presentation of a case or to persuade a fact finder.
13   So what are we talking about now?  Because the only Exhibit 168
14   that I have is not a PREA complaint.
15      BROWN:  Yes.  Apparently -- I apologize for the
16   confusion, but it's about three pages labeled Exhibit 168, and
17   they're all pertaining to that exact report.  One is a
18   grievance, you are correct, and the other two pages are
19   pertaining to substantiating and unsubstantiating a claim, et
20   cetera, et cetera.  But they are pertaining to the same report.
21   I apologize.
22      THE COURT:  No, that's quite all right, it's just this
23   is your opportunity.
24      BROWN:  Yes.
25      THE COURT:  And the fact that I am receiving exhibits



Exam. - Skillings

1   that are mismarked or misidentified does not assist any of us.

2   So this is a package of paperwork relating to something that

3   allegedly took place in July of 2019?

4           *BROWN:*  Yes, Your Honor.

5           *THE COURT:*  Very well.  Is there an objection to this?

6           *MS. ADAMS:*  Yes, Your Honor.  This is about a year and

7   a half after the incident that we're here for today.  I don't

8   believe this is relevant to whether or not these four

9   defendants have violated Brown's Eighth Amendment rights in

10  this particular matter.

11          *THE COURT:*  And, Brown, what is the relevance

12  connection between this July 30, 2019 matter and the

13  allegations relating to these defendants in February of 2018?

14          *BROWN:*  It was part of the record that Brown was

15  consistently threatened after she reported her claims by --

16          *THE COURT:*  Yes, but let me just note for you what I

17  think is the challenge for all of us on that score, which is

18  that you're talking about things that happened after the events

19  at issue here.  In this case, you're talking about matters that

20  allegedly happened perhaps a year after these events, a year or

21  more after these events, and they don't tell us anything about

22  what these four defendants knew in February of 2018.

23          So without some further tie-in or connection, I'm

24  going to sustain the objection.

25          *BROWN:*  That's appropriate.

1               *THE COURT:* Okay.

2               *BROWN:* That's appropriate.

3               *THE COURT:* Very well. Then was there any other

4    testimony from Officer Skillings?

5               *BROWN:* No.

6               *THE COURT:* Okay. Officer Skillings, thanks for

7    joining us. I appreciate you being here. I take it, in light

8    of the sustaining of the objection, there is no

9    cross-examination?

10              *MS. ADAMS:* No, Your Honor.

11              *THE COURT:* Very well. You may be excused, Officer

12   Skillings.

13              *THE WITNESS:* Thank you. Have a good day.

14              *UNIDENTIFIED ZOOM SPEAKER:* Would you like me to get

15   the next officer?

16              *THE COURT:* I very much would enjoy that, yes, please,

17   ma'am.

18              *UNIDENTIFIED ZOOM SPEAKER:* Okay. Okay, he's on his

19   way.

20              *THE COURT:* Thank you. And I take it this would be

21   Officer Hawn?

22              *MS. ADAMS:* Yes, Your Honor.

23              *THE COURT:* Thank you.

24              *UNIDENTIFIED ZOOM SPEAKER:* Yes, yes, Your Honor.

25              *THE COURT:* Mr. Neary, will you administer the oath.

1          *COURTROOM DEPUTY:*  I will.  Sir, if you would please
2    raise your right hand.
3          *CLINTON HAWN, called as a witness, having been duly sworn*
4    *or affirmed, testified via Zoom as follows:*
5          *COURTROOM DEPUTY:*  Thank you.  If you would please
6    state your full name for the record and please spell your last
7    name.
8          *THE WITNESS:*  That would be Clinton C. Hawn.  Last
9    name, H-a-w-n.
10         *THE COURT:*  Very well.  Brown, you may proceed.
11         *BROWN:*  Yes.
12                        DIRECT EXAMINATION
13   BY BROWN:
14   Q.  Officer Hawn, with due respect to your precious time, are
15   you currently employed with the DOC?
16   A.  Yes.
17   Q.  In February of 2018, were you employed with the DOC and
18   worked at SCI Huntingdon?
19   A.  Yes.
20   Q.  And who's housed at Huntingdon?  Am I correct state prison
21   criminals?
22   A.  That would be, I believe, correct, yes.
23   Q.  And are criminals watched by officers?
24   A.  They are observed, yes.  That's part of the corrections
25   officer's job, is to provide care, custody, and control of



1  those who are incarcerated.

2  Q.  Okay.  Thank you, Mr. Hawn.  Are there tools used to help

3  monitoring the inmates?

4  A.  Yes.

5  Q.  And are video monitoring some of the tools used to monitor

6  inmates and staff?

7  A.  One of many, yes.

8  Q.  And it's the objective that video monitoring will help keep

9  inmates safe.  Am I correct?

10  A.  Yes.

11  Q.  Is there another name for the video monitoring system at

12  SCI Huntingdon, I believe CCTV?

13  A.  Yes, it's known as CCTV.

14  Q.  And who at the facility is in charge of the CCTV

15  technology?  Put another way, is there a room or area where

16  this technology is located or can be controlled?

17  A.  Excuse me?

18  Q.  Who at the facility is in charge of the CCTV technology?

19  A.  That would be the security department.

20  Q.  And are there officers charged or put in a common area to

21  monitor or control over the CCTV technology?

22  A.  No.

23  Q.  Are you familiar with the RHU?

24  A.  Yes.

25  Q.  Are there video monitoring, surveillance, or recording on A

422

Exam. - Hawn

1   pod on G unit in the RHU?

2   A.  Yes.

3   Q.  Are you aware of any blind spots?

4           *MS. BEDELL:* Objection, Your Honor.

5           *THE COURT:* Excuse me, excuse me, Officer Hawn,

6   there's an objection to that.  The nature of the objection?

7           *MS. BEDELL:* We've already established there were no

8   cameras visible inside the cell, so I'm not seeing the

9   relevance of this line of questioning, and there are very

10  significant security concerns.

11          *THE COURT:* I understand a question that asks about

12  blind spots does raise security concerns, Brown, and I'm going

13  to sustain that objection because of the obvious security

14  concerns that question raises.  If you've got other more direct

15  and pointed questions for this witness, feel free to ask him.

16  BY BROWN:

17  Q.  Have you ever been assigned as a CCTV officer?

18  A.  Yes.

19  Q.  Does this duty saddle you to an area or room in which you

20  oversee the unit cameras?

21  A.  I have access to various areas that I can monitor.

22  Q.  In February of 2018, were you assigned at any time as a

23  CCTV officer?

24  A.  I don't recall, I don't recall if I was on duty that

25  particular day.

Exam. - Hawn

1       BROWN:  Okay.  We have stipulated to the shift

2  commander report pertaining to what I call in my exhibits -- or

3  they're Defendants' Exhibits 25 through -- through 40.

4       THE COURT:  Officer Hawn, if shift reports from

5  February of 2018 show that you were on duty, would you have any

6  reason to dispute that?

7       THE WITNESS:  No, sir, I would not.

8       THE COURT:  Okay.  Well, there you go, Brown, why

9  don't you pose your next question.  He said he didn't recall

10  being on duty, but he's not going to dispute if the shift

11  records show he was.

12  BY BROWN:

13  Q.  Mr. Hawn, with all due respect, do this technology, the

14  CCTV technology, have the ability to record, retent, and

15  preserve?

16  A.  It does.

17  Q.  Is there a policy that blueprint this derivative?

18       THE COURT:  I'm sorry, could you rephrase that,

19  please?  I'm not sure what blueprint the derivative means.

20       BROWN:  Yes, Your Honor.

21  BY BROWN:

22  Q.  Is there a policy that makes this apparent, basically

23  assert that the CCTV monitor retent and preserve and has such

24  ability to do that?

25  A.  It does have the ability to retain video.

Exam. - Hawn

1  Q.  And you may not be aware, but is this policy under DC-ADM
2  631?
3  A.  I believe so.
4  Q.  Can you quickly explain how the CCTV retention,
5  preservation works?
6  A.  That would be a request from a staff member or a certain
7  department, then we would retain that video that was requested.
8  Q.  Can an inmate request to preserve any such videos?
9  A.  An inmate can request that through the security department
10  or the different officers -- offices.
11  Q.  And can this be done through a grievance?
12  A.  Yes.
13  Q.  And if we're looking to retrieve a recorded footage, would
14  it be possible to retrieve this if this was at a location like
15  the RHU?
16  A.  Yes, that may be possible.
17  Q.  And do this video recording state times and dates where you
18  can distinguish the times and dates?
19  A.  Yes.
20  Q.  And, well, seven days, after seven days, would it still be
21  possible for an investigator to retrieve this preservation in
22  connection with any type of investigation or any type of
23  request made by an individual or staff member?
24  A.  In most cases, yes.
25  Q.  Can a preserve be retrieved after 14 days?

Exam. - Hawn

A.    In some cases, yes.

Q.    What about 21 days?

A.    Possible, yes.

Q.    Would anything affect or impair the CCTV technology from

recording or preserving, like bad weather, et cetera?

A.    That may have an effect at times.

Q.    And assuming this is done by a program hard drive, after

videos are recorded, does it simultaneously get stored to a

hard drive?  Would you be aware of this information?

A.    No.

Q.    Would you be aware as to the storage capacity of the hard

drive?

        MS. BEDELL:  Your Honor, I'm going to object to this

line of questioning.  We've established the Department of

Corrections has video cameras, they can retain footage.  No

footage was preserved in this instance, and I'm not seeing the

relevance here.

        THE COURT:  And I understand the inference, Brown,

that you may ask me to draw from the fact that there is no

footage.  Through this witness you have established what the

process is --

        BROWN:  Thank you.

        THE COURT:  -- and how it could have -- a request

could have been made to preserve footage that does not exist at

this juncture.  Is there anything further you have of this

1    witness, or should we move on to your next witness?

2              *BROWN:* Yes, it was just to establish those merits.

3              *THE COURT:* Okay. Well, then I think they're

4    established.

5              *BROWN:* Thank you.

6              *THE COURT:* Recognizing the kind of facially and

7    factually neutral testimony provided by Officer Hawn, which

8    I'll take into account along with the other testimony I've

9    received, is there any cross-examination of this witness?

10             *MS. BEDELL:* No, Your Honor. Thank you, Officer Hawn.

11             *THE COURT:* Thank you, Officer Hawn. I appreciate

12   your time and attention here today.

13             *THE WITNESS:* Thank you, Your Honor.

14             *THE COURT:* Very well. As we work through video

15   witnesses, is this the point where we need to go to yet another

16   institution?

17             *MS. BEDELL:* I believe so, Your Honor.

18             *THE COURT:* Is that right, Brown, you're done with

19   video witnesses from Huntingdon?

20             *BROWN:* Yeah. We're doing a lot of traveling today.

21             *THE COURT:* It is. It seems a long and strange

22   journey, as the Grateful Dead might have said. Let's take a

23   brief moment so you can find the next stop on our journey.

24   Okay?

25             *BROWN:* Okay.

1        *THE COURT:*  Very good.

2        *COURTROOM DEPUTY:*  Court is in recess.

3        *(Recess taken.)*

4        *THE COURT:*  Our next witness, I believe, is

5   Ms. Butterbaugh.  Thank you for joining us, ma'am.

6        *MS. BUTTERBAUGH:*  Good afternoon.

7        *THE COURT:*  Mr. Neary, will you administer the oath.

8        *COURTROOM DEPUTY:*  I will.  Ma'am, if you would please

9   raise your right hand.

40       *KIRSTEN BUTTERBAUGH, called as a witness, having been duly*

11  *sworn or affirmed, testified via Zoom as follows:*

12       *COURTROOM DEPUTY:*  Thank you.  If you would please

13  state your full name for the record and please spell your last

14  name.

15       *THE WITNESS:*  Kirsten Butterbaugh,

16  B-u-t-t-e-r-b-a-u-g-h.

17       *THE COURT:*  Very well.  Brown, you may proceed.

18       *BROWN:*  Yes.

19                     DIRECT EXAMINATION

20  BY BROWN:

21  Q.   Good afternoon, Ms. Butterbaugh.  Real fast --

22  A.   Good afternoon.

23  Q.   With due respect to your precious time, are you -- can you

24  please state your job duties when you were employed at SCI

25  Huntingdon around -- anywhere from October through -- October,

Exam. - Butterbaugh

1   2017, through February, 2018?

2   A.   I was employed with SCI Huntingdon as a psychological

3   services specialist.  My primary job duties were to provide

4   mental health contacts with inmates on the mental health

5   roster.  I also provided different psychological assessments at

6   the request of management.

7   Q.   Okay.  At any time in 2018 did your job duty consist of any

8   monthly or annual training?

9   A.   DOC employees are required to have annual training every

10  year, 40 hours per year.

11  Q.   And does training vary from mental health through PREA, I'm

12  assuming?

13  A.   All different, all different types of topics, yes, but

14  those two would be included in training.

15  Q.   Did you have access to inmate's cumulative adjustment

16  record, ICAR, during this time?

17  A.   I did, I did.

18  Q.   Do you remember any encounters with Brown in November of

19  2017?

20  A.   I do -- I don't recall.  However, I know that I did speak

21  with Mr. Brown twice in November because there are two ICAR

22  notes.

23  Q.   And you're not sure which encounter would distinguish

24  November of twenty -- so let's go with the first encounter, the

25  earliest encounter.



Exam. - Butterbaugh

1   A.   Okay.

2   Q.   Do you remember your disposition?

3   A.   I'm not sure what you're asking me.

4        THE COURT:  Are these encounters some sort of an

5   exhibit?

6        BROWN:  Yes, but I believe I'm objecting to stipulate

7   the entire ICAR because I didn't have that record during

8   discovery again.  However, I did have two, I believe two to

9   three pages of the ICAR specifically around the time --

10       THE COURT:  I'm just asking if it's an exhibit.

11       BROWN:  Yes.

12       THE COURT:  Does the witness have the exhibit in front

13  of her?

14       MS. BEDELL:  Yes, Your Honor.  It's Defendants'

15  Exhibit 57.

16       THE COURT:  Thank you.  And recognizing that there's

17  some sort of rule of completeness objection, let's proceed.  Go

18  ahead, Brown, you were asking about something in 2017.

19       BROWN:  Yes.

20  BY BROWN:

21  Q.   So in November of 2017, it appears to be November 15th of

22  2017.  Am I correct?

23  A.   I do have a contact on November 15th of 2017.

24  Q.   What was the encounter -- was the encounter pertaining to

25  psychological or supportive counseling per policy?



Exam. - Butterbaugh

1      *THE WITNESS:* Unfortunately, no.

2      *THE COURT:* That's quite all right. It's neither

3   fortunate nor unfortunate.

4      Brown, it seems to me then that these two notes would

5   be admissible under the rules of evidence as a past

6   recollection recorded, and since the witness says she has no

7   independent recall, I think that's what we've got.

8      *BROWN:* Okay. Thank you.

9      *THE COURT:* Okay?

10      *BROWN:* Yes.

11      *THE COURT:* But let me ask the defense if they have a

12   different view of those notes.

13      *MS. BEDELL:* I do not, Your Honor.

14      *THE COURT:* Very well. So was there anything else for

15   Ms. Butterbaugh?

16      *BROWN:* Yes.

17   BY BROWN:

18   Q.  Ms. Butterbaugh, are you -- were you a member of the IRC

19   during this time?

20   A.  Mr. Brown, I can't even tell you that because our job

21   duties have changed since then. At one point in time we were

22   doing IRC on rotation, and then at another point in time we

23   weren't doing IRC at all, so I don't have a recollection of

24   that.

25   Q.  That's fine. That's absolutely -- and it's been so long

Exam. - Butterbaugh

1  A.  Yes.

2  Q.  Did Brown appear significantly anxious and intermittently

3  tearful?

4  A.  My note indicates that Mr. Brown appeared significantly

5  anxious and intermittently tearful.

6  Q.  Also involved shaking?

7  A.  Yes.

8  Q.  And you requested anxiety management and to discuss --

9  A.  No.  The note reflects that I provided support of

10  counseling in regard to anxiety management.

11  Q.  Okay, okay.

12  A.  And discussed options of voluntary mental health groups.

13       THE COURT:  And may I just for a moment, Brown, I just

14  want to ask a couple of questions of the witness.

15       Ms. Butterbaugh, at this point do you have any

16  independent recollection of the encounters on the 15th and 17th

17  of November, 2017?

18       THE WITNESS:  I do not.

19       THE COURT:  The notes before us as part of Exhibit 57,

20  would they have been created contemporaneously at a time when

21  you did have a recollection of these events?

22       THE WITNESS:  Yes.

23       THE COURT:  And having read these notes, has your

24  recollection at all been refreshed regarding your encounters

25  with Brown on these two dates in November of 2017?

Exam. - Butterbaugh

1  ago.  Now, my followup question is -- and it's *PRAT question.*

2  don't remember, neither -- are you aware of the PRA_

3  Risk Assessment Tool?

4  A.  I am aware of that assessment tool.

5  Q.  Now, are inmates allowed to participate in the PRAT

6  questionnaires?

7  A.  Yes.

8  Q.  Okay.  Interesting.  What is the administration of the PRAT

9  questionnaires used for, if you remember, if you remember

10  anything about it?

11  A.  To the best of my recollection, the PRAT is used to

12  determine an inmate's risk in housing, whether or not they

13  would be a housing concern as a high risk predator or a high --

14  or a high risk victim.

15       BROWN:  Okay.  And I would like to enter Plaintiff's

16  Exhibit 32.

17       THE COURT:  I believe that's already been entered into

18  evidence.  I may be wrong there.  Do you have questions for

19  this witness regarding the exhibit?

20       BROWN:  Yes, only like two.

21       THE COURT:  Okay.

22       BROWN:  One or two questions.

23       THE COURT:  Does the witness have access to the

24  exhibit?

25       MS. BEDELL:  She has access, Your Honor.



```
                         Exam. - Butterbaugh

 1           THE WITNESS:  Right.

 2           MS. BEDELL:  Brown is asking about Plaintiff's Exhibit

 3    Number 32.

 4           THE COURT:  That's my understanding.  Go ahead, Brown.

 5    BY BROWN:

 6    Q.  Now, with this exhibit, this is consisting of Brown

 7    concerns, and were you made aware, were you ever made aware of

 8    these concerns via this grievance?

 9    A.  I don't, I don't have the exhibit that --

10    Q.  Oh, you don't?

11    A.  Ms. Bedell may have sent it to me, but I don't have that

12    exhibit in front of me.  I have not reviewed it, so I'm not

13    sure what you're, what you're asking.

14    Q.  Yeah.  Please, you're not even a defendant, so there's

15    nothing incompetent of you.  But if you don't remember, we

16    could leave it as that.

17           But, however, I would like to inquire on one last

18    exhibit, which would be Exhibit 34.  It might be testing your

19    memory again.  And this is Plaintiff Exhibit 34, request of

20    staff dated 10/25/17.

21           THE COURT:  Yes, I don't know whether the witness has

22    that exhibit before her, and I don't know if --

23           THE WITNESS:  I don't have that exhibit in front of

24    me.

25           BROWN:  Okay, yeah.  I'm sorry, there's nothing
```



Exam. - Butterbaugh

1      *THE WITNESS:* Right.

2           *MS. BEDELL:* Brown is asking about Plaintiff's Exhibit

3    Number 32.

4           *THE COURT:* That's my understanding.  Go ahead, Brown.

5    BY BROWN:

6    Q.   Now, with this exhibit, this is consisting of Brown

7    concerns, and were you made aware, were you ever made aware of

8    these concerns via this grievance?

9    A.   I don't, I don't have the exhibit that --

10   Q.   Oh, you don't?

11   A.   Ms. Bedell may have sent it to me, but I don't have that

12   exhibit in front of me.  I have not reviewed it, so I'm not

13   sure what you're, what you're asking.

14   Q.   Yeah.  Please, you're not even a defendant, so there's

15   nothing incompetent of you.  But if you don't remember, we

16   could leave it as that.

17          But, however, I would like to inquire on one last

18   exhibit, which would be Exhibit 34.  It might be testing your

19   memory again.  And this is Plaintiff Exhibit 34, request of

20   staff dated 10/25/17.

21          *THE COURT:* Yes, I don't know whether the witness has

22   that exhibit before her, and I don't know if --

23          *THE WITNESS:* I don't have that exhibit in front of

24   me.

25          *BROWN:* Okay, yeah.  I'm sorry, there's nothing

V (432)

Exam. - Butterbaugh

1   ago.   Now, my followup question is -- and it's okay if you

2   don't remember, neither -- are you aware of the PRAT, the PREA

3   Risk Assessment Tool?

4   A.   I am aware of that assessment tool.

5   Q.   Now, are inmates allowed to participate in the PRAT

6   questionnaires?

7   A.   Yes.

8   Q.   Okay.   Interesting.   What is the administration of the PRAT

9   questionnaires used for, if you remember, if you remember

10   anything about it?

11   A.   To the best of my recollection, the PRAT is used to

12   determine an inmate's risk in housing, whether or not they

13   would be a housing concern as a high risk predator or a high --

14   or a high risk victim.

15              BROWN:   Okay.  And I would like to enter Plaintiff's

16   Exhibit 32.

17              THE COURT:   I believe that's already been entered into

18   evidence.   I may be wrong there.   Do you have questions for

19   this witness regarding the exhibit?

20              BROWN:   Yes, only like two.

21              THE COURT:   Okay.

22              BROWN:   One or two questions.

23              THE COURT:   Does the witness have access to the

24   exhibit?

25              MS. BEDELL:   She has access, Your Honor.



Exam. - Butterbaugh

1  incompetent of you again.  It was just a request you responded
2  to pertaining to some serious concerns.

3        And maybe we may stipulate something or have another
4  chance to provide the exhibits.  They have a couple questions,
5  but nothing that's incompetent.  You're not a witness -- I mean
6  you're not a defendant.  I just wanted to ask just pertaining
7  to these two exhibits.  That's all.  Thanks for your precious
8  time.

9            *THE WITNESS:*  You're welcome.

10           *THE COURT:*  Is there any cross-examination?

11           *MS. BEDELL:*  Yes, Your Honor.

12                    CROSS-EXAMINATION

13  BY MS. BEDELL:

14  Q.  Ms. Butterbaugh, in your role, we've established that you
15  had access to the ICAR notes.  Correct?

16  A.  Yes.

17  Q.  And you added notes yourself to these ICAR entries.
18  Correct?

19  A.  Yes.

20  Q.  Did you add notes after all of your contacts with inmates?
21  A.  Yes.

22  Q.  So if there's no entry for a certain day, is it fair to say
23  you did not have contact with an inmate on that day?

24  A.  I'm sorry, I couldn't hear you.

25  Q.  If there's no entry for a particular day, is it fair to say

Exam. - Butterbaugh

1    that you did not have contact with the inmate on that day?

2    A.  Yes.  I mean, that would be true 99.9 percent of the time.

3    If there was a computer issue, there would be an entry the

4    following day that would indicate it was a late entry.

5    Q.  What kind of information did you record in your notes?

6    A.  Basic subjective, objective, assessment, prognosis.

7    Q.  Did you document the reason for the contact with the

8    inmate?

9    A.  Yes.  However, in the ICAR entry, that reason might not be

10   very clear.  The reason might have more specificity in the

11   DC-560.  ICAR notes are privy to all DOC staff, so if it was

12   anything that was more confidential, it would be in a 560.

13   Q.  Did you try to document all significant things that

14   happened during your contact with the inmate?

15   A.  Yes.

16   Q.  If an inmate reported to you he was seeking a Z code or a

17   single cell, is that something you would have recorded?

18   A.  Yes.

19   Q.  And if an inmate reported to you he was being abused by his

20   cellmate, is that something you would have recorded?

21   A.  Absolutely, and that would indicate further paperwork.

22   Q.  Do you remember --

23   A.  Because there would be additional --

24   Q.  Thank you.

25   A.  I'm sorry, there would be additional documentation.

Exam. - Butterbaugh

1  Q.  Understood.  Do you remember meeting with Brown?

2  A.  I do not.

3  Q.  Do you remember the nature of every contact that you may

4  have had with him?

5  A.  I do not.

6  Q.  And you testified you recorded notes into the ICAR entry

7  system.  I'd like to direct your attention to an entry that was

8  made on January 23rd.

9  A.  2018?

10  Q.  Yes.

11  A.  Okay.

12  Q.  So on Page 26 of 29 in Defendants' Exhibit 57.

13  A.  Yes, I have it.

14  Q.  Okay.  Do you see your entry at the bottom of that page?

15  A.  I do.

16  Q.  Outside of what is written here, do you have any

17  independent recollection of this contact with Brown?

18  A.  No.  And it appears I did not have a contact with Mr. Brown

19  that day.

20  Q.  On the 23rd?

21  A.  No.  He was on a call-out to be seen, but he didn't show up

22  to his appointment, so I didn't have a contact.

23  Q.  So are you able to recall what you did after making this

24  entry in the ICAR system?

25          BROWN:  Objection, Your Honor.  The witness doesn't

Exam. - Butterbaugh

1    remember anything.

     THE COURT:  Well, and it appears the witness does not,

3    but we'll find out.  Do you remember what, if anything, you

4    did?

     THE WITNESS:  No.

     THE COURT:  Okay.  Well, there you go.

     THE WITNESS:  I mean, my note reflects that he was on

8    a call-out, he didn't show up.  I put him on a call-out for the

9    following day, but he went to the RHU that day, so I never met

10   with him.

11       THE COURT:  That's what the note says.

12   BY MS. BEDELL:

13   Q.  Did you meet with Brown again?  After that date, did you

14   meet with Brown again?

15   A.  After 1/23.  It appears I met with him 11 months later.

16   Q.  By 11 months later, are you referring to November of 2018?

17   A.  Yes.

18       BROWN:  Again, objection, Your Honor.  I don't see how

19   this is relevant.  I wasn't even provided with outside the

20   dates.

21       THE COURT:  And I tend to agree with you, Brown.  The

22   notes reflect these three contacts by Ms. Butterbaugh and then

23   nothing for another eleven months.

24       MS. BEDELL:  It goes to Brown's intent and what he was

25   seeking here, Your Honor.

1           *THE COURT:*  I think you've covered that with some
2    other witnesses and some other testimony.  And I think that the
3    objection of temporal remoteness, which I used to limit some of
4    Brown's testimony earlier today, will apply with equal force
5    here.  I'm going to sustain that objection.
6           *MS. BEDELL:*  Certainly, Your Honor.  Then we have no
7    further questions.
8           *THE COURT:*  Very well.  Thank you, Ms. Butterbaugh.
9           *BROWN:*  Thank you.
10          *THE WITNESS:*  Have a good afternoon.
11          *THE COURT:*  You, too, as well, ma'am.  Your next
12   witness, Brown.
13          *BROWN:*  Yeah, it appears that Ms. Richards is
14   available now, but she doesn't have any exhibits.
15          *THE COURT:*  I don't know what she's got.  And,
16   Ms. Butterbaugh, you are excused with the thanks of the court.
17   This is a public proceeding, you can hang around if you want,
18   but there's no need for you to do so.
19          *THE WITNESS:*  I have work to do, but thanks.
20          *THE COURT:*  Okay.  Very well.
21          *THE WITNESS:*  Thank you.
22          *THE COURT:*  Bye-bye.  Ms. Richards.  Mr. Neary, will
23   you administer the oath.
24          *COURTROOM DEPUTY:*  I will.  Ma'am, will you please
25   raise your right hand.  Do you swear that the testimony you're

```
 1    about to give to the court and counsel shall be the truth, the

 2    whole truth, and nothing but the truth, do you so swear or

 3    affirm?  And, ma'am, we're going to have to ask you to unmute.

 4            THE COURT:  So, ma'am, can you hear us?  We cannot

 5    hear you, ma'am, which limits your value as a witness in this

 6    proceeding.

 7            THE WITNESS:  Can you hear me now?

 8            COURTROOM DEPUTY:  Yes, we can.

 9            THE COURT:  There you go.  Excellent.  Thank you.

10            COURTROOM DEPUTY:  Do you so swear or affirm?

11            THE WITNESS:  I do.

12        MARILYN RICHARDS, called as a witness, having been duly

13    sworn or affirmed, testified via Zoom as follows:

14            COURTROOM DEPUTY:  Thank you.  And if you would please

15    state your full name for the record and please spell your last

16    name.

17            THE WITNESS:  My name is Marilyn Richards,

18    R-i-c-h-a-r-d-s.

19            THE COURT:  Very well.  Brown.

20            BROWN:  Yes.  We -- Ms. Bedell has stated that

21    Ms. Richards did not have a copy of any such exhibits.

22            MS. BEDELL:  She has a copy of Exhibit 57, which is

23    these ICAR entries again, Your Honor.

24            THE COURT:  So she's got the ICAR entries.

25            BROWN:  Okay.  So I was -- I do have specific exhibits
```

```
 1    that was already stipulated that I was going to enter.  So
 2    would that be an issue, the fact that she doesn't have a copy
 3    of these exhibits?
 4          THE COURT:  I don't know whether it's an issue or not.
 5    I don't know what exhibits you're talking about or what use you
 6    might make of them.
 7          BROWN:  And also --
 8          THE COURT:  Did you have a question for the witness,
 9    Brown?
10          BROWN:  Yes.
11          THE COURT:  Well, then we ought to pose it, I suppose.
12          BROWN:  Okay.
13                      DIRECT EXAMINATION
14    BY BROWN:
15    Q.  Ms. Richards, do you remember your first encounter with
16    Brown?
17    A.  No, I do not.
18    Q.  To refresh your memory, this would have been in January,
19    January 9th, 2018, at a semiannual review.
20    A.  I do not recall.
21    Q.  Okay.  So you encounter Brown on the AA unit through the
22    cell doors or the gate doors.  Ms. Richards, how did you become
23    Brown counselor, do you remember?  Did you get an email, was
24    you just assigned?
25    A.  The typical process is once the unit manager receives the
```

Exam. - Richards

1   file and assigns it to a counselor, I would have been assigned
2   to process you routinely.

Q.   Okay.   What's a semiannual review?

4   A.   A semiannual review is a six-month review making contact
5   with, under DOC, the inmate to -- normally what -- as a
6   counselor, I would review misconducts, your housing work
7   reports.   I'll remind you that there are six more months until
8   you're classified, so get good housing reports, good work
9   reports, refrain from misconducts.   Ask you if you have any
10  questions or concerns for me, any change in your emergency
11  contact information.

12  Q.   And you say this is routinely done every six months?
13  A.   Yes.

14  Q.   So can you account -- is it sometimes done upon arrival at
15  an institution?   Because you had conducted this annual review
16  and Brown was in the institution for, I believe, 60, 80 days.
17  So sometimes this is conducted before the six months.   Am I
18  correct?

19  A.   An annual review, you have a set classification date upon
20  your arrival into the Department of Corrections, and it follows
21  you no matter what institution you go to or when you arrive on
22  a housing unit.

23       So your date would have been set by your initial
24  reception in the Department of Corrections, and as a counselor,
25  I am required to review you annually on that date and

Exam. - Richards

1  semiannually on the semiannual month.

2  Q.  Okay.  So would you dispute that you met with Brown before

3  the six months pertaining to the six-month policy of the annual

4  review?

5          *THE COURT:*  You'll forgive me, but I think she said

6  just the opposite, that your annual date is set by your date of

7  entry into the Department of Corrections, and then the

8  semiannual date would be six months after that.

9          And so it's not linked -- if I understood the

10  witness's testimony, it's not linked to your arrival at a

11  particular institution but rather your entry into the

12  Department of Corrections system.  Is that correct,

13  Ms. Richards?

14          *THE WITNESS:*  Yes, Your Honor.

15          *THE COURT:*  Very well.

16  BY BROWN:

17  Q.  Did you have access to Brown cumulative adjustment record?

18  A.  Do I now?  Yes.

19  Q.  At the time did you have access to those records, in

20  January of 2018?

21  A.  Yes.

22  Q.  So you had access to Brown previous counselor Banks' notes?

23  A.  Yes.

24  Q.  You was also aware of Brown's alleged PRAT score indicating

25  no current risk?

V. (443)

Exam. - Richards

1   A.   You're talking about two different things.  Are you asking
2   me about a PRAT score or a cumulative adjustment record, ICAR
3   notes?
4   Q.   Yeah, we established that you had access to the record, so
5   this was a followup question.  I had asked if you was aware of
6   Brown PRAT score indicated that she had no current risk.
7   A.   I do not have access to a PRAT score once it's submitted.
8   Q.   Okay.  But at one point in time did you have access to it?
9   Like, would you have known Brown PRAT score and known that it
10  exists at the time?
11  A.   Not the score.  Whether you were deemed a high risk abuser
12  or a potential victim, is that what -- I would see if that was
13  checkmarked, but I would not have access to the score.
14  Q.   Okay.  So you was aware that Brown had encountered
15  psychology, Ms. Butterbaugh, on multiple occasions prior to
16  your encounter with Brown.  Am I correct?
17  A.   No, what I see here in the ICAR notes before me is
18  Mr. Parsons.
19  Q.   Okay.  And I was just getting there, too.  So you wasn't
20  aware of any encounters with Ms. Butterbaugh?
21  A.   Encounters?  I'm not sure what your question is, Brown.
22  Q.   It would have been around November, 2017.
23  A.   I do see her ICAR entry, but, no, I can't say that --
24  Q.   Okay.  But you was aware of Mr. Parsons' disposition of
25  Brown both potentially dangerous and clearly manipulative for

Exam. - Richards

1   secondary gain?  And this would be around December, 2017.

2               THE COURT:  Let me ask you, Brown, the ICAR notes

3   reflect what they reflect.  Can they simply be admitted into

4   evidence, and then you can -- we can draw any inferences you

5   ask me to from them?

6               BROWN:  So I wouldn't object pertaining to the four

7   pages that I was able to obtain from defendants during

8   discovery.  However, I wasn't allowed --

9               THE COURT:  What's the timeframe of those four pages?

10              BROWN:  They're from 12/5/17, I'm sorry, through

11  2/16/18.

12              THE COURT:  Is there any objection to the admission of

13  those ICAR notes as regular business records and medical

14  records of the Department of Corrections?

15              MS. BEDELL:  No objection, Your Honor.

16              THE COURT:  Very well.  So they'll be admitted.

17  Brown, so they're in evidence, and we'll be able to draw

18  whatever inferences you would invite us to draw from them.

19  What, if anything else, would you ask of this witness before

20  she is excused?

21  BY BROWN:

22  Q.  So was you aware that Brown did not fit -- or Brown was not

23  an appropriate candidate for a Z code?

24  A.  Based upon -- what am I looking at?

25  Q.  Okay.  It's okay.  Nothing incompetent of you.  So my

445

1   question would be, what would be an ideal candidate for Z code
2   due to your profession or your experience?
3   A.   Well, there are various reasons outlined in policy.
4   Q.   Yes.
5   A.   And when someone meets the criteria outlined in policy,
6   then a process is initiated with a psych report, a vote sheet,
7   which is then circulated throughout the institution to decide
8   whether or not the institution supports a Z code or not.
9           If the institution does support the Z code, then the
10  vote sheet is forwarded to the RDS for final approval before an
11  inmate can have a Z code.
12  Q.   And pertaining to this vote sheet, is that the DC-46?
13  A.   Correct.
14  Q.   And did you take part in this voting via the DC-46?
15  A.   What are you looking at, what date?
16  Q.   I believe there was multiple dates where this vote sheet
17  went around.  We could start with the earliest, upon arrival at
18  SCI Huntingdon, basically around the same time you took place
19  as Brown's counselor.  Were you aware of any DC-46 vote sheet
20  going around?  So you took over on the 9th of January, just
21  before the sexual -- alleged sexual assault.
22          THE COURT:  If I might, Brown, perhaps it would be
23  helpful to me to understand what voting slips on Z code status
24  has to do with your allegations against these four correctional
25  defendants who you allege knowingly and intentionally placed

1   you at risk of harm by another inmate.

2            BROWN:  Well, first, that there were certain

3   procedures, as Ms. Richards stated, that was followed per

4   policy to allow Inmate Allen to be housed with Brown at the

5   time.  And we --

6            THE COURT:  She didn't testify to any such thing.  She

7   didn't testify to any such thing.

8            BROWN:  Mr. Maxwell did, though.

9            THE COURT:  Well, yeah, but this is your witness right

10  now, Ms. Richards, and a moment ago you were telling me she

11  testified to these things, and she clearly did not.

12           What would be -- what is the relevance of this

13  information to the issue that you ask me to decide regarding

14  whether these officers knowingly placed you at risk of harm

15  from another inmate?

16           BROWN:  The relevance would be, first and foremost,

17  the practicing at SCI Huntingdon and the conducting of basic

18  appearance of inmates via cell partners and what Ms. Richards

19  knew about the voting of such to basically --

20           THE COURT:  How does that relate to these four

21  defendants, the people you have sued?

22           BROWN:  So, for example, Mr. Maxwell routinely pointed

23  that he was not an IRC member and IRC made certain decisions.

24           THE COURT:  Right.

25           BROWN:  So therefore he could not answer --

1         *THE COURT:*  Right.

2         *BROWN:*  -- certain questions pertaining to certain

3    things, and I believe Ms. Richards was an IRC member.

4         *THE COURT:*  Yes, but you haven't sued Ms. Richards.

5    You've sued these four men alleging that they deliberately

6    placed you at risk of harm from another inmate, and I'm asking

7    how this line of questioning sheds any light on that question.

8         *BROWN:*  Well, I'm specifically asking her what's

9    stipulated on the record pertaining to the ICAR around this

10   time.

11        *THE COURT:*  Right, and the ICAR notes have been

12   admitted without objection from the period of December 5th,

13   2017, through February 16, 2018.

14        *BROWN:*  Okay.  Then I'll just conclude by asking her

15   about the PRAT questionnaires.

16        *THE COURT:*  Please.

17   BY BROWN:

18   Q.  So the PREA risk assessment tools, is it a policy that

19   inmates are participants as to the PRAT questionnaires?

20   A.  Anytime I ever did a PRAT with an inmate they were present,

21   or in the case where you may have been in the RHU for a PRAT,

22   it was a questionnaire where you circled -- you answered the

23   question, circled yes or no, so there was no verbal interaction

24   that anyone else could hear your answers.

25   Q.  So you wouldn't dispute that inmates are a participant

Exam. - Richards

1   pertaining to the PRAT questionnaires then.  Right?  But
2   sometimes it's not verbal, it's just via answering on a paper.
3   Right?
4   A.  Yes.  And some is your -- the inmate's records, some things
5   are in the record.
6   Q.  Can you confirm any participation of Brown pertaining to
7   these PRAT questionnaires at any time relevant around this
8   time?
9   A.  Where and, if so, when?  When?
10  Q.  Well --
11  A.  By me?
12  Q.  Yeah.  Hold on.
13          THE COURT:  Ms. Richards, do you have any information
14  regarding whether Brown participated in a PRAT questionnaire
15  between the time when you first appear in these notes,
16  January 9, 2018, through February 16, 2018?
17          THE WITNESS:  I would only be speculating, based on
18  the policy, if he made a PREA report, that psychology would
19  have met with him and done a PRAT.  But I myself would not have
20  done one in response.  I would have done retaliation
21  monitoring.
22          THE COURT:  Very well.  So there, I think, is an
23  answer to what I understood to be your question, Brown.
24          BROWN:  Yeah, so let's jump to retaliation monitoring
25  then.

Exam. - Richards

1        *THE COURT:*  And before we jump ther
2   have to do with your claims against these f‹
3   defendants as to whom you allege that they
4   you at risk of harm at the hands of another          'eer
5   February 3rd and February 7, 2018?  What does this line oʟ
6   questioning have to do with that?

7        *BROWN:*  I believe that, first, the PRAT questionnaire
8   is relevant and the retaliation monitoring is relevant because
9   at the time of Ms. Richards' placement as my counselor, I was
10  under retaliation monitoring.  And after my alleged claims to
11  whom we're here today, I just wanted to ask her if I was put on
12  retaliation monitoring after those claims.  So it's a brief
13  question.

14       *THE COURT:*  If you were put on retaliation monitoring
15  after those claims, what would that tell me about what these
16  officers knew before you made the claim?

17       *BROWN:*  You're right, so the logistics of the initial
18  retaliation monitoring would, in fact, be more relevant.

19       *THE COURT:*  Okay.  Ask her a question or two and see
20  if you can tie it to any of the people you have sued in this
21  lawsuit.

22       *BROWN:*  Okay.

23  BY BROWN:

24  Q.  Can you -- at any time was you aware that Brown was under
25  retaliation monitoring for a claim that basically, when you

Exam. - Richards

1  became his counselor, had already occurred?

2  A.   If there would have been retaliation monitoring with your

3  prior counselor, that counselor would have been doing

4  retaliation monitoring with you.

5  Q.   Okay, Ms. Richards.  And was Brown put on retaliation

6  monitoring after the claims that derive from February 3rd

7  through February 8th?

8  A.   Yes, under policy, you would have been put on retaliation

9  monitoring.

10  Q.   Do you have any record of the retaliation monitoring form

11  or anything that has to do with Brown being put on retaliation

12  monitoring after her claims from the 3rd through the 7th?  Do

13  you or the department have any record of such?

14            BROWN:  And that would be my closing, Your Honor.

15            THE COURT:  Okay.

16            THE WITNESS:  I could not say.  I would only

17  speculate --

18            BROWN:  There's no record.

19            THE WITNESS:  -- that the department would have a

20  record of the retaliation monitoring.  But as the counselor, I

21  would follow through the 90-day process of retaliation

22  monitoring or the -- initially meet with you within the first

23  few days, again in 30 days, 60 days, 90 days, and would have

24  brought the paper to you at the RHU and asked you the

25  questions.  Once that form is complete, it is submitted to the

Exam. - Richards

1   PREA office.  I no longer have access to it.

2          *BROWN:*  Okay.  Thank you, Ms. Richards.

3          *THE COURT:*  Very well.  Are there any questions of

4   Ms. Richards?

5          *MS. BEDELL:*  Yes, Your Honor.

6                      CROSS-EXAMINATION

7   BY MS. BEDELL:

8   Q.  Ms. Richards, you were the assigned corrections counselor

9   for Brown in February of 2018.  Is that correct?

10  A.  Yes, that is correct.

11  Q.  And one of your duties was, after your contacts, was to

12  enter notes into the ICAR system.  Is that correct?

13  A.  Sorry, I cannot hear you.                    .

14  Q.  After your contacts with Brown, did you add entries into

15  the ICAR system?

16  A.  Yes.

17  Q.  In what order did you typically record the information that

18  you added into the ICAR entries? Let me ask it this way, did

19  you record your entries in chronological order?

20  A.  Yes.

21  Q.  So did you list matters in the order that they were

22  discussed?

23  A.  Yes.

24  Q.  So the first item listed would be the first concern that an

25  inmate brought to you.  Is that fair?

452

1   A.   Correct.

2   Q.   Do you recall meeting with Brown on February 9th of 2018?

3   A.   Only from reviewing my notes; otherwise, no.

4   Q.   All right.  So you don't have an independent recollection

5   of meeting with Brown on that date?

6        *BROWN:*  Objection, Your Honor.  She just stated no.

7        *THE COURT:*  Well, yeah, I think we're just waiting

8   for -- you don't have an independent recall of meeting with

9   Brown on that date, do you?

10       *THE WITNESS:*  No.

11       *THE COURT:*  Okay.  There you go.

12       *MS. BEDELL:*  Thank you.

13  BY MS. BEDELL:

14  Q.   I'll direct your attention to Page 25 of 29 of Exhibit 57

15  for the defendants that should be in front of you.  And look at

16  the entry for February 9th of 2018 and take a moment and review

17  that and let me know when you're ready for a question.

18       *BROWN:*  Your Honor, again, I object.  How would this

19  be relevant if she doesn't remember independently?

20       *THE COURT:*  I don't want to hazard a guess as to what

21  Ms. Bedell is doing, but she might be doing what you did a

22  little bit ago with Ms. Butterbaugh, that is, she might be

23  trying to establish a predicate that these notes are a past

24  recollection recorded.

25       *BROWN:*  Okay.

Exam. - Richards

1       *THE COURT:* Okay? And let me check, though, because

2   Ms. Bedell might have some other errand entirely. Is that what

3   you were trying to do?

4       *MS. BEDELL:* You took the words out of my mouth, Your

5   Honor.

6       *THE COURT:* Okay. Well, there you go. So she's just

7   doing -- she's just trying to follow the example that you set

8   earlier when you, I thought, elicited testimony that

9   Ms. Butterbaugh's notes were a past recollection recorded. So,

10   Ms. Bedell, let's see if you can accomplish what Mr. Brown did

11   earlier today.

12       *MS. BEDELL:* Thank you.

13       *THE COURT:* You're certainly welcome.

14   BY MS. BEDELL:

15   Q. Are you ready?

16   A. Yes.

17   Q. Okay. Now that you've reviewed that contact with Brown on

18   February 9th of 2018, are you able to generally describe how

19   that contact with Brown went?

20   A. Yes.

21   Q. Okay. Please do.

22   A. In general, from every door -- I go door to door and meet

23   with everyone on my list. And I always -- good morning, how

24   are you, that's generally how it starts. Then, do you have any

25   questions or concerns for me today, and that's when they

1   usually do their reporting.

2           His focus that day was his misconducts, and he says
3   that he was not taken out of the cell for his hearing, he was
4   denied his right to the hearing.  We talked about the appeal
5   process, and usually that is done to see what their intentions
6   are and to also kind of inform them that they have that right
7   to a process because some guys do not know.  He discussed that.

8           He thought that he could not receive a misconduct for
9   refusing a cellmate while he was serving a DC sanction.  When I
10  told him that he was misinformed, he got kind of agitated with
11  me, are you serious right now?  Then he wanted me to try and
12  help him get the misconduct to go away.  Again, clearly I told
13  him no.

14          And then he followed that up asking if I had heard
15  from his family or if anyone called to check on him, which no
16  one else -- I told him that no one had.

17  Q.  And do you agree with me that the last sentence of the
18  entry that you made states, He did not have any other questions
19  or concerns to discuss today?

20  A.  Correct.

21  Q.  During this contact with Brown, did Brown have a bloody or
22  a broken nose?

23          BROWN:  Objection, Your Honor.  The witness doesn't
24  remember --

25          THE COURT:  I think that's fair.  Do you recall

455

1  Brown's appearance on February 9, 2018, at all?

2          *THE WITNESS:* Your Honor, I don't recall his

3  appearance.  However, had I seen a broken nose --

           *BROWN:* Objection.

5          *THE COURT:* No, no, no, I'm going to let her answer my

6  question, and then I'll hear your objection --

7          *BROWN:* Thank you.

8          *THE COURT:* -- to my question.  Go ahead, had you seen

9  a broken nose?

10         *THE WITNESS:* I did not.  I do not recall.  However,

11 with any inmate, if I saw something out of the ordinary, bloody

12 nose, any bruising, any type of injury, I have a duty to report

13 it and to get him help.  I also will have a duty to document

14 that.

15         *THE COURT:* Very well.

16         *THE WITNESS:* I do not have that documentation, so the

17 conclusion is no.

18         *THE COURT:* Very well.

19         *MS. BEDELL:* No further questions, Your Honor.

20         *THE COURT:* Very well.  Brown, may Ms. Richards be

21 excused?

22         *BROWN:* Yes.

23         *THE COURT:* Thank you, Ms. Richards.

24         *THE WITNESS:* Thank you, Your Honor.

25         *THE COURT:* Do we have anyone else by video today or

456

1    anyone else who is time-sensitive but remote?

2         *MS. BEDELL:*  That should be everyone, Your Honor.

3         *THE COURT:*  Is that your understanding, as well,

4    Brown?

5         *BROWN:*  Yes.

6         *THE COURT:*  Okay.  Then, Brown, you may call your next

7    witness.

8         *BROWN:*  Yeah, I wanted to rebuttal --

9         *THE COURT:*  Redirect of Maxwell?

10        *BROWN:*  Yes.

11        *THE COURT:*  Mr. Maxwell, we did interrupt that

12   redirect, so I will be inviting you back up to the stand.  You

13   are still under oath, sir.  Brown, keep in mind that your

14   redirect is limited to matters that were covered by the defense

15   in their questioning.

16        *BROWN:*  Yes, I remember, and you've reminded me a lot.

17        *THE COURT:*  That's what I get paid to do.

18        *BROWN:*  Thanks, Your Honor.

19        *THE COURT:*  It's no problem.  I'm happy to help out.

20        *BROWN:*  Here we go, here she go.

21        *THE COURT:*  Very good.

22                       REDIRECT EXAMINATION

23   BY BROWN:

24   Q.  Mr. Maxwell, you admitted that Brown was listed under

25   housing concerns, and you also stated that Allen was not listed

Exam. - Maxwell

1   under housing concerns at the time.

2          Will you agree that at -- would you agree that you had

3   acknowledged this at this time?

4          THE COURT: He acknowledged it.  I heard him say it,

5   that there was a housing concern for --

6          THE WITNESS: A housing concern and you were not --

7          THE COURT: Yes.

8          THE WITNESS: You were housed appropriately.

9          THE COURT: Yes, I heard that.

10         BROWN: Okay.

11  BY BROWN:

12  Q.  You did not interview any inmate witnesses considering that

13  Brown claims occurred in the cell.  Would it have been relevant

14  as to what an inmate witness heard or seen while looking

15  outside their cell?

16  A.  You were in a corner cell.  There was no direct view into

17  your cell.

18  Q.  Did you not call inmate witnesses for the same reasons that

19  would have contradicted the DOC employees' version of what

20  occurred?

21  A.  For when?

22  Q.  Anytime from February 3rd through 7th -- 8th.

23  A.  Talk to inmates during that time?

24  Q.  Yeah.  I'll re-predicate my question.

25         THE COURT: If I understand Brown's question, did you

458

Exam. - Maxwell

1  deliberately refrain from contacting potential inmate
2  witnesses --
3       *THE WITNESS:*  No.
4       *THE COURT:*  -- out of a concern that they would have
5  contradicted correctional staff?
6       *THE WITNESS:*  No.
7       *THE COURT:*  Was that your question, Brown?
8       *BROWN:*  Yes.  Thank you, Your Honor.
9       *THE COURT:*  Then we've got the answer.
10  BY BROWN:
11  Q.  Can you explain why, why a pervert, a pervert was in a cell
12  with an inmate with feminine characteristics and housing
13  concerns, in a cell furthest from the unit bubble?
14  A.  You were housed appropriately due to the PRAT scores.  I
15  don't have access to the PRAT scores, but you were housed
16  appropriately due to the PRAT system.
17       *BROWN:*  Objection, Your Honor.
18       *THE COURT:*  And your question invited some
19  speculation.
20       *BROWN:*  Yeah.
21       *THE COURT:*  But I'm going to just discount both your
22  question and the -- which was somewhat speculative and your
23  answer that was a little speculative.  Why don't you try
24  another nonspeculative question.
25       *BROWN:*  Yes.

```
                        Exam. - Maxwell

 1           THE COURT:  Okay.
 2    BY BROWN:
 3    Q.  Can you explain why Brown did not see medical for an
 4    alleged bloody nose when housed with a pervert on 2/7/18?
 5    A.  I was not present at that time.
 6           BROWN:  Okay.  I believe we had already stipulated to
 7    Exhibit 101 at -- Johnston statement.
 8           THE COURT:  And your 101, if memory serves, is the
 9    same as Defense Exhibit 7.  It's the PREA --
10           BROWN:  Yes.
11           THE COURT:  -- investigation.
12           BROWN:  Yes.
13           THE COURT:  And you're looking for the interview with
14    Mr. Johnston, which I believe is Page 42, the handwritten
15    notes.  Is that what you wanted him to look at?
16           BROWN:  Yes, yes.
17           THE COURT:  Okay.  Page 42 of Exhibit 7, staff written
18    statement of sexual abuse harassment.  Do you have it there
19    before you?
20           THE WITNESS:  Yes.
21           THE COURT:  Very well.  You may pose your question,
22    Brown.
23    BY BROWN:
24    Q.  And I understand you wasn't present, but would you dispute
25    that Brown did not see medical for the bloody nose?
```

460

1    A.    That is correct, you did not request medical attention for

2    a routine bloody nose.

3    Q.    Okay.  Would you dispute that Johnston is saying that I did

4    request medical attention for the bloody nose?

5    A.    No, you did not request medical attention.  It's stated

6    right here in his statement, no one requested medical

7    attention.

8    Q.    Did you read the -- other than the bloody nose?  It's

9    vivid.  It's in English.

10   A.    I can read English, and you did not request medical

11   attention.  The only thing you got, you requested, was your

12   linens and your jumper to be exchanged, which was completed.

13   Q.    Okay, Mr. Maxwell.  I'll move on.  Brown claimed that you

14   encountered her and refused to remove her from the cell to whom

15   led to sexual assault.

16         Was there any instance where CCTV monitoring was used

17   to be a fact finder regardless of if the CCTV monitoring would

18   not see the alleged victim at all times?

19   A.    CCTV footage was not obtained because it wasn't pertinent

20   for this incident.

21   Q.    Yes, I understand, and that's why my question was very

22   direct.  So was there any other instances that you remember

23   where CCTV monitoring was utilized to be a fact finder although

24   the CCTV monitoring could not see the alleged victim at all

25   times?

1   A.   No.

2          *BROWN:*   Okay.   For impeachment reasons, can I enter

3   the inmate misconducts, the one pertaining to him going into

4   the locked closet where it was concluded that CCTV was

5   basically used to acknowledge his behavior?

6          *THE COURT:*   That's already been admitted.

7          *BROWN:*   All right.

8          *THE COURT:*   And to the extent that you want to argue

9   some point based upon that, you'll have the opportunity to do

10  that in your post-hearing submission.

11         *BROWN:*   Yeah, yeah, yeah.   Thank you.

12         *THE COURT:*   You're welcome.

13  BY BROWN:

14  Q.   And you admitted that in February, 2018, Brown was nuts?

15  Or would you admit that in February, 2018, that Brown was not

16  mentally fit to be celled with Inmate Allen?

17  A.   I am not a psych person, so I can't answer that question.

18         *BROWN:*   Okay, yeah.   Thank you.

19         *THE COURT:*   Very well.   Is that it then?

20         *BROWN:*   Yeah.

21         *THE COURT:*   Well, thank you, Captain Maxwell.   You may

22  step down.   Brown, you may call your next witness.

23         *BROWN:*   I believe Mr. Fochtman.

24         *THE COURT:*   I would think so.   Looking about the room,

25  he appears to be the only other person who would be a prescient



1  witness.

2       *COURTROOM DEPUTY:* Good afternoon.  Please raise your

3  right hand.

4       *MICHAEL FOCHTMAN, JR., called as a witness, having been*

5  *duly sworn or affirmed, testified as follows:*

6       *COURTROOM DEPUTY:* Thank you.  Please be seated.

7  Please state your full name for the record, and please spell

8  your last name.

9       *THE WITNESS:* My name is Michael Scott Fochtman,

10  Junior.  Last name is spelled F-o-c-h-t-m-a-n.

11       *THE COURT:* You may proceed, Brown.

12       *BROWN:* Okay.

13                       DIRECT EXAMINATION

14  BY BROWN:

15  Q.  Mr. Fochtman, in February of 2018, did you usually do

16  dinner trays?

17  A.  Yes.

18  Q.  On February 4th, 2018, did you encounter Brown at the cell

19  door during or around dinner as Brown told you that Inmate

20  Allen had assaulted her and continued to and Brown requested to

21  be moved and you refused to move her, didn't you?

22  A.  You never brought to my attention that you were assaulted

23  by Inmate Allen.

24  Q.  On February 4th, 2018, Brown requested medical attention

25  through you, and you refused to see to it that she got the

V 46?

Exam. - Fochtman

1  attention she needed.  Is that true?

2  A.   That is not true.  You never requested medical attention.

3  Q.   You then encountered Brown on February 6th where she

4  requested that you remove her due to Allen's action.  Is that

5  correct?

6  A.   That is not correct.  You never stated those things to me.

7  Q.   From February 4th through 7th, you worked the RHU on G unit

8  as a CO 1.  Is that correct?

9  A.   That is correct.

10  Q.   You was aware that during this time Brown had requested to

11  other officers to be separated from Inmate Allen.  Is that

12  correct?

13  A.   That is not correct.

14  Q.   You was aware that Inmate Brown and Inmate Allen was housed

15  in the furthest cell from the unit bubble at the time.  Is that

16  correct?

17  A.   I don't know that that's a true statement, but visually, I

18  could assume that it is the furthest cell from the RHU bubble,

19  yes.

20  Q.   This led to February 7th, 2018.  On this date, sometime

21  after dinner, CO Johnston went to the bubble and told everyone

22  in the bubble that he had witnessed Allen attack Brown.  Is

23  that correct?

24  A.   That is not correct.  Officer Johnston came up to the

25  bubble and stated Inmate Brown stated he had a bloody nose to

Exam. - Fochtman

1   Sergeant Heaster.  Sergeant Heaster requested that I go out and
2   see what happened in the cell.
3   Q.   Johnston was sent back to the cell, and upon return, you
4   and Officer Plocinik simultaneously returned and even made
5   jokes about Brown conceiving.  Is that correct?
6   A.   That is incorrect.  Officer Johnston did not report back to
7   your cell at that time.  I came to the cell to see and speak to
8   both of you.
9   Q.   At this time you left and came back, I believe with some
10  kind of paper in hand, asking, which one of you guys am I going
11  to write up for fighting?  Am I correct?
12  A.   That is also incorrect.  I came to the cell door, asked you
13  about your bloody nose, because you did have a bloody nose, and
14  you stated, I occasionally get bloody noses.  And I asked you
15  and Inmate Allen if you were fighting.  You both stated no.  I
16  observed your hands, Inmate Allen's hands, and there were no
17  marks indicating an altercation between you guys.
18  Q.   And Allen confirmed there was no fight, that he did exactly
19  what he's been saying he was going to do, and that was sexual
20  assault.  Am I correct?
21  A.   You are partially correct.  You stated that Inmate Allen
22  said there was no altercation.  That is correct.  There was
23  nothing stated about a sexual assault or a fight between either
24  of you.  And you also stated, no, there was not an altercation
25  between you.

465

1   Q.   And Brown again asked you to be moved, and you stated to

2   Brown, we don't make courtesy move, this is Huntingdon, not the

3   Hilton.   Am I correct?

4   A.   That is also incorrect.

5             BROWN:   Okay.  And Exhibit 29.

6             THE COURT:   Whose exhibit?

7             BROWN:   Plaintiff's Exhibit 29.

8             THE COURT:   You won't find it in there.

9             THE WITNESS:   Okay.

10            THE COURT:   That's the defense exhibits.  That's why I

11  was asking.

12            MS. BEDELL:   Your Honor, I believe Plaintiff's Exhibit

13  29 is his deposition.

14            BROWN:   Page --

15            THE COURT:   You're questioning him about your

16  deposition?

17            BROWN:   Yeah, Page 61 and 62.

18            THE COURT:   Yes, but this is your deposition.

19            BROWN:   Yeah.

20            THE COURT:   It's not his deposition.

21            BROWN:   No.

22            THE COURT:   What's the question you are asking to

23  pose?  Because I'm struggling to understand how you could

24  cross-examine this witness about a statement that is not his.

25            BROWN:   Okay.  Yeah, then I wouldn't object to that.

V 466

Exam. - Fochtman

1          *THE COURT:*  Okay.  Well, then let's move on to a new
2     topic.
3     BY BROWN:
4     Q.  During this time, you also refused Brown medical attention,
5     didn't you?
6     A.  No, I did not refuse you medical attention.
7     Q.  You, Sergeant Heaster, and others sent Johnston back to the
8     cell, since he was a trainee, to exchange Brown's jumper suits,
9     boxers, t-shirts, and everything that had blood on it, didn't
10    you?
11    A.  I do not recall who exchanged your jumpsuit and your linen.
12    Q.  Interesting.
13            *BROWN:*  I would like to again enter Exhibit 101 at 10
14    and 11.
15            *THE COURT:*  And this would be --
16            *BROWN:*  Plaintiff's.
17            *THE COURT:*  Yes, I understand your plaintiff's is the
18    same as Defense Exhibit 7.
19            *BROWN:*  Seven, yes.
20            *THE COURT:*  Right?
21            *BROWN:*  Yes.
22            *THE COURT:*  Excellent.  So if you'd look at Exhibit 7
23    and Pages 10 and 11.  And I think to the extent that there is
24    something that's a report relating to this witness, it appears
25    to be on Page 11.

Exam. - Fochtman

1          *THE WITNESS:* Yes, I'm there.

2     BY BROWN:

3     Q.   Yes.  First, first, we may go over pertaining to Sergeant

4     Heaster acknowledging that he has sent trainee Johnston and

5     pertaining to Heaster acknowledging that Brown needed new

6     jumpers and that although Heaster did not specifically state

7     whom, to whom exchanged the jumpers, but he did acknowledge

8     that the jumper was exchanged.  Am I correct?

9     A.   Without reading Sergeant Heaster's statement --

10          *THE COURT:* Was the jumper exchanged that day?

11          *THE WITNESS:* Yes.

12          *THE COURT:* Okay.

13          *BROWN:* Okay.

14    BY BROWN:

15    Q.   So Mr. Heaster also stated that Mr. Johnston had told him

16    about a bloody nose.  Am I correct?

17    A.   Yes, that was stated to Sergeant Heaster, and then Sergeant

18    Heaster sent me out to see what was happening at the cell.

19    Q.   And that prior to February 17, 2018, Brown had exhibited

20    strange behavior, eating of feces from a cup?

21    A.   Without reading Sergeant Heaster's statement, I have no

22    recollection of that.

23    Q.   Okay.  And that Brown had asked various officers to be

24    removed from the cell with Inmate Allen, and we would be

25    jumping to 26, 000026.

Exam. - Fochtman

1          THE COURT:  You're questioning this witness regarding

2    a statement made by another witness.  I don't know that that's

3    an appropriate use of the other witness's statement.  You can

4    certainly question this witness regarding his own statements.

5          BROWN:  Yeah, and I believe under relevance and laying

6    a foundation, I could also question witnesses under 402 as to

7    what statements was made at the time of my alleged claims.

8          THE COURT:  You can certainly ask him about what

9    statements were made that he was a party to or present to, but

10   you can't be questioning him just generally about other

11   statements prepared by other witnesses.

12         To the extent that you want to highlight

13   inconsistencies in those statements, you'll have the

14   opportunity to do so in your closing submissions after I take

15   the evidence.

16         BROWN:  Okay.

17         THE COURT:  Okay?

18   BY BROWN:

19   Q.  Did Brown see medical at this time?

20   A.  No, you did not see medical at this time.

21   Q.  At any time did you or any other officer acknowledge that

22   Brown needed some kind of medical attention?

23   A.  No, I did not acknowledge that.  I asked you if you needed

24   to see medical, which is when you stated, no, I routinely get

25   bloody noses.

Exam. - Fochtman

1   Q.   Did any other officers acknowledge that Brown sought
2   medical attention around this time?

3   A.   I would have no idea.

4           BROWN:   Okay.  Can I submit this for impeachment
5   purposes?

6           THE COURT:   I don't know.  I don't know what it is.

7           BROWN:   It's basically Mr. Johnston stating that Brown
8   requested medical attention for a specific --

9           THE COURT:   I understand that you wish to highlight
10  these sort of discrepancies that you believe exist in the
11  reports.  You'll have the opportunity to do that.  You've
12  developed what the different officers said, and to the extent
13  there are discrepancies that you believe are material to a
14  decision in this case, you'll have the opportunity to do that.

15          But further questioning this witness about what
16  someone else recalled or said I think is not appropriate, so
17  why don't you develop what this witness recalls --

18          BROWN:   So according to you -- yes, Your Honor.

19  BY BROWN:

20  Q.   According to you, Brown had asked to be moved because she
21  could not see the TV from where she was located.  Am I correct?

22  A.   That is correct, yes.

23  Q.   And when did Brown ask to be moved because she could not
24  see the TV, do you remember the time or the date?

25  A.   No, I do not, but I know it was documented.

470

Exam. - Fochtman

1   Q.   Was this on February 7th?

2   A.   I do not know.  It was all documented.  You and Allen both

3   requested multiple times to move because you could not see the

4   TV.

5   Q.   And where was this documented where it stated the specific

6   date that Brown had asked you to be moved, directly you,

7   because she could not see the TV?  Do you have a specific date

8   that this was documented so I could try to locate it?

9   A.   It would have been in your cumulative adjustment record,

10  and I don't know if we have that here.

11          BROWN:  Yeah, objection.  It's sounding like he's

12  speculating.

13          THE COURT:  I think he's answered your question the

14  best he can.

15          BROWN:  Yeah.

16          THE COURT:  So why don't we just move on to another

17  question.

18  BY BROWN:

19  Q.   Do you know why Brown did not ask Mr. Johnston to be moved

20  because she could not see the TV but asked, specifically asked

21  you to be moved due to not being able to see the TV or any

22  other officer to be moved due to not being able to see the TV?

23          THE COURT:  Do you understand the question?

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  Then please feel free to answer.

Exam. - Fochtman

1       *THE WITNESS:*  You would have asked me because I work

2    down there every day and I did work in the RHU bubble, so I

3    would have been part of moves.

4    BY BROWN:

5    Q.  Okay.  So would you dispute that Brown didn't ask any other

6    officer or there's nothing on record that Brown ever asked

7    another officer to be moved pertaining to she couldn't see the

8    TV?

9    A.  That's correct, I have no knowledge of you asking another

10   officer to move.

11   Q.  Did you witness actual bleeding from Brown nose?

12   A.  No.

13   Q.  So from the time Mr. Johnston had encountered Brown until

14   the time you encountered Brown, Brown had cleaned the mess?

15   A.  I don't know if there was a mess to clean up.  Officer

16   Johnston came right to the bubble, and I came right out to your

17   cell and spoke to both you and Inmate Allen.

18   Q.  And you didn't encounter any blood or anything?

19   A.  A bleeding that was happening at that moment, no.  You did

20   have a bloody nose, and it was on your jumpsuit and your linen.

21   Q.  All right.  So Johnston go to the bubble, you come out

22   within minutes, and you state that you didn't witness any

23   bloody nose, but Johnston is stating that he clearly witnessed

24   blood outside of my bloody jumper?  So I guess he witnessed

25   something in my nose or blood dripping down.  Is that -- so at

Exam. - Fochtman

1   no time did you witness any blood outside of stains on the

2   jumper?

3   A.   That is correct.

4   Q.   What did the blood stains look like?

5   A.   I don't recall the blood stains.  It wouldn't be something

6   significant to stick in my mind.

7   Q.   It was significant enough to exchange a jumper, sheets,

8   boxers, t-shirts, but it wasn't significant enough to remember

9   what the stains looked like?

10  A.   It was significant enough to -- you have the attention

11  drawn to another officer and me come speak with you.  And then

12  your jumpsuit and your linen were exchanged because you

13  requested them to be exchanged, and that's our job.

14              *BROWN:*  With all due respect, I would like to enter

15  Exhibits -- Plaintiff's Exhibits 121 through 125,

16  interrogatories from Mr. Fochtman.  And on Page 2 --

17              *THE COURT:*  Yes, I'm still --

18              *BROWN:*  Oh, I'm sorry.

19              *THE COURT:*  -- desperately searching for these

20  interrogatory answers of Mr. Fochtman.

21              *BROWN:*  I'm sorry.

22              *THE COURT:*  Can anyone help me in this regard?

23              *MS. BEDELL:*  Your Honor, I may be able to put it on

24  the screen.

25              *THE COURT:*  That would be splendid.

Exam. - Fochtman

1      *MS. BEDELL:* Brown wanted Page 2, so that would be, I

2   believe, what he has marked as Plaintiff's Exhibit 122.

3      *THE COURT:* Very well. Okay.

4   BY BROWN:

5   Q. And the question was, what would you know about the events

6   from the 3rd through the current date? Did you see or hear

7   what -- what was your action, if any? Basically what you

8   witnessed. And would you admit that this is your response,

9   this is your statement?

10   A. Looking at this, I can't say that it is or is not mine. Is

11   there a page that has my signature on it? This was years ago.

12   I don't recall this exact document.

13   Q. Good point, there is not.

14      *THE COURT:* Is there any dispute from the point of

15   view of defense counsel that this is the answer to

16   interrogatory?

17      *MS. BEDELL:* It is, Your Honor.

18      *THE COURT:* Very well.

19      *THE WITNESS:* Okay.

20      *THE COURT:* I'm just going to accept that as a given,

21   given counsel's representation. Do you have a question, Brown?

22      *BROWN:* Yes.

23   BY BROWN:

24   Q. And you stated that -- assuming you stated that Brown and

25   Allen was kept -- had kept asking to be moved cells because

Exam. - Fochtman

1 they could not see the television, is that consistent with your
2 predication?

3 A. Yes.

4 Q. And that you went to cell 108 to see why Inmate Brown had a
5 bloody nose, is that consistent with your predication?

6 A. That's correct.

7 Q. So would you now conclude that the time of Brown asking to
8 be removed allegedly pertaining to not seeing the television
9 and a bloody nose was simultaneous?

10 A. Could you ask that question one more time, please?

11 Q. Would you now conclude that the time Brown had asked you,
12 allegedly asked you to be removed due to the fact that she
13 could not see the TV, and Allen, allegedly, was simultaneously
14 to the bloody nose incident, the alleged bloody nose incident?

15 A. No, I cannot say that that happened at the same time.

16 Q. Would you say that the officer asked Brown how he got the
17 bloody nose and Brown stated that he always get bloody nose?

18 A. If I am this officer, then, yes, that is what happened.

19 Q. And you stated that you had basically asked if there was a
20 fight and inmates had refused and that Brown did not need
21 medical attention but did request new sheets, this officer --
22 would you now state that you exchanged Brown's jumper and
23 sheets as consistent with this statement?

24 A. With that statement, yes, that is consistent, but I don't
25 have a memory of it actually happening. That is correct.

Exam. - Fochtman

14  Q.  Okay.  I thought earlier that you stated that you didn't,
2   or you may have stated that you didn't remember.

3   A.  Correct, I did not remember, but looking at this statement,
4   if I said I did it then, I'm sure I exchanged the linen then.

5   Q.  Now, pertaining to Brown, the alleged injury of the blood,
6   had Brown ever complained to you of having sinus, nasal
7   congestion at any time?

8   A.  No.

9   Q.  Around this time?  Well, before these events?

10  A.  No.

11  Q.  How about bleeding from blowing?

12  A.  No.

13  Q.  Are you aware of any grievances or medical record where
14  Brown was ordering nasal spray or a complaint of having some
15  type of nasal, sinus, nasal congestion?

16  A.  No.

17  Q.  So how would one state that is a routine bloody nose if it
18  was never apparent, there's nothing on record, there's no
19  grievances on record that this is consistent with a common
20  bloody nose?

21  A.  Because you told me that you get regular bloody noses.  And
22  I asked if you needed medical treatment, and you stated no.

23  Q.  You refused me medical attention because you did not want
24  me out of that cell, didn't you?

25  A.  I did not refuse you medical attention.  You said you did

Exam. - Fochtman

1   not need medical attention.

2   Q.  And you refused to let me out the cell so there was no

3   preservation of bloody underwear, jumpsuits, sheets, and

4   t-shirts, didn't you?

5   A.  No.

6   Q.  Mr. Fochtman, are you aware or are you familiar with the

7   term a rat or a snitch?

8   A.  Yes.

9   Q.  Now, in a prison environment, what does that mean if I'm

10  saying -- or somebody is called a rat or a snitch?

11  A.  That they tell on people.

12  Q.  Okay.  What about the term faggot in a prison environment,

13  what would that imply?

14          THE COURT:  Yeah, I think we've already gone over

15  this --

16          BROWN:  Yeah.

17          THE COURT:  -- a couple of times.  So --

18          BROWN:  Well, he's a different defendant.  He might

19  have a different answer, Your Honor.  Can I object to that?

20          THE COURT:  Well, you can object to anything you want,

21  and then I'll rule on it.  Did you understand the word faggot

22  to be a derogatory term for a homosexual?

23          THE WITNESS:  Yes.

24          THE COURT:  Very well.

25          BROWN:  It's just foundation reasons.

477

Exam. - Fochtman

1          THE COURT:  Yeah, let's move on.
2          BROWN:  Yeah.
3     BY BROWN:
4     Q.  And the term lifer, you was aware that it meant the person
5     has life in prison.  Right?
6     A.  Yes.
7     Q.  Okay.  And the term sex offender meant -- is a stigma
8     pertaining to touching kids, right, or some type of sex crime?
9     Right?
10    A.  Yes, it would be a sex crime.
11    Q.  Okay.  Now, in your opinion, are there some unique
12    challenges in the prison environment?  Can a person face --
13    what could a person be faced with, if any, if these labels are
14    attached?
15    A.  I have no idea.  I've never seen a statistic that states
16    people are treated a different way for the things they've done.
17    Q.  Okay.  Yeah, you was very speculative earlier, and this may
18    have been along the lines of speculation, but --
19          THE COURT:  Well, you're going to have to pose a
20    question.
21          BROWN:  Yes.
22          THE COURT:  This sort of narrative is inappropriate.
23    Pose a question.
24    BY BROWN:
25    Q.  Now, was you aware of any underlying circumstances as to

Exam. - Fochtman

1   why Brown should not have been withheld with Inmate Allen at
2   the time?
3   A.   No.
4   Q.   Were you aware of Brown misconduct history?
5   A.   No.
6   Q.   Were you aware of Inmate Allen misconduct history?
7   A.   Unless I personally wrote him up, which I don't have a
8   memory that pertains to any of this with Inmate Allen.
9   Q.   Were you aware that Brown routinely refused cellmates out
10  of fear?
11  A.   No.
12  Q.   How long have you been working at SCI Huntingdon prior to
13  February 7th?
14  A.   One year, eight months.
15  Q.   And were you aware that Mr. Allen was a sexual predator at
16  this time?
17  A.   No.
18  Q.   Do you believe there was any existing of imbalance of power
19  between Mr. Allen and Brown?
20  A.   No.
21  Q.   Did you undergo any type of PREA training, annual PREA
22  training --
23  A.   Yes.
24  Q.   -- per policy?
25  A.   Yes.

Exam. - Fochtman

1  Q.  What does the training entails as far as are you -- what

2  are you learning, prevention, reporting, retaliation? Like,

3  what are you learning in the training?

4  A.  Everything you just stated and the things that have already

5  been stated before.

6  Q.  Okay.  Were you aware of the PRAT, what the PRAT was?

7  A.  No.

8           *BROWN:*  Okay.  Yeah, that's it for now, Your Honor.

9           *THE COURT:*  Very well.  Is there any cross or defense

10  direct?

11          *MS. BEDELL:*  Yes, Your Honor.

12          *THE COURT:*  Very well.

13                    CROSS-EXAMINATION

14  BY MS. BEDELL:

15  Q.  Officer, what is your current position?

16  A.  I am a lieutenant on the 2:00 to 10:00 shift.

17  Q.  And what shift were you working in February of 2018?

18  A.  2:00 to 10:00.

19  Q.  At that time where were you stationed?

20  A.  In the RHU.

21  Q.  In your position in the RHU, did you have any involvement

22  in assigning inmates to cells?

23  A.  Yes.

24  Q.  Were you assigning cells on February 3rd of 2018?

25  A.  No, I was off that day.

Exam. - Fochtman

1  Q.  How do you know that?

2  A.  I looked at the shift report.

3  Q.  And if you were off that day, you also didn't escort Brown

4  to that cell.  Is that correct?

5  A.  That is correct.

6  Q.  In your time in February of 2018, did Brown or Allen ever

7  make any requests to be moved from their cell?

8  A.  They requested to be moved to a different cell, yes, not

9  separately, though.

10  Q.  And they requested to be moved to a different cell so they

11  could see the television.  That's correct?

12  A.  That is correct.

13  Q.  Did they make any other requests for any other reason?

14  A.  No.

15  Q.  We've heard a lot about February 7th of 2018.  Prior to

16  February 7th, did Brown ever tell you she was concerned she

17  could be harmed by a cellmate?

18  A.  No.

19  Q.  Prior to that date, did she ever say to you that she had

20  been injured in any way?

21  A.  No.

22  Q.  Were you working on February 7th, 2018?

23  A.  Yes.

24  Q.  And were you working the 2:00 to 10:00 shift that day?

25  A.  Yes.

Exam. - Fochtman

1  Q.  We've established that you went to Brown's cell.  When you
2  went to Brown's cell, did you stay outside the cell?
3  A.  Yes.
4  Q.  So you were at the cell door looking through the door.  Is
5  that right?
6  A.  That's correct.
7  Q.  Could you see inside the cell?
8  A.  Yes.
9  Q.  Were both inmates inside the cell?
10  A.  Yes.
11  Q.  Where was Brown when you first approached the door?
12  A.  I believe, if I remember correctly, he was laying on the
13  top bunk.
14  Q.  How would you describe Brown's appearance at that point?
15  A.  There was nothing out of the ordinary.
16  Q.  Brown wasn't in distress?
17  A.  No.
18  Q.  Was Brown talking in a normal tone?
19  A.  Yes.
20  Q.  Did you observe any injuries to Brown at that point?
21  A.  No, I did not.
22  Q.  And you didn't see the bloody nose.  Is that correct?  You
23  saw the blood on the clothes, but not blood dripping from
24  Brown's nose?
25  A.  That's correct.

Exam. - Fochtman

1   Q.  Did Brown have any marks or cuts on her hands?

2   A.  No.

3   Q.  Did Brown have a crushed nose?

4   A.  No.

5   Q.  Did Brown have water around her eyes?

6   A.  No.

7   Q.  Did it look like Brown had been crying?

8   A.  No.

9   Q.  Did Brown have any difficulty standing at this point?

10  A.  No.

11  Q.  Where was Allen at this point?

12  A.  On the bottom bunk.

13  Q.  How would you describe Allen's appearance?

14  A.  Normal.

15  Q.  Did he appear relaxed?

16  A.  Yes.

17  Q.  Did Allen have any visible injuries?

18  A.  No.

19  Q.  Did he appear to have any interest in what was going on at

20  the cell door?

21  A.  No.  He was more annoyed when I asked him to come up so I

22  could observe his hands.

23  Q.  Were there any signs at this point that a fight had

24  occurred?

25  A.  No.

Exam. - Fochtman

1  Q.  Did you ask Brown if they had been fighting?

2  A.  Yes.

3  Q.  How did Brown respond?

4  A.  That, no, they were not fighting.

5  Q.  Why did you ask if they had been fighting?

6  A.  Because it's a common thing in the RHU, which is why I went

7  out to investigate the situation.  As was stated before,

8  Johnston was a trainee at the time, so we just needed to make

9  sure that everything was okay in that cell.

10  Q.  Did you ask Allen if they had been fighting?

11  A.  Yes.

12  Q.  How did Allen respond?

13  A.  The same way, that there was no altercation.

14  Q.  Why did you ask both of them?

15  A.  To see if there was a different reaction out of either

16  inmate.

17  Q.  So then what did you do next?

18  A.  I had them, one at a time, come up to the cell door and

19  inspected their hands and their face for any signs of an

20  altercation.

21  Q.  Did you see any?

22  A.  No.

23  Q.  So then what did you do?

24  A.  I spoke to Inmate Brown, and he requested a new jumpsuit

25  and linen.  And I would have got that exchange -- from the

Exam. - Fochtman

1   statement, I guess I did it.  So I would have got a

2   water-soluble bag because that's where soiled linen would go so

3   that it can go to laundry.

4   Q.  Did you ask Brown if there was anything else you could do?

5   A.  Not that I can recall, no.

6   Q.  Did you ask Brown if she wanted medical attention?

7   A.  Yes.

8   Q.  Did you ask her multiple times?

9   A.  I don't recall if it was more than one time.

10  Q.  Did you have any reason to believe Brown had been attacked

11  or assaulted?

12  A.  No.

13  Q.  Did you have any further interactions with Brown after that

14  day?

15  A.  None that stick out in my mind, no.

16  Q.  Brown -- we know Brown reported she was attacked, and an

17  investigation ensued.  Were you interviewed as part of that

18  investigation?

19  A.  Yes.

20  Q.  I'm going to show you Defendants' Exhibit 7, Page DEF00028.

21          *BROWN:*  Did you say 26?

22          *THE COURT:*  You said 28.  Isn't that correct?

23          *MS. BEDELL:*  Yes.

24  BY MS. BEDELL:

25  Q.  What is this document?

Exam. - Fochtman

1   A.   It is a staff written statement that I wrote.

2   Q.   And is this a statement that you wrote during that

3   investigation that we just referred to?

4   A.   Yes.

5   Q.   And what is the date on your statement?

6   A.   February 15th, 2018.

7   Q.   And where was the statement taken?

8   A.   Upstairs in the clinic area.

9   Q.   Did you provide a truthful and accurate statement at this

10  time?

11  A.   Yes.

12  Q.   Were you also interviewed by the Pennsylvania State Police?

13  A.   Yes.

14  Q.   And did you provide a truthful and accurate statement to

15  them?

16  A.   Yes.

17  Q.   So did you fully cooperate with both investigations?

18  A.   Yes.

19  Q.   Throughout all of the events that have been discussed here,

20  were you ever aware of any threats to Brown's safety?

21  A.   No.

22  Q.   Did you ever delay or prevent Brown from getting medical

23  care?

24  A.   No.

25  Q.   And at any time did you ever intend for Brown to be hurt?

1   A.   No.

2                 *MS. BEDELL:*  No further questions, Your Honor.

3                 *THE COURT:*  Very well.  May the witness be excused?

4                 *BROWN:*  Yes.

5                 *THE COURT:*  You may step down.  So, Brown, do you have

6   further witnesses to call?

7                 *BROWN:*  No, Your Honor.

8                 *THE COURT:*  Are you resting then?

9                 *BROWN:*  Yeah.  I did have some offers.

10                 *THE COURT:*  You wanted to make some offers of proof?

11                 *BROWN:*  Yeah, that.

12                 *THE COURT:*  Well, then why don't you do that, because

13   what I'm understanding you to tell me is you're done with your

14   testimony.  Is that right?

15                 *BROWN:*  Yes.

16                 *THE COURT:*  Okay.  So what are your offers of proof

17   that you'd like me to consider?  And as you're considering what

18   you want me to consider, will the defense be calling any

19   witnesses?

20                 *MS. BEDELL:*  We will not, Your Honor.

21                 *THE COURT:*  Very well.  And I wanted to find that out

22   because I have an outstanding writ for Brown and an outstanding

23   date with you all on the 26th, but if there are no further

24   witnesses, we'll be wrapping up today.  Brown, your offers of

25   proof, sir?

1          *BROWN:*  Yes.  Now, I created these offers prior to any

2     issues that had occurred today.  So assuming that these offers

3     are allowed, can I be given time to create a couple more offers

4     pertaining to issues that occurred today?

5          *THE COURT:*  Well, I think what you need to do is, if

6     you have evidentiary issues you want to raise with me, let's

7     raise them now.

8          *BROWN:*  Yeah, because a lot went on today.

9          *THE COURT:*  Sure did.  So what are the issues you'd

10    like to raise with me?

11         *BROWN:*  All right.  So first -- yeah, first was my

12    initial offer pertaining to the medical records where

13    production of inspection and copies was not provided --

14         *THE COURT:*  Yes, and I think Ms. Bedell spoke to that

15    today, that her own review was -- indicated that medical

16    records were made available to you, that there then was a

17    motion to compel that related to some redactions of those

18    records, that that motion was addressed by Chief Judge Jones,

19    and there was no further motions practice.

20         *MS. BEDELL:*  To clarify, Your Honor, the medical

21    records were not included in that motion to compel.  My point

22    was only Brown could have raised the issue at that point.

23         *THE COURT:*  I understand.

24         *MS. BEDELL:*  Thank you.

25         *THE COURT:*  So --

1    *BROWN:* Yeah, so that would be my offer, that although

2 Ms. Bedell believed that I received the medical records, that I

3 did not receive the medical record, and my first reception of

4 the medical records was pertaining to the -- was it a July 8th,

5 2022 order?

6    *THE COURT:* Well, if I may here, in terms of those

7 medical records, given what's been represented to me, which is

8 that you made a request and that the DOC provided you access to

9 your own medical records, and recognizing that I'm adopting a

10 very liberal approach to the admission of evidence in terms of

11 exhibits here, I'm going to note your objection, but I'm also

12 going to overrule that objection because it is evident to me,

13 at a minimum, that these records were made available to you in

14 advance of trial as part of the defense exhibits.

15    *BROWN:* Okay. Can it be stipulated that -- can that

16 be stipulated?

17    *THE COURT:* Can what be stipulated?

18    *BROWN:* Available before trial.

19    *THE COURT:* Well, they were among the exhibits

20 provided by the defense to Brown.

21    *BROWN:* Yeah, before trial, right, that's when I

22 received them?

23    *THE COURT:* Yeah. Well, yes, I think you all agree to

24 that. Ms. Bedell is also under the impression that you had

25 even earlier access --

1          *BROWN:* Oh, yeah.

2          *THE COURT:* -- to these exhibits.

3          *BROWN:* That was my dispute.

4          *THE COURT:* And I understand you dispute that, but my

5 view is, I'm not going to exclude the evidence based upon that

6 dispute in light of the representation from defense counsel.

7 What else have you got for us?

8          *BROWN:* So my second offer was the ICAR. And, again,

9 I received records from the first day I entered the DOC and to

10 the last day I entered the DOC. Now my only thing of relevance

11 is the four pages that I had received during discovery which

12 would entail --

13          *THE COURT:* I understand. And I've admitted those

14 four pages. At this juncture, I would not intend to take other

15 material into consideration. Is there any objection to that?

16          *MS. BEDELL:* No, Your Honor.

17          *THE COURT:* Very well. You prevailed on that point.

18 What's your next point?

19          *BROWN:* Now, Brown misconduct history, again, I didn't

20 receive most -- or almost all of the misconducts that was

21 Exhibits 58 through 87. And I did receive it before, before

22 trial, but, however, I didn't receive this. So my offer is

23 pertaining to Rule 26, I wasn't given these exhibits.

24          *THE COURT:* And I'm unclear as to how many of these

25 exhibits have actually been admitted.

490

| | |
|---|---|
| 1 | *BROWN:* It was fifty -- yeah. |
| 2 | *MS. BEDELL:* Your Honor, we -- there were some |
| 3 | discovery requests that were directed to non-defendants, so as |
| 4 | counsel for the defendants, we did not respond to those. |
| 5 | Perhaps some of the confusion for Brown stemmed from that. |
| 6 | But I can say to the court that we responded to all of |
| 7 | the discovery requests with objections and responses.  Brown |
| 8 | disputed some of our objections.  It turned into a motion to |
| 9 | compel.  If he had an objection to our responses at that time, |
| 10 | it did not become part of that motion to compel, but all of |
| 11 | these documents which he had requested, again, post-discovery, |
| 12 | were provided to him as exhibits during our pretrial |
| 13 | disclosures. |
| 14 | *THE COURT:* Okay.  Again, in terms of that response, |
| 15 | to the extent that misconduct history information has been |
| 16 | received -- and it's been received at great length relating not |
| 17 | only to Brown, but to Inmate Allen -- I'm going to consider |
| 18 | that evidence, I'm not going to exclude it.  What's your next |
| 19 | point, Brown? |
| 20 | *BROWN:* Yeah.  So, again, can we stipulate that it |
| 21 | wasn't received until the pretrial -- |
| 22 | *THE COURT:* I don't think we can.  I think we disagree |
| 23 | as to that.  It is clear to me that the defense believes that |
| 24 | they responded either by producing items or by objecting to |
| 25 | items in each and every instance where you made a proper |

| | |
|---|---|
| 1 | request, that you litigated some of those claims, but you did |
| 2 | not litigate others, and that in any event, they produced these |
| 3 | items prior to trial. |
| 4 | So unless I'm mishearing you, Ms. Bedell, you're not |
| 5 | stipulating to that, but with this murky gestalt that ends with |
| 6 | a point of clarity where everyone has the exhibit, I'm not |
| 7 | going to exclude it. |
| 8 | *BROWN:* Okay. |
| 9 | *THE COURT:* Okay? |
| 10 | *BROWN:* And pertaining to the trauma Brown has |
| 11 | sustained to nose, the nosebleed pertaining to Brown previous |
| 12 | cellmate -- and this would have been Exhibit 28, and this was |
| 13 | excluded, and the medical past from that date was also |
| 14 | excluded. And I believe that this was attempted to be entered |
| 15 | under 402, 401, and 803, exception for hearsay. |
| 16 | *THE COURT:* You're talking about -- |
| 17 | *BROWN:* I'd like to offer it due to the error of |
| 18 | excluding it under both relevance and exception of hearsay. |
| 19 | *THE COURT:* So this is Plaintiff's Exhibit 28. |
| 20 | *BROWN:* Yes. |
| 21 | *THE COURT:* Which is some other -- |
| 22 | *BROWN:* Yes, it's a dated statement and a medical |
| 23 | past. |
| 24 | *MS. BEDELL:* I have it available. |
| 25 | *THE COURT:* That would be splendid, because the packet |

1   system of exhibit numbering is defeating me at this moment.

2          MS. BEDELL:  We will continue to object to this

3   document, Your Honor.

4          BROWN:  Yes.  As you can see, that's a created record

5   by the DOC.  That's a medical past dated 11/1/17, and that's a

6   consistent statement and dated by Inmate Saul Ortiz.

7          THE COURT:  When was this document created?

8          BROWN:  When I went to -- pertaining to the

9   investigation at Camp Hill.

10         THE COURT:  Okay.  So this is a different

11  investigation at a different institution at a different time?

12         BROWN:  Yeah, but it wasn't pertaining to the

13  investigation, it was just an incident where I sustained

14  injuries from a bloody nose and having a cellmate and it's

15  acknowledged that I had a cellmate at the time right before my

16  transfer back to SCI Huntingdon before the incident occurred.

17         THE COURT:  Okay.  But this is at a -- this is at Camp

18  Hill and involves other people.

19         BROWN:  Yes, but I believe it's relevant.  It could

20  fall under 401 and 402 and also exception of hearsay.

21         THE COURT:  I think that the statement is both hearsay

22  and is not relevant to the claims in this case, unless there's

23  some indication that these defendants knew about this prior

24  incident, and there has been none, and the testimony is closed.

25  So I'm going to continue to sustain that objection.

1         But, Brown, I will note for you, all of your exhibits

2   will be in the record in this case, and any error of mine will

3   be subject to review by the Court of Appeals.

4         BROWN:  Yes.

5         THE COURT:  Okay?  Anything else?

6         BROWN:  Yes.  And the court error by omitting Brown's

7   Exhibit 44, statement from Shea Delgrosso.

8         THE COURT:  Yes, yes, I recall the Delgrosso

9   statement, which, again, related to a different incident at a

10  different time.

11        BROWN:  Oh, no, no, it didn't.

12        THE COURT:  I'm sorry, I'm sorry, this is then just

13  the hearsay statement of Delgrosso.

14        BROWN:  Yes.

15        THE COURT:  Yes.

16        BROWN:  And the focal point was the date.  It wasn't

17  dated.

18        THE COURT:  Yes.  You were -- this is the document,

19  forgive me, that you were moving as an excited utterance last

20  week.

21        BROWN:  Yes, and also --

22        THE COURT:  And excuse me, excuse me, I hope you don't

23  mind if I finish my thought, and then I'll be delighted to hear

24  yours.

25        And as I ruled last week, the document was not dated.



1   The excited utterance doctrine would require that the statement

2   be prepared at the time that the witness was under the

3   immediate effects of some sort of exciting or dramatic event.

4          And because the statement isn't dated and there's no

5   chronological context to it, it would not fall under the

6   excited utterance doctrine, nor would it fall under the present

7   sense impression doctrine because, again, that would require it

8   be a present sense impression.

9          BROWN:  Okay.  What about 607 and 608?

10         THE COURT:  607 and 608 are rules that deal with

11  impeachment, and you did not offer this exhibit to impeach a

12  witness, you offered it as substantive evidence, so those rules

13  would also be inapplicable.

14         BROWN:  So those rules would be an afterthought, is

15  that what --

16         THE COURT:  No, that's not an afterthought.  Those

17  rules relate to impeaching witnesses.  They do not relate to

18  the admission of substantive evidence.

19         BROWN:  Okay, yeah.  Now, I don't remember, but --

20         THE COURT:  Okay.

21         BROWN:  -- I do believe that I stated -- I may have

22  stated also to enter the statement under 607 and --

23         THE COURT:  Yes, and what I'm saying is that to the

24  extent that you were advancing that as a grounds for the

25  substantive admission of the statement --

1          BROWN:  Yes.

2          THE COURT:  -- it would not be substantive evidence

3   because those rules only relate to the impeachment of

4   witnesses.

5          BROWN:  Okay.

6          THE COURT:  Okay?  But, again, the exhibit will be

7   part of the record, and certainly my evidentiary rulings can be

8   subject to review by a higher and more scholarly court.

9          BROWN:  All right.  And pertaining to the -- or

10  rejecting the marked -- well, the grievance wasn't rejected, it

11  was stipulated to, but the marked grievance dated January 16th,

12  I believe it was error to conclude that it was dated February

13  16th.

14         THE COURT:  Yes, and in that regard, the grievance

15  that you had referred to bears in the body of the grievance the

16  date January 15, but in the upper right-hand corner of the

17  grievance, the date is clearly February 16.

18         BROWN:  Okay, yeah.

19         THE COURT:  Okay.

20         BROWN:  So there may have been some type of error.  I

21  just want --

22         THE COURT:  There may have been some type of error,

23  but you and I are now in agreement that that's what the exhibit

24  says, and then I'll have to draw whatever inferences I can from

25  that exhibit.  Okay?  Anything else?

1          *BROWN:* Yes. And then pertaining to Exhibit 1 -- 172,

2     under, I believe, 607 and 608 for impeachment reasons

3     pertaining to Defendant Maxwell had admitted that Brown was

4     never a Z code, and the document created by the DOC contradicts

5     that statement. That was never stipulated to. So this would

6     be Exhibit 172.

7          *THE COURT:* And you'll forgive me, my recollection of

8     Exhibit 172 is that it was a document that related to a period

9     after the events in this case.

10          *BROWN:* Yes.

11          *THE COURT:* Okay. And so I understand that you would

12     like me to consider that for whatever value it has in terms of

13     impeaching Lieutenant Maxwell's testimony regarding your Z code

14     status during the pertinent time period, and I'll consider it

15     for that purpose.

16          *BROWN:* Okay.

17          *THE COURT:* Okay? Anything else?

18          *BROWN:* Yeah. So a lot went on today. I will ask

19     to --

20          *THE COURT:* Here's what I'm going to do with respect

21     to where we are at right now.

22          *BROWN:* Yes, please.

23          *THE COURT:* You have rested. Is that correct?

24          *BROWN:* Yes, negating more offers pertaining to only

25     today.

1         *THE COURT:* Well, yes, but you have rested in terms of

2    your presentation of evidence?

3         *BROWN:* Yes.

4         *THE COURT:* And the defense has rested in terms of

5    their presentation of evidence?

6         *MS. BEDELL:* We have no further witnesses. I do want

7    to move a few exhibits.

8         *THE COURT:* And I certainly want you to have that

9    opportunity. With respect to -- with respect to then

10   post-hearing submissions, Brown, I understand that you may want

11   to bring some evidentiary issues to my attention. You also may

12   want to make a submission to me regarding what you believe the

13   evidence has shown. So I was going to direct that you provide

14   me with a post-hearing brief two weeks from today. Is that

15   okay?

16        *BROWN:* Yes. And does it have to be a brief, or can

17   it just be an offer --

18        *THE COURT:* Oh, no, it should be both.

19        *BROWN:* Okay.

20        *THE COURT:* Okay?

21        *BROWN:* Okay.

22        *THE COURT:* And then what I'd ask is the Department of

23   Corrections to provide me with their own brief two weeks after

24   that. And then, Brown, we'll give you the last word. One week

25   after the Department of Corrections' brief, you can submit any

```
1    reply brief.  Okay?

2            BROWN:  Yes.

3            THE COURT:  Okay.

4            BROWN:  Thank you.  And pertaining to closing

5    statements --

6            THE COURT:  Well, that's what the briefing is for.

7            BROWN:  Okay.

8            THE COURT:  Okay?

9            BROWN:  Yes.

10           THE COURT:  And, Ms. Bedell, you wanted to -- it was

11   my intention, in light of the way in which exhibits have been

12   presented, to generally admit those exhibits of Brown's that

13   were stipulated to.  Is there any objection to that?

14           MS. BEDELL:  No, Your Honor.

15           THE COURT:  Very well.  And you had some exhibits you

16   wanted to make sure were admitted?

17           MS. BEDELL:  Yes.  From defendants' exhibits, I wanted

18   to request to admit Exhibit 7, 8, and 9.

19           THE COURT:  And that's been referred -- those have

20   been referred to by both parties.  Brown, any objection?

21           BROWN:  I would -- just a sec.

22           THE COURT:  Sure.

23           MS. BEDELL:  Your Honor, in case it will assist Brown,

24   Exhibit 7 was the investigative report, Exhibit 8 was the state

25   police report, and Exhibit 9 was the notification to Brown
```

1   about the investigation.

2        *BROWN:* Yeah, wasn't Exhibit 7 already stipulated to?

3        *THE COURT:* I believe it is. I'm just -- we're going

4   to admit those exhibits.

5        *MS. BEDELL:* Understood. Thank you, Your Honor. And

6   then Exhibit 11 was the photographs of Brown and Allen.

7        *BROWN:* Yeah, those are --

8        *THE COURT:* Brown is also indicating to me that those

9   are admitted, as well.

10       *MS. BEDELL:* Okay. And then Exhibits 48 and 49 were

11  both misconduct charges issued to Brown.

12       *BROWN:* Yeah, those I had objections due to the

13  discovery rule, but I believe it was already sustained, am I

14  correct, pertaining to admitting, not excluding?

15       *THE COURT:* Yeah, I have indicated that I would admit

16  those items.

17       *BROWN:* Yeah, so --

18       *THE COURT:* So they will be admitted.

19       *BROWN:* It's moot.

20       *MS. BEDELL:* And, Your Honor, the final two were

21  Exhibits 88 and 89, which were also misconducts issued to

22  Brown.

23       *THE COURT:* And again, Brown, I understand your

24  discovery objection. I am going to admit those. Anything else

25  then for the parties?

V-500

```
 1          BROWN:  You reject those?
 2          THE COURT:  No, no, I am admitting them.  They are
 3   coming into evidence.
 4          BROWN:  So 88 and 89 is not under the exhibit list
 5   here, so I'm not aware -- it stops at 87.
 6          THE COURT:  Not my exhibit list.  It goes on to 88 and
 7   89.
 8          BROWN:  Can I be shown the exhibits?
 9          MS. BEDELL:  They were shown to Captain Maxwell when
10   he was on the stand.
11          BROWN:  Yeah, a lot of --
12          THE COURT:  Here's what we're going to do, because I
13   have some other matters that are now pending and getting just a
14   little overdue.  As to those last two exhibits, I'll ask that
15   you all consult and confer, perhaps for a few minutes at the
16   marshal's keep, and then if there are objections, that you can
17   address them in your post-hearing submissions, and I'll take
18   those up as part of my overall ruling in the case.  Okay?
19          MS. BEDELL:  Your Honor, we have nothing further.
20          THE COURT:  Very well.  So then, Mr. Brown, you have
21   rested.  Correct?
22          BROWN:  Yes.
23          THE COURT:  The defense has rested.  We will get out
24   an order setting a post-hearing briefing schedule that can
25   cover the issues raised in this litigation and allow any
```

1    parties to raise any offers of proof or evidentiary objections.

2           The matter will be taken under advisement.  I can let

3    you all rest assured that I will promptly endeavor to address

4    this case through a written opinion and order as soon as full

5    briefing is complete in this matter.

6           Given the commendable progress that you have all made

7    here today, I take it that the writ that was issued for

8    Thursday may be withdrawn.  Is that correct?

9           *BROWN:*  Yes.

10          *MS. BEDELL:*  I have no objection, Your Honor.

11          *THE COURT:*  Very well.  And I want to thank our

12   friends from Immigration and Customs Enforcement for assistance

13   in allowing us to complete these evidentiary proceedings.  I

14   regret that we won't have a chance to see you on Thursday, but

15   I wish you safe travels back to your facility, and good luck to

16   you all.  We will stand in recess for five minutes before I

17   take up the criminal matters that I have awaiting me.

18          *COURTROOM DEPUTY:*  Court is in recess.

19       *(Whereupon, the proceedings were concluded at 4:29 p.m.)*

20

21

22

23

24

25

(Exhibit A)

RECEIVED
NOV 17 2023

# In The United States District Court
# For The Eastern District OF Pennsylvania

Gartor K. Brown

V.

LT. Gildea et al.

NO. 18-cv-1527

## Plaintiff's Request For Production OF Documents

Pursuant to Rule 34 of The Federal Rules OF Civil Procedure, Plaintiff requests that Defendant produce for inspection and copying the following documents to inspect or test, sample the following items in the responding party's possession, custody, or control; Please forward to Gartor Brown Pro Se Plaintiff, within thirty (30) days from service of this Request.

1) "Documents" as in original and any non-identical copy of any written, printed, typewritten, recorded or graphic matter, however produced or reproduced, including correspondence, medical records, telegrams, other written communications, tapes, annual reports, prospectuses, accountant's work sheets, contracts, deeds, agreements, draft agreements, schedules, notes, including handwritten notes from staff meetings, memoranda, analyses, projections, work papers, studies, surveys, investigations, diaries, calendars, appointment books, films, photographs, minutes of meetings, books of account, inventories, spreads, ledgers, invoices, receipts, confirmation slips, statements of accounts, checks, drafts, bills, personal financial statements, corporation policies, checking and savings account statements in custody or control of defendants, former agents and employees, and or all persons acting or authorized to act on his behalf; or and of them; and electronically stored information, any designated tangible things.

2) If you object to any of the requests herein, whether in whole, or in part, on the grounds that the information sought herein is privileged or confidential (hereinafter "privileged"), you shall produce as many of the documents; or as much of the documents and/or information concerned, as to which no privilege is claimed.
(a) Identify the privileged document, portion of document and/or information.
(b) State specifically the exact privilege claimed, together with such facts as will enable the court to determine the merits of the claim or of the privilege.

3) "You" and "Your" refer to defendants and or his attorney, and or any investigator performing work on behalf of defendants in connection with this case.

4) When a document is required to be identified, state with respect to each document the following information, to the extent it exists: (a) the date; (b) the author; (c) a description of the document (e.g. invoices, letters, etc.); (D) the address; (e) persons or entities, other than the addressee who received copies, or were identified on the document as to receive copies; (f) the custodian of the document; (G) the present location of the document; (H) if the document has been lost or destroyed, together with a description of all known circumstances pursuant to which the document was lost or destroyed.

5) Where a person is required to be identified, state his or her name, his or her present or last known home address, the name and address of his or her current or last known employer and his or her job classification with that employer, and his or her employer and job classification at the time of the events referred to in the complaint.

## Request For Production

1) Any statements concerning this lawsuit or it's subject matter made by any party regarding this matter or any person who is a witness in this matter.

②

2) Any statements concerning this lawsuit or it's subject matter made by an expert within your knowledge.

3) Any photographs concerning this lawsuit or it's subject matter within your knowledge.

4) Any diagram or drawings concerning this or it's subject matter within your knowledge.

5) Any reports provided by your investigator including tape recordings.

6) The entire claims and investigative file of defendants or his or their attorney, or any other organization related thereto, concerning the incident involved in this lawsuit, excluding references to mental impressions, conclusions or opinions representing strategy or tactics of privileged communications from counsel.

7) All income tax returns of defendants for the period from 2016 to present.

8) All wage/wage loss statements, if any, for the period from 2016 to present.

9) All doctor bill/receipts if any pursuant to any defendant injuries pursuant to this lawsuit.

10) Any other medical or economic records or reports regarding plaintiff's alleged injuries.

11) Any and all employment records of defendants that are relevant to any claims made in plaintiff's complaint.

12) Any documents which relate to or describe any or relied in preparation for trial in this case.

13) Any and all news articles concerning any event or party or matter involved in plaintiff's complaint.

14) All x-rays taken in this matter.

15) Produce all medical records from his stay at SCI Huntingdon.

16) All transcripts of deposition taken.

1/3/19

# In The United States District Court
# For The Middle District OF Pennsylvania

Gartor kiki Brown

(Exhibit C)

V.

NO. 3:18_CV_01527

LT. Maxwell et. al..

# Plaintiff's Request For Production OF Documents

Pursuant to Rule 34 of the Federal Rules Of Civil Procedure, Plaintiff requests specific documents are produce by defendants Maxwell, Plocinik, Johnston, Fochtman, Chilcole, Harris, Kendrick, Heaster for inspection and copying.

1) First & last name of the inmate he was housed with on Unit G Block A from 2/3/18 through 2/8/18 at SCI Huntindon in cell 108.

2) Plaintiff seeks for inspection & copying from the DOC defendants all Pennsylvania Adelitive Classification Tool Policy, or ("PACT") Policy, including but not limited to classifing & housing inmates.

3) Plaintiff seeks for inspection & copying all ("11.2.1") Policy Manual.

4) Plaintiff seeks for, inspection & copying all ("IRC)" documents pursuant to what the IRC team documented while at SCI camp Hille must importantly SCI Huntindon; Plaintiff also seek those documents as to the IRC Documents of inmate Allen some inmate he claim sexualy assaulted him or may the inmate have a different government name, Plaintiff seeks the information, as to the inmate he was housed with, on G-A in cell 108 from 2/3/18 through 2/8/18 while at SCI Huntindon in the RHU; Plaintiff seeks full history of IRC documents from the time the inmate entered the DOC to current date.

5) Plaintiff seeks for copying all classifide classification documents from the "diagnostic Center" all Psychological testing & integrated case Summary of the inmate Known as inmate Allen, seome person he claims sexualy assaulted him; Plaintiff also seeks the same information for one "Gartor kiki Brown."

6) Plaintiff seeks Misconduct, grievance, & Criminal record history of the inmate he was housed in cell 108 on G-A. in the RHU at SCI Huntindon from 2/3/18 through 2/8/18.

7) Last Plaintiff seeks for inspection & copying all complaints, statements, investigation files of any other inmate or staff that claim that inmate Allen had attempted to or did sexualy assault & abuse them or threaten to do as such; any other claims against the inmate pursuant to ADM 001 or 008 Policy.

8) Plaintiff also seeks for inspection & copying a statement from Ivan Costillo LS 3066, the statement predicates as to what the inmate Known about the sexual assault, the statement was confiscated by Ms. Spilkar & Ms. Maxwell after Brown gived the statement to his Counsler Richards to copy. She then gived it to maxwell & spiker, they then confiscated the statement claiming it as putting Investigation file and Brown could not get a copy.

# In The United States District Court
# For The Middle District OF Pennsylvania

Gartor kiki Brown

V.                                    NO. 18-CV-1527

LT. Maxwell et. al.,

## Plaintiff's Supplemental Request For Production OF Document

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff requests that defendants Fechtman, Johnston, Plocinik, Maxwell Produce for inspection and Copying the following documents to inspect or test, sample the following items in the responding Party's Possession, Custody, or Control:

1) Electronically stored information, specificly stating video recording from the RHU electronic monitoring system Pursuant to Policy (28 C.F.R. §115.18(b)) under the DOB Policy; all video recording around & outside Brown cell not limited to the Unit or Pod in which Brown was housed on from 2/2/18 through 2/8/18

2) All Photo tooken by the medical department in color not black & white

3) Plaintiff claims DEF 00015 & DEF 00014 states Inmate Allen is serving a life sentence for 1st degree Murder & that as of the date of the incident inmate Allen had 7.7 Misconducts 4 of which for sexual harassment, Brown seeks full Misconduct history of Inmate Allen while with the D.O.C. Specificly seeks all misconduct for sexual Harassment & abuse not just at SCI Huntingdon but all state institutions this inmate was housed in, Plaintiff also seeks the inmate Cumulative Adjustment Records Pursuant to the date's around every sexual absault-abuse Harassment Misconduct. The full documents should not just show the inmate misconduct charges, But as to why the inmate received the Misconduct, Plaintiff should note, every document send Prior Pertaining to the inmate misconduct history at SCI Huntingdon was blocked out Preventing the Plaintiff from viewing the Misconduct charges, Plaintiff seeks more then the inmate Misconduct charges but full history & not Just at SCI Huntingdon, these records Should not be blacked out, Brown also seeks the inmate Criminal history.

4) Plaintiff seeks DEF00085 through 88 not blacked out, it looks like part of his Cumulative Adjustment Records, Plaintiff also seeks or asking defendants to unblock these DEF numbers DEF000123, DEF000119, DEF000110, DEF000105, DEF000106, DEF000103, DEF000058, through 72, DEF000101, DEF000053, DEF000045, DEF000074 I can not see the DEF number on these two pages so I will cite the reference number through Smart Communication 1258613 Pg. 18 of 57, also 1258613 Pg. 19 of 57, Brown claims the Pages cited are all blacked out must of which are records of inmate Allen.

5) Plaintiff specificly seeks all documents or investigation & Misconducts, IRC documents Pursuant to Any sexual abuse, Harassment, assault claims against inmate Allen After 2/8/18

6) Plaintiff seeks documents pursuant to Retaliation monitoring as to (28 C.F.R. §115.62(b)(1)(c)) All Retaliation monitoring files documented while Brown has been in the D.o.C. Plaintiff also seeks all files synopsis of any P.R.E.A. related allegations against All defendants while Employed with the DOC



Exhibition of (Doc. 91)

Smart Communications/PA DOC
Gartor Kiki Brown, NA-6401
SCI Huntingdon
P O Box 33028
St. Petersburg, FL 33733

Lindsey Bedell
Deputy Attorney General
Office of Attorney General
Litigation Section
15th Floor, Strawberry Square
Harrisburg, PA 17120



COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL

JOSH SHAPIRO
ATTORNEY GENERAL

December 10, 2019

Litigation Section
15th Floor, Strawberry Square
Harrisburg, PA 17120
Phone: (717) 783-1471

Gartor Kiki Brown (NA6401)
Smart Communications/PADOC
SCI Forest
PO Box 33028
St Petersburg FL 33733

RE: *Brown v Lt. Maxwell, et al.*
No. 3:18-CV-01527(M.D. Pa.)

Dear Mr. Brown:

Enclosed please find Defendants' Responses to Plaintiff's Requests for Production of Documents to All Defendants.

Thank you for your attention to this matter.

Sincerely,

LINDSEY A. BEDELL
Deputy Attorney General

Enclosure

*prospective*
*inform*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GARTOR KIKI BROWN,** | : | **No. 3:18-CV-01527** |
| **Plaintiff,** | : | |
| | : | **Honorable James Munley** |
| **vs.** | : | |
| | : | |
| **LT. MAXWELL, C.O. PLOCINIK,** | : | |
| **C.O. JOHNSON** *and* **C.O.** | : | |
| **FOCHTMAN,** | : | *Complaint filed 08/01/18* |
| **Defendants** | : | |

## RESPONSES TO PLAINTIFF'S REQUESTS FOR
## PRODUCTION OF DOCUMENTS TO ALL DEFENDANTS

Defendants, by and through their undersigned counsel, hereby provide the

following Objections and Responses to Plaintiff's First Request for Production of

Documents to Defendants, as follows:

1.    First & last name of the inmate Brown was housed with on Unit G

Block A from 2/3/18 through 2/8/18 at SCI Huntingdon in Cell 108.

**RESPONSE:**    **OBJECTION.** Defendants object to this request because it

seeks information that is not relevant to the claims in this matter.

Defendants further object to this request as inmates are not permitted to access

records related to other inmates. Possession of such records would constitute

contraband. *See* 2017 Inmate Handbook, p. 30, § D(3)(o). *See also* Department

Policy DC-ADM 003, "Release of Information Policy," Section IV, subsection A.5.

("An inmate is prohibited from receiving inmate information pertaining to another inmate other than him/herself.").

Without waiving the foregoing objections, see PSP report previously produced and marked for production as DEF000139-DEF000147.

2.    Plaintiff seeks for inspection & copying from D.O.C. Defendants all Pennsylvania Additive Classification Tool Policy, or (PACT) Policy, including but not limited to classifiding (sic) & housing inmates.

**RESPONSE**:    **OBJECTION**.  Defendants object to this request because it is overbroad and is not relevant to the claims or defenses of any party.

Defendants further object to this request as not being proportional to the needs of this case.

Defendants further object to this request to the extent that it seeks information relating to matters beyond that are set forth in the complaint.  Because the scope of this matter is limited, all of the requested records are not relevant to the claims at issue.

Defendants further object to this request to the extent that it seeks certain information that if obtained, an inmate will be able to use such information to adversely affect institutional safety and security and may also attempt to manipulate and circumvent Department policy, which can affect the overall safety and security

2

of the institutions. Thus, the disclosure of this information would create safety and security concerns and may endanger the lives of involved staff. The Department has adopted various policies and rules regarding the care, custody, and control of the inmates within its institutions that it keeps confidential for security reasons. Certain policies, procedures manuals, and rules are confidential and cannot be disclosed to inmates. Inmates are not entitled to copies of confidential policies and procedures.

By way of further response, Section 3 – Pennsylvania Additive Classification Tool ("PACT") of 11.2.1, *Reception and Classification* is a confidential DOC policy and not subject to release.

3.      Plaintiff seeks for inspection & copying all "(11.2.1)" Policy Manual.

**RESPONSE**:  **OBJECTION**.  Defendants object to this request because it seeks information that is not relevant to the claims in this matter.

Defendants further object to this request because it is overly broad and unduly burdensome.

Defendants further object to this request to the extent that it seeks information relating to matters beyond that are set forth in the complaint.  Because the scope of this matter is limited, all of the requested records are not relevant to the claims at issue.

3

Defendants further object to this request as not being proportional to the needs of this case. The burden and expense on Defendants in searching for and producing the documents requested outweigh any benefit the documents as requested could confer on Plaintiff in his prosecution of this lawsuit.

Without waiving the foregoing objections, any public portions of DOC policies are in the prison's library and are available to all inmates.

4.     Plaintiff seeks for inspection & copying all "(IRC)" documents Pursuant to what the IRC team documented while Plaintiff was at SCI Camp Hill & most importantly SCI Huntingdon; Plaintiff also seek these documents as to the IRC documents of inmates Allen same inmate he claims sexually assaulted him on May the inmate have a different government name, Plaintiff seeks the information as to the inmate he was housed with on G_A_ in cell 108 from 2/3/18 through 2/8/18 while at SCI Huntingdon in the R.H.U. Plaintiff seeks full history of IRC documents from the time the inmate entered the DOC to current date. What has been documented by the IRC team at each institution the inmate had been housed at. (sic-paragraph)

**RESPONSE**:     **OBJECTION**.  Defendants object to this request because it is overbroad and is not relevant to the claims or defenses of any party.

4

Defendants further object to this request as not being proportional to the needs of this case.

Defendants further object to this request to the extent that it seeks information relating to matters beyond that are set forth in the complaint. Because the scope of this matter is limited, all of the requested records are not relevant to the claims at issue.

Defendants further object to this request to the extent that it seeks documents that contain evaluations, diagnoses, impressions, and recommendations, information that if obtained, an inmate will be able to use such information to adversely affect institutional safety and security and may also attempt to manipulate and circumvent Department policy that can affect the overall safety and security of the institutions. Thus, the disclosure of this information would create safety and security concerns and may endanger the lives of involved staff. The Department has adopted various policies and rules regarding the care, custody, and control of the inmates within its institutions that it keeps confidential for security reasons. Certain documents are confidential and cannot be disclosed to inmates.

Defendants further object to this request as inmates are not permitted to access records related to other inmates. Possession of such records would constitute contraband. *See* 2017 Inmate Handbook, p. 30, § D(3)(o). *See also* Department Policy DC-ADM 003, "Release of Information Policy," Section IV, subsection A.5.

("An inmate is prohibited from receiving inmate information pertaining to another inmate other than him/herself.").

    5.    Plaintiff seeks for copying all classified classification documents or all documents from the "diagnostic center" as to integrated case summary of the inmate knewn (sic) as inmate Allen same person Brown claims sexually assaulted him; Plaintiff also seek the same information for himself Gartor Kiki Brown.

**RESPONSE**:    **OBJECTION**.    Defendants object to this request because it is overbroad and is not relevant to the claims or defenses of any party.

    Defendants further object to this request as not being proportional to the needs of this case.

    Defendants further object to this request to the extent that it seeks information relating to matters beyond that are set forth in the complaint.  Because the scope of this matter is limited, all of the requested records are not relevant to the claims at issue.

    Defendants further object to this request to the extent that it seeks documents that contain evaluations, diagnoses, impressions, and recommendations, information that if obtained, an inmate will be able to use such information to adversely affect institutional safety and security and may also attempt to manipulate and circumvent Department policy that can affect the overall safety and security of the institutions.

6

Thus, the disclosure of this information would create safety and security concerns and may endanger the lives of involved staff. The Department has adopted various policies and rules regarding the care, custody, and control of the inmates within its institutions that it keeps confidential for security reasons. Certain documents are confidential and cannot be disclosed to inmates.

Defendants further object to this request as inmates are not permitted to access records related to other inmates. Possession of such records would constitute contraband. *See* 2017 Inmate Handbook, p. 30, § D(3)(o). *See also* Department Policy DC-ADM 003, "Release of Information Policy," Section IV, subsection A.5. ("An inmate is prohibited from receiving inmate information pertaining to another inmate other than him/herself.").

Without waiving the foregoing objections, see the DOC investigative report previously produced and marked for production as DEF000008-DEF000138.

_6._    Plaintiff seeks misconducts, grievances, & criminal record history of the inmate he was house in cell 108 on G_A_ in the RHU at SCI Huntingdon from 2/3/18 through 2/8/18.

**RESPONSE: OBJECTION.**    Defendants object to this request because it is overbroad and is not relevant to the claims or defenses of any party.

7

Defendants further object to this request as not being proportional to the needs of this case.

Defendants further object to this request to the extent that it seeks information relating to matters beyond that are set forth in the complaint. Because the scope of this matter is limited, all of the requested records are not relevant to the claims at issue.

Defendants further object to this request as inmates are not permitted to access records related to other inmates. Possession of such records would constitute contraband. *See* 2017 Inmate Handbook, p. 30, § D(3)(o). *See also* Department Policy DC-ADM 003, "Release of Information Policy," Section IV, subsection A.5. ("An inmate is prohibited from receiving inmate information pertaining to another inmate other than him/herself.").

7.    Last Plaintiff seeks for inspection & copying all complaints, statements, investigation files of any other inmate or staff that claim that inmate Allen had attempted to or did sexually abuse, assault them or threaten to do as such; any other claims against the inmate Pursuant to ADM 001 or 008 policy.

**RESPONSE:    OBJECTION.**    Defendants object to this request because it is overbroad and is not relevant to the claims or defenses of any party.

8

Defendants further object to this request as not being proportional to the needs of this case.

Defendants further object to this request to the extent it assumes facts not in evidence.

Defendants further object to this request to the extent that it seeks information relating to matters beyond that are set forth in the complaint. Because the scope of this matter is limited, all of the requested records are not relevant to the claims at issue.

Defendants further object to this request as inmates are not permitted to access records related to other inmates. Possession of such records would constitute contraband. *See* 2017 Inmate Handbook, p. 30, § D(3)(o). *See also* Department Policy DC-ADM 003, "Release of Information Policy," Section IV, subsection A.5. ("An inmate is prohibited from receiving inmate information pertaining to another inmate other than him/herself.").

8.     Plaintiff also seeks for inspection & copying a statement from Ivan Costillo LS3066, the statement predicates as to what the inmate knewn (sic) about the sexual assault, the statement was confiscated by Ms. Spkyer & Mr. Maxwell after Brown gived (sic) the statement to his Counslor (sic) Richards to copy she then gived

(sic) it to Maxwell & Spkyer they then confiscated the statement claimant it was put in a (sic) investigation file and Brown could not get a copy.

**RESPONSE:  OBJECTION.**  Defendants object to this request because it is overbroad and is not relevant to the claims or defenses of any party.

Defendants further object to this request as not being proportional to the needs of this case.

Defendants further object to this request to the extent it assumes facts not in evidence.

Defendants further object to this request to the extent that it seeks information relating to matters beyond that are set forth in the complaint.  Because the scope of this matter is limited, all of the requested records are not relevant to the claims at issue.

Defendants further object to this request as inmates are not permitted to access records related to other inmates.  Possession of such records would constitute contraband. *See* 2017 Inmate Handbook, p. 30, § D(3)(o). *See also* Department Policy DC-ADM 003, "Release of Information Policy," Section IV, subsection A.5. ("An inmate is prohibited from receiving inmate information pertaining to another inmate other than him/herself.").

10

# In The United States District Court
# Or The Middle District OF Pennsylvania

Gartor kiki Brown

V.

NO. 18-CV-1527

T. Gildea et. al.,

# Plaintiff's Motion To Compel Discovery

The Plaintiff moves Pursuant to Rule 34(b) and 37(a), Fed.R.Civ.P., for an order compelling the defendants to Produce for inspection and Copying the documents requested

I Gartor Kiki Brown declares Under Penalty of Perjury:
: am Plaintiff in this case, Defendants Fochtman, Plociniki, Johnston, Maxwell was served with a Request for Production of Document (Exhibit A) Plaintiff requested defendants to Produce all electronically stored information (ESI) specifically video recording from the incident alleged. Plaintiff Put defendants on notice to preserve all tape recording on 2/13/18 by way of their electronic Monitoring system. Plaintiff again Put defendants on notice with a Notice of Intent to Initiate Litigation regarding the incident from 2/5/18 through 2/8/18. Plaintiff seeks to Compel Video surveillance tape from 2/2/18 through 2/8/18. This is direct evidence the Court Could Use to set the tacks a lart

Plaintiff also requested Photographs concerning the subject matter, defendants did send Photographs, but it was not in color, Plaintiff can not see the Photos clearly Plaintiff request the color photos.

Plaintiff also, requested for inspection & copying All transcripts of deposition taken in which defendants did not Provide. Defendants response (Exhibit B) direct Brown to go through a court Reporting service, Brown objects, as he view such request as relevance in which under 26(b) defendants has to Provide the documents for viewing & or copying.

Under (Exhibit C) Plaintiff Request For Production Of Document in combining Request 4,6,7, Plaintiff seeks for inspection & copying All (IRC) team documents of Inmate Allen in full, this would inform Brown as to what defendants knew of the inmate cell, history not just at SCI Huntingdon but at all state institutions the inmate was housed at. Plaintiff also seeks all misconduct history and criminal history of the inmate while in the DOC. This will inform Brown as to any prior incident that should had Put defendants on g'ard. Brown also seeks all grievances filed by the inmate just at SCI Huntingdon only because the inmate could had warned defendants in writing,

Plaintiff claims these request were objected by defendants, defendants seemed to send Plaintiff inmate Allen's Misconduct history while at SCI Huntingdon but they were all blacked out Preventing Brown from seeing anything, they also cited that four of the Misconduct was Pursuant to Sexual harassment, see (Exhibit L) Brown seeks the inmate full misconduct history not Just at SCI Huntingdon.

Plaintiff Request for inspection All Pennsylvania Additive Classification Tool Policy or (PACT) including but not limited to, classification & housing inmates, this was also objected under request # 2 Pursuant to (Exhibit C). Also Pursuant to (Exhibit C) Plaintiff Request All Investigation file Pursuant to any claims against inmate Allen Under the, OPI P.R.E.A, or DOS. Brown seeks, the documents as relevance which was also objected.

: Defendants objected to (Exhibit D) request to (Exhibit I) request I & (Exhibit E) request 5 were all objection's & consist of the same request: "Have you been Under Investigation for any wrong done, this is not limited to DOI & DOS allegations, serious injuries etc, this is a important request because the defendants might have a history of ignoring or supporting Violence, Brown has a right to defendants files Pursuant to investigation for any wrong done in which he request the documents for inspection & copying.

# In The United States District Court
# For The Middle District Of Pennsylvania

Gartor Kiki Brown

V.

T. Gildea et. al..

NO. 18-CV-1527

# Brief To Plaintiff Motion To Compel Discovery

## Argument

Generally, courts afford considerable latitude in discovery in order to ensure that litigation proceeds with the fullest possible knowledge of the issues and facts before trial, Hickman V. Taylor, 329 U.S. 495, 501, 67 S. Ct. 385, 91 L. Ed. 451 (1947). Brown claims video recording outside the cell or Pod for which the incident took place is highly relevant to the subject matter, as defendants & the Plaintiff tell two different story, the court could use the footage as a fact finder, e.g. in Fochtman's interrogatories, he claims he exchanged Brown's sheets, that Brown only had a bloody nose & refused medical treatment & that Brown only asked to move to see the T.V. Brown, claim there was no tv. on the Pod at the time & Fochtman was not the one to change he sheets. Jumper, Bakers, ittius Johnston, that is of high relevance, & if defendants distory the tape knowing it would be crucial evidence despite Brown puting them on notice to reserve the tape, then Brown could request a sanction for s-poliation under Rule 37(e).

Brown argues that color pictures are also of relevancy, defendants send Brown pictures in black & white to prevent him from seeing anything. was the picture tooken with the inmate clothing on or off, are their discoloring, inflammation, Lumbs, abrasion, marks, cuts etc.

The transcript of the deposition is also in itself relevant for Liruxnk & copyinek, as it is Plaintiff right to cite to what was send in his deposition & produce it as exhibits.

Plaintiff predicates that the IRC team documents in full is of relevance, as many claims under the 008 it is important to know if the person had any fibis, did defendants that self document serious acts of violence by the inmate, was the inmate even classified to be house, with other inmates, was they red flags that officials them self acknowledged but ignored, did the inmate warn officials & they ignored it, Brown claims the IRC team document of the inmate & cell history, the inmate misconduct history & grievance history would tell or help the courts decide this case.

Plaintiff claims the Pennsylvania, Additive Classification tool Policy or CP, A.C.T), & the investigation files of other 001 or 008 claims against inmate Alex is highly relevant because it would show if defendants went against any classification policys in housing Brown with the liter & if their is a pattern of prior claims against the inmate.

Plaintiff claims all investigation files of defendants prior or allege misconduct is relevant to his claim, such as any prior incident of supporting or ignoring violence or 001 or 008 claims can not be ignored, as the defendant consistently under investigation for other allered wrong doing, this would inform the Plaintiff as to sensible material or any pattern of wrong doing.

Plaintiff, also claim all relevant information was black out on which he could not see what was on the page.

Relevance for discovery purposes is defined, broadly. The Rules permit, discovery the garding any, non-privileged matter, that is relevant to any parti's claim or defense, ... Relevant information need not be admissible at the trial if the discovery appears, reasonably calculated to lead to the discovery of admissible evidence. The burden is upon the Party objecting the discovery to state the grounds for the objection with specificity. Fed. R. Civ. P. 33(b)(4), Momah V. Albert Einstein Med. Cntr., 164 F.R.D. 412, 417 (E.D. Pa. 1996). "Mere recitation of the familiar litony that an interrogatory or a document production request is overly broad, burdensome, oppressive and irrelevant will not suffice. (quoting Josephs V. Harris Corp. 677 F.2d 985, 992 (3d Cir. 1982)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GARTOR KIKI BROWN,** | : | **No. 3:18-cv-01527** |
| **Plaintiff,** | : | |
| | : | **Judge Jones** |
| **vs.** | : | |
| | : | *Electronically Filed Document* |
| **LT. MAXWELL, C.O. PLOCINIK,** | : | |
| **C.O. JOHNSON, C.O. FOCHTMAN,** | : | |
| **and KENDRICK,** | : | *Complaint filed Nov. 28, 2018* |
| **Defendants** | : | |

## BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY

Plaintiff seeks to compel the production of various items. The Defendants will turn over color photographs to the Plaintiff. However, he is not entitled to the remainder of the items he seeks. Thus, his motion to compel should be denied.

## PROCEDURAL AND FACTUAL HISTORY

This is a civil rights action brought pursuant to 42 U.S.C. § 1983[1] by Gartor Kiki Brown, an inmate formerly incarcerated at SCI Huntingdon. The case proceeds via an amended complaint, wherein the Plaintiff claims Maxwell, Plocinik, Fochtman, and Johnson, all staff of the Pennsylvania Department of Corrections, violated his Eighth Amendment rights by failing to protect him from a former cellmate that he alleges sexually assaulted and abused him. *See generally* Doc. 25. He has filed a motion to compel as to the following items:

---

[1]   The Amended Complaint mistakenly notes that this is a case brought pursuant to 28 U.S.C. § 1331. (Doc. 25 at 1).

- Video recordings from February 2 to February 8, 2018. Doc. 85, ¶ 1.

- Color photographs (the Defendants previously provided black and white photographs). *Id.* at ¶ 2.

- The transcript from his deposition. *Id.* at ¶ 3.

- All "IRC team documents of Inmate Allen," as well as "misconduct and criminal history of the inmate" and "all grievances filed by the inmate." *Id.* at ¶ 4.

- All policies relating to "classification and housing inmates." *Id.* at ¶ 5.

- All "investigation file[s] pursuant to any claims against Inmate Allen under . . . PREA or [DC ADM] 008." *Id.*

- Documents relating to investigations of the defendants' wrongdoing. *Id.* at ¶ 6.

The Defendants file the following brief in opposition to the Plaintiff's Motion to Compel.

## QUESTION PRESENTED

Should the Court deny the Motion to Compel?

*Suggested Answer: Yes.*

## ARGUMENT

"While the scope of relevance in discovery is far broader than that allowed for evidentiary purposes, it is not without limits." *Stabilus, A Div. of Fichtel &*

*Sachs Indus., Inc. v. Haynsworth, Baldwin, Johnson & Greaves, P.A*, 144 F.R.D. 258, 265 (E.D. Pa. 1992) (internal citations omitted). "The Court will not permit discovery where a request is made in bad faith, unduly burdensome, irrelevant to the general subject matter of the action, or relating to confidential or privileged information." *Dixon v. Williams*, 2016 WL 631356, *1 (M.D. Pa. Feb. 17, 2016) (citation omitted). "The responses sought must comport with the traditional notions of relevancy and must not impose an undue burden on the responding party." *Hicks v. Arthur,* 159 F.R.D. 468, 470 (E.D. Pa. 1995).

## Video

The Plaintiff's first request—video between February 2 and February 8 of 2018—has already been disposed of by the Court. *See* Doc. 90 (denying Plaintiff's motion for sanctions for failing to preserve video, based on the fact that no video exists). Thus, the Defendants do not address it further.

## Photographs

The Plaintiff's next request is for color photographs. The Defendants will turn over color photographs of the photos that they have previously turned over in black and white; thus, the motion may be denied as moot as to his request for photos.

## Deposition Transcript

Next, the Plaintiff seeks his deposition transcript. As the Defendants noted,

to the extent the Plaintiff was seeking a transcript of his deposition, he needed to

contact the court reporting agency. *See* Doc 86, p. 4. The Third Circuit has

previously held that "[t]here is no provision in the statute for the payment by the

government of the costs of deposition transcripts, or any other litigation expenses,

and no other statute authorizes courts to commit federal monies for payment of the

necessary expenses in a civil suit brought by an indigent litigant." *Tabron v.*

*Grace,* 6 F.3d 147, 159 (3d Cir. 1993) (citation omitted); *see also Njos v. Kane,*

2015 WL 999398, * 5 (M.D. Pa. Mar. 5, 2015) ("Simply because Plaintiff is *pro se*

and allegedly lacks financial resources, does not entitle him to conduct his

discovery free of charge or to have his costs paid by the government.") (citations

omitted). The Defendants should not be required to pay for the Plaintiff's litigation

expenses, his *pro se* and *in forma pauperis* status notwithstanding, nor should the

stenographer be deprived of payment for her services based on the Plaintiff's

financial status. Thus, the motion to compel should be denied as to the deposition

transcript.

## Documents relating to Inmate Allen

The Plaintiff seeks various items relating to an "Inmate Allen," including

"IRC team documents," his "misconduct and criminal history," all grievances that

4

Inmate Allen filed, and any investigations against him under PREA or DC ADM 008. Doc. 85, ¶¶ 4, 5. He claims these documents are relevant to his claims. *Id.* However, assuming *arguendo* that this information is, indeed, relevant, DOC policy prohibits the dissemination of this type of information, as "[a]n inmate is prohibited from receiving inmate information pertaining to another inmate other than him/herself." *See* DC-ADM-003, "Release of Information Policy," Section IV(A)(5).[2] Additionally, the Middle District has previously acknowledged "a compelling security concern in that if an inmate is aware of certain information about another inmate, such knowledge 'can be used to manipulate, harass, blackmail, or assault that inmate, thereby creating a substantial risk of physical harm to the subject inmate and any staff who intervene.'" *Banks v. Beard,* 2013 WL 3773837, * 8 (M.D. Pa. July 17, 2013) (citation omitted);[3] *see also Williams v. Wetzel,* 2019 WL 1206061, * 3 (M.D. Pa. March 14, 2019) (collecting cases uniformly rejecting inmates' requests to obtain misconduct, grievance, and incident reports relating to other inmates on privacy and security

---

[2] https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/003%20Release%20of%20Information.pdf (accessed April 13, 2020).

[3] In *Banks,* the information sought was names of Muslim inmates who were in "debt" due to participation in Islamic Eid feasts." *Id.* at * 7. Here, the information is much more sensitive than information about other inmates' religious beliefs and/or monetary debts, as it pertains to a specific inmate.

grounds). Therefore, the Court should deny the Plaintiff's motion to compel this broad and sensitive information about Inmate Allen.

<div align="center">Policies Relating to Classification and Housing Inmates</div>

Next, Plaintiff demands that the Defendants turn over "all Pennsylvania Additive Classification Tool Policy (PACT)" relating to classifying and housing inmates. His request should be denied, for multiple reasons. First, as to this request, the Plaintiff has violated Local Rule 5.4(c), as he has not provided a copy of the Defendants' various objections to his request. That Rule mandates that "a copy of the discovery matters in dispute shall be filed with the court contemporaneously with any motion[.]" M.D. Pa. L.R. 5.4(c); *see also Easley v. Tritt,* 2020 WL 836695, * 9 (M.D. Pa. Feb. 20, 2020) (denying inmate's motion to compel for failure to comply with Local Rule 5.4(c)). Because the Plaintiff has failed to comply with this Rule, the motion to compel can be denied on that basis alone.

Additionally, the Defendants also note the obvious security and safety concerns that would be associated with releasing to an inmate any policy relating to how inmates are housed and/or classified. Furthermore, dissemination of this policy could lead to safety or security issues, not to mention attempts by inmates to manipulate their placements or classifications. Thus, the Defendants should not be required to turn over these policies to the Plaintiff.

<div align="center">6</div>

## Documents Relating to Investigations of the Defendants

Finally, the Plaintiff seeks documentation relating to investigations of wrongdoing of the defendants. Doc. 85, ¶ 6. This request should also be denied. First, as noted *supra,* the Plaintiff has failed to comply with Local Rule 5.4(c), which requires that he provide a complete copy of the discovery matter in dispute. As a result, the Court can, and should, deny his motion to compel for that reason. However, the Court may also deny the Plaintiff's request for substantive reasons, as well. Here, the Plaintiff demands information relating to "*any* wrongdoing . . . while employed at SCI-Huntingdon" and "*all* grievances you have written against you by inmates while employed at SCI Huntingdon." Doc. 86, Exhibit D, ¶¶ 10-11 (emphasis added). "These are precisely the kinds of sweeping, generalized and overly broad discovery requests judges in the Middle District of Pennsylvania have rejected as being not only overly broad, but unduly infringing upon the privacy interests of other inmates who may have sought to grieve unrelated issues that they had with staff." *Allen v. Eckard,* 2019 WL 1099001, *3-4 (M.D. Pa. Mar. 8, 2019) (collecting cases). Put another way, any benefit to the Plaintiff is vastly outweighed by the time, burden, and expense that would be placed upon the Defendants to collect and turn over this data, not to mention the myriad privacy and other issues that would be raised by allowing the Plaintiff to obtain this information. Therefore, the motion to compel should be denied for this request.

7

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that this Honorable Court deny the Plaintiff's Motion.

Respectfully submitted,

**JOSH SHAPIRO**
**Attorney General**

By:  *s/ Caleb Curtis Enerson*
      **CALEB CURTIS ENERSON**
      **Deputy Attorney General**
      **Attorney ID #313832**

**Office of Attorney General**
**15th Floor, Strawberry Square**
**Harrisburg, PA 17120**
**Phone: (717) 705-5774**

**cenerson@attorneygeneral.gov**

**Date: April 17, 2020**

      **KAREN M. ROMANO**
      **Chief Deputy Attorney General**
      **Chief, Civil Litigation Section**

      *Counsel for Defendants Maxwell,*
      *Fochtman, Plocinik, Johnson*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GARTOR KIKI BROWN,** | : | **No. 3:18-cv-01527** |
| **Plaintiff,** | : | |
| | : | **Judge Jones** |
| **vs.** | : | |
| | : | *Electronically Filed Document* |
| **LT. MAXWELL, C.O. PLOCINIK,** | : | |
| **C.O. JOHNSON, C.O. FOCHTMAN,** | : | |
| **and KENDRICK,** | : | *Complaint filed Nov. 28, 2018* |
| **Defendants** | : | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2020, I caused to be served a true and correct copy of the foregoing document to the Plaintiff via HAND DELIVERY through the Department of Corrections. This alternative method of service is being used as a result of the COVID-19 emergency.

*s/ Caleb Curtis Enerson*
**CALEB CURTIS ENERSON**
**Deputy Attorney General**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GARTOR KIKI BROWN, | : | |
| Plaintiff, | : | 3:18-cv-1527 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| LT. MAXWELL, *et al.*, | : | |
| Defendants. | : | |

## **ORDER**

### **June 4, 2020**

NOW THEREFORE, upon consideration of Defendants' May 15, 2020 *in camera* submission to the court *via* email, and it appearing that, in accordance with the Court's May 5, 2020 Order (Doc. 100) addressing Plaintiff's March 19, 2020 motion to compel (Doc. 85), the email contains the unsworn declaration of Jason Stauffer and produces for *in camera* inspection, a Pennsylvania Department of Corrections Investigative Report dated March 14, 2018, and an Initial Reception Committee ("IRC") record dated June 26, 2009, and upon further consideration of various other pending motions (Docs. 104, 106, 107) it is hereby ORDERED as follows:

1. The Clerk of Court is directed to DOCKET Defendants' May 15, 2020 letter to the Court and DOCKET, as an attachment to that letter, the Unsworn Declaration of Jason Stauffer.

2.    Based upon Stauffer's "precise and certain reasons for preserving" the confidentiality of the communications concerning the  policies relating to classification and housing of inmates, *U.S. v. O'Neill*, 619 F.2d 222, 226 (3d Cir. 1980), Plaintiff's motion to compel (Doc. 85) the production of such policies is DENIED.

3.    With regard to the requests concerning inmate Allen, the motion to compel (Doc. 85) is GRANTED in part and DENIED in part.

a.    Review of the Pennsylvania Department of Corrections Investigative Report dated March 14, 2018, reveals that this report contains some information, if divulged, would threaten the orderly operation of the prison as well as the security of other inmates and staff members. *See Bailey v. McMahon*, No. 1:07-cv-2238, 2012 WL 1246147, at *9 (M.D. Pa. Apr. 12, 2012).  However, to the extent that this document contains non-confidential and relevant information, including information contained in Plaintiff's ICAR files, production is warranted. *See id.; see also Paluch v. Dawson*, No. 1:06-cv-1751, 2008 WL 2785638, at *3 (M.D. Pa. July 17, 2008); *Alex v. Wetzel*, No. 1:13-cv-304, 2015 WL 418186, at *2-3 (M.D. Pa. Feb. 2, 2015). Defendants shall PRODUCE to Plaintiff the Pennsylvania Department of Corrections Investigative Report dated March 14, 2018, as follows[1]:

i.    Pages identified as DEF000045, 51-53, 57-72, 101-114, and 121-123, shall be REMOVED in their entirety based on either confidentiality and/or security concerns.  Defendants are not required to produce these pages.

ii.    Pages identified as DEF000020, 50, 54-56, 74,  85-92, 119, and 120, shall be reviewed by Defendants and REDACTED to the extent that they contain confidential, security, or irrelevant information.  Defendants shall PRODUCE to Plaintiff the redacted pages.

---

[1] The first page of the report is identified as DEF00008.  The last page is marked DEF000138.

iii.    Pages identified as DEF0008-19, 21-44, 46-49, 73, 75-84, 93-100, 115-118, and 124-138, shall be PRODUCED to Plaintiff. To the extent that any information within these pages is deemed confidential or raises security concerns, including, *inter alia*, employee numbers, enrollment details, identifying inmate information, Defendants may redact such information. Defendants shall PRODUCE to Plaintiff these pages, with any necessary redactions.

b.    The motion to compel (Doc. 85) is DENIED with respect to Inmate Allen's IRC documents as they are irrelevant.

c.    The motion to compel (Doc. 85) is GRANTED with respect to Misconduct C009726 issued to Inmate Allen on April 30, 2017. Defendants shall PRODUCE to Plaintiff the misconduct, the disposition of the misconduct and any appeal decisions. As noted *supra*, Defendants may redact any portions of those documents that raise confidentiality or security concerns

4.    Defendants shall PRODUCE the above documents to Plaintiff on or before June 15, 2020.

5.    Plaintiff's motion (Doc. 104) to consult with the Court concerning the various discovery issues surrounding the documents that are the subject of Defendants' *in camera* submissions is GRANTED. The Court has fully considered the issues raised by Plaintiff in his supporting brief (Doc. 105) in conducting the *in camera* review.

6.    The parties' motions (Docs. 106, 107) for extensions of time are GRANTED and the governing scheduling deadlines are as follows:

a.    Plaintiff may SUPPLEMENT his motion for summary judgment, supporting brief, statement of facts, and exhibits, on or before June 30, 2020, to address the documents which Defendants' are required to produce as a result of this Order.

b.     Defendants shall respond to Plaintiff's motion for summary judgment, and any supplement he may file, on or before July 15, 2020.

c.     Plaintiff may file a reply on or before July 30, 2020.

d.     Defendants shall file their motion for summary judgment, statement of material facts, and supporting brief on or before June 15, 2020.

> s/ John E. Jones III
> John E. Jones III, Chief Judge
> United States District Court
> Middle District of Pennsylvania



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GARTOR KIKI BROWN, | : | |
| Plaintiff, | : | 3:18-cv-1527 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| LT. MAXWELL, *et al.*, | : | |
| Defendants. | : | |

## MEMORANDUM AND ORDER

### March 16, 2021

Plaintiff Gartor Kiki Brown ("Brown"), a state inmate in the custody of the

Pennsylvania Department of Corrections ("DOC") who, at all times relevant was

incarcerated at the State Correctional Institution at Huntingdon ("SCI-

Huntingdon"), Pennsylvania, commenced this action pursuant to 42 U.S.C. § 1983.

The matter is proceeding *via* an amended complaint wherein Brown alleges that

Defendants Maxwell, Plocinik, Fochtman, and Johnston violated his constitutional

and state law rights in connection with February 2018 physical and sexual assaults

against him by his cellmate, Inmate Allen. (Doc. 25).

Presently pending are cross-motions for summary judgment pursuant to

Federal Rule of Civil Procedure 56. (Docs. 92, 113, 119).[1]  The motions are ripe

---

[1] On June 29, 2020, in accordance with the Court's June 4, 2020 Order addressing various
outstanding discovery issues (Doc. 108), Brown supplemented his previously filed motion for
summary judgment (Doc. 92) by filing another motion for summary judgment (Doc. 119).
Although it appears that the most recently filed motion (Dox. 119) stands alone, to be thorough,

for disposition. For the reasons that follow, Brown's motions will be denied and Defendants' motion will be granted in part and denied in part.

## I.    STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.*; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America*, 927 F.2d 1283, 1287-88 (3d

---

we will consider all documents filed in support of both Brown's original (Doc. 92) and supplemented (Doc. 119) motions.

2

Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex*, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out ... that there is an absence of evidence to support the nonmoving party's claims." *Id.* at 325.

Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Wooler v. Citizens Bank*, 274 F. App'x 177, 179 (3d Cir. 2008). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving

3

party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). "[T]he non-moving party 'may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.'" *Picozzi v. Haulderman*, 2011 WL 830331, \*2 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(e)(2)). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America. Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. The adverse party must raise "more than a mere scintilla of evidence in its favor" and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989). The mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. *Anderson*, 477 U.S. at 249–50.

4

## II.   STATEMENT OF MATERIAL FACTS

On February 14, 2018, Brown submitted a sick call request stating that he

was abused from February 3, 2018, through February 7, 2018, and raped on

February 7, 2018, by his cellmate, Inmate Allen. (Doc. 114, p. 136).

The DOC's Prison Rape Elimination Act ("PREA") Manual, commonly

referred to as DC-ADM 008, provides as follows:

> It is the policy of the Department to prohibit any form of sexual abuse
> and/or sexual harassment of an inmate. The Department has zero
> tolerance for sexual abuse or sexual harassment of any individual under
> the supervision of the Department. (28 C.F.R. §115.11[a]) Anyone who
> engages in, fails to report, or knowingly condones sexual abuse or
> sexual harassment of an inmate shall be subject to disciplinary action,
> up to and including termination, and may be subject to criminal
> prosecution. An inmate, employee, contractor, or volunteer of the
> Department is subject to disciplinary action and/or sanctions, including
> possible dismissal and termination of contracts and/or services, if
> he/she is found to have engaged in sexual abuse or sexual harassment
> of an inmate. A claim of consent will not be accepted as an affirmative
> defense for engaging in sexual abuse or sexual harassment of an inmate.

(Doc. 114, p. 9) (footnotes omitted).  "Inmates shall utilize the inmate grievance

system in accordance with Department policy DC-ADM 804, 'Inmate Grievance

System,' to report inmate-on-inmate sexual harassment allegations, which include

repeated and unwelcome sexual advances, requests for sexual favors, verbal

comments, gestures, or actions of a derogatory or offensive sexual nature.. . .

Inmates shall not utilize the inmate grievance system to report sexual abuse or

5

sexual harassment by a staff member or inmate-on-inmate sexual abuse, as defined in the Glossary of Terms for this procedures manual. However, if an inmate files a grievance related to staff on inmate sexual abuse/sexual harassment or inmate on inmate sexual abuse, the Facility Grievance Coordinator shall reject the grievance and forward it to the facility Security Office and PREA Compliance Manager (PCM)/designee for tracking and investigation. The inmate shall be notified of this action." (*Id.* at pp. 47, 48).

The policy requires that an individual who is reporting allegations of sexual abuse provide details including, but not limited to, the names of all parties involved and any witnesses. (*Id.* at p. 46). There are various methods for an inmate to report such abuse including a verbal report, a DC-135A, Inmate Request to Staff Member and/or submitting a written report to the designated Sexual Abuse Reporting Address. (*Id.* at p. 47). A staff member shall file "A DC-121, Part 2, Extraordinary Occurrence Report...in every sexual abuse allegation in accordance with Department policy 6.3.1, 'Facility Security.' Apart from reporting to designated supervisors or officials, staff shall not reveal any information related to a sexual abuse allegation to anyone other than to the extent necessary, to make treatment, investigation, and other security and management decisions, where

6

sexual abuse with an inmate is reported. (28 C.F.R. §115.61[b])." (*Id.* at pp. 48, 49).

DC-ADM 008 further provides that in investigating allegations of sexual abuse and/or sexual harassment, the investigator shall "interview the inmate complainant(s) and obtain an Inmate Written Statement of Sexual Abuse/Harassment (Attachment 5-A) following the interview. If the complainant refuses to be interviewed or provide a written statement, said refusal, including date, time, and persons present, shall be documented and included in the investigative report." (*Id.* at p. 65) The Inmate Written Statement form found at Attachment 5-A, seeks information such as location, date, time, facility of incarceration, and a statement which is to be "given by [the inmate complainant] freely without coercion." (*Id.* at pp. 71, 72).

In accordance with DC-ADM 008, LPN Trice, who initially reviewed the sick call request, reported the incidents *via* a DC-121 Extraordinary Occurrence Report. "On February 14, 2018, the Security Office at SCI Huntingdon received a DC-121 Employee Report of Incident authored by LPN Trice containing an allegation of sexual assault made by NA6401 Brown. NA6401 Brown sent a sick call slip to medical alleging his previous cellmate physically and sexually assaulted

7

him from 2/3/18 thru 2/7/18. Tracking number 2018-HUN-000327-HUN". (*Id.* at p. 97).

Defendant Maxwell interviewed many witnesses in connection with the incident. (Doc. 121, ¶ 8; Doc. 132 ¶ 8). On March 14, 2018, he submitted a PREA Investigative Summary. (Doc. 114, p. 96). In the "Synopsis", Defendant Maxwell indicated that Brown submitted to an interview but refused to provide a written statement during the PREA investigation. (*Id.*). Maxwell summarized Brown's interview as follows:

'It started on the 3rd when I was taken out of the camera cell and placed in a cell with Adam[2] [sic].'… Brown claimed he told CO Plocinik that he don't get along with Allen, and was put in the cell anyway. Brown stated 'Assaults started right when I got in the cell and CO Plocinik just said to have fun with Allen because he's a kid toucher'. Brown alleged he told several staff on several different dates he needed moved because he and Allen were not getting along. When asked to identify the staff members he told, Brown stated 'Mr. Parsons, CO Plocinik, Mr. Kendricks, a Sgt and other CO's'. [He] was asked to describe the details of the alleged assaults. Brown stated Allen attempted to pull his jumpsuit down while fighting. [He] alleged at this time he hit his head off the cell and continued to fight Allen. [He] alleged Allen was attempting to rape him but became tired and gave up. The second time Brown alleged he and Allen were fighting and Allen was attempting to pull his jumpsuit down again. Brown stated he got tired and didn't fight off Allen. [He] alleged Allen then 'put his dick in my butt and raped me'. When Brown was asked why he waited so long to report the allegations, [he] stated 'because the same CO's were on the block who kept ignoring me'.

---

[2] Throughout the interview, Brown repeatedly mistakenly referred to Allen as Adam. (Doc. 114, p. 97).

8

(*Id.*).  Brown did not request money damages during the PREA Investigation.
(*Id.*).

Maxwell also interviewed LPN Trice who "responded to the RHU and
attempted to assess Inmate Brown for any injuries since it was outside of the 96
hour window. [She] stated 'Inmate Brown refused any medical treatment'. [She]
was asked if Brown appeared to have any injuries sustained from a physical
altercation. LPN Trice stated 'Inmate Brown did not have any injuries or markings
related to his allegations.'." (*Id.* at p. 101). In addition, Maxwell interviewed and
obtained written statements from Defendants Fochtman, Plocinik, and Johnston,
among others. (*Id.* at pp. 96, 97, 116, 122, 130).

Defendant Fochtman stated that Brown did not inform him of any physical
or sexual abuse. (*Id.* at p. 116). On February 7, 2018, he indicates that he went to
Brown's cell to inquire about a reported bloody nose and whether it was the result
of a fight. Brown denied that there was a fight and reported that he had a history of
nose bleeds. He observed Brown's hands and did not notice any signs of fighting.
He exchanged Brown's sheets and jumpsuit for clean ones. He further stated that
Brown and Allen requested to move cells because they could not see the television.
Fochtman denied that request. (*Id.* at p. 116).

9

Defendant Plocinik stated that he did not place Brown in a cell with another inmate, was not notified by Brown that he was being physically and sexually assaulted, did not request to be moved out of any cell, did not notice any injuries on Brown, and did not witness any behavior that would indicate that Brown was in distress. *(Id.* at p. 122).

Defendant Johnston stated that on his RHU rounds, Brown informed him that he had a bloody nose and that there was blood on his jumpsuit and his sheet. *(Id.* at p. 130). Brown stated that there was no fight and that he just wanted his belongings replaced. "No one requested medical attention other than the bloody nose. At no time did an inmate state about a physical or sexual assault." *(Id.)*.

In connection with the PREA investigation, black and white photos were taken and provided to Brown. (Doc. 95, ¶ 3; Doc. 131 ¶ 3). At time of incident, Allen had 77 misconducts – 4 were for sexual harassment. *(Id.*; *Id.)*.

The PREA investigation concluded as follows:

This investigation has determined that Brown made the allegation of being sexually and physically assaulted several times by his cellmate, FX1504 Allen. There were several staff members who Brown claimed he allegedly reported his allegations to. All staff mentioned by Inmate Brown were interviewed and stated he never reported any allegation to any of them. On the night the sick call slip was submitted, Inmate Brown was questioned and medical attempted to evaluate him for injuries. Inmate Brown refused any medical treatment. Brown alleged he had a broken nose, however as noted by LPN Trice thee were no bruises, marks or evidence of the alleged allegations. Inmate Brown

10

stated he just didn't want any cellmates. There are multiple entries noted where Inmate Brown was attempting to request or manipulate staff into giving him a "Z" code. Inmate Allen denied all allegations against him. This allegation could be construed as another attempt to be manipulative for self-gain, a Z code. PSP concluded that the type of assault or rape did not occur and Inmate Brown was not credible or presented as a legitimate victim.

The findings of this investigation concludes that the allegations made by Inmate Brown are unfounded.

(Doc. 114, p. 104).

During his deposition, Brown testified that when he arrived at SCI-Huntingdon, he informed Maxwell and other officials that he feared for his safety because he was sexually assaulted at another institution. (Doc. 114, p. 262). He indicates that on February 2, 2018, when Plocinik informed him that he was being moved in with Inmate Allen, he informed him that "those guys were extorting me in population and like, I don't feel comfortable moving in there with him"; Plocinik responded that he would be moving in with Allen or force would be applied. (*Id.* at p. 218).

That same day, he was taken to see Defendant Maxwell, the PREA coordinator; inmates inferred from this that he got raped at SCI-Camp Hill. (*Id.*). He states that he questioned Maxwell as to why he was moving in with Allen and informed him that because of the SCI-Camp Hill rape, he did not feel comfortable with a cellmate. (*Id.* at p. 219). Maxwell told him the "the same thing Plocinik

11

told [him]." "You're going to move when we ask you to move with whoever we ask you to move with. I don't care it it's Allen or whoever it is. If you're asked to move to a cell they you're going or force will be used." (*Id.*).

On February 3, 2018, when Allen became aware that Brown was being moved into the cell with him, he started yelling "don't put that faggot in here. He's a homo. I'm going to f\*\*\* him up if you put him in here." (*Id.* at p. 221). When Plocinik placed him in the cell with Allen, he stated that Brown is a "kiddie toucher and a rat or something along those lines." (*Id.* at p. 222). Allen hit Brown as soon as his cuffs were removed; Plocinik laughed. (*Id.* at pp. 219, 221). Allen continued to threaten Brown over the next couple days and both inmates lobbied for Brown's removal from the cell. (*Id.* at pp. 221-225).

On February 4, 2018, when Allen returned from the yard, he informed Brown that he did not want him in his cell, called him a rat and a homosexual and continued to threaten him with bodily harm. (*Id.* at p. 225). When Brown informed him he did not want to be in the cell with him either, Allen smacked him and, every time he attempted to speak, Allen would tell him to "shut the F up". (*Id.*). He testified that "every time like a CO came to the door [Allen] actually moved over there to tell them to get me out the cell. So I would tell the CO hey, I really don't want to be here like this guy keep[s] assaulting me." (*Id.*). He states

12

the prison staff ignored him. He further testified that he wrote a help note that night. He's unsure of who collected the note, "Plocinik may have collected mail, may have been Smith it may have been Fochtman but I told them and I wrote a help me note." (*Id.* at pp. 225-26).

Brown testified that on February 5, 2018, there were numerous encounters between him and prison staff, including Psychiatrist Partsman, Unit Manager Kendrick, and Correctional Officer Chilcote, during which he expressed concern for his mental state and indicated that he feared for his safety. (*Id.* at pp. 226-28). He was basically being ignored. He is "pretty sure" that he informed Defendant Maxwell on that date that he should not be in the cell with Allen, that Allen did not want him in the cell, and that Allen had "recent history." (*Id.* at p. 228). Maxwell also ignored him. Later in the day he informed Defendant Johnston and expressed the same concerns about remaining in the cell with Allen. (*Id.* at p. 235). Johnston ignored him. Brown testified that Allen also informed Unit Manager Kendrick, Correctional Officer Chilcote and Defendant Johnston that he did not want Brown in his cell and that "I'm going to kill him in here." (*Id.*).

Brown testified that Allen physically assaulted him that night but that attempts to sexually assault him were unsuccessful. (*Id.* at p. 236). He indicates that he sustained injuries to his head, knee, back, groin, shoulder, and ribs as a

13

result of being pulled from the top bunk and being slammed to the floor several times and being "twisted weirdly." (*Id.* at p. 238). He states that he requested medical attention but does not indicate to whom he directed that request. (*Id.* at p. 239).

He testified that the threats and assaults continued the following day and that he had a "notable encounter" with Defendants Johnston and Plocinik concerning the continued threats and assaults. (*Id.* at pp. 242-43).

Brown testified that on February 7, 2018, while he was again informing Unit Manager Kendrick about his safety concerns, Allen punched him in the temple in the presence of Kendrick. (*Id.* at pp. 245-46). He states that he also interacted with Psychiatrist Partsman, Correctional Officers Garlick, Poorman, Harris, and Defendant Johnston. (*Id.* at p. 246). He states that despite informing Johnston of the physical assaults and attempted sexual assault, Johnston responded that he was told that Brown was to stay in the cell. (*Id.* at pp. 246-47). He indicates that Johnston walked away and that "Allen snapped." (*Id.* at p. 247). He started hitting and punching Brown, ripped his jumper open, and sexually assaulted him. (*Id.* at pp. 247-49). Brown indicated that the assault went on for a few minutes. (*Id.* at p. 250).

14

When it was over, he went to the cell door and yelled for help as he was bleeding from his mouth, anus, and nose. (*Id.*). He believes Defendant Johnston was the first one at the door and Brown reported to him that he was sexually assaulted. (*Id.* at pp. 250-51). Johnston then left. (*Id.* at p. 251). Correctional Officer Chilcote also came to the door and either him or Johnston said that "it looked like somebody got slayed here." He "think[s]" Defendant Fochtman then came to the door. (*Id.*). He said that he made it clear to Johnston and Fochtman that he was sexually assaulted. (*Id.* at p. 252). He further testified that it was evident from presence of blood on him, his jumper, and the sheets, and the state of his jumper and the missing buttons, which were on the floor, that there had been a sexual assault. (*Id.* at pp. 252-53).

Brown also stated during the deposition that "Fochtman basically asserted like I'm going to write you guys up. And he made it clear it wasn't a fight. That is was actually an attack, a sexual assault. And I made it clear too. And he left and the write up did not come but before he left I did ask him like please, please, remove me, I need medical attention. And he predicated we don't – we don't make courtesy rules this is not the Hilton." (*Id.* at p. 255).

Sergeant Eastern was at a cell nearby and Brown informed him of the sexual assault. (*Id.* at p. 258). He said that Johnston then returned to the cell and

15

indicated that "Eastern and those guys" wanted him to hand over everything with blood on it. (*Id.* at p. 256). He handed over his items and, after receiving new items, he stayed by the door and yelled for medical attention and to be removed from the cell. (*Id.*).

The following day, on February 8, 2018, following his shower, when Brown informed prison officials that he would not return to the cell with Allen, they moved him to a cell in D-Block. (*Id.* at p. 261). He was the only inmate in the cell at that time. (*Id.*). He states that he was deprived of grievances and sick call request forms. (*Id.* at p. 263). Specifically, Unit Manager Kendrick ignored his request for medical attention. (*Id.*). He did not get a sick call until February 14, 2018. (*Id.* at p. 264). After being moved to D-Block, Brown refused to take a cell mate and was "written up" for "refusing a celly." (*Id.* at p. 263).

## III.    DISCUSSION

### A.    Exhaustion of Administrative Remedies

Defendants seek an entry of summary judgment based on Brown's failure to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997(e)a. The PLRA "mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016); *see*

16

*Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000) ("[I]t is beyond the power of this court—or any other—to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis."). "[T]o properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules,' rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citation omitted) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). To "complete the administrative review process," means "substantial" compliance with the prison's grievance procedures. *See Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004) (citing *Nyhuis*, 204 F.3d at 77–78).

While the PLRA requires that prisoners comply with the procedural demands of a system created by their jailors, those jailors must also comply with the demands of the system they created. *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019). Consequently, "[a]s soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement." (*Id.*).

"The only limit to § 1997e(a)'s [exhaustion] mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are

17

'available.'" *Ross*, 136 S. Ct. at 1862 (quoting § 1997e(a)). In other words, "the

exhaustion requirement hinges on the 'availab[ility]' of administrative remedies:

An inmate, that is, must exhaust available remedies, but need not exhaust

unavailable ones." *Id.* at 1858 (quoting § 1997e(a)). "[T]he ordinary meaning of

the word 'available' is 'capable of use for the accomplishment of a purpose,' and

that which 'is accessible or may be obtained.'" *Id.* (quoting *Booth*, 532 U.S. at

737–38 (internal citations and quotation marks omitted)). "Accordingly, an inmate

is required to exhaust those, but only those, grievance procedures that are 'capable

of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (*Booth*,

532 U.S. at 738).

Defendants seek summary judgment based on Brown's failure to name those

involved in the February 2018 incidents in his PREA complaint and his failure to

seek money damages during the course of the PREA investigation. We reject both

arguments.

The PLRA does not have a "name all defendants requirement." *Jones v.

Bock*, 549 U.S. 199, 217 (2007). "[T]he primary purpose of a grievance is to alert

prison officials to a problem, not to provide personal notice to a particular official

that he may be sued." *Williams v. Beard*, 482 F.3d 637, 640 (3d Cir. 2007)

(quoting *Jones v. Bock*, 549 U.S. 199, 219 (2007)." There is no question, given the

18

a PREA incident provides no means for seeking relief of any type. (*Id.* at pp. 71, 72). It is simply a method by which to provide a written statement. Finally, DC-ADM 008 is the sole means for reporting and investigating a PREA incident. The policy specifically prohibits the use of DC-ADM 804 in any manner for grievances related to, or arising out of, the PREA incident and it has been concluded that "[t]he Department of Corrections' determinations with regard to an inmate's PREA complaint are 'akin to the final appeal decision of a grievance.' " *See Ricciardi v. Shumencky*, No. 1:17-cv-719, 2018 WL 1251834, at *5 (M.D. Pa. Mar. 12, 2018) (quoting *Tillman v. Pa. Dep't of Corr.*, No. 327 M.D. 2016, 2017 WL 2536456, at *3 (Pa. Cmwlth. Ct. June 9, 2017)). In fact, if an inmate attempts to utilize DC-ADM 804, DC-ADM 008 mandates rejection of the grievance and redirecting it through the process delineated in DC-ADM 008. (Doc. 114, pp. 47, 48). It is also unclear whether an inmate may exhaust a claim of abuse by filing a grievance pursuant to the policy set forth in DC-ADM 801, the DOC's policy regarding inmate abuse. *See Washington v. Sedlock*, No. 17-988, 2020 WL 4353198, at *6 (W.D. Pa. May 12, 2020).

Based on the above, we conclude that the completion of the PREA investigation as set forth in DC-ADM 008 constituted the exhaustion of the DOC's

scope of the PREA investigation, which included interviews of, and statements made, by each of the Defendants, that they were on notice of Brown's allegations concerning the incidents at issue here.

Also, closer examination of the function and purpose of DC-ADM 008, the various modes of reporting made available by the policy, and the administrative limitations the policy imposes on inmates and their ability to grieve PREA issues, makes clear that Defendants' exhaustion arguments are tenuous at best. Initially, the function and purpose of DC-ADM 008 is to prohibit any form of sexual abuse and/or sexual harassment of an inmate or any individual under the supervision of the DOC and to establish a zero tolerance for such conduct. (Doc. 114, p. 9). It is not a policy that affords administrative relief. Next, an incident subject to DC-ADM 008 may be reported by an inmate, by prison employees, administrators or officials, medical providers, or any third party. (*Id.* at pp. 47-49). If the incident is reported by someone other than the inmate victim, as is the case here, the description of the incident, who is identified as having been involved in, or having knowledge of, the incident, and other facts or details, are not within the control of the inmate victim. And there's no requirement that the inmate victim author a written statement. Even if such a requirement existed, unlike a sample grievance form submitted pursuant to DC-ADM 804, the sample form for an inmate to report

19

administrative remedies available to Brown. Defendants' motion for summary

judgment will be denied in this regard.

## B. Constitutional Claims

Section1983 of Title 42 of the United States Code offers private

citizens a cause of action for violations of federal law by state officials. *See*

42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

*Id.*; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v.*

*Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a

plaintiff must allege "the violation of a right secured by the Constitution and laws

of the United States, and must show that the alleged deprivation was committed by

a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

### 1. Eighth Amendment Failure to Protect

The Eighth Amendment requires prison officials to "take reasonable

measures to protect prisoners from violence at the hands of other prisoners." *See*

*Farmer v. Brennan*, 511 U.S. 825, 833 (1994). While prison officials have the

21

duty to protect prisoners from attacks by other prisoners, not every injury suffered by a prisoner at the hands of another implicates liability for the officials responsible for that inmate's safety. *See id.* at 833-34. Rather, an inmate raising a failure to protect claim under the Eighth Amendment must establish that a prison official both knew of and chose to disregard an "excessive risk to inmate health or safety." *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer*, 511 U.S. at 837). This knowledge requirement is subjective, "meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *See id.*; *see also Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997).

Actual knowledge may be proven circumstantially in situations where the general danger was obvious. *See Farmer*, 511 U.S. at 842. For example, if the prisoner presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id.* at 842-43 (quotation omitted).

Our circuit also recognizes that the sex offender label is stigmatizing in the
prison context, and that prison norms may call for the assault of sex offenders. *See
Renchenski v. Williams*, 622 F.3d 315, 326 (3d Cir. 2010) (noting that "[i]t is
largely without question ... that the sex offender label severely stigmatizes an
individual, and that a prisoner labeled as a sex offender faces unique challenges in
the prison environment"). Similarly, other circuits have held that prison officials'
failure to protect an inmate labeled a "snitch" constitutes deliberate indifference.
*See Irving v. Dormire*, 519 F.3d 441, 451 (8th Cir. 2008) ("After all, who better
knows the opprobrium and consequent effect thereof that attaches to the label of
snitch than those who work daily within the inmate population."); *Benefield v.
McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001); *Northington v. Marin*, 102 F.3d
1564, 1567 (10th Cir. 1996). Further, "[l]abeling an inmate a child molester 'may
give rise to an Eighth Amendment violation if the prison official acted with
deliberate indifference to a substantial risk of serious harm to the inmate.' " *See
Horan v. Collins*, No. 1:13-cv-140, 2016 WL 5030468, at *16 (M.D. Pa. Aug. 8,
2016) (quoting *Tabb v. Hannah*, No. 1:10-cv-1122, 2012 WL 3113856, at *6
(M.D. Pa. July 30, 2012)), report and recommendation adopted, 2016 WL 5033234
(M.D. Pa. Sept. 19, 2016).

23

"[A] defendant can rebut a *prima facie* demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring." *See Beers-Capitol*, 256 F.3d at 133.

The facts of this case, gleaned from official prison reports, investigative statements and interviews, declarations and Brown's deposition, vary wildly from fabrication of incidents and events and manipulation to ignorance of physical and sexual abuse of a prisoner at the hands of another prisoner. On this record, we are precluded from entering summary judgment in favor of any party as to this claim.

Defendants also seek summary judgment on the grounds of qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether a right was clearly established, the Court must ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *See Schmidt v. Creedon*, 639 F.3d 587, 598 (3d Cir. 2011). "If it would not have

24

been clear to a reasonable officer what the law required under the facts alleged, then he is entitled to qualified immunity." *Id.* Stated differently, for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *See al-Kidd*, 563 U.S. at 741. "[T]here must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." See *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (quoting *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001)).

Although "[t]he issue of qualified immunity is generally a question of law, [ ] a genuine issue of material fact will preclude summary judgment on qualified immunity." *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009) (citing *Deary v. Three Un-Named Police Officers*, 746 F.2d 185, 192 (3d Cir. 1984)). Here, we have found that there are genuine issues of material fact with respect to the failure to protect claim. Thus, granting summary judgment on the basis of qualified immunity would be inappropriate. This claim will proceed to trial.

2.    Eighth Amendment Failure to Provide Adequate Medical Care

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that prison officials violate the Eighth Amendment when they are deliberately

25

indifferent to a prisoner's serious medical needs. *Id.* at 104-05. To succeed on such a claim, "a plaintiff must make (1) a subjective showing that 'the defendants were deliberately indifferent to [his or her] medical needs' and (2) an objective showing that 'those needs were serious.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (alteration in original) (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)).

Deliberate indifference occurs when prison officials "intentionally deny[ ] or delay[ ] access to medical care or interfer[e] with the treatment once prescribed." *Pearson*, 850 F.3d at 534 (quoting *Estelle*, 429 U.S. at 104-05). A mere complaint "that a physician has been negligent in diagnosing or treating a medical condition does not state a valid [constitutional] claim of medical mistreatment[.]" *Estelle*, 429 U.S. at 106. Moreover, "mere disagreement as to the proper medical treatment does not support a claim of" deliberate indifference. *Pearson*, 850 F.3d at 535 (internal quotations omitted); *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326 (3rd Cir.1987). Rather, where there has been medical care, "we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Id.* As long as a physician exercises professional judgment, his or her behavior does not violate a detainee's constitutional rights. *See Brown v. Borough of Chambersburg*, 903 F.2d 274, 278

(3d Cir. 1990).

The record is devoid of any evidence that either Plocinik or Maxwell denied Brown medical treatment. These Defendants are entitled to an entry of summary judgment on this claim. Conversely, there are genuine issues of material fact with regard to whether Defendants Johnston and Fochtman were deliberately indifferent to Brown's serious medical needs in allegedly refusing him medical treatment after the alleged physical and sexual assault of February 7, 2018. The claim will proceed as to these Defendants.

### 3. Fourteenth Amendment Substantive Due Process Claim

The substantive component of the Due Process Clause "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them" and can only be violated by governmental employees when their conduct amounts to an abuse of official power that "shocks the conscience." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016) (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992)). "[T]he substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that 'shocks the conscience.' " *Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir. 1994) (citation omitted). The Supreme Court "has always been reluctant to

27

expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins*, 503 U.S. at 125.

"Under the more-specific-provision rule, 'if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.' *United States v. Lanier*, 520 U.S. 259, 272 n.7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)." *Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 447 (3d Cir. 2020). Brown's claims are appropriately considered under the Eighth Amendment. Defendants are entitled to an entry of summary judgment on this claim.

## C.    State Law Claims

The Defendants seek an entry of summary judgment on Brown's state law tort claims of negligence and intentional infliction of emotional distress, arguing that the doctrine of sovereign immunity bars these claims against state employees. We agree. It is beyond dispute that, "[t]he Department of Corrections is an agency of the Commonwealth and the defendants, as employees of an agency of the Commonwealth, are entitled to the protection afforded by sovereign immunity." *McGrath v. Johnson*, 67 F.Supp.2d 499, 511 (E.D. Pa. 1999) (citing *Maute v.*

28

*Frank*, 441 Pa. Super. 401, 402, 657 A.2d 985, 986 (1995) (state prison officials

enjoy sovereign immunity); *Robles v. Pennsylvania Dep't of Corrections*, 718

A.2d 882, 884 (Pa. Commw. Ct. 1998) (same) ), aff'd, 35 F. App'x 357 (3d Cir.

2002). As a general matter, subject only to nine specific statutory exceptions not

applicable here, this sovereign immunity bars state law tort claims like those

alleged here, since Commonwealth employees are immune from liability for either

negligence or intentional torts.[3] *McGrath*, 67 F.Supp.2d at 511, aff'd, 35 F. App'x

357 (3d Cir. 2002). Defendants are entitled to an entry of summary judgment on

the state law tort claims.

## IV.  **CONCLUSION**

Based on the foregoing, Brown's motions (Docs. 92, 119) for summary

judgment will be denied and Defendants' motion (Doc. 113) for summary

judgment will be granted in part and denied in part.

## V.  **ORDER**

NOW THEREFORE, it is hereby ORDERED that:

1.    Plaintiff's motions (Docs. 92, 119) are DENIED.

---

[3]  The Commonwealth of Pennsylvania has explicitly retained its sovereign immunity and not waived it except in nine carefully defined and limited circumstances: 1) vehicle liability; 2) medical-professional liability; 3) care, custody or control of personal property; 4) Commonwealth real estate, highway and sidewalks; 5) potholes and other dangerous conditions; 6) care, custody or control of animals; 7) liquor store sales; 8) National Guard activities; and 9) toxoids and vaccines. 42 Pa.C.S. § 8522(b).

( Exhibit F )

2.  Defendants' motion (Doc. 113) is granted in part and denied in part.

    a.  Defendants' motion is DENIED with respect to the failure to
        protect claim against all Defendants and the denial of adequate
        medical care claim against Defendants Johnston and Fochtman.
        These claims will proceed to trial.

    b.  Defendants' motion is GRANTED with respect to the denial of
        medical care claim against Defendants Maxwell and Plocinik,
        the substantive due process claim against all Defendants and the
        state law tort claims against all Defendants.

        Entry of judgment on these claims is DEFERRED pending the
        final outcome of the litigation.

3.  On or before April 1, 2021, the parties shall NOTIFY the Court as to
    whether they are agreeable to participating in mediation.

4.  On or before April 1, 2021, the parties shall NOTIFY the Court of
    their willingness to consent to the jurisdiction of a United States
    Magistrate Judge. *See* 28 U.S.C. § 636(c).

                        s/ John E. Jones III
                        John E. Jones III, Chief Judge
                        United States District Court
                        Middle District of Pennsylvania

Documents & Court Orders
Pursuant to Appellants 8th
   Issue Presented

Copys Made

182

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RECEIVED
NOV 17 2023

GARTOR KIKI BROWN,       :
            Plaintiff,   :      3:18-cv-1527
                         :
      v.                 :      Hon. John E. Jones III
                         :
LT. MAXWELL, et al.,     :
            Defendants.  :

## ORDER

### June 4, 2020

NOW THEREFORE, upon consideration of Defendants' May 15, 2020 *in camera* submission to the court *via* email, and it appearing that, in accordance with the Court's May 5, 2020 Order (Doc. 100) addressing Plaintiff's March 19, 2020 motion to compel (Doc. 85), the email contains the unsworn declaration of Jason Stauffer and produces for *in camera* inspection, a Pennsylvania Department of Corrections Investigative Report dated March 14, 2018, and an Initial Reception Committee ("IRC") record dated June 26, 2009, and upon further consideration of various other pending motions (Docs. 104, 106, 107) it is hereby ORDERED as follows:

1.    The Clerk of Court is directed to DOCKET Defendants' May 15, 2020 letter to the Court and DOCKET, as an attachment to that letter, the Unsworn Declaration of Jason Stauffer.

2. Based upon Stauffer's "precise and certain reasons for preserving" the confidentiality of the communications concerning the policies relating to classification and housing of inmates, *U.S. v. O'Neill*, 619 F.2d 222, 226 (3d Cir. 1980), Plaintiff's motion to compel (Doc. 85) the production of such policies is DENIED.

3. With regard to the requests concerning inmate Allen, the motion to compel (Doc. 85) is GRANTED in part and DENIED in part.

    a.    Review of the Pennsylvania Department of Corrections Investigative Report dated March 14, 2018, reveals that this report contains some information, if divulged, would threaten the orderly operation of the prison as well as the security of other inmates and staff members. *See Bailey v. McMahon*, No. 1:07-cv-2238, 2012 WL 1246147, at \*9 (M.D. Pa. Apr. 12, 2012). However, to the extent that this document contains non-confidential and relevant information, including information contained in Plaintiff's ICAR files, production is warranted. *See id.; see also Paluch v. Dawson*, No. 1:06-cv-1751, 2008 WL 2785638, at \*3 (M.D. Pa. July 17, 2008); *Alex v. Wetzel*, No. 1:13-cv-304, 2015 WL 418186, at \*2-3 (M.D. Pa. Feb. 2, 2015). Defendants shall PRODUCE to Plaintiff the Pennsylvania Department of Corrections Investigative Report dated March 14, 2018, as follows[1]:

        i.    Pages identified as DEF000045, 51-53, 57-72, 101-114, and 121-123, shall be REMOVED in their entirety based on either confidentiality and/or security concerns. Defendants are not required to produce these pages.

        ii.    Pages identified as DEF000020, 50, 54-56, 74, 85-92, 119, and 120, shall be reviewed by Defendants and REDACTED to the extent that they contain confidential, security, or irrelevant information. Defendants shall PRODUCE to Plaintiff the redacted pages.

---

[1] The first page of the report is identified as DEF00008. The last page is marked DEF000138.

        iii.     Pages identified as DEF0008-19, 21-44, 46-49, 73, 75-84, 93-100, 115-118, and 124-138, shall be PRODUCED to Plaintiff. To the extent that any information within these pages is deemed confidential or raises security concerns, including, *inter alia*, employee numbers, enrollment details, identifying inmate information, Defendants may redact such information. Defendants shall PRODUCE to Plaintiff these pages, with any necessary redactions.

    b.    The motion to compel (Doc. 85) is DENIED with respect to Inmate Allen's IRC documents as they are irrelevant.

    c.    The motion to compel (Doc. 85) is GRANTED with respect to Misconduct C009726 issued to Inmate Allen on April 30, 2017. Defendants shall PRODUCE to Plaintiff the misconduct, the disposition of the misconduct and any appeal decisions. As noted *supra*, Defendants may redact any portions of those documents that raise confidentiality or security concerns

4.    Defendants shall PRODUCE the above documents to Plaintiff on or before June 15, 2020.

5.    Plaintiff's motion (Doc. 104) to consult with the Court concerning the various discovery issues surrounding the documents that are the subject of Defendants' *in camera* submissions is GRANTED. The Court has fully considered the issues raised by Plaintiff in his supporting brief (Doc. 105) in conducting the *in camera* review.

6.    The parties' motions (Docs. 106, 107) for extensions of time are GRANTED and the governing scheduling deadlines are as follows:

    a.    Plaintiff may SUPPLEMENT his motion for summary judgment, supporting brief, statement of facts, and exhibits, on or before June 30, 2020, to address the documents which Defendants' are required to produce as a result of this Order.

3

b.     Defendants shall respond to Plaintiff's motion for summary judgment, and any supplement he may file, on or before July 15, 2020.

c.     Plaintiff may file a reply on or before July 30, 2020.

d.     Defendants shall file their motion for summary judgment, statement of material facts, and supporting brief on or before June 15, 2020.

<u>s/ John E. Jones III</u>
John E. Jones III, Chief Judge
United States District Court
Middle District of Pennsylvania

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GARTOR KIKI BROWN,** | : | **No. 3:18-cv-01527** |
| **Plaintiff,** | : | |
| | : | **Judge Jones** |
| **vs.** | : | |
| | : | *Electronically Filed Document* |
| **LT. MAXWELL, C.O. PLOCINIK,** | : | |
| **C.O. JOHNSON, C.O. FOCHTMAN,** | : | |
| **and KENDRICK,** | : | *Complaint filed Nov. 28, 2018* |
| **Defendants** | : | |

## BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY

Plaintiff seeks to compel the production of various items. The Defendants will turn over color photographs to the Plaintiff. However, he is not entitled to the remainder of the items he seeks. Thus, his motion to compel should be denied.

## PROCEDURAL AND FACTUAL HISTORY

This is a civil rights action brought pursuant to 42 U.S.C. § 1983[1] by Gartor Kiki Brown, an inmate formerly incarcerated at SCI Huntingdon. The case proceeds via an amended complaint, wherein the Plaintiff claims Maxwell, Plocinik, Fochtman, and Johnson, all staff of the Pennsylvania Department of Corrections, violated his Eighth Amendment rights by failing to protect him from a former cellmate that he alleges sexually assaulted and abused him. *See generally* Doc. 25. He has filed a motion to compel as to the following items:

---

[1]    The Amended Complaint mistakenly notes that this is a case brought pursuant to 28 U.S.C. § 1331. (Doc. 25 at 1).

- Video recordings from February 2 to February 8, 2018. Doc. 85, ¶ 1.

- Color photographs (the Defendants previously provided black and white photographs). *Id.* at ¶ 2.

- The transcript from his deposition. *Id.* at ¶ 3.

- All "IRC team documents of Inmate Allen," as well as "misconduct and criminal history of the inmate" and "all grievances filed by the inmate." *Id.* at ¶ 4.

- All policies relating to "classification and housing inmates." *Id.* at ¶ 5.

- All "investigation file[s] pursuant to any claims against Inmate Allen under . . . PREA or [DC ADM] 008." *Id.*

- Documents relating to investigations of the defendants' wrongdoing. *Id.* at ¶ 6.

The Defendants file the following brief in opposition to the Plaintiff's Motion to Compel.

## QUESTION PRESENTED

Should the Court deny the Motion to Compel?

*Suggested Answer: Yes.*

## ARGUMENT

"While the scope of relevance in discovery is far broader than that allowed for evidentiary purposes, it is not without limits." *Stabilus, A Div. of Fichtel &*

2

*Sachs Indus., Inc. v. Haynsworth, Baldwin, Johnson & Greaves, P.A*, 144 F.R.D. 258, 265 (E.D. Pa. 1992) (internal citations omitted). "The Court will not permit discovery where a request is made in bad faith, unduly burdensome, irrelevant to the general subject matter of the action, or relating to confidential or privileged information." *Dixon v. Williams*, 2016 WL 631356, *1 (M.D. Pa. Feb. 17, 2016) (citation omitted). "The responses sought must comport with the traditional notions of relevancy and must not impose an undue burden on the responding party." *Hicks v. Arthur,* 159 F.R.D. 468, 470 (E.D. Pa. 1995).

<u>Video</u>

The Plaintiff's first request—video between February 2 and February 8 of 2018—has already been disposed of by the Court. *See* Doc. 90 (denying Plaintiff's motion for sanctions for failing to preserve video, based on the fact that no video exists). Thus, the Defendants do not address it further.

<u>Photographs</u>

The Plaintiff's next request is for color photographs. The Defendants will turn over color photographs of the photos that they have previously turned over in black and white; thus, the motion may be denied as moot as to his request for photos.

3

## Deposition Transcript

Next, the Plaintiff seeks his deposition transcript. As the Defendants noted, to the extent the Plaintiff was seeking a transcript of his deposition, he needed to contact the court reporting agency. *See* Doc 86, p. 4. The Third Circuit has previously held that "[t]here is no provision in the statute for the payment by the government of the costs of deposition transcripts, or any other litigation expenses, and no other statute authorizes courts to commit federal monies for payment of the necessary expenses in a civil suit brought by an indigent litigant." *Tabron v. Grace,* 6 F.3d 147, 159 (3d Cir. 1993) (citation omitted); *see also Njos v. Kane,* 2015 WL 999398, * 5 (M.D. Pa. Mar. 5, 2015) ("Simply because Plaintiff is *pro se* and allegedly lacks financial resources, does not entitle him to conduct his discovery free of charge or to have his costs paid by the government.") (citations omitted). The Defendants should not be required to pay for the Plaintiff's litigation expenses, his *pro se* and *in forma pauperis* status notwithstanding, nor should the stenographer be deprived of payment for her services based on the Plaintiff's financial status. Thus, the motion to compel should be denied as to the deposition transcript.

## Documents relating to Inmate Allen

The Plaintiff seeks various items relating to an "Inmate Allen," including "IRC team documents," his "misconduct and criminal history," all grievances that

Inmate Allen filed, and any investigations against him under PREA or DC ADM 008. Doc. 85, ¶¶ 4, 5. He claims these documents are relevant to his claims. *Id.* However, assuming *arguendo* that this information is, indeed, relevant, DOC policy prohibits the dissemination of this type of information, as "[a]n inmate is prohibited from receiving inmate information pertaining to another inmate other than him/herself." *See* DC-ADM-003, "Release of Information Policy," Section IV(A)(5).[2] Additionally, the Middle District has previously acknowledged "a compelling security concern in that if an inmate is aware of certain information about another inmate, such knowledge 'can be used to manipulate, harass, blackmail, or assault that inmate, thereby creating a substantial risk of physical harm to the subject inmate and any staff who intervene.'" *Banks v. Beard,* 2013 WL 3773837, * 8 (M.D. Pa. July 17, 2013) (citation omitted);[3] *see also Williams v. Wetzel,* 2019 WL 1206061, * 3 (M.D. Pa. March 14, 2019) (collecting cases uniformly rejecting inmates' requests to obtain misconduct, grievance, and incident reports relating to other inmates on privacy and security

---

[2] https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/003%20Release%20of%20Information.pdf (accessed April 13, 2020).

[3] In *Banks,* the information sought was names of Muslim inmates who were in "debt" due to participation in Islamic Eid feasts." *Id.* at * 7. Here, the information is much more sensitive than information about other inmates' religious beliefs and/or monetary debts, as it pertains to a specific inmate.

grounds). Therefore, the Court should deny the Plaintiff's motion to compel this broad and sensitive information about Inmate Allen.

## Policies Relating to Classification and Housing Inmates

Next, Plaintiff demands that the Defendants turn over "all Pennsylvania Additive Classification Tool Policy (PACT)" relating to classifying and housing inmates. His request should be denied, for multiple reasons. First, as to this request, the Plaintiff has violated Local Rule 5.4(c), as he has not provided a copy of the Defendants' various objections to his request. That Rule mandates that "a copy of the discovery matters in dispute shall be filed with the court contemporaneously with any motion[.]" M.D. Pa. L.R. 5.4(c); *see also Easley v. Tritt,* 2020 WL 836695, * 9 (M.D. Pa. Feb. 20, 2020) (denying inmate's motion to compel for failure to comply with Local Rule 5.4(c)). Because the Plaintiff has failed to comply with this Rule, the motion to compel can be denied on that basis alone.

Additionally, the Defendants also note the obvious security and safety concerns that would be associated with releasing to an inmate any policy relating to how inmates are housed and/or classified. Furthermore, dissemination of this policy could lead to safety or security issues, not to mention attempts by inmates to manipulate their placements or classifications. Thus, the Defendants should not be required to turn over these policies to the Plaintiff.

6

## Documents Relating to Investigations of the Defendants

Finally, the Plaintiff seeks documentation relating to investigations of wrongdoing of the defendants. Doc. 85, ¶ 6. This request should also be denied. First, as noted *supra,* the Plaintiff has failed to comply with Local Rule 5.4(c), which requires that he provide a complete copy of the discovery matter in dispute. As a result, the Court can, and should, deny his motion to compel for that reason. However, the Court may also deny the Plaintiff's request for substantive reasons, as well. Here, the Plaintiff demands information relating to "*any* wrongdoing . . . while employed at SCI-Huntingdon" and "*all* grievances you have written against you by inmates while employed at SCI Huntingdon." Doc. 86, Exhibit D, ¶¶ 10-11 (emphasis added). "These are precisely the kinds of sweeping, generalized and overly broad discovery requests judges in the Middle District of Pennsylvania have rejected as being not only overly broad, but unduly infringing upon the privacy interests of other inmates who may have sought to grieve unrelated issues that they had with staff." *Allen v. Eckard*, 2019 WL 1099001, *3–4 (M.D. Pa. Mar. 8, 2019) (collecting cases). Put another way, any benefit to the Plaintiff is vastly outweighed by the time, burden, and expense that would be placed upon the Defendants to collect and turn over this data, not to mention the myriad privacy and other issues that would be raised by allowing the Plaintiff to obtain this information. Therefore, the motion to compel should be denied for this request.

7

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that this Honorable Court deny the Plaintiff's Motion.

**Respectfully submitted,**

**JOSH SHAPIRO**
**Attorney General**

By: *s/ Caleb Curtis Enerson*
         **CALEB CURTIS ENERSON**
**Office of Attorney General**              **Deputy Attorney General**
**15th Floor, Strawberry Square**        **Attorney ID #313832**
**Harrisburg, PA 17120**
**Phone: (717) 705-5774**                    **KAREN M. ROMANO**
                                                       **Chief Deputy Attorney General**
cenerson@attorneygeneral.gov        **Chief, Civil Litigation Section**

**Date: April 17, 2020**                       *Counsel for Defendants Maxwell,*
                                                       *Fochtman, Plocinik, Johnson*

8

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GARTOR KIKI BROWN,** | : | **No. 3:18-cv-01527** |
| **Plaintiff,** | : | |
| | : | **Judge Jones** |
| **vs.** | : | |
| | : | *Electronically Filed Document* |
| **LT. MAXWELL, C.O. PLOCINIK,** | : | |
| **C.O. JOHNSON, C.O. FOCHTMAN,** | : | |
| **and KENDRICK,** | : | *Complaint filed Nov. 28, 2018* |
| **Defendants** | : | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2020, I caused to be served a true and correct copy of the foregoing document to the Plaintiff via HAND DELIVERY through the Department of Corrections. This alternative method of service is being used as a result of the COVID-19 emergency.

> *s/ Caleb Curtis Enerson*
> **CALEB CURTIS ENERSON**
> **Deputy Attorney General**

# UNPUBLISHED
# CASES



# In The United States District Court
# For The Middle. District OF Pennsylvania

Gartor Kiki Brown

V.

Gildea, et, al.,

NO. 18-CV-1527
Honorable John E. Jones III

# Motion In Limine TO Propose Voir Dire Questions

· Plaintiff request to submit specific Voir Dire Questions Pursuant to Background, Race, Credibility
see accompany memorandum.

**FILED
SCRANTON**

MAY 2 5 2021

Per_____ _____
DEPUTY CLERK



2.

# In The United States District Court
# For The Middle District Of Pennsylvania

Gartar Kiki Brown

V.

Gildea, et al.,

**FILED**
**SCRANTON**

MAY 2 5 2021

Per _____
DEPUTY CLERK

NO 18-CV-1527

Honorable John E Jones III

## Memorandum TO Motion In Limine TO Exclude Certain Record

Rule 803 Fed. R. Evid. The rule defines such a record as:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time, by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity to make a memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness...

To determine whether a record is trustworthy the Advisory Committee suggests four factors to consider, the timeliness of the investigation, (ii) the special skill or experience of the investigators (iii) whether the agency held a hearing, & (iv) possible motivational problems." See Lewis v. Velez 149 F.R.D 474 (S.D.N.Y. 1993) the Court held that client reports generated by correction officers were not admissible under Rule 803 because they lacked reliability, where report conducted by a defendant himself in this civil case lack reliability & trustworthiness due to Self-interest of the record...

...Self-interest functions straight in the case at hand, where defendant Maxwell involved could had been subjected to disciplinary actions & even criminal proceedings, including dismissal of job or incur civil liability, the fact that correction officers receive strict instructions to make their reports truthfully does not diminish the motives that undermine the trustworthiness of such reports, See Klein v. Vanek 86 F. Supp. 2d 812, 820 U.N.D. Ill. 2000) (Police investigation report conducted by Lt. Maxwell concluded a PREA investigation to whom him... refers to resume some kind of conflict of interest... (Exhibit) Brown claims he was at the merit of the investigation to whom him...

Brown first point out Lt. Maxwell did not present any tape video monitoring...

...Plaintiff claims that any record by Nurse Trice or the medical staff Nurse Emsh at the prison official should not trust whatever, nor is it reliable & is not relevant (see Exhibit LASS) should not be admissible...

...treatment on 2/7/18 violating his Eighth Amendment right...

3

# Damages

D. Defendants LT. Maxwell, C/o Plocinik, C/o Fochtman & C/o Johnston's failure to take actions to curb the physical & sexual abuse by another inmate violated plaintiff's rights under the Eighth Amendment to the United States Constitution. Connected to Failure to Protect both defendants C/o Fochtman & C/o Johnston actions of intentionally deny Brown access to medical care or delaying as to his serious medical need violated plaintiff Eighth Amendment under the United States Constitution.

1. As a direct proximate result of the mentioned actions or acts of the collective defendants, Brown has been caused to suffer great bodily & mental harm, pain, suffering & injuries, including exacerbation or preexisting injuries and mental anguish, from the time of the incidents until now, and will continue to suffer some well into the future, including but not limited to head pain, scare on left circumference of the head, jaw & numbness around the circumference, sustained anal hip flexor, shoulder, knee pain, neurological pain from back, ribs, side through nip which is not limited to radiating pain & chronic pain, mouth bleeding, anal bleeding, broken nose or such symptoms as to hard to breathe, eyes bruises & pain, ribs bruises. All as necessary principal injuries.

2. There were no hospitalization due to defendants actions.

3. Still symptoms of head numbness, head pain, neurological & radiating & chronic pain to the back, hip flexor, ribs & side, still hard to breathe due to deformity, established difficulty in walking, running, climbing stairs.

4. Still to be determined, not limited to normal damages in any amount the Jury deem necessary.

5. Estimated value of pain and suffering; due to physical pain, mental anguish, fright & shock, embarrassment, humiliation, or mortification to whom plaintiff under went outside counseling pursuant to P.R.E.A., as plaintiff incorporates punitive & compensatory damages, as the actions & misconduct set forth above of defendants was extreme & outrageous & done intentionally and/or reckless and/or maliciously by defendants, said actions & misconduct were done with bad motives and in wanton, willful and reckless disregard for the rights of the plaintiff, plaintiff demands judgment against the defendants individually, compensatory damages 250,000 or deemed not limited at the judgment of the Jury as to each defendant, & 350,000 or deemed punitive at the judgment of the Jury as to each defendant as to judgment of punitive. Attorney's fees and costs as deemed necessary & just. And such other relief & costs this honorable court deems necessary and just.

6. Special damages, see above.

# Witnesses

E. Still to be determine

# Expert Witness

F. Still to be determine

# Special Comment About Pleading & Discovery

G. Defendants send Brown some documents that their their selfs may use against him at trial, however some of these documents are dacted denying Brown of any reasonable defense, some documents are also useful to Brown himself or of some of which Brown has mark down as exhibits & some are just DEF numbers. Brown request these document undacted.

Brown's cumulative Adjustment record (Exhibit O DEF0000 87), (Exhibit P DEF0000 83), (DEF0000 86) the courts had already order defendants to send those records undacted, however defendants resubmitted the record not undacted in its entreity.

Medical incident report (DEF0000 74 Exhibit 86), Inmate Query Cell history (Exhibit 78 DEF 0000 45) (Exhibit 79 DEF0000 53), (Exhibit 80 DEF number is redacted), (Exhibit 45 DEF number is also redacted), (Exhibit 74 DEF00053), (DEF0000 123 is not an exhibit but will like it too be), (DEF0000 58 is also redacted), (Exhibit 45 80) (Exhibit 45), Also Test Sexual Assault InterView (Exhibit M, N) of Brown & Allen DEF00044), DEF00000 Security Level 5 Housing Unit Exercise, Shower, Shave, Sign up, (Exhibit 46 DEF 00069 is redacted), (Exhibit 47 DEF0000 76), (Exhibit 48 DEF0000 91), (Exhibit 49 DEF0000 92) all related are part redacted & really do not need to be, Missouri Brown requests Security Level 5 Housing Unit Exercise, Shower, Shave Sign up Sheet for February 8, 2018 the day Brown refuse to return to 108 cell this document is highly relevant.

My medical records were send to SCI Huntingdon as part of a discovery request, however due to my transfer to SCI Forest, I did not receive the records, thus I am requesting the records.

Also relevant is the FMT or 11.2, 1 PRAt Policy pursuant to classification & screening procedures for inmates at risk of sexual victimization, as revealed the policy was requested through discovery but request was denied. Clearly the policy is relevant & Brown has no need for unlawful use as Brown is unit (150) days from discharge from the DOC.

# A Summary of Legal Issues

H. This is a prison rape case, to whom plaintiff claims defendants failed to protect him or did not take reasonable measures to protect him from assault & sexual assaults by another prisoner. Brown also protest that defendants Maxwell, Plocinik, Johnston & Fochtman had full knowledge of their actions from the very fact it was obvious, Brown a known homosexual with feminine characteristics with a history of being sexual victimized label as a snitch by inmates & snitch for cooperating with state police pursuant to previous sexual assaults, also label as a sex offender although non of his charges reflects such a label, also due to the labels & the fact that the plaintiff is a homosexual, he faced many challenges in the prison environment.

Besides looking for the presence of a Z-code, the IRC did not consider a real or potential imbalance of power between inmates. Policy 11.2.1, however, instructs that Staff shall review inmate records to determine imbalance of power exists that could lead to victimization of weaker inmate. IRC members knew that characteristics such as (the physical size history of violence, intellectual ability, experience with incarceration, & security threat group status affect the balance of power between inmates. During diagnostic center screening, Coleman was not an inmate at risk for sexual victimization. Inmate Ausley requested a single cell prior to being assigned cellmates with Coleman, claiming his paranoid thinking & lost of control was one reason & that he had the strong need to kill his last cellmate. Staff would later denied his request. "Z-code" status is not warranted. At the time Coleman was serving a 2 year to 2 year sentence for a Nine under the influence & Ausley was 15 to 30 year sentence for third degree murder of a prostitute. Upon Coleman arrival to the OSS-1 & his cell with Ausley, Ausley indicated & demanded he did not want Coleman in his cell & already him to seek reassignment. Over their cell intercom Coleman communicated to officials that he felt threatened by Ausley & cursing at him repeatedly telling him I will fuck u up. Coleman stated a situation doing Coleman on 10 to 6 am shift expressing that he needed out the cell, Coleman again asserted he did not feel safe expressing concerns in the presence of Ausley but no action taken.

When C/o Walters performed his security rounds approximately 12:20 am, Coleman stood at door again. Stated he needed out of the cell & three more times after that but did not state why. C/o Walters & Nick informed Lt. Heasler shift commander that a inmate wanted to be remove from cell the C/o indicated that the inmate did not provide a reason that the matter posed no issue. Sgt. Shipee & C/o Walters eventually responsed to Coleman cell. Afterwards, Coleman repeated his request it was ordered he did not tell officials why, however no action was taken. After the first encounter with Sgt. Shipee, Coleman did not press the intercom any further, Ausley then proceeded to sexually assault Coleman, in the early cell on the night of March 6, 2014. Coleman informed staff of the assault the following morning when he was outside the cell.

Defendants asserted that double ceiling Ausley with Coleman, & later deciding that he should remain in the cell did not pose an obvious risk of serious harm. Defendants stated that Ausley had no prior history of assaultive conduct, had not received any misconducts for violent behavior during his incarceration & had not been identified as a risk for sexual predation. Under DC-ADM 008, Coleman argued there is a substantial risk of sexual assault when inmates with certain characteristics are celled together. Coleman also cites to Dr. ADM 008 which outlines several predators of the escalated risk to potential cellmates for one inmate assaulting another. Characteristics of an inmate who is a sexually aggressive inmate includes but not limited to, between ages of 27&45, medium to large build possessing physical strength, aggressive in nature, incarcerated for sex offenses or other violent offenses, more streetwise & gang affiliated, more accustomed to prison life may be difficult controlling anger, may exhibit violent/exhibitionist behavior.

Characteristics of an inmate who may be targeted as a victim or prey not limited to between 16 to 26 years old. Small in build & not seen strong in appearance, seen as possessing "feminine" characteristics, first time offenders, convicted to family & has a means of financial support, identified as homosexual or have been previously raped, impaired possessive of weak willed, convicted or sexual offenses against a minor. The Middle District this same District concluded as reasonable jury could conclude that Coleman's assignment, and the subsequent decision to place him in the cell despite his repeated requests to be moved in carcerated him under conditions that posed an objective risk of serious harm. Thus not limited to Coleman's failure to protect claims survived summary judgment. The authorities in part refers to Brown's case, as it seemingly involve similar legal issues, & the ruling is directly out the same circuit & district court.

## Stipulations Desired

1. The PREA report did not include any mention of Maxwell & Fochtman because Maxwell conducted the investigation

Unit B-A have a single bunk in each cell & is in most part used to house Z-code inmates.

Unit A-A has double bunks in each cell & is appropriate housing for assigned double ceiling inmates.

A diagram of Unit G-A will show 108 cell is the cell farest from the bubble.

Plaintiff did not receive the inmate's misconduct record in it's entirarty.

Plaintiff did not receive any grievance filing or ICor history or PRC or IRC notes purquant to inmate Allen.

Plaintiff did not receive Prior PREA complaints from other inmates purant to any defendants.

Plaintiff did not receive any video monitoring from February 3-8, 2018 although he put defendants on notice in due time of his claims.

Pictures are not a form of treatment or evaluation.

Brown wrote a statement during the encounter with C/o's Ornelort & Lt. Maxwell.

None of Brown's P.R.E.A. complaints by phone were presented in this case, (4) of whom January of 2018.

A trial is not needed in this case, the facts are apparent, out of interest of Judicial Economy, a chief Judge knows best.

## Estimated Number Of Trial Days

J. N/A

K. N/A

## Identification Of Exhibits

L. see attachment

M. N/A

N. N/A

O. See attachment

P. To the best of my knowledge it appears defendants are seeking trial by the jury so Rule 48.2 may not be relevant.

2.

# In The United States District Court
# For The Middle District OF Pennsylvania

Garfor Kiki Brown

V.

Gildea, et al.,

NO. 18-CV-1527

Honorable John E. Jones

# Memorandum To Motion In Limine To Propose Voir Dire Questions

Due to Plaintiff Pro se status; this should help Probe the Jurs adequately for bias or Pre Judice; & better help Plaintiff to Conclude if he must Challenge the Juror for Cause, or exercise a "Peremptory Challenge."

1. Do you Know any defendants in this Case?

2. Do you have any opinions concerning homosexuals or gays? do you believe they should be treated any differently in Prison?

3. Do you Know anyone who was or is employed by or in any way connected with the D.O.C Department of Corrections or any county ran Jails?

4. Have you or anyone in your family ever held any Job in a law enforcement agency, such as the Police or Prosecutor office, any government agency, or a Private detective or security guard agency?

5. If a Constitutional violation was alleged in a Prison setting, in your opinion would video monitoring of the area be a consequential tool to find out facts?

6. Do you think Prisoners are treated too lightly?

7. Do you believe there are circumstances under which a Prisoner forfeits his or her right to humane and fair treatment?

8. Do you Know anyone who is black or African-American, such as a co-worker, friend or neighbor?

9. Have you ever had any bad opinion about any black or African-American or members of other ethnic race as do how some may conduct their self differently from your race?

10. Have you been a victim of a Crime; if so briefly state what crime & if you Know or believe to Know the race of the actor Please state their race?

11. On a scale from (1) one through (10) ten as (10) ten being the Most diabolical crime, how would you rate the crime of rape?

**FILED
SCRANTON**

MAY 2 5 2021

Per_____
DEPUTY CLERK

# Statements Of Undisputed Facts

C. Defendant Maxwell encountered Plaintiff upon arrival from SCI Camp Hill, acknowledged homosexual feminine characteristics with rape claims while at SCI Camp Hill.

2. Plaintiff transferred back to SCI Camp Hill from October 31, 2017 – November 13, 2017 meeting with State Police due to Previous Sexual assault.

3. Plaintiff meet with LT. Maxwell in January of 2018 after prior meetings as to housing concerns not limited to his cellmate at the time Dale Jackson assaulted him, with rated extorting with an inmate Allen (Exhib # 17). After Browns mail was passed to Jackson, working with State Police, Also Exhibit D1-3.(Def at 24-25.)

4. Readmitted to RHU on January 22, 2018 DoB1229, record also contest Brown refusal cell on January 25, 2018. (Exhibit 0)

5. Removed from Camera Cell 116 GA to 214 GD On February 2, 2018 by defendant Plocinik, later indicated & ordered "you will be moving with Allen, made aware Allen & Jackson Extorting sequence of events on Republ or black, Plocinik made clear he did not care (Exhibit 42). Simultaneously Plocinik escorted Brown to see Maxwell & leader Ship to whom Brown to iterated his serious concerns with inmate Allen not limited to working with State Police in connection with Camp Hill. "You will be moving or force will be use.

6. Upon return to Cell, Brown wrote a request of Staff to Counselor (Exhib# 43)

7. Plaintiff was threaten with use of force on February 3, 2018 by C/O Plocinik if he fail to comply with move to 108 with Allen.

8. At the time of the move, defendants did not consider their "II.2.1 reception & classification Procedure & or Policy tool" Section 5 Pursuant to housing inmates with history of Sexual vicimizition. (Exhibit 41).

9. Prior to February 3, 2018 defendants were aware of Allen exhibiting, dangerous & Predatoral behavior arousing from unlawful sexual desirous needs that were not being meat as a lifer. (Exhibits A-F) Misconduct 000728.

10. At the time of the Cell move, defendants were aware Allen had (77) Misconducts must of whom was violent, ill or of which, were sexual related (Exhibit 45), the inmate had a documented history of aggressive, or Predatory behavior towards cell partners, the inmate was also disfigled that the department took away his Z-Code, to whom defendants were aware of Potential imbalance of Power existed between Brown & Allen that would lead to victimization of the weaker Brown that was only sentence to 30 to 40 years, the followed inmate of this were consistent as to deliberately housing both inmates in a corner Cell, a cell the farest distance from monitoring cameras & the unit bubble.

11. Defendants had received employee training under (28 C.F.R.# 115.31[7]) Pursuant to zero tolerance Policy against sexual abuse & harrassment, defendants were also aware that Brown identified as a "Gay, homosexual, or Transgender."

12. Plaintiff was forced in 108 cell to whom a Shea Delgrosso witness, C/o Plocinik Predicated to Allen "Fuck him up he's a Kiddie touch er," C/O Plocinik failed to intervene when Allen started to assault Brown. (Exhib #4).

13. Plaintiff encountered LT. Maxwell, C/o Plocinik & C/o Fochtman on February 4, 2018 refusing to remove him nor acknowledge his medical concerns due to injuries from multiine assaults by the lifer, Allen made threats & or harming Brown, forced Plaintiff to sit in corner while inquirying about the Camp Hill sexual assault.

14. First shift officials ignored Plaintiff's concern on February 5, 2018, Brown was forced to Cuff up by which so order to to to back or wall & face wall So Allen could be let out cell for yard, same procedure for the disputed at cell door to remove Brown, both inmates disputed the wall to shower on February 5, 2018 with not limited to C/o Harris & Law, both inmates were threaten with force & forced back in Cell. (Exhibit 7 & 46, 47, 48, 49).

15. C/o Chilcote attempted to move inmate Allen with a friend, "I was told Brown must stay in this Corner Cell, I am move you now with your friend, the inmate refused demanding Brown be move or he will be sucking his dick." (Decl at 10)

16. On February 5, 2018 Brown also encountered encountered the unit manager & a Psych member but was ignored, Brown also encountered C/o Johnston but was ignored. (Decl at 12)

17. Due to defendants indifference, I was attacked on the night of February 5, 2018 while in bed, the inmate attempted to take of he Jumper as I resisted, Brown suffered serious injuries to the head, back, groin etc. (Decl at 13), Plaintiff encountered not limited to C/o Plocinik, Maxwell, Fochtman on February 5, 2018 telling them the inmate attempted to rape me & that he suffered some injuries, the inmate demanded that Plaintiff be move or he will rape & assault, the fast or & he will not eat as he punched Plaintiff during the encounters to whom I was ignored. (Decl at 14).

18. On February 7, 2018 Brown related concerns to many officials, by dinner C/o Plocinik & Fochtman handed Brown's dinner Tray to Allen as Brown Predicated safety concerns, after dinner Plaintiff encountered C/o Johnston, directing there are multiple open cells, pleading for something to be done, with sheet raffled around him, "I am sick of this shit," Allen attacked Plaintiff, ripping his Jumper off, Shunt the fuk I have done his is here? Sexual assaulting the weaker Brown, Brown would suffer bleeding from mouth, nose, anus, knee etc. After the encounter Sexual assault Brown encountered C/o Plocinik was sick, C/o Chochte, C/o Plocinik & Fochtman would joke or Brown concern, Fochtman would add "I don't make Courtesy Move, this is Humpindon not the Hilton." All defendants deprived Brown medical, ultimately caught or Payloads injuries, Defendant Johnston would even come back & exchange linens, boxers, Jumper, socks etc. (Decl at 14-17). (Exhibit's 46-1).

19. Due to Defendants deliberate indifference, Plaintiff was subject to another sexual assault while acting at the cell door if taken, the inmate dragged Brown by toilet & raped him. (Decl at 17). The next morning officials would deprive the inmate yard, to Prevent out instructions, during Showers officials would att empt to burn both inmates, another Prison Predator from other females covering their cell doors alone with inmate Allen did officials let non both Brown but yard should't Brown was threaten with his the not to come back, Brown refused all orders to go back to 108 cell. (Decl at 17-18).

20. During 594, Hester Interview on February 15, 2018, he stated that Brown requested to be moved to various officers from 2/2/18 through 2/7/18, claiming vibration of DOC policies (Exhibit 71), during C/o Johnston interview he stated that Brown asked him to move, but Brown was not a Z-Code i.e. he almost did moves, Johnston added he informed while some injuries to Brown & switched or channels for Brown's exposed injuries, sexual injury, contradary to C/o Fochtman's statement C/o Johnston admitted color Punches that day 2/7/18. (Exhibit 71) C/o Johnston.

21. The record indicates Brown wrote a statement contradary to LT Maxwell's P.R.E.A report (Exhibit 5) C/o 3 or ndo of, the misint statement would made apparent of LT Maxwell actions by Brown.

22. Pursuant to Policy 6.3.1 Section 15 which Provides for adequate staffing, & were affixable Video monitoring, to Protect inmates against sexual abuse (28 C.F.R. § 115.15[c]), During February 1 - 8 2018 there were video Monitoring cameras located on G-unit.

23. ADM 008 Section 4, B 1 & 2 directs that the Prison has a responsibilities upon notification of Sexual abuse involving Sexual Contact to secure any & all video & audio for evidence, thus there were no video record of LT Maxwell's P.R.E.A. investigation.

## Identification

1) DC-ADM 804 section 1 (1 of 2) DC 135 showing prison officials rejects PREA grievances (1 of 3) N/A indicates Plaintiff do not have access to the document due to Porforta restrains however the document is on the court record & will be identify before trail; N/A will also indicate the document is an Exhibit on the record, but can not be identify due to redactions; (1,4) Conclusion of investigation (2) PREA grievance 813998 Rejection Pursuant to another issue; (3,4,5,6) PREA grievance 707430 & rejection Pursuant to Camp Hill sexual assault (7) DC-ADM 008 Notification of inmates Pursuant to Camp Hill sexual assault (8,9) P.R.E.A. grievance 815213 & rejection (10) PREA grievance 813998 (11) Interview Statements of defendant (12) PREA Notification of inmates Pursuant to PREA grievance 813998 (13,14,14 of 2) PREA 722558 Pursuant to wint defendant Johnston failed to contact medical; PREA grievance 78728 (15,16) (17) Response from Secretary's office Pursuant to Exhibit D-1-3; (D-1-3) Golden copy of a grievance the institutional failed to address Pursuant to actions of cellie while housed on unit A-A; (Exhibits 18,19,29) Plaintiff request for production of documents to whom defendants (response); (20,21,22,23,24,25,26,27,28,29,) Response to Plaintiff Interrogatories & Request for Production of Documents to Lt. Maxwell & C/o Pocinik; (30,31,32,33,34,) Response TO Plaintiffs Interrogatories & Request for production of Documents to C/o Johnston; (35,36,37,38,39) Response to Plaintiffs Interrogatories & Production of Documents to C/o Fochtman; (40) Misconduct D031736 Refusing a cellie; (Exhibits 41,45,46,47) 1,2, Reception & Classification Procedures Manual Section 5 Double-celling Housing; (42) Inmate Brown's Quert Cell History; (43) Request of Staff to counselor Richards 2/2/18; (44) Inmate Statement; (44) DC 135 dating 2/4/18; (45) Inmate Allen's Quert Misconducts Redacted; (Exhibits 46,47,48,49) Security Level 5 Housing Unit Exercise, Shower, Shave, Sign up 2/4/18, 2/5/18, 2/6/18, 2/7/18; (50) Misconduct D031777, refusing to return to cell 103 on 2/8/18; (51,52,53) Lt. Maxwell's Job Discription; (54,55,56) Inmate's Statements; (Exhibits 57,58,59,60 and redacted; 61,62,63,64) black & white Photos of Inmate Allen & Inmate Brown; (65) Statement from defendant Pocinik; (66) Statement of defendant Fochtman; (67) Statement of Heaster; Statement of Defendant Johnston; (68) (Exhibits 69,70, 71,72,73 & 77) Interviews conducted by defendant Maxwell as Statements of Prison Staff & Allen; (Exhibit 74) Medical Sick Call written by Plaintiff dating 2/13/18; (Exhibits 75 & 76) Sick Calls dating 2/14/18 & 2/20/18; (Exhibit 77) Inmate Cumulative Adjustment Record of Inmate Allen Blacked out Redacted; (78) Quert Cell History redacted; (Exhibits 79, 80) blocked out redacted Assuming Inmate Allen's Quert Cell History; Icar, or Misconducts History; (84,85,86) Mental Health Referral, Medical Incident, injury Report of Inmate Allen all redacted; (Exhibits 87,88,89,90,91,92,93,94) Supplemental Response to Plaintiffs Request For Production of Documents (Exhibits 95,96,97,98) N/A; (Exhibit 99,100) Medical Injury Report of Inmate Brown; (Exhibit 101) DC 135 request of staff indicating Brown was/is Under going Counseling from emotional injuries Pursuant to the sexual assaults; (Exhibit 102) Request of Staff DC 85, Brown Requesting Counseling at SCI Forest; (Exhibit O) Misconduct D031229 dating 4/22/18; (Exhibit OO) grievance Response 705321 connected to the record to whom Brown claimed a personal document was given to his Cellmate on A-A unit Pursuant to CampHill Sexual assault & RHU (cooperating with State Police (Exhibit OPO) DC-ADM 008 Section 2 Pursuant to Video Monitoring; (Exhibit OOOO) DC-ADM 008 Section 4 Pursuant to Video Monitoring; (Exhibit OOOOO) A Summary of both Inmate Allen & Brown's Quert Cell History (Exhibit OOOOO) (9-1 through 9-6) P.R.E.A. Policy Section 9 Working with LGBTQ inmates; (Exhibits A,B,C, D,E,F) Misconduct CO09726 Sexual Harrassment & Indecent Exposure charges against Inmate Allen Mouthy, refusing to the Sexual assaults; (G) grievance 891572 acknowledging that CCTV, Video Monitoring Exsist in the RHU; (H) grievance 8000B indicates by custom & policy officials has clear access to video monitor ing in the RHU; (Exhibit I) grievance 721497, Plaintiff requested to Preserve the tape from 2/7/18 - 2/13/18; (J) DC-ADM 008 Section 2 Pursuant to Video Monitoring; (Exhibit K & K1) Synopcis of interviews, to whom Lt. Maxwell conduled also indicating no Video Surveillance Available; (L) Interview conducted by Lt. Maxwell; (M,N) Post Sexual Assault Interview of Inmate Allen & Brown both of whom's redacted; (Exhibits P1,P,P1,R) Inmate Brown's Cumulative Adjustment Record some of which is redacted; (Exhibits) Statement by Lt. Ornador; Statement Inmate Brown Provided a written Statement (Exhibit T1 & T2) grievance 722505 dating 2/14/18, Exhibit U (1-3) grievance 813994 officials refering Inmate Allen/Brown's legal mail & housing the (2) two inmates on same bed; (Deposition Transcript August 5, 2019 82 Pg.)



COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL

JOSH SHAPIRO
ATTORNEY GENERAL

May 15, 2020

**Litigation Section**
**15th Floor, Strawberry Square**
**Harrisburg, PA 17120**
**Phone (717) 772-3561**
**lbedell@attorneygeneral.gov**

John E. Jones III
United States District Court for the Middle District of Pennsylvania
Ronald Reagan Federal Bldg. & U.S. Courthouse
228 Walnut Street
Harrisburg, PA 17101

> Re:    *Brown, Gartor Kiki v. Maxwell, et al.*
> No. 18-1527 (M.D. Pa.)

Dear Judge Jones,

I write in response to the Court's Order of May 5, 2020 (Doc. 100 at 2-3) compelling an *in camera* submission by Defendants of certain documents including "IRC" team documents, Allen's misconduct history, any investigations into Allen under the PREA or DC ADM 008 as well as an affidavit asserting reasons for preserving the confidentiality of policies relating to classification and housing of inmates. Documents are enclosed.

Please note that the only investigation under the PREA or DC ADM 008 naming Allen as the subject in the six-month period prior to the alleged incident in this matter is the report for this alleged incident itself. This report is enclosed and includes Allen's misconduct history within the report. Also, "IRC" stands for Initial Review Committee and refers to an evaluation that is conducted when inmates are new to an institution. These evaluations are performed only when an inmate is transferred to a new facility. Allen was transferred into SCI Huntingdon in 2009, which is why the enclosed IRC documents reflect this date and not a date within the six-month period prior to February 2018, as requested by the Court.

Thank you for your attention to this matter.

Sincerely,

*s/ Lindsey A. Bedell*

**LINDSEY A. BEDELL**
**Deputy Attorney General**

CC:    Gartor Kiki Brown (w/o enclosures)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GARTOR KIKI BROWN,** | : | **No. 3:18-CV-01527** |
| **Plaintiff,** | : | |
| | : | **Judge Jones** |
| **vs.** | : | |
| | : | |
| **LT. MAXWELL, C.O. PLOCINIK,** | : | |
| **C.O. JOHNSON** *and* **C.O.** | : | |
| **FOCHTMAN,** | : | *Complaint filed 08/01/18* |
| **Defendants** | : | |

## UNSWORN DECLARATION OF
## JASON STAUFFER

I, Jason Stauffer, hereby declare under penalty of perjury in accordance with 28 U.S.C. §1746, that the following statements are true and correct based upon my personal knowledge, information, and belief:

1.    I serve as the Supervisor of the Assessment and Classification Unit, Division of Treatment Services ("DTS") for the Department of Corrections of the Commonwealth of Pennsylvania ("Department").

2.    In my capacity as Supervisor, I, *inter alia*, monitor policies, procedures, and implementation of standardized and specialized offender classification and assessment tools and instruments for the Department, including the Pennsylvania Additive Classification Tool.

3.      Through counsel for the Defendants in the case of *Brown v. Maxwell, et al.*, captioned above, I have been made aware of the request by Inmate Gartor Brown (NA6401) for Department Policy 11.2.1, *Reception and Classification*, including, but not limited to, the Pennsylvania Additive Classification Tool Policy, or ("PACT") Policy.

4.      John E. Wetzel, Secretary of the Department, has designated me as the Supervisor of the Assessment and Classification Unit to respond to this request on his behalf.

5.      Department Policy 11.2.1, *Reception and Classification*, Section 3 contains the PACT Policy as well as the PACT Manual ("PACT Manual"), and in my professional opinion, these records should not be released for the following reasons.

6.      The Department does not permit the PACT or the attachments to be viewed, maintained, shared with, or accessed by inmates or the public in general.

7.      The PACT Manual and/or its attachments are investigatory tools used to assess inmate security needs to determine housing and custody levels.

8.      Access to the PACT Manual and/or its attachments is reasonably likely to result in the manipulation of the tool which will in turn cause inappropriate housing decisions to be made for inmates.

2

9.    The PACT Manual is maintained by the Department in connection with its official law enforcement function of supervising the incarceration of inmates, including assigning their proper security and program code classifications for appropriate housing.

10.    Access to the PACT Manual and/or its attachments is reasonably likely to result in the manipulation of the tool which will in turn cause inappropriate housing decisions to be made for inmates.

11.    Inappropriate housing and security decisions will endanger the inmate, other inmates, staff or others present in the institution or even the public. For instance, an inmate who should be assigned a higher security classification may manipulate the process with the result that he or she obtains housing in a less secure facility/housing unit where they will be a risk to others or will attempt to escape.

12.    Inmates who are not assigned to the proper security statuses and programming courses will pose a danger to themselves, staff, and others.

13.    Improper classification of an inmate can result in the inmate's improper consideration for parole, clearance for outside work assignment, reclassification, or similar opportunities, when in fact the inmate has only manipulated the procedures and guidelines in place to his or her advantage.

3

14.    For instance, an inmate who should be assigned a "high risk" program code may manipulate the process with the result that he or she obtains housing in a less secure facility/housing unit where they will be a risk to others or will attempt to escape.

15.    For the reasons set forth above, the disclosure of an assessment tool such as the PACT Manual and/or its attachments is reasonably likely to result in a substantial and demonstrable risk of physical harm to facility staff and/or the community if inmates are improperly reclassified to an inappropriate setting.

Respectfully submitted,

Jason Stauffer, Supervisor
Assessment and Classification Unit
Division of Treatment Services
Pennsylvania Department of Corrections

Date: May 14, 2020

4

183

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GARTOR KIKI BROWN,** | : | **Civil No. 3:18-CV-1527** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **LT. MAXWELL, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM AND ORDER

### I.   Factual Background

The plaintiff, Gartor Kiki Brown, is a state inmate who filed in the instant case in 2018, lodging a series of sweeping claims against prison staff arising out of allegations that Brown was physically and sexually assaulted by another prisoner, Kaheim Allen, while these two inmates were housed together at SCI Huntingdon between February 3 and 8, 2018. Over the span of this longstanding litigation, the remaining claims in Brown's lawsuit have been narrowed considerably. At this juncture, Brown's sole remaining legal claims are Eighth Amendment failure to protect claims lodged against Defendants Maxwell, Plocinik, Johnston, and Fochtman, as well as Eighth Amendment medical deliberate indifference claims brought against Defendants Johnston and Fochtman.

exercises its discretion to rule *in limine* on evidentiary issues "in appropriate cases"). Courts may exercise this discretion in order to ensure that juries are not exposed to unfairly prejudicial, confusing, or irrelevant evidence. United States v. Romano, 849 F.2d 812, 815 (3d Cir. 1988). Courts may also do so in order to "narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1069 (3d Cir. 1990) (citation omitted). However, courts should be careful before doing so.

In considering motions *in limine* that call upon the Court to engage in preliminary evidentiary rulings under Rule 403 of the Federal Rules of Evidence, we begin by recognizing that these "evidentiary rulings [on motions *in limine*] are subject to the trial judge's discretion and are therefore reviewed only for abuse of discretion . . . . Additionally, application of the balancing test under Federal Rule of Evidence 403 will not be disturbed unless it is 'arbitrary and irrational.' " Abrams v. Lightolier Inc., 50 F.3d 1204, 1213 (3d Cir. 1995) (citations omitted); see Bernardsville Bd. of Educ. v. J.H., 42 F.3d 149, 161 (3d Cir. 1994) (reviewing *in limine* rulings for abuse of discretion). One of the key guiding principles governing the exercise of this discretion is reflected in the philosophy that shapes the rules of evidence. The Federal Rules of Evidence can aptly be characterized as evidentiary rules of inclusion, which are designed to broadly permit fact-finders to consider

3

the preliminary, wholesale exclusion of evidence, noting that it has "made clear that rulings excluding evidence on Rule 403 grounds should rarely be made *in limine*." Walden v. Georgia–Pacific Corp., 126 F.3d 506, 518 n. 10 (3d Cir. 1997). The reason for this caution is evident: oftentimes a court "cannot fairly ascertain the potential relevance of evidence for Rule 403 purposes until it has a full record relevant to the putatively objectionable evidence." Id.; see also In re Diet Drugs Products Liability Litigation, 369 F.3d 293, 314 (3d Cir. 2004). As the Court of Appeals has observed when advising against excessive reliance on motions *in limine* to exclude evidence under Rule 403:

> [M]otions *in limine* often present issues for which final decision is best reserved for a specific trial situation. American Home, 753 F.2d at 324; cf. Luce v. United States, 469 U.S. 38, 41–42, 105 S. Ct. 460, 463–64, 83 L.Ed.2d 443 (1984) (holding that criminal defendant must testify to preserve claim of improper impeachment with prior conviction) ("The [*in limine*] ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling."). This is particularly true when the evidence is challenged as irrelevant or prejudicial; the considerations weighed by the court will likely change as the trial progresses. See Rosenfeld v. Basquiat, 78 F.3d 84, 91 (2d Cir. 1996) ("Unlike rulings that involve balancing potential prejudice against probative value, the ruling in the present case was not fact-bound and no real purpose other than form would have been served by a later objection."). We have also made clear that rulings excluding evidence on Rule 403 grounds should rarely be made *in limine*. "[A] court cannot fairly ascertain the potential relevance of evidence for Rule 403 purposes until it has a full record relevant to the putatively objectionable evidence. We believe that Rule 403 is a trial-oriented rule. Precipitous Rule 403 determinations, before the challenging party

> [W]here a party has submitted an untimely discovery request, the court can, and in the exercise of its discretion often should, refuse to compel compliance with that request. See, e.g., Maslanka v. Johnson & Johnson, 305 F. App'x 848 (3d Cir. 2008) (affirming denial of *pro se* litigant motion to compel where discovery demands were untimely); Oriakhi v. United States, 165 F. App'x 991 (3d Cir. 2006) (same); Bull v. United States, 143 F. App'x 468 (3d Cir. 2005) (same).

Muniz v. Price, No. 3:10-CV-345, 2010 WL 4537037, at *2 (M.D. Pa. Nov. 3, 2010).

Accordingly, this request is denied without prejudice to Brown introducing evidence regarding the absence of any prison videos at trial and inquiring of defendants and defense witnesses concerning the absence of any such videos.

In addition, Brown requests that the court preclude the defendants from referring to his own criminal and disciplinary history at trial. In the alternative, Brown requests greater access to information concerning the criminal and disciplinary history of his alleged inmate assailant, Kaheim Allen. Further, Brown requests disclosure of the Department of Corrections Inmate Reception and Classification Policy.

Defendants aptly note that many of these issues were previously litigated by Brown. For example, Brown's request for inmate Allen's criminal history was previously denied by the district court in May of 2020. (Doc. 100, at 2). Likewise, Brown's request for the Department of Corrections confidential reception and classification policy was denied by the district court in June of 2020. (Doc. 108).

7

ruling upon such matters until trial, when questions regarding the proper scope of cross examination may be taken up on a fully formed factual record.

An appropriate order follows.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: July 6, 2022.

Third, Brown's request for greater access to information concerning the criminal and disciplinary history of his alleged inmate assailant Kaheim Allen and his request for disclosure of the Department of Corrections Inmate Reception and Classification Policy, which were previously denied by the district court prior to the parties consenting to magistrate judge jurisdiction, are denied pursuant to the law of the case doctrine. However, Brown may at trial question the defendants regarding their previous knowledge of any prior criminal or disciplinary history relating to Allen and assaultive or sexually predatory behavior since such information could be relevant to the claims of deliberate indifference advanced by the plaintiff in this lawsuit.

Finally, to the extent that Brown seeks to limit cross examination of the plaintiff regarding his own criminal or disciplinary history at trial, we will defer ruling upon such matters until trial, when questions regarding the proper scope of cross examination may be taken up on a fully formed factual record.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GARTOR KIKI BROWN,** | : | **Civil No. 3:18-CV-1527** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **(Magistrate Judge Carlson)** |
| | : | |
| **LT. MAXWELL, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## O R D E R

AND NOW, this 5th day of July 2022, in accordance with the accompanying

Memorandum, upon consideration of the defense motion *in limine* (Doc. 174), which

seeks to preclude Brown, who is proceeding *pro se*, from referring to or presenting

evidence relating to claims that have previously been dismissed at the trial of this

case, IT IS ORDERED that the motion is GRANTED in part as follows: Absent the

express approval of the trial judge, following a proffer of relevance by the plaintiff

and a full consideration of the positions of the parties, the plaintiff shall be precluded

from referring to these claims that have been dismissed.

> *S/ Martin C. Carlson*
> Martin C. Carlson
> United States Magistrate Judge

9

(182)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GARTOR KIKI BROWN,** | : | **Civil No. 3:18-CV-1527** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **LT. MAXWELL, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## <u>MEMORANDUM AND ORDER</u>

### I.   <u>Factual Background</u>

The plaintiff, Gartor Kiki Brown, is a state inmate who filed in the instant case in 2018, lodging a series of sweeping claims against prison staff arising out of allegations that Brown was physically and sexually assaulted by another prisoner, Kaheim Allen, while these two inmates were housed together at SCI Huntingdon between February 3 and 8, 2018. Over the span of this longstanding litigation, the remaining claims in Brown's lawsuit have been narrowed considerably. At this juncture, Brown's sole remaining legal claims are Eighth Amendment failure to protect claims lodged against Defendants Maxwell, Plocinik, Johnston, and Fochtman, as well as Eighth Amendment medical deliberate indifference claims brought against Defendants Johnston and Fochtman.

With the extant claims in this case framed in this fashion, the defendants have filed a motion *in limine*, (Doc. 174), which seeks to preclude Brown, who is now proceeding *pro se*, from referring to or presenting evidence at trial relating to these claims that have previously been dismissed. This motion is now ripe for resolution.[1] Upon consideration of this motion, for the reasons set forth below, the motion is GRANTED in part as follows: Absent the express approval of the trial judge, following a proffer of relevance by the plaintiff and a full consideration of the positions of the parties, the plaintiff shall be precluded from referring to these claims that have been dismissed.

**II.    Discussion**

**A. Motions *in Limine*—Guiding Principles**

The Court is vested with broad inherent authority to manage its cases, which carries with it the discretion and authority to rule on motions *in limine* prior to trial. See Luce v. United States, 469 U.S. 38, 41 n.4 (1984); In re Japanese Elec. Prods. Antitrust Litig., 723 F.2d 238, 260 (3d Cir. 1983), rev'd on other grounds sub nom., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) (the court exercises its discretion to rule *in limine* on evidentiary issues "in appropriate cases"). Courts may exercise this discretion in order to ensure that juries are not exposed to

---

[1] We note that Brown did not respond to this motion and the time for filing a response has now passed.

2

unfairly prejudicial, confusing, or irrelevant evidence. United States v. Romano, 849 F.2d 812, 815 (3d Cir. 1988). Courts may also do so in order to "narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1069 (3d Cir. 1990) (citation omitted). However, courts should be careful before doing so.

In considering motions *in limine* that call upon the Court to engage in preliminary evidentiary rulings under Rule 403 of the Federal Rules of Evidence, we begin by recognizing that these "evidentiary rulings [on motions *in limine*] are subject to the trial judge's discretion and are therefore reviewed only for abuse of discretion . . . . Additionally, application of the balancing test under Federal Rule of Evidence 403 will not be disturbed unless it is 'arbitrary and irrational.' " Abrams v. Lightolier Inc., 50 F.3d 1204, 1213 (3d Cir. 1995) (citations omitted); see Bernardsville Bd. of Educ. v. J.H., 42 F.3d 149, 161 (3d Cir. 1994) (reviewing *in limine* rulings for abuse of discretion). One of the key guiding principles governing the exercise of this discretion is reflected in the philosophy that shapes the rules of evidence. The Federal Rules of Evidence can aptly be characterized as evidentiary rules of inclusion, which are designed to broadly permit fact-finders to consider pertinent factual information while searching for the truth. Adopting this broad view of relevance, it has been held that

> Under [Rule] 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of

3

> the action more probable or less probable than it would be without the evidence." [Therefore] "[i]t follows that evidence is irrelevant only when it has no tendency to prove the fact. Thus the rule, while giving judges great freedom to admit evidence, diminishes substantially their authority to exclude evidence as irrelevant."

Frank v. County of Hudson, 924 F. Supp. 620, 626 (D.N.J. 1996) (citing Spain v. Gallegos, 26 F.3d 439, 452 (3d Cir. 1994) (quotations omitted)). Rule 402 of the Federal Rules of Evidence, in turn, provides that all "[r]elevant evidence will be admissible unless the rules of evidence provide to the contrary." United States v. Sriyuth, 98 F.3d 739, 745 (3d Cir. 1996) (citations omitted).

Rule 403 of the Federal Rules of Evidence then sets legal grounds for exclusion of some evidence, stating that:

> Although relevant, evidence may be excluded if its probative value **is** substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403.

These broad principles also shape and define the scope of this Court's discretion in addressing motions *in limine* like those filed by the parties here, which seek a pre-trial ruling excluding evidence on relevance and prejudice grounds. In the past, the United States Court of Appeals for the Third Circuit has cautioned against the preliminary, wholesale exclusion of evidence, noting that it has "made clear that rulings excluding evidence on Rule 403 grounds should rarely be made *in limine*." Walden v. Georgia–Pacific Corp., 126 F.3d 506, 518 n. 10 (3d Cir. 1997). The reason

4

for this caution is evident: oftentimes a court "cannot fairly ascertain the potential

relevance of evidence for Rule 403 purposes until it has a full record relevant to the

putatively objectionable evidence." Id.; see also In re Diet Drugs Products Liability

Litigation, 369 F.3d 293, 314 (3d Cir. 2004). As the Court of Appeals has observed

when advising against excessive reliance on motions *in limine* to exclude evidence

under Rule 403:

> [M]otions *in limine* often present issues for which final decision is best
> reserved for a specific trial situation. American Home, 753 F.2d at 324;
> cf. Luce v. United States, 469 U.S. 38, 41–42, 105 S. Ct. 460, 463–64,
> 83 L.Ed.2d 443 (1984) (holding that criminal defendant must testify to
> preserve claim of improper impeachment with prior conviction) ("The
> [*in limine*] ruling is subject to change when the case unfolds,
> particularly if the actual testimony differs from what was contained in
> the defendant's proffer. Indeed even if nothing unexpected happens at
> trial, the district judge is free, in the exercise of sound judicial
> discretion, to alter a previous *in limine* ruling."). This is particularly
> true when the evidence is challenged as irrelevant or prejudicial; the
> considerations weighed by the court will likely change as the trial
> progresses. See Rosenfeld v. Basquiat, 78 F.3d 84, 91 (2d Cir. 1996)
> ("Unlike rulings that involve balancing potential prejudice against
> probative value, the ruling in the present case was not fact-bound and
> no real purpose other than form would have been served by a later
> objection."). We have also made clear that rulings excluding evidence
> on Rule 403 grounds should rarely be made *in limine*. "[A] court cannot
> fairly ascertain the potential relevance of evidence for Rule 403
> purposes until it has a full record relevant to the putatively
> objectionable evidence. We believe that Rule 403 is a trial-oriented
> rule. Precipitous Rule 403 determinations, before the challenging party
> has had an opportunity to develop the record, are therefore unfair and
> improper." Paoli I, 916 F.2d at 859; see also In re Paoli R.R. Yard PCB
> Litig., 35 F.3d 717, 747 (3d Cir. 1994) ("Paoli II"). Under these and
> similar circumstances, if a district court makes a tentative pre-trial
> ruling, it has the opportunity to "reconsider [its] in limine ruling with

the benefit of having been witness to the unfolding events at trial."
United States v. Graves, 5 F.3d 1546, 1552 (5th Cir. 1993).

Walden, 126 F.3d at 518 n. 10.

There is, however, a caveat to these legal tenets that urge caution in considering motions *in limine*. Courts are frequently called upon to consider such motions in cases like the instant case where it is alleged that a plaintiff is endeavoring to introduce evidence relating to claims that have been dismissed. Reasoning that evidence regarding dismissed claims that have failed as a matter of law typically has little relevance, courts have often excluded evidence of dismissed claims from trial. See e.g., Branch v. Brennan, No. 2:17-CV-00777, 2019 WL 3892850, at *2 (W.D. Pa. Aug. 19, 2019); Devine v. Pittsburgh Bd. of Pub. Educ., No. 2:13-CV-220, 2015 WL 7301149, at *4 (W.D. Pa. Nov. 18, 2015); Brown v. Johnson & Johnson, No. CV 12-4929, 2015 WL 12834346, at *2 (E.D. Pa. Aug. 28, 2015); Moore v. Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ., No. CV 02-1734, 2005 WL 8165154, at *4 (W.D. Pa. Mar. 11, 2005). However, those courts that have excluded this evidence often have done so without prejudice to the plaintiff presenting some specific and narrowly tailored offer of proof as to the relevance and admissibility of particular evidence. Id.

Guided by the principles we turn to consideration of the instant motion *in limine*.

## B. The Motion *in limine* will be Granted in Part.

In this case, the defendants seek something that is commonly granted—an order forbidding reference at trial to claims that have been dismissed. We note that Brown may contend at trial that some evidence concerning these previously dismissed claims is still relevant to her sole remaining Eighth Amendment claims. Accordingly, consistent with caselaw governing the exercise of discretion in this field, this motion *in limine* will be granted in part as follows: absent the express approval of the trial judge, following a proffer of relevance by the plaintiff and a full consideration of the positions of the parties, the plaintiff shall be precluded from referring to these claims that have been dismissed.

By adopting this course, we provide clear guidance to Mr. Brown that he may not refer to claims that have been dismissed at trial without first explaining to the trial judge why specific evidence is relevant and obtaining the trial judge's approval. Following this path avoids the concerns that justify motions *in limine*—ensuring that juries are not exposed to unfairly prejudicial, confusing, or irrelevant evidence, Romano, 849 F.2d at 815, and "narrow[ing] the evidentiary issues for trial and to eliminate unnecessary trial interruptions." Bradley, 913 F.2d at 1069 (citation omitted). Yet following this course does not absolutely preclude Brown from presenting specific evidence if he can first demonstrate its relevance through a narrowly tailored offer of proof.

7

An appropriate order follows.

*S/Martin C.  Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: July 5, 2022.

**Pennsylvania Department of Corrections**      06/27/2022

**Inmate Cumulative Adjustment Records**      kelhoke

Inmate Name : BROWN, GARTOR      Inmate # : NA6401      **Exhibit 57**

Location : ---      Counselor : N/A      NOV 1 7 2023

| Entered Date | Entered By | Facility | Comments |
|---|---|---|---|
| 03/04/2022 | Vogt, Raymond C III | BENNER TOWNSHIP | SCI-Benner Township Introductory Interview: Completed Security Threat Evaluation form and forwarded it to Security Office. SCI Benner Township rule book was given and discussed. Form acknowledging rule book receipt, double occupancy, and Emergency Contacts were verified and/or updated. Inmate was briefed on secured forms of identification requirements for REENTRY PURPOSES, to include Birth Certificate, Social Security Card, and DL/Non-DL Photo ID. Inmate informed if no secured forms of identification are available, inmate should complete application through counselor or RSO services. The inmate was provided with DC-ADM 008 Attachment 11-D regarding Sexual Harassment/Sexual Assault. Inmate refused to sign all documents. |
| 02/03/2022 | Coulehan, Daniel T Jr | GREENE | AC placement seven day weekly review conducted. ICAR indicates appropriate level of counselor and MH coverage is occurring. No follow-up notification is necessary. |
| 02/03/2022 | Perkins, Robert Wayne | GREENE | RHU rounds were conducted on this date. Inmate had no issues or concerns. |
| 02/02/2022 | Berdine, Kris Ann | GREENE | AC Hearing - PRC Review 02/02/2022 Present DSFM Buzas, MOG Switzer, Lt. Arnold, and UM Dick. Inmate attended PRC. Discussed status. No concerns. Release to GP |
| 01/31/2022 | Kaczmark, Michelle Lee | GREENE | AC placement review conducted, notified CCPM. |
| 01/26/2022 | Perkins, Robert Wayne | GREENE | RHU rounds were conducted on this date. Inmate had no issues or concerns. |
| 01/25/2022 | Berdine, Kris Ann | GREENE | PRC Review 01/25/2022- Present DSFM Buzas, MOG Switzer, Lt. Arnold and UM Dick Inmate seen by PRC. Discussed status. Inmate states he was not wanting to go to GP. Move to AC at expiration of DC time. |
| 01/21/2022 | Brawdy, John A III | GREENE | Inmate seen cell-side by psychology staff on 1/21/22 for PV/RHU rounds. See Sapphire for more info. |
| 01/18/2022 | Perkins, Robert Wayne | GREENE | RHU rounds were conducted on this date. Inmate had no issues or concerns. |
| 01/03/2022 | Swartz, Carla S | GREENE | Late entry- PRC review on 12/28/21, maintain DC status. |
| 12/23/2021 | Perkins, Robert Wayne | GREENE | RHU rounds were conducted. Inmate had no issues or concerns. |
| 12/21/2021 | Brawdy, John A III | GREENE | Inmate was seen cell-side by psychology staff on 12/21/21 while performing daily RHU rounds. See Sapphire for more details. |
| 12/14/2021 | Perkins, Robert Wayne | GREENE | RHU rounds were conducted on this date. Inmate had no issues or concerns. |
| 12/14/2021 | Karp, Stacey L | GREENE | Completed mental health contact. See DC-560. |
| 12/08/2021 | Perkins, Robert Wayne | GREENE | RHU rounds were conducted on this date. Inmate had no issues or concerns. |
| 12/03/2021 | Perkins, Robert Wayne | GREENE | RHU rounds were conducted on this date. Inmate had no issues or concerns. |
| 12/02/2021 | Brawdy, John A III | GREENE | LATE ENTRY: Inmate was seen cell-side by psychology staff on 11/30/21 while performing daily RHU rounds. See Sapphire for more details. |
| 11/24/2021 | Perkins, Robert Wayne | GREENE | RHU rounds were conducted on this date. Inmate had no issues or concerns. |
| 11/19/2021 | Perkins, Robert Wayne | GREENE | RHU rounds were conducted on this date. Inmate had no issues or concerns. |
| 11/15/2021 | Karp, Stacey L | GREENE | Completed mental health contact. See DC-560. |
| 11/09/2021 | Perkins, Robert Wayne | GREENE | RHU rounds were conducted on this date. Inmate had no issues or concerns. |
| 11/03/2021 | Perkins, Robert Wayne | GREENE | RHU rounds were conducted on this date. Inmate had no issues or concerns. |
| 10/29/2021 | Perkins, Robert Wayne | GREENE | RHU rounds were conducted on this date. Inmate had no issues or concerns. |
| 10/22/2021 | Brawdy, John A III | GREENE | Inmate was seen cell-side by psychology staff on 10/22/21, for daily RHU rounds. See Sapphire for more info. |

**Pennsylvania Department of Corrections**                                                    06/27/2022

**Inmate Cumulative Adjustment Records**                                                      kelhoke

Inmate Name : **BROWN, GARTOR**                                      Inmate # : **NA6401**

Location : ---                                                        Counselor : N/A

| | | | |
|---|---|---|---|
| 10/25/2017 | Parsons, Eric W | HUNTINGDON | (RHU PSS OOC contact): Inmate seen per OOC contact by Mr. Parsons, PSS. Purpose of this encounter was to empower him to identify and address his own self identified recovery goals and interventions to reach them. the multi-modal approach of HELPING was provided, reviewed, and he was encouraged to complete the rest on his time for further review. Inmate presented no overt SMI, was stable, NAD, and denied SI/HI, plans, or intentions. Appears well-adjusted, supportive counseling provided. Seems vested in individual treatment even though he has no MH needs at present. |
| 10/25/2017 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: Stability D Weekly Review: (Deputy Brumbaugh, Major Walters, CCPM Sipple, PSS Diehl):   Inmate will be released to population on 10/25/17 CL:4H |
| 10/25/2017 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: (Deputy Brumbaugh, Major Walters, CCPM Sipple): Inmate was seen for an 802 review. Inmate was encouraged to talk to Security. Continue AC status pending a security report. Next review: 11/1/17. |
| 10/24/2017 | Parsons, Eric W | HUNTINGDON | (RHU PSS contact): Inmate seen by Mr. Parsons, PSS per routine contact. He was offered an OOC contact and stated he would like to participate.  His name was added to list to be seen.  No overt SMI, stable, NAD, denied SI/HI, plans, or intentions. Appears well-adjusted.  Supportive counseling offered. |
| 10/24/2017 | Stratton, Allan D | HUNTINGDON | initial PRAT completed yesterday; see comments in Security Concerns section; current PRAT scores indicate no current risks; however, inmate reported abuse as a victim and this was turned over to appropriate staff for further investigation and follow up. |
| 10/23/2017 | Parsons, Eric W | HUNTINGDON | (RHU OOC contact): Inmate Brown seen this afternoon by Mr. Parsons, PSS during OOC contact.  He was extremely soft spoken, resistant, and reluctant to cooperate with this PSS obtaining the MH informed consent document signed. Only after I read it verbatim did he oblige to sign.  Inmate reported needed help for a variety of matters that ranged from alleged, "Night sweats, anxiety, panic attacks,...."  It should be noted that he carries a mental health stability rating of S="A" and presented no overt symptoms of any concern, he is stable, and reported no acute distress or anything of specificity.  Inmate is a new man from SCI-Camp and appears to be attempting to manage a needy impression of himself.  Appears stable, no issues or concerns raised. |
| 10/18/2017 | Clements, George D II | CAMP HILL | PRC review held on 10-18-17.  In attendance were, Deputy Homer, CCPM Clements, UM Ritchey, Major Panasiewicz, PSS Searer, and CC2 Arnold. PRC's decision is to continue DC status until his minimum date of 10-21-17 and then release to population I block. |
| 10/16/2017 | Boone, Emily Anne | CAMP HILL | Psych Contact with CC2 Arnold.  Suitability for continued confinement still warranted.  Denied SI/HI/MH concerns.  OOC not warranted at this time.  In cell materials provided.  Will follow.  See DC-560 for further information. |
| 10/06/2017 | St Pierre, Robert C | CAMP HILL | H-Code = Assaultive with staff |
| 10/06/2017 | Crenshaw, Latasha D | CAMP HILL | The inmate was interviewed for classification, assigned a custody level, and informed of his preliminary programming plan.  Inmate received his 16E during his classification interview. |
| 10/02/2017 | Boone, Emily Anne | CAMP HILL | Psychology Contact.  PSA reviewed the DC-510 suicide indicator check list. Denied current SI/HI/MH concerns.  See DC-560 for further information. |
| 08/30/2017 | Kunkel, Allen D | CAMP HILL | New input on inmate, last input incorrect. OPTX: Inmate reported to DATS marijuana abuse 3 to 4 times a week - alcohol use 2 to 3 times a month - no prior AOD TX reported. |
| 08/30/2017 | Kunkel, Allen D | CAMP HILL | OPTX: Inmate reported to DATS alcohol abuse once a week and marijuana abuse monthly while on bail for current offence - no prior AOD TX. |
| 08/18/2017 | Zobitne, Renee M | CAMP HILL | Inmate received from R-Block.  Initial contact made.  Inmate issued block rules and basic necessities during orientation.  Inmate informed that he is a diagnostic inmate and is being housed at SCI-Camp Hill for classification purposes. |
| 08/14/2017 | Moslak, Tomara M | CAMP HILL | Inmate seen for routine psychological testing. No problems or concerns noted. Denies any suicidal ideation. |
| 08/01/2017 | DeGideo, Rachael E. | GRATERFORD | Individual attended E BLK New Commit Orientation on 8/1/17 and the following staff were present CC2 R. DeGideo and PSS Y. Tan.  PA DOC Inmate Handbook provided & various rules, regulations, and processing procedures were explained and a brief question and response session.  PREA video viewed and Inmate Education Verification Form signed.  Suicide Prevention was discussed and Psychology available for discussion afterwards. |



**Inmate Name : BROWN, GARTOR**                    **Inmate # : NA6401**

Location : ---                                     Counselor : N/A

| Date | Name | Location | Notes |
|---|---|---|---|
| 10/21/2021 | Perkins, Robert Wayne | GREENE | PV rounds were conducted on this date. Inmate had no issues or concerns. |
| 10/20/2021 | Karp, Stacey L | GREENE | Late Entry: 10/18/21 I completed mental health contact with Mr. Brown. See DC-560. |
| 10/19/2021 | Weeden, Shanda Marie | GREENE | Inmate Brown approved for a legal exemption on this date (1 legal box) for the following cases: 18-CV-1527, 19-CV-0057, and 17-CV-1138. |
| 10/12/2021 | Perkins, Robert Wayne | GREENE | RHU rounds were conducted on this date. Inmate had no issues or concerns. |
| 10/07/2021 | Karp, Stacey L | GREENE | Mental health contact completed. See DC-560. |
| 10/05/2021 | Perkins, Robert Wayne | GREENE | RHU rounds were conducted on this date. Inmate had no issues or concerns. |
| 09/23/2021 | Shawley, Tracy L | GREENE | AC placement seven day weekly review conducted this date. ICAR indicates appropriate level of counselor and MH coverage is occurring. No follow-up notification is necessary. |
| 09/17/2021 | Karp, Stacey L | GREENE | I offered Mr. Brown mental health contact out of cell, but he declined. See DC-560. |
| 09/17/2021 | Schetka, Courtney L | GREENE | Received staffing packet back supporting the removal of inmate Brown's program code H due to him not meeting criteria. |
| 09/16/2021 | Guyton, Michael Stanley | GREENE | Counselor round- inmate had no questions or concerns. |
| 09/14/2021 | Sibanda, Jabulani | GREENE | AC placement seven day weekly review conducted. ICAR indicates appropriate level of counselor coverage and MH coverage is occurring. |
| 09/10/2021 | Schetka, Courtney L | GREENE | Weekly RHU round conducted. Inmate expressed no concerns. |
| 09/09/2021 | Karp, Stacey L | GREENE | I completed mental health contact with Mr. Brown. See forms in sapphire. |
| 09/03/2021 | Schetka, Courtney L | GREENE | Weekly RHU round conducted, inmate expressed no concerns. |
| 09/01/2021 | Karp, Stacey L | GREENE | I completed mental health contact with Mr. Brown. See DC-560. |
| 09/01/2021 | Schetka, Courtney L | GREENE | September telephone add on submitted. |
| 08/31/2021 | Coulehan, Daniel T Jr | GREENE | AC placement seven day weekly review conducted. ICAR indicates appropriate level of counselor and MH coverage is occurring. No follow-up notification is necessary. |
| 08/30/2021 | Schetka, Courtney L | GREENE | LATE ENTRY: ANNUAL REVIEW: Inmate Brown was reviewed in absentia on August 16, 2021 for ANNUAL REVIEW purposes. DC-43 signed by this counselor and inmate received a copy via institutional mail. He is currently on the waitlist for his only recommended program (Co-Occurring Outpatient). Programming recommendations are appropriately assigned based on assessment scores and guidelines. He received average housing report rating and idle work report rating. ID photo taken on March 11, 2020. Emergency contact information updated in UM system. CVCF reviewed and has been satisfied as of January 1, 2018. PRAT completed and PREA flier offered to the inmate. Per assessment inmate has no housing concerns at this time. Due to his active detainer for possible deportation he is ineligible to be considered for outside clearance. At this time he is currently assigned a program code H. A vote sheet to review its appropriateness was circulated on August 24, 2021. At this time there are currently no reentry documents stored in the facility safe. PACT completed on August 13, 2021 and inmate informed that he is a CL 4 (5T). |
| 08/25/2021 | Schetka, Courtney L | GREENE | Weekly RHU round conducted, inmate asked to speak out of cell in regards to PREA retaliation monitoring. |
| 08/18/2021 | Berdine, Kris Ann | GREENE | PRC Review 08/17/2021- Present DSFM Buzas, MUM Malanoski, Lt. Saylor and UM Guyton Inmate seen by PRC. Discussed status. Continue AC. |
| 08/18/2021 | Karp, Stacey L | GREENE | I completed mental health contact with Mr. Brown. See DC-575. |
| 08/13/2021 | Schetka, Courtney L | GREENE | Weekly RHU round conducted, inmate appeared to be sleeping. |
| 08/13/2021 | Berdine, Kris Ann | GREENE | AC HEARING - PRC Review 08/10/2021 Present DSFM Buzas, Lt. Saylor, and UM Dick. Inmate attended PRC. Discussed status. Refused to GP. Refuses to take a cellie. |

**Inmate Name : BROWN, GARTOR**                    **Inmate # : NA6401**

Location : ---                                     **Counselor : N/A**

| | | | |
|---|---|---|---|
| 08/13/2021 | Berdine, Kris Ann | GREENE | PRC Review 08/10/2021 Present DSFM Buzas, Lt. Saylor, and UM Dick. Inmate attended PRC. Discussed status. Inmate refused GP. Self Confinement Effective 08/16/2021. |
| 08/03/2021 | Schetka, Courtney L | GREENE | Weekly RHU round conducted this date. Inmate asked questions about his telephone add on that was sent back to him. |
| 07/23/2021 | Schetka, Courtney L | GREENE | Weekly RHU round conducted. Inmate vented frustration with current housing situation. |
| 07/23/2021 | Lagos, George D | GREENE | Mental Health Contact Rounds completed by Psychology Staff for the week of 7/19/2021 through 7/23/2021. |
| 07/21/2021 | Berdine, Kris Ann | GREENE | PRC REVIEW 07/20/2021 Present DSFM Buzas, Lt. Saylor, UM Guyton. Inmate refused to attend PRC. Discussed status. Continue DC status. |
| 07/19/2021 | Lagos, George D | GREENE | Mental Health Contact Rounds completed by Psychology Staff for the week of 7/12/2021 through 7/15/2021. |
| 07/15/2021 | Schetka, Courtney L | GREENE | Weekly RHU round conducted. Inmate appeared to be sleeping. |
| 07/09/2021 | Kriger, Amanda Ann | GREENE | Screening rounds were completed for this individual from 07/06/2021 through 07/09/2021. |
| 07/02/2021 | Kriger, Amanda Ann | GREENE | Seen by psychology staff for mental health contact. See Sapphire for documentation. |
| 07/01/2021 | Lagos, George D | GREENE | Psychology Rounds were completed during the week of Monday 6/28/2021 through Thursday 07/01/2021. Psychology Staff to cover rounds on Friday 07/02/2021. |
| 06/28/2021 | Schetka, Courtney L | GREENE | LATE ENTRY: Weekly RHU round conducted on 6/25/21. Inmate had no concerns. |
| 06/25/2021 | Lagos, George D | GREENE | Psychology screening rounds were completed for this individual from 06/21/2021 through 06/25/2021. |
| 06/17/2021 | Lagos, George D | GREENE | Psychology screening rounds were completed for this individual from 06/14/2021 through 06/17/2021. |
| 06/15/2021 | Schetka, Courtney L | GREENE | Weekly RHU round conducted this date. Inmate had questions concerning his account and was advised to write to inmate accounts. |
| 06/11/2021 | Lagos, George D | GREENE | Screening rounds were completed for this individual from 06/07/2021 through 06/11/2021. |
| 06/10/2021 | Lagos, George D | GREENE | Seen by psychology staff for mental health contact. See Sapphire for documentation. |
| 06/08/2021 | Schetka, Courtney L | GREENE | Late Entry: Weekly RHU round conducted on 06-04-01. Inmate inquired about his 16E and how he believes it is incorrect. |
| 06/04/2021 | Lagos, George D | GREENE | Mental Health screening rounds were completed for this individual from 06/01/2021 through 06/04/2021. |
| 06/01/2021 | Schetka, Courtney L | GREENE | Late Entry: Weekly RHU round conducted on 5/28/21. Inmate inquired about his controlling max date. |
| 05/28/2021 | Lagos, George D | GREENE | Mental Health screening rounds were completed for this individual from 05/24/2021 through 05/28/2021. |
| 05/21/2021 | Schetka, Courtney L | GREENE | Weekly RHU round conducted this date. Inmate had no questions or concerns. |
| 05/21/2021 | Kriger, Amanda Ann | GREENE | Screening rounds were completed for this individual from 05/17/2021 through 05/21/2021. |
| 05/14/2021 | Kriger, Amanda Ann | GREENE | Screening rounds were completed for this individual from 05/10/2021 through 05/14/2021. |
| 05/13/2021 | Kriger, Amanda Ann | GREENE | Seen by psychology staff for mental health contact. See Sapphire for documentation. |
| 05/13/2021 | Guyton, Michael Stanley | GREENE | Counselor round- Inmate talked about a property grievance that he submitted and did not receive pink slip. Provided another grievance form to resubmit. No other questions or concerns. |
| 05/11/2021 | Weeden, Shanda Marie | GREENE | AC placement seven day weekly review conducted this date. ICAR indicates appropriate level of counselor and MH coverage is occurring. No follow-up notification is necessary. |
| 05/07/2021 | Kriger, Amanda Ann | GREENE | Screening rounds were completed for this individual from 05/03/2021 through 05/07/2021. |
| 04/29/2021 | Schetka, Courtney L | GREENE | May telephone add on submitted. |


Inmate Name : **BROWN, GARTOR**                                     Inmate # : **NA6401**

| | Location : --- | | Counselor : N/A |

| | | | |
|---|---|---|---|
| 04/28/2021 | Schetka, Courtney L | GREENE | Weekly RHU round conducted this date. Inmate asked about being able to send money to his power of attorney who he reports is also his uncle. |
| 04/27/2021 | Guyton, Michael Stanley | GREENE | Legal Property Exemption approval for one(1) box; dockets CP-15-CR-0001977-2006, 19-CV-0839, 19-CV-0057, and 18-CV-1527, all open/active and inmate is ProSe; expires 10/26/2021. |
| 04/23/2021 | Kriger, Amanda Ann | GREENE | Screening rounds were completed for this individual from 04/19/2021 through 04/23/2021. |
| 04/22/2021 | Berdine, Kris Ann | GREENE | LATE PRC ENTRY 04/20/2021 Inmate attended PRC. States he will not go to GP and take a cellie. Continue AC status. |
| 04/20/2021 | Johnson, Gregory | GREENE | AC placement seven day weekly review conducted. ICAR indicates appropriate level of counselor and MH coverage is occurring. No follow-up notification is necessary. |
| 04/16/2021 | Kriger, Amanda Ann | GREENE | Screening rounds were completed for this individual on 04/12/2021 through 04/16/2021. |
| 04/16/2021 | Schetka, Courtney L | GREENE | Weekly RHU round conducted this date. Inmate had no concerns. |
| 04/14/2021 | Kriger, Amanda Ann | GREENE | Seen by psychology staff for mental health contact. See Sapphire for documentation. |
| 04/13/2021 | Berdine, Kris Ann | GREENE | LATE ENTRY PRC REVIEW 04/06/2021   Inmate attended PRC. Discussed status. Requesting self confinement. |
| 04/09/2021 | Brawdy, John A III | GREENE | Inmate was seen for screening rounds on 4/6/21, 4/8/21. Inmate indicated no perceptual disturbance at this time. |
| 03/29/2021 | Gustafson, Ian R. | FOREST | PRC 7 day review; Remain in AC status pending return to sending facility as a PC Unit failure. Inmate Brown continues to refuse a COVID test and will be transported directly by van. |
| 03/24/2021 | Gustafson, Ian R. | FOREST | PRC 7 day review; Remain in AC status pending return to sending facility as a PC Unit failure. Inmate cannot be transferred due to refusing COVID testing multiple times. |
| 03/24/2021 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate had no questions or concerns at this time. |
| 03/22/2021 | Crissman, Charles R | FOREST | PSS met with IM at his cell door during RHU rounds to provide psychological support. IM was cooperative and appropriate throughout the interaction. IM did not report any current self-harming ideations or intent. IM did not report any current SI/SA. PSS observed no concerning symptomology in regard to acute MH issues. IM declined an out of cell to discuss any MH concerns or issues and/or concerns. IM appears stable at this time per interaction. Nothing further. |
| 03/17/2021 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate stated he was fine and had no questions or concerns at this time. |
| 03/16/2021 | Gustafson, Ian R. | FOREST | PRC 7 day review; Remain in AC status pending transfer to sending facility as a PC Unit failure. Inmate cannot be transferred despite multiple trip dates approved due to continually refusing to take a COVID test. |
| 03/10/2021 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate stated he was fine and had no questions or concerns at this time. |
| 03/09/2021 | Gustafson, Ian R. | FOREST | PRC 7 day review; Remain in AC status pending return to sending facility as a PC Unit failure. A trip date has been established. |
| 03/05/2021 | Cowan, Kevin C. | FOREST | Inmate provided with therapeutic journal for narrative writing |
| 03/04/2021 | Gustafson, Ian R. | FOREST | PRC attempted to meet with Inmate Brown for a DC expire. He refused to meet with PRC. He was placed in AC status pending his approved transfer back to his sending facility as a PC Unit failure. |
| 03/03/2021 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate stated he was fine and had no questions or concerns at this time. |
| 02/23/2021 | Sheesley, Jodi Lynn | FOREST | Mental health review conducted. Inmate denied any mental health concerns, no SI. |
| 02/23/2021 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate stated he was fine and had no questions or concerns at this time. |
| 02/18/2021 | Darr, Steven Michael | FOREST | RHU rounds conducted on 02/17/2021. Inmate stated he was fine and had no questions or concerns at this time. |
| 02/09/2021 | Darr, Steven Michael | FOREST | RHU rounds conducted. Inmate stated that he was missing page 59 from his stimulus packet. Inmate had no further questions or concerns at this time. |
| 02/04/2021 | Gustafson, Ian R. | FOREST | PRC met with Inmate Brown for an AC 90 day review. Continue AC status pending approved PC Unit removal transfer. |



Inmate Name : **BROWN, GARTOR**                    Inmate # : **NA6401**

Location : ---                    Counselor : N/A

| | | | |
|---|---|---|---|
| 02/04/2021 | Sheesley, Jodi Lynn | FOREST | Inmate was seen out of cell for PRC review with psychology present. Inmate was informed that he has been approved for transfer to his sending institution. Inmate stated, "You have 4 months." He did not report any mental health concerns at this time, no SI. Inmate maxes out this summer. |
| 02/03/2021 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate had no questions or concerns at this time. |
| 01/28/2021 | Crowther, Michelle L | FOREST | RHU rounds conducted no concerns noted. |
| 01/28/2021 | Dietrich, Nathan John | FOREST | Inmate was seen in the RHU. He had no issues or concerns. |
| 01/26/2021 | Sheesley, Jodi Lynn | FOREST | Mental health review conducted. Inmate denied any mental health concerns at this time. No SI. |
| 01/22/2021 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate stated he was fine and had no questions or concerns at this time. |
| 12/31/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Due to the enhanced quarantine procedure he was not seen on this date. |
| 12/30/2020 | Swanson, Ryan J. | FOREST | RHU rounds conducted on this date. Inmate Brown was issued paperwork from the Attorney General's office and signed an acknowledgement confirming that he received it. He had no further concerns. |
| 12/28/2020 | Sheesley, Jodi Lynn | FOREST | Mental health rounds conducted. Inmate was seen moving as he lay on his bed, however, he did not acknowledge PSS at his door. |
| 12/23/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on 12/18/2020. Inmate stated he was fine and had no questions or concerns at this time. |
| 12/22/2020 | Swanson, Ryan J. | FOREST | I hand delivered 136 pages (68 pages double sided) of documents to inmate Brown on this date at the request of the Attorney General. Inmate Brown refused to sign the acknowledgement form confirming the delivery. He accepted the documents and had no further concerns. |
| 12/10/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate had no questions or concerns at this time. |
| 12/03/2020 | Crowther, Michelle L | FOREST | Unit team rounds could not be performed due to COVID restrictions on this unit on this date. |
| 11/25/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate stated that he thinks he is receiving his mail late. CC advised the inmate that this CC had no knowledge of what mail or when specific mail is brought to the institution. Inmate told this counselor that he would no longer be signing for the documents the Attorney General sends to the institution to be delivered to him. Inmate had no further questions or concerns at this time. |
| 11/18/2020 | Dietrich, Nathan John | FOREST | Inmate was seen in the RHU on this day. He had no issues or concerns. |
| 11/12/2020 | Gustafson, Ian R. | FOREST | PRC attempted to meet with Inmate Brown for an AC 90 day review. He refused to meet with PRC. |
| 11/04/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate stated that he hasn't been to law library in two months and has not been receiving request slips back in the mail from PRC. CC advised the inmate that he would contact to see if they received his request slips. |
| 10/28/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate stated he was fine and had no questions or concerns at this time. |
| 10/26/2020 | Sheesley, Jodi Lynn | FOREST | Monthly mental health review attempted. PSS knocked on inmate's cell door three times with no response. Inmate appeared to be sleeping. |
| 10/21/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate said that he was concerned about his legal mail. Inmate had no other questions or concerns at this time. |
| 10/16/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate asked for copies of the acknowledgment form for his paperwork that the attorney general sent in. CC advised the inmate that he would make contact and make sure that is something we can do. CC e-mailed Ms. Biel. |
| 10/13/2020 | Gustafson, Ian R. | FOREST | PRC 7 day review; Remain in AC status pending return to sending facility as a PC Unit failure. Inmate is approved for transfer and was scheduled to depart however, he refuses to participate in a COVID test. His petition has been placed in pending status. |
| 10/06/2020 | Sheesley, Jodi Lynn | FOREST | Monthly mental health review attempted. PSS knocked on inmate's cell door window as he lay in his bed. Inmate looked to see at his door and covered back up with out engaging with PSS. |

Inmate Name : BROWN, GARTOR                         Inmate # : NA6401

Location : ---                                      Counselor : N/A

| Date | Officer | Facility | Notes |
|---|---|---|---|
| 10/06/2020 | Gustafson, Ian R. | FOREST | PRC 7 day review; Inmate Brown is approved to transfer as a PC Unit failure. He continues to refuse COVID testing and cannot be transferred until he is compliant. Remain in AC status. |
| 10/06/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate stated that he was missing a document from the last set of paperwork that he received from the attorney general. CC advised the inmate that every piece of paper that was told to be given to him was included. Inmate continued to say that he was missing a piece of the paperwork and was contacting his attorney to make sure he received it with in the future. Inmate moved to the topic of a transfer. Inmate stated he will refuse to leave if it is somewhere that he has a lawsuit pending due to him maxing out in 6 months and does not want to get retaliated against. Inmate stated he was fine other than those things and had no further questions or concerns at this time. |
| 09/30/2020 | Crowther, Michelle L | FOREST | RHU visit held on this date.    Inmate had no concerns. |
| 09/29/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate stated he was fine and had no questions or concerns at this time. |
| 09/29/2020 | Gustafson, Ian R. | FOREST | PRC 7 day review; Inmate Brown is approved as a PC Unit removal. He is scheduled to depart next week. Remain in AC status. |
| 09/22/2020 | Darr, Steven Michael | FOREST | RHU rounds. Inmate stated he was fine and had no questions or concerns at this time. |
| 09/21/2020 | Gustafson, Ian R. | FOREST | PRC 7 day review; Inmate Brown is approved to return to his sending facility as a PC Unit failure. Continue AC status pending transfer. |
| 09/15/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate stated he never received his extra legal box. CC confirmed he was approved to receive an extra legal box and contacted K-Unit staff. Inmate had no further questions or concerns at this time. |
| 09/14/2020 | Gustafson, Ian R. | FOREST | PRC 7 day review; Remain in AC status pending review for PC Unit failure. |
| 09/09/2020 | Gustafson, Ian R. | FOREST | PRC 7 day review; Remain in AC status pending review for PC Unit failure. |
| 09/09/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate stated he was fine and had no questions or concerns at this time. |
| 09/03/2020 | Sheesley, Jodi Lynn | FOREST | Monthly mental health review attempted.  PSS knocked on inmate's cell door several times.  Inmate was laying on his bunk covered in a blanket with something covering his eyes.  PSS observed inmate move, however, he did not respond to PSS at his cell door. |
| 09/02/2020 | Gustafson, Ian R. | FOREST | PRC 7 day review; Remain in AC status pending review for potential PC Unit failure. Packet is approved and CC2 Darr will forward memo up to be routed to RDS. |
| 09/01/2020 | Dietrich, Nathan John | FOREST | Inmate was seen on this day in the RHU. Inmate claims he was approved an extra legal box and has not yet received it. CC emailed UM. He had no other issues or concerns during this visit. |
| 08/26/2020 | Gustafson, Ian R. | FOREST | PRC 7 day review; Remain in AC status pending processing for PC Unit failure. |
| 08/25/2020 | Dietrich, Nathan John | FOREST | RHU rounds conducted on this date. Inmate stated he was fine and had no questions or concerns at this time. |
| 08/20/2020 | Gustafson, Ian R. | FOREST | PRC attempted to meet with Inmate Brown for a DC expire. He refused to meet with PRC. He was placed in AC status pending return to his sending facility as a PC Unit failure. |
| 08/20/2020 | Sheesley, Jodi Lynn | FOREST | Inmate was offered out of cell for PRC review with psychology present and he declined. |
| 08/18/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate stated he was fine and had no questions or concerns at this time. |
| 08/11/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate stated he was fine and had no questions or concerns at this time. |
| 08/11/2020 | Darr, Steven Michael | FOREST | Per DC-46 dated 08/10/2020 inmate is to maintain H code due to current offense for assaulting an officer, fighting M/C and the several threatening misconducts he has received. |
| 08/04/2020 | Crowther, Michelle L | FOREST | RHU visit held on this date.  He had no issues or concerns. |
| 08/04/2020 | Darr, Steven Michael | FOREST | . RHU rounds completed on this date. Inmate refused to get out of bed and speak with this CC. |

Inmate Name : **BROWN, GARTOR**                    Inmate # : **NA6401**

Location : ---                    Counselor : **N/A**

| 08/04/2020 | Sheesley, Jodi Lynn | FOREST | Monthly mental health review conducted. Inmate looked to see who was at his door when PSS knocked and continued doing what he was doing. He did not verbally respond to PSS. |
|---|---|---|---|
| 07/30/2020 | Darr, Steven Michael | FOREST | Inmate was seen on 07/28/2020 for his yearly annual review. He was given notice 48 hours in advance. At this review the following information was reviewed and updated as required and the inmate provided input as needed. Current correctional plan (DC-43) reviewed and inmate refused to sign, program recommendations and risk/needs assessment were reviewed to ensure accuracy. Current CP shows recommendation for Outpatient (waiting) with no refusals making a PACT rating of Motivated/waiting during this rating period. PACT determined a CL 4. NOK (refused), Separations (none at this facility), ACT 185 of 2004 DNA (drawn Per RAP), ID photographs (last photo 03/11/2020), PREA Act of 2003 (pamphlet provided) / PRAT Assessment was refused, CVCF (paid). Re-Entry forms of ID status as follows: PA Photo ID/DL (refused), Social Security Card (refused) and Birth Certificate (refused). Identification forms in accordance with 7.3.1, and status in regard to Hard to Place Offender reviewed (inmate determined not to be HTP). Inmate received average housing report and is currently idle. Vote Sheet sent for H code review. Inmate stated that he was doing fine and had no further questions or concerns at this time. |
| 07/28/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on 07/21/2020. Inmate stated he was fine and had no questions or concerns at this time. |
| 07/16/2020 | Gustafson, Ian R. | FOREST | PRC attempted to meet with Inmate Brown for a DC 90 day review. He refused to meet with PRC. Continue DC status. |
| 07/16/2020 | Darr, Steven Michael | FOREST | Per approved vote sheet dated 07/13/2020 inmate is a PCU failure and approved for transfer back to sending institution at this institutional level due to fighting M/C and per policy. Transfer petition will be entered when Deputy Secretary of the Western Region return memo approving PCU failure and the Transfer. |
| 07/16/2020 | Sheesley, Jodi Lynn | FOREST | Inmate was offered out of cell for PRC review with psychology present and he refused. |
| 07/14/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate reported he was okay and had no questions or concerns at this time. |
| 07/07/2020 | Sheesley, Jodi Lynn | FOREST | Monthly mental health review attempted. Inmate was standing at his cell door when PSS arrived. When asked if he had any concerns, inmate looked to PSS then returned his attention back to the TV on the pod without saying anything. |
| 07/07/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate questioned about going to the law library. CC advised the inmate to make sure he wrote the lieutenant for law library. Inmate had no further questions or concerns at this time. |
| 06/30/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. CC attempted to give the inmate documents sent to the DOC from his Attorney. Inmate reported that he had already received them. He refused to sign or keep the documents at this time. Inmate stated he was fine and had no questions or concerns at this time. |
| 06/25/2020 | Dietrich, Nathan John | FOREST | RHU rounds completed on this date. Inmate stated he was fine and had no questions or concerns at this time. |
| 06/18/2020 | Darr, Steven Michael | FOREST | RHU rounds completed on this date. Inmate received documents on this date from this CC. Inmate stated that UM Perry advised him that this CC would accept request slips at the inmates door for other departments. CC e-mail UM Perry to confirm the inmates statement. Inmate was advised to write this CC for his legal exemption box. Inmate had no further questions or concerns at this time. |
| 06/17/2020 | Sheesley, Jodi Lynn | FOREST | Inmate was offered out of cell with PRT for mental health follow up. Unit staff reported to PRT that inmate verbally refused to attend. |
| 06/11/2020 | Sheesley, Jodi Lynn | FOREST | Monthly mental health review conducted. Inmate asked why he was not seen by PRT. PSS did not have an answer for him at his door. Inmate stated that he will not refuse to attend PRT. Referral made via email. Inmate did not go into detail as to why he wanted to see PRT. No SI reported or indicated. |
| 06/09/2020 | Dietrich, Nathan John | FOREST | RHU rounds conducted on this date. Inmate had no questions or concerns at this time. |
| 06/02/2020 | Darr, Steven Michael | FOREST | RHU Rounds conducted on this date. Inmate stated he was fine and had no questions or concerns at this time. |
| 05/26/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. Inmate had no issues or concerns to report at this time. |
| 05/21/2020 | Crowther, Michelle L | FOREST | RHU visit held on this date. Inmate had no issues or concerns. |

**Pennsylvania Department of Corrections**    06/27/2022

**Inmate Cumulative Adjustment Records**    kelhoke

Inmate Name : **BROWN, GARTOR**    Inmate # : **NA6401**

Location : ---    Counselor : **N/A**

| Date | Staff | Facility | Notes |
|---|---|---|---|
| 05/12/2020 | Darr, Steven Michael | FOREST | RHU rounds conducted on this date. CC provided colored photos to inmate per UM Perry. Inmate accepted and signed acknowledgment. Inmate stated he was fine and had no questions or concerns at this time. |
| 05/07/2020 | Sheesley, Jodi Lynn | FOREST | 5/6/20 Monthly mental health review conducted. See DC 560 for more information. No SI. |
| 05/06/2020 | Darr, Steven Michael | FOREST | RHU Rounds conducted on 05/05/2020. Inmate stated he was fine and had no questions or concerns. |
| 04/28/2020 | Darr, Steven Michael | FOREST | RHU Rounds conducted on this date. Inmate stated he was fine and had no questions or concerns at this time. |
| 03/31/2020 | Darr, Steven Michael | FOREST | Inmate was seen today for his phase review (UM Crowther and Sgt. Kopchick present) on this date. Inmate stated that he would like to get a transfer so he can complete his Outpatient when he completes the program. Inmate was advised that he would advance to phase 1 on this date. |
| 03/13/2020 | Zofcin, Paul J Jr | FOREST | SUD note- IM requested to have refusal for OP to be removed. He is no longer refusing. |
| 02/05/2020 | Dietrich, Nathan John | FOREST | Met with inmate this date for IRC. The Initial Security Threat Evaluation was completed this date and forwarded to Security and his escape risk status was reviewed. He was advised of Visiting and Telephone List approval procedures. His outside clearance eligibility was reviewed, he is not eligible due to being placed on the PCU. His Emergency Contact, General Info., Security Concerns Screen, and Review Dates were updated in the UMS. H Code assigned, vote sheet routed to review. His DC-43 was reviewed and he was given a copy. His RRRI status was reviewed. His VCF was reviewed. His foreign national status was reviewed. He was given a PREA flyer. Inmate has been briefed on the procedures on the PCU, given a copy of the block rules, and was advised on how to contact or address issues with the Unit Team. PRAT Assessment completed. He had no issues or concerns during this interview |
| 01/27/2020 | Dietrich, Nathan John | FOREST | Inmate attended Orientation in the EB dayroom. PREA video was shown and PREA Inmate Education Verification Form was completed on this day. The group did not have any questions or concerns during this orientation. |
| 01/15/2020 | Case, Jeffrey S | FOREST | PSS gave inmate a CBT coping skills packet. |
| 01/08/2020 | Case, Jeffrey S | FOREST | Inmate Brown was seen by psychology. Inmate indicates he is currently experiencing mental health concerns. Inmate established and maintained eye contact. Inmate presents with a dysphoric mood as evidenced by anxious feelings. Inmate had a flat affect. His tone was conversational. Inmate is oriented to person, place and time. Inmate denies thoughts of suicide or harm to others. His thoughts are logical and goal directed. Please see DC-560 for more information. |
| 12/27/2019 | Beck, Michael L | HUNTINGDON | Per Vote Sheet Dated 12/13/2019 Inmate was NOT given institutional support for parole. He is on the March 2020 Docket. |
| 12/24/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Royer. He discussed the request to staff from last week again and said he did not get it back yet but really needs it back. He said he has a list of concerns today but cannot find his request slip at this time. I asked to tell me but he declined. I asked if he was okay right now or does he have issues that need immediate attention. He paused and said he does not know how to answer that because he does not want me to document that he does not. I asked him if he needed me to call medical or psych for immediate attention. He said no and denied being in immediate distress. I told him that he can put the request slip in the mail like all other inmates. I also informed him that the PCU process is continuing to move forward. He did not have any other questions or concerns to discuss today. |
| 12/23/2019 | Richards, Marilyn L | HUNTINGDON | PCU Placement Teleconference with UM Crowther at SCI Forest. Major Lechner, RHU Captain House, UM Goss, CC2Gochnour, and this CC2 were all present for the teleconference and answered questions about Inmate Brown. |
| 12/19/2019 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: Continue AC status pending transfer. |
| 12/19/2019 | Conway, Trista Dawn | HUNTINGDON | (RHU late entry for contact on 12/18/19) met with inmate for routine RHU contact, he verbally denied SIB/SI/HI. He was standing at cell door when this PSSC arrived, but declined offer for out of cell. He denied having any MH concerns to address at this time. No acute emotional distress apparent. Supportive counseling was offered. He was instructed to write this PSSC a request slip should he change his mind prior to the routine 30 day contacts. |



**Inmate Name : BROWN, GARTOR**                                    **Inmate # : NA6401**

Location : ---                                                    Counselor : N/A

| | | | |
|---|---|---|---|
| 12/19/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door. He discussed the request form from last week and asked for a copy of it back. He said he knows that I cannot address the issues but just wants it to be acknowledged. He was informed that the PCU process is moving forward. He did not have any other questions or concerns to discuss today. |
| 12/13/2019 | Richards, Marilyn L | HUNTINGDON | Vote sheet circulating for March 2020 Parole Docket. |
| 12/12/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown and accompanied by CC2 Beck. He handed out a white sheet of paper and said that it was a request for this CC2. I told him to send it in the mail like all other inmates. He said he received permission because his mail is being tampered with. I told him again that he could put it in the request box like everyone else. He said he has an urgent concern to report. I did take the paper in case it related to an immediate issue. The request form did not contain a question. He did not have any other questions or concerns to discuss today. |
| 12/12/2019 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: (Deputy Brumbaugh, Deputy Walters, Major Kohler CCPM Spyker, UM House): Inmate was continued on AC status pending transfer. |
| 12/09/2019 | Spyker, Jill J | HUNTINGDON | Grievance #831973 was addressed. Response forwarded to CSA Green for final review and signature. Inmate will be forwarded his response. |
| 12/05/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown. He was standing at his door while I was making rounds on his quad. He said "Ms. Richards, I'm good" and slid a request form through the door. I asked if he had any questions and he moved the paper in the door. I did get the request slip which outlines his concerns with how he will be transported if he is approved for a transfer. |
| 12/05/2019 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: Continue AC status pending transfer. |
| 11/27/2019 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: Continue AC status pending transfer. |
| 11/26/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown. He was standing at his door while I was on D-Quad and yelled "I'm good Ms. Richards". I responded "okay Brown" to acknowledge him and then continued my rounds. |
| 11/22/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown. He was standing at his door while I was on D-Quad and yelled "I'm good Ms. Richards". I said okay and continued my rounds. No concerns. |
| 11/21/2019 | Conway, Trista Dawn | HUNTINGDON | (RHU contact) met with inmate for routine RHU contact and for MH evaluation for purpose of completing Protective Custody Unit referral. He verbally denied . SIB/SI/HI. No acute emotional distress apparent. He declined offer for out of cell session, choosing to speak at cell door. He reported no current issues/concerns to address with this PSSC. He also declined offer to participate in evaluation and was agreeable to this writer completing this based on case file review. No further concerns noted. He was instructed to access Psychology dept. in RHU if any concerns or issues arose. |
| 11/20/2019 | Richards, Marilyn L | HUNTINGDON | DC-97 sent for an evaluation for PCU Placement. |
| 11/20/2019 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: (Deputy Brumbaugh, Deputy Walters, Major Kohler, UM George, UM House): Inmate Brown was moved to AC status today pending PCU placement. Inmate Brown agreed and signed the PCU placement agreement. Inmate had no concerns. Move to AC status. Next review: 2/5/20. |
| 11/19/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door after being notified that he wants to participate in the PCU Program after having had several days to review the program packet. This CC2 and PSS Diehl met with Inmate Brown to have him review and sign the PCU Acknowledgement. Inmate Brown handed this CC2 a DC-135A in which he said he would like to sign into the PCU Program but just wanted to be handed the form to sign without talking about it for fear of harassment by other inmates. After he had the acknowledgement form, he said he was not comfortable signing it today because the form states under #5 that he understands that he may be doubled celled while in the program. I reminded him that he did review the packet which indicates that the goal is work with him based upon his needs. We discussed him attending the review with PRC tomorrow to sign the acknowledgement form. |
| 11/14/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown and accompanied by CC2 Beck. He said he is "good" and did not have any questions or concerns. I asked him again about going to the PCU. He said that he wants to review more information about it and will let me know when he makes a decision. |

Inmate Name : **BROWN, GARTOR**                              Inmate # : **NA6401**

Location : ---                                            Counselor : **N/A**

| | | | |
|---|---|---|---|
| 11/07/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown and accompanied by CC2 Beck. When we arrived at his door, he announced that he was using the toilet so we left. We returned approximately 20 mins. later and met with him at his cell door. I asked him if he reviewed the PCU Program Information provided to him yesterday and if he is interested in participating in the program? He did not answer and held up his finger to "wait a minute." He walked over to his desk and wrote on a piece of paper. He held the paper to the door for us to read that he will have to talk to the RHU Captain to get more information about it because other people are listening to what is said at his door. I asked him if he wanted to sign the acknowledgement form or not? He declined. He did not have any other questions or concerns to discuss today. |
| 11/06/2019 | Richards, Marilyn L | HUNTINGDON | Correction to last entry: RHU contact with Inmate Brown at his cell door and accompanied by CC2 Mingle to give him some basic information about the PCU so that he can decide if he wishes to voluntarily participate in the program. I told him to think about it before I will meet with him tomorrow. And if he wants to participate, he can sign the PCU Acknowledgement Form tomorrow. He was eager to give this CC2 two requests to staff which do not have any questions or request. Both are to record/document he legal mail and mail correspondence. |
| 11/06/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Miller at his cell door and accompanied by CC2 Mingle to give him some basic information about the PCU so that he can decide if he wishes to voluntarily participate in the program. I told him to think about it before I will meet with him tomorrow. And if he wants to participate, he can sign the PCU Acknowledgement Form tomorrow. He was eager to give this CC2 2 requests to staff which do not have any questions or request. Both are to record/document he legal mail and mail correspondence. |
| 10/31/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Chamberlain. He said he is "good" and asked if I received the request forms he sent. I told him that I did but he did not ask any questions so they did not require a response. He indicated that he would like them acknowledged as received. He also talked about having issues with his toilet overflowing. He said the will send a request to staff if he has any concerns for this CC2. No concerns at this time. |
| 10/25/2019 | Conway, Trista Dawn | HUNTINGDON | (RHU contact late entry for 10/24/2019) met with inmate for routine RHU contact. He verbally denied SIB/SI/HI. He was encouraged to present to cell door, but chose to remain sitting on top bunk and stated "I have nothing to talk about today." No acute emotional distress was apparent. Supportive counseling offered. Inmate instructed on how to access Psychology dept. if further contact is needed. |
| 10/18/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by UM/Captain House. He said he is "good" and asked if I spoke to his uncle. I told him that I did not and that the only time I spoke to his uncle, he was notified. He had 2 request slips address to this CC2 relating to his mail, grievances and PREA. The information was forwarded to the appropriate staff. He did not have any other questions or concerns to discuss today. |
| 10/10/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. He said he is "good" and that he received the responses to the request forms he sent this CC2. I asked him if things have changed based upon the request slips. He said they have, and he is no longer having those issues in the Law Library. He also discussed wanting to withdraw a grievance he file about mail. He also asked if a call could be placed to his uncle to have his dad put money on his books. |
| 10/03/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. He said he is "good" and he submitted 3 different requests to staff regarding questions and concerns. He did not have any other questions or concerns to discuss today. |
| 09/26/2019 | Conway, Trista Dawn | HUNTINGDON | (RHU contact) met with inmate for routine RHU contact, he declined offer for out of cell session and chose to speak at cell door. He verbally denied SIB/SI/HI. No acute emotional distress apparent. He reported to be feeling "a little down, but you know the usual for me." He was offered supportive counseling and an opportunity to further process this but declined to do so. He was instructed to write this PSSC a request slip if he should change his mind about accepting an out of cell and willingness to process this further, to which he was agreeable to. |
| 09/26/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Royer. Inmate Brown said that he sent me a request because he does not want to discuss his business at the door where other inmates can hear. He also said he sent me one for Deputy Brumbaugh because he is not getting any responses back from administration. He did not have any other questions or concerns to discuss today. |


Inmate Name : **BROWN, GARTOR**                                     Inmate # : NA6401

Location : ---                                                      Counselor : N/A

| | | | |
|---|---|---|---|
| 09/24/2019 | Richards, Marilyn L | HUNTINGDON | On 9/13/2019, a vote sheet was routed for December 2019 Parole Docket because the previous vote sheet has expired. He was on the March 2019 Parole Docket, moved to the July 2019 Parole Docket and now on the December 2019 Parole Docket because of having DC time. The vote sheet was signed off on 9/23/2019 and indicated no support for parole, RSO or THU. Inmate Brown will be notified during RHU rounds this week. |
| 09/19/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. He said he is "good" and that he would send a request form about obtaining a state identification card. He did not have any other questions or concerns to discuss today. |
| 09/12/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Royer. Inmate Brown said that his 90 days in his current cell are up but he does not want to be moved to the 2nd level of the quad because of back pain he has when climbing the stairs while being escorted with a tether. He did not have any other questions or concerns to discuss today. |
| 09/11/2019 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: (Deputy Brumbaugh, Deputy Walters, Major Kohler, Major Lechner, UM George, UM House): Inmate was seen for a 90 day review. Inmate was encouraged to remain misconduct free. Inmate had no concerns. Continue DC status. Next review: 12/4/19. |
| 09/05/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. When we arrived, a CPS worker was there talking to him so we waited for him to leave. Inmate Brown discussed receiving a letter from his uncle about his father traveling out of the country so they were unable to visit. He is hopeful that he will get another letter soon with information about getting a visit. He was encouraged to refrain from getting misconducts so the unit team can continue to support him for the visit. Inmate Brown denied having any issues or concerns at this time. |
| 08/29/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. Inmate Brown was notified that a call was placed to his uncle to notify him that the visit was approved but he has not returned my call. Inmate Brown discussed having issues with his mail and said that he received a cash slip charging him for mailing envelopes but he received the 3 grievances back. He acknowledged that he already addressed it with out staff members. |
| 08/26/2019 | Conway, Trista Dawn | HUNTINGDON | (RHU OOC contact) met with inmate in RHU strip cage for OOC contact due to his reports to unit officer he was going to hang himself. S=B. He reported to this PSSC that this is "just my mood" and would not identify any source or trigger for the change. He then reported that he is "sick of people not doing their job" but denied this to have anything to do with his current reported mood. He refused to process mood any further with this PSSC. Psychiatry was contacted via telephone and met with inmate for further assessment. |
| 08/23/2019 | Richards, Marilyn L | HUNTINGDON | This CC2 placed a call to Inmate Brown's Uncle, Omentus Korlison (804) 246-3580. I left a voice message that a visit has been approved and to return my call with the date he plans to visit so notifications can be made. |
| 08/23/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. Inmate Brown was notified that he was approved for a 2 hour visit with his father and uncle but he has to refrain from getting misconducts or it can be revoked. He indicated that his uncle wrote to him about sending some money through JPay but he has not received any receipt of it. I checked his account before leaving the RHU and informed him that there has not been any received to date. Inmate Brown did not have any other questions or concerns to discuss today. |
| 08/16/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by PSA Conway. Inmate Brown was given 2 grievances per RHU UM. I asked if he received the response to the request form I sent back to him yesterday. He said that he did. I encouraged him to refrain from getting any misconducts and that he would be notified when a decision has been made. He shook his head yes and said "I'm chillin". |
| 08/09/2019 | Conway, Trista Dawn | HUNTINGDON | (RHU cell door) met with inmate for routine RHU contact, he declined offer for out of cell reporting he does not believe discussing his MH issues with this writer would be beneficial because it will not result in the outcome he wants. Inquiry was given into his goal related to Psychology contacts, and he responded with "to get my D code and I know that you can do nothing." He was offered supportive counseling/therapeutic interventions for any MH symptoms he may be experiencing, but declined these. No acute emotional distress apparent. He verbally denied SIB/SI/HI. Inmate was instructed on how to access Psychology staff in the RHU if needed. |
| 08/09/2019 | Richards, Marilyn L | HUNTINGDON | Vote sheet circulating for exception to DC ADM 812 for a special visit with uncle and father. |

Inmate Name : BROWN, GARTOR                        . Inmate # : NA6401

    Location : ---                                      Counselor : N/A

| | | | |
|---|---|---|---|
| 08/09/2019 | Richards, Marilyn L | HUNTINGDON | Inmate Brown's Uncle, Omentus Korlison (804) 246-3580 and left a voice message to return my call to follow up about visiting the last week of August. |
| 08/09/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by PSA Conway. Inmate Brown was notified that his Uncle, Omentus Korlison called yesterday about coming for a visit the last week of August and bringing Inmate Brown's Father, Ivan Brown with him. Inmate Brown seemed surprised that he contacted me and paused for a few seconds. He said that he would like to have a visit with them and that is the reason he asked about a visitor list yesterday. I told him that I will be returning a call to his uncle today after we talk about the visit because they will be making a long drive for video visit as a result of Inmate Brown being in DC status. Inmate Brown indicated that he would like to request a special visit because both men are influential to him. He was given the information to complete the visitor add on form and advised that a vote sheet would be generated for consideration for a special non-contact visit. |
| 08/08/2019 | Richards, Marilyn L | HUNTINGDON | Received a call from Inmate Brown's Uncle, Omentus Korlison. Mr. Korlison wanted to know about getting a phone call with his nephew to provide information to be added to his approved visitor's list. He was advised that Inmate Brown is in the RHU and his privilege to use the phone is restricted at this time but he can send and receive letters. Mr. Korlison and Inmate Brown's Father, Ivan Brown want to visit him the last week of August and needed to provide their address and birth dates for the visitor form. I informed him that it would be via video due to him being in the RHU and suggested the new video visitation instead of making the drive to Huntingdon. I did take his personal information and forwarded it to Inmate Brown via DC-134. I explained that I would talk to Inmate Brown tomorrow about the visits and return a call to Mr. Korlison about visit. |
| 08/08/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. Inmate Brown asked how many visitors he can add to a visitor list and if UM/Captain House could be notified that he wants a grievance. He said he will send a request to staff if he has any other questions or concerns. |
| 08/01/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by PSA Conway. Inmate Brown said he did not have any questions or concerns to discuss today. He said that he sent a request form out and asked if I received it. He was informed that it was received and forwarded to the appropriate staff. He repeated that he does not have any concerns and will send a request to staff if he does have concerns. |
| 07/29/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by UM/Captain House. Inmate Brown discussed a request to staff he sent about some grievances. He was informed that he should receive the response today as it has been answered. He denied having any immediate concerns and said he would send a request to staff if he does have any concerns. |
| 07/24/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. Inmate Brown said that his only concerns are that he never received responses to 3 grievances yet and no one got back to him. He did not have any other questions or concerns to discuss today. |
| 07/19/2019 | Richards, Marilyn L | HUNTINGDON | Annual H Code Review: Continue H Program Code per vote sheet dated 7/18/2019. |
| 07/18/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. Inmate Brown was notified of his annual review and given a copy of his correctional plan. He said that his only concerns are that he never received responses to 3 grievances he listed on a previous DC-135A. He did not have any other questions or concerns to discuss today. A Grievance Coordinator was in the RHU during my rounds and said there is nothing pending for him but she would double check the numbers he listed. Inmate Brown was notified. |
| 07/12/2019 | Conway, Trista Dawn | HUNTINGDON | (RHU contact) met with inmate at RHU cell door for routine contact, but he chose to not present at cell door and just stood in the cell staring at this PSSC when inquiry was given into his well-being. Multiple attempts were made to engage in inmate, but he continued to be uncooperative. Supportive counseling was offered. |

Inmate Name : **BROWN, GARTOR**    Inmate # : **NA6401**

Location : ---    Counselor : **N/A**

| | | | |
|---|---|---|---|
| 07/11/2019 | Richards, Marilyn L | HUNTINGDON | Annual Review conducted this date with Inmate Brown in abstention due to long term RHU placement. His Correctional Plan, Emergency Contact, and Custody Level were all reviewed and updated as needed. His current custody level is 5 and H program code is assigned due to his assaultive behavior toward staff. He is refusing to participate in programming (Outpatient). He is not eligible for RRRI. There is an ICE Detainer listed for deportation. There are no separations listed and no known STG affiliations or escape concerns noted. He does have a housing concern listed. His CVCF obligation will need to be verified with inmate accounts. He received 19 misconducts this review period. He currently housed in the RHU where he earned an average housing report and is unassigned. He does not have any forms of identification secured with the institution at this time. Inmate Brown will be notified of this annual review and given an opportunity to ask questions about it. <br> Corrections Counselor _ _ _ _ _ _ _ _ _ _ <br> Unit Manager _ _ _ _ _ _ _ _ _ _ |
| 07/11/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. Inmate Brown said he received my response to his request and thinks I misunderstood his request. He clarified that he did not get the 3 grievances he listed back. Inmate Brown said he would send me a request if he has other concerns. He did not have any other questions or concerns to discuss today. |
| 07/02/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. Inmate Brown said he has concerns about an officer working in the RHU that Brown had issues with. He also discussed not getting his grievances back or any responses his requests forms. Inmate Brown said he would send me a request if he has other concerns. He did not have any other questions or concerns to discuss today. |
| 06/27/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. Inmate Brown asked if there is any policy changes to the 804 and was directed to write to Ms. Wakefield for grievance questions. Inmate Brown did not have any other questions or concerns to discuss today. |
| 06/20/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown. He was using the Law Library when CC2 Beck and I attempted to meet with him. He put his hand up and pulled it in a direction, across his throat and said that he did not have any questions or concerns to discuss today. |
| 06/19/2019 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: (Deputy Brumbaugh, Deputy Walters, CCPM Spyker, UM House): Inmate was seen for a 90 day review. PRC discussed inmate's recent misconducts. PRC encouraged inmate to remain misconduct free. Inmate had no concerns. Continue DC status. Next review: 9/11/19. |
| 06/14/2019 | Conway, Trista Dawn | HUNTINGDON | (RHU contact) met with Mr. Brown at RHU cell door, he declined offer for out of cell session at this time reporting he would prefer to not interact with officers to come out of cell. He reported he was comfortable to speak at cell door. No acute emotional distress apparent. He discussed and processed medical related concerns and did confirm he has been seen by nursing and a P.A. He was encouraged to continue to work with medical staff as needed. Supportive counseling provided. No further concerns reported. He verbally denied any thoughts/feelings that are suicidal or homicidal in nature upon direct inquiry from this PSSC. |
| 06/13/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by COT B.C. Smith. He attempted to pass a request slip for this CC2 and was told that he needs to put in the mailbox when he is out of his cell for yard, showers or library. He pulled the request slip back into his cell. When asked if he had any questions or concerns to discuss today, he would not respond. No further discussion. |
| 06/06/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown. He was using the Law Library and shook his head yes when I asked him if he was good. |
| 06/05/2019 | Conway, Trista Dawn | HUNTINGDON | (RHU out of cell contact) met with inmate for routine out of cell RHU contact while inmate was in law library. He verbally denied SIB/SI/HI. No acute emotional distress apparent. Supportive counseling offered. He denied any current issues/concerns to address. |
| 05/30/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CO Reed. When asked if he had any questions or concerns to discuss today, Inmate Brown immediately said "I asked you not to bring a CO to my door". I responded that I have to have a staff member with me. Brown alleged that the Captain told him that it is a conflict of interest for me to bring a CO and kept repeating that he does not want a CO at his door. I asked him again if he had any questions today and he continued to lecture about bring a CO to his door. Nothing further discussed. |



Inmate Name : **BROWN, GARTOR**                                 Inmate # : **NA6401**

Location : ---                                              Counselor : **N/A**

| | | | |
|---|---|---|---|
| 05/23/2019 | Grimme, Mark A | HUNTINGDON | Weekly RHU visit. Inmate given opportunity to ask questions and express concerns. Inmate gave this counselor two request slips for counselor Richards. The one was addressed to Capt. House. Inmate Brown reported he wanted counselor Richards to give it to him. The other was addressed to her. Neither looked inappropriate when scanned over by this counselor. He was polite but evasive. No other issues. |
| 05/16/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. He was given the responses to the request forms he submitted last Thursday. He said he did not have any questions today and would send another request to staff if he does. |
| 05/09/2019 | Richards, Marilyn L | HUNTINGDON | A call was placed to Inmate Brown's Uncle (Omentus) at 804-246-3580 to ensure Inmate Brown of his uncle's wellness only. On the 3rd ring, a message was prompted that the number does not have a voice mailbox set up and said goodbye. |
| 05/09/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. Inmate Brown handed this CC2 2 separate requests (DC-135A) and said that I can just call out his name instead of knocking on his cell door during my rounds. One request form discusses his privacy issues with talking at his cell door and said this the request will justify any misconception pertaining to my weekly log from 1/14/2019 to now, in case he takes legal actions outside of the grievance systems because my log would contradict the grievance system. The other request was to call his uncle (Omentus) at 804-246-3580 because Brown wrote to him on 3/08/2019, 4/08/2019, and 4/23/2019 but did not get a response. He wants his uncle to send him $200.00. Copies of both requests (DC-135A) are in the DC-14. |
| 05/07/2019 | Conway, Trista Dawn | HUNTINGDON | (RHU contact) met with inmate for routine RHU contact, he was sitting on top bunk when this PSSC arrived to his door. He was asked to come down to the door to speak with this PSSC. He shook his head no. He was then asked if needed to come out of cell to address any issues/concerns. He again shook his head no. He was asked if he is experiencing any thoughts or feelings that are suicidal or homicidal in nature upon direct inquiry, he shook his head no to this again. He was encouraged one additional time to present to cell door but shook his head no. Contact ended at this time. No acute emotional distress was noted during contact. |
| 05/02/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Grimme. He was standing on something at his door again this week that made him look down on us. Inmate Brown said that other counselors are giving their inmates emergency calls, and he would like one to his family because he has not heard from them or received anything from them through JPAY. I asked if the family member is his listed emergency contact to make a wellness check. He said it is not the person listed. He was directed to send me the information on a request slip for consideration. He said that he does not like to send request slips because they have to go through the RHU "Bubble" and he don't trust people here with his request slips. He went on to explain that he wants to send them to express that he is unhappy in the RHU in case of litigation. Brown said when his case goes to litigation, my notes will be part of the record and "they" can say that he never expressed any issues to his counselor the 20 plus time she met with him. He also said he can not discuss his issues at his door because people are listening. I asked him about a request to withdraw grievance # 790899 and explained that it was for not getting mail with the reference numbers on them. He said he has never met with anyone about it and that no one should have put this CC2 in the middle of it. I explained that it is part of the process for the counselor to verify any withdraw. Inmate Brown said that he received some medical records and other mail from Smart Communications without numbers copied on them. He made it clear on 3 separate occasions during the interview that he does not wish to withdraw the grievance. |
| 05/01/2019 | Richards, Marilyn L | HUNTINGDON | Vote sheet circulating for July 2019 Parole Docket. |
| 04/25/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. He was standing on something at his door that made him look down on us. Inmate Brown said he don't have any questions at this time and will send a request to this CC2. He was notified that his DC max date is currently 8/08/2019. |
| 04/18/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. Inmate Brown said he don't have any questions at this time and will send a request to this CC2. |


**Inmate Name : BROWN, GARTOR**

**Location : ---**

**Inmate # : NA6401**

**Counselor : N/A**

| | | | |
|---|---|---|---|
| 04/11/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Gochnour. Inmate Brown said he does not have any questions or concerns to discuss today and will send a request to staff, if he does. |
| 04/10/2019 | Yost, Megan M. | HUNTINGDON | Addressed appeal for misconduct D339295; upheld and forwarded for signatures-MMY |
| 04/09/2019 | Conway, Trista Dawn | HUNTINGDON | (RHU contact) met with inmate for routine RHU contact, he declined offer for out of cell session reporting he has no issues/concerns to address at this time. He verbally denied SIB/SI/HI. No acute emotional distress apparent. Supportive counseling offered. |
| 04/08/2019 | Spyker, Jill J | HUNTINGDON | Remanded grievance #784274 was addressed and forwarded to Ms. Wakefield, AO for final review and signature. Inmate provided with grievance response. |
| 04/04/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. Inmate Brown said he did not have any questions or concerns today. |
| 03/28/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck. Inmate Brown asked why he has not been seen by Parole. I explained that he was pushed to the July Docket because he has DC time which is standard practice. He alluded to being "an exception" because Parole meets with other inmates with DC time. He was given the name of his Parole Agent and directed to write to him to find out when he will be seen. Inmate Brown did not have any other questions or concerns to discuss today. |
| 03/27/2019 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: (Deputy Brumbaugh, Deputy Walters, CCPM Spyker, Major Lechner, UM House): Inmate was released to population with recommendation from security. CL:4H |
| 03/21/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door, accompanied by CC2 Beck. Inmate Brown said that he provided the wrong case number last week when he was asking about legal mail and wanted to provide another number. He was directed to send a request slip (DC-135A). He said okay and did not have any other questions or concerns to discuss today. |
| 03/14/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Grimme. Inmate Brown asked about being seen by PBPP this month and discussed receiving 3 separate pieces of legal mail on the 12th but thinks he should have received a Court Order for Case#19CV0057. He did not have any other questions or concerns to discuss today. |
| 03/11/2019 | Conway, Trista Dawn | HUNTINGDON | (RHU contact) this PSSC attempted to meet with inmate at his RHU cell door for routine contact. He approached cell door but would not verbally acknowledge this writer when attempts were made to inquire into his current well-being. No acute emotional distress was apparent. |
| 03/07/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CO1 McMahon. Inmate Brown told Officer McMahon that he does not wish to talk to this CC2 with an officer present. Brown was directed to send a request to staff if he has any issues. |
| 03/01/2019 | Richards, Marilyn L | HUNTINGDON | Late entry due to lockdown. RHU contact with Inmate Brown at his cell door and accompanied by CC2 Beck on 2/28/2019. Inmate Brown wanted to discuss the response I sent him on his request to staff about not receiving his legal mail. He was informed that I did look into the matter with Security as they distribute legal mail and was notified that the mail was handled in accordance with DC ADM 803. Inmate Brown demanded that in the future, the response be more specific and name staff members I talk to. He alleges that he received legal mail from Laurie Faisen, Paralegal through Smart Communications and the date was cut off of the letter when it was copied so he cannot determine the turn around time for getting mail. He also alleged that it hurt him on his discovery. Inmate Brown did not have any other questions or concerns to discuss . |
| 02/21/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown, accompanied by COT Little. Inmate Brown indicated that he sent a request to staff to this CC2 and will send another with any issues he has because he does not wish to speak with me if an officer is present. He said "no offense" against CO Little but he prefers to speak to me when another counselor is present. Brown then reiterated that he would send a request to me if he has any issues. Nothing further discussed. |
| 02/21/2019 | Gerholt, Jennifer J | HUNTINGDON | Late Entry PRC Review for 2/20/19: (Deputy Brumbaugh, Deputy Walters, CCPM Spyker): Inmate will be released to population on 2/26/19 with recommendation from security. CL:4H |
| 02/14/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown and accompanied by CC2 Beck. Inmate Brown alleged that he has not received his mail for the last 2 weeks and is concerned about Court deadlines. He also discussed being seen by Ms. Conway for his psychology needs. He did not have any other questions or concerns to discuss today. |

**Pennsylvania Department of Corrections**

**Inmate Cumulative Adjustment Records**

06/27/2022

kelhoke

Inmate Name : **BROWN, GARTOR**                    Inmate # : **NA6401**

Location : --                    Counselor : **N/A**

| | | | |
|---|---|---|---|
| 02/13/2019 | Conway, Trista Dawn | HUNTINGDON | (RHU contact) met with Mr. Brown at RHU cell door for routine RHU 30 day contact. He declined offer for out of cell session reporting he did not think that this PSSC could assist him with obtaining medication management so he chose to have contact at door. He was preoccupied with discussing wanting medications but did not report any specific MH related symptoms upon inquiry from this PSSC. He denied any thoughts/feelings that are suicidal or homicidal in nature upon direct inquiry. No acute emotional distress apparent. Supportive counseling provided. |
| 02/07/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown and accompanied by CC2 Grimme. Inmate Brown discussed being told by someone in Psychology that he would be seen by a Psychiatric Doctor because he has issues with being seen by a Psychiatric Nurse. Contact was made with LPM Goss and Ms. Cousins, MHM | CRNP, PMHNP-CC to find out if he was referred to or is scheduled with a doctor. Both indicated that he was not. |
| 02/05/2019 | Swartz, Michael Todd | HUNTINGDON | Grievance response #781667 completed and forwarded to the CSA |
| 02/01/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown and accompanied by CC2 Grimme. Inmate Brown discussed wanting a second meeting with the CCPM, not getting a copy of the final decision paper for a misconduct he received for lying to an employee on 1/09/2019, and wanting a transfer to anther institution. He did not have any other questions or concerns to discuss today. |
| 01/24/2019 | Grimme, Mark A | HUNTINGDON | Weekly RHU visit. Accompanied Ms. Richards CC2 to see this inmate. Brown discussed wanting a copy of the vote sheet that denied him a Z-code. He was informed by Ms. Richards that he can not be given a copy of the vote sheet however, if he sent her a request she would write he was denied via the vote sheet process. He mentioned he was supposed to meet with the CCPM regarding a final determination of a misconduct he received on 12/11/2018. This did not occur because of his current situation. He discussed this current misconduct of Refusing To Obey an Order which was for him to move to AA-Unit on 01/14/2019. He became argumentative that he should not have received it since he had threatened to hang himself to go to the POC. Ms. Richards explained to him he was security housed not Psych housed. Brown became loud and hyperverbal towards this writer and Ms. Richards saying " No one is safe around here; not staff; not inmates; no one! " Ms. Richards made him aware that if he was making a threat towards one of us, he would receive another misconduct. He lowered his voice and spoke directly to this counselor at that point stating " I'm not threatening you two. " He went on to say that if he wanted to harm Ms. Richards he had chances to since he has been in her office and had a chance to if he wanted. He went on to saying he writes Grievances and has put Ms. Richards in other grievances and may have to include her again for this misconduct. He went on further to say that Administration promised him a single cell then took it away from him. He has filed several lawsuits  with the state and they will be settled after he leaves prison. He stated he is ok with maxing his remaining sentence from the RHU. This counselor encouraged him to focus on parole. Ms. Richards encouraged him to work with PRC. He replied he wanted to transfer. Ms. Richards told him to express this to PRC. He replied ok. We ended the visit. |


**Inmate Name : BROWN, GARTOR**

**Inmate # : NA6401**

Location : ---

Counselor : N/A

| | | | |
|---|---|---|---|
| 01/24/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door, accompanied by CC2 Grimme. Inmate Brown discussed his z code denial and asked for a copy of the vote sheet or something to show he was denied. He was informed that he cannot be given a copy of the vote sheet but could send a request to staff to verify the denial. He also discussed meeting with the CCPM to get a copy of the final determination of an investigation in which he was issued a misconduct for on 12/11/2018. He indicated that he was to have another meeting with the CCPM but was moved to the RHU before the meeting occurred. His final issue/concern was with this CC2 regarding the misconduct for Refusing to Obey an Order to move to AA Unit on 1/14/2019. He argued that he should not have received the misconduct because he threatened to hang himself to go to POC and the misconduct does not specifically address it. This CC2 explained to him that he was Security Housed, not placed in POC. Inmate Brown immediately went from talking to this CC2 to yelling at me, took an aggressive stance and yelled "no one is safe around here; not staff; not inmates; no one!" He was made aware that if he was threatening this CC2 he would could expect to receive another misconduct. He said he don't care about misconducts. He did calm down and directed the conversation to CC2 Grimme. Inmate Brown said that he is not mad at this CC2 or making threats toward me "because she is not making the decisions around here and if I wanted to do something to her, I could have because I have been alone with her in her office." He said that he has named this CC2 in one grievance before and will have to again in his next grievance because of the misconduct. This CC2 encouraged him to focus on his future outside of the DOC and making parole. He said he is up for parole now and will not make it. He said he likes the RHU and plans to stay in the RHU until he maxes out in 2 ? years because Administration "lied" to him about the single cell on CA Unit. Inmate Brown talked about his frustrations with Psych Staff and Administration and said that he has filed serval lawsuits with the Attorney General's Office that he knows will be settled after he maxes out of the DOC but, he wants to draw attention to what goes on here with the staff. He said other inmates don't know how to read or write to file the lawsuits so he does them. CC2 Grimme encouraged Inmate Brown to focus his energy on something positive, like parole. Inmate Brown said that he is up for parole now and not going to make it so he is not really worried about that now. He said all he wants is transferred out of the jail and asked this CC2 to put him in for a transfer. He was advised that administration has to approve a transfer before a vote sheet can be generated. He was advised to talk to PRC about a transfer this week and was told that it would be noted on the BAT for PRC. Inmate Brown was satisfied and said ok. Nothing further discussed. |
| 01/23/2019 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: (Deputy Brumbaugh, Deputy Walters, CCPM Spyker, Major Lechner, UM House): Inmate was released to population with recommendation from security, pending bed space. CL:4H |
| 01/17/2019 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Grimme. Inmate Brown did not have any questions or concerns to discuss. |
| 01/16/2019 | Conway, Trista Dawn | HUNTINGDON | (RHU out of cell contact) inmate was seen out of cell while returning to camera cell after being escorted to pick up legal mail. He verbally denied any thoughts/feelings that are suicidal or homicidal in nature, but requested this PSSC to assist him in being removed from camera cell. The process for this was explained to him, though he was continuously argumentative throughout contact. Supportive counseling was offered. He was given an opportunity to discuss any further concerns with this writer, but declined to do so. |
| 01/15/2019 | Diehl, Bruce D | HUNTINGDON | IM was seen during rounds in DTU. S=A. IM currently housed in camera cell per psychiatry. During contact he appeared agitated and was argumentative. IM stated, "They can't have me in here without an officer by my door for constant watch. I should be in POC. Why am I just in a smock with no bedding, the are violating policy". IM was informed that psychiatry ordered his camera cell placement due to stated plans of self-harm following a misconduct in general population for refusing to transition into another housing assignment. IM did not voice any plans to engage in self-injurious behavior during contact. Records indicate that he has refused (3) meals as of lunch today. It appears he will continue in protest of staff's "violation of policy" that occurred after "they refused to send me to POC". |

Inmate Name : BROWN, GARTOR                     Inmate # : NA6401

Location : ---                                  Counselor : N/A

| | | | |
|---|---|---|---|
| 01/15/2019 | Richards, Marilyn L | HUNTINGDON | Late entry: On 1/14/2018, CO1 Miller from BA Unit contacted this CC2 and said that Inmate Brown approached the desk and said that he is not refusing to move to AA Unit but is choosing to go to Observation, instead. CRNP Cousins, LPM Goss, CC2 Beck and this CC2 all met with him at his cell door on BA Unit. He indicated that he was told that he would be moved to a single and then was told something different by UM Swartz and this CC2. He was argumentative, confrontational and demanding to go to POC. He was told that POC is not a choice and that it is believed that he is being manipulative. He said he read the psych policies and knows that if he says he will hurt himself, we have to take him to POC. He asked "what do I have to do? Wrap a sheet around my neck to go?" He jumped up on his desk where he had some torn up cloth staged and wrapped it around his neck. I gave him several direct orders to get down during that time. Before OC could be administered, the thin and weak cloth broke. Brown got off the desk, walked over to his cell door and willingly cuffed up. |
| 01/14/2019 | Richards, Marilyn L | HUNTINGDON | UM Swartz and this CC2 met with Inmate Brown on BA Unit to notify him that he would be moved to AA Unit this evening and that he will be double celled. He mentioned being told that he was moving to CA Unit in a single cell. Mr. Swartz clarified that he is not and repeated that he would be moving to AA Unit this evening in a double cell. He said "ok" and then asked if he would have a cellie on AA Unit. Um Swartz told that he would. He was calm and simply said "ok". |
| 01/09/2019 | Smith, Brian J. | HUNTINGDON | Today I received a returned  Program Enrollment Notification form from Brown stating he was refusing the Outpatient program. |
| 01/03/2019 | Richards, Marilyn L | HUNTINGDON | Inmate Brown was brought to the UM's Office for Parole Staffing but as soon as he realized that it was in the UM's Office, he immediately said he cannot stay. He said he really needs to go use the bathroom and refused to patriciate in the staffing. (He just arrived for the staffing and did not have any wait to be seen.) The staffing was conducted while he waited. He was informed that he would not be supported by the Unit Team due to misconducts. Inmate Brown, UM Swartz, CC2 Beck and this CC2 were all present for the staffing. The vote sheet is circulating for the March 2019 Parole Docket. He was also notified that he was denied a Z Code. He was given a chance to discuss what he called "some serious concerns" in a request to this CC2 but refused to discuss the request. |
| 12/03/2018 | Richards, Marilyn L | HUNTINGDON | Vote sheet circulating for consideration for a permanent Z Code |
| 12/03/2018 | Butterbaugh, Kirsten Leigh | HUNTINGDON | Met with Mr. Brown in response to a  DC97 from CC2 Richards with regard to hearing voices, having anxiety, depression, and previous dx of PTSD and Schizophrenia. Mr. Brown began discussing the numerous lawsuits he has initiated against staff immediately upon arriving to this PSSC's office and was disgruntled that that he was meeting with psych as opposed to psychiatry. PSSC spent 45 minutes with Inmate Brown attempting to sort through his complaints and trying to promote a meaningful discussion about his mental health symptoms. Brown was adamant that he had not seen psychiatry since his initial reception to SCI-HUN. In the midst of discussing this, PSSC noted that she was not opposed to making a referral, but prompted him that his sense of entitlement is preventing him from making effective change. He then said, he really wasn't interested in meds, he just wanted to see the psychiatrist. PSSC then proposed that in lieu of an immediate referral, it would be beneficial for Brown to keep a log of his symptoms in order to drive the psychological treatment and determine if a referral to psychiatry was appropriate, at which point he shut down and said, "just make the referral now." Mr. Brown was informed that he will not dictate his manner and mode of treatment and PSSC illustrated how his refusal to keep a log of symptoms suggests he takes no personal responsibility, and the session was concluded. LPM and psychiatry were notified of the discussion via email. However, a formal referral was not made to psychiatry due to manipulative behaviors and threats of litigation. No overt SMI indicated. Denied SI/HI. |
| 11/29/2018 | Butterbaugh, Kirsten Leigh | HUNTINGDON | Z-Code Evaluation completed on this date in response to DC97 received from CC2 Richards on 11/27/2018. |
| 11/27/2018 | Richards, Marilyn L | HUNTINGDON | Met with Inmate Brown in AA Unit Counselor's Office per a request from him. CC2 Beck, UM Swartz, Inmate Brown and this CC2 were all present for the meeting. Inmate Brown expressed concerns about his mental health diagnosis, wanting a permanent Z code and a psychological evaluation he had while he was in the RHU. He submitted a Personal Data Questionnaire that he completed for the March 2019 Parole Docket. His correctional plan was reviewed with him and we discussed him taking the recommended programs. Brown said that he does not expect to be in this institution long because he filed lawsuits and will be moved. He claimed to be the "smartest inmate in the jail". He tip-toed around making allegations of retaliation by COs and said that he would not discuss that with this CC2 because of "history". |



**Pennsylvania Department of Corrections**

**Inmate Cumulative Adjustment Records**

06/27/2022

kelnoke

| | Inmate Name : **BROWN, GARTOR** | | Inmate # : NA6401 |
|---|---|---|---|

| | Location : --- | | Counselor : N/A |
|---|---|---|---|

| 11/27/2018 | Richards, Marilyn L | HUNTINGDON | DC-97 referral sent to Psychiatry. Inmate Brown reported that he is still hearing voices, has anxiety, is depressed, and has been previously diagnosed with PTSD and Schizophrenia. |
|---|---|---|---|
| 11/27/2018 | Richards, Marilyn L | HUNTINGDON | DC-97 sent for Z Program Code Evaluation. |
| 11/26/2018 | Richards, Marilyn L | HUNTINGDON | Met with Inmate Brown on BA Unit per a request from the block Sgt. Brown was provided his kiosk pin number and discussed his adjustment back into general population. He said he had some questions and would like to have an opportunity to meet in the counselor's office at a later date but there is no urgency. He also discussed wanting to be considered for a single cell long term. He was directed to send a request to this CC2 outlining his reasons for the single cell to initiate the process. |
| 11/07/2018 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: (Deputy Walters, CCPM Spyker, UM Yost, UM House): Inmate was released to population. CL:4H |
| 11/05/2018 | Richards, Marilyn L | HUNTINGDON | Personal Data Questionnaire sent to Inmate Brown in the RHU this date. He is on the February 2019 Parole Docket. The information will be used to assist with his Parole Summary. |
| 11/01/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door with CC2 Grimme. Brown did not have any questions or concerns to discuss. |
| 10/31/2018 | Conway, Trista Dawn | HUNTINGDON | (RHU 30 day contact) met with Mr. Brown for routine 30 day RHU contact. He accepted offer for out of cell contact, but when officers arrived to escort him to contact he verbally reported he changed his mind and would prefer to have his session at his cell door. He verbally denied any thoughts or feelings that are suicidal or homicidal in nature upon inquiry from this PSSC. He denied any current issues/concerns to address. Supportive counseling offered, no acute emotional distress apparent. DC560 completed. |
| 10/26/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door with CC2 Grimme. Brown did not have any questions or concerns to discuss. |
| 10/18/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door with CC2 Grimme. Brown shook his head yes when asked if he is good. He did not have any questions or concerns to discuss. |
| 10/11/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door with CC2 Grimme. Brown did not have any questions or concerns to discuss. |
| 10/10/2018 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: (Deputy Walters, Deputy Brumbaugh, CCPM Spyker, Major Lechner, UM House): Inmate was released to population with recommendation from security. CL:4H |
| 10/04/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door with CC2 Grimme. Brown was notified that we were making counselor rounds and asked if he needs anything. He replied "no" and turned away. No known issues at this time. |
| 10/04/2018 | Parsons, Eric W | HUNTINGDON | (RHU PSS contact): Inmate seen by Mr. Parsons, PSS the afternoon of 10/03/2018. Entry is late given the contact occurred just prior to the end of work shift. Inmate presented as pleasant, cooperative, and voiced no issues and or concerns. He was afforded and encouraged participation in an OOC contact, but respectfully declined indicating he had no present need. No overt SMI, stable, NAD, and denied SI/HI, plans, or intentions when asked. Appears to be adjusting well. |
| 09/28/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door (accompanied by CC2 Grimme). Inmate Brown was asked if he had any questions or concerns to discuss with the counselor's. He shook his head no. No issues reported. |
| 09/20/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CO1 Garlick. When asked if he had any questions or concerns to discuss today, he shook his head no. Nothing further discussed. |
| 09/14/2018 | Grimme, Mark A | HUNTINGDON | Weekly RHU Visit. Inmate was standing at his cell door watching the unit T.V. He was asked if he needed anything from this counselor. After a brief pause, he responded "No". Inmate given opportunity to ask questions and express concerns. No issues at this time. |
| 09/12/2018 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: (Deputy Brumbaugh, Deputy Walters, CCPM Spyker, Major Lechner, UM House): Inmate was released to population with recommendation from security pending bed space. CL:4H |
| 09/07/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Grimme. Inmate Brown looked way and refused to answer when asked if he had any questions or concerns to discuss today. |

**Pennsylvania Department of Corrections**                                    06/27/2022

**Inmate Cumulative Adjustment Records**                                      kelhoke

Inmate Name : BROWN, GARTOR                              Inmate # : NA6401

Location : ---                                           Counselor : N/A

| | | | |
|---|---|---|---|
| 09/06/2018 | Diehl, Bruce D | HUNTINGDON | IM was seen out of cell for an investigative interview. Although initially uncooperative, IM later complied and provided information during interview. IM elected to receive offered outside counseling support services. Information obtained forwarded to Clerk Pyle and Lt. Maxwell via email. IM verbally denied any suicidal ideations or intent. No acute emotional distress apparent. Supportive counseling provided. |
| 09/05/2018 | Parsons, Eric W | HUNTINGDON | (RHU PSS contact): Inmate seen by Mr. Parsons, PSS this afternoon per routine contact. Inmate was cordially invited to attend an OOC contact. Inmate declined the offer. No overt SMI, stable, NAD, and denied SI/HI, plans, or intentions when asked. Supportive counseling offered should he elect to participate? Appears to be well adjusted at the present. |
| 08/31/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by Captain House. Inmate Brown refused to answer when I asked him if he had any questions or concerns to discuss today. |
| 08/23/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by ACC1 Adams. Inmate Brown refused to answer and dropped his head down when asked if he has any questions or concerns to discuss. |
| 08/17/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by ACC1 Adams. Inmate Brown refused to answer when asked if he has any questions or concerns and just stared at us. |
| 08/10/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CC2 Grimme. Inmate Brown multiple times if he had any questions or concerns to discuss but he refused to answer and turned away from the door. |
| 08/06/2018 | Parsons, Eric W | HUNTINGDON | (RHU PSS OOC contact): Inmate was seen by Mr. Parsons, PSS this morning prior to lunch. Inmate was observed and spoken to while temporarily held in the RHU Secure Search Area. Inmate was questioned as to why he was there? Inmate presented as select mute. The officer present stated he was brought in by medical. It should be noted that the inmate stared directly pass this writer and elected to not speak a word this entire time. Rather, he attempted to manage a negative and/or needy impression of himself by starring as if he is catatonic. Inmate has a history of ingesting foreign bodies (i.e. paperclip, staple, etc.) Medical staff, Mr. Goss, LPM, and this writer are well aware of his dangerous and manipulative behavior(s). For this reason, he is monitored by a variety of staff, and given frequent opportunities to process his emotions. To no avail, he declines the OOC contacts that are afforded to him. As stated above, his dangerous and/or manipulative behavior(s) are indeed concerning as they do not appear to be a manifestation of any Serious Mental Illness (SMI). Inmate presently requires no need for clinical (mental health) services. He displays no overt SMI, he is stable, he presents no acute distress (or at least none of which he speaks of), and voices no plans, intentions, or preoccupation of SI/HI. Given this recent para-suicidal gesturing via ingesting what medical thinks may be a staple and/or paperclip? this behavior had prompted this writer to complete a DC516 Inmate Self-Injury Report. Report will be forthcoming. |
| 08/02/2018 | Parsons, Eric W | HUNTINGDON | (RHU PSS OOC contact refused: Inmate was seen by Mr. Parsons, PSS per the consult this PSS and Mr. Ake, Psychiatric Nurse had earlier. Inmate had allegedly swallowed a piece of metal yesterday, was seen by Medical and appropriately returned to the RHU without incident. This PSS had immediately seen the inmate after our consult. Inmate was observed at the cell. It should be noted that he had destroyed his mattress by tearing the stitching out on the one end and crawling into his mattress as if it was a sleeping bag. Inmate had his head covered and had a delayed response to this PSS knocking on his door. After several attempts to gain his attention, he had observed this PSS for a fleeting second and again buried his head in under the mattress bedding. This response is not an uncommon reaction from this inmate as he is typically dismissive, rude, and uncooperative. However, this PSS can say with confidence that he did not appear to be under any distress. He displayed no overt SMI, he was stable, voiced no acute distress, and said, "No" with regards to intentions, plans, or ideas of hurting and/or killing himself. Inmate was also afforded an OOC contact for which he dismissively said nothing and hid himself in his mattress. Inmate requires no need for clinical services. His current presentation is best described as both potentially dangerous and manipulative for secondary gain. |
| 08/02/2018 | Richards, Marilyn L | HUNTINGDON | Vote sheet dated 8/01/2018 supports continuing H Program Code. |
| 08/02/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door and accompanied by UM House. Inmate Brown was laying flat, inside his mattress as if it was a sleeping bag when we arrived. When asked if he had any questions or concerns to discuss with this CC2, he just turned away and refused to answer. |

**Pennsylvania Department of Corrections**                    06/27/2022

**Inmate Cumulative Adjustment Records**                      kelhoke

Inmate Name : BROWN, GARTOR                          Inmate # : NA6401

Location : ---                                       Counselor : N/A

| | | | |
|---|---|---|---|
| 08/01/2018 | Goss, Richard A. | HUNTINGDON | Inmate was seen in medical after I received word he had swallowed a piece of metal. Inmate denies any attempt at self harm and reports he feels it was placed in his food by a CO. The metal fragment was not considered large enough to pose either a medical or security risk and inmate was placed back in his cell. |
| 07/27/2018 | Parsons, Eric W | HUNTINGDON | (RHU OOC contact refused.) Inmate seen by Mr. Parsons, PSS this morning. Inmate was dismissive when this PSS invited him to attend OOC. Inmate is on the following restrictions: Property, bedding, and water restriction. He displayed no need for clinical services. Supportive counseling offered. No issues and or concerns. Appears to be adjusting well. |
| 07/26/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by CO1 Mills. This CC2 asked Inmate Brown multiple times if he had any questions or concerns to discuss but he refused to answer and turned away from the door. |
| 07/20/2018 | Richards, Marilyn L | HUNTINGDON | Annual Review conducted this date with Inmate Brown in abstention due to being housed in the RHU. His Correctional Plan, Emergency Contact, and Custody Level were all reviewed and updated as needed. His current custody level is 5 and H program code is assigned due to his assaultive behavior toward staff. He is not eligible for RRRI and there is an ICE Detainer listed. There are no separations listed and no known STG affiliations or security concerns noted. He does have a housing concern listed. His CVCF obligation will need to be verified with inmate accounts. He is housed in long term RHU where he earned an average housing report and is unassigned. He does not have any forms of identification secured with the institution at this time. Inmate Brown refused to participate in his annual review and did not have any questions or concerns regarding this review.<br>Corrections Counselor _ _ _ _ _ _ _ _ _ _ _ _<br>Unit Manager _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ |
| 07/20/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown and accompanied by CO1 Poorman. This CC2 notified him of his annual review and requested he sign his correctional plan. Inmate Brown refused to talk or sign the plan. He was given a copy of the correctional plan and asked multiple times if he had any questions or concerns to discuss but he refused to answer. |
| 07/13/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown and accompanied by PSS. I asked him multiple times if he had any questions or concerns to discuss but he refused to answer. CC2 Grimme also asked him if he had anything to discuss and he still would not answer. Nothing further discussed. |
| 07/11/2018 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: (Deputy Walters, Major Lechner, CCPM Spyker): Inmate was released to population with recommendation from security on 7/17/18, pending bed space. CL: 4H |
| 07/06/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown and accompanied by PSS. I asked him multiple times if he had any questions or concerns to discuss but he refused to answer. Mr. Parsons asked him if he had anything to discuss with him and he again, refused to answer. Nothing further discussed. |
| 07/03/2018 | Parsons, Eric W | HUNTINGDON | (RHU PSS contact): Inmate seen by Mr. Parsons, PSS this afternoon per routine rounds. Inmate was cordially invited to attend an OOC contact for which he respectfully declined. No overt SMI, stable, NAD, and voiced "No" with regards to SI/HI inquiry. No issues and/or concerns. Encouraged to attend OOC should he change his mind? Appears to be well adjusted. |
| 06/29/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown. He was laying on the top bunk when this CC2 accompanied by a PSS arrived at his door. He did not get out of his bunk to talk and when asked if he had any questions or concerns today, he just looked at this CC2 and would not answer. I asked him if he preferred out of cell contact to discuss any questions or concerns he had. He refused to answer and nothing further was discussed. |
| 06/22/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown. He was laying on the top bunk when this CC2 accompanied by a CO1 arrived at his door. He did not get out of his bunk to talk and when asked if he had any questions or concerns today, he looked at this CC2, covered up head and rolled over. I asked him a second time if he had any questions or concerns to discuss today, and he rolled over again but did not uncover his head. Nothing further discussed. |
| 06/20/2018 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: (Deputy Brumbaugh, Deputy Walters, CCPM Spyker): Inmate was seen for an 802 review. Continue PHC. Next review: 7/18/18-pending misconduct hearing. |
| 06/15/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with Inmate Brown at his cell door and accompanied by a CO. Inmate Brown did not get out of his bunk to talk but did hold up his thumb when asked if he is "good". |


Inmate Name : BROWN, GARTOR                    Inmate # : NA6401

Location : ---                    Counselor : N/A

| Date | Counselor | Location | Notes |
|---|---|---|---|
| 06/13/2018 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: (Deputy Brumbaugh, Deputy Walters, CCPM Spyker): PRC released inmate to population with recommendation from security, pending bed space. CL:4H |
| 06/08/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door, accompanied by a CO1. He asked why a CO was with me at his door. I told him that a CO will be with me every time I make rounds at his door. I asked him if he had any questions or concerns to discuss today. He said "yeah, where is my paper you took," (referring to the hand written letter he submitted back on 4/20/2018). I told him that is an old question which has been answered and then asked him if he has any new questions. He continued to asked about the paper and was told again that he already received an answer about the paper. He did not have any other questions or concerns to discuss today. |
| 06/05/2018 | Parsons, Eric W | HUNTINGDON | (RHU PSS contact): Inmate seen by Mr. Parsons, PSS this afternoon. Inmate was invited to attend OOC and he had politely declined. No need for clinical services. No overt SMI, stable, NAD, and voiced, "No" with regards to SI/HI inquiry. Inmate presented no issues and/or concerns at the present. Appears to be adjusting well. Supportive counseling offered. |
| 06/04/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown to interview him about his request to withdrawal grievance #735676. This CC2 requested that a CO go to the cell door as well due to inmate Brown's threats to show me his "dick" on Friday. Inmate Brown refused to acknowledge or deny his request to withdrawal the grievance. He indicated that it is just between he and the Lt. He was informed that as his counselor, I interview him to make sure there is no coercion or undue influence to withdrawal the grievance. He said you don't do you job so I am not talking to you and walked away. |
| 06/01/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. He discussed sending a request form to get a copy of a witness statement and said that he did not get a response so he talked to someone else about it and an email will be sent on his behalf. He also discussed how he can get a copy of his file. He was informed that as outlined in the inmate handbook, he can request specific documents from the Records Department but would be subject to copying charges. This CC2 asked him if he plans to return to general population at some point. He replied "if you ask me that again, I am going to show you my dick." He further stated that he felt disrespected by me asking him that and repeated that "if you asked me that again, I am going to show you my dick". This CC2 terminated the contact due to his disrespect. |
| 05/24/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. He reported that he is good and did not have any questions or concerns to discuss today. |
| 05/18/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. He discussed wanting a copy of a letter, again. He indicated that he requested a copy from the Lt. and filed a grievance but was denied. He asked if he could get a copy from this CC2. I explained to him that the letter was turned over immediately and a copy cannot be kept in his file in the counselor's office due to the content and allegations in the letter. He said he misunderstood that in the past which was why he got angry and yelled at this CC2. I told him that we will continue to move forward from the misunderstanding and hopefully communicate better. He said ok. Inmate Brown did not have any other questions or concerns to discuss today. |
| 05/11/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. He was asked if he wanted to meet out of cell today. He declined the out of cell meeting with this CC2. He asked "where is the copy of the letter I gave you"? I responded that this was discussed with you 2 weeks ago when you was told that the letter was forwarded to the appropriate staff. He repeated his question about his copy of the letter again. I then asked him if he had any new questions or concerns to discuss today. He said thank you and turned away. Nothing further was discussed. |

Inmate Name : **BROWN, GARTOR**                    Inmate # : **NA6401**

Location : ---                    Counselor : N/A

| | | | |
|---|---|---|---|
| 05/08/2018 | Diehl, Bruce D | HUNTINGDON | IM was seen during morning RHU rounds. IM was offered an out of cell contact with psychology but elected to speak at cell door. He was observed sleeping just prior to contact with psychology. During contact he presented a normal affect but was slightly agitated. IM claims that he was not "properly evaluated" by psychiatry during a brief contact at his cell door last week. He then went on to report plans to file a lawsuit against mental health services at SCI-HUN. He stated, "I'm the wrong guy to mess with because I know how to file my claims in court, I am being deprived of treatment". This writer reminded him that psychology staff was presently speaking with him to address any MH issues or concerns. IM replied, "I am not going to break things down for you again. You guys say I'm mentally stable, so I guess I am alright." PSS provided supportive counseling during contact. IM discussed unwanted thoughts that occur sporadically that increase anxiety at times. He was educated on intrusive thoughts and how to begin coping appropriately. No SI/HI reported. No overt signs of mental illness apparent. No acute emotional distress apparent. |
| 05/04/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. This CC2 made several attempts to find out if he had any questions or concerns to discuss but he turned away and refused to answer. |
| 04/27/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. He mentioned giving me a letter last week and requesting a copy of it. He also asked for a copy of the 803 and asked if I had time to talk to him. I informed him that I do and asked if he wanted me to get the officers to get him out of his cell to meet one on one with me. He said no, not now. He then asked again about his copy of the letter he gave me last week and demanded to have a copy. I informed him that the letter was turned over to the Lt., and the Lt. was notified that he asked of a copy of it. IM Brown stated that he was not given a copy and said that it is my responsibility to give him a copy because he gave it to me. I told him, again that the letter was given to the proper authority and I no longer have anything to do with it. He said he filed a grievance which was denied but has since refiled it because per policy, he can make a PREA allegation about a CO through a 3rd party and alleged that is what he did with me. I corrected him and said you handed me a witness statement after you made an allegation and it was turned over to the proper authority. At that point, his demeanor changed and he yelled "get the fuck away from my door now and don't come back." He continued to yell several times " I mean it, get away from my door and never come back." While he was talking to me about this IM LS3066 Castillo standing at his door laughing and yelling way to go man to IM Brown. Nothing further was discussed. |
| 04/20/2018 | Richards, Marilyn L | HUNTINGDON | Inmate Brown was notified via DC-134 that he will need to request legal exchange from 2nd shift Sgt. or Lt. to get additional legal envelopes. |
| 04/20/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. He reported that he is not good and then passed out a yellow sheet of paper that appeared to be a handwritten letter. He said to keep the letter to give to the "proper people" but wants a copy of it sent back to him. He also asked if he could get additional envelopes to send out legal mail. He did not have any other questions or concerns to discuss today. After reviewing the letter, it was turned over to Lt. Maxwell. |
| 04/18/2018 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: (Deputy Walters, Deputy Brumbaugh, A/CCPM Sipple): Inmate was released to population on 4/18/18 with recommendation from security. CL:4H |
| 04/13/2018 | Diehl, Bruce D | HUNTINGDON | IM was offered out of cell contact to discussed recently reported allegations. IM stated, "You can't do anything to help me, you're part of the problem". IM was again offered an opportunity to discuss any MH issues or concerns but he again declined the offering. No MH issues or concerns reported. No SI/HI reported. No acute emotional distress apparent. Supportive counseling was offered. Lt. Maxwell was informed of IMs unwillingness to cooperate with out of cell contact. |

Inmate Name : BROWN, GARTOR          Inmate # : NA6401

Location : ---          Counselor : N/A

| Date | Name | Location | Notes |
|---|---|---|---|
| 04/13/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. He said he is not doing good and said he needs a legal phone call because he has not had one since his arrival at SCI-Huntingdon. The UM had just left his cell door and moved to the next cell when I approached his door. I asked IM Brown if he discussed a legal call with the UM while he was there. IM Brown said that he did not because they had just discussed his legal property for more than 5 minutes. He alleged that he sent 2 written requests to the UM for a legal phone call. He then demanded that I get him a legal call because as his counselor, I am liable. When asked if he attended PRC to request a legal phone call, he said no, the UM is part of PRC. I then asked him if he was being released to general population soon and if so, I could arrange a legal call for him. He became even more argumentative and called me a "clown". He then said "I was just in population and you did not do anything for me. You are a clown, man". I gave him an order to not call me names or be disrespectful or this discussion is over. He continued to ramble on in a disrespectful and argumentative manner. I told him that based upon his behavior, he does not need my help. I turned and walked away, immediately terminating the discussion. |
| 04/10/2018 | Parsons, Eric W | HUNTINGDON | (RHU PSS contact): Inmate seen by Mr. Parsons, PSS the afternoon of 04/09/2018 per routine contact. Late entry given this PSS had numerous notes to make and did not get around to making this entry. Inmate was afforded an OOC contact for which he disrespectfully declined. In fact, he looked past this writer as if attempting to watch TV on the quad. It should be noted that this inmate had made previous allegation(s) against this writer? No overt SMI, stable, NAD, No SI/HI, plans, or intentions. Supportive counseling offered. Good adjustment. |
| 04/06/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. Inmate Brown refused to get out of his bunk and to talk. This CC2 asked him 3 times if he had any questions or concerns to discuss. He just looked away and refused to talk. |
| 03/29/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. When asked how he is doing, he started talking very softly and I was unable to hear what he was saying. I asked him several times to speak up so I could hear him but he did not. He began looking around like he was concerned someone else would hear what he was saying. I asked him if he would prefer an out of cell interview with this CC2, and he said no. I explained that if there is something he needs to talk about with this CC2, I can arrange to have him taken into an interview room to talk one-on-one. He said "maybe next week." I again offered to have an interview with him out of cell and he again said no. After he refused a third time, I informed him that he can send me a request form anytime with his questions or concerns. |
| 03/22/2018 | Richards, Marilyn L | HUNTINGDON | Carolyn Lidston from the Prison Society called regarding inmate NA6401 Brown. Ms. Lidston indicated that she met with him while he was in general population and again while he has been in the RHU. He has also sent her certified mail. She believes that there is reason to have concerns for him and wanted to know if he is talking to me about his concerns. A complete memo of her concerns is on file. |
| 03/22/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. Inmate Brown was laying on the top bunk covered up when I arrived at his door. He did sit up in his bunk but did not get out to talk. He said that he did not have any questions or concerns to discuss today. |
| 03/21/2018 | Gerholt, Jennifer J | HUNTINGDON | PRC Review: (Deputy Brumbaugh, Deputy Walters, CCPM Spyker): Inmate was released to population on 3/21/18 CL:4H |
| 03/16/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. Inmate Brown was on the top bunk, sleeping and just held up his thumb, indicating that he was good. |
| 03/13/2018 | Parsons, Eric W | HUNTINGDON | (RHU PSS contact): Inmate had been seen by Mr. Parsons, PSS this morning per routine contact. Inmate was cordially invited to attend an OOC contact for which he politely declined and indicated that he was doing well. Inmate was pleasant, engaging, and appeared to be adjusting well. Supportive counseling offered. Appears acclimated to the RHU. |
| 03/09/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. He discussed being frustrated with being charged for mail that he denies sending out and alleged that he did not receive a receipt for sending out certified mail. He discussed sending out mail that has not been received by his family, the Courts or any organization that he believes can help him. He was encouraged to write to inmate accounts about the charge on his monthly statement if he believes he was charged for something he did not send. Inmate Brown alleged that he has several times but does not get a response. He further alleged that several staff members are not doing their jobs so he intends to sue everyone. He said that he is smarter than other inmates and will continue to file paperwork and lawsuits until he is back in general population with a Z code or sent to another institution. |

**Pennsylvania Department of Corrections**

**Inmate Cumulative Adjustment Records**

06/27/2022

kelhoke

| Inmate Name : BROWN, GARTOR | | | Inmate # : NA6401 |
|---|---|---|---|

Location : ---

Counselor : N/A

| 03/06/2018 | Ciavarella, Michael L Jr | HUNTINGDON | PRC review of misconduct appeal #D031797 sent to Deputies for review. |
|---|---|---|---|

| 03/01/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. He reported that he is good and did not have any questions or concerns to discuss today. This CC2 noted that his blank envelops were slid in the side of his door when I arrived and mentioned it to him. He did pull the envelops through the side of the door and counted them. |

| 02/22/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. He reported that he is being deprived of his medications while housed in the RHU. He further stated that COs are intercepting his mail and denying him envelops, legal exchange and legal calls. He alleges that he as sent multiple grievances, request forms and certified mail without receiving any responses back. He denies talking to the UM about it and stated that the UM does not even make rounds on his quad. He was reassured that his concerns were heard and would be passed on. |

| 02/16/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. He was offered to meet with his CC2 for an out of cell interview but refused to come out of his cell. He discussed receiving additional misconducts for refusing to take a cellie and said that he thinks staff is trying to "bury" him in the RHU. This CC2 informed him that we did discuss these misconducts last week, and he was informed that he would continue to receive misconducts for refusing to obey an order if he continues to refuse to take a cellie. |

| 02/15/2018 | Diehl, Bruce D | HUNTINGDON | IM was interviewed out of cell per request by Lt. Maxwell for investigation purposes. Although IM agreed to attend out of cell contact, he elected not to answer any questions related to the investigation. IM displayed an appropriate affect, stable and appeared within normal limits. Prior to concluding the contact, IM raised concerns about his belief that his requests for psychotropic medications have been ignored. IM is currently listed as an "A" stability with no prior MH history. During the interview IM stated, "I have played with my feces before, don't you think that is serious". He dismissed efforts by this writer to discuss interventions that he could implement independently to address his current reported anxiety and depression. IM appears to not be looking to resolve his issue, but rather acquire psychotropic medications and be classified as a mental health inmate in effort to enhance privileges while serving his disciplinary sanction. IM also reported the need for single cell status. IM stated, "Based on my symptoms and situation, don't you think this should be addressed by giving me a Z code". When this writer asked IM why he believed single cell status was warranted he replied, "Like what if I play with my shit and hear voices and stuff. My cellmate would want to mess me up. I mean look at my last two incidents, that proves I don't work well with cellmates". At this point in time IM appeared frustrated and began ignoring inquires by this writer. He started looking around the out of cell area and acted as if he was incoherent. After he continued on for a few minutes, he then in an verbally aggressive tone stated, "You know, I think you're doing a half ass job here". Prior to ending the session, PSS encouraged IM to attend out of cell contacts as needed while housed within the RHU. No apparent need for psychiatric intervention at this time. Psychology staff will continue to monitor IM and provided supportive services. Supportive counseling offered. No SI/HI. No acute emotional distress apparent. |

| 02/09/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door. He reported that he is doing ok and discussed his misconducts. He alleges that he was denied a right to go to the hearing for his misconduct for refusing a cellie while in a camera cell. When asked if he appealed the decision, he indicated that he has no plans to appeal. He discussed being told that there is a DOC Policy that prohibits him from receiving a misconduct for refusing a cellie until his DC time expires. This CC2 explained that he was misinformed and if he continues to refuse cellies, he will get additional misconducts. He asked if I would talk to someone to get his misconducts reversed. When this CC2 told him that I would not, he got loud and said "are you serious right now? I have all of these grievances filed against staff and you are telling me no. Are you serious right now? This CC2 informed him that I am serious because there is an appeal process he can utilize. He said "I already told you that I am not going to appeal." This CC2 made it clear to him that if he is not willing to follow the appeal process to help himself, I will not be doing it for him. Inmate Brown also asked if his family has called to check on him. He was informed that they have not. He did not have any other questions or concerns to discuss today. |

Inmate Name : **BROWN, GARTOR**                              Inmate # : **NA6401**

Location : ---                                              Counselor : **N/A**

| Date | Staff | Facility | Note |
|---|---|---|---|
| 02/05/2018 | Parsons, Eric W | HUNTINGDON | (RHU PSS contact): Inmate was seen cell side by Mr. Parsons, PSS this afternoon. Specifically, it was his intent to have this PSS at his door as he complained (loudly as if to intend on others listening) about being housed with another inmate. Inmate has made an ongoing effort to speak with a variety of mental health staff with the interest to voice, "Symptoms" such as, "Hearing voices." This PSS had met with him previously about his alleged voices and he had indicated that they, "Come from within my head" and therefore was invited to think of them as, "Thoughts." It should be noted that he has no SMI, in fact he requires no need for clinical services at this time.  He then shouted, "You mean my mental health on the street and the fact I play with my s*&t, doesn't count for anything in here.?!"  This PSS afforded him an OOC contact to again discuss this matter in private, but he refused. Inmate presents as dangerous and manipulative in order to get what he wants.  For example, he stated, "You mean, I am saying I need a "Z" code, that I don't want to be with others, I get celled up, and have problems this would be my fault.!?"  This PSS urged him to contact his counselor to send a referral to have  a "Z" code evaluation; However, it is abundantly clear that he is not an appropriate candidate for single cell placement.  Poor adjustment by choice.  Supportive counseling offered. |
| 02/01/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door.  He reported that he is ok and did not have any questions or concerns to discuss today. |
| 01/31/2018 | Parsons, Eric W | HUNTINGDON | (RHU PSS contact): Inmate seen cell side by Mr. Parsons, PSS this morning. It should be noted that he elected to stay in bed and mutter some statements that this PSS was unable to distinguish due to his choice to not be heard as well as the ambient noise from the TV drowning out his voices.  Nevertheless, this PSS raised my voice to him and invited him to an OOC contact (where he could be heard).  Inmate was dismissive and declined the offer.  It should be noted that he was observed earlier with a handful of feces and staff have concern for him attempting to throw it on staff.  Additionally, this PSS is aware of a recent serious of both dangerous and/or manipulative behavior(s) demonstrated for no other reason than possibly obtaining psychotropic medications and/or being considered for a "Z" code.  Inmate carries a mental health stability rating of S="A" and requires no need for clinical services.  He presents no overt SMI, he is stable, reports no acute distress, and voiced no SI/HI, plans, or intentions. Inmate appears to be volitionally playing with his feces for secondary gain (i.e. "Z" code).  The above stated behavior does not appear to be brought on by any manifestation of any Serious Mental Illness (SMI).  Appears to be making poor adjustment to the RHU by choice. |
| 01/26/2018 | Richards, Marilyn L | HUNTINGDON | RHU contact with inmate Brown at his cell door.  He reported that this place has a conspiracy against him because he is not being given psych meds; he was informed that his family called his prior counselor but he was never told that they called; he received a misconduct for refusing to take a cellie; a certain CO in the RHU is out to get him; and there are no "black" CO's working in the RHU.  He indicated that there is a voice in his head and he has been playing with his "shit."  He reported that he is on a hunger strike and this is the 2nd day that he did not eat.  We discussed him being seen by the PSS while in the RHU.  He refused and said he only wants to be seen by someone to get medication. |
| 01/25/2018 | Parsons, Eric W | HUNTINGDON | (RHU PSS OOC REFUSED):  Inmate had declined to participate in his pre-planned OOC contact on this date.  This PSS noted that he had been seen, displayed no overt SMI, was stable, reported NAD, and denied SI/HI, plans, or intentions.  Supportive counseling offered.  Good adjustment. |
| 01/24/2018 | Diehl, Bruce D | HUNTINGDON | IM was seen at cell door after he declined the need for an out of cell individual. IM expressed that he had a legal deadline approaching and needed to access the law library and utilize the phone.  PSS forwarded concerns to UM Kendrick via email to address IMs reported issues.  No other reported issues at this time. No suicidal ideations or intent reported.  No acute emotional distress apparent. |
| 01/23/2018 | Diehl, Bruce D | HUNTINGDON | IM was seen at cell door in RHU to offer an out of cell contact.  During contact he refused to look at this writer and turned away from the door when contact was attempted.  He refused to answer after several attempts to communicate with him.  He appeared within normal limits.  No issues or concerns expressed. Contact was terminated after he refused to cooperate.  Past ICAR records indicate that IM has behaved in this manner during past contact attempts by his counselor.  No SI/HI reported.  No acute emotional distress apparent. |
| 01/23/2018 | Butterbaugh, Kirsten Leigh | HUNTINGDON | Mr. Brown was on a call-out yesterday to be seen following his release from the RHU.  PSSC called his housing unit at the time of his scheduled appointment and was informed that Mr. Brown opted to go to yard.  PSSC placed Mr. Brown on another call-out this morning.  However, Mr. Brown incurred a misconduct last evening and was placed in PHC.  He will be seen by psychology staff in the RHU until he returns to population. |

**Pennsylvania Department of Corrections**                    06/27/2022

**Inmate Cumulative Adjustment Records**                    kelhoke

Inmate Name : **BROWN, GARTOR**                    Inmate # : **NA6401**

Location : ---                    Counselor : N/A

| Date | Staff | Facility | Note |
|---|---|---|---|
| 01/09/2018 | Richards, Marilyn L | HUNTINGDON | SEMI ANNUAL REVIEW: Met with Inmate Brown at his cell door on AA Unit for his semi-annual review. He was counseled on the importance good institutional adjustment and programming. He did not have any questions or concerns regarding his semi-annual review. |
| 01/04/2018 | Richards, Marilyn L | HUNTINGDON | Inmate notified via DC-134 of new counselor designation and to check the callout for his initial interview. |
| 01/04/2018 | Yost, Megan M. | HUNTINGDON | Assigned to B caseload; process routinely. MMY |
| 12/27/2017 | Banks, Christopher R | HUNTINGDON | RHU Contact - Late Entry - I/M was seen in RHU, on 12/26/17, during rounds. When this writer first approached I/M Brown's cell he acted strange. I ask him if he was going to return to population when released from the RHU to which at first he refused to answer and continued to act delusional. After repeating my question, Brown became irritated and seems to suddenly come out of his delusion, and demanded that I give him a single cell based on his past homicidal thoughts. I explained that he is able to control his thoughts and he is not able to manipulate him self into single cell status. Brown made further demands that I help him get a single cell or he will sue me and cause me to lose my job. When I did not respond in a way he saw as proper he refused to answer any further questions with out me providing to him inappropriate personal information about myself or PSS Parsons. I then explained that was not appropriate, to which he stopped answering any questions and would only respond with his own inappropriate questions seeking personal information about PSS Parsons or myself. |
| 12/27/2017 | Gerholt, Jennifer J | HUNTINGDON | PRC Review; Stability D Weekly Review: (Major Grice, CCPM Sipple, UM Kendrick, PSS Diehl): Inmate will be released to population on 12/27/17. CL:4H |
| 12/26/2017 | Hollibaugh, Barbara J | HUNTINGDON | 30 Day Unit Team Review: Brown was placed in the RHU on 12-1-17 after receiving a misconduct for Threatening Another Person and Refusing to Obey an Order. On 12-5-17, he received a misconduct in the RHU for Refusing to Obey an Order. Both misconducts resulted in 15 day DC sanctions to be served consecutively and his DC sanctions extend to 12-30-17. Brown is seeking a single cell and his misconducts reflect his efforts to refuse to accept a cellmate by making a threatening statement and refusing to take a cellmate. |
| 12/19/2017 | Banks, Christopher R | HUNTINGDON | RHU Contact - This writer attempted to make contact with inmate Brown, on this date, during rounds. I/M was on his cell bunk and did not respond to attempts by this writer to make contact. Movement noted. |
| 12/18/2017 | Spyker, Jill J | HUNTINGDON | Both misconduct appeals #C084585 & C065592 were forwarded to both Ms. Sipple, CCPM and Mr. Goss, LPM as inmate addressed concerned related to concerns within their department. |
| 12/18/2017 | Spyker, Jill J | HUNTINGDON | Misconduct Appeal #C084585 was addressed. Paperwork forwarded to both Deputy Brumbaugh and Ms. Sipple, CCPM for final review and signatures. |
| 12/18/2017 | Spyker, Jill J | HUNTINGDON | Misconduct Appeal #C065592 was addressed. Paperwork forwarded to both Deputy Brumbaugh and Ms. Sipple, CCPM for final review and signatures. |
| 12/12/2017 | Banks, Christopher R | HUNTINGDON | RHU Contact - I/M was seen in the RHU on this date during RHU rounds. Brown displayed strange behavior during contact. He would respond to certain questions and then refuse to make eye contact and look away at other questions. PSS Parsons notified of overall behavior and demeanor. Brown had no questions or concerns at the time of contact. |
| 12/12/2017 | Parsons, Eric W | HUNTINGDON | (RHU PSS contact): Inmate was seen by Mr. Parsons, PSS this afternoon at the request of Mr. Banks, Counselor. Specifically, it was reported that Inmate had been behaving strangely, making minimal eye contact, etc. Inmate was seen promptly after our consultation. He was afforded an OOC contact and respectfully declined. No overt SMI, stable, NAD, denies SI/HI, plans, or intentions. Note, Inmate did glance about his cell when speaking to this PSS as if to present and/or suggest that he is paranoid. Inmate attempts to manage a negative impression and is currently in pursuit of obtaining a "Z" code. Inmate is currently frustrated at this staff for not advocating his desire to be ceiled by himself. No need for clinical attention. Supportive counseling offered. Appears well-adjusted. |
| 12/12/2017 | Parsons, Eric W | HUNTINGDON | (RHU PSS contact): Inmate seen by Mr. Parsons, PSS this morning per routine contact. Inmate was afforded an OOC contact for which he respectfully declined. No overt SMI, stable, NAD, denies SI/HI, plans, or intentions. Supportive counseling offered. Appears to be well-adjusted. |

Inmate Name : BROWN, GARTOR                                    Inmate # : NA6401

Location : ---                                                  Counselor : N/A

| Date | Staff | Location | Notes |
|---|---|---|---|
| 12/06/2017 | Parsons, Eric W | HUNTINGDON | (RHU PSS contact): Inmate was seen by Mr. Parsons, PSS this afternoon and he verbally berated this PSS claiming, "Do your job, you would let me get a "Z" code, there is nothing you could help me with!" Inmate presented no overt SMI, was stable, NAD, and reported no SI/HI, plans, or intentions. Very dismissive and rude. Poor adjustment. Attributes his current RHU housing to this PSS, "Not doing his job." Inmate has unrealistic expectations that this PSS should assign him "Z" code status when he is not even an appropriate candidate. OOC contact was afforded but he rudely refused. Poor adjustment, takes no responsibility for his own actions. |
| 12/05/2017 | Banks, Christopher R | HUNTINGDON | RHU Contact - I/M was seen in the RHU on this date during RHU rounds. Brown had many demands and questions regarding his misconducts and how to get a z-code, appropriate information provided. He had no other questions or concerns at the time of contact. |
| 12/01/2017 | Parsons, Eric W | HUNTINGDON | (RHU PSS OOC Contact, Suicide Risk Indicators Check): Inmate seen OOC in RHU SECURE SEARCH CELL. He was unwilling to be celled with another claiming, he will, "Kill" someone if housed double. Additionally, he made allegation which was reported to both Security and Lt. Maxwell by LT. Prokop. It should be noted that Inmate was reluctant to verbalize responses to questions asked of him and was dismissive towards this PSS. He requires no need for clinical attention, presents no overt SMI, is stable, and reported no SI, plans, or intentions. His current presentation is that of both potentially dangerous and clearly manipulative for secondary gain (i.e. really wants a "Z" code). Supportive counseling offered. Appears to be having a poor adjustment. |
| 11/22/2017 | Banks, Christopher R | HUNTINGDON | I/M provided with Kiosk Pin #587678 |
| 11/21/2017 | Shultz, Joshua P | HUNTINGDON | Met with the inmate for his initial contact interview. I informed IM that I will be his counselor while he is on CA Unit. He had no issues or concerns at this time. I informed him that Mr. Ralston is the UM. |
| 11/17/2017 | Butterbaugh, Kirsten Leigh | HUNTINGDON | Met with Mr. Brown in the psychology department to provide continued supportive counseling for depression and anxiety. I/M states that he has not been followed up with by medical with regard to an incident that occurred at SCI-Camp Hill. Cites intense anxiety and panic attacks as a result of that incident. DC-97 initiated to psychiatry and medical. No overt SMI indicated. Denied SI/HI. PSSC will follow-up in two weeks to provided continued supportive counseling. |
| 11/15/2017 | Banks, Christopher R | HUNTINGDON | Initial interview - conducted this date. Brown's Correctional Plan, Custody Level, and Emergency Contact information were all review with inmate. I/M states he has no forms of ID available to him, was given an application to apply for a SSC. Inmate given "Sexual Assault Awareness" pamphlet and PREA was discussed. Expectations while at SCI HUN were discussed. Brown had no additional questions or concerns. |
| 11/15/2017 | Butterbaugh, Kirsten Leigh | HUNTINGDON | Met with Mr. Brown in the psychology department to provide supportive counseling per policy. Mr. Brown cited significant mistrust of staff and other inmates. Mr. Brown appeared significantly anxious and intermittently tearful. (Shaking, head down, low voice volume). Provided supportive counseling with regard to anxiety management and discussed options of voluntary mental health groups that may be of benefit to him. Mr. Brown noted that he has been litigious with regard to his civil rights and feels that he is being retaliated against by staff at his former institution. PSSC will meet with Mr. Brown again tomorrow in order to determine an appropriate course of treatment. Mr. Brown denied any intent of self-harm or intent to do harm to others. |
| 11/13/2017 | Mingle, Michelle A. | HUNTINGDON | Initial PRAT completed at IRC. |
| 11/08/2017 | Hoerner, Wendy Jo | CAMP HILL | Office Contact: This counselor attempted to interview IM for the purpose of Retaliation Monitoring. IM was argumentative and uncooperative. |
| 10/27/2017 | Eckenrod, Kevin J | HUNTINGDON | Inmate attended orientation today. All required departments presented except Chaplaincy. This counselor explained about the chaplaincy, as directed by Chaplain Wireman, and directed all religious questions to that department. PREA was reviewed and video was watched. PREA inmate education form signed and forwarded to inmate's counselor for DC-14. |
| 10/26/2017 | Banks, Christopher R | HUNTINGDON | OOC-late entry-RHU contact out of cell on 10/25/17. This writer introduced myself to Brown as his counselor. We went over some information and services available to him. He reported no distress, overall seemed well adjusted, no indications of SI/HI. Brown had no questions or concerns at the time of contact. |

 **pennsylvania**
DEPARTMENT OF CORRECTIONS



June 28, 2022

Gartor Kiki Brown 094007050
Mshannon Valley Processing Center
555 Geo Drive
Philipsburg, PA 16866

Dear Mr. Brown,

Enclosed please find Defendants' exhibits for trial. Please note that some exhibits are not included here, starting with Exhibit 48. I will forward those exhibits as soon as they are ready. Also, I look forward to the receipt of your exhibits and pretrial filings.

Thank you for your attention to this matter.

Thanks,

*/s/ Lindsey Bedell*
Lindsey Bedell
Assistant Counsel

**Exhibit 51**

| Form DC-141 Part 1 | COMMONWEALTH OF PENNSYLVANIA | D 031184 |
|---|---|---|
| Rev. 12/2017 | DEPARTMENT OF CORRECTIONS | |

☒ MISCONDUCT REPORT     ☐ OTHER     ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|---|
| NA 6401 | BROWN | | SCI-H | 1839 | 1/22/18 | 1/22/18 |
| Quarters | Place of Incident | | | | | |
| GA 1016 | RHU  PROPERTY ROOM | | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

# 36  POSSESSION OF CONTRABAND (PROPERTY OF ANOTHER)

# 44  LOANING OR BORROWING

**STAFF MEMBER'S VERSION**

WHILE INVENTORYING INMATE BROWN's NA 6401 PROPERTY THIS
OFFICER FOUND A CLEARTUNES DIGITAL RADIO BELONGING TO
ANOTHER INMATE. WOMACK MW 7978 ENGRAVED ON THE RADIO
BROWN STATED "A FRIEND GAVE IT TO ME"

CIR # B025818

**IMMEDIATE ACTION TAKEN AND REASON** Investigated. No further inquiry indicated.
Inmate informed of this respect / Inappropriate for Informal Resolution
Due to nature of charges. Continue Pre-Hearing
Confinement States

**PRE-HEARING CONFINEMENT**

IF YES

| ☐ YES | TIME | DATE | |
|---|---|---|---|
| ☒ NO | | | |

☐ REQUEST FOR WITNESSES AND REPRESENTATION     ☒ INMATE'S VERSION     **FORMS GIVEN TO INMATE**

| **REPORTING STAFF MEMBER SIGNATURE AND TITLE** | **ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY  SIGNATURE AND TITLE** | **DATE AND TIME INMATE GIVEN COPY** | |
|---|---|---|---|
| | | DATE | TIME 24 HOUR BASE |
| COI PROCENIK | M. Att    COI | 1/22/18 | 2018:25 |

**YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER**

| DATE | TIME | **MISCONDUCT CATEGORY** | **Signature of Person Serving Notice** |
|---|---|---|---|
| 1/24/18 | 0800 | ☒ CLASS 1     ☐ CLASS 2 | S/M C |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

FORM DC-141   PART 2 D
Rev. 8/05
WAIVER OF DISCIPLINARY
PROCEDURES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Facility | Date |
|-----------|------|----------|------|
| NA6401 | Brown | Hun | 1-25-18 |

MISCONDUCT REPORT(S) NO. # D081229, # D031184

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his/her right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

☒ I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # _SEE ABOVE_

☐ I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

☐ I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

(REFUSED TO ATTEND)
_____
INMATE

DATE _1-25-18_

_____
WITNESS

DATE _1-25-18_

COI _____
WITNESS

DATE _1-25-18_

**002**

FORM DC-141   PART II B

DISCIPLINARY HEARING REPORT

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 1/25/2018 | 1007 | D031184 |

| INMATE PLEA | ☐ Guilty ☐ Not Guilty | ☐ No Plea ☒ Other | Verdict | ☒ Guilty ☐ Not Guilty |
|---|---|---|---|---|

**HEARING ACTION**

**CHARGES**   36, 44

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of CO1 Plocinik, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown was found to be in possession of a cleartunes radio belonging to another inmate. Inmate Womack MW7928 was engraved on the radio. Inmate Brown stated, "A friend gave it to me." A preponderance of evidence exists to support charges #36 and #44.

Guilty #36 - Revoke Contraband
       #44 - Reprimand/Warning

Total - Revoke Contraband
       Effective 1/25/18

**In Absentia**

| | | |
|---|---|---|
| ☐ Yes | ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. |
| ☐ Yes | ☒ No | The circumstances of the charge have been read and fully explained to the inmate. |
| ☐ Yes | ☒ No | The opportunity to have the inmate's version reported as part of the record was given. |
| ☐ Yes | ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. |

SEE APPENDICES
☒
Part 2D

CIR B025818

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger**<br>**Hearing Examiner** | *[signature]* |

FORM DC-141     PART 2 D
Rev. 8/05
WAIVER OF DISCIPLINARY
PROCEDURES

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

| DC Number | Name | Facility | Date |
|---|---|---|---|
| NA6901 | Brown | Hun | 1-25-18 |

MISCONDUCT REPORT(S) NO. # D081229, # D051184

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his/her right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

[X] I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # See Above

[ ] I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

[ ] I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

(REFUSED TO SIGN)
_____
INMATE

DATE _____ 1-25-18 _____

_____
WITNESS

DATE _____ 1-25-18 _____

COI
_____
WITNESS

DATE _____ 1-25-18 _____

**004**

**Exhibit 49**

(Exhibit 94A)  CC: MSwartz
M Richards
DC-15
File/Career
4-30-18

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**1920 Technology Parkway**
**Mechanicsburg, PA 17050**

April 30, 2018

OFFICE OF THE
CHIEF HEARING EXAMINER

Garter Brown, NA-6401
SCI-Huntingdon

Re:    DC-ADM 801 - Final Review
Misconduct No. D031777 & D031797

Dear Mr. Brown:

Your appeal of the above-referenced misconducts has been received by this office and accepted for final review.

In accordance with DC-ADM 801, § 5 (C. 6), I have reviewed the entire record of these misconducts. The record reveals you pled guilty at your misconduct hearings. In accordance with DC-ADM 801, you may only appeal that the evidence is contrary to law, policy or regulations or that the sanction is disproportionate to the offense. Review of the records fails to suggest any evidence which is contrary to law, policy or regulations. Further, there is no evidence that the sanction imposed is disproportionate to the offense.

For the above-stated reasons I conclude the issues raised for review do not, as a matter of law, require further action on these misconducts. Your appeal must, therefore, be denied.

Zachary J Moslak
Acting Chief Hearing Examiner
Pennsylvania Department of Corrections

ZJM/srh
cc:    Superintendent Kauffman

RECEIVED

BY: ......................

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime victims."*

Form DC-141 Part 1
Rev. 12/2017

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

D031777

☑ MISCONDUCT REPORT   ☐ OTHER   ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|---|
| NA6401 | BROWN | | SCI H. | 1130 | 2-8-18 | 2-8-18 |

| Quarters | Place of Incident |
|---|---|
| G-D loc5 | G-A Showers |

OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| STAFF | Co1 B HARRIS | | X | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

CLASS 1   #35   Refusing to obey an order.

**STAFF MEMBER'S VERSION**

On 2-8-2018 at approx 1130 hrs, I went to the Showers on The Bottom of G-A quad where inmate NA6401 BRown STATED to me "I Already told Harris, but I Am Not taking a cellie." He was given A Direct order to tAke A cellmate. Inmate Brown replied "I Am Not going back to loc8."

**IMMEDIATE ACTION TAKEN AND REASON** /m Informal o.c flm Report - Not Appropriate For Informal Resolution Due to change Institute Placed Status
**PRE-HEARING CONFINEMENT** Until Seen By Hoo

IF YES

| ☐ YES | TIME | DATE |
|---|---|---|
| ☐ NO | 1145 | 2/8/2018 |

FORMS GIVEN TO INMATE
☑ REQUEST FOR WITNESSES AND REPRESENTATION   ☑ INMATE'S VERSION

**REPORTING STAFF MEMBER SIGNATURE AND TITLE**
Col K Myers

**ACTION REVIEWED AND APPROVED BY**
**RANKING C.O. ON DUTY SIGNATURE AND TITLE**
Coxgx Coy

**DATE AND TIME INMATE GIVEN COPY**
DATE 2-8-18   TIME 24 HOUR BASE 1430

YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER
DATE 2/10/2018   TIME 0800

**MISCONDUCT CATEGORY**
☑ CLASS 1   ☐ CLASS 2

**Signature of Person Serving Notice**
Neider C01

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

**DC-ADM 801, Inmate Discipline Procedures Manual**
**Section 1 – Misconducts/Rule Violations**
Issued: 12/1/2017

**Attachment 1-B**
**008**

DC-141, Part 2 (E)                COMMONWEALTH OF PENNSYLVANIA
Misconduct Hearing Appeal

| DC Number | Name | Facility | No. From Part 1 |
|---|---|---|---|
| NA6401 | Carter Brown | SCI-H | D031777 |

I was found guilty of misconduct number ___D031777___ on ___2/13/18___
(date)

by the Hearing Examiner, and I wish to appeal that decision on the following grounds.

### Check Area(s) Involved

☐ a. the procedures employed were contrary to law, Department directives, or regulations;

☐ b. the punishment is disproportionate to the offense; and/or                    MAR 08

☐ c. the findings of fact were insufficient to support the decision.

Below is a brief statement of the facts relevant to my claims(s). It includes the identity
of all persons who may have information that may be helpful in resolving this matter.

The department does not permit any inmate to be subject to abuse sexually.
PRC fail to address that Brown claim rape; PRC was better off not even address[ing]
this appeal. Brown claim he was penagrated [penetrated] & which another inmate ___ of his
contact with his anus in which Brown claims he made C.O's aware but
they did nothing to remove Brown from the cell or to call medical.
At one point Brown was force to give his bloody jumper shorts & colors to
C.O's on 2/7/18 check answers. The DOC actions contradicts DC ADM 008
At no time can officials put an inmate in a cell were he claims he was
just sexually assaulted. PRC is indifference for not even address[ing] this
issue. The c.o. that wrote Brown up never even in contact with Brown
claims his abuse, Brown told Hersic & Custer & another c.o. not myers
& myers wrote him up. At no time can officials contradict policy
to write an inmate up. At no time can officials write an inmate up
for refusing to go in a cell were he was sexually assaulted, then
fail to address it in the appeal.

_____                              ___2/26/18___
Inmate's Signature                                        Date

| DC-141, Part III Program Review Committee Action | COMMONWEALTH OF PENNSYLVANIA | | FEB 2 6 REC'D | |
| Program Review Committee Action | Department of Corrections | | | |

× Misconduct Appeal    Periodic Review    ☐ Other

| DC Number | Name | Facility | Date of Review | No. from DC-141, Part 1 |
|---|---|---|---|---|
| NA6401 | BROWN | HUN | 2/21/2018 | D031777 |

## Program Review Committee's Decision and Rationale

P.R.C. Formal Review Of Misconduct # D031777

### BASIS OF APPEAL:

- A. The procedures employed were contrary to law, Department Directives, or regulations
- B. The punishment is disproportionate to the offense
- C. The findings of fact were insufficient to support the decision

NA6401 Brown is appealing misconduct D0311777. He did not choose a basis of appeal, therefore, all will be addressed. He states that he does not feel he can be given more time for refusing a cellie when he was already serving DC time for the same charge.

On 2/13/2018, NA6401 Brown received misconduct D031777 for charge #35 Refusing to obey an order. He refused to take a cell mate. At the misconduct hearing, he pled guilty. The HEX accepted the guilty plea. Brown was sanctioned to 15 days DC consecutive.

PRC has reviewed the misconduct and appeal. The procedures employed were not contrary to law, department directives or regulations. The findings of fact were sufficient to support the decision and the punishment is fair.

It is noted that this is NA6401 Brown's sixth misconduct for charge #35 Refusing to obey an order.

Uphold.

### Decision Relative to PRC Review

☐ Continue  ☐ Move to AC  ☐ Release to GP  ☐ Release Cell Restriction  ☐ Continue Investigation

☐ Release to Control GRP  ☐ Release Medical  ☐ Release Diag. Center  ☐ Release Sent. Complete

### Decision Relative to Hearing Examiner's Verdict

☐ Reject  × Uphold  ☐ Uphold-Modify  ☐ Remand back  ☐ Vacate-permit Recharge  ☐ Dismiss

| Names of Program Review Committee Members | Signatures | Date |
|---|---|---|
| T. Hicks-Kern, CEVC | *[signature]* | 2/21/2018 |
| W. S. Walters, DSCS | *[signature]* | 2-2-18 |
| B. Brumbaugh, DSFM | | 2-23-18 |

WHITE – DC-15    YELLOW – INMATE    PINK – STAFF MEMBER REPORTING MISCONDUCT
GOLDENROD - DSFM

FEB 2 3 2018

004

FEB 16 REC'D

DC-141, Part 2 E                    COMMONWEALTH OF PENNSYLVANIA
Misconduct Hearing Appeal

| DC Number | Name | Facility | No. From Part 1 |
|-----------|------|----------|-----------------|
| NN6901 NAG401 | Gaylor Brown | SCI H | |

I was found guilty of misconduct number __D 031777__ on __2/13/18__
                                                              (date)

by the Hearing Examiner, and I wish to appeal that decision on the following grounds:

### Check Area(s) Involved

□ a. the procedures employed were contrary to law, Department directives, or regulations;

□ b. the punishment is disproportionate to the offense; and/or

□ c. the findings of fact were insufficient to support the decision.

Below is a brief statement of the facts relevant to my claims(s). It includes the identity of all persons who may have information that may be helpful in resolving this matter.

I told the hearing Examiner that I was sexually assaulted that's why I refused to go back in the cell with inmate Allen, I will also assaulted in which co's are aware of this act, on 2/7/18 co Johnson even took Brown's jumper a sheet that was filled with blood from an attack, but then nothing to move Broam. The camera will show every thing, By custom & policy Brown already has D.C. time for refusing an celly & giving Brown more DC Time for refusing a celly with out him doing the time he got for the first refusal Contradicts policy. Not only that Brown was also Raped at the last jail he was at & suffered injuries, I don't feel PRC can ignor the fact that Brown was got sexually assaulted agange by a "cellier inmate Allen in which could had been avoided if staff did their job & conducted policy, his write up should be dismiss, Brown did refuse to go back into that cell, But Brown is also claiming Allen sexualy assulted him & assalted him for days in which co's was aware but did nothing!

| | |
|---|---|
| Inmate's Signature | 2/13/18 Date |

| DC-141, Part III Program Review Committee Action × Misconduct Appeal    Periodic Review    ☐ Other | | **COMMONWEALTH OF PENNSYLVANIA** Department of Corrections | | |
|---|---|---|---|---|

| DC Number | Name | Facility | Date of Review | No. from DC-141, Part 1 |
|---|---|---|---|---|
| NA6401 | BROWN | HUN | 2/21/2018 | D031777 |

**Program Review Committee's Decision and Rationale**

P.R.C. Formal Review Of Misconduct # D031777

<u>BASIS OF APPEAL:</u>

   **A. The procedures employed were contrary to law, Department Directives, or regulations**
   **B. The punishment is disproportionate to the offense**
   **C. The findings of fact were insufficient to support the decision**

NA6401 Brown is appealing misconduct D0311777. He did not choose a basis of appeal, therefore, all will be addressed. He states that he does not feel he can be given more time for refusing a cellie when he was already serving DC time for the same charge.

On 2/13/2018, NA6401 Brown received misconduct D031777 for charge #35 Refusing to obey an order. He refused to take a cell mate. At the misconduct hearing, he pled guilty. The HEX accepted the guilty plea. Brown was sanctioned to 15 days DC consecutive.

PRC has reviewed the misconduct and appeal. The procedures employed were not contrary to law, department directives or regulations. The findings of fact were sufficient to support the decision and the punishment is fair.

It is noted that this is NA6401 Brown's sixth misconduct for charge #35 Refusing to obey an order.

Uphold.

| Decision Relative to PRC Review | | | | |
|---|---|---|---|---|
| ☐ Continue  ☐  Move to AC  ☐  Release to GP  ☐ Release Cell Restriction  ☐ Continue Investigation | | | | |
| ☐ Release to Control GRP  ☐ Release Medical  ☐ Release Diag. Center  ☐  Release Sent. Complete | | | | |

| Decision Relative to Hearing Examiner's Verdict | | |
|---|---|---|
| ☐ Reject  × Uphold  ☐ Uphold-Modify  ☐ Remand back  ☐ Vacate-permit Recharge ☐ Dismiss | | |

| Names of Program Review Committee Members | Signatures | Date |
|---|---|---|
| T. Hicks-Kern, CEVC | | |
| W. S. Walters, DSCS | | |
| B. Brumbaugh, DSFM | | |

**WHITE – DC-15        YELLOW – INMATE        PINK – STAFF MEMBER REPORTING MISCONDUCT**
**GOLDENROD - DSFM**

FORM DC-141 PART II B

DISCIPLINARY HEARING REPORT

COMMONWEALTH OF PENNSYLVANIA

DEPARTMENT OF CORRECTIONS

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Kiki | Huntingdon | 2/13/2018 | 1050 | D031777 |

| INMATE PLEA | ☒ Guilty ☐ Not Guilty | ☐ No Plea ☐ Other | Verdict | ☒ Guilty ☐ Not Guilty |
|---|---|---|---|---|

## HEARING ACTION

CHARGES   35

### FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

Inmate Brown pleads guilty to charge #35.

HEX accepts guilty plea.

Guilty #35 - 15 Days DC
          Consecutive

| | | |
|---|---|---|
| ☒ Yes ☐ No | The inmate has heard the decision and has been told the reason for it and what will happen. | NONE |
| ☒ Yes ☐ No | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES |
| ☒ Yes ☐ No | The opportunity to have the inmate's version reported as part of the record was given. | ☒ |
| ☒ Yes ☐ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| S. Ellenberger Hearing Examiner | |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent



**pennsylvania**
DEPARTMENT OF CORRECTIONS

**MEMO**

| | |
|---|---|
| **TO** | Gator Brown, NA6401<br>GD-Unit |
| **FROM** | Kevin Kauffman<br>Superintendent |
| **DATE** | March 21, 2018 |
| **RE** | Appeal of Misconduct #D031797 |

My review of your appeal of misconduct #D031797 indicates it is based on your belief that:

A.     The procedures employed were contrary to law, department directives, or regulations:

I have taken the opportunity to read your instant appeal, the Program Review Committee decision, and the entire misconduct packet. In your appeal, you explain why you are refusing to accept a cellmate; however, there is no indication the procedures used in this misconduct and hearing were contrary to law, policy, or regulations.

For the reasons outlined above, I reject your appeal as lacking merit, and therefore sustain the decision of the hearing examiner.

KK:cjg

cc:     Deputy Brumbaugh
        Deputy Walters
        DC-14
        DC-15
        File

**Exhibit 87**

| | | | | | |
|---|---|---|---|---|---|
| *1, Part III* Program Review Committee Action | COMMONWEALTH OF PENNSYLVANIA Department of Corrections | | | | DEC 18 2017 |

☒ Misconduct Appeal   ☐ Periodic Review   ☐ Other

| DC Number | Name | Facility | Date of Review | No. from DC-141, Part 1 |
|---|---|---|---|---|
| NA6401 | Brown, Gartor | SCI H | 12/18/17 | C065592 |

**Program Review Committee's Decision and Rationale**

P.R.C. Formal Review of Misconduct # C065592

<u>BASIS OF APPEAL</u>:

    A.  The procedures employed were contrary to law, Department directives, or regulations.
    B.  The punishment is disproportionate to the offense; and/or
    C.  The findings of fact were insufficient to support the decision.

<u>DISCUSSION</u>:

Inmate Brown is appealing misconduct #C065592 but did not indicate on the DC141 Part 2E on what grounds.

The Program Review Committee has reviewed the misconduct, and appeal. On 12/01/17, COI Grace told inmate Brown he was moving to AA Unit. Inmate Brown responded "If you put me in with a celly I am going to kill him." He then repeated this "If you put me in with a celly I am going to kill him." This was said infront of both Sgt. Duffey and COI Grace. Inmate Brown was issued a misconduct for charge #17, Threatening another person, and charge #35, Refusing to obey an order. On 12/05/17, a hearing was conducted. Inmate Brown pled not guilty to both charges. The Hearing Examiner found him guilty of both charges #17 & #35. He was sanctioned to 15 days DC time for charge #17 and 15 days DC time for charge #35 (concurrent) for a total of 15 days DC time, and loss of job effective 12/01/17.

In conclusion, after reviewing misconduct #C065592 and the corresponding discussion, PRC finds no incident of procedural error, punishment was proportionate to the offense, and the findings of fact were sufficient to support the decision. It is important to note any PREA related concerns need to be addressed with the PREA Compliance Manager, Ms. Sipple. This information will be forwarded to the PREA Compliance Manager to review.

Therefore, uphold the decision of Hearing Examiner.

---

Decision Relative to PRC Review

☐ Continue  ☐ Move to AC  ☐ Release to GP  ☐ Release Cell Restriction  ☐ Continue Investigation

☐ Release to Control GRP  ☐ Release Medical  ☐ Release Diag. Center  ☐ Release Sent. Complete

Decision Relative to Hearing Examiner's Verdict

☐ Reject  ☒ Uphold  ☐ Uphold-Modify  ☐ Remand back  ☐ Vacate-permit Recharge  ☐ Dismiss

| Names of Program Review Committee Members | Signatures | Date |
|---|---|---|
| J. Spyker, Corrections Unit Manager | | 12/18/17 |
| M. Sipple, Classification Program Manager | M. Sipple | 12/18/17 |
| B. Brumbaugh, Deputy Supt./Facilities Management | | 12/18/17 |

WHITE – DC-15        YELLOW – INMATE        PINK – STAFF MEMBER REPORTING MISCONDUCT

| DC-141, Part 2 E | COMMONWEALTH OF PENNSYLVANIA | | |
|---|---|---|---|
| Misconduct Hearing Appeal | | | |
| DC Number | Name | Facility | No. From Part 1 |
| NA 6461 | Gavior Brown | SCI H | C 065592 |

I was found guilty of misconduct number __17 & 35__ on __12-5-17__
(date)

by the Hearing Examiner, and I wish to appeal that decision on the following grounds:

## Check Area(s) Involved

□ a. the procedures employed were contrary to law, Department directives, or regulations;

□ b. the punishment is disproportionate to the offense; and/or

□ c. the findings of fact were insufficient to support the decision.

Below is a brief statement of the facts relevant to my claims(s). It includes the identity of all persons who may have information that may be helpful in resolving this matter.

This right up is contradicting DOC Policys in which officials are aware & still found me in silly shows reckless intent & lack of training. With due respect to Mr. Ellenberger he is responsible to know Policys to an extent so that he could fairly conduct a hearing. Resemption of classification Policy 17.2.1  In pursuants to inmate not being punishible for thoughts in their head that was not acted apon & search as homicidal to suicidal if they make officials aware: ex. on 10-23-17 this inmate told one Maxwell he was a rape victim along with Counselor & medical Personally. on 10-23 & 24 of 2017 this inmate meet with one (Parkison Eric) from the psyc department asserted he was rape two times had a medical condition bleeding out the anal also sphy condition, depression, anxiety, things about killing himself also homicidal, he told Parkison he was diagnose with P.T.S.D because as a kid he was in a civil war, Parkison did nothing. This inmate wrote cousins asserting he was crazy himself to zeep, depression, anxisty, cousins sign her name on the respond it which I have to deliver the inferences that cousins wrote back in which Returning me to this butterhall base on my claims & Policy I should had been treated & seen by cousins. I need with butterhal, told her I, Hiny of killing myself sometimes after the rape, also I was homicidal & I did not feel safe with no one in the cility with Mr because of the rape & I was hearing voices saying "am quity to made your cily fuck you". After our meeting with syc by Policy a treatment round should had have Put together with a z code referred also mase or pation all informaton should had been forwarded to Richard Ralle's head Phys. This inmate was voted off team z code by Richard Grills, Maxwell, Parkison, butterhall & others in which shows that they was aware of Browns condition & did nothing.

| Inmate's Signature | | 12/5/17 |
|---|---|---|
| | | Date |

**Exhibit 86**

| DC-141, Part III<br>Program Review<br>Committee Action | COMMONWEALTH OF PENNSYLVANIA<br>Department of Corrections | | | DEC 1 9 REC'D |
|---|---|---|---|---|

☒ Misconduct Appeal   ☐ Periodic Review   ☐ Other

| DC Number | Name | Facility | Date of Review | No. from DC-141, Part 1 |
|---|---|---|---|---|
| NA6401 | Brown, Gartor | SCI H | 12/18/17 | C084585 |

**Program Review Committee's Decision and Rationale**

P.R.C. Formal Review of Misconduct # C084585

BASIS OF APPEAL:

    A. The procedures employed were contrary to law, Department directives, or regulations.
    B. The punishment is disproportionate to the offense; and/or
    C. The findings of fact were insufficient to support the decision.

DISCUSSION:

Inmate Brown is appealing misconduct #C084585 but did not indicate on the DC141 Part 2E on what grounds.

The Program Review Committee has reviewed the misconduct, and appeal. On 12/05/17, COI Poorman gave inmate Brown a direct order to move and except a cellmate. Inmate Brown refused to obey this order by stating he could not take a cellmate because he was homicidal. Inmate Brown was issued a misconduct for charge #35, Refusing to obey an order. On 12/07/17, a hearing was conducted. Inmate Brown pled not guilty to charge #35. The Hearing Examiner found him guilty of charge #35. He was sanctioned to 15 days DC time for charge #35 (consecutive).

In conclusion, after reviewing misconduct #C084585 and the corresponding discussion, PRC finds no incident of procedural error, punishment was proportionate to the offense, and the findings of fact were sufficient to support the decision. It is important to note any PREA related concerns need to be addressed with the PREA Compliance Manager, Ms. Sipple. Any mental health related concerns need to be addressed through Mr. Goss, LPM. This information will be forwarded to the PREA Compliance Manager and Mr. Goss for review as it will not be addressed through the appeal process.

Therefore, uphold the decision of Hearing Examiner.

| Decision Relative to PRC Review |
|---|

☐ Continue  ☐  Move to AC  ☐ Release to GP ☐ Release Cell Restriction ☐ Continue Investigation

☐ Release to Control GRP ☐ Release Medical ☐ Release Diag. Center ☐ Release Sent. Complete

| Decision Relative to Hearing Examiner's Verdict |
|---|

☐ Reject  ☒ Uphold  ☐ Uphold-Modify  ☐ Remand back ☐ Vacate-permit Recharge ☐ Dismiss

| Names of Program Review Committee Members | Signatures | Date |
|---|---|---|
| J. Spyker, Corrections Unit Manager | | 12/18/17 |
| M. Sipple, Classification Program Manager | | 12/18/17 |
| B. Brumbaugh, Deputy Supt./Facilities Management | | 12/18/17 |

**WHITE – DC-15**    **YELLOW – INMATE**    **PINK – STAFF MEMBER REPORTING MISCONDUCT**
**GOLDENROD - DSFM**

DEC 1 4 REC'D

| DC-141, Part 2 E | COMMONWEALTH OF PENNSYLVANIA | | |
|---|---|---|---|
| Misconduct Hearing Appeal | | | |
| DC Number | Name | Facility | No. From Part 1 |
| NM4101 | Gaige Brown | SCTH | C 08438S |

Brown had this appeal up in the doors by 12.00 Pm on 12-8-17 check the camera, co's did not Pick up this appeal till 12-10-17

I was found guilty of misconduct number ____ #35 ____ on ___ 12-7-17 ___
(date)

by the Hearing Examiner, and I wish to appeal that decision on the following grounds:

Check Area(s) Involved

□ a. the procedures employed were contrary to law, Department directives, or regulations;

□ b. the punishment is disproportionate to the offense; and/or

□ c. the findings of fact were insufficient to support the decision.

Below is a brief statement of the facts relevant to my claims(s). It includes the identity of all persons who may have information that may be helpful in resolving this matter.

This class one #35 contradicts Doc policys through the 8cu & reSection of classification 17.2.1. Also Brown's claims of sexual assault & his symtoms he is suffering pursuant to the Plc has not been addressed by the Physc department. Brown's claims of Family for his life, depression, Anxsity, PTSD, not trusting another inmate & Physical injuries has been over looked. Through his meetings with four different sphyc members there has not been any adicut teting or diagnosed or medication. 17.2.1 protects Brown in which the Doc provides Mention to tell officials if they are having homosidal thoughts, to prevent them from acting, I ask SCT Houtsbgton has a system of locking pass that & writing inmeifes up for shareing thoughts. Brown was made sphyc aware of his thoughts on 12/1/17 he made Brown aware in which he was put in an observation cell. Brown never saw A member from sphyc nor was he assigned all this observation cell before another ugame attempting to move him in the cell with another inmate, its ok to allow him with on the same block. All policy in the 804 or 802 was disregarded. Brown Backed his stuff came to the door to cuff up then made officals aware again of his thoughts in which he was involve up disregarding policy, as he told off brown refuse to obey order. By Brown Still being in the opperation cell & had not made with a sphyc medical or sphyc personal officials where not the same of their duty by attempting to Get Brown in the cell with another inmate. The only Reason Brown was written up because by policy he is protected from officials puting him in the cell with another inmate base on his thoughts in which officials are aldent

12/8/17

| Inmate's Signature | Date |
|---|---|

A1016

**Exhibit 85**

| Form DC-141 Part 1<br>Rev. 12/2017 | **COMMONWEALTH OF PENNSYLVANIA**<br>**DEPARTMENT OF CORRECTIONS** | D 081229 |
|---|---|---|

☑ MISCONDUCT REPORT      ☐ OTHER      ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number<br>NA6401 | Name<br>Brown | | Institution<br>SCIHun | Incident Time 24 Hr. Base<br>1716 | Incident Date<br>1-22-18 | Date of Report<br>1-22-18 |
|---|---|---|---|---|---|---|
| Quarters<br>AA1008 | Place of Incident<br>AA Desk | | | | | |

OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | COI Himes | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

Class 1 Charge #35 Refusing to obey an order, #15 Threatening an employee

**STAFF MEMBER'S VERSION**

SN, on the above listed date and approximate time, inmate NA6401 Brown began to argue with me in regards to mail. I explained to inmate Brown that the Officer was busy and would get him his legal mail When he was able to. Inmate Brown continued to argue with me. After I gave him his legal mail, I gave him two direct orders to return to his cell. Both of these orders were refused. On the third direct order, inmate Brown complied. As he was returning to his cell, he said "Alright Moore, I got something coming for you"

**IMMEDIATE ACTION TAKEN AND REASON** Investigated. No further inquiry indicated. Inmate informed of this report/ investigation findings. Taken off the Institution.

PRE-HEARING CONFINEMENT       during Investigation/charges. Placed on Pretory Cont for Control

IF YES

| ☑ YES | TIME | DATE |
|---|---|---|
| ☐ NO | 1800 | 1-22-18 |

☑ REQUEST FOR WITNESSES AND REPRESENTATION      **FORMS GIVEN TO INMATE**      ☑ INMATE'S VERSION

| REPORTING STAFF MEMBER<br>SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY<br>RANKING C.O. ON DUTY SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| COI N.Moore | | DATE<br>1-22-18 | TIME 24 HOUR<br>1838 BASE |

YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER       **MISCONDUCT CATEGORY**       Signature of Person Serving Notice

| DATE | TIME |
|---|---|
| 1-24-18 | 0800 |

| | |
|---|---|
| ☑ CLASS 1 | ☐ CLASS 2 |

Signature of Person Serving Notice

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15                    YELLOW – Inmate                    PINK – Reporting Staff Member

| FORM DC-141   PART II B | COMMONWEALTH OF PENNSYLVANIA | | | | |
|---|---|---|---|---|---|
| DISCIPLINARY HEARING REPORT | DEPARTMENT OF CORRECTIONS | | | | |

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 1/25/2018 | 1005 | D081229 |

| INMATE PLEA | ☐ Guilty  ☐ Not Guilty | ☐ No Plea  ☒ Other | Verdict | ☒ Guilty  ☐ Not Guilty |
|---|---|---|---|---|

### HEARING ACTION

**CHARGES**    15, 35

---

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of CO2 Moore, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown refused several orders to return to his cell. After the third order, Inmate Brown complied. A preponderance of evidence exists to support charge #35.

Guilty #35 - 30 Days DC
            Loss of Job
            Effective 1/22/18

Dismiss #15

**In Absentia**

| | | | |
|---|---|---|---|
| ☐ Yes | ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. | |
| ☐ Yes | ☒ No | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES ☒ |
| ☐ Yes | ☒ No | The opportunity to have the inmate's version reported as part of the record was given. | |
| ☐ Yes | ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | Part 2D |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger**  **Hearing Examiner** | _[signature]_ |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent

FORM DC-141    PART 2 D
Rev. 8/05
WAIVER OF DISCIPLINARY
PROCEDURES

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

| DC Number | Name | Facility | Date |
|-----------|------|----------|------|
| NA6401 | Brown | Hun | 1-25-18 |

MISCONDUCT REPORT(S) NO. # D081229 # D031184

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his/her right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

☒ I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # _SEE ABOVE_

☐ I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

☐ I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

REFUSED TO ATTEND
INMATE

DATE _1-25-18_

BY John
WITNESS

DATE _1-25-18_

COI
WITNESS

DATE _1-25-18_

FORM DC-141   PART 2 D
Rev. 6/05
WAIVER OF DISCIPLINARY
PROCEDURES

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

| DC Number | Name | Facility | Date |
|---|---|---|---|
| NK6401 | | Hua | 1-25-18 |

MISCONDUCT REPORT(S) NO. # D681229 # D651184

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his/her right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

☒ I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # See Above

☐ I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

☐ I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

(REFUSED TO ATTEND)
INMATE

DATE  1-25-18

_____
WITNESS

DATE  1-25-18

COT
WITNESS

DATE  1-25-18

**Exhibit 84**

| Form DC-141 Part 1<br>Rev. 12/2017 | COMMONWEALTH OF PENNSYLVANIA<br>DEPARTMENT OF CORRECTIONS | D 031184 |

☑ MISCONDUCT REPORT  ☐ OTHER  ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number<br>NA 6401 | Name<br>BROWN | Institution<br>SCI H | Incident Time 24 Hr. Base<br>1839 | Incident Date<br>1/22/18 | Date of Report<br>1/22/18 |
| Quarters<br>GA 10:16 | Place of Incident<br>RHU PROPERTY ROOM | | | | |

OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

#36 POSSESSION OF CONTRABAND (PROPERTY OF ANOTHER)

#44 LOANING OR BORROWING

**STAFF MEMBER'S VERSION**

WHILE INVENTORING INMATE BROWN's NA 6401 PROPERTY THIS
OFFICER FOUND A CLEARTUNES DIGITAL RADIO BELONGING TO
ANOTHER INMATE. WOMACK MW 7938 ENGRAVED ON THE RADIO
BROWN STATED "A FRIEND GAVE IT TO ME"

CDR # 302818

**IMMEDIATE ACTION TAKEN AND REASON** Investigated. No further inquiry indicated
Inmate informed of this report. Inappropriate for Informal Resolution
Due to notated charge. Continue Present
**PRE-HEARING CONFINEMENT**  Conf states

**IF YES**

☐ YES  ☑ NO

| TIME | DATE |
|---|---|

**FORMS GIVEN TO INMATE**

☐ REQUEST FOR WITNESSES AND REPRESENTATION  ☑ INMATE'S VERSION

| REPORTING STAFF MEMBER<br>SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY<br>RANKING C.O. ON DUTY  SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
| COI PLOCINIK | | DATE 1/22/18  TIME 24 HOUR BASE 20:45 |

YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER

| DATE | TIME |
|---|---|
| 1/24/18 | 08:00 |

**MISCONDUCT CATEGORY**

☑ CLASS 1  ☐ CLASS 2

Signature of Person Serving Notice

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

*DC-ADM 801, Inmate Discipline Procedures Manual*  *Attachment 1-B*
**Section 1 – Misconducts/Rule Violations**
Issued: 12/1/2017
Effective: 12/1/2017

001

FORM DC-141    PART 2 D
Rev. 8/05
WAIVER OF DISCIPLINARY
PROCEDURES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Facility | Date |
|---|---|---|---|
| NA6401 | Brown | Hun | 1-25-18 |

MISCONDUCT REPORT(S) NO. # D081229, # D031184

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his/her right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

☒ I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # _SEE ABOVE_

☐ I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

☐ I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

_(REFUSED TO ATTEND)_
INMATE

DATE _1-25-18_

_B. Yohn_
WITNESS

DATE _1-25-18_

_COT_
WITNESS

DATE _1-25-18_

FORM DC-141   PART II B

DISCIPLINARY HEARING REPORT

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 1/25/2018 | 1007 | D031184 |

| INMATE PLEA | ☐ Guilty | ☐ No Plea | Verdict | ☒ Guilty |
|---|---|---|---|---|
| | ☐ Not Guilty | ☒ Other | | ☐ Not Guilty |

### HEARING ACTION

CHARGES   36, 44

### FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of CO1 Plocinik, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown was found to be in possession of a cleartunes radio belonging to another inmate. Inmate Womack MW7928 was engraved on the radio. Inmate Brown stated, "A friend gave it to me." A preponderance of evidence exists to support charges #36 and #44.

Guilty #36 - Revoke Contraband
     #44 - Reprimand/Warning

Total - Revoke Contraband
     Effective 1/25/18

In Absentia

| | | | |
|---|---|---|---|
| ☐ Yes | ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. | |
| ☐ Yes | ☒ No | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES |
| ☐ Yes | ☒ No | The opportunity to have the inmate's version reported as part of the record was given. | ☒ Part 2D |
| ☐ Yes | ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | CIR B025818 |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| S. Ellenberger<br>Hearing Examiner | *[signature]* |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent

FORM DC-141    PART 2 D
Rev. 8/05
WAIVER OF DISCIPLINARY
PROCEDURES

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

| DC Number | Name | Facility | Date |
|---|---|---|---|
| N16901 | Brown | Hun | 1-25-18 |

MISCONDUCT REPORT(S) NO. # D081229, # D051184

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his/her right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed on by the Program Review Committee.

I have read and or this statement or have had it read to me, and with an understanding of my rights

[X] I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # See above

[ ] I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

[ ] I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

(REFUSED TO ATTEND)
_____
INMATE

DATE _1-25-18_

BY JM
_____
WITNESS

DATE _1-25-18_

COT
_____
WITNESS

DATE _1-25-18_

**004**

**Exhibit 83**

| FORM DC-141   PART II B | | COMMONWEALTH OF PENNSYLVANIA | | | | |
| DISCIPLINARY HEARING REPORT | | DEPARTMENT OF CORRECTIONS | | | | |
| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
| NA6401 | Brown, Gartor | Huntingdon | 1/30/2018 | 1025 | D031736 |

| INMATE PLEA | ☐ Guilty | ☐ No Plea | Verdict | ☒ Guilty |
| | ☐ Not Guilty | ☒ Other | | ☐ Not Guilty |

## HEARING ACTION

CHARGES    35

### FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of CO1 Stover, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown refused all orders to take a cellmate. A preponderance of evidence exists to support charge #35.

Guilty #35 - 15 Days DC
      Consecutive

In Absentia

| | | | |
|---|---|---|---|
| ☐ Yes | ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. | |
| ☐ Yes | ☒ No | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES ☒ |
| ☐ Yes | ☒ No | The opportunity to have the inmate's version reported as part of the record was given. | |
| ☐ Yes | ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | Part 2D |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed.  Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger** **Hearing Examiner** | *[signature]* |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent

**001**

| FORM DC-141 PART 2 D<br>Rev. 8/05<br>WAIVER OF DISCIPLINARY<br>PROCEDURES | COMMONWEALTH OF PENNSYLVANIA<br>DEPARTMENT OF CORRECTIONS | | |
|---|---|---|---|
| DC Number<br>N.A 6401 | Name<br>Brown | Facility<br>Hun. | Date<br>1-30-18 |

MISCONDUCT REPORT(S) NO. # D031736

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his/her right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

☒ I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # D031736

☐ I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

☐ I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

(Refused to sign)
INMATE

DATE 1-30-18

_____
WITNESS

DATE 1-30-18

_____
WITNESS

DATE 1-30-18

002

| Form DC-141 Part 1 | **COMMONWEALTH OF PENNSYLVANIA** | D031736 |
| Rev. 12/2017 | **DEPARTMENT OF CORRECTIONS** | |

☑ MISCONDUCT REPORT    ☐ OTHER    ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| NA6401 | Brown | SCI H | 1715 | 1-25-18 | 1-25-18 |
| Quarters | Place of Incident | | | | |
| GA 1016 | GA 1016 | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | COI Stanowski. | | X | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

Class 1 #35 Refusing to obey an order

**STAFF MEMBER'S VERSION**

On the above date and time this officer gave inmate Brown and direct order to take a cellmate. Inmate Brown refused this order by stating "im not taking any cellies." This ends this officers report.

**IMMEDIATE ACTION TAKEN AND REASON** Investigate, no further inquiry, not eligible for informal resolution. Inmate to remain present status until seen by hearing examiner. Inmate informed.

| PRE-HEARING CONFINEMENT | |
|---|---|
| **IF YES** | |
| ☐ YES   TIME   DATE | **FORMS GIVEN TO INMATE** |
| ☑ NO  Presently confined | ☑ REQUEST FOR WITNESSES AND REPRESENTATION   ☑ INMATE'S VERSION |

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY  SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| J. Stover COI | Small Col | DATE 1/25/18   TIME 24 HOUR BASE 2030 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER  DATE   TIME | **MISCONDUCT CATEGORY** | **Signature of Person Serving Notice** |
|---|---|---|
| 1-29-18   0800 | ☑ CLASS 1   ☑ CLASS 2 | |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law. If this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

***DC-ADM 801, Inmate Discipline Procedures Manual***          **Attachment 1-B**
***Section 1 – Misconducts/Rule Violations***
Issued: 12/1/2017
Effective: 12/1/2017          **003**

A D-105

**Exhibit 82**

Form DC-141 Part 1
Rev. 12/2017

## COMMONWEALTH OF PENNSYLVANIA
## DEPARTMENT OF CORRECTIONS

D 081010

☑ MISCONDUCT REPORT    ☐ OTHER    ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number NA6401 | Name Brown, Gartor | Institution SCIH | Incident Time 24 Hr. Base 0930 | Incident Date 02-03-18 | Date of Report 04-26-18 |
|---|---|---|---|---|---|
| Quarters GD1005 | Place of Incident GA1008 Cell | | | | |

### OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

MISCONDUCT CHARGE OR OTHER ACTION

**Class 1 Charge 42 Lying to an Employee**

STAFF MEMBER'S VERSION    On February 14, 2018 the Security Office received a DC-121 Employee Report of Incident containing an allegation of physical and sexual assault made by NA6401 Brown. The Investigation was assigned number 2018-P-197 and a thorough investigation was conducted by the Security Office and the State Police. At the conclusion of the Investigation, the allegations were declared unfounded. As unfounded Inmate Brown lied in his report of the physical and sexual abuse allegations. OSII has reviewed the findings and concurs with the findings of unfounded. The delay in this report was due to the time to complete a thorough investigation and OSII review.

IMMEDIATE ACTION TAKEN AND REASON  I/m informed of this Report - Not Appropriate for Informal Resolution due charge. Continue Current Status (AC) until Seen By Hex

| PRE-HEARING CONFINEMENT | | |
|---|---|---|
| IF YES | | |
| ☐ YES ☑ NO | TIME | DATE Currently confined |

FORMS GIVEN TO INMATE
☑ REQUEST FOR WITNESSES AND REPRESENTATION    ☑ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| Lt Maxwell | R Coup Coy | DATE 4-26-18 | TIME 24 HOUR 1520 BASE |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
|---|---|---|---|
| DATE 4/28/2018 | TIME 0800 | ☑ CLASS 1    ☐ CLASS 2 | |

### Notice to Inmate

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15                    YELLOW – Inmate                    PINK – Reporting Staff Member

FORM DC-141    PART II B

DISCIPLINARY HEARING REPORT

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 5/1/2018 | 1042 | D081010 |

| INMATE | ☐ Guilty | ☐ No Plea | Verdict | ☒ Guilty |
|---|---|---|---|---|
| PLEA | ☐ Not Guilty | ☒ Other | | ☐ Not Guilty |

**HEARING ACTION**

CHARGES    42

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of LT Maxwell, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown did lie to staff after it was determined through a thorough investigation by the security office and state police that Inmate Brown lied in his report of physical and sexual abuse allegations. Report 2018-P-197 was determined to be unfounded. A preponderance of evidence exist to support charge #42.

**Guilty #42 - 30 Days DC**
**Consecutive**

**In Absentia**

| | | | |
|---|---|---|---|
| ☐ Yes | ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. | |
| ☐ Yes | ☒ No | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES ☒ |
| ☐ Yes | ☒ No | The opportunity to have the inmate's version reported as part of the record was given. | |
| ☐ Yes | ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | Part 2D |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger**<br>**Hearing Examiner** | |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent        **002**

FORM DC-141      PART 2 D
Rev. 8/05
WAIVER OF DISCIPLINARY
PROCEDURES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Facility | Date |
|---|---|---|---|
| NAC401 | Brown | Hun | 5-1-18 |

MISCONDUCT REPORT(S) NO. # D08/010

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven working days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

☒ I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # D08/010

☐ I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

☐ I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven working days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

(REFUSED TO ATTEND)
_____
INMATE

DATE ___5-1-18___

_____
WITNESS

DATE ___5-1-18___

_____
WITNESS

DATE ___5-1-18___

**003**

**Exhibit 81**

| Form DC-141 Part 1<br>Rev. 12/2017 | **COMMONWEALTH OF PENNSYLVANIA**<br>**DEPARTMENT OF CORRECTIONS** | D 113453 |
|---|---|---|

☑ MISCONDUCT REPORT    ☐ OTHER        ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number<br>NAG4O1 | Name<br>BROWN | | Institution<br>SCI H | Incident Time 24 Hr. Base<br>1600 | Incident Date<br>3/21/18 | Date of Report<br>3/21/18 |
|---|---|---|---|---|---|---|
| Quarters<br>GD1OO5 | Place of Incident<br>GD1OO5 | | | | | |

OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

CLASS 1 - #35 REFUSING TO OBEY AN ORDER.

**STAFF MEMBER'S VERSION**

ON THE ABOVE DATE AND TIME THIS OFFICER GAVE INMATE BROWN NAG4O1 A DIRECT ORDER TO BE RELEASED TO POPULATION. INMATE BROWN REFUSED THIS ORDER BY STATING "I'M NOT LEAVING TO GO TO POP". THIS ENDS THIS OFFICERS REPORT.

**IMMEDIATE ACTION TAKEN AND REASON** Inmate noted. Notes. This inmate indicated Inmate informed of This report, I notify to for institutional Resolution. Inmate to noted of charge. Placed on R Holt for Control.

| **PRE-HEARING CONFINEMENT** | | | |
|---|---|---|---|
| ☑ YES | IF YES | | |
| ☐ NO | TIME<br>1834 | DATE<br>3-21-18 | |

FORMS GIVEN TO INMATE

☐ REQUEST FOR WITNESSES AND REPRESENTATION    ☐ INMATE'S VERSION

| **REPORTING STAFF MEMBER**<br>SIGNATURE AND TITLE<br>Fockman<br>mi_____ COI | **ACTION REVIEWED AND APPROVED BY**<br>RANKING C.O. ON DUTY  SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| | | DATE<br>3-21-18 | TIME 24 HOUR<br>1935 BASE |

YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER

| DATE<br>3-23-18 | TIME<br>0600 | MISCONDUCT CATEGORY<br>☐ CLASS 1    ☐ CLASS 2 | Signature of Person Serving Notice<br>CCI Kullman |
|---|---|---|---|

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15            YELLOW – Inmate            PINK – Reporting Staff Member

*DC-ADM 801, Inmate Discipline Procedures Manual*
*Section 1 – Misconducts/Rule Violations*
Issued: 12/1/2017

Attachment 1-B
001

FORM DC-141   PART II B

DISCIPLINARY HEARING REPORT

**COMMONWEALTH OF PENNSYLVANIA**
DEPARTMENT OF CORRECTIONS

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 3/23/2018 | 0942 | D113453 |

| INMATE PLEA | | | | Verdict | |
|---|---|---|---|---|---|
| | ☐ Guilty | ☐ No Plea | | | ☒ Guilty |
| | ☐ Not Guilty | ☒ Other | | | ☐ Not Guilty |

**HEARING ACTION**

**CHARGES**      35

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of CO1 Fochtman, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown did refuse all orders to be released to population. A preponderance of evidence exist to support charge #35.

**Guilty #35 - 30 Days DC**
           **Effective 3/21/18**

**In Absentia**

| | | |
|---|---|---|
| ☐ Yes | ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. |
| ☐ Yes | ☒ No | The circumstances of the charge have been read and fully explained to the inmate. |
| ☐ Yes | ☒ No | The opportunity to have the inmate's version reported as part of the record was given. |
| ☐ Yes | ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. |

**SEE APPENDICES**
☒

Part 2D

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed.  Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger**<br>**Hearing Examiner** | |

FORM DC-141    PART 2 D
Rev. 07-04
WAIVER OF DISCIPLINARY
PROCEDURES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Facility | Date |
|-----------|------|----------|------|
| NA6401 | Brower | Hun | 3-22-18 |

MISCONDUCT REPORT(S) NO. _# D113453_

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than 7 working days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Examiner to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

☒ I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # _D113453_

☐ I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

☐ I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within 7 working days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

_(REFUSED TO ATTEND)_
INMATE

_____
WITNESS

DATE __3-22-18__

DATE __3-22-18__

_____
WITNESS

DATE __3-22-18__

**003**

**Exhibit 80**

| FORM DC-141    PART II B | COMMONWEALTH OF PENNSYLVANIA | | | | |
|---|---|---|---|---|---|
| DISCIPLINARY HEARING REPORT | DEPARTMENT OF CORRECTIONS | | | | |

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 4/20/2018 | 0827 | D048747 |

| INMATE PLEA | ☐ Guilty ☐ Not Guilty | ☐ No Plea ☒ Other | Verdict | ☒ Guilty ☐ Not Guilty |
|---|---|---|---|---|

**HEARING ACTION**

CHARGES    35

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of CO1 Zabinsky, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown did refuse all orders to be released to population. A preponderance of evidence exist to support charge #35.

Guilty #35 - 30 Days DC
Effective 4/18/18

In Absentia

| ☐ Yes | ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. | |
|---|---|---|---|
| ☐ Yes | ☒ No | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES ☒ |
| ☐ Yes | ☒ No | The opportunity to have the inmate's version reported as part of the record was given. | |
| ☐ Yes | ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | Part 2D |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| S. Ellenberger Hearing Examiner | |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent

| Form DC-141 Part 1 | **COMMONWEALTH OF PENNSYLVANIA** | | D 048747 | |
| Rev. 12/2017 | **DEPARTMENT OF CORRECTIONS** | | | |

☒ MISCONDUCT REPORT   ☐ OTHER   ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|---|
| NA6401 | Brown | | HUN | 1600 | 4-18-18 | 4-18-18 |
| Quarters | Place of Incident | | | | | |
| GD1005-1 | GD1005-1 | | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

Class I Misconduct Charge #35 - Refusing to obey an order.

**STAFF MEMBER'S VERSION**

On the above date and time, inmate Brown was ordered to pack his cell contents and move to A block. Inmate Brown stated "im not going to general population".

**IMMEDIATE ACTION TAKEN AND REASON** Investigated. No further inquiry indicated. Inmate informed at this report. Inappropriate for informal resolution due to nature of charge. Place on pretty (cont. Pre Central)

| PRE-HEARING CONFINEMENT | | | |
|---|---|---|---|
| | **IF YES** | | |
| ☒ YES | TIME | DATE | |
| ☐ NO | 1955 | 4-18-18 | |

**FORMS GIVEN TO INMATE**
☒ REQUEST FOR WITNESSES AND REPRESENTATION   ☒ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY  SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| | | DATE | TIME 24 HOUR BASE |
| COI A. Zabinsky | _____ COY | 4/18/18 | 2195 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
|---|---|---|---|
| DATE | TIME | ☒ CLASS 1   ☐ CLASS 2 | COI Mahan |
| 4-20-18 | 0800 | | |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

**DC-ADM 801, Inmate Discipline Procedures Manual**   **Attachment 1-B**
**Section 1 – Misconducts/Rule Violations**
Issued: 12/1/2017
Effective: 12/1/2017

002

FORM DC-141    PART 2 D
Rev. 8/05
WAIVER OF DISCIPLINARY
PROCEDURES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Facility | Date |
|---|---|---|---|
| NH6401 | Brown | Hun | 4-20-18 |

MISCONDUCT REPORT(S) NO. #D048747

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven working days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

☒ I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # D048747

☐ I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

☐ I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven working days of receiving notice of the charge and request that it be scheduled within a reasonable time thereafter.

(REFUSED TO ATTEND)
INMATE

DATE 4-20-18

WITNESS

DATE 4-20-18

C.O.I
WITNESS

DATE 4-20-18

**003**

WHITE — DC-15      YELLOW — Inmate Cited

A

**Exhibit 79**

| Form DC-141 Part 1 | **COMMONWEALTH OF PENNSYLVANIA** | D 198891 |
|---|---|---|
| Rev. 12/2017 | **DEPARTMENT OF CORRECTIONS** | |

☑ MISCONDUCT REPORT    ☐ OTHER    ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|---|
| NA6401 | Brown | | SCIH | 1155 | 6-18-18 | 6-18-18 |
| Quarters | Place of Incident | | | | | |
| GD1006 | GD1006 | | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

#35 Refusing to obey an order

**STAFF MEMBER'S VERSION**

Sir, On the above date and time, this Officer gave inmate Brown (NA6401) a direct order to be released from the RHU. Inmate Brown refused this order.

**IMMEDIATE ACTION TAKEN AND REASON** Pending informal of this Report - Not Appropriate For Informal Resolution Due to Charge - Has Placed on PHC Until Seen By Hex

| PRE-HEARING CONFINEMENT | | |
|---|---|---|
| ☑ YES | TIME | DATE |
| ☐ NO | 1230 | 6.18.2018 |

**IF YES**

**FORMS GIVEN TO INMATE**
☐ REQUEST FOR WITNESSES AND REPRESENTATION    ☐ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| J. Blair | Lurn Co | DATE 6/18/18    TIME 24 HOUR BASE 1385 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
|---|---|---|---|
| DATE 6.20.2018 | TIME 0800 | ☑ CLASS 1    ☐ CLASS 2 | CO1 W5 —4 |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE – DC-15        YELLOW – Inmate        PINK – Reporting Staff Member

**DC-ADM 801, Inmate Discipline Procedures Manual**        **Attachment 1-B**
**Section 1 – Misconducts/Rule Violations**
Issued: 12/1/2017

| FORM DC-141   PART II B | | COMMONWEALTH OF PENNSYLVANIA | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| DISCIPLINARY HEARING REPORT | | DEPARTMENT OF CORRECTIONS | | | | |

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
| --- | --- | --- | --- | --- | --- |
| NA6401 | Brown, Gartor | Huntingdon | 6/21/2018 | 1125 | D198891 |

| INMATE | ☐ Guilty | ☐ No Plea | Verdict | ☒ Guilty |
| --- | --- | --- | --- | --- |
| PLEA | ☒ Not Guilty | ☐ Other | | ☐ Not Guilty |

**HEARING ACTION**

**CHARGES**   35

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown pleads not guilty to charge #35.

Inmate stated that he is scared to go out and has been threatened by other inmates.

This HEX believes the written report of CO1 J. Blair, over Inmate Brown's denial, about how Inmate Brown refused all orders to be released from the RHU. A preponderance of evidence exist to charge #35.

**Guilty #35 - 30 Days DC**
       **Effective 6/18/18**

| | | | |
| --- | --- | --- | --- |
| ☒ Yes   ☐ No | The inmate has heard the decision and has been told the reason for it and what will happen. | NONE | |
| ☒ Yes   ☐ No | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES ☒ | |
| ☒ Yes   ☐ No | The opportunity to have the inmate's version reported as part of the record was given. | | |
| ☒ Yes   ☐ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
| --- | --- |
| **S. Ellenberger**<br>**Hearing Examiner** | *[signature]* |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent

**Exhibit 78**

| FORM DC-141    PART II B | COMMONWEALTH OF PENNSYLVANIA | | | | |
|---|---|---|---|---|---|
| DISCIPLINARY HEARING REPORT | DEPARTMENT OF CORRECTIONS | | | | |

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 7/19/2018 | 0934 | D113581 |

| INMATE PLEA | ☐ Guilty  ☐ Not Guilty | ☐ No Plea  ☒ Other | Verdict | ☒ Guilty  ☐ Not Guilty |
|---|---|---|---|---|

### HEARING ACTION

CHARGES    35

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of CO1 Fochtman, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown did refuse all orders to be released from the RHU to general population. A preponderance of evidence exist to support charge #35.

**Guilty #35 - 30 Days DC**
        **Effective 7/17/18**

**In Absentia**

| | | | |
|---|---|---|---|
| ☐ Yes | ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. | |
| ☐ Yes | ☒ No | The circumstances of the charge have been read and fully explained to the inmate. | **SEE APPENDICES** |
| ☐ Yes | ☒ No | The opportunity to have the inmate's version reported as part of the record was given. | ☒ |
| ☐ Yes | ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | Part 2D |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger**  **Hearing Examiner** | |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent        **001**

| Form DC-141 Part 1 | **COMMONWEALTH OF PENNSYLVANIA** | D 113581 |
|---|---|---|
| Rev. 12/2017 | **DEPARTMENT OF CORRECTIONS** | |

☑ MISCONDUCT REPORT    ☐ OTHER    ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| NA641 | Brown | SCI Hun | 1539 | 17 Jul 2018 | 17 Jul 2018 |
| Quarters | Place of Incident | | | | |
| GD1006 | GD1006 | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

Class I # 35 refusing to obey an order

**STAFF MEMBER'S VERSION**

Sir, on the above date and time this officer gave inmate Brown a direct order to go to population inmate Brown refused stating "I am not going to population"

**IMMEDIATE ACTION TAKEN AND REASON** Investigated. No further inquiry indicate. Inmate informed of this report inappropriate for informal use. Due to nature of charge. Place on Pre-Hg cont for control

| PRE-HEARING CONFINEMENT | | | FORMS GIVEN TO INMATE |
|---|---|---|---|
| ☑ YES ☐ NO | **TIME** | **DATE** | ☒ REQUEST FOR WITNESSES AND REPRESENTATION    ☒ INMATE'S VERSION |
| | 16:00 | 7-17-18 | |

| **REPORTING STAFF MEMBER SIGNATURE AND TITLE** | **ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY  SIGNATURE  AND TITLE** | **DATE AND TIME INMATE GIVEN COPY** |
|---|---|---|
| _[signature]_ COI | _[signature]_ | DATE 7/17/18   TIME 24 HOUR BASE 1750 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | **MISCONDUCT CATEGORY** | **Signature of Person Serving Notice** |
|---|---|---|---|
| **DATE** | **TIME** | ☑ CLASS 1    ☐ CLASS 2 | _[signature]_ |
| 7-19-18 | 0800 | | |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

FORM **DC-141**    **PART 2 D**
Rev. 8/05
WAIVER OF DISCIPLINARY
PROCEDURES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Facility | Date |
|---|---|---|---|
| NA640| | Brown | Hun | 7-19-18 |

MISCONDUCT REPORT(S) NO.  # D113581

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven working days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

☒ I hereby voluntarily waive the disciplinary hearing on misconduct report(s) #  D113581

☐ I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

☐ I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven working days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

(REFUSED TO SIGN)
INMATE

DATE  7-19-18

WITNESS

DATE  7-19-18

COI
WITNESS

DATE  7-19-18

**003**

**Exhibit 77**

| FORM DC-141   PART II B | COMMONWEALTH OF PENNSYLVANIA | | | |
|---|---|---|---|---|
| DISCIPLINARY HEARING REPORT | DEPARTMENT OF CORRECTIONS | | | |

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 7/31/2018 | 1010 | D103716 |

| INMATE | ☐ Guilty | ☐ No Plea | Verdict | ☒ Guilty |
|---|---|---|---|---|
| PLEA | ☐ Not Guilty | ☒ Other | | ☐ Not Guilty |

**HEARING ACTION**

**CHARGES**   35, 38

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of CO1 Plocinik, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown did refuse all orders to stop flooding his cell. The officer attempted to confirm what the inmate was using to clog his toilet but the inmate stood between the cell door and the toilet refusing to moves. A preponderance of evidence exist to support charges #35 and #38.

Guilty #35 - 30 Days DC
　　　 #38 - 15 Days DC concurrent

Total - 30 Days DC
　　　 Consecutive

**In Absentia**

| | | | |
|---|---|---|---|
| ☐ Yes | ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. | |
| ☐ Yes | ☒ No | The circumstances of the charge have been read and fully explained to the inmate. | **SEE APPENDICES** |
| ☐ Yes | ☒ No | The opportunity to have the inmate's version reported as part of the record was given. | ☒ |
| ☐ Yes | ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | **Part 2D** |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger**<br>**Hearing Examiner** | |



| Form DC-141 Part 1 | **COMMONWEALTH OF PENNSYLVANIA** | D 103716 |
|---|---|---|
| Rev. 12/2017 | **DEPARTMENT OF CORRECTIONS** | |

☒ MISCONDUCT REPORT  ☐ OTHER  ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|---|
| **NA6401** | **Brown** | | **SCIH** | **2030** | 07-26-2018 | 07-26-2018 |
| Quarters | Place of Incident | | | | | |
| GA2015 | GA2015 | | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | | I | W |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

~~#35 refusing to obey an order #38 tampering with, or damaging property~~

**STAFF MEMBER'S VERSION**

On the above date and time G control was notified that inmate Brown (NA6401) was clogging his toilet with unknown items and intentionally flooding his cell. This officer approached GD1006 and gave Brown a direct order to stop flooding his cell which he refused by saying no. this officer gave Brown a direct order to remove the items from his toilet and brown refused. This officer attempted to visually confirm what items Brown was using to clog his toilet. Brown stood between the cell door and the toiled and refused to move.

Read to inmate

**IMMEDIATE ACTION TAKEN AND REASON** - Investigated. No Further inquiry inflicted. Inmate informed of the report. Inappropriate for that cruel duty. The due to nature of alleged. Place on Water bedding. Met'l. Cell property, post

| **PRE-HEARING CONFINEMENT** | | |
|---|---|---|
| | **IF YES** | |
| ☐ YES | TIME | DATE |
| ☒ NO | | |

**FORMS GIVEN TO INMATE**
☒ REQUEST FOR WITNESSES AND REPRESENTATION  ☒ INMATE'S VERSION

| **REPORTING STAFF MEMBER SIGNATURE AND TITLE** | **ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY SIGNATURE AND TITLE** | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| COI LOCINEK | | DATE | TIME 24 HOUR BASE |
| | | 7-26-18 | 2135 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | **MISCONDUCT CATEGORY** | Signature of Person Serving Notice |
|---|---|---|---|
| DATE | TIME | ☒ CLASS 1  ☐ CLASS 2 | |
| 7-30-18 | 0800 | | |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

FORM **DC-141**   **PART 2 D**
Rev. 8/05
WAIVER OF DISCIPLINARY
PROCEDURES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Facility | Date |
|---|---|---|---|
| NA6401 | Brown | Hun | 7-31-18 |

MISCONDUCT REPORT(S) NO. #D103716

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven working days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

☒ I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # D103716

☐ I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

☐ I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven working days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

_(REFUSED TO ATTEND)_
INMATE

DATE 7-31-18

WITNESS

DATE 7-31-18

COI
WITNESS

DATE 7-31-18

**003**

| Form DC-141 Part 1 Rev. 12/2017 | **COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS** | D 081019 |
|---|---|---|

☒ MISCONDUCT REPORT    ☐ OTHER    ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | SCIH | 0900 | 08-2-18 | 12-11-18 |
| Quarters | Place of Incident | | | | |
| BA2059 | Security Office | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**    Class 1 Charge 42 Lying to an Employee

**STAFF MEMBER'S VERSION**    On August 2, 2018, the Security Office received a written correspondence by NA6401 Gartor Brown reporting an allegation of sexual abuse. The Investigation was assigned number 2018-P-1303 and a thorough investigation was conducted by the Security office. At the conclusion of the investigation, the allegations made by NA6401 Gartor Brown were declared unfounded. As unfounded, Inmate Brown lied in his report of the sexual abuse allegations. BII has reviewed the findings and concurs with the findings of unfounded. The delay in the report was due to the time to complete a thorough investigation and BII review.

**IMMEDIATE ACTION TAKEN AND REASON**  I/m Informed of this Report - Not Appropriate for Informal Resolution Due to Nature of Offense - Continue Custody Status (GP) until Seen By Hex

| PRE-HEARING CONFINEMENT | |
|---|---|
| IF YES | |
| ☐ YES  ☒ NO | TIME —  DATE — |

**FORMS GIVEN TO INMATE**
☒ REQUEST FOR WITNESSES AND REPRESENTATION    ☒ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| L. Maxwell | R. Coon Coy | DATE 12-11-18   TIME 24 HOUR BASE |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
|---|---|---|
| DATE 12/13/2018   TIME 0800 | ☒ CLASS 1   ☐ CLASS 2 | C. M |

**Notice to Inmate**
You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15        YELLOW – Inmate        PINK – Reporting Staff Member

*DC-ADM 801, Inmate Discipline Procedures Manual*
*Section 1 – Misconducts/Rule Violations*
Issued: 12/1/2017

*Attachment 1-B*

| DC-141, Part 2(B) DISCIPLINARY HEARING REPORT | | **COMMONWEALTH OF PENNSYLVANIA** **Department of Corrections** | | | |
|---|---|---|---|---|---|
| DC Number NA6401 | Name BROWN | Facility Hunt | Hearing Date 13 DEC 18 | Hearing Time 0858 | No. from Part 1 D081019 |
| INMATE ☐ Guilty PLEA ☑ Not Guilty #42 | | ☐ No Plea ☐ Other | VERDICT | ☐ Guilty ☐ Not Guilty | |

HEARING ACTION

CHARGES #42

FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

I/m Brown pleads not guilty to #42.

Version: This statement was given by another inmate.
The co put a metalic object in my tray. The co said
he was going to come in my cell & Rape me. He said
he was going to stick a screwdriver in my ass. I asked for
A PREA. I had an Abuse Allegation against the co.

HIE finds the report of the officer more credible than
Browns denial he filed a sexual Abuse Allegation against
a co however the allegation was unfounded therefore
a preponderance of evidence exists to support the fact
that Brown lied about the sexual abuse Allegation
constituting #42, per investigation.    Guilty #42.

x Investigator Review by                  30 days cell Restriction
the Examiner                              Effective 12-13-18

| | | | |
|---|---|---|---|
| ☑YES | ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. | Prea investigation |
| ☑YES | ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES ☑ |
| ☐YES | ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. | |
| ☑YES | ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED) | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| Joseph Dupont | _Joseph Dupont_ SIGNATURE OF HEARING EXAMINER/COORDINATOR |

WHITE – DC-15        YELLOW – Inmate Cited        PINK – Staff Member Reporting Misconduct
GOLDENROD – Deputy Facility Manager

***DC-ADM 801, Inmate Discipline Procedures Manual***
***Section 4 – Disposition of Charges and Misconduct Sanctions***        **Attachment 4-A**
Issued: May 20, 2015
Effective: July 2, 2015

**Exhibit 75**

| FORM DC-141    PART II B | COMMONWEALTH OF PENNSYLVANIA | | | | |
|---|---|---|---|---|---|
| DISCIPLINARY HEARING REPORT | DEPARTMENT OF CORRECTIONS | | | | |

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 9/18/2018 | 1012 | D198712 |

| INMATE PLEA | ☐ Guilty | ☐ No Plea | Verdict | ☒ Guilty |
|---|---|---|---|---|
| | ☐ Not Guilty | ☒ Other | | ☐ Not Guilty |

### HEARING ACTION

**CHARGES** 35

---

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of CO1 R. Walker, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown did refuse all orders to be released from the RHU to general population. A preponderance of evidence exist to support charge #35.

**Guilty #35 - 30 Days DC**
      **Effective 9/14/18**

**In Absentia**

| | | | |
|---|---|---|---|
| ☐ Yes | ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. | |
| ☐ Yes | ☒ No | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES |
| ☐ Yes | ☒ No | The opportunity to have the inmate's version reported as part of the record was given. | ☒ |
| ☐ Yes | ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | Part 2D |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger**<br>**Hearing Examiner** | *[signature]* |

| Form DC-141 Part 1<br>Rev. 12/2017 | **COMMONWEALTH OF PENNSYLVANIA**<br>**DEPARTMENT OF CORRECTIONS** | | | D 198712 | |
|---|---|---|---|---|---|

☑ MISCONDUCT REPORT    ☐ OTHER    ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number<br>NAG401 | Name<br>BROWN | | Institution<br>SCI H | Incident Time 24 Hr. Base<br>1630 | Incident Date<br>9/14/18 | Date of Report<br>9/14/18 |
|---|---|---|---|---|---|---|
| Quarters<br>GA2016 | Place of Incident<br>GA2016 | | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

CLASS 1 – #35 REFUSING TO OBEY AN ORDER

**STAFF MEMBER'S VERSION**

ON THE ABOVE DATE AND TIME THIS OFFICER GAVE INMATE BROWN NAG401 A DIRECT ORDER TO BE RELEASED TO POPULATION. INMATE BROWN REFUSED THIS ORDER BY STATING "NO". THIS ENDS THIS OFFICER'S REPORT.

**IMMEDIATE ACTION TAKEN AND REASON** Investigated, no further injury. Not eligible for informal resolution. Inmate to be placed pre-hearing confinement until seen by hearing examiner. Inmate informed.

| **PRE-HEARING CONFINEMENT** | | | **FORMS GIVEN TO INMATE** | | |
|---|---|---|---|---|---|
| | **IF YES** | | | | |
| ☑ YES | TIME | DATE | | | |
| ☐ NO | 1635 | 9-14-18 | ☑ REQUEST FOR WITNESSES AND REPRESENTATION | | ☑ INMATE'S VERSION |

| **REPORTING STAFF MEMBER**<br>**SIGNATURE AND TITLE** | **ACTION REVIEWED AND APPROVED BY**<br>RANKING C.O. ON DUTY  SIGNATURE AND TITLE | **DATE AND TIME INMATE GIVEN COPY** | |
|---|---|---|---|
| | | DATE | TIME 24 HOUR |
| R.Walker  R.WALKER CO1 | Burell Cook  Burell | 9-14-18 | 2038 BASE |

| **YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER** | | **MISCONDUCT CATEGORY** | **Signature of Person Serving Notice** |
|---|---|---|---|
| DATE | TIME | | Cothard |
| 9-18-18 | 0800 | ☑ CLASS 1    ☐ CLASS 2 | |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

FORM **DC-141**    **PART 2 D**
Rev. 07-04
WAIVER OF DISCIPLINARY
PROCEDURES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Facility | Date |
|---|---|---|---|
| NA6401 | Brown | Hun | 9-18-18 |

MISCONDUCT REPORT(S) NO.    # D198712

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than 7 working days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Examiner to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

☒ I hereby voluntarily waive the disciplinary hearing on misconduct report(s) #  D198712

☐ I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

☐ I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within 7 working days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

REFUSED TO SIGN
INMATE

DATE    9-18-18

WITNESS

DATE    9-18-18

COI / R. Ryle
WITNESS

DATE    9-18-18

**003**

Exhibit 74

| FORM DC-141    PART II B | COMMONWEALTH OF PENNSYLVANIA |
|---|---|
| DISCIPLINARY HEARING REPORT | DEPARTMENT OF CORRECTIONS |

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 10/12/2018 | 1025 | D198782 |

| INMATE | ☐ Guilty | ☐ No Plea | Verdict | ☒ Guilty |
|---|---|---|---|---|
| PLEA | ☒ Not Guilty | ☐ Other | | ☐ Not Guilty |

## HEARING ACTION

**CHARGES**    35

### FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

Inmate Brown pleads not guilty to charge #35.

Inmate Brown stated that he told PRC and security that he is a homosexual and that he could be subject to attack by other inmates because they are aware that he has cooperated with state police pursuant to a previous incident.

This HEX believes the written report of CO1 R. Walker, over Inmate Brown's denial, about how Inmate Brown did refuse all orders to be released to population. A preponderance of evidence exist to support charge #35.

**Guilty #35 - 30 Days DC**
        **Effective 10/10/18**

| ☒ Yes | ☐ No | The inmate has heard the decision and has been told the reason for it and what will happen. | NONE |
|---|---|---|---|
| ☒ Yes | ☐ No | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES |
| ☒ Yes | ☐ No | The opportunity to have the inmate's version reported as part of the record was given. | ☒ |
| ☒ Yes | ☐ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger**<br>**Hearing Examiner** | |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent



| Form DC-141 Part 1 Rev. 12/2017 | **COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS** | **D 198782** |

☑ MISCONDUCT REPORT     ☐ OTHER     ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number NA6401 | Name BROWN | Institution SCIH | Incident Time 24 Hr. Base 1700 | Incident Date 10/10/18 | Date of Report 10/10/18 |
| Quarters GA2016 | Place of Incident GA2016 | | | | |

### OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

### MISCONDUCT CHARGE OR OTHER ACTION

CLASS 1 - #35 REFUSING TO OBEY AN ORDER

### STAFF MEMBER'S VERSION

ON THE ABOVE DATE AND TIME THIS OFFICER GAVE INMATE BROWN NA6401 A DIRECT ORDER TO BE RELEASED TO POPULATION. INMATE BROWN REFUSED THIS ORDER BY STATING "NO, I'M NOT GOING". THIS ENDS THIS OFFICER'S REPORT.

IMMEDIATE ACTION TAKEN AND REASON investigated, no further inquiry. Not eligible for informal resolution due to nature of misconduct. Inmate to be placed pre-hearing confinement until seen by hearing examiner. Inmate informed

| PRE-HEARING CONFINEMENT | | | |
| IF YES | | | |
| ☑ YES ☐ NO | TIME 1705 | DATE 10-10-18 | **FORMS GIVEN TO INMATE** ☑ REQUEST FOR WITNESSES AND REPRESENTATION    ☑ INMATE'S VERSION |

| REPORTING STAFF MEMBER SIGNATURE AND TITLE RWALKER COI | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY SIGNATURE AND TITLE Buell COII Buell | DATE AND TIME INMATE GIVEN COPY | |
| | | DATE 10-10-18 | TIME 24 HOUR BASE 1920 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
| DATE 10-12-18 | TIME 0800 | ☑ CLASS 1    ☐ CLASS 2 | COI |

### Notice to Inmate

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

**DC-ADM 801, Inmate Discipline Procedures Manual**                    **Attachment 1-B**
**Section 1 – Misconducts/Rule Violations**
Issued: 12/1/2017
Effective: 12/1/2017

| FORM DC-141   PART II B | COMMONWEALTH OF PENNSYLVANIA | | | | |
|---|---|---|---|---|---|
| DISCIPLINARY HEARING REPORT | DEPARTMENT OF CORRECTIONS | | | | |

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 1/17/2019 | 1130 | D233981 |

| INMATE | ☐ Guilty | ☐ No Plea | Verdict | ☒ Guilty |
|---|---|---|---|---|
| PLEA | ☒ Not Guilty | ☐ Other | | ☐ Not Guilty |

### HEARING ACTION

**CHARGES**   35

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown pleads not guilty to charge #35.

Inmate Brown stated that he was attempting to hang himself and should have never received this misconduct.

Inmate Brown began to talk over this HEX in regards to whether or not his witnesses would be called. It was explained to him that there was no witness form received but he could provide his witnessed verbally at the time of the hearing. After being told multiple times to not speak over this HEX when being explained something, Inmate Brown was removed from the hearing and it was completed in absentia.

This HEX believes the written report of CC2 Richards, over Inmate Brown's denial, about how Inmate Brown did approach the officer's desk and state that he was not refusing to move to AA block but was choosing to go to observation instead. When determined that he was attempting to manipulate the system, Inmate was then again ordered several times to AA unit and he refused. A preponderance of evidence exist to support charge #35.

**Guilty #35 - 15 Days DC**
      **Loss of Job**
      **Effective 1/14/19**

**Finished in Absentia**

| | | | |
|---|---|---|---|
| ☐ Yes | ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. | |
| ☒ Yes | ☐ No | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES |
| ☒ Yes | ☐ No | The opportunity to have the inmate's version reported as part of the record was given. | ☒ |
| ☐ Yes | ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | Part 2D |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger**<br>**Hearing Examiner** | *[signature]* |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent

A

(X)

| Form DC-141 Part 1 Rev. 12/2017 | COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS | | D 233981 | | |
|---|---|---|---|---|---|

☒ MISCONDUCT REPORT      ☐ OTHER      ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number NAB401 | Name BROWN, Nectar | Institution SCI | Incident Time 24 Hr. Base 1545 Hrs | Incident Date 1/14/2019 | Date of Report 1/14/2019 |
|---|---|---|---|---|---|
| BA-1075-01 | Place of Incident BA Unit | | | | |

### OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

MISCONDUCT CHARGE OR OTHER ACTION  DC ADM 801 B. 35. Refusing to Obey an Order

**STAFF MEMBER'S VERSION**

Sir, At approximately 1315, UM Swartz and this CC2 met with Inmate Brown to notify him that he would be moving to AA Unit this evening due to being denied a permanent Z Code for single cell placement. Inmate Brown clarified that he would be moving to AA Unit and have a double cell with another inmate and said okay. At approximately 1545 hours, I was contacted by the desk officer in BA Unit that Inmate Brown had approached the desk and said that he is not refusing to move to AA Unit but choosing to go to Observation instead. LPM Goss, CRNP Cousins, CC2 Beck and this CC2 all met with Inmate Brown on BA Unit and it was determined that he was be manipulative to avoid moving to AA Unit. He cited reading and knowing psych policy and said that we have to put him in observation if he chooses. At that time, he was given several orders to go to AA Unit but said no, "I'm choosing observation and you have to take me there".

Read to Inmate

| IMMEDIATE ACTION TAKEN AND REASON | Investigated. Not a true injury indicated. Inmate informed of this report. Inappropriate for Informal Resolution due to nature of charge. Place in pre Hrg Conf. for Control |
|---|---|

PRE-HEARING CONFINEMENT

IF YES

☒ YES   ☐ NO    TIME 1650   DATE 1-14-19

☒ REQUEST FOR WITNESSES AND REPRESENTATION

FORMS GIVEN TO INMATE      ☒ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE M Richards CC2 | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY, SIGNATURE AND TITLE CC2 | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| | | DATE 1-14-19 | TIME 24 HOUR BASE 1744 |

YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER

DATE 1-16-19   TIME 0800

MISCONDUCT CATEGORY
☒ CLASS 1   ☐ CLASS 2

Signature of Person Serving Notice

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE – DC-15        YELLOW – Inmate        PINK – Reporting Staff Member

**DC-ADM 801, Inmate Discipline Procedures Manual**
**Section 1 – Misconducts/Rule Violations**
Issued: 12/1/2017

Attachment 1-B
002

FORM **DC-141**     **PART 2 D**
Rev. 8/05
WAIVER OF DISCIPLINARY
PROCEDURES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Facility | Date |
|---|---|---|---|
| NA6401 | Brown | SCI H | 1-17-19 |

MISCONDUCT REPORT(S) NO. #D233981

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven working days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

[X] I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # D233981

[ ] I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

[ ] I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven working days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

INMATE  /REMOVED DUE TO His Behavior   COI /
_____
INMATE                                                    WITNESS

DATE  1-17-19                           DATE  1-17-19

                                        _____
                                                    WITNESS

                                        DATE  1-17-19

**003**

**Exhibit 72**

| Form DC-141 Part 1 | **COMMONWEALTH OF PENNSYLVANIA** | D 113210 |
|---|---|---|
| Rev. 12/2017 | **DEPARTMENT OF CORRECTIONS** | |

| ☒ MISCONDUCT REPORT | ☐ OTHER | ☐ DC-ADM 801 INFORMAL RESOLUTION | | | |
|---|---|---|---|---|---|
| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
| NA6401 | Brown | SCIH | 1630 | 1-28-19 | 1-28-19 |
| Quarters | Place of Incident | | | | |
| GA-1015-1 | GA 1015 | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

CLASS 1 #35. Refusing To Obey An Order

**STAFF MEMBER'S VERSION**

Sir, ON THE ABOVE DATE AND TIME, THIS OFFICER GAVE I/M Brown NA6401 A DIRECT ORDER TO LEAVE THE RHU AND MOVE TO BA-BLOCK. I/m Brown refused TO MOVE AND STATED "I'M NOT LEAVING THE RHU UNTIL I GET MY 'Z' code".

**IMMEDIATE ACTION TAKEN AND REASON** Investigated Nartes/he inquiry indicated Inmate informed of This report. Inappropriate for I/m form.

**PRE-HEARING CONFINEMENT** Appl. Twa du Tanetra of charge. Continue Present cont status pending day misc.

| | IF YES | | |
|---|---|---|---|
| ☐ YES | TIME | DATE | |
| ☒ NO | | | |

☒ REQUEST FOR WITNESSES AND REPRESENTATION   **FORMS GIVEN TO INMATE**   ☒ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY, SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| G. Yoln | M. Alt CO4 | DATE 1 28 19 — TIME 24 HOUR 2035 BASE |

YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER   **MISCONDUCT CATEGORY**   Signature of Person Serving Notice

| DATE | TIME | |
|---|---|---|
| 1-30-19 | 0800 | |

| ☒ CLASS 1 | ☐ CLASS 2 |
|---|---|

001 B

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15              YELLOW – Inmate              PINK – Reporting Staff Member

*DC-ADM 801, Inmate Discipline Procedures Manual*
*Section 1 – Misconducts/Rule Violations*
Issued: 12/1/2017

*Attachment 1-B*
**001**

| FORM DC-141  PART II B | COMMONWEALTH OF PENNSYLVANIA | | | | |
|---|---|---|---|---|---|
| DISCIPLINARY HEARING REPORT | DEPARTMENT OF CORRECTIONS | | | | |

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 1/31/2019 | 1110 | D113210 |

| INMATE | ☐ Guilty | ☐ No Plea | Verdict | ☒ Guilty |
|---|---|---|---|---|
| PLEA | ☒ Not Guilty | ☐ Other | | ☐ Not Guilty |

**HEARING ACTION**

**CHARGES**   35

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

**Inmate Brown pleads not guilty to charge #35.**

**Inmate stated that he told the officer that he has enemies in population.**

**This HEX believes the written of CO2 G. Yohn, over Inmate Brown's denial, about how Inmate Brown did refuse all orders to leave the RHU and move back to BA block. A preponderance of evidence exist to support charge #35.**

**Guilty #35 - 30 Days DC**
        **Effective 1/28/19**

| ☒ Yes | ☐ No | The inmate has heard the decision and has been told the reason for it and what will happen. | **NONE** |
|---|---|---|---|
| ☒ Yes | ☐ No | The circumstances of the charge have been read and fully explained to the inmate. | **SEE APPENDICES** |
| ☒ Yes | ☐ No | The opportunity to have the inmate's version reported as part of the record was given. | ☒ |
| ☒ Yes | ☐ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger**<br>**Hearing Examiner** | |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent

**002**

**Exhibit 71**

| FORM DC-141   PART II B | | COMMONWEALTH OF PENNSYLVANIA | | | | |
|---|---|---|---|---|---|---|
| DISCIPLINARY HEARING REPORT | | DEPARTMENT OF CORRECTIONS | | | | |

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 4/4/2019 | 1210 | D339602 |

| INMATE | ☐ Guilty | ☐ No Plea | Verdict | ☒ Guilty |
|---|---|---|---|---|
| PLEA | ☒ Not Guilty | ☐ Other | | ☐ Not Guilty |

**HEARING ACTION**

**CHARGES**    35

---

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown pleads not guilty to charge #35.

Inmate stated that the officer never told him that the conversation was inappropriate.

This HEX believes the written report of CO1 Plocinik, over Inmate Brown's denial, about how Inmate Brown did refuse an order previously given by the officer to not discuss inappropriate things regarding the officer's personal life. A preponderance of evidence exist to support charge #35.

**Guilty #35 - 15 Days DC**
**Consecutive**

| | | | |
|---|---|---|---|
| ☒ Yes | ☐ No | The inmate has heard the decision and has been told the reason for it and what will happen. | |
| ☒ Yes | ☐ No | The circumstances of the charge have been read and fully explained to the inmate. | **SEE APPENDICES** ☒ |
| ☒ Yes | ☐ No | The opportunity to have the inmate's version reported as part of the record was given. | |
| ☒ Yes | ☐ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | Inform Res Action Form |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| .S. Ellenberger **Hearing Examiner** | *[signature]* |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent

A. A2c9

| Form DC-141 Part 1 Rev. 12/2017 | **COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS** | D 339602 |

☒ MISCONDUCT REPORT    ☐ OTHER    ☒ DC-ADM 801 INFORMAL RESOLUTION

| DC Number NAL401 | Name BROWN | Institution SCI-H | Incident Time 24 Hr. Base 1930 | Incident Date 3/31/19 | Date of Report 3/31/19 |
| Quarters GA2009 | Place of Incident GA 2009 | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

#35 REFUSING TO OBEY AN ORDER

**STAFF MEMBER'S VERSION**

ON THE ABOVE DATE AND APPROXIMATE TIME WHILE COLLECTING MAIL ON A QUAD OF THE RHU THIS OFFICER ARRIVED AT GA2009 BROWN (NAL401) STATED TO THIS OFFICER "I SEE YOU MADE ALOT OF MONEY LAST YEAR, I NEED A LOAN." THIS OFFICER INFORMED BROWN HIS TOPIC OF DISCUSSION WAS INAPPROPRIATE. THIS IS NOT THE FIRST TIME BROWN HAS ATTEMPTED TO ENGAGE CONVERSATION WITH THIS OFFICER ABOUT FINANCIAL STATUS. BROWN WAS GIVEN A DIRECT ORDER ON 2/9/19 NOT TO DISCUSS FINANCIAL STATUS WITH THIS OFFICER AND WAS INFORMED HE WOULD RECIEVE A MISCONDUCT FOR REFUSING TO OBEY AN ORDER.

**IMMEDIATE ACTION TAKEN AND REASON** Informal Resolution Inquiry inmate. No further inquiry indicated. Inmate informed of this report. Inappropriate for Informal Resol. for formal Resolution by Unit Mgr. Continue present conf Status pending Misc.

**PRE-HEARING CONFINEMENT**

| | IF YES | |
|---|---|---|
| ☐ YES ☒ NO | TIME | DATE |

**FORMS GIVEN TO INMATE**

☒ REQUEST FOR WITNESSES AND REPRESENTATION    ☐ INMATE'S VERSION

| **REPORTING STAFF MEMBER SIGNATURE AND TITLE** | **ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY, SIGNATURE AND TITLE** | **DATE AND TIME INMATE GIVEN COPY** |
|---|---|---|
| Procific CO1 | | DATE 4-2-19    TIME 24 HOUR BASE 1822 |

YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER

| DATE | TIME |
|---|---|
| 4-4-19 | 0800 |

**MISCONDUCT CATEGORY**

☒ CLASS 1    ☐ CLASS 2

**Signature of Person Serving Notice**

B. Reed

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE – DC-15        YELLOW – Inmate        PINK – Reporting Staff Member

## Informal Resolution Action Form

| Inmate Name (Printed) | Inmate Number | DC-141 Part 1 Number | Date |
|---|---|---|---|
| Brown, Gartor | NA-6401 | D 339602 | 3-31-2019 |

| **Action Taken** | | | |
|---|---|---|---|
| ❏ No Action | | | |
| ❏ Reprimand and Warning | | | |
| ❏ Referred to the Hearing Examiner at the request of the inmate | | | |
| ☒ Referred to Hearing Examiner by Unit Manager | Reason: **Referred to Hearing Examiner** | | |
| ❏ Carried on active MH/ID Roster and assigned to RTU or other appropriate treatment/program after consultation with PRT | | | |
| ❏ Cell Restriction (Up to 14 days) | Number of Days: | Start Date: | End Date: |
| Loss of Privileges: (Up to 14 days) ❏ Telephone ❏ Yard ❏ Day Room ❏ *Tablet Usage* ❏ *Kiosk Access* ❏ Other: _____ | Number of Days: | Start Date: | End Date: |
| ❏ 14 days Loss of Commissary | | Start Date: | End Date: |
| ❏ Loss of job due to work-related misconduct(s) | | Start Date: | |
| ❏ Assignment of Additional Work Duties (No compensation allowed) up to 14 days | Assignment | Start Date: | End Date: |
| ❏ Restitution for Damaged/Destroyed State Items/Property | Item(s) | Amount to be Paid: | |

W. House
_____
Unit Manager's Name (Printed or Typed)

*W. House*        04-02-19
_____
Unit Manager's Signature        Date

cc: DC-14 (original)
   Hearing Clerk

_____
Inmate's Signature        Date

_____ **Exhibit 69**

| DC-141, Part 2(B)<br>DISCIPLINARY HEARING<br>REPORT | **COMMONWEALTH OF PENNSYLVANIA**<br>**Department of Corrections** | | | | |
|---|---|---|---|---|---|
| DC Number<br>NA6401 | Name<br>Brown, G. | Facility<br>CAM | Hearing Date<br>10/4/17 | Hearing Time<br>0850 | No. from Part 1<br>B209550 |
| INMATE<br>PLEA | ☐ Guilty<br>☑ Not Guilty | ☐ No Plea<br>☐ Other | VERDICT | ☑ Guilty<br>☐ Not Guilty | |

HEARING ACTION

CHARGES   #15, #33, #35

FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

I/M pleads NOT GUILTY to all charges.

I/M states "This is a case of retaliation. I had filed a bunch of grievances. I think Myers wrote it because he put his arm around me to get me in my cell. He didn't mean anything by it but I guess he felt he had to write it after that because I file a lot of grievances. This was between me and the sergeant. But you can tell this report is made up because I don't talk like that. I would never say whoop his ass."

HEX believes CO1 Myers' written report over the I/M's not guilty plea that he did threaten an employee or their family with bodily harm, did use absive, obscene, or inappropriate language to or about an employee and did refuse to obey an order by the reporting officer stating that the I/M was ordered to return to his cell and that the I/M did return to his cell door but refused to go in and began to argue with the reporting staff, resulting in several orders being given to enter his cell and get off the tier, all of which were refused by the I/M who stated "I ain't getting off the fucking tier." The reporting officer stated after the I/M was secured in his cell, the I/M did state "The next time I come out, I'm going to whoop your ass."

A preponderance of evidence exists to support charges #15, #33, & #35.

GUILTY #15 - 15 days DC
#33 - 15 days DC CS
#35 - 15 days DC CS

45 days DC

Effective 9/29/17

| ☑ YES | ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. | 2-A |
|---|---|---|---|
| ☑ YES | ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. | |
| ☑ YES | ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. | SEE APPENDICES<br>☑ |
| ☑ YES | ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE<br>(TYPED OR PRINTED) | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| J. Schneck | *J. Schneck* |
| | SIGNATURE OF HEARING EXAMINER/COORDINATOR |

**WHITE – DC-15**       **YELLOW – Inmate Cited**       **PINK – Staff Member Reporting Misconduct**
**GOLDENROD – Deputy Facility Manager**

No Stab Code Listed

RH4
A-3

No code

**FORM DC-141   PART 1**
Rev 8/05

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

B 209550

☒ MISCONDUCT REPORT   ☐ OTHER   ☐ DC-ADM 801   INFORMAL RESOLUTION

| DC Number | Name | Facility | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| NA6401 | Brown, G | SIC | 0825 | 9/29/17 | 9/29/17 |

| Quarters | Place of Incident |
|---|---|
| A-B-32 | A-Block B-Side Dayroom |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | Sgt. Thompson | | X | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION** Class 1 A#15 threatening an employee or their family with bodily harm A# 33 Using abusive, obscene, or inappropriate language to an employee Class 1 B# 35 Refusing to Obey an order

**STAFF MEMBER'S VERSION** On the above date and time while pushing out A Yard Inmate Brown was observed trying to hide on the tier in a blind spot. Inmate Brown (NA6401) was then ordered to return to his cell. When Inmate Brown returned to his cell door he did stand on the tier and became verbally argumentative with this officer. This officer ordered him several times to enter his cell and get off the tier. Each order was disobeyed and Inmate Brown did state "I ain't getting off the Fucking Tier." The Inmate did become more aggresive in his stance and begane to ball up his Fists and stated "you are going to have to Fucking make me." At which time this officer did secure inmate Brown's Right arm and assisted him into his cell and secure the door. There were approx. 30 Inmates on the tier. After Cell door was secured Inmate Brown did State "The next time I Come Out I'm going to Whoop Your Ass." As this report is being written Inmate Brown continues to yell and scream on the tier.

**IMMEDIATE ACTION TAKEN AND REASON** Misconduct unrealed. Inmate Placed AC STATUS In Bthe. until Seen by Hearing Examiner.

**PRE-HEARING CONFINEMENT**
**IF YES**

| ☒ YES | TIME | DATE |
|---|---|---|
| ☐ NO | 0900 | 9/29/17 |

**FORMS GIVEN TO INMATE**
☒ REQUEST FOR WITNESSES AND REPRESENTATION   ☒ INMATE'S VERSION

**REPORTING STAFF MEMBER**
**SIGNATURE AND TITLE**
CO  C. Myers — C. Myers

**ACTION REVIEWED AND APPROVED BY**
**RANKING C.O. ON DUTY**   **SIGNATURE AND TITLE**

| | DATE AND TIME INMATE GIVEN COPY |
|---|---|
| DATE | TIME 24 HOUR BASE |
| 9.29.17 | 1325 |

**YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER**

| DATE | TIME |
|---|---|
| 10/1/17 | 0800 |

**MISCONDUCT CATEGORY**
☒ CLASS 1   ☐ CLASS 2

**Signature of Person Serving Notice**
STALEY Cor

**NOTICE TO INMATE**
You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have will be removed.

WHITE — DC-15        YELLOW — Inmate        PINK — Reporting Staff Member        GOLDENROD — Deputy Superintendent Facility Management

002

**Rupinski, Michael J**

| | |
|---|---|
| **From:** | Searer, Emily |
| **Sent:** | Tuesday, October 03, 2017 9:03 AM |
| **To:** | Rupinski, Michael J |
| **Subject:** | RE: Inmate Brown |

IM is an A Roster. No referral should be needed. No psych meds.

**From:** Rupinski, Michael J
**Sent:** Tuesday, October 03, 2017 9:00 AM
**To:** Searer, Emily <esearer@pa.gov>
**Cc:** Schneck, Jeffrey C <jschneck@pa.gov>
**Subject:** Inmate Brown

Mrs. Searer, can you do a referral for inmate Brown NA-6401 cell A-3,141# b209550 shows no-code in computer.

**003**

DC-141   PART II(A)
Rev. 9/2009
INMATE REQUEST FOR
REPRESENTATION AND WITNESSES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Facility | Date | Number as on **Part 1** |
|---|---|---|---|---|
| NA0401 | Brown, Carter | SCIC | 9/29/17 | B2C9550 |

You have been charged with a misconduct. You may request assistance and/or witnesses to appear at your hearing by completing the section(s) below.

In order to have assistance or witnesses at your hearing, you must complete this form and present all copies to one of your housing officers no later than 9:00 a.m. the next day after you receive notice of the misconduct.

Assistance:  ☑ I do not request assistance
☐ I request assistance by _____
  (The person requested must be willing to assist you)

Witnesses:  You may request witnesses in accord with DC-ADM 801. State the relevance and importance of the testimony the witness will give.

---

1. Name of Witness:     No.     If Inmate Quarters

Why is this person's testimony relevant and important?
Hakeem Williams, A-Block B-side he is a worker, He seen what happened

DO NOT WRITE IN THIS SECTION
For Use by Hearing Examiner

Witness permitted?   If not, why not?
No - not necessary to establish innocence or guilt.

---

2. Name of Witness: Mitch   No.   If Inmate Quarters A-B-63

Why is this person's testimony relevant and important?
Address A-Block B-side cell 63
Mitch, He seen what happened

Witness permitted?   If not, why not?
No - not necessary to establish innocence or guilt.

---

3. Name of Witness:     No.     If Inmate Quarters

Why is this person's testimony relevant and important?

Witness permitted?   If not, why not?

---

Inmate's Signature

This section to be completed by Housing Officer only

Received completed form  1153 hours  10-3-17
                         Time        Date

Housing Officer's Signature

Hearing Examiner's Signature

---

WHITE – DC-15   YELLOW – Inmate's Copy to be Given After Action by Hearing Examiner   PINK – Staff Member Reporting Misconduct
GOLDENROD – Inmate Cited

---

***DC-ADM 801, Inmate Discipline Procedures Manual***
***Section 1 – Misconducts/Rule Violations***

**Attachment 1-C 004**

| FORM DC-141  PART II B | | COMMONWEALTH OF PENNSYLVANIA | | | | |
|---|---|---|---|---|---|---|
| DISCIPLINARY HEARING REPORT | | DEPARTMENT OF CORRECTIONS | | | | |
| DC Number | Name | | Institution | Hearing Date | Hearing Time | No. from PART I |
| NA6401 | Brown, Gartor | | Huntingdon | 4/23/2019 | 1156 | D339645 |

| INMATE PLEA | ☐ Guilty | ☐ No Plea | Verdict | ☒ Guilty |
|---|---|---|---|---|
| | ☐ Not Guilty | ☒ Other | | ☐ Not Guilty |

**HEARING ACTION**

**CHARGES**   15, 33, 35

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of CO1 Bollinger, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown refused orders to stop arguing with staff while he cell was being searched. Inmate was abusive and inappropriate when he replied, "I don't give a fuck what you say." Inmate Brown did threaten the officer with bodily harm when he made an aggressive turn to break the officer's grip and kicked the trash can. A preponderance of evidence exist to support charges #15, #33, and #35.

Guilty #15 - 30 Days DC
      #33 - 30 Days DC concurrent
      #35 - 30 Days DC concurrent

Total - 30 Days DC
      Consecutive to Misconduct D339650

In Absentia

| | | | |
|---|---|---|---|
| ☐ Yes ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. | | Part 2A |
| ☐ Yes ☒ No | The circumstances of the charge have been read and fully explained to the inmate. | | SEE APPENDICES |
| ☐ Yes ☒ No | The opportunity to have the inmate's version reported as part of the record was given. | | ☒ Part 2D |
| ☐ Yes ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger** <br> **Hearing Examiner** | |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent       **001**

A

D111

| Form DC-141 Part 1 Rev. 12/2017 | COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS | D 339645 |

☑ MISCONDUCT REPORT      ☐ OTHER      ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| NA6401 | Brown | SCI Hun | 1915 | 4/18/19 | 4/18/19 |

| Quarters | Place of Incident |
|---|---|
| GA 2009 | GA 2009 |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | J. Moore  CO1 | ✓ | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

Class I Charge 15 Threatening an employee, Class I Charge 33 Using abusive, obscene, or inappropriate language to or about an employee. Class I Charge 35 Refusing to obey an order.

**STAFF MEMBER'S VERSION**

Sir on the above date and time this officer was controlling inmate Brown (NA6401) by his right arm and medical restraint belt while his cell was being searched. Inmate Brown became argumentative with staff and was given a direct order to stop arguing. Inmate Brown responded " I don't give a fuck what you say". Inmate Brown then made an aggressive turn to break my grip, kicking Alpha quads trash can at which point this officer placed inmate Brown against the wall. This officer called for staff assistance at which point inmate Brown was escorted to the secure strip area. Once placed in the secure strip area ended this officers involvement.

**IMMEDIATE ACTION TAKEN AND REASON** NO Further inquiry. Inmate Informed of This Report. Not Appropriate For Informal Resolution Due To The Number of Charges. Remain present Status until Seen By The Hearing Examiner.

| PRE-HEARING CONFINEMENT | | |
|---|---|---|
| | IF YES | |
| ☐ YES ☑ NO | TIME Current Confines | DATE |

**FORMS GIVEN TO INMATE**

☑ REQUEST FOR WITNESSES AND REPRESENTATION    ☑ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY  SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| | | DATE 4-18-19 | TIME 24 HOUR 2127 BASE |
| an. Bolinger  CO1  Bolinger | ____ CO1E | | |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | | Signature of Person Serving Notice |
|---|---|---|---|---|
| DATE | TIME | | | |
| 4-20-19 | 0800 hrs. | ☑ CLASS 1 | ☐ CLASS 2 | B. Reed |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

DC-141   PART 2(A)
Rev. 9/2009
INMATE REQUEST FOR
REPRESENTATION AND WITNESSES

## COMMONWEALTH OF PENNSYLVANIA
## DEPARTMENT OF CORRECTIONS

| DC Number | Name | Facility | Date | Number as on Part 1 |
|---|---|---|---|---|
| NA640 | Carter Brown    SCI H | | 4/19/19 | D339645 |

You have been charged with a misconduct. You may request assistance and/or witnesses to appear at your hearing by completing the section(s) below.

In order to have assistance or witnesses at your hearing, you must complete this form and present all copies to one of your housing officers no later than 9:00 a.m. the next day after you receive notice of the misconduct.

Assistance:   ☐ I do not request assistance
☑ I request assistance by _Robert Wade Fm 2131_
(The person requested must be willing to assist you)

Witnesses:   You may request witnesses in accord with DC-ADM 801. State the relevance and importance of the testimony the witness will give.

| | |
|---|---|
| 1. Name of Witness;   No. IN14 Quarters GA 207<br>Thomas  Kones<br>Why is this person's testimony relevant and important?<br>He witness what took place | DO NOT WRITE IN THIS SECTION<br>For Use by Hearing Examiner<br><br>Witness permitted?     If not, why not?<br>NO                    Refused to<br>Attend |
| If Inmate<br>2. Name of Witness:   No.   Quarters<br><br>Why is this person's testimony relevant and important? | Witness permitted?     If not, why not? |
| If Inmate<br>3. Name of Witness:   No.   Quarters<br><br>Why is this person's testimony relevant and important? | Witness permitted?     If not, why not? |

_____
Inmate's Signature

This section to be completed by Housing Officer only

Received completed form 7:01 hours 4/21/19
                    Time        Date

_____
Housing Officer's Signature

_____
Hearing Examiner's Signature

WHITE – DC-15   YELLOW – Inmate's Copy to be Given After Action by Hearing Examiner   PINK – Staff Member Reporting Misconduct
GOLDENROD – Inmate Cited

**DC-ADM 801, Inmate Discipline Procedures Manual**
**Section 1 – Misconducts/Rule Violations**
Issued: May 20,2015
Effective: July 2, 2015

**Attachment 1-D**

**003**

**Exhibit 67**
D111

| Form DC-141 Part 1<br>Rev. 12/2017 | **COMMONWEALTH OF PENNSYLVANIA**<br>**DEPARTMENT OF CORRECTIONS** | D 339601 |
|---|---|---|

☑ MISCONDUCT REPORT    ☐ OTHER    ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number<br>NA6101 | Name<br>BROWN | | | Institution<br>SCIH | Incident Time 24 Hr. Base<br>1922 | Incident Date<br>4/18/19 | Date of Report<br>4/18/19 |
|---|---|---|---|---|---|---|---|
| Quarters<br>GA2009 | Place of Incident<br>RHU SECURE SEARCH AREA | | | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

#35  REFUSING TO OBEY AN ORDER

**STAFF MEMBER'S VERSION**

ON THE ABOVE DATE AND TIME THIS OFFICER GAVE INMATE BROWN
SEVERAL ORDERS TO COMPLY WITH AN UNCLOTHED SEARCH.  BROWN
REFUSED ALL ORDERS AND STATED HE WOULD ONLY COMPLY IF
ANOTHER OFFICER WOULD REPLACE THIS OFFICER.  ANOTHER OFFICER
WAS ABLE TO GET BROWN TO COMPLY WITH AN UNCLOTHED SEARCH

**IMMEDIATE ACTION TAKEN AND REASON** NO FURTHER INJURY INDICATED. INMATE INFORMED
OF THIS REPORT NOT APPROPRIATE. INTERNAL RESTRICTION DUE
TO CHANGE. REMAIN PRESENT STATUS UNTIL
SEEN BY THE HEARING EXAMINER

| **PRE-HEARING CONFINEMENT** | | | **FORMS GIVEN TO INMATE** | | |
|---|---|---|---|---|---|
| | **IF YES** | | | | |
| ☐ YES<br>☑ NO | TIME<br>Currently<br>Confined | DATE | ☑ REQUEST FOR WITNESSES AND REPRESENTATION    ☑ INMATE'S VERSION | | |

| **REPORTING STAFF MEMBER**<br>**SIGNATURE AND TITLE** | **ACTION REVIEWED AND APPROVED BY**<br>RANKING C.O. ON DUTY SIGNATURE AND TITLE | **DATE AND TIME INMATE GIVEN COPY** | |
|---|---|---|---|
| | | DATE | TIME 24 HOUR |
| CO1  PLOCINIK | D. Sister   Lt CO Sgt | 4-18-19 | 2137 BASE |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER<br>DATE          TIME | **MISCONDUCT CATEGORY** | **Signature of Person Serving Notice** |
|---|---|---|
| 4-20-19   0600 hrs. | ☑ CLASS 1    ☐ CLASS 2 | P. Reed |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

*Attachment 1-B*
**001**

**DC-141    PART 2(A)**
Rev. 9/2009
INMATE REQUEST FOR
REPRESENTATION AND WITNESSES

# COMMONWEALTH OF PENNSYLVANIA
## DEPARTMENT OF CORRECTIONS

| DC Number | Name | Facility | Date | Number as on **Part 1** |
|---|---|---|---|---|
| NA6401 | Gastor Brown | FCI H | 4/19/19 | N539601 |

You have been charged with a misconduct. You may request assistance and/or witnesses to appear at your hearing by completing the section(s) below.

In order to have assistance or witnesses at your hearing, you must complete this form and present all copies to one of your housing officers no later than 9:00 a.m. the next day after you receive notice of the misconduct.

Assistance: ☐ I do not request assistance
☑ I request assistance by Hubert Wade, FM2131
(The person requested must be willing to assist you)

Witnesses: You may request witnesses in accord with DC-ADM 801. State the relevance and importance of the testimony the witness will give.

| | |
|---|---|
| If Inmate<br>1. Name of Witness:    No.    Quarters<br>Nurse Debrea<br>Why is this person's testimony relevant and important?<br>They witness what took Place | DO NOT WRITE IN THIS SECTION<br>For Use by Hearing Examiner<br><br>Witness permitted?        If not, why not?<br>NO                    Refused to Attend |
| If Inmate<br>2. Name of Witness:    No.    Quarters<br><br>Why is this person's testimony relevant and important? | Witness permitted?        If not, why not? |
| If Inmate<br>3. Name of Witness:    No.    Quarters<br><br>Why is this person's testimony relevant and important? | Witness permitted?        If not, why not? |
| _Gastor Brown_<br>Inmate's Signature<br><br>This section to be completed by Housing Officer only<br><br>Received completed form _7:00_ hours _4/21/19_<br>      Time        Date<br><br>_Piolirill_<br>Housing Officer's Signature | _Ellenberg_<br>Hearing Examiner's Signature |

WHITE – DC-15   YELLOW – Inmate's Copy to be Given After Action by Hearing Examiner   PINK – Staff Member Reporting Misconduct
GOLDENROD – Inmate Cited

FORM DC-141    PART 2 D
Rev. 8/05
WAIVER OF DISCIPLINARY
PROCEDURES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Facility | Date |
|---|---|---|---|
| NA6401 | BROWN | HUN | 4-23-19 |

MISCONDUCT REPORT(S) NO.    #D339650  #D339645,  #D339601

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven working days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights.

☒ I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # _SEE ABOVE_

☐ I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

☐ I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven working days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

_REFUSED TO INITIAL & SIGN_
INMATE

DATE _4-23-19_

_____ WITNESS

DATE _4-23-19_

_COI_ _____ WITNESS

DATE _4-23-19_

**003**

| FORM DC-141    PART II B | COMMONWEALTH OF PENNSYLVANIA | | | | | |
|---|---|---|---|---|---|---|
| DISCIPLINARY HEARING REPORT | DEPARTMENT OF CORRECTIONS | | | | | |

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 4/23/2019 | 1157 | D339601 |

| INMATE | ☐ Guilty | ☐ No Plea | Verdict | ☒ Guilty |
|---|---|---|---|---|
| PLEA | ☐ Not Guilty | ☒ Other | | ☐ Not Guilty |

## HEARING ACTION

**CHARGES**    35

---

### FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of CO1 Plocinik, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown did refuse all orders to comply with an unclothed search. Inmate stated that he refused to comply unless CO1 Plocinik was replaced. A preponderance of evidence exist to support charge #35.

**Guilty #35 - 30 Days DC**
        **Consecutive to Misconduct D339645**

**In Absentia**

| | | | | |
|---|---|---|---|---|
| ☐ Yes | ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. | Part 2A | |
| ☐ Yes | ☒ No | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES | |
| ☐ Yes | ☒ No | The opportunity to have the inmate's version reported as part of the record was given. | ☒ | |
| ☐ Yes | ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | Part 2D | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed.  Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger**<br>**Hearing Examiner** | *[signature]* |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent    **004**

**DC-141   PART 2(A)**
Rev. 9/2009
**INMATE REQUEST FOR**
**REPRESENTATION AND WITNESSES**

## COMMONWEALTH OF PENNSYLVANIA
### DEPARTMENT OF CORRECTIONS

| DC Number | Name | Facility | Date | Number as on Part 1 |
|---|---|---|---|---|
| NA 0401 | Carter Broan | SCI H | 3/27/19 | Dillerein |

You have been charged with a misconduct. You may request assistance and/or witnesses to appear at your hearing by completing the section(s) below.

In order to have assistance or witnesses at your hearing, you must complete this form and present all copies to one of your housing officers no later than 9:00 a.m. the next day after you receive notice of the misconduct.

Assistance: ☐ I do not request assistance
☒ I request assistance by _Robert Wade, FM Z131_ — No. I'm Fully Understand
(The person requested must be willing to assist you)
The Charges. Not my Right
I'm - Sims

Witnesses: You may request witnesses in accord with DC-ADM 801. State the relevance and importance of the testimony the witness will give.

| | DO NOT WRITE IN THIS SECTION For Use by Hearing Examiner |
|---|---|
| If Inmate<br>1. Name of Witness: No. Quarters GA Z10<br>SanMiguel Martinez KBH702<br>Why is this person's testimony relevant and important?<br>he called here a witness what<br>happen. The inmate rodriges<br>he was going to kick me up & that | Witness permitted?<br>No<br><br>If not, why not?<br>Not Needed To Determine Innocence of Guilt |
| If Inmate<br>2. Name of Witness: No. Quarters<br><br>Why is this person's testimony relevant and important? | Witness permitted?<br><br>If not, why not? |
| If Inmate<br>3. Name of Witness: No. Quarters<br><br>Why is this person's testimony relevant and important? | Witness permitted?<br><br>If not, why not? |

_____
Inmate's Signature

This section to be completed by Housing Officer only

Received completed form _____ hours _____
         Time       Date

_____
Housing Officer's Signature

_____
Hearing Examiner's Signature

WHITE – DC-15   YELLOW – Inmate's Copy to be Given After Action by Hearing Examiner   PINK – Staff Member Reporting Misconduct
GOLDENROD – Inmate Cited

**DC-ADM 801, Inmate Discipline Procedures Manual**
**Section 1 – Misconducts/Rule Violations**            **Attachment 1-D**
Issued: May 20,2015
Effective: July 2, 2015                                  **005**

FORM DC-141    PART 2 D
Rev. 8/05
WAIVER OF DISCIPLINARY
PROCEDURES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Facility | Date |
|---|---|---|---|
| NA6401 | Brown | Hun | 4-23-19 |

MISCONDUCT REPORT(S) NO. #D339650, #D339645, #D339601

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven working days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

☒ I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # _SEE ABOVE_

☐ I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

☐ I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven working days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

_REFUSED TO READ & SIGN_
INMATE

_WITNESS_

DATE __4-23-19__

DATE __4-23-19__

_COI_
WITNESS

DATE __4-23-19__

**006**

A )    ( ,    **Exhibit 66**

| Form DC-141 Part 1<br>Rev. 12/2017 | COMMONWEALTH OF PENNSYLVANIA<br>DEPARTMENT OF CORRECTIONS | | D 339659 | |
|---|---|---|---|---|

☒ MISCONDUCT REPORT    ☐ OTHER    ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number<br>NAG401 | Name<br>BROWN | Institution<br>SCIH | Incident Time 24 Hr. Base<br>1559 | Incident Date<br>2 MAY 19 | Date of Report<br>2 MAY 19 |
|---|---|---|---|---|---|
| Quarters<br>GD1011 | Place of Incident<br>PHU MINI LAW LIBRARY | | | | |

### OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | Col N. Smith | | ✓ | | | | |
| | | | | | | | |
| | | | | | | | |

### MISCONDUCT CHARGE OR OTHER ACTION

CLASS I #35 - REFUSING TO OBEY AN ORDER

### STAFF MEMBER'S VERSION

SIR, ON THE ABOVE DATE AND TIME, THIS OFFICER GAVE I/M BROWN (NAG401) A DIRECT ORDER TO TURN AROUND AND BE RESTRAINED. THE I/M REFUSED BY STATING, "I'M NOT GOING ANYWHERE WITH THIS MAN, I'M STAYING." THIS OFFICER GAVE I/M BROWN ANOTHER DIRECT ORDER TO BE RESTRAINED AND TOLD HIM HIS TIME IN THE LAW LIBRARY WAS OVER. THE I/M REFUSED AND BEGAN MUMBLING AND IGNORED THIS OFFICER.

### IMMEDIATE ACTION TAKEN AND REASON

NO FURTHER INQUIRY. INMATE INFORMED OF THIS REPORT. NOT APPROPRIATE FOR INFORMAL RESOLUTION DUE TO INMATES ACTIONS. REMAIN PRESENT STATUS UNTIL SEEN BY THE HEARING EXAMINER. PLACE ON RESTRICTION PER DC-709.

| PRE-HEARING CONFINEMENT | | FORMS GIVEN TO INMATE |
|---|---|---|
| | IF YES | ☑ REQUEST FOR WITNESSES AND REPRESENTATION    ☑ INMATE'S VERSION |

| | TIME<br>CURRENTLY<br>CONFINED | DATE |
|---|---|---|
| ☐ YES | | |
| ☒ NO | | |

| REPORTING STAFF MEMBER<br>SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY<br>RANKING C.O. ON DUTY SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| R. Henry  Col HENRY | Dickson<br>CO IV | DATE | TIME 24 HOUR BASE |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
|---|---|---|---|
| DATE<br>5-4-19 | TIME<br>0800 hrs. | ☑ CLASS 1    ☐ CLASS 2 | |

### Notice to Inmate

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15    YELLOW - Inmate    PINK - Reporting Staff Member

*DC-ADM 801, Inmate Discipline Procedures Manual*    ***Attachment 1-B***
*Section 1 – Misconducts/Rule Violations*
Issued: 12/1/2017
Effective: 12/1/2017



| Form DC-141 Part 1<br>Rev. 12/2017 | COMMONWEALTH OF PENNSYLVANIA<br>DEPARTMENT OF CORRECTIONS | D 048343 |
|---|---|---|

☑ MISCONDUCT REPORT   ☐ OTHER   ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number<br>NA6401 | Name<br>Brown | Institution<br>SCIH | Incident Time 24 Hr. Base<br>1648 | Incident Date<br>05-02-19 | Date of Report<br>05-02-19 |
|---|---|---|---|---|---|
| Quarters<br>GD1011 | Place of Incident<br>GD1011 | | | | |

### OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | E. Long col | X | | | | | |
| | | | | | | | |

### MISCONDUCT CHARGE OR OTHER ACTION

Class 1 #35 refusing To obey an order, #17 Threatening another Person

### STAFF MEMBER'S VERSION

Sir on above date and Time, This officer assisted in escorting inmate Brown (NA6401) from mini law library back To his cell. once at cell GD1011 Inmate brown refused all orders To enter his cell. This officer used the minimal amount of force To place inmate Brown into cell GD1011 once cell door was secured This officer gave multible orders for inmate To place his hands in the feeding aperture To have hand restraints removed, Inmate refused all orders given. Inmate threated staff with Law suits due To being placed in cell. This ended this officer's involvement with This incident.

### IMMEDIATE ACTION TAKEN AND REASON

NO FURTHER inquiry. Inmate INformed of This report. NOT appropriate For informal Resolution Due to Charge- Remain present status until seen by Hearing Examiner. Place on Restriction per DC-709

| PRE-HEARING CONFINEMENT | IF YES | | FORMS GIVEN TO INMATE |
|---|---|---|---|
| ☐ YES<br>☑ NO | TIME<br>Currently<br>Confined | DATE | ☑ REQUEST FOR WITNESSES AND REPRESENTATION   ☑ INMATE'S VERSION |

| REPORTING STAFF MEMBER<br>SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY<br>RANKING C.O. ON DUTY  SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| D. Rimes col I   D.Rimes | DrickSon<br>cots | DATE<br>5/2/19   TIME 24 HOUR<br>BASE 1775 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
|---|---|---|---|
| DATE<br>5-4-19 | TIME<br>0800 hrs. | ☑ CLASS 1   ☐ CLASS 2 | N.Biles COT |

### Notice to Inmate

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

| FORM DC-141   PART II B | COMMONWEALTH OF PENNSYLVANIA | | | | |
|---|---|---|---|---|---|
| DISCIPLINARY HEARING REPORT | DEPARTMENT OF CORRECTIONS | | | | |

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 5/7/2019 | 0933 | D048343 |

| INMATE | ☐ Guilty | ☐ No Plea | **Verdict** | ☒ Guilty |
|---|---|---|---|---|
| PLEA | ☐ Not Guilty | ☒ Other | | ☐ Not Guilty |

**HEARING ACTION**

**CHARGES**    17, 35

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of CO2 D. Himes, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown did refuse direct orders to enter his cell after being returned from law library. Inmate Brown also refused several orders to place his hands in the aperture to have his restraints removed. A preponderance of evidence exist to support charge #35.

**Guilty #35 - 15 Days DC**
       **Consecutive to Misconduct D339659**

**Dismiss #17**

**In Absentia**

| | | | |
|---|---|---|---|
| ☐ Yes | ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. | Part 2A |
| ☐ Yes | ☒ No | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES |
| ☐ Yes | ☒ No | The opportunity to have the inmate's version reported as part of the record was given. | ☒ Part 2D |
| ☐ Yes | ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | 709 Form |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger**<br>**Hearing Examiner** | |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent

**002**

**DC-141    PART 2(A)**
Rev. 9/2009
INMATE REQUEST FOR
REPRESENTATION AND WITNESSES

# COMMONWEALTH OF PENNSYLVANIA
## DEPARTMENT OF CORRECTIONS

| DC Number | Name | Facility | Date | Number as on Part 1 |
|---|---|---|---|---|
| NA6401 | Guitar Brown | SCIH | 5/5/19 | D048343 |

You have been charged with a misconduct. You may request assistance and/or witnesses to appear at your hearing by completing the section(s) below.

In order to have assistance or witnesses at your hearing, you must complete this form and present all copies to one of your housing officers no later than 9:00 a.m. the next day after you receive notice of the misconduct.

Assistance:  ☐ I do not request assistance
☑ I request assistance by _Matthew Hinkle 155282_
(The person requested must be willing to assist you)

Witnesses:  You may request witnesses in accord with DC-ADM 801. State the relevance and importance of the testimony the witness will give.

| | DO NOT WRITE IN THIS SECTION<br>For Use by Hearing Examiner |
|---|---|
| If Inmate<br>1. Name of Witness: Lawend Hill  No. GC8778  Quarters GD 107<br>Why is this person's testimony relevant and important?<br>witness what happened | Witness permitted?    If not, why not?<br>NO    I/m Brown Refused to Attend Hearing |
| If Inmate<br>2. Name of Witness: Miller  No.  Quarters GD 109<br>Why is this person's testimony relevant and important?<br>witness what happened | Witness permitted?    If not, why not?<br>No    Same As Above |
| If Inmate<br>3. Name of Witness:  No.  Quarters<br>Why is this person's testimony relevant and important? | Witness permitted?    If not, why not? |

_Gedwon Brown_
Inmate's Signature

This section to be completed by Housing Officer only

Received completed form  _9011_ hours  _5/5/19_
           Time           Date

_K. Ow_
Housing Officer's Signature

_Eijenberger_
Hearing Examiner's Signature

WHITE – DC-15   YELLOW – Inmate's Copy to be Given After Action by Hearing Examiner  PINK – Staff Member Reporting Misconduct
GOLDENROD – Inmate Cited

***DC-ADM 801, Inmate Discipline Procedures Manual***
***Section 1 – Misconducts/Rule Violations***
Issued: May 20,2015
Effective: July 2, 2015

***Attachment 1-D***

**003**

| FORM DC-141        PART 2 D<br>Rev. 8/05<br>WAIVER OF DISCIPLINARY<br>PROCEDURES | COMMONWEALTH OF PENNSYLVANIA<br>DEPARTMENT OF CORRECTIONS | | |
|---|---|---|---|
| DC Number<br>NAG401 | Name<br>Brown | Facility<br>HVN | Date<br>5-7-19 |

MISCONDUCT REPORT(S) NO. __D339659, D048343__

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven working days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

· If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

[X] I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # __See Above__

[ ] I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

[ ] I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven working days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

Refused to attend
_____
INMATE

DATE ___5-7-19___

_____
WITNESS

DATE ___5-7-19___

_____
Th. Knzy
WITNESS

DATE ___5-7-19___

**004**

DC-709

**SECURITY LEVEL 5 HOUSING UNIT**
**INMATE ACTIVITY RESTRICTION FORM**

(C or D)

Y    N

☐    ☐

| Inmate Name | Inmate Number | Misconduct No. | Cell Assignment |
|---|---|---|---|
| Scown | NAG401 | D748343 | GD 1011 |

## Behaviors – Check all that Apply

☐ Pre-hearing Confinement
☑ Verbally Abusive
☐ Self Abusive Behaviors
☑ Destroys Property
☐ Throws Body Fluid

☐ Sexual Comments/Gestures
☐ Tampers w/ cell door/wicker
☐ Threatens Self-Abuse
☐ Contraband/Weapons(s)
☐ Feigning Medical Problems

☑ Assaultive Toward Staff
☐ Assaultive Toward Inmates
☐ Medical/Mental Health Issues
☐ Escape Attempt
☐ Other _____

## Approved Restrictions – Check all that Apply

☐ Exercise
☐ Shower
☐ Shave
☐ Cell Cleaning
☐ Spit Mask
☐ Water
☐ Container
☐ Commissary
☐ Bedding Materials
☐ In Cell Restriction – Use of handcuffs, treatment belt, and/or leg shackles (24 hour maximum unless approved by the Medical Department)

☐ Television
☐ Secure Food Pass
☐ Videotape of Movements
☐ Plexiglas Shield
☐ Commissioned Officer present for movements
☐ Mini Law Library
☐ Radio

☐ Restraint Chair* (8 hour maximum unless approved by the Facility Manager/designee
☐ Movement Restrictions – Use of belt for exercise/showers/toilet
☑ Movement Restrictions – Use of tether for exercise/showers/toilet
☐ Movement Restrictions – Use of leg restraints for exercise/showers/toilet

Requested By: _Lt. Snyder_ ____    Date: _5/2/19_    Time: _1648_

Shift Commander Signature/Date: _____ Call ☐ Approved    ☐ Disapproved
_5-2-19_

*Restraint Chair – Name of Medical Staff Member/Date:    ☐ Approved    ☐ Disapproved

Restriction Removed By: _____    Date: _____    Time: _____

**No restriction may exceed 7 days unless approved by the Facility Manager/designee.**
**Name/Title of approving authority:** _____
**Expiration date:** _____

*Comments* _____
_____
_____
_____
_____
_____
_____

cc:    Facility Manager        Shift Commander/Captains Office (original)    DC-14
       DSFM                    DSIS (If applicable)                          DC-15
       DSCS                    Intelligence Captain                          RHU Control Room

**6.5.1, Administration of Security Level 5 Housing Units**
**Section 1 – Administration**                                          **Attachment 1-L**
Issued: 2/7/2014
Effective: 2/14/2014
                                                                              005

Form DC-141 Part 1
Rev. 12/2017

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

D 276329

☒ MISCONDUCT REPORT    ☐ OTHER    ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| NHG4101 | Brown | Hun | 2130 | 13 June 2019 | 13 June 2019 |

| Quarters | Place of Incident |
|---|---|
| (-D 1011 | RHU |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| LPN | Flasher | | X | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

Class 1 Charge #35 Refusing to obey an Order, Class 2 Charge #51 Possession of any item not authorized for retention

**STAFF MEMBER'S VERSION**

On the above date and time, while escorting the nurse to CD1011 to asses inmate Brown NHG4101, Brown took the Pulse Oximeter hostage because the nurse told him his vitals were normal. This Officer gave Brown two orders to give the pulse oximeter back at which time inmate Brown attempted to smash the pulse ox and this officer applied OC.

**IMMEDIATE ACTION TAKEN AND REASON** Investigated. No further inquiry indicated. Inmate internal of this neglect. Inappropriate for informal resolution due to nature of charges. Continue present cont status pending disp misc.

**PRE-HEARING CONFINEMENT**

IF YES

| ☐ YES | TIME | DATE |
|---|---|---|
| ☒ NO | | |

**FORMS GIVEN TO INMATE**
☒ REQUEST FOR WITNESSES AND REPRESENTATION    ☒ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING CO ON DUTY SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| N. Smith CO1 | | DATE 6-13-19 | TIME 24 HOUR 2335 |

**YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER**

| DATE | TIME |
|---|---|
| 6-17-19 | 0800 |

**MISCONDUCT CATEGORY**
☒ CLASS 1    ☐ CLASS 2

Signature of Person Serving Notice
M. Chilcok CO1

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15        YELLOW – Inmate        PINK – Reporting Staff Member

**DC-ADM 801, Inmate Discipline Procedures Manual**
**Section 1 – Misconducts/Rule Violations**
Issued: 12/1/2017
Effective: 12/1/2017

*Attachment 1-B*
**001**

FORM DC-141   PART II B

DISCIPLINARY HEARING REPORT

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 6/18/2019 | 1015 | D276329 |

| INMATE PLEA | | | Verdict | | |
|---|---|---|---|---|---|
| ☐ Guilty | ☐ No Plea | | | ☒ Guilty | |
| ☐ Not Guilty | ☒ Other | | | ☐ Not Guilty | |

**HEARING ACTION**

**CHARGES**   35, 51

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of CO1 N. Smith, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown did refuse direct orders to return the pulse oximeter that he had taken from the nurse. A preponderance of evidence exist to support charge #35.

**Guilty #35 - 30 Days DC**
     **Consecutive to Misconduct D048343**

**Dismiss #51**

**In Absentia**

| | | | |
|---|---|---|---|
| ☐ Yes | ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. | |
| ☐ Yes | ☒ No | The circumstances of the charge have been read and fully explained to the inmate. | **SEE APPENDICES** ☒ |
| ☐ Yes | ☒ No | The opportunity to have the inmate's version reported as part of the record was given. | |
| ☐ Yes | ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | **Part 2D** |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger**<br>**Hearing Examiner** | |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent

002

FORM **DC-141**   **PART 2 D**
Rev. 8/05
**WAIVER OF DISCIPLINARY PROCEDURES**

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Facility | Date |
|---|---|---|---|
| NA6401 | Brown | Huu | 6-18-19 |

MISCONDUCT REPORT(S) NO. _#D276329_

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven working days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

[X] I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # _D276329_

[ ] I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

[ ] I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven working days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

_Refused to sign & sign_
INMATE

_____
WITNESS

DATE _6-18-19_

DATE _6-18-19_

_K. Hyle, Co I_
WITNESS

DATE _6-18-19_

**003**

**Exhibit 63**

| Form DC-141 Part 1<br>Rev. 12/2017 | COMMONWEALTH OF PENNSYLVANIA<br>DEPARTMENT OF CORRECTIONS | D 200044 |
|---|---|---|

☒ MISCONDUCT REPORT ☐ OTHER ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number<br>NA6401 | Name<br>Brown | Institution<br>SCI Hunt. | Incident Time 24 Hr. Base<br>1619 | Incident Date<br>6-24-19 | Date of Report<br>6-24-19 |
|---|---|---|---|---|---|
| Quarters<br>GD1009 | Place of Incident GD1009 | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | COI Booher | | x | | | | |
| | COI Johnston | | x | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

#35 Refusing to obey an order

**STAFF MEMBER'S VERSION**

On the above date and time, inmate Brown (NA6401) was given a direct order by this reporting officer to come out of his cell for a security check. Inmate Brown refused all orders and his actions resulted in a planned use of force

**IMMEDIATE ACTION TAKEN AND REASON** Investigated No further inquiry indicated Inmate informed of This report Inappropriate text et al allegation Due to nature of charges continue present confin status pending disp/Misc-

| PRE-HEARING CONFINEMENT | | |
|---|---|---|
| | IF YES | |
| ☐ YES<br>☒ NO | TIME | DATE |

FORMS GIVEN TO INMATE

☒ REQUEST FOR WITNESSES AND REPRESENTATION  ☒ INMATE'S VERSION

| REPORTING STAFF MEMBER<br>SIGNATURE AND TITLE<br>Campbell CO3 | ACTION REVIEWED AND APPROVED BY<br>RANKING C.O. ON DUTY SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| | | DATE 6/24/19 | TIME 24 HOUR BASE 19:45 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER<br>DATE 6-26-19   TIME 0800 | MISCONDUCT CATEGORY<br>☒ CLASS 1 ☐ CLASS 2 | Signature of Person Serving Notice<br>J.A. Shriver |
|---|---|---|

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15 YELLOW – Inmate PINK – Reporting Staff Member

*DC-ADM 801, Inmate Discipline Procedures Manual*
*Section 1 – Misconducts/Rule Violations*
Issued: 12/1/2017

*Attachment 1-B*
**001**

| FORM DC-141        PART 2 D<br>Rev. 8/05<br>WAIVER OF DISCIPLINARY<br>PROCEDURES | COMMONWEALTH OF PENNSYLVANIA<br>DEPARTMENT OF CORRECTIONS | | |
|---|---|---|---|
| DC Number<br>NA6401 | Name<br>Brown | Facility<br>Hun | Date<br>6-27-19 |

MISCONDUCT REPORT(S) NO. #D200044

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven working days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

☒ I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # D200044

☐ I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

☐ I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven working days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

REFUSED TO Appear & Sign
_____
INMATE

_____
WITNESS

DATE  6-27-19

DATE  6-27-19

_____
WITNESS  COI

DATE  6-27-19

**002**

**Exhibit 62**

| Form DC-141   Part 1 | **COMMONWEALTH OF PENNSYLVANIA** | | | | B | 976847 |
| Rev 8/05 | **DEPARTMENT OF CORRECTIONS** | | | | | |

☒ MISCONDUCT REPORT    ☐ OTHER    ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| NA6401 | BROWN | FRS | 0130 | 4/24/20 | 4/24/20 |
| **Quarters** | **Place of Incident** | | | | |
| EB2048 | Cell EB2048 | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| EU4565 | DAVIS | X | | | | | |
| | COI. HARRIGER | | X | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

Class 1 Charge 16. FIGHTING ; Class 1 Charge 35. Refusing to obey an order.

**STAFF MEMBER'S VERSION**

At approx. 0130 hrs, Inmate Brown (NA6401) and Inmate Davis (EU4565) were on their cell floor striking each other with closed fists and trying to choke one another. They were given several orders to stop fighting and refused each order and continued to fight one another. End of Report.

**IMMEDIATE ACTION TAKEN AND REASON** Refer to Hex Due to charge level. Inmate Informed of Report.

| **PRE-HEARING CONFINEMENT** | | |
|---|---|---|
| **IF YES** | | |
| ☒ YES | **TIME** | **DATE** |
| ☐ NO | 0200 | 4-24-2020 |

**FORMS GIVEN TO INMATE**
☒ REQUEST FOR WITNESSES AND REPRESENTATION    ☒ INMATE'S VERSION

| **REPORTING STAFF MEMBER SIGNATURE AND TITLE** | **ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY   SIGNATURE AND TITLE** | **DATE AND TIME INMATE GIVEN COPY** |
|---|---|---|
| C.O.1  A. Brill | Cet Baumme | **DATE** 4/24/20   **TIME 24 HOUR BASE** 0514 |

**YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER**

| **DATE** 4-25-2020 | **TIME** 1600 | **MISCONDUCT CATEGORY** ☒ CLASS 1   ☐ CLASS 2 | **Signature of Person Serving Notice** |

**Notice To Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE — DC-15        YELLOW — Inmate        PINK — Reporting Staff Member        GOLDENROD — Deputy Superintendent Facility Management

| DC-141 Part 2B | | COMMONWEALTH OF PENNSYLVANIA | | | | |
|---|---|---|---|---|---|---|
| Rev. 8-84 DISCIPLINARY HEARING REPORT | | DEPARTMENT OF CORRECTIONS | | | | |
| DC Number | Name | | Facility | Hearing Date | Hearing Time | No. from Part 1 |
| NAL401 | BROWN | | SCI-FRS | 4-27-20 | 0900 | B976847 |

| INMATE PLEA | ☐ Guilty ☐ Not Guilty | ☐ No Plea ☒ Other | | Verdict | ☒ Guilty ☐ Not Guilty |
|---|---|---|---|---|---|

**HEARING ACTION**

CHARGES    #16    #35

FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

Inmate Brown refused to attend his hearing, in accordance with DC-ADM 801, a waiver was signed.

HEx finds officer report more credible than the inmates' refusal to attend this hearing and contest that the inmate did engage in a fight, striking inmate Davis with closed fists, refusing all orders to stop fighting. A preponderance of evidence exists to support charges #16 #35.

GUILTY  #16 - 60 d DC > 75 d DC eff. 4/24/20
GUILTY  #35 - 15 d DC

An Absentia

| | | | |
|---|---|---|---|
| ☐ YES | ☒ NO | The inmate has heard the decision and has been told the reason for it and what will happen. | MED INJ RPT. WAIVER |
| ☐ YES | ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES ☒ |
| ☐ YES | ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. | |
| ☐ YES | ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED) | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| L. Fiscus | _Fiscus_  **002** SIGNATURE OF HEARING EXAMINER/COORDINATOR |

| FORM DC-141 PART II B | COMMONWEALTH OF PENNSYLVANIA | | | | |
|---|---|---|---|---|---|
| DISCIPLINARY HEARING REPORT | DEPARTMENT OF CORRECTIONS | | | | |

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 6/27/2019 | 1045 | D200044 |

| INMATE | ☐ Guilty | ☐ No Plea | Verdict | ☒ Guilty |
|---|---|---|---|---|
| PLEA | ☐ Not Guilty | ☒ Other | | ☐ Not Guilty |

**HEARING ACTION**

CHARGES     35

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of CO3 Campbell, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown did refuse to come out of his cell for a security check resulting in a planned use of force. A preponderance of evidence exist to support charge #35.

Guilty #35 - 30 Days DC
          Consecutive to Misconduct D276313

**In Absentia**

| | | | SEE APPENDICES |
|---|---|---|---|
| ☐ Yes  ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. | | |
| ☐ Yes  ☒ No | The circumstances of the charge have been read and fully explained to the inmate. | | ☒ |
| ☐ Yes  ☒ No | The opportunity to have the inmate's version reported as part of the record was given. | | Part 2D |
| ☐ Yes  ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger**<br>**Hearing Examiner** | |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent

| Form DC-141 Part 1 Rev. 12/2017 | COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS | | | D 043133 | |
|---|---|---|---|---|---|

☒ MISCONDUCT REPORT ☐ OTHER ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number NA6401 | Name Brown, Carter | Institution FRS | Incident Time 24 Hr. Base 1850 | Incident Date 6/4/2020 | Date of Report 6/4/2020 |
|---|---|---|---|---|---|
| Quarters KB2020 | Place of Incident KB2020 | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**
Class 1 #35 Refusing to obey an order

**STAFF MEMBER'S VERSION**

On the above date and approximate time, I/M Brown NA6401 was given a direct order to take a cell mate. I/M Brown refused all orders and stated "im not taking any cellies" Inmate Brown was informed that he would be receiving a misconduct for refusing to obey and order.

**IMMEDIATE ACTION TAKEN AND REASON** _Refer to HEX due to nature of charges. I/M informed_

| PRE-HEARING CONFINEMENT | | | |
|---|---|---|---|
| | IF YES | | |
| ☐ YES ☐ NO | TIME _Already_ | DATE _Confined_ | **FORMS GIVEN TO INMATE** ☒ REQUEST FOR WITNESSES AND REPRESENTATION  ☒ INMATE'S VERSION |

| REPORTING STAFF MEMBER SIGNATURE AND TITLE _T. Smith COIF_ | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY SIGNATURE AND TITLE _Ch.V. COIV_ | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| | | DATE _6/4/20_ | TIME 24 HOUR BASE _2121_ |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
|---|---|---|---|
| DATE _6/5/20_ | TIME _0800_ | ☒ CLASS 1  ☐ CLASS 2 | _[signature]_ |

**Notice to Inmate**
You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

**FORM DC-141**    **PART 2 D**
Rev. 07-04
WAIVER OF DISCIPLINARY
PROCEDURES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Facility | Date |
|---|---|---|---|
| NVA6401 | Brown | SCI FRS | 6/8/20 |

MISCONDUCT REPORT(S) NO. _____ D043133

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than 7 working days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Examiner to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

[✓] I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # _____

[ ] I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

[ ] I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within 7 working days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

X  I/m Refused to sign
   **INMATE**

DATE ___6/8/20___

_____ Mason CM
   **WITNESS**

DATE ___6/8/20___

_____ Murray CO/
   **WITNESS**

DATE ___6/8/20___

**002**

DC-141    Part 2B                    **COMMONWEALTH OF PENNSYLVANIA**
Rev. 6-84                                **DEPARTMENT OF CORRECTIONS**
DISCIPLINARY HEARING REPORT

| DC Number | Name | Facility | Hearing Date | Hearing Time | No. from Part 1 |
|---|---|---|---|---|---|
| NA6401 | BROWN | SCI-FRS | 6-8-20 | 0830 | DO43133 |

| INMATE PLEA | ☐ Guilty   ☐ No Plea   ☐ Not Guilty   ☒ Other | Verdict | ☒ Guilty   ☐ Not Guilty |
|---|---|---|---|

**HEARING ACTION**

CHARGES        #35

FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

Inmate Brown refused to attend this hearing in accordance with DC-ADM 801, per Officer Murray, a waiver was signed.

HEX finds the officer report more credible than the inmate refusal to attend this hearing and contest the inmate did refuse all orders to take a cellie. A preponderance of evidence exists to support charge #35.

        GUILTY #35 - 30d DC ept (Consecutive)

In Absentia:

| | | |
|---|---|---|
| ☐ YES | ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. |
| ☐ YES | ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. |
| ☐ YES | ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. |
| ☐ YES | ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. |

WAIVER

SEE APPENDICES
☐

NAME(S) OF HEARING EXAMINER/COMMITTEE
(TYPED OR PRINTED)

L. Fiscus

Hearing Report and all appended information must be signed. Signature indicates finished report with appendices.

SIGNATURE OF HEARING EXAMINER/COORDINATOR                    003

Ot#5 MH-4

**Exhibit 60**

| Form DC-141 Part 1<br>Rev. 12/2017 | **COMMONWEALTH OF PENNSYLVANIA<br>DEPARTMENT OF CORRECTIONS** | D 043138 |

☑ MISCONDUCT REPORT ☐ OTHER ☒ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| NA6401 | Brown, Carter | FRS | 1315 | 6/26/20 | 6/26/20 |

| Quarters | Place of Incident |
|---|---|
| B2020 | KB2020 |

### OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | U/M Perry | | ✓ | | | | |
| | | | | | | | |
| | | | | | | | |

### MISCONDUCT CHARGE OR OTHER ACTION

Class #1, Charge #35 Refusing to obey an order

### STAFF MEMBER'S VERSION

On 6/26/20 at approximately 1315 hrs, I/m Brown NA6401 refused several direct orders to let an inmate move into his cell.

| | | | | | | | | | | | |

IMMEDIATE ACTION TAKEN AND REASON  Refer to UM for Inf. Res. IM informed    CAD   6/26/20

| PRE-HEARING CONFINEMENT | | Refer to Hep By u/m. Inmate informed of Report |
|---|---|---|
| **IF YES** | | |
| ☐ YES<br>☒ NO | TIME<br>Already<br>Confined. | DATE |

| FORMS GIVEN TO INMATE |
|---|
| ☒ REQUEST FOR WITNESSES AND REPRESENTATION   ☒ INMATE'S VERSION |

| REPORTING STAFF MEMBER<br>SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY<br>RANKING C.O. ON DUTY  SIGNATURE  AND TITLE | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| J Butler Butlers COI | Capt Baumann | DATE | TIME 24 HOUR BASE |
| | | 6/24/20 | 1339 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
|---|---|---|---|
| DATE | TIME | | |
| 7/1/2020 | 1600 | ☒ CLASS 1   ☐ CLASS 2 | 6km-COI |

### Notice to Inmate

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15                YELLOW – Inmate                PINK – Reporting Staff Member

**DC-ADM 801, Inmate Discipline Procedures Manual**
**Section 1 – Misconducts/Rule Violations**
Issued: 12/1/2017
Effective: 12/1/2017

**Attachment 1-B**
001

## Informal Resolution Action Form   K31007

| Inmate Name (Printed) | Inmate Number | DC-141 Part 1 Number | Date |
|---|---|---|---|
| Brown | NA6401 | D043138 | 6/26/20 |

**Action Taken**

| | |
|---|---|
| ❑ No Action | Reason: _I'm refered to how_ |
| ❑ Reprimand and Warning | _Mc h.ld inforaly_ |
| ❑ Referred to the Hearing Examiner at the Request of the Inmate | _____ |
| ☑ Referred to Hearing Examiner by Unit Manager | _____ |
| ❑ Carried on active MH/ID Roster and assigned to RTU or other appropriate treatment/program after consultation with PRT | |

| | Number of Days: | Start Date: | End Date: |
|---|---|---|---|
| ❑ Cell Restriction (Up to 14 days) | | | |

| Loss of Privileges: (Up to 14 days)<br>❑ Telephone<br>❑ Yard<br>❑ Day Room<br>❑ Tablet Usage<br>❑ Kiosk Access<br>❑ Other: _____ | Number of Days: | Start Date: | End Date: |
|---|---|---|---|

| | | Start Date: | End Date: |
|---|---|---|---|
| ❑ 14 days Loss of Commissary | | | |

| | | Start Date: | |
|---|---|---|---|
| ❑ Loss of job due to work-related misconduct(s) | | | |

| | Assignment | Start Date: | End Date: |
|---|---|---|---|
| ❑ Assignment of Additional Work Duties (No compensation allowed) up to 14 days | | | |

| | Item(s) | Amount to be Paid: | |
|---|---|---|---|
| ❑ Restitution for Damaged/Destroyed State Items/Property | | | |

**D. Perry K-UNIT MGR**
Unit Manager's Name (Printed or Typed)

_signature_ 6/30/20

Unit Manager's Signature        Date

Inmate's Signature        Date

cc:  DC-14 (original form/goldenrod copy of m/c)
     DC-15 (original m/c/copy of Action Form)
     CEVC Office (copy of Action Form)
     Unit Control (Copy of All)
     Hearing Clerk (copy of All)

Writing Staff (pink copy of m/c & Action Form)
Inmate (yellow copy of m/c & Action Form)
Education (copy of All if Cell Restriction)
Activities (copy of All if Cell Restriction)
Other (ex. Business if assessing costs)

**DC-ADM 801, Inmate Discipline Procedures Manual**
**Section 2 – Informal Resolution**
Issued: 11/17/2016    Effective: 11/24/2016

002
**Attachment 2-A**

OC#5 MH-4

| Form DC-141 Part 1 | COMMONWEALTH OF PENNSYLVANIA | D 043138 |
|---|---|---|
| Rev. 12/2017 | DEPARTMENT OF CORRECTIONS | |

☐ MISCONDUCT REPORT    ☐ OTHER    ☒ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| NA6401 | Brown, Carter | FRS | 1315 | 6/26/20 | 6/26/20 |

| Quarters | Place of Incident |
|---|---|
| KB2020 | KB2020 |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | U/M Perry | | ✓ | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

Class #1, Charge #35 Refusing to obey an order

**STAFF MEMBER'S VERSION**

On 6/26/20 at approximately 1315 hrs, I/m Brown NA6401 refused several direct orders to let an inmate move into his cell.

**IMMEDIATE ACTION TAKEN AND REASON** Refer to UM for Inf. Res. 1M informed  CAD  6/26/20

| PRE-HEARING CONFINEMENT | | | | |
|---|---|---|---|---|
| | IF YES | | | |
| ☐ YES | TIME | DATE | | |
| ☐ NO | | | | |

**FORMS GIVEN TO INMATE**
☐ REQUEST FOR WITNESSES AND REPRESENTATION    ☐ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY  SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| J Butler Butlers COI | | DATE 6-26-20 | TIME 24 HOUR BASE 2035 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
|---|---|---|---|
| DATE | TIME | ☐ CLASS 1    ☐ CLASS 2 | Guarnieri |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

**DC-141    Part 2B**
Rev. 6-84
DISCIPLINARY HEARING REPORT

| | | | | | | |
|---|---|---|---|---|---|---|
| DC Number | Name | | Facility | Hearing Date | Hearing Time | No. from Part 1 |
| NAW401 | BROWN | | SCI-FRS | 7-2-20 | 1155 | A04338 |

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| INMATE PLEA | ☒ Guilty   ☐ No Plea | Verdict | ☒ Guilty |
|---|---|---|---|
| | ☐ Not Guilty   ☐ Other | | ☐ Not Guilty |

## HEARING ACTION

CHARGES        #35

FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

Inmate Brown pleads guilty to charge #35.

Inmate refused the Informal Resolution.

HEx accepts the inmates' guilty plea to charge #35.

Guilty    #35 - 15 d DC eft (Consec.)

| | | | |
|---|---|---|---|
| ☒ YES | ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. | INF RES ACT FORM |
| ☒ YES | ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. | |
| ☒ YES | ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. | SEE APPENDICES ☒ |
| ☒ YES | ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED) | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. | |
|---|---|---|
| L. Fiscus | *[signature]* SIGNATURE OF HEARING EXAMINER/COORDINATOR | 004 |

WHITE - DC 15      YELLOW - Inmate Cited      PINK - Staff Member Reporting Misconduct      GOLDENROD - Deputy Superintendent

| Form DC-141 Part 1<br>Rev. 12/2017 | **COMMONWEALTH OF PENNSYLVANIA**<br>**DEPARTMENT OF CORRECTIONS** | D 043156 |
|---|---|---|

☑ MISCONDUCT REPORT   ☐ OTHER   ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number<br>NAG401 | Name<br>Brown, Carter | | Institution<br>FRS | Incident Time 24 Hr. Base<br>1530 | Incident Date<br>2/9/21 | Date of Report<br>2/9/21 |
|---|---|---|---|---|---|---|
| Quarters<br>KC1011-01 | Place of Incident<br>KC1011-01 | | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| staff | Lt. Weaver | | ✓ | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

Class I #35 - Refusing to obey an order,

**STAFF MEMBER'S VERSION**

On the above date and approximate time this officer gave Inmate Brown (NAG401) several direct orders to pack his cell contents and be moved. Inmate Brown refused all orders given by this officer and stated "I am not going to move to the cell I want to move to one of my choice". Inmate Brown does not get to choose what cell he moves to and was given a direct order to move due to his 90 day move exspiring soon. Inmate Brown has also spoken to Lt. Weaver but continues to refuse to move.

**IMMEDIATE ACTION TAKEN AND REASON** Refer to HEX due to discuption to unit. UM informed

| PRE-HEARING CONFINEMENT | | | |
|---|---|---|---|
| | IF YES | | |
| ☐ YES<br>☐ NO | TIME<br>Already | DATE<br>Confined | |

| ☐ REQUEST FOR WITNESSES AND REPRESENTATION | ☑ INMATE'S VERSION |
|---|---|

**FORMS GIVEN TO INMATE**

| REPORTING STAFF MEMBER<br>SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY<br>RANKING C.O. ON DUTY SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| T. Smove COII /T/A COII | COIV | DATE<br>02-09-21 | TIME 24 HOUR<br>1830 BASE |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
|---|---|---|---|
| DATE<br>2/10/2021 | TIME<br>0800 | ☑ CLASS 1   ☒ CLASS 2 | COT |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

**DC-ADM 801, Inmate Discipline Procedures Manual**
**Section 1 – Misconducts/Rule Violations**
Issued: 12/1/2017
Effective: 12/1/2017

**Attachment 1-B**
**001**

FORM DC-141   PART 2 D
Rev. 07-04
WAIVER OF DISCIPLINARY
PROCEDURES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Facility | Date |
|---|---|---|---|
| NA6401 | Brown | FRS | 2-11-21 |

MISCONDUCT REPORT(S) NO. _D043156_

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than 7 working days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Examiner to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

[✓] I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # _D043156_

[ ] I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

[ ] I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within 7 working days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

_Refused to sign_
INMATE

_Colg mimick_
WITNESS

DATE _2-11-21_

DATE _2-11-21_

_Cy___ Cby_
WITNESS

DATE _2/11/21_

**002**

| DC-141, Part 2(B) DISCIPLINARY HEARING REPORT | COMMONWEALTH OF PENNSYLVANIA Department of Corrections | | | | |
|---|---|---|---|---|---|
| DC Number NA6401 | Name Brown | Facility SCI-FRS | Hearing Date 2-11-21 | Hearing Time 0925 | No. from Part 1 D043156 |
| INMATE PLEA ☐ Guilty ☐ Not Guilty | | ☐ No Plea ☒ Other | VERDICT | ☒ Guilty ☐ Not Guilty | |

**CHARGES** #35

**HEARING ACTION**

FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

Inmate Brown refused to attend this hearing in accordance with DC-ADM 801, per Officer Minich, a waiver was signed.

Hex finds officer report more credible than the inmate refusal to attend and contest the inmate did refuse all orders to pack his cell and move, stating "I am not going to move to the cell, I want to move to one of my choices." A preponderance of evidence exists to support charge #35.

An Absentia    GUILTY #35 – 30 d DC left (consecutive)

2-9-21

WAIVER

SEE APPENDICES

| | | |
|---|---|---|
| ☐ YES | ☒ NO | The inmate has heard the decision and has been told the reason for it and what will happen. |
| ☐ YES | ☒ NO | The circumstances of the charge have been read and fully explained to the inmate. |
| ☐ YES | ☒ NO | The opportunity to have the inmate's version reported as part of the record was given. |
| ☐ YES | ☒ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. |

| NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED) | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| L. Fiscus | |
| | SIGNATURE OF HEARING EXAMINER/COORDINATOR |

**WHITE – DC-15     YELLOW – Inmate Cited     PINK – Staff Member Reporting Misconduct**
**GOLDENROD – Deputy Facility Manager**

**Exhibit 58**

FORM DC-141   PART II B

DISCIPLINARY HEARING REPORT

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 2/28/2019 | 0940 | D339535 |

| INMATE PLEA | ☐ Guilty  ☒ Not Guilty | ☐ No Plea  ☐ Other | Verdict | ☒ Guilty  ☐ Not Guilty |
|---|---|---|---|---|

**HEARING ACTION**

CHARGES   35

FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

Inmate Brown pleads not guilty to charge #35.

Inmate stated that he told the officer that he has enemies where he is going.

This HEX believes the written of CO1 N. Smith, over Inmate Brown's denial, about how Inmate Brown did refuse all orders to leave the RHU and move back to population. A preponderance of evidence exist to support charge #35.

**Guilty #35 – 30 Days DC**
          **Effective 2/26/19**

| | | |
|---|---|---|
| ☒ Yes  ☐ No | The inmate has heard the decision and has been told the reason for it and what will happen. | NONE |
| ☒ Yes  ☐ No | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES |
| ☒ Yes  ☐ No | The opportunity to have the inmate's version reported as part of the record was given. | ☒ |
| ☒ Yes  ☐ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger**  **Hearing Examiner** | *[signature]* |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent

*A* ⓪

| Form DC-141 Part 1 | COMMONWEALTH OF PENNSYLVANIA | D 339535 |
|---|---|---|
| Rev. 12/2017 | DEPARTMENT OF CORRECTIONS | |

☒ MISCONDUCT REPORT    ☐ OTHER    ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| NA6401 | Brown | SCI-Huw | 1515 | 2/26/19 | 2/26/19 |

| Quarters | Place of Incident |
|---|---|
| RHU | GA 2009 |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

Class 1  # 35 - Refusing to obey an order

**STAFF MEMBER'S VERSION**

On the above date and time this officer gave inmate Brown (NA6401) a direct order to pack his cell and go to population. Inmate Brown refused all orders, by stating "No im not going".

**IMMEDIATE ACTION TAKEN AND REASON** Investigated. No further inquiry indicated. Tea mate informed of this report. Inappropriate for Informal Resolution due to nature of charge. Place on Pre-Hay Conf for Control

| PRE-HEARING CONFINEMENT | | |
|---|---|---|
| IF YES | | |
| ☒ YES ☐ NO | TIME 1650 | DATE 2-26-19 |

☒ REQUEST FOR WITNESSES AND REPRESENTATION    **FORMS GIVEN TO INMATE**    ☒ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY, SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| N. Smith CO1 | M. Acton Coy | DATE 02/26/19    TIME 24 HOUR BASE 1700 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
|---|---|---|
| DATE 2-28-19    TIME 0800 | ☒ CLASS 1  ☐ CLASS 2 | |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15                    YELLOW – Inmate                    PINK – Reporting Staff Member

*DC-ADM 801, Inmate Discipline Procedures Manual*    **Attachment 1-B**
*Section 1 – Misconducts/Rule Violations*
Issued: 12/1/2017
Effective: 12/1/2017                                                **002**



**pennsylvan.ɹ**
DEPARTMENT OF CORRECTIONS

**MEMO**

TO          Gartor Brown, NA6401
            GA-Unit

FROM        Kevin Kauffman
            Superintendent

DATE        03/28/2019

RE          Appeal of Misconduct #D339535

My review of your appeal of misconduct # D339535 indicates it is based on your belief that:

A.    The procedures employed were contrary to law, department directives, or regulations:

B.    The punishment is disproportionate to the offense.

C.    The findings of fact were insufficient to support the decision.

I have taken the opportunity to read your instant appeal, the Program Review Committee decision to your appeal, and the entire misconduct packet. In your appeal, you claim that HEX Ellenberger is not certified to conduct hearings and that the HEX should investigate your claims as to why he didn't receive your witness/representation forms and inmate version. In reviewing your appeal, you state that you asked the CO where you were going and said you expressed safety concerns to him, therefore the CO's written report is believed over your denial because your own explanation corroborates what the CO wrote in his misconduct report, that you refused a direct order to pack up and leave the RHU because of your alleged safety concerns; therefore, it is my decision to uphold the hearing examiners finding of guilt. Furthermore, I find that the procedures were not contrary to law, department directives, or regulations, the punishment is not disproportionate to the offense and the findings of fact were sufficient to support the decision. I also must note HEX Ellenberger is employed by the DOC as a hearing examiner to conduct misconduct hearings.

For the reasons outlined above, I reject your appeal as lacking merit, and therefore sustain the decision of the hearing examiner.

KK:alw

cc:    Deputy Brumbaugh
       Deputy Walters
       DC-14
       DC-15
       File

B
MAR 2 2 2019

| DC-141, Part 2 (E) | COMMONWEALTH OF PENNSYLVANIA | | |
|---|---|---|---|
| Misconduct Hearing Appeal | | | |
| DC Number | Name | Facility | No. From Part 1 |
| NR6901 | Gartor Brown | SCI H | D339535 |

I was found guilty of misconduct number __D339535__ on __2/26/19__
(date)

by the Hearing Examiner, and I wish to appeal that decision on the following grounds.

#### Check Area(s) Involved

☑ a. the procedures employed were contrary to law, Department directives, or regulations;

☐ b. the punishment is disproportionate to the offense; and/or

☑ c. the findings of fact were insufficient to support the decision.

Below is a brief statement of the facts relevant to my claims(s). It includes the identity of all persons who may have information that may be helpful in resolving this matter.

Brown's inmate version, request for witnesses inmate Duncan LF7863, representation from inmate Wade FM2131 the same day he received the write up 2-26-19 in which camera would show. Central office is aware of many appeals against Hearing Examiner Ellenbuger pursuant to these same violations in which Brown claims procedure due process. Ellenbuger is also not certified to conduct hearings. He is claiming Brown is or he is not getting Brown's witness forms, inmate version, and representation, in which he is doing nothing to investigate the matter. Brown claims on 2-26-19 c/o Smith walked to his cell door demanding he go to population to get fucked, Brown claims he asked this c/o which block he would write to the phone and come back and assert A block. Brown claims as he was expressing safety concerns, this c/o walked off after making some comments. This c/o walked off and wrote him up for refusing own order. P.R.C. asserts the view that Brown did not submit an inmate version or a request for witnesses and representation. Consequently Brown as received copys of his witness forms & inmate version pursuant to his last two write ups & the current right up in which officials tells Brown "you turn it in late" noting that Brown is turning these forms in the same day receiving the write ups, officials refuse to take up to the camera's to see as to when Brown turn in these forms are ask his witnesses officials is clearly maneuvering a system to ignore Brown's safety concerns claim that they are violating Brown's procedure due process, because they are finding him guilty for which not conducting any policy procedures

Gartor Brown                                    3/18/19
Inmate's Signature                              Date

**DC-ADM 801, Inmate Discipline Procedures Manual**
**Section 5 – Appeals**                          **Attachment 5-A**
Issued: May 20, 2015
Effective: July 2, 2015

004

| Form DC-141 Part 1<br>Rev. 12/2017 | **COMMONWEALTH OF PENNSYLVANIA**<br>**DEPARTMENT OF CORRECTIONS** | | D 039742 | |
|---|---|---|---|---|

☒ MISCONDUCT REPORT    ☐ OTHER    ☒ DC-ADM 801 INFORMAL RESOLUTION

| DC Number<br>nA6401 Brown | Name | Institution<br>F125 | Incident Time 24 Hr. Base<br>1139 | Incident Date<br>7-31-20 | Date of Report<br>7-31-20 |
|---|---|---|---|---|---|
| Quarters<br>KB3653 | Place of Incident<br>KB 2023 | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | SGt. mealy | | ☒ | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

Class III 35: Refusing to obey an order.

**STAFF MEMBER'S VERSION**

On the above Date and time this officer gave Inmate Brown two Direct orders to take a cellmate. Each order was Refused and Inmate Brown stated " look I'm not taking a cellie ". Inmate was Informed that refusing a cellmate would Result in a miscadcet.

End of report.

**IMMEDIATE ACTION TAKEN AND REASON** Refer to UM for Inf. Res. IM informed Honorably 7/31/2020

| **PRE-HEARING CONFINEMENT** | Refer to HEX at UM request. IM informed | |
|---|---|---|
| **IF YES** | | |

| | YES<br>NO | TIME<br>Already | DATE<br>Continued | | |
|---|---|---|---|---|---|

**FORMS GIVEN TO INMATE**
☒ REQUEST FOR WITNESSES AND REPRESENTATION    ☒ INMATE'S VERSION

| **REPORTING STAFF MEMBER**<br>**SIGNATURE AND TITLE**<br>COT | **ACTION REVIEWED AND APPROVED BY**<br>**RANKING C.O. ON DUTY, SIGNATURE AND TITLE**<br>COIV | **DATE AND TIME INMATE GIVEN COPY** | |
|---|---|---|---|
| | | DATE<br>8-4-20 | TIME 24 HOUR<br>1805 |

| **YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER**<br>DATE    TIME<br>8/5/2020    0810 | **MISCONDUCT CATEGORY**<br>☒ CLASS 1    ☐ CLASS 2 | **Signature of Person Serving Notice** |
|---|---|---|

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

## Informal Resolution Action Form  1 2023

| Inmate Name (Printed) | Inmate Number | DC-141 Part 1 Number | Date |
|---|---|---|---|
| Brown | NA6401 | D039742 | 7/31/20 |

**Action Taken**

| | | | |
|---|---|---|---|
| ☐ No Action | Reason: _I/m  refused  to  Attend_ | | |
| ☐ Reprimand and Warning | | | |
| ☐ Referred to the Hearing Examiner at the Request of the Inmate | | | |
| ☑ Referred to Hearing Examiner by Unit Manager | | | |
| ☐ Carried on active MH/ID Roster and assigned to RTU or other appropriate treatment/program after consultation with PRT | | | |
| ☐ Cell Restriction (Up to 14 days) | Number of Days: | Start Date: | End Date: |
| Loss of Privileges: (Up to 14 days) <br> ☐ Telephone <br> ☐ Yard <br> ☐ Day Room <br> ☐ Tablet Usage <br> ☐ Kiosk Access <br> ☐ Other: _____ | Number of Days: | Start Date: | End Date: |
| ☐ 14 days Loss of Commissary | | Start Date: | End Date: |
| ☐ Loss of job due to work-related misconduct(s) | | Start Date: | |
| ☐ Assignment of Additional Work Duties (No compensation allowed) up to 14 days | Assignment | Start Date: | End Date: |
| ☐ Restitution for Damaged/Destroyed State Items/Property | Item(s) | Amount to be Paid: | |

**D. Perry K-UNIT MGR**
Unit Manager's Name (Printed or Typed)

_____  cn  9/1/20
Unit Manager's Signature          Date

_____
Inmate's Signature          Date

cc: DC -14 (original form/goldenrod copy of m/c)
DC-15 (original m/c/copy of Action Form)
CEVC Office (copy of Action Form)
Unit Control (Copy of All)
Hearing Clerk (copy of All)

Writing Staff (pink copy of m/c. & Action Form)
Inmate (yellow copy of m/c & Action Form)
Education (copy of All if Cell Restriction)
Activities (copy of All if Cell Restriction)
Other (ex. Business if assessing costs)

**DC-ADM 801, Inmate Discipline Procedures Manual**
**Section 2 – Informal Resolution**
Issued: 11/17/2016    Effective: 11/24/2016

*Attachment 2-A* 002

| FORM DC-141    PART 2 D<br>Rev. 07-04<br>WAIVER OF DISCIPLINARY<br>PROCEDURES | COMMONWEALTH OF PENNSYLVANIA<br>DEPARTMENT OF CORRECTIONS | | |
|---|---|---|---|
| DC Number | Name | Facility | Date |
| NAL401 | BROWN | SCI-FRS | 8-6-20 |

MISCONDUCT REPORT(S) NO. _____ #D-039742 _____

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than 7 working days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Examiner to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

[X] I hereby voluntarily waive the disciplinary hearing on misconduct report(s) # ___D-039742___

[ ] I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

[ ] I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within 7 working days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

_Refused to Sign_
INMATE

DATE _____

_col mimmc_
WITNESS

DATE _6 Aug 20_

_____
WITNESS

DATE _Aug 6 20_

**003**

**DC-141, Part 2(B)**
**DISCIPLINARY HEARING REPORT**

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**

| DC Number | Name | Facility | Hearing Date | Hearing Time | No. from Part 1 |
|---|---|---|---|---|---|
| NAG401 | BROWN | SCI-FRS | 8-6-20 | 0925 | D039742 |

| INMATE PLEA | ☐ Guilty  ☐ Not Guilty | ☐ No Plea  ☒ Other | VERDICT | ☒ Guilty  ☐ Not Guilty |
|---|---|---|---|---|

**HEARING ACTION**

CHARGES    #35

FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

Inmate Brown refused to attend this hearing in accordance with DC-ADM 801, per officer Minich, a waiver was signed.

HEx finds the officer report over the inmate refusal to attend this hearing and contest the inmate did refuse to take a cellie as ordered, stating "look, I'm not taking a cellie". A preponderance of evidence exists to support charge #35.

(GUILTY #35 - 30 d loss phone eff. 8/6/20

An Absentia

| | | | |
|---|---|---|---|
| ☐ YES | ☒ NO | The inmate has heard the decision and has been told the reason for it and what will happen. | INF RES ACT FORM |
| ☐ YES | ☒ NO | The circumstances of the charge have been read and fully explained to the inmate. | WAIVER SEE APPENDICES ☒ |
| ☐ YES | ☒ NO | The opportunity to have the inmate's version reported as part of the record was given. | |
| ☐ YES | ☒ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED) | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| L. Fiscus | _____ SIGNATURE OF HEARING EXAMINER/COORDINATOR |

**WHITE – DC-15**     **YELLOW – Inmate Cited**     **PINK – Staff Member Reporting Misconduct**
**GOLDENROD – Deputy Facility Manager**

*DC-ADM 801, Inmate Discipline Procedures Manual*
*Section 4 – Disposition of Charges and Misconduct Sanctions*     **Attachment 4-A**
Issued: May 20, 2015
Effective: July 2, 2015

**004**

**Exhibit 52**

Form DC-141 Part 1

Rev. 12/2017

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

D 081229

☑ MISCONDUCT REPORT      ☐ OTHER      ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|---|
| NA6401 | Brown | | SCIHun | 1716 | 1-22-18 | 1-22-18 |

| Quarters | Place of Incident | | | | | |
|---|---|---|---|---|---|---|
| AA 1008 | AA Desk | | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | COI Himes | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

Class 1 Charge #35 Refusing to obey an order, #15 Threatening an employee

**STAFF MEMBER'S VERSION**

Sr. on the above listed date and approximate time inmate NA6401 Brown began to argue with me in regards to mail. I explained to inmate Brown that the officer was busy and would get him his legal mail when he was able to. Inmate Brown continued to argue with me. After I gave him his legal mail, I gave him two direct orders to return to his cell. Both of these orders were refused. On the third direct order, inmate Brown complied. As he was returning to his cell he said "Alright Moore, I got something coming for you"

**IMMEDIATE ACTION TAKEN AND REASON** Investigated. No further inquiry indicated. Inmate interned at This respect. Enappropriate for Informal Resol. Two due to nature of charges. Placed on Pre-Hry Conf for control

**PRE-HEARING CONFINEMENT**

| | IF YES | | |
|---|---|---|---|
| ☑ YES | TIME | DATE | |
| ☐ NO | 1800 | 1-22-18 | |

**FORMS GIVEN TO INMATE**
☑ REQUEST FOR WITNESSES AND REPRESENTATION   ☑ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| | | DATE | TIME 24 HOUR BASE |
| COII N.Moore | | 1-22-18 | 1838 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
|---|---|---|---|
| DATE | TIME | | |
| 1-24-18 | 0800 | ☑ CLASS 1   ☐ CLASS 2 | |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15                    YELLOW – Inmate                    PINK – Reporting Staff Member

| FORM DC-141   PART II B | COMMONWEALTH OF PENNSYLVANIA | | | | |
|---|---|---|---|---|---|
| DISCIPLINARY HEARING REPORT | DEPARTMENT OF CORRECTIONS | | | | |
| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
| NA6401 | Brown, Gartor | Huntingdon | 1/25/2018 | 1005 | D081229 |

| INMATE PLEA | ☐ Guilty ☐ Not Guilty | ☐ No Plea ☒ Other | Verdict | ☒ Guilty ☐ Not Guilty |
|---|---|---|---|---|

**HEARING ACTION**

**CHARGES**    15, 35

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of CO2 Moore, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown refused several orders to return to his cell. After the third order, Inmate Brown complied. A preponderance of evidence exists to support charge #35.

**Guilty #35 - 30 Days DC**
**Loss of Job**
**Effective 1/22/18**

**Dismiss #15**

**In Absentia**

| | | | |
|---|---|---|---|
| ☐ Yes | ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. | |
| ☐ Yes | ☒ No | The circumstances of the charge have been read and fully explained to the inmate. | **SEE APPENDICES** |
| ☐ Yes | ☒ No | The opportunity to have the inmate's version reported as part of the record was given. | ☒ |
| ☐ Yes | ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | **Part 2D** |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger** **Hearing Examiner** | |

Cc: DC-15, Inmate Cited, Staff Member Reporting Misconduct, Deputy Superintendent          **002**

FORM DC-141        PART 2 D
Rev. 8/05
WAIVER OF DISCIPLINARY
PROCEDURES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Facility | Date |
|---|---|---|---|
| NA6401 | Brown N | Hun | 1-25-18 |

MISCONDUCT REPORT(S) NO. # D081229, # D051184

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his/her right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

☒ I hereby voluntarily waive the disciplinary hearing on misconduct report(s) #  SEE ABOVE

☐ I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

☐ I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

(REFUSED TO ATTEND)
_____
INMATE

DATE _____ 1-25-18 _____

_____
WITNESS

DATE _____ 1-25-18 _____

COI
_____
WITNESS

DATE _____ 1-25-18 _____

**003**

FORM DC-141    PART 2 D
Rev. 8/05
WAIVER OF DISCIPLINARY
PROCEDURES

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

| DC Number | Name | Facility | Date |
|---|---|---|---|
| NAC961 | Brown | Hun | 1-25-18 |

MISCONDUCT REPORT(S) NO. # D081229    # D051184

(This form is to be used when an inmate charged with committing a misconduct wishes to waive his/her right to a disciplinary hearing or other procedural protections.)

I have received written notice of the offense(s) with which I am charged. I have read or have been informed of and understand the following:

I have a right to have a hearing not less than 24 hours nor more than seven days after receiving notice of the charges, to determine whether I am innocent or guilty of committing a misconduct.

If found guilty, discipline may be imposed against me, including but not limited to, loss of privileges and placement in disciplinary custody.

After the hearing, I have a right to appeal both the finding of guilt and the appropriateness of any discipline imposed by the Hearing Committee to the Program Review Committee.

I may waive my right to a hearing as well as any other procedural protections to which I am entitled.

If I waive my right to a hearing, the Hearing Committee/Examiner will determine my guilt or innocence in my absence, and that determination shall be final. If I am found guilty, discipline may be imposed. I may appeal the appropriateness of the discipline imposed by the Program Review Committee.

I have read the above statement or have had it read to me, and with an understanding of my rights,

☒ I hereby voluntarily waive the disciplinary hearing on misconduct report(s) #

☐ I wish to have a disciplinary hearing, but hereby voluntarily waive my right to 24 hours notice prior to the hearing and request that it be scheduled as soon as possible.

☐ I wish to have a disciplinary hearing, but I hereby voluntarily waive my right to have the hearing within seven days of receiving notice of the charge and request that it be scheduled within a reasonable time hereafter.

(REFUSED TO ATTEND)
INMATE

DATE 1-25-18

WITNESS

DATE 1-25-18

COT
WITNESS

DATE 1-25-18

**004**

A D-105

Exhibit 89

| Form DC-141 Part 1 | COMMONWEALTH OF PENNSYLVANIA | D 081010 |
| Rev. 12/2017 | DEPARTMENT OF CORRECTIONS | |

MISCONDUCT REPORT     ☐ OTHER     ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | SCIH | 0930 | 02-03-18 | 04-26-18 |
| Quarters | Place of Incident | | | | |
| GD1005 | GA1008 Cell | | | | |

OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

### Class 1 Charge 42 Lying to an Employee

**STAFF MEMBER'S VERSION**     On February 14, 2018 the Security Office received a DC-121 Employee Report of Incident containing an allegation of physical and sexual assault made by NA6401 Brown. The Investigation was assigned number 2018-P-197 and a thorough investigation was conducted by the Security Office and the State Police. At the conclusion of the Investigation, the allegations were declared unfounded. As unfounded Inmate Brown lied in his report of the physical and sexual abuse allegations. OSII has reviewed the findings and concurs with the findings of unfounded. The delay in this report was due to the time to complete a thorough investigation and OSII review.

**IMMEDIATE ACTION TAKEN AND REASON** I/m informed of this Report - Not Appropriate For Informal Resolution Due Charge. Continue Current Status (DC) until Seen By Hex

| PRE-HEARING CONFINEMENT | | |
|---|---|---|
| IF YES | | |
| ☐ YES | TIME | DATE |
| ☒ NO | Currently | Confined |

**FORMS GIVEN TO INMATE**
☒ REQUEST FOR WITNESSES AND REPRESENTATION     ☒ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| CT Maxwell | Coy Coy | DATE 4-26-18 | TIME 24 HOUR 1520 BASE |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
| DATE 4/28/2018 | TIME 0800 | ☒ CLASS 1   ☐ CLASS 2 | (signed) |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

*DC-ADM 801, Inmate Discipline Procedures Manual*          *Attachment 1-B*
*Section 1 – Misconducts/Rule Violations*          **001**
Issued: 12/1/2017
Effective: 12/1/2017

FORM DC-141   PART II B

DISCIPLINARY HEARING REPORT

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from PART I |
|---|---|---|---|---|---|
| NA6401 | Brown, Gartor | Huntingdon | 5/1/2018 | 1042 | D081010 |

| INMATE PLEA | ☐ Guilty ☐ Not Guilty | ☐ No Plea ☒ Other | Verdict | ☒ Guilty ☐ Not Guilty |
|---|---|---|---|---|

**HEARING ACTION**

**CHARGES**   42

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Inmate Brown refused to attend this hearing in accordance with DC ADM 801 per CO1 B. Yohn. The waiver form is signed.

This HEX believes the written report of LT Maxwell, over Inmate Brown's refusal to attend this hearing, about how Inmate Brown did lie to staff after it was determined through a thorough investigation by the security office and state police that Inmate Brown lied in his report of physical and sexual abuse allegations. Report 2018-P-197 was determined to be unfounded. A preponderance of evidence exist to support charge #42.

**Guilty #42 - 30 Days DC**
              **Consecutive**

**In Absentia**

| | | |
|---|---|---|
| ☐ Yes  ☒ No | The inmate has heard the decision and has been told the reason for it and what will happen. | |
| ☐ Yes  ☒ No | The circumstances of the charge have been read and fully explained to the inmate. | **SEE APPENDICES** |
| ☐ Yes  ☒ No | The opportunity to have the inmate's version reported as part of the record was given. | ☒ |
| ☐ Yes  ☒ No | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | Part 2D |

| NAME(S) OF HEARING EXAMINER/COMMITTEE | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| **S. Ellenberger**<br>**Hearing Examiner** | |

**002**

**Exhibit 88**

| Form DC-141 Part 1 Rev. 12/2017 | **COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS** | | D 081019 |
|---|---|---|---|

☑ MISCONDUCT REPORT    ☐ OTHER    ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| **NA6401** | **Brown, Gartor** | **SCIH** | **0900** | **08-2-18** | **12-11-18** |
| Quarters | Place of Incident | | | | |
| **BA2059** | **Security Office** | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**    Class 1 Charge 42 Lying to an Employee

**STAFF MEMBER'S VERSION**    On August 2, 2018, the Security Office received a written correspondence by NA6401 Gartor Brown reporting an allegation of sexual abuse. The Investigation was assigned number 2018-P-1303 and a thorough investigation was conducted by the Security office. At the conclusion of the investigation, the allegations made by NA6401 Gartor Brown were declared unfounded. As unfounded, Inmate Brown lied in his report of the sexual abuse allegations. BII has reviewed the findings and concurs with the findings of unfounded. The delay in the report was due to the time to complete a thorough investigation and BII review.

**IMMEDIATE ACTION TAKEN AND REASON**  I/m informed of this Report - Not Appropriate for Informal Resolution Due to Nature of Offense - Continue Current

**PRE-HEARING CONFINEMENT**  Status (G-P) until Seen By Hex

| | TIME | DATE | |
|---|---|---|---|
| ☐ YES | — | — | |
| ☑ NO | | | |

**FORMS GIVEN TO INMATE**

☑ REQUEST FOR WITNESSES AND REPRESENTATION    ☐ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| Lt Maxwell | Corp Coy | DATE 12-11-18 | TIME 24 HOUR BASE |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
|---|---|---|---|
| DATE 12/13/2018 | TIME 0800 | ☑ CLASS 1   ☐ CLASS 2 | C. M |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15    YELLOW – Inmate    PINK – Reporting Staff Member

**DC-ADM 801, Inmate Discipline Procedures Manual**
**Section 1 – Misconducts/Rule Violations**
Issued: 12/1/2017
Effective: 12/1/2017

**Attachment 1-B**
**001**

| DC-141, Part 2(B) DISCIPLINARY HEARING REPORT | COMMONWEALTH OF PENNSYLVANIA Department of Corrections | | | | |
|---|---|---|---|---|---|
| DC Number NA6401 | Name BROWN | Facility HUN | Hearing Date 13 DEC 18 | Hearing Time 0858 | No. from Part 1 D081019 |

| INMATE PLEA | ☐ Guilty  ☑ Not Guilty #42 | ☐ No Plea  ☐ Other | VERDICT | ☐ Guilty  ☐ Not Guilty | |
|---|---|---|---|---|---|

**HEARING ACTION**

CHARGES # 42

## FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

I/m Brown pleads not guilty to #42.

Version. This statement was given by another inmate. The co put a metalic object in my tray. The co said he was going to come in my cell & Rape me. He said he was going to stick a screwdriver in my Ass. I asked for a PREA. I filed an Abuse Allegation against the co.

HEC finds the report of the officer more credible than Brown's denial he filed a sexual abuse allegation against a co however the allegation was unfounded therefore a preponderance of evidence exists to support the fact that Brown lied about the sexual abuse allegation constituting #42, per investigation.   Guilty # 42.

x Investigator Review by this Examiner

36 days cell Restriction
Effective 12-13-18

| | | | |
|---|---|---|---|
| ☑YES | ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. | prea investigation |
| ☑YES | ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES ☑ |
| ☑YES | ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. | |
| ☑YES | ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED) | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| Joseph Dupont | Joseph Dupont SIGNATURE OF HEARING EXAMINER/COORDINATOR |

**WHITE – DC-15**          **YELLOW – Inmate Cited**          **PINK – Staff Member Reporting Misconduct**
**GOLDENROD – Deputy Facility Manager**

DC-ADM 801, Inmate Discipline Procedures Manual
Section 4 – Disposition of Charges and Misconduct Sanctions          Attachment 4-A
Issued: May 20, 2015
Effective: July 2, 2015

002

The findings of this investigation concludes that due to Inmate Brown submitting a forged statement, Inmate Witness statement backed by video evidence along with CO1 Plocinik stating he did not say anything to Inmate Brown, the allegations made by Inmate Brown are unfounded.

### RECOMMENDATIONS:

Close the investigation at the local level.

### Charges:

None

### Attachments:

JT1711 Hector Vargas-Torres written statement
COT Timothy Grove written statement
CO1 Duane Plocinik written statement
Official Inmate Grievance #731066
Inmate Query-Cell History for NA6401 Brown
Inmate Query-Cell History for JT1711 Vargas-Torres
Shift Commanders Report for August 2, 2018 for the 2-10 shift
CCTV DVD#HUN491-18
Non-Contact Abuse Response Checklist

# Pennsylvania Department of Corrections

**Ibedell**

## Misconducts

6/22/2022 12:35:04 PM

**Exhibit 47**

---

**Inmate Number:** NA6401

**Inmate Name:** BROWN, Gartor

---

**Location :** Greene     **Misconduct Date :** 10/04/2021     **Misconduct Number :** D635526

| Charge Category | Reference | Charge Description | Verdict |
|---|---|---|---|
| A | 33 | Using Abusive, Obscene, Or Inappropriate | Guilty |
| B | 38 | Destroying, Altering, Tampering With, Or | Guilty |

| Sanctions Imposed | Effective Date | No. of Days |
|---|---|---|
| Disciplinary Custody | 10/01/2021 | 30 |

---

**Location :** Greene     **Misconduct Date :** 10/01/2021     **Misconduct Number :** D635523

| Charge Category | Reference | Charge Description | Verdict |
|---|---|---|---|
| A | 01 | Assault | Guilty |
| A | 33 | Using Abusive, Obscene, Or Inappropriate | Guilty |
| B | 38 | Destroying, Altering, Tampering With, Or | Guilty |

| Sanctions Imposed | Effective Date | No. of Days |
|---|---|---|
| Disciplinary Custody | 10/01/2021 | 120 |

---

**Location :** Greene     **Misconduct Date :** 07/03/2021     **Misconduct Number :** D635978

| Charge Category | Reference | Charge Description | Verdict |
|---|---|---|---|
| A | 15 | Threaten An Employee Or Their Family Wit | Guilty |
| A | 33 | Using Abusive, Obscene, Or Inappropriate | Guilty |
| B | 35 | Refusing To Obey An Order | Guilty |

| Sanctions Imposed | Effective Date | No. of Days |
|---|---|---|
| Disciplinary Custody | 07/03/2021 | 45 |

---

**Location :** Forest     **Misconduct Date :** 02/09/2021     **Misconduct Number :** D043156

| Charge Category | Reference | Charge Description | Verdict |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |

| Sanctions Imposed | Effective Date | No. of Days |
|---|---|---|
| Disciplinary Custody | 02/09/2021 | 30 |

---

**Location :** Forest     **Misconduct Date :** 07/31/2020     **Misconduct Number :** D039742

| Charge Category | Reference | Charge Description | Verdict |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |

| Sanctions Imposed | Effective Date | No. of Days |
|---|---|---|
| Loss Of Privileges | 08/06/2020 | 30 |

---

**Location :** Forest     **Misconduct Date :** 06/26/2020     **Misconduct Number :** D043138

| Charge Category | Reference | Charge Description | Verdict | 001 |
|---|---|---|---|---|

| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 08/07/2020 | 15 |

---

**Location :**  Forest          **Misconduct Date :**06/04/2020          **Misconduct Number :**D043133

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 07/08/2020 | 30 |

---

**Location :**  Forest          **Misconduct Date :**04/24/2020          **Misconduct Number :**B976847

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| A | 16 | Fighting | Guilty |
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 04/24/2020 | 75 |

---

**Location :**  Huntingdon          **Misconduct Date :**06/24/2019          **Misconduct Number :**D200044

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 11/07/2019 | 30 |

---

**Location :**  Huntingdon          **Misconduct Date :**06/21/2019          **Misconduct Number :**D276313

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| A | 15 | Threaten An Employee Or Their Family Wit | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 10/08/2019 | 30 |

---

**Location :**  Huntingdon          **Misconduct Date :**06/13/2019          **Misconduct Number :**D276329

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 09/08/2019 | 30 |

---

**Location :**  Huntingdon          **Misconduct Date :**05/02/2019          **Misconduct Number :**D048343

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 08/24/2019 | 15 |

---

**Location :**  Huntingdon          **Misconduct Date :**05/02/2019          **Misconduct Number :**D339659

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 08/09/2019 | 15 |

---

**Location :**  Huntingdon          **Misconduct Date :**04/18/2019          **Misconduct Number :**D339601

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |

002

| Location : Huntingdon | | Misconduct Date :04/18/2019 | Misconduct Number :D339645 |
|---|---|---|---|
| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
| A | 15 | Threaten An Employee Or Their Family Wit | Guilty |
| A | 33 | Using Abusive, Obscene, Or Inappropriate | Guilty |
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 06/10/2019 | 30 |

| Location : Huntingdon | | Misconduct Date :04/18/2019 | Misconduct Number :D339650 |
|---|---|---|---|
| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
| B | 36 | Possess Contraband Including Money, Impl | Guilty |
| B | 44 | Loaning Or Borrowing Property | Guilty |
| B | 45 | Failure To Report The Presence Of Contra | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Confiscation Of Contraband | | | 0 |
| Disciplinary Custody | | 05/11/2019 | 30 |

| Location : Huntingdon | | Misconduct Date :03/31/2019 | Misconduct Number :D339602 |
|---|---|---|---|
| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 04/26/2019 | 15 |

| Location : Huntingdon | | Misconduct Date :03/27/2019 | Misconduct Number :D339295 |
|---|---|---|---|
| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 03/27/2019 | 30 |
| **Date Appeal Received by DOC** | **Grounds** | **Review Date** | **Review Outcome** |
| 05/20/2019 | NA | 05/21/2019 | Uphold Hear's Decision |
| 04/22/2019 | AC | 04/29/2019 | Uphold Hear's Decision |
| 04/04/2019 | AC | 04/10/2019 | Uphold Hear's Decision |

| Location : Huntingdon | | Misconduct Date :02/26/2019 | Misconduct Number :D339535 |
|---|---|---|---|
| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 02/26/2019 | 30 |
| **Date Appeal Received by DOC** | **Grounds** | **Review Date** | **Review Outcome** |
| 03/22/2019 | ABC | 03/28/2019 | Uphold Hear's Decision |
| 03/07/2019 | ABC | 03/12/2019 | Uphold Hear's Decision |

| Location : Huntingdon | | Misconduct Date :01/28/2019 | Misconduct Number :D113210 |
|---|---|---|---|
| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |

003

| B | 35 | Refusing To Obey An Order | Guilty |
|---|---|---|---|

**Sanctions Imposed** | **Effective Date** | **No. of Days**

Disciplinary Custody | 01/28/2019 | 30

| **Date Appeal Received by DOC** | **Grounds** | **Review Date** | **Review Outcome** |
|---|---|---|---|
| 02/15/2019 | AC | 02/21/2019 | Uphold Hear's Decision |
| 02/01/2019 | AC | 02/07/2019 | Uphold Hear's Decision |

---

**Location :**   Huntingdon        **Misconduct Date :** 01/14/2019        **Misconduct Number :** D233981

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |

**Sanctions Imposed** | **Effective Date** | **No. of Days**

Disciplinary Custody | 01/14/2019 | 15
Suspension/removal From Job | 01/14/2019 | 999

| **Date Appeal Received by DOC** | **Grounds** | **Review Date** | **Review Outcome** |
|---|---|---|---|
| 04/23/2019 | NA | 04/23/2019 | Uphold Hear's Decision |
| 02/08/2019 | ABC | 02/15/2019 | Uphold Hear's Decision |
| 01/28/2019 | ABC | 01/29/2019 | Uphold Hear's Decision |

---

**Location :**   Huntingdon        **Misconduct Date :** 10/10/2018        **Misconduct Number :** D198782

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |

**Sanctions Imposed** | **Effective Date** | **No. of Days**

Disciplinary Custody | 10/10/2018 | 30

---

**Location :**   Huntingdon        **Misconduct Date :** 09/14/2018        **Misconduct Number :** D198712

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |

**Sanctions Imposed** | **Effective Date** | **No. of Days**

Disciplinary Custody | 09/14/2018 | 30

---

**Location :**   Huntingdon        **Misconduct Date :** 08/02/2018        **Misconduct Number :** D081019

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 42 | Lying To An Employee | Guilty |

**Sanctions Imposed** | **Effective Date** | **No. of Days**

Cell Restriction | 12/13/2018 | 30

---

**Location :**   Huntingdon        **Misconduct Date :** 07/26/2018        **Misconduct Number :** D103716

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |
| B | 38 | Destroying, Altering, Tampering With, Or | Guilty |

**Sanctions Imposed** | **Effective Date** | **No. of Days**

Disciplinary Custody | 08/16/2018 | 30

---

**Location :**   Huntingdon        **Misconduct Date :** 07/17/2018        **Misconduct Number :** D113581

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |

**Sanctions Imposed** | **Effective Date** | **No. of Days**

Disciplinary Custody | 07/17/2018 | 30

**Location :** Huntingdon     **Misconduct Date :** 06/18/2018     **Misconduct Number :** D198891

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 06/18/2018 | 30 |

---

**Location :** Huntingdon     **Misconduct Date :** 04/18/2018     **Misconduct Number :** D048747

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 04/18/2018 | 30 |

---

**Location :** Huntingdon     **Misconduct Date :** 03/21/2018     **Misconduct Number :** D113453

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 03/21/2018 | 30 |

---

**Location :** Huntingdon     **Misconduct Date :** 02/23/2018     **Misconduct Number :** D081010

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 42 | Lying To An Employee | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 05/18/2018 | 30 |

---

**Location :** Huntingdon     **Misconduct Date :** 02/13/2018     **Misconduct Number :** D031797

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 02/13/2018 | 15 |

| **Date Appeal Received by DOC** | **Grounds** | **Review Date** | **Review Outcome** |
|---|---|---|---|
| 04/30/2018 | NA | 05/01/2018 | Uphold Hear's Decision |
| 03/19/2018 | A | 03/21/2018 | Uphold Hear's Decision |
| 03/05/2018 | A | 03/06/2018 | Uphold Hear's Decision |

---

**Location :** Huntingdon     **Misconduct Date :** 02/08/2018     **Misconduct Number :** D031777

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 03/08/2018 | 15 |

| **Date Appeal Received by DOC** | **Grounds** | **Review Date** | **Review Outcome** |
|---|---|---|---|
| 04/30/2018 | NA | 05/01/2018 | Uphold Hear's Decision |
| 03/08/2018 | NA | 03/14/2018 | Uphold Hear's Decision |
| 02/16/2018 | ABC | 02/21/2018 | Uphold Hear's Decision |

---

**Location :** Huntingdon     **Misconduct Date :** 01/25/2018     **Misconduct Number :** D031736

| **Charge Category** | **Reference** | **Charge Description** | **Verdict** |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |
| **Sanctions Imposed** | | **Effective Date** | **No. of Days** |
| Disciplinary Custody | | 02/21/2018 | 15 |

**Location :** Huntingdon    **Misconduct Date :** 01/22/2018    **Misconduct Number :** D031184

| Charge Category | Reference | Charge Description | Verdict |
|---|---|---|---|
| B | 36 | Possess Contraband Including Money, Impl | Guilty |
| B | 44 | Loaning Or Borrowing Property | Guilty |

| Sanctions Imposed | Effective Date | No. of Days |
|---|---|---|
| Confiscation Of Contraband | | 0 |
| Reprimand, Warning, Counseling | | 0 |

---

**Location :** Huntingdon    **Misconduct Date :** 01/22/2018    **Misconduct Number :** D081229

| Charge Category | Reference | Charge Description | Verdict |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |

| Sanctions Imposed | Effective Date | No. of Days |
|---|---|---|
| Disciplinary Custody | 01/22/2018 | 30 |
| Suspension/removal From Job | 01/22/2018 | 999 |

---

**Location :** Huntingdon    **Misconduct Date :** 12/05/2017    **Misconduct Number :** C084585

| Charge Category | Reference | Charge Description | Verdict |
|---|---|---|---|
| B | 35 | Refusing To Obey An Order | Guilty |

| Sanctions Imposed | Effective Date | No. of Days |
|---|---|---|
| Disciplinary Custody | 12/16/2017 | 15 |

| Date Appeal Received by DOC | Grounds | Review Date | Review Outcome |
|---|---|---|---|
| 12/27/2017 | AC | 01/04/2018 | Uphold Hear's Decision |
| 12/14/2017 | ABC | 12/18/2017 | Uphold Hear's Decision |

---

**Location :** Huntingdon    **Misconduct Date :** 12/01/2017    **Misconduct Number :** 065592C

| Charge Category | Reference | Charge Description | Verdict |
|---|---|---|---|
| A | 17 | Threatening Another Person | Guilty |
| B | 35 | Refusing To Obey An Order | Guilty |

| Sanctions Imposed | Effective Date | No. of Days |
|---|---|---|
| Disciplinary Custody | 12/01/2017 | 15 |
| Suspension/removal From Job | 12/01/2017 | 999 |

| Date Appeal Received by DOC | Grounds | Review Date | Review Outcome |
|---|---|---|---|
| 01/30/2018 | NA | 01/31/2018 | Uphold Hear's Decision |
| 12/27/2017 | A | 01/04/2018 | Uphold Hear's Decision |
| 12/14/2017 | ABC | 12/18/2017 | Uphold Hear's Decision |

---

**Location :** Camp Hill    **Misconduct Date :** 09/29/2017    **Misconduct Number :** B209550

| Charge Category | Reference | Charge Description | Verdict |
|---|---|---|---|
| A | 15 | Threaten An Employee Or Their Family Wit | Guilty |
| A | 33 | Using Abusive, Obscene, Or Inappropriate | Guilty |
| B | 35 | Refusing To Obey An Order | Guilty |

| Sanctions Imposed | Effective Date | No. of Days |
|---|---|---|
| Disciplinary Custody | 09/29/2017 | 45 |

---

Total Number of Upheld Misconducts : 38

## DC-472B - Progress Notes - Nursing

**Date/Time:**

02/14/2018 10:39

**Facility:**

SCI HUNTINGDON



**Subjective:**

the attempt of assault occurred on 2/5 and it actually happened on 2/7.

**Objective:**

This nurse reported to the rhu due to prea complaint. This inmate voiced he was sexually assaulted by FX 1504 on 2/7 718 and was always attempted on 2/5 but was unsuccessful. Inmate voiced that he did fight to stop this. He voices no complaints of rectal or abdominal pain on assessment. He voices complaints of pain to his head, neck, back, arms, wrist, legs, and ankles. There are no bruises or abrasions of any type that justify a struggle or any type of assault. Inmate was asked why he did not ask for the nurse when she completed rounds and he voiced he didn't want to because his cellmate would yell. There is no open areas to inmates face or mouth. He ambulated to the strip area with no difficulty and standing erect. inmate when being walked to the strip area, was smiling and smirking until this nurse voiced this is not a laughing matter currently. Inmate allowed this nurse to take pictures and was noted to attempt to rub his knuckle and knees to attempt to redden but not injuries noted. inmate refused to speak to anyone regarding testing

**Assessment:**

no injuries noted and inmate is in no distress

**Plan:**

will be seen as ordered by pa

**Other:**

*NO ANSWER PROVIDED*

**Add I/E/R:**

☑No

## Save Log

| User Name | Audit Date |
| --- | --- |
| EMIGH, NICHOLE | 2/14/2018 10:45:59 AM |

---

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By EMIGH, NICHOLE, RN on 2/14/2018 10:45:59 AM

(84)

**BROWN, GARTOR KIKI** #NA6401

## DC-472K - Progress Note - Medical Narrative

**Facility:**

SCI HUNTINGDON

**Date:**

02/13/2018

**Time:**

23:32:03

**Narrative:**

inmate placed a sick call to be seen on 2/14/18 for being abused from 2/3/18 to 2/7/18 and raped on 2/7/118. this nurse reported this information to control. LT and myself went to the RHU had the inmate removed from his cell and taken to the psych office on B-quad and placed into the secure area. I spoke with the inmate regarding the sick call slip. he stated he was "abuse by being punched and strangled by his former cell mate". no burses or marks around neck were noted or evidence of the alleged allegations , no acute distress noted or voiced. inmate refused to be taken to medical to be assess by the RN and stated "he is to only be seen by the doctor". inmate refused to have photo taken and stated he was not a threat to himself or having any thoughts of self harm that he was fine being housed alone and did not want any cell mates.

### Save Log

| User Name | Audit Date |
|-----------|-----------|
| TRICE, ANATA | 2/14/2018 12:49:29 AM |

---

**DC-472K - Progress Note - Medical Narrative**
DC-472K - Progress Note - Medical Narrative -- Narrative textbox for Medical

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By TRICE, ANATA, LPN on 2/14/2018 12:49:29 AM

## DC-472 - Progress Note Medical Provider

**Date/Time:**

02/23/2018 07:52

**Facility:**

SCI HUNTINGDON

**Subjective:**

Pt presents with unclear specific issues. Pt reports that he was assaulted by "alien" that was a past cellmate. Pt had refused care at that time and has since seen psychiatry and had not addressed to this issue at that time. Pt had placed sick calls for other items since this but never gave this as an issue per pt's own report . Pt was offered pictures at time first reported the issue but refused. Pt was then reseen and report pictures taken. Pt can not really describe the history beyond that because he started "quoting policy" and using medical terms that did not fit case. He started saying that he wanted and MRI and Cat scan and xrays. Of note he states rib pain side pain head pain /numbness on the left side and right "flexor " pain on the left leg . Pt states was assaulted but out right refuses rectal exam even before he was done with his history. Pt does not believe has rectal bleeding. When asked how long ago the injury occurred pt is unable to to give a time period

**Objective:**

NAD

skin without cyanosis pallor jaundice bruising swelling or redness

NC/At  at time of the exam pt states pain on the left side with palpation but no pin point pain no associated redness swelling bruising no bleeding from the ears

PERRL EOMI

neck supple pt reports pain to palp posteriorly but is not consistant with multiple palpations on exam non tender anteriorly

Cardiac rrr

lungs vesicular without wrr

pain to palp of the left ribs no intercostal retractions no crepitis

abdomen Pos BS no organomegally no guarding no rigidity

pain to palp of the right hip and left hip FROM and gait intact

CN II and XII intact strength +5/5

pt refused rectal exam

**Assessment:**

G89.21 - Pain, chronic, due to trauma - [GOMES, MICHAEL] - 2017-11-17

**Plan:**

Pt is persistent about having MRI and Cat scans despite exam not dictating a need for further testing at this time

pt asked if could be seen again and pt was educated he is welcome to place additional sick calls if persistent sx worsening sx weakness increased numbness or other issues occur

inquired if pt fells needs medication to help with pain and he stated that this was my decision

---

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By KING, KATHERINE, PA on 2/23/2018 8:44:20 AM

## DC-472B - Progress Notes - Nursing

### Date/Time:

06/07/2018 12:05

### Facility:

SCI HUNTINGDON

### Subjective:

you are forcing me against my will to sign for my normal diet back that's my right

### Objective:

this nurse approached inmates cell with co1 Kelly. This nurse explained to Inmate that he had wrote a request to have his diet put to a normal diet instead of his therapeutic diet. This nurse explained that a therapeutic diet was ordered because he has allergies to peanuts and fish. The therapeutic diet was ordered for his safety due to the allergy. Inmate became argumentative with this nurse saying I have the right for the diet your forcing me against my will to sign this. Nurse attempted to make him aware that if he didn't want to sign it was okay the therapeutic diet would just continue for his safety. Inmate refused to give the refusal form back to this nurse. Inmate was directed to retun continued to refuse this nurse explain again that his therapeutic diet would cont until he signed the refusal. then exited the cell

### Assessment:

refusal

### Plan:

inmate can make a request of place sick call for further concerns

### Other:

NO ANSWER PROVIDED

### Add I/E/R:

☑No

### Save Log

| User Name | Audit Date |
| --- | --- |
| EMIGH, NICHOLE | 6/7/2018 12:14:17 PM |

---

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By EMIGH, NICHOLE, RN on 6/7/2018 12:14:17 PM

( 82 )

## DC-472K - Progress Note - Medical Narrative

**Facility:**

SCI HUNTINGDON

**Date:**

02/14/2018

**Time:**

19:46:03

**Narrative:**

PT ON SICK CALL ALLEGES RAPE AND ASSAULT. WHEN ASKED ABOUT NEEDS WITH SICK CALL, PT STATES THAT HE IS HAVING TROUBLE BREATHING. PT STATES THAT HE HAD DISCUSSED HIS CONCERNS WITH PSYCH AND THAT THEY HAD BEEN NO HELP. HE STATED HE WANTED TO TALK TO SOMEWHAT ABOUT HIS SITUATION. I ASKED IF HE HAD ADDRESSED HIS CONCERN THROUGH THE DOC ADMINISTRATIVE PROCESS, WHICH HE STATED THAT HE HAD FILED A GRIEVANCE ABOUT HIS CARE THROUGH PSYCH. I ASKED IF HE WAS SUICIDAL OR THOUGHT HE MAY HARM SOMEONE ELSE AND HE DENIES SI/HI. I ASKED IF THIS WAS WHAT THE SICK CALL WAS ABOUT AND HE STATED, I'M NOT GOING TO TALK ABOUT THAT HERE. I STATED THAT WITHOUT SOME ADDITIONAL INFORMATION ABOUT WHAT WAS NEEDED, I WOULD NOT BE PULLING HIM FROM CELL FOR EXAMINATION OR FURTHER DISCUSSION WITHOUT BETTER INFORMATION. PT STATES HE HAS A RIGHT TO PRIVACY AND THAT HE WOULDN'T DISCUSS THROUGH THE WINDOW. PT STATES THAT IT WAS HIS RIGHT TO DISCUSS IN PRIVATE. I EXPLAINED THAT HE DIDN'T NEED TO SPEAK LOUDLY AND I WAS RIGHT WHERE HE COULD BE HEARD, BUT THAT IF HE WASN'T GOING TO LET ME KNOW WHAT WAS WRONG WE COULD GO NO FARTHER. PT AGAIN STATING THAT HE HAS A RIGHT TO PRIVACY. I STATED THAT GIVEN HIS LEVEL OF INCARCERATION, HIS PRIVACY WAS NOT A GUARRANTEED RIGHT. HE BECAME ANGRY AND WE LEFT THE CELL. PT SHOULD SICK CALL IN AT ANY POINT, IF HE WOULD LIKE TO DISCUSS HIS CONCERNS FURTHER.

### Save Log

| User Name | Audit Date |
| --- | --- |
| GESSEL, RANDYL | 2/14/2018 7:54:29 PM |

---

**DC-472K - Progress Note - Medical Narrative**
DC-472K - Progress Note - Medical Narrative -- Narrative textbox for Medical

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By GESSEL, RANDYL, PA on 2/14/2018 7:54:29 PM

DOB: 7/22/1988 (31y)   Location: G-D-1009-01

## DC-472B - Progress Notes - Nursing

**Date/Time:**

02/15/2018 12:11

**Facility:**

SCI HUNTINGDON

**Subjective:**

VOICED UNDERSTANDING

**Objective:**

HIV POST TEST COMPLETED FOR LABS DONE JAN 2018 RESULTS PROVIDED LABS REVIEWED. HIV PRE COONSELING COMPLETED R/T SEXUAL ASSAULT ALLEGATIONS. EDUCATED ON RISK BEHAVIOR AND TESTING

**Assessment:**

KNOWLEDGE DEFICIT

**Plan:**

F/U WITH RESULTS AND POST COUNSELING

**Other:**

*NO ANSWER PROVIDED*

**Add I/E/R:**

☑No

Save Log

| User Name | Audit Date |
|---|---|
| LUSK, ANGELA | 2/15/2018 12:12:21 PM |

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By LUSK, ANGELA, RN on 2/15/2018 12:12:21 PM

### RELEASE FROM RESPONSIBILITY FOR MEDICAL/PSYCHIATRIC TREATMENT

I, GARTOR BROWN, an inmate at SCI HUNTINGDON have been advised by the physician named below that I am in need of treatment for:

DR. JAQUES LECLERC

**I understand the nature of the treatment is: (Give brief description of the treatment required, and the possible consequences of this inmate not receiving it.):**

HIV 1& 2, rpr, hep c ab, chlamydia/gonorrhoeae panel-urine

### Select all That Apply:

☑ Refused laboratory services

**Comment on Refused Laboratory Services:**
REFUSED LABS

### Reason for Refusal:

REFUSED LABS

Possible consequences due to the refusal of treatment: by refusing the offered care, you could experience worsening of your condition, leading to permanent disability and/or death.

**Additional Comments:**

REFUSED LABS

I hereby refuse this treatment. I have been fully advised of the nature of my ailment or injury and fully realize the effects that may result from my refusal to accept the prescribed treatment. I hereby release the treating provider/physician, and the facility from all legal responsibility for any ill effects which may result from my refusal to accept treatment.

In signing this I certify that the above has been read and fully explained to me.

## Signatures



## Save Log

| User Name | Audit Date |
| --- | --- |
| LANDRUM, TRISHA | 2/21/2018 8:47:46 AM |

## Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
| --- | --- | --- | --- |
| LECLERC, JACQUES | 2/21/2018 4:40:50 PM | | False |

---

**DC-462 Release From Responsibility for Medical Treatment**
DC-462 Release From Responibility for Medical Treatment

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By LANDRUM, TRISHA on 2/21/2018 8:47:46 AM

## DOC CONSENT FOR HIV TESTING

Please read information on the reverse side before signing.

I have read, or someone has read to me, the information on this form. I have received an explanation about this information. I have also been given or offered information about ways to prevent infecting others and myself with the HIV virus. I have had a chance to ask questions and those questions have been answered to my satisfaction. I requested a sample of blood be taken from me and tested for HIV antibodies. I have been told that I will personally be informed of the results of my test.

The fact I have been tested and my test results, along with any information that identifies or can be used to identify me, are confidential and, except as otherwise permitted by law, will not be given to anyone without my signed permission.

### INFORMATION ON PERSON REQUESTING AN HIV ANTIBODY TEST

Brown              Garku

| Last Name | First Name | MI | Birth Date |

HUN                          NA6404

| Institution | | Facility # |

| City | County | State | Zip |

Signature of person consenting to test

Signature of witness

1-15-18

Date

DC-555

**BROWN, GARTOR KIKI** #NA6401                                    DOB: 7/22/1988 (31y)   Location: G-D-1009-01

DC-465B Therapeutic Diet Order Form (Non-Standard)

Facility:                                                              Height:
SCI HUNTINGDON                                                        5-8

Date:                                                                Weight:
10/04/2018                                                           140

Expiration Date:
10/04/2019

## Non-Standard Diets

*Non-Standard Diets and Non-Standard Snack Bags must be sent to DOC Dietitian for consultation and approval prior to implementation.*

**Select all Diet options that apply:**

☑Food Allergies

**Was a Food Allergy Questionnaire completed?**
☑Yes

**Was allergy testing ordered?**
☑Yes

### Assessment

**Nutrition Assessment Needed:**
*NO ANSWER PROVIDED*

## Non-Standard Snack Bags

**Select all Snack Bag options that apply:**
*NO ANSWER PROVIDED*

## Supplements

**Product (specify supplement):**
*NO ANSWER PROVIDED*

**Frequency (re: Supplement):**
*NO ANSWER PROVIDED*

**Additional information for Dietitian (i.e. food/drug interactions, diagnosis, medication prescribed, specific allergy, other non-standard diet or non-standard snack specific information, etc.):**

No fish, no peanuts

*DC - ADM 610 Food Service Procedures Manual, Section 2 Therapeutic Diets Attachment 2-A*

---

**DC-465B - Therapeutic Diet Order Form (Non-Standard)**          Patient Name: BROWN, GARTOR KIKI
DC-465B - Therapeutic Diet Order Form (Non-Standard)               **Patient Number:** NA6401
                                                                    **Location:** G-D-1009-01
                                                                    **DOB:** 7/22/1988
                                                                    **Facility:** SCI HUNTINGDON
                                                                    **Electronically Signed By** HARKER, MICHELE, RN on 10/4/2018 4:26:03 PM

**BROWN, GARTOR KIKI**  #NA6401                                    **DOB:** 7/22/1988 (31y)  **Location:** G-D-1009-01

## Form Order Details



### Save Log

| User Name | Audit Date |
|---|---|
| HARKER, MICHELE | 10/4/2018 4:28:03 PM |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| GORDON, MARGARET | 10/5/2018 8:01:36 AM | counsel to select alternate protein when fish is served and to avoid peanut butter when served. Food Service to provide an appropriate meal when fed in cell. | False |
| DELBIANCO, PAUL | 10/5/2018 2:26:35 PM | | False |

**DC-465B - Therapeutic Diet Order Form (Non-Standard)**
DC-465B - Therapeutic Diet Order Form (Non-Standard)

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** HARKER, MICHELE, RN on 10/4/2018 4:28:03 PM

## DC-440A - Use of Force Clearance/Contraindications Form

**Current Facility:**

SCI HUNTINGDON

Correctional systems use Oleoresin Capsicum (OC), Restraint Chairs, Electronic Devices (EBIDs, Tasers, and RACC Belts) as part of the force continuum to subdue violent, aggressive inmates. Due to the potential use of these in a correctional setting, the inmate shall also be checked for the following:

### Medical Contraindication for OC

**Check all Medical Contraindications for OC that apply:**

☑ Asthma, Emphysema/COPD, and Other Chronic Pulmonary Diseases    ☑ No Contraindications for OC

#### Asthma, Emphysema/COPD, and Other Chronic Pulmonary Diseases

**Describe Asthma, Emphysema/COPD, and Other Chronic Pulmonary Diseases in detail:**

very mild asthma which only uses an inhaler on occasion. This individual has necessitated this level of force twice without residual. Will clear for it's useage as long as he displays stable pulmonary functioning. If he shows decompensation (more meds/physical signs) will make this a contraindication.

### Medical Contraindications for Electrical Devices (EBID, Taser, RACC Belt)

**Check all Medical Contraindications for Electrical Devices that apply:**

☑ No Contraindications for Electronic Devices

Any of these conditions preclude the use of OC, and Electrical Devices (EBIDs, Tasers, and RACC Belts).Complicating conditions shall be documented as "Contraindications to [specific item(s) identified above]."See DC-440A", on the DC-445, Allergy/Drug Sensitivity Label.All contraindications shall be noted on the DC-467, Problem List.

**Medically Cleared for Use of Force:**

☑ Cleared for EBID and OC Spray

### Acute Medical Illness/Conditions

Prior to clearing/approving the inmate for Use of Force, the Registered Nurse Supervisor/RN Team Leader shall review the above information, and the inmate's medical record for the following:

**Check All Acute Medical Illness/Conditions that apply:**

☑ No Medical Illness/Conditions

If any of the above are checked, do not clear/approve the inmate for OC use; contact a practitioner for final approval/disapproval. Document the results of the DC-440A, and the medical record review; notate the approval/disapproval in the progress notes.

**DC-440A - Use of Force Clearance/Contraindications Form**

DC-440A - Use of Force Clearance/Contraindications Form

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By DELBIANCO, PAUL, MD on 6/24/2019 2:41:03 PM

1 of 2

**BROWN, GARTOR KIKI** #NA6401                          DOB: 7/22/1988 (31y)  **Location:** G-D-1009-01

## Form Order Details



### Save Log

| User Name | Audit Date |
|---|---|
| DELBIANCO, PAUL | 6/24/2019 2:41:03 PM |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| DELBIANCO, PAUL | 6/24/2019 2:41:03 PM | Form Processed Approval | False |

---

**DC-440A - Use of Force Clearance/Contraindications Form**

DC-440A - Use of Force Clearance/Contraindications Form

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** DELBIANCO, PAUL, MD on 6/24/2019 2:41:03 PM

**BROWN, GARTOR KIKI**  #NA6401                               DOB: 7/22/1988 (31y)  Location: G-D-1009-01

### RELEASE FROM RESPONSIBILITY FOR MEDICAL TREATMENT

I, GARTOR BROWN, an inmate at SCI HUNTINGDON have been advised by the physician named below that I am in need of treatment

**for:**

YEARLY TST.

**I understand the nature of the treatment is: (Give brief description of the treatment required, and the possible consequences of this inmate not receiving it.):**

YEARLY TST. UNABLE TO MONITOR FOR TB.

**Select all That Apply:**

☑ Other

**Comment/Reason for Refusal:**

STATED, "I JUST AIN'T TAKING IT. I CAN REFUSE ANYTHING I WANT."

Possible consequences due to the refusal of treatment: by refusing the offered care, you could experience worsening of your condition, leading to permanent disability and/or death.

**Additional Comments:**

INMATE COUNSELED ON S/S OF TB. DENIES ANY SYMPTOMS.

I hereby refuse this treatment. I have been fully advised of the nature of my ailment or injury and fully realize the effects that may result from my refusal to accept the prescribed treatment. I hereby release the treating provider/physician, and the facility from all legal responsibility for any ill effects which may result from my refusal to accept treatment.

In signing this I certify that the above has been read and fully explained to me.

## Signatures



## Save Log

| User Name | Audit Date |
|---|---|
| HARTZLER, RODNEY | 7/16/2019 11:46:10 AM |

## Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| DELBIANCO, PAUL | 7/17/2019 8:36:52 AM | | False |

**DC-462 Release From Responsibility for Medical Treatment**
DC-462 Release From Responibility for Medical Treatment

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By HARTZLER, RODNEY, LPN on 7/16/2019 11:46:10 AM

**BROWN, GARTOR KIKI** #NA6401                                    DOB: 7/22/1988 (31y)  Location: G-D-1009-01

## RELEASE FROM RESPONSIBILITY FOR MEDICAL/PSYCHIATRIC TREATMENT

I, GARTOR BROWN, an inmate at SCI HUNTINGDON have been advised by the physician named below that I am in need of treatment **for:**

DR. PAUL DELBIANCO

**I understand the nature of the treatment is: (Give brief description of the treatment required, and the possible consequences of this inmate not receiving it.):**

HIV 1&2

**Select all That Apply:**

☑ Refused laboratory services

> **Comment on Refused Laboratory Services:**
> REFUSED

**Reason for Refusal:**

REFUSED

Possible consequences due to the refusal of treatment: by refusing the offered care, you could experience worsening of your condition, leading to permanent disability and/or death.

**Additional Comments:**

REFUSED

I hereby refuse this treatment. I have been fully advised of the nature of my ailment or injury and fully realize the effects that may result from my refusal to accept the prescribed treatment. I hereby release the treating provider/physician, and the facility from all legal responsibility for any ill effects which may result from my refusal to accept treatment.

In signing this I certify that the above has been read and fully explained to me.

## Signatures



## Save Log

| User Name | Audit Date |
|---|---|
| LANDRUM, TRISHA | 10/24/2018 7:26:26 AM |

## Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| DELBIANCO, PAUL | 10/24/2018 9:46:35 AM | | False |

---

**DC-462 Release From Responsibility for Medical Treatment**
DC-462 Release From Responibility for Medical Treatment

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By LANDRUM, TRISHA on 10/24/2018 7:26:26 AM

**BROWN, GARTOR KIKI** #NA6401                                           **DOB:** 7/22/1988 (31y)   **Location:** G-D-1009-01

### RELEASE FROM RESPONSIBILITY FOR MEDICAL/PSYCHIATRIC TREATMENT

I, GARTOR BROWN, an inmate at SCI HUNTINGDON have been advised by the physician named below that I am in need of treatment for:

RANDYL GESSEL, PA

**I understand the nature of the treatment is: (Give brief description of the treatment required, and the possible consequences of this inmate not receiving it.):**

CMP, AMYLASE, CBC, URINE

**Select all That Apply:**

☑Refused laboratory services

> **Comment on Refused Laboratory Services:**
> REFUSED

**Reason for Refusal:**

REFUSED

Possible consequences due to the refusal of treatment: by refusing the offered care, you could experience worsening of your condition, leading to permanent disability and/or death.

**Additional Comments:**

*NO ANSWER PROVIDED*

I hereby refuse this treatment. I have been fully advised of the nature of my ailment or injury and fully realize the effects that may result from my refusal to accept the prescribed treatment. I hereby release the treating provider/physician, and the facility from all legal responsibility for any ill effects which may result from my refusal to accept treatment.

In signing this I certify that the above has been read and fully explained to me.

### Signatures



### Save Log

| User Name | Audit Date |
|---|---|
| LANDRUM, TRISHA | 8/15/2018 9:22:20 AM |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| PETZ, DARRELL | 8/17/2018 1:12:07 PM | | False |

---

**DC-462 Release From Responsibility for Medical Treatment**
DC-462 Release From Responbility for Medical Treatment

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By LANDRUM, TRISHA on 8/15/2018 9:22:20 AM

### RELEASE FROM RESPONSIBILITY FOR MEDICAL/PSYCHIATRIC TREATMENT

I, GARTOR BROWN, an inmate at SCI HUNTINGDON have been advised by the physician named below that I am in need of treatment
**for:**

X-Ray

**I understand the nature of the treatment is: (Give brief description of the treatment required, and the possible consequences of this inmate not receiving it.):**

X-Ray

**Select all That Apply:**

☑ Refused X-Ray service

**Comment on Refused X-Ray Service:**

Abdominal x-ray for supposed metal intake

**Reason for Refusal:**

Possible consequences due to the refusal of treatment: by refusing the offered care, you could experience worsening of your condition, leading to permanent disability and/or death.

**Additional Comments:**

Refusal to sign refusal of service

I hereby refuse this treatment. I have been fully advised of the nature of my ailment or injury and fully realize the effects that may result from my refusal to accept the prescribed treatment. I hereby release the treating provider/physician, and the facility from all legal responsibility for any ill effects which may result from my refusal to accept treatment.

In signing this I certify that the above has been read and fully explained to me.

**DC-462 Release From Responsibility for Medical Treatment**
DC-462 Release From Responibility for Medical Treatment

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** WHITESEL, ASHLEY, LPN on 8/3/2018 2:51:25 PM

**BROWN, GARTOR KIKI** #NA6401                                      DOB: 7/22/1988 (31y)   Location: G-D-1009-01

## Signatures



A. Madru
Captured On: 08/03/18 14:51:25
Patient has refused to sign



B. Buckley
Captured On: 08/03/18 14:51:25
Patient has refused to sign

### Save Log

| User Name | Audit Date |
|---|---|
| WHITESEL, ASHLEY | 8/3/2018 2:51:25 PM |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| PETZ, DARRELL | 8/4/2018 1:03:58 PM | | False |

---

**DC-462 Release From Responsibility for Medical Treatment**
DC-462 Release From Responibility for Medical Treatment

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** WHITESEL, ASHLEY, LPN on 8/3/2018 2:51:25 PM

**BROWN, GARTOR KIKI** #NA6401                                    DOB: 7/22/1988 (31y)  Location: G-D-1009-01

## RELEASE FROM RESPONSIBILITY FOR MEDICAL/PSYCHIATRIC TREATMENT

I, GARTOR BROWN, an inmate at SCI HUNTINGDON have been advised by the physician named below that I am in need of treatment for:

LAB WORK FOR HIV

**I understand the nature of the treatment is: (Give brief description of the treatment required, and the possible consequences of this inmate not receiving it.):**

LAB WORK FOR HIV

**Select all That Apply:**

☑ Refused laboratory services

Comment on Refused Laboratory Services:
INMATE REFUSED TO COME OUT OF RHU CELL FOR LAB WORK

**Reason for Refusal:**

INMATE REFUSED TO COME OUT OF RHU CELL FOR LAB WORK

Possible consequences due to the refusal of treatment: by refusing the offered care, you could experience worsening of your condition, leading to permanent disability and/or death.

**Additional Comments:**

..

I hereby refuse this treatment. I have been fully advised of the nature of my ailment or injury and fully realize the effects that may result from my refusal to accept the prescribed treatment. I hereby release the treating provider/physician, and the facility from all legal responsibility for any ill effects which may result from my refusal to accept treatment.

In signing this I certify that the above has been read and fully explained to me.

## Signatures



### Save Log

| User Name | Audit Date |
|-----------|------------|
| CALDWELL, JAMIE | 7/25/2018 8:31:13 AM |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|-------------|-------------|--------------|-------------|
| PETZ, DARRELL | 7/26/2018 12:20:06 PM | | False |

---

**DC-462 Release From Responsibility for Medical Treatment**
DC-462 Release From Responibility for Medical Treatment

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By CALDWELL, JAMIE on 7/25/2018 8:31:13 AM

**BROWN, GARTOR KIKI** #NA6401

DOB: 7/22/1988 (31y)   Location: G-D-1009-01

### RELEASE FROM RESPONSIBILITY FOR MEDICAL/PSYCHIATRIC TREATMENT

I, GARTOR BROWN, an inmate at SCI HUNTINGDON have been advised by the physician named below that I am in need of treatment

**for:**

DR. DARRELL PETZ

**I understand the nature of the treatment is: (Give brief description of the treatment required, and the possible consequences of this inmate not receiving it.):**

CMP

**Select all That Apply:**

☑ Refused laboratory services

**Comment on Refused Laboratory Services:**

REFUSED LABS

**Reason for Refusal:**

REFUSED LABS

Possible consequences due to the refusal of treatment: by refusing the offered care, you could experience worsening of your condition, leading to permanent disability and/or death.

**Additional Comments:**

*NO ANSWER PROVIDED*

I hereby refuse this treatment. I have been fully advised of the nature of my ailment or injury and fully realize the effects that may result from my refusal to accept the prescribed treatment. I hereby release the treating provider/physician, and the facility from all legal responsibility for any ill effects which may result from my refusal to accept treatment.

In signing this I certify that the above has been read and fully explained to me.

## Signatures



## Save Log

| User Name | Audit Date |
|---|---|
| LANDRUM, TRISHA | 6/6/2018 8:57:20 AM |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| PETZ, DARRELL | 6/6/2018 12:21:58 PM | | False |

---

**DC-462 Release From Responsibility for Medical Treatment**
DC-462 Release From Responbility for Medical Treatment

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By LANDRUM, TRISHA on 6/6/2018 8:57:20 AM

**BROWN, GARTOR KIKI** #NA6401      DOB: 7/22/1988 (31y)  Location: G-D-1009-01

### RELEASE FROM RESPONSIBILITY FOR MEDICAL/PSYCHIATRIC TREATMENT

I, GARTOR BROWN, an inmate at SCI HUNTINGDON have been advised by the physician named below that I am in need of treatment
for:

DR. CHRISTINA DOLL

**I understand the nature of the treatment is: (Give brief description of the treatment required, and the possible consequences of this inmate not receiving it.):**

HIV 1&2-REPEAT

**Select all That Apply:**

☑ Refused laboratory services

     **Comment on Refused Laboratory Services:**
     REFUSED LAB WORK

**Reason for Refusal:**

REFUSED LAB WORK

Possible consequences due to the refusal of treatment: by refusing the offered care, you could experience worsening of your condition, leading to permanent disability and/or death.

**Additional Comments:**

REFUSED LAB WORK

I hereby refuse this treatment. I have been fully advised of the nature of my ailment or injury and fully realize the effects that may result from my refusal to accept the prescribed treatment. I hereby release the treating provider/physician, and the facility from all legal responsibility for any ill effects which may result from my refusal to accept treatment.

In signing this I certify that the above has been read and fully explained to me.

Signatures



### Save Log

| User Name | Audit Date |
|---|---|
| LANDRUM, TRISHA | 4/11/2018 8:12:24 AM |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| PETZ, DARRELL | 4/11/2018 9:50:19 AM | | False |

**DC-462 Release From Responsibility for Medical Treatment**
DC-462 Release From Responbility for Medical Treatment

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By LANDRUM, TRISHA on 4/11/2018 8:12:24 AM

 **Laboratory Report**

| DOCTOR | LATTANZI, KELLY M | PATIENT | BROWN, GARTOR KIKI | | | SAMPLE | <Info Not Provided> | |
|---|---|---|---|---|---|---|---|---|
| | HC | SCI HUNTINGDON | | DOB: 7/22/1986 | AGE: 31 | | Reported Date: | 1/24/2018 04:50 |
| | HOSPITAL/MEDICAL DEPT | | SEX: M | W: D | | Date Collected: | 1/22/2018 06:30 |
| | HUNTINGDON PA 16654-1112 | | U/FL: G | BED: 01 | | Date Received: | 1/23/2018 11:31 |
| | 814-643-2400 | | RM: 1009 | | | Accession #: | 201801570603 |
| | | | #: NA6401 | | | | |




Key: L=Below Low Normal, H=Above High Normal, HH = Above Upper Panic Limits, LL=Below Lower Panic Limits, N=Normal(non-numeric only), *=critical value

### HIV-1/HIV-2 AB SCR - (NF)

| Test | Patient's Results | Reference Range | Units |
|---|---|---|---|
| HIV-1/HIV-2 AB SCR | NON-REACTIVE | | |

**Garcia Clinical Laboratory, Inc.**
2195 Spring Arbor Rd. | Jackson, MI 49203
Director: Lorenz P. Kielhorn, MD

Printed 8/5/2019 11:05:29 AM

**BROWN, GARTOR KIKI**  #NA6401  **Location:**  **DOB:** 7/22/1988 (31y)

| DOCTOR | | PATIENT | | SAMPLE | |
|---|---|---|---|---|---|
| LATTANZI, KELLY M | | BROWN, GARTOR KIKI | | <Info Not Provided> | |
| HC \| SCI HUNTINGDON | | DOB: 7/22/1988  AGE: 31 | | Reported Date: | 1/24/2018 04:50 |
| HOSPITAL/MEDICAL DEPT | | SEX: M    W:  D | | Date Collected: | 1/22/2018 06:30 |
| HUNTINGDON PA 16654-1112 | | U/FL: G    BED: 01 | | Date Received: | 1/23/2018 11:31 |
| 814-643-2400 | | RM:  1009 | | Accession #: | 201801570603 |
| | | #:  NA6401 | | | |

| SERVICE | SIGNOFF DATE | FOLLOW UP TYPE | SIGNED BY | NOTES |
|---|---|---|---|---|
| HIV-1/HIV-2 AB SCR | 2/1/2018 | Normal ~ Within Normal Limits (WNL) | DOLL, CHRISTINA | |

**Lab Signoff Notes**

Lab #:1473910

**Facility:**  SCI HUNTINGDON
**Created By:**  JACKSON, KYLIE
**Created On:**  08/05/2019 11:04:36 AM

1 of 1

# CONSULTATION RECORD

**A. Referring Facility Details ---**     6/18/2019 7:00 AM (SCI HUNTINGDON)          Auth # ON-SITE-CONSULT

| Consult Type: | Follow-up | Referred To: | PT |
|---|---|---|---|
| Location: | On Site | Urgency | Routine |
| Clinic Type: | Physical Therapy | Referring Phys: | BALDAUF, FAWN LYNN |
| Visit Type: | Office Visit | Entered By: | BALDAUF, FAWN LYNN |

| | |
|---|---|
| Destination: | ONSITE OR ONSITE/TELEMED CONSULT |
| Contact Person: | |
| Appt. Date: | 7/30/2019 | Appt. Time: | 08:30:00 |
| Appt. Findings: | |
| Findings Entered By: | Findings Entered On: N/A |

## Health Information

| | |
|---|---|
| Allergies: | FISH, PEANUT ALLERGY |
| Significant Past Medical & Surgical History: | [G89.21 - PAIN, CHRONIC, DUE TO TRAUMA], [INTAKE - MEDICAL INTAKE], [J45.909 - ASTHMA, UNSPEC.] |
| Present Illness Injury and Physical Findings: | [PRIMARY] LOW BACK PAIN |
| Treatment to Date: | NA |
| Current Medications &Significant Medication History: | DICLOFENAC SOD 75MG DR T (VOLTAREN) (S:6/18/2019), XOPENEX HFA 45MCG INHALER (LEVALBUTEROL HCL) (S:6/14/2019) |
| Relevant Health Information To Accompant Patient: | N/A |
| Special Instructions/Travel Needs: | NA |
| Post Consult Docs: | *FILE LIST: BROWN.PDF* |

### Referring Physician Comments:

CONSULT PT FOR LOW BACK PAIN

| Requested By | Date |
|---|---|
| *BALDAUF, FAWN LYNN* | *6/18/2019 7:00:01 AM* |
| **Electronically Signed By** | **Date** |
| *DELBIANCO,PAUL* | *6/19/2019 3:26:49 PM* |

---

Commonwealth of Pennsylvania
Department of Corrections
Consultation Record
DC-441

Revised 10/2015

Inmate Name: BROWN, GARTOR KIKI

Inmate Number: NA6401

DOB: 7/22/1988    HT:          WT:

Facility: SCI HUNTINGDON

**B. Findings and Recommendations** (to be completed by Consultant and returned with the officer to the facility)

**Subjective:**

c/c Low back pain that started in April 2019, when he was being restrained then another occurrence happened in May 2019. No report of LE radiation pain but does c/o ® knee pain ē movement.

**Objective:**

X-Ray of L-S spine - neg.
Trunk Rom + in flexion, rotation ® +©, SB® +©.
(-) Spasm palpated ē movement.
(-) SLR on ® but c/o pain in ® knee ē SLR m ®.
Ambu Ⓘ ē gait deviation.

**Assessment:**

Chronic LBP.

**Plan:**

Instructed in low back flexibility exercises d/
pelvic tilt, SKTC, DKTC, Rotation trunk rotation d/
nid Back Stretch.

f/u in PT x 1 month.

EUGENE J. ZAPPA, PT

_[signature]_                                                                                         0905
Signature of Consultant                                                                          7-30-19
                                                                                                                    Date/Time

Commonwealth of Pennsylvania
Department of Corrections
Consultation Record
DC-441

Revised 10/2015

Inmate Name: BROWN, GARTOR KIKI

Inmate Number: NA6401

DOB: 7/22/1988    HT:            WT:

Facility: SCI HUNTINGDON

## Global Diagnostic Services, Inc.

2066 Eastside Drive, Bldg. C, Suite 200
Conyers, GA 30013
Phone: 770-602-0502
Fax: 770-761-9742

PATIENT NAME:        BROWN, GARTOR
DATE OF BIRTH:  ·     07/22/1988
ID#:                 NA6401
DATE OF SERVICE:     20190503
REF. PHYSICIAN:      FAWN BALDAUF

FACILITY:            HUN

-RT ANKLE-LT KNEE

VIEWS OF THE LEFT KNEE

FINDINGS: Comparison is made to the November 2017 exam.

The examination fails to demonstrate evidence of an acute fracture or sizable suprapatellar effusion. The joint spaces appear to be well maintained. No intra-articular loose bodies are identified.

IMPRESSION:

1. No radiographic evidence of an acute fracture.

MULTIPLE VIEWS OF THE RIGHT ANKLE

FINDINGS: Examination fails to demonstrate obvious radiographic evidence of soft tissue swelling. There is no evidence of an acute osseous fracture or dislocation. The ankle mortise is well maintained.

IMPRESSION:

1. No radiographic evidence of acute fracture.

SCOTT LOGAN
Board Certified Radiologist

The above report was electronically reviewed and approved by SCOTT LOGAN on 05/04/2019

# Global Diagnostic Services, Inc.

2066 Eastside Drive, Bldg. C, Suite 200
Conyers, GA 30013
Phone: 770-602-0502
Fax: 770-761-9742

PATIENT NAME:     BROWN, GARTOR
DATE OF BIRTH:    07/22/1988
ID#:              NA6401
DATE OF SERVICE:  20190503
REF. PHYSICIAN:   FAWN BALDAUF

FACILITY:         HUN

-SKULL-L SPINE-RT HIP-C SPINE

MULTIPLE VIEWS OF THE SKULL

The examination fails to demonstrate evidence of a depressed calvarial
fracture. No radiopaque foreign bodies are identified. The visualize
paranasal sinuses are well pneumatized.

Negative skull radiographs do not confirm the absence of an intracranial
traumatic abnormality. The need for further evaluation with a CT scan of the
head should be determined clinically.

IMPRESSION:

1. No radiographic evidence of a depressed calvarial fracture.

CERVICAL SPINE

FINDINGS: The examination fails to demonstrate evidence of an acute
fracture, subluxation, or prevertebral soft tissue swelling. The vertebral body
heights and disc spaces are well maintained.

The need for further evaluation with a CT or MRI should be determined
clinically.

IMPRESSION:

1. There is no radiographic evidence of acute fracture.

LUMBOSACRAL SPINE - MULTIPLE VIEWS

Comparison is made to the 2017 exam.

Views of the lumbosacral spine fail to demonstrate evidence of an acute fracture, spondylolysis, or spondylolisthesis. The vertebral body heights and disc spaces are well maintained. Straightening of lumbar lordosis.

IMPRESSION:

1. No radiographic evidence of an acute fracture or subluxation.

MULTIPLE VIEWS OF THE RIGHT HIP

FINDINGS: The examination fails to demonstrate evidence of an acute fracture. The femoral head appears to articulate normally with the acetabulum.

If a radiographically occult fracture is clinically suspected, a MRI or CT evaluation could be obtained.

IMPRESSION:

1. No radiographic evidence of an acute fracture.

SCOTT LOGAN
Board Certified Radiologist

The above report was electronically reviewed and approved by SCOTT LOGAN on 05/04/2019

## Global Diagnostic Services, Inc.

2066 Eastside Drive, Bldg. C, Suite 200
Conyers, GA 30013
Phone: 770-602-0502
Fax: 770-761-9742

PATIENT NAME:        BROWN, GARTOR
DATE OF BIRTH:       07/22/1988
ID#:                 NA6401
DATE OF SERVICE:     20180808
REF. PHYSICIAN:      RANDYL^GESSEL^^^

FACILITY:        HUN

KUB, TWO VIEWS:INDICATION: Follow-up ingested foreign
body.COMPARISON: 08/06/2018.FINDINGS: The bowel gas pattern is
nonspecific. There is a moderate amount ofstool. There is no small bowel
obstruction or free air. No definite radiopaqueforeign body is identified.
Buttons over the right abdomen are felt to beextrinsic to the patient. A
wire-like foreign body in the pelvis on 08/06/2018 isno longer
visualized.IMPRESSION:1. Nonspecific bowel gas pattern with a moderate
amount of stool. There is no small bowel obstruction or free air. There is
more stool than on 08/06/2018.2. No definite radiopaque foreign body is
identified. A wire-like foreign body in the pelvis that measured about 2.5 x
0.5 cm on 08/06/2018 is no longer visualized.

James Zimmerman MD
Board Certified Radiologist

The above report was electronically reviewed and approved by James
Zimmerman MD on 08/09/2018

# Global Diagnostic Services, Inc.

2066 Eastside Drive, Bldg. C, Suite 200
Conyers, GA 30013
Phone: 770-602-0502
Fax: 770-761-9742

PATIENT NAME:        BROWN, GARTOR
DATE OF BIRTH:        07/22/1988
ID#:                          NA6401
DATE OF SERVICE:    20180806
REF. PHYSICIAN:       RANDYL^GESSEL^^^

FACILITY:                 HUN
KUB, TWO VIEWS:INDICATION: Follow-up ingested foreign
body.COMPARISON: 08/01/2018.FINDINGS: The bowel gas pattern is
nonspecific. There is a moderate amount ofstool. There is no small bowel
obstruction or free air. There is a wire-likecurved metallic foreign body in the
pelvis measuring about 3 x 0.5 cm that isprobably in the
rectum.IMPRESSION:1. Nonspecific bowel gas pattern with a moderate
amount of stool. There is no small bowel obstruction or free air. There is
less bowel gas than on 08/01/2018.2. Wire-like foreign body in the pelvis
measuring about 3 x 0.5 cm that is probably in the rectum and in a similar
location to 08/01/2018. Recommend clinical correlation with appropriate
follow-up and additional imaging as indicated.

James Zimmerman MD
Board Certified Radiologist

The above report was electronically reviewed and approved by James
Zimmerman MD on 08/07/2018



BROWN, GARTOR

22-JUL-1988 (29 yr)
Unknown

Room:
Loc:112

ID:NA6401

12-JUL-2018 14:35:36

DEFLT SCI HUNTINGTON

Normal sinus rhythm
Normal ECG

| | | | |
|---|---|---|---|
| Vent. rate | 89 | BPM | |
| PR interval | 154 | ms | |
| QRS duration | 96 | ms | |
| QT/QTc | 358/435 | ms | |
| P-R-T axes | 74 | 77 | 69 |

Technician:
Test Ind:

Med:

Unconfirmed

25mm/s    10mm/mV    150Hz    9.0.7    12SL 231    CID: 1

EID:        EDT:  ORDER:

Page 1 of 1

**BROWN, GARTOR KIKI** #NA6401                                    DOB: 7/22/1988 (31y)   Location: G-D-1009-01

**Current Facility:**
  SCI HUNTINGDON

**Date**
  07/30/2019

**Request:**
  ☑Routine

>     **Date or Date Range of Routine Test:**
>     7/31/2019

**X-Ray Being requested:**
  CXR

**Reason for Exam:**
  R/O TB R/T CONTINUED TST REFUSAL

## Form Order Details



### Save Log

| User Name | Audit Date |
|-----------|------------|
| LUSK, ANGELA | 7/30/2019 12:52:30 PM |

---

**DC-456 - X-Ray Order Form**
X-Ray Order Form

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By LUSK, ANGELA, RN on 7/30/2019 12:52:30 PM

**BROWN, GARTOR KIKI** #NA6401                                DOB: 7/22/1988 (31y)   Location: G-D-1009-01

**Current Facility:**
SCI HUNTINGDON

**Date**
05/03/2019

**Request:**
☑Routine

> **Date or Date Range of Routine Test:**
> 05032019

**X-Ray Being requested:**
LEFT TEMPORAL SKULL, CERVICAL AND LUMBAR SPINE, RIGHT ANKLE, LEFT KNEE, RIGHT HIP

**Reason for Exam:**
INMATE WAS RESTRAINED BY SECURITY AND IS NOW REPORTING MULTIPLE INJURIES. RULE OUT: SKULL FRACTURE, CERVICAL AND LUMBAR SPINE FRACTURE, RIGHT ANKLE FRACTURE, RIGHT HIP DISLOCATION

## Form Order Details



### Save Log

| User Name | Audit Date |
|---|---|
| BALDAUF, FAWN LYNN | 5/3/2019 7:08:16 AM |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| BALDAUF, FAWN LYNN | 5/3/2019 7:08:16 AM | Form Processed Approval | False |

---

**DC-456 - X-Ray Order Form**
X-Ray Order Form

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** BALDAUF, FAWN LYNN, CRNP on 5/3/2019
7:08:16 AM

BROWN, GARTOR KIKI  #NA6401                                              DOB: 7/22/1988 (31y)  Location: G-D-1009-01

## Date Settings

**Current Facility:**
SCI HUNTINGDON

**Please Select the time-frame for the Labs to be completed:**
☑Routine

## Special Circumstances

**Special Circumstances (If Testing is in relation to one of the following diagnoses, please check the appropriate box):**
*NO ANSWER PROVIDED*

## Patient Information

**Patient's ID Number:**
NA6401

**Patient's Name:**
BROWN, GARTOR

**Patient's Sex:**
M

**Patient's Date of Birth**
07/22/1988

**Fasting**
☑No

**Diagnoses:**
ABD PAIN

**Urine Hrs/vol - Patient Ht/Wt:**
*NO ANSWER PROVIDED*

## Lab Selection

**Panels:**
☑Comp Panel - S: Na, K, CL, CO2, Glucose, BUN, Creatinine, Ca, GFR, Albumin, Alk Phos, T. Bili, T. Protein, AST, ALT

**Microbiology:**
*NO ANSWER PROVIDED*

**Infectious Disease:**
*NO ANSWER PROVIDED*

**Clinical Tests:**

---

**PA - Lab Order Form**
Lab order form - creates tasks for Phlebotomist/CC to schedule labs

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By GESSEL, RANDYL, PA on 8/7/2018 1:57:07 PM

**BROWN, GARTOR KIKI**  #NA6401                                    DOB: 7/22/1988 (31y)   Location: G-D-1009-01

☑Amylase, Serum - S

☑CBC with Differential Platelet - L

☑Urinalysis, Routine - U

**Lab Panels and Individual Labs for Psychiatric Medications:**

NO ANSWER PROVIDED

|  | Tube Type |  |
|---|---|---|
| S = Serum Separator | L = Lavender | U = Urine |
| P = PPT Tube | B = Light Blue | R = Plain Red |

*If the required lab is not listed in the dropdowns above, please provide the Test Code and Test Name in the textbox below.*

**Other Labs (Provide Test Name and, if available/applicable, Test Code):**

NO ANSWER PROVIDED

## Form Order Details



### Save Log

| User Name | Audit Date |
|---|---|
| GESSEL, RANDYL | 8/7/2018 1:57:07 PM |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| GESSEL, RANDYL | 8/7/2018 1:57:07 PM | Form Processed Approval | False |

......................                                          .........................

---

**PA - Lab Order Form**
Lab order form - creates tasks for Phlebotomist/CC to schedule labs

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** GESSEL, RANDYL, PA on 8/7/2018 1:57:07 PM

**BROWN, GARTOR KIKI**  #NA6401                                    **DOB:** 7/22/1988 (31y)  **Location:** G-D-1009-01

**Current Facility:**
  SCI HUNTINGDON

**Date**
  08/07/2018

**Request:**
☑ Routine

> **Date or Date Range of Routine Test:**
>  8/7/18

**X-Ray Being requested:**
  ABD

**Reason for Exam:**
  FB ABD

## Form Order Details



### Save Log

| User Name | Audit Date |
|---|---|
| GESSEL, RANDYL | 8/7/2018 1:55:44 PM |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| GESSEL, RANDYL | 8/7/2018 1:55:44 PM | Form Processed Approval | False |

---

**DC-456 - X-Ray Order Form**
X-Ray Order Form

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** GESSEL, RANDYL, PA on 8/7/2018 1:55:44 PM

1 of 1

**BROWN, GARTOR KIKI  #NA6401**                           DOB: 7/22/1988 (31y)   Location: G-D-1009-01

**Current Facility:**
SCI HUNTINGDON

**Date**
08/06/2018

**Request:**
☑ STAT

**X-Ray Being requested:**
ABD

**Reason for Exam:**
FB; WITH WET READ

## Form Order Details



### Save Log

| User Name | Audit Date |
|---|---|
| GESSEL, RANDYL | 8/6/2018 8:53:54 AM |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| GESSEL, RANDYL | 8/6/2018 8:53:55 AM | Form Processed Approval | False |

---

**DC-456 - X-Ray Order Form**
X-Ray Order Form

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By GESSEL, RANDYL, PA on 8/6/2018 8:53:54 AM

**BROWN, GARTOR KIKI**  #NA6401                                    DOB: 7/22/1988 (31y)  Location: G-D-1009-01

**Current Facility:**
SCI HUNTINGDON

**Date**
08/01/2018

**Request:**
☑Routine

> **Date or Date Range of Routine Test:**
> 8/3/2018

**X-Ray Being requested:**
REPEAT ABDOMINAL XRAYS TO EVAL FOR PIECE OF METAL IN SIGMOID COLON

**Reason for Exam:**
PATIENT SWALLOWED A PIECE OF METAL, SEEN ON XRAY 8/1/ 2018 IN THE SIGMOID COLON.

## Form Order Details



### Save Log

| User Name | Audit Date |
|---|---|
| BUCKLEY, BARBARA M | 8/1/2018 3:40:21 PM |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| BUCKLEY, BARBARA M | 8/1/2018 3:40:21 PM | Form Processed Approval | False |

---

**DC-456 - X-Ray Order Form**
X-Ray Order Form

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By BUCKLEY, BARBARA M, PA on 8/1/2018 3:40:21 PM

**BROWN, GARTOR KIKI** #NA6401                                    DOB: 7/22/1988 (31y)  Location: G-D-1009-01

**Current Facility:**
  SCI HUNTINGDON

**Date**
  08/01/2018

**Request:**
  ☑STAT

**X-Ray Being requested:**
  XRAY OF ABDOMEN WITH WET READ. PLEASE ALLOW MEDICAL TO EXAM AND TALK WITH PATIENT WHILE AT XRAY.

**Reason for Exam:**
  PATIENT CLAIMS THAT HE SWALLOWED A PIECE OF METAL

## Form Order Details



### Save Log

| User Name | Audit Date |
|---|---|
| BUCKLEY, BARBARA M | 8/1/2018 9:04:08 AM |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| BUCKLEY, BARBARA M | 8/1/2018 9:04:08 AM | Form Processed Approval | False |

---

**DC-456 - X-Ray Order Form**
X-Ray Order Form

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** BUCKLEY, BARBARA M, PA on 8/1/2018 9:04:08 AM

**BROWN, GARTOR KIKI** #NA6401                          DOB: 7/22/1988 (31y)  **Location:** G-D-1009-01

## Date Settings

**Please Select the time-frame for the Labs to be completed:**
☑ASAP

## Special Circumstances

**Special Circumstances (If Testing is in relation to one of the following diagnoses, please check the appropriate box):**
*NO ANSWER PROVIDED*

## Patient Information

**Patient's ID Number:**
NA6401

**Patient's Name:**
BROWN, GARTOR

**Patient's Sex:**
M

**Patient's Date of Birth**
07/22/1988

**Fasting**
☑No

**Diagnoses:**
SCREENING

**Urine Hrs/vol - Patient Ht/Wt:**
*NO ANSWER PROVIDED*

## Lab Selection

**Panels:**
*NO ANSWER PROVIDED*

**Microbiology:**
*NO ANSWER PROVIDED*

**Infectious Disease:**
☑HIV-I Antibodies - S

☑Rapid Plasma Reagin (RPR) Qualitative Test - S

☑Hep C AB - S

**Clinical Tests:**

---

**PA - Lab Order Form**
Lab order form - creates tasks for Phlebotomist/CC to schedule labs

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By LUSK, ANGELA, RN on 2/15/2018 12:14:17 PM

**BROWN, GARTOR KIKI** #NA6401                                                   **DOB:** 7/22/1988 (31y)   **Location:** G-D-1009-01

☑ Chlamydia/Gonococcus, by DNA Probe (w/cont)

**Lab Panels and Individual Labs for Psychiatric Medications:**
*NO ANSWER PROVIDED*

|                          | Tube Type         |                 |
|--------------------------|-------------------|-----------------|
| S = Serum Separator      | L = Lavender      | U = Urine       |
| P = PPT Tube             | B = Light Blue    | R = Plain Red   |

*If the required lab is not listed in the dropdowns above, please provide the Test Code and Test Name in the textbox below.*

**Other Labs (Provide Test Name and, if available/applicable, Test Code):**
*NO ANSWER PROVIDED*

## Form Order Details



### Save Log

| User Name      | Audit Date               |
|----------------|--------------------------|
| LUSK, ANGELA   | 2/15/2018 12:14:17 PM    |

### Signoff Comments List

| Approved By        | Approved On            | Signoff Note | Is Declined |
|--------------------|------------------------|--------------|-------------|
| LECLERC, JACQUES   | 2/15/2018 4:21:31 PM   |              | False       |

---

**PA - Lab Order Form**
Lab order form - creates tasks for Phlebotomist/CC to schedule labs

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** LUSK, ANGELA, RN on 2/15/2018 12:14:17 PM

**BROWN, GARTOR KIKI** #NA6401    DOB: 7/22/1988 (31y)  Location: G-D-1009-01

## DC-472B - Progress Notes - Nursing

**Date/Time:**
07/18/2019 06:23

**Facility:**
SCI HUNTINGDON

**Subjective:**
TST

**Objective:**
Offered TST and refused

**Vitals Taken:**
☑No

**Assessment:**
NA

**Plan:**
Continue to offer TST per policy

**Other:**
NO ANSWER PROVIDED

**Add I/E/R:**
NO ANSWER PROVIDED

### Save Log

| User Name | Audit Date |
|---|---|
| HOFFMASTER, ANN | 7/19/2019 6:24:29 AM |

---

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By HOFFMASTER, ANN, LPN on 7/19/2019 6:24:29
AM

## DC-472B - Progress Notes - Nursing

**Date/Time:**
07/17/2019 09:20

**Facility:**
SCI HUNTINGDON

**Subjective:**
TST testing

**Objective:**
Sitting on bunk. Refused TST again today

**Vitals Taken:**
☑No

**Assessment:**
NA

**Plan:**
Continue to offer TST everyday per protocol

**Other:**
NA

**Add I/E/R:**
*NO ANSWER PROVIDED*

### Save Log

| User Name | Audit Date |
|---|---|
| HOFFMASTER, ANN | 7/17/2019 9:21:44 AM |

---

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** HOFFMASTER, ANN, LPN **on** 7/17/2019 9:21:44 AM

BROWN, GARTOR KIKI  #NA6401                                    DOB: 7/22/1988 (31y)  Location: G-D-1009-01

## DC-472B - Progress Notes - Nursing

**Date/Time:**
07/16/2019 11:37

**Facility:**
SCI HUNTINGDON

**Subjective:**
"I'M NOT TAKING IT. I DON'T NEED IT AND I AIN'T TAKING IT. I CAN REFUSE ANYTHING."

**Objective:**
OFFERED INMATE HIS YEARLY TST. INMATE REFUSED. INSTRUCTED INMATE ON IMPORTANCE OF TAKING IT. STILL REFUSED. DENIES S/S OF TB.

**Vitals Taken:**
☑No

**Assessment:**
NA

**Plan:**
OFFER TB DAILY. MISCONDUCT WRITTEN.

**Other:**
*NO ANSWER PROVIDED*

**Add I/E/R:**
*NO ANSWER PROVIDED*

### Save Log

| User Name | Audit Date |
|---|---|
| HARTZLER, RODNEY | 7/16/2019 11:39:47 AM |

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
**Electronically Signed By** HARTZLER, RODNEY, LPN **on** 7/16/2019 11:39:4 AM

**BROWN, GARTOR KIKI  #NA6401**                                    DOB: 7/22/1988 (31y)  Location: G-D-1009-01

## DC-472B - Progress Notes - Nursing

**Date/Time:**

06/24/2019 18:50

**Facility:**

SCI HUNTINGDON

**Subjective:**

PLANNED USE OF FORCE

**Objective:**

INMATE REFUSING TO COME OUT FOR SECURITY CHECK.  3 MAN COMPLIANCE TEAM ASSEMBLED.  INMATE COMPLIED WITH FINAL ORDER TO COME OUT OF CELL.  INMATE REFUSES MEDICAL EVALUATION AND PICTURES.  NO FORCE USED.  INMATE EXTREMELY UNCOOPERATIVE WITH ATTEMPT AT PICTURES AND EVALUATION.

**Vitals Taken:**

☑No

**Assessment:**

NONE

**Plan:**

ATTEMPTED PICTURES THROUGH CELL DOOR.  INMATE EXTREMELY UNCOOPERATIVE.  NO INJURIES NOTED.

**Other:**

*NO ANSWER PROVIDED*

**Add I/E/R:**

*NO ANSWER PROVIDED*

### Save Log

| User Name | Audit Date |
|---|---|
| WAGMAN, MELANIE | 6/24/2019 6:52:33 PM |

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
**Electronically Signed By** WAGMAN, MELANIE, LPN on 6/24/2019 6:52:33 PM

1 of 1

**BROWN, GARTOR KIKI**  #NA6401

**DOB:** 7/22/1988 (31y)  **Location:** G-D-1009-01

## DC-472 - Progress Note Medical Provider

**Date/Time:**
06/24/2019 14:42

**Facility:**
SCI HUNTINGDON

**Type of Progress Note:**
☑ SOAP Note

**Subjective:**
na

### Objective

### Vitals

| | |
|---|---|
| **Temp:** | **Respirations:** |
| NO ANSWER PROVIDED | NO ANSWER PROVIDED |
| **Blood Pressure:** | **O2 Sats:** |
| NO ANSWER PROVIDED | NO ANSWER PROVIDED |
| **Pulse:** | |
| NO ANSWER PROVIDED | |

**Objective Comments:**
na

### On-site Labs Results

**Select all On-site Labs that are being performed at the visit:**
NO ANSWER PROVIDED

**Assessment:**
asthma/oc spray.

### Plan

**Information:**

Pt has been sprayed with oc twice. He has not shown residual problems. Will clear for this level of force. If he needs additional pulmonary meds or displays decreased pulmonary functioning, will d/c clearance.

**Medications:**
NO ANSWER PROVIDED

**Select all that apply:**

---

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By DELBIANCO, PAUL, MD on 6/24/2019 2:47:18 PM

**BROWN, GARTOR KIKI** #NA6401      **DOB:** 7/22/1988 (31y)   **Location:** G-D-1009-01

*NO ANSWER PROVIDED*

## On-Site Lab to be Performed After the Visit on One Occasion

**Select Labs:**
*NO ANSWER PROVIDED*

**New Chronic Care Clinic Patient (Select all Chronic Clinics that apply):**
*NO ANSWER PROVIDED*

**Discontinue Chronic Care Clinic Patient:**
*NO ANSWER PROVIDED*

**Refer to (check all that apply):**
*NO ANSWER PROVIDED*

**Request Outside Medical Records:**
☑No

**Provider Line follow-up needed:**
☑No

**Additional Comments:**
*NO ANSWER PROVIDED*

### Save Log

| User Name | Audit Date |
| --- | --- |
| DELBIANCO, PAUL | 6/24/2019 2:47:18 PM |

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By DELBIANCO, PAUL, MD on 6/24/2019 2:47:18 PM

**BROWN, GARTOR KIKI**  #NA6401                          DOB: 7/22/1988 (31y)   Location: G-D-1009-01

## DC-472 - Progress Note Medical Provider

**Date/Time:**
06/18/2019 08:03

**Facility:**
SCI HUNTINGDON

**Type of Progress Note:**
☑ SOAP Note

**Subjective:**
na

### Objective

### Vitals

**Temp:**
NO ANSWER PROVIDED

**Respirations:**
NO ANSWER PROVIDED

**Blood Pressure:**
NO ANSWER PROVIDED

**O2 Sats:**
NO ANSWER PROVIDED

**Pulse:**
NO ANSWER PROVIDED

**Objective Comments:**
na

### On-site Labs Results

**Select all On-site Labs that are being performed at the visit:**
NO ANSWER PROVIDED

**Assessment:**
na

### Plan

**Information:**
na

**Medications:**
NO ANSWER PROVIDED

**Select all that apply:**
☑ Other Nursing Order

---

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By BALDAUF, FAWN LYNN, CRNP on 6/18/2019
8:03:57 AM

**BROWN, GARTOR KIKI**  #NA6401                                    DOB: 7/22/1988 (31y)  **Location:** G-D-1009-01

**Other Nursing Order:**
PLEASE DO SNELLEN AND REFER TO OPTOMETRY

## On-Site Lab to be Performed After the Visit on One Occasion

**Select Labs:**
*NO ANSWER PROVIDED*

**New Chronic Care Clinic Patient (Select all Chronic Clinics that apply):**
*NO ANSWER PROVIDED*

**Discontinue Chronic Care Clinic Patient:**
*NO ANSWER PROVIDED*

**Refer to (check all that apply):**
*NO ANSWER PROVIDED*

**Request Outside Medical Records:**
*NO ANSWER PROVIDED*

**Provider Line follow-up needed:**
☑No

**Additional Comments:**
*NO ANSWER PROVIDED*

### Save Log

| User Name | Audit Date |
|---|---|
| BALDAUF, FAWN LYNN | 6/18/2019 8:03:57 AM |

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01,
DOB: 7/22/1988
Facility: SCI HUNTINGDON
**Electronically Signed By** BALDAUF, FAWN LYNN, CRNP on 6/18/2019
8:03:57 AM

2 of 2

BROWN, GARTOR KIKI  #NA6401                                          DOB: 7/22/1988 (31y)  Location: G-D-1009-01

## DC-472 - Progress Note Medical Provider

**Date/Time:**
06/18/2019 06:54

**Facility:**
SCI HUNTINGDON

**Type of Progress Note:**
☑ SOAP Note

**Subjective:**
SICK CALL: CONTINUES TO COMPLAIN OF LOW BACK, BILATERAL SHOULDER, RIGHT HIP AND STOMACH PAIN. ALSO REPORTS BLURRY VISION WITH FLOATERS IN HIS VISUAL FIELD. DENIES ANY RECENT INJURIES. REPORTS THAT MOTRIN DOES NOT WORK TO RELIEVE HIS PAIN.

### Objective

### Vitals

| | |
|---|---|
| **Temp:** | **Respirations:** |
| NO ANSWER PROVIDED | NO ANSWER PROVIDED |
| **Blood Pressure:** | **O2 Sats:** |
| NO ANSWER PROVIDED | NO ANSWER PROVIDED |
| **Pulse:** | |
| NO ANSWER PROVIDED | |

**Objective Comments:**
NO ACUTE DISTRESS. ASSESSMENT WNL. A&O X 3, PERRL, EOM INTACT AND EQUAL THROUGHOUT. SEEN THROUGH RHU CELL DOOR

### On-site Labs Results

**Select all On-site Labs that are being performed at the visit:**
NO ANSWER PROVIDED

**Assessment:**
LUMBAGO, HIP PAIN, FLOATERS

### Plan

**Information:**
WILL ORDER PAIN MEDS AND CONSULT PT. REFER TO OPTOMETRY FOR FURTHER EVAL AND TREATMENT. F/U PRN

**Medications:**
☑ Start New

---

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** BALDAUF, FAWN LYNN, CRNP on 6/18/2019 6:57:42 AM

**BROWN, GARTOR KIKI**  #NA6401                                    DOB: 7/22/1988 (31y)   Location: G-D-1009-01

**Select all that apply:**
*NO ANSWER PROVIDED*

On-Site Lab to be Performed After the Visit on One Occasion

**Select Labs:**
*NO ANSWER PROVIDED*

**New Chronic Care Clinic Patient (Select all Chronic Clinics that apply):**
*NO ANSWER PROVIDED*

**Discontinue Chronic Care Clinic Patient:**
*NO ANSWER PROVIDED*

**Refer to (check all that apply):**
*NO ANSWER PROVIDED*

**Request Outside Medical Records:**
*NO ANSWER PROVIDED*

**Provider Line follow-up needed:**
☑No

**Additional Comments:**
*NO ANSWER PROVIDED*

## Save Log

| User Name | Audit Date |
|---|---|
| BALDAUF, FAWN LYNN | 6/18/2019 6:57:42 AM |

---

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By BALDAUF, FAWN LYNN, CRNP on 6/18/2019
6:57:42 AM

**BROWN, GARTOR KIKI**  #NA6401                    DOB: 7/22/1988 (31y)   Location: G-D-1009-01

## DC-472 - Progress Note Medical Provider

**Date/Time:**
06/14/2019 07:31

**Facility:**
SCI HUNTINGDON

**Type of Progress Note:**
☑ SOAP Note

**Subjective:**
SICK CALL: REPORTS THAT HE WAS SPRAYED LAST NIGHT AND WAS HAVING SOB.  HE WAS SEEN BY NURSING LAST NIGHT WHEN THE INCIDENT OCCURED AND WAS STABLE.  REPORTS THAT HE IS EXPERIENCING SOB.  NO OTHER COMPLAINTS AT PRESENT.

### Objective

### Vitals

| **Temp:** | **Respirations:** |
|---|---|
| NO ANSWER PROVIDED | NO ANSWER PROVIDED |
| **Blood Pressure:** | **O2 Sats:** |
| NO ANSWER PROVIDED | NO ANSWER PROVIDED |
| **Pulse:** | |
| NO ANSWER PROVIDED | |

**Objective Comments:**
NO ACUTE DISTRESS.  ASSESSMENT UNERMEARKABLE. NO VISIBLE SOB NOTED.

### On-site Labs Results

**Select all On-site Labs that are being performed at the visit:**
NO ANSWER PROVIDED

**Assessment:**
SOB

### Plan

**Information:**

XOPENEX REORDERED.  F/U PRN.

THE INMATE VOICED CONCERNS ABOUT NOT BEING SEEN QUICKLY ENOUGH BY MEDICAL WHEN THIS EPISODE OCCURED.  HE ALSO STATES THAT HE IS CONCERNED ABOUT BEING HOUSED IN THE CELL HE IS BECAUSE IF HE GOES INTO RESPIRATORY DISTRESS NOBODY WILL KNOW IT.  I INFORMED HIM THAT THERE IS NO MEDICAL INDICATION TO CHANGE HIS HOUSING CELL AND IF HE HAS CONCERNS HE CAN DISCUSS THEM WITH SECURITY.

---

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** BALDAUF, FAWN LYNN, CRNP on 6/14/2019
7:38:23 AM

**Medications:**
☑Renewed

**Select all that apply:**
*NO ANSWER PROVIDED*

On-Site Lab to be Performed After the Visit on One Occasion

**Select Labs:**
*NO ANSWER PROVIDED*

**New Chronic Care Clinic Patient (Select all Chronic Clinics that apply):**
*NO ANSWER PROVIDED*

**Discontinue Chronic Care Clinic Patient:**
*NO ANSWER PROVIDED*

**Refer to (check all that apply):**
*NO ANSWER PROVIDED*

**Request Outside Medical Records:**
*NO ANSWER PROVIDED*

**Provider Line follow-up needed:**
☑No

**Additional Comments:**
*NO ANSWER PROVIDED*

## Save Log

| User Name | Audit Date |
|---|---|
| BALDAUF, FAWN LYNN | 6/14/2019 7:38:23 AM |

---

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By BALDAUF, FAWN LYNN, CRNP on 6/14/2019
7:38:23 AM

**BROWN, GARTOR KIKI** #NA6401

**DOB:** 7/22/1988 (31y)  **Location:** G-D-1009-01

## DC-472B - Progress Notes - Nursing

**Date/Time:**
06/13/2019 22:28

**Facility:**
SCI HUNTINGDON

**Subjective:**

**Objective:**

fellow nurse A Flasher responded to inmate's complaints of SOB when RHU nurse made staff aware this evening. When the nurse approached inmate's cell to assess respiratory status, inmate SaO2 was 99% on RA. The inmate then took the pulse oximetry and would not give it back to staff after several orders were given to do so. When the inmate failed to return the pulse oximetry, he was sprayed. He was then removed from cell and taken to the secure search area. Per the inmate, he had notified staff 4 hours before any attention was given to the matter. Inmate was made aware that the fellow nurse responded to him being SOB as soon as she was made aware by the RHU nurse. The inmate was then refusing to be stripped in the secure search area but finally complied. Attempts at assessment by the nurse A. Flasher were unsuccessful as the inmate was unwilling to cooperate. Inmate would not allowed photographs to be taken as well reporting they are not "treatment." The inmate then began calling A. Flasher a "dumb bitch" and became verbally aggressive. Medical then left the secure search area.

**Vitals Taken:**

☑No

**Assessment:**

na

**Plan:**

inmate to be placed on to sick call to address his asthma. Unwilling to speak with medical staff this evening.

**Other:**
NO ANSWER PROVIDED

**Add I/E/R:**
NO ANSWER PROVIDED

### Save Log

| User Name | Audit Date |
|---|---|
| DEDEA, ALEXA | 6/13/2019 10:36:23 PM |

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By DEDEA, ALEXA on 6/13/2019 10:36:23 PM

1 of 1

## DC-472 - Progress Note Medical Provider

**Date/Time:**
05/13/2019 07:23

**Facility:**
SCI HUNTINGDON

**Type of Progress Note:**
☑SOAP Note

**Subjective:**
PA LINE TO REVIEW XRAYS.

### Objective

### Vitals

| | |
|---|---|
| **Temp:** | **Respirations:** |
| *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* |
| **Blood Pressure:** | **O2 Sats:** |
| *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* |
| **Pulse:** | |
| *NO ANSWER PROVIDED* | |

**Objective Comments:**
NO ACUTE DISTRESS

### On-site Labs Results

**Select all On-site Labs that are being performed at the visit:**
*NO ANSWER PROVIDED*

**Assessment:**
XRAY RESULT REVIEW

### Plan

**Information:**
XRAYS REVIEWED. INMATE REQUESTING PRINTED COPY. INFORMED HIM HE CAN PUT IN A REQUEST TO MEDICAL RECORDS TO REVIEW HIS RECORDS. F/U PRN

**Medications:**
☑None Needed

**Select all that apply:**

---

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** BALDAUF, FAWN LYNN, CRNP **on** 5/13/2019
7:24:24 AM

*NO ANSWER PROVIDED*

## On-Site Lab to be Performed After the Visit on One Occasion

**Select Labs:**
*NO ANSWER PROVIDED*

**New Chronic Care Clinic Patient (Select all Chronic Clinics that apply):**
*NO ANSWER PROVIDED*

**Discontinue Chronic Care Clinic Patient:**
*NO ANSWER PROVIDED*

**Refer to (check all that apply):**
*NO ANSWER PROVIDED*

**Request Outside Medical Records:**
*NO ANSWER PROVIDED*

**Provider Line follow-up needed:**
☑No

**Additional Comments:**
*NO ANSWER PROVIDED*

### Save Log

| User Name | Audit Date |
|---|---|
| BALDAUF, FAWN LYNN | 5/13/2019 7:24:24 AM |

### Notes List

| Created On | Description | Category Name | Created By |
|---|---|---|---|
| 6/14/2019 8:40:10 AM | XRAYS NEGATIVE FOR ACUTE FRACTURE | ADDENDUM | BALDAUF, FAWN LYNN |

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By BALDAUF, FAWN LYNN, CRNP on 5/13/2019
7:24:24 AM

## DC-472K - Administrative Note

# For administrative notes ONLY. Do not document clinical information using this form.

**Facility:**

SCI HUNTINGDON

**Date:**

05/08/2019

**Time:**

11:42:35

**Narrative:**

refused to sign ROI

### Save Log

| User Name | Audit Date |
|---|---|
| HOFFMASTER, ANN | 5/8/2019 11:43:04 AM |

**DC-472K - Administrative Note**

DC-472K - Administrative Note -- Narrative textbox for Administrative Notes only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By HOFFMASTER, ANN, LPN on 5/8/2019 11:43:04 AM

## DC-472B - Progress Notes - Nursing

**Date/Time:**

05/07/2019 03:53

**Facility:**

SCI HUNTINGDON

**Subjective:**

NONE

**Objective:**

CHART REVIEWED AND DC-108A AND DC-481 COMPLETED. CHART REFRESHED AND VERIFIED FORMS COMPLETED.

**Vitals Taken:**

☑No

**Assessment:**

NONE

**Plan:**

NONE

**Other:**

*NO ANSWER PROVIDED*

**Add I/E/R:**

*NO ANSWER PROVIDED*

### Save Log

| User Name | Audit Date |
|---|---|
| KINKAID, THERESA | 5/7/2019 3:55:41 AM |

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By KINKAID, THERESA, RN on 5/7/2019 3:55:41 AM

**BROWN, GARTOR KIKI**  #NA6401

DOB: 7/22/1988 (31y)   Location: G-D-1009-01

## DC-472 - Progress Note Medical Provider

**Date/Time:**
05/03/2019 06:57

**Facility:**
SCI HUNTINGDON

**Type of Progress Note:**
☑ SOAP Note

**Subjective:**
SICK CALL: THE INMATE DID NOT WANT TO DISCUSS HIS MATTERS IN FRONT OF SECURITY. HE TOLD ME I WAS NOT FOLLOWING POLICY AND THREATENED TO FILE A GRIEVANCE. I INFORMED HIM HE DID NOT HAVE ANY OTHER OPTION. INMATE REPORTS THAT HE WAS INJURED LAST NIGHT WHEN THE GUARDS USED EXCESSIVE FORCE TO RESTRAIN HIM. HE STATES THAT HE HIT HIS HEAD ON THE WALL DURING THE INCIDENT. HE REPORTS THAT HE IS HAVING PAIN IN THE LEFT SIDE OF HIS HEAD, HIS LOWER BACK, HIS LEFT KNEE, HIS RIGHT HIP, HIS RIGHT ANKLE. HE DID NOT LOSE CONSCIOUSNESS WHEN HE FELL. HE DENIES ANY AND ALL OTHER COMPLAINTS AT PRESENT INCLUDING N/V/D, CP, AND SOB.

### Objective

### Vitals

**Temp:**
NO ANSWER PROVIDED

**Respirations:**
NO ANSWER PROVIDED

**Blood Pressure:**
NO ANSWER PROVIDED

**O2 Sats:**
NO ANSWER PROVIDED

**Pulse:**
NO ANSWER PROVIDED

**Objective Comments:**
NO ACUTE DISTRESS. A& O X 3. PERRL. MOVES ALL EXTREMETIES WITH NORMAL ROM. GAIT STEADY. NO WEAKNESS NOTED.

### On-site Labs Results

**Select all On-site Labs that are being performed at the visit:**
NO ANSWER PROVIDED

**Assessment:**
BACK PAIN, RIGHT HIP PAIN, NECK PAIN, HEADACHE, RIGHT ANKLE PAIN; LEFT KNEE PAIN

### Plan

**Information:**
XRAYS AND MOTRIN ORDERED. F/U PRN

**Medications:**

---

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By BALDAUF, FAWN LYNN, CRNP on 5/3/2019
7:06:09 AM

**BROWN, GARTOR KIKI**  #NA6401                                   DOB: 7/22/1988 (31y)   Location: G-D-1009-01

☑ Start New

**Select all that apply:**

☑ Ordered X-Rays

On-Site Lab to be Performed After the Visit on One Occasion

**Select Labs:**
*NO ANSWER PROVIDED*

**New Chronic Care Clinic Patient (Select all Chronic Clinics that apply):**
*NO ANSWER PROVIDED*

**Discontinue Chronic Care Clinic Patient:**
*NO ANSWER PROVIDED*

**Refer to (check all that apply):**
*NO ANSWER PROVIDED*

**Request Outside Medical Records:**
*NO ANSWER PROVIDED*

**Provider Line follow-up needed:**
☑ No

**Additional Comments:**
*NO ANSWER PROVIDED*

## Save Log

| User Name | Audit Date |
| --- | --- |
| BALDAUF, FAWN LYNN | 5/3/2019 7:06:09 AM |

---

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** BALDAUF, FAWN LYNN, CRNP on 5/3/2019
7:06:09 AM

## DC-472 - Progress Note Medical Provider

**Date/Time:**
08/08/2018 09:37

**SOAP Note or Full Progress Note:**
☑SOAP

**Facility:**
SCI HUNTINGDON

**Subjective:**

PT REPORTS CONTINUED SORE THROAT PAIN AND GENERALIZED ABD PAIN. PT REPORTS BLOOD IN STOOL AND NOW HAVING BM'S. PT HAD 2 BM'S YESTERDAY. PT DENIES FEVERS OR INCREASING ABD PAIN. PT STATES METAL WASN'T IN STOOL FROM YESTERDAY. PT UNCLEAR HOW TO USE STOOL CARDS.

**Objective:**

CONST: NAD, A&O X3

EARS: AURICLES/EAC'S WITHOUT DEFORMITY/EXUDATES, TM'S GOOD CONE OF LIGHT

MOUTH: LIPS/MUCOUSA MOIST WITHOUT CYANOSIS/LESIONS, PHARYNX WITHOUT ERYTHEMA/EXUDATES

LYMPH: NEGATIVE BILAT ANT/POST CERVICAL CHAIN AND SUPRACLAVICULAR LYMPHADENITIS

LUNGS: CTA BILAT WITHOUT R/R/CRACKLES

CARDIAC: RRR WITHOUT M/R/G

ABD: NO LUMPS OR PULSATILE MASSES, BS NORMORESONANT, SOFT, SUPPLE AND NONTENDER TO PALPATION WITHOUT ORGANOMEGALY, MILDLY TYMPANIC TO PERCUSSION.

NEURO: NORMAL GAIT, CN II-VII INTACT, SENSATION/MOTOR GROSSLY INTACT

**Assessment:**

ABD PAIN

**Plan:**

X-RAY TODAY. NSG TO INSTRUCT PT IN USE OF HEMOCCULT CARDS.

**Provider Line follow-up needed:**

☑No

**Additional Comments:**

NO ANSWER PROVIDED

### Save Log

| User Name | Audit Date |
| --- | --- |
| GESSEL, RANDYL | 8/8/2018 9:41:42 AM |

---

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By GESSEL, RANDYL, PA on 8/8/2018 9:41:42 AM

## DC-472 - Progress Note Medical Provider

**Date/Time:**                          **SOAP Note or Full Progress Note:**

08/07/2018 13:55                        ☑ SOAP

**Facility:**

SCI HUNTINGDON

**Subjective:**

LATE ENTRY FOR 8/6/18: PT REPORTS ABD PAIN AND PROFUSE RECTAL BLEEDING. PT REPORTS HE ACCIDENTLY SWALLOWED METAL OBJECT. PT REPORTS PAIN EVERY TIME HE SWALLOWS AND EVERY TIME HE HAS BM. PT DENIES N/V/D. PT REPORTS REGULAR BM'S THEN STATES LATER THAN HE HASN'T HAD BM FOR SEVERAL DAYS.

**Objective:**

CONST: NAD, A&O X3

EARS: AURICLES WITHOUT DEFORMITY

MOUTH: LIPS/MUCOUSA MOIST WITHOUT CYANOSIS/LESIONS

NEURO: NORMAL GAIT, SENSATION/MOTOR GROSSLY INTACT

**Assessment:**

ABD PAIN SECONDARY TO SWALLOWING FB

**Plan:**

WET READ OF X-RAY SHOWS FB IN RECTUM. SMALL AND VERY PASSABLE. REPEAT X-RAY ON WED.

HEMOCCULTS X3 TO PT WITH INSTRUCT VIA NSG. LABS INCLUDING CBC, CMP, AMYLASE. PE IN AM.

**Provider Line follow-up needed:**

☑ Yes

**Comment on Follow-up:**
PA LINE IN AM FOR PE

**Additional Comments:**

*NO ANSWER PROVIDED*

### Save Log

| User Name | Audit Date |
|---|---|
| GESSEL, RANDYL | 8/7/2018 1:59:35 PM |

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By GESSEL, RANDYL, PA on 8/7/2018 1:59:35 PM

## DC-472B - Progress Notes - Nursing

**Date/Time:**
08/06/2018 17:37

**Facility:**
SCI HUNTINGDON

**Subjective:**
none

**Objective:**
dry cell removal.

**Assessment:**
no noted or voiced injuries, denies any pain/discomfort.  pictures taken as per policy

**Plan:**
· sick call as needed

**Other:**
*NO ANSWER PROVIDED*

**Add I/E/R:**
☑No

### Save Log

| User Name | Audit Date |
|---|---|
| TRICE, ANATA | 8/6/2018 5:38:17 PM |

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By TRICE, ANATA, LPN on 8/6/2018 5:38:17 PM

1 of 1

## DC-472B - Progress Notes - Nursing

**Date/Time:**

08/06/2018 12:05

**Facility:**

SCI HUNTINGDON

**Subjective:**

DRY CELL PLACEMENT

**Objective:**

DR. DANCHA ORDERED INMATE PLACED INTO DRY CELL DUE TO SWALLOWING A METAL FOREIGN BODY AS NOTED ON CXR THIS AM. INMATE ESCORTED FROM RHU SECURE STRIP AREA BY SECURITY TO BB1002. PICTURES TAKEN PRIOR TO ESCORT. INMATES LEFT WRIST SECURED TO WALL. CIRCULATION WITHIN NORMAL LIMITS. NO INJURIES VOICED OR NOTED.

**Assessment:**

NONE

**Plan:**

WILL MONITOR AND OFFER EXERCISE EVERY 2 HRS.

**Other:**

*NO ANSWER PROVIDED*

**Add I/E/R:**

☑No

### Save Log

| User Name | Audit Date |
|---|---|
| WAGMAN, MELANIE | 8/6/2018 12:52:15 PM |

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By WAGMAN, MELANIE, LPN on 8/6/2018 12:52:15 PM

BROWN, GARTOR KIKI  #NA6401                                          DOB: 7/22/1988 (31y)  Location: G-D-1009-01

## DC-472B - Progress Notes - Nursing

**Date/Time:**
08/06/2018 11:41

**Facility:**
SCI HUNTINGDON

**Subjective:**
NONE

**Objective:**
NOTIFIED BY R. GESSEL PAC THAT INMATE SHOWS A SECOND FOREIGN BODY ON HIS XRAY AND IS DIFFERENT FROM PREVIOUS FOREIGN BODY. PER PAC GESSEL INMATE MAY NEED TO BE PLACED INTO A DRY CELL. AND IS REQUESTING PSYCH TO SPEAK ABOUT THIS MATTER. INMATE IN NO DISTRESS.  INMATE IS TO TRANSFER TO ANOTHER SCI ON 8/7/18 .

**Assessment:**
NONE

**Plan:**
NOTIFIED P. PRICE CHCA, DR DANCHA ( STATES " HAS TO BE IN DRY CELL AND HIS TRANSFER WILL BE MEDICALLY HELD)  LT SNYDER (RHU) NOTIFIED AND WILL  NOTIFY COMMAND.  A. WAKEFIELD (RECORDS) NOTIFIED AND  SHE WILL CANCEL TRANSFER.

**Other:**
*NO ANSWER PROVIDED*

**Add I/E/R:**
☑No

### Save Log

| User Name | Audit Date |
|---|---|
| WAGMAN, MELANIE | 8/6/2018 11:45:19 AM |

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By WAGMAN, MELANIE, LPN on 8/6/2018 11:45:19 AM

## DC-472 - Progress Note Medical Provider

**Date/Time:**                          **SOAP Note or Full Progress Note:**

08/03/2018 08:55                        ☑SOAP

**Facility:**

SCI HUNTINGDON

**Subjective:**

SICK CALL. PATIENT IS STILL C/O ON GOING PAIN STARTING FROM THE BACK POF HIS THROAT TO LOWER PART OF HIS BELLY. NO CHNAGE IN PAIN. HE STILL CLAIMS THAT HE DID NOT PASS PIECE OF METAL.. PATIENT IS HAVING BM. PATIENT VERY AGITATED TODAY AND WANTING TO FILE A GRIEVANCE I TOLD PT THAT I DON'T KNOW ANYTHING ABOUT SUBJECT. I TRIED RE-DIRECTING PATIENT SEVERAL TIMES, BUT HE CONTINUED TO SPEAK ABOUT THE GRIEVNCE. PATIENT CONCERNED THAT MEDICAL WAS NOT CONTACTED UNTILO WED 8/1/18 REGARDING THIS PROBLEM. I INDICATED TO PATIENT THAT THIS IS WHEN WERE WE NOTIFIED. HE DEMANDING TO KNOW WHY IT TOOK SO LONG TO PUT THE SICK CALL INTO MEDICAL DEPT. I EXPLAINED TO THE PATIENT NUMEROUS TIMES, THAT I DIDN'T KNOW THE ANSWER TO THAT QUESTION AND THAT HE CAN PUT IN A grievance, as patient already did, to find out why the sick call took so long to get to medical department. PATIENT VERY ARGUMENTIVE AND CONTINUES TO REPEAT THE SAME QUESTIONS THAT I ALREADY ANSWERED.

**Objective:**

PATIENT STANDING IN AT THE CELL DOOR IN NAD. PATIENT IS STANDING IN XRAY ROOM IN NO OBIOUS DIETRESS. HE ALSO WALKED DOWN THE HALLWAY WITH NO EVIDENCE OF ABDOMINAL PAIN.

**Assessment:**

INGESTION OF FOREIGN BODY/METAL BODY LAST SEEN IN SIGMOID COLON

**Plan:**

ABD XRAY TO BE REPEATED TODAY. MEDICAL NEEDS TO DO A WET READ OF XRAY. PATIENT ARGUMENTIVE WHEN HE CAME DOWN TO XRAY, HE REFUSES NOW TO GET XRAYS. HE WANTS HIS QUESTIONS ANSWERED AS TO WHY WE DIDN'T SEE HIM UNTIL 8/1/2018. I EXPLAINED TO PATIENT NUMEROUS TIMES THAT WE DIDN'T GET THE SICK CALL UNTIL 8/1/2018. AND THEN PATIENT WANTED TO KNOW IT TOOK SO LONG TO PUT THE SICK CALL INTO THE MEDICAL DEPT.. I EXPLAINED TO PATIENT NUMEROUS TIMES THAT I DON'T KNOW THE ANSWER TO THIS QUESTION. HE ALSO SAID THAT SOMEONW TOLD HIM THAT HE WOULD BE SEEING THE DOCTOR WHEN HE COMES DOWN FOR HIS XRAYS. WHEN I ASK HIM WHO TOLD HIM THAT, THEN PATIENT REFUSED TO ANSWER THAT QUESTION. PATIENT WAS ASKING SEVERAL TIMES BY MYSELF, GUARDS AND XRAYS TECH, IF WANTED TO HAVE THE XRAY DONE TODAY TO GIVE HIM THE INFORMATION THAT THE METAL FOREIGN BODY HAS PASTED AS OF YET. AS THTAT HIS WOULD  BE THE BEST THING TO DO AT THIS TIME TO GIVE HIM PIECE THAT HE PASSED THIS FOREIGN BODY; PATIENT CONTINUED TO REFUSE. THEN PATIENT REFUSED TO A REFUSAL FORM. PATIENT CLAIMS THAT HE WILL PUT ANOTHER SICK CALL IN NEXT WEEK IF THE ABDOMINAL PAIN IS STILL PERSISTING.

**Provider Line follow-up needed:**

☑No

**Additional Comments:**

*NO ANSWER PROVIDED*

### Save Log

| User Name | Audit Date |
|---|---|
| BUCKLEY, BARBARA M | 8/3/2018 3:07:48 PM |

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By BUCKLEY, BARBARA M, PA on 8/3/2018 3:07:48 PM

1 of 1

**BROWN, GARTOR KIKI**  #NA6401                                    DOB: 7/22/1988 (31y)   Location: G-D-1009-01

## DC-472 - Progress Note Medical Provider

**Date/Time:**                                    **SOAP Note or Full Progress Note:**
08/01/2018 14:06                                  ☑SOAP

**Facility:**
SCI HUNTINGDON

**Subjective:**

SICK CALL. PATIENT WAS ON SICK CALL, BUT PATIENT COULD NOT BE FOUND IN RHU. PATIENT CLAIMS THAT HE SWALLOWED A PIECE OF METAL AND AN XRAY HAS ALREADY BEEN DONE. XRAY HAS NEVER BEEN DONE. WHEN PATIENT SEEN AT XRAY, HE CLAIMS THAT CEO PUT METAL IN HIS FOOD AND HE SWALLOWED THIS OVER THE PAST WEEKEND. BM ARE SOFT. PATIENT CLAIMS LAST BM WAS ON MONDAY, BUT HE DIDN'T SEE ANY METAL IN BM. PATIENT C/O "PAIN FROM MY THROAT ALL THE WAY DOWN TO THE BOTTOM OF MY BELLY". PATIENT CLAIMS THAT EVERYTHING HE SWALLOWS, EVEN HIS SPIT, CAUSES PAIN FROM THROAT DOWN TO THE BOTTOM OF HIS BELLY.

**Objective:**

ABDOMEN BS NORMAL. SOFT AND NOT TENDER. WHEN PATIENT IS SITTING AND LYING BACK ON THE TABLE, HE IS C.O ALL THIS PAIN FROM HIS THROAT , AND ALL THE WAY DOWN TO BOTTOM OF HIS ABDOMEN. BUT WHEN PATIENT WAS DISTRACTED, PATIENT DID NOT RESPOND TO DEEP PALPATIONS, NO GUARDING OR REBOUND. XRAY SHOWED A SMALL TWISTED PIECE OF METAL SEEN IN SIGMOID COLON.

**Assessment:**

ALLEGATION AS PER PATIENT OF " SWALLOWING A PIECE OF METAL."

**Plan:**

INITAL XRAY DONE 8/2/2018 WITH PIECE OF METAL SEEN IN THE SIGMOID COLON. REPEAT ABD XRAYS IN 2 DAYS

**Provider Line follow-up needed:**

☑Yes

**Comment on Follow-up:**
*NO ANSWER PROVIDED*

**Additional Comments:**
*NO ANSWER PROVIDED*

### Save Log

| User Name | Audit Date |
|---|---|
| BUCKLEY, BARBARA M | 8/1/2018 3:38:28 PM |

---

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By BUCKLEY, BARBARA M, PA on 8/1/2018 3:38:28 PM

## DC-472B - Progress Notes - Nursing

**Date/Time:**

07/31/2018 12:43

**Facility:**

SCI HUNTINGDON

**Subjective:**

Just don't even get involved lets this go so I can get something act like you nothing. Just let this all happen

**Objective:**

during assessment with inmate. CO1 tucker noted to leave to get the inmate a pen to sign his sick call at that time inmate began to voice the above to this nurse

**Assessment:**

acusation of swallowing metal

**Plan:**

sick call placed

**Other:**

*NO ANSWER PROVIDED*

**Add I/E/R:**

☑No

### Save Log

| User Name | Audit Date |
|---|---|
| EMIGH, NICHOLE | 7/31/2018 12:44:58 PM |

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** EMIGH, NICHOLE, RN on 7/31/2018 12:44:58 PM

**BROWN, GARTOR KIKI** #NA6401

DOB: 7/22/1988 (31y)  **Location:** G-D-1009-01

## DC-472B – Progress Notes – Nursing

**Date/Time:**

07/31/2018 12:24

**Facility:**

SCI HUNTINGDON

**Subjective:**

I swallowed a piece of metel on the 26th in my food.

**Objective:**

inmate noted to take TB at this time, after this nurse assessed the inmate. Inmate voiced he swallowed a small piece of metal that was in his food on the 26th of this month. TPR 98.7-88-20 Bp 120/64 SpO2 98% room air. Lung sounds clear bowel sounds active, abdomen is soft non distended. No complaints of palpation. Skin is warm and dry. Turgor is less then 3 seconds as well as capillary refill. There is no acute distress. There is no lesion in mouth from swallowing questionable metal. Inmate asked why he didn't spit the metal out and inmate voiced "i didn't know I swallowed it" inmate did not visualize the metal and has not passed a metal in a bowel movement. PA Gessel made aware of inmate concern. and sick call was placed.

**Assessment:**

no deviations from baseline noted

**Plan:**

placed on sick call

**Other:**

*NO ANSWER PROVIDED*

**Add I/E/R:**

☑No

### Save Log

| User Name | Audit Date |
|---|---|
| EMIGH, NICHOLE | 7/31/2018 12:31:49 PM |

**DC-472B – Progress Notes – Nursing**
Progress Note for Nursing use

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By EMIGH, NICHOLE, RN on 7/31/2018 12:31:49 PM**

1 of 1

## DC-472K - Progress Note - Medical Narrative

**Facility:**

SCI HUNTINGDON

**Date:**

07/30/2018

**Time:**

11:45:08

**Narrative:**

INMATE REFUSED TST. WOULD NOT COME TO CELL DOOR TO BE EVALUATED OR EDUCATED ON REFUSING TST.

### Save Log

| User Name | Audit Date |
|-----------|-----------|
| WAGMAN, MELANIE | 7/30/2018 11:46:05 AM |

---

**DC-472K - Progress Note - Medical Narrative**
DC-472K - Progress Note - Medical Narrative -- Narrative textbox for Medical

**Patient Name: BROWN, GARTOR KIKI**
**Patient Number: NA6401**
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By WAGMAN, MELANIE, LPN on 7/30/2018 11:46:05
AM

## DC-472B - Progress Notes - Nursing

**Date/Time:**
07/29/2018 11:53

**Facility:**
SCI HUNTINGDON

**Subjective:**
refused tb test

**Objective:**
refused tb test

**Assessment:**
na

**Plan:**
follow up in am continue offering

**Other:**
NO ANSWER PROVIDED

**Add I/E/R:**
☑No

### Save Log

| User Name | Audit Date |
|-----------|-----------|
| MCNELLY, DEREK | 7/29/2018 11:54:37 AM |

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By MCNELLY, DEREK, LPN on 7/29/2018 11:54:37
AM

## DC-472B - Progress Notes - Nursing

**Date/Time:**

07/28/2018 11:36

**Facility:**

SCI HUNTINGDON

**Subjective:**

Tb test refused

**Objective:**

tb test offered inmate refused

**Assessment:**

n/a

**Plan:**

continue offering daily

**Other:**

*NO ANSWER PROVIDED*

**Add I/E/R:**

☑No

### Save Log

| User Name | Audit Date |
|---|---|
| MCNELLY, DEREK | 7/28/2018 11:36:59 AM |

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By MCNELLY, DEREK, LPN on 7/28/2018 11:36:59 AM

## DC-472B - Progress Notes - Nursing

**Date/Time:**

07/27/2018 21:09

**Facility:**

SCI HUNTINGDON

**Subjective:**

**Objective:**

Inmate standing at his door with a sock puppet. No signs or symptoms of distress.

**Assessment:**

n/a

**Plan:**

Continue to monitor

**Other:**

*NO ANSWER PROVIDED*

**Add I/E/R:**

☑No

### Save Log

| User Name | Audit Date |
|---|---|
| DEDEA, ALEXA | 7/27/2018 9:10:07 PM |

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
**Electronically Signed By DEDEA, ALEXA on 7/27/2018 9:10:07 PM**

## DC-472B - Progress Notes - Nursing

### Date/Time:
07/27/2018 13:04

### Facility:
SCI HUNTINGDON

### Subjective:
Swallowed metal object

### Objective:
Unable to confirm

### Assessment:
IM states that on 7/26/18 at approximately 1615, he swallowed what he believes was a metal object. IM states he did not see the object prior to putting into his mouth, bit down on it and then swallowed before spitting out. States that he laid on the floor yelling for medical with no response and spit up blood. Unable to confirm report. Looked in inmate's mouth, no cuts or bleeding noted. IM denies having a BM since the incident and denies any blood or active bleeding from his rectum. No active bleeding or vomiting at this time. IM used a sock on his hand to as a conversation tool during this interaction.

### Plan:
s/c f/u prn. Mental health referral form completed.

### Other:
*NO ANSWER PROVIDED*

### Add I/E/R:
☑No

## Save Log

| User Name | Audit Date |
|---|---|
| WHITESEL, ASHLEY | 7/27/2018 1:08:18 PM |

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

**Patient Name: BROWN, GARTOR KIKI**
**Patient Number: NA6401**
**Location: G-D-1009-01**
**DOB: 7/22/1988**
**Facility: SCI HUNTINGDON**
**Electronically Signed By WHITESEL, ASHLEY, LPN on 7/27/2018 1:08:18 PM**

## DC-472B - Progress Notes - Nursing

**Date/Time:**
07/27/2018 10:41

**Facility:**
SCI HUNTINGDON

**Subjective:**
TB Refusal

**Objective:**
TB Offer

**Assessment:**
Offered IM TB test as indicated. IM verbally refuses.

**Plan:**
Continue with TB protocol

**Other:**
*NO ANSWER PROVIDED*

**Add I/E/R:**
☑No

### Save Log

| User Name | Audit Date |
|---|---|
| WHITESEL, ASHLEY | 7/27/2018 10:42:34 AM |

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
**Electronically Signed By WHITESEL, ASHLEY, LPN on** 7/27/2018 10:42:34
AM

1 of 1

## DC-472B - Progress Notes - Nursing

**Date/Time:**

07/26/2018 07:25

**Facility:**

SCI HUNTINGDON

**Subjective:**

TB Refusal

**Objective:**

TB Refusal

**Assessment:**

Offered IM TB test as indicated.  IM verbally refused.

**Plan:**

Cont to offer to IM, keep ICN informed

**Other:**

*NO ANSWER PROVIDED*

**Add I/E/R:**

☑No

### Save Log

| User Name | Audit Date |
| --- | --- |
| WHITESEL, ASHLEY | 7/26/2018 7:25:58 AM |

**DC-472B - Progress Notes - Nursing**
Progress Note for Nursing use

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By WHITESEL, ASHLEY, LPN on 7/26/2018 7:25:58
AM

## DC-472 - Progress Note Medical Provider

**Date/Time:**                          **SOAP Note or Full Progress Note:**
07/13/2018 07:19                        ☑ SOAP

**Facility:**
SCI HUNTINGDON

**Subjective:**

N/A

**Objective:**

PT REFUSED TO SIGN PAPERWORK FOR SICK CALL. PT TO F/U PRN.

**Assessment:**

N/A

**Plan:**

N/A

**Provider Line follow-up needed:**

☑ No

**Additional Comments:**

*NO ANSWER PROVIDED*

Save Log

| User Name | Audit Date |
| --- | --- |
| GESSEL, RANDYL | 7/13/2018 7:20:11 AM |

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
**Electronically Signed By** GESSEL, RANDYL, PA **on 7/13/2018 7:20:11 AM**

## DC-586M Chest Pain

**Current Facility:**
SCI HUNTINGDON

**Military Time Seen:**
15:24

**Date of Report:**
07/12/2018

### Subjective

*TO BE COMPLETED BY LPN/RN/RNS*

**Chief Complaint(s):**
chest pain

**Onset:**
in cell

**Activity prior to onset:**
none

**History:**
none

## Description of Pain:

**Is the pain reproducible?**
☑No

**Duration of Pain:**
unknown

**Does anything relieve the pain?**
☑No

**Onset of Pain:**
☑New onset

**Pain scale (1-10):**
0

**History of injury?**
☑No

**Radiation:**
☑No

**Aggravating Factors:**
*NO ANSWER PROVIDED*

---

**DC-586M - Chest Pain NET**
DC-586M - Chest Pain NET

**Patient Name:** BROWN, GARTOR KIKI  .
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** ESPINOSA, JOHNATHAN, RN on 7/12/2018
6:03:12 PM

**BROWN, GARTOR KIKI** #NA6401                              DOB: 7/22/1988 (31y)   Location: G-D-1009-01

**Associated Symptoms:**
*NO ANSWER PROVIDED*

**Cardiac Risk Factors:**
*NO ANSWER PROVIDED*

**History of:**
*NO ANSWER PROVIDED*

## Objective

*TO BE COMPLETED BY LPN/RN/RNS*

**Vitals Taken:**
☑Yes

> ## Vital Signs
>
> **Temperature:**
> 98.1
>
> **Pulse Rate:**
> 89
>
> **Respiratory Rate:**
> 16
>
> **Blood Pressure:**
> 122/70
>
> **Pulse Ox%:**
> 98
>
> **(Pulse Ox% continued):**
> ☑Room Air

**General Appearance:**
☑No acute distress

**Color:**
☑Normal

**Skin:**
☑Warm

**EKG completed?**
☑Yes

**EKG interpretation/computer read or available for physician?**

---

**DC-586M - Chest Pain NET**
DC-586M - Chest Pain NET

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** ESPINOSA, JOHNATHAN, RN **on** 7/12/2018
6:03:12 PM

☑Yes

## Lung Sounds:

**Right Lung**

☑Clear

**Left Lung**

☑Clear

**Additional Examination:**

Inmate was found unconscious in cell after complaining about chest pain. medical arrived and transferred inmate to medical via stretcher. Vital signs assessment and EKG completed. Inmate referred to Dr. Petz for additional orders. inmate was ordered to be placed back in RHU with no medical restrictions. inmate will be seen 7/13/2018 for follow up.

## Assessment

*TO BE COMPLETED BY RN/RNS*

**Referral:**

☑Required

**Referral Required due to the following (check all that apply):**

☑Other

**Specify "Other":**

. protocol

Comment:You should contact a physician, physician extender, and/or a nursing supervisor if you have any concerns about the status of the patient or are unsure of the appropriate care to be given.

## Plan

*TO BE COMPLETED BY RN/RNS*

***Acute distress*** - arrange for immediate emergency transport

**Check all that apply:**

☑Education: the patient demonstrates an understanding of the nature of their medical condition and instructions regarding what they should do as well as appropriate follow-up.

**Referral:**

☑No

**Schedule for return to Sick Call:**

☑Yes

---

**DC-586M - Chest Pain NET**
DC-586M - Chest Pain NET

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** ESPINOSA, JOHNATHAN, RN on 7/12/2018
6:03:12 PM

BROWN, GARTOR KIKI  #NA6401                                    DOB: 7/22/1988 (31y)  Location: G-D-1009-01

## Save Log

| User Name | Audit Date |
|---|---|
| ESPINOSA, JOHNATHAN | 7/12/2018 6:03:12 PM |

## Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| ESPINOSA, JOHNATHAN | 7/12/2018 6:03:12 PM | Form Processed Approval | False |

---

**DC-586M - Chest Pain NET**
DC-586M - Chest Pain NET

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By ESPINOSA, JOHNATHAN, RN on 7/12/2018
6:03:12 PM

## DC-472 - Progress Note Medical Provider

**Date/Time:**                          **SOAP Note or Full Progress Note:**

07/12/2018 16:13                        ☑ SOAP

**Facility:**

SCI HUNTINGDON

**Subjective:**

chest pain

**Objective:**

brought to med clinic on gurney would not respond to verbal stimuli but would respond to touch.  had pain at left costochrondral junction. VSS PE:awake with good eye movements opened mouth at my request no abnormalities noted chest clear  heart  RRR no murmur rate 80  abdomen soft non tender  BS normal.  extremities all intact good pulses  neuro no deficits

**Assessment:**

atypical chest pain, muted responses

**Plan:**

may return to RHU follow up PRN

**Provider Line follow-up needed:**

☑ No

**Additional Comments:**

NO ANSWER PROVIDED

### Save Log

| User Name | Audit Date |
|-----------|------------|
| PETZ, DARRELL | 7/12/2018 4:27:24 PM |

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By PETZ, DARRELL, MD on 7/12/2018 4:27:24 PM

1 of 1

when reviewed visit with pt and treatment plan he stated " my dad is a doctor and I needed these tests"

reviewed with PREA and nursing supervisory staff and it was noted that protocol was followed and pt refused several steps during the process but that what pt would permit was followed

**Other:**

*NO ANSWER PROVIDED*

## Save Log

| User Name | Audit Date |
|---|---|
| KING, KATHERINE | 2/23/2018 8:44:20 AM |

---

**DC-472 - Progress Note Medical Provider**
DC-472 - Progress Note - For Medical Provider use only

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By KING, KATHERINE, PA on 2/23/2018 8:44:20 AM

## DC-472K - Progress Note - Medical Narrative

**Facility:**

SCI HUNTINGDON

**Date:**

02/22/2018

**Time:**

07:43:06

**Narrative:**

Pt placed a sick call for finger per sick call. Pt noted this morning the his finger is fine and healed over. He has no swelling no drainage . the open area has scabbed over. Pt was educated that if has other issues to place additional sick calls.

### Save Log

| User Name | Audit Date |
|---|---|
| KING, KATHERINE | 2/22/2018 7:52:13 AM |

---

**DC-472K - Progress Note - Medical Narrative**
DC-472K - Progress Note - Medical Narrative -- Narrative textbox for Medical

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** KING, KATHERINE, PA on 2/22/2018 7:52:13 AM

## DC-472K - Progress Note - Medical Narrative

**Date:**

01/24/2018

**Time:**

12:17

**Narrative:**

Inmate seen in RHU. Inmate stated he is "having shortness of breath and chest pain". This nurse informed this inmate that he would need to sign a cash and would be charged five dollars. Inmate stated, "Im not signing anything". I informed this inmate that I wouldn't be able to see him if he doesn't sign because that's the policy. Inmate still refused to sign. Inmate was breathing without distress and able to talk without effort. HReihart LPN

### Save Log

| User Name | Audit Date |
|---|---|
| REIHART, HALLIE | 1/24/2018 12:26:37 PM |

**DC-472K - Progress Note - Medical Narrative**
DC-472K - Progress Note - Medical Narrative -- Narrative textbox for Medical

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By REIHART, HALLIE, LPN on 1/24/2018 12:26:37 PM

## DC-481 - Medical Release Summary

**Current Facility:**

SCI HUNTINGDON

| Last 4 digits of SSN: | Weight: |
|---|---|
| 3060 | 140 lbs - 2018-08-13 12:15 |
| Height: | Age |
| 5-8 | 30 |

**Allergies:**

FISH
PEANUT ALLERGY

### Current Housing Needs:

**Where is patient coming from?**

☑ Other

> **If Other specify location patient is coming from:**
> DTU

\* Skilled Nursing Care is defined as a service that must be provided by an RN or LPN.
\* Personal Care is defined as service performed by unlicensed workers to assist in meeting Activities of Daily Living.

### Activities of Daily Living:

**Any Employment Restrictions?:**

☑ No

**Can patient complete Activities of Daily Living?:**

☑ Yes

> **Can patient self-complete Activities of Daily Living?**
> ☑ Yes

**Visually impaired?:**

☑ No

**Hearing impaired?:**

☑ No

**Primary language:**

☑ English

### Chronic Conditions

---

**DC-481 - Medical Release Summary**

DC-481 - Medical Release Summary — Form to be filled out when patient is to be released.

**Patient Name: BROWN, GARTOR KIKI**
**Patient Number: NA6401**
**Location: G-D-1009-01**
**DOB: 7/22/1988**
**Facility: SCI HUNTINGDON**
**Electronically Signed By KINKAID, THERESA, RN on 5/7/2019 3:40:08 AM**

**Diagnosis - Including Medical, Psychiatric, and Dental (Do not use abbreviations in free text):**

J45.909 - Asthma, unspec. - [OKUROWSKI, JUSTINE] - 2017-08-09
G89.21 - Pain, chronic, due to trauma - [GOMES, MICHAEL] - 2017-11-17

**Current end-stage cancer:**

☑No

**Hospice patient/Palliative treatment:**

☑No

## Infection Control:

**Last PPD/Review:**

2018-08-02 - Negative - Size: 0.000mm

**Results of Review:**
*NO ANSWER PROVIDED*

**Last Chest X-ray:**

2017-07-27 - Normal

**Is Treatment for Latent TB Known:**

☑No

## Chronic Care:

**Check Any Conditions That Apply:**
*NO ANSWER PROVIDED*

## Medication:

**Medications:**

IBUPROFEN 600MG TABLET -- [TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY] -- 2019-05-03--2019-05-16

**Check All That Apply to the Above Medications:**
*NO ANSWER PROVIDED*

**Immunizations:**
*NO ANSWER PROVIDED*

## Female Section (If Applicable):

**Pregnant:**
*NO ANSWER PROVIDED*

**Last pap (date):**
*NO ANSWER PROVIDED*

---

**DC-481 - Medical Release Summary**
DC-481 - Medical Release Summary – Form to be filled out when patient is to be released.

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By KINKAID, THERESA, RN on 5/7/2019 3:40:08 AM

**Last mammogram:**
*NO ANSWER PROVIDED*

## Follow-up Care:

**Required Follow-up Care (Check All That Apply):**
☑ Follow-up with Family Physician as needed

**Bladder/Bowel Incontinence?**
☑ No

**Which approved medical aids will accompany patient:**
☑ None

**Release DC-481 per corresponding DC-108A:**
☑ Yes

## Save Log

| User Name | Audit Date |
|---|---|
| KINKAID, THERESA | 5/7/2019 3:40:08 AM |

---

**DC-481 - Medical Release Summary**
DC-481 - Medical Release Summary – Form to be filled out when patient is to be released.

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By KINKAID, THERESA, RN on 5/7/2019 3:40:08 AM

DOB: 7/22/1988 (31y)  Location: G-D-1009-01

## DC-488 - Snellen Visual Acuity Test

**Current Facility:**
SCI HUNTINGDON

**Date:**
06/21/2019

**Military Time:**
1115

### Distance - Snellen Acuity Test

| Distance Corrected Both Eyes: | Distance Corrected Right Eye: | Distance Corrected Left Eye: |
|---|---|---|
| 20/70 | 20/70 | 20/70 |
| **Distance Non-Corrected Both Eyes:** | **Distance Non-Corrected Right Eye:** | **Distance Non-Corrected Left Eye:** |
| 0 | 0 | 0 |

### Near - Snellen Acuity Test

| Near Corrected Both Eyes: | Near Corrected Right Eye: | Near Corrected Left Eye: |
|---|---|---|
| 20/200 | 20/200-2 | 20/200-2 |
| **Near Non-Corrected Both Eyes:** | **Near Non-Corrected Right Eye:** | **Near Non-Corrected Left Eye:** |
| 0 | 0 | 0 |

**Additional Comments:**
inmate stated that he could not see anything without glasses. Did take glasses off for far and near vision testing and inmate was unable to see anything.

**Plan/Referrals:**
☑Refer to Eye Clinic

### Save Log

| User Name | Audit Date |
|---|---|
| HOFFMASTER, ANN | 6/21/2019 12:51:44 PM |

---

**DC-488 - Snellen Visual Acuity**
For recording the corrected and non-corrected eye acuity test results

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By HOFFMASTER, ANN, LPN on 6/21/2019 12:51:44 PM

## DC-481 - Medical Release Summary

**Current Facility:**

SCI HUNTINGDON

| Last 4 digits of SSN: | Weight: |
|---|---|
| 3060 | 140 |
| Height: | Age |
| 5-8 | 30 |

**Allergies:**

FISH
PEANUT ALLERGY

## Current Housing Needs:

**Where is patient coming from?**

☑ General Population

\* Skilled Nursing Care is defined as a service that must be provided by an RN or LPN.
\* Personal Care is defined as service performed by unlicensed workers to assist in meeting Activities of Daily Living.

## Activities of Daily Living:

**Any Employment Restrictions?:**

☑ No

**Can patient complete Activities of Daily Living?:**

☑ Yes

**Can patient self-complete Activities of Daily Living?**

☑ Yes

**Visually impaired?:**

☑ No

**Hearing impaired?:**

☑ No

**Primary language:**

☑ English

## Chronic Conditions

**Diagnosis - Including Medical, Psychiatric, and Dental  (Do not use abbreviations in free text):**

J45.909 - Asthma, unspec. - [OKUROWSKI, JUSTINE] - 2017-08-09
G89.21 - Pain, chronic, due to trauma - [GOMES, MICHAEL] - 2017-11-17

**Current end-stage cancer:**

---

**DC-481 - Medical Release Summary**
DC-481 - Medical Release Summary – Form to be filled out when patient is to
be released.

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By WILKINS, HOLLI, LPN on 12/19/2018 2:14:24 AM

☑No

**Hospice patient/Palliative treatment:**
☑No

## Infection Control:

**Last PPD/Review:**
2018-08-02 - Negative - Size: 0.000mm

**Results of Review:**
*NO ANSWER PROVIDED*

**Last Chest X-ray:**
2017-07-27 - Normal

**Is Treatment for Latent TB Known:**
☑No

## Chronic Care:

**Check Any Conditions That Apply:**
*NO ANSWER PROVIDED*

## Medication:

**Medications:**
XOPENEX HFA 45MCG INHALER -- [INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED] -- 2018-10-01--2019-04-28

**Check All That Apply to the Above Medications:**
*NO ANSWER PROVIDED*

**Immunizations:**
*NO ANSWER PROVIDED*

## Female Section (If Applicable):

**Pregnant:**
*NO ANSWER PROVIDED*

**Last pap (date):**
*NO ANSWER PROVIDED*

**Last mammogram:**
*NO ANSWER PROVIDED*

## Follow-up Care:

---

**DC-481 - Medical Release Summary**
DC-481 - Medical Release Summary -- Form to be filled out when patient is to be released.

**Patient Name:** BROWN, GARTOR KIKI
**Patient Number:** NA6401
**Location:** G-D-1009-01
**DOB:** 7/22/1988
**Facility:** SCI HUNTINGDON
**Electronically Signed By** WILKINS, HOLLI, LPN on 12/19/2018 2:14:24 AM

2 of 3

**BROWN, GARTOR KIKI** #NA6401                                    DOB: 7/22/1988 (31y)   Location: G-D-1009-01

**Required Follow-up Care (Check All That Apply):**
☑ Follow-up with Family Physician as needed

**Bladder/Bowel Incontinence?**
☑ No

**Which approved medical aids will accompany patient:**
☑ None

**Release DC-481 per corresponding DC-108A:**
☑ Yes

## Save Log

| User Name | Audit Date |
|---|---|
| WILKINS, HOLLI | 12/19/2018 2:14:24 AM |

**DC-481 - Medical Release Summary**
DC-481 - Medical Release Summary – Form to be filled out when patient is to
be released.

Patient Name: BROWN, GARTOR KIKI
Patient Number: NA6401
Location: G-D-1009-01
DOB: 7/22/1988
Facility: SCI HUNTINGDON
Electronically Signed By WILKINS, HOLLI, LPN on 12/19/2018 2:14:24 AM

**Sapphire** eMAR

**SYMBOL KEY**
A: ABSENT
*: SEE NOTES
H: HELD
M: MISSED
R: REFUSED
N: NO SHOW
C: COMPLETED

**SITE KEY**
1. ORALLY
2. RIGHT BUTTOCK (GLUTEUS)
3. LEFT BUTTOCK (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK
13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK LEFT
21. UPPER BACK RIGHT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT
25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MEDIPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR
37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT
49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT
61. FEMORAL VEIN LEFT
62. LOWER LEG LEFT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP RIGHT
67. TRICEP RIGHT
68. HAND LEFT
69. HAND RIGHT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

## ROUTINE MEDICATION

**START** 04/14/2016
**STOP** 01/09/2020
**RX** 14433312
**NA**

**MEDICATION**
Xopenex HFA 45mcg Inhaler - KOP
SUB FOR: LEVALBUTEROL HCL

INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED -

BALDAUF, FAWN - [MEDICAL]

| EFFECTIVE DATE | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | INHL SCHEDU LED | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| EFFECTIVE DATE | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| EFFECTIVE DATE | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| EFFECTIVE DATE | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Agency: SCI HUNTINGDON
SSN
Alt Num: 3060

**Diagnosis** Asthma, unspec - Fairly chronic, due to trauma
**Allergies** FISH, PEANUT ALLERGY
**Facility** HIC-SCI HUNTINGDON
**DOB** 07/22/1988.      Gender:M

G - D - 1005 - 01
BROWN, GARTOR KIKI - NAG101

**Sapphire eMAR**

**SYMBOL KEY**
A: ABSENT
*: SEE NOTES
H: HELD
M: MISSED
R: REFUSED
N: NO SHOW
S: LEFT SIDE
C: COMPLETED

**SITE KEY**
1. ORALLY
2. RIGHT BUTTOCK (GLUTEUS)
3. LEFT BUTTOCK (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK
13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK LEFT
21. UPPER BACK RIGHT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT
25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MEDIPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR
37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT
49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM LEFT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. LOWER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT
61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP LEFT
67. TRICEP RIGHT
68. HAND LEFT
69. HAND RIGHT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

## ROUTINE MEDICATION

**START** 04/18/2019 **STOP** 07/17/2019 **RX** 14004939 **NA**
Diclofenac Sod 75mg DR T - KOP
SUB FOR: VOLTAREN
TAKE 1 TABLET(S) ORALLY TWICE DAILY -
BALDAUF, FAWN - [MEDICAL]

**START** 06/14/2019 **STOP** 06/18/2020 **RX** 14037952 **NA**
Xopenex HFA 45mcg Inhaler - KOP
SUB FOR: LEVALBUTEROL HCL
INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED -
BALDAUF, FAWN - [MEDICAL]

Diagnosis: Asthma, unspec., Pain, chronic, due to trauma
Allergies: FISH, PEANUT-ALLERGY
Facility: HC- SCI HUNTINGDON
DOB: 07/22/1988    Gender: M
G - D - C 1009 - 01

**BROWN, GARTOR/KIKI - NA6401**

Agency: SCI HUNTINGDON
SSN:
Alt Num: 3060
JULY 2019
PAGE: 1 OF 1

**Sapphire** emAR

**SYMBOL KEY**
- A: ABSENT
- *: SEE NOTES
- H: HELD
- M: MISSED
- R: REFUSED
- N: NO SHOW
- C: COMPLETED

**SITE KEY**
1. ORALLY
2. RIGHT BUTTOCKS (GLUTEUS)
3. LEFT BUTTOCKS (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK
13. LEFT ARM (DELTOID) BACK
14. RIGHT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK LEFT
21. UPPER BACK RIGHT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT
25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MEDIPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR
37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT
49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT
61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP LEFT
67. TRICEP RIGHT
68. HAND LEFT
69. HAND RIGHT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

## ROUTINE MEDICATION

| | MEDICATION | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| START 06/14/2019 | **Diclofenac Sod 75mg DR T – KOP** | 11:00 | | | | | | | | | | | | | | | | | | | AH 10 | | | | | | | | | | | | |
| STOP 07/17/2019 | SUB FOR: VOLTAREN | QUANTITY GIVEN | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| RX 14908559 | TAKE 1 TABLET(S) ORALLY TWICE DAILY – | DAYS TO LAST | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NA | BALDAUF, FAWN – [MEDICAL] | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| | MEDICATION | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| START 06/14/2019 | **Xopenex HFA 45mcg Inhaler – KOP** | 11:00 | | | | | | | | | | | | | | | | | AH 1 | | AH 40 | | | | | | | | | | | | |
| STOP 01/29/2020 | SUB FOR: LEVALBUTEROL HCL | QUANTITY GIVEN | | | | | | | | | | | | | | | | | AH 24 | | AH 30 | | | | | | | | | | | | |
| RX 14833021 | INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY /S NEEDED – | DAYS TO LAST | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NA | BALDAUF, FAWN – [MEDICAL] | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| | | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| INIT | FULL NAME | INIT | FULL NAME | INIT | FULL NAME | INIT | FULL NAME |
|---|---|---|---|---|---|---|---|
| AH | HOFFMASTER, ANN | | | | | | |

**Diagnosis** Asthma, unspec.; Pain, chronic due to trauma
**Allergies** FISH, PEANUT ALLERGY
**Facility** RC – SCI HUNTINGDON
**DOB** 07/22/1998          **Gender** M
**G–D 1009–01**

**BROWN, GARTOR KIKI – NA6501**

Agency SCI HUNTINGDON
SSN
Alt.Num 3060

June 2019
PAGE 1 OF 1

ALL DOE-PRINTED NAMES BELONG TO THE FACILITY STAFF
REPORT GENERATED BY VY JACKSON AT 06/20/19 12:07:36 PM

# Sapphire eMAR

**SYMBOL KEY**
A: ABSENT
*: SEE NOTES
H: HELD
M: MISSED
R: REFUSED
N: NO SHOW
C: COMPLETED

**SITE KEY**
1. ORALLY
2. RIGHT BUTTOCKS (GLUTEUS)
3. LEFT BUTTOCKS (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID) BACK

13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK LEFT
21. UPPER BACK RIGHT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT

25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MEDIPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR

37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT

49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT

61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP RIGHT
67. TRICEP LEFT
68. HAND LEFT
69. HAND RIGHT
70. DORSOGLUTAL RIGHT
71. DORSOGLUTAL LEFT
72. VENTROGLUTAL RIGHT
73. VENTROGLUTAL LEFT

## ROUTINE MEDICATION

| MEDICATION | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ibuprofen 600mg Tablet – KOP** SUB FOR: MOTRIN | 07:00 | | | | MW | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | QUANTITY GIVEN | | | | MW 43 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | DAYS TO LAST | | | | MW 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | |

START 03/03/2019
STOP 03/14/2019
RX 13653689

TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY –

BAUDAUF, FAWN – (MEDICAL)

| INIT | FULL NAME | INIT | FULL NAME | INIT | FULL NAME | INIT | FULL NAME | INIT | FULL NAME | INIT | FULL NAME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MW | WAGMAN, MELANIE | | | | | | | | | | |

Diagnosis: Asthma unspec.; Pain, chronic, due to trauma
Allergies: FISH, PEANUT ALLERGY
Facility: HC: SCIHUNTINGDON
DOB: 07/22/1988    Gender: M
G - P - D: 1009 - 01

Alt Num 3060
SSN
Agency: SCIHUNTINGDON

BROWN GARTOR KIKI - NA6401

May 2019
PAGE 1 OF 1

REPORT GENERATED BY KY.JACKSON AT 8/6/2019 12:00:06 PM

ALL PRE-PRINTED NAMES IN SIGNATURE TABLES COMPLY WITH ELECTRONIC SIGNATURE GUIDELINES

**Sapphire eMAR**

**SYMBOL KEY**
A: ABSENT
*: SEE NOTES
H: HELD
M: MISSED
R: REFUSED
N: NO SHOW
C: COMPLETED

**SITE KEY**
1. ORALLY
2. RIGHT BUTTOCK (GLUTEUS)
3. LEFT BUTTOCK (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK
13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK LEFT
21. UPPER BACK RIGHT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT
25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MEDIPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR
37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT
49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT
61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP LEFT
67. TRICEP RIGHT
68. HAND LEFT
69. HAND RIGHT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

**ROUTINE MEDICATION**

**MEDICATION**
START 10/31/2018
STOP 04/28/2019

RX
N4799912
NA

**Xopenex HFA 45mcg Inhaler – KOP**
SUB FOR: LEVALBUTEROL HCL

INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED -

GESSEL, RANDYL – (MEDICAL)

HOUR | NON-SCHEDULED

**Diagnosis:** Asthma, unspec, Pain, chronic, due to trauma
**Allergies:** FISH, PEANUT ALLERGY
**Facility:** HC- SCI HUNTINGDON
**DOB:** 07/22/1988     **Gender:** M
**Alt Num:** 3060
**Agency:** SCI HUNTINGDON
**SSN:**

April 2019
PAGE 1 OF 1

G - D - 1009 - 01
BROWN, GARTOR KTK - NA6401

REPORT GENERATED BY KY.JACKSON AT 8/5/2019 12:00:38 PM

ALL PRE-PRINTED NAMES IN SIGNATURE TABLES COMPLY WITH EMPLOYEE...

# Sapphire eMAR

**SYMBOL KEY**
A: ABSENT
*: SEE NOTES
H: HELD
M: MISSED
N: NO SHOW
R: REFUSED
C: COMPLETED

**SITE KEY**
1. ORALLY
2. RIGHT BUTTOCKS (GLUTEUS)
3. LEFT BUTTOCKS (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK
13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK LEFT
21. UPPER BACK RIGHT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT
25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MIDPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR
37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT
49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT
61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP RIGHT
67. TRICEP LEFT
68. HAND RIGHT
69. HAND LEFT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

## ROUTINE MEDICATION

**MEDICATION**

START 10/01/2018
STOP 04/24/2019
RX
MA 54777913

**Xopenex HFA 45mcg Inhaler - KOP**
SUB FOR: LEVALBUTEROL HCL
INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED -
GESSEL, RANDYL - [MEDICAL]

HOUR | 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31 — NON_SCHEDULED

Diagnosis: Asthma, unspec, Pain, chronic, due to trauma
Allergies: FISH, PEANUT ALLERGY
Facility: KC - SCI HUNTINGDON
DOB 07/22/1988    Gender M
G - D - 1009 - 01
BROWN, CARLOR, KIKO - NA6401

Agency SCI HUNTINGDON
SSN
Alt Num 3060

March 2019
PAGE 1 OF 1

ALL PRE-PRINTED NAMES IN SIGNATURE TABLES COMPLY WITH ELECTRONIC SIGNATURE GUIDELINES

**Sapphire eMAR**

**SYMBOL KEY**

A: ABSENT
H: HELD
*: SEE NOTES
M: MISSED
R: REFUSED
N: NO SHOW
C: COMPLETED

**SITE KEY**

1. ORALLY
2. RIGHT BUTTOCKS (GLUTEUS)
3. LEFT BUTTOCKS (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK

13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK LEFT
21. UPPER BACK RIGHT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT

25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MEDIPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR

37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT

49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT

61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP RIGHT
67. TRICEP LEFT
68. HAND RIGHT
69. HAND LEFT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL RIGHT
73. VENTROGLUTEAL LEFT

## ROUTINE MEDICATION

| EFFECTIVE DATES | MEDICATION | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| START 10/01/2018 STOP 04/21/2019 | Xopenex HFA 45mcg Inhaler - KOP SUB FOR: LEVALBUTEROL HCL | 20:00 | | | | | | | CR 1 | | | | | | | | | | | | | | | | | | | | | | | | | |
| RX 14727412 | INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED - | QUANTITY GIVEN | | | | | | | CR 25 | | | | | | | | | | | | | | | | | | | | | | | | | |
| NA | GESSEL, RANDYL - (MEDICAL) | DAYS TO LAST | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |



| INIT | FULL NAME | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CR | RAMPER, COURTNEY | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

Diagnosis  Asthma, unspec., Pain, chronic, due to trauma
Allergies  FISH MEAT/ALLERGY
Facility   HC - SCI HUNTINGDON
DOB        07/22/1988   Gender: M       Alt Num: 3050
G - D - 1009 - 01
**BROWN, GARTIOR KTKC - NA6401**

Agency SCI HUNTINGDON
SSN

February 2019
PAGE 1 OF 1

**Sapphire** eMAR

**SYMBOL KEY**
A: ABSENT
*: SEE NOTES
H: HELD
M: MISSED
R: REFUSED
N: NO SHOW
C: COMPLETED

**SITE KEY**
1. ORALLY
2. RIGHT BUTTOCKS (GLUTEUS)
3. LEFT BUTTOCKS (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK
13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK LEFT
21. UPPER BACK RIGHT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT
25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MEDIPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR
37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT
49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT
61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP LEFT
67. TRICEP RIGHT
68. HAND LEFT
69. HAND RIGHT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

## ROUTINE MEDICATION

| MEDICATION | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**START** Xopenex HFA 45mcg Inhaler - KOP
**10/01/2018** SUB FOR: LEVALBUTEROL HCL
**RX 04/29/2018**
**NA 4/29/2018**
INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED -
GESSEL, RANDYL - [MEDICAL]

HOUR: 07:00
QUANTITY GIVEN: AD (5), AD 1 (5), AD 21 (5)
DAYS TO LAST

EFFECTIVE DATES / INIT / FULL NAME

FULL NAME: OERDA, ALEXA

Agency: SCI HUNTINGDON
SSN
Alt Num: 3060
January 2019
PAGE 1 OF 1

Diagnosis: Asthma, Unspec., Pain, chronic, due to trauma
Allergies: RISK: PEANUT ALLERGY
Facility: HE SCI HUNTINGDON
DOB: 07/22/1988    Gender: M
G-D-1009-01
BROWN, GARTOR KIKI - NA6401

**Sapphire** eMAR

**SYMBOL KEY**

A: ABSENT
*: SEE NOTES
H: HELD
M: MISSED
R: REFUSED
N: NO SHOW
C: COMPLETED

**SITE KEY**

1. ORALLY
2. RIGHT BUTTOCKS (GLUTEUS)
3. LEFT BUTTOCKS (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK

13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK LEFT
21. UPPER BACK RIGHT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT

25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MIDPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR

37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT

49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN LEFT

61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP LEFT
67. TRICEP RIGHT
68. HAND LEFT
69. HAND RIGHT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

## ROUTINE MEDICATION

| MEDICATION | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**EFFECTIVE DATES**
**START** 10/01/2018
**STOP** 04/21/2019

**RX** Xopenex HFA 45mcg Inhaler - KOP
SUB FOR: LEVALBUTEROL HCL

**NA** 48797912

INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED -

GESSEL, RANDYL - [MEDICAL]

| HOUR | NON-SCHEDULED | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**EFFECTIVE DATES**

**EFFECTIVE DATES**

**EFFECTIVE DATES**

**Diagnosis** Asthma Unspec., Pain chronic due to trauma
**Allergies** FISH, PEANUT ALLERGY
**Facility** HC. SCI HUNTINGDON
**Gender** M
**DOB** 07/22/1988
**G - I - D - 1009 - 01**
**BROWN, GARTOR KIKI - NA6101**

**Agency** SCI HUNTINGDON
**SSN**

Alt Num 3060

December 2018
PAGE 1 OF 1

REPORT GENERATED BY KY JACKSON AT 8/5/2019 12:00:35 PM

**Sapphire eMAR**

### SYMBOL KEY
A: ABSENT
*: SEE NOTES
H: HELD
K: MISSED
R: REFUSED
N: NO SHOW
C: COMPLETED

### SITE KEY
1. ORALLY
2. RIGHT BUTTOCKS (GLUTEUS)
3. LEFT BUTTOCKS (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK
13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK RIGHT
19. LOWER BACK LEFT
20. UPPER BACK RIGHT
21. UPPER BACK LEFT
22. UPPER CHEST RIGHT
23. UPPER CHEST LEFT
24. ABDOMEN UPPER QUADRANT RIGHT
25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MEDIPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR
37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT
49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN LEFT
61. FEMORAL VEIN LEFT
62. ANTECUBITAL RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP RIGHT
67. TRICEP LEFT
68. HAND RIGHT
69. HAND RIGHT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

## ROUTINE MEDICATION

**MEDICATION**

START 10/01/2018
STOP 04/28/2019
RX
NA
897992

**Xopenex HFA 45mcg Inhaler - KOP**
SUB FOR: LEVALBUTEROL HCL

INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED -

GESSEL, RANDYL - [MEDICAL]

---

**Diagnosis:** Asthma, Upspec. / Pain, chronic, due to trauma
**Allergies:** FISH / PEANUT ALLERGY
**Facility:** MC SCI HUNTINGDON
**DOB** 07/22/1988    **Gender:** M

**BROWN, GARTOR KTKT - NA6401**

G - D - 1009 - 01

Agency: SCI HUNTINGDON
SSN
AIF Num: 3060

November 2018
PAGE 1 OF 1

## Sapphire eMAR

**SYMBOL KEY**

A: ABSENT
*: SEE NOTES
H: HELD
M: MISSED
R: REFUSED
N: NO SHOW
C: COMPLETED

**SITE KEY**

1. ORALLY
2. RIGHT BUTTOCKS (GLUTEUS)
3. LEFT BUTTOCKS (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK

13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK RIGHT
21. UPPER BACK LEFT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT

25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MEDIPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR

37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT

49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT

61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. LEFT FOOT RIGHT
65. FOOT LEFT
66. TRICEP RIGHT
67. TRICEP LEFT
68. HAND LEFT
69. HAND RIGHT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

## ROUTINE MEDICATION

| EFFECTIVE DATE | MEDICATION | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **START** 10/05/2018 **STOP** 04/28/2019 **RX** 8475752 **NA** | Xopenex HFA 45mcg Inhaler - KOP SUB FOR: LEVALBUTEROL HCL INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED - GESSEL, RANDYL - [MEDICAL] | NON_SCHEDU LED | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **START** 08/07/2015 **STOP** 10/04/2018 **RX** 8455651 **NA** | Xopenex HFA 45mcg Inhaler - KOP SUB FOR: LEVALBUTEROL HCL DISCONTINUED: 10/4/2018 11:55:43 AM INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED - HARRIS, RACHEL - [MEDICAL] | NON_SCHEDU LED | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EFFECTIVE DATE | | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| EFFECTIVE DATE | | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**Diagnosis:** Asthma, unspec., Pain, chronic, due to trauma
**Allergies:** FISH, PEANUT ALLERGY
**Facility:** HC - SCI HUNTINGDON
**DOB:** 07/22/1988    **Gender:** M
**G + D - 1009 - 01**
**BROWN, GARTOR-KIKI - NA6401**

**Alt Num:3050**    **Agency:SCI HUNTINGDON**    **SSN:**

October 2018
PAGE 1 OF 1

**Sapphire** eMAR

**SYMBOL KEY**
A: ABSENT
*: SEE NOTES
H: HELD
M: MISSED
R: REFUSED
N: NO SHOW
C: COMPLETED

**SITE KEY**
1. ORALLY
2. RIGHT BUTTOCKS (GLUTEUS)
3. LEFT BUTTOCKS (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK
13. LEFT ARM (DELTOID) BACK
14. RIGHT LEG REAR
15. LEFT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK RIGHT
19. LOWER BACK LEFT
20. RIGHT BACK RIGHT
21. LEFT BACK LEFT
22. UPPER CHEST RIGHT
23. UPPER CHEST LEFT
24. ABDOMEN UPPER QUADRANT RIGHT
25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MEDIPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EAR
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR
37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT
49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. OUTER THIGH RIGHT
56. OUTER THIGH LEFT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT
61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP RIGHT
67. TRICEP LEFT
68. HAND RIGHT
69. HAND LEFT
70. DORSOGLUTEAL RIGHT
71. DORSOGLUTEAL LEFT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

## ROUTINE MEDICATION

**MEDICATION**

START 10/31/2018
STOP 04/29/2019
RX
NA
8279753

Xopenex HFA 45mcg Inhaler - KOP
SUB FOR: LEVALBUTEROL HCL

INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED -

GESSEL - RANDYL - (MEDICAN)

START 07/27/2018
STOP 10/31/2018
RX
NA
8279953

Xopenex HFA 45mcg Inhaler - KOP
SUB FOR: LEVALBUTEROL HCL
DISCONTINUED - 10/31/2018 @16:45 AM

INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED -

HARRIS - RACHEL - (MEDICAL)

Agency: SCI HUNTINGDON
SSN
Alt Num:30560

Diagnosis: Asthma, unspec.; Pain, chronic, due to trauma
Allergies: FISH, PEANUT ALLERGY
Facility: HE - SCI HUNTINGDON
DOB: 07/22/1988    Gender: M
G y D - 1009 - 01
BROWN, GARTOR KTKT - NA6401

September 2018
PAGE 1 OF 1

**Sapphire eMAR**

**SYMBOL KEY**

A: ABSENT
*: SEE NOTES
H: HELD
M: MISSED
N: NO SHOW
R: REFUSED
C: COMPLETED

**SITE KEY**

1. ORALLY
2. RIGHT BUTTOCKS (GLUTEUS)
3. LEFT BUTTOCKS (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK
13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK LEFT
21. UPPER BACK RIGHT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT
25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MIDPORT
30. RIGHT MARE
31. LEFT MARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR
37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT
49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT
61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP LEFT
67. TRICEP RIGHT
68. HAND LEFT
69. HAND RIGHT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

## ROUTINE MEDICATION

| MEDICATION | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Xopenex HFA 45mcg Inhaler - XOP
SUB FOR: LEVALBUTEROL HCL
DISCONTINUED - 10/1/2018 11:43 AM
INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS
NEEDED

HARRIS, RACHEL - MEDICAL

START 07/27/2018
STOP 10/01/2018
RX ******

NON-SCHEDULED

**Diagnosis** - Asthma, Unspec., Pain, Chronic, due to trauma
**Allergies** - FISH, PEANUT, ALLERGY
**Facility** - HC - SCI HUNTINGDON
**DOB** - 07/22/1988        **Gender:** M

**Agency:** SCI HUNTINGDON
**SSN**

**Alt Num:** 3060

**August 2018**
**PAGE 1 OF 1**

BROWN, GARTOR KIKI - NA6401
C - D - 1009 - 01

**Sapphire**
eMAR

**SYMBOL KEY**
A: ABSENT
*: SEE NOTES
H: HELD
M: MISSED
R: REFUSED
N: NO SHOW
C: COMPLETED

**SITE KEY**

1. ORALLY
2. RIGHT BUTTOCKS (GLUTEUS)
3. LEFT BUTTOCKS (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK
13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK LEFT
21. UPPER BACK RIGHT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT
25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MEDIPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR
37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT
49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT
61. FEMORAL VEIN LEFT
62. LOWER LEG LEFT
63. LOWER LEG RIGHT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP LEFT
67. TRICEP RIGHT
68. HAND LEFT
69. HAND RIGHT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

**ROUTINE MEDICATION**

| MEDICATION | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Xopenex HFA 45mcg Inhaler - KOP SUB FOR: LEVALBUTEROL HCL | NON_SCHEDULED | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY (AS NEEDED)

HARRIS, RACHEL - [MEDICAL]

Diagnosis: Asthma, Unspec., Pain, chronic, due to trauma
Allergies: FISH, PEANUT, ALLERGY
Facility: HO - SCI HUNTINGDON
DOB: 07/22/1988    Gender: M

Agency: SCI HUNTINGDON
SSN
Alt Num: 3060

JULY 2018
PAGE 1 OF 1

**G - D - 1000 - 01**
**BROWN, GARTOR CKK - NA6401**

PLEASE ENSURE THAT ALL MEDICATIONS ARE ADMINISTERED AND DOCUMENTED IN ACCORDANCE WITH ESTABLISHED POLICIES AND GUIDELINES

Sapphire
eMAR

**SYMBOL KEY**
A: ABSENT
*: SEE NOTES
H: HELD
M: MISSED
R: REFUSED
N: NO SHOW
C: COMPLETED

**SITE KEY**
1. ORALLY
2. RIGHT BUTTOCK (GLUTEUS)
3. LEFT BUTTOCK (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK
13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK LEFT
21. UPPER BACK RIGHT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT
25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MEDIPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR
37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT
49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT
61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP LEFT
67. TRICEP RIGHT
68. HAND LEFT
69. HAND RIGHT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

## ROUTINE MEDICATION

**MEDICATION**

START / STOP — Xopenex HFA 45mcg Inhaler - KOP
SUB FOR: LEVALBUTEROL HCL
DISCONTINUED : 10/1/2018 6:18:43 AM
INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED
RX #
HARRIS, RACHEL (MEDICAL)

| MEDICATION | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NON_SCHEDU LED | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

**Diagnosis** — Asthma, unspec., Pain, chronic, due to trauma
**Allergies** — FISH, PEANUT ALLERGY
**Facility** — HC_SCI HUNTINGDON
**DOB** — 07/22/1988    **Gender** M
**G - D - 1009 - 01**
**BROWN, GARTOR KIKI - NA6401**

Agency SCI HUNTINGDON
SSN
Alt Num 3060

June 2018
PAGE 1 OF 1

**Sapphire eMAR**

**SYMBOL KEY**
- A: ABSENT
- *: SEE NOTES
- H: HELD
- M: MISSED
- R: REFUSED
- N: NO SHOW
- C: COMPLETED

**SITE KEY**
1. ORALLY
2. RIGHT BUTTOCKS (GLUTEUS)
3. LEFT BUTTOCKS (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK

13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK LEFT
21. UPPER BACK RIGHT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT

25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MIDPOINT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR

37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT

49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH LEFT
57. OUTER THIGH RIGHT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT

61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP LEFT
67. TRICEP RIGHT
68. HAND LEFT
69. HAND RIGHT
70. VENTROGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

## ROUTINE MEDICATION

**MEDICATION**

START: 03/07/2018
STOP: 10/01/2018
SUB FOR: LEVALBUTEROL HCL
DISCONTINUED: 10/1/2018 8:14:43 AM
RX #:
MA #:

Xopenex HFA 45mcg Inhaler - KOP

INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED

HARRIS, RACHEL - MEDICAL

| HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20:00 | | | | | | | | | | | | | | | | | | | | | | | | | | | AD | | | | |
| QUANTITY GIVEN | | | | | | | | | | | | | | | | | | | | | | | | | | | A2-1 | | | | |
| DAYS TO LAST | | | | | | | | | | | | | | | | | | | | | | | | | | | AD 21 | | | | |

| HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

EFFECTIVE DATES

INIT | FULL NAME | INIT | FULL NAME | INIT | FULL NAME

| HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

EFFECTIVE DATES

| HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

EFFECTIVE DATES

INIT | FULL NAME | INIT | FULL NAME | INIT | FULL NAME

INIT | AD | FULL NAME: DEREA, ALEXA

Diagnosis: Asthma, unspec., Pain, chronic, due to trauma
Allergies: FISH, PEANUT ALLERGY
Facility: HC - SCI HUNTINGDON
DOB: 07/22/1988    Gender: M

Agency: SCI HUNTINGDON
SSN:
Alt Num: 3060

G - D - 1009 - 01
BROWN, GARTOR KTKT - NA6401

May 2018
PAGE 1 OF 1

**Sapphire eMAR**

**SYMBOL KEY**
A: ABSENT
*: SEE NOTES
H: HELD
M: MISSED
R: REFUSED
N: NO SHOW
C: COMPLETED

**SITE KEY**
1. ORALLY
2. RIGHT BUTTOCKS (GLUTEUS)
3. LEFT BUTTOCKS (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK

13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK LEFT
21. UPPER BACK RIGHT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT

25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MEDIPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR

37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT

49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT

61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP LEFT
67. TRICEP RIGHT
68. HAND LEFT
69. HAND RIGHT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

## ROUTINE MEDICATION

| MEDICATION | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**START** 9/27/2018 **STOP** 10/02/2018 **NX** 9/27/2018 **NA**

Xopenex HFA 45mcg Inhaler - XOP
SUB FOR: LEVALBUTEROL HCL
DISCONTINUED = 10/1/2018 5:16:43 AM
INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED
HARRIS - RACHEL - MEDICAL

NON_SCHEDU LED

**Diagnosis** - Asthma, unspec - Palp, chronic, due to trauma
**Allergies** - FISH- PEANUT ALLERGY
**Facility** - HQ- SCI HUNTINGDON
**DOB** - 07/22/1988    **Gender:** M
**G = D - 1009 - 03**
**BROWN, GARTOR KIKT - NAG401**

Agency SCI HUNTINGDON
SSN
Alt Num 9060
April 2018
PAGE 1 OF 1

Sapphire eMAR

**SYMBOL KEY**
A: ABSENT
A/F: ABSENT w/ NOTES
H: HELD
M: MISSED
R: REFUSED
N: NO SHOW
C: COMPLETED

**SITE KEY**
1. ORALLY
2. RIGHT BUTTOCKS (GLUTEUS)
3. LEFT BUTTOCKS (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK

13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK LEFT
21. UPPER BACK RIGHT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT

25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. IV LINE
29. MIDPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR

37. RIGHT EAR
38. BOTH EARS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIAN RIGHT
44. SUBCLAVIAN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT

49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERALIS RIGHT
59. VASTUS LATERALIS LEFT
60. FEMORAL VEIN RIGHT

61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP RIGHT
67. TRICEP LEFT
68. HAND LEFT
69. HAND RIGHT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

**ROUTINE MEDICATION**

March 2018
PAGE 1 OF 1

**MEDICATION:** Naproxen Sod 220mg Tab – KOP
SUB FOR: ALEVE
TAKE 1 TABLET(S) ORALLY TWICE DAILY AS NEEDED FOR PAIN WITH FOOD –
KELADA, BASSEM – [MEDICAL]

**MEDICATION:** Acetaminophen 500mg Caplet – KOP
SUB FOR: TYLENOL EX-STR
TAKE 2 TABLET(S) ORALLY TWICE DAILY –
KING, KATHERINE – [MEDICAL]

**MEDICATION:** Ventolin HFA Inhaler – KOP
SUB FOR: ALBUTEROL
INHALE 2 PUFF(S) ORALLY THREE TIMES DAILY AS NEEDED FOR SHORTNESS OF BREATH –
KING, KATHERINE – [MEDICAL]

**MEDICATION:** Xopenex HFA 45mcg Inhaler – KOP
SUB FOR: LEVALBUTEROL HCL
INHALE 2 PUFF(S) ORALLY FOUR TIMES DAILY AS NEEDED –
HARRIS, RACHEL – [MEDICAL]

Diagnosis: Asthma-Juvenile, Pain, Chronic, due to Trauma
Allergies: FISH, PEANUT ALLERGY
Facility: HS, SCI HUNTINGDON
DOB: 07/24/1986    Gender: M    Alt Num: 3060
G – D: 1009 - 01
BROWN, SARTORI K2K2 – NA6401

AGENCY: SCI HUNTINGDON
SSN:

# Sapphire eMAR

**SYMBOL KEY**

A: ABSENT
*: SEE NOTES
H: HELD
M: MISSED
R: REFUSED
N: NO SHOW
C: COMPLETED

**SITE KEY**

1. ORALLY
2. RIGHT BUTTOCKS (GLUTEUS)
3. LEFT BUTTOCKS (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK

13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK LEFT
21. UPPER BACK RIGHT
22. UPPER CHEST LEFT
23. UPPER CHEST RIGHT
24. ABDOMEN UPPER QUADRANT RIGHT

25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PICLINE
29. MEDPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR

37. RIGHT EAR
38. RIGHT EANS
39. BOTH NARES
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT

49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT

61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP RIGHT
67. TRICEP LEFT
68. HAND LEFT
69. HAND RIGHT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

## ROUTINE MEDICATION

**February 2018**
**PAGE 1 OF 3**

| EFFECTIVE DATES | MEDICATION | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**START** 02/08/2018
**STOP**
03/03/2018
**RX**
12464038
**NA**

Naproxen Sod 220mg Tab - KOP
SUB FOR: ALEVE

TAKE 1 TABLET(S) ORALLY TWICE DAILY AS NEEDED FOR PAIN WITH FOOD -

KELADA, BASSEM - (MEDICAL)

NON_SCHEDULED / 07:00

| EFFECTIVE DATES | MEDICATION | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | ... |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**START** 02/27/2018
**STOP**
03/02/2018
**RX**
**NA**

Acetaminophen 500mg Caplet - KOP
SUB FOR: TYLENOL EX STR
DISCONTINUED 2/27/2018 1:27:33 PM

TAKE 2 TABLET(S) ORALLY TWICE DAILY

KING, KATHERINE - (MEDICAL)

QUANTITY GIVEN / DAYS TO LAST

| EFFECTIVE DATES | MEDICATION | HOUR | ... |
|---|---|---|---|

**START** 02/27/2018
**STOP**
03/03/2018
**RX**
**NA**

Ventolin HFA Inhaler - KOP
SUB FOR: ALBUTEROL
DISCONTINUED 2/27/2018 1:29:11 PM

INHALE 2 PUFF(S) ORALLY THREE TIMES DAILY AS NEEDED FOR SHORTNESS OF BREATH -

KING, KATHERINE - (MEDICAL)

NON_SCHEDULED

| INIT | FULL NAME | INIT | FULL NAME | INIT | FULL NAME | INIT | FULL NAME | INIT | FULL NAME |
|---|---|---|---|---|---|---|---|---|---|

REHART, HALLIE

Agency: SCI HUNTINGDON
SSN
Alt Num:3060

**Diagnosis** Asthma, unspec.; Pain, chronic, due to trauma
**Allergies** FISH; PEANUT; ALLERGY
**Facility** HC - SCI HUNTINGDON
**DOB** 07/22/1988    **Gender** M
**G - D - 1009 - 01**
**BROWN, GARTOR-KIKI - NA6401**

ALL PRE-PRINTED NAMES IN SIGNATURE TABLES COMPLY WITH FEDERAL SIGNATURE GUIDELINES

# Sapphire eMAR

**SYMBOL KEY**
A: ABSENT
*: SEE NOTES
H: HELD
M: MISSED
R: REFUSED
N: NO SHOW
C: COMPLETED

**SITE KEY**
1. ORALLY
2. RIGHT BUTTOCKS (GLUTEUS)
3. LEFT BUTTOCKS (GLUTEUS)
4. RIGHT VENTRAL GLUTEUS
5. LEFT VENTRAL GLUTEUS
6. RIGHT THIGH (QUADRICEPS)
7. LEFT THIGH (QUADRICEPS)
8. RIGHT KNEE
9. LEFT KNEE
10. RIGHT ARM (DELTOID)
11. LEFT ARM (DELTOID)
12. RIGHT ARM (DELTOID) BACK

13. LEFT ARM (DELTOID) BACK
14. LEFT LEG REAR
15. RIGHT LEG REAR
16. RIGHT ANTERIOR THIGH
17. LEFT ANTERIOR THIGH
18. LOWER BACK LEFT
19. LOWER BACK RIGHT
20. UPPER BACK RIGHT
21. UPPER BACK LEFT
22. UPPER CHEST RIGHT
23. UPPER CHEST LEFT
24. ABDOMEN UPPER QUADRANT RIGHT

25. ABDOMEN UPPER QUADRANT LEFT
26. ABDOMEN LOWER QUADRANT RIGHT
27. ABDOMEN LOWER QUADRANT LEFT
28. PIC LINE
29. MEDIPORT
30. RIGHT NARE
31. LEFT NARE
32. OTHER
33. RIGHT EYE
34. LEFT EYE
35. BOTH EYES
36. LEFT EAR

37. RIGHT EAR
38. BOTH EARS
40. RECTUM
41. JUGULAR RIGHT
42. JUGULAR LEFT
43. SUBCLAVIEN RIGHT
44. SUBCLAVIEN LEFT
45. DELTOID RIGHT
46. DELTOID LEFT
47. UPPER ARM RIGHT
48. UPPER ARM LEFT

49. ANTECUBITAL RIGHT
50. ANTECUBITAL LEFT
51. FOREARM RIGHT
52. FOREARM LEFT
53. WRIST RIGHT
54. WRIST LEFT
55. ABDOMEN
56. OUTER THIGH RIGHT
57. OUTER THIGH LEFT
58. VASTUS LATERAL RIGHT
59. VASTUS LATERAL LEFT
60. FEMORAL VEIN RIGHT

61. FEMORAL VEIN LEFT
62. LOWER LEG RIGHT
63. LOWER LEG LEFT
64. FOOT RIGHT
65. FOOT LEFT
66. TRICEP LEFT
67. TRICEP RIGHT
68. HAND LEFT
69. HAND RIGHT
70. DORSOGLUTEAL LEFT
71. DORSOGLUTEAL RIGHT
72. VENTROGLUTEAL LEFT
73. VENTROGLUTEAL RIGHT

## ROUTINE MEDICATION

**MEDICATION: Hemorrhoidal Suppository - KOP**
SUB FOR: PREPARATION H
INSERT 1 SUPPOSITORY(S) RECTALLY TWICE DAILY -
KELADA, BASSEM - (MEDICAL)

**MEDICATION: Naproxen Sod 220mg Tab - KOP**
SUB FOR: ALEVE
TAKE 1 TABLET(S) ORALLY TWICE DAILY AS NEEDED FOR PAIN WITH FOOD -
KELADA, BASSEM - (MEDICAL)

**MEDICATION: Naproxen Sod 220mg Tab - KOP**
SUB FOR: ALEVE
TAKE 1 TABLET(S) ORALLY TWICE DAILY AS NEEDED FOR PAIN WITH FOOD -
GOMES, MICHAEL (MEDICAL)

**MEDICATION: Ventolin HFA Inhaler - KOP**
SUB FOR: ALBUTEROL
INHALE 2 PUFF(S) ORALLY THREE TIMES DAILY AS NEEDED FOR SHORTNESS OF BREATH -
KING, KATHERINE (MEDICAL)

---

**Diagnosis:** Asthma, unspec., Pain, chronic, due to trauma
**Allergies:** FISH, PEANUT ALLERGY
**Facility:** HS - SCI HUNTINGDON
**DOB:** 07/22/1988          Gender M

**BROWN, GARTOR KIKI - NA6401**

REPORT GENERATED BY KY JACKSON AT 8/8/2019 12:00:33 PM

Agency: SCI HUNTINGDON
SSN:
Alt Num 3050

January 2018
PAGE 1 OF 1

ALL PRE-PRINTED NAMES IN SIGNATURE TABLES COMPLY WITH ELECTRONIC SIGNATURE GUIDELINES

| INIT | FULL NAME |
|------|-----------|
| AH | HOFFMASTER, ANN |
| HR | REINART, HALLIE |

G - D - 1009 - 01





| | | | |
|---|---|---|---|
| **Pennsylvania Department of Corrections** | | | 02/20/2018 |
| **Inmate Cumulative Adjustment Records** | | | rnaxwell |

Inmate Name : **BROWN, GARTOR KIKI**                    Inmate # : **NA6401**

Location : **G-D-1005-01**                    Counselor : **Richards-Rhodes,** ▮▮▮

| Entered Date | Entered By | Facility | Comments |
|---|---|---|---|
| 02/16/2018 | Richards-Rhodes▮ ▮-Corr Counselor 2 | HUNTINGDON | RHU contact with inmate Brown at his cell door. He was offered to meet with his CC2 for an out of cell interview but refused to come out of his cell. He discussed receiving additional misconducts for refusing to take a cellie and said that he thinks staff is trying to "bury" him in the RHU. This CC2 informed him that we did discuss these misconducts last week, and he was informed that he would continue to receive misconducts for refusing to obey an order if he continues to refuse to take a cellie. |
| 02/15/2018 | Diehl▮ ▮-Psycl Srvs Spcst Corr | HUNTINGDON | IM was interviewed out of cell per request by Lt. Maxwell for investigation purposes. Although IM agreed to attend out of cell contact, he elected not to answer any questions related to the investigation. ▮▮▮ ▮▮▮ Prior to concluding the contact, IM raised concerns about his belief that his requests for psychotropic medications have been ignored. IM is currently listed as an "A" stability with no prior MH history. During the interview IM stated, "I have played with my feces before, don't you think that is serious". He dismissed efforts by this writer to discuss interventions that he could implement independently to address his current reported anxiety and depression. ▮▮▮ ▮▮▮ ▮▮▮ IM also reported the need for single cell status. IM stated, "Based on my symptoms and situation, don't you think this should be addressed by giving me a Z code". When this writer asked IM why he believed single cell status was warranted he replied, "Like what if I play with my shit and hear voices and stuff. My cellmate would want to mess me up. I mean look at my last two incidents, that proves I don't work well with cellmates". At this point in time IM appeared frustrated and began ignoring inquires by this writer. He started looking around the out of cell area and acted as if he were incoherent. After he continued on for a few minutes, he then▮▮▮ ▮▮▮ stated, "You know, I think you're doing a half ass job here". Prior to ending the session, PSS encouraged IM to attend out of cell contacts as needed while housed within the RHU. Psychology staff will continue to monitor IM and provided supportive services. Supportive counseling offered. ▮ |
| 02/09/2018 | Richards-Rhodes▮ ▮-Corr Counselor 2 | HUNTINGDON | RHU contact with inmate Brown at his cell door. He reported that he is doing ok and discussed his misconducts. He alleges that he was denied a right to go to the hearing for his misconduct for refusing a cellie while in a camera cell. When asked if he appealed the decision, he indicated that he has no plans to appeal. He discussed being told that there is a DOC Policy that prohibits him from receiving a misconduct for refusing a cellie until his DC time expires. This CC2 explained that he was misinformed and if he continues to refuse cellies, he will get additional misconducts. He asked if I would talk to someone to get his misconducts reversed. ▮▮▮ ▮▮▮ ? I have all of these grievances filed against staff and you are telling me no. Are you serious right now? This CC2 informed him that I am serious because there is an appeal process he can utilize. He said "I already told you that I am not going to appeal." This CC2 made it clear to him that if he is not willing to follow the appeal process to help himself, I will not ba doing it for him. Inmate Brown also asked if his family has called to check on him. He was informed that they have not. He did not have any other questions or concerns to discuss today. |
| 02/05/2018 | Parsons▮ ▮-Psycl Srvs Spcst Corr | HUNTINGDON | (RHU PSS contact): Inmate was seen cell side by Mr. Parsons, PSS this afternoon. Specifically, it was his intent to have this PSS at his door as he complained (loudly as if to intend on others listening) about being housed with another inmate. Inmate has made an ongoing effort to speak with a variety of mental health staff with the interest to voice, "Symptoms" such as, "Hearing voices." This PSS had met with him previously about his alleged voices and he had indicated that they, "Come from within my head" and therefore was invited to think of them as, "Thoughts." ▮▮▮ ▮▮▮ He then shouted, "You mean my mental health on the street and the fact that I play with my s*&t, doesn't count for anything in here.?!" This PSS afforded him an OOC contact to again discuss this matter in private, but he refused. ▮▮▮ ▮▮▮ This PSS urged him to contact his counselor to send a referral to have a "Z" code evaluation; ▮▮▮ ▮▮▮ . Supportive counseling offered. |



| | Pennsylvania Department of Corrections | **02/20/2018** |
|---|---|---|
| | Inmate Cumulative Adjustment Records | maxwell |

Inmate Name : **BROWN, GARTOR KIKI**                    Inmate # : **NA6401**

Location : **G-D-1005-01**                    Counselor : **Richards-Rhodes,**

| 12/01/2017 | Parsons,　　-Psycl Srvs Spcst Corr | HUNTINGDON | (RHU PSS OOC Contact, Suicide Risk Indicators Check): Inmate seen OOC in RHU SECURE SEARCH CELL. He was unwilling to be celled with another claiming, he will, "Kill" someone if housed double. Additionally, he made allegation which was reported to both Security and Lt. Maxwell by LT. Prokop. It should be noted that Inmate was reluctant to verbalize responses to questions asked of him and was dismissive towards this PSS. ▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Supportive counseling offered. ▇▇▇▇▇▇▇. |
|---|---|---|---|
| 11/22/2017 | Banks,　　-Corr Counselor 2 | HUNTINGDON | I/M provided with Kiosk Pin #587678 |
| 11/21/2017 | Shultz,　　-Corr Counselor 2 | HUNTINGDON | Met with the inmate for his initial contact interview. I informed IM that I will be his counselor while he is on CA Unit. He had no issues or concerns at this time. I informed him that Mr. Ralston is the UM. |
| 11/17/2017 | Butterbaugh,　　Psycl Srvs Spcst Corr | HUNTINGDON | Met with Mr. Brown in the psychology department to provide continued supportive counseling for depression and anxiety. I/M states that he has not been followed up with by medical with regard to an incident that occurred at SCI-Camp Hill. Cites intense anxiety and panic attacks as a result of that incident. DC-97 initiated to psychiatry and medical. ▇▇▇▇▇▇▇▇▇▇ Denied SI/HI. PSSC will follow-up in two weeks to provided continued supportive counseling. |
| 11/15/2017 | Banks,　　-Corr Counselor 2 | HUNTINGDON | Initial interview - conducted this date. Brown's Correctional Plan, Custody Level, and Emergency Contact information were all review with Inmate. I/M states he has no forms of ID available to him, was given an application to apply for a SSC. Inmate given "Sexual Assault Awareness" pamphlet and PREA was discussed. Expectations while at SCI HUN were discussed. Brown had no additional questions or concerns. |
| 11/15/2017 | Butterbaugh,　　Psycl Srvs Spcst Corr | HUNTINGDON | Met with Mr. Brown in the psychology department to provide supportive counseling per policy. Mr. Brown cited significant mistrust of staff and other inmates. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Provided supportive counseling with regard to anxiety management and discussed options of voluntary mental health groups that may be of benefit to him. Mr. Brown noted that he has been litigious with regard to his civil rights and feels that he is being retaliated against by staff at his former institution. PSSC will meet with Mr. Brown again tomorrow in order to determine an appropriate course of treatment. Mr. Brown denied any intent of self-harm or intent to do harm to others. |
| 11/13/2017 | Mingle,　　-Corr Counselor 2 | HUNTINGDON | Initial PRAT completed at IRC. |
| 11/08/2017 | Hoerner,　　-Corr Counselor 2 | CAMP HILL | Office Contact: |
| 10/27/2017 | Eckenrod,　　Corr Counselor 2 | HUNTINGDON | Inmate attended orientation today. All required departments presented except Chaplaincy. This counselor explained about the chaplaincy, as directed by Chaplain Wireman, and directed all religious questions to that department. PREA was reviewed and video was watched. PREA Inmate education form signed and forwarded to inmate's counselor for DC-14. |
| 10/26/2017 | Banks,　　-Corr Counselor 2 | HUNTINGDON | OOC-late entry-RHU contact out of cell on 10/25/17. This writer introduced myself to Brown as his counselor. We went over some information and services available to him. ▇▇▇▇▇▇▇▇ Brown had no questions or concerns at the time of contact. |
| 10/25/2017 | Parsons,　　-Psycl Srvs Spcst Corr | HUNTINGDON | (RHU PSS OOC contact): Inmate seen per OOC contact by Mr. Parsons, PSS. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ the multi-modal approach of HELPING was provided, reviewed, and he was encouraged to complete the rest on his time for further review. ▇▇▇▇▇▇▇▇▇▇▇ supportive counseling provided. ▇▇▇▇▇▇▇▇▇▇▇▇ |
| 10/25/2017 | Gerholt,　　-Clerk Typist 2 | HUNTINGDON | PRC Review: Stability D Weekly Review: (Deputy Brumbaugh, Major Walters, CCPM Sipple, PSS Diehl): Inmate will be released to population on 10/25/17 CL:4H |
| 10/25/2017 | Gerholt,　　-Clerk Typist 2 | HUNTINGDON | PRC Review: (Deputy Brumbaugh, Major Walters, CCPM Sipple): Inmate was seen for an 802 review. Inmate was encouraged to talk to Security. Continue AC status pending a security report. Next review: 11/1/17. |



**Pennsylvania Department of Corrections**

**Inmate Cumulative Adjustment Records**

02/20/2018

maxwell

Inmate Name : BROWN, GARTOR KIKI                    Inmate # : NA6401

Location : G-D-1005-01                              Counselor : Richards-Rhodes,

| Date | Staff | | Location | Notes |
|---|---|---|---|---|
| 12/27/2017 | Banks, ▮-Corr Counselor 2 | | HUNTINGDON | RHU Contact - Late Entry - I/M was seen in RHU, on 12/26/17, during rounds. When this writer first approached I/M Brown's cell ▮ I ask him if he was going to return to population when released from the RHU to which at first he refused to answer ▮ After repeating my question, Brown became irritated ▮ and demanded that I give him a single cell based on his past homicidal thoughts. I explained that he is able to control his thoughts and he is not able to manipulate him self into single cell status. Brown made further demands that I help him get a single cell or he will sue me and cause me to lose my job. ▮ I then explained that was not appropriate, to which he stopped answering any questions and would only respond with his own ▮ questions seeking personal information about PSS Parsons or myself. |
| 12/27/2017 | Gerholt, ▮ Clerk Typist | | HUNTINGDON | PRC Review; Stability D Weekly Review: (Major Grice, CCPM Sipple, UM Kendrick, PSS Diehl): Inmate will be released to population on 12/27/17. CL:4H |
| 12/26/2017 | Hollibaugh ▮-Corr Unit Manager | | HUNTINGDON | 30 Day Unit Team Review: Brown was placed in the RHU on 12-1-17 after receiving a misconduct for Threatening Another Person and Refusing to Obey an Order. On 12-5-17, he received a misconduct in the RHU for Refusing to Obey an Order. Both misconducts resulted in 15 day DC sanctions to be served consecutively and his DC sanctions extend to 12-30-17. Brown is seeking a single cell and his misconducts reflect his efforts to refuse to accept a cellmate by making a threatening statement and refusing to take a cellmate. |
| 12/19/2017 | Banks, ▮-Corr Counselor 2 | | HUNTINGDON | RHU Contact - This writer attempted to make contact with inmate Brown, on this date, during rounds. I/M was on his cell bunk and did not respond to attempts by this writer to make contact. Movement noted. |
| 12/18/2017 | Spyker, ▮ Corr Unit Manager | | HUNTINGDON | Both misconduct appeals #C084585 & C065592 were forwarded to both Ms. Sipple, CCPM and Mr. Goss, LPM as inmate addressed concerned related to concerns within their department. |
| 12/18/2017 | Spyker, ▮-Corr Unit Manager | | HUNTINGDON | Misconduct Appeal #C084585 was addressed. Paperwork forwarded to both Deputy Brumbaugh and Ms. Sipple, CCPM for final review and signatures. |
| 12/18/2017 | Spyker, ▮-Corr Unit Manager | | HUNTINGDON | Misconduct Appeal #C065592 was addressed. Paperwork forwarded to both Deputy Brumbaugh and Ms. Sipple, CCPM for final review and signatures. |
| 12/12/2017 | Banks, ▮-Corr Counselor 2 | | HUNTINGDON | RHU Contact - I/M was seen in the RHU on this date during RHU rounds. ▮ He would respond to certain questions and then refuse to make eye contact and look away at other questions. PSS Parsons notified of overall behavior and demeanor. Brown had no questions or concerns at the time of contact. |
| 12/12/2017 | Parsons, ▮-Psycl Srvs Spcst Corr | | HUNTINGDON | (RHU PSS contact): Inmate was seen by Mr. Parsons, PSS this afternoon at the request of Mr. Banks, Counselor. ▮ Inmate was seen promptly after our consultation. He was afforded an OOC contact and respectfully declined. ▮ Inmate attempts to manage a negative impression ▮ Inmate is currently frustrated at this staff for not advocating his desire to be celled by himself. ▮ Supportive counseling offered. |
| 12/12/2017 | Parsons, ▮-Psycl Srvs Spcst Corr | | HUNTINGDON | (RHU PSS contact): Inmate seen by Mr. Parsons, PSS this morning per routine contact. Inmate was afforded an OOC contact for which he respectfully declined. ▮ Supportive counseling offered. |
| 12/06/2017 | Parsons ▮-Psycl Srvs Spcst Corr | | HUNTINGDON | (RHU PSS contact): Inmate was seen by Mr. Parsons, PSS this afternoon and he verbally berated this PSS claiming, "Do your job, you would let me get a "Z" code, there is nothing you could help me with!" ▮ Attributes his current RHU housing to this PSS, "Not doing his job." ▮ OOC contact was afforded but he rudely refused. ▮ |
| 12/05/2017 | Banks, ▮-Corr Counselor 2 | | HUNTINGDON | RHU Contact - I/M was seen in the RHU on this date during RHU rounds. Brown had many demands and questions regarding his misconducts and how to get a z-code, appropriate information provided. He had no other questions or concerns at the time of contact. |

| | | | |
|---|---|---|---|
| | **Pennsylvania Department of Corrections** | | 02/20/2018 |
| | **Inmate Cumulative Adjustment Records** | | maxwell |

Inmate Name : **BROWN, GARTOR KIKI**                    Inmate # : **NA6401**

Location : **G-D-1005-01**                    Counselor : Richards-Rhodes,

| 02/01/2018 | Richards-Rhodes,<br>-Corr Counselor 2 | HUNTINGDON | RHU contact with inmate Brown at his cell door. He reported that he is ok and did not have any questions or concerns to discuss today. |
|---|---|---|---|
| 01/31/2018 | Parsons, -Psycl Srvs<br>Spcst Corr | HUNTINGDON | (RHU PSS contact): Inmate seen cell side by Mr. Parsons, PSS this morning. It should be noted that he elected to stay in bed and mutter some statements that this PSS was unable to distinguish due to his choice to not be heard as well as the ambient noise from the TV drowning out his voices. Nevertheless, this PSS raised my voice to him and invited him to an OOC contact (where he could be heard). ▮▮▮▮▮▮▮. It should be noted that he was observed earlier with a handful of feces  |
| 01/26/2018 | Richards-Rhodes<br>-Corr Counselor 2 | HUNTINGDON | RHU contact with inmate Brown at his cell door. He reported that this place has a conspiracy against him because he is not being given psych meds; he was informed that his family called his prior counselor but he was never told that they called; he received a misconduct for refusing to take a cellie; a certain CO in the RHU is out to get him; and there are no "black" CO's working in the RHU. He indicated that there is a voice in his head and he has been playing with his "shit." He reported that he is on a hunger strike and this is the 2nd day that he did not eat. We discussed him being seen by the PSS while in the RHU. He refused and said he only wants to be seen by someone to get medication. |
| 01/25/2018 | Parsons, -Psycl Srvs<br>Spcst Corr | HUNTINGDON | (RHU PSS OOC REFUSED): Inmate had declined to participate in his pre-planned OOC contact on this date. This PSS noted that he had been seen, ▮▮▮▮▮▮▮ Supportive counseling offered. ▮ |
| 01/24/2018 | Diehl, -Psycl Srvs<br>Spcst Corr | HUNTINGDON | IM was seen at cell door after he declined the need for an out of cell individual. IM expressed that he had a legal deadline approaching and needed to access the law library and utilize the phone. PSS forwarded concerns to UM Kendrick via email to address IMs reported issues. No other reported issues at this time. No suicidal ideations or intent reported. ▮. |
| 01/23/2018 | Diehl, -Psycl Srvs<br>Spcst Corr | HUNTINGDON | IM was seen at cell door in RHU to offer an out of cell contact. During contact he refused to look at this writer and turned away from the door when contact was attempted. He refused to answer after several attempts to communicate with him. ▮▮▮▮ No issues or concerns expressed. Contact was terminated after he refused to cooperate. ▮▮▮▮ |
| 01/23/2018 | Butterbaugh,<br>Psycl Srvs Spcst Corr | HUNTINGDON | Mr. Brown was on a call-out yesterday to be seen following his release from the RHU. PSSC called his housing unit at the time of his scheduled appointment and was informed that Mr. Brown opted to go to yard. PSSC placed Mr. Brown on another call-out this morning. However, Mr. Brown incurred a misconduct last evening and was placed in PHC. He will be seen by psychology staff in the RHU until he returns to population. |
| 01/09/2018 | Richards-Rhodes<br>-Corr Counselor 2 | HUNTINGDON | SEMI ANNUAL REVIEW: Met with Inmate Brown at his cell door on AA Unit for his semi-annual review. He was counseled on the importance good institutional adjustment and programming. He did not have any questions or concerns regarding his semi-annual review. |
| 01/04/2018 | Richards-Rhodes,<br>-Corr Counselor 2 | HUNTINGDON | Inmate notified via DC-134 of new counselor designation and to check the callout for his initial interview. |
| 01/04/2018 | Yost, -Corr<br>Counselor 2 | HUNTINGDON | Assigned to B caseload; process routinely. MMY |

Plaintiff is asserting he informed official Kauffman, Eberlin, Farwell, Kendrick, Maxwell, Sipple, Young, Dunkle, Plocinik, and Crawford of the substantial risk of serious harm and they disregarded the risk despite known element See Beers - Capitol 256 F. 3d at 152. Plaintiff brings failure to Protect claims against these defendants

After the assault on Plaintiff on 2/3/18 he told officials every chance he got in which the vigent Liter also motivated him. Plaintiff would tell c/o Paarman that he was assaulted and that Allen did not want him in the cell with him. He would also tell a c/o Lau both c/o would iqnord Brown. Allen would take Brown's tray infront of both officials asserting "he don't eat until yall get him out of here" these officials did nothing. Plaintiff would also assert to both c/o's that his ribs was killing him in which he was in alot of pain, above he was finoroga. Plaintiff would then tell c/o Fachtman and Plocinik that Allen did not want him in the coll in which he cries, taking his trays, and now took his mattress forcing him to sleep on nothing. Also that he needed medical attention. These c/o did nothing.

On 2/5/18 Plaintiff was let out for showers, he would tell a c/o Harris and againe a c/o Lau that he fear for his safety and did not want to go back into the cell with the vigent Liter, Plaintiff also asserted he was in alot of pain in the ribs, c/o Harris would assert don't talk to me, and then would remind Brown of grievances he wrote on staff. Allen would also tell Harris and Lau "them going to kill him if yall let him back in here, I don't like cats." Nevertheless nothing was done.

Soon after being let back into the cell, Brown would talk to a Phychologis Eric Parksons. He told Parksons about the assaults and that he fear for his safety, unit manager Kendrick would also walk up. Allen encourged Brown to tell both actors, he would then tell Parksons he fear for his life and that he was "suicidal" in which Parksons asserted "Well your still alive" The violent Liter would start to yell at both defenda "If he's suicidal yall have to get him out of here and into a camera cell", Eric asserted "he will be fine" The Violent Liter would turn around and start to hit Plaintiff again Plaintiff would cover up. Defendants would walk off.

Although provided details about the nature of his serious dispute defendants Law, Harris, Partsons, Fachtman, fail to react. Brown brings failure to Protect claims against these defendants. Brown would also tell those defendants about his medical symptoms but they did nothing to even call medical. Later that day still on 2/5/18 Plaintiff would tell Sgt Heaster, c/o Chilcote, and c/o and c/o Johnson that inmate Allen would not stop attacking him and that officials were already awar that they was enemies on which they forced him in the cell and that he is suffering him in the ribs and that Allen had took his mattress forcing him to lay on nothing and the Violent Liter was depriving him of his trays.

Sgt. Heaster would iqnor Brown, c/o Johnson watched walk away, Brown then told c/o Chilcote that he can see that their are empty cells on the unit because inmates had just went back to population. c/o Chilcote asserted that he was aware of what was going on that officials were laughing about it, but for some reason the Unit Manager - bays, Farwell, maxwell and others wanted him to stay in the cell. He also assert that c/o Farwell was the Shift commander and with out him their could be no moves. The violent Liter would start to Yell at Chilcote "get him the fuck out me cell, or he will be sucking my dick pretty soon"C c/o Chilcote would come back asserting of the best I can make You, Farwell will not make Brown Allen would refuse to move, Brown brings failure to Protect claims against Sgt. Heaster, c/o Johnson and c/o Chilcote, Although c/o Chilcote was the only official that tried to remain inmate Allen, chilcote was aware that officials were conspiring to keep Brown in the cell with a violent inmate, that was assaulting him, Chilcote did not follow Police. He was to stay on Post untill he got a hold of someone that would do their job in removing Brown from the cell. Chilcote would have every reason of knowing and beleveing that Brown would suffer a mailicious attack causing more injuries if he left Brown in the cell. Defendants were aware of Brown on going injuries and that Brown was a house visol and that Plaintiff had already suffered sexual assault attacks while in the DoC. Allen told Chilcote "he will be sucking my dick soon if yall don't move him"

Brown is claiming to Chillcote action Assert that Lovelett Jackey The Violent Lifer would had never had the chance to attempt to sexually assault him on the night of 2/5/18 citing Paragraph number(2) on the top of page (2). On the morning of 2/6/18 Plaintiff would tell c/o Forcmgr, c/o Low, and c/o Harriss that the violent lifer had attempted to sexualy assault him in the middle of the night. Plaintiff will also later tell unit manager Kendrick and LT. Dunkle. Plaintiff would then ask to see medical by which it was now hard to move around and he was slower then an escargot; Letter on in the day Plaintiff would talk to both LT. Marinelli and Mady single asserting the violent Lifer had attack him in the middle of the night Aging the Lifer, would encourage Plaintiff also todainr defendants get him the fuck out on call! Brown would later tell c/o Piorcinsk, c/o Fochtman and sgt Heaster but nothing was done to call medical or remove him from the cell.

On 2-7-18 Brown would aganne tell unit manager Kendrick, in details what what had took place; he would tell Plaintiff there was nothing he could do, the next time he come out for showers just dont lock in, Brown would then talk to Kauffman and cpt. Powell telling them that he had been subjected to multiple assaults, at the has of Allen and on 2/5/18 he attempted to sexualy assault him. Allen would be in the back around asserting tell them, everythays!" get this, soit out my cell, he's going to be sucking my dickcoc and I'm going to take his ass! Kauffman would tell Brown to take it up with the mano Gruer team. Brown would ask to see medical but was Ignored. Powell would also walk off.

Same time after 11:00pm on 2-7-18 Plaintiff talked to c/o Johnson asking him and c/o Piorcinsk to remove him from cell 108; without warning the Violent Lifer snapped, "attacking Brown, ripping through his slumber, as if it was gold under the Juner Brown tried to put up a fight, at this time he was like a wounded animal" The violent Lifer then put the victom's leg over his shoulder and forcly trusted into him with no remorse. At THIS TIME BROWN'S ANCESTOR'S COULD HERE HIM CRY OUT FOR HELP!" The ample force used caused Plaintiff to start bleeding, the diabolical Goon started to hit Brown telling him to shut the "F—up", Brown was now bleeding from his nose, and Mouth, Plaintiff was subject to his sheate hemt force into his mouth, Brown could now feel an explotion m anal through his anal; it was contermation that the "arduous" "degrading" "demoting" got pussy over!

The Vulmerable Brown, slowly got up as he notice blood all around, Plaintiff started to yell out the door for half or medical attention. C/o Johnson came back to the door asserting "damm— it looks like an animal got slay in here!" Brown told Johnson he had just been rape. C/o Fochtman would come to the door asserting, "It's a boy, no it's a girl," "Allen You are the Father!?, Fochtman, then predicated which one of Yall can't uprise up for Everything?" Sgt Heaster want me to urine, one of Yall up! Plaintiff would assert You have to remove me from this, call I was just sexually assaulted. The attacker Predicated Yall dont move him I'am goink to keep fucking him, igm the next violent Lifer in this Sul, I'am in the hole for stabbing pur inmate over cookies!" C/o Fochtman they stated "WE DO NOT MAKE COURTESY MOVES." THIS IS NOT THE HILLTON, IT'S HUMINGDON!" This actor then started to leugh and walked off. C/o Johnson came back, this is a camera block, Brown claims will be constructout with the cameras, prior to Johnson coming back to the door, he would miss multiple counts. He asserted that Heaster and Young and Kendrick wanted him to collect every fathing that had bl and on it, summper, boxers, linen, sheets ect... Sgt Heaster would walk onto the block an inmale a door down would call ham to his cell in which Fochtman would also go to the inmates call, the inmate neuer rah sounded very concern "asserting "I have never seen nothing like this why dont Yall remove him?" See Extension of Exhibit E1-5. Defendants did nothing to remove Brown from the call or call medical.

In the Middle of the night around 11:30 or 12 am Brown was at the door frighten to sleep, he would tell a sgt. John Doe that he might get assaulted aganne, acking him to remove him. sgt. John Doe asserted I had direct orders from Powell the shift Commander, and Kauffman not to Move You, To make Allen would walk to the victim and slept to play with his hair, It was transparent that the wolf was hurdly aganne and that Brown would be food. "Allen grabed Brown by his long hair with ample force, he briefly looked at Brown asserting "tonight is your night!" then started to hit Brown in the body arow his ribbs, Brown was knocked over the toilet bending him over with his face in the toilet. The victim started to cry out "I can't breathe, stop, let me be."

of 12 Allen. Brown's head was put into the toilet both of Brown's hands was bent then forced behind his back as if he was getting cuffed. After the Violent Lifer restrain Brown in hogtied into Brown Brown could now feel it in his Stomach this continued until the Lifer ejaculated.

The next day officials did not want to let the log call out for showers as they had also refuse to let the violent lifer go for rec. Allen would tell one official if he did not let him out for showers he would kill him, Brown, and Allen was let out for showers and Allen would tell Brown "you come back in my cell this time I am going to kill you!" Plaintiff would tell a c/o Garlik and others that he is not going back into the cell with the "monster." Plaintiff would be token to another block and cell Plaintiff Wrote Grievances Pursuant to this Serious matter. See Exhibit # 1-5, Grievance # 723758.

Exhibit I L-6, Grievance # 739729, and Exhibit J.J.-13

Who will guard the guards them Selves? The Honorable Courts!

Plaintiff is aware he could bring as many claims as he wants against a party in the same case. In fact if you have multiple claims against a party arising from the same factual situation. You may have to bring them in the same action, because under the rule of res judicata you may not be permitted to litigate additional claims later about those same facts. Plaintiff is also aware he could bring more than one defendant in the same action if the claims about them arise out of the same transactions, occurrence, or series of transactions or occurrences, and if any question of law or fact common to all defendant will arise in the same action. See Fed. R. V. Miller, 2007 WL 2127478, 4-5 (S.D. Okla. Aug. 21, 2007).

Plaintiff is claiming he is only litigating the actions around him being sexually assaulted from 2/3/18 through 2/8/18. In which he was force in a cell in the RHU with a Violent Lifer. Although these acts happened on different days Plaintiff is claiming that they arose out of the same transaction, occurrence, or series of transactions or occurrences, and the question of law or fact are common as to all defendants. Plaintiff is also claiming the medical department left him treatment from injuries Suffered is clearly related to the series of transaction and occurrences. See George V. Smith, 507 F.3d 605 607-08 (7th cir 2007) Also see Rule 20(a)(2) Fed. R. Civ. P.

## Deliberate Indifference And Negligence

As a general matter, the supreme court has determined that failure to Provide adequate medical treatment violates the Eighth Amendment only when it results from deliberate indifference to a prisoner's serious illness or injury. "Estelle v. Gamble, 429 U.S. 97 105 (1976). In order to state a claim that the medical care provided by the defendants violated constitutional rights, a Plaintiff must Plead that his medical needs were serious and that Prison officials were deliberately indifferent to those needs. See Inmates of Allegheny County Jail V. Pierce 612 F. 2d 754, 762 (3d cir 1976).

A medical medical need is serious if it's obvious that a lay person would easily recognize the necessity for a doctor's attention. "see Woloszyn V. County of Lawrence 396 F.3d 314 340 3d cir, 2005). Negligence under Pennsylvania law claims or Plaintiff must show that defendants had a duty, to the Plaintiff under the circumstances and breached that duty.

Plaintiff is claiming at no point of time was he under any form of course of treatment. any medical official at SCI Huntingdon at no Point of time was Brown evaluated at their proper meant with multiple medical staff. Brown, is claiming he was deprived medical treatment by the medical staff at SCI Huntingdon, On 2/3-18 in the middle of the night a nurse Trice, would let Brown out his cell pursuant to a sick call he had at M. Plaintiff would assert to nurse Trice that it had took 5 days for to get a sick call. but on 2/7/18 medical was called or a c/o Johnson claimed medical was call in which he failed to show, to evaluate Brown.

Plaintiff told nurse Trice, in detail that he was sexually assaulted by his cellmate Do times, and was assaulted multiple times and has yet to get treatment for his symptoms. Brown claims his symptoms was as such; bruises in and around his anal, Neuralgia ach, Inflammation of the ankle and knee, Swelling around the nose in which it was hard to breathe, chronic back Pain, Erratic Pain in his Hand, thirst, numbness, along the left side of his head, Blurred sight, Nurse Trice claims, seems that it was so late that Brown would be seen the next day, at no time did she evaluate Brown conduct a stick man or do anything to see the extent of Brown's injuries. She would also tell Brown he would need a court order s see an outside specialist.

"See Exhibit 4 Case 1:18-cv-00342-DCN Document 84 Filed 10/25/21 Page 879 of 973 PageID #...

indifference to his serious symptoms. She also had a duty to treat or evaluate Brown and breached their duty in which she was negligent.

Brown was again called down on 2-14-18 to a case. Plaintiff would meet with 2 nurse Nikie. Brown would tell Nikie what he told Trice and all his medical symptoms in which they was getting worse calling him excruciating pain. Nurse Nikie did nothing to treat Brown or even evaluate him. Telling him she was only told to take pictures by Pecilia Price and Brown would have to fill out a sick call, and would need a court order if he was to see any outside specialist. Nurse Nikie also told Brown she has seen other cases were as homosexual claimed he was sexually assaulted and that in many cases they willingly acted out sexual acts with their cellmates then try to make medical the fall guy.[']! At no time did Nurse Nikie treat Brown or evaluate him.

Plaintiff would meet with Dr. Kollman and Paula Price. Brown would tell them, that he had suffered multiple sexual assaults and that the prison has failed to evaluate him in which his symptoms were getting worse. That he had abdominal pain, bleeding and bruises in and around his anal, Neuralgia pain through his body, although the swollen at his ankle has went down his knee is still had inflammation, his nose and chronic back pain was causing him was causing him excruciating pain and that the numbness along the side of his head will not go away causing serious concerns. Brown also expressed his sciatic pain in his hip and thigh was getting worse and is rib's was causing inexplicable pain.

Dr. Kollman will ask Brown "how many times will you get sexually assaulted?" It seems to me that you like getting assaulted! PA King would also walk in during the first meeting with Kollman. King would contest that if they order X-rays, and anything was wrong, that Plaintiff would need a court order to see a specialist because they were under funded. They would then assert "being that you are who you are, we really don't want to get involve because you sure everybody!" "The most we can do is order aspirin only if Yo sign a cash slip!" After Plaintiff told King Kollman and he was indigent, they deprived him from medication. Paula Price would do nothing for Plaintiff during the meeting with them. She would tell Plaintiff to go back to his cell untreated.

Brown brings claims of deliberate indifference and negligence to a amit Dr. Kollman, D.A. King and Paula Price, see Grievance # 734081. Plaintiff would fill out Moore Sick calls in which he would be ignore by the medical staff. The deprivation of treatment has caused deform in the healing, and permanent impairment. Plaintiff still feels pain around his ACL and LCL directed to the ligament surrounding it making it hard to climb stairs. Plaintiff's Neuralgia pain through his body has not stop, and his sciatic pain in his hip and thigh. along with his chronic back pain has caused him sleepless nights. Plaintiff head injure has left a nasty scar on the left side of his head, in which hair is not growing. Plaintiff still feels in tense stomach pain. The numbness on the left side of Plaintiff's head, has not gone away causing concerns. Plaintiff acute pain from scoliosis that is left untreated has caused him to move very slow and hunch back.

"If a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." Brown is bringing claims against non medical defendant, claiming they delay treatment and/or deliberately deprived him from seeing medical staff while in was in 108 cell from 2-3-18 through 2-9-18. Brown is claiming c/o Placenti, c/o Crawford, Lt. Young, unit Manager Kendrick and Lt. Aquoke had witness an assault on Brown after Put or forcing him in the call with the violent biter. Brown was attacked by this inmate in which he would cry out for medical attention but was ignored.

Plaintiff would again complain to c/o Law, c/o Poorman, and c/o Harris about feeling excruciating pain in the ribs, and numbness on the left side of his head. Brown was bleeding from his head after an attack on 2/5/18 in the middle of the night in which he hit his head on a metal like poll connected to the bed in Prevent inmate that fall in their sleep from falling. These three officials did nothing to get Brown medical attention ignoring his serious symptoms. These actors did nothing to all medical. Brown would also meet with Kauffman and Truvers telling them that he needs medical attention in which he was in joy, Brown's head was left to bleed. Brown would also tell Eric Parsons that he was attacked and had suffered head injuries. Parsons would do nothing to get Brown evaluated by medical staff.

After the attack on on 2/5/18 Plaintiff would also talk to Lt. Marxwell and ady simple, asserting the violent biter had attacked him in the middle of the night in which nothing would be done.

Plaintiff was a gain attacked on 2/7/18, this time he would suffer three injuries, a c/o Johnson and c/o Plocinik would run off as the assault starts; a c/o Johnson would come back to the very same cell asserting "it looks like an animal got slay in here". A c/o Fochtman would also come by asserting "who am I writing up for frird that". Brown asked both c/o Plocinik was also aware of Brown's cry for medical help, as well as Sgt. Heaster and LT Young they would go as far as telling Brown to give him his jumper, linen, boxers, sheets in which had bleed all over it but they would refuse to call medical for Plaintiff. Brown would also talk to a Sgt. John Doe during the night of 2/7/18 telling him that he was just sexually assaulted and his injuries were serious this actor failed to respond. Brown is claiming that all medical defendants we deliberate Indifference and negligence to his serious medical injuries, officials clearly had a duty to see to it that Brown see medical after his injuries in which they breached that duty.

"Deliberate Indifference" may be inferred when a Prison official knows of a Prisoner's need for medical treatment but intentionally fails to provide it; delays necessary medical treatment for a non-medical reason; or prevents a Prisoner from receiving medical treatment. Read See Rouse V. Plaintiff, 182 F.3d 192, 197 (3d cir 1999).

## Cruel and Unusual Punishment

Plaintiff is claiming Cruel and unusual Punishment under the Eighth Amendment. To state a viable Eighth Amendment claim, Brown need to allege that 1) he suffered an "objectively, sufficiently serious" deprivation and 2) that the officials being sued had sufficiently culpable states of mind. Beers - capital V. Whartzel, 256 F.3d 120, 125 (3d cir 2001) To satisfy the first prong of this test, the condition of confinement at issue must deprive the prisoner of the minimum of civilized life's basic necessities see Farmer 511 U.S. at 83. The state of mind necessary for a viable claim under the second prong is "deliberate indifference" to inmate health or safety, a standard that requires actual knowledge or awareness of the risk of the condition of confinement to the prisoner.

Plaintiff was place in the RHU, he visited with Kevin Kauffman the warden of the jail, CPT. Russell a Shift commander, LT. Maxwell the P.R.E.A. LT. Mandy Sipple a head P.R.E.A. Supervisor. Brown voiced that he was a homosexual inmate with a history of being sexually assaulted and harass. Brown claimed because of his youth and feminine appearance he would be likely to experience sexual pressure from inmates that's bigger and stronger then him. It is also transparent because he also switches his hips when he walks, talk like a girl and wears eye linder.

Brown was force to sign a double bunking sheet. Brown would again meet with cpl. LT. Maxwell, Mandy Sipple, unit Manager Kendrick, CPT. Powell, LT. Freeline, in which was very concern, Persuant to his housing while in the RHU. Plaintiff told those defendants at c/o Plocinik is going to put him in a cell with a known enemies Allen inmin is very inmate was extorting him along with a inmate Jackson. In which Jackson put a shank to his neck, saying he will kill him if he told about an assault and while being force to call family members for money to put on both Jacckson and Allen books. The officials was also aware that Brown was a victom of sexual assault at a mother son prior to coming to the facility again.

They told Brown if he did go in the cell with inmate Allen O.G. will be use him "The Good Stuff" The violent lifer would tell c/o Plocinik, c/o Crawford, Dunkel, LT Young, & unit Manager Kendrick that he did not want Brown in the cell him because he was a "homosexual and a rat" Plaintiff would then Suffer an sault by the violent lifer in which Plocinik and Crawford was right there to witness, it would be deprived medical attention Plaintiff would then voice out to c/o Pharmsay, calaus, c/o Fochtman, c/o Harkis, in which he told these officials he fear for safety. The violent lifer would motivate Brown to tell these officials because he not want him in the cell with him. Brown cry would be ignore, Plaintiff will suffer 24 assault while Phychdotist Eric Bitgons at his door along with the unit manager kendrick Plaintiff then told Perkins he was suicidal in which he was ignored. Brown would subject to multiple fake assaults at the hand of the lifer in which LT Young, easter, c/o Plocinik, c/o Fochtman, c/o Chillcote, c/o Johnson would ignored not called medical.

the constitution, does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth amendment see Helling, 509 US at 31. 125 L Ed 22. 113 S Ct 2475." Brown is claiming he was incarcerated under conditions posing a substantial risk of serious harm, and that each action would cause him unnecessary and wanton infliction of pain in which violated his rights under Cruel and unusual Punishment.

## Due Process Under The Fourteenth Amendment

Plaintiff is claiming the Prison-Condition he was subjected to violated his fourteenth amendment rights. Plaintiff is claiming he has an federally Protected liberty interests under the due Process Clause. Plaintiff is claiming conditions while in the RHU violated his substantive Due Process. Conditions that are reasonably related to a Penal institutions interest in maintaining Prison security typically Pass constitutional muster. The RHU is a segregated housing Unit where inmates are confined in Solitary or near-solitary conditions in a six by eight foot cell for 23 to 24 hours a day, with little or no opportunity to interact with other inmates. Brown is claiming all defendants violated his rights under His Due Process.

Brown was transferred to SCI Huntingdon in which he made a LT. Maxwell and Maudy Sieple both P.R.E.A. Supervisors at the Prison that he was a homosexual inmate, and he was subject to sexual assault at the Prison in which he came from. Brown would then meet with Kevin Kauffman the warden of the Jail, also cpt. Powell, LT. Fleding and Unit Manager Kendrick, in which he would voice his concerns pursuant to his housing while in the RHU. Plaintiff concerns would be ignored and officials would force him to sign a suicide bunk/no sheet.

These same officials would then force him in a cell with a known enemy. Plaintiff was then subject to multiple sexual assaults and assaults at the hand of a larger, stronger and "ruthless Lifer." During Brown's stay in cell 108 on G-A he would voice out for help to multiple defendants such as c/o Placinik, crawford, LT. Young, LT. Dunkel, Unit Manager Kendrick. Plaintiff cry for help would be ignored by these officials. Plaintiff would again voice out to c/o Law, c/o Eckleman, a Psychologist that work the Unit name Eric Partsons, a sgt. Hooster, c/o Chilcote. Mr. Partson Violated Brown's 8th Amendment rights by his actions. Plaintiff liberty interest was not Protected. Partson's and Undermanager Kendrick left Brown in the cell although aware he had last 10 times assaulted by a violent inmate. Brown would even claim he was suicidal, in which he was ignored. Both Partsons and Kendrick was aware that Brown was a vulnerable homosexual that had already been subject to sexual assaults because Brown told them.

The Violent Lifer would tell these he would kill Brown or sexually assault him if he did not get him out the cell. They would have every reason to believe Brown was being harmed. c/o Chilcote and c/o Johnson would subject Brown to Punishment through their tronic. Chilcote would try to move the Violent Lifer with a friend, but the Lifer would use telling him "Brown will be sucking my dirk if you don't remove him." Chilcote failed to stay on Post until he got help for Brown. c/o Johnson was order to change or exchange Plaintiff's Jumper, boxers, sheets, socks ect in which are cover with blood, from Sexual assault. Johnson was aware Brown had been harm and would have reason to believe he would be against harm if he did not remove Brown from his attacker. Johnson witness the Lifer tell Brown, in which he would run off with c/o Placinik. Him and Placinik would then leave Brown in the very cell in which he would be subject to another sexual assault hours later.

Kauffman deprived Brown Of the minimal degree of Process, in which he was overly deliberate indifference to the fact that Brown was forced into a cell with a Violent Lifer that was on the RHU for stabbing another inmate over Cookies. Kauffman aware that Brown was a homosexual inmate already subject to sexual assault on another in RHU. Kauffman subject Brown to conditions of Confinement that could had been fatal. Brown Voice out to Kauffman and LT Maxwell and Maudy Sieple he would be Voice out to these defendants, while in the cell with the attacker in which the 2nd incarcerated Brown, because he did not voice Brown in the cell, with him being that Brown got out or homosexual. Brown told Kauffman through the doors that he had been subject to painful physical harm and had serious symptoms. Brown was ignored by these defendants. defendants had actual Knowledge or awareness of the risk of the condition of Confinement was deliberate, Indifference to Brown's health or safety. Brown has Protected liberty interests in which defendants Violated Pursuant to his amendment rights.

## Fourteenth Amendment Due Process Against Medical and Treatment

Brown brings claims of 14th Amendment due Process against Medical defendants and only for medical reasons; Brown do not hring these claims against non medical defendants.

Failure to provide medical treatment to a prisoner violates the Due Process Clause of the Fourteenth Amendment when it results from deliberate indifference to a prisoner's serious illness or injury. For a denial of medical care to constitute a violation of the Fourteenth Amendment, the Plaintiff must show(i) a serious medical need, and (ii) acts or omissions by law enforcement officers that indicate deliberate indifference to that need.

A prison official does not act with deliberate indifference unless the official knows of and disregards an excessive risk to inmate health and safety in which is the case, Brown is claiming he meat with a nurse Trica on or around 2/13/18 in the middle of the night after it took him days, just to get a sick call. He would tell nurse Trica that he was sexually assaulted multiple times and was in excruciating pain. He expressed that he already had on going numness in the head before the assaults, in which had gotten worse after the assaults. Also his boxers would be red in the back because he wouldn't stop bleeding from his anal causing pain. He was feeling neuralgia pain through out his body, inflammation of the ankle and knee causing acute pain and discoloring. Trouble seeing in which he had Abrasion in the eye, Plaintiff also asserted swelling around the nose making it hard to breath, and scratchy pain in his hip and thigh, and chronic back pain, also bleeding from his head with his long hair covered.

Plaintiff would explane these same injuries to a nurse Nikie a day later and got the same results. He was never evaluated by nurse Trice or Nikie, Brown would then meet with RN King, Dr. Kolman, and Paula Price. He would explane to these defendants that is serious symptoms were getting ignored by officials and had been on going sexual brutal assaults and sexual assaults. Brown would assert he was suffering from abdominal Pain, acute pain from his scoliosis, Neuralgia, and sciatic Pain through his hip and thigh, sharp pain in the ribs, on going numness in the head, also bleeding from his head in which his long hair covered, his knee inflammation was not getting better & he was still bleeding from the anal and haveing vision trouble and chronic back pain.

These defendants would fail to evaluate Plaintiff, telling him he would need a court order to see a specialist and because he was indigent he could not get any pain medication, Brown was left to go back to his cell in pain. A prisoner can demonstrate deliberate indifference by showing that a doctor intentionally inflicted pain, prison authorities denied reasonable requests for medical treatment, the reby exposing the inmate's need to undue suffering or the threat of tangible, residual injury or prison officials knew of the inmate's need for medical care but refused to provide it.

## Retaliation First Amendment

Plaintiff brings retaliation claims against LT. Maxwell and Mandy Sipple, after Brown was admitted to SCI Huntingdon. He meat with both Sipple and Maxwell telling them he was subject to sexual assaults at a SCI camp Hill Brown would be transfer back to camp Hill then back to Huntingdon meeting with defendants Grawe, Maxwell told Brou he use to work at camp Hill and that Brown claims had alot of his friends under fire. He and Sipple them while Brown a "whistle blower" that don't deserve to live. They then fail to evaluate Brown for single cell status which is clear with in PARU for sexual assault victims. (Z-code) During Brown next meeting with Mandy Sipple and LT. Maxwell he would vroce his concern pursuant to his housing in the RHU.

Both defendants would ignor Brown's claims telling him, he can't have his cake nd eat it too, that he's trying to attrack men by wearing eye liner and acting like a girl. These two defendants would then force Brown in a cell with a knew enemie. Brown would then tell those defendant while in 108 cell that he was subject to assaults. These defendants ignored Brown causing the attacker to "sexualy assault Brown. Brown is protected under the 1rst Amendment. Brown's factual allegations plausibly support the elements of First Amendment retaliation claims. Brown suffered adverse action against defendants because of his claims against Maxwell and Sipple, friends. See Gill v. Piatt F.3d 379, 380 (2d Cir. 2004).

Plaintiff also brings these claims against LT. Eberling, Kevin Kauffman, CPT Powell, nd Unit Manager Kendrick; Apparently Brown had wrote a grievance against these defendants identifying Powell as House. Nevertheless these defendants forced Brown to in a dubble bunking sheet although he asserted concerns pursuant to his housing. See Exhibit G1-7. These defendants would put Plaintiff in a cold cell with nothing when the cell was infested with flik and feces in which Brown was given nothing.

When Plaintiff meet with defendants Lt. Eberling, Kevin Kauffman CPL. Powell told Brown the reason why he is being put in the cell with inmate Allen was because he likes to file law suits and grievances, the As a result of Lt. Eberling, Kevin Kauffman and CPL. Powell and Unit manager Kendrick forcing Plaintiff in a cell with a violent Ruthless Lifer, he was sexually assaulted multiple times. These defendants would also refuse to take Brown out the cell after meeting with Brown while Brown was in cell 108, Plaintiff would suffer an assault while Kendrick and Pontoon witness and did nothing; Plaintiff would then tell Kauffman he would tell Plaintiff to take it up with management.

Plaintiff suffered an adverse action because he had filed a grievance against defendants. Defendants also failed to conduct or evaluate Plaintiff for a state cell because of this. Plaintiff is claiming there is a causal link connection him filing a grievance against officials and the action taken by conspiring to keep him in a cell despite aware of abuse. Plaintiff is claiming retaliation c/o Hariss, c/o Plocinik, and C/O Fochtman. Hariss was one of the defendants that put Brown in a cold cell in which he suffered symptoms of hypothermia and frostbites. He would tell Brown because he wrote a grievance on Lt. Eberling and others; Brown is not prosuing those claims, but Brown would later file a grievance on him, Plocinik and Fochtman in which would lead to 2/5/18 when Brown was let out for showers; Brown would tell hariss he did not want to go back to the cell because he was being assaulted; he would tell Plaintiff those would he use also he don't get his fagit ass back in the cell, You like filing grievances.

Plocinik and Fochtman would also ignore Plaintiff claims of assaults because Brown had filed grievances against them. They would also tell Plaintiff they do not like fagits or rats. Plocinik would witness an assault on Plaintiff after he put him in the cell, telling Allen "Fuck him up he's a fagit and a rat." Fochtman would laugh and joke after Brown was sexually assaulted on, 2/7/18 stating "Allen you are the Father". Plaintiff K claiming his grievances against defendants, and them labeling him as a "fat and a fagit" motivated them to retaliate against him. In which there is a causal link between their actions and Plaintiff's injures.

## Intentional Infliction of Emotional Distress

Plaintiff is claiming state claim of emotional distress. Defendants caused Plaintiff emotional distress. Plaintiff is asserting defendants actions in housing him with a violent lifer while in the RHU, then conspiring to keep him in such cell after awareness of abuse, assault, and sexual assaults was "outrageous behavior" also then depriving Plaintiff of medical treatment after he suffered serious injuries is as a conduct that exceed the bounds of decency and is regarded as intolerable in a civilized community. Defendants conduct has "intentionally or recklessly" cause severe emotional distress to Plaintiff. See Fanean v. Rite Aid corp. of Delaware, 984 A2d 812, 918 (Del Super ct. 2009)

## Negligence

Brown is bringing claims of negligence against non medical defendant. The victim is claiming Lt. Maxwell and nanny Sipple had a duty as P.R.E.A. Personals to evaluate Brown in which they ignored his claim and the fact that he was a 120 pound homesexual men that had feminine appearance in which was transfer can't be cause the switch his hips when he walked and acts and Suwn like a Girl, and dollar Kelmer, Brown also has a history of being sexually assaulted. These defendants were negligence in putting him in a cell with a violent lifer that did not want him in his cell. Defendants Hill nanslee kendelle, Kauffman, Powell, Eberling, Jacksons, were also negligence in housing Brown in the cell after Brown made them aware of an agent abuse, assault and sexual assaults in which was ignored.

Defendants Crawford, Plocinik, Hooster, Young, Drinkle, Fochtman, Lacu, Chairate Johnson, was also negligence in leaving Brown in the cell, these defendants had witness assault on Brown and had event reason to believe it would not stop. Defendants would even exchange his Jumper, socks, sheets act that had blood all on it after a sexual assault then refuse him medical attention. Defendants actions was negligence. All defendants had a duty to protect Brown from violent and breach that duty in a causal relationship between the breach and the result an jury see Burman v. Golay & Lonine 420 Pa. super. 209, 616 A2d 657 (1992) Also official Pooman and thesis.

Munnipal Claim # 1

Brown is bringing municipal claims under Monelli for Inadequate treatment. Failure to train, Discipline and Supervise in which is a custom that he's linking to officials at SCI Huntingdon depriving him medical treatment causing his serious. Symptoms to worsen after multiple sexual assaults and assaults while he was in cell 108 from 2/3/18 through 2/10/18. Brown is claiming there are other inmates subject to these same deprivation of medical treatment or lack of medical treatment in which liability falls on policy makers such ass John Wetzel, Medical Provider Wexford, Paula Price, Kotffman, Andrew Dancha.

Plaintiff will keep this short and is only asserting actions of the medical department from his injuries suffered from 2/3/18 through 2/10/18 respecting the Honorable Court's order. In this case Plaintiff alleged that defendants knew that medical care was necessary but simply refused to provide it. Defendants concluded that Brown would need a court order to get evaluated by a specialist persuant to his severe injuries suffered from multiple sexual assaults such symptoms that would be link to Sciatic condition, Sharp Pain Passing down the hip through his ba and thick pain in his neck. rain inflammation, numbness along the left side of his head, although Brown claimed that the numbness, along his head was an result of an on long injure from high school after being slam on his head, Brown teller him in a wrestling match. Brown explains he did not tell his rccb and the numbness would to away, and come back everytime he suffers hits to the head. Brown predicated this time it was not going away in the 2002 Injured, Brown also offered Scoliosis Pains and Neuralgia pain along his nervous system, Knee and ankle pain and pins.

They also claimed the Doc lack faults that would be the reason for a court order said Kolm Brice and King, Brown is claiming the D.O.C. is responsible for Providing funds to insure that the medical needs of the inmates are properly met. The limited funds Provided would contribute to deliberate indifference to inmate like Brown's serious medical injuries. The State and local government have the obligation to Provide medical care to incarcerated inmate see Estelle, Sulton. The duty is not absolved when the DOC contract with an entity such as Wexford.

A municipality that consciously fails to train, supervise, or discipline, its officials may have a Policy or Custom of deliberate indifference. A Pattern of deprivation may imply deliberate indifference on the Part of D.O.C. Policy makers to the need for training, discipline and supervise on a Particular area. Plaintiff Must Present Sceenter — like evidence of indifference on the Part of a Particular Policy, Custom or Policy maker which generally indifferent acquiescent in a custom or Policy to inadequate training treatment, supervision or discipline.

Other Inmates

Although other inmates medical condition has nothing to do with Brown's claime of deliberate indifferant from injuries suffered from 2/3/18 through 2/7/18, in order for Brown to show it's a Policy it's imperative he shows that other inmate were subject to the same custom, A inmate Chambers was jealous Sharp Pain in his heart, he would meet with Dr. Kollman and P.A. King, they would tell him it was only a mild stroke and the reason was from his inlents work out in which was causing in teruation, of normal blood flow to the brain. Chamber would assert he do not work out? Chambers ask to see a specialist they told him he would need a court order unless he was about to die, while Chambers was in his cell indching til the next day, he would have a hard time breathing from his heartrate, causing him to Pass out. He was rush to the hospital for treatment after almost loosing his life. During Chambers recovery and how "Passive" the cardiologyst, at the hospital would ask him why hadn't the jail tookes actions in bringing him to the hospital after an heart attack. In which the prison dose not have the tools to treat such injuries. Chambers would assert it could't be true that P.A. King and Dr. Kollman told him it was only a mild stroke in which they started Joking to stop his inlent workouts, The specialist told Chambers that the jail had jokes his condition as a acute heart attack. These defendant was aware of Chambers serious injuries, inmade they lost but telling him somehow ease was wrong so they would't have to treat him, in which Chambers would later suffer cardiac arrest because of delay internment.

An inmate Luke Tomas suffers from epilepsy and have sonar seizures, officials are aware of his serious condition; this inmate would pass out from a vitalet and shaking, after nurse Nikol and Kollman was called they would threaten the inmate more that O.C. would be use on him if the did not get up, Another inmate Whitee would die in his cell after night after outside doctors would tell the Person to house this inmate By a medical block for his serious condition. The prison has no medical blocks and would fail to transfer Whitee, in which, they would send him to population. Whitee would dee in the cell over night after an heart attack. On October 1st 2017 Dr. Kollman and other medical officials would instruct Whitee cellmate Frederick Brooks ML 8061 to conduct C.P.R. on his celly that was already dead.

Under Monell V. New York Dept of Social Services 436 U.S. 658 (1978), a local government entity or Private entity acting as a State actor may not be held vicariously liable under 10 for the action of its agents unless the Plaintiff Prove the entity's Policy or Custom is the moving force.

"... Brown is claiming that during their Rogers' ... meeting with defendants, they would fail to let his injuries and conduct any follow up or evaluate him. This is a pattern of behavior that has manifested from the custody of failing to provide disciplinarie at supervise its officials. In 2012 over 1/2 of the deaths reported to the human services in which is 244 deaths, was blamed on inproper supervision or inadequate care by private jail medical providers such as Wexford. The DOC also had a custom of changing medical providers once every four years.

### Municipal claim # 2

Brown is claiming the D.O.C. was deliberate Indifference in housing him; sending him to a level five state institution in which half the population are Lifers; with "take tides." Munich its rutine to send inmates with violent propair register like history; such as the inmate that beat a official/ C/O to death with timberland boots at SCI Summerset. Or Another inmate that killed his cell then tie him up and rolled him under the bunk. Brown is a Vulnerable homosexual inmate with feminine appearance in which is grevance because he switch his hills when he walks, wear eyeshader, and looks like he's had years of ... Brown is a non violent inmate and was send to prison for two years bcq non violent crime. Brown also link the deliberate indifference to the DOC. policy DC_ADM_008 "Prisen Rape Elimination Act addressing homosexual Safety or accomodatong them pursuant to pursive if they have a claim of or a history of being sexually assaulted. The policy is discretion base favour the power in officials hands in conducing evaluation, and hopeing inmates like Brown. It does not have a strait regulation or policy otherwise would have no follow him using rumale with a history of having sexually assaulted.

A inmate should be given (2-redle) or single cell if he choce after evaluation and claims such as Brown while entering one of its many institutions; Subsection B.4 Reads "The transgender or intersex inmate shall be interviewed at the GRC's privacy and brought if recommendation with in 48 hours of the GRC meeting and be permitted the opportunity to concur or object the recommendation" 5) "In deciding whether to assign a trousgender inmate to a facility is consisten with his/her gender identity, and in making other frNACY, housing and Programmed assignments the Department shall consider, on a case by case bases, whether a placement would au some the health and safety of all inmates inmates and whether the placment or accommodation could potentially present management or security problems" A inmate that is homosexual or and has a history of sexual assaults should not be force to call up while Violent inmates, the policy is discretion base, and it officials to conduct an evaluation they are free to House the obvious and put these inmates in harms way by housing them with violent inmates Brown brings claims under Morell against John Wetzel, LT Maxwell, Maud Sipple for the deliberate indifference in housing Brown in a level(5) rape tide Prison, with inmates with Violent Rot type center his history and the lack in DC_ADM 008 Rape Elimination Act in which Brown links this to officials actions causing his injuries from 2/5/18 through 2/8/18.

### Municipal claim #3

Brown is asking for a Preliminary and Permanent Injunction on DC_ADM 803 mailing and incoming publications procedures Postage and APVNA. Section 4 of this policy. Pursuant to Anti Legation Postage for indigent inmates and for using this section of the policy discrimnates against indigent inmates and puts restraint on adequate reseach or adequate litigating. The policy Reads a) an indigent inmate may anticipate on his or her account, postage for legal mail, to include explanation of grievances, and reporting charges of up to $10.00 per month; Under no circumstances shall the business manager/designee approve requests in excess of $10.00 per month. An inmate is responsible for managing $10.00. This policy does not even address giving inmate funnel does to fight their cases.

Although this policy does not link to these cases Brown is claming with out appointment of counsel in this case, he would be unable to adequately litigate this case because of the lack of alternatives in this policy. Brown is already fighting a criminal appeal pro,se and multiple civil cases under this policy in which official has refuse to send out responds to the courts from court orders see Exhibits A_N 1-9. Brown is claming this policy if not adress will impair him from litigating his case.

I declare under Penalty of Perjury that the foregoing is true and correct.

09/18/18

RE:   Brown v. Lt. Maxwell, et al.
      C.A. No. 19-1528
      Page 2

_____ORDER_____

     The foregoing motion to proceed in forma pauperis ("IFP"), and the motions to
reopen the appeal, are granted. Brown is required to pay the full $505.00 fee in
installments regardless of the outcome of the appeal. The Court hereby directs the
warden or his or her designee to assess an initial filing fee of 20% of the greater of (a) the
average monthly deposits to the prisoner's account; or (b) the average monthly balance in
the prisoner's account for the six month period immediately preceding the filing of the
notice of appeal. The warden, or his or her designee, shall calculate, collect, and forward
the initial payment assessed in this order to the United States District Court for the
Middle District of Pennsylvania. In each succeeding month when the amount in the
prisoner's account exceeds $10.00, the warden, or his or her designee, shall forward
payments to the United States District Court for the Middle District of Pennsylvania
equaling 20% of the preceding month's income credited to the prisoner's account until
the fees are paid. Each payment shall reference the appellate docket number for this
appeal. The warden, or his or her designee, shall forward payments to the appropriate
courts sequentially if there are multiple orders, rather than collecting multiple fees at the
same time which would exceed 20% of the prisoner's account.

     The appeal is dismissed for lack of appellate jurisdiction. Brown appeals from the
February 14, 2019 order of the District Court, which denied his motion to reopen and
struck an amended complaint. However, the matter is proceeding in the District Court.
The order appealed is not a "final order [that] ends the litigation on the merits and leaves
nothing for the court to do but execute the judgment." See Republic Natural Gas Co. v.
Oklahoma, 334 U.S. 62, 68 (1948). Because the order appealed does not dismiss all

claims as to all parties and is not certified by the District Court under either Rule 54(b),
Fed. R. Civ. P., or 28 U.S.C. § 1292(b), the order is not appealable at this time. To the
extent Brown's Motion to Waive the appeal is directed to this Court, it is denied.

By the Court,

s/ L. Felipe Restrepo
Circuit Judge

Dated: October 21, 2019
Lmr/cc: Gartor Kiki Brown
Sean A. Kirkpatrick

A True Copy:

Patricia S. Dodszuweit, Clerk
Certified Order Issued in Lieu of Mandate

(Doc ∉ 10)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GARTOR KIKI BROWN,** | : | **Civil No. 3:18-cv-1527** |
| | : | |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **LT. GILDEA, *et al.*,** | : | |
| | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### MEMORANDUM AND ORDER

On August 1, 2018, plaintiff Gartor Kiki Brown ("Plaintiff"), an inmate presently

incarcerated at the State Correctional Institution at Huntingdon ("SCI-Huntingdon"),

Pennsylvania, filed this civil rights complaint pursuant to 42 U.S.C. § 1983. (Doc. 1).

He seeks to proceed *in forma pauperis*. (Doc. 7). Preliminary review of the complaint

reveals that Plaintiff includes unrelated claims against numerous individuals employed at

various Pennsylvania Department of Corrections facilities. Allowing the pleading to

proceed as filed is not in the interest of judicial economy. Consequently, he will be

directed to file an amended pleading which strictly adheres to the mandates of Federal

Rules of Civil Procedure, Rule 8, General Rules of Pleading, and Rule 20, Permissive

Joinder of Parties.

"Pleadings must be construed so as to do justice." FED. R. CIV. P. 8(e). Rule

8(d)(1) states, in pertinent part, that "[e]ach allegation must be simple, concise and

direct." Rule 20(a)(2), states that "[p]ersons . . . may be joined in one action as

defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." FED. R. CIV. P. 20(a)(2). Although Rule 20 is a flexible rule that allows fairness and judicial economy, the rule only permits "joinder in a single action of all persons asserting, or defending against, a joint, several, or alternative right to relief that arises out of the same transaction or occurrence and presents a common question of law or fact." 7 Charles Allen Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure §1652 at 371-72 (1986).

Plaintiff's complaint violates Federal Rules of Civil Procedure 8 and 20. The claims contained therein concern a number of unrelated separate transactions or occurrence or series of transactions or occurrences against various defendants and do not involve an issue of law or fact common to all defendants. While Plaintiff will be granted an opportunity to file an amended complaint, he is strictly cautioned that the amended complaint must comply with Rule 20 and involve only related claims or parties. "It must be a new pleading which stands by itself as an adequate complaint without reference to the complaint already filed." Young v. Keohane, 809 F. Supp. 1185 (M.D.Pa. 1992). To the extent he believes that he has been subjected to more than one violation of his rights, and inasmuch as these violations are unrelated to each other, Plaintiff should file separate complaints addressing each violation in the appropriate forum

The Prison Litigation Reform Act of 1995 ("PLRA"), which substantially changed the judicial treatment of civil rights actions by state and federal prisoners, also compels

2

compliance with Rule 20. Specifically, under the PLRA the full filing fee must
ultimately be paid in a non-habeas action. Allowing a prisoner to include a plethora of
separate, independent claims, would circumvent the filing fee requirements of the PLRA.

AND NOW, to wit, this 28th day of August 2018, it is hereby ORDERED that:

1. Plaintiff's motion (Doc. 7) for leave to proceed *in forma pauperis* is
   construed as a motion to proceed without full prepayment of fees and
   costs and is GRANTED.

2. Plaintiff shall FILE an amended complaint on or before September 10,
   2018.

3. The amended complaint shall contain the same case number that is
   presently assigned to this action, 3:18-cv-1527, and shall be direct, concise,
   and shall stand alone without reference to any other document filed in this
   matter. See FED. R. CIV. P. 8(d).

4. Plaintiff is strictly cautioned that the inclusion of separate, unrelated
   claims will be considered a failure to comply with an Order of Court
   and will result in dismissal of the complaint. See FED. R. CIV. P. 20.

5. Plaintiff's motion (Doc. 3) for a preliminary injunction is DENIED without
   prejudice.

6. Plaintiff's motion (Doc. 2) to appoint counsel is DENIED without
   prejudice to Plaintiff's right to re-file the motion with his amended
   complaint.

**BY THE COURT:**

**s/James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**

Summary Judgment Exhibits

| Pennsylvania Department of Corrections | 02/20/2018 |
|---|---|
| Inmate Cumulative Adjustment Records | maxwell |

Inmate Name : BROWN, GARTOR KIKI      Inmate # : NA6401

Location : G-D-1005-01      Counselor : Richards-Rhodes,

| Date | | Name/Title | Location | Notes |
|---|---|---|---|---|
| 12/01/2017 | | Parsons, -Psycl Srvs Spcsl Corr | HUNTINGDON | (RHU PSS OOC Contact, Suicide Risk Indicators Check): Inmate seen OOC in RHU SECURE SEARCH CELL. He was unwilling to be celled with another claiming, he will, "Kill" someone if housed double. Additionally, he made allegation which was reported to both Security and Lt. Maxwell by LT. Prokop. It should be noted that Inmate was reluctant to verbalize responses to questions asked of him and was dismissive towards this PSS. Supportive counseling offered. |
| 11/22/2017 | | Banks, -Corr Counselor 2 | HUNTINGDON | I/M provided with Kiosk Pin #587678 |
| 11/21/2017 | | Shultz, -Corr Counselor 2 | HUNTINGDON | Met with the inmate for his initial contact interview. I informed IM that I will be his counselor while he is on CA Unit. He had no issues or concerns at this time. I informed him that Mr. Ralston is the UM. |
| 11/17/2017 | ✓+ | Butterbaugh, - Psycl Srvs Spcsl Corr | HUNTINGDON | Met with Mr. Brown in the psychology department to provide continued supportive counseling for depression and anxiety. I/M states that he has not been followed up with by medical with regard to an incident that occurred at SCI-Camp Hill. Cites intense anxiety and panic attacks as a result of that incident. DC-97 initiated to psychiatry and medical. Denied SI/HI. PSSC will follow-up in two weeks to provided continued supportive counseling. |
| 11/15/2017 | | Banks, -Corr Counselor 2 | HUNTINGDON | Initial interview - conducted this date. Brown's Correctional Plan, Custody Level, and Emergency Contact information were all review with inmate. I/M states he has no forms of ID available to him, was given an application to apply for a SSC. Inmate given "Sexual Assault Awareness" pamphlet and PREA was discussed. Expectations while at SCI HUN were discussed. Brown had no additional questions or concerns. |
| 11/15/2017 | ✓I | Butterbaugh, - Psycl Srvs Spcsl Corr | HUNTINGDON | Met with Mr. Brown in the psychology department to provide supportive counseling per policy. Mr. Brown cited significant mistrust of staff and other inmates. Provided supportive counseling with regard to anxiety management and discussed options of voluntary mental health groups that may be of benefit to him. Mr. Brown noted that he has been litigious with regard to his civil rights and feels that he is being retaliated against by staff at his former institution. PSSC will meet with Mr. Brown again tomorrow in order to determine an appropriate course of treatment. Mr. Brown denied any intent of self-harm or intent to do harm to others. |
| 11/13/2017 | | Mingle, -Corr Counselor 2 | HUNTINGDON | Initial PRAT completed at IRC. |
| 11/08/2017 | | Hoerner, -Corr Counselor 2 | CAMP HILL | Office Contact: |
| 10/27/2017 | | Eckenrod, Corr Counselor 2 | HUNTINGDON | Inmate attended orientation today. All required departments presented except Chaplaincy. This counselor explained about the chaplaincy, as directed by Chaplain Wireman, and directed all religious questions to that department. PREA was reviewed and video was watched. PREA inmate education form signed and forwarded to inmate's counselor for DC-14. |
| 10/26/2017 | | Banks, -Corr Counselor 2 | HUNTINGDON | OOC-late entry-RHU contact out of cell on 10/25/17. This writer introduced myself to Brown as his counselor. We went over some information and services available to him. Brown had no questions or concerns at the time of contact. |
| 10/25/2017 | | Parsons, -Psycl Srvs Spcsl Corr | HUNTINGDON | (RHU PSS OOC contact): Inmate seen per OOC contact by Mr. Parsons, PSS. the multi-modal approach of HELPING was provided, reviewed, and he was encouraged to complete the rest on his time for further review. supportive counseling provided. |
| 10/25/2017 | | Gerholt, -Clerk Typist 2 | HUNTINGDON | PRC Review: Stability D Weekly Review: (Deputy Brumbaugh, Major Walters, CCPM Sipple, PSS Diehl): Inmate will be released to population on 10/25/17 CL:4H |
| 10/25/2017 | | Gerholt, -Clerk Typist 2 | HUNTINGDON | PRC Review: (Deputy Brumbaugh, Major Walters, CCPM Sipple): Inmate was seen for an 802 review. Inmate was encouraged to talk to Security. Continue AC status pending a security report. Next review: 11/1/17. |

*Exhibit P*

| | Pennsylvania Department of Corrections | 02/20/2018 |
|---|---|---|
| | Inmate Cumulative Adjustment Records | maxwell |

**Inmate Name : BROWN, GARTOR KIKI**  **Inmate # : NA6401**

**Location : G-D-1005-01**  **Counselor : Richards-Rhodes,**

| Date | Staff | Facility | Notes |
|---|---|---|---|
| 12/27/2017 | Banks, ██████ -Corr Counselor 2 | HUNTINGDON | RHU Contact - Late Entry - I/M was seen in RHU, on 12/26/17, during rounds. When this writer first approached I/M Brown's cell ██████ ask him if he was going to return to population when released from the RHU to which at first he refused to answer ██████ After repeating my question, Brown became irritated ██████ and demanded that I give him a single cell based on his past homicidal thoughts. I explained that he is able to control his thoughts and he is not able to manipulate him self into single cell status. Brown made further demands that I help him get a single cell or he will sue me and cause me to lose my job. ██████ I then explained that was not appropriate, to which he stopped answering any questions and would only respond with his own ██████ questions seeking personal information about PSS Parsons or myself. |
| 12/27/2017 | Gerholt, ██████ Clerk Typist 2 | HUNTINGDON | PRC Review; Stability D Weekly Review: (Major Grice, CCPM Sipple, UM Kendrick, PSS Diehl): Inmate will be released to population on 12/27/17. CL:4H |
| 12/26/2017 | Hollibaugh ██████ -Corr Unit Manager | HUNTINGDON | 30 Day Unit Team Review: Brown was placed in the RHU on 12-1-17 after receiving a misconduct for Threatening Another Person and Refusing to Obey an Order. On 12-5-17, he received a misconduct in the RHU for Refusing to Obey an Order. Both misconducts resulted in 15 day DC sanctions to be served consecutively and his DC sanctions extend to 12-30-17. Brown is seeking a single cell and his misconducts reflect his efforts to refuse to accept a cellmate by making a threatening statement and refusing to take a cellmate. |
| 12/19/2017 | Banks, ██████ -Corr Counselor 2 | HUNTINGDON | RHU Contact - This writer attempted to make contact with inmate Brown, on this date, during rounds. I/M was on his cell bunk and did not respond to attempts by this writer to make contact. Movement noted. |
| 12/18/2017 | Spyker, ██████ Corr Unit Manager | HUNTINGDON | Both misconduct appeals #C084585 & C065592 were forwarded to both Ms. Sipple, CCPM and Mr. Goss, LPM as inmate addressed concern related to concerns within their department. |
| 12/18/2017 | Spyker, ██████ -Corr Unit Manager | HUNTINGDON | Misconduct Appeal #C084585 was addressed. Paperwork forwarded to both Deputy Brumbaugh and Ms. Sipple, CCPM for final review and signatures. |
| 12/18/2017 | Spyker, ██████ -Corr Unit Manager | HUNTINGDON | Misconduct Appeal #C065592 was addressed. Paperwork forwarded to both Deputy Brumbaugh and Ms. Sipple, CCPM for final review and signatures. |
| 12/12/2017 | Banks, ██████ -Corr Counselor 2 | HUNTINGDON | RHU Contact - I/M was seen in the RHU on this date during RHU rounds. ██████ He would respond to certain questions and then refuse to make eye contact and look away at other questions. PSS Parsons notified of overall behavior and demeanor. Brown had no questions or concerns at the time of contact. |
| 12/12/2017 | Parsons, ██████ -Psycl Srvs Spcst Corr | HUNTINGDON | (RHU PSS contact): Inmate was seen by Mr. Parsons, PSS this afternoon at the request of Mr. Banks, Counselor. ██████ Inmate was seen promptly after our consultation. He was afforded an OOC contact and respectfully declined. ██████ Inmate attempts to manage a negative impression ██████ Inmate is currently frustrated at this staff for not advocating his desire to be celled by himself. ██████ Supportive counseling offered. ██████ |
| 12/12/2017 | Parsons, ██████ -Psycl Srvs Spcst Corr | HUNTINGDON | (RHU PSS contact): Inmate seen by Mr. Parsons, PSS this morning per routine contact. Inmate was afforded an OOC contact for which he respectfully declined. Supportive counseling offered. |
| 12/06/2017 | Parsons ██████ -Psycl Srvs Spcst Corr | HUNTINGDON | (RHU PSS contact): Inmate was seen by Mr. Parsons, PSS this afternoon and he verbally berated this PSS claiming, "Do your job, you would let me get a "Z" code, there is nothing you could help me with" ██████ Attributes his current RHU housing to this PSS. "Not doing his job." ██████ OOC contact was afforded but he rudely refused. |
| 12/05/2017 | Banks, ██████ -Corr Counselor 2 | HUNTINGDON | RHU Contact - I/M was seen in the RHU on this date during RHU rounds. Brown had many demands and questions regarding his misconducts and how to get a z-code, appropriate information provided. He had no other questions or concerns at the time of contact. |

DEF000087

Ref: 1258613 pg 54 of 57 for GARTOR BROWN

(Exhibit Q)

| Pennsylvania Department of Corrections | 02/20/2018 |
|---|---|
| Inmate Cumulative Adjustment Records | maxwell |

**Inmate Name : BROWN, GARTOR KIKI**                    **Inmate # : NA6401**

Location : G-D-1005-01                    Counselor : Richards-Rhodes,

| 02/01/2018 | Richards-Rhodes, -Corr Counselor 2 | HUNTINGDON | RHU contact with inmate Brown at his cell door. He reported that he is ok and did not have any questions or concerns to discuss today. |
|---|---|---|---|
| 01/31/2018 | Parsons, -Psycl Srvs Spcsl Corr | HUNTINGDON | (RHU PSS contact): Inmate seen cell side by Mr. Parsons, PSS this morning. It should be noted that he elected to stay in bed and mutter some statements that this PSS was unable to distinguish due to his choice to not be heard as well as the embient noise from the TV drowning out his voices. Nevertheless, this PSS raised my voice to him and invited him to an OOC contact (where he could be heard). ████████████████. It should be noted that he was observed earlier with a handful of feces ████████████ |
| 01/26/2018 | Richards-Rhodes -Corr Counselor 2 | HUNTINGDON | RHU contact with inmate Brown at his cell door. He reported that this place has a conspiracy against him because he is not being given psych meds; he was informed that his family called his prior counselor but he was never told that they called; he received a misconduct for refusing to take a cellie; a certain CO in the RHU is out to get him; and there are no "black" CO's working in the RHU. He indicated that there is a voice in his head and he has been playing with his "shit." He reported that he is on a hunger strike and this is the 2nd day that he did not eat. We discussed him being seen by the PSS while in the RHU. He refused and said he only wants to be seen by someone to get medication. |
| 01/25/2018 | Parsons, -Psycl Srvs Spcsl Corr | HUNTINGDON | (RHU PSS OOC REFUSED): Inmate had declined to participate in his pre-planned OOC contact on this date. This PSS noted that he had been seen, ████████████ Supportive counseling offered. |
| 01/24/2018 | Diehl, -Psycl Srvs Spcsl Corr | HUNTINGDON | IM was seen at cell door after he declined the need for an out of cell individual. IM expressed that he had a legal deadline approaching and needed to access the law library and utilize the phone. PSS forwarded concerns to UM Kendrick via email to address IMs reported issues. No other reported issues at this time. No suicidal ideations or intent reported. ████████████ |
| 01/23/2018 | Diehl, -Psycl Srvs Spcsl Corr | HUNTINGDON | IM was seen at cell door in RHU to offer an out of cell contact. During contact he refused to look at this writer and turned away from the door when contact was attempted. He refused to answer after several attempts to communicate with him. ████████████ No issues or concerns expressed. Contact was terminated after he refused to cooperate. ████████████ |
| 01/23/2018 V I | Butterbaugh, Psycl Srvs Spcsl Corr | HUNTINGDON | Mr. Brown was on a call-out yesterday to be seen following his release from the RHU. PSSC called his housing unit at the time of his scheduled appointment end was informed that Mr. Brown opted to go to yard. PSSC placed Mr. Brown on another call-out this morning. However, Mr. Brown incurred a misconduct last evening and was placed in PHC. He will be seen by psychology staff in the RHU until he returns to population. |
| 01/09/2018 | Richards-Rhodes; -Corr Counselor 2 | HUNTINGDON | SEMI ANNUAL REVIEW: Met with inmate Brown at his cell door on AA Unit for his semi-annual review. He was counseled on the importance good institutional adjustment and programming. He did not have any questions or concerns regarding his semi-annual review. |
| 01/04/2018 | Richards-Rhodes, -Corr Counselor 2 | HUNTINGDON | Inmate notified via DC-134 of new counselor designation and to check the callout for his initial interview. |
| 01/04/2018 | Yost, -Corr Counselor 2 | HUNTINGDON | Assigned to B caseload; process routinely. MMY |

·f: 1258613 pg 53 of 57 for GARTOR BROWN

*Exhibit R*

| Pennsylvania Department of Corrections | 02/20/2018 |
|---|---|
| Inmate Cumulative Adjustment Records | maxwell |

**Inmate Name : BROWN, GARTOR KIKI**    **Inmate # : NA6401**

**Location : G-D-1005-01**    **Counselor : Richards-Rhodes,** ▮

| Entered Date | Entered By | Facility | Comments |
|---|---|---|---|
| 02/16/2018 | Richards-Rhodes ▮ -Corr Counselor 2 | HUNTINGDON | RHU contact with inmate Brown at his cell door. He was offered to meet with his CC2 for an out of cell interview but refused to come out of his cell. He discussed receiving additional misconducts for refusing to take a cellie and said that he thinks staff is trying to "bury" him in the RHU. This CC2 informed him that we did discuss these misconducts last week, and he was informed that he would continue to receive misconducts for refusing to obey an order if he continues to refuse to take a cellie. |
| 02/15/2018 | Diehl ▮ -Psycl Srvs Spcst Corr | HUNTINGDON | IM was interviewed out of cell per request by Lt. Maxwell for investigation purposes. Although IM agreed to attend out of cell contact, he elected not to answer any questions related to the investigation. ▮ Prior to concluding the contact, ▮ IM raised concerns about his belief that his requests for psychotropic medications have been ignored. IM is currently listed as an "A" stability with no prior MH history. During the interview IM stated, "I have played with my feces before, don't you think that is serious". He dismissed efforts by this writer to discuss interventions that he could implement independently to address his current reported anxiety and depression. ▮ IM also reported the need for single cell status. IM stated, "Based on my symptoms and situation, don't you think this should be addressed by giving me a Z code". When this writer asked IM why he believed single cell status was warranted he replied, "Like what if I play with my shit and hear voices and stuff. My cellmate would want to mess me up. I mean look at my last two incidents, that proves I don't work well with cellmates". At this point in time IM appeared frustrated and began ignoring inquires by this writer. He started looking around the out of cell area and acted as if he was incoherent. After he continued on for a few minutes, he then ▮ stated, "You know, I think you're doing a half ass job here". Prior to ending the session, PSS encouraged IM to attend out of cell contacts as needed while housed within the RHU. Psychology staff will continue to monitor IM and provided supportive services. Supportive counseling offered. ▮ |
| 02/09/2018 | Richards-Rhodes ▮ -Corr Counselor 2 | HUNTINGDON | RHU contact with inmate Brown at his cell door. He reported that he is doing ok and discussed his misconducts. He alleges that he was denied a right to go to the hearing for his misconduct for refusing a cellie while in a camera cell. When asked if he appealed the decision, he indicated that he has no plans to appeal. He discussed being told that there is a DOC Policy that prohibits him from receiving a misconduct for refusing a cellie until his DC time expires. This CC2 explained that he was misinformed and if he continues to refuse cellies, he will get additional misconducts. He asked if I would talk to someone to get his misconducts reversed. ▮ ? I have all of these grievances filed against staff and you are telling me no. Are you serious right now? This CC2 informed him that I am serious because there is an appeal process he can utilize. He said "I already told you that I am not going to appeal." This CC2 made it clear to him that if he is not willing to follow the appeal process to help himself, I will not be doing it for him. Inmate Brown also asked if his family has called to check on him. He was informed that they have not. He did not have any other questions or concerns to discuss today. |
| 02/05/2018 | Parsons ▮ -Psycl Srvs Spcst Corr | HUNTINGDON | (RHU PSS contact): Inmate was seen cell side by Mr. Parsons, PSS this afternoon. Specifically, it was his intent to have this PSS at his door as he complained fixudly as if to intend on others listening) about being housed with another inmate. Inmate has made an ongoing effort to speak with a variety of mental health staff with the interest to voice, "Symptoms" such as, "Hearing voices." This PSS had met with him previously about his alleged voices and he had indicated that they, "Come from within my head" and therefore was invited to think of them as, "Thoughts." ▮ He then shouted, "You mean my mental health on the street and the fact that I play with my s*&t, doesn't count for anything in here.?!" This PSS afforded him an OOC contact to again discuss this matter in private, but he refused. ▮ This PSS urged him to contact his counselor to send a referral to have a "Z" code evaluation; ▮ . Supportive counseling offered. |

(Exhibit S)

| DC-121 Part 3<br>Revised 8/2012<br>Attachment C 6.3.1, Section 17 | Pennsylvania Department of Corrections<br>Employee Report of Incident | | ☐ Use of Force Occurrence | |
|---|---|---|---|---|
| To:<br>█ Brumbaugh | Title:<br>Deputy Superintendent | | Date:<br>2-13-18 | Time:<br>2225 |
| From (Name Printed):<br>█ Orndorf | Title:<br>CO3 | | Location of Incident.<br>RHU  cell GA1008 | |
| Employee Signature: | | Type of Incident:<br>PREA allegation | | |

| Inmates Involved<br>(Name and Number) | Staff Involved<br>(Name and Title | Witnesses |
|---|---|---|
| Brown NA6401 | LPN Trice | |
| Allen FX1504 | | |
| | | |
| | | |

**1.  Detailed description of the occurrence**

On the above time and date control center was notified by medical department LPN Trice that she received a sick call slip from inmate Brown NA6401 that stated he (inmate Brown) was assaulted physically and sexually from February 3, 2018 to February 7, 2018. I responded to the RHU with LPN Trice RHU staff then informed me that inmate Brown was housed in cell GD1005 and that he did not have a cell mate. I then instructed RHU staff to remove inmate Brown from his cell and escort him to the Psych. Office on B-quad and place him in the secure holding area. Inmate Brown was then interviewed and inmate Brown stated that he was assaulted by inmate Allen FX1504 from February 3, 2018 to February 7, 2018. I then asked him how he was assaulted and inmate Brown stated that inmate Brown punched him in the face and the chest area then inmate Allen sexually assaulted him by putting his dick in my butt. Inmate Brown then stated that he informed several staff on numerus occasions and none of the staff would help him. Inmate Brown was then asked who the staff members were that he informed and he stated CO Plocinick CO Harris CO Chilcote CO Clark CO Johnson MR. Parsons unit manager Kendrick Sgt. Heaster and CO Garlick. Inmate Brown was then offered medical attention in which he refused inmate Brown stated that he would only be seen by a Doctor he also refused to let medical staff take photos of alleged injuries. Inmate Brown was then asked if he was going to hurt himself or commit suicide inmate brown stated No he was fine he just did not want a cell mate. Inmate Brown was then escorted back cell GD1005 and secured. All notifications made PREA check list initiated.

Inmate Brown did provide a written statement see attached
PSP Trooper Lear stated he would be in to the Institution 2/14/18 to interview inmate Brown

| DC-121 Part 3<br>Revised 8/2012<br>Attachment C 6.3.1, Section 17 | Pennsylvania Department of Corrections<br>Employee Report of Incident | | ☐ Use of Force Occurrence | |
|---|---|---|---|---|
| To:<br>Brumbaugh | Title:<br>Deputy Superintendent | | Date:<br>2-13-18 | Time:<br>2225 |
| From (Name Printed):<br>Trice | Title<br>LPN | | Location of Incident:<br>RHU cell GA1008 | |
| Employee Signature:<br>Trice | | Type of Incident:<br>PREA alleigation | | |

| Inmates Involved<br>(Name and Number) | Staff involved: | Witnesses |
|---|---|---|
| NA6401 Brown | CO III Orndorf | |
| FX1504 Allen | | |
| | | |
| | | |

**1. Detailed description of the occurrence:** Sir on the above date and time: upon the start of my shift
Inmate Brown NA6401 had placed and sick call slip to be seen on 2/14/14. His sick call request stated that
He was abused from 2/3/18 to 2/7/18 and raped on 2/7/18. This nurse reported the information and then
Went to the cell with LT. Orndorf. Inmate was taken to the psych office and placed into the secure area. Inmate
Brown stated that he was assaulted by inmate Allen FX1504 from February 3, 2018 to February 7, 2018
Inmate Brown was then offered medical attention in which he refused inmate Brown stated that he would only be
Seen by doctor, he also refused to take photos. Inmate denies any thoughts of selfharm or to others. Denies
Any suicidical thoughts, stated he is fine and alone now he has no cell mate. Inmate was then takent back to
Cell and sercued. This nurse returned to medical

| DC-121 Part 3<br>Revised 8/2012<br>Attachment C 6.3.1, Section 17 | Pennsylvania Department of Corrections<br>Employee Report of Incident | | ☐ Use of Force Occurrence | |
|---|---|---|---|---|
| To:<br>Brumbaugh, B | Title:<br>Deputy Superintendent | | Date:<br>2-13-18 | Time:<br>2225 |
| From (Name Printed):<br>Anata Trice | Title<br>LPN | | Location of Incident:<br>RHU cell GA1008 | |
| Employee Signature:<br>*(signature)* | | Type of Incident:<br>PREA alleigation | | |
| Inmates Involved<br>(Name and Number) | Staff involved: | | Witnesses | |
| NA6401 Brown | CO III Orndorf | | | |
| FX1504 Allen | | | | |
| | | | | |
| | | | | |
| | | | | |

**1. Detailed description of the occurrence:** Sir on the above date and time: upon the start of my shift Inmate Brown NA6401 had placed and sick call slip to be seen on 2/14/14. His sick call request stated that He was abused from 2/3/18 to 2/7/18 and raped on 2/7/18. This nurse reported the information and then Went to the cell with LT. Orndorf. Inmate was taken to the psych office and placed into the secure area. Inmate Brown stated that he was assaulted by inmate Allen FX1504 from February 3, 2018 to February 7, 2018 Inmate Brown was then offered medical attention in which he refused inmate Brown stated that he would only be Seen by doctor, he also refused to take photos. Inmate denies any thoughts of selfharm or to others. Denies Any suicidical thoughts, stated he is fine and alone now he has no cell mate. Inmate was then takent back to Cell and sercued. This nurse returned to medical

DEF000049

| DC-121 Part 3<br>Revised 8/2012<br>Attachment C 6.3.1, Section 17 | Pennsylvania Department of Corrections<br>Employee Report of Incident | | ☐ Use of Force Occurrence | |
|---|---|---|---|---|
| ʿo:<br>ɓ, Brumbaugh | Title:<br>Deputy Superintendent | | Date:<br>2-13-18 | Time:<br>2225 |
| From (Name Printed):<br>Eric Orndorf | Title:<br>CO3 | | Location of Incident.<br>RHU  cell GA1008 | |
| Employee Signature: | | Type of Incident:<br>PREA allegation | | |
| Inmates Involved<br>(Name and Number) | Staff Involved<br>(Name and Title | | Witnesses | |
| Brown NA6401 | LPN Trice | | | |
| Allen FX1504 | | | | |
| | | | | |
| | | | | |
| | | | | |

### 1.  Detailed description of the occurrence

On the above time and date control center was notified by medical department LPN Trice that she received a sick call slip from inmate Brown NA6401 that stated he (inmate Brown) was assaulted physically and sexually from February 3, 2018 to February 7, 2018. I responded to the RHU with LPN Trice RHU staff then informed me that inmate Brown was housed in cell GD1005 and that he did not have a cell mate. I then instructed RHU staff to remove inmate Brown from his cell and escort him to the Psych. Office on B-quad and place him in the secure holding area. Inmate Brown was then interviewed and inmate Brown stated that he was assaulted by inmate Allen FX1504 from February 3, 2018 to February 7, 2018. I then asked him how he was assaulted and inmate Brown stated that inmate Brown punched him in the face and the chest area then inmate Allen sexually assaulted him by utting his dick in my butt. Inmate Brown then stated that he informed several staff on numerus occasions and none of the staff would help him. Inmate Brown was then asked who the staff members were that he informed and he stated CO Plocinick CO Harris CO Chilcote CO Clark CO Johnson MR. Parsons unit manager Kendrick Sgt. Heaster and CO Garlick. Inmate Brown was then offered medical attention in which he refused inmate Brown stated that he would only be seen by a Doctor he also refused to let medical staff take photos of alleged injuries. Inmate Brown was then asked if he was going to hurt himself or commit suicide inmate brown stated No he was fine he just did not want a cell mate. Inmate Brown was then escorted back cell GD1005 and secured. All notifications made PREA check list initiated.

Inmate Brown did provide a written statement see attached
PSP Trooper Lear stated he would be in to the institution 2/14/18 to interview inmate Brown

6.3.1, Facility Security Manual
Section 17 – Extraordinary Occurrences
Issued: 9/28/2012
Effective: 10/5/2012

Attachment 17-C  Page 1 of 2
DEF000048

( Exhibit 70 )

speaks to any of us but he was in the shower the one day and said he didn't want to live with Allen anymore so we moved him that same day to D quad". CO1 Garlick stated "As we escorted Brown back from the shower to move cells he was smiling the whole time".

CO1 Garlick submitted a written statement.

CO1 Plocinik was interviewed on February 16, 2018 in the Clinic area by Lt Maxwell and AO1 Pyle.

During the interview the allegations made by Inmate Brown were reviewed. CO1 Plocinik was asked if he escorted Brown from the camera cell to GA1008 cell with Allen, he stated "I don't remember if I moved him or not". CO1 Plocinik was asked if he moved Brown and Brown was immediately assaulted by Allen as he alleged, he stated "No, I would have administered OC". CO1 Plocinik was asked if he ever witnessed Allen physically assault Brown, he stated "No". CO1 Plocinik was asked if Brown ever reported to him being physically or sexually assaulted by Inmate Allen, he stated "No". CO1 Plocinik was asked if at any time he witnessed any signs of Brown being physically or sexually assaulted, he stated "No". CO1 Plocinik was asked if Brown requested to be moved from the cell at any time, he stated "No". CO1 Plocinik was asked if Brown was forced into the cell with Allen, he stated "No".

CO1 Plocinik submitted a written statement.

CO1 ▓ Clark was interviewed on February 20, 2018 in the Clinic area by Lt Maxwell and AO1 Pyle.

During the interview the allegations made by Inmate Brown were reviewed. CO1 ▓ Clark was asked if Brown or Allen ever asked him about being moved from the cell, he stated "No". CO1 ▓ Clark was asked if he witnessed what appeared to be injuries from a possible physical altercation on Inmate Brown, he stated "No". CO1 ▓ Clark was asked if Inmate Brown ever reported to him he was physically and/or sexually assaulted by Inmate Allen, he stated "No". CO1▓ Clark stated the only thing Inmate Brown said to him was he was to live by himself when Inmate Allen was being escorted to yard. CO1 ▓ Clark stated "Nothing seemed to be out of the normal since Brown was always trying to get a cell by himself".

CO1 ▓ Clark submitted a written statement.

PSS Parsons was interviewed on February 20, 2018 in the Clinic area by Lt Maxwell and AO1 Pyle.

During the interview the allegations made by Inmate Brown were reviewed. PSS Parsons was asked if at any time Inmate Brown reported to him he was physically or sexually assaulted by his cellmate, PSS Parsons replied "No". PSS Parsons was asked if Inmate

*(Exhibit 69)*

both went out for showers and neither refused to go back in the cell afterwards". CO2 Heaster further stated "I think Brown has had mental problems recently because last week he was sitting in his cell eating feces out of a cup".

CO2 Heaster submitted a written statement.

CO1 Fochtman was interviewed on February 15, 2018 in the Clinic area by Lt Maxwell and AO1 Pyle.

During the interview the allegations made by Inmate Brown were reviewed. CO1 Fochtman was asked if Brown ever reported being physically or sexually assaulted, he stated "No". CO1 Fochtman was asked if Brown ever asked to be moved from his cell with Allen, he stated "No". CO1 Fochtman was asked if he witnessed Brown with a nose bleed, he stated "No, I never actually saw the nose bleed but he did report to a trainee he had a nose bleed". CO1 Fochtman stated "I went to talk to Brown to see for myself if anybody was fighting and they both stated they weren't". CO1 Fochtman stated "Allen and Brown neither one asked for a cell move due to not getting along or physical assaults but they did complain they couldn't see the TV from their cell and I told them we don't do courtesy moves for the TV".

CO1 Fochtman submitted a written statement.

CO1 Chilcote was interviewed on February 15, 2018 in the Clinic area by Lt Maxwell and AO1 Pyle.

During the interview the allegations made by Inmate Brown were reviewed. CO1 Chilcote was asked if at any time he witnessed any signs of Brown being physically or sexually assaulted, he stated "no". CO1 Chilcote was asked if Brown ever reported being physically or sexually assaulted, he stated "No". CO1 Chilcote was asked if at any time Brown asked to be moved to a different cell, he stated "No but Brown told me he was moving because the unit manager saw him eating feces and told him he was moving so he was under the impression he had a temporary "Z" code". CO1 Chilcote was asked if he ever heard Allen threaten Brown with physical or sexual harm, he stated "No".

CO1 Chilcote submitted a written statement.

CO1 Garlick was interviewed on February 16, 2018 in the Clinic area by Lt Maxwell and AO1 Pyle.

During the interview the allegations made by Inmate Brown were reviewed. CO1 Garlick was asked if Brown ever reported to him being physically or sexually assaulted by Inmate Allen, he stated "No". CO1 Garlick was asked if at any time he witnessed any signs of Brown being physically or sexually assaulted, he stated "No". CO1 Garlick was asked if Inmate Brown ever asked to be moved from the cell, he stated "He rarely ever

Form DC-141 Part 1
Rev. 12/2017

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

D031736

☑ MISCONDUCT REPORT ☐ OTHER ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| NK6401 | Crown | SCI H | 1715 | 1-25-18 | 1-25-18 |

| Quarters | Place of Incident |
|---|---|
| GA 1016 | GA 1016 |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | CO Stanowski | | X | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

Class 1 # 35 Refusing to obey an order

**STAFF MEMBER'S VERSION**

On the above date and time this officer gave inmate Brown and direct order to take a cellmate. Inmate Brown refused this order by stating "Im not taking any cellies" This ends this officers report.

**IMMEDIATE ACTION TAKEN AND REASON** Investigated, as bed has removing plt chg lost free in housing ? restrictions. I may be chosen project status could save by having increase. I mate informed.

| PRE-HEARING CONFINEMENT | | |
|---|---|---|
| | IF YES | |
| ☐ YES ☐ NO | TIME | DATE |

☑ REQUEST FOR WITNESSES AND REPRESENTATION ☑ INMATE'S VERSION

FORMS GIVEN TO INMATE

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON-DUTY SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| Stover COI | Lionel Cobb | DATE 1/25/18 — TIME 24 HOUR BASE 2020 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
|---|---|---|---|
| DATE 1-29-18 | TIME 0800 | ☑ CLASS 1 ☑ CLASS 2 | |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law. If this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

*DC-ADM 801, Inmate Discipline Procedures Manual*          **Attachment 1-B**
*Section 1 – Misconducts/Rule Violations*
Issued: 12/1/2017
Effective: 12/1/2017

( EXhibit 39 )

inadmissible in civil cases. Fed. R. Evid. 404(a). Under the Federal Rule of Evidence 404(b), evidence of other crimes, wrongs or acts is not admissible character evidence in a civil case.

Without waiving the above objections, no.

11. Do you currently work at SCI Huntingdon in the RHU on 2 to 10 shift, if so are their (sic) any clo (sic) of color working on your shift?

**RESPONSE**: Yes, I work on the 2-10 shift in the RHU at SCI Huntingdon. The rest of this request is objected to as being unintelligible and unclear as to what is being requested, so I am unable to respond meaningfully.

√ 12. Produce for inspection all grievances wroten (sic) against you by inmates while employed at SCI Huntingdon.

**RESPONSE**: **OBJECTION.** Defendant OBJECTS to this request as seeking information that is over broad, unduly burdensome, not relevant to Plaintiff's claims or proportional to the needs of this case. Character evidence is generally inadmissible in civil cases. Fed. R. Evid. 404(a). Under the Federal Rule of Evidence 404(b), evidence of other crimes, wrongs or acts is not admissible character evidence in a civil case. Defendant further object that complaints reflect allegations only and are not indicative of a finding of wrongdoing.

5

BROWN FILED for 45 of 19 Pg 5d 145207 :je

$\left( EXhibit\ 38 \right)$

inadmissible in civil cases. Fed. R. Evid. 404(a). Under the Federal Rule of Evidence 404(b), evidence of other crimes, wrongs or acts is not admissible character evidence in a civil case. Defendant further object that complaints reflect allegations only and are not indicative of a finding of wrongdoing.

Without waiving the above objections, no.

VĽ    8.    At anytime (sic) during any encounter with Brown Pursuant to his claims in his complaint against you, did you see to it that he got medical attension(sic)?

**RESPONSE**:    Inmate Brown refused medical attention stating it was a normal bloody nose.

9.    Have you had any other incidents with Brown after 2/8/18?

**RESPONSE**:    No.

10.    Do you have a criminal record, if so Produce document for inspection reiating to what happend (sic)?

**RESPONSE**:    **OBJECTION**. Defendant OBJECTS to this request as seeking information that is over broad, unduly burdensome, not relevant to Plaintiff's claims or proportional to the needs of this case, Character evidence is generally

4

(Exhibit 37)

There was no TV on the Pod

5.      At anytime(sic) did Brown Predicate to you inmate Allen's actions

and did Brown asked to be remove, are their(sic) any video tape recording that

would surport(sic) your claims?

**RESPONSE**:      Inmates Brown and Allen only ever asked to move due to not

being able to see the television.

√t (6.)      State all witnesses if any that you may call on at Trial (sic)?

**RESPONSE**:      **OBJECTION.** Answering Defendant has not yet identified the

witnesses they will rely upon at trial. This response will be supplemented in

accordance with the Federal Rules of Civil Procedure, Local Rules, and any

applicable case management schedule.

√I   7.      Have you been under investigation for any wrong doing by in house

Administration or outside government agency while employed at SCI Huntingdon

including but not limited to serious injuries, ignoring inmate on inmate assaults or

sexual assaults, force, death, searches, also are you a defendant in any pending

litigations?

**RESPONSE**:      **OBJECTION.** Defendant OBJECTS to this request as seeking

information that is over broad, unduly burdensome, not relevant to Plaintiff's

claims or proportional to the needs of this case. Character evidence is generally

3

Ref: 124412 Pg 17 of 45 for GARION BROWN

( Exhibit 36 )

✓II 3.    What do you know about the events stated in Plaintiff's complaint from 2/3/18 through current date, what did you see or hear what was your actions if any who are your witnesses be very detail and specific.

**RESPONSE**:    Inmate Brown NA6401 and inmate Allen FX1504 were celled together in GA 1008. Inmates Brown and Allen kept asking to move cells because they could not see the television. This officer went to GA 1008 to see why inmate Brown had a bloody nose. This officer asked inmate Brown how he got the bloody nose and Brown stated he "always gets a bloody nose". This officer asked if there was a fight and both inmates refused. Inmate Brown stated he did not need medical attention but did request new sheets. This officer gave inmate Brown new sheets. No further incidents with inmate Brown.

✓I 4.    Where you ever on post from 2/3/18 through 2/8/18 while inmate Brown was in a GA 108 cell with inmate Allen, if so did you have any encounters with Brown or Allen at such time be specific as to each encounter if any, were you passing out mail, were you call to the cell, or doing punches, who was on shift at the supervisor level during this time?

**RESPONSE**:    Yes. Refer to answer in Question # 3.

2

$$\left(\text{Exhibit 35}\right)$$

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GARTOR KIKI BROWN,** : | **No. 3:18-CV-01527** |
| **Plaintiff,** : | |
| : | **Honorable James Munley** |
| **vs.** : | |
| : | |
| **LT. MAXWELL, C.O. PLOCINIK,** : | |
| **C.O. JOHNSON** *and* **C.O.** : | |
| **FOCHTMAN,** : | *Complaint filed 08/01/18* |
| **Defendants** : | |

### RESPONSES TO PLAINTIFF'S INTERROGATORIES
### AND REQUESTS FOR PRODUCTION OF DOCUMENTS
### TO FOCHTMAN

1.     State the duties of defendant Fochtman, a (sic) official at SCI Huntingdon, Correctional Facility, if those are set forth in any job descriptions or other documents, produce the documents for inspection.

**RESPONSE**:     See Bates #DEF000001-DEF000007.

②     State the R.H.U. Policy after an inmate on inmate sexual assault or assault in which the cellmate was the actor, if the policy is set (sic) forth in any documents Produce them for inspections.

**RESPONSE**:     **OBJECTION.** This request is objected to as seeking information that is overbroad, unduly burdensome and unclear as to what is being requested. If Inmate Brown clarifies this request, I will attempt to respond with further information.

(Exhibit 68)

## STAFF WRITTEN STATEMENT OF SEXUAL ABUSE/HARASSMENT

LOCATION: Clinic Area     DATE 02-20-18  TIME: 1350  CASE: 7018-P-187

LAST NAME: Johnston     FIRST █████████

DOB: ████     EMPLOYEE NUMBER ████████

FACILITY OF EMPLOYMENT:     SCI Huntingdon

█████████ Johnston _____, hereby state that Lt Maxwell has identified himself/herself to me as a Commissioned Officer employed by the Pennsylvania Department of Corrections. ████████

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel. ████████

While conducting a punch round in the RHU, I was
stopped at A-Quad 1008 cell with Inmate Brown telling
me he had a bloody nose and that there was blood
on his sheet and jump suit. Brown was asked about
fighting, after returning from the Sgt. on the RHU stating
Inmate Brown had a bloody nose and blood on his
sheet and jump suit. I noticed nothing in the cell was
disruptive and the cellmate was okay and not harmed
in any way. Inmate Brown stated there was no
fight, that he just wanted his belongings replaced.
No one requested medical attention other than the bloody
nose. At no time did an inmate state about a physical
or sexual assault.

I have read and understand this entire statement or it has been read and explained to me. I have signed this statement indicating that it is true and correct.

Having read this statement, which was given by me for official Commonwealth business, to be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel, I find I have nothing further to add.

_Judith W2_
(Witness)

_____ CGT ____ 02-20-18
(Signature of Person Making Statement) /Date

Page _1_ of _1_

**DC-ADM 008, Prison Rape Elimination Act (PREA) Procedures Manual     Attachment 5-C, Page 1**
**Section 5 – Investigating Allegations of Sexual Harassment and/or Sexual Abuse**
Issued: 8/22/2016
Effective: 9/22/2016

DEF000042

## STAFF WRITTEN STATEMENT OF SEXUAL ABUSE/HARASSMENT

LOCATION: _Clinic Area_  DATE: _2/15/18_  TIME: _____  CASE: _2018-P-197_

LAST NAME: _Heaster_  FIRST: _Erik_  MIDDLE: _____

DOB: N/A  EMPLOYEE NUMBER: ▮▮▮▮▮▮

FACILITY OF EMPLOYMENT:  SCI Huntingdon

▮▮▮▮▮▮ _Heaster_ _____, hereby state that Lt Maxwell has identified himself/herself to me as a Commissioned Officer employed by the Pennsylvania Department of Corrections. ▮▮▮▮▮

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel ▮▮▮ (Initial)

Inmate Brown (NA6401) claims that he was a victim of a sexual assault in the RHU on 2/7/18. I was alerted by the punchman that inmate Brown had a nose bleed so I sent officer Fochtman to investigate as to what the issue was. Inmate officer Fochtman reported to me that inmate Brown stated he frequently had nose bleeds and that all that he wanted was clean sheets and a jumpsuit. No officer on shift reported any evidence of an altercation and when both inmates were questioned by officer Fochtman he reported back to me that neither inmate admitted to fighting. Inmate Brown was moved into GA1008 with inmate Allen (FX1504). on 2/3/18. Inmate had requested to move to a different cell to various officers between 2/3/18 and 2/7/18 but his reasoning was that we had violated policy by placing him a cell with another inmate after he had received a misconduct for refusing to double cell on an earlier date. Inmate Brown went to showers on multiple occasions and voluntarily

I have read and understand this entire statement or it has been read and explained to me. I have signed this statement _went back_ indicating that it is true and correct. _into that cell._

Having read this statement, which was given by me for official Commonwealth business, to be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel, I find I have nothing further to add.

_____ (Witness)

Page _1_ of _1_

▮▮▮▮▮▮ _____ 2/15/18
(Signature of Person Making Statement) /Date

*DC-ADM 008, Prison Rape Elimination Act (PREA) Procedures Manual   Attachment 5-C, Page 1*
*Section 5 – Investigating Allegations of Sexual Harassment and/or Sexual Abuse*
Issued: 8/22/2016
Effective: 9/22/2016

DEF000026

| SP 7-0051 (12-2011)<br>**PENNSYLVANIA STATE POLICE**<br>CONTINUATION SHEET ☒<br>SUPPLEMENTAL INVESTIGATION REPORT ☐ | **REPORT TYPE**<br>☒ INCIDENT<br>☐ OTHER | DATE(S)/DAY(S) OF INCIDENT | | INCIDENT NO.<br>PA18-154001 |
| | | TIME(S) OF INCIDENT | JUVENILE | DOMESTIC VIOLENCE |
| | | | ☐ | ☐ |

**ATTACHMENTS:**
☐ INTOXICATION WORK SHEET
☐ FELONY CRIMES AGAINST THE PERSON
☐ VICTIM/WITNESS ASSISTANCE GUIDE RECEIPT
☐ PROPERTY RECORD
☐ OTHER
☐ MISSING PERSON CHECKLIST
☐ STATEMENT FORM(S)
☐ RIGHTS WARNING AND WAIVER

**DISP.:** ☐ CLEARED BY ARREST  ☐ UNFOUNDED  ☐ EXCEPTIONALLY CLEARED- DATE
A ☐ DEATH OF ACTOR          D ☐ VICTIM REFUSED TO COOPERATE
B ☐ PROSECUTION DECLINED    E ☐ JUVENILE/NO CUSTODY
C ☐ EXTRADITION DENIED      N ☐ NOT APPLICABLE      ☐ MULTIPLE CLEAR-UP

| 1. ORIENTATION | 2. DATE OF REPORT |
| 3. OFFENSE | 4. VICTIM |

**5. NARRATIVE**

**INTERVIEW:** ▓▓▓ HARRIS (Corrections Officer) ▓▓▓

On 02/19/18 at 1005HRS I interviewed HARRIS about this investigation. HARRIS related he did not wish to change or add anything to the written statement he provided to LT. MAXWELL on 02/15/18. HARRIS related that neither Inmate BROWN or Inmate ALLEN reported any fight or assault to him at any time. HARRIS never witnessed any assault between BROWN and ALLEN. Inmate BROWN never made a request to him to go to the Medical Department. Interview concluded at 1015HRS.

**INTERVIEW:** ▓▓▓ KENDRICK (Acting Unit Manager) ▓▓▓

On 02/19/18 at 1025HRS I interviewed KENDRICK about this investigation. KENDRICK related he did not wish to change or add anything to the written statement he provided to LT. MAXWELL on 02/15/18. KENDRICK related he is the Unit Manager of the RHU/DTU and makes numerous rounds on the housing units. Inmate#NA6401 BROWN has talked to him on several occasions and never once told him he was being assaulted physically or sexually by his cellmate Inmate#FX1504 ALLEN. Inmate BROWN has told him he wanted a single cell because he has mental and physical issues. Inmate BROWN also told him he tends to eat and play with feces which bothers his cell mates. KENDRICK advised Inmate BROWN he was able to have a cellmate and that if he refused he would receive a Misconduct. Interview concluded at 1035HRS.

**INTERVIEW:** ▓▓▓ HEASTER (Sergeant) ▓▓▓

On 02/19/18 at 1045HRS I interviewed HEASTER about this investigation. HEASTER related he did not wish to change or add anything to the written statement he provided to LT. MAXWELL on 02/15/18. HEASTER related he is the Sergeant in the RHU. On 02/07/18 he was alerted that Inmate BROWN had a nosebleed. HEASTER had C.O. FOCHTMAN check as to why Inmate BROWN had a nose bleed. C.O. FOCHTMAN reported to HEASTER that Inmate BROWN stated he frequently gets nosebleeds and only requested clean sheets and a jumpsuit. C.O. FOCHTMAN also reported that when both Inmate BROWN and Inmate ALLEN were questioned about fighting neither admitted to fighting. HEASTER stated no officer on shift reported any evidence of an altercation between Inmate BROWN and Inmate ALLEN. HEASTER related Inmate BROWN requested to move to a different cell to various officers between 02/03/18-02/07/18. Inmate BROWN's rationale for moving to a different cell was because he felt DOC policies/procedures had been violated. HEASTER stated Inmate BROWN went to showers on multiple occasions and voluntarily returned to his cell. Interview concluded at 1100HRS.

| 6. OFFICER'S NAME/SIGNATURE<br>TPR. ▓▓ LEAR/ | BADGE NO.<br>8698 | 7. INVEST. RECD.<br>☐ CONT. ☒ TERM. | 8. SUPV. INIT./BADGE NO. | 9. ☐ CONCUR<br>☐ NONCONCUR | 10. PAGE<br>04 |

STATION

DEF000143

(Exhibit 72)

| SP 7-0051 (12-2011) | REPORT TYPE | DATE(S)/DAY(S) OF INCIDENT | INCIDENT NO. |
|---|---|---|---|
| **PENNSYLVANIA STATE POLICE** CONTINUATION SHEET ☒ SUPPLEMENTAL INVESTIGATION REPORT ☐ | ☒ INCIDENT ☐ OTHER | | PA18-154001 |

| | TIME(S) OF INCIDENT | JUVENILE | DOMESTIC VIOLENCE |
|---|---|---|---|
| | | ☐ | ☐ |

**ATTACHMENTS:**
☐ INTOXICATION WORK SHEET ☐ MISSING PERSON CHECKLIST
☐ FELONY CRIMES AGAINST THE PERSON ☐ STATEMENT FORM(S)
☐ VICTIM/WITNESS ASSISTANCE GUIDE RECEIPT ☐ RIGHTS WARNING AND WAIVER
☐ PROPERTY RECORD
☐ OTHER

**DISP.:** ☐ CLEARED BY ARREST ☐ UNFOUNDED ☐ EXCEPTIONALLY CLEARED- DATE
A ☐ DEATH OF ACTOR  D ☐ VICTIM REFUSED TO COOPERATE
B ☐ PROSECUTION DECLINED  E ☐ JUVENILE/NO CUSTODY
C ☐ EXTRADITION DENIED  N ☐ NOT APPLICABLE  ☐ MULTIPLE CLEAR-UP

| 1. OR/STATION | | 2. DATE OF REPORT |
|---|---|---|
| 3. OFFENSE | | 4. VICTIM |

**5. NARRATIVE**

**INTERVIEW: Victim-Continued**

The victim alleged he received a bloody lip during this attempted rape. On 02/06/18 the victim stated he talked with LT. KENDRICK and reported the assault and rape but nothing was done. On 02/07/18 the victim reported he and "Adam" talked to C.O. JOHNSON about being assaulted and the attempted rape. On 02/07/18 "Adam" jumped on him, ripped his jumper off and raped him. The victim related he was too tired to fight off "Adam". He received a bloody nose from this rape. The victim stated after the rape he yelled for C.O. JOHNSON but "another" C.O. observed him and stated he needed medical attention. The victim related he was advised by an unknown C.O. "The D.O.C. does not make courtesy moves". The victim gave his bloody clothes to C.O. Johnson but nothing was done due to medical refusing to see him. The victim reported "Adam" raped him a second time later in the day on 02/07/18. The victim reported his anus was penetrated twice, on two separate occasions by "Adam's" penis. "Adam" also rubbed his penis on the victim's face. The victim related he didn't refuse to go to "Medical" last night. The victim stated the nurse told him she wasn't a doctor and asked if he would rather be seen by a doctor. The victim stated the nurse never asked to take pictures. Nurse "Nikki" did take pictures of him but never asked for details of his assaults/rapes. Interview concluded at approximately 1435HRS.

**INTERVIEW: Raheem (NMN) ALLEN(Inmate#FX1504)**

I interviewed Inmate#FX1504 Raheem ALLEN on 02/14/18 at approximately 1445HRS in the presence of LT███ MAXWELL. ███ PYLE, Administrative Officer 1, transcribed this interview. It should be noted; ALLEN was the cell mate of the victim. ALLEN is who the victim referred to as "Adam" during his interview. ALLEN was advised of the nature of this investigation. ALLEN was advised of his Miranda Rights via a Rights and Warning Waiver at 1447HRS this date. ALLEN agreed to be interviewed and provided a written statement on DOC form Attachment 5-C/PREA Procedures Manual. ALLEN denied all allegations made by the victim. ALLEN stated, "He never had a fight with BROWN or any sexual encounter at all". ALLEN related he wants a "Z code" but this isn't an attempt for him to get one. ALLEN stated he wasn't forcing anyone to do anything they didn't want to do. ALLEN related he didn't know BROWN was crazy until he was in the cell a couple days. ALLEN stated he tried to "deal" with BROWN because he too was young and wild. ALLEN stated he was questioned about BROWN having a nosebleed and if they had been fighting. ALLEN related that BROWN just had a nosebleed. Interview concluded at approximately 1505HRS.

| 6. OFFICER'S NAME/SIGNATURE | BADGE NO. | 7. INVEST. RECN. | 8. SUPV. INIT./BADGE NO. | 9. | 10. PAGE |
|---|---|---|---|---|---|
| TPR. ███ LEAR/ *The Troy Q. Lew* | 8698 | ☐ CONT. ☒ TERM. | | ☐ CONCUR ☐ NONCONCUR | 03 |

STATION

## STAFF WRITTEN STATEMENT OF SEXUAL ABUSE/HARASSMENT

LOCATION: _C12.9C AREA_ DATE: _2/16/18_ TIME: _1100_ CASE: _7273.R.197_

LAST NAME: _PLOCINIK_ FIRST ▒▒▒▒▒▒▒

DOB: ▒▒ EMPLOYEE NUMBER ▒▒▒▒▒▒▒

FACILITY OF EMPLOYMENT: SCI Huntingdon

▒▒▒▒▒ _PLOCINIK_ , hereby state that Lt Maxwell has identified himself/herself to me as a Commissioned Officer employed by the Pennsylvania Department of Corrections. ▒▒▒▒▒

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel. ▒▒▒▒▒

AT NO TIME DID THIS OFFICER FORCE INMATE BROWN (CVA640')
INTO A CELL WITH ANOTHER INMATE. AT NO POINT DID INMATE
BROWN NOTIFY THIS OFFICER THAT HE WAS BEING PHYSICALY OR
SEXUALY ASSAULTED. AT NO POINT DID BROWN REQUEST TO BE
MOVED OUT OF ANY CELL. AT NO POINT DID THIS OFFICER NOTICE
ANY INJURIES ON INMATE BROWN. AT NO POINT DID THIS OFFICER
WITTNESS ANY BEHAVIOR FROM INMATE BROW THAT WOULD INDICATE HE
WAS IN DISTRESS

I have read and understand this entire statement or it has been read and explained to me. I have signed this statement indicating that it is true and correct.

Having read this statement, which was given by me for official Commonwealth business, to be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel, I find I have nothing further to add.

_[signature]_ 603

(Witness)

Page _1_ of _1_

(Signature of Person Making Statement) /Date _2/16/18_

*DC-ADM 008, Prison Rape Elimination Act (PREA) Procedures Manual* Attachment 5-C, Page 1
*Section 5 – Investigating Allegations of Sexual Harassment and/or Sexual Abuse*
Issued: 8/22/2016
Effective: 9/22/2018

DEF000034

ref: 1258511 pg 44 of 45 for GARTOR BROWN

(EXHIBIT 66)

## STAFF WRITTEN STATEMENT OF SEXUAL ABUSE/HARASSMENT

LOCATION: Clinic Area     DATE: 15 Feb 2018 TIME: 1430   CASE: 2012-P-197

LAST NAME: Fochtman     FIRST: ▮▮▮▮▮

DOB ▮▮▮▮     EMPLOYEE NUMBER ▮▮▮▮▮

FACILITY OF EMPLOYMENT:   SCI Huntingdon

▮▮▮▮ Fochtman ▮▮▮▮, hereby state that Lt Maxwell has identified himself/herself to me as a Commissioned Officer employed by the Pennsylvania Department of Corrections. ▮▮▮ F (initial)

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel. ▮▮ F (initial)

Sir, at no time did inmate Brown NA6401 inform this officer of any physical or sexual abuse. On 7 Feb 2018 this officer went to inmate Browns cell to ask about a reported bloody nose. This officer asked inmate Brown if the nose bleed was caused from fighting. Inmate Brown stated no it was not from fighting and that he has a history of nose bleeds. This officer observed inmate Allens hands and inmate Browns nose and neither had any signs of fighting. This officer then X exchanged inmate Browns sheets and jumpsuit. This officer would also like to report that inmate Brown and Allen have requested to move cells because they could not see the tv, this officer informed them that we do not do courtesy moves.

I have read and understand this entire statement or it has been read and explained to me. I have signed this statement indicating that it is true and correct.

Having read this statement, which was given by me for official Commonwealth business, to be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel, I find I have nothing further to add.

_____ (Witness)

▮▮▮▮▮▮▮     15 Feb 2018
(Signature of Person Making Statement) /Date

Page _1_ of _1_

***DC-ADM 008, Prison Rape Elimination Act (PREA) Procedures Manual    Attachment 5-C, Page 1***
***Section 5 – Investigating Allegations of Sexual Harassment and/or Sexual Abuse***
Issued: 8/22/2016
Effective: 9/22/2016

DEF000028

( Exhibit 30 )

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GARTOR KIKI BROWN,** | : | **No. 3:18-CV-01527** |
| **Plaintiff,** | : | |
| | : | **Honorable James Munley** |
| **vs.** | : | |
| | : | |
| **LT. MAXWELL, C.O. PLOCINIK,** | : | |
| **C.O. JOHNSON** *and* **C.O.** | : | |
| **FOCHTMAN,** | : | *Complaint filed 08/01/18* |
| **Defendants** | : | |

## RESPONSES TO PLAINTIFF'S INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO JOHNSTON

1.    State the duties of defendant Johnston, a (sic) official employed at SCI Huntingdon, Correctional Facility, if those are set forth in any job descriptions or other documents, produce them for inspection.

**RESPONSE:**    See Bates # DEF000001-DEF000007.

2.    Mr. Johnston what race are you?

**RESPONSE:**    **OBJECTION.** This request is OBJECTED to as seeking information not relevant to Plaintiff's claims and not proportional to the needs of the case.

Without waiving the objection, I am an American.

(EXhibit 29)    Procink & Maxwell
Interrogatory Production of Documents
NO COPY

17.     What are your Separation Policy during a Pending, P.R.E.A. investigation, how is it different from an inmate reporting an inmate and an inmate reporting a guard, and reguardless(sic) of the outcome of the investigation are their(sic) any policy in place to keep both partys(sic) separated?

**RESPONSE:**     **OBJECTION.** Defendants OBJECT to this request as the documents requested are not relevant and are not proportional to the needs of the case. This request also seeks information that is confidential and cannot be publicly disclosed. These procedures are implemented for purposes including safety and security within the Department of Corrections. If this information were released, inmates would be privy to the very procedures intended to ensure their supervision, control, and safety such as procedures concerning security operations. Thus, this would greatly hinder the ability of DOC staff to effectively manage units. An inmate in possession of this information could circumvent security measures crucial to the proper operation of these units and the safety of the inmates and staff therein. Additionally, it is likely that this information would be shared among inmates further impairing the operation of DOC facilities.

10

( Exhibit 3] )

3. What do you know about the incidents stated in Plaintiff's Complaint or Amended Complaint can you be specific and can you produce all documents that would help surport (sic) your response?

**RESPONSE**:   I do not recall this incident at this time.

4. As an extension of question #(3) Brown claim between 2/3/18 through 2/8/18 he was housed on G_A 108 cell with inmate Allen, did you have any encounters with eather (sic) inmate around this time, if so when, what was your actions? Did you at anytime (sic) switch all of Brown's clothing (sic) and linens because they had blood on them.

**RESPONSE**:   I do not recall this incident at this time.

5. Did you see to it that Plaintiff received medical attension (sic) during an encounter with him on 2/7/18 Pursuant to switching his linens?

**RESPONSE**:   I do not recall this incident at this time.

6.   On 2/7/18 at anytime (sic) were you responsible for punches on G_A, if so at anytime (sic) did you not conduct a punch because you was told not to or because you was aware of that was going on in cell 108, in which you tried (sic) to avoid?

2

Ref: 1244207 Pg 35 of 45 for GARION BROWN

( Exhibit 31 )

**RESPONSE:**    I do not recall this incident at this time.

7.    As policy can you state what it is you would have to do if you encounter a(sic) inmate on inmate sexual assault by witnessing or by a(sic) inmate telling you with whom he is in the cell with while in the RHU walk me through your policy.

**RESPONSE:**    **OBJECTION.**    Defendant OBJECTS to this request as the documents requested are not proportional to the needs of the case. This request also seeks information that is confidential and cannot be publicly disclosed. These procedures are implemented for purposes including safety and security within the Department of Corrections. If this information were released, inmates would be privy to the very procedures intended to ensure their supervision, control, and safety such as procedures concerning security operations. Thus, this would greatly hinder the ability of DOC staff to effectively manage units. An inmate in possession of this information could circumvent security measures crucial to the proper operation of these units and the safety of the inmates and staff therein. Additionally, it is likely that this information would be shared among inmates further impairing the operation of DOC facilities.

3



(Exhibit 52)

- Observes Inmate behavior and takes appropriate action when anything unusual is detected.

- Participates as a member of a housing unit team.

- Conducts and participates in operational inspections to observe officers' performance, ensures officers are alert and diligent in the performance of their duties, ensures compliance with facility operations, and observes inmates' behavior.

- Monitors Corrections Officer Trainees' progress through observation, discussions with employees and other staff, and review of progress reports.

- Interprets rules, regulations, policies, and objectives of the facility to subordinate corrections officers and to inmates.

- Interviews inmates and staff, investigates incidents of inmate abuse or staff misconduct, and prepares required reports of findings and conclusions.

- Handles and secures evidence obtained from investigations and maintains chain-of-custody.

- Takes, receives, and verifies periodic counts of inmates.

- Investigates and prepares reports regarding findings, with conclusion and recommendations on infractions of the rules and regulations by staff and inmates, initiates corrective action, and recommends major corrective disciplinary action or dismissal.

- Authorizes and reviews the use of force.

- Supervises and participates in the search of visitors and in the inspection of incoming and outgoing vehicles, materials, and supplies for the presence of contraband and to prevent escape.

- Serves as a member of a facility Program Review Committee.

- Receives inmate and staff grievances, complaints, and requests and conducts initial investigation into causes and conditions, and resolves or recommends resolution.

- Prepares required reports on inspections and activities.

- Serves as a liaison with agency facilities or federal, state, and local law enforcement agencies.

- Audits and reviews facilities' security operations to ensure compliance with policies, rules, and regulations.

- Ensures that searches conducted by the Drug Interdiction Teams are in accordance with established procedures.

- Reviews extraordinary incident, inmate misconduct, and/or other reports prepared by facility staff to determine program and procedural compliance.

---

Commonwealth of Pennsylvania                                                                    2

DEF000005

Rec 12/27/2007 pg 26 45 for CARTON BROWN

( Exhibit 33 )

v.5 (8)    Who was your supervisor on on (sic) 2/7/18 from Sgt. to LT & so on, did they tell you to switch Brown's linens, what did you tell them, who are your witnesses Pursuant to your Predications and if this case were to go to trial? Produce all documents.

**RESPONSE**:    I do not recall. Additionally, Defendant has not yet identified the witnesses they will rely upon at trial. This response will be supplemented in accordance with the Federal Rules of Civil Procedure and any applicable case management schedule.

9.    Do you think their (sic) is a policy where supervisors put c/o's of color on a post where they think a constitutional tort is going on, or pending?

**RESPONSE**:    **OBJECTION.** This request is objected to as being unintelligible and unclear as to what is being requested.

Without waiving the objection, I do not understand the question and am unable to respond meaningfully.

10.    Have you been under investigation for any wrong doing by in house Administration or outside injuries, ignoring, inmate on inmate sexual or assault, force, death, searches, also are you currently a defendants in any pending litigation, produce all documents as related.

4

(EMb if 76)

**Block:** ___

**MEDICAL/ DENTAL**
**SICK CALL REQUEST**

DATE: 2/26/15                    TIME: 6:30 PM

INMATE NAME: _Carlos Bryan_ NUMBER: _LA Gcci_

Sick call is for     Medical     Dental
                     Circle one of the above

PROBLEM: I was sexually assaulted & being depri...

Medical attention - have ran in risk of...

& Urinating hard too, hard to... here hip folk...

back pain from pain, multiples of hand, arth pain...

right knead & another Pain. Cramp. Pain in back...

TO SIGN UP FOR SICK CALL: COMPLETE THE ABOVE
FORM AND SECTION # 1 AND SECTION # 4 ON THE
ATTACHED CASH SLIP.

I UNDERSTAND THAT THIS SICK CALL VISIT MAY BE
SUBJECT TO THE FEES AS PER DC-ADM 820; CO-
PAYMENT FOR MEDICAL SERVICES. THE PRACTITIONER
THAT SEES YOU WILL DETERMINE IF YOU ARE TO BE
CHARGED OR NOT.

If the visit is not chargeable this form will be destroyed.

After the sick call charges are completed the cash slip
portion will be torn off and only the cash slip will be sent to
Inmate Accounts.

PLACE THIS REQUEST FORM IN THE LOCKED MEDICAL
BOX ON YOUR HOUSING UNIT.

---

DC-138A

**CASH**
**SLIP**

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

**1. REQUISITIONING INMATE**

| INSTITUTIONAL NUMBER | LOCATION | DATE |
|---|---|---|
| SCI H | 620 65 | 2/26/15 |

**2. RECEIVING INMATE**

| INSTITUTIONAL NUMBER | LOCATION | DATE |
|---|---|---|
|  |  |  |

**3. ITEMS TO BE CHARGED TO MY ACCOUNT**

MEDICAL CO-PAY

☑ Sick Call Medical/Dental ($5.00)

___ Prescriptions # ___ ($5.00 each)

___ Self Inflicted Injury ($5.00)

___ Assaulted by # ___          Sick Call

___ Sports Injury ($5.00)

___ Sports Physical ($5.00)

___ Telebinocular exam in conjunction with Eyewear Policy ($5.00)

TOTAL CHARGE THIS VISIT: $ ___

_____          _____
                               WITNESS SIGNATURE

**4. INMATE SIGNATURE**          **5. OFFICIAL APPROVAL**

**6. BUSINESS OFFICE'S SPACE**

| CHARGE ENTERED | DATE | BOOKKEEPER |
|---|---|---|
|  |  |  |

Exhibit 74

Block: (C-D 165

## MEDICAL/ DENTAL
## SICK CALL REQUEST

DATE: 2/3/18      TIME: 6:30

INMATE NAME: _Carter Brown_ NUMBER: _N A 6464_

Sick call is for    Medical.     Dental
              Circle one of the above

PROBLEM: _Brown has assaulted from_
_2-3-18 - 2-7-18 he has also dealt on 2-7-18_
_w alot of injuries from hard to mobs, from bleeding_
_from the that & broken nose_

TO SIGN UP FOR SICK CALL: COMPLETE THE ABOVE
FORM AND SECTION #1 AND SECTION #4 ON THE
ATTACHED CASH SLIP.

I UNDERSTAND THAT THIS SICK CALL VISIT MAY BE
SUBJECT TO THE FEES AS PER DC-ADM 820; CO-
PAYMENT FOR MEDICAL SERVICES. THE PRACTITIONER
THAT SEES YOU WILL DETERMINE IF YOU ARE TO BE
CHARGED OR NOT.

If the visit is not chargeable this form will be destroyed.

After the sick call charges are completed the cash slip
portion will be torn off and only the cash slip will be sent to
Inmate Accounts.

PLACE THIS REQUEST FORM IN THE LOCKED MEDICAL
BOX ON YOUR HOUSING UNIT.

DEF000124

---

ebDC-138A

**CASH SLIP**

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

**1. REQUISITIONING INMATE**

| | DATE |
|---|---|
| | |

**2. RECEIVING INMATE**

| INSTITUTIONAL NUMBER | LOCATION | DATE |
|---|---|---|
| | | |

**3. ITEMS TO BE CHARGED TO MY ACCOUNT**

MEDICAL CO-PAY

- Sick Call Medical/Dental ($5.00)
- Prescriptions # ___ ($5.00 each)
- Self Inflicted Injury ($5.00)
- Assaulted by # ___
- Sports Injury ($5.00)
- Sports Physical ($5.00)
- Telebinocular exam in conjunction with Eyewear Policy ($5.00)

TOTAL CHARGE THIS VISIT: $ ___

_Unable to Sign_      WITNESS SIGNATURE

**5. OFFICIAL APPROVAL**

**6. BUSINESS OFFICE'S SPACE**

| CHARGE ENTERED | DATE | BOOKKEEPER |
|---|---|---|
| | | |

(EXhibit 99)

## MEDICAL INCIDENT/INJURY REPORT

| Person Involved: | (Last Name) Brown | (First Name) Gaartor | (Middle Initial) | (check) Male ☑   Female ☐ |
|---|---|---|---|---|

| Reported to Medical Department: | Date: 2-13-18 | Time: 2225 | Date of Birth: ▓▓▓ |
|---|---|---|---|

| Date of incident: 2-3-18/2-7-18 | Time of Incident: Unknown | Exact location of Incident: GA1008 |
|---|---|---|

| Inmate: (check) ☑ | Inmate/Employee number: NAG401 | Housing unit: GD1005 | Work related: (Check) Yes ☐ No ☐ |
|---|---|---|---|
| Employee: (check) ☐ | | | Sport related: (Check) Yes ☐ No ☐ |
| | Supervisor (Name/Title): | | |
| | Department: | Job title: | |

| Visitor/Other: ☐ (check) | Home address: | | Home phone: |
|---|---|---|---|
| | Occupation: | Reason for presence at this facility: | |

| Property Involved: Yes ☐ No ☑  Equipment Involved: Yes ☐ No ☑ Describe: | Was person authorized to be at location of incident: Yes ☑  No ☐ |
|---|---|

1. Describe exactly what happened, why it happened and action(s) taken. Describe all injuries to the body and include specific information regarding the part(s) of the body impacted. Describe the damage to property and/or equipment.
   NET/Nursing Protocol used  Yes ☐  No ☐  N/A ☑   Description of illness/injury:

   PREA allegation ⊕ Inmate Allen (J1504

   (Continue on reverse)

2. Treatment rendered: Inmate refused medical attention to this time Only wants to be seen by md. refused to have photo taken per policy.

   (Continue on reverse)

3. Follow-up: Inmt8 in medical

   (Continue on reverse)

| Physician notified? Yes ☐ No ☑ | Family notified? Yes ☐ No ☑ | Name: | Time: |
|---|---|---|---|
| Person involved seen by a facility practitioner?  Yes ☐  No ☑ | Date: | Time: | Where: | Practitioner's name: |
| Person involved taken to a hospital? Yes ☐  No ☑ | Date: | Time: | Where: | Transport Mode? |

Type of Injury:          Indicate on diagram location of injury:
1. Laceration  ☐
2. Hematoma  ☐
3. Abrasion  ☐
4. Burn  ☐
5. None Apparent  ☑
6. Other  ☐
Specify:

| Date of report: 2-13-19 | Signature & title of person preparing report: ▓▓▓ ▓▓▓ —TRICE LPN | Reviewing Authority: |
|---|---|---|

**13.1.1, Management and Administration of Health Care Procedures Manual**
**Section 5 – Occupational Exposure to Blood-borne Pathogens**
Issued: 2/8/2017   Effective: 2/13/2017

Attachment 5-D
Page 1 of 2

DEF-000073

f: 1258613 pg 40 of 57 for GARTOR BROWN

# In The United States District Court
# For The Middle District Of Pennsylvania

Gartor Kiki Brown

V.

Gildea, et al.,

NO. 18-CV-1527

Honorable John E. Jones III

# Motion In Limine To Exclude Certain Record

Plaintiff request that Part Of the record be excluded under Rule 26, 403, 404, 608 etc

* Exhibit 1&4 conclusion of PREA Investigation by LT. Maxwell & the State Police; also(Exhibit L) and Part of investigation to whom defendant himself conducted

* Exhibit L Interview statement by LPN Trice & DEF000049 Statement by Nurse Trice; 8 (Exhibit 99) Medical Injury report by Nurse Trice, (Exhibit 100) medical injury report by nurse Emigh & States ments by both nurses on the injure report,

* (Exhibits O, P, Q, R) Plaintiffs Cumulative Adjustment Records Outside of encounter by Persons on 2/5/18

* (Exhibit not limited to Exhibit 77) Inmate's Cumulative Adjustment Record DEF000101 in it's entirety, Exhibit 78 Inmate Allen's cell History in it's entirety, Exhibits 85 & 86 Inmate's Allen's Medical Incident Report DEF000119 & DEF000074,

* Exhibit N DEF000099 Inmate Brown Post sexual Assault interview
  Exhibit M DEF000101 Inmate Allen Post sexual assault interview

**FILED**
**SCRANTON**

MAY 2 5 2021

Per_____
**DEPUTY CLERK**

# In The United States District Court
# For The Middle Distric OF Pennsylvania

Gartor Kiki Brown

      V.

Gildea, et al.,

NO. 18-CV- 1527

Honorable John E. Jones III

## Motion In Limine To Exclude Certain Records

- Plaintiff request to exclude Prior conviction for Aggravated Harassment & Burglary or Prior arrest history.
- Plaintiff also request to exclude Prior litigating history both requests as not relevant as to if defendants violated his Eighth Amendment rights Under Failure to Protect, this would only form Prejudice bias to Brown & be a distraction.

**FILED**
**SCRANTON**

MAY 2 5 2021

Per_____
       **DEPUTY CLERK**

2.

# In The United States District Court
# For The Middle District OF Pennsylvania

Gartor Kiki Brown

V.

Gildea, et al.,

NO. 18-CV-1527

Honorable John E. Jones III

## Memorandum TO Motion In Limine TO Exclude Certain Records

Brown brings his memorandum under the Fed. R. Evid. Admissions Rule 403, 804, 609

Rule 609(a) says it's provisions are "Subject to Rule 403," which provides that relevant evidence "may be excluded if it's probative value is substantially outweighed by the danger of unfair prejudice." "A court may exclude more recent serious convictions from evidence if they do not have much to do with credibility & if there is a likelihood that they would be prejudicial to a jury against you. See Walker V. Horn, 385 F.3d 321, 332-35 (3d Cir. 2004) (joint exclusion of convictions for assault, firearms violations, and terroristic threats on the grounds that their prejudicial effect was greater than their probative value; holding robbery convictions should have been excluded because they do not involve "communicative or expressive qualities"); Abshire V. Walls, 830 F.2d 1277, 1281 (4th Cir. 1987) (receiving stolen property is "not highly probative, of credibility"); Wierszewski V. Heffernan, 789 F.2d 968, 971-72 (3d Cir. 1986) (breaking, entering, larceny & drug convictions were properly excluded as having little bearing on truthfulness, drug offenses excluded as having prejudicial rating); U.S. V. Alberti, 470 F.2d 878, 882 (2d Cir. 1972) (assault conviction "does not relate to truthfulness or untruthfulness").

Plaintiff claims his prior convictions of aggravated harassment & burglary not limited could only be used to impeach the credibility of a kind of witness Brown claims at best none of these crimes apply to admission of act, of dishonesty or false statement, thus defendants only use of my underlined criminal record would be to show that I am a bad character & therefore out to lose the lawsuit, or that I did something bad in the past so my credibility as a victim now is moot. Same could be said about plaintiffs previously the lawsuits to whom has nothing to do with the failure to protect claim plaintiff brings to defendants. The previously filed lawsuit could only be identified to the jury by defendants that "Brown has the property 23-of-filthy lawsuits so this is just another one of his lawsuits to waste the government time." not doing this for money plaintiff came from SCI came in with sexual assault claims is really the only relevant admissible evidence & even than defendants may be limited as to how it's presented.

Rule 404 of the federal rules of evidence prohibits the use of evidence of prior wrongs, to prove a persons character in order to show that on a particular occasion the person acted with, the character. The third circuit apply a four-part test to determine whether prior bad acts are admissible under rule 404(b): (1) a proper evidentiary purpose, (2) relevance under federal rule of evidence 402, (3) a weighing of the probative value of the evidence against the prejudicial effect. Under Rule 403, & (4) a limiting instruction concerning the purpose for which the evidence may be used. See United States V. Mastrangelo, 172 F.3d 288, 295 (3d Cir. 1999). Additionally "when evidence of prior bad acts is offered, the proponent must clearly articulate how that evidence fits into a chain of logical inferences, points of which can be the interence that the party has the propensity to commit the act charged. United States V. Lindsay, 359 F. App'x 463, 272 (3d Cir. 2009).

FILED
SCRANTON

MAY 2 5 2021

Per_____
DEPUTY CLERK

**DC-ADM 804, Inmate Grievance System Procedures Manual** (Exhibit 1)
**Section 1 – Grievances & Initial Review**

## Section 1 – Grievances & Initial Review

18-CV-1527

### A. Filing of an Initial Grievance

1. The Department encourages an inmate to express his/her concerns to staff through respectful, constructive, written, or oral communication so that problems are resolved as soon as possible.[1]

2. The Inmate Grievance System is intended to deal with a wide range of issues, procedures, or events that may be of concern to an inmate. It is not meant to address incidents of an urgent or emergency nature including allegations of sexual abuse. Any allegation of a sexual nature (abuse/harassment) against a staff member or inmate-on-inmate sexual *abuse must* be addressed through Department policy **DC-ADM 008, "Prison Rape Elimination Act (PREA)."** When faced with an incident of an urgent or emergency nature, the inmate shall contact the nearest staff member for immediate assistance.

3. An inmate is encouraged to attempt resolution of a concern informally by use of a **DC-135A, Inmate Request to Staff Member** or direct conversation with the Unit Manager or Officer-in-Charge prior to submitting a **DC-804, Part 1, Official Inmate Grievance Form (Attachment 1-A)**. This is not required in cases of allegations of *physical or sexual abuse*.

   a. A staff member who receives an oral or written concern from an inmate is expected to attempt to resolve the concern if possible.

   b. It is encouraged, when possible, to resolve every concern quickly and informally.

   c. If the staff member is not the appropriate person to resolve the concern raised by the inmate, he/she should be referred to the appropriate staff member.

   d. The Unit Manager or Officer-in-Charge shall document the result of the resolution, including each party involved, in the Inmate Cumulative Adjustment Record (ICAR).

4. While an inmate should make every effort to resolve a concern informally prior to filing an official grievance, failure to attempt to informally resolve a concern will not be cause to reject an official grievance. However, if an attempt was made to resolve the concern informally, this information should be included in Section B of the DC-804, Part 1.

5. When an inmate has a concern that he/she is unable to resolve, the inmate must submit his/her grievance to the Facility Grievance Coordinator/designee using the **DC-804, Part 1**.

   a. **DC-804, Part 1** forms shall be readily available on every housing unit as well as in the main and mini-law libraries.

---

[1] 4-4016

1-1

Issued: 1/26/2016
Effective: 2/16/2016

(Exhibit 1) of 3

| SP 7-0051 (12-2011) **PENNSYLVANIA STATE POLICE** CONTINUATION SHEET ☒ SUPPLEMENTAL INVESTIGATION REPORT ☐ | REPORT TYPE ☒ INCIDENT ☐ OTHER | DATE(S)/DAY(S) OF INCIDENT / | INCIDENT NO. PA18-154001 |
| | | TIME(S) OF INCIDENT hours | JUVENILE ☐ | DOMESTIC VIOLENCE ☐ |

| ATTACHMENTS: | DISP.: ☐ CLEARED BY ARREST ☐ UNFOUNDED ☐ EXCEPTIONALLY CLEARED- DATE |
|---|---|
| ☐ INTOXICATION WORK SHEET  ☐ MISSING PERSON CHECKLIST | A ☐ DEATH OF ACTOR  D ☐ VICTIM REFUSED TO COOPERATE |
| ☐ FELONY CRIMES AGAINST THE PERSON  ☐ STATEMENT FORM(S) | B ☐ PROSECUTION DECLINED  E ☐ JUVENILE/NO CUSTODY |
| ☐ VICTIM/WITNESS ASSISTANCE GUIDE RECEIPT  ☐ RIGHTS WARNING AND WAIVER | |
| ☐ PROPERTY RECORD | C ☐ EXTRADITION DENIED  N ☐ NOT APPLICABLE  ☐ MULTIPLE CLEAR-UP |
| ☐ OTHER | |

| 1. DRUG/STATION | | 2. DATE OF REPORT |
|---|---|---|
| 3. OFFENSE | | 4. VICTIM |

**5. NARRATIVE**

**DETAILS/CONCLUSION:**

It should be noted LT. MAXWELL provided copies of the interviews he conducted with all staff involved. LT. MAXWELL also provided Inmate Cumulative Adjustment Records for Inmate BROWN (Victim). At the conclusion of all interviews and reading the Cumulative Adjustment Records for Inmate BROWN I don't believe a crime was committed against Inmate BROWN. I did not believe Inmate BROWN to be credible in my initial interview. Inmate BROWN did not present as a legitimate victim. I do not believe any type of assault or rape occurred.

As per AR 9-36, Prison Rape Elimination Act, section 36.04 MEMORANDUMS OF UNDERSTANDING AND LETTER AGREEMENTS, LT. ███ MAXWELL/PREA Security Lieutenant of S.C.I. Huntingdon, was provided a copy of this report on 03/13/18.

This case shall be closed. All attachments shall be forwarded to Department Headquarters.

There are no active NCIC/CLEAN messages associated with this report.

There is no Property in PSP Custody associated with this investigation.

**ADDITIONAL ATTACHMENTS:**
DOC reports
Medical Sick Call Request Slip
Progress Note-Medical Narrative (Inmate BROWN) 02/13/18
Progress Note-Medical Narrative (Inmate BROWN) 02/14/18
Progress Note-Medical Narrative (Inmate ALLEN) 02/14/18
Medical Incident/Injury Reports (Inmate BROWN/Inmate ALLEN)
8 Color Photographs (Inmate BROWN)
7 Color Photographs (Inmate ALLEN)
Inmate Face Sheets
Cell History (Inmate BROWN/Inmate ALLEN)
Interview of Inmate BROWN-Transcribed
Interview of Inmate ALLEN-Transcribed
Staff Written Statement of Sexual Abuse/Harassment (12 Staff Statements)
Inmate Written Statement Regarding Sexual Abuse/Harassment (Inmate ALLEN)
Inmate Cumulative Adjustment Records
Investigative Report Transmittal Sheet

| 6. OFFICER'S NAME/SIGNATURE TPR. ███ LEAR | BADGE NO. 8698 | 7. INVEST. REQM ☐ CONT. ☒ TERM. | 8. SUPV. INIT./BADGE NO. | 9. ☐ CONCUR  ☐ NONCONCUR | 10. PAGE 08 |

STATION

DEF000147

(Exhibit 2)

VI

**DC-ADM 008, Prison Rape Elimination Act (PREA) Procedures Manual**
**Section 3 – Reporting Sexual Abuse and Sexual Harassment**

## B. Methods of Reporting for Inmates

1. An inmate who is an alleged victim of any of the following shall report the abuse to a staff member as soon as possible:

   a. Sexual abuse;

   b. Sexual harassment;

   c. retaliation by other inmates or staff for reporting sexual abuse and sexual harassment; and/or

   d. staff neglect or violation of responsibilities that may have contributed to such incidents. (28 C.F.R. §115.51(a))

2. A report may be made to any staff member in the facility including, but not limited to, Medical staff, Psychology staff, Corrections Officers, and Counselors. (28 C.F.R. §115.51(a))

3. As soon as a staff member, contractor, or volunteer receives a report of sexual abuse or sexual harassment, either verbally or in writing, he/she is required to notify the Shift Commander immediately. The required process for making this report is outlined in Subsection C, below. (28 C.F.R. §115.51(c))

4. Methods of reporting include the following: (28 C.F.R. §115.51(a))

   a. verbal report to a staff member;

   b. submitting a DC-135A, Inmate Request to Staff Member; and/or

   c. submitting a written report to the Sexual Abuse Reporting BC/PREA Coordinator, 1800 Elmerton Avenue, Harrisburg, PA 17110.

5. These written reports may be submitted, either in every housing unit within the facility above, or through the facility grievance lock-boxes located on every housing unit within the facility. These lock-boxes are accessed only by an approved management staff, and reports shall be forwarded for review and action, as outlined within this policy. Inmates shall utilize the inmate grievance system in accordance with Department policy DC-ADM 804, Inmate Grievance System, "to report inmate-on-inmate sexual harassment allegations, which include repeated and unwelcome sexual advances, requests for sexual favors, verbal comments, gestures, or actions of a derogatory or offensive sexual nature."

6. Inmates shall not utilize the inmate grievance system to report sexual abuse or sexual harassment by a staff member or inmate-on-inmate sexual abuse, as defined in the Glossary of Terms for this procedures manual. However, if an inmate files a grievance

---

## PREA Inmate Education Verification Form (Spanish)
## PREA Formulario de Verificación de la Educación Recluso

[28 C.F.R. §115.33]

En la sección 2 de DC-ADM 008, el Departamento de Correcciones se requiere los reclusos para justificar y reconocer entendimiento y la comprensión de la formación anual PREA.

Nombre de Recluso: _____    Número de Recluso: _____

Finalidad: _____

Fecha de la Capacitación: _____

Reconozco en esta fecha _____ hereby/usted) _____ capacitación en la Eliminación de Violación en Prisión (PREA). Entiendo que el departamento de correcciones mantiene una política de tolerancia cero en lo que respecta los reclusos al abuso sexual, al acoso sexual y las represalias. Tengo la obligación de identificar todas las formas de abuso sexual y el acoso sexual.

Firma Recluso: _____

Fecha: _____

Firma de un Testigo: _____

Fecha: _____

CC: DC-14

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

FOR OFFICIAL USE

~~707~~ 707430

GRIEVANCE NUMBER

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: | DATE: 11/14/17 |
|---|---|---|
| FROM: (INMATE NAME AND NUMBER) Carter Brown NAC401 | SIGNATURE OF INMATE: | |
| WORK ASSIGNMENT: none | HOUSING ASSIGNMENT: GA – 203 | |

INSTRUCTIONS:
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½" x 11" page). State all relief that you are seeking.

Inmate Brown is challenging his transfer back to SCI Camp Hill on 10-30-17, in which D.O.C.'s there officials are liable under all claims. This Prisoner alleged on 10-1-17, he was brutaly & concupiscencly raped by his Celly (Stronal) MZ4115 while in the R.H.U. at Camp Hill, in which a LT. Gildea Condoned. At one point while this victom was attempting to yell with a dirty sock forced in his mouth, Gildea Came to the Cell door on 10-1-17 & stated "you guys don't get blood on my sheets"! The anus & malicrouse disregard by other officials that was Notified; C.o. Harig, C.r.o. DL Hill Jr, LT. Snyder triggered another rape on 10-4-17. After which (Stronal) was switched Cells. This victom raised concerns to medical Personnel Edwards, Lisa, Jennifer, Justin, & others. Also Sgt. Zimmerment, C.o. Sposito, C.o. Boone, & Nothing was done. After his transfer to SCI Huntingdon on 10-23-17 a day after leaving the R.H.U. at Camp Hill. This victom again rase concern Consulting in LT. Maxwell, A PREA Aid, Nurse Nicke, PA Ichs, LT House, LT. Etherling & other Schmucks. his injuries whent untreated. This victom was told he would be going on rart on 10-27-17, on 10-30-17 he was told by LT. Herken it would be back to Camp Hill. Against the victom rase concerns also having an Pantic attack, but LT. Herken & the Sheriff showed no Sympathy. It due respect to LT Herken he said if he could help he would

B. List actions taken and staff you have contacted, before submitting this grievance.
but there was nothing he could do. By sheriff also stated excessive Force would be applied with any failure to compliment. This victom is claiming imminent danger, First Amendment, Fourth, Fifth, Eight, Fourteenth amendment violations. Also Assault & battery, Negligent, Medical malpractice, Harassment & discrimination

Your grievance has been received and will be processed in accordance with DC-ADM 804.

_____
Signature of Facility Grievance Coordinator

_11/20/17_
Date

WHITE Facility Grievance Coordinator Copy    CANARY File Copy    PINK Action Return Copy
GOLDEN ROD Inmate Copy

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 1 – Grievances & Initial Review*
Issued: 4/27/2015
Effective: 5/1/2015

*Attachment 1-A*

DC-804
Part 1 (Exhibit 6)

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

FOR OFFICIAL USE
7074320
GRIEVANCE NUMBER

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: SCI Huntingdon | DATE: 11/14/17 |
|---|---|---|
| FROM: (INMATE NAME & NUMBER) Carter Brown NA6401 | SIGNATURE OF INMATE: | |
| WORK ASSIGNMENT: none | HOUSING ASSIGNMENT: BA 203 | |

INSTRUCTIONS:
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½" x 11" page). State all relief that you are seeking.

This victom was put in a cell with an inmate name willson, & was subject to an assult by willson because gards search as Sgt. Leleux telling his celly he's a rat fuck him up! This victom was sent to medical on 10-1-17 with a brocken nose with blood alpover him. Inmate told Dr. Edward, PA mary Beth, Dr. Steve, nurse Jennifer what happened with his nose & in the A.H.U. Nothing was done. I LT. Francis was called in which he told Brown to go back to his block. This inmate then meat with state police on 11-16-17, telling them about the rape in the RHU. on 10-1-17& 10-4-17. They asked if this victom will like to press charges in which he stated yes, & they said they will get back be him. After this meeting inmate brown was spit on by co. myers & harrass by prison officials. The state police could had arrange video confriends or phone call in which they are also liable for my injurks surfed, while at camp Hill. with all of Inmate Brown's claims, he is seeking 20,000,000 in funative & compensatory damages in persuanti to all partys also normal damages.

B. List actions taken and staff you have contacted, before submitting this grievance.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

_____
Signature of Facility Grievance Coordinator

_____
Date

WHITE Facility Grievance Coordinator Copy    CANARY File Copy    PINK Action Return Copy
GOLDEN ROD Inmate Copy

D 1009



 (Exhibit Z)

# Rejection Form
SCI Huntingdon
1100 Pike St
Huntingdon, PA, 16654-1112

07/31/2019 02:30

| Inmate Name: | BROWN, GARTOR KIKI | DOC #: | NA6401 |
|---|---|---|---|
| Facility | Huntingdon | Unit Location | G-B |
| Grievance #: | 815213 | | |

This serves to acknowledge receipt of your grievance to this office. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy", I have reviewed all documents provided as part of the grievance. Upon consideration of the grievance, it is the decision of this office to reject your grievance due to a failure to comply with the provisions of the DC-ADM 804, as specified below:

| Rationale: |
|---|
| • DC-ADM 008 Prison Rape Elimination Act (PREA) – allegations of a sexual nature against a staff member and/or inmate-on-inmate sexual contact |

Regarding Policy DC-ADM 008: Sexual abuse is taken seriously by the Department of Corrections. Any allegations of a sexual nature (abuse/harassment) against a staff member or inmate-on-inmate sexual abuse must be investigated to make sure that inmates are safe in this facility. This grievance is being forwarded to the Security Office and the PREA Compliance Manager for initiation of an investigation.

Response:

| Signature: | |
|---|---|
| Name: | A. Wakefield |
| Title: | Facility Grievance Coordinator |
| Date: | |

cc:   Facility Grievance Coordinator
      DC-15

---

**DC-ADM 804, Inmate Grievance System Procedures Manual**

Section 1 - Grievances & Initial Review, Attachment 1-C                    Issued: 1/26/2016  Effective: 2/16/2016

NA6401     Grievance #:815213

BROWN, GARTOR KIKI                                                                                    Page 1 of 1

(EXHIBIT D)

DC-804
Part 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| FOR OFFICIAL USE |
|---|
| 813978 |
| GRIEVANCE NUMBER |

**OFFICIAL INMATE GRIEVANCE**

| | | |
|---|---|---|
| TO: FACILITY GRIEVANCE COORDINATOR<br>Green | FACILITY:<br>SCI-H | DATE:<br>7/19/19 |
| FROM: (INMATE NAME & NUMBER)<br>Gaston Brown NA6481 | SIGNATURE OF INMATE:<br>[signature] | |
| WORK ASSIGNMENT: | HOUSING ASSIGNMENT:<br>G-D-109 | |

INSTRUCTIONS:
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½" x 11" page). State all relief that you are seeking.

Brown is bringing claims of Retaliation as an individual claim against Kauffman, House, Brumbaugh, Sheaffer, Maxwell, Spyker, Walters. Brown brings claims of Retaliation, Discrimination, Harassment, Emotional Distress, equal protection against Dr. Pizzaltk[?], House, Maxwell, Walker, Spyker, Walters, Brumbaugh, Kauffman, N. Smith, Lenthhefer[?], Brown claims around 7/8/19 a inmate named Ray Tone[?] in his cell on GD told Mr. Brown a prison inmate support member that Brown was a [illegible], he wants to fuck him up, Brown was a rat, he met with prison staff and police because he was raped, Brown claims a inmate named Mulder[?] in his cell on G-D last one night by Sherman also threaten Brown with bodily harm, claiming Brown was [illegible] that he was in the RHU at the [illegible] house. On the same [illegible] that Brown told on his man Allen that if he sees Brown in population he will stab him & fuck him up. This inmate [illegible] a vent with Brown I could hear on his vent and [illegible] keeping Brown up all night. Brown is claiming he met with all officials and telling them the inmates are threatening him with serious harm which [illegible] inmates threatening Brown with [illegible] him down in the [illegible] [illegible] that the inmate in 210 cell is [illegible] on his cell [illegible] keeping him up all night these inmates told Mr. Brown they [illegible]. Brown also brings 8th Amendment Violations and seeks [illegible] damages and punitive & compensatory damages in 250,000 each defendant.

B. List actions taken and staff you have contacted, before submitting this grievance.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

[signature] 7/24/19

Signature of Facility Grievance Coordinator — Date

WHITE Facility Grievance Coordinator Copy CANARY File Copy PINK Action Return Copy
GOLDEN ROD Inmate Copy

(Exhibit 12)

(28 C.F.R. §115.73)

## COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS
### PREA Investigation - Inmate Notification – for use with alleged victims only

| ☐ Staffing Update | ☑ Investigative Results | ☐ Notice of Criminal Action |
|---|---|---|

| DOC Number NA6401 | Name Brown | Current Facility HUN | Investigation # 2019-P-1198 |
|---|---|---|---|

| Date of Incident 7/27/19 | Place of Incident (name/location of SCI, CCC, CCF, or Lockup where allegation occurred) SCI Huntingdon - GD quad | Alleged Abuser ☐ Department Staff ☐ Contract Facility Staff ☑ Inmate: DOC# MX0885, Sherrill ☐ Other: |
|---|---|---|

### 1. INVESTIGATION STATUS

☐ Ongoing
☐ Substantiated
☑ Unsubstantiated
☐ Unfounded
☐ Single Incident of Sexual Harassment – Incident has been tracked and will be investigated if "repeated"
☐ Allegation does not meet the definition of sexual abuse or sexual harassment (explain in additional comments)

### 2. STAFFING UPDATE

Involved staff member has been:

☐ transferred to another post
☐ transferred to another facility
☐ temporarily restricted from this facility
☐ permanently restricted from this facility
☐ permanently restricted from all Department of Corrections sites and its Contracted sites
☐ is no longer employed by the Department of Corrections
☐ is no longer employed by the Contract Facility (Specify facility):_____
☐ other (Please define below)

### 3. CRIMINAL ACTION

☐ Criminal Charges have been filed against the abuser in relation to the sexual abuse report filed.
☐ Abuser has been convicted of criminal charges related to the sexual abuse report filed.

OTHER ACTION TAKEN

### 4. ADDITIONAL COMMENTS

Allegation of sexual harassment against MX0885, Sherrill calling Brown a "faggot" is unsubstantiated.

### 5. SIGNATURE

| REPORTING STAFF MEMBER | DATE |
|---|---|
| Grassmyer  CO III (Signature)          (Title) | 12-10-19 |

| INMATE SIGNATURE | DATE |
|---|---|
| (Signature)          (DOC#) | |

cc: Investigation File

*DC-ADM 008, Prison Rape Elimination Act (PREA) Procedures Manual*          **Attachment 18-C**
*Section 18 – Investigating Allegations of Sexual Abuse and/or Sexual Harassment*
Issued: 3/22/2019
Effective: 4/22/2019

(Exhibit 14)

# INITIAL REVIEW RESPONSE
SCI-Huntingdon
1100 Pike St.
Huntingdon, PA  16654-1112



This serves to acknowledge receipt of your grievance to the assigned Grievance Officer. The response is as follows.

| Inmate Name: | Brown | Inmate Number: | NA6401 |
|---|---|---|---|
| Facility: | Huntingdon | Unit Location: | G block |
| Grievance #: | 722558 | Grievance Date: | 2/18/18 |

| Decision: | ☐ Uphold Inmate | ☐ Uphold in Part/Deny in Part |
|---|---|---|
| | X Grievance Denied | |

*It is the decision of this grievance officer to uphold or deny the inmate's initial grievance. This response will include a brief rationale, summarize the conclusion, any action taken to resolve the issue(s) raised in the grievance and, relief sought.*

**Response:** _____ Frivolous

I have received your grievance in which you allege that Officers refused you medical treatment.   I have investigated your grievance and my findings are as such I spoke to the staff named in your grievance and also to the RHU Sgt that was working that day.  The RHU Sgt informed me that he talked to you that very night and you told him that you had a nose bleed and that you never once made any allegations about being assaulted in any way by your cell mate. He did state that he swapped out part of your linen but not all that you claim in your grievance.  This is another example of you making false allegations on staff that they are not doing their job.

For the above reasons this grievance is denied and no relief was sought.

*green*

| Signature: | *C. K...l...l...ov* |
|---|---|
| Title: | RHU/DTU UM |
| Date: | 2/27/18 |

cc:   Superintendent
DC-15
File

***DC-ADM 804, Inmate Grievance System Procedures Manual***
***Section 1 - Grievances & Initial Review***
Issued:   12/1/2010
Effective: 12/8/2010

***Attachment 1-D***

DC-804 (Exhibit 16)
Part 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

FOR OFFICIAL USE
187288
GRIEVANCE NUMBER

## OFFICIAL INMATE GRIEVANCE

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: | DATE: |
|---|---|---|
| Green | SCI H | 2/8/19 |
| FROM: (INMATE NAME & NUMBER) | SIGNATURE OF INMATE: | |
| Gavtor Brown NA6401 | Gator B | |
| WORK ASSIGNMENT: | HOUSING ASSIGNMENT: | |
| — | C - DA604 | |

**INSTRUCTIONS:**
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½ x 11" page). State all relief that you are seeking.

Plaintiff Gavtor Brown is claiming "Failure To Protect" Cruel and Unusual Punishment, Deliberate Indifference to his serious Medical injuries no delaying or denying him medical attention, Negligence, due process, Emotional Distress, Retaliation against LT. Manuells Fochtmall, Pipcinik, Johnstons kmedrick isst Hess Chilcote, Hess, Kauffman john Doe, John Doe, John Doe, John Doe etc in. From 2-3-18 through 2-8/18 Plaintiff was subbed to multiple assaults and sexual assaults by his cellmate Allen. Plaintiff told Plaintiff and another officer that they was enemies. Plaintiff would also meet with LT Manuelll telling him not to put him in the cell with the violent liker that was in the RHU for stabing another over costkes. Plaintiff also told all defendants that while in population he was being extorted by the liker after officials faxed his cellmate at the time a maill essential that Plaintiff was a homosexual and a victim of a sexual assault at geortys jail. Inmate Allen would also tell officials he did not want Plaintiff in the cell with him because he was a rat in prison so well and that he was harm Plaintiff. Claims were ignord. After this assaulted Brown in front of Flesric after the cells come off. Plaintiff would tell all different defendant what was going on in which they couldn't to keep him in the cell. Plaintiff would a take to to mansuelll, PN 2-5-18 Chilcote would actomt to move Allen, after he refused damage Ma Plaintiff should move be moved at was his cell Northing will do Plaintiff would suffer another another assault that night Allen would after

B. List actions taken and staff you have contacted, before submitting this grievance.
to Sexual assault Brown in which was a full extent. Plaintiff would tell officals in the Morning and ask for medical attention as well were RHM the door out for Yet in which that were laughs and told Plaintiff to stay by the cell, Plaintiff would pull a sexual assault on 2/7/19 he would ask me tell defendants defendant would also mainsues duty force to you hell in the cell offer plossibly a defendant An 2/8/18 n they would exchange clothing after they copulse assault him in the cell

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Signature of Facility Grievance Coordinator

2/19/19
Date

WHITE Facility Grievance Coordinator Copy    CANARY File Copy    PINK Action Return Copy
GOLDEN ROD Inmate Copy

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 1 – Grievances & Initial Review*
Issued: 1/26/2016
Effective: 2/16/2016

*Attachment 1-A*

(Exhibit 19)

In the event an expert is consulted, their response will be supplemented in accordance with the Federal Rules of Civil Procedure and any applicable Case Management Order.

3.    Any Photographs concerning this lawsuit or it's (sic) subject matter within your knowledge.

**RESPONSE**:    **See response to # 1.** By way of further response, photographs taken on February 14, 2018 are included in the Investigative Report 2018-P-197 as DEF000008-DEF000138.

4.    Any diagram or drawings concerning this or its subject matter within your knowledge.

**RESPONSE**: **OBJECTION.** Defendants OBJECT to this request as it is overly broad, unduly burdensome, and not proportional to the needs of this case. Defendants further OBJECT in that the request is confusing as worded. Specifically, it is unclear and confusing as to what the Plaintiff is specifically requesting. Without waiving said objection, Defendants refer Plaintiff to the documents already produced.

3

(Exhibit 2)    Plocinik & Maxwell    no copys
Interrogatory & POD

responsibility "for responding to, investigating or decoding inmates' grievances." Without waiving the foregoing objection, the DC ADM 804, "Inmate Grievance System", requires that each facility have a designated Facility Grievance Coordinator and Facility Manager addressing initial grievances and appealed grievances, respectively.

3. To defendants LT. Maxwell and c/o Plocinik Produce for inspections all grievances filed against you at the facility management level with in the last five years from 2014 to current date, including complaints from co workers (sic) filed against you, to specified the grievances are filed by inmates.

**RESPONSE:** **OBJECTION.** Defendants OBJECT to this request as seeking information that is over broad, unduly burdensome, not relevant to Plaintiff's claims or proportional to the needs of this case. Character evidence is generally inadmissible in civil cases. Fed. R. Evid. 404(a). Under the Federal Rule of Evidence 404(b), evidence of other crimes, wrongs or acts is not admissible character evidence in a civil case. Additionally, this request is overly broad, unduly burdensome, and not proportional to the needs of this case.

Defendants further OBJECT to the production of any such records, to the extent that responsive records exist, based upon the privacy of the employees with respect to their personal information, as well as upon the concerns that are affected

2

( Exhibit 23 )

Defendants further OBJECT in that Plaintiff seeks information that is privileged and confidential. Character evidence is generally inadmissible in civil cases. Fed. R. Evid. 404(a). Under Federal Rule of Evidence 404(b), evidence of other crimes, wrongs or acts is not admissible as character evidence in a civil case.

Without waiving the foregoing objections, I have not been under investigation at any administrative level or by any government agency outside in house administration within the last five years.

6.    Lt. Maxwell, state the Procedure in effect during Octorber (sic) 23rd 2017 Pursuant to evaluating and Processing Pursuant to an inmate that came from another state institution with claims of victimization by a Sexual Predator at his Prior institution, if the Procedure is in the form of documents Produce them.

**RESPONSE:**    **OBJECTION.** Defendant OBJECTS to this request as the documents requested are not relevant and are not proportional to the needs of the case. This request also seeks information that is confidential and cannot be publicly disclosed. These procedures are implemented for purposes including safety and security within the Department of Corrections. If this information were released, inmates would be privy to the very procedures intended to ensure their supervision, control, and safety such as procedures concerning security operations. Thus, this would greatly hinder the ability of DOC staff to effectively manage units. An

4

(Exhibit 25)

case. Further, inmates may not possess information about other inmates due to reasons of privacy, confidentiality and institutional safety. Records containing other inmates' information would be considered contraband and would be confiscated. *See also* Department Policy DC-ADM 003, "Release of Information Policy," Section IV, subsection A, 5 ("An inmate is prohibited from receiving inmate information pertaining to another inmate other than him/herself.").

VI 9.    LT. Maxwell and c/o Plocinik at anytime (sic) did inmate Gartor Brown meet with you asserting safety concerns, at anytime (sic) did Brown tell you he was a homosexual?

**RESPONSE**:    No. Additionally, he never stated he was a homosexual.

VI 10.    LT. Maxwell, Brown meat (sic) with you and state police asserting he was sexualy (sic) assaulled (sic) by his celly (sic) inmate Allen on GA cell 108, a short time after did you and he State Police, call inmate Allen and told him Brown's claims after the meeting did you send inmate Allen back to G-Unit?

**RESPONSE**:    To conduct an investigation, both the alleged victim and the abuser are interviewed.

6

Exhibit 28

**RESPONSE**:    I did escorts for Lt. Maxwell and I was never informed the topics discussed in the interviews.

13.    C/o Maxwell and C/o Plocinik can you be specific as to what you know about the incidents Plaintiff stated in his Complaint? Can you Produce all documents as to Witnesses interview statement from staff members.

**RESPONSE**:    See attached Investigative Report 2018-P-197 and the Pennsylvania State Police Investigative Report PA18-154001 as DEF000008-DEF000147.

14.    Are you c/o Maxwell and c/o Plocinik currently (sic) a defendant in any Pending law suits?

**RESPONSE**:    **OBJECTION.** Defendants OBJECT to this request as seeking information that is over broad, unduly burdensome, not relevant to Plaintiff's claims or proportional to the needs of this case. Character evidence is generally inadmissible in civil cases. Fed. R. Evid. 404(a). Under the Federal Rule of Evidence 404(b), evidence of other crimes, wrongs or acts is not admissible character evidence in a civil case. Defendants further object that complaints reflect allegations only and are not indicative of a finding of wrongdoing.

Without waiving the above objections, no.

8

*Section 5 – Single-Celling ("Z" Code) and Double-Celling Housing*
*11.2.1, Reception and Classification Procedures Manual*

(Exhibit 41)

c. The Unit Management staff shall review the inmates' records to determine whether there is an imbalance of power between the inmates that could lead to victimization of the weaker inmate. This review shall include: misconducts (especially assaultive and sexually assaultive behavior), an inordinate number of cell partners for either inmate; evaluate for "Housing Concerns" (Potential Sexual Assault Victim and/or Institutional Sexual Predator), and review of the *Prison Rape Elimination Act (PREA) Risk Assessment Tool (PRAT)* scores as outlined in *Department policy DC-ADM 008, "PREA." (28 C.F.R. §115.42[b])* Any identified Housing Concerns *must be recorded* in DOCInfo by clicking on the appropriate box on the "Security Concerns" screen of the Unit Management System and entering the reason for this designation in the Comments box.

d. Or any other information that may suggest a potential for one inmate assaulting the other.

e. The Department shall not assign housing based solely on race. Where an inmate states a preference for double-celling on race, that preference should be considered.

## C. Evaluating and Processing Inmates for Single Cell Status ("Z" Code)

1. Any inmate who meets any of the following criteria shall be carefully reviewed by staff and considered for Program Code "Z" housing classification.[1]

   a. An inmate who is evaluated by psychiatric or psychological staff as having mental health problems.[2] Examples include the following:

   (1)   dangerous to self;

   (2)   dangerous to others;

   (3)   self-mutilative; and/or

   (4)   unable to care for self.

   b. An inmate with certain medical conditions (an infectious disease, colostomy, etc.), indicating a possible need for a single cell.[3]

   c. An inmate who staff believes may be victimized as a result of double-celling, multiple celling, or placement in a dormitory.[4]

*Hector Vargas Torres JT 1711*

[1] 4-4133
[2] 4-4133
[3] 4-4133
[4] 4-4133

| | |
|---|---|
| **Form DC-135A** | Commonwealth of Pennsylvania |
| **INMATE'S REQUEST TO STAFF MEMBER** | Department of Corrections |

RHU

A1008

D1005   ~~109~~

**INSTRUCTIONS**
Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

1. To: (Name and Title of Officer)
Ms. Richards

2. Date: 2/2/18

3. By: (Print Inmate Name and Number)
Carlos Brown d1cai

_____
**Inmate Signature**

4. Counselor's Name
Ms. Bearhals

5. Unit Manager's Name
Kendrick

6. Work Assignment

7. Housing Assignment
GH-108

8. Subject: State your request completely but briefly. Give details.

From imevions of how much time I have back here, I do not have a hearing for the write up I got on 1/22/18 nor did I get any paper work Persiant to how much time I get. A hearing was conducted with out me, in which I should have been given a change to appeal. 1/22/18 I did not receive a chance to attend a hearing for the write up I got on 1/5/18 as illegaly refused to get a hearing report. Shot recertive I refused to attend the hearing & I was given 15 days. I want to know how much time I have in the RHU. I also spent with Lt Maxwell Ric cink told me I have to cell up with Allen the same Person that was explaining me in Reputation with my cell I told Maxwell that they know that I was sexualy assaulted at camp hill because the Co Koreck Pass thim paperwork. Mert Well told me four I have to go in the cell with him or Pollie Will be Use can you help??

9. Response: (This Section for Staff Response Only)

you received 30 days for the first and 15 days ② for the second. The first expires on 2/20/18 and the second expires on 3/7/18 - Stay out of trouble moving forward to avoid adding more time down the...

To DC-14 CAR only ☐          To DC-14 CAR and DC-15 IRS ☐

Staff Member Name  M Richards ℓℓℓℓ   ,  _____   Date  2-08-2018
                      *Print*                    *Sign*

Revised July 2000

(Exhibit 44)

| | |
|---|---|
| Form DC-135A | Commonwealth of Pennsylvania |
| **INMATE'S REQUEST TO STAFF MEMBER** | Department of Corrections |
| D1005 | **INSTRUCTIONS** |
| | Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |
| 1. To: (Name and Title of Officer) Unit manager | 2. Date: 2/4/18 |
| 3. By: (Print Inmate Name and Number) Carter Brown NAG401 | 4. Counselor's Name |
| _Inmate Signature_ | 5. Unit Manager's Name Kendrick |
| 6. Work Assignment | 7. Housing Assignment GA 108 |

8. Subject: State your request completely but briefly. Give details.

Law Library - maybe someone Carr here me I fear for my Sefty, I am geting assaulted Placinic and other c/o's witness, He's now talking about rape me me Showers, Rec law libary are some ways to get out the cell to assert my concerns he's also taking my trays and forcing me to sit in the corner every time he hits me I cover up

9. Response: (This Section for Staff Response Only)

2-9-18    1400 - 1600
2-10-18    1400 - 1600

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

Staff Member Name ___R WALKER___ / ___[signature]___ Date ____
Print                    Sign

Revised July 2000

(Exhibit 45)

# Inmate Query - Misconducts - Home

Welcome CWUPA\hopye

Inmate Apps    Inmate Inquiry    Reports    Photos    JNET

| JNet Inmate |
| --- |

**Offender Details**

Name: ALLEN, Raheem    CL/Prog.cd: ▓▓▓    Housing Unit: ▓▓▓▓▓    Inmate Status: ▓▓▓▓
DOB: ▓▓▓▓▓    Sex: ▓▓▓    Race: ▓▓▓    Perm Location: ▓▓▓▓▓
PBPP #:    SID: ▓▓▓▓▓    FBI #: ▓▓▓    Temp Location:
RRRI:    Rebuttable:    Counselor: ▓▓▓▓    Detainers: ▓▓▓




**Misconducts**

| Misconduct # | Charges | Drug Related | Incident Date | Incident Location | Reporting Staff |
| --- | --- | --- | --- | --- | --- |
| ▓▓▓ | ▓▓ | ▓▓ | ▓▓▓▓ | | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓ | ▓ | ▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |

| New Search |
| --- |

DE ▓▓▓

(Exhibit 45 #3)

# Pennsylvania Department of Corrections
## Misconducts

hopyle

**2/14/2018 9:11:03 AM**

**Inmate Number:** FX1504
**Inmate Name:** ALLEN, Raheem



F000059

Exhibit 45 #

**Location :** Huntingdon          **Misconduct Date :** ▓▓▓▓▓          **Misconduct Number** ▓▓▓▓

| Charge Category | Reference | Charge Description | Verdict |
|---|---|---|---|



DEF000061

of: 1258613 pg 30 of 57 for CANTOR BROWN

BCH-000063

Verdict

Location :

Sanctions Imposed

A

( Exhibit 45 #1 )



**Sanctions Imposed**

Verdict

Ref: 1258613 pg 35 of 57 for GANTOR BROWN

EF000068

Sanctions Imposed

Date

(EXHIBIT #11)

Exhibit 45 #13



Ref: 1258613 pg 37 of 57 for GARTOR BROWN

Exhibit 45

| Charge Category | Reference | Charge Description | Verdict |
|---|---|---|---|
| ▮ ▮▮▮▮▮▮▮ | ▮ | ▮▮▮▮ ▮▮▮▮▮▮▮▮ | ▮▮▮▮ ▮▮▮ |
| ▮▮▮▮▮▮▮▮ | | ▮▮▮▮ | ▮ |
| ▮▮▮▮ ▮▮▮▮ | ▮▮▮ ▮▮▮▮▮ | ▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮ | |
| ▮ | ▮ | ▮▮▮▮ ▮▮▮▮ | ▮ |
| ▮ | ▮ | ▮▮▮▮ ▮▮▮ | ▮ |
| ▮ | ▮ | ▮▮▮ ▮▮▮ | ▮ |
| ▮ | ▮ | ▮▮▮ ▮▮▮ | ▮ |
| ▮▮▮▮▮▮▮ | | ▮▮▮ ▮▮ | ▮ |
| ▮▮▮▮▮ | | ▮▮▮ | ▮ |

Total Number of Misconducts : ▮

DEF000072

DC-707

## SECURITY LEVEL 5 HOUSING UNIT
## EXERCISE, SHOWER, SHAVE SIGN-UP

Monday

**Housing Unit: GA**                                              **Date:**   2/5/2018   GA

All inmates listed were provided the opportunity for recreation, shower and/or shave.
Each inmate's response is as noted.

**Codes:**

X = Inmate accepted opportunity
D = Inmate denied opportunity
R = Inmate refused opportunity (Verbal or Physical Response Required)
N/A = Specific activity not available on this date
INA = Inmate not available (ATA, etc.)

**Abbreviations**        RZ = Razor,        NC = Nail Clippers        IND = Indigent

| Cell# | Inmate# | Ex | Shwr | BI | IND | CB | RZ | M | NC | Cell# | Inmate# | Ex | Shwr | BI | IND | CB | RZ | M | NC |
|-------|---------|----|------|----|-----|----|----|----|----|-------|---------|----|------|----|-----|----|----|----|----|
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 1008 | FX1504 | X |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 1008 | NA6401 | R | R |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

Vio Jent

DEF000090

Form DC-141 Part 1
Rev. 12/2017

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

D031777

☑ MISCONDUCT REPORT    ☐ OTHER    ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| NA6401 | BROWN | SCI H | 1130 | 2-8-18 | 2-8-18 |

| Quarters | Place of Incident |
|---|---|
| ED 1005 | GA Showers |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| STAFF | C/O B. HARRIS | | X | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

CLASS 1 #35 Refusing to obey an order.

**STAFF MEMBER'S VERSION**

On 2-8-2018 at approx 1130 hrs, I went to the Showers on the Bottom of GA quad where inmate NA6401 Brown STATED to me " I Already told Harris but I AM Not taking a cellie." He was given A Direct order to take A cellmate. Inmate Brown replied " I AM Not going back to 1008."

**IMMEDIATE ACTION TAKEN AND REASON** Inm informed of this Report - Not Appropriate For informal Resolution Due to charge Continues Current Status until Seen By Hex

| PRE-HEARING CONFINEMENT | | |
|---|---|---|
| | IF YES | |
| ☐ YES | TIME | DATE |
| ☑ NO | | |

**FORMS GIVEN TO INMATE**
☑ REQUEST FOR WITNESSES AND REPRESENTATION    ☑ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| C/O K Myers | R Com C/O | DATE 2-8-18 | TIME 24 HOUR BASE 1430 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | | Signature of Person Serving Notice |
|---|---|---|---|---|
| DATE | TIME | | | |
| 2/10/2018 | 0800 | ☑ CLASS 1    ☐ CLASS 2 | | Newser C/O |

**Notice to Inmate**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say shall be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you shall be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have shall be revoked.

WHITE - DC-15          YELLOW – Inmate          PINK – Reporting Staff Member

*DC-ADM 801, Inmate Discipline Procedures Manual*          ***Attachment 1-B***
*Section 1 – Misconducts/Rule Violations*
Issued: 12/1/2017

I am inmate Juan Castillo #L53066. On 04/10/2018 while standing at my door I could hear inmate Garter Brown and CO Placinik arguing. I then heard Placinik call Garter a homosexual whit a whole dick. Garter said Fuck off and the CO told him to stick his thing up ass, and something about sucking dick. I then heard Garter asking 104 cell if he heard what the co had said to him he said yes. latter he told 105 he did not want to get envolve for reasons or retaliation. He also tel garter what ever he wrote. For him he cou't use it because CO's keep cuming to his cell harssing him. I feel differently about what is happening to Brown because I know a third party can report allegations of abuse verbally or in writing to any staff member or to central office. I also have inmate harass Garter Brown all the time. the inmate tell him he got rape and he tell the police. They call Garter a rat, a geix that likes it up the you know know what. Some guys back here said if Garter go to population they will kill him, because they are friend whit the other guy on A-pod. they say the other guy will pay anyone that harm Garter. Everytime Garter leave the cell guys always threating him and call him gay. The CO's moved some guy from A-pod here in 104 the guy send shit in a coffe bag to Garter. I do not know what was in the bag. Garter told me when he get the bag it was shit and a note the said

DEF000296

Exhibit 56

This document on which this certificate is affix is

CERTIFIED

A TRUE, CORRECT, AND COMPLETE COPY of the original

By: Signed                                    Date

Convention de la Haya du
5 - October - 1961

(Exhibit 57)



FX1504 Allen

Upper Back

February 14, 2018   0832

Picture by ⬛. Emigh, RN

DEF000138

(Exhibit S9)



NA6041 Brown, Gartor

Upper Back

February 14, 2018    0846

Picture by ▮. Emigh, RN

DEF000127

Exhibit 63



FX1504 Allen

Upper Front

February 14, 2018  0832

Picture by ▓. Emigh, RN

DEF000134

( Exhibit 77 )

Brown told him he was suicidal and that he feared for his life. PSS Parsons stated "No, if he would have I would have taken action, for example observation placement". PSS Parsons stated he had several contacts with Inmate Brown, all of which indicated no need for clinical services and possible manipulation for a single cell. PSS Parsons was asked if he witnessed any injuries on Inmate Brown that could have possibly been sustained from a physical assault, he stated "No".

PSS Parsons submitted a written statement.

LPN Trice was interviewed on February 20, 2018 in the Clinic area by Lt Maxwell and AO1 Pyle.

LPN Trice was the nurse who initially reported the allegation upon reviewing the sick call slip authored by NA6401 Brown. Once LPN Trice reviewed the sick call slip and saw the allegation she notified control. LPN Trice responded to the RHU and attempted to assess Inmate Brown for any injuries since it was outside of the 96 hour window. LPN Trice stated "Inmate Brown refused any medical treatment". LPN Trice was asked if Inmate Brown appeared to have any injuries sustained from a physical altercation. LPN Trice stated "Inmate Brown did not have any injuries or markings related to his allegations".

LPN Trice submitted a written statement.

COT C Johnston was interviewed on February 20, 2018 in the Clinic area by Lt Maxwell and AO1 Pyle.

During the interview the allegations made by Inmate Brown were reviewed. COT Johnston was asked if he witnessed Inmate Allen attack Inmate Brown at any time, he stated "No". COT Johnston was asked if Brown ever asked him to move, he stated "The one day Brown did ask me to move but we already had the cell moves done and he wanted in a single but isn't a "Z" code". COT Johnston stated "Another thing I remember about Brown is the one day he had a bloody nose, asked to see medical, wanted different sheets and wanted another jumpsuit". COT Johnston was asked if the bloody nose looked to be a result from an assault, he stated "No, both inmates were asked if a fight occurred between them and they both stated no". COT Johnston stated "Brown told me from time to time he gets a bloody nose". COT Johnston stated "I let the Sgt. know about it and medical was actually doing rounds at that time so I informed them also". COT Johnston was asked if Brown ever reported to him he was physically or sexually assaulted, he stated "At no time did Brown tell me he was physically or sexually assaulted, he just asked for a change of clothes and some new sheets".

COT C Johnston submitted a written statement.

Lt Orndorf was interviewed on February 22, 2018 in the Clinic area by Lt Maxwell and AO1 Pyle.

DEF000013

Ref: 1258511 pg 23 of 45 for GARTOR BROWN

Welcome CWOPA\hopyle

# Inmate Query - Cell History

Inmate Apps    Inmate Inquiry    Reports    Photos    JNET

2/14/2018 9:21:30 AM [CR2PRODWEB04]

Mail Inmate

**Offender Details**

Name: ALLEN, Raheem        CL/Prog.cd            Housing Unit            Inmate Status
DOB:                       Sex                   Race                    Perm Location:
PBPP #:                    SID:                  FBI #                   Temp Location:
RRRI:                      Rebuttable:           Counselor               Detainers

New Search

| Location | Building | Section | Cell Dorm. | Bed No. | House Status | Sec. Level | Cust. Level | Date In | Date Out | Date Entered |
|----------|----------|---------|------------|---------|--------------|------------|-------------|---------|----------|--------------|

13988611 no 19 of 57 for GARTOR BROWN



(Exhibit 82)

**ALLEN, RAHEEM** #FX1504                                    DOB: ▓▓▓▓▓    Location: ▓▓▓▓▓

**DC-550 MENTAL HEALTH CONTACT NOTE**
PA DOC DC-550 MENTAL HEALTH CONTACT NOTE



000106

:f: 1258489 pg 16 of 59 for GARTOR BROWN

(Exhibit 84)

## MENTAL HEALTH REFERRAL FORM



Mental Health Referral Form
Commonwealth of Pennsylvania
Department of Corrections
DC-97
Revised 5-01

Inmate Name: Raheem Allen

Original - Medical Record    Copy - Counselor    Copy - Psychology    Copy - Referral (retain for tracking)

**13.8.1, Access to Mental Health Care Procedures Manual**
**Section 1 - Psychological Services**
Issued: 2/6/2014
Effective: 2/13/2014

*Attachment 1-A*

DEF000110

Inf: 1258489 pg 22 of 53 for GARTOR BROWN

(Exhibit 86)

DC-457

## MEDICAL INCIDENT/INJURY REPORT

| Person involved: | (Last Name) | (First Name) | (Middle Initial) | (check) Male ☑    Female ☐ |
|---|---|---|---|---|
| | Allen | Raheem | | |
| Reported to Medical Department: | Date: NA | | Time: | Date of Birth: |

*13.1.1, Management and Administration of Health Care Procedures Manual*
*Section 5 – Occupational Exposure to Blood-borne Pathogens*
Issued: 2/8/2017    Effective: 2/13/2017

*Attachment 5-D*
*Page 1 of 2*

DEF000074

(Exhibit 87)

("An inmate is prohibited from receiving inmate information pertaining to another inmate other than him/herself.").

Without waiving the foregoing objections, see PSP report previously produced and marked for production as DEF000139-DEF000147.

2.    Plaintiff seeks for inspection & copying from D.O.C. Defendants all Pennsylvania Additive Classification Tool Policy, or (PACT) Policy, including but not limited to classifiding (sic) & housing inmates.

**RESPONSE:**    **OBJECTION.** Defendants object to this request because it is overbroad and is not relevant to the claims or defenses of any party.

Defendants further object to this request as not being proportional to the needs of this case.

Defendants further object to this request to the extent that it seeks information relating to matters beyond that are set forth in the complaint. Because the scope of this matter is limited, all of the requested records are not relevant to the claims at issue.

Defendants further object to this request to the extent that it seeks certain information that if obtained, an inmate will be able to use such information to adversely affect institutional safety and security and may also attempt to manipulate and circumvent Department policy, which can affect the overall safety and security

2

this matter is limited, all of the requested records are not relevant to the claims at issue.

Defendants further object to this request as not being proportional to the needs of this case. The burden and expense on Defendants in searching for and producing the documents requested outweigh any benefit the documents as requested could confer on Plaintiff in his prosecution of this lawsuit.

Without waiving the foregoing objections, any public portions of DOC policies are in the prison's library and are available to all inmates.

4.    Plaintiff seeks for inspection & copying all "(IRC)" documents Pursuant to what the IRC team documented while Plaintiff was at SCI Camp Hill & most importantly SCI Huntingdon; Plaintiff also seek these documents as to the IRC documents of inmates Allen same inmate he claims sexually assaulted him on May the inmate have a different government name, Plaintiff seeks the information as to the inmate he was housed with on G_A_ in cell 108 from 2/3/18 through 2/8/18 while at SCI Huntingdon in the R.H.U. Plaintiff seeks full history of IRC documents from the time the inmate entered the DOC to current date. What has been documented by the IRC team at each institution the inmate had been housed at. (sic-paragraph)

4

(Exhibit 91)

institutional safety and security and may also attempt to manipulate and circumvent Department policy that can affect the overall safety and security of the institutions. Thus, the disclosure of this information would create safety and security concerns and may endanger the lives of involved staff. The Department has adopted various policies and rules regarding the care, custody, and control of the inmates within its institutions that it keeps confidential for security reasons. Certain documents are confidential and cannot be disclosed to inmates.

Defendants further object to this request as inmates are not permitted to access records related to other inmates. Possession of such records would constitute contraband. *See* 2017 Inmate Handbook, p. 30, § D(3)(o). *See also* Department Policy DC-ADM 003, "Release of Information Policy," Section IV, subsection A.5. ("An inmate is prohibited from receiving inmate information pertaining to another inmate other than him/herself.").

Without waiving the foregoing objections, see the DOC investigative report previously produced and marked for production as DEF000008-DEF000138.

6.    Plaintiff seeks misconducts, grievances, & criminal record history of the inmate he was house in cell 108 on G_A_ in the RHU at SCI Huntingdon from 2/3/18 through 2/8/18.

7

*Exhibit 93*

Defendants further object to this request as not being proportional to the needs of this case.

Defendants further object to this request to the extent it assumes facts not in evidence.

Defendants further object to this request to the extent that it seeks information relating to matters beyond that are set forth in the complaint. Because the scope of this matter is limited, all of the requested records are not relevant to the claims at issue.

Defendants further object to this request as inmates are not permitted to access records related to other inmates. Possession of such records would constitute contraband. *See* 2017 Inmate Handbook, p. 30, § D(3)(o). *See also* Department Policy DC-ADM 003, "Release of Information Policy," Section IV, subsection A.5. ("An inmate is prohibited from receiving inmate information pertaining to another inmate other than him/herself.").

8.    Plaintiff also seeks for inspection & copying a statement from Ivan Costillo LS3066, the statement predicates as to what the inmate knewn (sic) about the sexual assault, the statement was confiscated by Ms. Spkyer & Mr. Maxwell after Brown gived (sic) the statement to his Counslor (sic) Richards to copy she then gived (sic) it to Maxwell & Spkyer they then confiscated the statement claimant it was put in a (sic) investigation file and Brown could not get a copy.

9



## Section 5 – Single-Celling ("Z" Code) and Double-Celling Housing

### A. General Procedures/Orientation

During the diagnostic and classification process and upon reception at any facility as a result of a transfer, each inmate shall be interviewed and available records shall be reviewed by the Initial Reception Committee (IRC), after which the appropriate housing status shall be determined. Staff shall inform inmates of the conditions which apply to double-celling. During this orientation, staff shall explain rules governing behavior as well as those governing the conditions and contents of the cell. Included shall be procedures for requesting consideration for termination of double-celling and instructions for inmates to follow to inform staff of any problems arising as a result of double-celling.

### B. Processing Inmates for Double-Celling

An inmate who does not require single-cell status ("Z" Code) may be processed for double-celling according to the following guidelines and procedures.

1. Selection of cells: Selection of cells to be used for double occupancy should be made pursuant to the following guidelines:

   a. cells in administrative custody (AC) or disciplinary custody (DC) may be used for double occupancy only after careful review of those inmates to be double celled; and

   b. every attempt should be made to designate cells in locations that afford the most appropriate access, supervision, and control.

2. Selection criteria governing inmates to be double-celled are listed below.

   a. Double-celling of inmates generally shall be based on the inmate's expression of preferences affecting double-celling compatibility. An inmate's requests generally shall be accommodated if circumstances permit and provided there are no contraindications (custody level, security needs, etc.) noted by staff. If the inmate does not express a preference, the double-cell assignment shall be made based on facility need (available bed space).

   b. During the inmate reception process, the IRC or designated responsible staff shall ask the inmate if he/she has preferences affecting double-celling compatibility, but shall not offer the inmate choices. If the inmate indicates a preference (non-smoking cell, familial relationships, age, race, etc.), this information shall be documented and forwarded to the inmate's counselor for inclusion in the **DC-14, Cumulative Adjustment Record** for future reference. To the extent reasonable, the inmate's indicated preferences should be accommodated. When it is not reasonable to accommodate, staff should inform the inmate whether the preference is likely to be accommodated in the future and, if so, when such an accommodation is likely to occur. The facility does not have to move an inmate based solely on his/her request.

5-1

Case: 23-1480    Document: 34    Page: 971    Date Filed: 11/17/2023    (Exhibit 97)

**11.2.1, Reception and Classification Procedures Manual**
**Section 5 – Single-Celling ("Z" Code) and Double-Celling Housing**

d. **At a minimum, the review of existing "Z" Codes shall be conducted during the annual review.**

e. **The assignment of temporary "Z" Codes are not subject to review by the Regional Deputy Secretary. All "Z" Codes assigned longer than six continuous months shall not be considered temporary and must be reviewed by the Regional Deputy Secretary. Assignment or removal of temporary "Z" Codes may not require a DC-46; however, rationale for the assignment or removal of the temporary code is required to be documented in the ICAR.**

f. **Removal of the "Z" Code does not require review by the Regional Deputy Secretary. However, the removal of a "Z" Code will require the Facility Manager's approval via the DC-46 Vote Sheet procedures.**

5. Use of Program Code "Z"

   a. "Z" Code housing status can be assigned to an inmate any time during an inmate's incarceration.

   b. In addition to staff-initiated housing evaluations, an inmate may request to be reviewed for the addition or deletion of "Z" Code housing classification. Staff shall make the final determination regarding Program Code "Z" addition or removal according to procedures in **Subsection C.4. above**. Unless there is an obvious demonstrated need, this will be completed at the inmate's regularly scheduled annual review. If the inmate meets the criteria for consideration of a single cell, the counselor shall follow procedures outlined in **Subsection C.4. above**. If the inmate does not meet the criteria, the counselor shall inform the inmate of his/her ineligibility and document the specific reason why in the **ICAR.**

   c. An inmate assigned Program Code "Z" due to an inability to double cell is not necessarily precluded from open dormitory housing if staff believe the inmate or others will not be jeopardized as the result of the dormitory housing placement.

   d. The "Z" Code housing status is not necessarily a permanent status. An inmate who is classified with a "Z" Code shall be reviewed at least annually and at any other staffing to insure the code is still the most appropriate housing classification.

   e. An inmate assigned Program Code "Z" due to assaultive tendencies towards cell partners or who staff have reason to believe would be assaultive toward cell partners:

      (1) shall be Custody Level 4 or greater as determined by the PACT in accordance with **Section 3** of this procedures manual. Staff shall make a notation in the "Security Concerns" section of the Unit Management System, specifying the type of assaultive behavior (e.g., physical/sexual);

      (2) who is identified as a Facility Sexual Predator must be assigned Custody Level 4 or 5 and Program Codes "Z" and "H";

| Form DC-135A | Commonwealth of Pennsylvania |
|---|---|
| **INMATE'S REQUEST TO STAFF MEMBER** | Department of Corrections |

INSTRUCTIONS
Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

:File

1. To: (Name and Title of Officer)
Ms Spyther

2. Date: 6/12/19

3. By: (Print Inmate Name and Number)
Garlor Brown NA6401

_Inmate Signature_

4. Counselor's Name

5. Unit Manager's Name
House

6. Work Assignment

7. Housing Assignment
GA 111

8. Subject: State your request completely but briefly. Give details.

P.R.E.A. on 5/29/19, c/o Hariss came to get me for a Rape counseling, after taking me to the D.T. and putting me in a cage, c/o Hariss would put to P.R.E.A. Phone infront of me has he has done before. As the phone started to ring, I asked and told the c/o he could not Pick the Phone up that it would break all confidentiality in which had arready been confirm by the P.R.E.A. Counselor over the Phone weeks prior. The c/o asserted "Your not picking up our fucking Phone" I then told the c/o he could Pick it up, but to hand the Phone to me, I was ignored, the c/o Picked the Phone up & started to talk to the P.R.E.A. counselor, before handing me the Phone, the c/o then left the room leaving the door wide open so other inmates can here me, talk out of retaliation. The P.R.E.A. counselor again told me over the phone that she would report the c/o actions. This is an issue because, A inmate King AKi 2085e while I was housed on GA back in April & march this inmak told him I was playing the rape hot line & was threatning & harrassing me because of such, I asked for seParation from the the inmate. The c/o actions on 5/24/19 confirmed the confidentiality Policy.

9. Response: (This Section for Staff Response Only)

Mr. Brown-
The officers do verify who is on the telephone before they hand you the telephone. That is not a

To DC-14 CAR only ☐          To DC-14 CAR and DC-15 IRS ☐

Staff Member Name _____ Print _____ CCSOU Sign _____ Date 6/20/19.

Revised July 2000

violation. You indicate the offi... walked out providing

I Gartor Kiki Brown here Pro se as Plaintiff Certify that a true and Correct Copy of his Motion For Summary Judgment (1) page, Plaintiff's Statement OF Undisputed Material Facts (2) Pages, memorandum of law in Support OF Motion For Summary Judgment (13) pages (2) pages of which is Plaintiff's declaration (102) Exhibits, Exhibit (45) has (15) Exhibits was all Put into the Prison's mail box for First Class Postage to the address below On April 23, 2020.

United States District Court Middle District
   235 North Washington Ave
   P.O. Box 1148
Scranton, PA 18501

Dated  4/23/20

Gartor Kiki Brown NA6401
   P.O. Box 307
   286 Woodland Drive
Marienville, PA 16239
   SCI Forest.